UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

  - v.-                                                  :              S1 16 Cr. 338 (PKC)

WILLIAM T. WALTERS,                           :
     a/k/a "Billy,"

                                :

              Defendant.

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION FOR A BILL OF PARTICULARS, *BRADY* MATERIAL, AND A HEARING

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
     of America.

Daniel S. Goldman
Brooke E. Cucinella
Assistant United States Attorneys
   -Of Counsel-

## TABLE OF CONTENTS

TABLE OF CASES..................................................................................................III

I.   The Court Should Deny Walters' Demand for a Bill of Particulars............................2

   A.   Relevant Facts ...........................................................................................2

      1.   The Beginning of the Conspiracy and Walters' Trades in Dean Foods ...................3

      2.   Walters' Trades in Darden ................................................................................5

      3.   Davis Received Benefits in Exchange for Providing Walters With Inside Information ...........................................................................................................6

      4.   The Government Has Produced Voluminous, Organized, Searchable Discovery.....6

   B.   Applicable Law ..........................................................................................7

   C.   Discussion ................................................................................................11

II.   The Court Should Not Order the Government to Search Investigative Files of the Parallel SEC Investigation for Brady Material....................................................19

   A.   Relevant Facts .........................................................................................20

   B.   Applicable Law ........................................................................................22

   C.   Discussion ................................................................................................25

      1.   The Defendant's Request for Documents in the SEC Action Moots this Motion...25

      2.   The Criminal and Civil Investigations Were Parallel, Not Joint ...........................26

      3.   Walters' Request is Distinguishable from Gupta and Martoma............................29

III.   The Court Should Deny the Defendant's Request for a Hearing...............................32

   A.   Relevant Facts .........................................................................................33

      1.   The Investigations .........................................................................................33

      2.   News Reports About the Government and SEC Investigations..............................35

   B.   Applicable Law ........................................................................................39

      1.   Rule 6(e).......................................................................................................39

      2.   Remedy ........................................................................................................43

C. Discussion ...................................................................................................................44

   1.   The Government Engaged in No Misconduct in Connection With the Wiretap Application........................................................................................................................45

   2.   Walters Cannot Make a *Prima Facie* Showing that the Information Provided to the Press Violated Rule 6(e) ..............................................................................................47

      a)   Walters Cannot Show that Information About the Criminal Investigation Was a "Matter Occurring Before the Grand Jury" ..............................................................48

      b)   Walters Fails to Show that the Source of Information Was An Official for the Government.................................................................................................................52

      c)   Even if Walters Could Make a Prima Facie Showing, a Government Affidavit Sufficiently Rebuts the Defendant's Case and Eliminates the Need for a Hearing.....55

   3.   None of the Alleged Misconduct Resulted in Prejudice to Walters, and Thus His Requests for a Hearing and a "Windfall" Remedy Should Be Denied...........................56

**CONCLUSION** ...........................................................................................................**59**

## **TABLE OF CASES**

**Cases**

*Bank of Nova Scotia* v. *United States*, 487 U.S. 250 (1988) ............................................passim

*Barry* v. *United States*, 865 F.2d 1317 (D.C. Cir. 1989) ...................................................passim

*Blalock* v. *United States*, 844 F.2d 1546 (11th Cir. 1988)......................................................45

*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) ........................................................22

*Ferreira* v. *United States*, 350 F. Supp. 2d 550 (S.D.N.Y. 2004) ..........................................26

*Gov't of Virgin Islands* v. *Fahie*, 419 F. 3d 249 (3d Cir. 2005) .............................................61

*Hemphill* v. *United States*, 392 F.2d 45 (8th Cir. 1968) ........................................................18

*In re Grand Jury Investigation (Lance)*, 610 F.2d 202 (5th Cir. 1980)...........................passim

*In re Grand Jury Subpoena*, 103 F.3d 234 (2d Cir. 1996)................................................44, 53

*In re Sealed Case No. 98-3077*, 151 F.3d 1059 (D.C. Cir. 1998)............................................44

*In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.C. Cir. 1999)......................................passim

*In re United States of America,* 441 F. 3d 44 (1st Cir. 2006) ............................................47, 61

*Kyles* v. *Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995).........................................................24

*SEC* v. *Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980) ..........................................30

*SEC* v. *Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) ....25, 29, 31

*Senate of P.R. ex rel. Judiciary Comm. v. United States DOJ*, 262 U.S. App. D.C. 166, 823 F.2d 574 (1987)................................................................................................................43

*United States* v. *Avellino*, 136 F.3d 249 (2d Cir. 1998)....................................................24, 30

*United States* v. *Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003)...........................................11

*United States* v. *Bin Laden*, 92 F.Supp. 2d 225 (S.D.N.Y. 2000) ..........................................14

*United States* v. *Bonventre*, 2013 WL 2303726 (S.D.N.Y. 2013)...........................................19

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016)....................................................25

*United States* v. *Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550 (S.D.N.Y. July 24, 2014) ...........................................................................................................................25

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ..................................................8, 9

*United States* v. *Brooks*, 966 F. 2d 1500 (D.C. Cir. 1992) ........................................................32

*United States* v. *Carter*, No. 04 Cr. 594 (NRB), 2005 WL 180914 (S.D.N.Y. Jan. 25, 2005)47

*United States* v. *Cuervelo*, 949 F. 2d 559 (2d Cir. 1991) ........................................................61

*United States* v. *Cuti*, 2009 WL 3154310 (S.D.N.Y. 2009) .................................................8, 19

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)......................................8, 11

*United States* v. *Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ........................................................19

*United States* v. *Eastern Air Lines, Inc.*, 923 F.2d 241 (2d Cir. 1991)...................................44

*United States* v. *Eisen*, 974 F.2d 246 (2d Cir. 1992) ...............................................................60

*United States* v. *Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) ....................................25, 31

*United States* v. *Friedman,* 854 F.2d 535 (2d Cir. 1988) ........................................................60

*United States v. Gaggi,* 811 F.2d 47 (2d Cir. 1987) .................................................................28

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)..............................................11

*United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) .................................30

*United States* v. *Guerrerio*, 670 F. Supp. 1215 (S.D.N.Y. 1987)............................................26

*United States v. Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ........................................passim

*United States v. Guttenberg*, 2007 WL 4115810 (S.D.N.Y. 2007) .........................................20

*United States* v. *Hasting*, 461 U.S. 499 (1983)........................................................................47

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994)...........................................passim

*United States* v. *Kazarian*, 2012 WL 1810214 (S.D.N.Y. 2012) ..............................................9

*United States v. Leonelli,* 428 F. Supp. 880 (S.D.N.Y. 1977) .................................................10

*United States* v. *Levy*, 2013 WL 664712 (S.D.N.Y. 2013)................................................10, 14

*United States* v. *Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ........15

*United States* v. *Locascio*, 6 F.3d 924 (2d Cir. 1993)..............................................................24

*United States v. Mahabub*, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) .......................10, 11

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010)..............................................9

*United States v. Martoma,* 48 F. Supp. 3d 555 (S.D.N.Y. 2014*)* ......................................16, 31

*United States* v. *Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ....................................27, 32

*United States* v. *Mechanik,* 475 U.S. 66 (1986)........................................................................47

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ..........................................10, 11

*United States* v. *Monserrate*, 2011 WL 3480957 (S.D.N.Y. 2011)..............................................8

*United States v. Muyet*, 945 F. Supp. 586 (S.D.N.Y 1996) ........................................................15

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000).........................................9, 15

*United States v. Newman,* 773 F.3d 438 (2d Cir. 2014) ............................................................16

*United States* v. *Quinn*, 445 F.2d 940 (2d Cir. 1971) ................................................................24

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ......................................................16

*United States* v. *Reale*, 1997 WL 580778 (S.D.N.Y. Sep. 17, 1997) ........................................20

*United States* v. *Regan*, 706 F. Supp. 1102 (S.D.N.Y. 1989)....................................................47

*United States* v. *Reinhold*, 994 F.Supp. 194 (S.D.N.Y. 1998)...................................................14

*United States v. Rigas*, 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) ..........................................29

*United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) .................................................................25

*United States* v. *Rioux*, 97 F.3d 648 (2d Cir. 1996)............................................................passim

*United States* v. *Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003)......................................10, 14

*United States* v. *Rosen*, 471 F. Supp. 2d 651 (E.D. Va. 2007) ...........................................passim

*United States* v. *Sabri*, 973 F. Supp 134 (W.D.N.Y. 1996)......................................................61

*United States* v. *Samsonov*, 2009 WL 176721 (S.D.N.Y. 2009) ............................................9, 20

*United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ....................................................................................................................................................passim

*United States* v. *Soberon*, 929 F. 2d 935 (3d Cir. 1991)............................................................61

*United States* v. *Sophie,* 900 F. 2d 1064 (7th Cir. 1990) ...........................................................62

*United States v. Steinberg,* 21 F. Supp. 3d 309 (S.D.N.Y. 2014) ..............................................16

*United States* v. *Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016)........................................8, 16

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) .........................................................passim

*United States* v. *Toscanino*. 500 F. 2d 267 (2d Cir. 1974) .......................................................61

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) .................................................9

*United States* v. *Upton,* 856 F. Supp. 727 (E.D.N.Y. 1994) ..................................................... 26

*United States* v. *Voight*, 89 F.3d 1050 (3d Cir. 1996) ............................................................ 61

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................................ 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   - v.-                                       :               S1 16 Cr. 338 (PKC)

WILLIAM T. WALTERS,                         :
      a/k/a "Billy,

                                  :

            Defendant.

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION FOR A BILL OF PARTICULARS, *BRADY* MATERIAL, AND A HEARING

The Government respectfully submits this memorandum of law in opposition to defendant William T. Walters' motions for (1) a bill of particulars; (2) disclosure of *Brady* material contained in the files of the U.S. Securities and Exchange Commission ("SEC"); and (3) a hearing to address Government misconduct.  These motions should be denied.

First, Walters' claim that a bill of particulars is "necessitated" in this case because, without it, the defense will be "in the dark" about the allegations in this case is unsupported. (Def. Mot. at 1).  It ignores the unusually detailed factual narrative that has already been supplied in the Superseding Indictment, along with the voluminous, indexed discovery the Government has furnished, which — taken together — make this a particularly poor case in which to advance such a demand.  There is no question that the detail contained in the Indictment, as supplemented by the ample and organized discovery, provides Walters with a roadmap of the Government's theory of the case.  Thus, no bill of particulars is warranted.

Second, Walters' demand that the Government search through the files of the SEC and provide hypothetical *Brady/Giglio* material also should be rejected.  First, as the Court is aware, the defendant is likely to obtain the very same material through civil discovery that he seeks to compel the Government to provide him in criminal discovery.  Thus, his motion

1

should be denied as moot.  Second, Walters' request that criminal authorities conduct a burdensome and time-consuming review of voluminous materials in the sole possession of civil regulators is unsupported by law and unwarranted where, as in this case, there was no joint investigation conducted.

Finally, Walters' request for a hearing regarding alleged Government misconduct in connection with supposed misrepresentations to the court and leaks of grand jury material — of which there was none — should be rejected as a fishing expedition.  Walters cannot show that any "matter occurring before the grand jury" was provided to reporters, nor that any Government attorney leaked any such material.  The claims in Walters' motion are nothing more than unfounded speculation, and should be dismissed as such.  Accordingly, the request for a hearing should be denied.

## I.    The Court Should Deny Walters' Demand for a Bill of Particulars

### A.  Relevant Facts

On May 19, 2016, the Government unsealed the superseding indictment (the "Indictment") in this case, charging defendant William T. Walters in ten counts: one count each of conspiracy to commit securities fraud related to a scheme to commit insider trading in the securities of the Dean Foods Company ("Dean Foods") and Darden Restaurant Inc. ("Darden"); one count of conspiracy to commit wire fraud in connection with the same conduct; three counts each of securities fraud and wire fraud related to the scheme to commit insider trading in Dean Foods; and one count each of securities fraud and wire fraud related to the scheme to commit insider trading in Darden.[1]  Specifically, the 39-page, 59-paragraph Indictment alleges that from at least 2008 through 2014, Walters and Davis participated in a

---

[1]    On May 16, 2016, Davis appeared before Judge P. Kevin Castel and pled guilty to a 12-count Information (the "Information").  The Information charged Davis with the same ten counts as Walters, as well as one count each of perjury and obstruction of justice.

scheme in which Davis provided material, non-public information to Walters, who then used that information to make profitable — and illegal — trades in the securities of two-publicly traded companies, Dean Foods and Darden.  (Ind. ¶ 7).  In total, Walters gained profits and avoided losses from this insider trading in excess of $40 million.  (Ind. ¶ 9).

### 1.   The Beginning of the Conspiracy and Walters' Trades in Dean Foods

Walters and Davis first met in the mid-1990's, when they began to develop a personal friendship founded on a shared interest in golf, gambling, and business.  (Ind. ¶ 9).  By 2007, in addition to their friendship, Walters and Davis engaged each other in actual and prospective business dealings, including, among other things, a potential investment in Dallas-based golf courses and securing financing for a golf-related investment.  (Ind. ¶ 6). Emails reflecting conversations among Walters, Davis, and Michael Luce, one of Walters' employees, about these opportunities were produced to the defendant in discovery.

Also by this time (and at all times relevant to the Indictment), Davis was a member of the Board of Directors for Dean Foods (the "Board").  (Ind. ¶ 5).  Through his role on the Board, Davis had access to inside information about the company's financial outlook and performance, strategic plans, and the potential spinoff of a segment of Dean Foods called WhiteWave-Alpro ("WhiteWave").  (Ind. ¶ 8).  Board meeting minutes, press releases, internal company memos, and emails reflecting conversations between Davis and other members of the board have been provided to the defendant in discovery.  The Indictment alleges that, by at least April of 2008, Davis began providing inside information to Walters so that Walters could make well-timed, profitable trades in Dean Foods stock.  (Ind. ¶ 8).  By providing this information to Walters, Davis breached his fiduciary and other duties to Dean Foods.  (Ind. ¶ 8).

The Indictment specifically alleges — in significant detail — nine examples in which Walters traded in Dean Foods stock based on material, non-public information provided to

3

him by Davis.  (Ind. ¶¶ 13-42).  For each of these examples, the Indictment states the nature of the public announcement or market-moving event around which Walters traded (Ind. ¶¶ 13, 16, 19, 22, 26, 29, 32, 37, 40, 42); the nature of the information Davis is alleged to have provided to Walters (Ind. ¶¶ 7, 8, 10, 14, 17, 20, 23, 23a, 27, 30, 32, 33, 37, 40); the specific dates and times of key communications between Davis and Walters when the information is alleged to have been passed (Ind. ¶¶ 14a, 14b, 17a, 17b, 20a, 23a, 23d, 27a,, 27b, 27c, 30b, 33a, 33b, 33c, 33d); the dates and times of certain trades Walters placed based on that information (Ind. ¶¶ 11, 14a, 14b,17b, 17c, 20a, 20b, 23b, 23e, 27a, 27b, 27c, 28, 30b, 33a, 33b, 33c, 33d, 34, 37a, 40, 42); the effect of the announcement on Dean Foods' stock price (Ind. ¶¶  15, 18, 21, 24, 28, 31, 35, 39, 41); and Walters' resulting unrealized or actual profits (or losses avoided) (Ind. ¶¶ 9, 11, 15, 18, 21, 24, 28, 31, 35, 38, 41, 42).

For example, paragraphs 22 to 25 of the Indictment detail an instance in which Walters traded ahead of Dean Foods' May 10, 2010 earnings announcement.  (Ind. ¶¶ 22-25). Prior to that announcement — which fell below the Wall Street analysts' expectations and resulted in the company suspending full-year guidance — the Indictment alleges that Davis provided Walters with inside information about (i) the fact that Dean Foods was exploring its strategic options regarding the spinoff of WhiteWave (a highly profitable subsidiary), and (ii) the fact that Dean Foods' 2010 first quarter earnings would not meet Wall Street's expectations.  (Ind. ¶¶ 22-23).  Specifically, the Indictment alleges that Walters and Davis had a lunch meeting on or about Friday April 9, 2010, during which Walters agreed to cause another individual to provide Davis with a $625,000 loan and, in return, Davis provided Walters with the inside information that "Dean Foods had engaged an investment bank to explore strategic possibilities to separate WhiteWave from Dean Foods and capture unrealized shareholder value."  (Ind. ¶ 23a).  The Indictment then details the purchases of

Dean Foods stock Walters made following that meeting, beginning on the following Monday, April 12 through Friday, April 16 (Ind. ¶¶ 23b, 23c).

As alleged in the Indictment, after Walters made these purchases, Davis learned through a phone call with Dean Foods' Chief Executive Officer, on or about May 2, 2010, that Dean Foods' as yet unannounced first quarter earnings "had been poor." (Ind. ¶ 23d). That same day — a Sunday — Davis placed a phone call to Walters, which lasted approximately two minutes. (Ind. ¶ 23d). The following day, a Monday, Walters began selling his Dean Foods stock. (Ind. ¶¶ 23e, 23f). Following Dean Foods' pre-market Earnings Announcement on May 10, 2010, Dean Foods stock closed the trading day down approximately 28 percent from the previous day. (Ind. ¶ 24). By selling his shares ahead of the announcement, the Indictment alleges that Walters avoided $7.3 million in losses. (Ind. ¶ 24). The Indictment further alleges that beginning on May 14, 2010, Walters re-established his position in Dean Foods stock, purchasing 1.5 million shares, at a reduction in cost basis of approximately $9.5 million. (Ind. ¶ 25). This is just one example. Each of the nine instances of alleged insider trading in Dean Foods stock is laid out in the same way, each with the same high level of precision and detail.

The Indictment also alleges certain means and methods of committing the charged crimes, including that, during the pendency of the conspiracy, Walters provided Davis with a pre-paid cellphone for Davis to use to when communicating inside information to Walters. (Ind. ¶ 47c). In addition to providing Davis with the prepaid cellphone, Walters instructed Davis to use code words when conveying the secret information by, for example, using "Dallas Cowboys" to refer to Dean Foods. (Ind. ¶ 47c).

### 2. Walters' Trades in Darden

The Indictment alleges that, in the summer of 2013, Davis also provided to Walters material, non-public information he received, pursuant to a non-disclosure agreement, from

an Investment Firm, about a plan to invest in Darden.  (Ind. ¶ 43).  The Indictment further alleges that Davis, once in possession of this information (which outlined the Investment Firm's desire to separate or spin off one or more of Darden's restaurant chains), discussed the plan with representatives from the Investment Firm, and then provided the information to Walters.  (Ind. ¶¶ 43,44).  The Indictment alleges that Walters used this information to purchase approximately $30 million worth of Darden shares on or about August 20 and 21, 2013, and that the value of that stock rose upon the publication of an October 9, 2013 article in a national newspaper reporting that the Investment Firm had made a significant investment in Darden and was looking to separate Darden into two companies.  (Ind. ¶¶ 43, 44). Specifically, the Indictment alleges that as of October 9, 2013, Walters earned unrealized profits of approximately $1 million, and that on or about December 19, 2013, Walters sold his shares of Darden stock for gross proceeds of approximately $1 million.  (Ind. ¶ 45).

### 3.  Davis Received Benefits in Exchange for Providing Walters With Inside Information

The Indictment alleges that Davis received significant personal benefits from Walters in exchange for providing the inside information.  On several occasions, Walters sought advice and assistance from Davis about business ventures.  (*Id.* ¶¶ 6a, 6b).  In other instances, Walters provided capital and financial backing to Davis for other business ventures.  (*Id.* ¶¶ 6d-6f).  Moreover, on two occasions, in April 2010 and November 2011, Walters caused nearly $1 million of loans to be provided to Davis, which Davis largely failed to repay during the time period of the conspiracy.  (*Id.* ¶¶ 6c, 6e, 46).

### 4.  The Government Has Produced Voluminous, Organized, Searchable Discovery

Walters was arrested in Las Vegas, Nevada, on May 18, 2016, and made an initial appearance in this District on June 1, 2016, on which date bail conditions were set for his release pending trial.  The Government completed the production of Rule 16 discovery in

mid-July.  In total, the Government has produced approximately 152 GB of documents, as well as audio files, to the defense in this matter.  Included in the production, among other things, are trading records for seven individuals or entities; telephone records; bank records; business records from Dean Foods; records relating to the Investment Firm's potential investment in Darden; SEC testimony provided by Davis before he began cooperating with the Government; an affidavit that lays out the Government's probable cause to wiretap Walters' cellphone; and audio recordings and line sheets of calls intercepted on a Title III wiretap on Walters' cellphone.  In addition, the Government has produced all the pen registers and phone records that were subpoenaed in connection with the wiretap, as well as flight records regarding the location of Walters' plane at certain time periods in the conspiracy.  The production of this material has been accompanied by detailed indices that identify the source of these materials and their date range.  Where possible, each page has been Bates stamped.  It was also produced in a format that allows for electronic searching.

In addition, the Government has produced documents maintained by Davis, a cooperating witness, including but not limited to the universe of Davis's email during the pendency of the conspiracy.  The Government produced these materials as part of Rule 16 discovery even though a significant portion of them could be characterized as Jencks Act materials.  The production of Davis's email is, like the rest of the production, fully searchable.

### B.  Applicable Law

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added).  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the

defendant of the specific acts of which he is accused." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted).

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars where defendants had "been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits") (internal citation omitted); *United States* v. *Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016) (denying request for a bill of particulars in an insider trading case where the information already proffered was sufficient to enable the defendant to prepare for trial); *United States* v. *Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts were supplied to defense by way of letter); *United States* v. *Cuti*, 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (in accounting fraud case, denying request for particulars identifying all fraudulent transactions, payments, and statements made in furtherance of charged scheme where Government had furnished more than a million pages of discovery and, by letter, identified a series of fraudulent transactions and payments); *United States* v. *Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been

provided); *United States* v. *Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In

determining whether to grant a motion requesting a bill of particulars, the Court must

ascertain whether the information sought has been provided elsewhere, such as through pre-

trial discovery, voluntary disclosure by the government, or the indictment itself.").

Although the Government's provision of "mountains of documents to defense counsel

who [a]re left unguided as to which documents" are relevant to the charges does not

substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*,

820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the

provision of voluminous discovery in combination with some guidance about what is most

relevant can vitiate a need for further particulars, *see, e.g.*, *United States* v. *Kazarian*, 2012

WL 1810214, at *25 (S.D.N.Y. 2012); *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385

(S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where

the indictment was 34 pages long and Government had provided voluminous, organized

discovery).  In no event should volume of discovery alone warrant a bill of particulars;

"[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of

materials that continue to be produced," that concern is addressed by granting the defense

sufficient time in which to conduct the review in advance of trial.  *See United States* v. *Levy*,

2013 WL 664712, at *13 (S.D.N.Y. 2013).

Bills of particulars would undoubtedly be helpful to the defense in any case.  But

because "the law does not impose upon the Government an obligation to preview its case or

expose its legal theories," *United States v. Leonelli,* 428 F. Supp. at 880 (S.D.N.Y. 1977)

"[t]he ultimate test must be whether the information sought is necessary, not whether it is

helpful."  *United States* v. *Mitlof*, 165 F. Supp. 2d at 569 (S.D.N.Y. 2001); *United States* v.

*Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The purpose of a bill of

particulars is to ensure that a defendant has the information necessary to prepare a defense,

not to turn over all information that would aid the defendant."); *United States* v. *Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).  A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories."  *Mitlof*, 165 F. Supp. 2d at 569; *see also D'Amico*, 734 F. Supp. 2d at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

There are good reasons why bills of particulars are warranted only where the allegations in the Indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case."  *Id.*; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill").  Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case."  *Henry*, 861 F. Supp. at 1197.  These concerns animate the rule that "if

10

the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

### C. Discussion

Applying these principles, Walters is not entitled to, and should not be granted, a bill of particulars. Walters' request impermissibly seeks to compel the Government to preview its case-in-chief and to cabin the Government's proof months before trial. Accordingly, the request should be denied.

The Indictment in this case, standing alone, is sufficiently detailed to defeat a claim for a bill of particulars. The Indictment provides detailed information about (1) the history of Walters' relationship with Thomas Davis, Walters' co-conspirator who is cooperating with the Government; (2) the dates of the trades Walters placed, beginning in 2008, based on inside information received from Davis, in the stock of two publicly-traded companies; (3) the nature of the material, non-public information that Davis passed to Walters ahead of Walters' illegal trading; (4) the public announcements and/or market-moving events that caused Walters to profit or avoid losses in the stocks he purchased based on the inside information provided by Davis; (5) the realized and unrealized profits that Walters is alleged to have made based on each of the alleged instances of insider trading; (6) the time, date, and length of certain communications during which the Government has alleged that material, non-public information was passed from Davis to Walters; (7) the wires (including phone calls and stock purchases) that Walters is alleged to have used to facilitate the fraudulent insider trading scheme; and (8) the benefits that the Government alleges Davis received from Walters in exchange for providing inside information to him. Taken together, the Indictment provides Walters with a detailed chronology of the Government's allegations concerning the nine events related to Dean Foods, and one event related to Darden, around which Walters is

11

alleged to have traded.  Walters essentially has in hand a road map, set forth in the Indictment, of what the principal witness against him will say at trial about the nature of the inside information he passed to Walters ahead of each market-moving event.

The defense has also been provided with substantial additional detail in the searchable productions the Government has made, the vast majority of which was produced four months ago, and which were accompanied by detailed, itemized indices.  This discovery includes (a) bank and brokerage records for the two trading accounts in which the Government alleges Walters made illegal trades (including the account he controlled in the name of Nature Development, B.V.); (b) trading accounts of alleged co-conspirators; (c) phone records reflecting communications between Walters and Davis and Walters and the respective brokers through which he placed his trades; (d) documents from the files of  Davis, who has pled guilty to the charged conspiracy, including material that would typically be considered Jencks Act material to which the defendant is not entitled at this juncture of the case; (e) documents reflecting the Board Meetings and internal discussions of Dean Foods, which Davis had access to and/or knowledge of during the pendency of the conspiracy; and (f) documents related to the Investment Firm's 2013 proposed investment in Darden Restaurants, among other documents.  According to Walters, however, this is not enough.

Walters argues, first, that the Government must "cure the Indictment's overly vague pleading of when the conspiracy started," suggesting that the Government is giving itself "wiggle room" by alleging that the conspiracy existed "at least from 2008 through in or about 2014."  (Def. Mot. at 5).  But the contention that the Government must identify — or even prove at trial — exactly when the conspiracy started is simply baseless.  *See, e.g.*, *Torres*, 901 F.2d at 233–34 (affirming the denial of a request for a bill of particulars that sought the date defendant joined narcotics conspiracy, the identities of the coconspirators, and the precise dates and locations relating to overt acts involved in the conspiracy).  "[T]he government is

12

not required to prove . . . exactly when or how a conspiracy was formed or when a particular

defendant joined the scheme." *United States* v. *Bin Laden*, 92 F. Supp. 2d 225, 242

(S.D.N.Y.2000) (Sand, J.). (internal citations omitted).  Therefore, "[t]o require specification

of particulars with respect to the formation of the conspiracy when such details need not be

proved at trial would . . . unduly restrict the Government's proof." *Id*. (internal quotations and

citations omitted).  Further, rather than suggesting that the Indictment prevents the defendant

from preparing for the case against him, Walters essentially claims that the Government —

both in the Indictment and through discovery — has provided *too* much information about the

history of the relationship between Davis and Walters, thereby "multiplying exponentially"

the information that must he must review and analyze.  (Def. Mot. at 6).  These exaggerated

claims do not form a basis to demand additional particularization.  *See Levy*, 2013 WL

664712, at *13 (denying defendant's request for a bill of particulars and instructing that the

proper request in the face of voluminous, detailed discovery is more time to review, not

additional particularization).

Nor is the Government under any obligation to identify all known co-conspirators, as

Walters next argues.  (Def. Mot at 7).  Courts routinely deny requests for a list of all

unindicted co-conspirators.  *See, e.g.*, *Rittweger*, 259 F. Supp. 2d at 292 (collecting cases);

*Torres*, 901 F.2d at 233–34 (upholding district court's denial of a bill of particulars where the

defendant had requested, in part, "the identity of other persons 'known and unknown' as

alleged in . . . the indictment"); *United States* v. *Reinhold*, 994 F. Supp. 194, 200-01

(S.D.N.Y. 1998) (denying defendants' motion for a bill of particulars that sought

"identification of alleged co-conspirators who have not been named in the Indictment");

*United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y 1996) (holding that where the

Indictment and pretrial discovery had provided sufficient information to the defense, "[t]he

defendants are not entitled to a bill of particulars setting forth the 'whens,' 'wheres,' and

13

'with whoms' regarding the . . . conspiracy."). The cases Walters supports for his contention

that "requests for names of unindicted co-conspirators have been routinely granted in this

district" (Def. Mot. at 8), involve facts completely at odds with those presently before the

Court. For example, in *United States* v. *Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356

(S.D.N.Y. Jan. 2, 2001), a case charging a 26-count RICO conspiracy, the Court reasoned

that the Government should identify unidentified, known co-conspirators because the alleged

conspiracy "involve[ed] a large number of defendants [23], is wide-ranging in terms of the

nature of the predicate acts and the amount of commerce affected, and is comprised of a

number of schemes, some of which are temporally removed from the main scheme, and in

such contexts, 'a defendant is more likely to be surprised by the identity of other co-

conspirators, whom he may never have met.'" *Id.* at *13. (quoting *Nachamie,* 91 F. Supp. 2d

at 572-73). Here, the Government has charged an insider trading conspiracy based on tips

provided by one person about the stocks of two publicly traded companies. To suggest that

the two cases are comparable — and the facts here necessitate the same level of guidance as

in *Lino* to understand the charges levied against Walters — is patently inapt.

In his brief, Walters also directs the Court to certain insider trading cases in this

district in which the Government was either ordered to or voluntarily provided additional

particulars. (*See e.g.*, Def. Mot. at 8, 10, 11; Schoeman Decl. at Ex. B-F) (citing *United

States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013); *United States v. Gupta,* 848 F. Supp. 2d

491 (S.D.N.Y. 2012); *United States v. Newman,* 773 F.3d 438 (2d Cir. 2014); *United States v.

Steinberg,* 21 F. Supp. 3d 309 (S.D.N.Y. 2014); *United States v. Martoma,* 48 F. Supp. 3d

555 (S.D.N.Y. 2014); and others). These examples are enlightening, but not for the reasons

Walters suggests. These cases make plain that the detail included in the Indictment here

(especially when combined with the detailed, organized discovery) far exceeds that which the

Government had originally provided in those cases, and is unquestionably sufficient under

14

the law.

Take for example Walters' demand for greater particularity regarding the "inside information" Walters received.  (Def. Mot. at 9-11).  In *Stewart*, a recent insider trading case in this District, a son was charged with providing his father tips in advance of five different mergers and acquisitions.  Stewart moved for a bill of particulars in advance of trial, claiming — as Walters does — that he required additional specificity as to the material, non-public information that he was charged with tipping to his father. *United States* v. *Stewart*, No. 15 Cr. 287 (S.D.N.Y. Jan. 19, 2016) (Dkt. No. 64, at 21).   In support of his contention, Stewart referred the Court — as Walters does — to the additional disclosures provided in *Rajaratnam*, which involved multiple insider trading conspiracies.  *Id*. at 22.  Judge Swain rejected this comparison, reasoning that "specificity as to the substance of tipping communications may sometimes be necessary in complex insider trading cases involving multiple alleged conspirators and communications, large numbers of companies and transactions and extended time periods … [but] no such challenge of complexity is presented here." *Id.*  This case is much more like *Stewart* than *Rajaratnam*, *Newman* (lengthy tipping chains) or *Steinberg* (tips on 13 publicly-traded companies involving 13 separate sources of information).  And while it is true that the conspiracy here spans close to six years, the Indictment provides particularization as to 10 specific instances of illegal trading with which the defendant has been charged, including the dates on which those trades were made and the specific nature of the inside information passed.  No more detail is required.

Walters' reliance on the Government's subsequent disclosures in the *Gupta* prosecution to support his demand for greater particularization about the personal benefits at issue in this case is similarly misplaced.  (*See* Def. Mot. at 11-12; Schoeman Decl. Ex. B).  In *Gupta*, the original indictment's benefit allegation charged as follows: "[The defendant] provided the Inside Information to [his tippee] because of [the defendant's] friendship and

business relationships with [the tippee].  [The defendant] benefitted and hoped to benefit

from his friendship and business relationships with [the tippee] in various ways, some of

which were financial." *Gupta*, No. 11 Cr. 907 (JSR), Sealed Indictment, Dkt. No. 1, at ¶ 25.

In its superseding indictment, the Government realleged the same benefit allegation as before,

but added three examples of the financial relationships the defendant had with his tippee.

*Gupta*, No. 11 Cr. 907 (JSR), Superseding Indictment, Docket Entry No. 25, at ¶ 29.  When

the defense moved for further particulars regarding the examples, Judge Rakoff denied the

motion, characterizing it as a request for "highly specific evidentiary detail [in]appropriate

for a bill of particulars."  *Gupta*,  11 Cr. 907 (JSR), 2012 WL 1066804, at *3 (S.D.N.Y. Mar.

27, 2012).  Here, the Government has offered as many particulars about the character of the

pecuniary benefits Davis expected and received as part of his participation in the charged

scheme as were offered in the superseding indictment in *Gupta*.  Indeed, Paragraphs 6a-f, 46

and 47d of the Indictment detail the financial opportunities and benefits Davis received from

Walters during the course of the scheme, and allege that Davis received those benefits in

exchange for repeatedly providing Walters with inside information on which he could — and

did — base profitable trades.  Again, no more detail is required.

Walters next demands that the Government identify any allegedly "coded language"

that was used by any member of the conspiracy.  (Def. Mot at 12).  The defendant cites no

support for his request — because none exists. This is precisely the sort of evidentiary

demand that courts have said is not grounds for a bill of particulars.  In making this demand,

Walters acknowledges the Indictment provides an example of this coded language —

specifically, that the Government has alleged that the defendant instructed Davis to use the

phrase "Dallas Cowboys" when referring to Dean Foods (Def. Mot. at 12), but suggests that

the Government should be forced, at this time, to say whether it intends to introduce

additional coded language at trial.  But the Government has no such obligation; in fact, the

16

Government was not obligated to include any references to coned language in the Indictment in the first place.  Nor is Walters entitled to a preview of the Government's evidence through a bill of particulars.  *See, e.g.*, *Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *Hemphill* v. *United States*, 392 F.2d 45, 49 (8th Cir. 1968)).  Further, to require the Government to disclose more detailed information about the evidence it intends to present at trial simply because the defendant wants it (and not because of any actual need) would be improper, as it would not only force the Government to preview its entire case (which it is not required to do), it would allow Walters to tailor his testimony and/or defenses to explain away the Government's case.  *Henry*, 861 F. Supp. at 1197.

To this end, Walters also claims to seek protection "from unfair surprises at trial" and asks the court to require the Government to provide notice if it intends to offer evidence at trial of any allegedly illegal trades besides those set forth in the Indictment.  This is not the law.[2]  It is axiomatic that, at least in cases where some specific examples are offered, the Government is not required to furnish an inventory of every act or individual it plans to prove furthered the fraud.  *See, e.g.*, *United States* v. *Bonventre*, 2013 WL 2303726, at \*5-7

---

[2]      In support of his demand, Walters again directs the Court to a case whose facts and holding are inapposite.  Walters correctly points out that, in *United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), the Second Circuit reversed a conviction for "failure to grant a bill of particulars where [the] indictment alleged extortion of one company but at trial the defendant was confronted with evidence of extortions aimed at entirely different companies." (Def. Mot. at 13).  What Walters fails to note is that *Davidoff* was a RICO case, and that its holding expressed specific concerns about the risks attendant to the Government charging criminal offenses under statutes as broad as RICO.  *Id.*  Specifically, the court instructed that, "[w]ith the wide latitude accorded the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."  *Id.*  To suggest that this holding is instructive on the facts of the insider trading conspiracy charged here is simply wrong.

(S.D.N.Y. 2013) (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction); *United States v. Guttenberg*, 2007 WL 4115810, at *4-5 (S.D.N.Y. 2007) (in insider trading case, denying request for bill of particulars itemizing trades alleged to have been based on material nonpublic information).

Moreover, this request reveals Walters' true aim as nothing more than an attempt to force the Government to disclose the extent of its proof, and to lock the Government into its proof ahead of trial. The law recognizes that no such disclosure is required, and indeed, cases in this District caution against it. *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

Finally, to the extent Walters seeks to force the Government to provide additional specificity about the wires at issue in the wire fraud counts charged in Counts Seven through Ten of the Indictment, this too should be denied. This request again ignores the particulars supplied in the Indictment and discovery, which details for each of those four counts the specific dates on which Walters purchased securities on the basis of inside information.[3] As

---

[3] The defendant again cites irrelevant cases. For example, in *United States* v. *Reale*, 1997 WL 580778, at *14 (S.D.N.Y. Sep. 17, 1997), the most specific allegation in the

is alleged in the Indictment, each of those purchases was preceded by phone communications between Davis and Walters, as well as phone calls from Walters to his broker, and each involved at least one purchase of securities on the New York Stock Exchange. The phone and brokerage records evidencing those wires were produced in discovery.[4]

Walters cannot demonstrate a genuine necessity for further particulars, and his efforts to capitalize on insider trading cases in which less detail was provided must fail given the highly particularized Indictment returned in this case and the other materials already provided to the defense. Walters' request should be denied in its entirety.

## II.   The Court Should Not Order the Government to Search Investigative Files of the Parallel SEC Investigation for Brady Material

Walters urges the Court to order the Government to conduct a review for exculpatory material under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), of the "SEC's investigative files for exculpatory and other discoverable information" because the Government and the SEC allegedly conducted a joint investigation. (Def. Mot. at 16). In support of this argument, Walters urges the Court to improperly extend the law of this Circuit, which would result in perverse and undesirable incentives and undermine the efficient enforcement of the criminal and civil laws. His motion should therefore be denied.

---

Indictment details only that mailings had taken place "in or about 1991 and in or about late 1992 or early 1993" and involved monthly cash payments of approximately $1,800; another count failed to identify any specific mailing or the approximate date on which it occurred. Accordingly, the court granted the defendant's request for a bill of particulars. *Id.* If anything, *Reale* demonstrates exactly why a bill of particulars is unnecessary with respect to the wire fraud counts charged here.

[4]     To the extent that Walters claims that the Government must identify specific wire transmissions to avoid a claim of multiplicity, this argument makes no sense. The Government has properly identified numerous securities transactions underlying each of the four wire fraud counts, each of which involve the use of wires. The defense's claim that, without additional detail, they cannot be sure that the Government is not relying on the *same* wire transmission in all four counts is belied by both the Indictment and the discovery.

## A.  Relevant Facts

The United States Attorney's Office is an arm of the United States Department of Justice, which is an executive agency responsible for enforcing the criminal laws in this country.  The SEC is an independent regulatory agency charged with enforcing civil securities laws.  In this case, the SEC commenced an investigation into insider trading related to the defendant and others in or about August 2011 (the "SEC Investigation"), shortly after Walters engaged in suspicious trading in the stock of The Clorox Company around the announcement of a takeover bid by Carl Icahn.  The Government opened a parallel, criminal investigation into that conduct in September 2011 (the "Criminal Investigation"), around which time the Government submitted an access request letter to the SEC, which was granted.  This access request letter allowed the SEC to provide to the Government documents and materials that the SEC obtained as part of its investigation (and which were otherwise not subject to any privilege or limitation).  Pursuant to that access request letter, the Government obtained tens of thousands of documents from the SEC.  All of the SEC materials in the possession, custody and control of the Government have either been produced to the defendant pursuant to the Government's disclosure obligations under Rule 16 of the Federal Rules of Criminal Procedure.  To the best of the Government's knowledge, there remain documents in the possession, custody and control of the SEC that the Government does not have.  Likewise, the Government obtained evidence pursuant to wiretaps, court orders, and grand jury subpoenas which it did not share with the SEC.

In addition, in order to maximize efficiency and reduce the financial and other burdens on third-party witnesses, the Government and the SEC conducted a number of

witness interviews together.[5]  Before each interview, the respective, independent agencies informed the witness that the criminal and civil investigations were separate investigations designed to enforce separate laws, and that the interviews were conducted at the same time primarily for the convenience of the witness.  For the most part (but with some exceptions), representatives from both the Government and the SEC asked questions, but in all cases, an FBI agent took the only notes and drafted FD-302 reports memorializing the interviews.  On some occasions, an attorney for the SEC went to the U.S. Attorney's Office to review and create notes and/or memoranda from some, but not all, of the FD-302s.

On May 19, 2016, the Indictment was unsealed charging Walters in ten counts.  The Government also unsealed a guilty plea by Davis to a criminal information charging comparable offenses.  On that same day, May 19, 2016, the SEC filed a complaint against Walters and Davis, and named Phil Mickelson, the Walters Group, and Nature Development, B.V. as relief defendants, alleging violations of the securities laws related to the same scheme to commit insider trading in Dean Foods and Darden securities (the "SEC Action").  Although the insider trading charges were based on the same underlying conduct, and the Government and the SEC discussed broad theories of liability based on the underlying facts, the Government and the SEC each evaluated its own evidence and made independent charging decisions based on each agency's own mandate to enforce its respective laws.  The Government did not direct the SEC to take any action or make any particular decision, nor did the SEC direct the Government to do the same.

By motion dated August 10, 2016, the Government intervened and sought a stay in the parallel SEC Action until this case concludes.  *See* Government Memorandum of Law in

_____

[5]      The SEC also conducted at least two interviews without the Government.  In addition, the SEC took Davis's deposition. The Government neither attended that deposition nor had any substantive discussions with the SEC about it beforehand.

21

Support of Motion for a Complete Stay, *SEC* v. *Walters et al.*, No. 16 Civ. 3722 (LSS) (Aug. 10, 2016) (Dkt. No. 47).  On August 19, 2016, Walters filed an opposition to the Government's motion.  *See* Memorandum of Law in Opposition to the Government's Application for a Complete Stay, *Walters*, No. 16 Civ. 3722 (Aug. 19, 2016) (Dkt. No. 53) ("Walters Stay Opp.").  In opposing the Government's motion, Walters emphasized the "efficiencies" that could be maximized if the "parallel" criminal and civil actions proceeded "on parallel tracks."   (Walters Stay Opp. at 10.)  On August 26, 2016, Judge Stanton denied the Government's motion and allowed the SEC Action to proceed "in the usual fashion."  *See* Order, *Walters*, No. 16 Civ. 3722 (Aug. 26, 2016) (Dkt. No. 61).  Discovery in the parallel civil action is proceeding apace, and on September 30, 2016, Walters served the SEC with a broad document request that includes, among other things, the entire investigative file related to the SEC Action — the same materials Walters now asks the Government to review for *Brady*.  (*See* Walters' First Request to Plaintiff for Production of Documents, Exhibit 1.)  The SEC's response to Walters' request is due October 31, 2016.

### B.  Applicable Law

"An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995)).  "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'"  *Id*. at 255 (internal citations

omitted); *see also United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting

imputation of knowledge of FBI reports by agents who were not involved in the investigation

or trial); *United States* v. *Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting imputation of

knowledge of a Florida prosecutor to an AUSA in New York).  Thus, where information was

independently obtained through sources outside of the prosecution team, *Brady* "is not a

discovery doctrine that c[an] be used to compel the Government to gather information for the

defense."  *Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24,

2014), *aff'd in part*, *United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016).

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the

materials in the possession, custody or control of another agency for *Brady* evidence only

where the Government conducts a "joint investigation" with another state or federal agency.

*United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding

that there was "no joint investigation with the SEC" and therefore the Government did not

need to produce documents in the custody of the SEC); *SEC* v. *Stanard*, No. 06 Civ. 7736

(GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those

here "make clear that the investigations, while they may have overlapped, were not

conducted jointly" in denying the defendant's request for the Court to require the SEC to

access and review FBI interview notes that were not in the SEC's possession, custody or

control); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, *J.*)

(holding that the Government and the NYSE, even if it were a state actor, did not conduct a

joint investigation related to the policies of the NYSE); *Ferreira* v. *United States*, 350 F.

Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government

and NYPD was "not sufficient to make the Government and the state prosecutor members of

the same 'prosecutorial team'"); *United States* v. *Upton,* 856 F. Supp. 727, 749-50 (E.D.N.Y.

1994) (holding that USAO and FAA did not conduct a "joint investigation" even though the

FAA provided two inspectors to assist the criminal investigation); *United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the USAO and USAO had no control over the material).

Walters relies exclusively on two recent decisions in this District that have attempted to determine whether parallel investigations became joint through an analysis of the ways in which the agencies gathered relevant facts.  In *United States* v. *Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012), the Government and the SEC interviewed 44 witnesses together, attorneys for both agencies asked questions, and the SEC attorney prepared memoranda that summarized the relevant information shortly after the interviews occurred while also consulting with the Government in doing so.  *Id.* at 494.  While recognizing the inconsistency of the case law in this area, and without citing to any authority, Judge Rakoff determined that, in the context of *Brady* disclosures, the proper inquiry to determine whether parallel investigations are also joint investigations "is one of fact-gathering, not charging determinations or otherwise."  *Id.*  Judge Rakoff thus determined that "joint fact-gathering" triggers *Brady* obligations for the Government related to the interviews conducted together by the Government and the SEC, even if there is no "joint prosecution." *Id.* at 494-95.  Judge Rakoff clarified that "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation," but rather held that the Government need only review for *Brady* documents related to the witness interviews conducted by both agencies.  *Id.* at 495.

In *United States* v. *Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), the court addressed a narrow and specific request by the defendant: that the Government review for *Brady* notes and memoranda of communications between the SEC and counsel for the cooperating witnesses that were in the sole custody of the SEC that related to threats of

24

criminal prosecution or promises related to non-prosecution agreements.  *Id.* at 459.

Purportedly relying on *Gupta* to evaluate whether the parallel criminal and civil

investigations were "engaged in joint fact-gathering," Judge Gardephe held that the

Government and the SEC conducted a joint investigation because (a) they conferred with

each other about the respective investigations, (b) they "jointly conducted" 20 interviews of

12 witnesses, (c) the SEC provided the Government with documents it obtained during its

investigation, and (d) they coordinated efforts in connection with SEC depositions of

witnesses.  *Id.* at 461.  Unlike in *Gupta*, however, where Judge Rakoff held that the

Government's *Brady* obligation extended only to memoranda in the custody of the SEC

related to interviews that were part of the joint fact-gathering, Judge Gardephe held that the

fact that "the agencies [were] engaged in joint fact-gathering" required the Government to

review a narrow subset of memoranda related to conversations in which the Government was

not involved at all.  *Id.* at 462.  Accordingly, while *Martoma* purported to follow *Gupta*,

which itself refashioned the joint investigation analysis, *Martoma* extended *Gupta*'s analysis

to materials that were not generated through joint fact-gathering.

### C.  Discussion

Rather than requesting a limited review of a narrow subset of interview or other

memoranda, as the *Gupta* and *Martoma* courts required, Walters instead relies on *Gupta* and

*Martoma* to ask the Court to order the Government to undertake the impossibly burdensome

and cumbersome task of reviewing the SEC's entire "investigative files" for *Brady*.  (Def.

Mot. at 16.) Walters provides no support for this overbroad proposition, and it should be

rejected.

### 1.  The Defendant's Request for Documents in the SEC Action Moots this Motion

As a threshold matter, the defendant was successful in opposing a stay in the parallel

SEC Action, notwithstanding that all parties agreed that the trial in this case would proceed

eu

before any trial in the SEC Action. As a result, discovery is proceeding in the SEC action, and the defendant has recently requested the production of documents by the SEC that includes (but is not limited to) the SEC's entire investigative file for the SEC Action. (Ex. 1 ¶ 1.) Put simply: Walters seeks and will receive in the SEC Action the same material that Walters asks the Government to review for *Brady*. *Brady*, however, does not require the Government to turn over exculpatory evidence "if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir. 1987), *cert. denied,* 482 U.S. 929 (1987).[6] Therefore, once the SEC produces documents and materials responsive to Walters' request for documents — the SEC's initial response is due October 31, 2016 — then Walters will be in possession of the materials he asks the Government to review, rendering Walters' request superfluous and demonstrating that Walters presses this claim simply for tactical advantage.[7]

## 2. The Criminal and Civil Investigations Were Parallel, Not Joint

Walters' overly broad and burdensome request demonstrates why the proper inquiry into whether parallel civil and criminal investigations are "joint investigations" should focus on decision-making, not fact-finding as suggested in *Gupta* and *Martoma*. *See Stanard*, 2007

---

[6]     In an effort to extend the Government's *Brady* obligations beyond the prosecution team, Walters cites *Kyles* for the proposition that the Government's *Brady* obligations extend to others acting on the Government's behalf, "which can include those outside the prosecutor's office." (Def. Mot. at 17 (citing *Kyles*, 514 U.S. at 437).)  *Kyles*, however, does not address an agency independent from the prosecution team, such as the SEC.  Rather, in *Kyles*, the Supreme Court found that the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police*." *Kyles*, 514 U.S. at 437 (emphasis added).  The police, of course, were the investigating agents for the prosecutor — the equivalent of the FBI in this case — and there is no dispute that the Government's *Brady* obligations extend here to the FBI.  Thus, *Kyles* is inapposite.

[7]     To the extent that the SEC claims privilege over any documents in their possession, including work-product privilege in connection with their own memoranda, the Government expects that Judge Stanton will be able to resolve any litigation related to those issues.

WL 1834709, at *3 (noting that the SEC is an independent agency from the Government in holding that, although the parallel investigations "may have overlapped," they were not conducted jointly); *see also United States* v. *Rigas*, 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008)  (finding similarly parallel civil and criminal investigations were not "joint").  Any long-term parallel investigation will inevitably result in some overlap in fact gathering.  To do otherwise would require witnesses to travel, sit and be asked questions about the same subject matter by two (or more) agencies serially, and would require subpoena recipients to respond and produce documents to two (or more) agencies on multiple occasions.  Asking the Government to review the entire SEC investigative file — including searching databases located around the country, reviewing terabytes of documents, and parsing through attorney work product — simply because the Government and the SEC sought to maximize the efficiencies of investigation would "inappropriately require [the court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'"  *Avellino*, 136 F.3d at 255.  Reviewing the entire investigative file of another independent agency would be inordinately time consuming and burdensome for attorneys for the Government, which does not have custody of the files, is not familiar with the files, and knows of no effective way to search the files.  Indeed, the Government routinely does not ask the SEC for its entire investigative file for this precise reason, as it cannot afford to take on obligations it cannot realistically be expected to meet.

Even Walters appears to recognize the benefits of efficiencies in parallel investigations.  In his opposition to the Government's motion to stay the SEC Action, Walters emphasized the "efficiencies" that could be maximized if the "parallel" criminal and civil actions proceeded "on parallel tracks."  (Walters Stay Opp. at 10.)  Indeed, parallel investigations between the SEC and the Government have been endorsed in support of the "[e]ffective enforcement of the securities laws."  *SEC* v. *Dresser Industries*, *Inc.*, 628 F.2d

1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions.").  To that end, the typical overlap between investigations that existed here to promote efficiency and reduce costs has been affirmed by several judges in this District as indicative of parallel, not joint, investigations. *See, e.g.*, *United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90) (denying identical motion to this based, in part, on representations by the Government that similar cooperation as here occurred between the Government and the SEC); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *2.  In *Stanard*, for example, then-District Judge Lynch addressed a defendant's discovery request to the SEC to obtain and produce notes and memoranda that were in the possession, custody and control of the U.S. Attorney's Office but which the SEC had reviewed.  *Stanard*, 2007 WL 1834709, *2.  Acknowledging that the SEC could be considered to have "effective control" over the documents if it conducted a joint investigation with the Government, Judge Lynch instead determined that the facts of the case "ma[d]e clear that the investigations, while they may have overlapped, were not conducted jointly," and rejected the defendant's argument.  *Id.*; *see also Finnerty*, 411 F. Supp. 2d at 433 (finding NYSE investigation into own policies that were relevant to criminal charges was not joint investigation).  This analysis is squarely at odds with, for example, the *Martoma* decision's consideration of whether the SEC and the Government ever conferred about their respective investigations at all.  *See Martoma*, 990 F. Supp. 2d at 461.

Instead of focusing the "joint investigation" inquiry on joint fact-gathering, which simply is a result of efforts to promote efficiency and which would lead to perverse results if abandoned, the Government urges the Court to consider whether the parallel investigations

28

made joint decisions about which charges to bring or which defendants to charge, or if the SEC otherwise acted as a member of the prosecution team by, for example, obtaining evidence solely for use in the criminal case.  Where, as here, the two agencies did not strategize about what charges they intended to bring, or which defendants each would charge, but instead independently evaluated their separate evidence to make independent investigatory and charging decisions consistent with their separate mandates, there is no joint investigation.  For these reasons, the defendant's request should be denied.

### 3.   Walters' Request is Distinguishable from Gupta and Martoma

Even if the Court were inclined to focus on joint fact-gathering, Walters' requested relief is unsupported by any authority and excessively broad.  Unlike here, where Walters seeks to compel the Government to review the entire SEC investigative file for *Brady*, Gupta simply requested that the Government review for *Brady* the SEC's notes and memoranda of interviews that the two agencies conducted together.  Indeed, in holding that the Government's *Brady* obligations extended to the SEC's notes and memoranda of jointly conducted interviews, *Gupta* relied on the fact that the Government could easily access the requested materials.  *See Gupta*, 848 F. Supp. 2d at 495 (citing *United States* v. *Brooks*, 966 F. 2d 1500, 1503 (D.C. Cir. 1992) (holding that prosecutor must search files "particularly when files can be searched 'without any difficulty'")).  That is not the case with the SEC's entire investigative file, which is cumbersome, located in multiple places, and difficult, if not impossible, to search.  Moreover, *Gupta* makes clear that not "all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation."  *Id.* Rather, *Gupta* held that the Government's obligation to review for *Brady* extends only to

"documents arising from those joint efforts" to "investigate the facts of a case together. *Id.* Accordingly, Walters' overbroad request runs afoul of *Gupta*.[8]

In *Martoma*, the defendant requested that the Government review even less material than in *Gupta*. *See Martoma*, 990 F. Supp. 2d at 459 (defendant requested that the Government review notes of communications between the SEC and attorneys for two cooperating witnesses in the sole possession of the SEC). With this narrow request in mind, Judge Gardephe conducted an analysis of the Government's and the SEC's investigations, ultimately finding that there was a "joint investigation" because (1) the two agencies conferred about their investigations and (2) jointly conducted interviews; (3) the SEC provided the Government with documents it obtained as part of its investigation; and (4) the two agencies "coordinated their efforts in conducting depositions of SAC Capital and its employees."[9] *Id*. at 461. As a result, Judge Gardephe held that the Government was obligated to "produce to Defendant communications from the SEC to the doctors' counsel, or to [the cooperating witnesses] directly, that (1) threaten criminal prosecution of either [witness] if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if he implicates Martoma." *Id.* at 462.

The Government respectfully submits that *Martoma* was not intended to extend *Gupta* to all materials in the SEC's custody or control, or to contradict *Goffer*, *Rigas*, or *Stanard*, and must be limited to its unusual facts. If *Martoma* were extended as Walters requests, the

---

[8]     As noted above, the Government respectfully suggests that the proper lens through which to assess whether two investigations are joint or parallel is in connection with the presence or absence of joint charging decisions. In the event that the Court disagrees and believes that the relevant inquiry is one turning on joint fact gathering, the Government respectfully submits that a review of the notes SEC attorneys made of the FBI FD-302 reports for *Brady* would satisfy the concerns articulated in *Gupta*.

[9]     Notably, the Government did not confer with the SEC before or during the deposition of Thomas Davis, which was the only deposition the SEC took during its investigation.

30

exception would swallow the rule, and any jointly-conducted interviews or document-sharing between the SEC and the Government would require the Government to search the entire SEC investigative file.  That result would diverge wildly from the rationale of *Gupta*, and cannot be what *Martoma* intended.  In fact, Martoma's narrow request related to communications between the SEC — a *civil* regulator — and Government witnesses in connection with the possibility of *criminal* prosecution, which was an outcome that was exclusively in the control of the Government, not the SEC.  *Martoma* is therefore properly read to simply provide a safeguard in an unusual situation to ensure that no promises or representations about a putative *criminal* prosecution are relayed to witnesses by the SEC, a *civil* regulator.  Thus, to the extent that Walters relies on *Martoma* to support his request for the Government to search the entire investigative file of the SEC, such reliance is misplaced.

In conclusion, the United States Attorney's Office and the SEC are separate agencies with separate mandates.  One is located within the Department of Justice, the other is an independent administrative agency.  One is a law enforcement agency, the other a regulator. They have separate offices, budgets, personnel, and files, not to mention procedures for organizing and maintaining evidence and other materials.  Government attorneys seek indictments from the grand jury.  SEC attorneys seek approval to file charges from the members of their Commission.  Although, as here, they occasionally investigate the same conduct, they make their own, independent determinations about whether the evidence gathered satisfies their respective criminal and civil standards and burdens of proof.  They make independent decisions about whom to charge and with what offenses.  While they occasionally gather evidence together to promote efficiencies and ease the burden on witnesses and subjects of their investigations, they are not the same party.  To require the Government to search the SEC's entire voluminous files for material that is not, and never was, in its possession nor was ever reviewed based simply on their efforts to conduct parallel

investigations would seriously undermine the separate but complementary criminal and regulatory structure set up by Congress. Accordingly, where, as here, the only collaboration between the Government and SEC investigations was to conduct interviews together to promote efficiency and reduce costs, and for the SEC to provide documents to the Government that the Government could have otherwise obtained through grand jury subpoena, the Government respectfully submits that the Court should determine that the investigations were parallel, not joint, and deny Walters' motion.

## III.    The Court Should Deny the Defendant's Request for a Hearing

Relying on false assumptions and misplaced arguments, Walters argues that the Government violated Rule 6(e) of the Federal Rules of Criminal Procedure and committed other alleged misconduct in connection with a wiretap on his cellphone. Notably, Walters does not move to suppress the wiretap; rather, he seeks an open-ended hearing to address allegedly misleading statements to the court and purported violations of Rule 6(e). The Court should not countenance this request to conduct a fishing expedition.

Walters' baseless accusations are undermined by the facts and unsupported by the law. First, the Government did not mislead a court in connection with the wiretap. Second, contrary to Walters' argument, articles in the *Wall Street Journal* and *New York Times* in May and June 2014 did not include any information related to a grand jury investigation. Indeed, the articles did not include any "matters occurring before the grand jury" at all. Nor can Walters demonstrate that the source of the information was a member of the prosecution team. The generalized sources cited in the articles — "people briefed on the matter" or similar descriptions — cannot support a finding that the source of the information was an attorney or agent for the Government when others also had access to the same information obtained through means other than grand jury subpoena. Accordingly, the defendant cannot

make out a *prima facie* case of a violation of Rule 6(e)(2).  His request for a hearing should be denied.

### A.  Relevant Facts

#### 1.  The Investigations

As detailed above, in or about September 2011, the Government commenced a criminal investigation that ultimately resulted in the charges included in the Indictment. (Declaration of AUSA Telemachus P. Kasulis ¶ 4 ("Kasulis Decl.").)  As part of the Government's investigation, the Government began a grand jury investigation, and from September 2011 through May 2014 (the "Relevant Period"), the Government issued a number of grand jury subpoenas to obtain various records.  (*Id*. ¶ 5.)  During the Relevant Period, the Government did not present any evidence to a grand jury — either through witness testimony or by presenting the information contained in subpoenaed documents.  (*Id*. ¶ 20.)  Beginning in or about August 2011 and continuing through the Relevant Period, the SEC conducted a parallel civil investigation into the same underlying conduct, and the SEC used civil process to obtain the same types of documents as the Government, including phone records and trading records for Walters, Phil Mickelson and others.  (*Id.* ¶ 5.)  The SEC provided certain of these documents to the Government pursuant to a standard access request letter, which included, among other things, 2012 trading records for Walters and Mickelson, as well as information about XO Communications.  (*Id.*)  The Financial Industry Regulatory Authority ("FINRA") also conducted an investigation into suspicious trading patterns in Dean Foods stock in 2012, which included an evaluation of relevant trading records.  (*Id.* ¶ 4.)

During the Relevant Period, the Government also conducted a criminal investigation separate from its grand jury investigation.  In addition to reviewing documents provided by the SEC, the criminal investigation also included the use of pen registers on various

telephones, voluntary witness interviews, surveillance, and review of publicly available materials. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

     In or about early May 2014, the Government learned that the *Wall Street Journal* was contemplating publishing an article about an insider trading investigation into Walters, Mickelson, and Carl Icahn.  (Kasulis Decl. ¶ 11.)  Soon thereafter, the Government came to understand that the *Journal* would not be prepared to publish the article until at least May 22, 2014, and likely thereafter.  (*Id*. ¶ 12.)  In conjunction with the FBI, the Government determined to continue with a covert investigation until it became clear that the investigation would be publicized, at which point approaching individuals would be an appropriate measure of last resort.  (*Id*.)  On or about May 27, 2014, ████████████████████████ ████████████████████████, the Government learned that at least one article about the investigation would be published imminently.  (*Id*. ¶ 14.)  After learning of the immediacy of public disclosure of the investigation, the Government quickly decided to approach subjects of the investigation before that occurred.  (*Id*.)  Accordingly, on or about May 29, 2014, FBI agents approached Davis at his home in Dallas, Texas, and Mickelson at a golf course in Ohio.  (*Id*.)  Both denied wrongdoing.  (*Id*.)  ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

### 2.   News Reports About the Government and SEC Investigations

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████

The May 30, 2014 *Wall Street Journal* Article

On May 30, 2014, the *Wall Street Journal* published an article about the existence of investigations by the FBI and the SEC into insider trading by Walters, Icahn, and Mickelson. (*See* Schoeman Decl. Ex. L (the "May 30 WSJ Article").)  Citing "people briefed on the probe," this article stated that both the FBI and the SEC were examining Walters' and Mickelson's trading patterns, and further revealed that FBI agents had approached Mickelson to speak with him about the investigation, according to a "person familiar with the situation." The article included a comment from Mickelson's lawyer, and further noted that the FBI declined to comment about Mickelson's lawyer's statement.  Notably, the article also said that the sources of the information stated that "publicity of the probe could jeopardize the government's ability to put together any potential case . . . by limiting its ability to covertly gather evidence."  Finally, the article reported that "[i]nvestigators have examined trades in Clorox options," and also included a chart related to trading in Clorox, including a data point of "unusual trading in Clorox options" on July 11, 2011 that is sourced to the "WSJ Market Data Group."

The May 30, 2014 *New York Times* Article

Later that same day, the *New York Times* published an article about an investigation by the Government, the FBI and the SEC.  (*See* Schoeman Decl. Ex. M (the "May 30 NYT Article").)  Citing "people briefed on the investigation," this article stated that "federal authorities" were examining "well-timed trades" by Walters and Mickelson, including trades in Dean Foods stock around August 2012, as well as phone records.  The article reported that "one initial theory" of the investigation was that Walters passed information to Mickelson, and that Mickelson did not trade in Clorox but did trade in the stock of another company "tied to Mr. Walters."  The article further noted that "published reports" documented "unusual trading activity in shares of Clorox and options to buy the stock" around the time that Icahn announced an unsolicited bid to take over Clorox, and also stated that FINRA initiated the investigation by tracing "a series of well-timed Clorox trades to Mr. Walters and other investors."  Furthermore, the article referenced the fact that the SEC requested information from Icahn related to Clorox, and that "federal authorities" were "examining phone records to see whether Mr. Walters spoke to Mr. Icahn shortly before the trades."  Finally, the article stated that "[f]ederal authorities declined to comment."

The May 31, 2014 *New York Times* Article

The following day, May 31, 2014, the *New York Times* published another article on the investigation, which largely reiterated information included in the articles from the previous day.  (*See* Schoeman Decl. Ex. N (the "May 31 NYT Article")).  Citing "people briefed on the matter who spoke anonymously because they were not authorized to discuss the investigation," the article led that "[i]n the summer of 2011, a series of winning stock trades raised immediate red flags for financial regulators."  The article also included information about the "government's tactics," which included efforts to convince individuals to cooperate with "authorities."  The article referenced "trading records" related to Clorox,

36

and reiterated that "authorities have pored over phone records, the people briefed on the matter said, seeking to line up Mr. Icahn's calls to Mr. Walters with the trading in Clorox," which was also reported in the May 30 NYT Article.

### The June 2, 2014 *Wall Street Journal* Article

On June 2, 2014, the *Wall Street Journal* published another article on the "[c]riminal and civil" investigations.  (*See* Schoeman Decl. Ex. O ("the June 2 WSJ Article")).  Citing "people briefed on the probe," this article led with the assertion that "[n]ews of the probe derailed government efforts to secretly deploy wiretaps."  This article further explained that "[a]uthorities were considering the use of wiretaps," and that "investigators were using other types of electronic and human surveillance."  The article also outlined "roadblocks" in the investigation, including the fact that Icahn "owned a stake in a telecommunications company through which surveillance might have to be conducted."  The article reported that, as a result of the publicity around the investigations, the Government "has lost the advantage" of utilizing cooperating witnesses to make recordings of illegal conduct, as had occurred in previous insider trading cases.  In addition, the story noted that FBI agents inquired about Mickelson's trading in Dean Foods at the suggestion of Walters but "when they learned the investigation might become public, investigators accelerated their pace, dispatching a pair of agents on a plane from New York on [May 29, 2014] to confront Mr. Mickelson after a round of golf."  To that end, a lawyer for Mickelson told the *Journal* that he had spoken to an FBI agent, who informed Mickelson's lawyer that Mickelson was not a "target" of the investigation, and that Mickelson's lawyer intended to discuss the "government's concerns" in the coming days.  Finally, the article concluded by reporting that "law enforcement officials have said" in the past that subjects of investigations might discuss reports of ongoing investigations, or take other actions to avoid being caught, including by destroying evidence, which occurred in another investigation in 2010.

The June 11, 2014 *New York Times* Article

On June 11, 2014, the *New York Times* published another article on the investigations, principally aimed at correcting misstatements in previous reporting about Mickelson's purported trading in Clorox, which never occurred according to "four people briefed on the matter." (*See* Schoeman Decl. Ex. R (the "June 11 NYT Article").)   The article specifically referenced the fact that "[t]he F.B.I. is pursuing a criminal investigation, while the S.E.C. is running a parallel civil inquiry," and further noted that "one of the four people briefed on the matter" stated that Walters' and Mickelson's trades in Dean Foods in 2012 "generated more than $15 million in proceeds for Mr. Walters and nearly $1 million for Mr. Mickelson." The article also provided some detail on statements Mickelson made to F.B.I. agents when they approached him to interview him, and further noted that "two of the people briefed on the matter" said that an FBI agent had told Mickelson that the FBI was interested in information about Walters and had "no plans to criminally charge him." The article further cited one of Walters' lawyers as stating that Walters had not received a subpoena, nor had Icahn, according "a person briefed on the matter." Finally, the article reiterated that "[t]he S.E.C. began the inquiry into Clorox trading after finding suspicious trades in the stock just days before Mr. Icahn's solicited bid," and also stated that the FBI, federal prosecutors in Manhattan, and the SEC were continuing to investigate "well-timed trades" made by Mickelson and Walters in Dean Foods in the summer of 2012 under a theory that "a source inside Dean Foods" gave Walters a tip about Dean Foods's plans to spin off its WhiteWave subsidiary, although it remained "unclear what exactly prompted Mr. Walters and Mr. Mickelson to trade."

The June 23, 2014 *New York Times* and *Wall Street Journal* Articles

On June 23, 2014, both the *New York Times* and the *Wall Street Journal* published articles principally to disclose that Dean Foods had received a subpoena from the

38

Government.  (*See* Schoeman Decl. Ex. R (the "June 23 NYT Article") and Ex. S (the "June 23 WSJ Article").)  In the June 23 NYT Article, "people briefed on the matter" are cited as sources of reporting that the Government had subpoenaed Dean Foods for documents shortly after published reports disclosed the investigation, but that "it was unclear what documents federal prosecutors requested."  The article further noted that spokesmen for the Government and the FBI declined to comment, and that a spokesman for Dean Foods "declined to comment on whether federal authorities had made any requests for documents."  Nevertheless, the article quoted the Dean Foods spokesman as saying, "We are reviewing this matter, and our practice is to offer our full support to any government investigation."

In the June 23 WSJ Article, "people familiar with the matter" stated that Dean Foods received a subpoena for documents from the Government and that Clorox and Icahn received requests for information from the SEC in 2011.  Like the June 23 NYT Article, this article noted that "[i]t isn't clear what records they sought from Dean Foods and Clorox."  This article included quotations from written statements by Dean Foods, a lawyer for Mickelson, and Walters.

## B.  Applicable Law

### 1.  Rule 6(e)

Federal Rule of Criminal Procedure 6(e)(2) bars the disclosure of any "matter occurring before the grand jury" by, among others, attorneys for the Government and law enforcement agents privy to such grand jury material.  Fed. R. Crim. P. 6(e)(2)(B)(iv).  In order to demonstrate that Rule 6(e) has been violated by the Government, a defendant must first make a *prima facie* showing that (1) there has been disclosure of a matter or matters occurring before the grand jury, and (2) the source of the disclosure was an attorney or agent of the government.  *United States* v. *Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, *9 (S.D.N.Y. Oct. 20, 2015) (holding that defendant did not make *prima facie* showing to

warrant a hearing) (citing *Barry* v. *United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989)).  If the defendant can meet both requirements, then the burden shifts to the Government to rebut the defendant's allegations of a violation of Rule 6(e).  *Id.*  Courts can consider an affidavit from the Government in assessing whether a hearing is necessary.  *See United States* v. *Rioux*, 97 F.3d 648, 662 (2d Cir. 1996) (affirming district court's reliance on Government affidavits in denying request for a hearing where newspaper article included matters appearing before the grand jury and the source of that information was "likely" a government official) (citing cases).

Although Rule 6(e) does not define when a matter is one "occurring before the grand jury," courts have explained that the phrase covers a disclosure that "would tend to reveal some secret aspect of the grand jury's investigation."  *Senate of the Com. of Puerto Rico ex rel of Judiciary Comm.* v. *U.S. Dep't of Justice (SoCPR)*, 823 F.2d 574, 582 (D.C. Cir. 1987) (Ginsburg, R.B., J.) (internal punctuation omitted).  "Past decisions indicate that disclosures about the following might constitute Rule 6(e) violations: revelations of the identity of either grand jurors or expected witnesses; information about expected testimony of witnesses or likely questions; information that reveals the strategy or direction of a grand jury investigation (distinct from any outside investigations); or the date when a grand jury will return an indictment."  *Skelos*, 2015 WL 6159326, *10 (citing *United States* v. *Rosen*, 471 F. Supp. 2d 651, 655 (E.D. Va. 2007) (citing cases)); *see also In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001-02 (D.C. Cir. 1999) (stating that Rule 6(e) does not require that a "veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury" and holding that disclosure of prosecutors' belief that an indictment would be brought did not violate Rule 6(e) (citation omitted)).[10]

---

[10]     The case law defining "matters occurring before the grand jury" generally focuses on past or likely future proceedings before the grand jury.  *See. In re Sealed Case No. 99-3091*,

Notably, Rule 6(e) protections "do[] not apply to disclosures of information obtained independently of the grand jury process, even if the information might later be presented to the grand jury."  *Skelos*, 2015 WL 6159326, *10 (citing *In re Grand Jury Subpoena*, 103 F.3d 234, 238–39 (2d Cir. 1996)); *see also In re Sealed Case No. 99–3091*, 192 F.2d at 1002 ("It is therefore necessary to differentiate between statements by a prosecutor's office with respect to its own investigation and statements by a prosecutor's office with respect to a *grand jury's* investigation, a distinction of the utmost significance.") (emphasis in original); *United States* v. *Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991) (holding that search warrant affidavit derived from investigation independent of the grand jury is not a "matter occurring before the grand jury" even if it may be presented to a grand jury in the future); *Blalock* v. *United States*, 844 F.2d 1546, 1551 (11th Cir. 1988) (per curiam) (grand jury secrecy rule "does not protect from disclosure information obtained from a source other than the grand jury, even if the same information is later presented to the grand jury"); *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 217 (5th Cir. 1980) (finding that a Government official's "statement of opinion as to an individual's potential criminal liability [does not] violate the dictates of Rule 6(e) . . . even though the opinion may be based on knowledge of the grand jury proceedings, provided, of course, the statement does not reveal the grand jury information on which it is based").  Moreover, "the disclosure of information coincidentally

---

192 F.3d at 1001 (D.C. Cir. 1999) (defining "matters occurring before the grand jury" to encompass 'not only what has occurred and what is occurring, but also what is likely to occur,' including 'the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like.'" (quoting *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1071 n.12 (D.C. Cir. 1998)); *Rosen*, 471 F. Supp. 2d at 656 (E.D. Va. 2007) ("In sum, disclosures of information concerning a criminal investigation violate Rule 6(e) only where the matters disclosed are 'matters occurring before the grand jury,' which phrase, as elucidated by the courts, means that Rule 6(e) is implicated only if the matters disclosed concern the details of the grand jury's past or future proceedings.").  The Government's position is more expansive, however, and treats all information obtained pursuant to grand jury subpoena, including the contents of documents, as material subject to the secrecy protections of Rule 6(e)(2).

before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury is not prohibited." *In re Sealed Case No. 99-3091*, 192 F.3d at 1002 (quotation marks and citations omitted); *see also id.* at 1003 ("[I]nternal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material.").

In order to show that a Rule 6(e) violation occurred, a defendant must also show that the disclosure was made by an attorney or agent for the Government. *Barry*, 865 F.2d at 1321; *Skelos*, 2015 WL 6159326, *11. Courts typically focus on the information contained in the relevant media reports to determine whether the source was an attorney or agent for the Government, and it is not necessary for a media report to expressly reference a Government official if the nature of the information provides a connection. *Barry*, 865 F.2d at 1325 (citing *In re Grand Jury Investigation (Lance)*, 610 F.2d at 218). However, a defendant must draw a connection between a law enforcement official and the disclosure of Rule 6(e) material. *Id.* at 1320 (noting that some articles "either do not explicitly mention 'law enforcement officials' in connection with information disclosed about the grand jury proceedings, or they mention law enforcement officials only in connection with 'investigations' underway that were not explicitly linked to the grand jury proceeding").

Finally, in assessing whether a defendant has made a *prima facie* case sufficient to warrant a Rule 6(e) hearing, the court must weigh any evidence presented by the Government to rebut allegations of a Rule 6(e) violation, including in the form of an affidavit. *Rioux*, 97 F.3d at 662 (holding that Government affidavit was sufficient to rebut *prima facie* case); *In re Grand Jury Investigation (Lance)*, 610 F.2d at 219 ("[t]he inability to show a definite source for some of the information contained in the articles might cause a *prima facie* case to fail if a responsive affidavit denying the allegations is made") (citing cases).

### 2. Remedy

As a threshold issue, to the extent that a defendant seeks a remedy for either an alleged violation of Rule 6(e) or purported misstatements to the court in connection with a Title III wiretap application, he must first be able to show that the error was not harmless and that he has been prejudiced as a result of the alleged misconduct. *See generally* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").  The Supreme Court has made clear that "a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)." *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 254 (1988) (rejecting defendant's request to dismiss the indictment in the face of Rule 6(e) violations, including the public identification of the targets and the subject matter of the grand jury investigation, because the misconduct did not result in prejudice to the defendant). In so doing, the Court reasoned that "it would be inappropriate to devise a rule permitting federal courts to deal more sternly with non-constitutional harmless errors than with constitutional errors that are likewise harmless." *Id.* at 255; *United States* v. *Mechanik,* 475 U.S. 66, 71-72 (1986); *accord United States* v. *Carter*, No. 04 CR. 594 (NRB), 2005 WL 180914, at *4 (S.D.N.Y. Jan. 25, 2005).

Further, while a court may use its supervisory powers to fashion remedies for prosecutorial misconduct that violates legally-compelled standards and results in prejudice to the defendant, those remedies should be tethered to the alleged misconduct — and not simply result in "a windfall for the unprejudiced defendant." *See In re United States of America,* 441 F. 3d 44, 60 (1st Cir. 2006) (quoting *Bank of Nova Scotia*, 487 U.S. at 253); *see also United States* v. *Hasting*, 461 U.S. 499, 506 (1983)  (instructing that deterrence is not an appropriate basis on which to reverse a conviction where "means more narrowly tailored to deter objectionable prosecutorial conduct are available" and recognizing that, where the error is

43

harmless, concerns about the "integrity of the [judicial] process" will carry less weight). A court may not disregard the doctrine of harmless error "to chastise what the court view[s] as prosecutorial overreaching." *Id*. Indeed, when a knowing violation of Rule 6 is found, the remedy provided by the Rule is contempt as to the wrongdoer, not "windfall" to any target of the investigation. *See* Fed. R. Crim. P 6(e)(7) ("A knowing violation of Rule 6 . . . may be punished as a contempt of court"); *see also United States* v. *Regan*, 706 F. Supp. 1102, 1120 (S.D.N.Y. 1989) (holding that where an agent violated grand jury secrecy rules in securing a search warrant but did not violate a defendant's substantive rights, appropriate sanction was contempt, not suppression of fruits of warrant).

### C. Discussion

Walters requests a hearing to address two purported categories of Government misconduct. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████████

Second, Walters asserts that reporting reflected in communications between Walters and a *Wall Street Journal* reporter and the seven published news articles "clearly indicates" that a "member of the government's team with complete knowledge of all aspects of the grand jury's investigation" improperly provided "details of the grand jury's investigation" to the press. (Def. Mot. at 23.) This argument suffers from two fatal mistakes. *First*, none of the information about the investigations reported in the communications and newspaper articles included a "matter occurring before the grand jury" and therefore did not constitute a violation of Rule 6(e). *Second*, Walters cannot demonstrate that the source of the information

was an attorney or agent of the Government rather than others who had access to the information through alternative means, including civil regulatory authorities.  For these reasons, Walters cannot make out a *prima facie* case of a Rule 6(e) violation.  Moreover, even if such a showing could be made, a sworn declaration submitted by the prosecutor responsible for this investigation at the time of the published reports persuasively rebuts this argument, obviating the need for a hearing.  Finally, Walters identifies no prejudice to him from the purported misconduct, which provides yet another basis for denying the defendant's request for a hearing.

### 1.  The Government Engaged in No Misconduct in Connection With the Wiretap Application



On May 23, 2014, w███████████████████████████████████ ████████████, the Government had no plans to approach any witnesses; in fact, the Government hoped such an investigative step would not be necessary.  (Kasulis Decl. ¶ 13.) On May 27, 2014, ████████████████████████████████████████████, the Government learned that its covert investigation was likely to be made public by the

media in the immediate future.[11]  (*Id.* ¶ 14.)  At that time, the Government scrambled to dispatch agents to Ohio and Texas to approach Mickelson and Davis before the investigation became public (after which an approach would be less likely to be successful).  (*Id.*); *see also* June 2 WSJ Article ("[W]hen they learned the investigation might become public, investigators accelerated their pace, dispatching a pair of agents on a plane from New York on [May 29, 2014] to confront Mr. Mickelson after a round of golf.").  Accordingly, contrary to the speculative assumptions made by Walters, the Reauthorization Application was entirely truthful and accurate.



---

[11]     Notwithstanding Walters' unfounded allegations that the Government purposely leaked information about the investigation to instigate criminal conversations between Walters and others that could be intercepted over the wiretap, the consequences of public disclosure of a covert investigation are significant and detrimental to the investigation.  If targets of an investigation learn about the investigation, they naturally become more careful and less likely to engage in criminal conduct.  Furthermore, those targets are less likely to discuss past criminal matters for fear of a wiretap, as in this case, or of being recorded by a confidential informant or cooperating witness.  In addition, potential targets of the investigation might destroy evidence or otherwise obstruct justice, which is an undesirable occurrence for any investigation.  Simply put, Walters' efforts to identify a motive for the Government to disclose the investigation — and thereby mislead ▆▆▆▆▆▆▆ — have no basis in fact or common sense.



Accordingly, there was no Government misconduct, no reason to discontinue the wiretap and no prejudice to the defendant.[13]

### 2. Walters Cannot Make a *Prima Facie* Showing that the Information Provided to the Press Violated Rule 6(e)

Walters argues that an agent or attorney for the Government leaked information about a grand jury investigation to the press in violation of Rule 6(e).  Walters, however, cannot satisfy either of the requirements to make a *prima facie* showing of a violation of 6(e), as none of the information he cites was a "matter occurring before the grand jury," and he cannot demonstrate that the source of the information was "likely" an agent or attorney for the Government.  In any event, even if he could make such a *prima facie* showing, the sworn

---

12


13

affidavit from the Government adequately rebuts the defendant's assertion and eliminates the

need for a hearing.

> a) *Walters Cannot Show that Information About the Criminal Investigation Was a "Matter Occurring Before the Grand Jury"*

Walters does not clearly or specifically identify which "matters occurring before the

grand jury" were improperly revealed to the media.  As best as the Government can tell,

Walters appears to include the following categories of information in support of his

argument:

- Trading records, patterns and profits in connection with trades in the stock of Dean Foods and Clorox (Def. Mot. at 24-28, 31);

- Telephone records (Def. Mot. at 27);

- The Government's "thinking," or theory of a potential case (Def. Mot. at 28-29, 32);

- The Government's use of "pen registers and other surveillance techniques," and its consideration of wiretaps (Def. Mot. at 29); and

- A grand jury subpoena to Dean Foods (Def. Mot. at 32).

Under any view of the secrecy protections of Rule 6(e) — the case law's focus on

proceedings actually occurring before the grand jury or the Government's more expansive

view — none of the information cited in the defendant's brief includes grand jury material.

Trading Records, Patterns and Profits

Walters argues that the emails from a *Wall Street Journal* reporter and certain of the

news articles reveal the disclosure of grand jury information in the form of trading records,

patterns and profits.[14]  As a threshold matter, vague references to the fact that investigators

obtained trading records and were examining them — even if they were procured by grand

jury subpoena — cannot support an inference that the source revealed any *information*

---

[14]    In support of this argument, Walters cites to the May 30 WSJ Article, the May 30 NYT Article, the May 31 NYT Article, and the June 11 NYT Article.

48

contained in those records, as is required to demonstrate that a disclosure includes a "matter occurring before the grand jury." *See Skelos*, 2015 WL 6159326, *10 (finding that the details in news reports did not "clearly pertain to the secret aspect of the inner workings of the grand jury") (internal citations and quotation marks omitted); *Rosen*, 471 F. Supp. 2d at 656 (requiring a disclosure of "detailed and specific information").   Accordingly, to the extent that any of the articles simply referenced records of trading in Clorox — some of which related to *public* reports of unusual trading in Clorox in 2011 in any event, *see* May 30 WSJ Article (including chart noting "unusual trading in Clorox options" on July 11, 2011); May 30 NYT Article — no information contained in those records was reported in any of the articles.

Moreover, the information contained in certain articles about Mickelson's and Walters' trading in Dean Foods in 2012, including their profits, were not matters occurring before the grand jury insofar as the relevant trading records in the Government's possession were initially obtained from the SEC pursuant to the grant of an access request letter. Because these documents were obtained as part of the Government's separate criminal investigation, they were therefore not subject to the secrecy protections of grand jury material and cannot be the basis of a Rule 6(e) violation.  *See Skelos*, 2015 WL 6159326, *10 ("Information produced by a criminal investigation that parallels but is independent of a grand jury investigation is not subject to Rule 6(e) provisions on disclosure." (citing *In re Grand Jury Subpoena*, 103 F.3d at 238) (internal quotation marks and punctuation omitted)).[15]

---

[15]     After receiving the trading records from the SEC, and before the news reports were published, the Government received additional materials related to Mickelson's trading pursuant to grand jury subpoena that were duplicative of the records received from the SEC. After the news reports, the Government received additional materials related to Walters' trading records for 2012 pursuant to grand jury subpoena that were also duplicative of the records received from the SEC.   (Kasulis Decl. ¶ 5.)

<u>Phone Records</u>

Similarly, none of the references to phone records in any of the articles reveals any *information* contained in the phone records; rather, the references simply indicated that investigators were reviewing phone records, without revealing more.[16]  *See* May 30 NYT Article (investigators examining phone records); May 31 NYT Article ("[A]uthorities have pored over phone records, the people briefed on the matter said, seeking to line up Mr. Icahn's calls to Mr. Walters with the trading in Clorox.")   Thus, the information in the publications about phone records cannot be categorized as a "matter occurring before the grand jury" because the articles merely disclosed the fact that investigators obtained and reviewed phone records, not any information contained therein.

<u>The Government's Thinking and Theory of the Case</u>

Courts have consistently held that statements related to a prosecutor's theory or opinion is not a "matter occurring before the grand jury," even if it is based on grand jury information and even if it relates to the likelihood of charges being filed against identified individuals.  *See In re Sealed Case No. 99-3091*, 192 F.3d at 1003 ("[I]nternal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material."); *Barry*, 865 F.2d at 1320 (noting that U.S. Attorney's detailed comments about the investigation was "not tied to any of the matters occurring before the grand jury"); s*ee also In re Grand Jury Investigation (Lance)*, 610 F.2d at 217 (statement of opinion as to individual's potential criminal liability, even if it relies on grand jury material, does not violate Rule 6(e), provided that the statement does not reveal grand jury information on which it is based).

---

[16]     Notably, the Government can obtain telephone records in ways other than from grand jury subpoena, including pen registers, which were used in this case, orders pursuant to 18 U.S.C. § 2703(d), and administrative subpoena by a law enforcement agency.

Here, Walters cites to typical investigative patterns of insider trading cases unrelated to this investigation and generalized summaries of the focus of this investigation included in the articles, none of which reveal grand jury material or proceedings. *See* May 30 NYT Article (identifying "one initial theory" that Walters passed inside information to Mickelson); May 31 NYT Article (federal authorities "exploring a theory" that Walters passed inside information to Mickelson; describing "tactics" used in other insider trading investigations); June 11 NYT Article (identifying theory that a source inside Dean Foods provided a tip to Walters related to the WhiteWave spinoff). Even if the information concerning theories or tactics reported in these articles relied upon documents or materials obtained through a grand jury investigation, and it is not clear that it does, the generalized references to the Government's thinking did not include any detailed or specific information from any grand jury materials and is therefore insufficient to support a *prima facie* showing of a Rule 6(e) violation.

<u>The Government's Use of Other Investigative Techniques</u>

Similarly, Walters argues that, as reflected in the June 2 WSJ Article, "[i]t appears that the reporters may have been briefed in some way about the government's earlier use of pen registers or other surveillance techniques, and specifically told the reason wiretaps could not be used on Mr. Icahn's phone." (Def. Mot. at 29.) Even if such disclosures had been made, information about investigative techniques such as pen registers, surveillance, or wiretaps would pertain to a criminal investigation and are plainly not a "matter occurring before the grand jury." *See Skelos*, 2015 WL 6159326, *10 ("Since the disclosures cited by Defendants refer to information that could have been discovered in the course of either investigation and do not pertain specifically to the workings of the grand jury itself, Defendants have failed to demonstrate that there was a violation of grand jury secrecy."); *see also In re Sealed Case No. 99–3091*, 192 F.2d at 1002 ("It is therefore necessary to

51

differentiate between statements by a prosecutor's office with respect to its own investigation and statements by a prosecutor's office with respect to a *grand jury's* investigation, a distinction of the utmost significance.") (emphasis in original).



The Dean Foods Grand Jury Subpoena

For reasons explained above, reporting on the fact that the Government issued a grand jury subpoena, without more, is insufficient to make out a *prima facie* showing. *See* June 23 NYT Article; June 23 WSJ Article.  Moreover, not only were these articles devoid of any *information* obtained from a subpoena, but both articles also explicitly stated that the publications did not know what documents were requested, further undermining any argument that a "matter occurring before the grand jury" was revealed.

Accordingly, none of the information reported in the seven newspaper articles revealed a "matter occurring before the grand jury."  For this reason, Walters fails to make a *prima facie* showing of a violation of Rule 6(e).

        b.  *Walters Fails to Show that the Source of Information Was An Official for the Government*

There is yet another reason why Walters cannot make a *prima facie* showing: He cannot show that the source of the information contained in the articles was an agent or

attorney for the Government, and not others who also had access to the reported information. For this reason, as well, his argument fails.

In all of the articles cited by Walters, the sources of the information about the investigation were uniformly non-specific, such as "people briefed on the probe" or "people familiar with the matter." Indeed, none of the articles ever linked a source directly to the Government. *See Barry*, 865 F.2d at 1320 (drawing distinction between "sources" and "Government sources"); *In re Grand Jury Investigation (Lance)*, 610 F.2d at 218 (noting that, absent any clear indication from the nature of the material, references to "sources close to the investigation" are insufficient to determine a link to the Government). Moreover, three of the articles reported that representatives of the Government declined to comment. *See* May 30 WSJ Article (FBI declined to comment about Mickelson's lawyer's statement;); May 30 NYT Article ("Federal authorities declined to comment."); June 23 NYT Article (noting that spokesman for the U.S. Attorney's Office and the FBI declined to comment). In addition, the only reference to the term "grand jury" in any of the articles was a quote from a former federal prosecutor in the May 31 NYT Article about the investigation's hypothetical future steps. *See Rosen*, 471 F. Supp. 2d at 656 (noting that "the existence of a grand jury is not even mentioned" in finding that information sourced to "government officials" and "law enforcement sources" was not sufficiently detailed and specific to fall under the category of "matters occurring before the grand jury" as opposed to a parallel criminal investigation). These references are insufficient to make a *prima facie* showing that the source of the information was an attorney or agent for the Government. *See Skelos*, 2015 WL 6159326, *11 ("[N]one of the news articles or the letter indicates that a government attorney or agent was the source of the information, and at least one explicitly states that the U.S. Attorney's Office and FBI representatives declined to comment."); *see also Rioux*, 97 F.3d at 662 (noting that "[m]ost of the media surrounding the Rioux investigation either: (1) failed to

53

identify the source as one proscribed under Rule 6(e); or (2) discussed federal

'investigations,' without actually discussing matters before the grand jury.").[17]

 Moreover, notwithstanding the fact that each of the articles referenced the existence

of both criminal and civil investigations[18] — which Walters independently knows from the

fact that the SEC sued him in a parallel civil action — Walters does not even acknowledge,

much less attempt to address, the fact that civil regulators and others had access to certain of

the information about the investigations included in the articles.  In this case, FINRA and the

SEC conducted separate civil investigations and obtained documents, including phone

records and trading records, through their own civil process, as Walters knows from a review

of Rule 16 discovery in this case.  Civil regulators are not bound by Rule 6(e) and are not

subject to grand jury secrecy rules.  Nor are the recipients of SEC or grand jury subpoenas

obligated to keep them confidential — another fact with which Walters does not grapple.  In

any event, given the vague sourcing discussed above, and others' access to the information,

Walters cannot show that the information was "likely" provided to the media by a

Government official.[19]  *See Rioux*, 97 F.3d at 662.

---

[17] To the extent that the Court could draw an inference that a Government official was the source of information particular to a criminal investigation — such as information concerning surveillance, wiretaps, or even the issuance of a grand jury subpoena to Dean Foods — that information is not grand jury material, as explained above.  In addition, it is not at all clear that a Government official disclosed the fact of a subpoena to Dean Foods.  According to the June 23 NYT Article, a spokesperson for both the U.S. Attorney's Office and the FBI declined comment, whereas a spokesperson for Dean Foods did provide a comment.

[18] *See, e.g.*, June 2 WSJ Article (noting "criminal and civil investigations"); June 11 NYT Article ("The F.B.I. is pursuing a criminal investigation, while the S.E.C. is running a parallel civil inquiry.").

[19] In addition, information could have come from other sources as well, such as lawyers for Mickelson who are quoted in a number of articles and could have provided background information to the reporters about their understanding of the investigation.  *See, e.g.* June 2 WSJ Article (reporting that Mickelson's attorney had spoken to an FBI agent).

In fact, the natural and logical inferences lead to the conclusion that the source was not a Government official.  As several of the articles note, and contrary to the illogical arguments proffered by Walters, disclosure of even the existence of the investigation, much less details about it, ran counter to the goals of the investigation while a potential target's cellphone was being intercepted by a court-authorized wiretap.  *See* May 30 WSJ Article ("[P]ublicity of the probe could jeopardize the government's ability to put together any potential case . . . by limiting its ability to covertly gather evidence."); June 2 WSJ Article ("News of the probe detailed government efforts to secretly deploy wiretaps."); *see also* Kasulis Decl. ¶ 11 (confirming disclosure of the investigation was a "significant negative development").  The SEC, however, did not know about the Government's wiretap on Walters' cellphone at the time the stories were written.[20]  (Kasulis Decl. ¶¶ 7, 13.)

Walters bears the burden of demonstrating that the source of this information was a Government official with access to grand jury information.  Here, where the published reports merely include generalized references to the sources of the information and others, including civil regulators, also had access to any information that might have been obtained pursuant to grand jury subpoena, Walters cannot meet this burden.  For this reason, as well, Walters fails to make a sufficient *prima facie* showing that a violation of Rule 6(e) occurred.

   c. *Even if Walters Could Make a Prima Facie Showing, a Government Affidavit Sufficiently Rebuts the Defendant's Case and Eliminates the Need for a Hearing*

Even if Walters were able to make a *prima facie* showing, which he cannot, the declaration submitted under oath by the prosecutor principally responsible for the investigation in May and June 2014 rebuts any notion that a Government attorney or agent

---

[20] To the Government's knowledge, FINRA's investigation into suspicious trading in Clorox and Dean Foods was completed by the time the news articles were published, although FINRA had access to trading records for both stocks.

provided grand jury material to the press.[21]  In this declaration, AUSA Kasulis affirms that

neither he nor the FBI case agent responsible for the investigation revealed to the press any

information related to the investigation.  (Kasulis Decl. ¶ 17.)  Accordingly, even if Walters

could make a *prima facie* case of a Rule 6(e) violation, the Court should deny his request for

a hearing.  *See Skelos*, 2015 WL 6159326, *11 (relying on affidavit affirming that

Government attorneys and investigating agents did not speak to the press in denying the

defendant's request for a Rule 6(e) hearing).

### 3. None of the Alleged Misconduct Resulted in Prejudice to Walters, and Thus His Requests for a Hearing and a "Windfall" Remedy Should Be Denied.

Separate and apart from his failure to identify misconduct in connection with the

wiretap materials or to state a *prima facie* case of any Rule 6(e) violation, Walters does not

— and cannot — claim that he has suffered any actual prejudice, and thus his request for a

hearing must be denied.  *Bank of Nova Scotia*, 487 U.S. at 254; s*ee also United States* v.

*Eisen*, 974 F.2d 246, 261 (2d Cir. 1992) ("a defendant seeking reversal or a hearing regarding

alleged grand jury abuse must show prejudice or bias"); *United States* v. *Friedman,* 854 F.2d

535, 583-84 (2d Cir. 1988) (not error to deny post-trial relief for alleged grand jury leaks

without holding a hearing in the absence of showing of prejudice).  Rather than

demonstrating that he can meet the threshold showing of prejudice, Walters asks the Court to

grant him a fishing expedition of a hearing to *determine* whether he has been prejudiced and

to fashion a remedy to prevent any future prejudice.  (Def. Mot. at 36, 40.)  He then further

suggests — with no relevant support — that following that hearing, it may be proper for the

---

[21]     In addition to relying on a declaration to rebut a *prima facie* case, some courts have
considered such an affidavit as part of analyzing whether a defendant has made a *prima facie*
case at all.  *See Skelos*, 2015 WL 6159326, *11 (citing *Rioux*, 97 F.3d at 662).

Court to use its supervisory powers to grant additional discovery, issue pre-trial evidentiary rulings, fashion curative instructions to the jury, or even dismiss the indictment.[22]

Walters' arguments are transparent.  Rather than claiming actual prejudice from any of the misconduct he has alleged and seeking a remedy appropriately tethered to that alleged misconduct, as the law requires, Walters seeks a hearing to explore theories of hypothetical prejudice in what appears to be effort to gain an impermissible "windfall" of a remedy.  *See In re United States,* 441 F. 3d at 60-61.  For example, the defendant does not claim any actual prejudice with respect to the wiretap Reauthorization Application, which he alleges was secured through misstatements to the court.  Rather, Walters actually asserts that he is *not* prejudiced by the calls intercepted by the wiretap, claiming instead that the "defense does not believe the calls between Mr. Walters and Mr. Davis are in any way incriminating of Mr. Walters."  (Def. Mot. at 33.)  Thus, instead of asking the Court to suppress the intercepted calls — which would be the logical remedy to the misconduct he alleges — the defendant seeks a hearing to explore his speculative, unfounded theory that the calls may have been

---

[22]     The cases the defendant cites in support of his request that the Court invoke its supervisory powers all reflect clear, demonstrable prejudice to the defendant.  Further, the allegations of misconduct here, even if true (which they are not), do not rise anywhere close to the alleged misconduct in the cases to which Walters directs the Court.  By example, these cases include allegations of a Government agent sleeping with a defendant (*United States* v. *Cuervelo*, 949 F. 2d 559, 565 (2d Cir. 1991)); Government actors allegedly manipulating the attorney client-relationship to induce a defendant's attorney to make inculpatory recordings and otherwise gather evidence against the defendant (*United States* v. *Sabri*, 973 F. Supp 134 (W.D.N.Y. 1996) and *United States* v. *Voight*, 89 F.3d 1050 (3d Cir. 1996)); the alleged use of perjured testimony before the grand jury (*United States* v. *Soberon*, 929 F. 2d 935 (3d Cir. 1991)); a prosecutor's failure to disclose exculpatory evidence (*Gov't of Virgin Islands* v. *Fahie*, 419 F. 3d 249 (3d Cir. 2005)); the alleged failure to disclose that the Government had acted illegally in procuring a green card for a cooperating witness (*United States* v. *Ross,* 372 F. 3d (9th Cir. 2004)); and allegations that Government agents kidnapped the target of a criminal investigation (*United States* v. *Toscanino*. 500 F. 2d 267 (2d Cir. 1974)).  The defendant's reliance on these cases is, at best, misguided.

used to induce Davis to cooperate — a theory that is directly refuted by the facts of this case. (Kasulis Decl. ¶ 19).  This request should be swiftly rejected.

Nor does the defendant claim (much less show) that he has suffered actual prejudice from any alleged grand jury leak.[23]  Thus, given that the Court must apply a harmless error standard when deciding whether to invoke its supervisory powers, and because even assuming the defendant's allegations of misconduct were true (which they are not) the defendant has suffered no prejudice as a result of the alleged misconduct, his request for a hearing and an unspecified remedy should be denied.  *See United States* v. *Sophie,* 900 F. 2d 1064, 1071 (7th Cir. 1990) ("A district court does not have to hold an evidentiary hearing on a motion just because a party asks for one.").

---

[23]    Even if the defendant could make such a showing (which he cannot), and the Court found that such a knowing violation occurred (which it did not), the next step in the inquiry would be to consider whether it would be appropriate to impose contempt sanctions.  Fed. R. Crim. P. 6(e)(7).  The Government submits that, on the facts here, contempt sanctions would not be appropriate.  The alleged leaks occurred over two years ago, there is no allegation of ongoing leaks, and thus no need to issue injunctive relief; nor does the alleged misconduct — even taking all of the defendant's allegations as true — rise to the level of warranting sanctions intended to punish Government actors.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's motions in their entirety.

Dated: New York, New York                      Respectfully submitted,
      October 21, 2016

                                       PREET BHARARA
                                       United States Attorney

                    By:    /S/ Daniel S. Goldman
                                    Daniel S. Goldman
                                    Brooke E. Cucinella
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2289/2477