

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 16, 2016

**BY HAND**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York          **FILED *EX PARTE***
Daniel Patrick Moynihan                **AND UNDER SEAL**
   United States Courthouse
500 Pearl Street, Chambers 1020
New York, New York 10007

     **Re:**   *United States* **v.** *Walters*,
             S1 16 Cr. 338 (PKC)

Dear Judge Castel:

     The Government respectfully writes, *ex parte* and under seal, to provide the Court with additional details regarding the inquiry undertaken by the U.S. Attorney's Office (the "USAO") in response to the Court's November 17, 2016 Order, into leaks of confidential information to *The New York Times* and *The Wall Street Journal* regarding the investigation that ultimately led to the indictment in this matter (the "Investigation").

     As described below, a significant development in our inquiry occurred on December 6, 2016, when an FBI Special Agent (the "Special Agent"), during an in-person interview with the USAO and attended by counsel for the FBI, admitted that in 2013 and 2014, he was a significant source of confidential information regarding the Investigation for the *Times* and *Journal*. The Special Agent admitted to providing confidential information to reporters without the knowledge or consent of the USAO. The Special Agent furthermore admitted that, prior to December 6, 2016, he had never informed his superiors at the FBI, or anyone else at the FBI, about his private communications with reporters regarding the Investigation. On December 8, 2016, the FBI referred the Special Agent's conduct to its Office of Professional Responsibility. In addition, on December 15, 2016, the USAO separately referred this matter to the Office of Inspector General for the Department of Justice. Both matters are now pending.

     It is now an incontrovertible fact that FBI leaks occurred, and that such leaks resulted in confidential law enforcement information about the Investigation being given to reporters.

     This *ex parte* submission sets forth details regarding the inquiry the USAO undertook and a summary of what we learned, including the limitations of what we were able to learn. We then

address why the USAO, based upon its review of the available information, is unable to say with certainty whether a violation of Federal Rule of Criminal Procedure 6(e) occurred.

It is precisely because we cannot say with certainty whether a Rule 6(e) violation in fact occurred that we also cannot conclusively rebut the *prima facie* case that leaks to the media involved a Rule 6(e) violation. Accordingly, we believe that the appropriate course is for the Court to assume that a Rule 6(e) violation occurred and proceed to consider the issue of remedy. *See In re Sealed Case*, 151 F.3d 1059, 1068 (D.C. Cir. 1998) (explaining that where the Government cannot rebut a prima facie case that a Rule 6(e) violation occurred, a violation is deemed to have occurred and a court should proceed to consider the appropriate remedy to deter further leaks).

Given the seriousness of this matter, we want the Court to have the relevant facts surrounding the leak as we currently understand them. We stand ready to supply the Court with any additional information and to answer any questions the Court may have.

## A. Our Inquiry

In preparation for the hearing ordered by the Court, the USAO undertook to identify those individuals involved in the Investigation, the individuals likely to have had contact with the press regarding the Investigation during the relevant time period (i.e., April 1, 2014 through June 30, 2014), and the individuals to whom they reported. We then collected and reviewed thousands of emails and text messages, and records of phone calls sent or received by those individuals during the relevant time period.

After collecting and reviewing that material, we interviewed from the USAO:

- Preet Bharara, the United States Attorney,
- Richard B. Zabel, then the Deputy United States Attorney,
- Joon H. Kim, the current Deputy United States Attorney, and then Chief Counsel to the U.S. Attorney,
- Anjan Sahni, then the Chief of the USAO Securities and Commodities Fraud Task Force (the "Task Force"),
- Katherine R. Goldstein, the current Chief of the Task Force, and then the Deputy Chief,
- Telemachus P. Kasulis, the current Co-Chief of the Task Force, and then the Assistant U.S. Attorney primarily responsible for the Investigation, and
- James M. Margolin, the USAO Chief Public Information Officer.

Each of those individuals unequivocally denied involvement in the leaks at issue. In addition, Kasulis reaffirmed the accuracy of the affidavit he previously had submitted to the Court.

From the FBI, we interviewed:

- George Venizelos, then the Assistant Director in Charge ("ADIC") of the FBI's New York Field Office ("NYFO"),
- Richard Frankel, then the Special Agent in Charge of the Criminal Division of the NYFO,
- Douglas Leff, then an Assistant Special Agent in Charge and The Special Agent's direct supervisor,
- the Special Agent,
- Christos Sinos, then the Supervisory Special Agent who led the NYFO's media program,
- J. Peter Donald, then an NYFO media representative, and
- Matthew Thoresen, the case agent primarily responsible for the Investigation.

Of these FBI personnel, only the Special Agent has admitted to involvement in the leaks. Four other individuals acknowledged their participation in a May 27, 2014 meeting with the *Journal*—at which the FBI asked the *Journal* to delay publication of its story on the Investigation—but viewed their participation in that meeting as having been appropriate.

**B.     Summary of What We Learned**

Below we detail, in the form of a timeline, what we have learned from our inquiry. First, we provide the following high-level points:

- We have found no evidence indicating that anyone from the USAO participated in the leaks. To the contrary, the available information uniformly indicates that the USAO was not a source of confidential information provided to reporters about the Investigation. Members of the USAO, at all levels, were distressed by the leaks, as corroborated by contemporaneous emails and our interviews.

- The Special Agent has admitted that, in 2013 and 2014, he was a repeated source of information regarding the Investigation to as many as four reporters: Matthew Goldstein and Ben Protess at the *Times*, and Susan Pulliam and Michael Rothfeld at the *Journal*.

   That said, much about the scope and content of the information that the Special Agent leaked to reporters remains unclear. While phone logs reflect the timing of some of the Special Agent's communications with the press, and certain text messages suggest the content of certain phone calls, there are no contemporaneous documents reflecting what the Special Agent told the press on any occasion. In our interviews of him,[1] the Special Agent admitted to providing certain confidential information to the press. His tone was contrite and he acknowledged never informing the USAO or the FBI about his leaks to

---

[1] We interviewed the Special Agent on December 6 and 8, 2016, for multiple hours on each date. We had scheduled a third interview of the Special Agent for December 13, but were informed that day that the Special Agent had become unavailable. We were recently informed that the Special Agent has retained counsel.

3

the press at any time before our first meeting with him on December 6. However, the Special Agent also denied having provided all of the confidential information regarding the Investigation that appeared in those newspapers during the relevant time period, and at times stated that he could not recall whether certain information came from him or whether he had reviewed certain records at the time.

During our interviews of him, the Special Agent was not entirely consistent on certain key points, and we are not in a position to vouch for his credibility.

- It appears that in early May 2014, *Journal* reporter Pulliam first alerted the FBI press office that she possessed substantial information about the Investigation and was planning to write a story. Following that notification, the FBI sought to dissuade Pulliam and the *Journal* from publishing the story, including by agreeing to meet with *Journal* staff on May 27, 2014. That meeting was attended by Frankel, Leff, the Special Agent, Sinos and Donald on behalf of the FBI, and Pulliam, Rothfeld and an editor on behalf of the *Journal*. As set forth below, there are differing accounts of what members of the FBI said to reporters at that meeting. The USAO did not participate, had counseled against having the meeting, and, when it was clear the meeting was going to take place, cautioned the FBI not to disclose or confirm any confidential information, either directly or indirectly.

- In June 2014, *Times* reporter Protess told Zabel (then the Deputy U.S. Attorney) that Protess's sources (whom he did not name) on the Investigation included a man at the FBI and someone at the U.S. Securities and Exchange Commission ("SEC").

- The leaked information that appeared in *Journal* and *Times* articles in May and June 2014 caused then-ADIC George Venizelos to issue warnings and directives within the FBI about speaking with the *Journal* and *Times* reporters. The Special Agent admitted that, even after those warnings and directives, he engaged in further communications with the press about the Investigation, without the knowledge or authorization of the FBI or the USAO.

## C.   A Timeline of Events

Below, we set out a rough chronology of events that we believe occurred during the relevant time period, and the information that led us to form that belief. Wherever possible, we have set out what we learned from the Special Agent, and what we learned from independent evidence.

### 1.   2013 to April 2014: The Special Agent First Mentions the Investigation to the Press

The Special Agent told us that in approximately April 2013, believing the Investigation to be dormant, he told *Times* reporters Goldstein and Protess about the Investigation over dinner. The Special Agent admitted telling the *Times* reporters about an investigation involving ▮

███████████████████████ William T. Walters, the defendant. The Special Agent could not recall whether he mentioned ███████ at that dinner.

According to the Special Agent, about five or six months later, in or about late 2013, he had lunch with *Journal* reporter Pulliam. The Special Agent believed that Pulliam mentioned ████████████████, and that the Special Agent then told Pulliam that the FBI was investigating ██████████████ Walters, ████████. The Special Agent asked Pulliam to let him know if she came across information regarding Walters. The Special Agent did not recall mentioning ██████ at that lunch, but believed that ████████████████████████, the Special Agent must have mentioned it at some point.

The Special Agent said that from then on, Pulliam would from time to time call the Special Agent to describe what she was learning regarding Walters ████████████. According to the Special Agent, he would at times tell Pulliam—and the *Times* reporters—to "check your sources," suggesting that something the reporter had learned was incorrect.

As the Investigation began to gain momentum, the Special Agent told us that he became uncomfortable with Pulliam's questions and stopped responding to her phone calls. Based on his review of his text messages, the Special Agent believes he stopped responding to Pulliam in or about April 2014 or shortly before. Phone records show that Pulliam left voicemail messages for the Special Agent on April 2 and 3, but we do not have the content of those messages. The Special Agent told us that Pulliam also emailed articles to a personal email account.

2. **April 2014: The Special Agent's Dinner and Calls with the *Times* Reporters**

The Special Agent acknowledged having had dinner with three *Times* reporters in April 2014, including Goldstein and Protess. According to the Special Agent, after some small talk, the *Times* reporters began asking questions about the Investigation. The Special Agent said that, at this dinner, the *Times* reporters knew that the Investigation also ████████████████. Though he is unsure, it is likely that the Special Agent first mentioned ██████ to the *Times* reporters, whether at this dinner or before. The Special Agent said that he told the *Times* reporters that the FBI was investigating a number of different stocks in which Walters ████████████████ had invested.

Records of text messages between the Special Agent and Goldstein corroborate that the Special Agent had dinner with at least Goldstein on April 17, 2014.

Text messages and phone logs also show that the Special Agent likely had multiple phone calls with Protess later in April 2014, including an approximately 21-minute phone call with Protess on April 20.

3. **May 6, 2014: The Special Agent and Donald Meet with Pulliam**

Emails and text message records demonstrate that Donald (then an NYFO media representative), the Special Agent, and Pulliam met for coffee on May 6, 2014, at Pulliam's initiation. Donald invited the Special Agent to attend with him.

5

According to Donald, toward the end of the meeting, Pulliam asked them about the Investigation. While not remembering specifics, Donald recalled that Pulliam had a high level of detail about the investigation. According to Donald, neither he nor the Special Agent confirmed or commented on anything Pulliam said. Donald remembered the Special Agent telling Pulliam at the conclusion of the meeting that he had no idea what she was talking about.

According to the Special Agent, at the time of the meeting over coffee, Pulliam had a good sense of the Investigation, the relationships of its subjects, and the stocks involved. According to the Special Agent, he and Donald confirmed that the FBI was working on the investigation with the SEC. The Special Agent believed they said nothing else about the investigation to Pulliam. The Special Agent remembered Pulliam telling them that she planned to publish something and Donald asking her to wait to do so and to allow them to discuss it.

### 4. May 13, 2014: The *Journal* Agrees to Hold Publication Until May 22, 2014

Emails show that on May 13, 2014, Donald called the *Journal* and the paper agreed to hold publishing its story until May 22, and that the *Journal* was open to listening about the need to hold off longer. Donald does not have a strong recollection of that call.

### 5. May 22 and 23, 2014: The FBI and the USAO Discuss the FBI's Decision to Meet with the *Journal* to Ask It to Continue to Hold Publication

According to emails and witnesses, the *Journal* asked to meet with the FBI to discuss continuing to hold the story. The FBI was inclined to meet with the paper, but first sought the USAO's opinion. According to contemporaneous emails, and as corroborated by our interviews of current and formers members of the USAO and of Frankel (then the FBI's Special Agent in Charge of the New York Criminal Division), the USAO was opposed to such a meeting and counseled against it. However, the USAO did not believe it could forbid the FBI from meeting with the *Journal*, and the FBI ultimately decided to proceed with the meeting. When it became clear that the FBI intended to go forward despite the USAO's recommendation to the contrary, the USAO warned the FBI not to comment on the Investigation, and simply to seek the paper's agreement to hold publication.[2]

### 6. May 27, 2014: The FBI Meets with the *Journal*, and Later Learns the *Times* Also Is Investigating

Emails make clear that the Special Agent, Leff, Frankel, Sinos, and Donald met with Pulliam, Rothfeld, and an editor on May 27. What is not clear is precisely what occurred at that meeting.

---

[2] The Special Agent, Donald, and Leff believed that, despite some initial reservations, by the time of the FBI's meeting with the *Journal*, the USAO concurred with the FBI's decision to meet with the paper.

The Special Agent told us that he assumed that, in preparing for the meeting, the FBI personnel had discussed their willingness to discuss some aspects of the investigation—though nothing related to the grand jury or wire intercepts—in exchange for the *Journal* agreeing to continue to hold publication.  Specifically, the Special Agent recalled that the FBI was prepared to discuss the subjects of the Investigation—including Walters ███████████████—the stocks and trades involved, and other investors and avenues of investigation.  However, the Special Agent described the "plan" as to provide as little information as possible to persuade the *Journal* to hold the story.

The Special Agent's assumption and recollection is contradicted by other FBI witnesses, who stated that the FBI was not prepared and would not have been willing to provide the *Journal* with information related to the Investigation.

As to the meeting itself, the Special Agent told us that the FBI personnel present confirmed various aspects of the investigation, consistent with the strategy as the Special Agent claimed to remember it.  For example, the Special Agent recalled one of the *Journal* reporters asking whether the FBI was employing wiretaps, and someone from the FBI (but not him) responding that they could not discuss that and were considering using all sophisticated surveillance techniques available.  In sum, the Special Agent recalled the FBI providing just enough information in response to the *Journal* reporters' questions to persuade the paper to hold publication of the story.

Sinos (then the Supervisory Special Agent who led the NYFO's media program) vaguely remembered the FBI confirming certain information the *Journal* reporters described, and also telling the *Journal* reporters that some of the information they had described was incorrect.  Sinos recalled almost no details of the meeting.

However, the Special Agent's recollection is contradicted by two other FBI witnesses present, Leff and Donald, who stated that, at the meeting, the FBI asked the *Journal* to hold the story, but told the reporters nothing about the Investigation.  Moreover, the Special Agent gave a somewhat different account to Thoresen (the case agent) of the May 27 meeting.  According to Thoresen, shortly after the May 27 meeting, the Special Agent told him that the FBI had not provided details of the Investigation to the *Journal* at that meeting.

According to multiple witnesses, the FBI did agree to tell the *Journal* if the FBI learned that another news organization was looking at a similar story.  Of course, as described above, the Special Agent knew at that time that the *Times* also was working on a story regarding the Investigation, but he did not disclose that fact.

According to emails and witnesses, later that day, May 27, the USAO learned from the SEC that the *Times* was looking into the Investigation.  According to emails, one or more of the *Times* reporters had reached out to an SEC lawyer and asked questions about the Investigation.  The USAO immediately notified the FBI, which in turn alerted the *Journal* the same day.

Because of the imminent news stories, the USAO and the FBI had to change course in the Investigation, and immediately began to plan for agents to approach Mickelson and Thomas

7

Davis on May 29, 2014, ahead of publication and earlier than they had previously contemplated. In a May 28, 2014 email to the Special Agent, Thoresen wrote, "Whomever is leaking[] apparently has a specific and aggressive agenda in that they are now going to other media outlets in an effort to derail this investigation." (Ex. A.) The Special Agent does not appear to have responded.

### 7.     May 29, 2014: Rothfeld Calls Zabel

According to emails and our interview of him, Zabel spoke to *Journal* reporter Rothfeld on May 29, 2014. (Ex. B.) Specifically, Rothfeld told Zabel that Rothfeld knew the USAO and the FBI were investigating ▆▆▆. Zabel "gave a lot of no comments but listened." Zabel sensed that Rothfeld was "struggling with how to explain the insider trading theory and wanted to discuss it which I declined to do." (*Id.*) Rothfeld also "mentioned ▆▆▆ Walters ▆▆▆▆▆▆," and "said the 'whole thing began with ▆▆▆.'" (*Id.*)

### 8.     May 30, 2014: The *Journal* and *Times* Publish Their First Stories

On May 30, 2014, the *Journal* notified the FBI that it planned to run a story about the Investigation, and that story was published online later that day. According to emails and witnesses, upon reading the article, Venizelos instructed Frankel, the Special Agent, Sinos, and Donald not to speak to the *Journal* reporters again. (There is no indication that Venizelos knew that the Special Agent had spoken to the *Journal* reporters in the past. Rather, Venizelos's instruction appears to have been aimed primarily at the FBI press office and to ensure that no one spoke to the *Journal* reporters moving forward.) According to emails and witnesses, Venizelos threatened to discipline and/or reassign anyone who spoke to the *Journal* reporters in the future. (Ex. C at 1.)

The *Times* also published its first story on May 30, shortly after the *Journal* had done so. Donald told us that he spoke to the *Times* reporters on May 30, around the time the *Times* published its story online. According to Donald, the *Times* reporters were incensed that the *Journal* had scooped them, and asked Donald why the FBI had notified the *Journal*, since the *Times* reporters had not made a formal inquiry of law enforcement. Donald remembered being puzzled by that question, because it sounded to him like the *Times* reporters knew of the agreement between the FBI and the *Journal* (whereby the *Journal* agreed to hold publication in return for a commitment from the FBI that it would notify the *Journal* if another news agency inquired about the Investigation). Donald also remembered that the *Times* reporters had the entire story and even more details about the Investigation than the *Journal*. Based on his conversations with the *Times* reporters on May 30, Donald believed that the *Times* reporters had been working on the story longer than the *Journal*. Based on emails and interviews, it also appears that on May 30 the *Times* reporters knew something about the Government's wiretap, though it is unclear what.

Though the Special Agent initially told us he did not remember providing information to the *Times* reporters about the FBI's agreement with the *Journal*, upon review of certain of his text messages and phone logs, he agreed that that may have been what occurred.

9. **May 31 to June 1, 2014: The *Times* and *Journal* Each Publish a Second Story, and the USAO and FBI Senior Management Are Increasingly Outraged**

The following day, May 31, 2014, the *Times* published another article on the Investigation, which largely repeated information included in the articles from the previous day. And on June 1, 2014, the *Journal* published its second article on the Investigation.

Emails show that on June 1, the *Journal* article was circulated to multiple FBI personnel, who generally found it disturbing. In an email to Assistant U.S. Attorney Kasulis, Thoresen described the article as "deplorable and reprehensible." (Ex. D.)

The article also was circulated within the USAO on June 1. U.S. Attorney Preet Bharara forwarded the story to Venizelos, writing, "I know you agree these leaks are outrageous and harmful. Let me know what action you want to take together." (Ex. E.) Venizelos forwarded the story and the U.S. Attorney's email to the Special Agent, Frankel, Sinos, Donald, and another supervisory agent, writing, "This new article takes a 'not good' situation to a 'bad' one. This is now an embarrassment to this office. . . . We have issues to deal with and they will be address[ed] approp[r]iately." (*Id.*) Venizelos also instructed the agents to meet with him first thing the next morning, Monday, June 2.

According to witnesses who participated in those June 2 meetings, Venizelos was extremely angry about the leaks, and again explicitly directed the agents not to speak to any of the reporters involved.

In addition, Thoresen recalled that, in the days after the *Times* and *Journal* published their second articles, the Special Agent apologized to him, saying, in sum, that he (the Special Agent) felt partly responsible for the articles given what had been said at the FBI's May 27 meeting with the *Journal*. The Special Agent did not tell Thoresen about his other contacts with the *Times* and *Journal*.

10. **Post-June 2, 2014: the Special Agent Continues to Talk to the *Times* Reporters on a Personal Cellphone and Deletes His Personal Email Account**

The Special Agent also admitted that, despite Venizelos's explicit directive that no one speak to the *Journal* or *Times* reporters, the Special Agent continued to do so. The Special Agent admitted that he told the *Times* reporters that he could no longer speak to them on his work cellphone, and, at their request, gave them his personal cellphone number. The Special Agent also told us that he needed a way to contact the *Times* reporters after Venizelos had forbidden anyone from doing so, and therefore used his personal cellphone. The Special Agent believed that he spoke to the *Times* reporters on his personal cellphone sometime between on or about June 2 and June 11, the date the *Times* published its correction article. The Special Agent was unsure whether he spoke to the *Times* reporters on his personal cellphone after the publication of the June 11 article.

The Special Agent also said that, around that same time, he deleted a personal email account in part because he did not want Pulliam to be able to contact him at that address.

**11.    June 11 to 12, 2014: The *Times* Runs a Correction Article, and Protess and Zabel Discuss It Afterwards**

As mentioned above, on June 11, 2014, the *Times* published another article on the Investigations, principally aimed at correcting misstatements in previous reporting about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, which had never occurred according to "four people briefed on the matter."[3]

The next day, June 12, Zabel had what he described in an email as an "astonishing" conversation with Protess. (Ex. F.) Zabel told us that he generally recalled the conversation as it was described in his June 12 email. In the email, Zabel wrote that Protess "was quite upset to have to walk back his story and blames an FBI person (and it sounds like an agent) whom he sa[]ys they have confirmed lied to the NYT and some other news orgs." (*Id.*) Per the email, Protess "had corroborated the ▓▓▓ info (the subject of the lie) with an SEC person who had confirmed it mistakenly and has now acknowledged the mistake." (*Id.*) Protess also "said he thinks the FBI person ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ did not like being called out for lying or the story being walked back and was a bit threatening saying Ben [Protess] and the NYT are 'on the radar.'" (*Id.*) In the email, Zabel said that the USAO would "need to address this with the FBI." (*Id.*)

**12.    June 23, 2014: The *Times* and *Journal* Run Additional Articles**

On June 23, 2014, both the *Times* and *Journal* published articles principally to disclose that Dean Foods had received a subpoena from the Government.

**D.    Evidence of Leaks Involving Rule 6(e) Material Is Inconclusive**

As the Court knows, the *Times* and *Journal* articles contained a significant amount of confidential information about the Investigation, including its subjects, particular stock trades and tipping chains under investigation, potential illegal trading profits, and the consideration of the use of particular investigative techniques. To be clear, none of this information should ever have been shared with members of the press by anyone in the Government.

In the course of our inquiry, we attempted to question the Special Agent about whether he was the source of each piece of confidential information reported in the articles. His responses were clear and certain as to whether he had disclosed certain pieces of information and vague or contradictory as to others. In certain instances, his recollection was corroborated by text messages, phone logs, or other witnesses, but in others it was not. And, in some cases, his denials about having provided specific pieces of information that facially appeared to be from a

---

[3] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

law enforcement source did not ring true in light of other admissions he made. It is for these reasons, among others, that we noted at the outset of this submission that we cannot stand behind his representations to us, or vouch for them to the Court.[4]

For example, at one end of the spectrum, the Special Agent confirmed that he initially disclosed the existence of the FBI's investigation into ▓▓▓▓▓▓▓▓▓▓ Walters to both sets of reporters. At the other end, he categorically denied having been the source for certain other pieces of information, such as the reporting involving trading records, phone records, trading profits, or the fact that the Government had issued subpoenas to Dean Foods. And with regard to the vast middle, he acknowledged that he *might* have confirmed certain pieces of information, or might not have denied them—thereby confirming them—but his memory was not clear or he could not be certain. What's more, his recollection of particular key events, such as the May 27 meeting with the *Journal*, was largely inconsistent with the accounts of the other participants, as we described above.

As we acknowledged in our initial briefing, although much of what was contained in the Articles did not amount to Rule 6(e) material, some of the confidential information disclosed clearly might have come from grand jury subpoenas. For example, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[5] Thus, the specificity of these pieces of information—disclosures about particular trading or phone patterns by particular subjects under investigation—suggests that this information could have been leaked by someone with access to the trading and phone records we had gathered in our investigation, both by grand jury subpoena and from the SEC.

We initially argued, among other things, that these disclosures could have come from a source with access to the records obtained by regulators as opposed to the criminal authorities.

---

[4] In the event that the Court did hold an evidentiary hearing, the Government does not feel it would be able to call the Special Agent as a Government witness, consistent with its ethical duties. The Court could, of course, call him as a witness, and if he chose to testify the Government could cross-examine him.

[5] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

That remains true.[6]  Given that we have now learned that the Special Agent passed confidential information about the Investigation to the authors of the articles, however, we cannot be confident that he did not pass information protected by Rule 6(e) as well.[7]  Accordingly, we no longer believe that we can rebut Walters' *prima facie* case of a Rule 6(e) violation.  The Government respectfully submits that the Court should assume such a violation has occurred on these facts and proceed to the question of remedy.

                                    Respectfully submitted,

                                    PREET BHARARA
                                  United States Attorney

By:    /S/ Joan M. Loughnane
        Joan M. Loughnane
        Daniel S. Goldman
        Michael Ferrara
        Assistant U.S. Attorneys
        (212) 637-2265/2289/2526

---

[6] As mentioned earlier, Protess informed Zabel that he (Protess) had a source at the SEC in addition to having a source at the FBI.

[7] We note that we do not believe that further investigation, irrespective of the expenditure of time or resources, would shed more light on the question of what precisely was leaked by the Special Agent to the reporters.  We have spoken to the Special Agent's counsel and it is unclear whether the Special Agent is available for further interview.  Reporters will not answer questions about their sources, nor are U.S. Department of Justice attorneys permitted to ask.  In these circumstances, we believe that further investigation by the USAO is not likely to lead to additional evidence responsive to Walters' motion.