# EXHIBIT U

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                    ) File No. SF-3735
THE CLOROX COMPANY          )
                    )

WITNESS:    THOMAS C. DAVIS

PAGES: 1-230

PLACE: Securities and Exchange Commission
        Brookfield Place
        200 Vesey Street
        New York, New York 10281

DATE:    May 18, 2015

        The above-entitled matter came on for
hearing at 9:41 o'clock a.m.

1          A.  Yeah.  I think -- I think I've

2     accurately described that.  I mean, it was really

3     more of a -- you know, he would ask me more of a

4     global question about the milk business, you know,

5     and how that affected Dean Foods, was sort of implied

6     I guess in my answer.  I guess that's the easiest way

7     I can address it.

8              He never asked me anything specific

9     about Dean Foods.  He never asked me about the

10    spinoff.  He never asked me about the earnings.  It

11    never came up.

12         Q.  How did you know -- to the extent that

13    you commented on Dean Foods to Mr. Walters, how did

14    you know whether or not what you were commenting on

15    was public information or information that was not

16    public that you gleaned from your time on the board

17    of Dean Foods?

18         A.  I never gave him any confidential

19    information.  I'm quite certain about that.

20         Q.  Well, but you did discuss with him, on

21    occasion, Dean Foods; is that right?

22         A.  I think I've stated that, yes, sir.

23         Q.  So do you have a specific recollection

24    of any sort of process in your mind when you're

25    talking to Mr. Walters that would ensure that you

1    didn't share with him information about Dean Foods
2    that wasn't public?
3           A.  Do I have a process in my mind?  I think
4    the process is pretty simple in my mind, is that I
5    never discussed confidential information with
6    anybody, including Mr. Walters.
7           Q.  Well, let's give this example that you
8    gave of the impact of China on the milk business.
9           A.  Sure.
10          Q.  Is it possible that such information, in
11   terms of how it impacts Dean Foods, might not be
12   public information?  In other words, milk sales and
13   milk production, as it's impacting Dean Foods, as a
14   factor of how China is affecting it, that might not
15   be public information; is that right?
16          A.  I'm not sure I understand your question.
17   Milk sales -- I'm not sure I follow your question.
18   Try me again.
19          Q.  Well, the example you gave, are there
20   situations where that kind of information, China and
21   how it impacts the milk industry in Dean Foods, that
22   information might be information that Dean Foods has
23   but is not yet public yet.
24          A.  No, no.  I never provided him any
25   confidential information whatsoever.  I'm certain of

Page 79

1    that. And whatever we discussed was typically
2    available by analysts. So, yeah, I'm certain of
3    that.
4         Q. Well, when you discussed stuff with him,
5    did you -- how did you know whether or not the
6    information was typically available by analysts? Did
7    you check analysts' reports?
8         A. I read analysts' reports frequently.
9         Q. Now, you also mentioned that you
10   discussed with him other securities investments. Did
11   you generally discuss with him investments in the
12   stock market?
13        A. No, we did not.
14        Q. Well, did you ever discuss with him
15   other stocks that might be worthwhile investments?
16        A. Not that I recall, no.
17        Q. Did you ever discuss with him the price
18   of Dean Foods stock?
19        A. The price?
20        Q. Yeah.
21        A. No, not that I recall, no.
22        Q. Did you ever discuss with him whether or
23   not Dean Foods securities would be a worthwhile
24   investment for him?
25        A. No.

# EXHIBIT V



5 of 6 DOCUMENTS

Copyright 2015 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2015 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.

The Wall Street Journal Online

August 12, 2015

**SECTION:** MARKETS

**LENGTH:** 1282 words

**HEADLINE:** Trading Investigation Eyes Ex-Chairman of Dean Foods and Golfer Phil Mickelson

**BYLINE:** By Michael Rothfeld, Jean Eaglesham and Christopher M. Matthews

**BODY:**

Criminal and civil authorities are investigating whether the former chairman of Dean Foods Co. leaked inside information about a corporate spinoff to a professional gambler who in turn is suspected of tipping off golfer Phil Mickelson, according to people familiar with the probe.

The scrutiny of Dean Foods ex-Chairman Thomas Davis brings a high-profile investigation first reported by The Wall Street Journal last year into the boardroom of a major company. The showcase probe could test the limits of the government's ability to pursue high-profile insider-trading cases, as its efforts have been significantly set back by a 2014 appellate-court ruling.

The Securities and Exchange Commission and the Manhattan U.S. attorney's office are examining whether Mr. Davis leaked information on his company's 2012 announcement of a spinoff of its WhiteWave Foods division to Las Vegas bettor William "Billy" Walters, the people familiar with the investigation said.

Mr. Davis unexpectedly resigned Friday from the Dallas-based dairy company, ahead of the company's Monday earnings announcement. Mr. Davis's resignation was voluntary, his lawyer said.

The lawyer representing him, Thomas Melsheimer, said in a statement that Mr. Davis has "fully and without

reservation cooperated with the SEC in their investigation of alleged insider trading in Dean Foods Company stock from day one. He has no knowledge of any material non-public information about Dean Foods Company being conveyed to Mr. Walters by him or anyone else."

Mr. Walters said last year that it would be "preposterous to think that I would involve myself in insider trading." Efforts to reach him Wednesday were unsuccessful. Mr. Mickelson couldn't be reached Wednesday. A lawyer representing him previously said: "Phil has done absolutely nothing wrong. He has been cooperating with the investigation."

Dean Foods in a statement said it has "cooperated with the government's requests for information and will continue to do so. Because there is an ongoing government investigation, it would be inappropriate to comment further at this time."

Representatives of the SEC and the Justice Department declined to comment.

The scrutiny of Dean Foods' former chairman reflects a shift in focus for the government in its sweeping insider-trading probe. The Journal last year reported that federal prosecutors, the Federal Bureau of Investigation and the SEC were investigating whether activist investor Carl Icahn had passed tips to Mr. Walters, with whom he had a casual relationship, about cleaning-products maker Clorox Co., and whether Mr. Walters passed tips to Mr. Mickelson. The investigation drew world-wide attention for its spotlight on the intersection of Wall Street, Las Vegas and professional sports.

The portion of the investigation related to Mr. Icahn-which involved potential trading in Clorox, in which Mr. Icahn once held a stake-is now largely dormant, the people familiar with the matter said.

Mr. Icahn said last year, "We are always very careful to observe all legal requirements in all of our activities." The suggestion that he was involved in improper trading, he said, was "inflammatory and speculative."

The SEC now is homing in on the Dean Foods element of the probe, the people familiar with it said. SEC investigators from the SEC's New York and San Francisco offices are scrutinizing potential links between Messrs. Davis and Walters, a prominent sports bettor, these people said, and agency officials are conducting interviews with potential witnesses.

FBI agents have inquired about any trading by Mr. Mickelson in Dean Foods, the Journal reported last year, citing people familiar with the matter. The stock was suggested to him by Mr. Walters, although Mr. Mickelson had owned it previously, the Journal reported.

Dean Foods received a subpoena from criminal authorities requesting information in 2014, and the company has turned over to the government copies of emails from Mr. Davis, a person familiar with the matter said. Investigators requested emails that relate to Messrs. Walters or Mickelson, although it is unclear what was found, this person said.

The New York Times earlier reported that the SEC was scrutinizing a Dean Foods director as a suspected source of information for Mr. Walters.

Mr. Davis, who had been a Dean Foods board member since 2001, has also served as chief executive of the Concorde Group, a financial-advisory firm that invests in small companies, according to a biography on the website of the Dallas Stars, a hockey team for which he has served as an adviser. He worked for 17 years for investment bank Donaldson, Lufkin & Jenrette, and he has served on the boards of several companies besides Dean Foods. He served in the Navy and graduated from Harvard Business School, his biography says. He has led a nonprofit group, Shelter Golf Inc., which raises money for homeless shelters through golf tournaments, nonprofit records show.

Mr. Davis and Mr. Walters were acquaintances, and Mr. Walters had a social relationship with Mr. Mickelson,

Trading Investigation Eyes Ex-Chairman of Dean Foods and Golfer Phil Mickelson The Wall Street Journal Online
August 12, 2015

according to people familiar with the probe.

The gambler has been the subject of various government probes since the 1980s, resulting in four indictments but no convictions, the Journal previously reported. In one case, prosecutors accused him of being part of an illegal gambling operation. He was acquitted by a federal jury in 1992. Mr. Walters denied wrongdoing in all of the cases, calling the government's pursuit "a shakedown" in a 2011 interview with the Journal.

Messrs. Walters and Mickelson have belonged to the same San Diego-area golf club. The golfer, a three-time Masters tournament champion, is one of the sport's most popular and recognizable athletes.

He was approached by FBI agents in September 2013, at an airport in Bedford, Mass., after playing in the Deutsche Bank Championship golf tournament, the Journal previously reported. The FBI, aware that the investigation was about to be reported on by the Journal , approached him again on May 29, 2014, after he finished a round at an Ohio golf tournament. Mr. Mickelson referred the two agents to his lawyer, a person familiar with the matter told the Journal, which reported on the investigation the following day.

While all three men's activities are being investigated, the SEC could face a heightened legal hurdle in bringing any case against Mr. Mickelson, after an appeals court last year overturned the convictions of former hedge-fund traders Todd Newman and Anthony Chiasson . The court cited judicial error and prosecutors' failures to meet their burden of proof in a decision the government has criticized as weakening insider-trading law.

If that ruling were applied in full to any action potentially brought against Mr. Mickelson, the golfer would be liable only if the U.S. could "show that the tipper...expected to receive a personal benefit from disclosing the information and that Mr. Mickelson knew that the insider expected to receive that benefit," said Adam Pritchard, a law professor at the University of Michigan. The U.S. solicitor general has asked the Supreme Court to review the 2014 ruling.

Write to Michael Rothfeld at michael.rothfeld@wsj.com , Jean Eaglesham at jean.eaglesham@wsj.com and Christopher M. Matthews at christopher.matthews@wsj.com

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** August 13, 2015

# EXHIBIT W



1 of 1 DOCUMENT

Copyright 2010 Factiva ®, from Dow Jones
All Rights Reserved

# FACTIVA®

Copyright 2010 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.

The Wall Street Journal Online

May 26, 2010

**SECTION:** LAW

**LENGTH:** 418 words

**HEADLINE:** Lawyer Says DOJ, SEC to Probe Leaks in Rajaratnam Case

**BYLINE:** By Kara Scannell

**BODY:**

Lawyer Says DOJ, SEC to Probe Leaks in Rajaratnam Case The Wall Street Journal Online May 26, 2010



Internal watchdogs at the Justice Department and Securities and Exchange Commission have opened inquiries into allegations that government officials improperly disclosed nonpublic information tied to the government's insider-trading case against Galleon Group founder Raj Rajaratnam, a lawyer for Mr. Rajaratnam said.

The lawyer, John Dowd, requested the investigations in a letter to SEC Inspector General David Kotz, Attorney General Eric Holder and the Justice Department's Office of Professional Responsibility.

In the April 20 letter, Mr. Dowd said he was writing "to formally complain about a pervasive and continuing pattern of unconstitutional conduct by attorneys and other acting on behalf" of the SEC, the Federal Bureau of Investigation, and U.S. attorney's office in Manhattan, which announced criminal fraud charges against Mr. Rajaratnam in October. Mr. Rajaratnam has denied any wrongdoing.

On a website, Mr. Rajaratnam's defense team posted a letter dated May 11 in which an official of the Office of Professional Responsibility said it had opened an inquiry. Separately, the SEC's Mr. Kotz called Mr. Dowd earlier this month and said he would look into the matter as part of a broader probe into press leaks, according to a statement by the defense team.

Mr. Kotz declined to comment, as did representatives of the Justice Department, the FBI, the U.S. attorney's office in Manhattan and the SEC. The Office of Professional Responsibility official who signed the letter didn't return a call seeking comment. The Office of Professional Responsibility routinely opens inquiries if requested.

In his letter, Mr. Dowd complained about prosecutors and SEC officials holding news conferences to publicize their case, disclosing excerpts from sealed wiretaps during the news conference, and allegedly leaking the names of unindicted co-conspirators to the news media, including The Wall Street Journal.

Defense lawyers often argue that their client is being tried in the press and that statements by authorities are influencing potential jurors before a trial. Usually those complaints are made before a trial judge rather than to internal watchdogs at the governmental bodies.

Jim McCarthy, Mr. Rajaratnam's spokesman, said, "I'm glad that they're looking into it and we certainly hope they get to the bottom of it and take all necessary action to put a stop to it."

A spokeswoman for the Journal said: "We stand by the fairness and accuracy of our reporting."

Lawyer Says DOJ, SEC to Probe Leaks in Rajaratnam Case The Wall Street Journal Online May 26, 2010

Write to Kara Scannell at kara.scannell@wsj.com

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**GRAPHIC:** Bloomberg News | Raj Rajaratnam

**LOAD-DATE:** April 26, 2011

# EXHIBIT X

1/10/2017                                    Rajaratnam Camp Offended By Inside Information Leaks To Media

# Forbes

http://onforb.es/RIfjZS



Step into your future
with student loans that help make college happen

SallieMae

Start your journey ▸



**Walter Pavlo** Contributor

*I write, consult and lecture on white collar crime situations*

Opinions expressed by Forbes Contributors are their own.

3/22/2011 @ 11:54AM | 900 views

# Rajaratnam Camp Offended By Inside Information Leaks To Media

A few
times
each
day I
search
for



*AP Photo*



Cool Kids
in Data
Storage

Datrium Named 2016 "Cool Vendor in Storage" by Gartner

Da trium.

Gartner Names
Datrium "Cool
Vendor" —
Learn About All
5 Vendors.

Learn More

information on the Raj Rajaratnam case. As a
blogger, I'm just looking for a story on which I
can provide my own perspective on the case and
each time I search Raj on Google I see a paid ad
by RajDefense.org. The site "...provides factual
information regarding the defense of Mr. Raj
Rajaratnam, founder of New York-based hedge
fund Galleon Group..." So what has Raj's camp
upset these days? Believe it or not, leaks to the
media of inside information from the
prosecution.

Rajaratnam, who is on trial for charges related to
receiving insider information, is using his PR
team, CounterPoint Strategies, Inc., to call out
the Wall Street Journal's Susan Pulliam. It
seems Ms. Pulliam is gaining inside information
from the government in its prosecution of
Rajaratnam. They have even started a
"LeakCounter" that keeps track of Pulliam's
articles that will "chronicle Ms. Pulliam's ongoing
collaboration with concealed sources". The
LeakCounter was at 29 of 36 stories that Pulliam
has written...but the day is still young.



Datrium Named 2016 "Cool
Vendor in Storage" by Gartner

Cool Kids in Data Storage

Gartner Names Datrium
"Cool Vendor" - Learn About
All 5 Vendors.

In looking at the RajDefense website, one gets a glimpse of a real life "Thank You for Smoking" (by Christopher Buckley) example of how a PR firm tries to present a story of how things like smoking, fire arms, alcohol and, now, insider trading are somehow good for us.  Beyond slamming Pulliam's coverage of using inside informants, the site provides some good reading (links to other articles) to see Raj's spin on his case.  Putting together some favorites, I recommend:

Huffington Post – White-Collar Americans are Guilty Until Proven Innocent

Forbes – Legalize Insider Trading

Reuters – U.S. Insider Probe Making Investors Wary: Report

NY Times DealBook – John Kinnucan – Why I Chose Not To Wear A Wire

Wall Street Journal – Information on the Lam

The last article noted from the WSJ compares the current insider-trading probe by the government to tactics used in China's ongoing suppression of market information.  Interesting comparison.

One has to admire the Raj PR team for defending their client's interest.  But to claim that the Rajaratnam camp is offended by "inside information" in a case that involves "inside information" seems weak.

Beyond Raj's website, his PR firm is also on Twitter @RajDefense.  The last Tweet?  March 19, 2011 "Legal Development: Key cross-examination of Anil Kumar", with a link so you can read the entire court transcript.  I could hardly stay awake reading Kumar's testimony and it made me feel for the jury who must pull key bits of data from the ramblings of lawyers (both sides) getting the witness to tell them what they want to hear.  I would rather read Susan Pulliam's take at the WSJ to see what HOT TIP she has for me today....and then I'll write on it.

**FOLLOW WALT PAVLO ON TWITTER**

**RECOMMENDED BY FORBES**

The Richest Person In Every State

WWE Raw Results: The Case For The
Undertaker Winning The 2017 Royal Rumble

This article is available online at: http://onforb.es/RlfjZS                    2017 Forbes.com LLC™   All Rights Reserved

# EXHIBIT Y



1 of 2 DOCUMENTS

Copyright 2009 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2009, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

October 19, 2009 Monday

**SECTION:** Pg. A1

**LENGTH:** 1418 words

**HEADLINE:** Colleagues Finger Billionaire --- Galleon Founder Pushed Hard for Stock-Trading Tips; 'Get an Edge or You're Gone'

**BYLINE:** By Gregory Zuckerman, Don Clark and Susan Pulliam

**BODY:**

Galleon Group, the hedge-fund firm at the center of the biggest insider-trading case in decades, pushed its traders so hard to get market-moving information that those who failed were frequently berated or pushed out, former employees and people familiar with Galleon said.

Co-founded by Raj Rajaratnam, Galleon is among Wall Street's biggest traders and has a web of contacts among technology and health-care executives, some of whom have been investors in the firm's hedge funds.

Parts of that network appear to have turned on the billionaire investor. Three former colleagues of Mr. Rajaratnam secretly are bolstering the government's probe, say people familiar with the criminal investigation.

They include California hedge-fund managers Ali Far and Choo Beng Lee, who are cooperating witnesses in the case, the people say. Mr. Rajaratnam and five others were detained and charged Friday with involvement in a ring that allegedly traded on nonpublic information involving International Business Machines Corp., Google Inc. and other big companies. (See related article "How Associates Helped Build Case -- WSJ October 19, 2009.)

Colleagues Finger Billionaire --- Galleon Founder Pushed Hard for Stock-Trading Tips; 'Get an Edge or You're Gone'
The Wall Street Journal October 19, 2009 Monday

Aggressively pursuing information is commonplace on Wall Street, and the case against Mr. Rajaratnam will likely hinge on whether he crossed the line and profited from information obtained illegally. His lawyer says he did nothing wrong and will fight the charges.

"I get thousands of calls a week with people pitching ideas," Mr. Rajaratnam told one friend on Saturday. He said information he obtained was just another piece of the puzzle the New York hedge-fund firm assembled before buying or selling, according to this person, who said Mr. Rajaratnam seemed in good spirits.

Galleon made its name investing in tech stocks in the 1990s. In that era, analysts and favored clients got early looks at analyst reports, tips about corporate earnings and allocations of hot initial public offerings. That world ended after the tech bubble burst in 2000 and new rules -- dubbed Regulation Fair Disclosure -- barred companies from disclosing information selectively.

Getting exclusive information remained a crucial part of Galleon's investment strategy, and the firm aggressively pursued rumors and used sources to gain it. Pressure was intense on traders and analysts to get information, especially about coming corporate earnings.

"Get an edge or you're gone," said a former trader. "Galleon is looking for that little bit of extra edge. That's what the firm is about." A spokesman for Galleon wouldn't comment on that but said Friday that the fund firm was "shocked" at the charges, adding that it would cooperate fully and remained "highly liquid."

Federal prosecutors Friday charged Mr. Rajaratnam and three others not at Galleon with securities fraud and conspiracy, and two others with conspiracy; all six also face civil insider-trading charges leveled by the Securities and Exchange Commission.

Galleon is a fast-moving firm, which has been making about 1,000 trades a day, according to a document supplied to an investor. Its position as a big commission generator encourages brokerage firms to dole out favors. For instance, the fund firm has been a big recipient of IPOs, generally bestowed on the best clients.

One time Galleon went too far. After it bet against a group of 17 stocks in 2005 within five days of a sale of more shares by those companies, the SEC charged the firm with improper trading and creating "sham transactions." Galleon paid a fine of nearly $2 million without admitting or denying the charges.

Mr. Rajaratnam once told an employee he couldn't know where the broad market was going but he could make money if he could get a sense of what a company's earnings might be.

After one Galleon analyst in 2008 was repeatedly urged to press a company representative for information a potential acquisition, the analyst became so nervous he consulted an attorney on what to do, the analyst says. The analyst says the lawyer told him he would be "bending the ethics bar," but wasn't sure the analyst would be doing anything illegal. The analyst ended up being let go.

Those who couldn't come up with an edge faced pressure even if they were senior executives, though the tension usually didn't come directly from Mr. Rajaratnam, a native of Sri Lanka who rose to prominence in the late 1980s as a semiconductor analyst at investment-banking firm Needham &Co.

A senior trader, Leon Shaulov, who wasn't named in any federal charges, sometimes berated traders or analysts who couldn't uncover enough information that could move stocks, say several current and former employees. They add that Mr. Shaulov also would sometimes shout with joy when stocks moved the right way. Nearby, Mr. Rajaratnam would listen to the commotion through the glass door to his office. Through Galleon, Mr. Shaulov declined to comment.

People familiar with the matter say one of Mr. Shaulov's regular targets was Gary Rosenbach, who helped start Galleon with Mr. Rajaratnam. One trader says Mr. Shaulov, in front of the rest of the staff, once turned on Mr.

Colleagues Finger Billionaire --- Galleon Founder Pushed Hard for Stock-Trading Tips; 'Get an Edge or You're Gone'
The Wall Street Journal October 19, 2009 Monday

Rosenbach, screaming, "You're a disease, you're a jinx."

Mr. Rosenbach ended up leaving the firm for reasons he says were related to a family health issue. "Leon [Shaulov] is a gifted trader," he said. "I don't have a problem with a yeller and screamer. Type-A personality."

A Galleon trader who uncovered something particularly interesting would sometimes go into Mr. Rajaratnam's office to share it privately, closing the sliding glass door, says one person who worked at the firm. Then, "Everyone would look and wonder what was going on."

In the case of Google, the SEC civil complaint said that a person the agency identified as Tipper A received information in 2007 about an impending earnings shortfall from an unnamed employee of Market Street Partners, a San Francisco investor-relations firm. The SEC complaint said that Tipper A provided the information to Mr. Rajaratnam and that Galleon executed trades designed to profit on a decline in Google stock, netting $9 million.

The SEC complaint said the informant at Market Street demanded $100,000 to $150,000 a quarter to keep supplying Tipper A with information, but Tipper A refused and the informant stopped providing tips.

Google declined to comment. Market Street said it hadn't been contacted by any authority, adding that it fully supports the prosecution of insider trading and will provide any necessary aid in the investigation.

Some of the allegations describe trading based on advance knowledge of developments at Intel Corp., where the federal criminal complaint alleges Mr. Rajaratnam boasted of having a source. One of those facing conspiracy and securities-fraud criminal charges, as well as civil insider-trading charges, is Intel executive Rajiv Goel, an executive in Intel's treasury department. The SEC complaint alleges he gave Mr. Rajaratnam information about impending Intel earnings releases and also information related to Intel's dealings with Clearwire Corp. That wireless Internet carrier was recapitalized as part of a transaction that included an Intel investment. Clearwire declined to comment.

The criminal complaint says that in a call intercepted in 2008, Mr. Goel asked Mr. Rajaratnam to get him a job "with one of your powerful friends," as he was "tired" of working at Intel.

Reached by phone, Mr. Goel declined to comment, saying he hadn't yet retained an attorney. An Intel spokesman said Friday Mr. Goel had been placed on administrative leave while the matter is investigated.

One topic that commanded Mr. Rajaratnam's attention last year was a restructuring at Advanced Micro Devices Inc., which spun off its chip-manufacturing unit to a joint venture that received funding from investors from Abu Dhabi. Government documents allege that advance information about the transaction came to Galleon from Anil Kumar, a McKinsey &Co. executive also charged with fraud, conspiracy and insider trading. AMD had retained McKinsey as an adviser.

Through his lawyer, Mr. Kumar denied the charges Friday. McKinsey said it had put Mr. Kumar "on an indefinite leave of absence." McKinsey said it was taking the matter seriously and making every effort to understand the facts of the situation. The consulting firm said it would cooperate fully if contacted by the government. An AMD spokesman said the chip company was reviewing the situation.

---

Robert A. Guth and Jenny Strasburg contributed to this article.

Colleagues Finger Billionaire --- Galleon Founder Pushed Hard for Stock-Trading Tips; 'Get an Edge or You're Gone'
The Wall Street Journal October 19, 2009 Monday

## Galleon Flash Points | Key dates in the government's investigation of insider trading

| November 2007 | October 2008 | January 2009 | April 2009 |
|---|---|---|---|
| An individual named as 'CW' in criminal complaint filed against Raj Rajaratnam begins cooperating with law enforcement officials, agreeing to participate in recorded phone conversations with Mr. Rajaratnam. | The government begins monitoring cellphone conversations of an individual known as 'CW-1.' | Danielle Chiesi, a hedge-fund manager at New Sastele Partners calls CW-1's cellphone with information about IBM's earnings. | An informant referred to as 'CW-2' records a conversation with Ms. Chiesi at the direction of the FBI. |

Source: Criminal complaint filed by U.S. Attorney's office

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** October 10, 2014

# EXHIBIT Z



1 of 1 DOCUMENT

Copyright 2009 Factiva ®, from Dow Jones
All Rights Reserved

**FACTIVA®**

(Copyright (c) 2009, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

October 24, 2009 Saturday

**SECTION:** Pg. B1

**LENGTH:** 857 words

**HEADLINE:** The Galleon Case: Probe Widening in Galleon Case --- Prosecutors Subpoena Hedge-Fund Manager Grodin;
Ties to a Witness

**BYLINE:** By Susan Pulliam

**BODY:**

   Federal investigators in the Galleon Group case have requested trading records from a hedge-fund manager who once worked for Steven A. Cohen's SAC Capital Advisors and who employed a cooperating witness in the insider-trading case announced last week, people familiar with the matter say.

   The subpoena sent to the hedge-fund manager, Richard Grodin, doesn't suggest wrongdoing. Nor does it suggest that Mr. Cohen -- one of the nation's most well-known and successful hedge-fund managers -- has been implicated in any way, or that he knew about any trading by Mr. Grodin that the U.S. is seeking to examine as part of its continuing case.

   The subpoena, sent in the past week, is the first indication that the circle of trading being examined in the case is broadening.

   It also illustrates how traders engulfed in the alleged insider-trading ring had many personal and professional ties, and signals a potential avenue investigators may be following in the burgeoning case. In this instance, Mr. Grodin also

employed a former employee of an investor-relations firm who prosecutors say passed along inside information in the case about Google Inc., according to people familiar with the matter.

Mr. Grodin didn't return calls for comment on Friday.

An SAC spokesman said Mr. Grodin left SAC in January 2004 and that Mr. Cohen didn't invest in Mr. Grodin's most-recent fund. Spokesmen for the Securities and Exchange Commission and the Justice Department's U.S. Attorney's Office in Manhattan declined to comment.

In criminal and civil cases, the U.S. has alleged that Galleon hedge-fund founder Raj Rajaratnam was part of an insider-trading ring that also has ensnared a number of corporate executives and employees -- an alleged conspiracy in which Mr. Rajaratnam and executives at blue-chip firms including International Business Machines Corp. and Intel Corp. allegedly connived to profit on Google and other big-name stocks. Mr. Rajaratnam and others involved in the case have said they are innocent.

Mr. Cohen has claimed a special place in the $1.2 trillion hedge-fund industry. He has received $1 billion in pay in some years and he has gained a following for producing annual returns of roughly 15%.

Mr. Cohen runs SAC's main hedge fund and has invested money on behalf of his investors as well as his own money in funds run by former SAC managers. Over the years, Mr. Grodin has worked as a portfolio manager for SAC, as well as a division that invested SAC investors' money. He also ran a separate independent fund in which Mr. Cohen was an investor.

It is unclear which specific trades of Mr. Grodin's and their timing are being sought. The 6-foot-5 Mr. Grodin, 40 years old, took time away from his hedge fund this summer to play in a basketball tournament in Israel, a person familiar with the matter says.

Mr. Grodin and Choo Beng Lee, who has been identified as a cooperating witness in the government's case, have ties that stretch back to the late 1990s when the two worked for SAC, people familiar with the matter say. Mr. Grodin was a portfolio manager and Mr. Lee was an analyst that worked with him.

Several years later, Mr. Grodin broke away from the main SAC fund to work at Sigma, an SAC division, where Mr. Grodin continued to work as a portfolio manager and Mr. Lee continued to serve as an analyst for him. Mr. Lee's lawyer declined to comment.

Mr. Grodin later launched a hedge-fund named Stratix outside of SAC's sphere, in which Mr. Cohen was an investor. At Stratix, Mr. Lee worked for Mr. Grodin for several years, according to people familiar with the matter. Mr. Grodin closed Stratix in December 2007.

Mr. Lee formed his own fund, Spherix with Ali Far, who also has been identified by people close to the probe as another of the government's cooperating witnesses in the case. SAC never invested in Mr. Lee's and Mr. Far's fund.

Around the same time, Mr. Grodin opened another fund, Quadrum Capital. He closed that fund in recent weeks, people close to the situation say. Mr. Far didn't respond to requests for comment.

In March 2009, Messrs. Lee and Far closed their fund, which had posted returns of around 10% for the year, people familiar with the matter say. Some rival hedge-fund managers said shutting the fund amid such good returns aroused suspicions that something was amiss. In the weeks following the closure, Mr. Lee approached Mr. Cohen about rehiring him and was rejected, a person familiar with the matter says.

Another individual who worked as a low-level assistant for Mr. Grodin and with Mr. Lee at Stratix was an individual whom prosecutors now allege passed along inside information regarding Google.

The Galleon Case: Probe Widening in Galleon Case --- Prosecutors Subpoena Hedge-Fund Manager Grodin; Ties to a Witness The Wall Street Journal October 24, 2009 Saturday

That individual, identified by people familiar with the matter as Shammara Hussain, left Stratix in May 2007 to briefly work for Market Street, a small San Francisco investor-relations firm.

A lawyer for Ms. Hussain, 23, who hasn't been named or charged by prosecutors, said her client intends to cooperate and that she "didn't ask for or receive money in connection with conversations about Google. Whatever happened was a naive mistake," the lawyer says.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** May 31, 2010

# EXHIBIT AA



1 of 6 DOCUMENTS

Copyright 2010 Factiva ®, from Dow Jones
All Rights Reserved

# FACTIVA®

(Copyright (c) 2010, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

November 20, 2010 Saturday

SECTION: Pg. A1

LENGTH: 1407 words

HEADLINE: U.S. in Vast Insider Trading Probe

BYLINE: By Susan Pulliam, Michael Rothfeld, Jenny Strasburg, and Gregory Zuckerman

BODY:

Federal authorities, capping a three-year investigation, are preparing insider-trading charges that could ensnare consultants, investment bankers, hedge-fund and mutual-fund traders and analysts across the nation, according to people familiar with the matter.

The criminal and civil probes, which authorities say could eclipse the impact on the financial industry of any previous such investigation, are examining whether multiple insider-trading rings reaped illegal profits totaling tens of millions of dollars, the people say. Some charges could be brought before year-end, they say.

The investigations, if they bear fruit, have the potential to expose a culture of pervasive insider trading in U.S. financial markets, including new ways nonpublic information is passed to traders through experts tied to specific industries or companies, federal authorities say.

One focus of the criminal investigation is examining whether nonpublic information was passed along by independent analysts and consultants who work for companies that provide "expert network" services to hedge funds and mutual funds. These companies set up meetings and calls with current and former managers from hundreds of companies for traders seeking an investing edge.

U.S. in Vast Insider Trading Probe The Wall Street Journal November 20, 2010 Saturday

Among the expert networks whose consultants are being examined, the people say, is Primary Global Research LLC, a Mountain View, Calif., firm that connects experts with investors seeking information in the technology, health-care and other industries. "I have no comment on that," said Phani Kumar Saripella, Primary Global's chief operating officer. Primary's chief executive and chief operating officers previously worked at Intel Corp., according to its website.

In another aspect of the probes, prosecutors and regulators are examining whether Goldman Sachs Group Inc. bankers leaked information about transactions, including health-care mergers, in ways that benefited certain investors, the people say. Goldman declined to comment.

Independent analysts and research boutiques also are being examined. John Kinnucan, a principal at Broadband Research LLC in Portland, Ore., sent an email on Oct. 26 to roughly 20 hedge-fund and mutual-fund clients telling of a visit by the Federal Bureau of Investigation.

"Today two fresh faced eager beavers from the FBI showed up unannounced (obviously) on my doorstep thoroughly convinced that my clients have been trading on copious inside information," the email said. "(They obviously have been recording my cell phone conversations for quite some time, with what motivation I have no idea.) We obviously beg to differ, so have therefore declined the young gentleman's gracious offer to wear a wire and therefore ensnare you in their devious web."

The email, which Mr. Kinnucan confirms writing, was addressed to traders at, among others: hedge-fund firms SAC Capital Advisors LP and Citadel Asset Management, and mutual-fund firms Janus Capital Group, Wellington Management Co. and MFS Investment Management. SAC, Wellington and MFS declined to comment; Janus and Citadel didn't immediately comment. It isn't known whether clients are under investigation for their business with Mr. Kinnucan. The investigations have been conducted by federal prosecutors in New York, the FBI and the Securities and Exchange Commission. Representatives of the Manhattan U.S. Attorney's office, the FBI and the SEC declined to comment.

Another aspect of the probe is an examination of whether traders at a number of hedge funds and trading firms, including First New York Securities LLC, improperly gained nonpublic information about pending health-care, technology and other merger deals, according to the people familiar with the matter.

Some traders at First New York, a 250-person trading firm, profited by anticipating health-care and other mergers unveiled in 2009, people familiar with the firm say.

A First New York spokesman said: "We are one of more than three dozen firms that have been asked by regulators to provide general information in a widespread inquiry; we have cooperated fully." He added: "We stand behind our traders and our systems and policies in place that ensure full regulatory compliance."

Key parts of the probes are at a late stage. A federal grand jury in New York has heard evidence, say people familiar with the matter. But as with all investigations that aren't completed, it's unclear what specific charges, if any, might be brought.

The action is an outgrowth of a focus on insider trading by Preet Bharara, the Manhattan U.S. Attorney. In an October speech, Mr. Bharara said the area is a "top criminal priority" for his office, adding: "Illegal insider trading is rampant and may even be on the rise." Mr. Bharara declined to comment.

Expert-network firms hire current or former company employees, as well as doctors and other specialists, to be consultants to funds making investment decisions. More than a third of institutional investment-management firms use expert networks, according to a late-2009 survey by Integrity Research Associates LLC in New York.

The consultants typically earn several hundred dollars an hour for their services, which can include meetings or

U.S. in Vast Insider Trading Probe The Wall Street Journal November 20, 2010 Saturday

phone calls with traders to discuss developments in their company or industry. The expert-network companies say internal policies bar their consultants from disclosing confidential information.

Generally, inside traders profit by buying stocks of acquisition targets before deals are announced and selling after the targets' shares rise in value.

The SEC has been investigating potential leaks on takeover deals going back to at least 2007 amid an explosion of deals leading up to the financial crisis. The SEC sent subpoenas last fall to more than 30 hedge funds and other investors.

Some subpoenas were related to trading in Schering-Plough Corp. stock before its takeover by Merck & Co. in 2009, say people familiar with the matter. Schering-Plough stock rose 8% the trading day before the deal plan was announced and 14% the day of the announcement. Merck said it "has a long-standing practice of fully cooperating with any regulatory inquiries and has explicit policies prohibiting the sharing of confidential information about the company and its potential partners."

Transactions being focused on include MedImmune Inc.'s takeover by AstraZeneca Plc in 2007, the people say. MedImmune shares jumped 18% on Apr. 23, 2007, the day the deal was announced. A spokesman for AstraZeneca and its MedImmune unit declined to comment.

Investigators are also examining the role of Goldman bankers in trading in shares of Advanced Medical Optics Inc., which was taken over by Abbott Laboratories in 2009, according to the people familiar with the matter. Advanced Medical Optics's shares jumped 143% on Jan. 12, 2009, the day the deal was announced. Goldman advised MedImmune and Advanced Medical Optics on the deals.

A spokesman for AstraZeneca and its MedImmune unit declined to comment.

In subpoenas, the SEC has sought information about communications -- related to Schering-Plough and other deals -- with Ziff Brothers, Jana Partners LLC, TPG-Axon Capital Management, Prudential Financial Inc.'s Jennison Associates asset-management unit, UBS AG's UBS Financial Services Inc. unit, and Deutsche Bank AG, according to subpoenas and the people familiar with the matter.

Representatives of Ziff Brothers, Jana, TPG-Axon, Jennison, UBS and Deutsche Bank declined to comment.

Among hedge-fund managers whose trading in takeovers is a focus of the criminal probe is Todd Deutsch, a top Wall Street trader who left Galleon Group in 2008 to go out on his own, the people close to the situation say. A spokesman for Mr. Deutsch, who has specialized in health-care and technology stocks, declined to comment.

Prosecutors also are investigating whether some hedge-fund traders received inside information about Advanced Micro Devices Inc., which figured prominently in the government's insider-trading case last year against Galleon Group hedge fund founder Raj Rajaratnam and 22 other defendants.

Fourteen defendants have pleaded guilty in the Galleon case; Mr. Rajaratnam has pleaded not guilty and is expected to go to trial in early 2011.

Among those whose AMD transactions have been scrutinized is hedge-fund manager Richard Grodin. Mr. Grodin, who received a subpoena last fall, didn't return calls. An AMD spokesman declined to comment.

U.S. in Vast Insider Trading Probe The Wall Street Journal November 20, 2010 Saturday



**Healthy Gains** | Shares of MedImmune and Schering-Plough before and after takeover plans were announced.

*No longer traded after acquisition*

Source: FactSet Research Systems

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** October 10, 2014

# EXHIBIT BB



1 of 2 DOCUMENTS

Copyright 2015 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2015, Dow Jones & Company, Inc.

# THE WALL STREET JOURNAL.

The Wall Street Journal

March 30, 2015 Monday

**SECTION:** REVIEW & OUTLOOK (Editorial); Pg. A12

**LENGTH:** 860 words

**HEADLINE:** Preet Bharara's Methods

**BODY:**

Prosecutors enjoy awesome powers and immunity for their conduct, and this means they are seldom held accountable for misconduct. So all the more reason to notice an unusual and important legal challenge to Preet Bharara's holy war on Wall Street.

The U.S. Attorney for the Southern District of New York is being sued by financier David Ganek for destroying his business and depriving him of due process and other constitutional rights. The case may become a referendum on Mr. Bharara's methods and ethics in his campaign against alleged insider trading.

---

Mr. Bharara has become a political celebrity for his aggressive tactics and portrait of U.S. finance as akin to organized crime. Yet in his zeal he has often jettisoned his obligation to fairness. In December the Second Circuit Court of Appeals overturned -- with prejudice -- the convictions of a portfolio manager at Mr. Ganek's former hedge fund, Level Global, and another trader at a firm called Diamondback. The court ruled there was "no evidence" the traders committed securities fraud and rebuked the "doctrinal novelty" of Mr. Bharara's prosecution.

Mr. Ganek was never charged, even under Mr. Bharara's elastic definition of insider trading. The Securities and Exchange Commission also brought no civil complaint, which requires merely a preponderance-of-evidence standard.

Preet Bharara's Methods The Wall Street Journal March 30, 2015 Monday

Mr. Ganek is suing now because the damage to his reputation from the investigation forced him to liquidate Level Global, which had $4 billion under management.

Law enforcement is chaotic and contingent. Mistakes are inevitable, which is why the courts shield officers of the United States from civil liability. But Mr. Ganek isn't second-guessing what turned out to be bad judgment. He claims the government fabricated evidence in bad faith. If true, this breaks established law and may allow a civil-rights suit against the prosecutors.

The problem is that Mr. Bharara's team used information now known to be false to name Mr. Ganek personally in a November 2010 search warrant in the pursuit of Level Global and the two exonerated traders, Anthony Chiasson and Todd Newman. The affidavit supporting the warrant was recently unsealed.

Even the search itself was extraordinary, if in keeping with Mr. Bharara's M.O. He has exploited tools once reserved for the mafia or terrorists to go after white-collar crime, such as wiretaps and raids. The November 2010 bust of Level Global seized records and computers; prosecutors would normally obtain such material with a subpoena. They made no arrests.

Someone also leaked advance notice to the press, and the raid was conducted in coordination with others on hedge funds in Boston and Connecticut. The dramatic crackdown -- featuring B-roll of FBI agents wheeling boxes of documents out of office buildings -- became a media circus.

A Level Global trader named Sam Adondakis was working at the time as a confidential informant, and the U.S. Attorney's office asserted in the warrant application that he told FBI agents that Mr. Ganek participated in an insider-trading scheme involving Dell. Unlike the allegations against Messrs. Chiasson and Newman, the affidavit contains few details about Mr. Ganek's alleged role. The legal standard for probable cause is supposed to be "particularized evidence."

---

We now know Mr. Adondakis never said this to the FBI. To his knowledge, he said, his boss had never engaged in insider trading -- as he later testified at Mr. Chiasson's trial. An FBI agent also disavowed "confusion" to explain the warrant application, noting that "I was certain that Mr. Adondakis was not saying that he specifically told Mr. Ganek that the information was coming from someone at Dell." Asked again for emphasis, the FBI agent repeated his statement.

None of this was public at the time of the raid or its aftermath, and Mr. Ganek had no answer to reassure investors. The U.S. Attorney's office and Mr. Bharara repeatedly assured Level Global that they stood by Mr. Ganek's inclusion in the warrant, that the decision had been careful and considered, and all precautions had been taken.

The suggestion of law-breaking by the fund's principal partner amounted to a corporate death sentence. Mr. Ganek was forced to close Level Global by February 2011.

So the question is how the false accusation made it into the warrant. If it was mere carelessness, then the Justice Department's Office of Professional Responsibility should conduct an internal audit, given the depth of the financial damage. Then again, the U.S. Attorney also labeled Mr. Ganek an "unindicted co-conspirator," despite the lack of evidence. If he's a criminal, then charge and try him.

The history of the Level Global case -- the raid, the media tip-offs, the legal inventiveness -- suggests a false allegation wasn't an accident. The goal was to arraign hedge-fund managers and CEOs, not merely their minions, and then to try these unpopular defendants on the evening news.

Mr. Bharara isn't the first ambitious prosecutor to abuse his discretion, but perhaps there will be fewer in the future

Preet Bharara's Methods The Wall Street Journal March 30, 2015 Monday

if Mr. Ganek succeeds. Discovery would be educational.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** April 25, 2015

# EXHIBIT CC



1 of 2 DOCUMENTS

Copyright 2011 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2011, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

December 1, 2011 Thursday

**SECTION:** Pg. A1

**LENGTH:** 1190 words

**HEADLINE:** More Charges Set For Insider Probe

**BYLINE:** By Michael Rothfeld, Jenny Strasburg and Susan Pulliam

**BODY:**

Federal authorities are pursuing charges against individuals at three prominent investment firms, including a large mutual-fund company, in a new phase of a high-profile insider-trading case that has shaken Wall Street, according to people familiar with the matter.

Investigators are focusing on an analyst at mutual-fund firm Neuberger Berman Group LLC and traders who worked at hedge funds Diamondback Capital Management LLC and Level Global Investors LP, the people say. Law-enforcement officials expect charges against the individuals to be filed by mid-December, the people say.

The charges, if they are brought, would represent a significant broadening of an insider-trading investigation of employees at public companies passing along confidential information. Hundreds of conversations have been monitored on U.S. wiretaps in the probe.

Any charges would for the first time extend that investigation to well-known hedge funds on Wall Street as well as an established mutual-fund company that manages money for individual investors -- and not just the well-heeled.

The hedge funds, which each have managed billions of dollars in assets, were raided by the Federal Bureau of

More Charges Set For Insider Probe The Wall Street Journal December 1, 2011 Thursday

Investigation a year ago following a Wall Street Journal article that revealed the probe.

The expected charges come at a time when two former research analysts at Level Global and Diamondback -- Spyridon "Sam" Adondakis and Jesse Tortora, respectively -- have been cooperating with the federal investigation, according to people familiar with the matter. Both left their firms early last year.

Messrs. Adondakis and Tortora couldn't be reached.

In the past year, the investigation has resulted in criminal cases primarily against employees and consultants associated with Primary Global Research LLC, an "expert network" firm that arranged calls between investors and public-company employees for a fee.

Prosecutors have alleged that some employees and consultants at Primary Global passed along corporate earnings and other inside information to hedge funds.

A Primary Global spokesman declined to comment.

FBI agents raiding Level Global's office last year asked for data and records contained on computers used by the firm's co-founders, Anthony Chiasson and David Ganek, among others, according to people familiar with the matter.

Mr. Chiasson is among those against whom investigators are pursuing charges, two of the people said.

Lawyers representing Messrs. Chiasson and Ganek declined to comment.

Diamondback has said a government search warrant last year appeared to be focused on an analyst and a portfolio manager; the Journal previously identified the analyst as Mr. Tortora.

Level Global told investors in February it was closing its doors, citing the impact of the government's investigation.

The firm, which had offices in Greenwich, Conn., and New York, managed about $4 billion in assets at the time of the FBI raid last year.

Diamondback, based in Stamford, Conn., managed more than $5 billion at the time of the FBI raid and now manages about $3 billion in assets, say people close to the firm.

Level Global and Diamondback have said they are cooperating with the probe. In a statement Wednesday, a Level Global spokesman said, "Sam Adondakis was terminated by Level Global in May 2010, fully six months before the search."

The scope of the insider-trading investigation is still widening to include hedge funds the government hasn't yet named, according to the people familiar with the matter.

By early this year, the government had gathered information on at least 50 hedge funds through 300 hours of wiretaps, according to a May court filing in a Primary Global case.

The development comes amid an unprecedented crackdown on insider trading on Wall Street and elsewhere. Since August 2009, the office of Manhattan U.S. Attorney Preet Bharara has charged 56 people in insider-trading cases, of whom 52 have pleaded guilty or been convicted at trial.

The government's successes -- particularly the conviction of Galleon Group founder Raj Rajaratnam, who was sentenced in October to 11 years in prison -- have shaken Wall Street.

Investigators continue to mine data stemming from that case and others, according to people familiar with the

More Charges Set For Insider Probe The Wall Street Journal December 1, 2011 Thursday

matter.

Two informants in the continuing investigation, Messrs. Adondakis and Tortora, are friends who previously worked together as technology analysts at Prudential Equity Group, now part of Wells Fargo & Co., the people say.

They shared stock tips with one another -- and with friends at different investment firms -- and socialized together after going to Diamondback and Level Global, others familiar with the case say.

One of those friends, analyst Fayad Abbasi of Neuberger Berman, is among those against whom investigators are pursuing charges, according to people familiar with the matter. Mr. Abbasi also previously worked as an analyst at Prudential Equity Group.

Messages left for Mr. Abbasi at Neuberger Berman, on voice-mail identified as his, weren't immediately returned. Mr. Abbasi started at Neuberger in 2005, according to regulatory records.

A spokeswoman for Neuberger, which manages about $180 billion in assets, including mutual funds and investments in hedge and private-equity funds, said the company wasn't aware of an investigation involving Mr. Abbasi.

Messrs. Adondakis and Tortora each spoke frequently with various public company employees moonlighting through Primary Global, whose calls were being wiretapped by the government starting in 2009, according to documents and testimony from an insider-trading trial of a Primary Global employee over the summer.

Four experts with whom Messrs. Tortora or Adondakis have spoken, according to court documents, have pleaded guilty in the Primary Global investigation to leaking inside information about their companies to hedge-fund clients.

By aiding the government, the two would be the latest in a long list of hedge-fund employees to have been "flipped" by the FBI in the past several years.

Level Global paid Primary Global $210,000 a year for access to its experts, and Diamondback paid $165,000 a year, according to an August 2008 email written by former Primary Global sales manager James Fleishman that was introduced as evidence for his insider-trading trial over the summer.

Mr. Fleishman was convicted of conspiracy to commit securities fraud and conspiracy to commit wire fraud.

He hasn't been sentenced and is appealing his conviction; his lawyer declined to comment.

Mr. Tortora was described as a "fast money" client by Mr. Fleishman, according to testimony at Mr. Fleishman's trial in a New York federal court.

In an email to a co-worker, Mr. Fleishman said fast money referred to clients who "get info and trade on it that day," according to a document from the trial.

Messrs. Chiasson and Ganek, along with Diamondback's founders, previously worked at giant hedge fund SAC Capital Advisors.

Diamondback and Level Global were searched by the FBI on Nov. 22, 2010, three days after the Journal reported that the government was investigating hedge funds and consultants tied to Primary Global.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

More Charges Set For Insider Probe The Wall Street Journal December 1, 2011 Thursday

**LOAD-DATE:** December 2, 2011

# EXHIBIT DD



1 of 2 DOCUMENTS

Copyright 2013 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2013, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

February 14, 2013 Thursday

**SECTION:** Pg. C1

**LENGTH:** 1087 words

**HEADLINE:** Ex-Analyst At SAC Felt Pressured For Tips

**BYLINE:** By Michael Rothfeld and Jenny Strasburg

**BODY:**

Corrections & Amplifications

SAC Capital Advisors held a position tied to 12 million shares of a pharmaceutical company's stock, which the hedge fund says offset profits the government has alleged were from insider trading. A Money & Investing article on Thursday about the government's insider-trading investigation of SAC incorrectly said the size of the holding was $12 million.

(WSJ Feb. 15, 2013)

Subscribe to WSJ: http://online.wsj.com?mod=djnwires

(END)

A former analyst at SAC Capital Advisors told federal criminal investigators that he was pressured by his manager to gather inside information on technology stocks, according to people familiar with the briefing.

The Federal Bureau of Investigation and the Manhattan U.S. Attorney's office now are using the statements from

the analyst to try to build a case against the SAC portfolio manager, Michael Steinberg, and others that could result in charges in the coming months, these people said.

Authorities currently are preparing to present evidence to a grand jury against Mr. Steinberg, according to a person familiar with the investigation.

The development ramps up the legal pressure on the big hedge fund, highlighting that the previously reported insider-trading investigation of SAC and its founder, Steven A. Cohen, is proceeding on multiple fronts.

Federal authorities are attempting to reach into the highest ranks of the $14 billion hedge fund. Since late 2009, six former SAC employees have been convicted of or pleaded guilty to insider-trading charges; four, including the ex-SAC analyst, are cooperating with authorities.

"Michael Steinberg did absolutely nothing wrong," said his lawyer, Barry H. Berke. "His trading decisions were based on detailed analysis" and information "he understood had been properly obtained through the types of channels that institutional investors rely upon on a daily basis."

SAC put Mr. Steinberg, 40 years old, on paid leave last fall, declining to specify the reasons for the move. Neither he nor Mr. Cohen has been accused of any wrongdoing.

An SAC spokesman declined to comment on Mr. Steinberg. The spokesman has said Mr. Cohen and the hedge-fund firm acted appropriately and will cooperate with the investigation.

Representatives of the FBI and Manhattan U.S. Attorney's office declined to comment.

The SAC ex-analyst, Jon Horvath, began cooperating with U.S. officials in September under a plea agreement in which he acknowledged trading illegally in Dell Inc. and other stocks along with his boss.

Mr. Horvath was interviewed again on Jan. 23 by a federal prosecutor and the FBI at the office of the Manhattan U.S. Attorney in preparation for possible criminal charges against Mr. Steinberg and others, the people familiar with the meeting said.

That meeting, the pending grand jury presentation and Mr. Horvath's statements to investigators that he was encouraged to develop inside information, haven't previously been reported.

Legal pressure on SAC rose in November, when a seventh former SAC employee, Mathew Martoma, was criminally charged with $276 million in illicit trading in two pharmaceutical companies, by selling stock to avoid losses and profiting on bets their stocks would decline.

In that case, authorities have said in court documents that Mr. Cohen -- referred to in the documents as the hedge fund's "owner" -- also traded based on inside information allegedly obtained by Mr. Martoma.

The Securities and Exchange Commission has filed a civil suit against CR Intrinsic Investors, the SAC unit where Mr. Martoma worked, and sent SAC a "Wells notice," indicating SAC likely will be sued as an entity responsible for overseeing his trading.

SAC has responded in part that it didn't profit from negative bets against the drug companies because it held an offsetting $12 million position, through a derivative product, tied to one company's stock.

Mr. Martoma has pleaded not guilty, and his lawyer, Charles Stillman, has said he did nothing wrong.

As previously reported, in a criminal trial last year involving two other traders, prosecutors referred to Mr. Steinberg by name as an unindicted co-conspirator in an insider-trading scheme involving the stocks of Dell, Nvidia

Ex-Analyst At SAC Felt Pressured For Tips The Wall Street Journal February 14, 2013 Thursday

Corp. and others.

Mr. Horvath, was slated to be a defendant in that trial. In an indictment of Mr. Horvath, prosecutors said he and his portfolio manager earned profits of $1 million illegally trading in Dell and $400,000 in Nvidia.

In September 2012, shortly before trial, Mr. Horvath began cooperating with U.S. officials under a plea agreement. At a plea hearing, he acknowledged taking part in illegal trading of both those stocks along with his manager. He was referring to Mr. Steinberg, people familiar with the case said.

Mr. Steinberg, who worked at SAC's Sigma Capital Management unit, is seen by authorities as a potential witness against Mr. Cohen if he ever were to cooperate, according to the people.

Investigators continue to examine the actions of several people involved or mentioned in email exchanges in August 2008 between Messrs. Steinberg and Horvath about a coming earnings announcement for Dell, the people familiar with the matter said. In the emails, which prosecutors filed in court last year, Mr. Horvath referenced secondhand information from a company source about disappointing earnings that could drive down the stock.

In the subject line of an email chain on Aug. 18, 2008, Mr. Horvath told Mr. Steinberg, "Pls keep the DELL stuff especially on the down low" because an analyst friend had asked him "to be extra sensitive with the info".

On Aug. 26, 2008, Mr. Steinberg and Mr. Horvath corresponded by email with another Sigma trader, who apparently had a more positive view of Dell.

Mr. Steinberg wrote that he "was talking to Steve about DELL earlier today" -- referring to Mr. Cohen, who wanted Mr. Horvath and the other trader to "compare notes" because of their opposing views.

Mr. Steinberg joined Stamford, Conn.-based SAC in 1997. He started working for its Sigma division, based in New York, in 2003. Mr. Steinberg managed a team investing in technology stocks and regularly communicated with Mr. Cohen about those stocks and portfolio strategies, say people familiar with the firm's operations.

He built trust with Mr. Cohen as an arbiter of analysts, able to assess their sometimes contradicting views and reliably advise Mr. Cohen on recommended investment actions, say people close to the firm's operations.

---

Chad Bray contributed to this article.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** December 18, 2013

# EXHIBIT EE

# KRAMER LEVIN NAFTALIS & FRANKEL L.L.P

BARRY H. BERKE
PARTNER
PHONE 212-715-7560
FAX 212-715-7660
BBERKE@KRAMERLEVIN.COM

April 25, 2016

<u>Via E-mail</u>

Assistant U.S. Attorney Ian McGinley
Assistant U.S. Attorney Joshua Naftalis
Assistant U.S. Attorney Damian Williams
U.S. Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10008

   Re: <u>Grand Jury Investigation of Visium Asset Management LP</u>

Gentlemen:

   On behalf of our client Sanjay Valvani, we write to register our strong objection and deep concern about the recent leaks to the press concerning highly significant details of the above-referenced investigation, including that Mr. Valvani is the target of that investigation. For the reasons stated below, we request that the U.S. Attorney's Office (the "USAO") investigate to determine whether any government agents were the source of the leaks to the media, preserve all materials related to this issue, and take any and all steps necessary to prevent further violations.

<u>Background</u>

   Late in the day on Friday, April 8, 2016, the Wall Street Journal published an article on its website entitled, "Insider Trading Is Focus of Probe Into Visium; Prosecutors investigating one current and several former employees of hedge fund," which is attached as Ex. A. This article contains information revealing what is occurring before and in connection with the grand jury investigating Visium and Mr. Valvani, and raises substantial concerns that the government is the source of the leaks.

   Most concerning, the article specifically states that "[f]ederal prosecutors have zeroed in on one current and several former employees of hedge fund Visium Asset Management LP as they determine whether to file criminal insider-trading charges," and then expressly identifies the one current employee who is a target of the investigation: "the U.S. Attorney's office has targeted Sanjay Valvani, a current partner and portfolio manager."

1177 AVENUE OF THE AMERICAS  NEW YORK NY 10036-2714  PHONE 212.715.9100  FAX 212.715.8000

990 MARSH ROAD  MENLO PARK CA 94025-1949  PHONE 650.752.1700  FAX 650.752.1800

47 AVENUE HOCHE  75008 PARIS FRANCE  PHONE (33-1) 44 09 46 00  FAX (33-1) 44 09 46 01

WWW.KRAMERLEVIN.COM

KRAMER LEVIN NAFTALIS & FRANKEL LLP
April 25, 2016
Page 2

The article also includes other examples of information that suggests it was leaked by government sources. The article states that "[prosecutors] have indicated in meetings with defense lawyers that they believe insider trading may have occurred," and that "[d]efense lawyers have argued privately to prosecutors that the trades under investigation weren't illegal." The article also states that "the probe is at an advanced stage."

We can assure you that we had no communication with the press about this investigation, and we are confident that Visium's counsel also was not the source of the information that Mr. Valvani is the principal target of the investigation. While the article vaguely attributes this information to "people familiar with the matter," the nature of the information disclosed and the lack of any reason to believe it would be leaked by the defense lawyers strongly supports an inference pointing to the government as the likely source. *See, e.g., In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1068 n.7 (D.C. Cir. 1998).

<u>Discussion</u>

The Supreme Court has "consistently . . . recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979) (citation omitted), and has "consistently stood ready to defend it against unwarranted intrusion," *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). Rule 6(e) of the Federal Rules of Criminal Procedure codifies the "strong historic policy of preserving grand jury secrecy" by providing that the government is "forbidden to disclose matters occurring before the grand jury." *Id.* at 425, 428; *see also* Fed. R. Crim. P. 6(e)(2)(B)(iv). "Both the direct and indirect disclosure of information are proscribed." *In re Grand Jury Matter*, 682 F.2d 61, 63 (3d Cir. 1982); *accord* 1 Wright & Miller, Federal Practice & Procedure Criminal § 106 (4th ed. 2008) ("The rule of secrecy . . . applies to anything else that might indirectly reveal what happened in the grand-jury room.").

Among the most important policy reasons for the secrecy requirement is to protect the reputation of the target of an investigation. "[B]y preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Douglas Oil*, 441 U.S. at 219. "To have the prosecutor himself feed the press with evidence . . . is to make the State itself . . . a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice." *Stroble v. California*, 343 U.S. 181, 201 (1952) (Frankfurter, J., dissenting) (quoted in *In re Sealed Case No. 98-3077*, 151 F.3d at 1077).

Accordingly, identifying an individual as the target of a grand jury investigation is a core violation of grand jury secrecy. *See, e.g., Bank of Nova Scotia v. United States*, 487 U.S. 250, 259 (1988) ("[P]ublicly identifying the targets . . . of [a] grand jury investigation" violates the secrecy provisions of Rule 6(e)); *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1097 (7th Cir. 1992) (finding that Rule 6(e) covers FBI report where disclosure "would reveal the identities of targets . . ."); *United States v. Kilpatrick*, 821 F.2d 1456, 1472 (10th Cir. 1987) (recognizing that the government's identification of the subject and targets of a grand jury investigation to defendants' business associates violates Rule 6(e)); Wright & Miller, *supra*, §

KRAMER LEVIN NAFTALIS & FRANKEL LLP
April 25, 2016
Page 3

106 (citations omitted) ("[T]he identity of the target and subjects of the investigation, the names of the witnesses, and the documents, testimony and other evidence being presented [to the grand jury] are all covered by the secrecy rule.").

Here, the article discloses what any reasonable person involved in these kinds of investigations would know is almost certainly career-ending information – i.e., that Mr. Valvani is the target of a federal criminal insider trading investigation, that prosecutors "believe insider trading may have occurred," and that the "probe is at an advanced stage" such that charging decisions would be expected in the short-term. And in fact, as could have been predicted, following publication of the article, Visium placed Mr. Valvani on paid administrative leave – not because it believed he did anything wrong (indeed, it told its investors it did *not* so believe), but because the article identifying him as the target of the criminal investigation made it too difficult for him to do his job – instantly decimating his reputation and likely ending forever his heretofore unblemished and highly successful 15+ year career in the securities industry.[1]

On the basis of these developments, and so that Mr. Valvani can assess whether these extremely serious and regrettable developments require judicial intervention, we ask that you promptly confirm whether the USAO agrees to: (1) address the issues raised above and undertake an investigation to identify the source of any government leaks to the media, (2) preserve and cause to be preserved any emails, documents or other evidence related to the leaks, and (3) take all steps necessary to prevent any further violations. Absent such prompt

---

[1] The information in the article is similar to details that also appeared to have been leaked to the Wall Street Journal in prior insider trading investigations involving your office and the same group of FBI agents involved in our matter. *See, e.g.,* Michael Rothfeld, Jenny Strasburg & Susan Pulliam, *More Charges Set for Insider Probe,* Wall St. J., Dec. 1, 2011, http://www.wsj.com/articles/SB10001424052970204397704577070423777097892 (The article stated that "Federal authorities are pursuing charges against individuals at three prominent investment firms . . . according to people familiar with the matter . . . ," and referenced three individuals by name, including Fayad Abbasi of Neuberger Berman, who was never charged but was immediately placed on leave by his firm following the leak.); Michael Rothfeld & Jenny Strasburg, *Ex-Analyst at SAC Felt Pressured for Tips,* Wall St. J., Feb. 14, 2013, http://www.wsj.com/articles/SB10001424127887324432004578302243722094464 (The article identified a cooperating witness used by the government "to build a case against the SAC portfolio manager, Michael Steinberg," and specifically noted that "[a]uthorities currently are preparing to present evidence to a grand jury against Mr. Steinberg, according to a person familiar with the investigation.").

KRAMER LEVIN NAFTALIS & FRANKEL LLP
April 25, 2016
Page 4

assurances, Mr. Valvani fully intends to seek all available legal remedies. *See, e.g., In re Sealed Case No. 98-3077*, 151 F.3d at 1067-68 (a party seeking to enforce Rule 6(e) "typically" can establish a *prima facie* case based solely on the submission of news articles to the court – a "minimal" burden); *United States v. Rioux*, 97 F. 3d 648, 662 (2d Cir. 1996).

Sincerely,

Barry H. Berke
Eric Tirschwell

# EXHIBIT FF



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 28, 2016

<u>BY E-MAIL</u>

Barry H. Berke, Esq.
Eric A. Tirschwell, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036

       Re:   <u>Sanjay Valvani</u>

Dear Messrs. Berke and Tirschwell:

      We have your April 25, 2016 letter in which you speculate that the Government was "the source of the leaks" prompting the *Wall Street Journal*'s April 8, 2016 article about the Government's investigation. The Government understands its obligations when conducting a grand jury investigation, takes all practicable measures to ensure that grand jury information is not made public, and takes seriously any publication of information regarding an ongoing investigation. We have complied fully with our obligations.

      We further note that Visium disclosed the existence of the Government's investigation to its investors in a March 7, 2016 letter. In that letter, Visium stated that it had provided information to the Government regarding "the trading of certain securities, including the use of a consultant who had stopped providing services to the firm in 2011." It was only after that disclosure that the media began to report on this investigation.

                  Very truly yours,

                  PREET BHARARA
                  United States Attorney

        By:    /s/_____
           Ian McGinley
           Damian Williams
           Joshua A. Naftalis
           Assistant United States Attorneys
           (212) 637-2257 / 2298 / 2310

# EXHIBIT GG



1 of 1 DOCUMENT

Copyright 2016 Factiva ®, from Dow Jones
All Rights Reserved

# FACTIVA®

Copyright 2016 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.

The Wall Street Journal Online

April 8, 2016

**SECTION:** MARKETS

**LENGTH:** 668 words

**HEADLINE:** Insider Trading Is Focus of Probe Into Visium;
Prosecutors investigating one current and several former employees of hedge fund

**BYLINE:** By Christopher M. Matthews and Gregory Zuckerman

**BODY:**

Federal prosecutors have zeroed in on one current and several former employees of hedge fund Visium Asset Management LP as they determine whether to file criminal insider-trading charges, according to people familiar with the matter.

Prosecutors are focused on the trading of several pharmaceutical stocks at the $8 billion firm, the people said. They have indicated in meetings with defense lawyers that they believe insider trading may have occurred.

Criminal charges would touch off the most significant insider-trading case brought by the office of Manhattan U.S. Attorney Preet Bharara since an appeals court ruling in 2014 made it more difficult for prosecutors to bring such cases. That ruling followed a string of more than 80 convictions and only one acquittal for the New York prosecutors in insider-trading cases. Officials in the office have privately said they have had to drop some investigations over the past year due to the ruling.

As part of the investigation into Visium, the U.S. attorney's office has targeted Sanjay Valvani, a current partner and portfolio manager who focuses on pharmaceutical shares, the people familiar with the matter said. The identities of the former employees under investigation couldn't be determined.

Insider Trading Is Focus of Probe Into Visium; Prosecutors investigating one current and several former employees of hedge fund The Wall Street Journal Online April 8, 2016

The probe is at an advanced stage, the people said.

A spokesman for Visium declined to comment. In a letter to investors in March, the firm said it was "providing the requested information to the government."

A spokesman for the U.S. attorney's office declined to comment.

Mr. Valvani didn't reply to several requests for comment. Defense lawyers have argued privately to prosecutors that the trades under investigation weren't illegal, said one of the people familiar with the matter.

Last month, The Wall Street Journal reported that Visium, one of the largest hedge funds focusing on health-care investing, had told clients and employees that it was being investigated by the Justice Department and the Securities and Exchange Commission over trading and valuation issues.

At the time, Visium told investors that the government requested information from several years ago related to the valuation of certain securities in the firm's credit fund, which was closed in 2013, along with information related to the trading of certain securities.

The investigation compounds an already difficult year for Visium, run by Dr. Jacob Gottlieb, who has a medical degree from New York University Medical School. Amid difficulties for health-care shares, three of the firm's funds lost 5.4%, 6.9% and 7.3%, respectively, through March 31, according to investors, well below the performance of the 1.4% rise in the S&P 500 index, including dividends. The firm's largest holding as of Dec. 31, Laboratory Corp. of America, is down 4.2% this year.

Visium, which also has offices in London and San Francisco, was founded in 2005. It has more than 170 employees. The firm uses borrowed money amounting to about 2.5 times its assets, a person familiar with the matter said, suggesting that the firm holds nearly $20 billion of investments.

Mr. Bharara's office has focused on insider trading at hedge funds, charging dozens of individuals in the industry over the past eight years.

The 2014 appeals-court decision overturned the 2012 convictions of former hedge-fund traders Todd Newman and Anthony Chiasson in New York federal court.

The court said prosecutors had been too aggressive in their interpretation of the law and that they must prove traders knew that the person who provided an inside tip gained some sort of tangible reward for doing so.

Some observers predicted the ruling would slow insider-trading prosecutions. In October, Mr. Bharara abandoned a high-profile insider-trading case, moving to dismiss charges against former SAC Capital Advisors LP portfolio manager Michael Steinberg and six analysts, who had previously been convicted of insider trading.

Write to Christopher M. Matthews at christopher.matthews@wsj.com and Gregory Zuckerman at gregory.zuckerman@wsj.com

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** April 9, 2016