UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

    - v. -                                              :

                                  S1 16 Cr. 338 (PKC)

WILLIAM T. WALTERS,                           :
      a/k/a "Billy,"

                            :

             Defendant.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
    of America.

Joan M. Loughnane
Daniel S. Goldman
Brooke E. Cucinella
Michael Ferrara
Assistant United States Attorneys
    -Of Counsel-

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

I.   Relevant Facts............................................................................................................ 3

   A.   The Investigation .............................................................................................. 4

      1.   July 2011: The USAO Commences an Investigation....................................... 4

      2.   Spring of 2013: The Investigation Begins to Focus on Suspicious Trading by Walters and ████████ in Dean Foods ........................................................... 5

      3.   A Circumstantial Pattern Emerges and the USAO and FBI Pursue a  Title III Wiretap........... 6

      4.   The Threat of Exposure of the Investigation Forces the Government to Prematurely Approach Davis and ████████ ........................................................ 7

      5.   Media Reports Expose the Investigation and Covert Operations Come to a Halt; Attempts at Overt Operations Remain Fruitless........................................ 7

      6.   Early 2015: Davis Begins Producing Documents to the SEC and the USAO, and Becomes the Focus of the Investigation .................................................... 9

      7.   May 18, 2015: Davis Perjures Himself During Sworn SEC Testimony, Creating Renewed Criminal Interest and Leading to Additional Criminal Exposure That Sets the Stage for His Decision to Cooperate............................ 10

      8.   Early 2016: Davis Decides to Cooperate with the Criminal Investigation and Pleads Guilty to a 12-Count Information...................................................... 11

      9.   May 17, 2016: Walters Is Charged in a 10-Count Indictment ....................... 12

   B.   The Disclosure of Confidential Information about the Investigation ................ 13

      1.   Walters's Motion for a Hearing to Address Government Misconduct ............ 13

      2.   The Court Orders a Hearing on Press Contacts at the FBI and the USAO ...... 14

      3.   The Government Inquiry in Preparation for the Hearing................................ 15

      4.   Agent Chaves Admits to Disclosing Information about the Investigation to the Press .......... 15

      5.   The Government Reports Its Findings to the Court ....................................... 16

      6.   Agent Chaves Is Referred to the FBI's OPR and the DOJ OIG ..................... 17

7.   The USAO's and FBI's Response to the Misconduct in This Case ........................................ 18

ARGUMENT ................................................................................................................................ 19

I.   Because Walters Suffered No Prejudice, the Indictment Should Not Be Dismissed Under the Court's Supervisory Powers ................................................................................................ 19

A.   Applicable Law ................................................................................................................ 19

B.   Discussion ........................................................................................................................ 22

1.   The Leaks Did Not Help the Investigation, They Hindered It Significantly ........................ 23

2.   The Leaks Did Not Lead to Davis's Cooperation ................................................ 25

3.   The Government Would Not, and Did Not, Induce the Destruction of Powerful Evidence of Walters's Guilt ............................................................................ 26

4.   Walters Suffered No Prejudice from Calls Intercepted on the Wire Following the Leaks ..... 27

II.   The Court Should Reject Walters's Attempt to Side-Step the Prejudice Requirement by Asking the Court to Apply a Legal Standard That No Court Has Ever Used to Dismiss an Indictment ................................................................................................................ 27

A.   *Bank of Nova Scotia* Requires Prejudice to Dismiss an Indictment ............................. 27

III.   The Government Did Not Engage in Outrageous Misconduct .................................... 30

A.   Applicable Law ................................................................................................................ 30

B.   Discussion ........................................................................................................................ 31

IV.   Other Remedies Will Punish the Wrongdoer and Provide Deterrence Without Providing an Inappropriate Windfall to Walters, Who Has Not Established Prejudice .................................. 35

A.   Applicable Law ................................................................................................................ 35

B.   The Ongoing Criminal Investigation ................................................................. 36

C.   No Further Hearing Is Warranted ..................................................................... 37

CONCLUSION ............................................................................................................................. 38

## TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia* v. *United States*, 487 U.S. 250 (1988) .................................................. passim

*Hampton* v. *United States*, 425 U.S. 484 (1976) ....................................................... 31

*In re United States*, 441 F.3d 44 (1st Cir. 2006) ......................................................... 35

*Rochin* v. *California*, 342 U.S. 165 (1952) .................................................................. 32

*Skilling* v. *United States*, 561 U.S. 358 (2010) ......................................................... 37

*United States* v. *Al-Kassar*, 660 F.3d 108 (2d Cir. 2011) ........................................... 30

*United States* v. *Berkovich*, 168 F.3d 64 (2d Cir. 1999) ............................................. 31

*United States* v. *Brito*, 907 F.2d 392 (2d Cir. 1990) .................................................. 28

*United States* v. *Broward*, 594 F.2d 345 (2d Cir. 1979) ............................................. 31

*United States* v. *Brown*, 602 F.2d 1073 (2d Cir. 1979) ................................... 22, 35, 36

*United States* v. *Carlone*, 666 F.2d 1112 (7th Cir. 1981) ........................................... 35

*United States* v. *Carter*, 2005 WL 180914 (S.D.N.Y. Jan. 25, 2005) ........................... 29

*United States* v. *Castro-Gonzalez*, 2014 WL 3490506 (S.D. Cal. July 11, 2014) ....................... 21

*United States* v. *Chin*, 934 F.2d 393 (2d Cir. 1991) ................................................... 31

*United States* v. *Cuervelo*, 949 F.2d 559 (2d Cir. 1991) .................................... passim

*United States* v. *Eisen*, 974 F.2d 246 (2d Cir. 1992) .................................................. 19

*United States* v. *Felton*, 755 F. Supp. 72 (S.D.N.Y. 1991) ......................................... 29

*United States* v. *Fisher*, 692 F. Supp. 495 (E.D. Pa. 1988) ........................................ 29

*United States* v. *Friedman*, 854 F.2d 535 (2d Cir. 1988) ..................................... passim

*United States* v. *Hatfield*, 2010 WL 183522 (E.D.N.Y. Jan. 8, 2010) ........................... 36

*United States* v. *Isgro*, 974 F.2d 1091 (9th Cir. 1992) ......................................... 22, 35

iii

*United States* v. *LaPorta*, 46 F.3d 152  (2d Cir. 1994)...................................................................... 31

*United States* v. *Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) ...................................... 21, 32, 34

*United States* v. *Mechanik*, 475 U.S. 66 (1986)........................................................................ 20

*United States* v. *Mendez-Hernandez*, 1990 WL 64600 (S.D.N.Y. 1990) ...................................... 29

*United States* v. *Myers*, 510 F. Supp. 323 (E.D.N.Y. 1980).................................................. passim

*United States* v. *Rabinowitz*, 645 F. App'x 63 (2d Cir. 2016) ...................................... 31

*United States* v. *Rioux*, 97 F.3d 648 (2d Cir. 1996)........................................................... 13

*United States* v. *Rubio*, 709 F.2d 146 (2d Cir. 1983)............................................................. 31

*United States* v. *Sabri*, 973 F. Supp. 134 (W.D.N.Y. 1996)............................................. 21, 32, 33

*United States* v. *Schmidt*, 105 F.3d 82 (2d Cir. 1997) ................................................. 31

*United States* v. *Sessa*, 2011 WL 256330 (E.D.N.Y. Jan. 25, 2011)........................................... 31

*United States* v. *Simpson*, 813 F.2d 1462 (9th Cir. 1987) ........................................... 34

*United States* v. *Skelos*, No. 15 Cr. 317 (KMW) (S.D.N.Y. Oct. 20, 2015)................................ 14

*United States* v. *Williams*, 504 U.S. 36 (1992) ........................................................................ 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   - v. -                                             :

                                                 S1 16 Cr. 338 (PKC)

WILLIAM T. WALTERS,                         :
     a/k/a "Billy,"

                                      :

                 Defendant.

                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

### PRELIMINARY STATEMENT

Despite many opportunities to do so, defendant William T. Walters has consistently failed to show that he suffered any actual prejudice from the improper leaks here.  His latest effort to manufacture a theory of harm fares no better, because the reality is the leaks did not harm Walters.  This failure to show harm or prejudice is fatal to his motion, because without prejudice, dismissal of the Indictment is not legally proper.

The leaks by Federal Bureau of Investigation ("FBI") Supervisory Special Agent David Chaves that contributed to articles being written in 2014 about this case were unquestionably wrong and improper.  There should be serious consequences for that misconduct, and there will be.  Already his conduct has been referred to the FBI's Office of Professional Responsibility ("OPR") and the Department of Justice's Office of Inspector General ("DOJ OIG").  As a result, a criminal investigation, led by the DOJ's Public Integrity Section ("PIN"), is underway, and

1

Agent Chaves (and anyone else who is found to have engaged in misconduct) will be fully investigated and prosecuted, as appropriate.

While the leaks merit serious consequences, those consequences should not include the dismissal of the Indictment, because one (the leaks) did not affect the other (the Indictment). Walters was indicted because the evidence presented to the grand jury (including ███████ ███████████████████████████████████████████████████████████████████ ███████████████████████) demonstrated—and unquestionably established probable cause that—Walters had committed serious federal crimes.  He had participated in a years-long conspiracy to unlawfully profit from material nonpublic information Davis gave him, netting him over $40 million in illicit gains. ████████████████████████████████████████████ ██████████████████████████████████████████

Unable to show prejudice, as he must, Walters resorts to mischaracterizing the facts and governing law.  The Supreme Court has made clear that where, as here, there has been no showing of actual prejudice to a defendant from misconduct in grand jury proceedings, a district court may not dismiss an indictment on that ground.  *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 255 (1988).  Indeed, in that very case, the Supreme Court held that prosecutors' breaches of Federal Rule of Criminal Procedure 6(e)—including "by publicly identifying the targets and subject matter of the grand jury investigation"—did not and "could not" have affected the grand jury's charging decision, and thus could not support a finding of prejudice or dismissal of the indictment.  Unable to meet the high standard set forth in *Bank of Nova Scotia*, Walters instead invites the Court to apply a *different* legal standard—one based on one sentence of dicta (discussing instances of "systematic and pervasive" prosecutorial misconduct) that did not change the core holding of *Bank of Nova Scotia*: that dismissal requires prejudice.  Not

surprisingly, Walters can cite to no federal court anywhere in the 29 years since *Bank of Nova Scotia* that has dismissed an indictment on the basis Walters requests.  The Court should reject Walters's invitation to be the first to do so.

In addition to mischaracterizing *Bank of Nova Scotia,* Walters pushes for dismissal of the Indictment on constitutional due process grounds, arguing that the Government's misconduct so shocks the conscience that a showing of prejudice is not required.  That argument rests on a misleading narrative that asserts, for example, that the United States Attorney's Office for the Southern District of New York ("USAO") and FBI decided not to stop Agent Chaves's leaks and tacitly "approved" them (Def. Br. 54-55), one belied by contemporaneous emails showing prosecutors' and other agents' outraged reactions to the leaks.  In any event, even Walters's erroneous and exaggerated version of the Government's conduct does not entitle him to the relief he seeks.  Although plainly wrong, the leaks by Agent Chaves are not the kind of shock-the-conscience misconduct that justifies the drastic remedy of dismissal of an indictment, nor is the Government's failure to identify or stop the leaker earlier.

At bottom, what we have here is unquestionable misconduct by an agent of the Government—the improper and inexcusable leaking of information to the media.  But equally apparent is the lack of actual prejudice suffered by Walters.  Under these circumstances, the law is clear: Dismissal of the Indictment is not the appropriate remedy.  We therefore respectfully submit that the Court should deny the motion to dismiss the Indictment and the request for a hearing.

## I.     Relevant Facts

At the outset, we provide a chronology of the Government's underlying investigation in some detail to show the basis for the grand jury's Indictment, and to correct errors and

mischaracterizations in Walters's brief concerning the timing, pace, and key events in the investigation.

### A.     The Investigation

#### 1.     July 2011: The USAO Commences an Investigation

In July 2011, the FBI, along with the USAO, began an investigation into suspicious trading by Walters in shares of ███████████████████████████████████████ ███████████████████████████████████████████████ .  Upon learning that the United States Securities and Exchange Commission ("SEC") was also investigating Walters's suspicious trading, the USAO sent an "access request" to the SEC, allowing the SEC to share information it had gathered through its parallel, civil investigation.  Pursuant to that request, the SEC shared documents it had gathered, ranging from "blue sheets" reflecting all trades in ██████, to documents it had obtained in response to a civil subpoena issued to ██████.

With an initial focus on Walters's suspicious trading in ██████, the USAO and FBI began taking routine investigative steps common to all insider-trading investigations, ██████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ ██████████ ██████████████████████████████████ FBI Special Agent Matthew Thoresen, the case agent for the investigation.  Agent Thoresen's supervisor was Agent Chaves.

---

1   ████████████████████████████████████████████████ ██████████

> 2.     **Spring of 2013: The Investigation Begins to Focus on Suspicious Trading by Walters and** ██████████ **in Dean Foods**

In the spring of 2013, a referral by the Financial Industry Regulatory Authority ("FINRA")—which reported suspicious trading in the stock of the Dean Foods Company ("Dean Foods")—brought a new focus to the criminal investigation of Walters.

Specifically, on April 26, 2013, FINRA made a referral to the SEC (which the SEC then shared with the USAO) in which FINRA identified suspicious trading by Walters and ████████████████████████████, among others, in Dean Foods shortly ahead of an August 2012 announcement that Dean Foods intended to spin off its successful branded dairy business, WhiteWave. (*See* Ex. 1 (FINRA referral).) FINRA concluded that Walters had made approximately $17.1 million in profits from his trading activity, and that ██████████████████████. The FINRA referral also noted that Walters had been friends with an individual who served on the Board of Directors of Dean Foods, Thomas C. Davis, for 15 years.

On May 15, 2013, the SEC received exhibits associated with the FINRA referral and, pursuant to the USAO's access request, shared those documents with the USAO and FBI on May 17, 2013. While the Government had previously known of Walters's trading in Dean Foods and was aware of Davis, the revelation of his close relationship with Walters broadened the investigation. ████████████████████████████████████████████████████████████████████████████████████████████████████████████. Thus, contrary to Walters's assertion or any claim by Agent Chaves that the Government's investigation was dormant in 2013, it was in fact expanding as a result of the FINRA referral.

3.    **A Circumstantial Pattern Emerges and the USAO and FBI Pursue a Title III Wiretap**

████████████████████████  during the remainder of 2013 and early 2014, a strong circumstantial case of securities fraud developed in connection with Walters's trading in ████,

Dean Foods, and ████████████████████████████████



██████████████████████████████████████████████████████

████████████████████████████████████████

### 4.      The Threat of Exposure of the Investigation Forces the Government to Prematurely Approach Davis and ████████

████████████████████████████████████████, the USAO learned of the media's intention to run a story about the investigation.[3]  Realizing that publicity about the investigation would likely eliminate the potential for covert investigative steps, the USAO and FBI had to change their investigative plan and took steps to send FBI agents to approach two of the targets. On May 28, 2014, agents booked flights to Texas and Ohio, and the following day approached Davis at his home in Dallas and █████████████████████.  During these hurried approaches, conducted under less-than-ideal circumstances necessitated by the imminent news stories, both Davis and ████████ proclaimed their innocence and refused to assist in the investigation.

### 5.      Media Reports Expose the Investigation and Covert Operations Come to a Halt; Attempts at Overt Operations Remain Fruitless

Articles revealing the existence of the investigation were published on May 30, 2014. The *Journal* first broke the story; *The New York Times* (the "*Times*") followed with a piece shortly thereafter. Other articles followed in the *Times* on May 31 and in the *Journal* on June 1, each revealing more information about the scope of the investigation.[4]

---

[3]      As described more fully below, the FBI learned that a reporter from *The Wall Street Journal* (the "*Journal*") knew details about the investigation on or about May 6, 2014.  (Docket Entry 65-1, at 5 ("Gov't Submission")).  The USAO was informed of this information no later than May 8, 2014 (Decl. of Telemachus P. Kasulis ¶ 11 ("Kasulis Decl.")), although neither office knew that an article would be published about the investigation until at least May 27, 2014 (*id.* ¶ 14).

[4]      None of the seven articles about the investigation published in the *Journal* or the *Times* in 2014 referenced Davis by name.

Putting aside Agent Chaves—whose true motive for leaking is unclear, and whose post-facto explanation for why he leaked may not be credible—what is exceedingly clear is that the FBI case agent, the AUSAs, and the leadership at the USAO and FBI all around Agent Chaves were appalled by the leaks:

• Agent Thoresen, the case agent, vented that the leaker was pursuing an "aggressive agenda . . . to *derail* this investigation." (Gov't Submission, Ex. A. (Docket Entry 65-5) (emphasis added); *see also* Gov't Submission, Ex. D (Docket Entry 65-5) (Agent Thoresen to AUSA Kasulis, calling the leaks "[d]eplorable and reprehensible").)

• The then-Assistant Director in Charge ("ADIC"), George Venizelos, wrote to his subordinates, "*This is not good*" and "do not speak to this reporter again for now." (*Id.* Ex. C (Docket Entry No. 65-4) (emphasis added).)[5]

• United States Attorney Preet Bharara to Venizelos: "I know you agree these leaks are outrageous and *harmful*." (*Id.* Ex. E (Docket Entry 65-6) (emphasis added).)

After four articles about the investigation were published over a two-day period from May 30 through June 1, 2014, ███████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

█████████

██████████████████████████████████████

███████████████████████████████████████

---

[5]     In a subsequent email, Venizelos elaborated: "Just stop talking to this reporter now!  If we don't have enough evidence by now it's over. . . . [I]f I find out someone is still talking to this reporter after today th[e]n there will be reassignments immediately."  (Gov't Submission, Ex. C (Docket Entry No. 65-4).)

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████. Far from assisting the investigation, the leaks—and the publicity that

followed—harmed it. ███████████████████████████████████████

███████████████████████████████████████████████████████[6]

If there was any time period when the Government's investigation could fairly be

characterized as "dormant," it was the six months from August 2014 to February 2015—the

period of time directly *following* the press publication of the leaks, not the period right before, as

Walters would have the Court believe.

### 6. Early 2015: Davis Begins Producing Documents to the SEC and the USAO, and Becomes the Focus of the Investigation

In February 2015, the SEC informed the USAO that Davis had been interviewed in

connection with an internal investigation conducted by outside counsel for Dean Foods.

According to the SEC, Davis—who had been elevated to Dean Foods' Chairman of the Board of

Directors following the WhiteWave spinoff—denied any involvement with insider trading in

Dean Foods stock.  On March 6, 2015, the USAO reached out to Davis's counsel and inquired

again whether he would be interested in cooperating with the Government, but Davis, through

his counsel, again declined.

---

[6]     In the fall of 2014, Agent Thoresen transferred out of the FBI's New York Field Office
("NYFO"), and the case was reassigned to another agent on Agent Thoresen's squad.  At around
the same time, Agent Chaves was promoted to be the Coordinating Supervisory Special Agent of
the white collar branch of the NYFO, which meant he no longer directly supervised the
investigation and instead nominally oversaw several FBI squads that focused on white collar
crime.

In early 2015, the SEC subpoenaed documents from Davis, including certain bank records, emails, and calendar entries, which Davis then voluntarily provided to the USAO.  On March 27, 2015, the SEC noticed Davis for a deposition.[7]  In April 2015, as the SEC prepared to depose Davis, ███████████████████████████████████████████████████████████

███████████████

### 7.    May 18, 2015: Davis Perjures Himself During Sworn SEC Testimony, Creating Renewed Criminal Interest and Leading to Additional Criminal Exposure That Sets the Stage for His Decision to Cooperate

On May 18, 2015, nearly a year after press articles had exposed the investigation, Davis testified at an SEC deposition and made a number of false statements.  (*See* Ex. 2 (Davis's SEC deposition transcript).)  Davis denied discussing the WhiteWave spinoff with Walters, denied knowing that Walters owned Dean Foods stock, and denied knowingly making phone calls to Walters after important board meetings or announcements.  Davis claimed that one of the suspiciously timed phone calls to Walters must have been a "pocket dial," notwithstanding that it was quickly followed by Dean Foods trading by Walters.  (*Id.* at 199.)  Davis acknowledged that he had sought a loan from Walters, but denied he was in financial trouble.  He also could not satisfactorily explain other matters related to his finances.  The SEC provided the USAO with a transcript of the deposition on May 26, 2015.

It was at this point that the Government's investigation again gained steam; Davis's demonstrably false SEC testimony was a key development.  The Government focused energies on Davis's deposition testimony and personal finances, Walters's trades in Dean Foods (going back to 2008), and the timing of those trades in relation to communications with Davis.  The

---

[7]     Around this time, AUSA Kasulis became Deputy Chief of the USAO's Securities and Commodities Fraud Task Force, and AUSA Brooke E. Cucinella was assigned to this investigation.

USAO, FBI, and SEC also interviewed multiple Dean Food representatives.  This renewed focus on Davis and the additional criminal exposure arising out of his demonstrably false SEC testimony forced Davis to confront his own criminal liability and the decision whether to cooperate.  That decision was driven by his and his counsel's assessment of his exposure at that time, not by articles about the case written more than a year earlier that did not even mention Davis and at the time had not convinced Davis to cooperate.

### 8.   Early 2016: Davis Decides to Cooperate with the Criminal Investigation and Pleads Guilty to a 12-Count Information

In or about February 2016, facing significant criminal exposure now exacerbated by his SEC testimony, Davis, through new counsel, indicated that he wished to cooperate. (Kasulis Decl. ¶ 18.)  In proffers with the Government, Davis admitted passing material, nonpublic information to Walters for use in securities trading.  Davis also reported that Walters had provided him with a cellphone to use when passing Walters confidential information about Dean Foods and at least one other company.  Davis had used the phone as directed (when possible), and had kept it in his possession until the FBI approached him on May 29, 2014.  The Government expects Davis to testify that, approximately one week after the FBI approached him (and close to two years before he proffered), he tossed the phone into a pond in an effort to prevent the FBI from finding it.

On May 16, 2016, Davis pled guilty, pursuant to a cooperation agreement, to a 12-count Information.  Along with the securities- and wire-fraud counts with which Walters is also charged, Davis pled guilty to (a) one count of obstruction of justice for lying to the FBI agents who approached him in May of 2014 and then destroying the prepaid cellphone, and (b) one count of perjury for providing false sworn testimony to the SEC.

### 9.     May 17, 2016: Walters Is Charged in a 10-Count Indictment

One day later (and almost two years after the 2014 articles in the *Journal* and *Times*), on

May 17, 2016, ██████████████████████████████████████████████

████████████████████████████████████████████████████████.

████████████████████

    ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

    ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

The grand jury returned a 10-count Indictment charging Walters with one count each of

conspiracy to commit securities and wire fraud, and four counts each of substantive securities

and wire fraud.

On May 18, 2016, exactly one year after Davis sat for a deposition with the SEC, Walters was arrested.

**B.      The Disclosure of Confidential Information about the Investigation**

    **1.      Walters's Motion for a Hearing to Address Government Misconduct**

On September 23, 2016, Walters filed his pre-trial motions, including a motion for a hearing to address alleged violations of Rule 6(e) and alleged misrepresentations to the Court in connection with ███████████████████████████. (Docket Entry 42 ("Sep. 23 Def. Mem."))  Citing to the seven articles published in the *Journal* and *Times* from May 30, 2014, through June 23, 2014, Walters argued that he had made a *prima facie* showing of a Rule 6(e) violation.[8] (*Id.* at 37.)  In making his motion at the time, Walters did not articulate any actual prejudice he suffered from the 2014 *Journal* and *Times* articles.

On October 21, 2016, the Government filed its opposition to Walters's motions.  In that opposition, the Government argued that (a) it had not misled the Court in connection with ██ ████ (b) Walters could not meet his burden of making a *prima facie* showing of a Rule 6(e) violation because the information included in the articles did not include "matters occurring before the grand jury," and (c) Walters could not make a *prima facie* showing because he could not demonstrate that the source of the information was a member of the prosecution team (and not, for example, a civil regulator).  (Docket Entry 43, at 47 ("Gov't Opp. Mem.").)[9]

---

[8]      As Walters noted in his brief, to find a Rule 6(e) violation, the Court had to find that the articles (1) disclosed a matter or matters occurring before the grand jury, and (2) that a Government attorney or agent was the source of the disclosure.  (Def. Br. 37 (citing *United States* v. *Rioux*, 97 F.3d 648 (2d Cir. 1996)).)

[9]      At the time the Government's opposition papers were drafted, no one involved independently recalled the June 12, 2014 email from then-Deputy U.S. Attorney Richard B. Zabel, in which Zabel summarized a conversation with Ben Protess of the *Times* about a source

In support of its opposition, the Government submitted a declaration from AUSA Kasulis (the "Kasulis Declaration"), who led the investigation during the time the articles were published.  The Kasulis Declaration largely focused on Walters's argument about ████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (Kasulis Decl. ¶¶ 7-17.)  The Kasulis Declaration also included a sworn representation from AUSA Kasulis that neither he nor Agent Thoresen, the case agent on the investigation at the time of the articles, had disclosed any information about the investigation to any member of the press.[10]  (Kasulis Decl. ¶ 17.)

### 2.    The Court Orders a Hearing on Press Contacts at the FBI and  USAO

On November 17, 2016, the Court directed the parties to prepare for an evidentiary hearing on December 12, 2016 to address two issues: the timing of the decision to send FBI agents to approach two targets,[11] and communications between FBI agents or AUSAs involved in the investigation and reporters or employees of the *Journal* or *Times* during the period April 1

---

in the FBI and another source in the SEC.  (Gov't Submission, Ex. F.)  Zabel left the USAO in June 2015 and was not involved in the preparation of the Government's opposition.

[10]    The Kasulis Declaration was modeled on a similar, recently submitted declaration cited with approval in *United States* v. *Skelos*, No. 15 Cr. 317 (KMW) (S.D.N.Y. Oct. 20, 2015).  Judge Wood, in denying the defendants' motion without a hearing, relied upon a declaration from an AUSA responsible for the investigation that included representations from line AUSAs, one supervising AUSA who attended a grand jury presentation, and line investigators and case agents handling the investigation, that none of them had disclosed any information about the investigation to the press (*see* Affidavit of AUSA Tatiana Martins, *United States* v. *Skelos*, No. 15 Cr. 317 (KMW) (Docket Entry 33-1)).

[11]    After the Government presented documentary evidence that the FBI agents had made their travel arrangements well after the wiretap application was submitted, the Court vacated the order with respect to the first issue, *i.e.*, the timing of the approaches.  (12/2/2016 Tr. at 32-33.)

to June 30, 2014 (the "Relevant Period").  (Docket Entry 46 ("Nov. 17 Order").)  The Court

wrote that "the newspaper articles in totality and in specifics are suggestive of a government

leak, including subpoenas arguably protected under Rule 6(e)" (*id.*), which the Government

understood to reflect a finding that Walters had met his burden of making a *prima facie* showing.

### 3.       The Government Inquiry in Preparation for the Hearing

In response to the Court's November 17 Order, the Government attempted to identify all

the FBI agents and AUSAs who had been involved in this investigation, at the line and

supervisory levels, as directed by the Court.  The Government also identified additional

individuals not specified in the Court's Order who may have had contact with the press,

including the USAO's Chief Public Information Officer, and a member of the FBI press office.

In total, the Government identified 14 people (seven each from the USAO and the FBI) who

merited interviewing about the activities during the Relevant Period.

The Government obtained and reviewed relevant emails for all 14 individuals during the

Relevant Period.  In addition, the Government obtained cellphone logs and text messages for FBI

personnel during the Relevant Period.  (The USAO does not maintain a centralized system for

cellphone contacts.)  After reviewing these materials, the USAO interviewed all 14 individuals.

Only Agent Chaves admitted to providing confidential information to the *Journal* and the *Times*;

other agents acknowledged participating in a May 27, 2014 meeting with the *Journal*—at which

the FBI asked for a delay publishing any story about the investigation—but viewed their

participation in that meeting as appropriate.

### 4.       Agent Chaves Admits to Disclosing Information about the
### Investigation to the Press

On December 6, 2016, the Government interviewed Agent Chaves with FBI counsel

present.  Agent Chaves admitted providing confidential information about the investigation to

the *Journal* and *Times* dating back to in or about April 2013, but reported that before December 6, 2016, he had never informed anyone at the FBI or the USAO that he had done so.  On December 8, 2016, Agent Chaves returned to the USAO for a second interview, and a third interview was scheduled for December 13, 2016, because the USAO had not concluded its debriefing of Agent Chaves.  Before that interview took place, however, Agent Chaves informed the USAO that he was unavailable to meet.  He then retained personal counsel, who subsequently informed the Government that Agent Chaves would no longer meet with the Government and would assert his Fifth Amendment privilege against self-incrimination.

### 5.    The Government Reports Its Findings to the Court

On December 16, 2016, the Government made two submissions to the Court—one public, one *ex parte*.  The public submission informed the Court of its discovery that an FBI agent had been a significant source of confidential information to the media about the investigation, and of the Government's referral of the agent's conduct to the appropriate investigatory bodies within the DOJ.  (Docket Entry 53.)

The *ex parte* submission, filed under seal, provided a more detailed factual description of the inquiry the Government had undertaken and what it had found.[12]  This submission explained that, although Agent Chaves had admitted to having been a repeated source of information to reporters at the *Journal* and *Times* regarding the investigation in 2013 and 2014, the contours of the information Agent Chaves provided to the reporters were not entirely clear, in part because the Government was "not in a position to vouch for his credibility."  (Gov't Submission at 3-4, 10.)

---

[12]    By Court order dated January 3, 2017 (Docket Entry 64), this letter was publicly filed on January 4, 2017 with redactions approved by the Court (Docket Entry 65-1.)

Both submissions set forth the Government's view of the proper procedure for proceeding under the relevant caselaw, given that the Government could not say with certainty whether a violation of Rule 6(e) had occurred. Specifically, the Government suggested that the Court assume such a 6(e) violation and proceed to consider a remedy.

On December 19, 2016, the Court agreed "that the government cannot rebut defendant Walters' *prima facie* case of a violation of Rule 6(e)." (Docket Entry 57 ("Dec. 19 Order").) The Court converted the hearing scheduled for December 21, 2016 to a conference to address the next steps, including "what relief may be appropriate." (*Id.*)

On December 21, 2016, the Court held a conference at which it provided defense counsel with what it described as a "more than fair opportunity" to describe the relief he sought in light of the assumed Rule 6(e) violation and any prejudice he could show. (12/21/2016 Tr. at 8, 34.) As the Court will recall, during the ample time provided to defense counsel, he was unable to articulate prejudice to Walters as a result of the assumed Rule 6(e) violation. Nonetheless, the Court provided Walters with another opportunity to make a written motion to dismiss the Indictment or for other relief. (*Id.* at 34, 36.) This motion followed.

### 6.      Agent Chaves Is Referred to the FBI's OPR and the DOJ OIG

On December 8, 2016, the FBI referred Agent Chaves's conduct to OPR, the internal division within the FBI responsible for investigating allegations of misconduct and taking any appropriate disciplinary actions. On December 15, 2016, the USAO referred Agent Chaves's conduct to the OIG, an investigative body within the DOJ that conducts full-fledged criminal investigations into the conduct of DOJ employees. On or about December 20, 2016, the OIG opened a criminal investigation into the leaks at issue here, including but not limited to Agent Chaves's conduct. PIN, a DOJ component independent of the USAO, will be overseeing that

investigation.[13]  According to PIN, although the investigation will initially focus on the

disclosure of non-public information in this case, if the investigation uncovers evidence of

misconduct in other matters, PIN can broaden the scope of the investigation.

### 7.    USAO's and FBI's Response to the Misconduct in This Case

The USAO and FBI NYFO leadership have responded to the recent events in this case,

not only by referring Agent Chaves to disciplinary and criminal authorities, but also by taking

remedial measures to deter and respond more effectively to any future potential government

leaks.  Among other things, within the last six weeks, NYFO leadership has educated and

reminded its agents, task force officers, and other personnel working criminal matters—orally

and in writing—of the FBI media policy; agents and their supervisors have been made to

understand that leadership in the NYFO is committed to fully addressing instances where

investigative information, not already in the public domain, appears likely to have been leaked to

the media by an FBI source; USAO and FBI leadership have met in person to discuss remedial

and investigative approaches that could be pursued in the event of a suspected government leak;

and the U.S. Attorney has also reinforced to USAO employees the importance of keeping

ongoing investigations secret, and the severe consequences of failing to do so.

---

[13]      Although PIN will oversee this investigation, which relates to a case currently being
handled by the USAO, the USAO routinely investigates and prosecutes corruption by law
enforcement, including law enforcement partners who work directly with the USAO.  *See, e.g.*,
*United States* v. *Kun Shan Chun*, No. 16 Cr. 518 (VM) (New York FBI employee convicted of
espionage offense); *United States* v. *Lustyik*, No. 13 Cr. 616 (VB) (White Plains FBI agent
convicted of graft offenses); *United States* v. *Busby*, No. 11 Cr. 370 (HB) (New York FBI agent
convicted of false statement offenses); *United States* v. *Polos*, No. 15 Cr. 692 (PGG) (senior
New York DEA supervisor and a DEA telecommunications analyst convicted for false
statements in connection with a national-security background investigation); *United States* v.
*Harrington*, No. 16 Cr. 468 (GHW) (two senior NYPD officials charged with soliciting and
accepting bribes in exchange for official action).

**ARGUMENT**

I.     **Because Walters Suffered No Prejudice, the Indictment Should Not Be Dismissed Under the Court's Supervisory Powers**

Dismissing an indictment based on a defendant's claim that government misconduct affected the grand jury's charging decision is an extreme remedy—one that federal courts have granted in the rarest of circumstances and only upon a showing of actual prejudice.  Here, Walters cannot show prejudice and the Court should deny his motion.

A.     **Applicable Law**

As the Supreme Court explained in its seminal decision on this issue, *Bank of Nova Scotia*, the same rationale that underlies the "harmless error" standard for trials applies to grand jury proceedings, namely:

•     that it is not necessary to reverse a conviction (or dismiss an indictment) where "the conviction [or indictment] would have been obtained notwithstanding the asserted error";

•     that deterrence is "an inappropriate basis for reversal" (or dismissal of an indictment) where more "narrowly tailored" means can address the misconduct; and

•     that concerns about the integrity of the process carry less weight absent a showing of prejudice.

487 U.S. at 255-56 (internal quotation marks omitted).  Thus, the Supreme Court held that a district court "exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." *Id.* at 255; *see also United States* v. *Eisen*, 974 F.2d 246, 261 (2d Cir. 1992) ("a defendant seeking reversal or a hearing regarding alleged grand jury abuse *must* show prejudice or bias" (emphasis added)); *United States* v. *Friedman*, 854 F.2d 535, 583-84 (2d Cir. 1988) (in the absence of showing of prejudice, district court's refusal to grant post-trial relief for alleged grand jury leaks without a hearing was not error).

19

*Bank of Nova Scotia* also articulated the standard for assessing prejudice: "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." 487 U.S. at 255 (quoting *United States* v. *Mechanik*, 475 U.S. 66, 78 (1986)).[14]

That prejudice standard is a high one.  In *Bank of Nova Scotia*, the Court determined that the standard was unmet even though the trial court had affirmatively found violations of Rule 6(e) secrecy provisions and a slew of errors that occurred in the grand jury room itself— including improperly instructing grand jury witnesses that they could not reveal the substance of their grand jury testimony; allowing simultaneous appearances by two Internal Revenue Service ("IRS") agents before the grand jury; violating the witness immunity statute through the use of "pocket immunity"; and causing IRS agents to mischaracterize testimony in prior proceedings. *Id.* at 257-58.  Notwithstanding all of the above, the Supreme Court concluded:

> In considering the prejudicial effect of the foregoing instances of alleged misconduct, we note that these incidents occurred as isolated episodes in the course of a 20-month investigation, an investigation involving dozens of witnesses and thousands of documents.  In view of this context, those violations that did occur do not, even when considered cumulatively, raise a substantial question, much less a grave doubt, as to whether they had a substantial effect on the grand jury's decision to charge.  Errors of the kind alleged in these cases can be remedied adequately by means other than dismissal.

*Id.* at 263.

---

[14]    The only "isolated" exception to the standard identified by *Bank of Nova Scotia* is that prejudice may be presumed where the indictment was obtained under circumstances in which the "structural protections of the grand jury have been so compromised as to render the proceedings unfair," such as when racial or gender discrimination was used in selection of grand jurors in violation of the Constitution.  487 U.S. at 257.  That principle is not at issue here.

Walters has not cited a single case—and the Government is aware of none—where a court found this standard met, and dismissed the indictment, on the basis of a Rule 6(e) violation. As set forth above, the Supreme Court denied such a motion in *Bank of Nova Scotia*, 487 U.S. at 259-60 ("it is plain that these alleged breaches [of Rule 6(e)] could not have affected the charging decision"), as did the Second Circuit (albeit on a motion raised post-trial) in *Friedman*, 854 F. 2d at 582, 584 ("assum[ing] *arguendo* that the government persistently leaked information about grand jury proceedings to the press in an unethical and unlawful campaign . . . appellants *simply cannot show resultant prejudice* from the publicity surrounding the grand jury proceedings" (emphasis added)).

Moreover, in the handful of cases cited by Walters where courts have dismissed the indictment under *Bank of Nova Scotia* (Def. Br. 49-50), all of those courts found that prejudice needed to be, and was in fact, shown.  *See United States* v. *Castro-Gonzalez*, No. 13CR0693 AJB, 2014 WL 3490506, at *3 (S.D. Cal. July 11, 2014) (defendant "clearly suffered" actual prejudice where he spent seven months in jail on account of agent's "extreme" misconduct); *United States* v. *Sabri*, 973 F. Supp. 134, 148 (W.D.N.Y. 1996) (defendant was "clearly prejudiced" by Government's manipulation of the attorney-client relationship); *United States* v. *Marshank*, 777 F. Supp. 1507, 1529 (N.D. Cal. 1991) (defendant was prejudiced by Government's flagrant violations of his Fifth and Sixth Amendment rights).[15]

By contrast, notwithstanding the nature of the misconduct, courts have denied motions for dismissal where prejudice has not been shown, or where dismissal is not the appropriate remedy for the resulting prejudice.  *See United States* v. *Brown*, 602 F.2d 1073, 1077-78 (2d Cir.

---

[15]     The cases Walters cites in a footnote (Def. Br. 50 n.16) also each clearly meet this standard: In each of those cases, the grand jury was misled, either legally or factually, thereby calling into question the validity of the indictment and prejudicing the defendant in each case.

1979) (reversing district court's dismissal of indictment based on government's failure to properly supervise an informant, and concluding that "prejudice is not of the type that should be cured by means of dismissal of the indictment"); *United States* v. *Isgro*, 974 F.2d 1091, 1098 (9th Cir. 1992) (reversing dismissal of indictment on ground of prosecutorial misconduct in grand jury and pretrial proceedings, where it was "difficult to identify the prejudice to the defendants"); *United States* v. *Myers*, 510 F. Supp. 323, 328 (E.D.N.Y. 1980) (in situation where DOJ officials had supplied grand jury information to the press, declining to dismiss indictment where defendants had "not demonstrated that they have suffered any prejudice by reason of the misconduct"); *see also Bank of Nova Scotia*, 487 U.S. at 263 (concluding that court "had no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct").

## B.    Discussion

Walters has not demonstrated prejudice here.  That is because the Rule 6(e) violation[16] that led to the seven press articles published in May and June of 2014—while unquestionably improper—simply does not "raise a substantial question, much less a grave doubt, as to whether they had a substantial effect on the grand jury's decision to charge."  *Bank of Nova Scotia*, 487 U.S. at 263. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

---

[16]     For purposes of this motion, the Government assumes a Rule 6(e) violation occurred.

███████████████████████████████████████████████████

████████████████████████████████████████████ There is no

reason to think that articles published two years before the grand jury heard the case (and almost

two years before Davis, a critical witness, cooperated) affected the grand jury's decision to

charge in any way, let alone substantially.[17]

Although Walters cannot point to any prejudice he suffered, he nevertheless asks the

Court to make a leap and find—without a grounding in the facts—that "grave doubts" exist as to

whether Walters would have been indicted by the grand jury but for the 2014 publicity.  As set

forth below, Walters's arguments should be rejected.

### 1. The Leaks Did Not Help the Investigation, They Hindered It Significantly

First, Walters claims that the investigation that Agent Chaves described as "dormant"

was "revived" by the information that Agent Chaves received from reporters, and that without

that "revival," there is "grave doubt" as to whether Walters would have been indicted. (Def. Br.

51.)  This argument should be rejected.

For starters, the reality is the opposite.  Far from "dormant," the USAO and FBI were

working diligently to review trading and phone records during the time that Agent Chaves says

he leaked confidential to the press in 2013 and 2014.  In fact, in the spring of 2013, the USAO

and FBI received the FINRA referral about suspicious trading in Dean Foods stock in August

2012, which highlighted Walters's trading in Dean Foods, and focused the Government on the

longstanding relationship between Davis and Walters.  Indeed, by February 2014— ███████████

---

[17] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████    Thus, Agent Chaves's description of the investigation as "dormant" during the time period

of his leaks is inaccurate.[18]

      But even if the investigation could have been considered "dormant" in April 2014, the

leaks and the articles did not "revive" the investigation, as Walters suggests.  Instead they

brought it to a halt.  The articles forced the Government to take premature investigative steps,

like approaching certain individuals before the investigation became public.  Those efforts were

unsuccessful.  The media coverage hampered the ability to gather evidence covertly.  As a result,

the Government ████████████████ and conducted no interviews between August of 2014 and

April of 2015.

      The agents (other than Agent Chaves) and prosecutors understood that any leaks were

harmful to the investigation and expressed this view—and their frustration over the impact of the

leaks—in contemporaneous emails.  Agent Thoresen wrote that whoever was leaking

"apparently has a specific and aggressive agenda . . . to derail this investigation."  (Gov't

Submission, Ex. A.)  Then-ADIC Venizelos wrote that "if we don't have enough evidence by

now its [sic] over."  (*Id.* Ex. C.)[19]

---

[18]    It is possible that Agent Chaves described the investigation as "dormant" in an attempt to
provide a strategic justification for the leaks and explain or excuse his behavior.

[19]    In a puzzling argument, Walters suggests this email "confirmed [Venizelos']
understanding . . . [that] one or more agents . . .were illegally leaking to the press as an
investigative strategy to breathe life into a dead investigation."  (Def. Br. 20.)  The true meaning
of this email is obvious: If the FBI did not have enough evidence to charge before the articles,
Venizelos feared the investigation would be crippled—in fact "over"—once they were published.

Walters's assertion that the leaks helped the investigation is simply wrong; the leaks harmed the investigation and hampered it.  And it was nearly a year later, after Davis had sat for his sworn SEC deposition and testified falsely, that the investigation regained momentum.

### 2.       The Leaks Did Not Lead to Davis's Cooperation

Walters's argument that the leaks somehow caused Davis to cooperate fares no better. For that proposition, Walters cites emails Davis received from his friends in and around the time of the leaks (Def. Br. 21-22), while ignoring that Davis did not decide to cooperate with the Government until almost two years after the media publicity began.[20]  In point of fact, Davis continued, even after publication of the 2014 articles, to falsely maintain his innocence through an internal investigation conducted by outside counsel for Dean Foods, and even through sworn SEC testimony almost a year after the articles were published.  No causal link exists between the purported "heat" from the articles in 2014, and Davis's decision to cooperate in 2016, as can be seen from Davis's decision to lie and continue to press his innocence in his SEC deposition in 2015.

But critically, even when grand jury leaks have been found to prompt cooperation—and indeed where they were designed to—the Second Circuit has declined to dismiss an indictment without a showing of prejudice.  In *Friedman*, the Second Circuit considered extensive publicity surrounding a grand jury investigation that the court characterized as "'outrageous.'"  854 F.2d at 582.  In that case, the Second Circuit assumed *arguendo* "that the government persistently leaked information about grand jury proceedings to the press in an unethical and unlawful campaign

---

[20]       Walters raises for the first time in the instant motion a story published by the *Journal* in August 2015, which named Davis as a target of the investigation.  This story was published five months after Davis had testified falsely before the SEC, a full six months before he expressed his desire to cooperate with the Government, and over a year after the 2014 leaks.

both to induce the cooperation of potential witnesses and to supplant state prosecutorial efforts in a bureaucratic turf fight." *Id.* at 582. The Second Circuit deemed even those circumstances insufficient to merit dismissal. When appellants could not "show resultant prejudice from the publicity surrounding the grand jury proceedings," the court declined to dismiss the indictment.[21]

### 3. The Government Would Not, and Did Not, Induce the Destruction of Powerful Evidence of Walters's Guilt

Walters also argues, as he did in his original motion, that the leaks in this case were deliberate efforts to scare and pressure others into committing incriminating acts, like Davis's destruction of the prepaid cellphone. (Def. Br. 52.) This strained argument turns logic on its head. If the phone had not been destroyed, and Davis ultimately cooperated, it would have been valuable evidence in the Government's case. Rather than being limited primarily to Davis's testimony about the phone, which will undoubtedly (and properly) be subject to thorough cross-examination by defense counsel, recovery of the cellphone would have allowed the Government to admit the cellphone itself—and any information it contained—into evidence. In fact, after learning from Davis that he had thrown the phone into a pond near his home, the FBI sent a dive team there to see if there was any possibility of recovering the cellphone. Unfortunately, despite days of divers searching the pond, they were unable to locate the phone. Nor is the claim that the Government used Davis's destruction of the cellphone as leverage valid. The Government learned of both the cellphone's existence and its destruction from Davis himself, after he admitted it during proffers, so the Government's knowledge of the phone *followed*, rather than

---

[21]     The district court in *Friedman* fashioned a remedy short of dismissal to deal with any pre-trial publicity caused by the grand jury leaks—it transferred venue. Here, where the leaks took place almost three years before the start of trial, any concern about publicity can be addressed through the additional *voir dire* of potential jurors.

*caused*, his cooperation.  In short, the loss of the cellphone did not prejudice Walters; to the contrary, it benefited him.

### 4.      Walters Suffered No Prejudice from Calls Intercepted on the Wire Following the Leaks

Finally, Walters did not suffer any prejudice entitling him to dismissal of the Indictment as a result of the Government intercepting calls on the wiretap generated in response to the media stories following the leaks.  First, Walters argues that the conversations are not inculpatory (Def. Br. 52), and so in effect concedes that they are not prejudicial.  But second, and even more fundamentally to Walters's motion, ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

At bottom, Walters fails to show any causal link between the leaks and the grand jury's much later decision to indict, and thus falls far short of demonstrating actual prejudice.

## II.     The Court Should Reject Walters's Attempt to Side-Step the Prejudice Requirement by Asking the Court to Apply a Legal Standard That No Court Has Ever Used to Dismiss an Indictment

Because he cannot meet the prejudice requirement, Walters tries a different tack: avoidance.  He asks the Court to read a sentence of dicta in *Bank of Nova Scotia* as having created "a second, independent basis for dismissing the indictment" without a prejudice showing. (Def. Br. 53.)  Despite some reference to this dicta in a handful of cases decades ago, in the nearly 30 years since *Bank of Nova Scotia* was decided no court has ever embraced the standard Walters proposes to dismiss an indictment.

### A.     *Bank of Nova Scotia* Requires Prejudice to Dismiss an Indictment

Under what he terms the "'systematic and pervasive' test," Walters contends that the Supreme Court in *Bank of Nova Scotia* authorized dismissal of an indictment "where . . . the

record demonstrates 'a history of professional misconduct spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment.'"   (*Id.* at 53, 56 (quoting *Bank of Nova Scotia*, 487 U.S. at 259).)   But *Bank of Nova Scotia* created no such test.   Rather, the language regarding "systematic and pervasive" government misconduct was isolated dicta in a decision where the Court concluded prejudice was necessary for dismissal.   In applying the governing prejudice standard, the Court noted, as an aside, that it was not "faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment."   *Id.* at 259.   The Supreme Court did not say that if it were faced with such a history, the consequence would be dismissal.[22]

Two years after the *Bank of Nova Scotia* decision, in *United States* v. *Brito*, 907 F.2d 392, 394 (2d Cir. 1990), the Second Circuit mentioned the dicta regarding pervasive and systematic misconduct as "possibly" a basis for dismissal of an indictment.   ("[P]ursuant to our supervisory power, we may dismiss an indictment for prosecutorial misconduct if the grand jury was misled . . . or possibly if there is a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the

---

[22]     To be clear, *Bank of Nova Scotia* did identify an exception to the requirement of prejudice on the rare occasion when "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." 487 U.S. at 257.   Examples of such a "structural" fundamental impediment cited by the Court included the systematic exclusion of potential grand jurors on the basis of race or gender.   *See Vasquez* v. *Hillary*, 474 U.S. 254, 256-58 (1986) (California Supreme Court found that the "total absence of blacks from the grand jury in the history of Kings County was an undisputed fact); *Ballard* v. *United States*, 329 U.S. 187, 190-93 (1946) (women were "intentionally and systematically excluded" from the grand jury by virtue of their gender).   It may be these cases to which the Court referred when it noted that *Bank of Nova Scotia* did not address pervasive and systemic misconduct.   These issues obviously are not at issue here.

fundamental fairness of the process"). To the extent *Brito* can be read as suggesting that the dicta in *Bank of Nova Scotia* "possibly" allows for the dismissal of an indictment without prejudice, however, it bears mention that the *Brito* court itself declined to dismiss the indictment, even though the alleged misconduct which troubled that court was wholly "systematic" and "pervasive": the use of a single hearsay witness in the grand jury, as in most federal criminal cases. *Id.* at 395-96.

Nor is the Government aware of any case in which the Second Circuit has revisited the issue and embraced the "possibly" language in *Brito* as an appropriate standard for dismissal of an indictment. In any event, it is not clear that the "possibly" language of *Brito* can be relied upon after the Supreme Court's subsequent decision in *United States* v. *Williams*, 504 U.S. 36 (1992) (calling into question in a different context the supervisory power to dismiss an indictment absent prejudice). *See United States* v. *Carter*, No. 04 Cr. 594 (NRB), 2005 WL 180914, at *2 (S.D.N.Y. Jan. 25, 2005) (defendant's reliance on *Brito* "is fatally flawed because it relies on authority that was undermined by the Supreme Court's decision in [*Williams*], decided two years after *Brito*").

Even the cases cited by Walters, all of which predate *Williams*, deny requests to dismiss the indictment. *See United States* v. *Felton*, 755 F. Supp. 72, 77 (S.D.N.Y. 1991) (declining to find any pervasive and systematic misconduct undermining a fair grand jury process); *United States* v. *Mendez-Hernandez*, No. S-89-cr-323 (SWK), 1990 WL 64600 (S.D.N.Y. 1990) (declining to dismiss the indictment under a prejudice analysis or a systematic and pervasive misconduct analysis, "even assuming" the latter possibility exists); *United States* v. *Fisher*, 692 F. Supp. 495, 502-03 (E.D. Pa. 1988) (finding no misconduct and declining to dismiss the indictment). In the end, Walters has not identified, and the Government is not aware of, a single

case dismissing an indictment under the "systematic and pervasive" test Walters proposes.  This Court should not be the first to do so.  The facts of this case illustrate the wisdom of *Bank of Nova Scotia*'s test and the many reasons why the Court should not dismiss the very serious charges against Walters, who has not been prejudiced by publicity that occurred two years ago, and where the Government misconduct at issue can be addressed by more narrowly tailored means.  *See Bank of Nova Scotia*, 487 U.S. at 263 (dismissal of an indictment risks "granting a windfall to the unprejudiced defendant, at the expense of the public interest.").

## III.  The Government Did Not Engage in Outrageous Misconduct

Walters's last attempt to evade the required showing of prejudice is to claim a constitutional due process violation.  He argues that, in addition to Agent Chaves, the FBI and the USAO engaged in such outrageous misconduct that it "shocks the conscience" and therefore requires dismissal of the Indictment.  (Def. Br. 56.)  Although the Government fully recognizes the impropriety of Agent Chaves's conduct, neither Agent Chaves's leaks nor the responses by the USAO and FBI rise to the "admittedly high bar" of outrageous government misconduct (Docket Entry 42, at 35 (9/23/2016 Def. Mem.).)  The Court therefore should reject this argument as well.

### A.  Applicable Law

To meet the "very heavy" burden of establishing a due process violation on the ground of outrageous government misconduct, a defendant must show that the Government's conduct is "so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction."  *United States* v. *Al-Kassar*, 660 F.3d 108, 121 (2d Cir. 2011).  Indeed, "the existence of a due process violation must turn on whether the

governmental conduct, standing alone, is so offensive that it shocks the conscience." *United States* v. *Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (internal quotation marks omitted).

Motions for the "extreme" and "drastic" sanction of dismissal on the ground of outrageous government misconduct "rarely succeed." *United States* v. *Rubio*, 709 F.2d 146, 152 (2d Cir. 1983). *United States* v. *Sessa*, Nos. 92-CR-351(ARR), 97-CV-2079(ARR), 2011 WL 256330, at *37 (E.D.N.Y. Jan. 25, 2011). The Second Circuit has recently reiterated that this "'sanction is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases.'" *United States* v. *Rabinowitz*, 645 F. App'x 63, 65 (2d Cir. 2016) (quoting *United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir. 1979)); *see also United States* v. *Berkovich*, 168 F.3d 64, 68-69 (2d Cir. 1999) (noting that such a challenge has almost never succeeded); *United States* v. *LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (noting that at that time only one appellate court had granted such relief since *Hampton* v. *United States*, 425 U.S. 484, 490 (1976), which held that the remedy for police misconduct during the course of an investigation lies "not in freeing the equally culpable defendant but in prosecuting the police under the applicable provisions of state or federal law"). Absent either coercion or violation of the defendant's person, "relief in the form of reversal of a conviction is rare" on a claim of government misconduct. *United States* v. *Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997). Finally, in order to obtain dismissal on the basis of outrageous government misconduct, a defendant must demonstrate that the misconduct occurred "in connection with the alleged criminal events" charged in the Indictment. *United States* v. *Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991).

### B.    Discussion

Agent Chaves's misconduct in this case, while undoubtedly wrong, and the alleged failure by the FBI and USAO to do enough to stop Agent Chaves, do not "shock the conscience."

They share none of the outrageous and coercive characteristics that existed in the extremely rare cases where due process violations were found.  Those have included physical coercion or torture, deliberate use of sex in furtherance of an investigation, or exploitation of defense counsel to develop evidence of a crime.  *See Rochin* v. *California*, 342 U.S. 165, 172 (1952) (agent forcibly caused the defendant's stomach to be pumped to retrieve contraband); *Cuervelo*, 949 F.2d at 565 (agent deliberatively seduced target to induce her into committing crimes); *Sabri*, 973 F. Supp. at 147 (dismissing one count of indictment where the Government used the defendant's immigration attorney to make recordings and direct conversation to illegal threats, forming the basis of that count); *Marshank*, 777 F. Supp. at 1521 (finding outrageous government misconduct where the Government used defense attorney to aid the investigation and "the taint of the government's constitutional transgression infected every part of the investigation and prosecution of the defendant").  Unsurprisingly, Walters identifies no case—nor has the Government found such a case—in which a court found a due process violation for outrageous government misconduct in connection with a violation of grand jury secrecy rules.

Walters's argument that the Government decided not to stop the leaks, and in fact tacitly approved them (Def. Br. 56, 59), is both wrong and insufficient.  Far from tacit approval, contemporaneous emails reflect the outrage and anger of prosecutors and other agents about the potential for a leak.  (*See* Gov't Submission, Exs. A, C-E.)  Although in hindsight more could have been done, neither the FBI nor the USAO took the potential for leaks lightly.  And they certainly did not approve of them.  On June 1, 2014, after articles published by the *Times* and *Journal*, U.S. Attorney Bharara emailed ADIC Venizelos that the leaks were "outrageous and harmful," and asked ADIC Venizelos about action they could take together.  (*Id.* Ex. E.)  ADIC Venizelos, who had already directed FBI personnel to stop speaking with the *Journal* reporters,

(*id.*), forwarded U.S. Attorney Bharara's email to FBI employees involved in the case—including Agent Chaves—saying that "[we] have issues to deal with and they will be address[ed] approp[r]iately," and ordering them to meet with him the following morning at 9:00.  (*Id.*)  During subsequent meetings on June 2, ADIC Venizelos again directed the agents and press office not to speak to any of the reporters who wrote the articles about the investigation.  (Gov't Submission 9.)  In an apparent acknowledgement that his conduct was not approved by the FBI, Agent Chaves told reporters from the *Times* that he could not speak to them on his work cellphone, and instead used his personal cellphone to do so.  (*Id.*)  The fact that FBI management's actions did not succeed in rooting out the leaker cannot seriously be characterized as a decision to approve the leaks.

Walters also tries to argue that the Government hid and misstated the truth about these events.  (Def. Br. 56.)  In hindsight, knowing what we know now, the Government should have done more to identify the leaker at the time of the articles in 2014 and also in preparing the opposition to Walters's original motion.  But those failings were not, in any way, deliberate attempts to hide from or misstate the truth.  It was only upon interviewing Agent Chaves in preparation for the December 2016 hearing that he admitted to leaking, and only after the directly relevant emails from 2014 were retrieved from archives that the specific circumstances in them were recalled.  (*See* Gov't Submission, Ex. F (June 12, 2014 email from then-Deputy U.S. Attorney Zabel).)  These errors, although ones that we do not take pride in or excuse, do not constitute the sort of outrageous government misconduct that rises to a due process violation.

In those few cases—Walters cites only three—where courts have found due process violations for outrageous Government misconduct, the misconduct was inextricably intertwined with the charged crime, *see Cuervelo*, 949 F.2d at 568; *Sabri*, 973 F. Supp. at 147, or the

Government deliberately and extensively violated the defendant's attorney-client relationship to build a case against him, *see Marshank*, 777 F. Supp. at 1519. In *Cuervelo*, for example, upon which Walters extensively relies, the allegations were that an undercover Government agent impermissibly and deliberately used sex to coerce the defendant into committing the charged crime. *Cuervelo*, 949 F.2d at 568. The Second Circuit held that such conduct could support a claim of outrageous Government misconduct if the defendant could show

> (1) that the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes upon learning that such a relationship existed; (2) that the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; and (3) *that the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein.*

*Id.* at 567 (emphasis added). *But see United States* v. *Simpson*, 813 F.2d 1462, 1466 (9th Cir. 1987) (rejecting outrageous conduct claim even where government informant pretended to be defendant's close personal friend and had sex with defendant on regular basis, concluding that the Due Process Clause "does not protect [the individual] from voluntarily reposing his trust in one who turns out to be untrustworthy of it.").[23]  Here, obviously, the alleged Government misconduct was far less extreme and certainly post-dated the illegal insider trading conduct charged in the Indictment.

---

[23]      Likewise, in *Sabri*, the defendant's civil immigration lawyer was instructed by law enforcement to initiate a recorded conversation with the defendant, to stress the importance of being truthful in response to her questions, and then directed the conversation to the previous threats by the defendant which formed the basis of the criminal conduct. 973 F. Supp. at 147. The resulting recording formed the primary basis of the count in the indictment that was dismissed. In *Marshank*, the Government "actively collaborated" with a defense attorney to build a case against his own client through his own cooperation and that of other clients of his. 777 F. Supp. at 1524. Indeed, "absent the government's improper interference with the relationship between [the attorney] and his clients, there would not have been any indictments against [the defendant]." *Id.* at 1521.

Accordingly, the Court should deny Walters's motion to dismiss the Indictment on the basis of outrageous Government misconduct.

## IV.    Other Remedies Will Punish the Wrongdoer and Provide Deterrence Without Providing an Inappropriate Windfall to Walters, Who Has Not Established Prejudice

When there has been no prejudice to the defendant, dismissal of an indictment is not the appropriate remedy.  Instead, the remedy should "focus on the culpable individual," and serve the goals of punishment and deterrence.  *Bank of Nova Scotia*, 487 U.S. at 263.  In this case, the criminal investigation of the events surrounding these leaks will serve those goals, and the Court can continue to protect Walters's right to a fair trial by taking any necessary additional steps at trial.

### A.    Applicable Law

In fashioning an appropriate remedy, courts are appropriately wary of providing a windfall to defendants who have not been prejudiced.  *See id.* at 263; *United States* v. *Brown*, 602 F.2d 1073 (2d Cir. 1979); *see also In re United States*, 441 F.3d 44, 59-60 (1st Cir. 2006) (noting that the "[t]he advantage of contempt as a remedy for misconduct by government agents is that the remedy focuses, as it should, 'on the culpable individual" and that dismissal of indictment posed "risk of granting a windfall to the unprejudiced defendant, at the expense of the public interest" (quoting *Bank of Nova Scotia*, 487 U.S. at 263)); *United States* v. *Isgro*, 974 F.2d 1091, 1099 (9th Cir. 1992) (reversing dismissal of indictment on ground of prosecutorial misconduct in grand jury and pretrial proceedings, where "alternative means of sanctioning the prosecutor" existed, including departmental discipline, and "dismissing the indictment is simply an unwarranted 'windfall' to the defendants"); *United States* v. *Myers*, 510 F. Supp. 323 (E.D.N.Y. 1980); *cf. United States* v. *Carlone*, 666 F.2d 1112, 1115-16 (7th Cir. 1981) (reversing

district court's de facto dismissal of indictment as sanction for government misuse of time allowed by continuances, because district court's decision "punish[ed] not only the prosecutor but the entire law-abiding public" and "[a]lternative sanctions are available that do not involve such windfalls for law breakers"); *United States* v. *Hatfield*, No. 06-CR-0550 (JS), 2010 WL 183522, at *10 (E.D.N.Y. Jan. 8, 2010) (where government failed to promptly return privileged documents, concluding that dismissal of indictment was "too severe" a remedy and imposing other sanctions "to avoid an unjust windfall" to the defendant).

Courts favor remedies short of dismissal for misconduct of the type found in this case. *See Bank of Nova Scotia*, 487 U.S. at 263 ("Errors of the kind alleged in these cases can be remedied adequately by means other than dismissal.").  "For example, a knowing violation of Rule 6 may be punished as a contempt of court," or result in "disciplinary proceedings" against the wrongdoer.  *Id.*  Independent criminal investigations of the conduct at issue also will deter similar misconduct in the future, *see Myers*, 510 F. Supp. at 328, as will changes in policies and procedures designed to eliminate similar conduct, *see Brown*, 602 F.2d at 1078.

## B.     The Ongoing Criminal Investigation

As set forth in more detail above, on December 15, 2016, the Government referred Agent Chaves's conduct to the DOJ OIG.  On or about December 20, 2016, the OIG opened a criminal investigation into the leaks at issue here.  PIN, a component of the DOJ's Criminal Division independent of the USAO, will oversee that investigation.  PIN and OIG may bring criminal charges against Agent Chaves or others, based on conduct in this case or beyond it.  That criminal investigation is the appropriate remedy for the alleged misconduct here and sufficient to deter misconduct in the future.

In this regard, the decision in *Myers* is on point.  There, the court confronted a situation where one or more DOJ officials had supplied grand jury information to the press.  510 F. Supp. at 324-25.  Recognizing that the conduct, "if proved, should be dealt with severely," the court nevertheless declined to dismiss the indictment, concluding that the defendant had not been prejudiced and that other sanctions existed to deter similar conduct.  *Id.* at 328.  Specifically, the court noted "that the Attorney General had instituted an investigation of the disclosures," and that Rule 6(e) allowed for contempt sanctions.  *Id.*

Moreover, as noted above, both the FBI and USAO have taken steps since learning of Agent Chaves's leaks to strengthen their practices aimed at preventing and responding to potential leaks.  Among other things, the senior leadership in both offices have forcefully reminded employees of their critical obligation to keep investigations secret and the severe consequences (to themselves, their investigations, and the public) of failing to do so.

Finally, the Court can safeguard Walters's right to a fair trial by additional *voir dire* aimed at determining whether any potential jurors were exposed to press reports regarding Walters, including those reports that contained unauthorized disclosures.  *Cf. Skilling* v. *United States*, 561 U.S. 358, 387-95 (2010) (discussing *voir dire* in case involving significant pretrial publicity).

### C.        No Further Hearing Is Warranted

Walters urges the Court to hold a hearing in the event the Court determines, as it should, that Walters was not prejudiced by the leaks and the Indictment should not be dismissed.  But where, as here, the Court has assumed, for the purposes of the motion, a Rule 6(e) violation, a further hearing will serve no purpose.  The issue now before the Court is whether the Indictment

should be dismissed.  And on that issue, because of the lack of prejudice, no further factual

hearing is necessary.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should

deny Walters's motion without a hearing.

Dated:  New York, New York
      January 30, 2017

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney

By:    /s/ Joan M. Loughnane
                                      Joan M. Loughnane
                                      Daniel S. Goldman
                                      Brooke E. Cucinella
                                      Michael Ferrara
                                      Assistant U.S. Attorneys
                                      212-637-2265/2289/2477/2526