UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                16-cr-338 (PKC)

            -against-                           MEMORANDUM
                                                AND ORDER

WILLIAM WALTERS,

                    Defendant.
----------------------------------------------------------x
CASTEL, U.S.D.J.

        David Chaves, a Supervisory Special Agent of the Federal Bureau of

Investigation ("FBI"), acting without authorization, leaked sensitive information regarding a

criminal insider trading investigation to reporters at the *Wall Street Journal* and *New York Times*.

The reporters revealed details of the investigation in several newspaper articles.  The existence of

internal leaks was suspected near contemporaneously by the Assistant Director in Charge of the

FBI's New York Field Office and the United States Attorney.  Despite warnings initiated by

them, Chaves continued the unauthorized disclosures to the media.

        This Court granted defendant William Walters' motion for an evidentiary hearing

on the possibility of leaks.  (Memorandum and Order, Nov. 17, 2016, Dkt. No. 46.)  Chaves did

not disclose his role in the unauthorized leaks until confronted by prosecutors preparing for the

hearing.

        The leaks at issue began in April 2013 and ended at the earliest in June 2014, but

may have continued as late as August 2015.  The grand jury returned its indictment against

Walters on May 17, 2016, charging him with wire fraud, securities fraud, and conspiracy to

commit wire and securities fraud.

Walters moves to dismiss the indictment based on government misconduct.  The government has, for the purpose of this motion, conceded that Rule 6(e), Fed. R. Crim. P., which ensures secrecy in grand jury proceedings, has been violated.  For reasons to be explained, Walters' motion is denied.

Chaves is currently the subject of a criminal investigation led by the Department of Justice's Public Integrity Section.  (Gov.'s Mem. in Opp., Jan. 30, 2017, Dkt. No. 82 at 1-2.)  The Court directs the United States Attorney for this district to report to the Court in writing on the status of all investigations and proceedings against Special Agent Chaves or any other person making or concealing unauthorized disclosures related to insider trading investigations within 14 days of this Memorandum and Order and, thereafter, within 14 days of the close of every calendar quarter until further ordered.

BACKGROUND

A.  The Insider Trading Investigation Begins.

In July 2011, the FBI, along with the Office of the United States Attorney for this district ("USAO"), began investigating suspicious trading in shares of the Clorox Company in advance of an announcement of a potential acquisition of Clorox by another company.  (Id. at 4.)  The USAO requested and received access to documents gathered by the Securities and Exchange Commission ("SEC"), which had been conducting a civil investigation into the Clorox trading.  (Id.)  Walters was a target of both the USAO and SEC investigations.  (Id.)  By April 2013, approximately 30 grand jury subpoenas had been issued in connection with the investigation, including for phone, bank, and trading records, as well as credit reports.  (Id.)  Special Agent Matthew Thoresen of the FBI was assigned to the investigation and his work was supervised by Supervisory Special Agent Chaves.  (Id.)

On April 26, 2013, the Financial Industry Regulatory Authority ("FINRA")
brought to the SEC's attention trading in Dean Foods by Walters and others shortly before an
August 2012 announcement that Dean Foods intended to spin off its dairy business, WhiteWave.
(Id. at 5.)  The SEC received information and documents from FINRA, which it shared with the
USAO and FBI on May 17, 2013.  (Id.)  At this point it came to light that Walters had been
friends with Thomas Davis, who served on the board of directors of Dean Foods, for fifteen
years.  (Id.)  The FBI thus expanded its investigation to include Davis and others in close
communication with him around the time of significant Dean Foods trades.  (Id.)

The government asserts that the subpoena returns in the remainder of 2013 and
early 2014 provided a circumstantial case of securities fraud in connection with Walters' trading
in Clorox, Dean Foods, and another company.  (Id. at 6.)

B.  The Leaks.

As will be apparent, not all communications between Chaves and newspaper
reporters were unauthorized or concealed from others within the FBI.  Nor did all
communications relate to grand jury proceedings or sealed wiretaps.

Chaves admitted that he leaked information regarding the investigation to
reporters between approximately April 2013 and June 2014.  (See Gov. Ltr., Jan. 4, 2017, Dkt.
No. 65-1 at 4, 9.)  During this time he disclosed information to Matthew Goldstein and Ben
Protess of the *New York Times* and Susan Pulliam and Michael Rothfeld of the *Wall Street
Journal*.  (Id. at 3.)

According to Chaves, in April 2013 he met Goldstein and Protess for dinner,
during which he discussed the investigation into the Clorox trading, mentioning Walters by
name.  (Id. at 4.)  Chaves says he also disclosed information regarding the investigation during

lunch with Pulliam in late 2013, and asked her "to let him know if she came across any information regarding Walters." (Id. at 5.) From that time on, Chaves claims to have discussed the investigation during periodic telephone calls with Pulliam. (Id.) Pulliam also emailed articles to Chaves' personal email account. (Id.) Chaves claims that he ceased contact with Pulliam around April 2014. (Id.) However, around that time, Chaves had dinner with Goldstein and Protess, where he continued to discuss the investigation, informing them that the investigation had expanded to trading in stocks besides Clorox. (Id.) Chaves likely continued his discussions with Protess following the meeting during multiple phone calls later in April. (Id.)

Pulliam invited J. Peter Donald, then an FBI New York Field Office media representative, to meet for coffee on May 6, 2014. (Id.) The context of the invitation is not clear from any of the government's submissions. Donald invited Chaves to attend and both men met with Pulliam. (Id.) Pulliam inquired about the Walters investigation, about which she already had detailed information. (Id.) Pulliam stated that she planned to publish a piece on the investigation and Donald requested that she wait to do so. (Id. at 6.) On May 8, 2014, the FBI informed the USAO that the *Journal* planned to publish an article on the investigation. (Decl. of Telemachus Kasulis, Dkt. No. 44 at ¶ 11.)

On May 13, 2014, Donald spoke with persons at the *Journal* who agreed to hold the story at least until May 22, 2014. (Gov. Ltr., Jan. 4, 2017 at 6.) Sometime after May 13 the *Journal* asked to meet with the FBI to discuss the continued holding of the story; the FBI and USAO discussed available options, with the FBI ultimately deciding to go forward with a meeting. (Id.) On May 27, 2014, Chaves, Donald, and several other FBI personnel met with Pulliam, Rothfeld, and a *Journal* editor. (Id.) There are contradictory descriptions of this

meeting, with Chaves claiming that the FBI confirmed certain information unrelated to the grand jury or wire intercepts in exchange for the *Journal* continuing to hold its story, while other FBI personnel present claim that no information was given to the reporters.  (Id. at 6-7.)  However, multiple witnesses corroborate that the FBI agreed to tell the *Journal* if the FBI learned that another news organization was looking into a similar story.  (Id. at 7.)

That same day, the USAO learned from the SEC that one or more *Times* reporters had reached out to an SEC lawyer regarding the Walters investigation.  (Id.)  The USAO notified the FBI, which in turn notified the *Journal*.  (Id.)  In a May 28, 2014 email to Chaves, Special Agent Thoresen wrote, in reference to the Walters investigation: "Whomever is leaking[] apparently has a specific and aggressive agenda in that they are now going to other media outlets in an effort to derail this investigation."  (Id.; id. at Ex. A.)

In light of the imminent publication of information regarding the investigation, the FBI decided further covert surveillance was useless and approached Davis and another person on May 29, 2014.  (See Gov.'s Mem. in Opp., Jan. 30, 2017 at 7.)  Both insisted they were innocent of any wrongdoing.  (See id.)

Also on May 29, 2014, Rothfeld of the *Journal* called then Deputy United States Attorney Richard Zabel, telling him that he knew that Walters and others were being investigated, and that the "whole thing began with Clorox."  (See Gov. Ltr., Jan. 4, 2017 at Ex. B.)  Zabel did not disclose any information.  (Id.)

On May 30, 2014, the *Journal* published an online story regarding the government's investigation into the Clorox trading.  (Id. at 8.)  The article identified Walters, Phil Mickelson, and Carl Icahn as targets, and provided details of the investigation.  (See Schoeman Decl. in Supp., Jan. 13, 2017, Dkt. No. 69 at Ex. H.)  The article also mentioned that

federal authorities were looking into Walters' and Mickelson's trading of Dean Foods stock and detailed the business and personal connections between the three men.  (Id.)

       The *Times* published a similar online story regarding the Walters investigation that same day.  (See id. at Ex. B; Gov. Ltr., Jan. 4, 2017 at 8.)  Around the time of the publication, Donald, an FBI media representative, spoke with the *Times*, and based on the conversation believed that the *Times* knew about the FBI's agreement with the *Journal* to inform the *Journal* if the FBI discovered that another media outlet was investigating the story.  (Id.) According to the government's recent investigation, the *Times* reporters appeared to know something about the government's wiretap, though it is unclear what.  (Id.)

       That evening, George Venizelos, then Assistant Director in Charge of the FBI's New York Field Office, emailed Donald, Chaves, and others, asking: "[h]ow did [the reporter] find out about [the] agent approaching [a target] on thursday [sic].  I don't buy that [the target] told them."  (Id. at Ex. C.)  He instructed Chaves and other FBI personnel to cease contact with the *Journal* reporters, stating that if he found out anyone continued to speak to the reporters, "there will be reassignments immediately."  (Id.)

       On May 31, 2014, the *Times* published another article on the Walters investigation, which largely repeated information included in the articles from the previous day. (Id. at 8.)  On June 1, 2014, the *Journal* published its second article on the investigation.  (Id.; Schoeman Decl. in Supp., Jan. 13, 2017 at Ex. L.)  This article noted that making the investigation public had compromised the government's secret wiretaps.  (See Schoeman Decl. in Supp., Jan. 13, 2017 at Ex. L.)  The article also disclosed additional details of the investigation, including roadblocks the government faced in gathering evidence.  (See id.)

On the day the *Journal* article was published, Special Agent Thoresen forwarded it to the Assistant United States Attorney primarily responsible for the investigation, describing the article as "deplorable and reprehensible."  (Gov. Ltr., Jan. 4, 2017 at Ex. D.)  Also on June 1, United States Attorney Preet Bharara forwarded a link to the online version of the article to Venizelos, stating, "I know you agree these leaks are outrageous and harmful.  Let me know what action you want to take together."  (Id. at Ex. E.)  Venizelos forwarded the link and Bharara's email to Donald, Chaves, and others, stating that, "This new article takes a 'not good' situation to a 'bad' one.  This is now an embarrassment to this office."  (Id.)  Venizelos instructed Donald, Chaves, and others to meet with him the next morning, concluding that "[w]e have issues to deal with and they will be address [sic] appropriately."  (Id.)  At the meeting, on June 2, Venizelos expressed anger about the leaks and again directed the special agents to not speak with the reporters involved with the stories.  (Id. at 9.)

Despite the June 2 meeting with Venizelos, Chaves continued to communicate with reporters regarding the investigation.  (Id.)  He ceased using his FBI-issued cell phone and gave the *Times* reporters his personal cell phone number.  (Id.)  Chaves spoke to the *Times* reporters on his personal cell phone sometime between June 2 and June 11, 2014, and does not remember if he spoke to them on his personal cell phone again after that time.  (Id.)   Around this time Chaves deleted a personal email account in part because he did not want Pulliam to be able to contact him at that address.  (Id.)

On June 11, 2014, the *Times* published another article about the investigations, addressing erroneous statements in previous reporting regarding Mickelson's purported trading in Clorox.  (Schoeman Decl. in Supp., Jan. 13, 2017 at Ex. Q.)  The article reported that in reality the FBI had no evidence that Mickelson traded Clorox shares in the lead up to Icahn's attempted

acquisition of the company, and maintained that its source acknowledged the mistake.  (Id.)  On June 12, 2014, Zabel had a telephone conversation with Protess of the *Times*, who was "upset to have to walk back his story and blames an FBI person (and it sounds like an agent) who[]. . . lied to the [*Times*] and some other news org[anizations]."  (Gov. Ltr., Jan. 4, 2017 at Ex. F.)  In a subsequent email to the United States Attorney and others Zabel stated: "I don't think this should be discussed generally right now for a number of reasons but obviously we need to discuss and will need to address this with the FBI."  (Id.)

On June 23, 2014, both the *Times* and the *Journal* published articles principally to disclose that Dean Foods had received a subpoena.  (Id. at 10; Schoeman Decl. in Supp., Jan. 13, 2017 at Exs. S, T.)

Walters alleges that an August 12, 2015 *Journal* article, in which Davis was named publically for the first time in connection with the investigation, was also the result of leaks by the FBI.  (See Def.'s Mem. in Supp., Jan. 13, 2017, Dkt. No. 68 at 34-35.)  The article reported that the portion of the investigation related to Icahn and Clorox had become dormant. (Schoeman Decl. in Supp., Jan. 13, 2017 at Ex. V.)  The government is unable to dispute that this article contained information leaked by Chaves.  (Gov.'s Mem. in Opp., Jan. 30, 2017 at 25 n.20.)

In early 2015 the SEC subpoenaed documents from Davis, including bank records, emails, and calendar entries, which Davis then voluntarily provided to the USAO.  (Id. at 10.)  On March 27, 2015, the SEC noticed Davis for an examination.  (Id.)  On May 18, 2015, Davis appeared before the SEC and testified.  (Id.)

The government alleges that Davis made false statements at this examination, including that he did not know Walters owned Dean Foods stock, that he did not discuss the

WhiteWave spinoff with Walters, and that he did not knowingly make phone calls to Walters after important board meetings or announcements.  (Id.)  The government also alleges that Davis was unable to adequately explain his finances, including a loan he sought from Walters.  (Id.)

In February 2016, (id. at 11), approximately six months after the publication of the last article which defendant contends contained leaked information and nine months after the SEC examination, Davis indicated that he wished to cooperate with the government.  On May 16, 2016, Davis pled guilty to, among other crimes, securities and wire fraud, obstruction of justice, and perjury.  (Id.)

C.  The Indictment.

The government has submitted to the Court a transcript of the grand jury testimony leading to Walters' indictment and provided the same to Walters.  (See Dkt. No. 83.) The testimony was given on May 17, 2016, nine months after the last article allegedly containing leaked information was published, and almost two years after the bulk of the leaked information was publically disclosed.  Chaves did not testify before the grand jury and no evidence specific to Chaves was presented.  That same day the grand jury returned an indictment charging Walters with wire fraud, securities fraud, and conspiracy to commit wire and securities fraud.  On May 18, 2016 Walters was arrested.  (Gov. Mem. in Opp., Jan. 30, 2017 at 13.)  The indictment was unsealed on May 19, 2016.  Trial is set for March 13, 2017, more than one year and seven months since the last article disclosing leaked information was published.

D.  Defendant's Motions Regarding Government Misconduct.

On September 23, 2016, before Chaves' admissions, Walters moved for, among other things, a pretrial hearing to address possible government misconduct during the investigation leading up to the indictment, alleging that false statements were made in support of

Title III wiretap applications and that one or more members of the prosecution team leaked grand jury information, resulting in the above described articles.  (Dkt. Nos. 40, 42.)  The Court granted defendant's motion for an evidentiary hearing, based in part on the timing and content of the newspaper articles that were suggestive of a leak of grand jury subpoenas protected under Rule 6(e), Fed. R. Crim. P.  (Dkt. No. 46.)

In a letter to the Court dated December 16, 2016, the government disclosed that an FBI agent had admitted to being a significant source of confidential information leaked to reporters at the *Times* and *Journal* during a December 6, 2016 interview conducted by the USAO in preparation for the evidentiary hearing.  (Dkt. No. 53.)  The government further stated that before this interview the agent had hidden these communications from the USAO and others within the FBI.  (Id.)  The government conceded that defendant had made out a *prima facie* case of a Rule 6(e) violation which it could not rebut.  (Id.)

That same day, the government submitted ex parte and under seal additional information uncovered during its investigation into the leaks, including that the person responsible for the leaks was Chaves.  This submission was later filed on the public docket with redactions.  (See Dkt. No. 65.)  Chaves' identity as the leaker was made known to defendant on December 20, 2016.  (See Dkt. No. 61, Transcript of December 21, 2016 Hearing, 3-4; Dkt. No. 65.)  On December 21, 2016, the Court heard the parties regarding the now conceded leaks.  The Court set a briefing schedule for Walters' motion to dismiss the indictment.

Defendant argues that dismissal is appropriate under the Court's supervisory authority as discussed in Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988), and in the alternative, that the continued prosecution of defendant in light of the government's misconduct would violate due process.  (See Def.'s Mem. in Supp., Jan. 13, 2017 at 3.)

- 10 -

Defendant further argues that in the event the Court is not prepared to grant the requested relief, an evidentiary hearing would be appropriate to further develop the record and resolve factual disputes between defendant and the government.  (See id. at 60-61.)

### E.  Possible Violation of Rule 6(e), Fed. R. Crim. P.

The government interviewed Chaves on December 6 and 8, 2016.  (Gov.'s Mem. in Opp., Jan. 30, 2017 at 15-16.)  He was scheduled to return for a third interview, but canceled the interview and refused to answer further questions, invoking his Fifth Amendment privilege against self-incrimination.  (Id. at 16.)  During the interviews, Chaves confirmed that he provided some of the confidential information appearing in the *Times* and *Journal* articles.  (Gov. Ltr., Jan. 4, 2017 at 10.)  The government "attempted to question Chaves about whether he was the source of each piece of confidential information reported in the articles."  (Id.)  The government describes Chaves' responses to this line of questioning:

> His responses were clear and certain as to whether he had disclosed certain pieces of information and vague or contradictory as to others.  In certain instances, his recollection was corroborated by text messages, phone logs, or other witnesses, but in others it was not.  And, in some cases, his denials about having provided specific pieces of information that facially appeared to be from a law enforcement source did not ring true in light of other admissions he made.

(Id.)  Chaves could not remember whether he had disclosed certain other pieces of information to reporters.  (Id. at 11.)  For those reasons, among others, the government does not stand behind the representations Chaves made during the interviews.  (Id. at 10.)

The government acknowledges that the *Times* and *Journal* articles contained a significant amount of confidential information relating to the investigation.  (Id.)  Among the confidential information disclosed were the subjects of the investigation, particular stock trades and tipping chains, potential illegal trading profits, and the use of particular investigative

techniques.  (Id.)  The government acknowledges that some of the confidential information

disclosed may have come from grand jury subpoenas in violation of Rule 6(e), Fed. R. Crim. P.

(See id. at 11.)  The government concedes that specific disclosures in the articles about particular

trading and phone patterns by certain target subjects under investigation suggest a leak by

someone with access to the trading and phone records gathered by grand jury subpoena.  (See

id.)

        "Rule 6(e) of the Federal Rules of Criminal Procedure prohibits, with certain

specified exceptions, the disclosure of 'matters occurring before the grand jury.'"  DiLeo v.

Commissioner, 959 F.2d 16, 18 (2d Cir. 1992) (quoting Rule 6(e), Fed. R. Crim. P.)  Based on its

interrogation of Chaves, the Government states that it cannot rebut Walters' *prima facie* case of a

Rule 6(e) violation and submits that the Court should assume such a violation occurred.  (Id. at

11-12.)

DISCUSSION

        A.  Defendant was not Prejudiced by any Illegally Leaks.

        Both parties agree that, as an exercise of a district court's supervisory authority to

remedy government misconduct in connection with a criminal prosecution, "dismissal of the

indictment is appropriate only 'if it is established that the violation substantially influenced the

grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free

from the substantial influence of such violations."  Bank of Nova Scotia, 487 U.S. at 256

(quoting United States v. Mechanik, 475 U.S. 66, 78 (1986)).  According to the Court, "a district

court may not dismiss an indictment for errors in grand jury proceedings unless such errors

prejudiced the defendants."  Id. at 254.

While Walters has made an unrebutted *prima facie* case of grand jury leaks, he has failed to show, despite efforts, that he was prejudiced. Walters points to the actions of his alleged co-conspirator Davis upon learning about the investigation. Specifically, Davis destroyed a cell phone he allegedly used to communicate material non-public information to Walters, abandoned his protestations that he and Walters were innocent, and agreed to cooperate with the government against Walters. (<u>See</u> Def.'s Mem. in Supp., Jan. 13, 2017 at 52.)

Davis' conduct is not causally related to the government misconduct. Nor is it cognizable legal prejudice. When Davis learned through newspaper reports that he and Walters were targets of investigations, he first sought to conceal his actions by destroying the cell phone but later reconsidered and admitted his crime and became a cooperator. Walters' theory fails to adequately take account of Davis' likely conduct in the absence of leaks – he would have learned of the grand jury's investigation through subpoenas directed to him or to persons or entities close to him. His first reaction – conceal and deny – and his reconsidered reaction – admit and cooperate – may well have been the same.

Davis has admitted his guilt. In this Circuit, juries are routinely instructed that they may "draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the fact that a prosecution witness pled guilty to similar charges. That witness' decision to plead guilty was a personal decision about his own guilt. It may not be used by you in any way as evidence against or unfavorable to the defendant on trial here." <u>United States v. Ramirez</u>, 973 F.2d 102, 104 (2d Cir. 1992). The instruction is not just aspirational and precautionary: it reflects the judgment that such a decision is, indeed, a personal choice of the individual based upon a variety of considerations, including genuine remorse. If the newspaper articles had never been published, there is no reason to think that Davis would not have been indicted. Reading the

indictment may have prompted the same reaction that Walters attributes to his reading the newspaper articles. Attributing Davis' choice to newspaper reports six or more months earlier, on this record, is sheer speculation.

A conspiracy to trade on inside information requires an insider, who is the tipper, and one or more tippees or remote tippees. A person could not qualify as a tippee unless that person traded in the window of time between the tipper learning the information and public disclosure of that information. Walters will have the ability to cross-examine Davis at trial to endeavor to establish that the published information was sufficient to construct a false narrative. There is not, however, any basis to conclude that the newspaper articles had any impact whatsoever on the grand jury's decision to indict.

Defendant argues that the cell phone contained exculpatory evidence that would have been available for his defense but for the illegal leaks, which caused Davis to destroy the phone. (See Def.'s Mem. in Supp., Jan. 13, 2017 at 33-34.) However, Walters does not argue that the destruction of the cell phone in any way prejudiced him at the grand jury proceedings, at which he has no right to present exculpatory evidence. Further, he has not shown prejudice at trial, as Walters acknowledges that Davis destroyed the phone "around May or June 2014, *after the FBI visited [his] home*. . ." (Id. at 33 (emphasis in original).) This suggests that Davis destroyed the phone in response to the FBI contacting him rather than because of any leaked information that appeared in the press.

Not only has defendant failed to demonstrate that the phone would not have been destroyed but for the leaks, neither has he demonstrated that access to the phone would in any way further his defense. Defendant claims that Davis' story of defendant's participation in illegal activity is fabricated. It is thus completely consistent with defendant's theory of Davis'

trustworthiness that Davis is lying about destroying the phone and that there was never any phone to begin with. In other words, if Davis is lying about giving Walters tips on the phone he threw in the river he could just as easily lie about giving Walters tips on a phone that never existed. In the end, the jury will either believe Davis or not believe Davis.

Walters also points out that the grand jury was informed that Walters had made a loan to Davis, and Davis made his first payment on that loan shortly after the *Journal* articles were published in late May and early June. (See Def.'s Reply to Gov.'s Mem. in Opp., Feb. 6, 2017, Dkt. No. 92 at 9-10.) Walters argues that this media coverage prompted by the leaks caused an innocent payment by Davis appear inculpatory. (See id.) However, Walters cannot show that any illegally leaked grand jury or wiretap materials specifically caused this allegedly innocent payment to look like part of a criminal scheme. The mere disclosure that there was a government investigation into Walters and Davis with respect to trades in Dean Foods, which Walters does not contend would have violated any law, (see Def.'s Mem. in Supp., Jan. 13, 2017 at 26 n.9), would have also made the payment look culpable.

Walters' speculation regarding Davis' decision to cooperate, and then the effect of that cooperation upon the grand jury's decision to indict, does not raise "grave doubt that the decision to indict was free from the substantial influence" of any illegally leaked information. Bank of Nova Scotia, 487 U.S. at 256. Neither are such doubts raised by speculation as to whether Davis would have destroyed the cell phone or repaid the loan from Walters had the articles never been published.

Moreover, the FBI's investigation into Walters' allegedly illegal activities has been long and complex, involving many FBI agents and many targets. The necessarily limited effect of the leaks on such a complex investigation that required gathering a wealth of evidence

weighs against dismissal.  See id. at 263 (standard for dismissal not met when government

misconduct "occurred as isolated episodes in the course of a 20-month investigation, an

investigation involving dozens of witnesses and thousands of documents").

       The Court in Bank of Nova Scotia found that violations of Rule 6(e), Fed. R.

Crim. P., "can be remedied adequately by means other than dismissal," such as by a contempt

punishment for the violator.  487 U.S. at 263.  As mentioned previously, Chaves' contact with

reporters is now the subject of a criminal investigation.  Further, if Davis testifies, defendant may

cross examine him, including by impeaching him with his prior affirmations of he and

defendant's innocence.  Defendant may also impeach Davis with evidence of the plea agreement

he made with the government.  Defendant may argue to the jury that Davis is a liar who changed

his story in order to obtain a lighter sentence for himself.  Ultimately the jury will decide whether

Davis is telling the truth.

       A further evidentiary hearing is not necessary.  Chaves has indicated that he will

refuse to answer questions pursuant to his Fifth Amendment privilege against self-incrimination.

In any event, the Court has been provided sufficient evidence by the parties in order to make a

ruling.

      B.  Dismissal is not Appropriate Based on a Purported History of Prosecutorial
          Misconduct.

       Defendant argues that under Bank of Nova Scotia, an indictment may also be

dismissed upon a showing that there is "a history of prosecutorial misconduct, spanning several

cases, that is so systematic and pervasive as to raise a substantial and serious question about the

fundamental fairness of the process which resulted in the indictment."  487 U.S. at 259; see

United States v. Brito, 907 F.2d 392, 394 (2d Cir. 1990).  Defendant argues that no prejudice

need be shown under this second Bank of Nova Scotia test on the grounds that otherwise it

would be subsumed by the first <u>Bank of Nova Scotia</u> test, improperly rendering some of the

language of the Supreme Court's opinion meaningless.  (<u>See</u> Def.'s Reply to Gov.'s Mem. in

Opp., Feb. 6, 2017 at 13.)

As an initial matter, the Court is not aware of any case in which an indictment

was dismissed based on the authority of the cited language from <u>Bank of Nova Scotia</u>.  The

language Walters refers to is dicta, and was prefaced with the following words: "we note that we

are *not* faced with a history of prosecutorial misconduct, spanning several cases. . . ."  487 U.S.

at 259 (emphasis added).  However, even if this <u>Bank of Nova Scotia</u> test is not dictum, the

Court does not agree with defendant's contention that he need not be prejudiced for dismissal to

be appropriate.  The Supreme Court explicitly stated that "a district court may not dismiss an

indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."  <u>Id.</u>

at 254.  The Court's reasoning that "a federal court may not invoke supervisory power to

circumvent the harmless-error inquiry prescribed by" Rule 52(a), Fed. R. Crim. P., which

provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights

[must] be disregarded," and that "federal courts have no more discretion to disregard the Rule's

mandate than they do to disregard constitutional or statutory provisions," holds true in

circumstances involving a history of misconduct as well as when only one instance of

misconduct is at issue.

Defendant highlights similar leaked information reported in articles about past

white collar cases that Chaves worked on, written by some of the same reporters to whom

Chaves admitted leaking information about the Walters investigation.  (<u>See</u> Def.'s Mem. in

Supp., Jan. 13, 2017 at 37-42.)  The Court agrees with defendant that the potential for a pattern

of leaks is concerning.  However, for the reasons discussed, even if these articles evidenced a

pattern of illegal leaks by the FBI, that pattern would not raise such serious questions about the fundamental fairness of the process that resulted in *this* indictment as to warrant dismissal, and thus the Court will decline to break new ground on the facts before it.  These other articles and the role of Chaves and possibly other special agents in leaks ought to be the subject of the pending criminal investigation.

C.   Defendant's Continued Prosecution does not Violate Due Process.

Lastly, defendant argues that the indictment must be dismissed because the government misconduct at issue here rises to such a level that defendant cannot be prosecuted on the indictment consistent with due process.  "In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct reach[ed] a demonstrable level of outrageousness."  United States v. Cuervelo, 949 F.2d 559, 565 (2d Cir. 1991) (alterations in original; internal quotation marks and citations omitted).  "[T]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience'. . . ."  United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991) (quoting Rochin v. California, 342 U.S. 165, 172 (1952)).

This rule, stemming from the Supreme Court's holding in Brown v. Mississippi, 297 U.S. 278, 281, 287 (1936) that the admission into evidence at a criminal trial of confessions obtained through torture violates due process, cannot reasonably be applied to the facts of this case.  More recent applications of this doctrine under the Fifth and Fourteenth Amendments expand it beyond the context of torture confessions, but all still involve stunning invasions of bodily integrity, see, e.g., Rochin, 342 U.S. at 172, or truly egregious conduct by government investigators who manipulated attorney-client privilege, see e.g., United States v. Marshank, 777

F. Supp. 1507, 1524 (N.D. Cal. 1991), or themselves brought about the illegal conduct charged in the indictment, see Cuervelo, 949 F.2d at 564.  This case does not fall within the category of cases in which dismissal on such grounds would be appropriate.

No evidence has been presented indicating that others besides Chaves were illegally sharing information with the press.  The proper remedy here is to investigate and, if appropriate, prosecute the offender, rather than dismiss the indictment based on the grand jury investigation that was the subject of the leaks.

CONCLUSION

But for the grant of defendant's initial motion directed to the leaks, the misconduct at issue may never have come to light.  Thankfully, the outing of the leaker may serve to deter other faithless federal agents.

Federal prosecutors rely upon federal investigative agencies, such as the FBI, to bring to their attention investigations that may mature into prosecutions worthy of pursuit.  This requires a prosecutor's office to have a reputation of trust, accommodation, and cooperation with the special agents engaged in the investigation.  A known willingness to refer special agents for investigation and prosecution for their own misconduct may be bad for business, but it is essential to the federal prosecutor's role in seeing that justice is done according to a process that respects the rights of others.  See R. Jackson, The Federal Prosecutor, 24 J. Am. Jud. Soc'y 18 (1940).

In fairness, the government correctly notes that when information came to the attention of the United States Attorney in May 2014, he immediately contacted the Assistant Director of the FBI's New York Field Office describing the press reports as the result of "leaks." (Gov. Ltr., Jan. 4, 2017 at Ex. E.)  The Assistant Director, consistent with a belief that the source

of leaks was within, met with special agents working on the investigation and expressed anger about the leaks.  (Id. at 9; see also id. at Ex. C.)  While the government's artful opposition to Walters' initial motion contained no affirmative statements that were false, it confined itself to denials from limited sources and never disclosed high level concerns over FBI leaks.  (Gov. Mem. in Opp. to Def.'s Mot. for a Bill of Particulars, *Brady* Material, and a Hearing, Oct. 21, 2016, Dkt. No. 43 ("he cannot demonstrate that the source of the information was 'likely' an agent or attorney for the Government").)[1]

The conduct on the part of at least one special agent of the FBI in leaking grand jury material is worthy of the full measure of the Department of Justice's investigative and, if appropriate, prosecutorial resources.  The Court trusts that these resources will be devoted to this matter.

The absence of a showing of cognizable prejudice to Walters dooms his motion. Defendant's motion to dismiss the indictment (Dkt. No. 67) is DENIED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 1, 2017

---

[1] In its more recent submission, the government also points out that it has aggressively pursued wrongdoing by investigative agents in other contexts and that the investigation of Walters was harmed rather than helped by the leaks.  (See Gov. Mem. in Opp., Jan. 30, 2017 at 23-24, 37.)