H3F3WAL1

                              TRIAL

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                 New York, N.Y.

4              v.                              S1 16 Cr. 0338(PKC)

5    WILLIAM T. WALTERS,

6                   Defendant.

7    ------------------------------x
                                              March 15, 2017
8                                             2:00 p.m.

9    Before:

10                      HON. P. KEVIN CASTEL,

11                                            District Judge

12                           APPEARANCES

13   JOON H. KIM
          Acting United States Attorney for the
14        Southern District of New York
     BY:  DANIEL S. GOLDMAN
15        BROOKE E. CUCINELLA
          MICHAEL FERRARA
16            Assistant United States Attorneys

17   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
          Attorneys for Defendant
18   BY:  BARRY H. BERKE
          PAUL H. SCHOEMAN
19        ANDREW J. ESTES
          MICHELLE BEN-DAVID
20               -and-
     WRIGHT STANISH & WINCKLER
21   BY:  RICHARD WRIGHT

22           – also present –

23   SA Edmund Rom
     SA Nicholas Anderson, Federal Bureau of Investigation
24   Raymond McLeod, Defense Tech Support
     Holly Meister
25   Sarah Pyun, Government Paralegal Specialists

H3F3WAL1

```
 1              (In open court; jury not present)
 2              THE COURT:  I'm told by my deputy that there are four
 3     jurors who want to see me at the sidebar.  Why don't you bring
 4     in Jurors 16 and 17.
 5              (At the sidebar)
 6              THE COURT:  Ma'am?
 7              (Juror present)
 8              THE COURT:  You're juror number?
 9              JUROR:  17.
10              THE COURT:  Yes, ma'am.
11              JUROR:  What am I supposed to say?
12              THE COURT:  Nothing.  How are you?
13              JUROR:  I'm fine.  You're looking at me.
14              THE COURT:  No.  That's fine.  Okay.  Thank you.
15              JUROR:  Okay.
16              THE COURT:  You can go back to your seat then.
17              (Juror not present)
18              THE COURT:  Flo, just stay there, ma'am, for a second.
19              Put on the record what happened.  And put the white
20     noise machine on.
21              THE DEPUTY CLERK:  Yesterday --
22              THE COURT:  Get over here.
23              THE DEPUTY CLERK:  Yesterday she said she couldn't --
24              THE COURT:  You mean on Monday?
25              THE DEPUTY CLERK:  On Monday.  That juror, which was
```

H3F3WAL1

1    17, said she couldn't do it because of the business trip that

2    she needed to go on, and I said you can bring some proof that

3    it can't be adjourned and speak to the judge.

4           THE COURT:  I'm not inclined to do anything.  Am I

5    supposed to say is there some reargument you want to make?  I

6    think it was a fair opportunity to say whatever she wanted to

7    say.

8           MR. BERKE:  We agree, Judge.

9           MR. GOLDMAN:  That's fine with us, your Honor.

10          THE COURT:  All right.

11          Juror No. 16, if you want to come over, please.

12          (Juror present)

13          THE COURT:  Hi.

14          JUROR:  Hi.

15          THE COURT:  What's going on?

16          JUROR:  I mentioned to you two days ago that I had a

17   trip booked, and I wasn't going to be here that Monday.  And I

18   asked my sister if she could forward me the information.  So I

19   brought the ticket.  It says non-refundable, non-transferable,

20   so, I'm going on the trip.

21          THE COURT:  All right.  So you could come in on

22   Tuesday though.

23          JUROR:  Yeah.

24          THE COURT:  Okay.

25          JUROR:  So I'm leaving Friday, and coming back Monday

1    night.  So I could be here Tuesday, yeah.

2            THE COURT:  What is the Monday that you would be

3    missing?

4            JUROR:  April 10th.  Let me double check that.

5    April 10.

6            THE COURT:  I think that's going to be fine.

7    Because -- I don't know.  That's Passover.  Let me talk to the

8    lawyers and see what they have to say.  If you can go back.

9            (Juror not present)

10           MR. GOLDMAN:  It's the same deliberation issue, your

11   Honor.  It is that Monday of the fifth week that we discussed

12   earlier.  We have enough alternates, I don't know --

13           THE COURT:  We might.  I could always excuse somebody

14   at the last minute, depending on where we are in the trial.

15           MR. BERKE:  I would say, Judge, we should keep her.

16   If by chance we are not done and we are sitting Passover, we

17   have alternates.

18           THE COURT:  Okay.  Thank you.

19           (In open court)

20           THE COURT:  You may return to the jury room.

21           So you can bring the jury in now.

22           MR. BERKE:  Your Honor, during the opening we're going

23   to use a slide.  We gave it to the government yesterday.

24           THE COURT:  As long as you've shown it to the other

25   side.

H3F3WAL1

1          MR. BERKE:  Thank you, Judge.

2          THE COURT:  Are our jurors ready?

3          THE DEPUTY CLERK:  Yes.

4          THE COURT:  Bring them in, please.

5          (Jury present)

6          THE COURT:  Please be seated.

7          Ladies and gentlemen, I see we all survived the

8  non-blizzard of 2017.  It did, however, give me something in my

9  voice, and I apologize if it is a little gravelly today, but

10  that's just the way it is.

11          I'm going to give you some preliminary instructions.

12  And as I mentioned, there will be full instructions at the

13  close of the case.  In fact, I'll deliver them to you orally,

14  and I'll also give you the typed text of the instructions at

15  the time of closing arguments.

16          This is a criminal case.  The defendant has been

17  charged with, as I indicated, four counts of securities fraud,

18  four counts of wire fraud, one count of conspiracy to commit

19  securities fraud, and one count of conspiracy to commit wire

20  fraud.

21          This is set forth in an indictment returned by a grand

22  jury sitting in this district.  An indictment itself is not

23  evidence.  It simply contains the charges that the government

24  is required to prove beyond a reasonable doubt.

25          The defendant, William Walters, has entered a plea of

H3F3WAL1

1    not guilty to the indictment, and the law presumes him to be

2    innocent of all charges against him, and the burden is on the

3    prosecution to establish the defendant's guilt beyond a

4    reasonable doubt with respect to each element of the offenses

5    charged.  The burden of proof never shifts to the defendant in

6    a criminal case, and the law never imposes on a defendant the

7    obligation of doing anything in a criminal trial.

8           The presumption of innocence remains with the

9    defendant throughout the trial, unless and until, after hearing

10   and considering all of the evidence and my final instructions

11   on the law, you as jurors unanimously are convinced of

12   defendant's guilt beyond a reasonable doubt.

13          Until it is time to deliberate at the conclusion of

14   the case, it is important that you keep an open mind.

15          You must pay close attention to all the evidence

16   presented.  Evidence consists only of the testimony of

17   witnesses, documents, and other things admitted as evidence, or

18   stipulations or agreements by the attorneys.

19          Certain things are not evidence, and may not be

20   considered by you.  Statements, arguments and questions by

21   lawyers are not evidence, nor are my own statements to you.

22   So, say a witness is asked "Were you at the Barclay Center on

23   August 1, 2016 to watch a particular game?"  And the witness

24   says "no."  You're not to speculate, I wonder why the lawyer

25   asked about the Barclay Center on August 1, 2015.  The question

H3F3WAL1

is not evidence.  It's the witness's answer together with the
question that is the evidence.

       Now, the lawyers here are going to make opening
statements to you.  They're going to stand at the podium and
give you a preview of what they hope to prove in the trial.
Those opening statements are not evidence.  It's the actual
testimony of the witnesses, the documents, the stipulations.
Not lawyers' argument at the podium.  But, lawyers' argument
can be helpful in giving you a preview of a case.

       Objections to questions are not evidence.  Lawyers
have an obligation to their client to make an objection when
they believe evidence is being offered for improper purpose
under the rules of evidence.  You should not be influenced by
the objection or by the Court's ruling on it.  If the objection
is sustained, ignore the question and any answer that may have
been given.  If it is overruled, treat the answer like any
other answer.

       If you are instructed that some item of evidence is
received for a limited purpose only, you must follow that
instruction.  Testimony that the Court has stricken or excluded
or that I've told you to disregard is not evidence and may not
enter into your deliberations.

       Finally, anything you may have seen or heard outside
the courtroom is not evidence and must be disregarded.  You are
to decide the case solely on the evidence presented in the

H3F3WAL1

1    courtroom.

2              Now, in deciding the facts of the case you will have

3    to decide on the credibility of the witnesses.  How truthful

4    and believable they are.  How do you decide what to believe and

5    what not to believe?  Well, you are going to listen to the

6    witness, watch him or her, observe him or her, and then decide

7    as you would decide such questions in your ordinary life.  Did

8    they know what they were talking about?  Were they candid,

9    truthful, honest?  Did they have a reason to falsify,

10   exaggerate or distort their testimony?

11             Sometimes it's not what a witness says but the way

12   that he or she says it that may give you a clue as to whether

13   or not to accept the witness's version of an event or incident

14   as credible or believable.  In short, the way a witness

15   testifies may play an important part in your reaching a

16   judgment as to whether you can accept the witness's testimony

17   as reliable.  You will use your common sense and good judgment

18   to evaluate their testimony, based on all the circumstances.

19             I cannot emphasize too strongly, and you're going to

20   hear it from me every day, that you must keep an open mind

21   until the trial is over.  A case can be presented only step by

22   step, witness by witness, and it would be terribly unfair to

23   one side or the other if you made up your mind before you heard

24   all the evidence.

25             We know from experience that frequently we'll hear a

H3F3WAL1

1    person give a version of events which sounds pretty impressive.

2    And yet, when we hear another person's version of the same

3    event, or maybe that person being asked questions about the

4    event, what seemed so impressive and compelling is totally

5    weakened and may not be believable.  You will use your common

6    sense and good judgment to evaluate their testimony based on

7    all of the circumstances.

8            You should not reach any conclusion until you have all

9    the evidence in.  In order to ensure that you decide the case

10   only on the evidence, and that you're not influenced in any way

11   by anything that may occur outside the courtroom in your

12   presence, I'm going to give you a specific set of instructions.

13           First, do not discuss the case among yourselves or

14   with any other person.  When you go in the jury room on a

15   break, you can talk about snow shoveling, you can talk about

16   your weekend plans, but you don't talk about a witness's

17   testimony or that was interesting, or that person did or did

18   not know what they were talking about.  That is improper, and I

19   direct you not to do so.  You will have the opportunity and,

20   indeed, the duty to discuss the case among yourselves after all

21   the evidence is in, and the case is given to you to decide.

22           We've talked about this during jury selection.  You

23   may not discuss this case with family or friends.  Remember

24   what I said about a little mystery in your life.  Just tell

25   them you're on a jury, you'll tell them all about it when it's

H3F3WAL1

over, and you are under court order not to discuss the case.
Think about it.  You're here in the courtroom.  You will know
more about the case than any other human being outside of the
courtroom.  And so, their opinions are worthless and dangerous
and undermine the integrity of the process.

         Next, you are not to read anything in the newspapers
or elsewhere about the case.  You're not to listen to any
reporting about the case, if it should be broadcast on TV or
cable channel or on the internet or radio, and as I told you,
you do not do any internet searches.  Think of how unfair that
is to one side or the other.  They may have a simple answer
when something comes up in the courtroom, they can respond to
it.  But if jurors are doing their own internet searches, it's
unfair because they don't know what you're searching and
whether it is reliable.  They don't even know how to respond to
it.  They don't even know there should be a response to it.  If
you believe in our American system of justice, you will follow
that instruction scrupulously.

         Now, don't send or receive any communications about
the case.  No texting, e-mailing, blogging, posting information
on social media, or using electronic communications to discuss
the case.  You don't discuss it with your fellow jurors by text
or otherwise.

         If it becomes necessary to send the Court a note about
something you saw or heard or about any matter, do not share

1    the content of the note with your fellow jurors.  Imagine

2    sitting in the jury room, and you arrive in the morning, and

3    one of the jurors needs to send me a note.  Maybe it's about

4    something they heard about the trial.  I don't know.  If that's

5    the case, they should write that note and send it to me.

6    They're not being rude when they don't share it with the other

7    jurors.  You know, you're saying what's the matter with this

8    person, they're sending the judge a note and they're not even

9    going to tell their fellow jurors what they're writing about?

10   No.  That's following my instruction.  Because sometimes,

11   something somebody heard or saw could require their removal as

12   a juror.  And in that case, if they've shared it with the rest

13   of the room, well, you can imagine what the consequences could

14   be.

15           Now, you're not to allow anyone to speak to you about

16   the case.  If you're approached by anyone to speak about the

17   case, politely tell them that the judge has directed you not to

18   do so.  If any person seeks to contact you, you are required to

19   report the incident to me promptly.

20           The attorneys, the defendant, and the witnesses are

21   not permitted to talk to the jury outside the courtroom.  They

22   can't even offer you a friendly greeting.  So you can wind up

23   in an elevator with them, and you know, in our society, it's

24   kind of -- you would think almost rude for somebody who you're

25   sitting in the same room with not even to acknowledge you

H3F3WAL1

exist.  But, when they do not acknowledge you, they are
following my direction to them not to talk to jurors about
anything.

        If anyone you know comes into the courtroom, please
let me know.  It's a public courtroom.  That could happen.
But, I need to know about it because there may be matters
discussed out of the presence of the jury that the jury is not
supposed to know about, so I just need to know about that.

        A few words about trial procedure.  The lawyers have
the opportunity, but are not required, to make opening
statements.  Preview of the evidence.  But the preview is not
evidence.  It is a preview of the evidence.

        After all the evidence has been received, the lawyers
then have an opportunity to sum up.  They may review the
evidence and make arguments to you as to what conclusions they
think you should or should not draw from the evidence.  These
arguments are not evidence themselves.  And then I'll give you
detailed instructions on the law, and then and only then can
you go into the jury room to deliberate.

        A witness will take the stand, typically, and they
will be examined by the party calling them.  Now, the defendant
has no obligation in a criminal case.  So let's say the
government calls a witness, the defendant may choose to
cross-examine the witness, and then following that
cross-examination, the government gets to ask questions on

1    redirect.  So that's what happens in a trial.

2           And at this point, ladies and gentlemen, we're going

3    to begin.  And we're going to begin with the opening statement

4    of the government, that's going to be delivered by Mr. Ferrara,

5    is that correct?

6           MR. FERRARA:  Yes, your Honor.

7           THE COURT:  Whenever you're ready, Mr. Ferrara, you

8    may begin.

9           MR. FERRARA:  Thank you, your Honor.

10          Good afternoon, ladies and gentlemen.

11          Greed.  That's what this case is about.  It's about

12   this man, William Walters, illegally and unfairly using secret

13   business information to make millions in profits and avoid

14   millions in losses.  In total, he benefited from his crimes by

15   over $40 million.  It's about Walters conspiring with a

16   well-connected businessman to get confidential, non-public

17   information about companies, what is called inside information,

18   so that he could trade stocks based on it.  This case is about

19   how Walters took unfair advantage of that inside information to

20   make more money for himself in the stock market.  An unfair

21   advantage that ordinary investors, investors who follow the

22   law, never get to have.

23          As you'll learn, over a period of six years, from 2008

24   to 2013, Walters requested and received some of the most

25   sensitive and confidential information about a company called

H3F3WAL1                          Opening - Mr. Ferrara

1    Dean Foods.  Dean Foods is a Fortune 500 company.  It is the

2    nation's largest distributor of milk.  Walters received that

3    sensitive and non-public information about Dean Foods from an

4    insider of that company who was a close personal friend of his.

5    Walters then repeatedly used that inside information again and

6    again to illegally trade in the stock of Dean Foods.

7            What did Walters get out of it?  Enormous profits in

8    the stock market.  What did the Dean Foods insider get in

9    return for giving Walters the inside information?  Well, a

10   deepening friendship with Walters, and nearly $1 million in

11   personal loans that he asked Walters to give him.  One million

12   reasons for the insider to keep providing the inside

13   information.

14           So let me back up for a minute.  William Walters, who

15   goes by Billy with his friends, is a highly successful sports

16   bettor.  He owns golf courses, businesses, Walters was also a

17   knowledgeable investor who bought and sold stocks.  You're

18   going to learn during the course of this trial that secret or

19   confidential information about a company that the public

20   doesn't know can be a very valuable thing in the stock market,

21   which makes sense, right?  If you know confidential information

22   about a company before everyone else, well, you can make a lot

23   of money trading stocks with people who haven't been given

24   access to the same secrets as you.

25           Insider trading is a crime because the marketplace is

1    supposed to be a fundamentally fair place for people to invest.

2    Big or small, rich or poor, Wall Street or Main Street.  And

3    insider trading is a way for people to cheat that entire

4    system.  A way for people who have inside information to give

5    each other that edge, that illegal edge that the rest of the

6    public never gets to have.  That the rest of investors never

7    get to enjoy.

8         And that's exactly what Walters did.  He schemed with

9    a corrupt businessman named Tom Davis to get access to secret,

10   confidential, corporate information about Dean Foods, and then

11   Walters traded on that information.

12        The evidence is going to show that Walters often knew

13   tomorrow's news today.  And he knew it because he had an

14   insider, Tom Davis, who was illegally supplying it to him.  And

15   you're going to hear testimony from Tom Davis, Walters' partner

16   in crime.  After initially lying to authorities, Davis

17   ultimately came clean.  Davis has pled guilty to insider

18   trading.  And he's going to come and testify before you.  He'll

19   give you a first-hand account of the crimes he committed with

20   Walters.

21        He'll tell you right from that witness stand how he

22   fed Walters critical, inside information.  That he did so

23   knowing that he was betraying obligations to keep that

24   information secret, that he did it knowing that Walters would

25   illegally trade on the information, and that he did it in part

1    because Walters was giving him almost $1 million in loans.

2           You're also going to see charts and documents that lay

3    out Walters' trades and his phone calls.  Those documents and

4    charts alone will show you that Walters was committing insider

5    trading.  Those records will show a pattern of insider trading

6    by Walters.

7           Those records will show again and again Walters would

8    receive a phone call from Davis, the insider with access to the

9    secret info, and then, sometimes just minutes later, just

10   minutes after speaking to Davis, Walters would call his

11   stockbroker and make a huge trade in the stock of Dean Foods.

12          That, ladies and gentlemen, is called insider trading.

13   It is cheating, it is securities fraud and wire fraud, and it

14   is a serious crime.

15          And that's why we're here today.  Because Walters

16   broke the law again and again and again by placing his own

17   greed over the laws designed to make the stock market fair.

18   And the law finally caught up with him.

19          Now, this opening statement is our chance to tell you

20   a little bit about what the case is about, what the evidence

21   will show, and how we're going to prove it to you.  So I just

22   gave you a sense of what the case is about, let me now talk a

23   little bit about what the evidence will show.

24          First, you're going to learn how Walters and Tom Davis

25   came to know and trust one another.  Walters and Davis first

1   met in the mid '90s during a golf tournament.  They became

2   friends based on their shared interest in business and sports.

3   They play golf together a few times a year, they socialize

4   occasionally, and as they became better friends, they started

5   to discuss doing business together.

6          You'll hear that in 2001, Davis joined the board of

7   directors of Dean Foods.  That's the milk company I mentioned

8   earlier.  And a director or a board member is a person who is

9   hired by the company to do things like help oversee the

10  company's business and vote on big decisions the company makes.

11         And being on the board of directors meant that Davis

12  had access to secret, sensitive information about Dean Foods

13  and its business.  Information he had an obligation to keep

14  confidential.  Information that would be a goldmine in the

15  wrong hands, like Walters' hands.

16         And that's exactly what happened.  In total violation

17  of his obligations to his own company, Tom Davis agreed to

18  repeatedly give Walters inside information so that Walters

19  could make money through insider trading.  Important

20  confidential information about the company's business

21  performance before it was announced to the public, important

22  confidential information about the company's strategies and

23  plans, and ultimately, specific and secret information about

24  the company's plan to split itself into two separate companies,

25  which finally happened in 2012.

1          Now, many of the instances of insider trading you'll

2     hear about in this trial revolved around Dean Foods' quarterly

3     earnings.  I want to just take a minute to explain what

4     quarterly earnings are, because they'll be important during

5     trial.

6          So Dean Foods was a public company, which means its

7     shares or stock was traded on a public exchange, like the New

8     York Stock Exchange.  Like all publicly traded companies, every

9     few months, Dean Foods compiled its earnings, basically its

10    performance, and was required to report those earnings every

11    three months, so every quarter of the calendar year.  The

12    information would be filed in a report with the SEC, that's the

13    government watchdog that polices Wall Street.  And when the

14    report was filed, that information became available to the

15    public.

16         So every three months or so, Dean Foods would gather

17    up from all over the company their sales information, their

18    revenue information, their costs, so they could put it all

19    together and they could tell the public.  And they made this

20    announcement to everyone at the same time, which you'll learn

21    is required by law.  It is a law designed to keep the stock

22    market fair.

23         Now, why is it so important that this earnings

24    information, this quarterly information go to everyone at the

25    same time?  Well, you'll hear that financial information like

H3F3WAL1                    Opening - Mr. Ferrara

1    this, it has a major impact on the stock price of a company.

2    Investors and Wall Street professionals who follow companies

3    like Dean Foods, they make predictions about a company's

4    performance based on their own analysis and information

5    available to the public.

6            So if Dean Foods' earnings information is coming in

7    above where the market expects it to be, the stock price of the

8    company is very likely going to go up, because people are

9    surprised by how well the company is doing.  On the other hand,

10   if that earnings information is coming in below where the

11   market expects it to be, the price stock is very likely to go

12   down, because people are surprised by how poorly the business

13   is doing.

14           So, again, if you know, if you can get an unfair

15   advance preview of Dean Foods' earnings performance, because

16   someone is illegally sharing inside information with you, you

17   can make a lot of money in the stock market.  And that's what

18   Walters did.  You are going to see it in the documents, and

19   you're going to hear it in the testimony.

20           You'll see a pattern, and the pattern went like this:

21   Davis would tell Walters some confidential thing that Dean

22   Foods was going to announce in the future.  Walters would call

23   his broker and illegally trade on that information.  Dean Foods

24   would make the announcement that Walters expected, and Walters

25   would come out ahead.  Way ahead.  That's insider trading.

1    That's simple.

2            So, let me give you some specific examples of Walters'

3    pattern of insider trading.  And to be clear, any one of these

4    examples is itself illegal.  And you're going to hear about

5    many more throughout the course of the trial, but I just want

6    to give you a few examples.

7            So, for example, Dean Foods planned to publicly

8    announce in April 2008 that its earnings were higher than

9    expected.  That would be good news, pushing the stock price up.

10   In the weeks leading up to that announcement, Davis told

11   Walters before the public knew.  You'll see records of phone

12   calls Walters made and received, and you'll see that Walters

13   and Davis spoke on the phone in March.  Just minutes later,

14   just minutes after hanging up with Davis, Walters called his

15   stockbroker, and throughout that day and the next, bought over

16   half a million shares of Dean Foods for just over $20 a share.

17   You'll have the trading records.  That's over $10 million worth

18   of Dean Foods stock.

19           In April, Dean Foods publicly announced that its

20   profits were better than expected and its stock price went up

21   just like Walters expected, and he cashed in.  He sold a bunch

22   of his Dean Foods stock and made over $1.2 million in profits.

23   That was a crime.

24           Here's another example of the pattern of insider

25   trading.  In June 2008, Davis learned that Dean Foods was again

1   beating its earnings expectations, that is to say, Dean Foods

2   was making more money than the public expected it to.  Really

3   good.  And when the public learned, the stock price would go

4   up.  But again, no one outside the company was supposed to know

5   that information.  But Davis again told Walters, Davis told

6   Walters that Dean Foods was doing better than Wall Street

7   professionals expected it to do, and Walters illegally profited

8   from that confidential information.  And again, you'll see a

9   lot of this in the documents.  For example, you'll see phone

10  records showing that Davis called Walters on the evening of

11  June 18.  The very next morning, Walters called his stockbroker

12  and started buying Dean Foods stock.

13          The trading records will show that over the course a

14  few days, Walters bought almost 4 million shares of Dean Foods

15  stock.  Then Dean Foods publicly announced the good news that

16  business was doing better than expected, and the stock jumped.

17  Walters made $3 million.

18          You'll see this pattern time and again:  Call from

19  Davis, trade by Walters, announcement, profit.

20          So why was Davis doing this?  Well, he's going to tell

21  you.  And I expect you'll learn that Davis gave Walters this

22  inside information because it strengthened their friendship,

23  and Davis believed if he did, Walters would help him out down

24  the road.  You scratch my back, I'll scratch yours.  And that's

25  in fact what happened.

1          In April 2010, Davis called in a big favor.  The

2     evidence is going to show that at that time Davis was in dire

3     financial straits, he couldn't pay his debts.  Davis knew a

4     bank wouldn't give him a real loan, so where could he get the

5     money?  Well, from the guy he had been feeding inside

6     information to for a couple of years, Billy Walters.  Walters

7     owed Davis big time.

8          So the two met privately at Walters' golf club in Las

9     Vegas on April 9, 2010.  During that meeting, Walters agreed to

10    loan Davis $625,000 through a friend.  Davis was enormously

11    grateful to Walters for the loan, and in their world of I

12    scratch your back, you scratch mine, Davis knew that Walters

13    expected something in return.  At that same Las Vegas meeting,

14    at that same meeting where Davis had asked Walters to loan him

15    money, Davis also passed some important inside information to

16    Walters about Dean Foods.

17         Specifically, Davis told Walters that Dean Foods was

18    seriously considering spinning off a part of its business

19    called WhiteWave.  So, let me take a moment and explain what

20    these spinoff plans were and why they were so important and

21    secret.  It's not complicated.

22         You'll hear that Dean Foods was a large company, with

23    a few different lines of business.  One of those business lines

24    was called WhiteWave.  WhiteWave was the part of Dean Foods

25    responsible for brands like Horizon organic milk and Silk soy

1   milk.  The idea of a spinoff was that Dean Foods wanted to make

2   WhiteWave its own business with its own stock, and then

3   distribute WhiteWave stock to Dean Foods shareholders.  That's

4   what the concept of a spinoff is.  So, it would be really

5   valuable to own Dean Foods stock if the spinoff ultimately

6   happened.

7          And as you'll learn during the course of this trial,

8   the concept of spinning off WhiteWave had been discussed for a

9   few years as a future possibility.  But by April 2010, it was

10  getting some legs.  Dean Foods had taken the step of asking

11  outside bankers to analyze how it could be done.  That itself

12  was a highly secret piece of information, something that Dean

13  Foods board members, including Tom Davis, had an absolute legal

14  duty not to disclose to anyone outside the company.  But that's

15  exactly what Davis told Walters in Las Vegas when he asked

16  Davis for a loan.

17         And not surprisingly, given the corrupt scheme between

18  Davis and Walters, on the very first day after their Vegas

19  meeting, Walters bought one million shares of Dean Foods.  The

20  trading records show it plain as day.  Walters bought one

21  million shares of Dean Foods stock.  That is a lot of stock.

22  And it cost him almost $17 million.  But Walters was happy to

23  pay it, because he was acting on the secret information

24  illegally given to him by Davis.

25         In fact, a couple days later, Walters bought another

1   half million shares of Dean Foods stock.  And this is another

2   example of Walters' insider trading.  And another example of

3   the insider trading scheme happened not too long after that,

4   because Davis learned something bad.

5          Not long after the Vegas meeting, Davis learned that

6   Dean Foods' business was doing worse than the public thought.

7   And again, that was secret information.  And Davis knew that

8   when the public found out, the price of Dean Foods stock would

9   go down.  But Walters had just bought Dean Foods stock.  If he

10  held onto that stock, he'd lose a lot of money when Dean Foods

11  announced that earnings were worse than expected.  So now Davis

12  had to warn Walters that the company stock might have to take a

13  hit.  He had to warn him right away, and the phone records show

14  he did just that.

15         The phone records, which you'll see during trial, show

16  that shortly after Davis learned the bad information, he placed

17  a phone call to Walters.  And the trading records will show

18  that the very next morning, after that phone call, Walters

19  started selling all his Dean Foods stock like it was on fire.

20  He had gotten rid of all of it by the next day.

21         So a week later, Dean Foods in fact publicly announced

22  the bad news, that its earnings were worse than expected,

23  information that Walters already illegally knew.  And the stock

24  price dropped a whopping 30 percent.  By selling his stock

25  before that announcement, Walters avoided losing over $7

million.

         But that's not all.  You see, Walters still wanted to
own Dean Foods stock going forward, because Davis had told him
about the likelihood of a WhiteWave spinoff, and that would
lead to big, big profits for people who own the stock.  So one
week after Walters had conveniently sold off all of his Dean
Foods stock to avoid losses, on the very day that Dean Foods
announced the bad news about its quarterly earnings and its
stock price dropped 30 percent, Walters started to repurchase
his 1.5 million shares of Dean Foods stock.  But this time, at
a much cheaper price.  At a way cheaper price, because the
stock price had dropped.

         So by trading on secret inside information he got from
Davis, it was a double win for Walters.  First, he avoided huge
losses.  And second, he was able to buy back the stock cheaper
than ever.  So he was perfectly positioned to profit even more
once the WhiteWave spinoff happened.

         So think about that.  As the evidence will show,
Walters literally sold the stock just low enough to avoid
getting crushed by the bad earnings announcement that Davis had
warned him about, and he was right back in the market happily
buying Dean Foods stock.

         Was this all a coincidence?  Of course not.  Was
Walters a trading genius knowing exactly when to sell high and
buy low?  Absolutely not.  He was a cheater trying to look like

1   a genius.  He was the kid who aces the test because someone

2   gave him the answers beforehand.

3           Meanwhile, while Walters was cheating through years of

4   repeated insider trading, you'll learn that Tom Davis was

5   growing more financially desperate.  By the middle of 2011,

6   Davis had already burned through the $625,000 loan he had asked

7   Walters for a year earlier.  Davis had spent all that money and

8   he was so desperate for cash, you'll learn he even embezzled

9   money from a charity he ran, and then he turned again to

10  Walters.  After all, Davis had been helping Walters out with

11  all these inside tips, it was time for him to ask Walters for

12  some back scratching.

13          Walters, you'll hear, loaned Davis another $350,000

14  during the same period of time that Davis was continuing to

15  share secret inside information with him.  So, by the spring of

16  2012, Davis owed Walters almost a million dollars, and was not

17  making any payments on that debt, because Davis was repaying

18  the loan in a different way:  By feeding Walters inside

19  information worth millions of dollars.

20          So, throughout 2012, Davis continued to give Walters

21  realtime updates about the status of the WhiteWave spinoff.

22  Throughout 2012 Davis fed Walters secret details like whether

23  the spinoff would in fact happen, when it would happen, how it

24  would happen, and how much it would be worth.

25          And you'll hear that Walters held onto his Dean Foods

1   stock for much of 2012, because Davis was giving him these

2   realtime updates and making sure Walters knew when he'd get the

3   biggest payout.

4            When Walters finally sold his Dean Foods stock in May

5   of 2013, it was worth about $110 million.

6            The evidence will also show that Walters wanted his

7   friends to trade in Dean Foods, too, because Walters knew he

8   had a sure thing in Tom Davis.  An inside man who could feed

9   him the most valuable secret information around.  And you'll

10   see that some of Walters' friends also bought Dean Foods stock

11   after calls from Walters, like his business associate Luther

12   James and the golfer Phil Mickelson.  That's another way you

13   know that Walters had the hottest information in town.

14            Okay, so I've talked a lot about Dean Foods.  But the

15   evidence will also show that Walters committed insider trading

16   with respect to a second company, Darden Restaurants.  And the

17   documents and the testimony will show that Walters illegally

18   bought Darden stock based on inside information from Davis,

19   just like he did with Dean Foods, and that Walters made a cool

20   million bucks in just a few months.

21            So, that's what you'll learn in this case.  That over

22   the course of about six years, Walters benefited about over $40

23   million by illegally trading based on inside information he

24   received from Tom Davis.

25            So, let's talk for a few minutes about how we're going

1   to prove this to you.  So you are going to hear from witnesses,

2   and you're going to see documents.  Let's start with the

3   witnesses.

4          You'll hear from witnesses at Dean Foods and Darden

5   Restaurants, they're going to explain that Tom Davis in fact

6   possessed confidential, non-public information.  They'll

7   explain why it was so important for the companies and for board

8   members like Davis to keep this information absolutely secret

9   so that no one could gain an illegal edge and cheat in the

10  marketplace.

11         You'll hear from the Dean Foods CEO who will explain

12  why the information that Davis passed to Walters was so

13  important, and how it could affect the company's stock price

14  and decisions that the company made.

15         You'll hear from Walters' stockbrokers about Walters'

16  trading.  You'll hear from an employee of FINRA, another Wall

17  Street watchdog, and an FBI special agent.  They'll walk you

18  through Walters' trading and phone records, which vividly

19  demonstrate Walters' guilt.

20         Those charts alone, ladies and gentlemen, will show

21  you in black and white how Walters committed insider trading.

22  They tell the whole story.

23         And you'll hear from Tom Davis.  Now, as I said, Davis

24  will tell you that he passed inside information to Walters lots

25  and lots of times over the course of their conspiracy.  And

Davis will also tell you that he sometimes passed that inside information to Walters using a prepaid cell phone that Walters had given him.  Now, the prepaid cell phone, sometimes called a burner phone, is a cell phone that doesn't have your name associated with it, and isn't linked to you so it's harder to trace.  Davis called it the bat phone.  Walters told Davis that they should use the phone to discuss Dean Foods because it was safer to avoid leaving a trail of phone records that law enforcement could follow.  And Walters actually went further, suggesting a code in which they would refer to Dean Foods as the Dallas Cowboys.  And that was a good code word because Dean Foods was based in Dallas, and it is also where Tom Davis lived.

        And Walters himself also sometimes used his own prepaid cell phone to get inside information from Davis about the WhiteWave spinoff.  So, it was a good plan to avoid getting caught, if both of them kept their crimes a secret.

        And Davis will tell you that he kept that secret for a long time.  He denied his involvement to everyone who asked him.  Davis lied to FBI agents in 2014 when they went to his home, denying that he had committed insider trading with Walters.  He later lied to the SEC about the same thing.  Shortly after the meeting with the FBI, Davis threw the bat phone into a creek near his house to destroy it.

        Now, ladies and gentlemen, let me be clear up front

about Tom Davis.  This is a man who committed serious crimes.
Davis will tell you, among other things, that he knew it was
illegal for him to pass the inside information to Walters.  It
was wrong, it was a crime, a conspiracy that he and Walters
participated in together.  And for a period of time, Davis
tried to cover up and lie about his crimes and Walters' crimes
and keep their secrets.  But, it's hard to stick to a lie for
that long, and law enforcement started closing in.

         Davis couldn't keep a secret anymore.  He admitted
what he had done and he accepted responsibility for his crimes.
Davis will tell you that he has been arrested and pled guilty
to insider trading, obstructing justice for destroying the cell
phone and lying to the FBI, and perjury for lying to the SEC.
Davis also will tell you that he's now cooperating with the
government, and testifying because he hopes to receive leniency
at sentencing.

         When you see and hear from Davis, you may not like
him, and you certainly will not approve of the things he's
done.  But the only relevant question for you in evaluating his
testimony isn't whether you like him, but whether you believe
he's telling the truth.

         So, please, listen very carefully to his testimony.
Compare his testimony with the other evidence, and see if his
testimony fits with that other evidence.  When you do, you will
find that Davis' testimony fits with the other witnesses, and

H3F3WAL1                    Opening - Mr. Ferrara

1    is backed up by the trading records and phone records and

2    e-mails and other documents demonstrating the pattern of

3    illegal insider trading of inside information flowing from

4    Davis to Walters, and of Walters' trading on the inside

5    information to cheat and personally benefit to the tune of $40

6    million.

7            In addition to hearing from witnesses I mentioned,

8    you'll see documents.  I've mentioned some of those, phone

9    records showing calls between Davis and Walters, those trading

10   records showing how quickly Walters began buying or selling

11   stock, sometimes just minutes after receiving the information

12   from Davis.  You'll see the size of some of these massive

13   trades, just massive purchases and sales of Dean Foods stock

14   made by Walters based on the illegal edge that regular

15   investors didn't get to have.

16           Now, at the close of this case, we're going to have an

17   opportunity to talk to you again.  And between now and then,

18   we're going to ask you to do three things.  First, please pay

19   careful attention to the evidence.  Second, follow Judge

20   Castel's instructions on the law.  And third, use your common

21   sense, the same common sense you use in your lives every day.

22   If you do those three things, Walters will get a fair trial,

23   the government will get a fair trial, and you'll reach the only

24   conclusion consistent with the evidence in this case:  That the

25   defendant, William Walters, is guilty as charged.

H3F3WAL1

1          Thank you.

2          THE COURT:  Thank you, Mr. Ferrara.

3          Ladies and gentlemen, please stand up and stretch.

4     And let me ask you, we're going to have as I understand an

5     opening statement by Mr. Berke in a moment.  Would you like a

6     break before that or are you ready to go on and we can take the

7     break after the opening statement?

8          JUROR:  Go on.

9          THE COURT:  All right, let's do that.  Terrific.  But

10    sometimes it feels good to just stretch a little bit.

11         JUROR:  I can't get up, I'm sorry.

12         THE COURT:  That's fine.

13         JUROR:  From shoveling.

14         THE COURT:  All right.  Ladies and gentlemen, we're

15    just going to take care of an administrative task, and

16    Mr. Deputy, you can proceed with that.

17         THE MARSHAL:  For all of you standing up and the

18    people sitting in the back on the bench have to get up and go

19    upstairs, 14D.

20         THE COURT:  That's enough.  14D, just go to 14D.

21    Thank you very much.  Outside, please.  No talking in the

22    courtroom.  Outside.

23              (Continued on next page)

24

25

1          THE COURT:  Mr. Berke, you may begin.

2          MR. BERKE:  Thank you, your Honor.

3          Good afternoon.

4          A long time ago a man left a small town in Greece to

5     travel to the capital Athens with a plan to steal the riches of

6     others.  When he reached the gate of Athens, the guard asked

7     him his business.  He falsely said he was there to see old

8     friends because he used to be from Athens.  The guard inquired,

9     "Are you going to visit Piraeus?"  The man falsely and

10    confidently said, "But of course, he is very close to me, like

11    a cousin."  The guard looked at the man and said, "Arrest him,"

12    and told the surprised imposter that Piraeus is the oldest port

13    in Athens and he would have known that if he was telling the

14    truth.

15          Members of the jury, my name is Barry Berke, and with

16    my colleagues, I have the great honor of representing Bill

17    Walters.

18          I begin with that old Greek fable because it explains

19    a lot about why we are here today.  Aesop, an ancient Greek

20    fabulist, explained that the moral of that story is, when

21    somebody tells a falsehood or a lie, they are required to tell

22    more falsehoods in order to prevent the truth from coming out,

23    and ultimately it's those additional falsehoods that lead the

24    person to be found out.

25          You see, what you're going to hear is that the

prosecution's star witness, Tom Davis, was in a desperate

situation.  He got caught stealing from a charity that he was

involved with, lying about it, cheating on his taxes, all sorts

of things, and he knew the only way he could avoid the

consequences of his actions was to falsely accuse Mr. Walters.

And when he did that -- because Mr. Ferrara said it's hard to

tell a lie -- he had problems, so he started telling more lies

and more lies and more lies, and you're going to hear about

them.  And like the man in the old Greek story, those lies are

going to cause him to be found out by you, the guards of the

gate of justice for Mr. Walters.

          Let me tell you more of what you're going to hear.

Tom Davis, Harvard Business School trained investment banker,

with a taste for cards, was dealt a very bad hand.  He got

caught cheating a charity that was supposed to benefit battered

women as his own personal piggy bank.  He got caught lying

about it.  He got caught cheating on his taxes.  He is

prosecuted.  The FBI were looking into all of that.  He was

afraid about being charged with insider trading.  He was afraid

about losing what money he had that still funded his

extravagant lifestyle.  He was concerned about his reputation

in Dallas, where he was part of the business elite, and

believed that if people found that he had taken from this

charity, where he hosted a big golf tournament, that he would

never recover.  And he was concerned about serving a very

1  lengthy jail sentence.

2          So you will hear that what he did is he went in and

3  met with the prosecutors, and he told people that he knew the

4  only way he could get out of his problem, the only way he could

5  avoid the consequences of his acts, was to tell a story about

6  Mr. Walters, and he falsely claimed that he gave him illegal

7  inside information.  I am going to talk more about that in the

8  opening statement about what you will hear.  And we are going

9  to prove during this trial, through incontrovertible

10  documentary evidence, testimonial evidence, and pure common

11  sense, that he is lying about every allegation in his whole

12  story.

13          Now, I have no doubt, when he is on direct

14  examination, being asked questions by these prosecutors, he is

15  going to tell a smooth story, like the smooth-talking

16  investment banker he used to be.  But on cross-examination, we

17  are going to get to confront him with everything that doesn't

18  make sense, the facts that inconveniently show his lies, the

19  logic that doesn't make sense, his prior inconsistent

20  statements that were exactly the opposite.  And I submit to

21  you, members of the jury, as you hear his testimony, you may

22  think of the famous Mark Twain quote that a lie travels halfway

23  around the world before the truth is putting on its shoes.

24          I would submit to you a corollary of that quote is

25  that it doesn't take much time to tell a lie, but it takes a

1    while to unravel.  And we are going to unravel every single lie

2    Tom Davis is going to say here.  You're going to see it.

3    You're going to feel it.  You're going to know it.

4           Now, as many of you know, this week starts March

5    Madness, the big college basketball tournament.  And I want you

6    to imagine for a moment that you're invited to a March Madness

7    party by a friend, and they tell you as you walk in that

8    someone who is widely recognized as the world's greatest sports

9    gambler and one of the world's best poker players was at the

10   party.

11          Now, I would bet that all of us would decline to bet

12   on the games against this person.  We would not want to play

13   poker with him.  But we would probably want to see his

14   brackets, who he was picking to win the games, or watch him

15   play cards.  But we would assume that that person understands,

16   has experience about sports betting and poker that's far more

17   advanced than us.  We would assume that he has worked harder to

18   become the best in the world.  We would assume that he is

19   better able to evaluate and identify tells, subtle clues that

20   aren't obvious, about who might win a game or what is going on

21   in a poker game.  We would assume that that person has a very

22   different appetite for risk than us.

23          And I tell you that because what you're going to hear

24   is that Mr. Walters took the same skills that made him so

25   successful in sports gambling and poker and he applied them to

1   investing, and it explains a lot of what the prosecution is

2   pointing to for you to look at.

3           The prosecution might ask:  Who would bet tens of

4   millions of dollars on a single trade or a single stock when

5   they didn't have illegal inside information?  Bill Walters

6   would.  And he did it again and again and again, having nothing

7   to do with these allegations.  He did it long before the

8   alleged conspiracy and during.  That's how he invested in the

9   stock market.  That's how he made bets.

10          The prosecution might ask:  Who would make

11  split-second decisions to take a very large position in a

12  stock, even though their information was proper?  Again, you're

13  going to hear Bill Walters did it again and again, and you will

14  see the evidence of that.

15          The prosecution might ask:  Who would make big bets in

16  the stock market based on tells, something that they see in the

17  movement of the stock price, like the betting line, or tells

18  from investment professionals or others associated with the

19  company?  Again, drumroll, please.  You're going to hear Bill

20  Walters.  And you will see it and you will learn a lot about it

21  again and again.

22          Let me step back.  What you're going to hear is that

23  Bill Walters was born 70 years ago in Munfordville, Kentucky.

24  He grew up very poor, raised by his grandmother.  At a young

25  age he started working jobs, and he started gambling in the

H3F8WAL2                          Opening - Mr. Berke

1    pool hall, and he found that he had a real aptitude for it.

2              He graduated high school, began working in Kentucky in

3    an automobile dealership, and then decided to move his family

4    to Las Vegas and pursue his passion full time for sports

5    gambling, poker, and the like.  As you probably know, in Las

6    Vegas, it's a big industry, heavily regulated, as you heard

7    from Judge Castel at the beginning.

8              And Mr. Walters did very, very well, as you will hear,

9    and had a lot of success, became quite well-known, and that's

10   what, again, led him to often be referred to as one of the

11   world's greatest, if not the world's greatest sports gambler.

12   He won the World Series of poker, which is an event of poker

13   players, and again, helped cementing his reputation.

14             Now, what you will hear is Bill and his wife Susan,

15   who he has been married to for 40 years, they started a

16   business called The Walters Group.  And what Mr. Walters tried

17   to do is take the same skills that he used in sports gambling

18   and poker and apply them to business.  And they bought

19   automobile dealerships in his home state of Kentucky, all over

20   the country, car rental agencies, golf courses, real estate

21   companies, all sorts of businesses, applying the same skills

22   that led to his success in sports gambling and poker, and they

23   had a lot of success.  Together, The Walters Group helped Mr.

24   Walters and Susan Walters be worth hundreds of millions of

25   dollars, they employ thousands of people, and the business does

1   very well.

2            As I mentioned, Mr. Walters also applied those same

3   skills and techniques that he had honed in gambling to

4   investing in the stock market.  And you will hear Mr. Walters

5   was drawn to the stock market because you could have a much

6   larger bankroll than in sports betting.  As you will hear, in

7   sports betting there are limits as to how much you can play on

8   a game because you need equal action on the other side.  In the

9   stock market, particularly for liquid stocks that have a lot of

10  shares, you can invest a lot more money.  And what you will

11  hear as well is that banks were more than happy to lend Mr.

12  Walters a lot of money to do those investments, at a low rate

13  of interest, because he was such a good customer.

14           You will hear that over the period we are talking

15  about, 2008 to 2014, Mr. Walters invested in close to a hundred

16  different companies.  And what he would do with these companies

17  is he would invest in them over a period of time, often looking

18  for the moment when there would be action involving those

19  companies, earnings announcements or other significant events,

20  where you would either win or lose and you would make that bet.

21           And in order to make those decisions, Mr. Walters

22  applied the same techniques, the same work ethic that you are

23  going to hear about, to learn everything he could about those

24  companies and stocks that he invested in.  So what he would do

25  is he would really immerse himself, individually and with

1   investment professionals, to learn the industries and the

2   companies he was looking at.

3            So, for example, for Dean Foods, which was principally

4   a fluid milk company at the time, he tried to understand

5   everything he could about the dairy industry and how the

6   company and the industry are affected by changing milk

7   commodity prices; grain prices to feed the cows; resin prices

8   for the containers around the milk; diesel fuel prices to run

9   the machines; currency fluctuations, because you will hear

10  there are a few countries across the world that can help

11  determine whether milk sells at a good price or not; weather,

12  drought can have a big impact; and a whole host of other

13  factors that he would try to understand so that he could know

14  what to do with the stock.

15           Mr. Walters also tried to understand how Wall Street

16  treated the industry and the stock.  Because, again, like in

17  sports betting, when it's most important to understand the

18  betting line, understanding how Wall Street was looking at the

19  company, and how that might affect the stock price, could also

20  be very helpful in determining what is a good bet or a bad bet.

21           You will hear he also spoke to investment

22  professionals, a lot of them.  He often had them compare

23  various ideas and advice and the like.  And as you hear all the

24  evidence of what he did constantly, including with Dean Foods,

25  when he supposedly had the answers to the test, you may ask

1    yourself, Why is he doing all of this if he knows the answer?

2    And I submit to you you will see it's because Tom Davis is

3    lying, and he really didn't.

4           But what you are going to hear is that Mr. Walters had

5    a bank of computers in his office, and used them for gambling,

6    his business, The Walters Group, as well as investing.  And he

7    often chose the companies and came across the companies that he

8    decided to invest in based on how he learned about them from

9    people who had something to do with it who he respected and

10   trusted.  So, for example, they may be an investor in the

11   company, they may be a founder of the company, or they may be

12   in management of the board.  And you will hear that when

13   Mr. Davis was interviewed by the FBI, when they showed up and

14   surprised him on his doorstep, he specifically said that he

15   understood the reason why Mr. Walters invested in Dean Foods is

16   because Mr. Walters respected Mr. Davis, trusted Mr. Davis, had

17   confidence in Mr. Davis.

18          You're also going to see that Mr. Walters made big

19   bets, as I said, tens of millions of dollars at a time, went in

20   quickly, when he decided to do it, in all of the stocks, having

21   nothing to do with this case, and you will also hear he made a

22   lot of bets based on tells.  For example, if he saw something

23   unusual happening with the stock price, he would assume that

24   something was going on on Wall Street, that the big Wall Street

25   firms may know something, and he would look at that.

1          He would look for tells from other investment

2     professionals and people associated with the company, stock

3     sales, stock purchases, those sorts of things, and he would

4     make decisions.  And you are going to hear a lot about that,

5     see how he traded again and again and again, and understand why

6     he did it and how he did it.

7          Let me turn now and talk to you about Tom Davis.

8          First, let me tell you that Tom Davis, as Bill Walters

9     knew him at the time, Tom Davis presented himself as a very,

10     very impressive person.  He was a navy veteran.  True.  After

11     the navy, he graduated from Harvard Business School.  He went

12     to work for the one of the great investment banks, known as

13     DLJ.  He ran the Dallas, Texas office and was in charge of all

14     investment banking in the southeast region.  He did big deals,

15     names you would know, big people.  When DLJ got sold to an

16     international investment bank, Credit Suisse, he took a big

17     payout, and wasn't shy about talking about the lucrative payout

18     he received.

19          He was the part owner of two sports teams, the Texas

20     Rangers and the Dallas Stars, and talked a lot about that.  He

21     owned multiple homes.  He co-owned his own airplane that he

22     flew across the United States.  He belonged to four prestigious

23     golf courses.  He was the pillar of the community in Dallas,

24     well-known.  I told you he threw this big golf tournament,

25     charitable golf tournament, of professional golfers, became

1    well-known for that.  And he was somebody with a big reputation

2    in Dallas.

3            You will hear it is what led Dean Foods to make him

4    chairman of the board, because he persuaded people how

5    impressive he was, how knowledgeable he was about Wall Street

6    generally, what a good resource he was.

7            What you are going to hear is unknown to Mr. Walters,

8    unknown to all these other people he fooled, including people

9    on the board of Dean Foods.  Mr. Davis had a dark side.  He

10   used this charity, this golf tournament, to benefit a shelter

11   for battered women as his own personal piggy bank, committed

12   tax fraud, committed other crimes, including stealing and lying

13   to Mr. Walters, his purported co-conspirator.  You will hear he

14   had other issues.  You will hear that he lived above his means,

15   both his lifestyle and his exercises of excess.

16           Mr. Walters, who got to know Mr. Davis better,

17   Mr. Davis had one of his homes in Southern California, near

18   where Bill and Susan Walters had their home, and they would

19   socialize with Mr. Davis and his then wife Louise, and they

20   would see each other and play golf and the like.

21           What you are going to hear is that Mr. Walters and the

22   president of The Walters Group, a fellow by the name of Mike

23   Luce, who you will hear about, they at one point were looking

24   to buy golf courses in Texas and needed some advice about

25   financing and the like, and they spoke to Mr. Davis, and they

1    were very impressed with him.  He was knowledgeable about Wall

2    Street, about business, gave them very good advice, and

3    counseled them.  He was helping them.  They ultimately didn't

4    do the deal, but they gained trust in Mr. Davis and his

5    judgment, his probing, his financial knowledge.

6            And over time you are going to hear that Mr. Davis

7    brought business deals to them, something you are going to hear

8    about called Periscope Holdings, a software company.  You will

9    hear about Park Cities Bank, an effort of a bank that had a

10   problem with ownership.  They can recapitalize and take it

11   over, a lucrative opportunity in Texas.  Something called

12   Benefit Harbor.

13           What you will hear is for all those investments, Mr.

14   Walters and Mike Luce believed that Mr. Davis was giving them a

15   benefit, because it was such a good business opportunity and

16   had good return, applying a risk/reward, as Mr. Walters always

17   did, using the same technique and background that he had.

18           And you are going to hear that Mr. Davis at the time,

19   contrary to what he may be claiming now, viewed these

20   investments as benefits as well for Mr. Walters and The Walters

21   Group, and you will hear that.

22           Now, what happened?  The government's argument is

23   supposedly for many years he is giving illegal inside

24   information, committing a crime, just because he wants to be

25   friends and who knows.  You are going to evaluate that whole

1    story that Mr. Davis was peddling to them.

2              But what happened is in 2010, Mr. Davis went to Mr.

3    Walters and said he had a bit of an issue.  He had a costly

4    divorce with his second wife Louise that took half his liquid

5    assets, and that most of his other substantial assets were tied

6    up in illiquid investments, like the two sports teams, which he

7    thought would be sold, and stock and other things.  So he asked

8    Mr. Walters would he mind loaning him money.  And you're going

9    to hear that Mr. Walters regularly loaned people money or

10   arranged for loans.  He did it for people just like Mr. Davis,

11   friends and business contacts.  He did it for simply personal

12   friends.  He did it for employees, people who worked at his

13   golf courses.  He regularly did it.  He was known for doing

14   that.

15             So Mr. Walters said he would help him.  He put him in

16   touch with Luther James, an old friend of Mr. Walters, who is

17   also quite wealthy, who had a lot of cash and often did loans

18   in order to get the rate of return; and, in fact, regularly

19   loaned Mr. Walters money himself for business deals, gambling

20   and the like.

21             So they did a loan.  It was an interest rate loan, in

22   writing, nothing suspect about it.  And you will see over a

23   period of time, well into a year, Mr. Davis was falling behind

24   in the interest payments.  Said again, liquidity issues, cash

25   flow, soon he will be able to sell stock, the sports teams will

1   be sold, he will be fine.  And Mr. Walters agreed to take over

2   the loan.  But he said, but because you're having trouble

3   paying, I am going to increase the interest rate.  So it was a

4   higher rate of interest.  Again, it was documented.  It was on

5   the books of The Walters Group.  It was audited by their fancy

6   accounting firm that did their books.

7            You are going to hear that for sports gambling in Las

8   Vegas you had to use cash at that time, that was the rule and

9   the law.  So Mr. Walters and his business had a lot of cash,

10  and supposedly he could have given a payoff to Mr. Davis, if he

11  was really getting illegal information, he could have given a

12  suitcase of cash, but instead he gave a market rate loan fully

13  documented.  And you will ask yourself and evaluate whether

14  that makes sense to you.

15           In any event, you are going to also hear that after

16  that loan, that Mike Luce, the president of The Walters Group,

17  and Mr. Walters regularly asked Mr. Davis, When are you going

18  to pay off the loan?  When are you going to pay off the loan?

19  And Mr. Davis said, Well, I will pay it out of these

20  investments we have together, or something else.  And that went

21  on, and you will see evidence of that, and you will ask

22  yourself again, if this was some payoff, why are they

23  collecting this loan?

24           Now, I am going to submit to you the prosecution said

25  something very interesting, and again, it's based on the lies

1   of Mr. Davis.  They said there was another loan.  Let me tell

2   you about that.

3          There was an investment in a company called Park

4   Cities, that was this bank recapitalization that I told you

5   about.  It was a great opportunity.  You will hear that.  A lot

6   of people were interested.  And Mr. Davis persuaded The Walters

7   Group -- Mike Luce, Bill Walters -- to invest $400,000.  It was

8   going to be a line of credit to draw down to do the work

9   necessary for the deal, and in return they would get equity in

10  the company back, the bank, or Mr. Davis would have to pay it

11  back.  And what Mr. Davis did is he proceeded to steal that

12  money and lie about it.  Instead of using it for Park Cities,

13  like he told everyone he was going to do, he used it to pay off

14  his own personal debt and other expenses he had.  And you will

15  ask yourself, if they are supposedly co-conspirators, and Mr.

16  Walters is making tens of millions of dollars based on some

17  illegal tips, why is he going to steal and cheat Mr. Walters

18  for pittance of that?

19         Now, let me tell you some more of what you're going to

20  hear about Mr. Davis.  As I told you, Mr. Davis, as you will

21  hear, was in dire straits.  He was caught committing a variety

22  of crimes, lying about it, knew he faced a long jail sentence,

23  could be charged with insider trading.  He had a problem.  And

24  you will hear he told people he knew the only way out was to

25  point a finger at that man.  And so he went in and he told a

1    story to the prosecutors.  And you're going to hear it wasn't

2    good enough for him to get his deal.  But he was stuck.

3    Because now he admitted to all these other crimes he did, and

4    he couldn't turn back.

5           So what you're going to hear is for a number of months

6    Mr. Davis went in ten separate times, over ten separate times,

7    to try to persuade the prosecutors to give him his deal.  He

8    had ten tryouts to try to persuade them to let him be on the

9    government's junior varsity team, the trophy of which would be

10   a get-out-of-jail-free card if he could persuade them he had a

11   story to tell.

12          What you are going to see what Mr. Davis did, and

13   which led to exactly what Mr. Ferrara said to you right here,

14   is Mr. Davis reverse engineered his testimony and his story

15   like a bad science experiment.  What he did is he looked at

16   phone calls, and he would be asked by the prosecutors, well,

17   did you give inside information there?  No, I didn't.  Are you

18   sure?  Well, maybe I did.  Then he would look at an earnings

19   announcement, something the company announced later on, and

20   said, Oh, I told him that, everything they announced later,

21   that's what I told him.  Tomorrow's news today.  Then they

22   would have to say, well -- session two maybe -- sorry, you

23   wouldn't have known that information back then.  OK, maybe

24   something else.  And they did this again and again, where Davis

25   is telling a different story each time, and between each tryout

1    he would meet with his lawyers and come again.  And we are

2    going to unravel those lies.  And you will see how many of

3    those lies we will show are false, every last one of them, and

4    we will show how they were constructed, and you will see it and

5    you will understand it.

6          Not only that, but what you're going to hear is that

7    even after he got his deal, he had over 15 more sessions to try

8    to polish the rough spots and the like.

9          Now, let me say, what Mr. Davis did is sort of like

10   what conspiracy theorists do, where they take real facts and

11   they connect them in ways that have nothing to do with reality

12   or what really happened.  So Mr. Davis takes phone calls, or

13   stock trades, or announcements by the company and connects them

14   in ways that don't really connect.

15         And what you are going to see about the things he

16   tries to connect, for example, phone calls.  You heard Mr.

17   Ferrara say there were times Mr. Walters spoke to Mr. Davis on

18   the same day he spoke to his broker.  But what you're going to

19   see and hear is that Mr. Walters spoke to his broker nearly

20   every single day, and usually multiple times, and sometimes as

21   much as six times a day.  And you will see during the critical

22   period he talked to his broker literally every single day.

23         You are going to hear he talked to Mr. Davis hundreds

24   and hundreds of times during this period, often multiple times

25   in a week.  They talked about their business together.  They

1      talked about other business opportunities.  They talked about

2      Wall Street generally.  They talked about sports.  You will

3      hear Mr. Davis was very interested in what Mr. Walters had to

4      say about who is going to win a game.  They talked about

5      friends they had in common.  They were both big golfers.  They

6      talked about golf.  And what you are going to hear again is

7      they talked about Dean Foods.  They talked about things that

8      were entirely proper.

9              You heard that you're going to see Mr. Davis up there.

10     He is going to take an oath.  He took an identical oath before

11     the Securities and Exchange Commission, where he said so

12     clearly he never gave illegal information to Mr. Walters.  And

13     freely admitted they talked about Dean Foods, topics that were

14     entirely proper.

15             Let me show you what he said, and this is sworn

16     testimony by Tom Davis:

17             "I never provided Bill Walters any confidential

18     information whatsoever.  I'm certain of that.  And whatever we

19     discussed was typically available by analysts.

20             "Well, you know, he would ask me about what I'd call

21     sort of 50,000 foot business questions, like how China was

22     affecting the milk market in the United States.  You know, has

23     organic milk products changed the dynamics of the fresh milk

24     business?  I mean, things like that.  He was a curious guy and

25     he would occasionally ask me questions like that.

1          "Bill Walters never asked me any leading questions

2     about Dean Foods, so I felt like he respected the fact that I

3     was on the board and didn't want to put me in that kind of

4     position so he never did."

5          Not only did Mr. Davis swear to that in testimony

6     before the Securities and Exchange Commission, he told that to

7     the FBI when they showed up.  He told that for well over a year

8     to his own lawyers, who repeated it to government agencies.  He

9     told it to his friends.  He told it to the world.

10          What you're going to hear about this is that companies

11     like Dean Foods regularly talk to investors.  They talk to

12     investors all the time.  They talk about topics they are

13     allowed to talk about.  They have big meetings.  They have

14     small meetings.  They take phone calls from investors.  All

15     sorts of information is fair game to talk about about Dean

16     Foods.  And you are going to hear that Mr. Davis, as a board

17     member, was told what information the company was sharing with

18     investors and knew what was proper to share and not share.  And

19     that Mr. Walters trusted and understood that Mr. Davis, the

20     navy veteran, Harvard Business School, trained investment

21     banker, philanthropist, community leader, experienced board

22     member, only shared that information which he knew was proper

23     and appropriate to share with Mr. Walters, just like the

24     company shared with all those big Wall Street investor firms

25     that also made big bets on Dean Foods.  That's what he

1   understood.

2            Now, what you are also going to see is something

3   interesting.  I would submit to you, as you will see, that

4   someone who is telling a lie generally knows where there is a

5   problem with their story, because they know the truth.  And

6   Mr. Davis knew there were problems.  So he sort of came up with

7   a real doozy of a story to help him persuade that Mr. Walters

8   would have known that the information was bad.  So he said,

9   during the critical White Wave period in 2012, the summer of

10  2012 -- that's where Mr. Walters made most of the money, which

11  we are going to talk about in a second -- that Mr. Walters,

12  during that critical summer of 2012 period, before that had

13  given him a prepaid phone so there would be no record of their

14  calls.  That's how you know he knew something was wrong.  And

15  he said use codes.  That's how he knew.

16           I submit to you, members of the jury, at the end of

17  this trial you're going to call the "bat phone" argument from

18  Mr. Davis, that we just heard from the prosecution, you're

19  going to think of it as the "bat phony" argument, because we

20  are going to show you it's entirely made up.

21           You can roll your eyes on bat phony.  I have three

22  teenagers daughters at home.  I'm used to eye rolls.  That's

23  OK.  But you're going to hear that this prosecution has been

24  going like crazy trying to keep up with the lies about the "bat

25  phone" argument.  It's a lie.  He didn't have a bat phone.  He

1     had no codes.  It's a lie like his whole story.  But that was

2     like the man in Greece who had to tell more lies to prevent the

3     truth from coming out.  That's what Tom Davis did.

4           I know you all take notes and you all make your own

5     independent decision about what notes to take, but one of the

6     things we are going to do is every time during Mr. Davis's

7     testimony that we believe he is telling a lie, another lie and

8     he is lying, we are going to make a notation.  We are going to

9     show him later in the trial, through other evidence, that he

10    was lying, another notation.  And at summation, we are going to

11    give you our tally.  We can compare notes if you want.  And I

12    suspect it's going to be very large tally.

13          What you are going to see is that the prosecution's

14    entire case, I submit to you, rises and falls over whether you

15    can believe Tom Davis, and believe him beyond a reasonable

16    doubt.  And you're going to ask yourselves, I submit, in the

17    most important decisions in your lives -- because obviously

18    this is an important one -- would you rely on Tom Davis?  Would

19    you rely on him beyond a reasonable doubt?  And I submit to you

20    what you're going to find out is that the only thing Bill

21    Walters is guilty of is being friends with and trusting Tom

22    Davis.

23          Let me return for a moment to White Wave.  You're

24    going to hear White Wave was the organic division of Dean

25    Foods.  Silk Milk, it's sort of a big deal because it was sort

H3F8WAL2                          Opening - Mr. Berke

1      of sexy and they have a big share of the market, and the big

2      question of Dean Foods is, when would White Wave be spun off,

3      because it was a popular brand, more and more people are

4      drinking organic and almond milk and the like.  And analysts

5      and smart investors like Mr. Walters have been following this

6      for a long, long time.  Mr. Walters had believed it would be

7      spun off, and you will see the evidence of that.  He was

8      researching it for a long, long time.

9              But what happened is, in mid-2012, Dean Foods, known

10     to everyone, was contemplating this White Wave transaction,

11     spinning it off.  There were a lot of tells in the market.  The

12     company was talking about when they would do it.  So there were

13     a lot of the tells, Mr. Walters' currency, and you will hear

14     all about that.  So there were some people like Mr. Walters who

15     thought it was going to be a great thing and were heavily

16     invested, and you will hear about that.  But it was a tough

17     time for the milk industry, raw milk prices had affected the

18     profitability of Dean Foods, so the stock was beaten so low.

19     And again, from Mr. Walters' perspective, he didn't think it

20     would go much lower because at some point everybody drinks

21     milk.  So he perceived it to be the gambling equivalent, as you

22     will hear, of a free roll.

23             Let me tell you what a free roll is if you don't know.

24     If people are playing poker and there's only two players left,

25     and one player believes, based on the cards that are shown and

1    known, that the worst they can do is tie the other player, so

2    the worst that they could get is they would split the pot, but

3    if they won they would get the whole pot, that is known in

4    poker gambling as a free roll.  A limited downside, a huge

5    upside.

6            You will see Mr. Walters believed that was an

7    opportunity in mid-2012, and he told people about it, which you

8    will hear about it, and he invested a lot of money.  And you

9    will hear that there were times he invested tens of millions,

10   even a hundred million in other companies.  That's what he did,

11   having nothing to do with this case.  And he made a big

12   investment, and he was right, like a lot of institutional

13   investors.

14           What you're going to hear is he told people, and among

15   the people he told was Phil Mickelson, his good friend, a

16   golfing buddy, someone who he regularly gave sports tips to,

17   because Phil was interested, and would also share stock tips at

18   times, as you will hear.  Phil Mickelson, as you will hear, and

19   if you don't already know, is a Hall of Fame golfer, huge

20   endorser, very, very wealthy in his own right, and he made the

21   trade.

22           I will submit to you that the fact that the

23   prosecution referred to Phil Mickelson as some evidence of the

24   case is a tell of how weak they know the allegation of Tom

25   Davis is, the gaps they see in the evidence, the huge

1    credibility gap, the canyon of Tom Davis's credibility.

2              I would submit to you even more than that.  What

3    sophisticated investors know, as you will hear, is that when

4    there is a big event for a company, whether it's a merger,

5    acquisition or a spinoff, the Securities and Exchange

6    Commission looks to see who are the buyers leading up to that,

7    and they investigate, that's what they do.  So if you're Bill

8    Walters, I would submit, and you believe that someone has given

9    you illegal inside information, the last thing you would do is

10   give it to Phil Mickelson, one of the most famous athletes in

11   the world, that is immediately going to track regulatory

12   scrutiny and lead back to Bill Walters.

13             More than that, you are going to hear that during this

14   time period, Bill Walters had all his cards turned over,

15   because you are going to hear that he made big investments that

16   often reflected a substantial percentage of the volume of the

17   stock traded.  Again, as you will hear, sophisticated investors

18   know that FINRA, another regulatory agency that regulates the

19   stock market, they looked for spikes for when there is an

20   investor buying a lot of volume, and they investigate.

21             So I submit to you, as you see this evidence, what you

22   are going to see is that the allegation that Mr. Walters knew

23   he had illegal inside information, traded to bring all this

24   attention by being a substantial volume, got Phil Mickelson

25   involved, would be akin to a bank robber pulling on his mask,

1    putting a note to the teller so it's sticking out of his

2    pocket, and walking up to a police officer and asking for

3    directions to the nearest bank.  I submit to you, as you will

4    hear, it makes no sense.

5           Let me briefly address Darden.  Darden, again, I would

6    submit is a tell.  If the prosecution really believed they had

7    a case that they felt confident in about Dean Foods, they never

8    would have brought Darden.  With Darden, Mr. Davis was not on

9    the board or otherwise involved, but he was approached by

10   people who were interested in making a significant investment

11   in Darden and had him personally sign a nondisclosure

12   agreement.  So he was restricted from talking about the stock

13   or trading the stock because he signed this agreement that was

14   confidential and personal between him and the company.  So when

15   he told people about it, when he told Bill Walters and others

16   that Darden is a great company, there's a real opportunity

17   there, he was violating the law.  He is guilty of insider

18   trading because he had a nondisclosure agreement.  But all the

19   other folks, who didn't have nondisclosure agreements and

20   didn't know it, are not at all, which you will hear about.

21          So you will see that that case, you will be scratching

22   your head a little bit when you see the evidence, and it has

23   nothing to do with why we are here, although I submit again

24   it's a tell.

25          Members of the jury, I would like to end where we

1    began, in talking about what this prosecution's case is about.

2    Three things:

3            One, lies.  The lies of Tom Davis, which you will hear

4    about and you will see how they were constructed, and you will

5    see them for what they are I submit;

6            Two, speculation.  Speculation about what was said on

7    phone calls or why trades were made;

8            Three, innuendo.  These trades were so big, tens of

9    millions of dollars, a hundred million, Mr. Walters must have

10   had illegal inside information.

11           I submit to you, lies, speculation, innuendo, that may

12   be an OK gossip page Twitter post, but that is a far cry from

13   proof beyond a reasonable doubt.  And it's certainly not

14   evidence that you can rely on to find someone guilty of these

15   serious crimes.

16           I submit to you, when this case is over, you are going

17   to be persuaded of two things.  And I will tell you, as Judge

18   Castel said, we obviously don't have to prove anything.  We

19   have no burden.  The burden is on the prosecution to prove this

20   case beyond a reasonable doubt.  But I submit to you you will

21   persuaded of two things:  Tom Davis is lying and Bill Walters

22   never believed he was doing anything wrong.

23           I am humbled by the responsibility of representing

24   Bill Walters.  Bill Walters has his wife Susan, his family and

25   friends behind him, but he has us, his counsel, standing

H3F8WAL2

1    between him and you, the holders of his fate.  And I believe

2    that if we do our jobs, and you see what was really going on at

3    this time, you see what is really going on with Tom Davis, what

4    is really going on back then, what Mr. Walters was believing

5    and doing, you will find him not guilty of these charges.

6            Judge Castel said a little while ago, as Mr. Walters

7    sits here, he is presumed innocent.  When you look over at him,

8    you have to see him as presumed innocent.  As the trial

9    progresses, sitting in a big courtroom, you look over, he is

10   presumed innocent.  When the judge tells you the law at the end

11   of the case, Mr. Walters is still presumed innocent.  And that

12   continues all the way through deliberations, unless you find

13   that the prosecution has proven this case beyond a reasonable

14   doubt.  And I submit to you, members of the jury, that when you

15   see the evidence, and the lack of evidence, and what is really

16   going on here, you will reach the only just and fair verdict

17   and find Mr. Walters not guilty of all the charges against him.

18           Thank you.

19           THE COURT:  Thank you, Mr. Berke.

20           Ladies and gentlemen, we will take a ten-minute break.

21   Remember, do not discuss the case among yourselves or with

22   anyone.  Keep an open mind.  See you in ten minutes.

23           (Jury exits courtroom)

24           (Recess)

25           MR. BERKE:  I just want to mention one thing real

H3F8WAL2

1    quick.  I think two of the jurors had their chairs switched.  I

2    think Juror No. 3 is the back row, but we will talk to Flo with

3    your Honor's permission.

4              THE COURT:  Flo is the one who is going to get this

5    straight.  They should be in the chairs based on their juror

6    numbers and whether they were selected as regular or

7    alternates.  So it's a good point to raise.

8              Madam deputy, you will work that out.

9              Thank you.

10             MR. BERKE:  Thank you.

11             THE COURT:  See you in ten minutes.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H3F3WAL3

1          (In open court; jury not present)

2          THE COURT:  You're going to put your witness in the

3     box before or after each break so that we're ready to go.

4          MR. GOLDMAN:  Certainly, your Honor.  We're getting

5     him right now.

6          THE COURT:  I understand.  Bring our jurors in,

7     please.  Sir, right up here.

8          (Jury present)

9          THE COURT:  This is absolutely appropriate, but I just

10    understand, my deputy advised me that one of the jurors in the

11    back row knows one of the jurors in the second row.  Is that

12    correct?

13         A THE WITNESS:  Yes.

14         THE COURT:  How do you know him?

15         A THE WITNESS:  He used to work where I work.

16         THE COURT:  Okay.  Excellent.  Great.  Terrific.

17    Thank you very much.

18         A THE WITNESS:  You're welcome.

19         (Witness sworn)

20         THE COURT:  All right.  You may inquire.

21         MR. GOLDMAN:  Thank you, your Honor.

22    GREGG ENGLES,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25    DIRECT EXAMINATION

H3F3WAL3                        Engles - direct

1   BY MR. GOLDMAN:

2   Q.   Good afternoon, Mr. Engles.

3   A.   Good afternoon.

4   Q.   How old are you?

5   A.   I'm 59 years old.

6   Q.   Where do you live?

7   A.   I live in the Denver, Colorado area.

8   Q.   What is your educational background?

9   A.   I have an undergraduate degree from Dartmouth College and a

10  law degree from the Yale Law School.

11  Q.   What is your current occupation?

12  A.   I am the chairman and the chief executive officer of the

13  WhiteWave Foods Company.

14  Q.   What does the chairman mean?

15  A.   I'm the chairman of the board of the directors of the

16  WhiteWave Foods Company.

17  Q.   What is the board of directors?

18  A.   The board of directors of a corporation is the body that

19  oversees the management and direction of a corporation.

20  Q.   What kind of business is WhiteWave?

21  A.   WhiteWave is a food manufacturing and distribution

22  business.

23  Q.   What kinds of things does WhiteWave sell?

24  A.   WhiteWave sells organic milk products, it sells dairy

25  alternative beverages like almond milk and soy milk, flavored

1  coffee creamers.

2  Q.  Does WhiteWave have any brands it sells?

3  A.  Yes.  It sells in the United States under the Horizon

4  Organic brand, the Silk brand of dairy alternative beverages,

5  and the International Delight brand of coffee creamers.

6  Q.  How long have you been chairman and chief executive officer

7  of WhiteWave?

8  A.  I've been the chairman and CEO, chief executive officer, of

9  WhiteWave since October of 2012.

10 Q.  Prior to that, what was your occupation?

11 A.  I was the chairman and chief executive officer of a company

12 called the Dean Foods Company.

13 Q.  What kind of company is the Dean Foods Company?

14 A.  It is also a food manufacturing and distribution company.

15 Q.  What is its primary business?

16 A.  Its primary products are fluid milk products, so milk you

17 would buy in a gallon jug or half-gallon carton.

18 Q.  Where is Dean Foods located?

19 A.  Dean Foods is headquartered in Dallas, Texas.

20 Q.  For how long were you chairman and chief executive officer

21 of Dean Foods?

22 A.  I was chairman of and CEO of Dean Foods from approximately

23 1995 until 2012 in the case of chief executive officer, and

24 2013 as chairman.

25 Q.  How did it come to be that you went from chairman and CEO

1   of Dean Foods to chairman and CEO of WhiteWave?

2   A.   The Dean Foods Company owned the WhiteWave Foods Company.

3   At some point in time in October of 2012, we sold shares --

4   Dean Foods sold shares of WhiteWave to the public in an

5   offering, and at that point in time I became the CEO and

6   chairman of the WhiteWave Foods Company.

7   Q.   When Dean Foods sold shares in WhiteWave, what happened to

8   those shares?

9   A.   The shares were sold on the New York Stock Exchange and

10  they were bought by investors, either individuals or firms that

11  make investments in public companies.

12  Q.   What kind of transaction is that called?

13  A.   It's called a public offering.

14  Q.   Ultimately, what happened to the WhiteWave Company?

15  A.   The WhiteWave Company was ultimately completely separated

16  from Dean Foods, in a distribution of Dean Foods shares to its

17  shareholders.

18  Q.   What is that called?

19  A.   It's called a spinoff.

20  Q.   We're going to get into some more detail about that a bit

21  later, but first I want to ask you a few questions about

22  WhiteWave and Dean Foods as public companies.

23       Are they traded on a stock exchange?

24  A.   Yes.  Both of those companies are traded on the New York

25  Stock Exchange.

Q.  What does it mean for a company to be traded on the New York Stock Exchange?

A.  It means that investors, individuals or investment firms, can buy or sell the shares of a company that's traded on the exchange on any day the exchange is open.

Q.  Are public companies governed by securities laws and regulations?

A.  Yes, they are.

Q.  Broadly speaking, what requirements, if any, do public companies have about releasing their financial performance results?

A.  The securities laws of the United States require that firms that are publicly traded release financial statements every three months, we call that on a quarterly basis.  And that they release full-year statements that are audited by our auditors on an annual basis.

Q.  Is it important for a company to maintain that information confidentially from the public before those filings and announcements are made?

A.  Yes, it is.

Q.  Is there a specific securities regulation that deals with the public distribution or dissemination of information?

A.  Well, there are, there are a number, yes, that require filings, and that require that information that is released to individual investors is released broadly to the market at the

 1   same time.

 2   Q.   What is that particular regulation called?

 3   A.   That's called Regulation F.D. or Regulation Fair

 4   Disclosure.

 5   Q.   Can you explain to the jury what that regulation requires?

 6   A.   It requires that if a company discusses or discloses to an

 7   investor or a group of investors information that would affect

 8   how they view the value of a stock or their desire to buy or

 9   sell it, that that information be released to the market

10   broadly, so that all investors have the same information.

11              MR. BERKE:  Your Honor, sorry to interrupt.  Can I ask

12   your Honor to consider instructing the jury about the law, the

13   legal issues that pertain to this case?

14              THE COURT:  Yes.

15              Ladies and gentlemen of the jury, I'm allowing this

16   general testimony at this time.  But if any witness or lawyer

17   states a principle of law different than what I tell you in my

18   closing instructions in this case, it is my closing

19   instructions that you must follow.  That said, I'll allow the

20   general overview evidence.  Go ahead.

21              MR. GOLDMAN:  Thank you, your Honor.

22   Q.   What information falls under this Regulation F.D.?

23   A.   Information that is thought to be material.

24   Q.   What types of information about a public company are

25   considered to be material?

1    A.  I think the generally accepted notion is that it is

2    information that an investor would consider important in their

3    decision to buy or sell a security.

4    Q.  Can you be more specific about information that you dealt

5    with as chief executive officer that was material to the

6    company?

7    A.  Well, there are a number of types of information.  The

8    financial results that we would file on a quarterly and annual

9    basis under the securities laws are generally believed to be

10   material information.  Information about important corporate

11   transactions, the purchase of a business, for example, of a

12   certain size would be thought to be material.  The issuing of

13   security, the sale of securities like shares of common stock or

14   the issuance of debt by the company is often thought to be

15   material.  Those sorts of important corporate transactions.

16   Q.  You mentioned that you are currently the chief executive

17   officer of WhiteWave and were previously the chief executive

18   officer of Dean Foods.  Can you explain to the jury what duties

19   and responsibilities you have as chief executive officer?

20   A.  The chief executive officer of a company is generally

21   responsible for the oversight of the management of the

22   business, the actual management of the business.

23        So, the primary responsibilities of the chief

24   executive officer would be defining the company's strategy, and

25   then making sure that appropriate management and systems and

1    capabilities were in place in order to bring that strategy to

2    life.

3    Q.   You discussed a little bit about what the board of

4    directors is.  What types of responsibilities does the board of

5    directors have?

6    A.   The board of directors' responsibilities really come down

7    to hiring the chief executive officer, and making sure that he

8    or she hires appropriate senior managers to guide the business.

9    And reviewing and assessing and ultimately approving the

10   strategy that the corporation undertakes.

11   Q.   Must the board of directors approve other things in

12   addition to the strategy of the company?

13   A.   Yes, there are many types of activities that the board has

14   to approve.

15   Q.   Can you give the jury some examples.

16   A.   Well, for example, a sale of the business would require the

17   board's approval.  Or sale of a material meaningful part of its

18   assets.  The declaration of dividends requires the board's

19   approval.  The issuance or the sale of common stock securities

20   or the issuance of debt would require the board's approval.

21   Those sorts of things.

22   Q.   Do members of the board of directors have duties to the

23   company?

24   A.   Yes, they do.

25   Q.   What are the principal duties that a director has?

H3F3WAL3                              Engles - direct

1    A.  Well, both of the companies that I have been involved with

2    are Delaware companies, and under Delaware law, the duties of

3    the board of directors to the company are really two fold.  The

4    first is the duty of care, which means that directors are meant

5    to do all of the work necessary and to get advice necessary as

6    to make thoughtful decisions in their role as a member of the

7    board.

8            The second duty under Delaware law is the duty of

9    loyalty, which is really the duty to act in the best interest

10   of the corporation and its shareholders.

11   Q.  Is there a duty of confidentiality that a board member has

12   to the company?

13   A.  I think that duty generally falls under the duty of

14   loyalty, and the duty to act in the corporation's best

15   interests, and not in the self-interest of a director.

16   Q.  As chief executive officer, did you update the board of

17   directors on all material information about the company?

18   A.  Yes.

19   Q.  Generally, what types of things must be kept confidential

20   by the board of directors?

21   A.  Well, generally things that are material, and that are not

22   otherwise known in the marketplace.

23   Q.  Can board members discuss confidential company matters with

24   each other?

25   A.  Yes.

H3F3WAL3                         Engles - direct

1   Q.  Can board members discuss confidential company matters with

2   the CEO?

3   A.  Yes.

4   Q.  Can board members discuss confidential matters with friends

5   or members of the public?

6   A.  No.

7   Q.  In your experience, are investment professionals aware of

8   the confidentiality requirements of the members of the board of

9   directors of public companies?

10              MR. BERKE:  I'm going to object, your Honor.

11              THE COURT:  Basis?

12              MR. BERKE:  Foundation, your Honor.

13              THE COURT:  Lay a foundation.

14  Q.  You stated you were the chief executive officer, is that

15  right?

16  A.  Correct.

17  Q.  As chief executive officer and chairman of the board, did

18  you interact with the investment public quite frequently?

19  A.  Yes, it was one of my principal duties.

20  Q.  From that experience as chief executive officer interacting

21  with investment professionals, are you aware that investment

22  professionals are aware of the confidentiality requirements of

23  members of the board of directors?

24  A.  I would say generally, yes.

25  Q.  Why does it matter to the company that significant

1    information shared with the board of directors remains

2    confidential?

3    A.  Well, there are many reasons.  Depending upon the nature of

4    the information, it could be competitively sensitive.  For

5    example, if a corporation were competing to make an acquisition

6    that other parties might be interested in.  For that

7    information to become public would be harmful to the interests

8    of the corporation.

9          There are important matters that corporations deal

10   with that are internally sensitive.  They have important

11   organizational implications within the company, and so the

12   management of the release of that information is often

13   carefully considered.

14         And then, of course, material information affects the

15   way that companies are valued by investors.  What the price of

16   their stock is.  And it's certainly in the corporation's

17   interest for that flow of information to be orderly and managed

18   by the company.

19   Q.  Generally speaking, how is information about the company

20   made public?

21   A.  There are a number of ways.  There are regular filings

22   under the securities laws, so, three months, every three months

23   we file our quarterly reports; at the end of every year we file

24   our fiscal reports.  Those are typically accompanied by and

25   other important matters are disclosed by a press release that

H3F3WAL3                    Engles - direct

1    is issued by the company.

2              And then the company also participates in conferences

3    from time to time organized to bring companies and investors

4    together usually in a particular industry, in our case the

5    consumer goods or food manufacturing industries.  There are a

6    number of conferences at which we would present our company to

7    the investment community, and those would be public.

8    Q.  Until the company makes information public in the manners

9    you just described, can a member of the board disclose that

10   information to anyone outside the company?

11   A.  They should not, no.

12   Q.  Did Dean Foods board members receive training on

13   confidentiality requirements?

14   A.  Yes.

15   Q.  Broadly speaking, what did that training include?

16   A.  Well, there were a number of formats for training

17   directors.  Dean Foods had a code of ethics in place that dealt

18   with the maintenance of confidential information.  Board

19   members would have to read that code of ethics and take

20   training with respect to that code of ethics and certify that

21   they had read it and received periodic training.

22             And then, usually in conjunction with a major

23   transaction, a major securities issuance or a major corporate

24   transaction like the consideration of the sale of a business,

25   we would have our outside counsel come in and remind the board

H3F3WAL3                         Engles - direct

1   specifically of their duties.

2   Q.   Focusing on Dean Foods for a minute, when you were chairman

3   and CEO, how many board members were there?

4   A.   I don't remember exactly.  But I believe it ranged from

5   nine on the low side to maybe 13 on the high side.

6   Q.   How often did the board of directors of Dean Foods meet?

7   A.   Well, the board would have regularly scheduled meetings

8   each quarter, usually shortly following the release of our

9   financial statements for the quarter and the year end.  And

10  then we would meet from time to time, either in person or by

11  telephone, if there were matters that needed to be addressed

12  between the regularly scheduled meetings.

13  Q.   Were there also subcommittees of the board of directors?

14  A.   Yes.

15  Q.   What committees were there?

16  A.   At Dean Foods we had I believe four committees.  We had an

17  executive committee of the board, an audit committee of the

18  board, a compensation committee of the board, and a nominating

19  and governance committee of the board.

20  Q.   Would these committees also meet separate from the rest of

21  the board?

22  A.   Yes, they would.

23  Q.   Was one board member of Dean Foods an individual named Tom

24  Davis?

25  A.   Yes.

1              MR. GOLDMAN:  If I could ask Ms. Pyun to show the

2   witness Government Exhibit 4.

3   Q.  Do you recognize that individual?

4   A.  Yes.  That's Tom Davis.

5              MR. GOLDMAN:  Government offers Exhibit 4.

6              MR. BERKE:  No objection, your Honor.

7              THE COURT:  Received.

8              (Government's Exhibit 4 received in evidence)

9              MR. GOLDMAN:  If we may publish for the jury, your

10  Honor?

11             THE COURT:  You may.

12  Q.  When did Tom Davis join the board of Dean Foods?

13  A.  It was in the early part of the decade, from 2000 to 2010.

14  Q.  What was Tom Davis' background?

15             THE COURT:  Do you have this up on your monitor,

16  ladies and gentlemen?

17             A THE WITNESS:  Yes.

18             THE COURT:  Okay.

19  Q.  What was Tom Davis' background?

20  A.  Tom was an investment banker in Dallas that worked for a

21  couple of investment banking firms.  I think most recently, a

22  firm called DLJ, prior to that company being sold in the early

23  2000s.

24             MR. GOLDMAN:  We can take that down, thank you.

25  Q.  Are there restrictions on buying and selling stock for

H3F3WAL3                    Engles - direct

1   board members at Dean Foods?

2   A.  Yes, there are.

3   Q.  What were they?

4   A.  Because of the confidential nature of our earnings, in any

5   given quarter prior to their release, Dean Foods, like most

6   companies, would have what they call a window which started

7   about 45 days before the release of those earnings, during

8   which the board of directors and all the senior managers were

9   prohibited from trading in the securities of Dean Foods.

10  Q.  Were there other times, in addition to that 45-day period,

11  when directors were prohibited from trading?

12  A.  Yes.  Anybody in possession of information that was

13  material and not public would be specifically prohibited from

14  trading until that information became public.

15  Q.  How was that fact relayed to the members of the board?

16  A.  Usually by virtue of a communication from somebody on the

17  general counsel staff, our lawyers' staff.

18  Q.  Let's return to WhiteWave for a moment.  You mentioned that

19  you became chairman and CEO of WhiteWave in October of 2012

20  after an initial public offering.

21         Can you explain for the jury what an initial public

22  offering is?

23  A.  Yes.  An initial public offering is the first time that a

24  company's stock, common stock, is offered for sale on a public

25  exchange like the New York Stock Exchange.

H3F3WAL3                          Engles - direct

1    Q.   Then I believe you testified that WhiteWave became its own

2    company after Dean Foods did what's called a spinoff.

3    Approximately when was that spinoff?

4    A.   The spinoff from Dean to WhiteWave of its shares was I

5    believe in May of 2013.

6    Q.   Just for ease of reference, we'll call the entire

7    transaction a spinoff going forward.  But when did Dean Foods

8    announce that it intended to spinoff WhiteWave?

9    A.   It announced its intention to spinoff WhiteWave in early

10   August of 2012.

11   Q.   Do you recall what happened to Dean Foods' stock the day

12   after the announcement?

13   A.   Yes.  It rose about 40 percent.

14   Q.   Prior to the announcement of the WhiteWave spinoff in early

15   August, did you have an understanding of whether the public

16   knew that Dean Foods would be spinning off WhiteWave?

17          MR. BERKE:  Objection, your Honor.

18          THE COURT:  No, I'll allow it.

19   A.   Could you ask the question again, please?

20   Q.   Prior to the announcement of the spinoff of WhiteWave in

21   early August, did you have an understanding of whether the

22   public knew that Dean Foods would be spinning off WhiteWave at

23   that time?

24   A.   I believed they did not know.

25   Q.   Prior to that announcement, did members of the board of

H3F3WAL3                        Engles - direct

1   directors know that Dean Foods would be spinning off WhiteWave

2   on that date?

3   A.  Yes.

4   Q.  In fact, did the board of directors have to approve the

5   spinoff before it was announced?

6   A.  Yes, they did.

7   Q.  Was the spinoff a big deal at Dean Foods?

8   A.  Yes.  It was one of the most important things that we had

9   done or considered at Dean Foods.

10  Q.  When the announcement was made in early August of the

11  spinoff and the IPO of WhiteWave, was the IPO certain to occur?

12  A.  No.

13  Q.  Was it possible that it would not occur?

14  A.  Yes.

15  Q.  At the time of the announcement in August, did you have a

16  date for the IPO?

17  A.  No, we did not.

18  Q.  Did you know what the price of the WhiteWave shares would

19  be at the IPO?

20  A.  No, we did not.

21  Q.  Was that information important to the Dean Foods Company?

22  A.  Yes.

23  Q.  Why was that?

24  A.  Well, the money that we got from selling shares to the

25  public would be used -- it would be Dean Foods money.  Dean

1    Foods shares that were sold to the public.  And that money was

2    used to reduce Dean's indebtedness, and that was important to

3    even completing the spinoff.

4    Q.  Do you recall approximately when WhiteWave announced a

5    price range and the number of shares that it would be selling

6    as part of the IPO?

7    A.  Not exactly, but it was -- it was shortly before the IPO,

8    so it would have been in mid October sometime.

9    Q.  After you became CEO of WhiteWave following the IPO, who

10   became the CEO of Dean Foods?

11   A.  Gregg Tanner.

12          MR. GOLDMAN:  We can show the witness Government

13   Exhibit 22.

14   Q.  Do you recognize that individual?

15   A.  Yes, that's Mr. Tanner.

16          MR. GOLDMAN:  The government would offer Exhibit 22.

17          MR. BERKE:  No objection, your Honor.

18          THE COURT:  Received.

19          (Government's Exhibit 22 received in evidence)

20          MR. GOLDMAN:  If we may publish it to the jury.

21   Q.  Now, did Dean Foods remain a separate publicly traded

22   company under the guidance of Gregg Tanner?

23   A.  Yes, it did.

24   Q.  Did Dean Foods retain any ownership in WhiteWave stock

25   following the IPO?

1  A.  Yes.  It owned 87 percent of WhiteWave following the IPO.

2  Q.  Can you explain to the jury what happened in May of 2013

3  with regard to the WhiteWave stock that Dean Foods owned?

4  A.  Yes.  A -- most of the stock that Dean owned in WhiteWave,

5  all but 20 percent, Dean gave as a dividend to its

6  shareholders.  So they got WhiteWave stock, shares of stock in

7  proportion to the amount of Dean stock that they owned, and

8  they became direct owners of WhiteWave foods.

9  Q.  Did Dean Foods retain any ownership of WhiteWave stock at

10  that time?

11  A.  Dean retained about 20 percent as I recall.

12      MR. GOLDMAN:  We can take that down.

13  Q.  Did there come a time --

14      THE COURT:  Let me see whether I understand this.

15  Before the transaction, if you owned stock in Dean Foods, you

16  owned stock in a Dean Foods that owned WhiteWave.

17      THE WITNESS:  Correct.

18      THE COURT:  And so, if you are a shareholder of Dean

19  Foods, you're getting separate shares in WhiteWave, but it

20  reflects the fact that before you got those shares, you were an

21  owner of WhiteWave through Dean Foods.  Is that accurate?

22      THE WITNESS:  Yes, that's exactly right.

23      THE COURT:  Thank you.

24  Q.  Just following on the judge's questions, what was the

25  rationale to do a transaction like that?

1    A.  The rationale was that Dean had two business, it had this

2    WhiteWave business that was branded and rapidly growing, and it

3    had a milk business that was more of a commodity business and

4    slow growing.  But the commodity business was much larger than

5    this WhiteWave business.  We believed that WhiteWave's value

6    was not adequately reflected in Dean Foods' price because of

7    its relatively small size.  And that by separating Dean into

8    two companies, the value owned by our shareholders in the

9    marketplace would increase.

10   Q.  And the total value would include the shareholders'

11   ownership in Dean Foods stock and the shareholders ownership in

12   WhiteWave stock, is that right?

13   A.  Yes, because you now, following the spinoff, had two

14   different stocks, WhiteWave and Dean.

15   Q.  Did there come a time when Dean Foods sold its remaining

16   20 percent of WhiteWave stock?

17   A.  Yes, it was the summer of 2013.  I think July.

18   Q.  Mr. Engles, when did you become CEO of the company that is

19   now Dean Foods?

20   A.  I became CEO of the company in during 1995, I don't

21   remember exactly when.

22   Q.  I think you briefly touched on this earlier, but what was

23   Dean Foods' primary business?

24   A.  It was a milk company.

25   Q.  What is the, generally speaking, what is that business

1    called?

2    A.  Well, we refer to it as the fluid milk business.

3    Q.  Can you give the jury a little primer on how this business

4    operated?

5    A.  Pretty simple business.  Farmers or a farm cooperative

6    would deliver milk to one of our factories, we'd receive that

7    milk, pasteurize it, homogenize it, and put it into a gallon

8    jug or half-gallon carton or take some of the fat off and make

9    half and half.

10   Q.  What would you do --

11   A.  We would then deliver that product directly to stores with

12   our own trucks.

13   Q.  How long did that entire process take, from the time the

14   cows were milked until the milk was put on the shelf?

15   A.  It's usually on the shelf within two days.

16   Q.  How did you measure the performance of Dean Foods' fluid

17   milk business?

18   A.  We really looked at it on a pennies of profit per gallon.

19   Q.  Can you briefly just explain what profit is.

20   A.  Profit is how much money you have left after you subtract

21   your costs from the selling price of the product.

22   Q.  Broadly speaking, what were the most important costs of

23   Dean Foods' milk business?

24   A.  Well, without a doubt, it was the cost of milk was the

25   single most important cost.  About 70 percent of total costs in

1   the milk business.  And then, because we ran 6,000 trucks

2   around the country every day, the cost of fuel was very

3   important in our business.  And the other most important costs

4   was the cost of the plastic pellets that we bought to make our

5   jugs that we put the milk into.

6   Q.  Can you explain generally how the cost of milk affected the

7   bottom line of Dean Foods?

8   A.  Yes.  When the cost of milk was going up, our profits were

9   usually going down.  Because we would experience the rise and

10  the cost of milk faster than we could pass it on to our

11  customers.  And then, of course, the opposite was true.  When

12  the price of milk was going down, our profits would go up

13  because we experienced the decline in the cost of milk from

14  farmers faster than we could pass it along to our customers.

15  Q.  Did this fluid milk business have a lot of growth

16  opportunities?

17  A.  No.

18  Q.  Why not?

19  A.  I think milk's been in everybody's refrigerator since they

20  were born, and they know how to use it, and they use it in a

21  very consistent way, and they have a glass at night, they eat

22  it on their cereal in the morning, and those habits don't

23  change very much.

24  Q.  I'm going to direct your attention to the year 2004.  What

25  percentage of the milk supply in the United States did Dean

1   Foods provide?

2   A.  We manufactured and distributed somewhere between 35 and

3   40 percent of all the milk sold in the United States.

4   Q.  Was that the most of any milk supplier in the country?

5   A.  Yes.

6   Q.  At that point in 2004, were there limitations on Dean

7   Foods' ability to get any bigger?

8   A.  Yes, there were.

9   Q.  What were those limitations?

10  A.  Well, primarily, the antitrust regulators viewed that Dean

11  had a big enough share of the market, and to have any more

12  would be uncompetitive.

13  Q.  You testified earlier that the brands that WhiteWave sold

14  included Silk, Horizon Organic, and International Delight.  Did

15  there come a time when you consolidated all of those brands

16  under the WhiteWave name?

17  A.  Yes.

18  Q.  When was that?

19  A.  It was in the summer of 2004.

20  Q.  Can you briefly just explain to the jury what the Silk

21  brand is.

22  A.  Silk is the country's leading brand of beverages that are

23  sold under the milk name but aren't dairy milk, so soy milk,

24  almond milk, coconut milk, those sorts of things.

25  Q.  What does the Horizon brand sell?

A.   Horizon is the largest brand of organic milk in the United

States.

Q.   International Delight, what does that sell?

A.   International Delight is a brand of flavored coffee

creamers.  If you want a hazelnut creamer in your coffee,

International Delight makes that product.

Q.   Generally, what were these businesses referred to as in

your industry?

A.   Well, in our company we called them our branded businesses.

Q.   How did these branded businesses compare in their

opportunities to the fluid milk business?

A.   Well, as opposed to milk, dairy milk, these plant-based

products and organic milk, flavored coffee creamers, were

relatively new products in the marketplace.  So, we had a great

opportunity to educate consumers about their benefits and

convince them to use more and more of these products over time.

Q.   In 2004, why did you combine all these brands into one

subsidiary?

A.   Well, so we could run the brands more efficiently.  So,

prior to combining them, we had two of these branded businesses

in Colorado, one of them was in Texas, they each had their own

president, they each had their own sales organizations, they

each had their own accounting organizations, and it was

inefficient.  So, in putting these three branded businesses

together, we were able to hire one staff, we were able to

1    upgrade that staff because the combined business was a bigger

2    business and make it more professional.  And we felt that

3    combining them gave us the tools that we needed to grow the

4    businesses more quickly.

5    Q.  At the time that you did the combination, what, if any,

6    vision did you have for this subsidiary called WhiteWave?

7    A.  Well, really, two fold.  First of all, we believed that,

8    based on their history, that this combined group of brands

9    would become a growth engine for Dean Foods, because their

10   products were growing much more quickly than the liquid milk

11   business, and we could foresee a day where ultimately their

12   growth and profitability would be sufficiently large that we

13   could separate them from the milk business and do what we

14   ultimately did in 2012.

15   Q.  At that point, how long did you imagine it would take to

16   build the company sufficiently to separate it from Dean Foods?

17   A.  Several years.

18   Q.  Did you discuss that with the public at that time?

19   A.  No.

20   Q.  I want to direct your attention to May of 2006.  Did there

21   come a time when another public company approached you to

22   discuss purchasing Dean Foods?

23   A.  Yes.

24   Q.  Which company?

25   A.  The Coca-Cola Company.

H3F3WAL3                           Engles - direct

1    Q.   Approximately when did Coca-Cola approach you?

2    A.   Sometime in mid to late May 2006.

3    Q.   What was your initial response?

4    A.   Well, I questioned whether it made any sense, given the

5    businesses were very different from one another.

6    Q.   Did there come a time when you expressed interest in

7    pursuing discussions with Coca-Cola after that initial

8    interaction?

9    A.   Oh, yes.  I mean, it all happened really in one meeting.

10   After I said it doesn't make any sense to me, the chief

11   executive officer of Coca-Cola said, well, we've done a lot of

12   work on it, and we've thought really hard about it, and

13   something that we think makes sense for us, and we'd like to

14   pursue it.  At which point in time I said let me talk to my

15   board and I'll get back to you.

16   Q.   Did there come a time when Coca-Cola indicated a price that

17   they would be willing to pay Dean Foods?

18   A.   Yes.

19   Q.   What was your reaction to their initial price offering?

20   A.   That it was too low.

21   Q.   What was Coca-Cola's response?

22   A.   That they needed to think about whether or not they could

23   get to a higher price, and probably had more work to do if they

24   were going to get to a higher price.

25   Q.   Did there come a time when they increased their indication

1    of the price they would be willing to pay?

2    A.  Yes.

3    Q.  Do you recall what that price was that they eventually

4    settled on?

5    A.  Our discussions ultimately centered around $55 a share.

6    Q.  Around where was Dean Foods' stock trading?

7    A.  I have no idea.

8    Q.  Was it much lower than $55?

9    A.  It was well below $55.

10   Q.  Was that a price that you were happy about?

11   A.  Yes.

12   Q.  Did there come a time when you reported about these

13   negotiations to the board of directors?

14   A.  Yes.

15   Q.  Why did you present these negotiations to the board?

16   A.  Well, there's really nothing more important in a

17   corporation's existence than selling the business.  So, this

18   was clearly one of those things that the board would have to

19   approve and needed to think about all along the way through the

20   process.

21          MR. GOLDMAN:  If we can pull up Government Exhibit 402

22   for the witness, please.

23   Q.  Do you recognize this document, Mr. Engles?

24   A.  Yes, I do.

25   Q.  What is this?

1   A.   These are the minutes of a telephonic meeting of the board

2   of directors of the Dean Foods Company held on July 19, 2006.

3   Q.   What are minutes of the board of directors?

4   A.   Minutes are a high-level reader's digest version of what

5   took place at a meeting.

6           MR. GOLDMAN:  The government offers Exhibit 402.

7           THE COURT:  Any objection?

8           MR. BERKE:  No objection.

9           THE COURT:  Received.

10          (Government's Exhibit 402 received in evidence)

11          MR. GOLDMAN:  If we can publish this for the jury.

12  Q.   You said this is a special telephonic meeting.  What is

13  that?

14  A.   This was not a regularly scheduled quarterly meeting, so

15  this was a meeting that would have happened between meetings.

16  Between quarterly meetings.

17  Q.   How were these in-between meetings, so to speak, how were

18  they organized?

19  A.   Usually, my assistant or my general counsel's assistant

20  would send an e-mail to members of the board asking for times

21  that they would be able to join a meeting at some date in the

22  future.  And we try to pick a date that worked for as many

23  people's schedule as possible.

24  Q.   Prior to testifying here today, did you review the minutes

25  of this meeting?

1   A.  Yes.

2   Q.  Did you review minutes of most of Dean Foods' board

3   meetings from 2006 through -- through the time that you were

4   CEO?

5   A.  Yes.

6   Q.  Was Tom Davis present at this meeting?

7   A.  The minutes indicate he was, yes.

8   Q.  What did you call this meeting to discuss?

9   A.  I believe I called this meeting to discuss the status of

10  the discussions with the Coca-Cola Company about acquiring Dean

11  Foods.

12          MR. GOLDMAN:  If we could zoom out, Ms. Pyun, and pull

13  up the bottom half.

14  Q.  There is a reference there to Copper transaction.  What is

15  Copper?

16  A.  Copper is the Coca-Cola Company, and it is an investment

17  banking code name for sensitive information or sensitive

18  project.

19  Q.  Why do they use code names?

20  A.  Because this is typically confidential information, so, it

21  would make it harder for somebody to figure out what this was

22  if they just got ahold of a document.

23  Q.  Did the investment bankers typically present slide decks or

24  presentations at meetings such as these?

25  A.  Yes.

H3F3WAL3                       Engles - direct

1   Q.  Would those be potentially circulated around the investment

2   bank as well?

3   A.  I assume so, yes.

4   Q.  What was the board's reaction to the possibility of selling

5   the company to Coca-Cola at the July 19 board meeting?

6   A.  I think they were generally intrigued by the idea, and you

7   know, were making an assessment of whether or not this was a

8   good thing for the shareholder, but I think they were positive

9   with respect to the idea.

10  Q.  Moving on as the summer went on -- you can take that down

11  now -- what happened after this special board meeting with

12  respect to negotiations with the Coca-Cola?

13  A.  They proceeded through the summer.

14  Q.  Did there come a time when negotiations intensified?

15  A.  Yes, they always intensified towards the end.  So, in the

16  fall, early to mid fall, yes.

17  Q.  Did you continue to update the board on the progress of

18  negotiations?

19  A.  Yes.

20          MR. GOLDMAN:  If we could pull up Government Exhibit

21  403 for Mr. Engles, please.

22  Q.  Do you recognize this document?

23  A.  Yes, I do.

24  Q.  What is this?

25  A.  These are the minutes of a regularly scheduled quarterly

1    meeting of the board of directors of Dean Foods held on

2    August 25, 2006.

3              MR. GOLDMAN:  Government offers Exhibit 403.

4              MR. BERKE:  No objection, your Honor.

5              THE COURT:  Received.

6              (Government's Exhibit 403 received in evidence)

7    Q.  Do you recall whether you updated the board on the progress

8    of the Coca-Cola negotiations at this board meeting?

9    A.  Yes, I believe I did.

10             MR. GOLDMAN:  If we can pull up the bottom of page

11   three of this exhibit, Ms. Pyun.

12   Q.  Is this again referencing the Copper transaction, that's

13   Coca-Cola?

14   A.  Yes.

15   Q.  Could you read the very last paragraph or the first

16   sentence of the last paragraph.

17   A.  Yes.  "Mr. Robinson reviewed the fiduciary duties of

18   members of the board under Delaware law in connection with a

19   potential change in control of the company."

20   Q.  Who was Mr. Robinson?

21   A.  He was one of our outside lawyers.

22   Q.  What fiduciary duties did Mr. Robinson discuss with the

23   board at that time?

24   A.  He reviewed the fiduciary duties that I described earlier.

25   Q.  Was it typical for lawyers to review the fiduciary duties

1    at board meetings such as this?

2    A.  Well, when a very major transaction was taking place, yes.

3            MR. GOLDMAN:  You can take that down now.

4    Q.  Now, after this meeting, were negotiations with Coca-Cola

5    still ongoing?

6    A.  Yes, they were.

7    Q.  Did there come a time when you called a special meeting

8    with the board to discuss the progress with Coca-Cola again?

9    A.  Yes.

10           MR. GOLDMAN:  If we can pull up Government Exhibit 405

11   for Mr. Engles, please.

12   Q.  Do you recognize this document?

13   A.  Yes, I do.

14   Q.  What is this?

15   A.  These are the minutes of a special telephonic meeting of

16   the board of directors of the Dean Foods Company held on

17   September 21, 2006.

18   Q.  Did you update --

19           MR. GOLDMAN:  The government offers Exhibit 405.

20           MR. BERKE:  No objection, your Honor.

21           THE COURT:  Received.

22           (Government's Exhibit 405 received in evidence)

23           MR. GOLDMAN:  If we can publish this for the jury.  If

24   we can go to page three, please.

25   Q.  At this point, September 21, 2006, what did you think the

1   chances were that this transaction with Coca-Cola would occur?

2   A.  I thought they were quite high.

3   Q.  What happened after this meeting?

4   A.  I received a call from the chief financial officer who had

5   been my principal contact in negotiating the Coke transaction

6   in I believe early October of 2006, and he asked if he and the

7   Coca-Cola CEO could come to Dallas to visit me.

8   Q.  Did you meet with them?

9   A.  I did.

10  Q.  What happened at that meeting?

11  A.  At that meeting they informed me that another strategic

12  opportunity that they viewed as more important to Coca-Cola had

13  come up, and they would be discontinuing their discussions with

14  Dean Foods and would not make us a formal offer to buy the

15  company.

16  Q.  Was that a surprise to you?

17  A.  Very much so.

18  Q.  Did you relay this information to the board?

19  A.  Yes, I did.

20  Q.  Approximately when in time after your lunch meeting with

21  the Coca-Cola management?

22  A.  I don't remember exactly, but as soon as we could organize,

23  as soon as we could organize a call and get everybody on the

24  phone.

25          MR. GOLDMAN:  If we can pull up Government Exhibit

1    406, Ms. Pyun, just for the witness.

2    Q.  Do you recognize this is document?

3    A.  Yes, I do.

4    Q.  What is this?

5    A.  These are the minutes of a special telephonic meeting of

6    the board of directors of Dean Foods Company held on October 6,

7    2006.

8            MR. GOLDMAN:  Government offers Government Exhibit

9    406.

10           MR. BERKE:  No objection, your Honor.

11           THE COURT:  Received.

12           (Government's Exhibit 406 received in evidence)

13   Q.  Did you inform the board of Coca-Cola's decision to

14   withdraw from the negotiations at this meeting?

15   A.  I did.

16   Q.  Now, after this meeting, was there any further discussion

17   with Coca-Cola?

18   A.  No substantive discussion, no.

19   Q.  At any point during your negotiations with Coca-Cola from

20   May 2006 through this meeting in October 6, 2006, were any of

21   the discussions that you had with Coca-Cola about selling your

22   company to Coca-Cola made public?

23   A.  Not to my knowledge.

24   Q.  Were these discussions considered to be confidential

25   negotiations?

H3F3WAL3                          Engles - direct

1   A.  Yes.

2   Q.  Were your discussions with the board of directors about the

3   Coca-Cola transaction confidential?

4   A.  Yes.

5   Q.  If Coca-Cola had purchased Dean Foods, would that have been

6   an important event for the company?

7   A.  Absolutely.

8   Q.  Can you think of anything more significant than selling

9   your entire company?

10  A.  No.

11  Q.  Did you ever inform the public of the merger discussions

12  with Coca-Cola?

13  A.  Not to my recollection.

14  Q.  To your knowledge, were those discussions ever made public

15  before you just stated them in court today?

16  A.  Not to my recollection.

17          MR. GOLDMAN:  We can take that down, Ms. Pyun.

18  Q.  Now, after these negotiations fell through, where did that

19  leave the company?

20  A.  We had a business that we were proud of and that was a fine

21  business before Coca-Cola called, and we had a business that we

22  were proud of after Coca-Cola decided not to pursue the

23  transaction.

24  Q.  How was the company's performance in 2006?

25  A.  I think it was quite good.

1    Q.   If I can direct your attention to early 2007.  Did there

2    come a time when the company made a significant financial

3    transaction?

4    A.   Yes.

5    Q.   What was that?

6    A.   The company paid to its shareholders a dividend, special

7    dividend of $15 per share in the spring of 2007.

8    Q.   What is a special dividend?

9    A.   It's a dividend that's only paid one time.  Many companies

10   pay dividends every quarter, Dean Foods did not do that, but we

11   paid this very large dividend one time.

12   Q.   How big was the dividend?

13   A.   It was $15 a share.

14   Q.   Was that considered to be quite a large special dividend?

15   A.   Yes.  It was a significant percentage of our total share

16   value.

17   Q.   How did you pay the shareholders that special dividend?

18   A.   We borrowed $2 billion from our banks and from the bond

19   market.

20   Q.   Was this an important transaction for the company?

21   A.   Yes, it was.

22   Q.   Did you discuss this transaction with the board?

23   A.   Yes, I did.

24            MR. GOLDMAN:  If we can pull up Government Exhibit

25   408, please.

1    Q.  Do you recognize this exhibit?

2    A.  Yes, I do.

3    Q.  What is this?

4    A.  These are the minutes of a special telephonic meeting of

5    the board of directors of the Dean Foods Company on

6    February 12, 2007.

7              MR. GOLDMAN:  Government offers Exhibit 408.

8              MR. BERKE:  No objection, your Honor.

9              THE COURT:  Received.

10             (Government's Exhibit 408 received in evidence)

11             MR. GOLDMAN:  We can publish this.

12   Q.  Was Tom Davis present at this meeting?

13             THE COURT:  We're going to pause right there, ladies

14   and gentlemen.  We'll keep you hanging in suspense overnight.

15   And listen, I've learned from the people in the film and

16   television industry how to keep the interest levels high.

17             So, what am I going to tell you?  I'm going to tell

18   you it's been a long day for you, for some of you.  Some of you

19   arrived here early this morning, some of you arrived at 2

20   o'clock.  We just went through the snowstorm.

21             But, you're going to go home tonight, and you do not

22   discuss the case with anyone and you do not read news reports,

23   you do not do internet searches, you can talk all you want

24   about this case when it's over.  You can tell anybody you want.

25   But not now.

1          And in any event, I know you also have all sorts of

2     personal responsibilities, dry cleaning and laundry and picking

3     up a quart of milk and things like that, so I know your day is

4     not over as you leave here.  Some of you have a long way to

5     travel.  But I hope you have a great evening, and you'll go in

6     downstairs at like a quarter to 10 so that you can be in the

7     jury room for 10 o'clock.  And remember, your fellow jurors are

8     depending on each and every one of you to make it on time.

9     Because we have to wait until you're all here.  So, have a

10    pleasant evening and see you tomorrow.

11         A JUROR:  Can you just clarify, one of the jurors said

12    we don't come on Friday?

13         THE COURT:  This Friday, we will not sit on this trial

14    this Friday.

15         A JUROR:  So we go to our regular jobs on Friday?

16         THE COURT:  Regular jobs, etc.

17         A JUROR:  Anything you can tell us for next week or

18    no?

19         THE COURT:  Can't tell you yet, but I will give you

20    updates.  I'll give you regular updates.

21         (Jury excused)

22         (Continued on next page)

23

24

25

H3F3WAL3

1          THE COURT:  See you tomorrow morning.

2          MR. GOLDMAN:  We have one issue after the witness is

3    excused.

4          THE COURT:  All right, sir, Mr. Engles, you are

5    excused.

6          THE WITNESS:  Thank you.

7          THE COURT:  See you tomorrow morning.

8          MR. GOLDMAN:  Your Honor, we started getting some of

9    the potential defense exhibits that they are going to intend to

10    introduce through Mr. Engles, they started trickling in and we

11    anticipate having a number --

12          THE COURT:  Mr. Engles, I'd ask you to step out of the

13    courtroom, if you don't mind.

14          THE WITNESS:  They just stopped me because the jurors

15    aren't gone yet.

16          THE COURT:  That's a little tricky then.

17          MR. GOLDMAN:  Is it possible to go into the witness

18    room?

19          (Witness not present)

20          MR. GOLDMAN:  We expect to have a number of objections

21    or potential objections, depending on what they do, and this is

22    the first time this has come up here and we -- I don't know if

23    the Court wants to do this on a case-by-case basis.  There are

24    going to be general hearsay objections.

25          We expect them to try to introduce analysts' reports

H3F3WAL3

1    through Mr. Engles.  The law is -- we can brief this for your

2    Honor, but the law is pretty clear that unless something is to

3    declare a public fact, the only hearsay exception we are aware

4    of is if it goes to the defendant's state of mind, and

5    therefore the defendant must show and lay a foundation that the

6    defendant would have seen the analyst report.  I don't know how

7    they're going to do that through Mr. Engles.  There are other

8    witnesses that we do expect them to be able to do that before.

9         But we're sort of in the dark here and we don't want

10   to waste the jury's time, so we're flagging this for the Court,

11   to note that it may become somewhat of an issue.

12        THE COURT:  I think the thing to do is if you can

13   conveniently get me at least the law part of it, and Mr. Berke,

14   what are you planning on offering the analyst reports for?  We

15   talked about this a bit in the in limines.

16        MR. BERKE:  And your Honor, we're using, again, in

17   part it depends on direct, but we have analyst reports we use

18   for a variety of reasons, much of it with this witness will be

19   to establish what the company itself was saying to the world.

20   In other words, what is public.  And I believe we will lay a

21   proper foundation through this witness for the reports in which

22   we do seek to introduce information to show that it reflects

23   what is public by the company.  Either things they said at a

24   conference, which Mr. Engles has already talked about that

25   meant public, or directly with analysts or the like.

1          So I feel we will be able to lay a proper foundation

2     for any information we're seeking to introduce.

3          MR. GOLDMAN:  Well, the problem, if they want to

4     introduce a transcript of something Mr. Engles said, that's one

5     thing.  If they're going to introduce an analyst interpretation

6     of what Mr. Engles said, that's something entirely different.

7     And we've gotten from them analyst reports that, you know,

8     precede earnings announcements that don't have anything

9     noteworthy that's public, that's even separate from this issue

10    of the spinoff which will come up.

11         But we're in the dark as to what Mr. Engles said that

12    was the basis of those analyst reports.  And even if he had

13    said anything, the analyst reports are not the vehicle.  There

14    are transcripts of Mr. Engles that if he makes -- if they

15    become prior inconsistent statements, they can use them to

16    impeach him.  We understand all that.  But it does not appear

17    that's what they're trying to do, and we would object to the

18    analyst reports interpreting what he said, other than instead

19    of putting in his own words.

20         MR. BERKE:  Your Honor, if I may.  First, a couple

21    things.  The analyst reports do, I think will reflect in part

22    what the company said.  But also, Mr. Goldman certainly asked

23    Mr. Engles a number of times, including over my objection in

24    one instance, what the public understood, for example, about

25    WhiteWave.  Did they know it.  And in fact, there was a robust

H3F3WAL3

1    public discussion about WhiteWave going way back in time.  And

2    certainly relevant the discussion and the debate that this

3    witness was aware of and aware of analyst reports and news

4    articles and the like that addresses the issue that Mr. Goldman

5    himself brought up.  What did the public know and what were

6    they were discussing about WhiteWave at various key parts in

7    time.  And I believe it's absolutely fair game.  This witness

8    knows it.  These are reports he would have reviewed and

9    responded to.

10             THE COURT:  Well, listen, I think somebody ought to

11   get me, Mr. Berke, why don't you get me a set of the exhibits

12   you've given to the government so I have them.  And if you have

13   any law you want to get me, that's fine as well.  And it may be

14   that this is going to be on a question-by-question basis.

15   You'll try and lay a foundation before it comes in.  It doesn't

16   walk in.  You're going to have to lay a foundation through the

17   witness.

18             MR. BERKE:  Absolutely, your Honor.

19             THE COURT:  All right.

20             MR. GOLDMAN:  Your Honor, Mr. Berke -- I understand

21   the rationale for it -- doesn't want to give us the exhibits he

22   intends to get in through this witness until the direct was

23   done.

24             THE COURT:  I thought you had these exhibits.

25             MR. GOLDMAN:  We have all of the defense exhibits.  We

H3F3WAL3

1      don't know necessarily which ones he's going to put in.

2                  THE COURT:  All right.

3                  MR. GOLDMAN:  I'm not sure we have all of them.  They

4      have given us a number of them.  There may be others.

5                  THE COURT:  How much longer do you have with this

6      witness?

7                  MR. GOLDMAN:  I think I've got probably about two and

8      a half hours, your Honor.  I'll try to pare it down but there

9      is a lot to get through.

10                 THE COURT:  Is this the man who wants to go to China?

11                 MR. GOLDMAN:  Yes.

12                 THE COURT:  His fate seems to be in your hands.

13                 MR. GOLDMAN:  And Mr. Berke's, your Honor.

14                 THE COURT:  Well, you know what the rules of the road

15     are.

16                 MR. GOLDMAN:  I have no application.  If we are

17     getting close to the end, perhaps we could stay a little late

18     tomorrow night to try to finish it.  But if not --

19                 THE COURT:  You know, listen, if it is a bench trial,

20     I'm all in favor of it.  If, on the other hand, it is a jury

21     trial, it is a long day for the jurors going back to Rockland

22     County and places like that.

23                 MR. GOLDMAN:  We understand, and the witness

24     understands as well.

25                 THE COURT:  Thank you.

H3F3WAL3

1              MR. GOLDMAN:  Thank you.  That's it from the

2   government.

3              THE COURT:  We are adjourned.

4              MR. BERKE:  Thank you, your Honor.

5              MR. FERRARA:  Have a good evening, your Honor.

6              THE COURT:  You too.

7              (Adjourned until March 16, 2017, at 9:45 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2    Examination of:                          Page

3    GREGG ENGLES

4    Direct By Mr. Goldman  . . . . . . . . . . . .62

5                     GOVERNMENT EXHIBITS

6    Exhibit No.                            Received

7    4    . . . . . . . . . . . . . . . . . . .74

8    22   . . . . . . . . . . . . . . . . . . .78

9    402  . . . . . . . . . . . . . . . . . . .88

10   403  . . . . . . . . . . . . . . . . . . .91

11   405  . . . . . . . . . . . . . . . . . . .92

12   406  . . . . . . . . . . . . . . . . . . .94

13   408  . . . . . . . . . . . . . . . . . . .97

14

15

16

17

18

19

20

21

22

23

24

25
```