H3G3WAL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           S1 16 Cr. 0338(PKC)

5    WILLIAM T. WALTERS,

6              Defendant.

7    ------------------------------x
                                           March 16, 2017
8                                          11:00 a.m.

9    Before:

10                      HON. P. KEVIN CASTEL,

11                                         District Judge

12                      APPEARANCES

13   JOON H. KIM
          Acting United States Attorney for the
14        Southern District of New York
     BY:  DANIEL S. GOLDMAN
15        BROOKE E. CUCINELLA
          MICHAEL FERRARA
16            Assistant United States Attorneys

17   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
          Attorneys for Defendant
18   BY:  BARRY H. BERKE
          PAUL H. SCHOEMAN
19        ANDREW J. ESTES
          MICHELLE BEN-DAVID
20            -and-
     WRIGHT STANISH & WINCKLER
21   BY:  RICHARD WRIGHT

22        – also present –

23   SA Edmund Rom
     SA Nicholas Anderson, Federal Bureau of Investigation
24   Raymond McLeod, Defense Tech Support
     Holly Meister
25   Sarah Pyun, Government Paralegal Specialists

H3G3WAL1                          Engles – direct

1              THE COURT:  Bring our jurors in.

2              How is the chair doing today?

3              THE WITNESS:  Much improved.

4              (Jury present)

5              THE COURT:  Good morning, ladies and gentlemen.

6   Please be seated.

7              This morning's experience just goes to show that we're

8   all subject to the human condition, including judges who can

9   get bad colds, so I apologize for the scratchy voice, but we're

10  back in action.

11             And Mr. Engles, the Court reminds you that you are

12  still under oath.  And Mr. Goldman, you may inquire.

13             MR. GOLDMAN:  Thank, your Honor.

14   GREGG ENGLES,

15       called as a witness by the Government,

16       having been previously sworn, testified as follows:

17  DIRECT EXAMINATION (Continued)

18  BY MR. GOLDMAN:

19  Q.  Good morning, Mr. Engles.

20  A.  Good morning.

21  Q.  Before I return to where we left off yesterday, I wanted to

22  go back to one thing that you testified earlier in your

23  testimony.  You were discussing about the fact that you

24  reviewed the Dean Foods board minutes prior to your testimony

25  here.

H3G3WAL1                          Engles – direct

1          Did you review those minutes on your own?

2     A.  Yes, I reviewed them on my own.

3     Q.  Why did you review the board minutes prior to testifying

4     here today?

5     A.  Well, these events span a long period of time, some number

6     of years, and they happened between five and 10 or 11 years

7     ago.  So, I needed to review the minutes to be able to testify

8     accurately, and refresh my recollection.

9     Q.  Were there things about that time period that you did

10    remember without reviewing the minutes?

11    A.  Certain things, yes.

12    Q.  How did the minutes help you clarify your recollection?

13    A.  Well, they helped me put things in order and they clearly

14    refreshed my recollection for some things that I did not

15    remember.

16    Q.  Yesterday we ended the day by discussing the special

17    dividend that Dean Foods distributed to its shareholders in

18    early 2007.  Do you remember that?

19    A.  Yes, I do.

20    Q.  Can you remind the jury what Dean Foods did with that

21    special dividend?

22    A.  Dean Foods paid to its shareholders $15 for each share that

23    the shareholder held.

24    Q.  Prior to issuing that special dividend, did you discuss

25    this transaction with the board?

1    A.  Yes, I did.

2    Q.  We can pull up Government Exhibit 408 which have been

3    entered into evidence yesterday.

4            And where we left off with the cliffhanger was the

5    question of whether Tom Davis was at this board meeting on

6    February 12, 2007.

7    A.  The minutes indicate that he was, yes.

8    Q.  If we can go to the bottom of page two, please.  It says

9    there, II Special Dividend.  Had you provided the board with

10   materials about this proposed special dividend prior to the

11   meeting?

12   A.  Yes, I had.

13   Q.  Did the board approve the dividend at this meeting?

14   A.  I don't recall.

15   Q.  Did there come a time in February of 2007 when the board

16   did approve the issuance of the special dividend?

17   A.  Yes, the board did approve the issuance of the dividend.

18           MR. GOLDMAN:  If we can pull up Government Exhibit

19   701-B for the witness.

20   Q.  Mr. Engles, do you recognize this document?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  This is a press release issued by Dean Foods on March 2nd,

24   2007.

25           MR. GOLDMAN:  Government offers Exhibit 701-B.

H3G3WAL1                        Engles - direct

1          MR. BERKE:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 701-B received in evidence)

4          MR. GOLDMAN:  If we can publish that for the jury.

5   Q.  Can you read the --

6          THE COURT:  Okay.  Do you have it, ladies and

7   gentlemen?

8          A JUROR:  No, sir.

9          THE COURT:  Okay.

10          A JUROR:  We do now.

11          THE COURT:  Great.

12   Q.  If you can read the first sentence of the third paragraph.

13   A.  "The special dividend declared by Dean Foods' board of

14   directors is payable on April 2nd, 2007, to shareholders of

15   record as of March 27, 2007."

16   Q.  What does that mean in terms of the actual distribution of

17   the special dividend?

18   A.  Well, it means that the money was deposited into the

19   accounts of shareholders on April 2nd.  And that the

20   shareholders who got that money on April the 2nd, were the

21   official shareholders, the shareholders of record as of

22   March 27, 2007.  So if you sold your shares, for example, after

23   March 27, you would receive the dividend, but if you sold them

24   prior to March 27, you would not.

25   Q.  If you -- sorry.  Can you explain that?  If you sold your

H3G3WAL1                         Engles - direct

1    shares after March 27, would you still get the dividend?

2    A.  As long as you owned them on the 27th, yes.

3    Q.  Understood.  Were there tax consequences to shareholders

     who received this dividend?

5    A.  Yes, there were.

6    Q.  How was it treated?

7    A.  Dividends are taxable income if you're a taxpayer who pays

8    tax.  Pension funds and non-profit organizations that own these

9    shares would not necessarily be taxed on them.

10             MR. GOLDMAN:  We can take this exhibit down.

11             THE COURT:  I don't want to get you on a big detour,

12   but can you briefly explain why a public corporation would

13   borrow $2 billion in order to pay a dividend to shareholders?

14             THE WITNESS:  Yes.  The basic idea is that the

15   corporation has a lot of borrowing capacity that is unused.

16   And shareholders generally appreciate having that capital to

17   make other investments with, rather than continuing to --

18   instead of having to sell shares, they keep the number of

19   shares, but the dividend allows them to invest in other things

20   that they might want to invest in.

21             THE COURT:  Thank you.

22   Q.  When you say "capital," what do you mean?

23   A.  Money.

24   Q.  Do you recall what happened to the stock price after this

25   dividend was announced on March 2?

1  A.  The stock price went up following the announcement.

2  Q.  What happened to the stock price after the distribution of

3  the special dividend on April 2?

4  A.  The stock price went down in about the amount of the

5  dividend.

6  Q.  After you distributed this dividend, what happened to the

7  cost of milk during the rest of 2007?

8  A.  The cost of milk during the balance of 2007 rose

9  significantly.

10  Q.  Remind the jury how important the cost of milk was to Dean

11  Foods' bottom line?

12  A.  It was the most important part of our cost structure.

13  Q.  Yesterday you also mentioned a couple of other important

14  costs, including fuel, diesel fuel and resin.  What happened to

15  those costs during the course of 2007?

16  A.  My recollection is that they began to rise pretty

17  significantly as well.

18  Q.  Is there a term that's generally used for costs like fuel

19  and resin in the industry?

20  A.  Input costs or commodity costs.

21  Q.  How did each of the increase in those costs affect Dean

22  Foods' performance during the year 2007?

23  A.  They made our challenges significantly higher during the

24  year.  So, our performance declined during the back half of

25  2007.

H3G3WAL1                          Engles - direct

1  Q.  Was that something that you anticipated at the time that

2  you borrowed the money to make the special dividend?

3  A.  No.

4          MR. GOLDMAN:  If we can pull up Government Exhibit

5  701-F for the witness, please, and zoom in on the top third.

6  Q.  What is this document, Mr. Engles?

7  A.  This is a press release issued by Dean Foods on October 2.

8          MR. GOLDMAN:  The government offers Exhibit 701-F.

9          MR. BERKE:  No objection.

10          THE COURT:  Received.

11          (Government's Exhibit 701-F received in evidence)

12          MR. GOLDMAN:  If we may publish for the jury.

13  Q.  What is the headline of this press release?

14  A.  "Dean Foods reduces earnings expectations."

15  Q.  Let's talk a second about earnings expectations.  What are

16  earnings expectations?

17  A.  It's a term generally used to describe the market's

18  collective belief, sort of the general sentiment of the stock

19  market, or the investors in the stock market, as to how a

20  company will perform.  How much money it will earn in upcoming

21  periods.

22  Q.  You discussed yesterday that filing of the financial

23  performance and the earnings performance.  How are earnings

24  generally measured to the market?

25  A.  They're typically measured in dollars and cents per share.

So, $1.10 per share of stock that's outstanding.

Q.   Does Dean Foods issue guidance to the market about its
expected or anticipated earnings per share?

A.   It typically did, yes.

Q.   Was Dean Foods required to provide guidance about earnings
per share?

A.   No.

Q.   Remind the jury what Dean Foods is required to provide to
the public?

A.   Dean Foods is required to file with the SEC quarterly and
annual financial statements, so every three months and at the
end of every fiscal year, and those are public documents.

Q.   When typically did Dean Foods make its quarterly filings?

A.   Usually about five weeks after the end of a quarter.

Q.   Can you just give the jury a sense of the quarters that
Dean Foods operated on?

A.   Yes.  Dean Foods operated on a calendar year.  So, our
quarters would end at the end of March, at the end of June, at
the end of September, and at the end of December.  And so, our
earnings announcements would typically be in early to mid
February, early to mid May, early to mid August, and early to
mid November.

Q.   Were those dates of your quarterly earnings announcements
known to the public?

A.   At some point in time, prior to the earnings announcement

1    we would -- we would publish the actual date at which we would

2    release our earnings and have an earnings conference call.  But

3    we typically had them about the same time.

4    Q.  You were discussing the earnings guidance that you gave to

5    the market.  Who pays attention to that earnings guidance?

6    A.  Well, I think all of the serious market participants, so,

7    investors, people who either were interested in owning Dean

8    Foods stock or already did own Dean Foods stock, securities

9    analysts who covered our company and wrote research about our

10   company.  The market participants, right.

11   Q.  Can you explain what a securities analyst is?

12   A.  Securities analyst is someone who does research on a

13   particular company, usually a number of companies within a

14   specific industry, like food manufacturing.  And they research

15   the factors affecting that company and its performance, and

16   they use that information to develop their own predictions in

17   the future about how that company will perform financially.

18   Q.  Did those predictions differ from Dean Foods' own

19   predictions of its earnings performance?

20   A.  Somewhat.

21   Q.  What, if anything, did these analysts publish with regard

22   to their coverage or following of Dean Foods?

23   A.  Well, they published research reports regarding the

24   companies that they follow.  So if they followed Dean Foods,

25   they would publish reports about Dean Foods.  They all had a

1    different calendar for publishing reports.  Some would issue a

2    major report every year or every other year about a particular

3    company.  But they would almost all write what they called a

4    note following the earnings release and the conference call

5    that the company would hold in which they would summarize what

6    they thought the important takeaways were from the call and the

7    earnings release.

8    Q.  How, if at all, did these analysts rate the companies that

9    they followed?

10   A.  Well, they all have different ratings systems, but they

11   sort of boiled down to three fundamental recommendations:  You

12   should sell the stock, if you own the stock you should hold it

13   but you shouldn't buy anymore, or you should buy the stock.

14   Q.  Approximately how many analysts covered Dean Foods while

15   you were the CEO?

16   A.  At any given time about 20.

17   Q.  Did you read all the reports that the analysts issued about

18   Dean Foods?

19   A.  No.

20   Q.  You discussed the fact that the analysts would put together

21   reports and issue their expectations.  Was there a way that

22   these analysts' expectations were consolidated?

23   A.  There were.  There are services that compile the list and

24   the specific forecast of each of the analysts that covers a

25   given company, whether it's Dean Foods or IBM.  And so if there

is 20 companies covering Dean Foods, there are companies that
list the analysts and compile their forecasts and their
expectations of stock price, and publish those as well.

Q.  What is that consensus view generally referred to?

A.  The consensus, the analysts' consensus estimates or
consensus price target, depending on what the number they're
talking about.

Q.  Generally speaking, when Dean Foods announced its earning
performance, what affect did that have on the stock price?

A.  It varied from quarter to quarter.  It was really never the
same.

Q.  How would it vary?  Can you explain to the jury typically
how the market would react to Dean Foods' earnings
announcements?

A.  Well, the market looks forward, right.  Not in the past.
So, if the company had done better than the consensus
estimates, oftentimes investors assumed that would continue and
your stock would go up because their expectations of future
performance would go up.

        If you missed your estimates, the opposite would
happen.  Often your stock price would go down.

        If you met earnings estimates, I would say to the
extent there is a typical reaction, it would be not so much of
a change in the stock price.

Q.  When you're discussing earnings estimates, are those the

1  earnings estimates of the analysts or potentially the

2  investors, or are those the earnings expectations or estimates

3  of the company?

4  A.  It would really be the market's expectations.

5  Q.  So was it possible that the company would meet its own

6  expectations but that that would not meet the market's

7  expectations or vice versa?

8  A.  Absolutely.

9  Q.  Were there times when you were surprised by how the stock

10  price performed after an earnings announcement?

11  A.  Yes.

12  Q.  How might you be surprised?

13  A.  Well, we might have a great quarter and feel very good

14  about the underlying dynamics of our business, we might have

15  reported earnings that were in excess of what we had told the

16  market to expect, and yet, the stock might go down.

17        MR. GOLDMAN:  If we can republish 701-F, Ms. Meister,

18  and zoom in again.

19  Q.  So as you said, the headline of this press release is that

20  "Dean Foods reduces earnings expectations."  Remind the jury of

21  what the date of this press release is.

22  A.  October 2nd.  I assume that's 2007.

23  Q.  Was this announcement provided at the regularly scheduled

24  time when the third quarter performance was routinely

25  announced?

H3G3WAL1                          Engles - direct

1    A.  No.  The third quarter hadn't -- no, the third quarter had

2    ended, but it was about a month before we would normally

3    produce results.

4    Q.  Why might you publish to the public earnings expectations a

5    month before they would have been scheduled?

6    A.  Well, typically because we felt that the company's

7    performance and what the market believed about our performance

8    that we would report in the future was substantially different.

9    Q.  Did the market expect this announcement on October 2?

10   A.  No.

11   Q.  Was it a surprise to the market when Dean Foods issued this

12   press release about its earnings?

13           MR. BERKE:  I would object, your Honor, to "surprise

14   to the market."

15           THE COURT:  Well, I'm going to allow that.

16           You followed the market, correct, in your stock?

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.  You can answer.

19           MR. GOLDMAN:  I can rephrase, your Honor.

20   Q.  Was there any forewarning to the market that Dean Foods

21   would be making this press release?

22   A.  No.

23   Q.  At the end of 2007, do you recall what the company's

24   outlook for 2008 was?

25   A.  It was a difficult outlook.

H3G3WAL1                          Engles - direct

1          MR. GOLDMAN:  If we can pull up Government Exhibit

2   420, Ms. Meister, just for the witness.

3   Q.  Do you recognize this document, Mr. Engles?

4   A.  Yes.

5   Q.  What is this?

6   A.  These are the minutes of a regularly scheduled quarterly

7   meeting of the board of directors of the Dean Foods Company on

8   November 16, 2007.

9   Q.  Did you say November 16, 2007?

10  A.  Yes.

11         MR. GOLDMAN:  The government offers Exhibit 420.

12         MR. BERKE:  No objection, your Honor.

13         THE COURT:  Received.

14         (Government's Exhibit 420 received in evidence)

15  Q.  Was Tom Davis at this meeting?

16  A.  Yes.

17         MR. GOLDMAN:  If you can go to page three,

18  Ms. Meister.  On the bottom, if we can zoom in on the bottom

19  third.

20  Q.  It says there "2008 preliminary financial plan summary."

21  What is the preliminary financial plan?

22  A.  Well, every business has a planning cycle.  And at Dean

23  Foods, we would prepare our budget, do much of the work to

24  establish our budget in the fall for the -- for the coming

25  year.  So, in the fall of 2007, we would prepare our basic

H3G3WAL1                         Engles - direct

1   budget for the year 2008.  And we would typically present that

2   preliminary plan to our board at the November meeting.

3   Q.  Was this only an internal document?

4   A.  Yes.

5   Q.  Was the preliminary plan ever made public in any fashion?

6   A.  Not to my recollection.

7   Q.  What do you do with the preliminary plan as you go forward

8   during the year?

9   A.  Well, we take that preliminary plan, and we update it for

10  how we actually finish the year.  So we would have taken that

11  preliminary plan and updated it for how we finished 2007, and

12  that document then would become our budget for -- our official

13  budget for the year 2008.

14  Q.  You were discussing a little bit earlier the earnings

15  guidance that you provide to the market.  Did there come a time

16  during the course of every year when you would provide guidance

17  to the market about the full year's outlook?

18  A.  Yes.  We typically provided guidance about the full year at

19  our February earnings conference call.  So when we reported the

20  prior year's full year results.

21  Q.  What was that full year guidance based on?

22  A.  It was based upon our updated plan, which became our

23  budget.

24  Q.  Can you explain how, if at all, the guidance to the market,

25  the full year guidance to the market, related to the internal

H3G3WAL1                              Engles - direct

1    plan or the annual budget?

2    A.  Yes.  It was based upon the annual budget.  Really the

3    principal difference was that the budget gave you specific

4    numbers, right, we're going to have this amount of sales and

5    this amount of profit and this amount of profit per share.  But

6    of course, that was a document about trying to predict the

7    future, and you can't predict the future with certainty.  So,

8    good things can happen to you, bad things can happen to you,

9    and so we would typically give guidance that was a range around

10   the numbers produced by the budget.  So, if the budget produced

11   an earnings per share projection of say a dollar, we might give

12   guidance of 95 cents to $1.05.  We'd give a range around the

13   numbers that were actually produced in the budget.

14   Q.  Was that budget something that was otherwise confidential

15   within the company?

16   A.  Yes.

17   Q.  Around the end of 2007 or early 2008, was there any

18   discussion within Dean Foods about a spinoff or other

19   separation of WhiteWave from the company?

20   A.  Not to my recollection.

21   Q.  Directing your attention to 2008.  What, if anything, did

22   you begin to do that changed the direction of the company's

23   strategy?

24   A.  Well, because of the significant volatility and increasing

25   prices for commodities that began in the middle of 2007, we

H3G3WAL1                           Engles - direct

1   began to accelerate our efforts to actually restructure our

2   business to take out cost, in order to make us more able to

3   weather the storm of volatility that we had started to

4   experience in 2007.

5   Q.  Did there come a time when you met with the board for a

6   two-day strategy planning meeting in early 2008?

7   A.  Yes, I did.

8   Q.  Do you recall when that was?

9   A.  I think it was in early February.

10  Q.  Around that time, what was the status of the company's

11  increased debt that you had taken in order to pay the special

12  dividend?

13  A.  It was starting to create problems for us.

14  Q.  In February 2008, what action, if any, did you take to try

15  to reduce that debt?

16  A.  I believe that we took the opportunity to sell stock to the

17  public to raise cash.

18  Q.  What is that called?

19  A.  It would be called a stock offering or a public offering.

20  Q.  How would a stock offering reduce the debt?

21  A.  Well, we would sell a share of stock to an investor in

22  exchange for cash, and we would use that cash to pay down the

23  balances of our debt.

24  Q.  Does the board of directors need to approve something like

25  this stock offering?

H3G3WAL1                          Engles - direct

```
 1   A.  Yes.
 2   Q.  Would internal discussions about this stock offering be
 3   considered confidential material?
 4   A.  Yes.
 5           MR. GOLDMAN:  If I can go to Government Exhibit 1900
 6   for the witness.
 7   Q.  Do you recognize what this document is, Mr. Engles?
 8   A.  Yes, it's an e-mail from Carolyn Boulet who I believe was
 9   my assistant at the time, dated February 19, 2008.
10   Q.  Was this e-mail sent to you as well?
11   A.  Yes, it was.
12           MR. GOLDMAN:  The government offers Exhibit 1900.
13           MR. BERKE:  No objection, your Honor.
14           THE COURT:  Received.
15           (Government's Exhibit 1900 received in evidence)
16           MR. GOLDMAN:  If we can publish that for the jury.
17   Q.  Mr. Engles, if you can read the first significant sentence
18   after "good morning."
19   A.  "I would like to check your availability for a possible
20   board call on Wednesday, February 27, to approve the 10-K and
21   the equity offering."
22   Q.  Would board members likely have known about this potential
23   equity offering before you sent this e-mail?
24   A.  Yes.
25   Q.  Was there subsequently a meeting of the board of directors
```

H3G3WAL1                        Engles - direct

1   to approve the equity offering?

2   A.  I believe so, yes.

3   Q.  Were there some board members with whom you met outside of

4   the ordinary course of board meetings?

5   A.  Yes.

6   Q.  Typically, who did you meet with on a regular basis,

7   somewhat regular basis?

8   A.  Well, depending upon the issue, I met with all of my

9   directors on a one-on-one basis outside of the context of a

10  meeting.  But, there were three directors who lived in Dallas,

11  Texas, who I had the occasion to see more often.  It was

12  easier, they were there, and they were individuals whose

13  opinions I valued.

14  Q.  Who were they?

15  A.  It would be John Muse, Jim Turner, and Tom Davis.

16          MR. GOLDMAN:  If we can pull up Government Exhibit 21

17  for the witness.

18  Q.  Do you recognize that individual?

19  A.  That's John Muse.

20          MR. GOLDMAN:  Government offers Exhibit 21.

21          MR. BERKE:  No objection, your Honor.

22          THE COURT:  Received.

23          (Government's Exhibit 21 received in evidence)

24          MR. GOLDMAN:  If we may publish.

25  Q.  What was John Muse's background?

H3G3WAL1                          Engles - direct

1    A.   John Muse was the principal and founder of a private equity

2    firm in Dallas, originally called Hicks Muse.

3              MR. GOLDMAN:   If we can pull up Government Exhibit 20

4    for the witness.

5    Q.   Who is this individual?

6    A.   Jim Turner.

7              MR. GOLDMAN:   Government offers Exhibit 20.

8              MR. BERKE:   No objection.

9              THE COURT:   Received.

10             (Government's Exhibit 20 received in evidence)

11             MR. GOLDMAN:   If we may publish.

12   Q.   What was Jim Turner's background?

13   A.   Jim Turner was an individual who was primarily in the soft

14   drink, soda bottling, and branding industry.  He had owned his

15   companies together with John Muse and his firm, some of his

16   companies.  And he was a food executive and investor.

17   Q.   To your knowledge, were John Muse, Jim Turner and Tom Davis

18   all friends as well?

19   A.   Yes.

20   Q.   If you were considering a significant financial matter or

21   transaction for the company, were there particular board

22   members that you sought advice from?

23   A.   There were particular members who had expertise in that

24   area, and yes, I would tend to seek their advice.

25   Q.   Who were they?

H3G3WAL1                         Engles - direct

1   A.   They would have been John Muse, clearly; Tom Davis; Steve

2   Green to some extent; Jim Turner to some extent.

3   Q.   I think you mentioned yesterday that Tom Davis had an

4   investment banking background.  How did you come to meet Tom

5   Davis yourself?

6   A.   Gosh, I don't remember exactly.  But, I was a young man

7   getting started in my career in Dallas, and trying to buy

8   companies and raise funds to make investments, and I believe I

9   met Tom in that context.

10  Q.   In the context of him being an investment banker?

11  A.   Yes.

12  Q.   And you raising money?

13       Did you become friends with Tom Davis?

14  A.   Yes, I did.

15  Q.   How frequently would you see Tom Davis outside of board

16  meetings?

17  A.   Several times a year.

18  Q.   In what context might you see him?

19  A.   Well, I might see him out having dinner when I was out

20  having dinner.  I might schedule a time or he might schedule a

21  time to have breakfast or lunch together.  We played golf

22  together.

23  Q.   Did there ever come a time when you played in a charity

24  golf tournament that he organized?

25  A.   I did, yes.

H3G3WAL1                        Engles - direct

1   Q.  What was that called?

2   A.  I don't remember exactly.

3   Q.  Where was the tournament located?

4   A.  It was held at Preston Trail Golf Club.

5   Q.  When you met with Tom Davis for breakfast or lunch or

6   played golf with him, was it typical for you to discuss Dean

7   Foods' business?

8   A.  It was not unusual.

9   Q.  Sometimes would those matters include confidential issues

10  within Dean Foods?

11  A.  Yes.

12  Q.  Was it permitted for you to discuss confidential

13  information with Tom Davis about Dean Foods in social

14  situations?

15  A.  Yes, he was one of my directors.

16  Q.  By the middle of March of 2008, what would you have known

17  about the first quarter earnings performance for the company?

18  A.  Well, I would have known what our performance was in

19  January and February.

20  Q.  Would you have known anything about March?

21  A.  I might have, I might not have.  If I knew something it

22  would be more how our sales were.

23  Q.  Do you recall whether you met with Tom Davis in the middle

24  of March of 2008?

25  A.  I do not.

H3G3WAL1                      Engles - direct

1    Q.  If you did meet with him around that time frame, would it

2    have been typical for you to discuss the company's first

3    quarter performance?

4            MR. BERKE:  I would object, your Honor.  The witness

5    does not recall meeting with him.

6            THE COURT:  Sustained.

7    Q.  If I could direct your attention to Government Exhibit

8    423-A.  What is this document?

9    A.  These are the minutes of a telephonic meeting of the audit

10   committee of the board of the Dean Foods Company on April 29,

11   2008.

12           MR. GOLDMAN:  The government offers Exhibit 423-A.

13           MR. BERKE:  No objection, your Honor.

14           THE COURT:  Received.

15           (Government's Exhibit 423-A received in evidence)

16   Q.  You mentioned yesterday the audit committee.  Can you

17   explain to the jury what that is?

18   A.  The audit committee is the committee of the board that is,

19   has the duty of overseeing the company's financial systems and

20   its preparation of the financial reports that it is required to

21   file with the Securities and Exchange Commission, and is also

22   responsible in that regard for hiring the company's outside

23   auditors who audit and verify the company's financial

24   statements on an annual basis.

25   Q.  Was Tom Davis on the audit committee?

H3G3WAL1                              Engles - direct

1   A.  Yes, he was.

2   Q.  Did he attend this meeting?

3   A.  The minutes reflect that he did not.

4   Q.  If we can go to the second page of this document.  I don't

5   know if we published this yet.  And highlighting the first

6   paragraph there, could you read the sentence that begins with

7   "he began his review."

8   A.  "He began his review with the first quarter significant

9   items noting that adjusted EPS for the quarter was 23 cents,

10  above the company's previous guidance of 15 to 20 cents."

11  Q.  What does that mean for the company's performance for the

12  first quarter?

13  A.  It means then we did better than what we had told the

14  market we expected to do, probably on our earnings call in mid

15  February.

16          MR. GOLDMAN:  If we can pull out, Ms. Meister, and

17  zoom in below where it says "outlook."

18  Q.  At the end of this paragraph, can you read the last

19  sentence -- let me take a step back.

20          Who is Mr. Callahan who is referenced here?

21  A.  Mr. Callahan was our chief financial officer.

22  Q.  What is a chief financial officer?

23  A.  He's the executive in charge of the finance activities of

24  the company, from managing our balance sheet, amount of debt,

25  those sorts of things that we had, and also preparing the

1   company's financial statements.

2   Q.  Can you read the last sentence here.

3   A.  "He stated that second quarter guidance would be adjusted

4   earnings per share of between 26 and 31 cents."

5   Q.  When did you release the earnings performance for the first

6   quarter?

7   A.  It would have been shortly after this audit committee call.

8   Q.  Typically, how long before the earnings announcement did

9   the audit committee meet?

10  A.  A day or two.

11  Q.  If I can direct your attention to Government Exhibit 1907,

12  please.  Zoom in on the top half to include everything,

13  including below.

14         What is this document, Mr. Engles?

15  A.  This is an e-mail from me to Tom Davis dated June 11, 2008.

16         MR. GOLDMAN:  Government offers Exhibit 1907.

17         MR. BERKE:  No objection, your Honor.

18         THE COURT:  Received.

19         (Government's Exhibit 1907 received in evidence)

20         MR. GOLDMAN:  If we may publish, please.

21  Q.  I want to focus your attention on the second line of your

22  e-mail to Mr. Davis.  And if you can read beginning "by the

23  way."

24  A.  "By the way, we are having a great quarter, already at 25

25  cents through two months, and guided to 26 to 31 cents."

H3G3WAL1                          Engles - direct

1   Q.  Can you explain what you meant by already at 25 cents

2   through two months?

3   A.  Well, by this date, we would have closed the months of

4   April and May, and so I would have had those results.  And so

5   the earnings per share of the company in April and May would

6   have totaled 25 cents.

7   Q.  Within Dean Foods, would you calculate earnings per share

8   on a monthly basis?

9   A.  Yes.

10  Q.  Then when you say guided to 26 to 31, what did that mean?

11  A.  That's what we told the market to expect in our earnings

12  conference call that would have preceded this quarter, so it

13  would have been in early May of 2008.

14  Q.  Was that the same guidance that you read in the earlier

15  board minutes that Jack Callahan discussed?

16  A.  Yes.

17  Q.  At this rate of performance, 25 cents through two months,

18  where in relation to your guidance did you expect the second

19  quarter performance to be?

20  A.  We expected it to be at or above the top end of this range.

21  Q.  Was this information about the second quarter earnings

22  performance confidential, non-public information?

23  A.  Yes.

24  Q.  If you or a board member had shared that information with

25  someone outside of Dean Foods, would that have been a breach of

1  the duties and obligations of that individual?

2  A.  Yes.

3  Q.  When did the second quarter end?

4  A.  On June 30.

5  Q.  When would the second quarter earnings usually be announced

6  to the market?

7  A.  In August.

8       MR. GOLDMAN:  If I can pull up Government Exhibit

9  702-L, please.

10 Q.  What is this document?

11 A.  This is a press release issued by Dean Foods Company on

12 June 25.  2008, I presume.

13      MR. GOLDMAN:  The government offers exhibit 702-L.

14      MR. BERKE:  No objection, your Honor.

15      THE COURT:  Received.

16      (Government's Exhibit 702-L received in evidence)

17 Q.  Can you read the headline, please.

18 A.  "Dean Foods raises second quarter EPS guidance."

19 Q.  There are two subheads.  Could you read those as well.

20 A.  "Strong performance leads to increased forecast; continued

21 strong cash flows.  Company plans to issue a full earnings

22 release and a webcast conference call on August 6, 2008."

23 Q.  What is that in reference to the webcast and conference

24 call on August 6, 2008?

25 A.  Well, it was the quarterly conference call that I've

H3G3WAL1                        Engles - direct

1   mentioned several times.  Following our earnings release, we

2   would host a telephone conference call that was webcast, so

3   anybody with a computer could listen to it, in which we would

4   go over the figures that we had released in our financial

5   statements and our press release and then give usually

6   securities analysts the opportunity to ask us questions about

7   the company's performance.

8   Q.  Can you read the first paragraph, please.

9   A.  "Dean Foods Company today announced that results for the

10  second quarter ending June 30 are expected to exceed the

11  company's previously issued guidance of 26 to 31 cents per

12  diluted adjusted share.  The company now expects adjusted

13  diluted earnings as defined below for the second quarter to be

14  at least 32 cents per share."

15  Q.  Prior to June this June 25 press release, had Dean Foods

16  indicated to the market that it would be making a press release

17  about its second quarter earnings?

18  A.  Not to my recollection.

19  Q.  Let's move on to the rest of 2008.  How was the company's

20  performance?

21  A.  The company's performance got increasingly better as we

22  went through 2008.

23          MR. GOLDMAN:  If I could pull up Government Exhibit

24  427-A for the witness, please.

25  Q.  What is this document?

H3G3WAL1                         Engles - direct

A.   These are the minutes of a telephonic meeting of the audit

committee, so the regular audit committee meeting before our

earnings the Dean Foods Company held on November 3, 2008.

                (Continued on next page)

H3gdwal2                          Engles - direct

```
 1              MR. GOLDMAN:  The government offers Exhibit 427A.

 2              MR. BERKE:  No objection, your Honor.

 3              THE COURT:  Received.

 4              (Government's Exhibit 427A received in evidence)

 5              MR. GOLDMAN:  You may publish it, Ms. Meister.  Now,

 6    if you could highlight the overview portion of this document,

 7    Ms. Meister.

 8    Q.  And if you could see -- if you could read where -- the

 9    second sentence beginning, "Mr. Callahan."

10    A.  Yes.  "Mr. Callahan noted that adjusted earnings per share

11    increased 100 percent compared to the third quarter of 2007 to

12    $0.28, which was within the company's guidance range of $0.26

13    to $0.31."

14    Q.  And read the next sentence, please.

15    A.  "He noted that Wall Street's consensus was EPS of $0.31 for

16    the third quarter."

17    Q.  Now, how did you view the earnings performance of $0.28 per

18    share?

19    A.  I thought it was solid performance.

20    Q.  But how did it compare to the consensus expectations?

21    A.  It was below the consensus expectations.  The analysts had

22    focused around the top end of our range.

23    Q.  Notwithstanding the fact that your guidance was below the

24    expectations, how did you feel about the direction of the

25    company at that time?
```

H3gdwal2                        Engles - direct

1    A.  I thought we were in a pretty sound period of performance.

2    Q.  And as the year 2008 finished, how was the company's

3    performance in the fourth quarter of that year?

4    A.  My recollection is that it was good.

5    Q.  And as of early February 2009, did you expect to have a

6    good year for the remainder of 2009?

7    A.  Yes.  No prices had started going down in mid to late 2008

8    and we were going to continue going down in 2009, and that was

9    usually a good sign for the company's performance.

10   Q.  At this point in early 2009, was there any internal

11   discussion to split off WhiteWave?

12   A.  Not to my recollection.

13   Q.  Did there come a time in 2009 when Dean Foods acquired

14   another company?

15   A.  Yes.

16   Q.  What company?

17   A.  We acquired a company called the Alpro Company in Belgium.

18   Q.  What was Alpro?

19   A.  Alpro was a business that was much like our Silk business.

20   It was plant-based milks and yogurts but it was based in

21   Europe, not the United States.

22   Q.  And is this type of acquisition something that you would

23   have discussed with the Dallas members of the board prior to

24   doing it?

25   A.  I would have discussed it with all members of the board

H3gdwal2                          Engles - direct

1    prior to doing it.

2    Q.  How did you believe that this purchase would have impacted

3    the company's performance?

4    A.  Well, I believed it was an important strategic step for

5    Dean Foods.  It made us the global leader in these alternative

6    milks.

7    Q.  Did the market react in sync with that view?

8    A.  No, they did not.

9    Q.  In what segment did you place this Alpro unit?

10   A.  We put it in the WhiteWave business unit.

11   Q.  Why was that?

12   A.  Because it was a company like the WhiteWave companies and a

13   brand like the WhiteWave brands and it was to be managed in a

14   similar way, and it was the appropriate price -- place for it

15   to be owned.

16   Q.  How was the company's performance during the remainder of

17   2009?

18   A.  I think that 2009 started off very strong, and it weakened

19   as we got to the back half of 2009 because milk prices -- it

20   became evident that milk prices were going to rise and maybe

21   started rising in the back half of 2009.

22   Q.  And when during the year in 2009, approximately, did you

23   purchase Alpro?

24   A.  It was in June or July.

25   Q.  Now, toward the end of 2009, given your excellent

H3gdwal2                         Engles - direct

1    performance, how did the stock perform as the year went on?

2    A.  I think the stock performed relatively poorly or the stock

3    struggled in the back half of 2009.

4    Q.  Toward the end of 2009, what, if any, consideration did you

5    give to the possibility of a separation of WhiteWave?

6    A.  We began to consider it.

7    Q.  Why did you begin to consider that possibility?

8    A.  WhiteWave was becoming really the engine of profit and

9    sales growth for the company.  It was a very strongly

10   performing company.  And we were at the early stages in the

11   stock market of the market recognizing and beginning to value

12   highly these new food companies, food companies that made

13   organic products, food companies that made new and innovative

14   food products, and we believed or began to believe at that

15   point in time that the market was not giving us credit for the

16   value of WhiteWave in Dean Foods' stock price.

17            MR. GOLDMAN:  If I could show the witness Government

18   Exhibit 437, please.

19   Q.  What is this document?

20   A.  These are the minutes of a special meeting of the Dean

21   Foods Board of Directors held on December 14, 2009.

22            MR. GOLDMAN:  The government offers Exhibit 437.

23            MR. BERKE:  No objection, your Honor.

24            THE COURT:  Received.

25            (Government's Exhibit 437 received in evidence)

H3gdwal2                          Engles - direct

1    BY MR. GOLDMAN:

2    Q.  And you mentioned this was a special meeting.  What was the

3    purpose of calling this special meeting?

4    A.  Well, it's to discuss important matters that we didn't want

5    to wait to discuss until our March meeting at the board.  So --

6    Q.  And if we could go to page 2.

7         Was one of those considerations -- was one of those

8    topics portfolio considerations to enhance shareholder value?

9    A.  Yes.

10   Q.  What did you mean -- what does the term "shareholder value"

11   or "enhancing shareholder value" mean?

12   A.  Well, enhancing shareholder value is the fundamental

13   activity of corporations, trying to make their share price go

14   up.

15   Q.  And in the first paragraph, there is a reference in the

16   second sentence to Mr. Magro.

17        Who was Mr. Magro?

18   A.  Mr. Magro was -- is an investment banker who over much of

19   Dean Foods' history and development was an important advisor to

20   the company.

21   Q.  What is an investment banker?

22   A.  An investment banker is an individual in investment banks

23   or firms that help companies raise money for purposes of using

24   in their business.  They assist companies in transactions,

25   whether those are purchases of companies or sales of businesses

H3gdwal2                        Engles - direct

1    or sales of the firm itself, those sorts of strategic

2    activities.

3    Q.  What, if anything, had you asked Mr. Magro to prepare for

4    the board at this special meeting?

5    A.  I had asked him to prepare an analysis of a number of

6    things that we considered doing in order to cause the market to

7    more fully appreciate the value of the business that we had at

8    Dean Foods.

9    Q.  What were those types -- we can leave that up, actually.

10   What were the types of things that Mr. Magro presented on?

11   A.  I believe that we considered the sales of businesses.  I

12   believe that we considered separating WhiteWave from the milk

13   business from what we called FDD.  We considered things that we

14   might do to make our debt situation more stable in the short

15   run.

16   Q.  Was this the first time that you presented to the board

17   about the possibility of separating WhiteWave?

18   A.  I believe so, yes.

19   Q.  Ultimately, what, if anything, did the board resolve about

20   these various alternatives?

21   A.  They didn't resolve anything at this meeting other than

22   based on the material presented to them, they did not believe

23   it was the appropriate time to take any action with respect to

24   these items.

25           MR. GOLDMAN:  We can take that down now.

1    Q.  After this December 2009 meeting, where did the possibility

2    of a spin-off stand?

3    A.  It was -- it was not an active topic of discussion after --

4    at least for the board after this meeting.

5    Q.  At the beginning of 2010, how was the performance of the

6    company?

7    A.  The company was struggling in the beginning of 2010.

8    Q.  During that quarter, did you have additional discussions

9    with bankers about a potential spin-off or separation of

10   WhiteWave?

11   A.  Yes, we did.

12   Q.  And if the board had previously decided not to move forward

13   with it, why did you continue to consider it?

14   A.  Well, one of the principal reasons in late 2009 that we

15   did -- that the discussions ended early with the board, we did

16   not move forward, is that the financial markets were such that

17   raising the money necessary to separate the businesses -- so

18   new indebtedness for WhiteWave and restructuring the

19   indebtedness of Dean Foods -- would have been a very expensive

20   proposition given the nature of the debt markets.  They were

21   very unsettled in that part of the financial crisis.

22   Q.  And what had happened -- what happened in the first quarter

23   that changed that situation?

24   A.  Well, the financial markets began to improve and get their

25   footing, get more stability, and the cost of raising the

H3gdwal2                          Engles - direct

1    financing necessary to effect a separation began to decline

2    pretty meaningfully.

3            MR. GOLDMAN:  If I could show the witness Government

4    Exhibit 1912B?

5    Q.  What is this document, Mr. Engles?

6    A.  This is an email from Steve Kemps, who is the general

7    counsel of Dean Foods, to the Board of Directors, including me,

8    dated March the 11th, 2010.

9    Q.  And what was the subject of this email?

10   A.  The subject is J.P. Morgan research note on Dean Foods.

11           MR. GOLDMAN:  The government offers 1912B.

12           MR. BERKE:  No objection, your Honor.

13           THE COURT:  Received.

14           (Government's Exhibit 1912B received in evidence)

15   BY MR. GOLDMAN:

16   Q.  What was this email in reference to?

17   A.  This email was in reference to an analyst report that the

18   JPMorgan analyst Terry Bivens had issued following a visit that

19   we had made to Boston to meet with large investors who either

20   owned or were interested in owning Dean Foods' stock.

21   Q.  Now, did you regularly have meetings with large investors,

22   such as this one?

23   A.  Occasionally.  Once or twice a year we would have what's

24   called a road show to go to Boston and usually New York to meet

25   with big investors.

1   Q.  What was the company's purpose for meeting with large

2   investors?

3   A.  Well, they were the biggest owners of our stock and the

4   biggest potential buyers of our stock, and we met with them in

5   order that they might have the opportunity to ask questions

6   they had about the business and more fully understand why Dean

7   was an attractive investment.

8   Q.  Now, typically when during a quarter would you meet with

9   large investors?

10  A.  We limited our meetings with large investors to that period

11  of time not too long after our earnings announcement, because

12  we had communicated publicly the most recent results of the

13  business and we were not so far into the next quarter that we

14  would have too much insight into that quarter's performance.

15  So it was a comfortable time to meet with investors and answer

16  their questions.

17  Q.  Were there times of the year or quarters when you were not

18  permitted, either by company policy or otherwise, to speak to

19  investors or analysts?

20  A.  Yes.  We had what we called a trading window that was

21  announced when it opened and closed by our general counsel's

22  office.  But typically that window would close around the

23  beginning of the third month of a quarter, and it would remain

24  closed until one or two days after our earnings announcements.

25  Q.  You referenced a trading window.  Was this also a time

H3gdwal2                          Engles – direct

1   period when you as CEO were not permitted to speak with

2   investors or analysts?

3   A.  Yes.

4   Q.  Now, when you met with these investors at a meeting, as is

5   referenced in this email, what information did you provide to

6   the investors?

7   A.  Typically, we didn't make a presentation to the investors.

8   It was usually a question-and-answer session.  They had

9   typically reviewed our financial statements and filings and our

10  conference call transcripts and analyst reports, and they had

11  their own questions about the business that they wanted us to

12  answer.

13  Q.  What information were you permitted to give to them?

14  A.  Information that was public, or publicly available.

15              THE COURT:  All right.  Pause.

16              We are going to take a ten-minute break, ladies and

17  gentlemen.  Do not discuss the case among yourselves or with

18  anyone.  We'll be back in action in ten minutes.  Thank you.

19              (Continued on next page)

20

21

22

23

24

25

H3gdwal2                          Engles - direct

1                (Jury not present)

2                THE COURT:  Please be seated.  I have a note, which

3       I've marked as Court Exhibit 2, from Juror No. 16, an alternate

4       juror.  Also, she had in jury selection the juror number 49.

5                She lives in Tappan, New York, and she indicated that

6       on March 22nd, at 5:15, she has a doctor's appointment, and

7       there is more detail in here about the medical situation that

8       you can read.  But she is asking that she be dismissed at

9       3 p.m., which obviously means that we would not sit after

10      3 p.m.

11               Take a look at it and you will let me know what your

12      position is on it.  I am inclined to honor the request.

13               See you in ten minutes.

14               I should say the other alternative would be to dismiss

15      the alternate juror.  That is another possible option.

16               MR. FERRARA:  Your Honor, I don't mean to curry favor

17      with the Court but I have hundreds of cough drops, if you would

18      like one.

19               THE COURT:  The Court does not accept gratuities from

20      the parties, and my deputy has supplied me.  I plowed through

21      this bag but we have backups.  Thank you very much.

22               MR. FERRARA:  OK.

23               (Recess)

24               THE COURT:  All right.  Bring our jurors in, please.

25               We will discuss it later.

H3gdwal2                          Engles - direct

1          MR. GOLDMAN:  The witness is coming right in.

2          THE COURT:  What is the position of the parties on the

3     juror's doctor's appointment?

4          MR. GOLDMAN:  Your Honor, our view is that we really

5     don't want to lose any more time given how much we have been

6     losing.  We have six alternates and we would be fine excusing

7     her now.  The defense made the suggestion, which we think is

8     reasonable, that we can wait until Monday to make sure jurors

9     are coming back, if that's something the Court wants to do, but

10    we do not want to lose the time.

11         THE COURT:  That's a good suggestion from both sides

12    and I'm going to follow that.  Good.

13         MR. SCHOMAN:  Your Honor, we would have no objection

14    to telling the juror that she will be able to get to the doctor

15    on Wednesday.

16         THE COURT:  Yes.  Thank you.

17         (Continued on next page)

18

19

20

21

22

23

24

25

H3gdwal2                         Engles - direct

1           (Jury present)

2           THE COURT:  All right.  Please be seated.

3           Juror No. 2 -- not Juror No. 2, Juror No. 16, the

4    answer to your question is yes.

5           One message I have to give you is jurors are not

6    permitted in the courthouse cafeteria, which is reserved so

7    that the attorneys can meet in private with their clients, etc.

8    So, unfortunately, you may not use the 8th floor cafeteria.

9           All right.  Mr. Goldman, you may continue.

10          MR. GOLDMAN:  Thank you, your Honor.

11   BY MR. GOLDMAN:

12   Q.  Mr. Engles, before we broke, we were discussing your

13   meeting with some large investors in Boston in March of 2010.

14          Was this meeting widely disseminated to the public?

15   A.  No, it was not.

16   Q.  Now, during these meetings with investors that you have

17   been describe, did you ever give or provide them with material

18   confidential information about the company that was not

19   otherwise available to the public?

20   A.  Not to my recollection.

21   Q.  If you had provided information such as that, what did the

22   security laws require you to do?

23   A.  They would have required us to file what's called an 8K,

24   which would be a public filing that acknowledges that we gave

25   information that was previously not available to the public and

H3gdwal2                    Engles - direct

1    describing what that information was so it would be available

2    to the public.

3    Q.   Did Dean Foods, under your leadership, ever file an 8K to

4    remedy an improper disclosure?

5    A.   Not to my recollection.

6    Q.   Did you ever meet with an individual named Billy Walters

7    about Dean Foods?

8    A.   No.

9            MR. GOLDMAN:   Now, if we can pull up Exhibit 1912B on

10   page 2.  And go to the paragraph at the bottom, which is

11   entitled "WhiteWave."

12   Q.   Can you read the last two sentences of this paragraph,

13   beginning with "We were asked about."

14   A.   "We were asked about the possibility of spinning the

15   business out.  We reiterated our belief that the platform will

16   continue to post strong double-digit growth and is a valuable

17   asset for the company."

18   Q.   Had investors started discussing the possibility of a

19   WhiteWave spin-off with you?

20   A.   Well, they had certainly started understanding that

21   WhiteWave was an important part of the Dean Foods' portfolio,

22   and at this point in time they may have -- well, here it says,

23   "We were asked about the possibility of spinning the business

24   out."  So, yes, by this time we were starting to get questions

25   about that.

H3gdwal2                        Engles - direct

1   Q.  And did you give any indication to these investors at this

2   time that you were in fact analyzing that possibility within

3   the company?

4   A.  Not to my recollection.

5        MR. GOLDMAN:  If we could show the witness Government

6   Exhibit 507A.

7   Q.  What is this document?

8   A.  This is an email from Carolyn Boulle, who I believe was my

9   assistant at the time, to the Dean Foods Board of Directors

10  regarding a Dean Foods' board call.  It is dated April the 1st,

11  2010.

12  Q.  Now, did you instruct Carolyn Boulle to send this email to

13  arrange this board meeting on your behalf?

14  A.  I'm sure I did.

15       MR. GOLDMAN:  The government offers Exhibit 507A.

16       MR. BERKE:  No objection, your Honor.

17       THE COURT:  Received.

18       (Government's Exhibit 507A received in evidence)

19       MR. GOLDMAN:  We could publish it.

20  Q.  And, Mr. Engles, if you could read the second sentence

21  where it begins, "We would like to."

22  A.  "We would like to conduct a two-hour telephonic meeting on

23  the afternoon of April 14th to discuss strategic alternatives."

24  Q.  What did you mean by "strategic alternatives"?

25  A.  It really meant that that group of possibilities -- of

H3gdwal2                         Engles - direct

1   possible actions that we might take to enhance shareholder

2   value or cause our stock price to go up.  And at this point in

3   time it was focused on, or an important element of that would

4   have been the potential separation of WhiteWave and Dean Foods.

5   Q.  And was that a term that the members of the board would

6   understand?

7   A.  I believe so, yes.

8              MR. GOLDMAN:  We could show Government Exhibit 439 to

9   the witness, please.

10  Q.  What is this document?

11  A.  These are the minutes of a special meeting of the Board of

12  Directors of Dean Foods held on April the 14th, 2010.

13             MR. GOLDMAN:  The government offers Exhibit 439.

14             MR. BERKE:  No objection, your Honor.

15             THE COURT:  Received.

16             (Government's Exhibit 439 received in evidence)

17             MR. GOLDMAN:  If we may publish it.

18  Q.  Where did this meeting take place?

19  A.  This meeting took place at John Muse's office in Dallas.

20  Q.  Why not at Dean Foods?

21  A.  Board meetings were pretty important and notable events

22  inside the company.  Many, many people who worked in our

23  building knew members of the Board of Directors, and if we were

24  to hold a meeting there that was not a scheduled quarterly

25  meeting, it would just cause people to ask a lot of questions

H3gdwal2                          Engles - direct

1   that you didn't have to answer if you held the meeting

2   somewhere else.

3   Q.   Was Tom Davis present at this meeting?

4   A.   Yes, he was.

5            MR. GOLDMAN:   And if we could blow up the bottom half,

6   beginning with Project West.

7   Q.   What is Project -- what was Project West?

8   A.   Project West was the code name given to this project,

9   probably by our investment bankers, in which we considered the

10  separation of WhiteWave from Dean Foods.

11  Q.   And if you could read the second paragraph -- sorry, the

12  second sentence, rather, where it begins, "Mr. Engles stated

13  that."

14  A.   "Mr. Engles stated that the board had considered a spin-off

15  transaction in December 2009, noting that since then the

16  financial performance of the company had allowed further

17  deleveraging, the capital markets had improved, lower financing

18  costs were available, and that WhiteWave's performance had been

19  improving."

20  Q.   Now, what did you mean by "further deleveraging"?

21  A.   It just meant that as time had passed from December until

22  April, the company had earned profits which had been used to

23  reduce its debt.

24  Q.   And how would that -- how would leverage or deleveraging

25  the company have an impact on the possibility of spinning off

H3gdwal2                          Engles – direct

1    WhiteWave?

2    A.   Well, companies have -- a lot of companies have debt on

3    their balance sheet, they borrowed money to finance their

4    operations, and the amount of that debt is important in

5    relation to the earnings of the business so that the business

6    can continue to invest and develop its business.  After the

7    dividend, Dean had quite a bit of debt, and it was important

8    that before we could spin off the businesses we got that debt

9    to where it was manageable for when it was divided up among the

10   two companies, WhiteWave and Dean.

11   Q.   And next you discussed that the capital markets had

12   improved.  What did you mean by that?

13   A.   Well, it's sort of the opposite of what I discussed in

14   relation to your question about 2009.  2009, the markets for

15   banks making loans and the bond market making loans to

16   companies was poor and the interest rates were high.  Since

17   that December timeframe the markets had improved so that

18   interest costs were lower and it was possible to conceive

19   getting the bank loans and the bond financing necessary to do

20   this kind of transaction.

21   Q.   Can you read the next sentence, please?

22   A.   "He also noted that Messrs. Scalzo and McPeak had been

23   enrolled for more time and that many investors had been

24   recommending that the company consider a transaction that would

25   enhance shareholder value."

H3gdwal2                    Engles - direct

1   Q.  Who were Messrs. Scalzo and McPeak?

2   A.  Joe Scalzo was a senior executive who had been brought in

3   to really build WhiteWave.  He had since moved on up to a more

4   senior role in the Dean Foods Company, and Mr. McPeak had

5   replaced him as the chief executive -- chief operating

6   executive at WhiteWave.

7   Q.  And then it says that the investors had been recommending

8   that the company do such a thing.

9            At this point, do you recall what your response was to

10  investors making such a recommendation to you?

11  A.  I think at this point in time it was still the response

12  that we gave in 2009 when we visited investors, that we as

13  Dean's management understood that WhiteWave was a very valuable

14  part of our portfolio, that it was growing and should be

15  creating value inside of our company, that we were concerned

16  that it was not reflected in our stock price, and -- but that

17  we felt it was creating value for the company.

18  Q.  Did you ask Mr. Magro to present at this board meeting?

19  A.  I did.

20  Q.  And what, generally speaking, if you could summarize what

21  he presented?

22  A.  He presented, as he almost always did, a series of slides

23  that had a financial analysis of the alternatives that we

24  discussed at the meeting.

25  Q.  And one of the topics of that analysis was a potential

H3gdwal2                         Engles - direct

1   spin-off of WhiteWave?

2   A.  Yes.  It was the principal focus of the meeting.

3   Q.  And what, if anything, did the board resolve or authorize

4   you to do after this meeting?

5   A.  I believe that the board authorized us to continue to work

6   on this project, Project West, to determine if it was feasible.

7   Q.  Was that the first time that you had asked the board for

8   authority to pursue a spin-off?

9   A.  To my recollection, yes.

10  Q.  And what, if anything, did you do with regard to a

11  potential spin-off after getting the board's authorization?

12  A.  We began to map out the work that needed to be done and

13  continued to do analysis with respect to that work.

14          MR. GOLDMAN:  Now, if I could show the witness

15  Government Exhibit 508.

16  Q.  What is this document?

17  A.  This is an email from me to Tom Davis, dated April the

18  30th, 2010.

19          MR. GOLDMAN:  The government offers Exhibit 508.

20          MR. BERKE:  No objection, your Honor.

21          THE COURT:  All right.  Received.

22          (Government's Exhibit 508 received in evidence)

23  Q.  And if you could read at the bottom where Tom Davis emails

24  you at 10:10 a.m.

25  A.  "Gregg, got your voice message.  No problem on the golf

H3gdwal2                         Engles - direct

1    turning.  Let's take care of business first.  I will be

2    available on Friday afternoon.  Talk soon.  TD."

3    Q.  Was Tom Davis often referred to as "TD"?

4    A.  Almost always.

5    Q.  And then what was your response?

6    A.  "Thanks, TD.  Sorry to cancel on you late."

7              MR. GOLDMAN:  If we can now pull up Government Exhibit

8    509.

9    Q.  What is this document?

10   A.  This is an email from me to the Board of Directors, dated

11   April the 30th, 2010.

12             MR. GOLDMAN:  The government offers Exhibit 509.

13             MR. BERKE:  No objection, your Honor.

14             THE COURT:  Received.

15             (Government's Exhibit 509 received in evidence)

16   Q.  What is the subject of this email?

17   A.  "Meeting next Friday."

18   Q.  Can you read the first two sentences of the first

19   paragraph, please?

20   A.  "You should have gotten an email from Steve Kemps regarding

21   making the audit committee call next week into a full board

22   call.  That is driven by an increasingly pessimistic forecast

23   from the FDD group regarding their balance of year

24   performance."

25   Q.  Now, why did you want to convert the audit committee

1    meeting into a full board meeting?

2    A.   Well, there was a matter that I felt needed the full

3    board's attention and that the full board needed to be aware

4    of.

5    Q.   What was that matter?

6    A.   It was the fact that as we reforecasted our business, in

7    April our milk business brought forward a very much worse

8    projection of their balance -- what they expected to do over

9    the balance of the year.  And that was important in and of

10   itself but it was also important for Project West.

11   Q.   Was that an expected development by the company?

12   A.   No, it was not.

13   Q.   If you could read the first sentence of the second

14   paragraph?

15   A.   "On next week's call, I want to update the board on this

16   issue as well as outline its impact on our strategic initiative

17   discussed with the board a couple of weeks ago."

18   Q.   And what strategic initiative discussed a couple of weeks

19   ago were you referring to here?

20   A.   Project West.

21   Q.   And how would this new information about the company's

22   yearly outlook affect the -- affect Project West?

23   A.   Well, the expectation that we were going to earn less money

24   would have meant that it was more difficult to pay our debts.

25   And as we discussed a moment ago, the ability to pay your debts

H3gdwal2                         Engles - direct

1    and support the debt that the company had on it was essential

2    to separating the businesses, to spinning off WhiteWave.

3                (Continued on next page)

H3G3WAL3                          Engles - direct

1   Q.  Was any of the information related to the company's

2   performance that you passed on to the board, was that

3   information considered to be confidential information?

4   A.  Yes, it was.

5   Q.  If you could read the second-to-the-last sentence of the

6   second paragraph.

7   A.  "I will make an effort to contact each of you by telephone

8   prior to the meeting to give you a brief in-person preview."

9   Q.  Did you do that?

10  A.  I believe I did.

11          MR. GOLDMAN:  If I can now show the witness Government

12  Exhibit 440, please.

13  Q.  What is this document?

14  A.  These are the minutes of a special meeting of the board of

15  directors of Dean Foods held on May 7, 2010.

16          MR. GOLDMAN:  Government offers Exhibit 440.

17          MR. BERKE:  No objection, your Honor.

18          THE COURT:  Received.

19          (Government's Exhibit 440 received in evidence)

20  Q.  Was this the full board meeting that you had told the board

21  about the week before in those e-mails?

22  A.  Yes, it is.

23  Q.  Did you discuss the impact of the revised performance for

24  Dean Foods on Project West at this meeting?

25  A.  Yes, I did.

H3G3WAL3                          Engles - direct

1   Q.  What did you relay to the board about the potential impact

2   on Project West?

3   A.  I relayed that it would in all likelihood impact the -- our

4   ability to proceed with Project West at this time.

5             MR. GOLDMAN:  If we can move to page two, Ms. Meister.

6   Blow up the last paragraph that begins with "now therefore."

7   Q.  If you can read number two in there, please.  Beginning

8   "now therefore is resolved" and go to "the second aspect."

9   A.  "Now, therefore, be it resolved that the board authorized

10  and directs the officers of the company to continue to explore

11  and analyze a potential transaction with respect to the

12  WhiteWave and Alpro businesses, including such additional

13  business preparation, as such officers deem necessary and

14  appropriate, and to report back to the board in due course in

15  relation to the progress of the foregoing transactions."

16  Q.  Could you explain to the jury in plain English what the

17  board authorized you to do in with that?

18  A.  This is not plain English, is it.  The board authorized us

19  to continue working on this transaction.

20  Q.  Did you announce -- we can take that down.

21             Did you announce first quarter earnings shortly after

22  this meeting?

23  A.  Yes.

24  Q.  How was the first quarter earnings performance?

25  A.  I think they were quite poor.

H3G3WAL3                          Engles - direct

1    Q.  Did you indicate to the public the information that you had

2    gotten about the new outlook for the year's financial

3    performance?

4    A.  I don't recall with specificity, but I can't imagine that

5    we did not.

6    Q.  Generally, how was the news perceived by the public and the

7    market?

8    A.  I think they viewed the developments negatively.

9    Q.  At this point, what was the company's status with the

10   possible spinoff of WhiteWave?

11   A.  It was not possible to spin off WhiteWave at this time.

12   Q.  What, if any, work was the company doing in preparation for

13   such a possibility?

14   A.  Well, as the board authorized us, we were continuing to

15   think about if we would spin the company in the future, how

16   would we separate these businesses.  So there was overlap

17   between the milk business and WhiteWave in terms of how they

18   were operated, and that had to be unwound if you were to spin,

19   and that was going to take a long time.

20   Q.  How did Dean Foods' performance continue during the summer

21   of 2010?

22   A.  2010 was a very difficult year for Dean Foods.

23   Q.  Did there come a time during the summer of 2010 when the

24   company considered a straight sale of the WhiteWave business?

25   A.  Yes.

H3G3WAL3                        Engles - direct

1    Q.  Can you explain to the jury what the difference is between

2    a spinoff and a sale?

3    A.  Yes.  In a sale, if you own something and you sell it, you

4    get money for it, the money is yours to use as you wish, and

5    Dean Foods would have used that money to pay down its debt.

6         A dividend is more of -- it's not a sale.  There is no

7    cash involved.  It is the company giving to its shareholders

8    something that they already own, by virtue of owning the shares

9    of that company, but they're just giving it to them separately,

10   whether that's cash or shares of stock of a company, like

11   WhiteWave.

12   Q.  What would be the tax ramifications of the two different

13   transactions?

14   A.  A sale would have, from Dean's perspective, a very heavy

15   tax bill.  So Dean would have paid a very large amount of tax

16   had it sold WhiteWave to a third party.  The spinoff could be

17   organized and arranged in such a way that neither Dean nor its

18   shareholders paid any meaningful tax.

19   Q.  What was your view about the possibility of a sale of

20   WhiteWave?

21   A.  I thought it was a terrible idea.

22   Q.  Were there others in management that thought it was a good

23   idea?

24   A.  There were some, yes.

25   Q.  Did there come a time when the board met in August of 2010

H3G3WAL3                        Engles - direct

 1    and discussed these two alternatives?

 2    A.   Yes, we had a discussion at our August quarterly board

 3    meeting.

 4    Q.   What, if anything, did the board decide to do with regard

 5    to a discussion about these two alternatives?

 6    A.   The board asked Mr. Magro, who was our advisor, the

 7    company's advisor, and the management team to more fully

 8    explore the various alternatives and their ramifications for

 9    the company, and to report back to the board when that analysis

10    was complete.

11    Q.   Was the sale of WhiteWave a possibility at this time?

12    A.   It was a possibility, yes.

13    Q.   Was the spinoff a possibility at this time?

14    A.   No, it was not.

15    Q.   Why not?

16    A.   Too much debt.

17    Q.   At this point, were investors and analysts continuing to

18    ask you about the possibility of separating WhiteWave from the

19    Dean Foods Company?

20    A.   Yes.

21    Q.   Did you have an understanding for why they were focusing on

22    this issue?

23    A.   Yes.  Dean Foods' stock had performed terribly.  And yet,

24    many investors saw the value, both in our milk business, but

25    more importantly in the WhiteWave business.  And there was a --

H3G3WAL3                    Engles - direct

1   investors want their investments to increase in value, they

2   want the stocks they own to go up in price.  And there was a

3   strong belief among many in the investment community that the

4   value of WhiteWave was not reflected in Dean Foods' stock

5   price.

6   Q.  Did you share that belief?

7   A.  I did.

8   Q.  How was the performance of WhiteWave?

9   A.  WhiteWave performed very well during most of these periods.

10  Q.  So why was the stock price so depressed?

11  A.  Well, WhiteWave was a small part of a very large company.

12  So, WhiteWave had $2 billion in sales, our milk business was

13  over $10 billion in sales.  So it was the proverbial tail

14  wagging the dog, if you will, and that doesn't really happen

15  very often.

16          So, as the milk business went and as investors'

17  concerns about the milk business went, so went Dean Foods'

18  stock price.  That was just the frustrating reality of the way

19  it was.  Particularly as the market was concerned about the

20  amount of debt that we had as a company.

21  Q.  Did you begin to respond to these questions in public

22  forums?

23  A.  I did, yes.

24  Q.  Why did you begin to answer these questions substantively

25  about the possibility of a separation?

H3G3WAL3                          Engles - direct

A.  Well, there was a number of reasons.  First of all, we were

getting a lot of questions about it, and being able to discuss

it publicly was the right way to go about it, right, because

people had lots of questions and it was -- it is awkward when

they ask you those questions in private and you haven't

addressed it publicly, because you really can't speak about it.

So, getting it out into the public domain was an important

thing to do.

        But, maybe more importantly, our job as management is

to be stewards of the investments of people who invest in our

company.  And it was our firm belief that the market was not

appropriately valuing WhiteWave as part of our business, and we

felt it was an essential part of our job to highlight the value

of that business to the marketplace, so that our shareholders

would reap the benefit of the stock reflecting its value.

Q.  Are you familiar with the term "activist investor"?

A.  Yes.

Q.  What is an activist investor?

A.  An activist investor is an investor who doesn't just buy a

share of stock and leave it in their brokerage account.  They

have a point of view or a reason why they believe the stocks

they invest in are either over or undervalued, usually

undervalued.  And they take relatively large stakes in

businesses, buy a lot of shares, a large percentage, and then

they actively and publicly push management to do the things

H3G3WAL3                     Engles - direct

1   necessary to make the stock reflect that value for the benefit

2   of shareholders.

3   Q.  In light of WhiteWave's excellent performance and the Dean

4   Foods' stock's poor performance, were you concerned at all

5   about an activist investor investing in Dean Foods?

6   A.  I thought it was a significant likelihood that an activist

7   would come along.  There was so much discussion of the value of

8   WhiteWave within our portfolio, that I felt like it was a

9   matter of time until an investor came along, and I was not

10  enthusiastic about that idea.

11  Q.  How did your views on that idea affect your decision to

12  speak publicly about the company's view of WhiteWave's value?

13  A.  Well, it was part of it.  This was a company that I had

14  really started and I had an enormous amount of pride in the

15  value that we had built for our shareholders over time.  And it

16  was, it was important to me that at a minimum the market knew

17  that we understood the value of this asset, and that we would

18  be proactive in seeing the value of this asset recognized for

19  the benefit of our shareholders.  Effectively, part of the

20  reason, part of the message was, you don't need to come here as

21  an activist, we're already on this issue.

22  Q.  Can you describe some of the ways that the value of

23  WhiteWave could have ultimately been reflected in the company's

24  decisions or the company's stock price?

25  A.  Well, we talked a lot about WhiteWave on our earnings

1    calls.  And we talked a lot about WhiteWave in our conferences.

2    And it was possible that the market would simply pay attention

3    to the arguments that we were making about the value of

4    WhiteWave, and it would be reflected in Dean's stock going up.

5    Q.  If that occurred, would you have wanted to do a spinoff of

6    WhiteWave?

7    A.  Not necessarily.

8    Q.  Did you regularly speak at conferences, investor

9    conferences?

10   A.  Yes, we spoke at usually two major conferences a year.

11   Sometimes more.

12   Q.  Were these conferences widely disseminated?

13   A.  Yes, they were.

14          MR. GOLDMAN:  If I can show Government Exhibit 513.

15   Q.  What is this document?

16   A.  This is the transcript of our presentation at the Barclays

17   Back-to-School Consumer Conference in September of 2010.

18          MR. GOLDMAN:  The government offers Exhibit 513.

19          MR. BERKE:  No objection, your Honor.

20          THE COURT:  Received.

21          (Government's Exhibit 513 received in evidence)

22          MR. GOLDMAN:  If we can turn to page eight of this

23   document.  I'm sorry, the next page.  If we can zoom in on the

24   top half.

25   Q.  You're asked a question here that I'd like you to read

H3G3WAL3                    Engles - direct

1   beginning with -- two questions, but I'd like you to begin "and

2   secondly."

3   A.   "And secondly, WhiteWave is now about 30-year total" -- the

4   question was "WhiteWave is now about 30 percent of your total

5   earnings and obviously a much higher multiple business than the

6   market is giving you credit for overall.  What is the

7   likelihood that you might consider a tax-free spinoff of that

8   business to enhance value?"

9            MR. GOLDMAN:  If we can go to the bottom of the page

10  Ms. Meister.

11  Q.   If you could read the last two paragraphs, please.

12  A.   "As to WhiteWave, look, we are cognizant of where value is

13  in our business.  And we have a tradition and a track record of

14  creating long-term value for our shareholders in this business,

15  and we're going to continue to do so.

16            "What specific form that might take with respect to

17  our corporate portfolio is something we are not prepared to

18  comment on at this point in time.  But, clearly, we have value

19  that we believe is not being recognized in our share price

20  today in our branded business.  And I think it's incumbent upon

21  us as a management team to try and find a way to unlock that

22  value for our shareholders over time."

23  Q.   Thank you.  At this time, was Dean Foods pursuing a spinoff

24  of WhiteWave?

25  A.   Not at this time, no.

H3G3WAL3                         Engles - direct

1    Q.  Did you indicate to the market that you intended to pursue

2    a spinoff of WhiteWave?

3    A.  No.

4    Q.  Did you and the board continue to discuss the possibility

5    of selling WhiteWave?

6    A.  We did.

7    Q.  Through the month of September, is that right?

8    A.  In the back part of 2010.

9           MR. GOLDMAN:  We can take that down, Ms. Meister, and

10   pull up Government Exhibit 516.

11   Q.  What is this document?

12   A.  This is an e-mail from me to Tom Davis or an e-mail string

13   between me and Tom Davis dated September 27, 2010.

14          MR. GOLDMAN:  Government offers Exhibit 516.

15          MR. BERKE:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibit 516 received in evidence)

18          MR. GOLDMAN:  Ms. Meister, we can blow up the bottom

19   as well.  Just the bottom portion.

20   Q.  I believe this is the e-mail from Tom Davis to you.  Can

21   you read it.

22   A.  "Gregg:  Thanks for taking the time to discuss strategic

23   alternatives today.  I'm convinced we will collectively make to

24   right decision."  Make the right decision.  "There are no easy

25   choices, but we will get to an acceptable outcome with hard

H3G3WAL3                      Engles - direct

1   work and persistence.  Thanks for keeping me in the loop.  TD."

2   Q.  Do you recall having a lunch meeting with Tom Davis on

3   September 27, 2010?

4   A.  Vaguely.

5   Q.  Do you recall whether anyone else was there?

6   A.  I believe that the meeting included Jim Turner and John

7   Muse.

8                MR. GOLDMAN:  If we can go to the top of this

9   document.

10  Q.  Just remind the jury who Jim Turner and John Muse were?

11  A.  They were both members of the Dean Foods board of directors

12  who lived in Dallas.

13  Q.  Were they experienced in matters of financial

14  considerations?

15  A.  Yes.

16  Q.  Can you read your response here.

17  A.  "You bet TD.  Thanks for taking the time to attend.  It was

18  very helpful and my thinking is beginning to coalesce."

19  Q.  What did you mean that your thinking was beginning to

20  coalesce?

21  A.  Well, you'll recall that this was after the August board

22  meeting at which the board had asked the company and its

23  advisors to go work through the various alternatives we had

24  discussed at that meeting and report back to the board.  We

25  were in -- into that work, and my point of view was starting to

H3G3WAL3                          Engles - direct

1    become more firm.

2    Q.  What was that point of view, again?

3    A.  My point of view was very strongly that we should not sell

4    WhiteWave.

5    Q.  Do you recall what the Dallas board members' view -- what

6    their view was as well?

7    A.  Ultimately all three of those guys were very supportive of

8    not selling WhiteWave.

9            MR. GOLDMAN:  If we can show Government Exhibit 445,

10   please.

11   Q.  What is this document?

12   A.  These are the minutes of a special meeting of the Dean

13   Foods board of directors, held on October 18, 2010.

14           MR. GOLDMAN:  Government offers Exhibit 445.

15           MR. BERKE:  No objection, your Honor.

16           THE COURT:  Received.

17           (Government's Exhibit 445 received in evidence)

18   Q.  What was the purpose of this special meeting on October 18,

19   2010?

20   A.  The fundamental purpose was to review the analysis that we

21   previously discussed, that the company and its advisors

22   prepared regarding various alternatives for dealing with the

23   company's issues.

24           MR. GOLDMAN:  Have we published it?  Okay.

25   Q.  Was Tom Davis at this meeting?

1    A.  Yes, I believe he was.

2    Q.  Now, at this point, by October 18 of the year, did you know

3    what the company's third quarter earnings would be?

4    A.  Yes.  We knew the company's third quarter earnings by this

5    time.

6    Q.  When would those earnings be announced?

7    A.  They would be announced in early November.

8           MR. GOLDMAN:  If we can turn to page three of this

9    document, Ms. Meister.

10   Q.  At the top it says "the business update."  How were the

11   third quarter earnings of Dean Foods in 2010?

12   A.  They were poor.

13   Q.  If we can go back to page one, there was a reference to a

14   litigation update with some material that was redacted.  What

15   did that relate to?

16   A.  The company had been sued in I believe 2007 and accused of

17   antitrust violations.

18   Q.  How many lawsuits were there?

19   A.  I believe ultimately there were five or six.

20          THE COURT:  Ladies and gentlemen, you see the word

21   "redacted" on the document.  When documents are produced by an

22   entity in litigation, they are permitted to hold confidential

23   communications typically between an attorney and that

24   attorney's client.  That's protected by the attorney-client

25   privilege.  So what one would do is to let the person who is

1    getting the document know that there was something there, but

2    now it's covered, it's not being shown to you, they would have

3    that word "redacted."  And that's a very common thing.  There's

4    text underneath there, but it's been shielded from view in the

5    document.

6              Go ahead, Mr. Goldman.

7    Q.  Now, it's only shielded from view in the document, right,

8    Mr. Engles?  You were there for the conversation?

9    A.  I was there, yes.

10   Q.  What did you learn about the time table of this antitrust

11   litigation?

12   A.  Well, I don't remember exactly what I learned at this

13   meeting.  But, the antitrust litigation was a long, drawn-out

14   process.  And it was at this point in time not close to

15   resolution.

16   Q.  Had things gone against the company's way as part of that

17   litigation by this point?

18   A.  Yes.  We believed early on that this would be quickly

19   resolved and it was not.

20   Q.  What affect, if any, would the pending litigation have on a

21   possible spinoff of WhiteWave?

22   A.  It would have made it impossible.

23   Q.  Why is that?

24   A.  Because if we had lost the cases, it would have added even

25   more substantially -- substantially more to the debt of Dean

Foods to pay any judgment, which would have made it even more

unlikely that the spin could happen.

Q.  Was there uncertainty around that ultimate number?

A.  Tremendous amount of uncertainty about it.

Q.  How would the public markets and the capital markets

respond to such uncertainty?

A.  Negatively.

Q.  What, if anything, did the board decide at this meeting

with regard to the sale of WhiteWave?

A.  The board decided at this meeting not to sell WhiteWave at

this time.

Q.  What did that mean for the possibility of a spinoff of

WhiteWave?

A.  The board specifically decided to preserve the possibility

of spinning WhiteWave off in the future.

Q.  What, generally speaking, at this point, what would have to

occur before a spinoff was possible?

A.  We would have to resolve these lawsuits, either win them or

settle them, and we would have to further reduce our

indebtedness or our leverage in order to be able to create

sound balance sheets for both companies, WhiteWave and Dean

Foods.

          MR. GOLDMAN:  We can take the exhibit down.

Q.  Now, were these conversations about the litigation, about

selling or spinning off WhiteWave, about the third quarter

1    earnings at this October meeting, were all of these

2    conversations confidential?

3    A.  Yes.

4    Q.  Was the possibility of a sale or spinoff of WhiteWave

5    material to the company?

6    A.  Yes.

7    Q.  If any board member shared any of these internal

8    deliberations, would that board member be violating his duties

9    and obligations to the company?

10   A.  Yes.

11   Q.  Now, at this point, how was the fluid milk business doing?

12   A.  The fluid milk business at the end of 2010 is struggling.

13   Q.  How is WhiteWave doing?

14   A.  The milk business -- oh, WhiteWave is doing well.

15   Q.  But over all, how is the company doing?

16   A.  Milk business was most of the company, so the company was

17   struggling.

18   Q.  After this board meeting, how did you resolve to try to fix

19   the milk business?

20   A.  Our most pressing issue was with our bank lenders, and so,

21   we basically refinanced our debt.  We borrowed some money from

22   the bond market, we used that money to pay down our banks.

23   Q.  What was your goal in 2011 to fix the balance sheet of the

24   fluid milk business?

25   A.  The quickest way to fix the balance sheet of the business

H3G3WAL3                         Engles – direct

1    was to make its earnings go up.  So we turned our efforts to

2    cutting costs so we could improve profitability in the milk

3    business.

4    Q.  During 2011, was there any internal discussion about

5    pursuing a spinoff of WhiteWave?

6    A.  Not to my recollection.

7    Q.  What was the status of the antitrust litigation during the

8    course of the year of 2011?

9    A.  Much of the antitrust litigation as we got into the middle

10   and end of 2011 began to be resolved.  So we settled the two

11   biggest cases, I believe we settled them both during the second

12   half of 2011.

13   Q.  As 2011 progressed, how did the performance of the company

14   progress?

15   A.  It started to improve.  So we cut a meaningful amount of

16   cost out of the business, and that started to show up as

17   profit, and then of course the big driver for our business was

18   always milk prices that had been at very high levels, and they

19   began to show signs that they were going to decline.

20   Q.  Did there come a time when you spoke at another conference

21   in February of 2011?

22   A.  Yes.

23   Q.  Did you address the issue of separation of WhiteWave at

24   that conference?

25   A.  Yes, we did.  We addressed it in our prepared remarks.

1           MR. GOLDMAN:  If we can show the witness Government

2    Exhibit 505.

3    Q.  What is this document?

4    A.  This is a transcript of our remarks and the

5    question-and-answer session that followed at the Consumer

6    Analyst Group of New York conference.

7    Q.  What is that commonly referred to as?

8    A.  CAGNY.

9           MR. GOLDMAN:  Government offers Exhibit 505.

10          MR. BERKE:  No objection, your Honor.

11          THE COURT:  Received.

12          (Government's Exhibit 505 received in evidence)

13          MR. GOLDMAN:  If we can go to page seven of this

14   exhibit, please.  If we can zoom in from where it begins Gregg

15   L. Engles.

16   Q.  Mr. Engles, I think you've testified to this as well, but

17   by this point in February of 2011, was it your view -- what was

18   your view about whether WhiteWave and Alpro was properly valued

19   in the Dean Foods stock price?

20   A.  I believed it was not.

21   Q.  If you could read the third paragraph there, please.

22   A.  "Which leads me to a discussion of an issue that investors

23   and analysts have historically asked us to address,

24   particularly recently, namely, how do we think about our

25   options for maximizing shareholder value as it relates to

H3G3WAL3                          Engles - direct

1   WhiteWave-Alpro?"

2   Q.   Then if you can continue on the second paragraph -- the

3   next paragraph down, please.

4   A.   "We have and continue to look at this very closely.  And I

5   think a solid argument can be made that, given the challenges

6   we face in FDD Morningstar, the larger of our businesses, that

7   the value of WhiteWave-Alpro is not fully reflected in Dean

8   Foods' share price.

9   Q.   You can continue.  Well, let me -- the FDD Morningstar

10  reference, what is that?

11  A.   That's the milk business.

12  Q.   What does FDD stand for?

13  A.   Fresh dairy direct.

14  Q.   If you can read the next sentence, please.

15  A.   "With WhiteWave-Alpro's strong brands, attractive

16  categories, solid financial performance, and robust growth

17  prospects, I think it safe to say that the market would assign

18  an independent WhiteWave-Alpro company a significantly higher

19  multiple than the combined businesses currently receive."

20  Q.   All right.  Now, you then proceed --

21              THE COURT:  Just explain what a multiple is.

22              THE WITNESS:  A multiple is if you have a dollar of

23  earnings and your stock trades for $12, the multiple is 12.  12

24  times the earnings gives you the stock price.

25              THE COURT:  Thank you.

H3G3WAL3                          Engles - direct

1   Q.  You then proceed to explain the viable alternatives that

2   you see for the company.  If you can read the first paragraph

3   that says "first."

4   A.  "First, we could sell WhiteWave-Alpro and significantly

5   deleverage the remaining Dean Foods.  That would eliminate much

6   of the financial risk associated with our balance sheet and

7   allow us to somewhat accelerate the transformation of our core

8   dairy business.  But this strategy comes with significant

9   costs."

10  Q.  Is this in reference to the sale that the board considered

11  and rejected in October of 2010?

12  A.  It is.

13  Q.  Can you just summarize what you said about the costs of

14  this type of transaction?

15  A.  They're really two.  First of all, as I mentioned, we would

16  pay a lot in tax.  That money would not go to the shareholders,

17  but to the government.

18          Secondly, WhiteWave-Alpro was our best business.  We

19  would have sold our best business and kept our worst business,

20  and that just didn't make a lot of sense.

21  Q.  What was the bottom paragraph, what was the second viable

22  alternative, if you can read that.

23  A.  "Secondly, we could separate our two businesses through a

24  tax-free separation, giving our shareholders two distinct

25  securities, one representing FDD Morningstar and the other

H3G3WAL3                          Engles - direct

1    representing WhiteWave-Alpro.  This is both a theoretically and

2    a practically attractive alternative.  Each company could find

3    its natural shareholder base, and the two companies, each a

4    pure play, could be fairly valued by the market."

5              THE COURT:  Stop.  Let's take our lunch break.

6              Ladies and gentlemen, remember, don't discuss the case

7    among yourselves or with anyone.  Keep an open mind.  We'll be

8    back in action at 2 o'clock.  Thank you very much.

9              (Jury excused)

10             THE COURT:  See you after lunch.

11             (Luncheon recess)

12             (Continued on next page)

H3gdwal4                          Engles - direct

**A F T E R N O O N   S E S S I O N**

2:04 p.m.

3      (Jury not present)

4      THE COURT:  With regard to the analyst reports, it

5  seems to me that there isn't much at the moment that the

6  parties are disagreeing on.  It is part of the government's

7  burden to show that the information on which trades were made

8  was both material and nonpublic.  The analyst reports certainly

9  can be used for the nonhearsay purpose of showing the fact that

10  a statement was made as bearing on whether or not the

11  information was in fact nonpublic, and I will allow that.

12      Now, if there is some other purpose at some point in

13  the trial, we can discuss that, but I think that's all you need

14  at the moment for the cross-examination of Engles, unless I am

15  missing something.

16      MR. FERRARA:  This might be question by question.  But

17  to the extent Mr. Berke plans to ask Mr. Engles to interpret

18  things in the analyst report, we think that is improper and not

19  admissible.

20      THE COURT:  Well, there is a -- I have to say, there

21  is a fine line there.  If something is written in jargon, a

22  jargon that this witness speaks, he certainly can testify as to

23  what it says, what it says to a person who read this.

24      MR. FERRARA:  Your Honor, I'm not going to quibble

25  about what sort of a particular word might mean, etc.  What we

H3gdwal4                         Engles - direct

1    are suggesting in our letter is that if it's in black and white

2    in the report, then it is in black and white and it's in the

3    public or it is not, as your Honor had flagged, and that's

4    relevant.  But if what the defense wants to do is have

5    Mr. Engles interpret how investors might have put different

6    information together or interpreted opinions or analysis and

7    then later say I did the same thing, that's back-dooring his

8    testimony.  That is not allowing us to test that.  So we just

9    want to flag, to the extent we are objecting to questions about

10   interpretation, that's the basis.

11            THE COURT:  Yes.  I have to say, I am having a little

12   bit of trouble visualizing what the objectionable question is.

13   Give me a for instance.

14            MR. FERRARA:  Mr. Engles, isn't it true that based on

15   this sentence, etc., etc., in connection with some -- let me

16   say, isn't it true that these two sentences, a reasonable

17   investor would interpret that as a signal that WhiteWave --

18   that Dean Foods was considering spinning off WhiteWave?  That

19   would be objectionable because what is relevant is what

20   Mr. Walters would have understood, and only Mr. Walters is

21   competent to speak to what he understood the language to mean.

22            THE COURT:  Mr. Berke or Mr. Schoman.

23            MR. SCHOMAN:  Yes, your Honor.

24            Mr. Engles spent the better part of the day already on

25   questioning from Mr. Goldman talking about what the public

H3gdwal4                          Engles - direct

would or wouldn't understand from different announcements, and

all we're trying to do is -- this is basically a conversation

between the company and the analysts about whether WhiteWave or

other things would or wouldn't happen.  And we think it is fair

game for him to do exactly what your Honor said, which is to

say what this is referring to or what this means or what this

was saying was X.  We are not going to be making arguments

through Mr. Engles about Mr. Walters' subjective state of mind.

THE COURT:  I think I have to hear the question in

context.

MR. FERRARA:  That's fine, your Honor.  We just wanted

to flag for the Court what our objection would be.

THE COURT:  Thank you.

Flo, bring our jurors in, if you will.

(Continued on next page)

1          (Jury present)

2          THE COURT:  Afternoon, ladies and gentlemen.  Please

3     be seated.

4          Mr. Goldman, you may continue.

5          MR. GOLDMAN:  Thank you, your Honor.

6     BY MR. GOLDMAN:

7     Q.  Good afternoon, Mr. Engles.

8     A.  Good afternoon.

9     Q.  We were going through the CAGNY February 2011 conference

10    where you were addressing the possibility of -- or the future

11    strategic alternatives of the company.

12         MR. GOLDMAN:  And if we could pull up Government

13    Exhibit 505 and go to the bottom of page 8.  Actually zoom out

14    on it.  I think that is the wrong page.  Page 7, I believe.

15         Yes.  So we can zoom in.

16    Q.  And you had just read that last paragraph, but why don't

17    you read the paragraph again for the jury.

18    A.  "Secondly, we could separate our two businesses through a

19    tax-free separation, giving our shareholders two distinct

20    securities, one representing FDD-Morningstar and the other

21    representing WhiteWave-Alpro.  This is both a theoretically and

22    a practically attractive alternative.  Each company could find

23    its natural shareholder base, and the two companies, each a

24    pure play, could be fairly valued by the market."

25    Q.  Now, what do you mean here by "pure play"?

H3gdwal4                          Engles - direct

1    A.  Well, WhiteWave and Alpro were different businesses, and so

2    when they were in inside one company, the old Dean Foods, I

3    think investors struggled to parse out the two businesses.  If

4    you separated them, they became two very clearly different

5    businesses -- a food and milk business in the case of Dean and

6    a branded business in the case of WhiteWave.

7    Q.  Now, was the possibility of a spin-off available to the

8    company at this time, in your opinion?

9    A.  Not at this time, no.

10   Q.  And was Dean Foods pursuing a spin-off at this time?

11   A.  Not at this time.

12          MR. GOLDMAN:  If we could go to the next page,

13   Ms. Meister.  It continues at the top.

14   Q.  If you could read the top paragraph, please.

15   A.  "Unfortunately, given Dean's indebtedness today and the

16   recent trajectory of FDD-Morningstar, we've been unable to

17   construct separate balance sheets for the two businesses that

18   each company could support.  To do so would require issuing

19   substantial amounts of equity.  This would significantly dilute

20   our current shareholders and, again, greatly diminish the value

21   that we're trying to capture.  We don't believe such an

22   approach currently makes sense for the company or its

23   stockholders, and are convinced that today it is unnecessary."

24   Q.  Now, this is obviously a conference for investors who

25   understand some of the complex language here.  But could you

1   explain for the jury what you mean by construct separate

2   balance sheets for the two companies to support?

3   A.  Probably the best way to describe it is that if you have

4   one house, you have one mortgage.  If you were to take that

5   house and subdivide it into two condominiums each owned by

6   different people, you would have two mortgages on it.  You

7   would separate the debt into two pieces.

8   Q.  And you say that in order to do this transaction you would

9   have to issue substantial amounts of equity.  What does that

10  mean?

11  A.  It means we would have to sell a lot of stock.

12  Q.  And it would significantly dilute the current shareholders

13  and diminish the value that we're trying to capture.  What did

14  you mean by that?

15  A.  Well, what I meant was let's say you have a company that

16  has a hundred shares of stock.  Everybody who owns one share

17  owns one percent of the company.  If, however, you need to

18  raise money and you sell another hundred shares of stock to

19  other people, then that one share of stock now only represents

20  one half of the company.  It is the same company but you have

21  spread the ownership out over a larger number of shares.

22  Q.  And then the last sentence, you say that you are convinced

23  that today such an approach is unnecessary, is that right?

24  A.  Yes.

25  Q.  Now, you then go on to discuss a third option.  Can you

H3gdwal4                          Engles - direct

1   just summarize what the third option was?

2   A.  Leave things the way they are.  We're OK.  If we leave

3   things the way that they are, perhaps we can improve the

4   situation so we don't have to do those things that I described

5   in the top paragraph and can still spin off WhiteWave if it is

6   appropriate at some point in time in the future.

7   Q.  Finally, if you would just read the next paragraph, "This

8   is the option that we're pursuing today."

9   A.  "This is the option that we're pursuing today.  We may

10  pursue another option in the future if circumstances warrant.

11  However, I felt it was important to give you a perspective of

12  the pros and cons of any short-term separation event, with the

13  understanding that we continue to evaluate this on a regular

14  basis, with an eye towards maximizing shareholder value."

15          MR. GOLDMAN:  All right.  We can take that down now.

16  Q.  Had you and the board resolved that you would in fact

17  pursue a spin-off of WhiteWave in the future by this time?

18  A.  No.  By this time, no.

19  Q.  And I believe you touched on this before, but were there

20  other possible ways that shareholders could have received

21  proper value for WhiteWave other than a spin-off?

22  A.  Again, by our description of the benefits and the

23  attractiveness of WhiteWave as a company and its performance,

24  it could have simply been reflected in Dean's share price.

25  Q.  Now, Mr. Engles, you've now read from transcripts from two

H3gdwal4                    Engles - direct

1    investor conferences where you spoke.  Who was authorized to

2    speak on behalf of the company?

3    A.  It was me.

4    Q.  And who generally made the decision whether and when to

5    make information public?

6    A.  I did.

7    Q.  Did you -- were board members authorized to speak on behalf

8    of the company?

9    A.  Generally, no.

10   Q.  Now, I would like to turn your attention to 2012.

11           Did there come a time when you believed that a

12   spin-off of WhiteWave as a viable possibility?

13   A.  Yes, I did.

14   Q.  Approximately when?

15   A.  It would have been sometime in the late winter or early

16   spring of 2012.

17   Q.  What, if anything, had occurred that made you believe a

18   spin-off was possible?

19   A.  Well, a number of things had occurred.  We had won in court

20   the last antitrust case that remained, and we had settled the

21   others.  So the court cases that had prohibited us from

22   spinning the company had been resolved.

23           Secondly, we had been through a year of intensive cost

24   cutting that had improved the underlying economics,

25   profitability of our business.

H3gdwal4                              Engles - direct

1          Third, milk prices were coming down, and that is the

2     most favorable time for Dean Foods because its profit generally

3     expands when milk prices come down.

4          And, finally, the financial markets were good.  We had

5     the ability to issue the debt necessary to finance these

6     businesses separately.

7          THE COURT:  And when you say the prices come down and

8     that's good for profitability, you're speaking of the prices

9     that Dean Foods pays to purchase milk which --

10         THE WITNESS:  From farmers.

11         THE COURT:  -- from farmers which you then in turn

12    sell?

13         THE WITNESS:  Yes.

14         THE COURT:  So if the price of purchasing the raw

15    material goes down, then there is more of an opportunity for

16    profit?

17         THE WITNESS:  There is more profit, yes.

18         THE COURT:  Thank you.

19         MR. GOLDMAN:  Thank you, your Honor.

20    BY MR. GOLDMAN:

21    Q.  At that point, what, if any, steps did you begin taking

22    toward a spin-off?

23    A.  Well, we had internal discussions with my close team, the

24    people who work on these sorts of things.  And then we began

25    discussions with Mr. Magro and his team to do some analysis,

H3gdwal4                          Engles - direct

1    financial analysis, to support the idea that this was feasible

2    at this time.

3            MR. GOLDMAN:  If I could show the witness Government

4    Exhibit 519, please.

5    Q.  And just to remind the jury, who was Mr. Magro?

6    A.  Mr. Magro was our long-standing investment banker who

7    advised us often on these kinds of matters.

8    Q.  And what is this document that you see in front of you?

9    A.  It's an email from Shane Vales, who is at this time my

10   assistant, to members of the Board of Directors of Dean Foods,

11   dated April the 23rd, 2012.

12           MR. GOLDMAN:  The government offers Exhibit 519.

13           MR. BERKE:  No objection, your Honor.

14           THE COURT:  Received.

15           (Government's Exhibit 519 received in evidence)

16           MR. GOLDMAN:  If we could publish for the jury.

17   Q.  What is the subject of this email?

18   A.  The subject of this email is Dean Foods Audit Committee

19   Call.

20   Q.  And the date?

21   A.  April 23, 2012.

22   Q.  If you could read the first paragraph, please.

23   A.  "Given the positive momentum in the businesses, we are

24   requesting that the full board join the audit committee for its

25   regularly scheduled first quarter earnings conference call

H3gdwal4                      Engles – direct

1    May 8, 2012 at 11 a.m. Central Standard Time.  The audit

2    committee will conduct its regular call, and then we will

3    discuss with the full board our intended communications with

4    the street in the May 9th earnings call."

5    Q.  What did you –– why did you want to convert this –– or add

6    on a full board meeting following the audit committee meeting?

7    A.  Well, because we had an important matter that we wanted to

8    discuss with the board and needed to be discussed with the full

9    board.

10   Q.  And what did you mean by "positive momentum in the

11   businesses"?

12   A.  Just those factors that I described, that milk prices were

13   coming down, cost control was having its effect, and our

14   profits were increasing –– significantly.

15   Q.  And then you reference below, "Our intended communications

16   with the street."  What did you mean by that sentence?

17   A.  Well, the street is shorthand for Wall Street, which is

18   shorthand for the investment community.  And we –– we had a

19   specific message that we wanted to deliver to the investment

20   community at the time of this conference call, or of our

21   earnings release, and we wanted to discuss that with the board.

22             MR. GOLDMAN:  Now, if I could pull up Government

23   Exhibit 521, and zoom in.

24   Q.  What is this document?

25   A.  This is an email from Shane Vales, my assistant, to the

H3gdwal4                          Engles - direct

```
 1   Board of Directors of Dean Foods, dated May the 4th, 2012.
 2               MR. GOLDMAN:  Your Honor, the government would offer
 3   Exhibit 521.
 4               MR. BERKE:  No objection, your Honor.
 5               THE COURT:  Received.
 6               (Government's Exhibit 521 received in evidence)
 7               MR. GOLDMAN:  Publish it.  Thank you.
 8   Q.  What is the subject of this email?
 9   A.  Dean Foods audit and board teleconference, Tuesday May 8th.
10   Q.  Can you read beginning with the second sentence,
11   "Attached"?
12   A.  "Attached are Project Mito materials we will review in the
13   second section of the teleconference.  Please do not share
14   these materials with anyone inside or outside of the company.
15   Also, please do not mention or discuss Project Mito during the
16   first section of the teleconference."
17   Q.  What was Project Mito?
18   A.  Project Mito was now the code name for the project to
19   spin-off WhiteWave Foods.
20   Q.  Why was the name Project Mito now when it was referred to
21   as Project West before?
22   A.  I think because Mr. Magro had changed investment banks so
23   we had to have a new code name.
24   Q.  And then it says, "Please do not share these materials with
25   anyone inside or outside of the company."  Why did you feel
```

H3gdwal4                      Engles - direct

1    like you had to include that sentence in this email?

2    A.  Really because these -- this project was highly sensitive

3    and it was highly sensitive inside of the company, and there

4    were going to be people on this conference call inside the

5    company who didn't know anything about this project or these

6    materials, and we didn't want that to become known to anybody

7    in the company.  And, of course, it was sensitive outside of

8    the company.  It was not public information.

9    Q.  And then below it indicates the timing of the two separate

10   board meetings, is that right?

11   A.  Yes.

12            MR. GOLDMAN:  Now, if we could pull up Government

13   Exhibit 522.

14   Q.  Do you recognize this document, Mr. Engles?

15   A.  Yes, I do.

16   Q.  What is this?

17   A.  This is a slide deck of information that was presented at

18   the Board of Directors' meeting on May the 8th, 2012.

19            MR. GOLDMAN:  The government offers Exhibit 522.

20            MR. BERKE:  No objection, your Honor.

21            THE COURT:  Received.

22            (Government's Exhibit 522 received in evidence)

23   Q.  And did you discuss this presentation at that board call on

24   May 8th?

25   A.  Yes, we did.

H3gdwal4                         Engles - direct

1    Q.  Was that meeting by telephone or in person?

2    A.  I think it was both.  I think some people attended in

3    person and some people attended by telephone.

4    Q.  And if I could turn to page 2, please.

5         Could you just read the -- well, could you go through

6    the bullet points, not the dashes?  We'll keep it high level.

7    A.  Yes.  The situation overview was that there was strong 2012

8    financial performance across all the business units.  The

9    lawsuits were settled or summary judgment granted.  Favorable

10   capital markets, and declining leverage levels.

11   Q.  And then at the bottom, what was the conclusion?

12   A.  The time is right to separate the business.

13   Q.  And those are essentially the things that you've just

14   summarized for us a few moments ago, right?

15   A.  Yes.

16   Q.  If we could go to page 3, please.  What is the title here?

17   A.  "Key objectives to maximize shareholder value."

18   Q.  And, again, if you could read the bullet points?

19   A.  "Separate WhiteWave-Alpro from Fresh Dairy Direct.  Leave

20   Fresh Dairy Direct and WhiteWave-Alpro with sound balance

21   sheets.  Keep control of our own destiny.  Move as quickly as

22   possible to capitalize on current conditions."

23   Q.  Now, the top one is the one that you've been talking about

24   for a while, the separation of WhiteWave-Alpro from the fluid

25   milk business, is that right?

H3gdwal4                    Engles - direct

1    A.  Yes.

2    Q.  And you touched upon this as well, but just describe again

3    for the jury what the second bullet point meant.

4    A.  Again, this is the point about debt.  Right?  You are going

5    to separate these two companies.  So you have to separate the

6    mortgage, if you will, and the mortgage had to be of a size

7    that the business could pay it.  Right?  And so the amount of

8    debt on each of these companies had to be such that the

9    business could support it.

10   Q.  And the third bullet point, "Keep control of our own

11   destiny," what does that mean?

12   A.  Well, it meant having little, if any, in the way of third

13   parties involved in the transaction that you had to rely on to

14   get something done.  So we tried to organize this in such a way

15   that our success or failure was within our own control as much

16   as possible.

17   Q.  And, finally, why did you want to move as quickly as

18   possible to get this done?

19   A.  Well, experience had taught us that time was your enemy in

20   deals.  Market conditions change.  Business performance

21   changes.  You know, factors outside of your control insert

22   themselves into your plans.  And so the conditions were good at

23   the time, and we felt like, hey, let's go.

24   Q.  And then, finally, on the right-hand side there is a little

25   box that says "Morningstar's role."  What was Morningstar?

H3gdwal4                          Engles – direct

1    A.  Morningstar was really our third business.  It was a

2    milk-based business but it's what we called value added milk.

3    So milk is in the milk business.  Half and Half would have been

4    in the Morningstar business.  Cottage cheese would have been in

5    the Morningstar business.  Sour cream would have been in the

6    Morningstar business.  So it was products that had slightly

7    more value added nature to them.

8    Q.  Approximately what percentage of Dean Foods did Morningstar

9    make up?

10   A.  10 to 15, something like that.

11   Q.  What were the possibilities for Morningstar in this

12   transaction?

13   A.  Either keep Morningstar as part of the milk business or

14   sell it to further pay down the debt.

15          MR. GOLDMAN:  Now, if we could go to Government

16   Exhibit 460, please, for the witness.

17   Q.  What is this document?

18   A.  These are the minutes of the board meeting that was held on

19   May the 8th, 2012, the Dean Foods board meeting.

20          MR. GOLDMAN:  The government offers Exhibit 460.

21          MR. BERKE:  No objection, your Honor.

22          THE COURT:  Received.

23          (Government's Exhibit 460 received in evidence)

24          MR. GOLDMAN:  If we could zoom in on the top.

25   Q.  Did Tom Davis attend this meeting?

H3gdwal4                          Engles - direct

1   A.  Yes, he did.

2   Q.  Now, did you go through that presentation that we just went

3   through here --

4   A.  Yes.

5   Q.  -- at this board meeting?

6   A.  Yes.

7   Q.  What, if anything, did the board decide at that meeting?

8   A.  The board instructed the management of the company to

9   proceed with work to determine whether the spin-off of

10  WhiteWave was in fact feasible, and commenced the work

11  necessary to effect that spin-off.  That was the principal

12  outcome of the meeting.

13  Q.  And did that outcome give you the authority you needed to

14  pursue the spin-off with great speed?

15  A.  Yes.

16  Q.  Were there some risks that the spin-off would not happen

17  even as you pursued it?

18  A.  Absolutely.

19  Q.  What risks existed at that time?

20  A.  Well, the same risks that derailed us in 2010:  That the

21  business would falter; that the milk market would change and

22  prices would rise, which would impact our profitability; that

23  the debt markets and the bank market would not be receptive or

24  open to us refinancing our mortgages, if you will, refinancing

25  our indebtedness and separating it between the two companies;

H3gdwal4                        Engles - direct

1    and that the markets would not be available or open for us to

2    conduct a public offering of WhiteWave Foods, which was part of

3    the plan that we were developing.

4              MR. GOLDMAN:  If we could pull out, Ms. Meister, and

5    go toward the bottom of the exhibit.

6    Q.  Mr. Engles, if you could read for the board the -- sorry,

7    for the jury, rather, where it begins, "Mr. Engles noted,"

8    about five lines up.

9    A.  "Mr. Engles noted that he expected questions in relation to

10   strategic alternatives from analysts and media during the first

11   quarter earnings call and subsequent thereto.  Mr. Engles

12   reviewed his intended answer to such questions, including his

13   awareness of the value of the WhiteWave-Alpro business and its

14   relative inaccessibility to stockholders in the present

15   structure."

16             MR. GOLDMAN:  And if we could go to the next page,

17   Ms. Meister, so you could continue.

18   Q.  Continue reading.

19   A.  "The company's inability to predict when and if it would be

20   able to unlock that value, and the company's continued analysis

21   of the issue.  The board discussed Mr. Engle's intended

22   responses."

23   Q.  And did the board ultimately agree for you to provide that

24   response to questions about WhiteWave?

25   A.  Yes, they did.

H3gdwal4                          Engles - direct

1            MR. GOLDMAN:  You can take that down.

2   Q.  Now, was the company's and the board's decision to pursue

3   the spin-off confidential?

4   A.  Yes, it was.

5            MR. GOLDMAN:  If we could now go to Government Exhibit

6   605A.

7   Q.  Before we get there, was this spin-off something that was

8   particularly important to the company?

9   A.  Yes.  This is -- separating the company into two parts was

10  one of the most important things that we considered.

11  Q.  Do you see this exhibit in front of you, 605A?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  It is the transcript of the call following -- the

15  conference call with analysts following the release of our

16  earnings that took place on Wednesday, May 9th.

17  Q.  Now, I think you've mentioned this a little bit before, but

18  was this something that you did every quarter?

19  A.  Every quarter, yes.

20  Q.  After you released the earnings, would you hold a

21  conference call with interested parties?

22  A.  Yes.

23  Q.  And how were the company's first quarter's earnings for

24  2012?

25  A.  They were quite good.

H3gdwal4                        Engles - direct

1              MR. GOLDMAN:  Could we go to page 9, please, and

2      highlight the bottom half, including, "Eric Katzman."

3      Q.  Who is Eric Katzman?

4      A.  He was a securities analyst that followed the food group

5      and followed Dean Foods and wrote research on Dean Foods.

6      Q.  Did he know the company well?

7      A.  Yes, he did.  He was a longtime analyst.

8      Q.  In the middle of his question, he says -- oh, I'm sorry.

9      Did I offer this?  I may not have even offered it.

10              The government offers 605A.

11              MR. BERKE:  No objection, your Honor.

12              THE COURT:  Received.

13              (Government's Exhibit 605A received in evidence)

14              MR. GOLDMAN:  If we can publish it.

15      Q.  So there is Eric Katzman.  And then in the middle, he says,

16      "Can you talk a little about at what leverage point WhiteWave

17      is a potential asset to be spun off or sold?"

18              Again, what is this reference to "leverage point" you

19      talked about a little bit?

20      A.  It's again a question about the debt.  And he's asking at

21      what debt level relative to your earnings could you separate

22      WhiteWave from Dean Foods.

23      Q.  And then can you read your response starting from the

24      beginning?

25      A.  "Look, I think we hit this issue head-on at CAGNY in early

H3gdwal4                    Engles - direct

```
 1   2011.  And our point of view with respect to the role that
 2   WhiteWave plays in our portfolio hasn't really changed.  So let
 3   me start by saying we are keenly aware of the fact that -- or
 4   our belief that WhiteWave is a highly valuable property."
 5   Q.  If I could stop you there.
 6             So what are you saying there?
 7   A.  I'm saying, look, what we've been telling you about
 8   WhiteWave hasn't changed.  It's a fantastic business and it's
 9   very valuable to us, and it should be very valuable to the
10   marketplace.
11   Q.  If you could go down --
12             THE COURT:  All right.  Let's pause.  Let's stand up
13   and stretch, ladies and gentlemen.
14             (Pause)
15             I may appoint a callisthenics director from the jurors
16   to lead us in jumping jacks and the like.  All right, you might
17   be the right guy for that.  Get us in shape.
18             JUROR NO. 1:  No problem.
19             (Pause)
20   Q.  Mr. Engles, in the middle of this paragraph, it says,
21   "We're also keenly aware."  Can you begin reading from there?
22   A.  "We're also keenly aware of our duty as a management team,
23   and the board is keenly aware of its duty, to maximize value
24   for its shareholders over time.  So if we don't feel that the
25   value of WhiteWave is being reflected in the aggregate value of
```

H3gdwal4                        Engles - direct

1   Dean Foods, we understand that there is an opportunity to

2   recognize value for our shareholders by separating it.  And we

3   again, I think, stated that very clearly 1.5 years ago.  There

4   have been some constraints on our ability to do so, which we

5   highlighted in 2011.  And those constraints were around the

6   amount of leverage that the businesses, being separated, could

7   sustain and what the appropriate leverage profile was for the

8   businesses if you were to separate" --

9   Q.  Can you go to the next page.

10              (Pause)

11              The top.  Continue, please.

12  A.  -- "if you were to separate them, and litigation that

13  frankly had to be resolved before you could separate the

14  businesses.  We've largely resolved the litigation.  That is a

15  very large net positive for this company, and our leverage

16  level is working down.  So what I would tell you is we don't

17  have a specific leverage target at which we're going to pull

18  the trigger, but we're mindful of the opportunity we think to

19  perhaps accrete value for our shareholders.  And it's something

20  that our management and our board considers on a regular basis.

21  Q.  So when you reference there that you don't have a specific

22  leverage target in which we're going to pull the trigger, was

23  that in response to Eric Katzman's question about the leverage

24  point?

25  A.  Yes.

1          MR. GOLDMAN:  All right.  We can take that down.

2     Q.  Now, you stated earlier that you wanted to move quickly

3     with this spin-off.  Did you have a timeline in mind?

4     A.  Just as quickly as possible.

5     Q.  And what did you think that might be in early May of 2012?

6     A.  I think we believed it would be some months.

7     Q.  Was it -- was the end of the summer a possibility?

8     A.  It was a possibility, yes.

9     Q.  What kind of work did you need to do within the company in

10    order to accomplish the necessary steps to do a spin-off?

11    A.  Well, the first thing that we had to do was to treat these

12    businesses as though they were separate and put in place

13    arrangements that looked like they were arm's length

14    arrangements between two unrelated companies.  So WhiteWave

15    made things for Dean Foods.  Dean Foods made or distributed

16    things for WhiteWave.  And since they were all part of the same

17    company, we didn't pay much attention to what we charged one

18    another, what WhiteWave charged Dean or what Dean charged

19    WhiteWave for those services.  Plus, we did a lot of things for

20    the whole company.  We did payroll for the whole company.  We

21    did bill paying for the whole company.  And we had to create

22    arrangements and systems that treated those as distinct

23    companies so that we could figure out how much money WhiteWave

24    really made.  Because we had to file for an initial public

25    offering, and we had to create financial statements for that

H3gdwal4                          Engles - direct

1   public offering as though WhiteWave was a separate company from

2   Dean Foods, and that was an enormous amount of work.

3   Q.   Now, did there come a time after this point when you were

4   able to determine when you would be able to file the IPO

5   statement that you needed to file with the SEC?

6   A.   At some point in time, yes.

7   Q.   And what date did you ultimately settle upon?

8   A.   We ultimately filed that statement, I believe, on August

9   the 7th.

10  Q.   And was that date ever made public to -- was that date ever

11  made public?

12  A.   Not to my knowledge, yes.

13  Q.   Now, did there come a time in late May when you attended

14  another investor conference?

15  A.   Yes.

16  Q.   Where was that?

17  A.   It was in New York City.

18           MR. GOLDMAN:   If we could pull up Government Exhibit

19  534.

20  Q.   What is this document?

21  A.   This is a transcript of our presentation at the Sanford

22  Bernstein Strategic Decisions Conference on May the 30th, 2012.

23  Q.   And did you attend this conference?

24  A.   Yes, I did.

25  Q.   Is this a transcript of your statements?

H3gdwal4                          Engles - direct

1   A.  Yes, it is.

2              MR. GOLDMAN:  The government offers Exhibit 534.

3              MR. BERKE:  No objection, you your Honor.

4              THE COURT:  Received.

5              (Government's Exhibit 534 received in evidence)

6              MR. GOLDMAN:  If we could go to the bottom of page 8,

7   please, and publish.  Just the very bottom.

8   Q.  Who was Alexia Howard?

9   A.  She was the securities analyst for Sanford Bernstein that

10  covered Dean Foods.

11  Q.  Just generally speaking, what was this question about?

12             You can read the first sentence, if you want.

13  A.  This question is about the WhiteWave spin-off and how they

14  should be thinking about it.

15  Q.  If we could now move to page 9.  And in the middle of the

16  page, paragraph 4 there, can you read this?

17  A.  "And the ability to spin the businesses off, or one of the

18  businesses off, in a tax-efficient manner was not feasible

19  given our level of leverage in the business.  And so we felt

20  that holding the businesses together in order to get to the

21  point where we had more viable strategic alternatives was the

22  right path, and that's the path that we pursued.  And that's

23  the place that we still are today, primarily because we have

24  to, in order to effect a tax-free separation of the businesses,

25  be able to leave each of them with a sound balance sheet.  And

1   while we have made great progress in delevering the business, I

2   don't think we're completely there in terms of our ability to

3   do so today.  But we are delevering rapidly and we continue to

4   monitor the situation carefully."

5           MR. GOLDMAN:  Thank you.  We can take that down.

6   Q.  Now, you described a number of the things that needed to

7   occur before the spin-off could happen.

8           Did there come a time when you decided that you wanted

9   to go with WhiteWave to be CEO?

10  A.  Yes.  Yes.

11  Q.  And ultimately was that decision made?

12  A.  Yes, it was.

13  Q.  And what, if anything, would you do with your role as

14  chairman of the board of Dean Foods if you went to WhiteWave?

15  A.  Well, at the time that I became the CEO of WhiteWave, I had

16  to relinquish my role as the CEO of Dean Foods.  But until Dean

17  Foods completed the spin-off, I remained as the chairman of the

18  Dean board.

19  Q.  Did you devise a succession plan for who would become

20  chairman of the board after you left?

21  A.  Yes, we did.

22  Q.  Who did the board resolve to become chairman of the Dean

23  Foods board?

24  A.  Tom Davis.

25  Q.  During the summer of 2012, were you speaking regularly with

1   Tom Davis about the spin-off?

2   A.  Yes.

3   Q.  Were you providing regular updates to Tom Davis about the

4   progress and details about the spin-off?

5   A.  Yes.

6   Q.  And what effect, if any, did the fact that Tom Davis was

7   going to become Dean Foods' chairman did that have on the

8   frequency of your conversations with him?

9   A.  Well, it increased them because he was -- he now became a

10  principal actor on the Dean Foods' board in deciding matters

11  regarding separation because he was going to become the Dean

12  chairman.

13          MR. GOLDMAN:  We could show the witness Government

14  Exhibit 463 now.

15  Q.  What is this document?

16  A.  These are the minutes of a telephonic meeting of the Board

17  of Directors of Dean Foods on June the 27th, 2012.

18          MR. GOLDMAN:  The government offers 463.

19          MR. BERKE:  No objection, your Honor.

20          THE COURT:  Received.

21          (Government's Exhibit 463 received in evidence)

22  Q.  Well, was Tom Davis at this meeting?

23  A.  Yes.

24          MR. GOLDMAN:  And if we could publish the first sort

25  of update on strategic matters down to the middle of it.  Not

1   that part.  A little higher.  OK.

2   Q.  Now, could you read the first few sentences, please?

3   A.  "Mr. Engles commenced a discussion of the company's

4   strategic matters, following the materials previously provided

5   to the board.  He stated that all business units had performed

6   well in the second quarter of 2012.  He noted that the

7   company's net debt to EBITDA ratio was expected to be below

8   four times by the end of 2012.  He noted that capital markets

9   remained generally favorable and the company was on track to

10   file an S-1 registration statement with the Securities and

11   Exchange Commission in six weeks with respect to a proposed

12   initial public offering of up to 20 percent of the common stock

13   of a company holding the assets of the WhiteWave-Alpro

14   business."

15   Q.  All right.  You can stop there.

16         Now, this was June 27th.  When did the second quarter

17   end?

18   A.  On June the 30th.

19   Q.  So how much of the second quarter's results would you have

20   known by then?

21   A.  We had two months of the closed results, and we had a sense

22   of the sales in June.

23   Q.  And second sentences says that the business units had

24   performed well in the second quarter of 2012, is that right?

25   A.  Yes.

1    Q.  The next sentence, can you just give us a sense of what the

2    four times meant there?

3    A.  It meant that the company had as debt four times the amount

4    of its earnings as measured by this ratio, EBITDA.

5    Q.  And we don't need to go into EBITDA, but how did that

6    compare to what you felt like you needed the company -- where

7    you needed the company to be?

8    A.  That was about where we needed the company to be.

9    Q.  And then what is an S-1 registration statement?

10   A.  It's the document that you file with the Securities and

11   Exchange Commission that is ultimately given to prospective

12   investors that they can use to educate themselves about a

13   business that's going public and helps inform them as to

14   whether or not they want to buy the stock.

15   Q.  And here it says that the company was on track to file it

16   within six weeks.  When was six weeks from June 27th?

17   A.  Sometime in the early part of August.

18   Q.  Now, what else did the company announce in the early part

19   of August?

20   A.  Its earnings.

21   Q.  Did there come -- did there come a time when you decided

22   that you would make this IPO announcement at the same time as

23   the earnings announcement?

24   A.  At some point in time we decided to do it that way, yes.

25   Q.  But by this board meeting on June 27th, did the board know

H3gdwal4                          Engles - direct

1   that the announcement would be made six weeks later, in early

2   August?

3   A.  Well, we indicated that that's -- that we were on track for

4   that, but I wouldn't say that the board knew that with

5   certainty, no.

6   Q.  And why was it not certain?

7   A.  Well, because there was just a lot of work to be done in

8   those six weeks.

9   Q.  And was there still uncertainty as to whether the IPO could

10  occur?

11  A.  Yes.  But the -- the filing of the offering, it was more a

12  matter of uncertainty around time.  Right?  The filing of the

13  offering was in our control.

14  Q.  Now, by the end of June -- we can take that down,

15  Ms. Meister.

16          By the end of June, do you recall how the stock price

17  for Dean Foods was doing?

18  A.  The stock had performed very well in May and June of 2012.

19  Q.  And did there come a time after this June 27th meeting when

20  you learned more definitively how the second quarter results

21  were?

22  A.  Yes.  Once we closed our books in the first ten days of

23  July, we would have known definitively how we did.

24  Q.  And how were those results?

25  A.  They were very good.

1    Q.   Was that an important hurdle for the spin-off?

2    A.   It was important that we be on track with the earnings that

3    we had contemplated when we started the process.

4    Q.   Now, in early to mid-July, when you learned about the

5    company's second quarter earnings, did the public know what

6    those second quarter earnings were?

7    A.   No.

8    Q.   And when were -- remind the jury again when you were going

9    to announce those earnings.

10   A.   In early August.

11   Q.   Now, do you recall what happened to the price of Dean

12   Foods' stock in July of 2012?

13   A.   Well, it started off strong.  It took a precipitous drop in

14   the middle of the month, and then it really stayed down for the

15   rest of the month.

16   Q.   Now, were the company's earnings that you learned in

17   mid-July, was that something that you shared with the board?

18   A.   Yes.

19   Q.   Did there come a time when the board -- when you obtained

20   board approval to go forward with the IPO and spin-off?

21   A.   Yes.

22   Q.   And did you ultimately announce it to the public?

23   A.   Yes, we did.

24            MR. GOLDMAN:  We could show Government Exhibit 706K.

25   Q.   What is this document?

1   A.   This is a press release issued by Dean Foods on August the

2   7th, 2012.

3              MR. GOLDMAN:  The government offers Exhibit 706K.

4              MR. BERKE:  No objection, your Honor.

5              (Government's Exhibit 706K received in evidence)

6              MR. GOLDMAN:  If we may publish it.

7   Q.   And what is the headline of this press release?

8   A.   Dean Foods announces filing of IPO registration statement

9   for the WhiteWave Foods Company.

10  Q.   Now, can you just summarize what you announced to the

11  public about the spin-off on August 7th?

12  A.   We announced that we intended to pursue the spin-off; that

13  the first step of that was the filing, or was the filing of

14  this initial public offering; and that within 180 days

15  following the completion of the initial public offering, or

16  thereabouts, we intended to distribute the shares that Dean

17  Foods owned to its shareholders as a dividend.

18  Q.   To your knowledge, was the public aware that you were going

19  to make this announcement on August 7th?

20  A.   Not to my knowledge.

21  Q.   After this announcement, what aspect of the transaction

22  still needed to be resolved?

23  A.   Which transaction specifically?

24  Q.   The entire spin-off transaction.

25  A.   The entire spin-off?  Well, there was a lot.  We had to

H3gdwal4                              Engles - direct

1    successfully complete the IPO.  We had to arrange bank

2    financing for each of WhiteWave and Dean Foods separate

3    companies.  We had to completely redo their capital structures.

4    Leverage had to get to and remain at levels that would permit

5    that to happen.  Those were the principal things that had to be

6    done.

7    Q.  And in terms of the IPO, was that a certainty at this point

8    or August 7th?

9    A.  No.

10   Q.  What needed to happen with respect -- what was still

11   uncertain with respect to the IPO?

12   A.  Well, the timing was uncertain because we had to have our

13   registration statement approved by the Securities and Exchange

14   Commission so that we could market the stock to the investment

15   community.  And then we had to successfully do so and receive

16   price offers from the investment community that would make this

17   deal work and that were acceptable to Dean.

18   Q.  And was the pricing known on August 7th of the WhiteWave

19   stock?

20   A.  No.

21   Q.  When you say be acceptable to Dean, what do you mean by

22   that?

23   A.  Well, Dean really had two issues with respect to the price

24   that were important to it.  First, it was selling 13 percent of

25   a business that it owned all of, and it needed to, in its duty

1    to its shareholders, make sure that it got a fair price for

2    that.  It was selling a big asset.  So the price had to be a

3    price that could be supported as a fair price for the asset

4    that was being sold.

5           And, secondly, we needed to raise enough money in that

6    offering to make all the other pieces of the financing work, to

7    make the bank financing and the bond financing -- I don't

8    remember if there was bond financing, but if there was, to make

9    that all work.  So the amount of money to be raised was an

10   important consideration, and the price was an important

11   consideration.

12   Q.  Without knowing the price of the WhiteWave IPO, was it

13   possible to know with specificity what WhiteWave would be

14   valued at?

15   A.  No.

16          MR. GOLDMAN:  We could now show the witness Government

17   Exhibit 467, please.

18   Q.  What is this document?

19   A.  These are the minutes of a telephonic meeting of the board

20   of directors of Dean Foods on September the 12th, 2012.

21          MR. GOLDMAN:  The government offers Exhibit 467.

22          MR. BERKE:  No objection, your Honor.

23          THE COURT:  Received.

24          (Government's Exhibit 467 received in evidence)

25          MR. GOLDMAN:  If we could zoom in on the paragraph,

H3gdwal4                          Engles – direct

1    "Update on Strategic Matters."

2    Q.  Was this a regularly scheduled board meeting?

3    A.  I don't believe so, no.

4    Q.  And if you could read the sentence towards the end that

5    begins with "Mr. Fugger?

6    A.  "Mr. Fugger reviewed a potential timeline for the initial

7    public offering with the most optimistic timing resulting in

8    the offering being consummated in mid to late October."

9    Q.  Was that date of mid to late October a date known to the

10   public?

11   A.  No.

12   Q.  Was that confidential?

13   A.  Yes.

14   Q.  Were other discussions with the board about the pricing or

15   timing of the IPO confidential communications?

16   A.  Yes.

17            MR. GOLDMAN:  And if we could now show Government

18   Exhibit 1929.  Just zoom in on the top third.

19   Q.  What is this document?

20   A.  This is an email from me to Joe Harden and Tom Davis, dated

21   September 16, 2012.

22            MR. GOLDMAN:  The government offers Exhibit 1929.

23            MR. BERKE:  No objection, your Honor.

24            THE COURT:  Received.

25            (Government's Exhibit 1929 received in evidence)

H3gdwal4                          Engles – direct

1               MR. GOLDMAN:  And we may publish it.

2    Q.   Who was Joe Harden?

3    A.   Joe Harden was a member of the Dean Foods Board of

4    Directors and he had been designated as our lead director.

5    Q.   If you could just read the first paragraph, please?

6    A.   "Joe and Tom, given the pace of things on the WhiteWave

7    front and the fact that Joe is going to head for Africa on the

8    24th and will be hard to reach, I thought it would be useful to

9    try and get the remaining big governance issues resolved before

10   Joe leaves.  We are trying to schedule a board meeting to

11   tackle those issues on Friday afternoon this coming week."

12               (Continued on next page)

1          MR. GOLDMAN:  Not sure that the jury saw it.  But you

2     can catch up with us, we just read the first paragraph.

3     Q.  Why did you include Tom Davis on this e-mail?

4     A.  Well, because following the spinoff, Tom was going to be

5     the chairman of the board of Dean, and would be the member of

6     the Dean board who was -- had principal responsibility for its

7     governance practices.

8     Q.  Did you regularly consult with Tom Davis during the time

9     period between the announcement on August 7 and the IPO at the

10    end of October?

11    A.  Yes, I did.

12    Q.  Did Tom Davis know details of the transaction that were not

13    public?

14    A.  Yes, he did.

15         MR. GOLDMAN:  If we can go to Government Exhibit

16    706-P.  Zoom in on just the top third.

17    Q.  What is this document?

18    A.  It's a press release issued by Dean Foods on September 26,

19    2012.

20         MR. GOLDMAN:  Government offers Exhibit 706-P.

21         MR. BERKE:  No objection, your Honor.

22         THE COURT:  Received.

23         (Government's Exhibit 706-P received in evidence)

24         MR. GOLDMAN:  If we can publish.  Can you see it?

25         A JUROR:  Not yet.

1            MR. GOLDMAN:  I have nos and yeses.

2            A JUROR:  There it is.

3    Q.  What is the headline of this press release?

4    A.  "Dean Foods Explores Sale of Morningstar Business."

5    Q.  Prior to this announcement, was it public knowledge that

6    Dean Foods intended to sell the Morningstar business?

7    A.  No, it was not.

8    Q.  What affect would the sale of the Morningstar business have

9    on Dean Foods' bottom line?

10   A.  It would allow Dean Foods, because it would get cash for

11   the sale, to pay down more of its debt.

12   Q.  Did you discuss with the board the prospect of selling

13   Morningstar prior to this press release?

14   A.  Yes.

15   Q.  Did you receive approval to sell the Morningstar business

16   from the board?

17   A.  We certainly received approval to evaluate it, or we

18   wouldn't have put this press release out.

19            THE COURT:  Ladies and gentlemen, at the conclusion of

20   the case, when you're deliberating, you will have the exhibits

21   that have been received into evidence with you in the jury room

22   and you can look at them at your leisure at that point.  So

23   you'll have everything, even if it wasn't shown on the screen

24   for some reason.  Go ahead.

25            MR. GOLDMAN:  Thank you, your Honor.  I'm almost

1    finished.

2              If we can go to Government Exhibit 529.

3    Q.  What is this document?

4    A.  This is an e-mail from Steve Kemps to the board of

5    directors of Dean Foods dated October 5, 2012.

6              MR. GOLDMAN:  The government offers Exhibit 529.

7              MR. BERKE:  No objection, your Honor.

8              THE COURT:  Received.

9              (Government's Exhibit 529 received in evidence)

10             MR. GOLDMAN:  If we can publish it.

11   Q.  If you can read the second sentence, please.

12   A.  "We remain on track to potentially launch a roadshow on

13   Tuesday, October 16, which would require the red herring

14   prospectus to be filed on Monday October 15."

15   Q.  What is the -- you mentioned a roadshow before.  What would

16   be -- sorry.

17             What was the roadshow with relation to the WhiteWave

18   IPO?

19   A.  We went out to many cities in the United States where there

20   are large institutional investors, and we held meetings with

21   them to basically pitch them on WhiteWave and tell them why it

22   was a great investment.

23   Q.  What is the red herring prospectus?

24   A.  It is the prospectus that you send to investors before the

25   roadshow begins and it's used for marketing the stock.  It's

1    the next to last prospectus, last prospectus is filed after the

2    offering price is determined, which follows the roadshow.

3             THE COURT:  It has red ink on its cover.

4             THE WITNESS:  Which is why it's called a red herring.

5    Q.  So, did you have a sense of the timing of the IPO as of

6    this e-mail?

7    A.  Yes, we had a sense of it.

8    Q.  Did there come a time when WhiteWave announced to the

9    public the timing and the price information of the IPO?

10   A.  There came a time, yes.

11            MR. GOLDMAN:  If we can show Government Exhibit 888-A,

12   please.

13   Q.  What is this document?

14   A.  This looks like Form S-1 filed with the United States

15   Securities and Exchange Commission.

16   Q.  What is the date on the top in the middle there?

17   A.  October 17, 2012.

18            MR. GOLDMAN:  Government offers Exhibit 888-A.

19            MR. BERKE:  Your Honor, I have no objection.  Just

20   noting, I think it may be an excerpt of the document, not the

21   whole document.  I don't know if that's intended.

22            MR. GOLDMAN:  We put an excerpt in the exhibit

23   binders, but we have the entire document.

24            MR. BERKE:  No objection.

25            THE COURT:  So the entire document will be in

1    evidence?

2              MR. GOLDMAN:  The entire document is in evidence, yes.

3              THE COURT:  Received.

4              (Government's Exhibit 888-A received in evidence)

5              MR. GOLDMAN:  If we can publish to the jury.

6    Q.  So, what is this document?

7    A.  This is one -- it is an amendment to the Form S-1, it may

8    be the last amendment, it may be final, I don't know.

9              MR. GOLDMAN:  If we can go to page two, please.  Zoom

10   in on the top half there.

11   Q.  Can you read across the row that says class A common stock.

12   A.  Yes.  "Class A common stock, one penny par value per share.

13   Amount to be registered:  23 million shares.  Proposed maximum

14   offering price per share:  16.  Proposed maximum aggregate

15   offering price:  $368 million.  Amount of registration fee:

16   $50,195.20."

17   Q.  So, what relevant information to the IPO was included in

18   this S-1 registration statement?

19   A.  How many shares we intended to sell, what we -- our

20   estimate of the price at which we would sell them, and the

21   amount of proceeds that would be raised by selling those

22   securities.

23   Q.  On the left, numeral two or number two, it says

24   "anticipated between to be between 14 and $16 per share."

25   A.  Yes.

H3G3WAL5                          Engles - direct

1    Q.   What is that?

2    A.   That's called the range.  You go out when you start a

3    roadshow and you say to people, hey, we think we're going to

4    sell these shares between 14 and $16 a share.  And then

5    following the end of the roadshow, you actually price it.  And

6    sometimes you raise the range if you get a good response, and

7    sometimes you lower the range if you get a bad response while

8    you're on the roadshow.

9              MR. GOLDMAN:  We can take that down.

10   Q.   What ultimately happened with the IPO?

11   A.   It priced in late October.  I believe it priced at $17 a

12   share, so slightly above this range.  I don't remember if we

13   sold more shares or not, frankly.

14   Q.   Ultimately, did the Dean Foods' shareholders receive more

15   value for their shares after the company split into two?

16   A.   You might have to ask me that question again.  I'm not sure

17   I track what the question --

18   Q.   Did Dean Foods' shareholders, as of August 7, 2012,

19   ultimately receive more value for their shares after the

20   spinoff was completed in May of 2013?

21   A.   Yes.  The stock ultimately went up.

22   Q.   Was the spinoff the success that you thought it would be?

23   A.   Yes, it has been.

24   Q.   Finally, Mr. Engles, have you spoken to Tom Davis about

25   this case at all?

1     A.  I have not.

2                MR. GOLDMAN:  One moment, your Honor.

3                THE COURT:  Yes.

4                MR. GOLDMAN:  No further questions.

5                THE COURT:  All right.  You may cross -- in fact, what

6     we'll do, we'll take a 10-minute recess.

7                Do not discuss the case among yourselves or with

8     anyone.  We'll be back in 10 minutes, ladies and gentlemen.

9                (Jury excused)

10               THE COURT:  See you in 10 minutes.

11               (Recess)

12               (In open court; jury present)

13               THE COURT:  Mr. Berke, whenever you're ready.

14               MR. BERKE:  Thank you, your Honor.

15    CROSS-EXAMINATION

16    BY MR. BERKE:

17    Q.  Mr. Engles, I believe you said yesterday that you had never

18    had a conversation with Mr. Walters about Dean Foods, is that

19    correct?

20    A.  That's my recollection, yes.

21    Q.  But am I right that long before this case, you did know of

22    Mr. Walters as a friend of Tom Davis?

23    A.  I did, yes.

24    Q.  You knew him, as described by Mr. Davis, as a legendary

25    gambler, a larger-than-life swashbuckling-type character?

H3G3WAL5                          Engles - cross

1   A.   Yes.

2   Q.   That was, other than what you knew through his friendship

3   with Mr. Davis, that's really all you knew of Mr. Walters and

4   continue to know of him, right?

5   A.   Yes, that's correct.

6   Q.   So, what I'd like to do, Mr. Engles, is you talked

7   obviously a lot about Dean Foods during the period we're

8   talking about, 2008 to 2012.  And what I'd like to do is take a

9   deeper dive on some of the things you talked about, about the

10  business during that period, from the perspective of a

11  potential investor who would like to do as much research as

12  possible to try to --

13            MR. GOLDMAN:  Your Honor, is there a question here?

14            THE COURT:  Yes.  Mr. Berke.

15            MR. BERKE:  Yes.

16            THE COURT:  Put a question to the witness.

17  Q.   So let me now go, so obviously you've testified that Fresh

18  Dairy Direct, main component of Dean Foods during that time

19  period?

20  A.   Yes.

21  Q.   Fresh Dairy Direct, am I right, was made up of two

22  principal components, right?  There was a private label, and

23  then the branded portion, is that correct?

24  A.   Yes.  Just to elaborate a little bit, the milk business

25  produces brands that we sell, like in this marketplace, Tuscan

H3G3WAL5                          Engles - cross

1  or Lehigh Valley, for example, and we also produce products for

2  retailers themselves that they sell under their brands like

3  Great Value for Walmart, yes.

4  Q.  Just to understand the business, your brands you can

5  typically sell at a premium to where you sell the private label

6  for other people's brands, is that correct?

7  A.  Yes, we typically got more money for our own brands.

8  Q.  So it's fair to say that an investor who is interested in

9  maybe making an investment or a bet on the company, one thing

10 he can look at is how do the businesses relate to each other

11 since you have higher margins in your branded business than in

12 your private label business, correct?

13 A.  Yes.

14 Q.  Also we talked about, obviously, we talked a lot about

15 WhiteWave is the second, and you talked a little bit -- the

16 second component of the Dean Foods business, correct?

17 A.  Yes.

18 Q.  And you talked today about Morningstar, and I think you

19 described what that was.  Morningstar also had a restaurant

20 component.  For example, didn't it do the McDonald's coffee

21 that they sold, the fancy coffee sold by McDonald's?

22 A.  Yes.  Morningstar manufactured products for sale under

23 store brands, primarily at retail, so if you go to grocery

24 store.  And then they manufactured products for sale in what we

25 call the food service channel, so we would make products that

1    Sysco would deliver to the restaurant to use there, or that

2    McDonald's would use, for example, to make a milkshake.

3    Q.   But Fresh Dairy Direct was responsible for roughly

4    three-quarters of the revenue of the company for much of that

5    period, correct?

6    A.   Yes.

7    Q.   Not only that, but Fresh Dairy Direct was far and away the

8    largest milk provider in the United States?

9    A.   Without a doubt.

10   Q.   It represented well over -- is it well over 35 --

11   38 percent of the milk consumed in our country?

12   A.   Correct.

13   Q.   It's five times as large as its next larger competitor?

14   A.   Correct.

15   Q.   In terms of looking how Dean Foods through its

16   three-quarters of its business Fresh Direct portion, you can

17   get a sense of how it's going to be affected by the various raw

18   materials and factors that affect the milk industry as a whole,

19   because it was so large and dominant, correct?

20   A.   Yes.

21   Q.   You've talked at length about raw milk prices as one of the

22   key factor that could influence the profitability or margins of

23   Dean Foods, correct?

24   A.   Correct.

25   Q.   That is something -- raw milk prices are set by the

H3G3WAL5                          Engles - cross

1   government, correct?

2   A.  Minimum, the minimum price is set by the government.  And

3   then farmers or co-ops would typically add fees and expenses on

4   top of that.  But yes, the government announced price, and the

5   price we paid were moved in lockstep.

6   Q.  That's fair correction.  And the government price for raw

7   milk comes out once a month, correct?

8   A.  Yes, it does.

9   Q.  So that there is a constant effort by sophisticated

10  investors who are looking at the milk industry to try to

11  predict what might happen with milk prices over time?

12          MR. GOLDMAN:  Objection, your Honor.

13          THE COURT:  I'm going to sustain that question.

14  Q.  You understand, sir, that investors in Dean Foods looked to

15  how they believed the milk prices might change over time in

16  making investment decisions, correct?

17  A.  Yes, they did.

18  Q.  You and others at the company sometimes addressed your own

19  views about what might happen to the raw milk commodity prices

20  over time, correct?

21  A.  Very often.

22  Q.  In fact, there are something called "futures."  That is a

23  separate creation of Wall Street, is that correct?

24  A.  Yes.

25  Q.  Futures are when investors are literally making separate

H3G3WAL5                        Engles - cross

1   bets about how various commodity prices, including dairy, may

2   go up or down over time, correct?

3   A.  Yes, they are.

4   Q.  There is a whole industry where people are on either side

5   of a bet about whether they're going to go up or down, correct?

6   A.  Yes, there is.

7   Q.  Again, just to drill down a little bit further for the way

8   Dean Foods' business operated, if you look at this one factor,

9   there was a lag in terms of how your profitability could be

10  affected, depending on what happened on this monthly changing

11  milk price, correct?

12          THE COURT:  Do you understand the question?

13          THE WITNESS:  Not exactly.

14  Q.  Let me rephrase.  If you don't understand the question,

15  please tell me, I'll rephrase any.

16          So, is it fair to say that the Dean Foods'

17  profitability is affected most by the trajectory of the raw

18  milk prices as opposed to the actual raw milk prices?

19  A.  Absolutely.

20  Q.  That's because when a raw milk price, for example, falls,

21  the retailers' price for milk doesn't fall immediately,

22  correct?

23  A.  That's correct.

24  Q.  So there is a period of time when Dean Foods may pay less

25  for milk but get the same price when they sell it and make

 1   greater profits or margins for a period of time, correct?

 2   A.  Yes.  And the opposite happens when milk prices are going

 3   up.

 4   Q.  Exactly.  That's something, if someone is a sophisticated

 5   investor researching Dean Foods, they may try to predict how

 6   future quarters may be affected based on what happens with

 7   milk, based on your understanding of the investors in Dean

 8   Foods?

 9            MR. GOLDMAN:  Objection, your Honor.

10            THE COURT:  Sustained.

11   Q.  Let me rephrase.  You understood that investors in Dean

12   Foods were very interested in the company's views about how

13   changing milk prices may affect future quarters, correct?

14   A.  Yes.

15   Q.  There are other factors as well that influence Fresh Direct

16   like resin that can be used for the containers.  I think you

17   referenced that as well?

18   A.  Yes, we use it to make plastic bottles.

19   Q.  Just to take a deeper dive, for someone who wants to

20   research what's going on with resin, is it fair to say the

21   price of resin is affected by more than one factor?

22   A.  Yes.

23   Q.  So, for example, resin is affected by fuel.  Is fuel

24   required for resin?

25   A.  Yes, it's made out of natural gas, basically.

1    Q.  So you want to look at whether natural gas prices are up or

2    down to determine the price of resin, correct?

3    A.  Natural gas prices, oil prices, the oil complex, yes.

4    Q.  And again --

5            THE COURT:  We're talking about the materials that go

6    into the making of a plastic bottle?

7            THE WITNESS:  The jug.

8            THE COURT:  The jug in which you find your milk in

9    your grocery store.

10            THE WITNESS:  Yes.

11    Q.  Am I right, sir, in terms of the changing energy complex or

12    fuels, that also affects Dean Foods based on a trajectory, so

13    there is a delay in how it may impact quarters of Dean Foods?

14    A.  Yes.  The same affect as milk basically, it lags.

15    Q.  I'm sorry.

16    A.  Well, the price that Dean as a manufacturer paid would tend

17    to lag what got incorporated in Dean's prices to its customers,

18    so the same affect as milk.

19    Q.  Isn't it also true, sir, that diesel fuel price also can

20    have a direct impact on the profitability of Dean Foods,

21    because they need it for the machinery and the operation of

22    your facilities?

23    A.  Yes.  And we had 6,000 trucks that we ran every day.

24    Q.  And again --

25    A.  That run on diesel fuel.

1    Q.  The impact they had on the company, there will be a lag

2    that investors will try to pay attention to, based on your

3    experience?

4    A.  Absolutely.

5    Q.  Am I also right another factor that someone researching,

6    going to make decisions about how to invest in Dean Foods may

7    look at is the seasonal nature of the profitability of the

8    Fresh Dairy Direct component of your business, correct?

9    A.  Yes.

10   Q.  For example, given how the business operates, first quarter

11   is usually strongest of all the four quarters, correct?

12           I'm sorry.  I'm sorry.  I meant to say the first

13   quarter is typically the weakest of the quarters.

14   A.  No.  The -- there was a seasonality to Dean Foods for sure.

15   But, it was more driven by schools being in session or out of

16   session.  So the summer months often are -- in the milk

17   business, the least profitable months because school milk made

18   up about 8 percent of our volume.  And when schools are not in

19   session in the summer, our volumes are down, our sales were

20   down, our profitability was lower.

21   Q.  So forget which month.  There is a seasonality aspect that

22   investors would also look at to try to predict profitability,

23   correct?

24   A.  Yes.

25   Q.  And is it also fair, sir, that as of 2007, at least, so

1    prior to the period I'm asking about, 2008 to 2012, the milk

2    industry became much more of a global market than a domestic

3    market?

4    A.   The -- yes, around that time, there was the emergence of a

5    global impact on U.S. milk prices.

6    Q.   But it became -- because milk is also produced in other

7    countries, correct?

8    A.   Yes.  It's a little bit of a complicated topic.  But, there

9    was not a lot of milk imported or exported from the United

10   States prior to 2007.  In 2007, one of the other large global

11   producers developed a global trading exchange for dairy

12   commodities that set prices outside of the United States.  And

13   that emergence began to influence the price of milk in the

14   United States.

15   Q.   So can we say in 2007 your milk prices began to be more set

16   by what's happening in the global market for dairy commodities

17   than the domestic supply-and-demand balance in the United

18   States, which was the traditional driver of milk prices up

19   until that point?

20   A.   Well, what I would say is after 2007 it was more influenced

21   than it had been prior to 2007.

22   Q.   Would you disagree with what I said, sir?

23   A.   Yes, I would in the sense that domestic supply-and-demand

24   is still the primary driver of milk prices in the United

25   States.

H3G3WAL5                          Engles - cross

1    Q.  Sir, can I show you what's been marked for identification

2    but not in evidence as Government Exhibit 604-B.

3    A.  Sure.

4    Q.  Do you recognize that as a second quarter 2011 earnings

5    call transcript for Dean Foods Company?

6    A.  Yes.

7            MR. BERKE:  Your Honor, I would offer what's been

8    marked for identification Government Exhibit 604-B.

9            MR. GOLDMAN:  One minute, your Honor.

10           THE COURT:  Sure.

11           MR. GOLDMAN:  Your Honor, I'm not sure what the

12   purpose of introducing it.  It is hearsay.

13           THE COURT:  Well, this is a call transcript from Dean

14   Foods.  Did you not offer transcripts from earnings calls on

15   your direct examination?

16           MR. GOLDMAN:  We did.

17           THE COURT:  What's the difference?

18           MR. GOLDMAN:  I'm not -- I'm not sure what purpose

19   Mr. Berke is trying to use this.

20           THE COURT:  I'll take it subject to a motion to

21   strike.  You may continue.

22           (Government's Exhibit 604-B received in evidence)

23   Q.  Can I direct your attention to page eight of this earnings

24   call transcript.

25   A.  Sure.

Q.  You see where it begins "and sir"?  Do you see that?  We
can first go to the question.

A.  Would you like me to read it?

Q.  Let me just point it out for you.  Thank you.

        And you see that Alexia Howard, Sanford Bernstein,
that's also an analyst, correct?

A.  Yes, it is.

Q.  She has two questions.  And asking about -- just to
summarize, we don't have to go through it, but asking about is
it possible you might see an overhaul of the way the class one
milk prices stacked as part of the fondue it says in 2012 that
might reduce volatility?

A.  My guess is that transcription was garbled, but yeah, I see
the question.

Q.  Can I go to your answer, and I want to highlight the
sentence that begins with "2007."  It says "as to the milk
price expectations," I'm sorry.  See the second sentence?

A.  Yes.

Q.  "As to the milk price expectations" if we can take that
down to the word "time."

A.  "As to the milk price expectations going forward,
increasingly, Alexia, really starting in 2007, our milk prices
have begun to be set more by what's happening in the global
market for dairy commodities than the domestic
supply-and-demand balance in the United States, which was the

1    traditional driver of the milk price up until that point in

2    time."

3    Q.  So that's what you had said in 2011 to your investors on an

4    earnings call, correct?

5    A.  Yes.

6    Q.  Is it fair to say that's an accurate description of what

7    was going on in the global market at that time, sir?

8    A.  What I would say, it is a one-sentence answer to a

9    complicated question.  And that clearly, beginning in 2007,

10   global prices had a bigger impact on U.S. dairy prices than it

11   had historically.

12   Q.  Again, I don't want to get down too much in the details on

13   this.  You would agree about the impact of the global economy

14   that started to change right before 2008, correct?

15   A.  No question about that.

16   Q.  So no doubt somebody who is researching Dean Foods for

17   investment needs to pay attention to everything that could

18   impact the global market, correct?

19   A.  You betcha.

20   Q.  Particularly fluctuations in U.S. currency?

21   A.  Currency was definitely important because they change the

22   price of goods --

23            MR. GOLDMAN:  Can he finish his answer.

24   A.  Currencies are important because they change the price that

25   buyers in the global market outside the United States

H3G3WAL5                         Engles - cross

1    experience.  Cost of the currency is important.

2    Q.  Is it also true, sir, there is a general lack of storable

3    dairy commodity inventories in many parts of the world?

4    A.  There are from time to time.  And from time to time we have

5    too much.

6    Q.  If we talk about 2008, would it be fair to say during that

7    time, relatively small changes in global supply or demand

8    dynamics would likely have an outsized effect on domestic dairy

9    prices?

10   A.  Yes.

11   Q.  So again, starting in 2007, this is yet another variable

12   that could have a significant impact on the business of Dean

13   Foods, given what a big footprint it has on the U.S. dairy

14   market, correct?

15   A.  Correct.

16   Q.  Sir, fair to say during the 2008-2009 period, during the

17   financial crisis, you recall that the dollar became sort of

18   devalued or the currency level was low vis-a-vis other

19   currencies?

20   A.  I --

21   Q.  There was a depreciation of our currency?

22   A.  I thought there was an appreciation of our currency during

23   the credit crisis.  But, I thought we were the store value that

24   the market rushed towards.  But our currency moves around, so I

25   don't have a great recollection.

1    Q.  Let me ask you, do you recall in 2008 you had expressed the

2    view that the depreciation of our currency at that time had

3    made the United States effectively the world's lowest cost

4    producer of dairy proteins?

5            Sorry, was the answer "yes"?

6    A.  Yes.

7            MR. BERKE:  Just for the record, the witness was

8    shaking his head up and down.  But it didn't seem like I'm

9    directing your answer.  Thank you.

10   Q.  So again, an investor could look, just as you understand

11   that there is a whole Wall Street industry where people make

12   bets on how the U.S. currency may change vis-a-vis currencies

13   all over the world, that same bet could impact significantly

14   Dean Foods, correct?

15   A.  Yes.

16   Q.  Turning now to the farmer side of it.  Right.  One of the

17   farmers' largest input to what they need to charge for milk is

18   grain, correct?

19   A.  Correct.

20   Q.  And so, when grain prices go up, that can dramatically

21   affect the price Dean Foods has to pay for milk in a variety of

22   ways, correct?

23   A.  Over time, yes.

24   Q.  And again, there is a trajectory to that as well, correct?

25   A.  Yes, there is.

1    Q.  Just to be clear, for each of these factors, someone

2    researching Dean Foods, wanting to make an investment or bet,

3    would need each of these factors, would want to research both

4    how the factor may change and also what the trajectory might

5    be, based on your experience of Dean Foods' investors?

6              MR. GOLDMAN:  Objection, your Honor.

7              THE COURT:  Sustained as to form.

8    Q.  You understood, sir, looking at each of these factors

9    there's two components, one being how the price may change, the

10   other being the trajectory?

11   A.  Yes.

12   Q.  So, grain prices, am I right if grain prices go up too

13   significantly, one thing that farmers may do in response is cut

14   their herd of cows?

15   A.  Yes.

16   Q.  And again, we're talking details.  That means they may use

17   their cows for other things than milk, correct?

18   A.  Yes.

19   Q.  Being polite for all sensitivities.

20   A.  You can occasionally find them at McDonald's.

21   Q.  I understand.

22   A.  During that period of time.

23   Q.  And that may cause the raw price of milk to go up, and

24   again, affect the profitability of Dean Foods, correct?

25   A.  Yes.

1    Q.  The price, another thing that might happen if grains go up

2    a lot, is farmers may feed their cows less grain, which would

3    mean the cows would produce less milk?

4    A.  Yes.

5    Q.  Also having the same impact, correct?

6    A.  Yes.

7    Q.  And again, like other things we talked about, there is a

8    whole Wall Street industry on grain futures where people --

9    where different investors get on both sides of a bet about

10   whether grain will go up or down for a period of time, correct?

11   A.  Correct.

12   Q.  And yet another factor, two-part factor, again, for Dean

13   Foods, on the price change and the trajectory through the

14   profitability of Dean Foods, correct?

15   A.  Correct.

16   Q.  Sir, in addition to -- I think you had said already, am I

17   right, sir, that the company -- that you and others at the

18   company at various points would share with investors your views

19   about the long-term outlook on any number of these factors,

20   correct?

21   A.  Yes, we would.

22   Q.  You would also look back and say this is how I think

23   changes in these prices that did occur may impact us in the

24   future, correct?

25   A.  Yes, we did.

H3G3WAL5                           Engles - cross

1   Q.  And am I right, sir, that you're familiar with analysts who

2   would also make predictions to the marketplace about how all of

3   these factors may influence the performance of Dean Foods,

4   correct?

5   A.  Yes, they did.

6   Q.  For example, sir, do you recall that in June 2008, there

7   was a concern that commodity prices like the grains would go

8   up, and because of those concerns, Dean Foods' price fell

9   significantly, like 7 percent?

10  A.  I don't remember the specific concern or the fall of the

11  stock, but clearly through late 2007 and 2008, it was a lot of

12  volatility in the stock, there was a lot of uncertainty about

13  what was going to cause Dean Foods' performance to increase or

14  decrease, and that could well have been one of those items.

15  Q.  Maybe we don't have to get bogged down in the details.

16  Would you agree with me there is often disagreement about how

17  much commodity prices could impact Dean Foods' performance over

18  time, correct?

19  A.  Absolutely.

20  Q.  And also be fair to say that at times the company,

21  including yourself, would speak out and say you think the

22  market overreacted because the commodity prices won't have the

23  impact that it appears to be motivating some of the selling?

24  A.  Yes, there were times when we gave the market our opinion.

25  Q.  Another factor that impacted not just the Fresh Dairy

H3G3WAL5                          Engles - cross

1   Direct business but also the organic business, the

2   WhiteWave-Alpro business, could be oversupply, is that correct?

3   A.  Yes, there were periods of oversupply in that business as

4   well.

5   Q.  During the period we're talking about, the 2008 and 2012

6   period, the problem of oversupply was another factor that

7   impacted the profitability of Dean Foods?

8   A.  Yes, the supply and demand balance of organic milk was an

9   important factor for Dean during some of that period.

10  Q.  You recall, sir, that the oversupply of milk was also --

11  oversupply of product was also an issue for your traditional

12  milk, your Fresh Dairy Direct, during that same period of time?

13  A.  Ask the question again please?

14  Q.  Do you recall that there was also an issue of oversupply of

15  your regular milk, of the Fresh Dairy Direct business, during

16  the 2008-2012 period?

17  A.  No.  That -- that basically can't happen in the

18  conventional business, because we only order from our co-ops

19  the amount of milk that we need in the conventional milk

20  market.

21         In the organic milk market it was a problem, because

22  we had contracts with farmers where we said we'll take all of

23  your milk, even if it was more than we needed.  So, that really

24  wasn't oversupply or undersupply affected the price of

25  conventional milk, but it wouldn't affect the amount that we

1    had to take, and therefore we didn't get stuck with extra

2    conventional milk.

3              THE COURT:  Wait until the witness finishes his

4    answer.

5              MR. BERKE:  Of course, Judge.

6    Q.  Mr. Engles, are you done?

7    A.  Yes.

8    Q.  Okay.  So let me ask this differently.  But in 2008 was

9    there a period of time when the export demand for domestic

10   production of milk fell because there was an increase of

11   production of milk in New Zealand and -- well, particularly in

12   New Zealand, dairy production increased?

13   A.  How long do you have?  It is a little bit of a complicated

14   answer.

15             So, the way that milk business works globally is that

16   milk is a very perishable commodity.  The jury knows that

17   because it goes off in about 10 days in your fridge.  So,

18   liquid milk is not distributed around the world.  The way that

19   the global markets impact the milk market are that liquid milk

20   is converted to non-fat dry milk powder and butter, primarily.

21   Those are very long shelf-life items, and those could be

22   shipped and stored around the world.

23             So, the way global demand for milk affects the U.S.

24   milk system is that global demand for powder or butter would

25   draw down our stocks in the United States and drive up the

price of powdered milk or butter.  And that then would, because

of how the government sets price, drive up the price of the

liquid milk that we bought.

         But, the liquid milk system in the United States is

structured so there is also enough liquid milk for bottlers,

because there are tiered prices.  Farmers get paid more for

milk that they would ship to me as a bottler than they would if

they shipped to a powder plant or butter plant.  So liquid milk

plants are always supplied first, and they're always adequately

supplied.

Q.  Do you recall, was there an oversupply of milk in -- New

Zealand is a producer of milk?

A.  It is the biggest global exporter of milk.

Q.  Do you recall that in late 2008, that time period, they

significantly increased the production?

A.  Yes, if they had a very good season for producing milk in

New Zealand, and they put those supplies on the market, that

would tend to depress the price of milk powder everywhere in

the world.  And if U.S. milk powder prices went down, then U.S.

milk prices for all uses of milk would also go down.

Q.  I probably could have got there quicker.  In other words,

that is something that could also have an impact on Dean Foods

and its profitability?

A.  Yes, sir.

Q.  Also the state of the economy can have a significant impact

H3G3WAL5                          Engles - cross

1   on Dean Foods' --

2   A.   Sure.

3   Q.   -- profitability, correct?

4           Because I think you've said that you have nearly a

5   full saturation because most everyone uses milk in some way,

6   correct?

7   A.   Yes.

8   Q.   But, the practices of both consumers as well as retailers

9   can change in a depressed economy, correct?

10  A.   Absolutely.

11  Q.   So, for example, and again, that's what we were dealing

12  with during the 2008-2009 period, do you recall that?

13  A.   Yes.

14  Q.   One of the factors is it reflected a move by consumers away

15  from your branded milk, like Tuscan and others that you talked

16  about, towards the -- if you want to say the private label or

17  more generic milk sold through the supermarket or other chains,

18  correct?

19  A.   Yes.

20  Q.   That obviously had lower profitability?

21  A.   Yes.

22  Q.   So again, another factor is to try to predict what might

23  happen with the economy and how it would impact consumers'

24  practices, correct?

25  A.   Yes, sir.

H3G3WAL5                          Engles - cross

1    Q.  On that, the 2009 and 2010 period was particularly

2    significant in terms of how this factor impacted Dean Foods,

3    correct?

4    A.  It was.

5    Q.  Because there was the famous or "famous" -- there was the

6    well-known and publicized, at least in the industry, milk wars,

7    correct?

8    A.  Yes.

9    Q.  And am I right that what happened is, because consumers

10   were shopping less more generally, retailers tried to use milk

11   to encourage consumers to come to their stores?

12   A.  Yes, it was really because consumers didn't have the money

13   to spend that they used to because of the financial crisis.

14   And so, grocers tried to lure those shoppers to their stores by

15   appealing to them with very low priced milk, which was in

16   almost everybody's grocery cart.

17   Q.  Right.  And in fact, your understanding, sir, that there

18   was a time, and again, all the factors people are familiar with

19   that so negatively impacted our economy, where retailers were

20   selling milk without getting any profit just to attract

21   consumers to their stores?

22   A.  Oh, there was a time when they were losing a lot of money

23   on every gallon they sold to attract consumers to their stores.

24   Q.  Which obviously had a significant impact on the largest, by

25   far, provider of milk to those retailers?

1     A.   Absolutely.

2     Q.   Sir, do you remember that, again, during the time we're

3     talking about, there was a time where a gallon of private label

4     milk was selling for less money than a half gallon of your

5     branded milk?

6     A.   I do.

7     Q.   That was a very, very difficult business model at the time,

8     correct?

9     A.   Exceptionally hard.

10    Q.   So, investors who are committed to understanding as best as

11    they can what might happen with Dean Foods, would have a lot to

12    try to understand to make bets on in terms of making investment

13    decisions in Dean Foods, correct?

14    A.   We were very hard to understand for a while.

15    Q.   There was a lot to look at to try to figure out if you

16    could get it right, correct?

17    A.   Yes.

18    Q.   There was a lot of other factors that continued during the

19    2008 and 2012 period that also had a real impact on what Dean

20    Foods' share price might look like, correct?

21    A.   There was always, there's always factors.

22    Q.   We talked about the significant debt that Dean Foods faced,

23    correct?

24    A.   Yes.

25    Q.   The litigation -- and again, the debt was something that

1    was regularly reported, so any investor interested in doing a

2    lot of research could track the debt of Dean Foods, correct?

3    A.  Absolutely.

4    Q.  And litigation, the litigation that's filed is public, so

5    if somebody wanted to independently look at and research the

6    impact of the litigation, which we'll talk about in a bit, they

7    can do that, correct?

8    A.  Correct.

9    Q.  Somebody could simply walk into a store, they could walk

10   into their store and look at how the prices of milk change to

11   get an impact of what retailers may be doing particularly

12   during difficult economic times, correct?

13   A.  Yes.

14   Q.  I want to now turn to a little bit, given all those factors

15   that sophisticated investors could look at, I want to turn now

16   more to a topic you touched on, and that is how the company

17   communicates with investors.

18   A.  Sure.

19   Q.  Because obviously there are the formal public statements

20   you've talked about, the earnings release is a public

21   statement, correct?

22   A.  Yes.

23   Q.  Press releases?

24   A.  Yes.

25   Q.  Investor calls?

H3G3WAL5                         Engles - cross

1   A.  Conference calls, yes.

2   Q.  And anything said on those calls, that's public

3   information, that can be talked about, about the company,

4   right?  That's fair game?

5   A.  Absolutely, fair game.

6            MR. GOLDMAN:  Your Honor, can we have a clarification

7   as to what investor calls or conference calls he's referring

8   to.

9            MR. BERKE:  Happy to clarify.

10  Q.  Did you understand what when I'm saying investor calls was

11  I'm talking about after an earnings announcement, you would

12  have regular conference calls with investors who choose to call

13  in?

14  A.  Our earnings conference calls.

15  Q.  Yes.  Thank you, sir.  And I think you mentioned that you

16  would also participate at large conferences, correct?

17  A.  Yes.

18  Q.  Where there might be over a hundred people, and you would

19  also talk about the business of Dean Foods and any number of

20  factors we just covered, correct?

21  A.  Yes, sir.

22  Q.  And am I also fair to say that anything you talked about at

23  any of those conferences, that's public information, fair game

24  to talk about as well?

25  A.  Absolutely.

1   Q.   And for example, sir, do you recall that in 2009 Dean Foods

2   had its own Investor Day for investors where they had like 150

3   people to New York to hear about the business?

4   A.   Yes, I do recall that.

5   Q.   Do you recall that the plan was to build an understanding

6   and awareness of the Dean Foods business and the host of

7   factors I just talked about?

8   A.   Yes.

9   Q.   Do you recall, sir, that -- and you participated in giving

10  that presentation along with other people and senior

11  management, correct?

12  A.   I did.

13  Q.   Do you recall, sir, that you explained to the investors

14  there what you wanted to do is understand Dean Foods and the

15  opportunities and what your plans were for the future to take

16  advantage of those opportunities?

17  A.   What we wanted them to understand.

18  Q.   Yes.   That's what I meant.

19  A.   Yes.

20  Q.   There are other also conferences that you would go to like

21  CAGNY and the rest we'll talk about.   Same idea, anything you

22  said at a conference like that, public information, fair to

23  talk about?

24  A.   Yes, once we said it, it was fair to talk about.

25  Q.   And you also speak to analysts, right?   I think you said

H3G3WAL5                          Engles - cross

1 there are at various times roughly 20 different analysts who

2 covered Dean Foods, correct?

3 A. Yes.

4 Q. And just I think we touched on, but just so it's clear,

5 these analysts at various points in time would issue things

6 that are available to the investment public that might reflect

7 communications with the company, as well as their analysis of

8 the company's statement, correct?

9 A. That's correct.

10 Q. If information is shared with an analyst, that, too,

11 becomes public information and is fair game?

12 A. That's correct.

13 Q. Do you recall, sir, that in 2009, Dean Foods hired a

14 company called Financial Dynamics, which is a communications

15 consulting firm, to try to help with your communications with

16 investors for the good of the company?

17 A. I don't have a clear recollection of that, no.

18    (Continued on next page)

19

20

21

22

23

24

25

H3gdwal6                         Engles – cross

1   Q.  Let me show you what's been marked as Defense Exhibit 1056,

2   for identification.

3        Sir, do you recall -- do you see this as the third

4   quarter of 2009 performance update for the board of directors'

5   meeting November 19, 2009?

6   A.  Yes, I do.

7        MR. BERKE:  Your Honor, I offer Defense Exhibit 1056

8   into evidence.

9        THE COURT:  Any objection?

10       MR. GOLDMAN:  No objection.

11       THE COURT:  Received.

12       (Defendant's Exhibit 1056 received in evidence)

13       MR. BERKE:  May I publish it?

14  Q.  And we're going to -- I think it is coming in a moment and

15  we are going to go to page -- we will show the first page and

16  go to page 25.

17       Sir, you see that this says at the top "Developing a

18  Proactive and Informed Investor Relations Plan."

19  A.  Yes.

20  Q.  And you see that on the left it refers to a Perception

21  Study?

22  A.  Yes.

23  Q.  And then if you go to the third bullet point, it says,

24  "Study is being conducted by Financial Dynamics Financial

25  Communications consultancy."

H3gdwal6                        Engles – cross

1   A.   OK.

2   Q.   And if you go to the second bullet point, the one right

3   above it, it says, "The goal is a deeper understanding of

4   investor views of Dean Foods to inform future investor

5   communications."

6   A.   Yes.

7   Q.   Do you see that, sir?

8          Does that refresh your memory that there was a process

9   underway in 2009 so that management and the company could

10  better communicate with investors?

11  A.   Yes.  My recollection, having seen this, is that was the

12  initiative undertaken by our investor relations department.

13  Q.   Let's talk a little bit about that.

14         You referred to investor relations a bit.  So investor

15  relations, that is the -- that is the division or department at

16  Dean Foods responsible for overseeing outreach to investors,

17  correct?

18  A.   Yes.  It was a department of one.

19  Q.   Barry Sievert during a period of time?

20  A.   During a period of time Barry Sievert, yes.

21  Q.   During the 2008/2012 period, there was one other

22  individual?

23  A.   Umm --

24  Q.   We'll go through it.

25  A.   You'll refresh my recollection.

H3gdwal6                          Engles - cross

1    Q.  I will.  Often what investor relations did is they

2    facilitated meetings for you as well as your other senior

3    management to meet with investors, correct?

4    A.  Yes.

5    Q.  And you recall in 2009, just if you look again at the

6    slide, things that you were doing to reach out to investors,

7    there is the Barclays Back to School Conference, which we

8    talked about already, or you did on your direct; do you see

9    that?

10   A.  Yep.

11   Q.  And you were going to do things like if you go to there is

12   a post-earnings road show?

13   A.  Yes.

14   Q.  And is that where you went and visited investors in

15   different cities to talk about your earnings-to-performance and

16   all the factors we talked about awhile ago?

17   A.  Correct.

18   Q.  And you also joined a group of investors for dinner on

19   November 10th?

20   A.  OK.

21   Q.  You host a group of investors for a headquarters meeting on

22   December 10th, right?

23   A.  The company did.  I don't know if I did.

24   Q.  Yes.

25   A.  The company did.

H3gdwal6                        Engles – cross

1   Q.   And then the CAGNY conference, which we talked about?

2   A.   Yes.

3   Q.   And it talked about a plan of developing a full calendar of

4   investor outreach for 2010 based on the study that was going to

5   be done by Financial Dynamics; do you see that?

6   A.   Yes.

7   Q.   And just to be clear, part of what this is addressing in

8   the 2009 period is the company going out, in addition to the

9   big groups we talked about, in smaller and sometimes individual

10  meetings with investors, correct?

11  A.   Those activities took place, yes.  Smaller group meetings

12  or smaller individual meetings with investors.

13  Q.   And you often participated in those, correct?

14  A.   Yes.

15  Q.   And am I right that part of the goal in those meetings was

16  to help maintain credibility with significant investment firms,

17  Wall Street investment firms and other investment firms, that

18  either were heavily invested in Dean Foods or may be interested

19  in investing in Dean Foods?

20  A.   Well, I'd say the purpose was to maintain a dialogue with

21  your investors to help them understand the company, and

22  hopefully that did help you maintain credibility.

23  Q.   Yeah.  And you say the company and all the various factors

24  we talked about?

25  A.   Yes.

H3gdwal6                          Engles - cross

1   Q.  And do you recall, sir, that you had a view that in 2010

2   you were not as successful in communicating the company's

3   message as you had hoped to be, you personally?

4   A.  It might not have just been 2010, but I don't specifically

5   recall -- I don't specifically recall what you are referring

6   to.

7   Q.  Well, you recall that you, sir, gave yourself

8   self-evaluations during this time period?

9   A.  Yes.

10  Q.  And let me show you a document marked Defense Exhibit 658

11  and 659, for identification.

12          And, sir, if you look at 658 -- if you could highlight

13  the top part -- do you see that, sir, as a -- well, actually,

14  let's go to 659 right now.  Do you recognize this, sir, as

15  being your self-evaluation?  And if you need 658 to help you

16  identify this as such, I am happy to do that as well.

17  A.  Yes, I recognize this.

18  Q.  And I'd like to turn your attention to the page ending in

19  8687, under number 4.

20          I ask you, sir, just briefly review what's under

21  number 4 to yourself.

22          (Pause)

23          Let me ask you this, sir.  Does this refresh your

24  memory?  Do you recall giving yourself sort of a below-target

25  rating for your communications with the investment community?

H3gdwal6                          Engles - cross

1    A.  I see that I did.

2           THE COURT:  Well, no.  This is not in evidence.  You

3    know, if I asked you who won the World Series in 1986, I could

4    forgive you because you're not from these parts; you might not

5    remember that it was a great picture year for the Mets.  Now,

6    if I showed you the cover of Sports Illustrated, you might see

7    that Sports Illustrated is saying that the Mets won in 1986,

8    but it may not jog your memory.  Then, again, you may remember,

9    oh, yeah, I was in New York that summer.  I remember the parade

10   and what have you, and it may in fact refresh your

11   recollection.

12          So I understand you are sitting here and you say,

13   well, why can't I just read the document aloud?  You can't.  It

14   is not in evidence.

15          The question is, when you read it, does it refresh

16   your recollection on the subject about which you have been

17   asked so that you have a new and independent recollection apart

18   from the document?

19          THE WITNESS:  The answer is no, it does not refresh my

20   recollection.

21          THE COURT:  OK.

22          MR. BERKE:  Thank you.

23   BY MR. BERKE:

24   Q.  And do you recognize, though, this document, your

25   self-evaluation, as a business record kept in the ordinary

H3gdwal6                              Engles - cross

1    course of Dean Foods' business?

2    A.  Yes, I do.

3              MR. BERKE:  Your Honor, I'd offer Defense Exhibit 659

4    into evidence.

5              THE COURT:  Any objection?

6              MR. GOLDMAN:  One second, your Honor.

7              (Pause)

8              Your Honor, this is not a business record.  We would

9    object.

10             THE COURT:  Let me see the first page of the document.

11             (Pause)

12             Do I have it in a binder here?

13             MR. BERKE:  Your Honor, we have a binder for you.  I

14   can either put up 659, and I believe you have the first page

15   right now.  I have a binder for you as well, if you would

16   rather, your Honor.

17             THE COURT:  Yes.

18             Who prepared document 659?

19             THE WITNESS:  That would have been my assistant?

20             THE COURT:  All right.  And did you prepare such

21   objectives and self-evaluations in the ordinary course of Dean

22   Foods' business?

23             THE WITNESS:  Every year.

24             THE COURT:  And did you maintain this document in the

25   ordinary course of Dean Foods' business?

H3gdwal6                         Engles - cross

1               THE WITNESS:  Yes.

2               THE COURT:  All right.  Coupled with the questions

3      Mr. Berke asked, I think it meets the business record

4      exception.

5               MR. GOLDMAN:  Your Honor, OK.  It is not maintained

6      contemporaneously -- that's fine.  We accept your ruling.  OK.

7               MR. BERKE:  Your Honor, may I publish it?

8               THE COURT:  You may.  Yes, it's been received.

9               (Defendant's Exhibit 659 received in evidence)

10     BY MR. BERKE:

11     Q.  Sir, this is -- again, this is the annual CEO objectives

12     and self-evaluation.  I think you said your assistant filled it

13     out, but you gave her obviously the information to put in it,

14     correct?

15     A.  Yes, sir.  I would have written it and she would have typed

16     it up.

17     Q.  OK.  I would like to go to number 4, back where we were.

18               And, sir, if you would read number 4 for us, please?

19     A.  "Investment community rating:  Below-target.  Improve

20     management credibility with the firms that routinely evaluate

21     Dean Foods.

22               "Despite the analysts current assessment of our firm's

23     value and prospects, the investment community 1) clearly

24     understands the forces affecting Dean's performance; 2)

25     understands the company's strategy to address its issues; and

H3gdwal6                           Engles - cross

3) in general supports the company's efforts to transform its
business.  We have placed particular emphasis this past year on
clearly communicating the company's issues and strategies to
the investment community in order to retain their support for
an extended and sweeping transformation of the business.
Nonetheless, the investment community's assessment of Dean
Foods has turned decidedly negative during the year, leading to
a below-target rating."
Q.  And that was your evaluation of the investment community
and your communications with it, correct?
A.  Yes.
Q.  And then that's, just to be clear, the evaluation of you
personally?
A.  Of me personally, yes.
Q.  And, sir, do you recall that in 2010, and thereafter, you
personally, along with other people in Dean Foods' management,
met with individual investors to try to better communicate the
messages and the business of Dean Foods?
A.  Yes.  That was a regular part of my job.
Q.  OK.  And let me show you -- if I could publish what's
already in evidence as Government Exhibit 1912B.

        And, sir, Steve Kemps, somebody who is in -- do you
remember Steve Kemps' position at Dean Foods?
A.  He is general counsel.
Q.  And, sir, do you see where this talks about -- it is an

1   email from Steve Kemps to the board, correct?

2   A.  Yes, it is.

3   Q.  And it is providing a J.P. Morgan research note on Dean

4   Foods, correct?

5   A.  Yes.

6   Q.  And do you see where it says, "Dear board members:  Earlier

7   this week Gregg Engles and Barry Sievert, vice president

8   investor relations, met with several investors in Boston.

9   Following these meetings, J.P. Morgan analyst Terry Bivens

10  issued the attached research note.  Gregg asked me to forward

11  this to you to point out that these are important meetings.  He

12  wanted the board to have this excellent synopsis of the

13  conversations."

14          And, sir, do you recall these meetings?

15  A.  Vaguely, yes.

16  Q.  We could scroll down.  And you recall at this particular

17  meeting there was a JPMorgan analyst present who also did a

18  report?

19  A.  Correct.

20  Q.  And fair to say the report that he wrote generally reflects

21  the -- what was discussed at the meeting, correct?

22  A.  What he thought was important, yes.

23  Q.  And the people who were invited to the meeting, do you see

24  in the second line where it starts to say it was Fidelity, MFS,

25  Wellington, Adage and Columbia, representing well over 25

H3gdwal6                    Engles - cross

1   million shares currently held?

2   A.  Yes.

3   Q.  And fair to say these are sophisticated investors who

4   really understand the company?

5   A.  Yes.  I think that's fair.

6   Q.  And I think you already said these were investors that are

7   going to be very familiar with the press releases, the earnings

8   announcements and the investor calls because they're closely

9   following such things, correct?

10              MR. GOLDMAN:  Objection, your Honor.

11              THE COURT:  Yes.  Sustained.

12  Q.  Do you expect these investors who are heavily invested in

13  the company to be aware of all of those public statements?

14              MR. GOLDMAN:  Objection, your Honor.  The same thing.

15              THE COURT:  That I'll overrule.

16  A.  I expect them to be knowledgeable about the business and

17  its issues.

18  Q.  And up to date, of course, correct?

19  A.  Typically they were up to date, yes.

20  Q.  And if I could show you what's been marked for

21  identification as Defense Exhibit 370 and 371.  We can start

22  with 370.

23              Sir, again, do you recognize that Barry Sievert would

24  often send analyst reports and the like to the board and they

25  would appear like this?

H3gdwal6                         Engles - cross

1    A.  Yes.

2    Q.  BCC to the board?

3    A.  Yes.  The board asked to be copied on -- or to be forwarded

4    analyst reports on a regular basis, usually once a quarter.

5            MR. BERKE:  Your Honor, I'd offer Defense Exhibit 370.

6            THE COURT:  Any objection?

7            MR. GOLDMAN:  Yes.  We object, your Honor.  He is not

8    on this email.

9            MR. BERKE:  Your Honor --

10           THE COURT:  I didn't hear the last words you said.

11           MR. GOLDMAN:  He is not on this email, and he hasn't

12   laid a proper foundation that he would have seen this.

13           MR. BERKE:  Your Honor, I believe I established that

14   what these emails reflect is that it is a BCC to the board,

15   which this witness said he recognized as such.

16           MR. GOLDMAN:  I don't know that the witness

17   acknowledged that.

18           THE COURT:  Why don't you try it again.

19   BY MR. BERKE:

20   Q.  Sir, you understood that this reflects Barry Sievert

21   sending analyst reports to the board who were typically BCC'ed

22   on these type of emails?

23           THE COURT:  If you know, you know.  If you don't know,

24   you don't know.

25   A.  I don't know who this is to.  It doesn't say.  And I don't

H3gdwal6                          Engles – cross

 1   know if Barry Sievert typically BCC'ed them or named them.  I

 2   don't know that.

 3            MR. BERKE:  Give me a moment.

 4   Q.  Let me show you, for identification, Defense Exhibit 1009.

 5            And you see that this is Barry Sievert.  And if you go

 6   down lower -- well, actually, look to yourself.  It is not in

 7   evidence.

 8            Ms. McLeod, if you could make it a little smaller so

 9   the witness could see the page.

10   A.  OK.

11   Q.  Well, sir --

12   A.  What is your question?

13   Q.  Let me do this.  It may be more trouble than it is worth.

14   We will come back to this issue.

15            You do recall, sir, that Barry Sievert regularly sent

16   analyst reports to the board, including yourself, correct?

17   A.  I do, yes.

18   Q.  OK.  And I want to get back to this question of meeting

19   with small groups.  And can I ask you to look at Defense

20   Exhibit DX1063.  And you recognize this to be for the March 5,

21   2008 Board of Directors meeting, fourth quarter and full year

22   2007 financial results?

23   A.  Yes, I do.

24            MR. BERKE:  OK.  Your Honor, I would offer Defense

25   Exhibit 1063.

H3gdwal6                        Engles - cross

1            MR. GOLDMAN:  No objection.

2            THE COURT:  Received.

3            (Defendant's Exhibit 1063 received in evidence)

4            MR. BERKE:  I would like to publish on half the

5    screen, which we probably can -- oh, actually, before we do

6    that, let me get the other one into evidence that I want to

7    show side-by-side.

8    Q.  Could I also show you Defense Exhibit 1042, for

9    identification.

10           And you recognize that, sir, as a performance update

11   first quarter 2008 Board of Directors meeting May 22, 2008?

12   A.  Yes, I do.

13           MR. BERKE:  Your Honor, I would offer Defense Exhibit

14   1042.

15           MR. GOLDMAN:  No objection.

16           THE COURT:  Received.

17           (Defendant's Exhibit 1042 received in evidence)

18           MR. BERKE:  Thank you, your Honor.

19           On 1063, could I publish at page 23.

20   Q.  And, sir, do you see that that reflects the top ten holders

21   of Dean Foods' stock as of December 31, 2007?

22   A.  Yes, I do.

23   Q.  And you recognize the names there.  They are very

24   sophisticated, large holders of Dean Foods?

25   A.  I recognize most of them.

1    Q.  OK.  If you just go to the next page, again, these reflect

2    the top ten buyers of Dean Foods' stock, again, large

3    institutional investors buying Dean Foods, correct?

4    A.  Yes.

5    Q.  OK.  So we can just leave the top ten holders up on the

6    left side, page 24.  And on Defense Exhibit 1042, if we could

7    go to page 23.  And you see, sir, that this reflects, in going

8    now back in time, 2008 stepped up investor relations

9    activities.  Do you see that, sir?

10   A.  Yes.

11   Q.  OK.  And you see where this is going to be meetings of the

12   company with its largest investors, correct?

13   A.  Yes.

14   Q.  For example, if you look at -- you were going to meet on

15   May 6 in Dallas with Manning & Napier, correct?

16   A.  Yes.

17   Q.  And if you look, Manning & Napier, on the left, is a very

18   large holder of Dean Foods at this time, nearly 5 million

19   shares, and you are meeting with them in person, correct?

20   A.  Yes.

21   Q.  If you look down again -- let's do a few.  If you look

22   down, May 15th in Boston, for example --

23   A.  Can I just stop you right there?

24   Q.  Of course.

25   A.  When you say you are meeting, that doesn't necessarily mean

1    I'm meeting.  I may well have.  I don't recall at all.  It

2    could be the company is meeting.

3    Q.   The company -- management of the company is meeting with

4    them, correct?

5    A.   Yes.  That's what this indicates, yes.

6    Q.   I appreciate that clarification.

7         And you'll see in Boston there is the Boston Company?

8    A.   Yes.

9    Q.   And if you go to the next page, 24, Defense Exhibit 42, you

10   will see they are a top ten buyer.  And then if you see also

11   Fidelity and Wellington, who are top ten holders, page 23.

12   A.   Am I reading this right, counsel, that the document on the

13   left happens before the document on the right?  Is that right?

14   Q.   All of these are -- yes.  So if you go back to -- let me

15   show you.  Go back.  Go to the first page of Defense Exhibit

16   42.

17   A.   Mm-hmm.

18   Q.   So you see that is the -- so you see we are talking about

19   the first quarter 2008 were the meetings, and we're looking at

20   the end of 2007.  Does that make sense?

21   A.   Yes.  Thank you.

22   Q.   OK.  Again, not just to -- we don't have to do them all,

23   but if you look at the names, you recognize them, Brookside,

24   NFS.  Again, these are some of the largest holders of Dean

25   Foods, correct?

H3gdwal6                           Engles - cross

1    A.  Apparently so, yes.

2    Q.  And, sir, let me just do one other example I am going to

3    show you.  Can I show you defense -- now I am going to ask you

4    questions about all of these -- Defense Exhibit 1038.

5    A.  Sure.

6    Q.  Sir, do you see that this is a board of directors' meeting

7    August 19, 2010, second quarter of 2010.  So now we are going,

8    just to be clear, we went from the first quarter of 2008

9    showing throughout this period.  Now we are at second quarter

10   of 2010.  Do you see that, sir?

11   A.  I do.

12           MR. BERKE:  Your Honor, I would offer Defense Exhibit

13   1038.

14           MR. GOLDMAN:  No objection.

15           THE COURT:  Received.

16           (Defendant's Exhibit 1038 received in evidence)

17           MR. BERKE:  May I publish, your Honor?

18           THE COURT:  You may.

19           MR. BERKE:  Thank you.

20   Q.  OK.  That is the Board of Directors meeting.

21           If we could now go to page 29.  And so these are

22   meetings August 11, New York City, meetings with 25

23   high-quality investors, including a group lunch.  Do you see

24   that, sir?

25   A.  Yes, I do.

H3gdwal6                          Engles - cross

1    Q.  And these are, again, one-on-one meetings.  So this would

2    be management of Dean Foods, some group of them, along with the

3    individual investors, correct?

4    A.  Yes.

5    Q.  So Alliance Bernstein, which is identified as the third

6    largest shareholder, 9 million shares, correct?

7    A.  Yes.

8    Q.  Columbia Management, 1.6 million shares.  Oppenheimer

9    Capital, 1.7 million shares.

10         Then you also -- you have the government of Singapore,

11   but that would be fair to describe them as a potential investor

12   but not a current investor?

13   A.  Right.

14   Q.  And then Lord Abbett, active recent buyer, 3 million

15   shares.

16         And it would be fair to say, sir, these are examples

17   of the type of individual meetings with large institutional

18   investors that the management of Dean Foods would have

19   throughout the time period of 2008 through 2012?

20   A.  Yes.

21   Q.  And they happen regularly but these are just a few of

22   those, correct?

23   A.  They happened from time to time, yes.

24   Q.  And you would often participate, correct?

25   A.  I would sometimes participate, yes.

H3gdwal6                          Engles - cross

1   Q.  And I think you said that these meetings could be a little

2   challenging, correct?

3   A.  Umm --

4   Q.  Let me go back to your direct.

5           I think you said that these are people who understand

6   the company and they would understand essentially -- they would

7   be up to date with what's going on in the company, correct?

8   A.  Correct.

9   Q.  Typically you wouldn't be there making a presentation; they

10  would have questions, correct?

11  A.  Yes.

12  Q.  So you would be meeting in a conference room with investors

13  who were smart, who understand all those factors I went

14  through, and they would have questions for you, correct?

15  A.  Yes.

16  Q.  And you would feel comfortable answering their questions

17  and helping them understand their business without in any way

18  disclosing information that you're not permitted to disclose,

19  correct?

20  A.  Yes.

21  Q.  And these investors, you didn't go in there and just read a

22  press release or read an earnings report, correct?

23  A.  No.

24  Q.  Because they wouldn't need to meet with you, they could

25  just get that off your website, correct?

H3gdwal6                          Engles - cross

1    A.   Sure.

2    Q.   They wanted to go deeper to understand more of what's

3    proper information to better evaluate all those factors we

4    talked about and evaluate their investment in Dean Foods,

5    correct?

6    A.   Correct.

7    Q.   And you felt, as well as other management at Dean Foods,

8    that there is a whole host of information that you could share

9    to address some of the credibility and communications issues we

10   talked about that was perfectly fair game, legal and proper, to

11   help these investors better understand the company without

12   doing anything that was not legal, correct?

13   A.   Correct.

14   Q.   And you, sir, you are an experienced professional and you

15   were able to determine what was appropriate to disclose and

16   what was not, based on what you knew was already public and

17   your own judgment, correct?

18   A.   Yes.  And there was always more than me sitting in the

19   room.

20   Q.   Right.  There is you and other senior management typically

21   of Dean Foods who would answer other questions?

22   A.   Yes.

23   Q.   And am I correct, sir, that sometimes, for example, the

24   CFO, the chief financial officer, would attend if people had

25   very specific questions about the balance sheet or the earnings

H3gdwal6                          Engles - cross

1  releases?

2  A.  Or sometimes he was the chief spokesman.  I wasn't there.

3  Sometimes he went.

4  Q.  Right.  But sometimes they would have questions about the

5  milk business, technical questions, some of the factors, and

6  you would address it to the best of your ability, correct?

7  A.  Yes.

8  Q.  And I think you said that you not once remember a situation

9  where you were concerned that in all these meetings with these

10 sophisticated investors that you or anyone else went over the

11 line and disclosed too much so that you had to issue a press

12 release afterwards because you went over that line of what you

13 could talk about?  You know that didn't happen because you knew

14 what to say and you stuck to what you understood was proper and

15 legal, correct?

16 A.  That's my recollection, yes.

17 Q.  Now, and it's true, sir, that do you recall that Tom Davis

18 and the other board members were kept apprised of your meetings

19 with individual investors such as we've seen in some of the

20 exhibits we went through, correct?

21 A.  Yes.  I believe we gave a report like that at virtually

22 every board meeting.

23 Q.  And is it also fair that -- if you recall, that the -- that

24 investor relations tried to communicate to the Board of

25 Directors what the company was sharing with analysts and other

H3gdwal6                         Engles - cross

1    investors, substantively?

2    A.  Yes.

3    Q.  And it was your goal and management's goal and investor

4    relations' goal, as much as possible, to give the board, to the

5    extent possible, a perfect view of your communications with

6    investors?

7    A.  I think "perfect" would be overstating it.

8    Q.  That's the goal, anyway?

9    A.  We wanted the board to understand what our conversations

10   with the investment community were.

11   Q.  And you generally took steps to do that, correct, sir?

12   A.  Yes.

13   Q.  Sir, I'd like to ask you about Eric Katzman.

14   A.  OK.

15   Q.  He was the analyst for -- at Deutsche Bank during, again,

16   the time period we care about 2008/2012, correct?

17   A.  Yes, he was.

18   Q.  And I know the numbers change, but, again, most of the time

19   roughly 20 analysts covered the stock?

20   A.  Basically, yes.

21   Q.  And you thought he was the best?

22   A.  I thought he was very good.

23   Q.  Do you recall expressing the view that you thought he was

24   the best?

25   A.  I don't recall that but I might have.

H3gdwal6                          Engles - cross

1   Q.  Let me show you -- if I can show the witness a document

2   marked 3509-11?

3            And first I just want you to see the first page so

4   that you can see what it is.  Can you just look at the very

5   top, sir, just to yourself just so you can see what it is.  I

6   am going to refer you to a specific page when you are ready.

7   A.  OK.

8   Q.  OK.  Now I would like you to go to page 2, first full

9   paragraph.

10  A.  OK.

11  Q.  Sir, my question is does that refresh your recollection

12  that you had previously characterized Mr. Katzman as the best

13  analyst that covered Dean Foods?

14  A.  Yes --

15            THE COURT:  Pause.  Pause.

16            Remember what I told you.

17            THE WITNESS:  I do.

18            THE COURT:  You look at it and you see whether it

19  refreshes your recollection.

20            THE WITNESS:  It does refresh my recollection, yes.

21  Thank you.

22  BY MR. BERKE:

23  Q.  And do you recall expressing that view, sir?

24  A.  Yes, I do.

25  Q.  And I get it, whether the best or nearly the best, but,

H3gdwal6                          Engles - cross

 1   roughly, you thought he was better than everyone else or at

 2   least --

 3   A.  He was a very good analyst.

 4   Q.  OK.  And you thought that he understood market speak,

 5   correct?

 6   A.  Yes.

 7   Q.  Explain to me, sir, what that means.

 8   A.  Market speak is I guess a colloquialism for --

 9            THE COURT:  You mean like slang?

10            THE WITNESS:  Yeah, a little bit.

11            THE COURT:  OK.  Go ahead.

12   A.  In the sense that sometimes you meant more than you said or

13   wrote in words.  All right?  So if I were to say to you it's

14   lunchtime, or if I were to say to you it's time to eat, and

15   either one of those things you might understand me to say I'm

16   hungry.  All right?  So market speak would be analysts parsing

17   through your words and phrases and what you wrote and maybe

18   coming to a conclusion that was not what you necessarily wrote

19   or said.

20   Q.  And so it would be fair to say --

21            THE COURT:  Or intended?

22            THE WITNESS:  Sometimes not intended, sometimes

23   intended.

24   Q.  But often intended, correct?

25   A.  Sometimes, yes.

H3gdwal6                              Engles – cross

1    Q.  And so what you meant, is it is fair to say that you meant

2    he was an analyst who could pick up subtle clues when you made

3    statements?

4    A.  Yes.

5    Q.  Have you heard the phrase "tell" before, sir?  I could

6    tell?

7    A.  Like in a gambling tell?

8    Q.  Like in gambling or poker.

9    A.  Yes, I have heard the phrase.

10   Q.  Is it fair to say that somebody could pick up a tell that

11   you might be trying to convey or not trying to convey?

12   A.  He was a very astute analyst.

13   Q.  So would that be a yes, generally yes?

14   A.  Yeah, he was a guy that could read the tea leaves.

15   Q.  And that made him very effective in understanding how Dean

16   Foods was performing and may perform in the future; fair to

17   say?

18   A.  He was a very good analyst.

19   Q.  Is it fair to say, sir, that there were investors who were

20   also better at picking up subtle clues that may be conveyed by

21   you or others in management about the performance of the

22   company?

23   A.  Of course.

24   Q.  I want to just, as an example, I want to ask you about one.

25   You know an investor named David Tepper, correct?

H3gdwal6                         Engles – cross

1   A.  Well, I don't know him personally but I know who he is and

2   I know his firm.

3   Q.  And he has a -- he and his firm, Appaloosa, correct?

4   A.  Yes.

5   Q.  I might not be pronouncing it exactly right, but you will

6   correct me?

7   A.  I think it is exactly right.

8   Q.  OK.  And David Tepper is someone who has a reputation as an

9   astute investor who often can pick up clues and tells from

10  companies, particularly those he sees as undervalued, correct?

11  A.  Yes.

12  Q.  And I think you talked about that there was in late

13  2010/early 2011 a challenging time at the company, correct?

14  A.  Yes.

15  Q.  Stock price of Dean Foods was beaten down, correct?

16  A.  Yes.

17  Q.  And you recall that David Tepper's firm Appaloosa, they

18  were interested in potentially an investment in the firm,

19  correct?

20  A.  Correct.

21  Q.  And do you recall, sir, that they reached out to you

22  personally?  They started to buy your shares, so they were an

23  active investor, and then they reached out to you to have

24  discussions with you to understand the company; fair to say?

25  A.  Yes.  They notified us that they owned shares, and they

1  said that they would like to have a conversation with us.

2  Q.  And they were a very big fund, correct?

3  A.  Well, I can't speak to relative size.  They're not nearly

4  as big as Fidelity but they were a meaningful investor.

5  Q.  They had some money behind them?

6  A.  Yes, they were a real investor.

7  Q.  And you testified on direct about during this time period

8  your concerns about activist investors, correct?

9  A.  Yes.

10  Q.  And you described that as well.  But would it be fair to

11  say that activist investors are often very active in wanting to

12  do things different than what management wants?

13  A.  Yes.  That is their basic stock and trade, right.  They

14  want to change the direction of a company or cause it to take

15  an action that it's not taking or stop taking actions it is

16  taking.

17  Q.  And sometimes they want to change management and replace

18  the senior management?

19  A.  Sure.

20  Q.  And when you saw Appaloosa starting to build a position and

21  they reached out to you, is it fair to say, sir, that you had a

22  concern that they may be an activist investor looking to take a

23  big stake in Dean Foods to start making changes that you might

24  not agree with?

25  A.  Well, they are an activist investor.  And I was -- I was

H3gdwal6                        Engles - cross

1   not concerned that they would want to change management, but I

2   think it's fair to say nobody really wants an activist investor

3   in their stock.

4   Q.  Let's just be -- for the benefit of the jury, if I could

5   just break that down a little bit?

6   A.  Sure.

7   Q.  So when you say they are an activist investor, you mean

8   they very frequently invest in stocks with the goal of having

9   the company make decisions that is different from what the

10  current management wants to do?

11  A.  Yes.  They often encourage companies, at least my

12  understanding, to change course.

13  Q.  And the concern would be that if they came to your company

14  as an activist investor, they would seek to make different

15  decisions, say, about WhiteWave or other parts of the business

16  than you and your management team wanted; fair statement?

17  A.  No, not a fair statement.

18  Q.  Tell me why.

19  A.  Because the changes that they would want to make, in your

20  question, are changes that we also believe were appropriate

21  changes.

22  Q.  OK.  Well, let me not be so granular, then, in my question.

23          The only point I'm making is you, I think you said on

24  direct, you were not looking for an activist investor to come

25  in and tell you what to do, correct?

H3gdwal6                          Engles - cross

1    A.  Yes, because we wanted, as the management team, to make

2    those changes and do those activities that would create value

3    for our shareholders.

4    Q.  And I think you said no management team wants an activist

5    investor to come in?

6    A.  No, of course not.

7    Q.  So when they first started talking to you about your

8    business and they were starting to build a position in shares

9    in your business, is it fair to say that part of your goal in

10   talking to them was to help persuade them that you're on the

11   right path and you have the right view for the business?

12   A.  I think we need to step back because the presumption of

13   your question, at least to my recollection, is not correct.  At

14   least I don't recall what your question implies as being a

15   conversation that had multiple parts.

16        I believe that Appaloosa called us.  They told us that

17   they had taken a stake.  They wanted to have a meeting with us.

18   And to my recollection we had one meeting with Appaloosa, not a

19   conversation.

20   Q.  OK.  Let me show you Defense Exhibit 1124, if I can.

21   A.  Sure.

22   Q.  Yes.  And do you recognize this, sir, as two emails, one

23   from Tom Davis to you and then a return email from you to Tom

24   Davis from January 7, 2011?

25   A.  Yes.

H3gdwal6                          Engles - cross

1          MR. BERKE:  Your Honor, I would offer Defense Exhibit

2    1124.

3          THE COURT:  Any objection?

4          MR. GOLDMAN:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 1124 received in evidence)

7          MR. BERKE:  May I publish it?

8    Q.  And do you see, are you aware, to sort of tell more of what

9    happened, but there was a point in time when Appaloosa's

10   investment in Dean Foods became public, correct?

11   A.  I don't recall that but it is entirely possible.

12   Q.  Let me first deal with this email.

13          You see this is an email from Tom Davis to you.

14          And if we could just enlarge the bottom part.

15          January 7th.  It says, "Did you know anything about

16   Appaloosa before today?  Interesting investment.  Happy new

17   year.  TD."

18          And then if we go to your response.

19          If you could read that, sir?

20   A.  "Tom.  We have had several conversations with Appaloosa

21   over the last few months.  They have been accumulating this

22   position.  They called yesterday to give us a heads up, said

23   they supported our strategy, and wished us luck.  We will see,

24   but it feels like a normal hedge fund investment for now."

25   Q.  OK.  So let me ask you this.  Do you see where you said,

H3gdwal6                         Engles - cross

```
 1   Mr. Davis, we had several conversations with Appaloosa over the
 2   last few months?
 3   A.   Yes, I do see that.
 4   Q.   And do you recall, sir, that you had had several
 5   conversations with them?
 6   A.   I did not have conversations with them.  The "we" is -- is
 7   a reference, apparently, to the company, and I would be
 8   guessing what happened here.
 9            THE COURT:  Don't guess.
10   Q.   Let me ask you a question.
11   A.   OK.
12   Q.   Again, so if not you personally, is it your understanding
13   that management had conversations with Appaloosa over the past
14   several months?
15   A.   I came to know that at the time of this email.
16   Q.   So you are saying you became aware of it at the time you
17   wrote this email, which is why you described it?
18   A.   Yes.  Well, they called us yesterday to give us a heads up.
19   My recollection is that is when I heard that Appaloosa,
20   probably because that's when they told us the amount of shares
21   that they had been buying and accumulating our position.  But
22   apparently they had been talking to Barry Sievert or somebody
23   else in the investment relations world.
24            And they are not just an activist investor, they are a
25   big hedge fund and they make investments.  So, big investors
```

H3gdwal6                              Engles - cross

1   called investor relations all the time to talk about the

2   company.

3   Q.  Right.  And those conversations are about the company and

4   all the factors we talked about before, correct?

5   A.  Yes.

6   Q.  And do you, sir, remember that you yourself participated in

7   at least one call, and maybe it was this call you're

8   referencing, where you described the business -- discussed the

9   business with somebody from Appaloosa as well as WhiteWave?

10  A.  Yes, and -- but it was after this email.  So this email

11  exchange happened because, as you just said, Appaloosa made

12  their ownership stake public.  Right?  And they called us to

13  tell us it was going to become public before they put their

14  press release out, and that's when I learned of whatever

15  conversations our group had been having with them.

16  Q.  Right.  You understood that they were taking a stake in the

17  company that was big enough that they had to disclose it,

18  correct?

19  A.  Sometimes they don't have to disclose it; sometimes they

20  just choose to disclose it.

21  Q.  Do you recall the stake was over 7 percent?

22  A.  I do not recall that but it doesn't surprise me.

23  Q.  OK.  Well, let me show you -- well, it was a substantial

24  stake in the company, correct?

25          MR. GOLDMAN:  Can we clarify what the 7 percent

H3gdwal6                         Engles - cross

1    relates to?

2    BY MR. BERKE:

3    Q.  Well, do you recall that they had a substantial stake,

4    greater than 5 percent ownership of all the shares of Dean

5    Foods?

6    A.  I recall they owned a significant amount of the shares of

7    Dean Foods.

8    Q.  When you say "significant," do you recall whether it was

9    more than 5 percent?

10   A.  I don't recall that, but it was a significant stake.  They

11   were a big shareholder.

12   Q.  All right.  Let me show you and see if it refreshes your

13   recollection -- well, your recollection.  Can I show you

14   Defense Exhibit 2171?

15   A.  Sure.

16   Q.  Thank you.

17            I ask you, sir, does that refresh your memory that

18   they took a substantial stake, of over 7 percent, in Dean Foods

19   in January 2011?

20   A.  No, it doesn't refresh my memory, but I can see they had a

21   big stake.

22   Q.  OK, it was substantial.  Fair enough.

23            And do you recall, sir, that when you personally spoke

24   to them, that you discussed with them the WhiteWave spin-off?

25            THE COURT:  Rephrase your question.  What do you mean

H3gdwal6                          Engles - cross

1   by the "WhiteWave spin-off"?

2          MR. BERKE:  Well, fair question, your Honor.  Thank

3   you.

4   Q.  Do you recall that you discussed with them the potential

5   WhiteWave spin-off?

6   A.  I recall having a conversation with Appaloosa in which we

7   discussed WhiteWave and the strength of its business and its

8   value to the Dean Foods shareholders, and we may well have

9   talked about the possibility of a spin-off.  He may have asked

10  me.  But I do not recall whether -- the nature of that

11  discussion.  I'm sure we talked about WhiteWave.

12  Q.  Do you recall, sir, that earlier this month, in March --

13  withdrawn.

14         Do you recall, sir, in a prior meeting you had with

15  the FBI, indicating that you in fact did tell him -- discuss

16  with Appaloosa, let's say, the potential WhiteWave transaction?

17         THE COURT:  No.  No.  If you want to refresh his

18  recollection with a document, show him the document.  Don't

19  characterize the document.  Just show him the document.

20         MR. BERKE:  Of course.

21         Can I show Mr. Engles what is marked as 3509-11, and,

22  first, let me first show Mr. Engles what it is.

23  Q.  Directing you just at the top, sir, so you can see what it

24  is.

25  A.  Yes.  I see what it is.

H3gdwal6                              Engles - cross

Q.  And now if I can go to the middle of the third paragraph.

A.  Yes.

Q.  OK.  Is it now your recollection, sir, that you believed

you discussed the potential WhiteWave spin-off in your meeting

with Appaloosa?

          THE COURT:  All right.  Now, having looked at it, the

question is does that refresh your recollection?

          THE WITNESS:  Yes.  I didn't need this to refresh my

recollection.  The difficulty I'm having with the question is

that it's presuming that this one sentence from this interview

is an accurate way to characterize the whole conversation.

          So, if I might, clearly WhiteWave was a focus of our

conversations with the market generally and with investors

generally.  They often asked us whether we would or could

spin-off WhiteWave.  We always said that if the value of

WhiteWave stock was not reflected in Dean Foods' share price,

we could spin off WhiteWave, and I would have absolutely

told -- it was not Mr. Tepper, it was an individual from his

firm that we could potentially spin off WhiteWave.

Q.  Sir --

A.  So that's absolutely true.

Q.  OK.  And, sir, am I right that it was perfectly proper --

A.  Yes.

Q.  -- and legal for you to discuss at this one-on-one meeting

just between you and Appaloosa the potential WhiteWave spin-off

H3gdwal6                          Engles - cross

1    in January 2011?  Perfectly fine?

2    A.  Yes.  I would characterize it as the potential for

3    WhiteWave or Dean to spin off WhiteWave.

4    Q.  Perfectly appropriate?  Perfectly fine?

5    A.  Absolutely.

6    Q.  Do you recall, sir, that in 2011 Dean Foods did improve so

7    that by May 2011 from January, the price of the stock had gone

8    up roughly 40 percent?

9    A.  I don't recall those stock movements, but, yes, the

10   business got better as we moved through 2011.

11   Q.  Well, sir, do you recall that the Appaloosa investment,

12   again, from January 2011, that's substantial, and it went up

13   approximately 40 percent?

14   A.  I don't have a specific recollection of that because they

15   make a lot more noise on the way in than they do on the way

16   out.

17   Q.  I hear that, Mr. Engles.

18          Let me show you Defense Exhibit 2172.  And if you

19   would just look at this to yourself, see what it is.

20   A.  Yes.

21   Q.  And read the first two paragraphs.

22          THE COURT:  To yourself.

23          MR. BERKE:  To yourself.

24          I'm sorry.  Thank you, Judge.

25   A.  OK.  I've read them to myself.

H3gdwal6                        Engles - cross

1   Q.  And my question is, sir, not if you read it, but does that

2   refresh your recollection that they made a very substantial and

3   more than 40 percent profit?

4            MR. GOLDMAN:  Sorry, your Honor.  It is a different

5   question than he asked before.

6            MR. BERKE:  I don't think it is.

7            MR. GOLDMAN:  Are you asking whether Appaloosa made a

8   40 percent profit, or whether Dean Foods' stock went up by

9   40 percent?

10  BY MR. BERKE:

11  Q.  Well, you understood that Appaloosa -- did you understand

12  that Appaloosa made more than a 40 percent profit?

13  A.  No, I did not.

14  Q.  Did you understand they made a very substantial profit?

15  A.  I have no idea how much money they made because I don't

16  know when they sold their stock and I don't know the price at

17  which they bought their stock.  So without knowing where they

18  bought or where they sold, they could have if they sold at the

19  top, but I have no idea when they bought their stock and when

20  they sold it.

21           THE COURT:  Don't speculate, sir.

22           THE WITNESS:  OK.

23  Q.  You do know, though, sir, that the price of the stock went

24  up from January to May very substantially, correct?

25  A.  Well, yes.  My recollection is refreshed on that.

H3gdwal6                        Engles - cross

1   Q.  And so they're correct that from January to May, that was

2   simply because they made the proper analysis of all the factors

3   we talked about and got it right, correct?

4                MR. GOLDMAN:  Objection, your Honor.

5                THE COURT:  Sustained.

6   Q.  It was not because you said anything to them that was in

7   any way improper that you shouldn't have, correct?

8                MR. GOLDMAN:  Objection, your Honor.

9                THE COURT:  Sustained.

10  BY MR. BERKE:

11  Q.  You had no basis to think that -- well, withdrawn.  Fair

12  enough.

13                Now I want to talk more about WhiteWave, and I want to

14  go into some other periods than we talked about in terms of

15  WhiteWave existed as part of Dean Foods for a significant

16  period of time, correct?

17  A.  Yes.

18  Q.  Prior to the 2008/2012 period?

19  A.  Yes, during all of that period.

20  Q.  And do you recall that even going back to 2006, people were

21  sort of interested in the potential of a WhiteWave separation

22  from Dean Foods?

23  A.  I don't know when it really began, but certainly it became

24  a topic when we started reporting WhiteWave separately in our

25  financial statements.

H3gdwal6                         Engles - cross

1   Q.  Can I show you what's been marked as Defense Exhibit 2068,

2   for identification.

3           Sir, do you recognize this or see this as a second

4   quarter 2006 earnings call?

5   A.  Yes, I do.

6   Q.  For Dean Foods?

7           MR. BERKE:  Your Honor, I offer into evidence Defense

8   Exhibit 2068.

9           MR. GOLDMAN:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 2068 received in evidence)

12          MR. BERKE:  Thank you, your Honor.

13          If I may publish it?

14          And if we could go to page 12.

15  Q.  And I'd like to show you the question by Pablo Zuanic?

16  A.  Pablo Zuanic.

17  Q.  Thank you.  Do you know who that was, or is?

18  A.  Yes.

19  Q.  Who is that?

20  A.  He is a securities analyst.  I don't recall who he works

21  for, but a securities analyst that also covered Dean Foods.

22  Q.  OK.  Again, this is, as we saw before, August 2, 2006, he

23  asked:  "And just one very last Gregg.  How should I interpret

24  it, from outside it seems to me that you could do a lot more in

25  terms of trying to integrate the Dairy Group business with

H3gdwal6                         Engles - cross

WhiteWave on the manufacturing side and on the distribution

side.  Clearly you are moving away from that.  How should I

think about that?  I would have thought that there would be

some synergies there on the distribution and manufacturing

side."

A.  Yes.

Q.  And, sir, will you read your answer?

A.  "Well, actually, actually the reality is the opposite is

true.  The manufacturing processes and the distribution network

for WhiteWave are distinct to a large degree from what happens

today in the Dairy Group.  The WhiteWave products tend to be

long shelf life, so it is a different processing technology,

and they tend to be warehouse distributed, whereas the Dairy

Group products tend to be shorter shelf life, pasteurization

and DSD distributed.  And so consolidating the branded products

into a branded manufacturing infrastructure has allowed us to

make the right kind of investments in technology and to obtain

the right sorts of run lengths and efficiencies in the

manufacturing facility in order to maximize the profitability

of that business.  So we take orders separately.  They go

through a different distribution channel, and we have moved to

what we believe is the optimal manufacturing infrastructure

between WhiteWave and the Dairy Group."

Q.  And, sir, do you recall that on that very day, and the next

day, analysts interpreted that answer and made predictions that

H3gdwal6                          Engles - cross

1   WhiteWave would be spun off in the near term?

2   A.  I don't recall that but it -- I don't recall that but it

3   doesn't surprise me.

4   Q.  Can I show you, for identification, Defense Exhibit 1070?

5           And first I want you to see what it is.

6           MR. BERKE:  Just go a little higher, Ms. McLeod, just

7   to show the witness what it is.  OK.

8   A.  Yes.

9   Q.  So you see what it is.

10          Now I want to direct you to page 6.  You saw the date

11  of it as well, correct, upper left corner?

12  A.  August 3, 2006.

13  Q.  Yes.  And that was the same day as the earnings call that

14  we just reviewed?

15  A.  Yes.

16  Q.  And, again, please read to yourself, if we could go to page

17  6.  And do you see -- and I would ask you to read that to

18  yourself.

19          (Pause)

20          My question for you, sir, is does that refresh your

21  memory that, roughly on the same day you had answered the

22  question on the earnings call, an analyst was predicting that

23  WhiteWave would be spun off in the near term?

24  A.  No.  This is ten years ago.  I don't have any recollection

25  of this.

1   Q.  OK.  Do you recall that during this earlier period of time

2   at various points in time analysts would -- withdrawn.

3           Do you recall, sir, that, again, during the pre-2008

4   time period, there were periods where analysts made predictions

5   that WhiteWave would be spun off?

6   A.  I don't recall that.

7   Q.  Well, let me show you a document that's marked for

8   identification as Defense Exhibit 1089.

9           And, sir, do you recognize that as an email from Jack

10  Callahan and others -- Jack Callahan to others, including

11  yourself, dated September 26, 2007?

12  A.  I do recognize that, yes.

13          MR. BERKE:  And, your Honor, I would offer Defense

14  Exhibit 1092.

15          MR. GOLDMAN:  No objection.

16          MR. BERKE:  I'm sorry.  1089.

17          THE COURT:  Any objection?

18          MR. GOLDMAN:  As long as he is just offering this one

19  document and not the attachments, we don't object.

20          THE COURT:  All right.

21          MR. BERKE:  For now.

22          THE COURT:  Received without the attachments.

23          (Defendant's Exhibit 1089 without attachments received

24  in evidence)

25          MR. BERKE:  May I publish it, your Honor?

1              THE COURT:  You may.

2              MR. BERKE:  Thank you.

3    BY MR. BERKE:

4    Q.  So -- and who is Jack Callahan, sir?

5    A.  He was at the time our chief financial officer at Dean

6    Foods.

7    Q.  OK.  And you see that this relates to Dean Foods Audit

8    Committee conference call?

9    A.  Yes.

10   Q.  The first paragraph.

11   A.  Yes.

12             MR. BERKE:  And then if we could highlight the bottom

13   that says there are three attachments, and just enlarge it,

14   right.  I'm sorry.  Thank you, Ms. McLeod.

15   Q.  It says there are three attachments.  Do you see where it

16   says the third attachment is a sell side analyst report by

17   Terry Bivens of Bear Stearns who downgraded the stock to "peer

18   perform" this week.  Terry is a long time supporter.  The

19   report provides a good external view on the challenges facing

20   the business; however, he, like the rest of Wall Street,

21   underestimates the magnitude of the impact on near term

22   performance.

23   A.  Yes.

24   Q.  Again, Terry Bivens is an analyst at Bear Stearns, correct?

25   A.  Correct.

H3gdwal6                         Engles - cross

1   Q.  And you described essentially the three general choices for

2   analysts -- buy, sell, hold -- and peer perform is one of those

3   three.  Do you recall which one?

4   A.  That would be hold.

5   Q.  That would be hold.  You are performing on peer -- on par

6   with your peers, correct?

7   A.  Yes.

8   Q.  OK.  And, your Honor, I was now planning on showing the

9   witness the attachment, for identification.  I recognize there

10  has been an objection, and also that -- but if your Honor would

11  like, I will proceed and --

12          THE COURT:  As you are speaking, the clock on my phone

13  is at 4:59.  So if you want to go on -- it is 5 o'clock.  There

14  you go.

15          MR. BERKE:  So suspenseful.

16          THE COURT:  Saved by the bell.

17          So, ladies and gentlemen, some of you I met on Monday.

18  I feel like I've known you a significant part of my life.

19  Others of you I knew -- first met on Wednesday.  We went

20  through a pseudo-blizzard together, and you have been wonderful

21  in your attentiveness.

22          This is our last day of sitting this week.  We are

23  going to pick up at 10 a.m. on Monday.  Monday, of course there

24  is more traffic on Mondays than on other days of the week, so

25  do what you can to accommodate that.  We want to get a good

H3gdwal6                          Engles - cross

 1   start, if we can.

 2          And it's especially important as we come up on the

 3   weekend that when you are having a cup of coffee on Sunday

 4   morning or whatever -- maybe you will be having a glass of

 5   milk, I don't know, but that you not discuss the case with

 6   anyone, that you refrain from any electronic communications

 7   about the case, and refrain from any research.

 8          I hope you have a great weekend, and I'll see you on

 9   Monday morning.

10          Thank you, ladies and gentlemen.

11          A JUROR:  Feel better, sir.

12          THE COURT:  Thank you.

13          A JUROR:  Feel better.

14          THE COURT:  Thanks.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H3gdwal6                              Engles - cross

1          (Jury not present)

2          THE COURT:  Please be seated.

3          If you want to -- do you want to put it in a short

4     letter, your objection?

5          MR. GOLDMAN:  Our objection?

6          THE COURT:  Yes.

7          MR. GOLDMAN:  We could put in a letter in or we could

8     discuss it very briefly.

9          THE COURT:  Go ahead.  What is it?

10         MR. GOLDMAN:  It is a page 15 paragraph.  I assume

11    what he is trying to get in is the statement that, "We believe

12    eventually shareholders will be rewarded by owning the DF

13    shares.  Not only is this one of the better managed companies,

14    but there is the potential for a value-creating spin-off of the

15    WhiteWave division."

16         And I will let the witness leave.

17         THE COURT:  Yes.

18         (Witness not present)

19         THE COURT:  Go ahead.

20         MR. GOLDMAN:  So, your Honor, this is exactly what we

21    are talking about, the distinction between what is a public

22    fact and what is a somewhat speculation or rumor analysis by an

23    analyst that is relevant to Mr. Walters' state of mind if he

24    can show that he saw this.  There is nothing that indicates a

25    public fact about the spin-off in this analyst report, and,

1   therefore, it is not -- it does not contradict our argument

2   that the spin-off was confidential.

3           THE COURT:  Let me hear the words again.

4           MR. GOLDMAN:  "Not only is this one of the better

5   managed companies, but there is the potential for a

6   value-creating spin-off of the WhiteWave division."

7           THE COURT:  Yes.

8           MR. BERKE:  Your Honor, may I?

9           THE COURT:  Go ahead.

10          MR. BERKE:  I'm not putting it in for Mr. Walters'

11  state of mind.  That is not the issue.

12          THE COURT:  No.  I don't think the government thought

13  you were.  But what are you putting it in for?

14          MR. BERKE:  It is really two-fold.  So, you know, it

15  is produced by the CFO of Dean Foods to the board's audit

16  committee, and he says that this provides a good -- and this is

17  the exhibit that is in evidence, 1089, and number 3.  It says

18  that the report provides a good external view on the challenges

19  facing the business and says the rest -- however, he, like the

20  rest of the Wall Street, underestimates the magnitude of the

21  impact of near-term performance.

22          So, first, there is a dialogue going on between the

23  company and the analyst, and this one in particular is being

24  shared with Mr. Engles by the CFO as an example of the

25  challenges they face.  So in that regard what he's saying is

1  not being offered for the truth of the matter but to provide

2  support for what Mr. Callahan is saying about how they need to

3  address and deal with some of the problems they have from

4  external challenges.

5          It also, as Mr. Engles said, that he often made

6  comments that were picked up, intentionally or unintentionally,

7  and interpreted in a certain way by astute analysts.  And what

8  I was asking him about is did his comments that he had made the

9  month prior in August about the separateness of the two

10  businesses, had that been picked up by analysts in thinking the

11  separation -- this is not a question of whether what the

12  government alleged was leaked.  We dispute it was ever leaked.

13  This is telling the longer WhiteWave story that continued for a

14  long period of time, and it is to add context to some of the

15  documents the government put in.

16          And there is no question that there is a back and

17  forth between the management of Dean Foods and the investment

18  community about WhiteWave over an extended period of time

19  that's important to understand in interpreting the later

20  comments and how they may impact on other facts that obviously

21  are either in evidence or will be in evidence.  So for this,

22  this doesn't relate directly to any alleged tip or the like.

23  What it relates to is how the company is sending messages I

24  believe in the analyst calls or, I'm sorry, the investor calls

25  at various points and how they're responding to and addressing

H3gdwal6                          Engles - cross

the analysts on this WhiteWave issue.  And there will be more

of it, but I think it is clear, your Honor, that there is a

long back and forth that I think this witness will be able to

address as well as it gets into the 2008 to 2012 period.

          THE COURT:  Well, he received this report, did he not?

          MR. BERKE:  He did.

          THE COURT:  It was given to him?

          MR. BERKE:  He did.  It was.

          MR. GOLDMAN:  But, your Honor, we will ask to lay a

foundation as to whether he saw this, because we expect that he

would testify that he received numerous attachments that he

never looked at and would --

          THE COURT:  Let's find out the answer to that.

          MR. GOLDMAN:  OK.

          THE COURT:  We'll find out next week.

          MR. GOLDMAN:  We'll find that out.

          But separately, your Honor, if Mr. Berke wants to get

into the back and forth in terms of how the analysts

interpreted what Mr. Engles said, he can call Pablo Zuanic, the

guy who wrote this analyst report, and ask him what he thought

and interpreted.

          But Mr. Engles is purely speculating about what the

market would have interpreted, and this very vague, speculative

analysis is precisely something that Mr. Engles is not equipped

or is not properly placed to comment on.  And that's the basis

H3gdwal6                          Engles - cross

1   of our objection.

2              MR. BERKE:  Your Honor --

3              THE COURT:  Why isn't your remedy to call the analyst

4   and have him come in and testify as to what he said, what he

5   thought, and why he thought it?

6              MR. BERKE:  Your Honor, we could.  I have to tell you

7   that we -- I think there are at least a dozen, if not more,

8   analysts who have reports that could be relevant.  We could do

9   it.  It would lengthen this trial.  Our goal is not to do that.

10  We think it is relevant that this person asked a question, and

11  we have more of those, if that's how your Honor wanted to

12  proceed.

13             But I do think it is fair, Judge, because, as you will

14  see, over time -- and it will add a lot more meat to the bones

15  that the government had -- the company is at various points

16  talking about this WhiteWave spin-off in different contexts

17  that explains how they view WhiteWave and they are having this

18  dialogue communication with the investment community that could

19  not be clearer.

20             I didn't show him analyst reports that he didn't

21  receive because we have ones that I asked him that he didn't

22  remember.  I am showing him the one that the CFO himself -- I

23  think it can come in as a business record, frankly, your Honor.

24  The CFO is sending material to the audit committee.  The

25  government is sending en masse anything that was sent to the

H3gdwal6                          Engles - cross

1   audit committee --

2              THE COURT:  You still have a hearsay within hearsay

3   problem.

4              MR. BERKE:  Not offered for the truth, your Honor.

5   Offered that the company was aware in 2006 that the answer to

6   that analyst question and investor call is being interpreted as

7   sending a message about WhiteWave, rightly or wrongly.

8              THE COURT:  Why is that a relevant fact?

9              MR. BERKE:  I think it is a relevant fact, your Honor,

10  to understand the subsequent comments about WhiteWave and how

11  they deal with the investor demand about WhiteWave.  WhiteWave

12  was the biggest issue facing this company.  They addressed it

13  in a variety of contexts, and they were aware that for so many

14  analysts, how they were treating the stock in terms of what

15  they recommended directly correlated with what they saw as the

16  potential for a WhiteWave spin-off.  It is just fact.  It's

17  part of the story.  And, your Honor, I think to understand it,

18  it is necessary to get into some of the analyst statements,

19  especially when the witness saw it himself.

20             THE COURT:  I will give you my tentative read on this.

21             A statement by an analyst of the analyst's awareness

22  of certain information may go to the question of whether that

23  information was nonpublic.  If he says, gee, I learned the

24  earnings are going to be up this quarter, they're going to be

25  above expectations, that goes to the question of whether the

H3gdwal6                              Engles - cross

1    company treated it as nonpublic information.

2              This is a step -- a considerable step removed, where

3    the analyst is surmising, if you will, reading tea leaves at

4    best, and you can get that in by calling that witness.  Listen,

5    I don't want to prolong the trial any more than anybody else,

6    but in that situation there can be fair cross-examination.

7    What did you base that on?  Were you just spit-balling, or did

8    you have anything serious to go on?

9              So, that's my tentative ruling.  And anybody who wants

10   to send me anything, you are welcome to do it.  I'm not going

11   to stop you.  You have enough other things to do.  And I'm not

12   requiring it.  But that's my tentative ruling.

13             MR. BERKE:  Thank you, Judge.

14             THE COURT:  All right.  Have a great weekend.  Have a

15   productive day tomorrow.  I suspect for some lawyers in this

16   courtroom, including prosecutors and defense counsel, this may

17   not be the only case they are working on.  And so I'll see you

18   on Monday morning.

19             MR. BERKE:  Thank you, Judge.  Feel better.

20             MR. GOLDMAN:  Thank you, Judge.  Feel better.

21             (Adjourned to 10 a.m., Monday, March 20, 2017)

22

23

24

25

<pre>
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   GREGG ENGLES

 4   Direct By Mr. Goldman . . . . . . . . . . . . 107

 5   Cross By Mr. Berke . . . . . . . . . . . . . . 223

 6                      GOVERNMENT EXHIBITS

 7   Exhibit No.                              Received

 8    701-B  . . . . . . . . . . . . . . . . . . 110

 9    701-F  . . . . . . . . . . . . . . . . . . 113

10    420  . . . . . . . . . . . . . . . . . . . 120

11    1900  . . . . . . . . . . . . . . . . . . . 124

12    21  . . . . . . . . . . . . . . . . . . . . 125

13    20  . . . . . . . . . . . . . . . . . . . . 126

14    423-A  . . . . . . . . . . . . . . . . . . 129

15    1907  . . . . . . . . . . . . . . . . . . . 131

16    702-L  . . . . . . . . . . . . . . . . . . 133

17    427A  . . . . . . . . . . . . . . . . . . . 136

18    437  . . . . . . . . . . . . . . . . . . . 139

19    1912B  . . . . . . . . . . . . . . . . . . 143

20    507A  . . . . . . . . . . . . . . . . . . . 150

21    439  . . . . . . . . . . . . . . . . . . . 151

22    508  . . . . . . . . . . . . . . . . . . . 155

23    509  . . . . . . . . . . . . . . . . . . . 156

24    440  . . . . . . . . . . . . . . . . . . . 159

25    513  . . . . . . . . . . . . . . . . . . . 167
</pre>

```
 1    516  . . . . . . . . . . . . . . . . . 169

 2    445  . . . . . . . . . . . . . . . . . 171

 3    505  . . . . . . . . . . . . . . . . . 177

 4    519  . . . . . . . . . . . . . . . . . 190

 5    521  . . . . . . . . . . . . . . . . . 192

 6    522  . . . . . . . . . . . . . . . . . 193

 7    460  . . . . . . . . . . . . . . . . . 196

 8    605A  . . . . . . . . . . . . . . . . . 200

 9    534  . . . . . . . . . . . . . . . . . 205

10    463  . . . . . . . . . . . . . . . . . 207

11    706K  . . . . . . . . . . . . . . . . . 212

12    467  . . . . . . . . . . . . . . . . . 214

13    1929  . . . . . . . . . . . . . . . . . 215

14    706-P  . . . . . . . . . . . . . . . . . 217

15    529  . . . . . . . . . . . . . . . . . 219

16    888-A  . . . . . . . . . . . . . . . . . 221

17    604-B  . . . . . . . . . . . . . . . . . 233

18                     DEFENDANT EXHIBITS

19    Exhibit No.                          Received

20    1056  . . . . . . . . . . . . . . . . . 251

21    659  . . . . . . . . . . . . . . . . . 258

22    1063  . . . . . . . . . . . . . . . . . 264

23    1042  . . . . . . . . . . . . . . . . . 264

24    1038  . . . . . . . . . . . . . . . . . 267

25    1124  . . . . . . . . . . . . . . . . . 280
```

1   2068      . . . . . . . . . . . . . . . 289

2   1089 without attachments   . . . . . . . . 292

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25