H3kdwal1

<pre>
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          S1 16 Cr. 0338(PKC)

 5   WILLIAM T. WALTERS,

 6              Defendant.

 7   ------------------------------x
                                           March 20, 2017
 8                                          10:09 a.m.

 9   Before:

10                  HON. P. KEVIN CASTEL,

11                                         District Judge

12                         APPEARANCES

13   JOON H. KIM
          Acting United States Attorney for the
14        Southern District of New York
     BY:  DANIEL S. GOLDMAN
15        BROOKE E. CUCINELLA
          MICHAEL FERRARA
16             Assistant United States Attorneys

17   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
          Attorneys for Defendant
18   BY:  BARRY H. BERKE
          PAUL H. SCHOEMAN
19        ANDREW J. ESTES
          MICHELLE BEN-DAVID
20             -and-
     WRIGHT STANISH & WINCKLER
21   BY:  RICHARD WRIGHT

22        - also present -

23   SA Edmund Rom
     SA Nicholas Anderson, Federal Bureau of Investigation
24   Raymond McLeod, Defense Tech Support
     Holly Meister
25   Sarah Pyun, Government Paralegal Specialists
</pre>

H3kdwal1

1              (Trial resumed; jury not present)

2              THE COURT:  Please be seated.

3              I understand there is an issue that counsel wanted to

4    see me on.

5              MR. GOLDMAN:  Your Honor, there are a couple of

6    outstanding matters.  The most pressing one relates to the

7    analyst report issue that we ended Thursday with.  And I think

8    it would be helpful to address this and reach some clarity on

9    it before the cross-examination continues, because our review

10   of the documents indicates Mr. Berke is going to try to show a

11   number of analyst reports to the witness, Mr. Engles.

12             And what we would just want to point out, and it is to

13   kind of separate the foundational issues from the hearsay

14   issues.  Mr. Berke can correct me if I am wrong, but we have

15   not seen anything in the analyst reports that would amount to

16   what your Honor described as a public fact as, as an example

17   used last Thursday, earnings will be X.  And so given that

18   there is nothing in the analyst reports that would just simply

19   be a public fact that would come in to defeat our allegation of

20   the nonpublic nature of the information, we are then left

21   merely with the state of mind of the defendant as the only

22   nonhearsay purpose for which these analyst reports should be

23   admitted.

24             And so we don't believe any of them can come in

25   through Mr. Engles, because they go to the defendant's state of

H3kdwal1

mind.  And the defendant -- they must make a showing, that they

can do in several ways, including through emails or through the

defendant testifying, that the defendant himself saw the

analyst reports, because otherwise it does not go to his state

of mind.  And so we are going to have a number of objections to

these analyst reports coming in because there is no showing

that the defendant saw them, and, therefore, it cannot be shown

that it goes to his state of mind at this point.

MR. BERKE:  Your Honor, if I may?

THE COURT:  Yes.

MR. BERKE:  For this witness we are not introducing

any reports to show Mr. Walters' state of mind.  Really, I am

introducing them for one of three reasons, all of which I would

submit a proffer.  One, as Mr. Goldman agrees, is it reflects a

public statement.  Two, on a few occasions, I think we have two

instances, that we are going to talk about today, Mr. Engles

gives a report of events, statements he has made to the board,

and attaches one or two analyst reports as part of that

discussion for them to discuss at the board meeting.  And I

will refer to those.  And he has a cover memo and email saying

that he's doing that so it is clear.

THE COURT:  Yes.  But why would that be admissible?

MR. BERKE:  It is admissible, your Honor, because it

goes to inform -- it is not for the truth of the matter.  It

goes to inform his discussion with the board that he's making

H3kdwal1

1  certain statements, in this case about WhiteWave.  The analysts

2  are reporting on his statements and what they understand to be

3  important, and then he is presenting them to the board for

4  discussions about WhiteWave and the impact it could have on the

5  company.

6          THE COURT:  I'm still not understanding why that is

7  relevant.

8          MR. BERKE:  Well, the big issue for WhiteWave and

9  Mr. Engles is that they believe that the market analyst

10  investors did not adequately recognize the value of WhiteWave,

11  and part of the discussion that went on over a period of years

12  is how they could better get value out of WhiteWave.  And one

13  of their at least two instances where they are having

14  discussions with the board about this is what analysts are

15  saying why they're concerned about WhiteWave, let's talk about

16  it and figure out what we can do.

17          THE COURT:  What do you mean by "concerned about

18  WhiteWave?"

19          MR. BERKE:  That they don't -- they are not valuing

20  WhiteWave as part of Dean Foods to the extent that Mr. Engles

21  at least felt they should and that the board should consider in

22  contemplating various actions.  So it's given for context to

23  help explain his position about why they should consider some

24  action, because the investors -- I'm sorry, the analysts are

25  concerned that in its present formation it is not worth as much

H3kdwal1

1    as it would be.  And it is actually the discussion part.  I'm

2    only doing it, your Honor --

3             THE COURT:  How is that cross-examination?  That was

4    his direct testimony.  And what are you trying to do?

5    Reinforce his direct testimony?

6             MR. BERKE:  The cross-examination actually goes to a

7    specific timeline that is different than the direct but that is

8    important for our defense in the case, the timeline of when

9    certain events happened and didn't happen which correlates to

10   part of our defense.  So as a board we go through the various

11   board minutes to establish the timeline on WhiteWave that is --

12            THE COURT:  No.  Mr. Berke, let's not kid ourselves.

13   It's not about going through board minute.  That's not why

14   we're having this discussion right now -- at all.  We're having

15   the discussion because you want to use the analyst reports that

16   you point out were transmitted by Mr. Engles to board members.

17   That's the focus here.

18            So if you want to do this without the analyst reports,

19   I don't think there is an objection, even.  So let's not beat

20   around the bush.

21            MR. BERKE:  All right.  But in those two instances,

22   your Honor, I do think where -- and I'll tell you what they

23   are.  There is a situation where Mr. Engles is giving his

24   periodic report to the board and says I want to give you a

25   summary from our investor relations person and I want to attach

H3kdwal1

1    one or two reports about recent events that we just had and

2    what these two analysts are saying, including Mr. Katzman, who

3    we talked about.  I have two instances where I am doing it,

4    your Honor.

5              THE COURT:  So what do the analysts say?  Let's get to

6    the heart of what we are talking about here.  What do the

7    analysts say?

8              MR. BERKE:  The analysts say, in both instances, your

9    Honor --

10             THE COURT:  This is not about a chronology before the

11   board.  This is about what the analysts said.  So let's hear

12   what it is.

13             MR. BERKE:  In these instances, the analysts say

14   that -- excuse me, your Honor.  They say -- in one instance

15   they say that Mr. Engles' statement at a big conference created

16   a crack in the door regarding a possible WhiteWave spin-off.

17   It is a departure from prior statements.  Our model, however,

18   suggests less than robust value creation from the spin.

19             And that's from a -- that was sent to the board, and

20   that is from a JPMorgan report.  And then we also have a --

21             THE COURT:  What is that relevant to, that statement?

22             MR. BERKE:  Well, that statement in particular, two

23   things:  One, it shows that Mr. Engles is explaining to the

24   board how his statements at the conference -- because if you

25   remember, he said that he often implies things without stating

H3kdwal1

1    it directly, so he wants the board to know that the analysts

2    heard the message; but also that the analysts think at this

3    time it is not necessarily a value creator because of debt

4    problems and other problems.  There is a discussion about these

5    analyst reports.

6              THE COURT:  Here's what I think.  You can examine

7    Mr. Engles all you want about what he said at the conference,

8    that's fair game, but how what he said was interpreted is a

9    different matter.  You can even ask him, When you said, you

10   know, the sun rises in the east, weren't you trying to imply

11   that you were open to considering the spin-off of WhiteWave?

12   That's a fair question.  I don't mind that.  But the analyst

13   statement that he perceived that as an opening is an

14   out-of-court statement by the analyst that is being proffered

15   for the truth of the content that it was an opening to a

16   WhiteWave spin-off.

17             MR. BERKE:  If I may, your Honor?

18             THE COURT:  Yes.

19             MR. BERKE:  What I would say is I'm not offering it

20   for the truth.  What I'm offering it for is that Engles is

21   saying to the board, just so you know, look at these analyst

22   reports.  The investors, based on my comments, are going to get

23   the message that I wanted to convey.  That's what it is.

24   Whether it would be a news report or an analyst report, they

25   got the message that I wanted them to.  If I can't establish a

H3kdwal1

1    foundation I can't do.

2              THE COURT:  No, but you can -- you can't use the

3    analyst report.

4              MR. BERKE:  OK.

5              THE COURT:  OK?  You can ask Engles, did you intend to

6    communicate to the analyst community an openness on your part

7    to considering a spin-off of WhiteWave?  And did you tell them

8    that you were considering a spin-off?  No, I didn't.  Did you

9    communicate to them any other way an openness to it?  Yes, I

10   did; no, I didn't, so on and so forth.

11             MR. BERKE:  And without using the analyst reports, can

12   I also ask him, your Honor, you understood, sir, that just as

13   you had said last week that you often wanted analysts to pick

14   up subtle messages, it was your understanding that based on

15   your comments they heard you without introducing the report?  I

16   might refresh his memory, if necessary, but I won't introduce

17   the report.

18             THE COURT:  Mr. Goldman.

19             MR. GOLDMAN:  We would object to that, your Honor.

20   That's exactly the same thing on how the analysts interpreted

21   it.  He can get into what Mr. Engles intended to say, but how

22   the analyst interpreted it is --

23             THE COURT:  I agree.  I want to make it abundantly

24   clear.  So far I have not said in any way, shape or form that

25   the defense cannot call analysts on their case as to what they

H3kdwal1

1   heard, what they believed, what they perceived, what they

2   understood.  That's a different question and I haven't been

3   called upon to address that.

4           But, no, you can explore what Mr. Engles intended to

5   convey, and that's the water's edge there.

6           MR. BERKE:  Can I ask you one question, your Honor,

7   while we are talking?  I do have an instance where I am using a

8   news article, again, that Mr. Engles is using with the board.

9   I assume that's different, the news article?

10          THE COURT:  Tell me about it.

11          MR. BERKE:  It is a news article that is reporting on

12  Mr. Engles' conference and what he had said to investors and

13  that he includes it along with a summary by investor relations

14  as well.

15          THE COURT:  Well, I think the correct way to do that

16  is to say, Mr. Engles, what did you say at the conference da,

17  da, da, da, da.  If he leaves out a detail:  Let me show you

18  this document.  Read it to yourself.  Does this refresh your

19  recollection on the subject of what you said?

20          That's the way to do it.

21          MR. BERKE:  Understood, your Honor.

22          THE COURT:  All right.  Let's bring our jury in.

23          (Continued on next page)

24

25

H3kdwal1                       Engles - cross

1              (Jury present)

2              THE COURT:  Please be seated.

3              Good morning, ladies and gentlemen.

4              JURORS:  Good morning.

5              THE COURT:  It's very good to see you.  And I'm

6    pleased to report that, with your good wishes, some chicken

7    soup, some tea with lemon and honey, and a doctor's

8    prescription and a little bit of sleep, I am back in action

9    today feeling much better.  So we're ready to proceed, and I

10   very much appreciate your cooperation throughout the trial.

11             Mr. Engles, the Court reminds you, you are still under

12   oath.

13             THE WITNESS:  I understand.

14             THE COURT:  OK.  You may inquire.

15             MR. BERKE:  Thank you, your Honor.

16    GREGG ENGLES,

17        Resumed, and testified further as follows:

18   CROSS-EXAMINATION (Resumed)

19   BY MR. BERKE:

20   Q.  Good morning, Mr. Engles.

21   A.  Good morning.

22   Q.  You recall -- you may not recall -- when we were talking on

23   Thursday we were discussing WhiteWave?

24   A.  Yes.

25   Q.  And I want to move a little forward in our -- the timeline

H3kdwal1                         Engles - cross

1    as to where we were on Thursday and ask you just about events

2    in December of 2009.

3            And you testified on direct that in 2009 the board at

4    that time considered the wisdom of a spin-off of WhiteWave,

5    correct?

6    A.  Yes.

7    Q.  You met with your investment banker to think about it,

8    correct?

9    A.  Yes.

10   Q.  And you decided not to go forward, correct?

11   A.  Yes.

12   Q.  And I believe that there was a report -- and I think you

13   may have said this -- that the advice was that the company

14   would be replacing low cost debt with high cost debt if they

15   did that, is that correct?

16   A.  That is correct, yes.

17   Q.  Would you explain what that means?

18   A.  Yes.  Probably the best way to do so is to give you an

19   analogy to a mortgage on your house.  There are times when

20   interest rates are low and there are times when interest rate

21   are high.  Late 2009 was a time when interest rates were high,

22   and the debt that we had put on the company that existed at

23   that time had been put on when interest rates were low.

24   Q.  And the company had substantial debt, you testified about,

25   at that time, correct?

H3kdwal1                           Engles - cross

1    A.  Yes, it did.

2    Q.  And that was an issue -- you understood that was an issue

3    that investors were focused on, correct?

4    A.  Yes.

5    Q.  Now, I want to ask you, you recall that -- now I am going

6    into the early 2010 period, the first half of 2010.  And you

7    recall at this time that there was litigation that you

8    mentioned?

9    A.  Yes.

10   Q.  I want to ask you about some of the dates.  There were two

11   separate -- well, there was a series of separate antitrust

12   litigations failed, correct?

13   A.  Yes.

14   Q.  One was filed by the farmers, correct?

15   A.  Two, two -- well, three -- there were five actions, I

16   believe, and I think three or four were farmer actions.

17   Q.  Do you recall all the farmer actions were consolidated in

18   Tennessee into one big action?

19   A.  Yes.  There was a class action in Tennessee.  There was

20   also a class action in Vermont.

21   Q.  OK.  And do you recall, sir, that -- and then there was a

22   retailer litigation raising antitrust issues as well, correct?

23   A.  Yes.

24   Q.  And you recall, sir, that those cases were filed in 2007?

25   A.  That is -- I believe that's correct.

H3kdwal1                          Engles - cross

```
 1    Q.  And do you recall, sir, that at some point there were

 2    motions to dismiss these cases?

 3    A.  Yes.

 4    Q.  And you recall, sir, that those were denied in 2008?

 5    A.  I recall they were denied.  I don't remember the date.

 6    Q.  Could I show you, just for identification, GX802?

 7    A.  Sure.

 8    Q.  This is just for you, sir.

 9              (Pause)

10              And could we look at page 96?  Paragraphs 1 and 2.  If

11    we could make the heading bigger just for the witness.

12              And, sir, I would ask you to look -- do you see the

13    first paragraph, sir?

14    A.  That begins, "We were named."

15    Q.  Yes.  Just to yourself, sir.

16    A.  Yes.

17    Q.  I just want you to see what it is just so you see what it

18    is.

19              And then I want you to go to the second paragraph.

20    Again, in the middle of the paragraph beginning, "A motion to

21    dismiss."  No.  The sentence above that, Mr. McLeod.

22              Again, just to yourself, sir.

23    A.  Yes.

24    Q.  And my question for you, sir, is do you recall motions to

25    dismiss were denied in 2008?  Does that refresh your memory?
```

H3kdwal1                          Engles - cross

1    A.  Yes, it does.

2    Q.  OK.  Thank you, sir.

3           And, sir, I think you testified that in your direct

4    litigation would have made it impossible to do the spin-off,

5    correct?

6    A.  Yes.

7    Q.  And am I right, sir, that the damages were something

8    like -- they were seeking something like three-quarters of a

9    billion dollars, or some very large number?

10   A.  They were a very large number, yes.

11   Q.  Sir, I want to now go to March 2010, and I want to show you

12   a document that's been admitted into evidence as Defense

13   Exhibit 1912B.

14          MR. BERKE:  And if I may show it, your Honor,

15   published?  It is in evidence.

16          THE COURT:  All right.

17          (Pause)

18   Q.  If we could just highlight the top just as a reminder of

19   what it is.

20          So you see, sir, just to orient you as to what it is,

21   you see this is an email from Steve Kemps, your general

22   counsel, to others, including yourself, and it refers to a

23   meeting with several investors in Boston?  Do you see that,

24   sir?

25   A.  Yes.

H3kdwal1                          Engles - cross

1   Q.  OK.  And in the second half, if you go down a little lower,

2   you will see there is -- if we could just go to the end of this

3   just so you can see what that is first.  You will see it is a

4   summary by Barry Sievert, the head of the investor relations.

5           MR. BERKE:  Mr. McLeod, if you could go to the bottom

6   of the document just to show the witness what it is.  All the

7   way to the bottom, the second page.

8   Q.  And you see there is a summary by Mr. Sievert, sir?

9   A.  Yes.

10  Q.  Now if we could go back up to the first page of the

11  summary.

12          And you see, if you go to the first paragraph, this is

13  summarizing the meeting.  If you look at the second sentence,

14  this was a visit with investors in Boston on Tuesday, and it

15  was attended by some of your largest investors -- Fidelity,

16  MFS, Wellington -- who represent well over 25 million shares;

17  is that correct, sir?

18  A.  Yes.

19  Q.  Now, if you go to the substance of the meeting on the

20  second page, and if we could highlight the portion that says

21  "WhiteWave."

22          And, sir, do you see where it says -- again, March 9,

23  the summary of the meeting on March 9, 2010:  "While less of a

24  focus of our meetings, investors continue to show interest in

25  the WhiteWave business, which today is a strong example of the

H3kdwal1                          Engles - cross

1    benefits of investment and transformation."  It goes on to

2    describe how the platform grew operating profits.  And then it

3    says, "We were asked about the possibility of spinning the

4    business out.  We reiterated our belief that the platform will

5    continue to post strong double-digit growth, and is a valuable

6    asset for the company."

7              Sir, that reflects that a large sum of your largest

8    investors, most sophisticated investors were asking in

9    March 2010 about possibly spinning off WhiteWave, correct?

10   A.  Yes.

11   Q.  And that reflects generally how the company would respond

12   to those questions at that time, correct?

13   A.  Correct.

14   Q.  Now, sir, if I -- now, could I ask you a question, sir?

15   Could I show you what is marked 1044, in evidence?  I'm sorry,

16   not in evidence, for identification.  Excuse me, your Honor.

17   Defense Exhibit 1044.

18             And do you recognize this as an email sent from

19   Ms. Sellers to you and the board on your behalf on April 1,

20   2010?

21   A.  Yes, I do.

22             MR. BERKE:  Your Honor, I would offer into evidence

23   Defense Exhibit 44.

24             MR. GOLDMAN:  No objection.

25             THE COURT:  Received.

H3kdwal1                         Engles - cross

1          (Defendant's Exhibit 44 received in evidence)

2    BY MR. BERKE:

3    Q.  And, sir, you say, "Attached is my first mid-cycle update

4    memo."  And then if you see in the attachment line, you see

5    that you attach, it says, a "board update article"?  Do you see

6    that, sir?

7    A.  Yes.

8    Q.  Now, do you recall that during this time period, or maybe

9    all the time periods, you will tell us, that you would send

10   articles as part of your mid-cycle updates to the board?

11   A.  No, I don't.  I don't recall that.

12   Q.  Is that something you would do?

13   A.  I sent things just to the board from time to time.  I don't

14   recall exactly how many mid-cycle updates I did but it was --

15   this is the only one I've ever seen, actually.  I don't know if

16   there was a practice that I continued.

17   Q.  OK.  Well, let me show you what's been marked for

18   identification as Defense Exhibit 1046.  And I'll ask you, sir,

19   again, without identifying it, do you recall sending this

20   article to the board?

21   A.  I don't recall it.

22   Q.  OK.

23   A.  But I see it.

24   Q.  Understood.  And as you sit here today, I mean, in terms of

25   your practice in dealings with the board, if you would send the

H3kdwal1                              Engles - cross

1    materials, generally what would be the purpose you would send

2    them for?

3    A.   Just to keep them updated on what was happening between

4    meetings, if there were items of interest or importance that I

5    felt needed to be communicated to them.

6    Q.   Would it be to share with them points of view that you felt

7    were important for them to be aware of?

8    A.   Yes.  From time to time, absolutely.

9    Q.   And, sir, do you recall during when sending the March 2010

10   mid-cycle review, you wanted to -- you were interested in them

11   knowing what the market, the reporters and the like, were

12   saying about a possibility of a WhiteWave spin-off?

13   A.   I don't recall specifically what I intended with that memo;

14   it was seven years ago.  But I certainly intended to make them

15   aware of things that I attached to it.

16   Q.   OK.  And, now, do you recall, sir -- if I could show you

17   what's in evidence as Government Exhibit 513?

18           Do you recall, sir, that this is a transcript of the

19   Back-To-School conference that you were asked about?

20   A.   Yes.

21   Q.   And you recall, sir, that you were shown, if you

22   remember -- and I can show it to you if you need it -- that you

23   were asked a question and answer about WhiteWave?  Let me just

24   show you, if I may, it is at page 8 of the transcript, the last

25   two paragraphs.

H3kdwal1                        Engles - cross

1   A.  Yes.

2   Q.  OK.  And do you recall -- we talked a little bit about that

3   on direct -- that this is in response to the questions?  And,

4   again, the date of this is September 2010, if you recall?

5   A.  Yes.

6   Q.  And in talking about WhiteWave, you again are talking about

7   you are aware of the value it has in your business.  And if you

8   go down to the last sentence, you think it is incumbent upon

9   management to try and find a way to unlock that value for your

10  shareholders over time, correct?

11  A.  Yes.

12  Q.  And am I right, sir, that what you were trying to convey to

13  investors by making that statement was that you thought

14  WhiteWave would was not adequately reflected in your share

15  price and that the appropriate time, when the preconditions

16  were right, you were going to go forward with the spin-off?

17  A.  We were certainly trying to convey that we did not believe

18  that the value of WhiteWave was reflected in our stock and that

19  we were going to do those things necessary -- whatever they

20  might be -- in order that it be reflected in our stock.  I

21  don't believe at this point in time we had described what we

22  thought were preconditions necessary to spinning the business

23  off, and so I don't think at this point in time I would have

24  been alluding to the satisfaction of those because we hadn't

25  articulated those.

H3kdwal1                      Engles - cross

1    Q.  Do you recall being interviewed by the prosecutors in this

2    case early last year?

3    A.  Yes.

4    Q.  And, sir, do you recall telling them at that time that --

5    when looking at that transcript, that we thought the value of

6    WhiteWave was not adequately reflected in --

7          MR. GOLDMAN:  Your Honor, if he could just refresh by

8    showing -- it is not in evidence.

9          THE COURT:  Yes.  If you are reading from a document

10   that is not in evidence, it is not appropriate.

11   Q.  All right.  Sir, let me ask you, sir, do you recall

12   addressing this transcript in meetings with the prosecutors in

13   this case?

14   A.  In general, yes.

15   Q.  OK.  And do you recall specifically what you told them

16   about this?

17   A.  Not exactly, no.

18   Q.  OK.  Let me show you what's been marked for identification

19   as 3509-2.  And this is just for you, sir.  So first I am just

20   going to show you what's at the beginning just so you can see

21   what it is.

22   A.  OK.

23   Q.  And if I could direct your attention to page 3, last

24   paragraph.

25          And, sir, if you would just read that to yourself.

H3kdwal1                              Engles - cross

```
 1          (Pause)
 2   A.  Yes.  I see that.
 3   Q.  OK.  And my question to you, sir, is do you recall that in
 4   meetings in early 2016, you had said that one of your purposes
 5   in making that statement was to convey that at the appropriate
 6   time, when the preconditions were met, the company would go
 7   forward with the spin-off?
 8   A.  I do not recall saying that specifically.  These notes --
 9          THE COURT:  No.  No.  That was the question.
10          THE WITNESS:  OK.
11          THE COURT:  That was the question.
12   A.  I do not recall saying that specifically.
13   Q.  But would it be fair to say, sir, that you intended to
14   convey at the conference positive feelings about actions you
15   might take with regard to WhiteWave?
16   A.  Yes.  Yeah, I think the transcript that you showed me
17   reflects that, that we understood the value of WhiteWave and
18   that we intended to make that value tangible for our
19   shareholders.
20   Q.  And the notion of unlocking value, that's a phrase you use
21   repeatedly over time, correct?
22   A.  Absolutely, yes.
23   Q.  Would it be fair to say, sir, that you understood that over
24   time savvy investors understood unlocking value to refer
25   specifically to a spin-off?
```

H3kdwal1                          Engles - cross

1          MR. GOLDMAN:  Objection, your Honor, asking what

2    investors think.

3          MR. BERKE:  The witness' understanding, your Honor.

4          (Pause)

5          THE COURT:  There is no question pending.

6          THE WITNESS:  I'm waiting.

7          MR. BERKE:  Oh, your Honor.  I didn't hear your Honor.

8          THE COURT:  I said, rephrase the question.

9          MR. BERKE:  I'm sorry.  I didn't hear your Honor.

10    Thank you.

11    Q.  And, sir, do you have an understanding of how, over time,

12    investors understood your statement that you were looking for

13    ways to unlock the value of WhiteWave?

14          MR. GOLDMAN:  Objection, your Honor.

15          THE COURT:  Rephrase it, please.

16    Q.  The phrase that you used, unlocking the value for

17    WhiteWave, you used that phrase repeatedly over time, correct?

18    A.  Yes, I did.

19    Q.  OK.  Why did you use the phrase, unlocking the value of

20    WhiteWave?

21    A.  Because the value of WhiteWave was, to use that language,

22    locked inside of the larger Dean Foods, and we needed to find a

23    way to get it out.

24    Q.  And do you recall on Thursday you talked about that

25    sometimes you had made statements that you had hoped savvy

H3kdwal1                          Engles - cross

1    investors or analysts would understand more than what you are

2    saying?  Do you recall that, sir?

3    A.  Well, we -- I recall saying that we made statements that

4    weren't necessarily taken literally but that were intended to

5    convey what we were considering doing as a company.  We felt

6    that was important for investors.

7    Q.  And that was your intent in using the phrase "unlocking the

8    value of WhiteWave," correct?

9    A.  Well, it was quite literal in that sense that our intent

10   was that the value of WhiteWave be made available for our

11   shareholders who owned company one way or the other.

12   Q.  And generally I think you testified one way was a spin off

13   of WhiteWave, correct?

14   A.  Absolutely, yes.

15   Q.  The other was a sale of WhiteWave, correct?

16   A.  Possibly, yes.

17   Q.  And you were opposed to a sale of WhiteWave, correct?

18   A.  I was opposed to a sale of WhiteWave.

19   Q.  If I may show you what's marked for identification as

20   Defense Exhibit 1050?

21          And is this an email from your assistant Angelle

22   Sellers to you and others at the company?

23   A.  Yes, to the Board of Directors.

24   Q.  And the board.

25          It is dated September 20, 2010?

H3kdwal1                          Engles - cross

1    A.   Correct.

2            MR. BERKE:   Your Honor, I would offer Defense Exhibit

3    1050 into evidence.

4            MR. GOLDMAN:   No objection.

5            THE COURT:   Received.

6            (Defendant's Exhibit 1050 received in evidence)

7            MR. BERKE:   If we may publish it.

8    Q.   Now, if I can direct your attention to the sentence that

9    begins, "Given the recent rumors."

10   A.   Can you highlight that for me, please?

11   Q.   Yes.   One second.   You have to go down further.   And a

12   little further.

13           MR. GOLDMAN:   Which exhibit is this again?

14           MR. BERKE:   1050.

15   Q.   And so, sir, you see in the summary it says, "Given the

16   recent rumors, as well as the trajectory of the business over

17   the past few quarters, investors are probing as to what assets

18   might be for sale to help shore up the balance sheet and fund

19   the increase in capital expenditures that the network

20   optimization projects will require?"

21           Sir, do you remember what rumors you are talking

22   about?

23   A.   I do not.

24   Q.   I should have been clear.   This summary, if we go to the

25   first page, this is talking about the September 2010

H3kdwal1                    Engles - cross

1    Back-To-School combined conference we talked about, correct?

2    A.  Yes.

3    Q.  Can I ask you, sir, you see that you attach two analyst

4    reports to this?  If you see, J.P. Morgan 9-7-10, Stifel

5    Nicolaus 9-7-10?

6    A.  Yes.

7    Q.  Can I ask you why you did that, sir?

8    A.  I believe they had information that was relevant to the

9    board.

10   Q.  Was it important to you, sir, as the CEO how analysts were

11   interpreting or understanding the remarks that you made at

12   conferences like these?

13   A.  Sure.

14   Q.  And was it important how they were interpreting and

15   understanding comments you made at events like about WhiteWave?

16   A.  Yes.

17   Q.  Why?

18   A.  We wanted accurate information to be out there in the

19   marketplace.

20   Q.  And so you wanted to see how they were interpreting what

21   you said to make sure it was accurate, correct?

22   A.  Yes.

23   Q.  And if it wasn't accurate, what would you do?

24   A.  If it was materially inaccurate, certainly from time to

25   time we would correct it.

H3kdwal1                          Engles - cross

1    Q.  Do you recall whether in this instance you believed that

2    the analysts you attached were accurate in what they were

3    reporting on?

4    A.  I don't recall these reports at all.

5            MR. BERKE:  Your Honor, may I show to the witness the

6    reports?

7            THE COURT:  Yes, if the question is do you recall the

8    reports.

9    BY MR. BERKE:

10   Q.  Can I show you what's been marked Defense Exhibit 1053,

11   just for identification?

12   A.  Sure.

13   Q.  And you see what that is, correct?

14   A.  Yes.

15   Q.  OK.  If you will scroll down.  Still the first, and if you

16   can just make the whole page big.

17           If you look at the third bullet point and just to

18   yourself, sir.

19           (Pause)

20   A.  Yes.

21   Q.  OK.  And could I also show you the first paragraph, as

22   well?

23           (Pause)

24   A.  Yes.

25   Q.  OK.  And, sir, does that refresh your memory as to why you

H3kdwal1                    Engles - cross

1    were attaching -- and you see what the report is -- why you

2    were attaching a JPMorgan report, as indicated in your email to

3    the board?  Was it because you felt the report was accurate or

4    inaccurate in your --

5              THE COURT:  Well.  Pause.  Pause.  Pause.

6              The witness testified that he did not recall these

7    reports.  I thought you were showing the witness these reports

8    to take a look at to see whether they refreshed his

9    recollection as to the reports.

10             MR. BERKE:  Fair enough, your Honor.  Thank you.

11   Q.  Sir, does this refresh your recollection as to, in this

12   case, the JPMorgan report?

13   A.  It refreshes my recollection that it was put out, yes, but

14   not as to the details that are in it or why I would have

15   attached it to the email.

16             THE COURT:  Next question.

17             MR. BERKE:  OK.  Thank you, your Honor.

18   BY MR. BERKE:

19   Q.  Sir, let me show you what's been marked for identification

20   as GX603-C.

21   A.  Yes.

22   Q.  And you see, sir, that this is a Dean Foods earning call

23   transcript for third quarter 2010?

24   A.  Yes.

25             MR. BERKE:  Your Honor, I would offer Government

H3kdwal1                          Engles - cross

1   Exhibit 603C into evidence.

2              MR. GOLDMAN:  No objection.

3              THE COURT:  Received.

4              (Government's Exhibit 603-C received in evidence)

5   BY MR. BERKE:

6   Q.  And you said, Mr. Engles, these are all public?  These are

7   publicly available, correct?

8   A.  Yes.

9   Q.  And I'd like to show you, if I could direct your attention

10  to page 10.

11             I'd like to show you a question by Eric Sirota.  And

12  he's an analyst -- do you recall, he is an analyst at I believe

13  it is Wells Fargo?

14  A.  I don't recall where he is from but definitely an analyst

15  that covered the company.

16  Q.  OK.  Do you see where he asked, "I'm wondering whether you

17  could comment on potential asset sales or spinoffs," correct?

18  A.  Yes.

19  Q.  And if you could go to your answer during this third

20  quarter 2010 earnings call, which is right below, and I'd like

21  to identify what you say first and third.  So if you could read

22  the words beginning with "First."

23  A.  "First of all, let me just clear up the point of greatest

24  confusion in your question.  We are not further integrating

25  WhiteWave with FDD-Morningstar.  My commentary around

H3kdwal1                    Engles - cross

1   organizational structure is that we are further integrating FDD
2   and Morningstar, which reside within the same segment."
3   Q.  Could you go one more sentence, please?
4   A.  "So apparently that wasn't clear enough in our prepared
5   comments, but we have quite separate businesses between
6   WhiteWave and Alpro."
7   Q.  Again, I'm sorry, the next two sentences as well.
8   A.  "And it's important that we maintain separate businesses
9   for lots of reasons.  First of all, they're quite different,
10  and, secondly to your point, perfectly appropriately, it allows
11  us to maintain strategic flexibility to make decisions in the
12  future that will maximize value for our shareholders."
13  Q.  Sir, let me stop you there.
14         What did you intend to convey when you said maintain
15  WhiteWave separate from the other business allows you to
16  maintain strategic flexibility to make decisions in the future?
17  A.  It means that we could separate them in the future either
18  by a sale or a spin-off.
19  Q.  Now, sir, if you would go to the bottom where it says,
20  "Third."
21  A.  "The third thing I would point out is that these sources of
22  corporate structural activities that you allude to often come
23  with a host of other costs and complexities that aren't readily
24  apparent on the surface.  So for the time being,
25  WhiteWave-Alpro is an important value-creating asset within the

H3kdwal1                              Engles - cross

1    portfolio of Dean Foods.  It is managed quite separately and is

2    separable, and we're keenly aware of all the valuation issues

3    that you're discussing.

4    Q.  Is it fair to say, sir, when you say, in the beginning of

5    the last sentence, "so for the time being," and then go on to

6    say in the next sentence it is quite separable -- "and is

7    separable," you are intending to convey again that WhiteWave

8    could be separate from the company that is having a spin-off

9    for sale, correct?

10   A.  Absolutely.

11   Q.  Now, I'd like to turn to a topic -- so, leaving third

12   quarter 2010, and you recall in the end of 2010 going through

13   2011 and into 2012, the debt ratio of the company was a

14   significant issue that the company addressed; do you recall

15   that, sir?

16   A.  Yes, I do.

17   Q.  Could you explain for the jury what "debt ratio" refers to

18   in the context of Dean Foods?

19   A.  It refers to the amount of income that you generate in

20   comparison to how much debt that you have.  So, for example,

21   the more income you have, the more money you earn, the easier

22   it is to manage any given amount of debt and the debt ratio is

23   lower.  When the income goes down or the debt goes up, the debt

24   ratio gets higher and more difficult to manage.

25   Q.  And is it fair to say, sir, that during the time period

H3kdwal1                    Engles - cross

1    when you say second half of 2010 into 2011, the company was

2    trying very hard to lower the debt ratio, correct?

3    A.  Yes, it was.

4    Q.  That was a problem for Dean Foods, correct?

5    A.  Yes, it was.

6    Q.  And you talked about how the stock value of Dean Foods

7    during this period was low, and you understood -- and it was

8    your belief, was it not, that one of the reasons was because

9    investors had concerns about that debt ratio?

10   A.  Yes.

11   Q.  And I'd like to just -- if I could go to a document you

12   were shown on direct testimony and admitted into evidence as

13   Government Exhibit 505.  And if I may publish it briefly?

14        And if we could look at page 8, the second and third

15   paragraph, please, Mr. McLeod.

16        And, again, you've already talked a bit about this.  I

17   just want to ask you very briefly.

18        In this -- and, again, if I could just -- I don't

19   think I showed the date.  If we could just show the date of

20   this as well.

21   A.  Yes.  Can you tell me what this document is?

22   Q.  I'm sorry.  Let me go to the first page and then I'll come

23   back to page 8.  If we could highlight it?  Thank you.

24        This is the CAGNY conference that you talked about --

25   A.  OK.

H3kdwal1                          Engles - cross

1    Q.  -- on Thursday?

2              THE COURT:  Government Exhibit 505.

3              MR. BERKE:  Yes.  Thank you, Judge.

4    Q.  And if we could just get a date on it.

5              Do you recall it is February 22, 2011, and we will

6    show you?

7    A.  Yes.

8    Q.  OK.  Thank you, sir.

9              Now if you go to page 8?  Thank you, Mr. McLeod.  I

10   want to show you the second and third paragraph.

11             You see here you are talking about the WhiteWave

12   business again, correct?

13   A.  Correct.

14   Q.  And you -- if you look at the first paragraph that is shown

15   here, you are talking about supporting the continued growth in

16   earnings and we expect while reducing the leverage on our

17   balance sheet, correct?

18             when you talk about reducing the leverage on the

19   balance sheet, is that referring to debt ratio?

20   A.  Yes, it is.

21   Q.  OK.  And then you say about it, "This approach preserves

22   our future ability to separate the businesses tax-free."

23   A.  Correct.

24   Q.  OK.  And then if you go to the next paragraph, and if you

25   go just to the sentence beginning with "However," do you see

H3kdwal1                        Engles - cross

where you said, "I felt it was important to give you a

perspective of the pros and cons of any short-term separation

event, with the understanding that we continue to evaluate this

on a regular basis?"

A.   Yes.

Q.   Correct, sir?  OK.

         Now, do you recall, sir, again at this conference you

were asked specifically about how the debt ratio of the company

impacted the potential spin-off of WhiteWave?

A.   Yes.

Q.   OK.  And, sir, if we could go to our -- excuse me, Mr.

McLeod, if we could now go to page 9.  And you see there is a

question being asked by an unidentified questioner, and it

says:  "Just in terms of where you covered the strategic

options, and with the prospect or the theory of being able to

do a tax-free split, what level of debt would make that a

possibility?  Is it under three times debt-to-EBITDA ratio?"

         Sir, first, you understood the person asking how low

did you think the debt ratio had to go before you could

potentially do a spin-off of WhiteWave, correct?

A.   Yes.

Q.   And if I now can direct you to your answer.  And if you

could just read your answer here, sir, in the first paragraph.

A.   "No, I don't think it's that low.  I think, without being

in debt markets where you know what the terms are at the time

H3kdwal1                           Engles - cross

available, it's hard to find a -- to give you a specific number
of leverage or leverage multiple that the business needs to get
to.  But the things that you need to consider are that the milk
business today -- that the milk business has clearly been, over
the last several quarters, a much more volatile business than
it has historically."
Q.  OK.  Sir, that is good there, but I am going to ask you now
to go to the second paragraph, if I may.  And you see the
paragraph saying, "So the determining factor," the second --
A.  Yes.
Q.  If you would read that now, sir.
A.  "So the determining factor will be how much leverage we can
put on the milk business at the time of a spin in order to
affect the spin, and it's, I think, significantly below the
level that exists today.  So I would say certainly below four
times to make the milk business a comfortable business in terms
of pursuing a strategy and leveraging price."
Q.  So is it fair to say, sir, that you are conveying in
February 2011, that you thought, based on your current thinking
then, getting the Dean Foods' debt ratio below 4 would be a
good situation to potentially do a spin-off of WhiteWave?
A.  Yes.
Q.  OK.  And did you expect, sir, that savvy, sophisticated
investors were going to pay particular attention to your debt
ratio going forward?

H3kdwal1                          Engles – cross

1               MR. GOLDMAN:  Objection, your Honor.

2               THE COURT:  I will allow it.

3    A.  Yes.

4    Q.  And do you recall, sir, going forward, that Dean Foods and

5    you were in fact were successful in bringing down the debt

6    ratio?

7    A.  Yes.

8    Q.  And can I show you what's been marked for identification as

9    Government Exhibit 604-B?

10              (Pause)

11              And you see, sir, this is now the second quarter 2011

12   earnings call.  We went from February 2011.  You see now we are

13   in August 4, 2011, correct?

14   A.  Yes.

15              MR. BERKE:  Your Honor, I would offer Government

16   Exhibit 604B into evidence.

17              MR. GOLDMAN:  No objection.

18              THE COURT:  Received.

19              (Government's Exhibit 604B received in evidence)

20              MR. BERKE:  If we can publish it.  First publish the

21   first page to show what it is.

22              Thank you, your Honor.

23              (Pause)

24   Q.  Again, sir, as you said, it's the second quarter 2011

25   earnings call transcript on August 4, 2011, and, again, a

H3kdwal1                         Engles - cross

1   publicly available document, correct?

2   A.   Correct.

3   Q.   OK.   I'd like you to go to -- again, as you know there are

4   questions, I would like you to go to the questions at page 13,

5   if I may.   There is a question from Judy Hong of Goldman Sachs.

6            If we could highlight that and the answer.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3K3WAL2                      Engles - cross

1    Q.  Do you see Judy Hong, an analyst from Goldman Sachs,

2    correct?

3    A.  Correct.

4    Q.  You see where she says "Okay, and just finally on the

5    WhiteWave-Alpro, given your leverage has come down a bit, any

6    update to thinking in terms of potentially unlocking the value

7    of that business?  I know you guys went through the review in

8    October of last year, but just in terms of how you're thinking

9    about the option at this point."

10   A.  Yes.

11   Q.  If you would begin to read your answer.

12   A.  "Yes, look.  I think what we said early this year and late

13   last year, we understand the value unlocking potential of

14   disaggregating our portfolio.  We understand that really

15   clearly and we understand the benefit of our shareholders of

16   doing that.  We've got to get to a position where we can do it

17   in a way that in fact unlocks value.  And we still have some

18   hurdles to overcome in terms of getting there.  So really no

19   update with respect to that other than to reiterate that we are

20   mindful of the value creation opportunity for our stockholders,

21   and we continue to try to move the business and its positioning

22   to a logical place where that can be accomplished should, at

23   that time, it continue to present value creation

24   opportunities."

25   Q.  You recall, sir, at subsequent earnings announcement and

H3K3WAL2                     Engles - cross

1   earnings call you highlighted the debt ratio and the fact that

2   it was falling each quarter?  Do you recall that, sir?

3   A.  Yes, we spoke about our leverage ratio on almost every

4   call, I believe.

5   Q.  If I can now show you what's marked as 604-D for

6   identification.  Sir, you see that's fourth quarter 2011

7   earnings call February 15, 2012?

8   A.  Yes.

9         MR. BERKE:  Your Honor, I'd offer Government Exhibit

10  604-D into evidence.

11        MR. GOLDMAN:  No objection.

12        THE COURT:  Received.

13        (Government's Exhibit 604-D received in evidence)

14        MR. BERKE:  If we can publish beginning with the first

15  page, Mr. McLeod.

16  Q.  You see it says February 15, 2012, correct?

17  A.  Yes.

18        MR. BERKE:  If we can go to page seven, sixth

19  paragraph.  Sixth.  And just to be clear, if we can go a little

20  higher so you can show the witness who is speaking here.

21  Q.  This is Shaun Mara speaking.  And it says here he is your

22  former chief financial officer and executive vice president.

23  Was this a recent change of his position?

24  A.  I believe that's mistaken.  I believe he was our chief

25  financial officer at the time.

H3K3WAL2                    Engles - cross

1   Q.  Good.  Okay.  And so you see he's speaking now.  If you can

2   go to the sixth paragraph.  And you see where he says "If I

3   may.  With the added cash provided by divestitures we

4   successfully reduced our debt outstanding by 324 in 2011.  Our

5   leverage ratio of funded debt to EBITDA as defined by our

6   credit agreements continues to decline.  As we stated earlier

7   in the year, our goal was to reduce our leverage to below 4.75X

8   by year end.  We achieved this ending the year at 4.64.  This

9   is more than a full turn below our current maximum covenant."

10          Then you say "we anticipate our" -- I'm sorry.  This

11  is Mr. Mara, says "We anticipate our leverage ratio will be

12  approximately 4.5 at the end of the first quarter."  Continuing

13  that sentence, the next sentence, "and we will continue to

14  focus our leverage reduction in 2012.  All in all, fourth

15  quarter was very successful from an operating income, EPS, cash

16  flow and debt reduction perspective."

17          Again, sir, all of that debt references are all the

18  same debt ratio concept we've been talking about, correct?

19  A.  Yes.

20  Q.  After, sir, this February conference call it continued

21  to -- the debt ratio of Dean Foods continued to decline in the

22  first half of 2012, didn't it, sir?

23  A.  Yes, it did.

24  Q.  Let's go forward.  Do you recall, sir, that in July of

25  2011, there was an announcement that the litigation, that you

H3K3WAL2                          Engles – cross

1   had reached a settlement with the plaintiffs in the litigation

2   we talked about, the antitrust litigation, and it would be over

3   subject to the judge approving that settlement?

4   A.  As to one of the cases, yes.

5   Q.  Do you recall, you recall that was the dairy farmer case,

6   correct?

7   A.  Yes.  Excuse me.

8   Q.  Finish.

9   A.  Just to be clear, there were two large dairy farmer class

10  actions.  They were not consolidated.  One in Vermont, one in

11  Tennessee, there was a retailer antitrust litigation, and then

12  there were one or two individual cases in Mississippi.  As to

13  one of those cases, I believe that July was the announcement.

14  Q.  Do you recall it was a significant case where you were

15  going to pay $140 million?

16  A.  Yes, that was the Tennessee litigation.

17  Q.  My only question about that, sir, in July 2011, the company

18  issued a press release indicating you're starting to settle

19  these matters, correct?

20  A.  Yes.

21  Q.  Those efforts continued after July 2011, correct?

22  A.  Correct, yes.

23  Q.  Is it fair to say that by May 2012, a lot of events were

24  coming together to create preconditions for the WhiteWave

25  spinoff?

H3K3WAL2                         Engles - cross

1    A.   Yes.

2    Q.   It's fair, I think you've said publicly, and that two

3    conditions that definitely had to be met before there could be

4    a WhiteWave spinoff would be the litigation had to be resolved,

5    correct?

6    A.   Yes.

7    Q.   And the debt ratio had to come down significantly, correct?

8    A.   Yes.

9    Q.   Both those things were happening, correct?

10   A.   That's correct.

11   Q.   Now, sir, if I can show you what is admitted into evidence

12   as Government Exhibit 605-A.  Again, sir, if I can show you

13   this is the first quarter 2012 earnings call dated May 9, 2012,

14   correct?

15   A.   Correct.

16   Q.   What I want to ask you about is at page seven, top

17   paragraph, but I needed to go a little before then to show you

18   who is talking.

19        Again you see for some reason they keep getting

20   Mr. Mara's title wrong, but you see your chief financial

21   officer is speaking there?

22   A.   Yes.

23   Q.   If we go to page seven, the paragraph beginning "despite."

24   And you see where on May 9, 2012, Mr. Mara says that "Despite

25   the slight growth in debt with a strong growth in EBITDA our

H3K3WAL2                          Engles - cross

1    leverage ratio" -- sir, I'm sorry what is EBITDA?

2    A.  It is a measure of earings.  How much money you earn.

3    Q.  It is a way of measuring earnings?

4    A.  Yes.

5            THE COURT:  Earnings before interest, tax and

6    amortization.

7            THE WITNESS:  Interest, taxes, depreciation, and

8    amortization.

9            THE COURT:  That's the D.

10           MR. BERKE:  Thank you, Judge.  I appreciate that.

11   Q.  And you see where it says that the funded debt or the debt

12   ratio is continuing to fall, correct?

13   A.  Correct.

14   Q.  And you see where if you go to the last sentence, Mr. Mara

15   says "We expect total leverage to be at or below 4X by the end

16   of the year"?

17   A.  I do see that.

18   Q.  You recall, sir, when we go back to February of 2010, in

19   response to a question from an analyst in February on the

20   earnings call, you indicated at that time that looking ahead

21   you thought if the debt ratio fell below 4, that would be a

22   good time to do the spinoff?

23   A.  I do recall that, yes.

24   Q.  That wasn't hard and fast, correct?

25   A.  Not hard and fast, no.

1    Q.  On the same document, if I can go to your question and

2    answer at 10.  I'm sorry, begins at nine actually just to see

3    the questioner.  Eric Katzman, who we discussed on Thursday you

4    thought he was the best or one of the best analysts at Deutsche

5    Bank that covered Dean Foods?

6    A.  Very good analyst.

7    Q.  You see where Mr. Katzman says "The leverage has limited

8    your -- by your own comments -- your financial flexibility or

9    strategic flexibility with WhiteWave to recognize an asset that

10   by the comments today is hitting on all cylinders.  Can you

11   talk about a little bit about at what leverage point WhiteWave

12   is a potential asset to be spun off or sold."

13            You see that, sir?

14   A.  I do see that, yes.

15   Q.  And now if we can pick up where it says "so what I would

16   tell you."  Well, actually we can go a little higher than that.

17   Okay.  Can we go a little bit higher than that.  Thank you.

18            Can you read the sentence beginning "so if we don't

19   feel."

20   A.  Yes.  "So if we don't feel that the value of WhiteWave is

21   being reflected in the aggregate value of Dean Foods, we

22   understand that there is an opportunity to recognize the value

23   for our shareholders by operating it.  And we, again, I think,

24   stated that very clearly -- stated very clearly -- stated that

25   very clearly one and a half years ago.  There have been some

H3K3WAL2                    Engles - cross

1    constraints on our ability to do so, which we highlighted in

2    2011.  And those constraints were around the amount of leverage

3    that the businesses being separated could sustain, and what the

4    appropriate leverage profile was for the businesses if you were

5    to separate them, and litigation that frankly had to be

6    resolved before you could separate the businesses.  We've

7    largely resolved the litigation.  That's a very large net

8    positive for this company, and our leverage level is working

9    down.  So what I would tell you is we don't have a specific

10   leverage target at which we are going to pull the trigger, but

11   we're mindful of the opportunity we think to perhaps accrete

12   value for our shareholders.  And it's something that our

13   management and our board considers on a regular basis."

14   Q.  Is it fair to say, sir, your intent in making that

15   statement is to convey to the investment community that you

16   were seriously contemplating a spinoff of WhiteWave based on

17   all the things you just read?

18   A.  Yes.  I think that's fair.

19   Q.  At that time, the board had not approved a spinoff,

20   correct?

21   A.  No, it had not.

22   Q.  You didn't know if there was going to be a spinoff?

23   A.  I did not.

24   Q.  It was something you wanted to see happen if it could?

25   A.  Yes.

H3K3WAL2                        Engles - cross

1    Q.  You recall the same day you made that statement, sir, that

2    Dean Foods issued a press release indicating that significant

3    settlement in the antitrust litigation had been approved?

4    A.  I do not recall it was that day.  I don't recall when it

5    was.

6    Q.  Can I show you what's been marked GX 819 for

7    identification.

8    A.  Sure.  This is our form 10-Q.

9    Q.  Can I show you the date of this.

10            MR. GOLDMAN:  It's right there.

11            MR. BERKE:  Yes.

12   Q.  You see the date, sir?

13   A.  April 27 -- well --

14            THE COURT:  You need a magnifying glass.

15            MR. BERKE:  Hold on.

16   A.  There's a lot of dates on here.

17   Q.  Yeah.  So let me -- give me one second.  All the way at the

18   bottom I'm told.  There.

19   A.  No, that's not the date of the document.

20   Q.  That's not it.  Okay.  I think we have to go to the end of

21   it.  The next page.

22            MR. BERKE:  I'm sorry, your Honor.  If we can go to

23   the very end.

24   Q.  May 9, 2012.

25            So, sir do you recall that the company filed their

H3K3WAL2                         Engles - cross

1    10-Q May 9, 2012?

2    A.  I do, yes.

3    Q.  All right.  I apologize for the delay.

4            THE COURT:  Let me ask you.  Do you recall they filed

5    May 9, 2012 or do you read on the piece of paper they filed

6    May 9, 2012?

7            THE WITNESS:  I read it on the piece of paper.

8            THE COURT:  Do you recall whether it was that day?

9            THE WITNESS:  We almost always filed it on the day

10   that we issued our press release and our earnings, so that's my

11   recollection.

12           THE COURT:  But do you recall --

13           THE WITNESS:  I don't specifically recall filing this

14   or any Q as of that date, but that was our practice.

15           THE COURT:  I understand it was your practice.  I just

16   wanted to make the distinction between your practice and what

17   you recall.

18           THE WITNESS:  Got it.  Thank you.

19           MR. BERKE:  Thank you, your Honor.

20   Q.  But you recognize this as your 10-Q filed roughly around

21   that time period, correct?

22   A.  Yes.

23           MR. BERKE:  Your Honor, I'd offer Government Exhibit

24   819 into evidence.

25           MR. GOLDMAN:  No objection.

1          THE COURT:  Received.

2          (Government's Exhibit 819 received in evidence)

3          MR. BERKE:  If we can publish the first page.

4     Q.  This is the company's 10-Q, correct?

5     A.  Yes, it is.

6     Q.  Can you just briefly tell the jury what a 10-Q is?

7     A.  This is the document that we file with the Securities and

8     Exchange Commission, it is a publicly available document.  And

9     it reports our financial results for the prior quarter, which

10    this is for the quarterly period ending on March 31, 2012.  It

11    has in addition description of important matters that happened

12    during the quarter.

13    Q.  Thank you, sir.  If we can go to the last page.  Thank you.

14    As we saw it was May 9, 2012, the same day as the transcript

15    that we looked at with your remarks about WhiteWave, correct?

16    A.  Yes.

17         MR. BERKE:  Now if I can show you page 29.  We can go

18    to the section Tennessee retailer and purchaser actions.  We

19    have to go a little further.  I'm sorry a little higher,

20    actually.

21         Sir, and I'm sorry, if we can go the page before,

22    Mr. McLeod, show what we're talking about.  Thank you.

23    Q.  See it's talking about the Tennessee dairy farmer action

24    which you described as the big case, correct?

25    A.  Yes.

H3K3WAL2                    Engles - cross

1    Q.  And the related Mississippi action.

2           Now if we go to page 29.  On February 14, 2012, the

3    Court granted preliminary approval of the settlement agreement

4    and set May 15, 2012 as the date to consider final approval of

5    the agreement.

6           That was significant for the company?

7    A.  Very.

8    Q.  You made clear here, but you also made clear to investors

9    at the time, that the resolution of the litigation was a

10   critical precondition, correct?

11   A.  Yes.

12   Q.  You understood, sir, that a lot of -- not everything, but a

13   lot of what happened with the litigation was publicly available

14   through transcripts and the like?

15   A.  Yes.

16   Q.  Did you have an understanding that investors were watching

17   those litigations based on your comments?

18   A.  I believe they were, yes.

19   Q.  If I could show you what's been marked for identification

20   as Defense Exhibit 1000-A.

21          MR. BERKE:  Your Honor, in light of our discussions

22   earlier, I'd like to just raise an issue with your Honor, I

23   think just to be in fairness given the discussion we had, this

24   is not an issue that came up and I can put a page on the screen

25   about this exhibit before I go forward or ask your Honor about

H3K3WAL2                    Engles - cross

1    it.

2                THE COURT:  All right.  Do you want to put a page up.

3                MR. BERKE:  Let me do that, your Honor, and you see

4    what it is.  The first page and if we can go to page 29.  And

5    if you see the lower-right-hand corner in particular, your

6    Honor.

7                THE COURT:  I see.

8                MR. BERKE:  It continues on the next page as well.

9                THE COURT:  The comments attributed to the individual

10   would seem to be covered by my prior ruling.

11               MR. BERKE:  Okay, your Honor.  Thank you.  Your Honor,

12   while we have the witness here if I can do one thing.  If we

13   can put that back up for identification.

14   Q.  Sir, was it common for you to do a regular financial

15   business view and outlook for the board of directors?

16   A.  Yes, we did it at every board meeting.

17   Q.  You'd use slides to do that, correct?

18   A.  Yes, we did.

19               MR. BERKE:  Thank you.  You can take that down.

20   A.  I should rephrase that.  We did it every regularly

21   scheduled board meeting.

22   Q.  Now if I can direct your attention, sir, to what's been

23   marked for identification as GX 462.

24               Sir, do you see that this is minutes of a board of

25   directors for Dean Foods?

H3K3WAL2                          Engles - cross

```
 1   A.  Yes, I do.

 2   Q.  It's dated May 17, 2012, correct?

 3   A.  Yes.

 4            MR. BERKE:  Your Honor, I'd offer in evidence what's

 5   been marked for identification as Government Exhibit 462.

 6            MR. GOLDMAN:  No objection.

 7            THE COURT:  Received.

 8            (Government's Exhibit 462 received in evidence)

 9            MR. BERKE:  If I may publish it.

10   Q.  This is minutes of a board of directors meeting that took

11   place on May 17, 2012, correct?

12   A.  Yes, it is.

13   Q.  In the corporate offices in Dallas, correct?

14   A.  Correct.

15   Q.  Mr. Davis was there, correct?

16   A.  Yes, he was.

17   Q.  Among the other board members?

18   A.  Uh-huh.

19   Q.  Do you recall at this time, you again spoke about the

20   WhiteWave spinoff?

21   A.  If you would --

22   Q.  Let me show you this.

23   A.  -- refresh my recollection, please.

24   Q.  If we can go to page four, first about 10 lines down from

25   the top of the page.  You see in the middle it notes that
```

H3K3WAL2                        Engles - cross

1    Mr. Engles reviewed leverage consideration and the additional

2    flexibility afforded by declining leverage levels.

3              Again, that's the debt ratio we were talking about,

4    correct?

5    A.  Yes.

6    Q.  Mr. Magro, and that's your investment banker who had been

7    at Bank of America at this time and he changed to a different

8    firm, do you remember?

9    A.  He was at Evercore at this time.

10   Q.  That's a boutique investment banking advisor, correct?

11   A.  Yes.

12   Q.  It says "Mr. Magro then discussed a potential separation of

13   the company's business platforms and the potential value

14   creation opportunity that such a separation may afford."

15   Correct?

16   A.  Yes.

17   Q.  Then, among other things, you're talking about the spinoff

18   of WhiteWave if you go down.  Do you see that, sir?

19   A.  Yes, I do.

20   Q.  If I could go to the action taken, if we can go to page

21   four.  Beginning at the bottom of page four and resolution,

22   that's when the board agrees to take action, correct?

23   A.  Correct.

24   Q.  You see that what you're doing at this time is you're

25   saying that the officers are authorized to continue an analysis

H3K3WAL2                    Engles - cross

1   of, just to be clear, saying continue, because there had been

2   an ongoing analysis of the potential of a WhiteWave spinoff,

3   correct?

4   A.  Correct.

5   Q.  And commence the work associated with the potential

6   separation transactions set forth in the materials previously

7   distributed to the board.  Is that correct, sir?

8   A.  That is correct.

9   Q.  Again, decision had not yet been made to actually have the

10  spinoff for the IPO, but you're now deciding at this board

11  meeting you are going to start doing more work with that goal

12  in mind to potentially do it.  Fair statement?

13  A.  Fair.

14  Q.  Can I now show you, sir, now I'd like to go forward a

15  little further in time.  Do you recall in May and June of 2012,

16  you increased your public appearances substantially and your

17  statements about WhiteWave in particular?

18  A.  I certainly appeared publicly during those months.  I don't

19  know if it was more or less than I normally did, but I

20  certainly appeared publicly.  And yes, WhiteWave was much more

21  of a topic following our May earnings call than it had been

22  prior to that time.

23  Q.  So let me show you, remember you were asked on direct about

24  your attendance at a Bernstein conference at the end of

25  May 2012?

H3K3WAL2                          Engles - cross

1    A.  Yes, I do.

2    Q.  If we can publish or put on the screen what's already in

3    evidence as Government Exhibit 534.

4            Again, this is the transcript of the Bernstein

5    conference, correct?

6    A.  Correct.

7    Q.  Again, information here publicly available, correct?

8    A.  Yes.

9    Q.  If we can go to page 199.  There is a question about by

10   Alicia Howard.

11   A.  Alexia Howard, yes.

12   Q.  She was an analyst at Sanford Bernstein?

13   A.  Correct.

14   Q.  I think we have to go a little further in her questions.

15   I'm sorry.  She was the moderator of this conference, correct?

16   A.  Yes, and she was also the analyst that covered us at

17   Sanford Bernstein.

18   Q.  We have to go to the bottom of page 198, there was another

19   question from her.  So, and she asked "One of the questions

20   that investors are most curious about is the question of

21   whether the WhiteWave business can be split off from the rest

22   of the company.  And I think you mentioned on last earnings

23   call that's something that you and the board consider on a

24   regular basis.  Could you tell us a little more about the

25   criteria they use to value each different part of the business

H3K3WAL2                          Engles - cross

1   of the comparable companies."

2              Is that correct, sir?

3   A.  That is correct, yes.

4   Q.  Then she goes on at the end "And what criteria would you

5   think about in terms of when it might be possible or

6   appropriate to split off the WhiteWave business further down

7   the road."  Correct?

8   A.  Yes.

9   Q.  Now if we go to your answer.  Do you see top of the

10  paragraph and you see where you say the very -- can you read

11  the very first sentence?

12  A.  Yes.  "I think that is perhaps one of the most pressing

13  topics of the day for us as a company.  And it really comes

14  back to the fact that when you go back and" --

15  Q.  No, that's the first sentence.  We can go further in a

16  second.

17              Did that reflect your true views at that time, that in

18  May 30, 2012, that that was the most pressing topic of the day

19  for the company?

20  A.  Yes, it did.

21  Q.  Sir, I think there's other parts of your answers that I

22  think actually you addressed in your direct testimony but that

23  also reflect WhiteWave.

24              Now, do you recall in May 2012 that you appeared on a

25  very popular -- or a show called Squawk Box?

1    A.  I do recall that, yes.

2    Q.  And for those not familiar, can you describe what Squawk

3    Box is?

4    A.  Squawk Box is a show hosted by a gentleman named Jim Cramer

5    who is a very interesting financial analyst and very engaging

6    guy.  He has a television show that's a daily television show.

7    Q.  So you're familiar with Mad Money, correct?

8    A.  Yes.

9    Q.  That's the Jim Cramer show, Mad Money?

10   A.  Yes.

11   Q.  Is Squawk Box a show on CNBC that is very popular?

12   A.  You asked me about Squawk Box.

13   Q.  I did.  We're going to do Mad Money next.  You appeared on

14   both?

15   A.  And he hosts both.  So hence my confusion.

16   Q.  Good.

17   A.  I do not remember my experience on Squawk Box.

18   Q.  Do you recall it was your first time -- so you just don't

19   recall it?

20   A.  Well, I do recall a -- I do recall a visit with I believe

21   Carl Quintanilla.

22          MR. BERKE:  Let me show you what's been marked for

23   identification as Defense Exhibit 2006, if I may.  If we can go

24   to page two.  This is just for you, sir.  If we can go down to

25   the next page too.  You can see what it is.

H3K3WAL2                       Engles - cross

 1              Now if we can go to the first page.
 2   Q.  My question to you is, do you recall that in early
 3   May 2012, you, sir, appeared on Squawk Box?
 4   A.  Yes, I do.
 5   Q.  Do you recall, sir, that you had not appeared on that show
 6   in a long time?
 7   A.  Yes.
 8   Q.  Do you recall that it was remarked during your interview it
 9   had been 10 years since you had last appeared?
10   A.  Yes, I have a general recollection of that.
11   Q.  Now, do you recall, sir, that you appeared later that month
12   also in May on Jim Cramer's Mad Money?
13   A.  Yes, I do recall.
14              MR. BERKE:  Your Honor, if I may offer Defense Exhibit
15   2031.  We discussed this with the government.  It's Mr. Engles'
16   interview on the show that contains just his interview, not the
17   preceding, and we would offer Defense Exhibit 2031 and ask to
18   play it for the jury.
19              THE COURT:  Any objection?
20              MR. GOLDMAN:  No objection.
21              THE COURT:  Received.
22              (Defendant's Exhibit 2031 received in evidence)
23              (Video recording playing)
24              THE COURT:  We're going to take our midmorning break.
25   Ladies and gentlemen, please do not discuss the case among

H3K3WAL2                              Engles - cross

1    yourselves or with anyone.  We'll be back in action in 10

2    minutes.  Thank you.

3               (Jury excused)

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3K3WAL2                          Engles - cross

1          THE COURT:  Before we break, I have Court Exhibit no.

2     3, which is a note from the Juror No. 16, the same juror who

3     sent me the note that was marked as Court Exhibit No. 2.  Over

4     the break I'm going to invite counsel to review the note.  And

5     I plan at the end of the day today to, when we excuse the

6     jurors, to have her remain behind and then excuse her as an

7     alternate juror.

8          MR. GOLDMAN:  Your Honor --

9          THE COURT:  I'll see you in 10 minutes.

10         MR. GOLDMAN:  We want to know how much more Mr. Berke

11    may have on cross because Mr. Engles has rearranged his travel,

12    but we'd like to finish by the lunch break if possible.

13         MR. BERKE:  I'm trying.  I think I have an hour, maybe

14    an hour and a little bit of change.  But it should be very

15    doable.

16         MR. GOLDMAN:  We'll have some redirect.  So I don't

17    know whether --

18         THE COURT:  Okay.  See you in 10 minutes.

19         (Recess)

20         THE COURT:  Any objection to dismissing the juror at

21    the end of the day?

22         MR. GOLDMAN:  No.

23         MR. BERKE:  No objection, your Honor.

24         THE COURT:  Thank you.

25         (Continued on next page)

H3K3WAL2                        Engles - cross

1            (Jury present)

2    BY MR. BERKE:

3    Q.  Mr. Engles, fair to say that your appearance on Mad Money

4    was positively received?

5            MR. GOLDMAN:  Objection, your Honor.

6    Q.  That was a positive event?

7            THE COURT:  Sustained.  Sustained.

8    Q.  Did you view that appearance as a positive event for the

9    company?

10   A.  Yes.

11   Q.  You recall that at the end of the interview, Jim Cramer

12   says that he thinks that if there is a spinoff the stock could

13   go to 20?  Do you recall that?

14   A.  I do, yes.

15   Q.  And the stock at that time was significantly below 20,

16   correct?

17   A.  I don't recall exactly where it was, but yes, it was below

18   20.

19   Q.  Your response was "that's constructive"?

20   A.  Yes.

21   Q.  Sir, again, do you recall the date of this interview was

22   May 31, 2012?

23   A.  I believe that's about the right time frame, yes.

24   Q.  Again, at this time, we saw the board had authorized

25   continuing to do steps to analyze the possible transaction, but

H3K3WAL2                         Engles - cross

1   it had not approved the transaction yet, correct?

2   A.   That is correct.

3   Q.   And ultimately, the IPO was announced on August 7, 2012,

4   correct?

5   A.   That's correct, yes.

6            THE COURT:  When you say the IPO, would that include

7   the fact of the spinoff?

8            THE WITNESS:  It would have included -- it included

9   our intention to spin following the IPO, yes.

10           THE COURT:  All right.

11           MR. BERKE:  Thank you.

12           THE COURT:  So it would be an initial public offering

13  of the shares of new WhiteWave.

14           THE WITNESS:  Yes.

15           THE COURT:  Okay, go ahead.

16           MR. BERKE:  Thank you, Judge.

17  Q.   Can I show you what's been marked for identification as DX

18  1040.  This is a financial business overview and 2012 outlook

19  dated November 15, 2012, correct?

20  A.   Yes, it is.

21  Q.   Can I show you pages 30 and 36.

22  A.   Yes.

23           (Continued on next page)

24

25

H3kdwal3                        Engles - cross

1    A.  Yes.

2    Q.  And 36.

3             (Pause)

4             And this is part of the presentation to the board,

5    correct?

6    A.  Yes, it is.

7             MR. BERKE:  Your Honor, I would ask to introduce as

8    what I'll call Defense Exhibit 1040A the first page, page 30,

9    and page 36 of the exhibit.

10            THE COURT:  Any objection?

11            MR. GOLDMAN:  No objection, your Honor.

12            THE COURT:  Received.

13            (Defendant's Exhibit 1040A, pages 30 and 36, received

14   in evidence)

15            MR. BERKE:  May I publish it, your Honor?

16            THE COURT:  You may.

17   Q.  OK.  And again, sir, so this is a November 15, 2012 board

18   meeting, financial business overview and 2012 outlook, correct,

19   sir?

20   A.  Yes, it is.

21   Q.  And this follows the August 7th announcement of the IPO, of

22   the initial public offering we talked about, correct?

23   A.  Yes, it does.

24   Q.  OK.  I'd like to direct your attention to page 30 of this

25   exhibit.

H3kdwal3                        Engles - cross

1              MR. BERKE:  OK.  Mr. McLeod, can you make that as big

2    as you can?

3              Your Honor, may I approach the screen to point out

4    some things?  I think it may be helpful, given the nature of

5    the chart.

6              THE COURT:  You may.

7              MR. BERKE:  Thank you, Judge.

8              MR. GOLDMAN:  While he is doing that, I just wanted to

9    clarify only pages 30 and 36 came in as 1040A and B, right?

10             MR. BERKE:  I introduced the entire exhibit as 1040A,

11   which is the cover sheet and page 30 and 36, calling that

12   Exhibit 1040A.

13             MR. GOLDMAN:  Did you intend to introduce the whole

14   document or just those two pages?

15             MR. BERKE:  Those two pages.  I am happy to introduce

16   the whole document if you should wish.

17             THE COURT:  You offered the cover page --

18             MR. BERKE:  The cover and two pages.

19             THE COURT:  -- and two pages.

20             MR. GOLDMAN:  That is fine.  That's where we are at.

21             THE COURT:  Proceed.

22             MR. BERKE:  Thank you, Judge.

23   BY MR. BERKE:

24   Q.  And, Mr. Engles, can you see this, because if you would

25   rather stand, as well?  Whatever --

H3kdwal3                          Engles - cross

1    A.  I can see just fine.

2            THE COURT:  You can stand if you wish to.

3            THE WITNESS:  No.  I can see just fine.

4    Q.  OK.  So you see where it says, up high, "Investors are

5    playing tug-of-war with DF stock?"

6    A.  Yes.

7    Q.  There is, again, in November looking back to what happened

8    between the period of at least, you know, throughout 2012,

9    correct?

10   A.  Yes.

11   Q.  And you see on the left side, it says "Excitement Over:

12   Strong performance value unlock."

13   A.  Yes.

14   Q.  And, again, that's where people felt very excited about the

15   potential for WhiteWave, correct?

16   A.  Yes.

17   Q.  And on the right hand it said, "Concern Over:  Rising dairy

18   forecasts."

19   A.  Yes.

20   Q.  And we talked a little bit about that issue on Thursday.

21   And, again, there was a problem with milk prices going up,

22   correct?

23   A.  Well, the issue here was slightly different.  The issue

24   here during this time period was you will recall there was a

25   very bad drought in the summer of 2012 and feed prices were

H3kdwal3                          Engles - cross

1    going up.

2    Q.   Right.  I'm sorry.

3    A.   And people were concerned that milk prices would then rise.

4    Q.   And, in fact, it refers to that lower.  So the rising dairy

5    forecast because, as you correct, the grain prices were going

6    to go higher, so the greater cost, lower profits, correct?

7    A.   Greater cost would drive up the milk prices, yes.

8    Q.   And then "Retailer Pressure," what is that, sir?

9    A.   Concern that we would end up back in the same place where

10   the retailers were deeply discounting milk.

11   Q.   And "Weak milk category volumes."

12   A.   Yes.

13   Q.   What did that refer to, sir?

14   A.   For quite some time, I think it has continued ever since

15   the financial crisis, milk volumes -- total amount of milk sold

16   has drifted down.

17   Q.   And, sir, you see -- so now wee have May here and June.  If

18   you can see that?

19   A.   Yes.

20   Q.   And you recall May, we went over a variety of statements

21   you made and public appearances.  The stock price of Dean Foods

22   was climbing, it started to climb around this period through

23   June it kept going up leading into July.  Do you see that on

24   the chart, sir?

25   A.   Yes, I do.

H3kdwal3                          Engles - cross

1    Q.   Then when we are in July and August, you begin to see the

2    stock price, notwithstanding -- you didn't have any contrary

3    statements about WhiteWave during that period, correct?

4    A.   No.

5    Q.   But the stock price was beginning to fall as part of this

6    tug of war with investors, correct?

7    A.   Yes.

8    Q.   So, again, we see it reaching a peak and if you look to

9    what is roughly shortly sometime early in July, and then coming

10   down in the July and August time period, correct?

11   A.   Yes.

12   Q.   And on the chart it refers to the drought that you

13   mentioned, correct?

14   A.   Yes.

15   Q.   The USDA crop report revisions, correct?

16   A.   Yes.

17   Q.   And it continues to come down through July and August and

18   stays relatively low going into August 7th, when you announce

19   the initial public offering and the intent to spin off

20   WhiteWave, correct?

21   A.   That is correct, yes.

22   Q.   And do you recall, sir -- can you recall, again, in terms

23   of the tug of war, do you recall you yourself participating in

24   discussions about how the stock was falling while at the same

25   time WhiteWave was in the air, as it were?

H3kdwal3                    Engles - cross

1    A.  I actually don't recall that, having those discussions.

2    Q.  Now let me show you, sir, slide 36.

3          Now, slide 36 is the top 15 -- you see at the top, it

4    says, "Top 15 have increased their cumulative holdings to

5    46 percent?"

6    A.  Yes.

7    Q.  I just want to break it up.  These are the top 15

8    shareholders in Dean Foods' stock, correct?

9    A.  That is correct, yes.

10   Q.  And if you go to the column that says "Position as of

11   3/30/2012."

12   A.  Yes.

13   Q.  OK.  And if you go down, it adds up and it shows that your

14   top 15 investors had 33 percent of the market share of Dean

15   Foods, correct?

16   A.  That's correct, yes.

17   Q.  And if you look at the position on June 30, 2012, your top

18   15 had increased it from 33 percent to 40 percent of the market

19   share, is that correct?

20   A.  Yes, that's correct.

21   Q.  And you would agree, sir, that reflects that your -- and

22   the top 15 tend to be your most sophisticated investors who

23   best understand Dean Foods as a general matter, correct?

24   A.  Well, they are also sophisticated investors, and they all

25   have the ability to do the work necessary to understand the

H3kdwal3                    Engles - cross

1   business.

2   Q.  OK.  And you understood that this reflects that these

3   investors, again cumulatively, had increased their holding

4   based on their evaluations of the company, as we just

5   indicated, from March 31 to June 30 in the numbers, right?

6   A.  Yes.

7   Q.  We will come back to that in one second.

8        MR. BERKE:  We could take it down for now, Mr. McLeod.

9   Thank you.

10  Q.  And fair to say that the announcement on August 7th was

11  very well received, as indicated in the chart?

12  A.  Yes, it was.

13  Q.  You recall the stock price went up roughly 40 percent?

14  A.  That's correct.

15  Q.  And you made statements to the board and others about how

16  pleased you were that it had been so well received, correct?

17  A.  I believe I did, yes.

18  Q.  Now, sir, do you recall that after the announcement, you

19  took steps to show to the investment community how good you

20  felt about the announcement?

21  A.  I don't recall that, no.

22  Q.  Let me show you what's been marked for identification as

23  GX706-M.

24        And, sir, do you recall that -- do you recognize that

25  as a Dean Foods' press release issued on August 10, 2012?

H3kdwal3                        Engles - cross

1    A.   Yes.

2              MR. BERKE:  Your Honor, I would offer into evidence

3    GX706-M.

4              MR. GOLDMAN:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 706-M received in evidence)

7              MR. BERKE:  If I may publish it?

8    Q.   Again, this says, "Dean Foods announces Chief Executive

9    Officer exercised options with intent to hold shares."

10             And that is you, of course, correct, sir?

11   A.   That's me, yes.

12   Q.   And if you go down to the substance, it says, "Dean Foods

13   today announced that Gregg Engles, Chairman and Chief Executive

14   Officer, exercised stock options for approximately 950,000

15   shares in a net exercise transaction with the company."

16   A.   Yes.

17   Q.   "He intends to hold all of the shares of Dean Foods common

18   stock obtained through the option exercise net of those shares

19   necessary to cover the exercise price and related tax

20   liability."

21   A.   Yes.

22   Q.   And then it goes on at the end to say, "Following the

23   completion of the exercise, Mr. Engles will hold approximately

24   2.8" and change "million shares of Dean Foods common stock,"

25   correct, sir?

H3kdwal3                          Engles - cross

1    A.  Yes.

2    Q.  And when you made this announcement -- the company made

3    this announcement, you understood that that would be

4    perceived -- well, was it your intent for that to be perceived

5    by the market as a positive endorsement of the recent decisions

6    by you, sir, the Chief Executive Officer?

7    A.  No.  It was just intended to communicate what the Chief

8    Executive Officer was doing with his shares.

9    Q.  Right.  But did you understand that your statement that you

10   were going to exercise and hold the shares, as opposed to sell

11   them, would generally be positively received?

12   A.  Certainly more positive than the alternative, yes.

13   Q.  And you understood that very sophisticated investors looked

14   to whether senior management was buying their stock or selling

15   their stock as one indicator of how they feel about the stock?

16   A.  Yes.

17   Q.  And, sir, if I can -- and you know -- if we can go back to

18   the slide we were looking at, which is Defense Exhibit 1040A at

19   36.

20           I'm sorry.  There it is, yes.

21           And now, if we can -- sir, after your announcement of

22   the IPO and after the other announcements we've talked about,

23   do you see on this -- if we could make it a little bigger,

24   Mr. McLeod, if possible?  Bless you.  Thank you.  You see that

25   that says, "Current position as of September 30, 2012?"

H3kdwal3                    Engles - cross

1    A.  Yes.

2    Q.  And you see that your top 15 increased their position from

3    40 percent all the way to 46 percent, correct?

4    A.  Yes, that is correct.

5    Q.  So your top 15 were hold nearly half -- nearly 50 -- well,

6    46 percent, a substantial number?

7    A.  Yes.

8    Q.  And can I show you now, sir, what's marked for

9    identification as Defense Exhibit 657.

10           And, sir, do you recognize this as your

11   self-evaluation for 2012?  We looked at one for an earlier

12   year.

13   A.  Yes, I do.

14   Q.  This is a document kept in the regular course of business

15   of Dean Foods, correct?

16   A.  Yes, it is.

17           MR. BERKE:  Your Honor, I would offer Defense Exhibit

18   657.

19           MR. GOLDMAN:  Your Honor, I hate to do this but could

20   we have a short sidebar, please?

21           THE COURT:  All right.

22           (Continued on next page)

23

24

25

H3kdwal3                          Engles - cross

1                    (At the sidebar)

2                    MR. GOLDMAN:  Your Honor, this is a document that is

3          similar to one that came in last week after the Court went

4          through some of the foundational questions about a business

5          record.  The government, the problem we have is that you can

6          ask those questions that are foundational questions for a

7          business record, but this is really an after-the-fact summary

8          that's prepared via the CEO's secretary of his own

9          self-evaluation.  It's much more akin to a police report.

10                   If you were to ask a police officer the same questions

11         that you asked the witness, the foundational questions, was it

12         kept in the matter of the regular course of business, etc., for

13         a police report, the police officer would also agree with your

14         Honor.  But this document is an after-the-fact summary of the

15         witness' assessment, and, therefore, we don't believe that it

16         falls under the business records exception.

17                   THE COURT:  All right.  Do you have the text of the

18         document?

19                   MR. BERKE:  I do.  Do you want me to put it on the

20         screen, your Honor?

21                   THE COURT:  Yes.  Is it in a binder?

22                   MR. BERKE:  There were so many binders.  We have them.

23                   THE COURT:  If you would just give me a clean copy of

24         it, that would be best.

25                   (In open court)

H3kdwal3                    Engles - cross

1          THE COURT:  Ladies and gentlemen, feel free to stand

2     up and stretch, if that would help.

3          (At the sidebar)

4          MR. BERKE:  And it is on page 4.  It is question 4

5     about investment community.

6          MR. GOLDMAN:  That's what he intends to introduce.

7          THE COURT:  I understand.

8          (Pause)

9          It seems to me this is -- this document was prepared

10    how long after the events?

11         MR. BERKE:  I believe this --

12         THE COURT:  Or the announcement of the IPO, I should

13    say.

14         MR. BERKE:  Yes.  I believe this was prepared in

15    January of 2013.

16         THE COURT:  Right.  All right.  It is prepared

17    substantially after the fact and gives a retrospective summary

18    evaluation of this witness' belief of his own actions over a

19    long period of time.  So, you know, in about 12 lines of text,

20    he summarizes an extended period of interaction with analysts,

21    who he refers to we had for years stated our intent to separate

22    WhiteWave and Dean.  And he goes on, "True to our word."

23         What I'll allow you to do is to ask questions of the

24    witness about his present-day recollection, and depending on

25    what his answers are, you can use this to see whether you can

H3kdwal3                          Engles – cross

1    refresh his recollection.

2            MR. BERKE:  And if not, can I use it for impeachment,

3    your Honor?

4            THE COURT:  We'll see when we get to that point.

5            MR. BERKE:  OK.

6            THE COURT:  Here's your binder.

7            MR. BERKE:  I'm sorry.  Thank you.

8            Your Honor, if you would like a set of binders, we are

9    happy to do it.

10           THE COURT:  No.  I'm fine.  Thank you.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3kdwal3                         Engles - cross

1             (In open court)

2             THE COURT:  All right.  You may proceed, Mr. Berke.

3             MR. BERKE:  Thank you, Judge.

4    BY MR. BERKE:

5    Q.  Sir, is it fair to say that the company had indicated for

6    some time of your desire or your intent to separate WhiteWave

7    from Dean to unlock the value of that branded business?

8    A.  Yes.

9    Q.  And is it also fair to say that you moved aggressively to

10   do so when your leverage ratios declined?

11   A.  Yes.  We moved aggressively to do so when we had the

12   opportunity.

13   Q.  Thank you, sir.

14            I want to very quickly take you back to some earlier

15   quarters that you were asked about on your direct.  I will try

16   to identify it, but we are going to go through different time

17   periods just so you are aware.

18   A.  OK.

19   Q.  Do you recall, sir, that you were asked about the earnings

20   announcement on February 13, 2008?  All the way back in time

21   now, 2008.

22   A.  I recall being shown that, yes.

23   Q.  OK.  And do you recall, sir, that that period of time was a

24   very volatile period for Dean Foods and the industry?

25   A.  Yes, in fact it was.

H3kdwal3                          Engles - cross

1    Q.  And do you recall, sir, that you indicated to the market

2    your intent to issue guidance, in part, because it was such a

3    volatile period?

4    A.  Did you say my -- would you rephrase that, please?

5    Q.  Actually, let me show you a document.

6            Can I show you what's been marked for identification

7    GX702-C?  This is in 2008, correct, sir?

8    A.  Yes, this is 2008.

9    Q.  OK.  This is the announcement of fourth quarter earnings,

10   correct?

11   A.  Yes.  This is fourth quarter earnings.

12   Q.  OK.  Could I show you the second page, first paragraph.

13   A.  Yes.

14   Q.  And then the next paragraph.

15           (Pause)

16           And there is a paragraph that begins, "Turning to the

17   outlook for 2008."

18   A.  Yes.

19           MR. GOLDMAN:  Your Honor, I don't think this document

20   is in evidence, and I'm not sure that there is any refreshing

21   that is --

22           MR. BERKE:  Your Honor, I would offer Government

23   Exhibit 702-C.

24           MR. GOLDMAN:  No objection.

25           THE COURT:  Received.

H3kdwal3                              Engles – cross

1                (Government's Exhibit 702-C received in evidence)

2                MR. BERKE:   Mr. McLeod, if we could just publish the

3    top of the first page and then back to that paragraph.

4                Thank you, Judge.

5    Q.   OK.   That is your announcement for fourth quarter year-end

6    2007, correct?

7    A.   Yes, it is.

8    Q.   Now if we could go to the second page, the paragraph

9    beginning "Turning to the outlook."

10               You see for this period you say, "Turning to the

11   outlook for 2008, it's clear that our results will continue to

12   be driven primary by swings in the dairy commodity markets."

13   A.   Yes.

14   Q.   And then you go down to the last sentence of that

15   paragraph, "Faced with these highly volatile and uncertain

16   markets, we believe it is prudent to provide a wider guidance

17   range for quarterly guidance than previous practice, and

18   limited guidance for the full year," correct?

19   A.   Yes.

20   Q.   Stated simply, is it fair to say giving guidance is giving

21   some indication of what you expect your earnings will be based

22   on where you are at that time in the quarter?

23   A.   Yes.   That's what guidance consists of.

24   Q.   Now, sir -- thank you, Mr. McLeod.   If we could go to

25   what's been marked as DX2176, for identification.

H3kdwal3                          Engles - cross

1            Sir, do you recognize that as a Dean Foods' press

2    release issued on February 29, 2008?

3    A.  Yes, I do.

4            MR. BERKE:  Your Honor, I would offer Defense Exhibit

5    2176 into evidence.

6            MR. GOLDMAN:  No objection.

7            THE COURT:  Received.

8            (Defendant's Exhibit 2176 received in evidence)

9            MR. BERKE:  May I publish it, your Honor?

10           THE COURT:  You may.

11   Q.  Again, that reflects it is a press release issued by the

12   company to the market, correct?

13   A.  Correct.

14   Q.  And if you -- and you recognize this, sir, that this is

15   guidance that you're giving, that you had said you would give

16   in the earlier announcement?

17   A.  Well, this -- we're announcing that we sold stock.

18   Q.  I'm sorry.

19   A.  Or intend to sell stock.

20   Q.  If we could go to page 2, under "Forward Outlook."

21           You see, sir, where it says, "As a result, the company

22   is reiterating its previously issued guidance of between $0.15

23   and $0.20 per share for the first quarter and at least $1.20

24   per share for the full year 2008," correct?

25   A.  Yes.

H3kdwal3                          Engles - cross

1    Q.  And when you were giving guidance like that, you were being

2    honest with the market; that's your best guess of where you are

3    at that time, correct?

4    A.  Yes, it is.

5    Q.  And that is your obligation and you are complying with that

6    obligation, correct?

7    A.  Yes.

8    Q.  And just on this same period, do you recall, sir, that you

9    had asked about an equity offering that you borrowed money to

10   have for the company; do you recall that?

11   A.  We sold shares.

12   Q.  Yes.

13   A.  Yes.

14   Q.  And when you announced the equity offering, the price of

15   Dean Foods went down substantially, correct?

16   A.  I don't recall that specifically but it's not unusual.

17   Q.  Let me show you Defense Exhibit 2177, for identification.

18          You see what it is.  I want to show you the third line

19   from the bottom.

20          (Pause)

21          If you would look at the date as well.

22          My question to you, sir:  Does that refresh your

23   recollection that when you had your equity offering, the price

24   of Dean Foods fell down substantially?

25   A.  Yes.

H3kdwal3                          Engles - cross

1    Q.  And now I want to go forward to -- do you recall that in

2    June of 2008, you revised your earnings?

3    A.  How do you mean, "revised"?

4    Q.  You provided additional -- additional earnings?

5            Let me show you what's been identified -- marked for

6    identification as Defense Exhibit 411.  I may have misspoke.

7            My question is:  Do you understand that you provided

8    revised guidance to the market in June of 2008?

9    A.  Yes.

10   Q.  And if I could show you Defense Exhibit 411, do you

11   recognize that as your revised guidance?

12   A.  Yes.

13           MR. BERKE:  And if we could just publish it briefly.

14           MR. GOLDMAN:  It is already in evidence I believe as

15   702-L, Government Exhibit 702-L.

16           MR. BERKE:  OK.

17           MR. GOLDMAN:  The same thing, right?

18           MR. BERKE:  If that is in, that is fine.

19           MR. GOLDMAN:  Your Honor, I don't have an objection to

20   this.

21           MR. BERKE:  I am happy to use GX702-L, for simplicity.

22           THE COURT:  Yes.

23           MR. BERKE:  If we can publish it?

24           THE COURT:  Yes.

25   BY MR. BERKE:

H3kdwal3                         Engles - cross

1   Q.  Again, you see in the first paragraph, you indicate that

2   you're expecting -- you're giving revised guidances from 26

3   cents to 31, correct?

4   A.  No.  We're revising our guidance to say it will be at least

5   32, as opposed to our previous guidance of 26 to 31.

6   Q.  Thank you, Mr. Engles.  That is correct.

7           Again, when you did that, that is because that was

8   your best guess at the time of what it would be, correct?

9   A.  Yes.

10  Q.  This is only a guess based on what you know at that time,

11  correct?

12  A.  That's correct.

13  Q.  Sir, am I right that you believed you would have discussed

14  this with the board at the board meeting that followed this

15  announcement?

16  A.  That would be typical.

17  Q.  Sir, now let me go to your earnings announcement on

18  November 4, 2008.  And could I show you what has been marked as

19  Defense Exhibit 601-C, for identification.  601.  Thanks.

20          Again, this is your Dean Foods earning announcement

21  for third quarter 2008, dated November 4, 2008, correct?

22  A.  Yes, that's correct.

23          MR. BERKE:  Your Honor, may I offer Defense Exhibit --

24  I'm sorry, it is Government Exhibit 601-C, for identification.

25  I offer into evidence.

1           MR. GOLDMAN:  No objection.

2           THE COURT:  Received.

3           (Government's Exhibit 601-C received in evidence)

4           MR. BERKE:  And if we may publish it.  It is

5    published.  OK.

6    Q.  You see, sir, that that is the earnings announcement on

7    November 4, 2008, correct?

8    A.  Yes.

9           MR. BERKE:  And could we go to page 8, last two lines,

10   beginning, "The third quarter highlights."

11          (Pause)

12   A.  OK.

13   Q.  It goes over two pages.  Sir, do you see where it says

14   here, "The third quarter highlights how far the business has

15   moved in the past year.  We look forward to successfully

16   closing out 2008 with what we expect to be a solid forth

17   quarter.  Looking ahead to next year, we're very excited about

18   the impact we expect our cost saving initiatives to have on the

19   DSD dairy business.  And as you consider," and then you go on

20   to talk about factors.  Is that correct, sir, that's what it

21   says?

22   A.  Yes, that's what it says.

23   Q.  Is it fair to say November 4, 2008 was a time that was

24   essentially in the middle of the financial crisis?

25   A.  Yes.  The financial crisis was getting geared up.

H3kdwal3                          Engles - cross

1   Q.  And it was a volatile time in the markets?

2   A.  Yes, it was.

3   Q.  Fair to say that you wanted to provide a positive statement

4   on behalf of the company to the investors in that market?

5   A.  Well, our business was performing well in that period of

6   time, and we were communicating that to the market.

7   Q.  And you were particularly focused, am I right, you were

8   particularly focused on it given how volatile the markets were

9   in that time?

10  A.  I think this was consistent with our practice in times of

11  volatility or not.  We tried to accurately portray for the

12  market how our business was performing.

13  Q.  OK.  If you go to page 6, second-to-last paragraph, and

14  just show enough of it to see that it is Jack Callahan speaking

15  here.

16          In 2008, Jack Callahan was the CFO, correct?

17  A.  That is correct, yes.

18  Q.  If we could go to page 6, the second-to-last paragraph.

19          And, again, Mr. Callahan echoes your very positive

20  message to say, we're very -- We expect to finish the year very

21  much on track and expect to continue to deliver on the original

22  guidance.

23  A.  Yes.

24  Q.  And it goes down further that -- well, again, also giving a

25  positive message, correct?

H3kdwal3                          Engles - cross

1   A.  Yes.  The message was positive for this quarter.

2   Q.  And if we could go to what has been marked as GX702-Q, for

3   identification.

4           And this is your press release that was also released

5   for this quarter, correct?

6   A.  Correct.

7           MR. BERKE:  Your Honor, I would offer into evidence

8   GX702-Q.

9           MR. GOLDMAN:  No objection.

10          THE COURT:  Received.

11          (Government's Exhibit 702-Q received in evidence)

12          MR. BERKE:  Thank you, Judge.  If I may publish it?

13          And go to the paragraph beginning, "The third quarter

14  results."

15  A.  Yes.

16  Q.  And you see it quotes you, sir, as saying -- if we could go

17  to the next page.  I'm sorry.

18          Actually, I'm sorry, it is the first page.  Thank you,

19  Mr. McLeod.

20          Do you recall, sir, when we get to it, that the press

21  release would have echoed the same positive comments, correct?

22  A.  Yes, sir.

23  Q.  Thank you, sir.

24          Now, do you recall, sir, going forward now, January

25  '09, do you recall that in early 2009 the milk prices

H3kdwal3                         Engles – cross

1   collapsed?

2   A.  Yes.

3   Q.  And, again, collapsing milk prices, as we talked about on

4   Thursday, is good for Dean Foods, correct?

5   A.  Yes.

6   Q.  Because that's one of your inputs, and when that goes down,

7   profits in the future will go up, correct?

8   A.  Well, profits go down when the milk price goes down before

9   you've passed along that decrease to your customers, so your

10  profits expand.

11  Q.  OK.  Again, that fact that your raw milk prices went down,

12  or collapsed, that's publicly available, correct?

13  A.  Yes.

14  Q.  Sir, you talked about the Alpro acquisition in your direct

15  testimony; do you recall that?

16  A.  Yes.

17  Q.  And the Dean Foods Company acquired Alpro, correct?

18  A.  That's correct.

19  Q.  And you're certainly familiar that often when an acquirer

20  acquires a company, its own stock price will fall down,

21  correct?

22  A.  That sometimes happens, yes.

23  Q.  And that's in fact what happened when Dean Foods acquired

24  Alpro, its stock price fell, correct?

25  A.  That's correct.

H3kdwal3                    Engles - cross

1   Q.  Now, there came a point in time, sir, do you recall, that

2   Mr. Callahan, your CFO, resigned as CFO?

3   A.  Yes.

4   Q.  And do you recall, sir, that that was the first week of

5   November 2010, November 4th or 5th?

6   A.  Yes.

7   Q.  Do you recall, sir, that when you heard he was resigning,

8   you were surprised he was resigning because you didn't think he

9   was going to be resigning?

10  A.  Yes, I was surprised.

11  Q.  And he had earlier assured you that he was going to remain

12  in his position, correct?

13  A.  He had.

14  Q.  Sir, now I want to go to May 8, 2012.

15          Well, actually, let me ask you this before we go

16  there.  Let me ask you, sir, about September 2012.

17          Do you recall that Dean Foods was looking -- was

18  intending and had intended to sell its Morningstar division?

19  A.  We had considered that, yes.

20  Q.  And do you recall that in September of 2012, that -- and

21  you had spoken to investment bankers about that, correct?

22  A.  Yes.

23  Q.  And when I say speak to investment bankers, there are a

24  variety of banks that have investment banking firms, and you

25  went around to speak to each one of them to see who you might

H3kdwal3                          Engles - cross

1    want to hire to participate in the sale if you did go forward

2    with the sale, correct?

3    A.  I think we did that with respect to the -- leading the IPO

4    of WhiteWave.  I think we had chosen Mr. Magro to lead the sale

5    of Morningstar.

6    Q.  Do you recall that the sale did involve contacting other

7    bankers out there about the potential sale?

8    A.  I believe the whole process of the WhiteWave-Alpro spin-off

9    and the potential sale of Morningstar was discussed with a

10   number of investment banks.

11   Q.  OK.  Let me show you what's been identified or marked for

12   identification as Defense Exhibit 663.

13           Sir, do you recognize that as an email from you to Tom

14   Davis?

15   A.  Yes.

16   Q.  Dated September 26, 2012?

17   A.  Yes.

18           MR. BERKE:  Your Honor, I would offer Defense Exhibit

19   663 in evidence.

20           MR. GOLDMAN:  No objection.

21           THE COURT:  Received.

22           (Defendant's Exhibit 663 received in evidence)

23   BY MR. BERKE:

24   Q.  You understand for these exhibits, we read them from the

25   bottom up time-wise?

H3kdwal3                          Engles – cross

1    A.   Sure.

2    Q.   OK.  If we can go to the bottom.

3         And this is you on September 26 sending an email to

4    the board that says -- would you read it for me, sir?

5    A.   Yes.  "We received a media call from Reuters confirming

6    that they have information about Dean Foods pursuing the sale

7    of Morningstar.  They have the information from several sources

8    with a level of detail that we consider substantiated.  We have

9    a contingency plan in place that we are activating now which

10   includes issuing an external statement once we see the story

11   run, and conducting internal and customer communications as

12   needed.  We will send the story to you once we see it."

13   Q.   And fair to say this was an unintended leak?

14   A.   Unanticipated, yes.

15   Q.   Unanticipated.  And certainly not authorized?

16   A.   No.

17   Q.   That's why you are telling the board.

18        And do you recall -- if we could go to the response

19   you received in this document.  I think one below that.  In the

20   middle.  Thank you.

21        So Mr. Davis responds just to you, and Steve Kemps is

22   your general counsel, correct?

23   A.   Yes.

24   Q.   And he says, "That is not a surprise given how many people

25   received a contact from our banker."

H3kdwal3                          Engles - cross

1   A.   Yes.

2   Q.   And did you understand when he said "people" to mean other

3   bankers?

4   A.   No.

5   Q.   What did you understand him to mean?

6   A.   Companies that had been approached to be potential

7   acquirers of Morningstar.

8   Q.   So other people in the industry or the community, correct?

9   A.   Yes.  And they probably all had bankers as well.

10  Q.   And that's typically how these transactions would be done,

11  correct?

12  A.   Yes.

13  Q.   OK.  And if you could go to the top paragraph.

14       And then can you read your response, sir?

15  A.   "I totally agree, Tom.  Been hearing lots of chatter.  At

16  least we will try to get a sense of the market's reaction."

17  Q.   And you're saying you respond that because you had spoken

18  to so many companies and their bankers, that explains how it

19  probably got leaked?

20  A.   Yes.

21  Q.   Now, sir, I want to take you to May.

22       Do you recall on May 9th, prior to announcing -- I'm

23  sorry, May 9, 2012, prior to announcing to the market that you

24  were going to take steps to pursue a possible WhiteWave

25  spin-off, that you had been speaking to bankers?

H3kdwal3                     Engles - cross

1   A.   Yes.

2   Q.   And do you recall, sir, that -- do you recall during that

3   period you spoke to a variety of different investment banks?

4   A.   Yes.

5   Q.   Morgan Stanley?

6   A.   I believe so, yes.

7   Q.   JPMorgan?

8   A.   I believe so, yes.

9   Q.   And you called and you actually even spoke to Merrill Lynch

10  the actual day before, on May 8, 2012?

11  A.   I don't recall that but it is certainly possible.

12  Q.   Can I show you, just for identification, what's been marked

13  as Defense Exhibit 5337?

14          And this is just for you, sir.  And I would ask that

15  you look at the very top of that first, and -- I'm sorry, the

16  first entry in the chart.

17          And I ask, sir, does that refresh your memory that you

18  had reached out to Merrill Lynch on May 8, 2012, the day before

19  the announcement?

20  A.   It doesn't refresh my recollection.

21  Q.   OK.  All right.

22  A.   I may not have been the one if they were contacted --

23  Q.   Understood.  But, in any event, you understood in the

24  period leading up to that you were reaching out to a variety of

25  bankers?

H3kdwal3                          Engles - cross

1    A.  Yes.

2    Q.  Sir, do you recall that on May 8th, the day before --

3    May 8, 2012, the day before the May 9, 2012 announcement, the

4    stock volume of Dean Foods spiked over 250 percent as to what

5    it had been the day before?

6    A.  I do not recall that.

7    Q.  And -- thank you, sir.

8           Sir, you ultimately learned that other sophisticated

9    investors purchased Dean Foods' stock prior to the

10   August 7th announcement; is that a fair statement, other than

11   the ones we've already talked about?

12   A.  I don't recall learning that.

13   Q.  Well, you understood -- you know, sir, that it's common

14   that after a big transaction or IPO, that FINRA, the regulatory

15   arm, would look to see who purchased stock leading up to that

16   announcement?

17   A.  Yes.  I'm aware of that.

18   Q.  And you are aware that, as is typical, they did that here,

19   too?

20   A.  Yes.

21   Q.  And you recall that you, sir, were shown a list and asked

22   if you recognized any of the people who had bought stock

23   leading up to the announcement on August 7?

24   A.  Yes.

25   Q.  Sir, do you recall that one of the people you were asked

H3kdwal3                        Engles - cross

1    about was an individual who had been the former Dean Foods'

2    Treasurer, Corey Olson?

3    A.  Yes.

4    Q.  And he was no longer involved with Dean Foods, so it is

5    perfectly fine for him to buy stock, correct?

6    A.  I don't know whether it was fine or not, but he was no

7    longer involved with Dean Foods.

8    Q.  What I mean by that is he was at that point decidedly the

9    former treasurer.  He had been out of his position for a while?

10   A.  He had been gone from the company for quite a long time,

11   yes.

12   Q.  But he knew the company and knew it well, correct?

13   A.  Yes, he did.

14   Q.  Fair to call him a very sophisticated -- that he was very

15   sophisticated in his understanding of Dean Foods given his long

16   tenure as treasurer of the company?

17   A.  Cory was a very knowledgeable person, yes.

18   Q.  And you understood that he had purchased stock in Dean

19   Foods leading to the August 7 WhiteWave announcement, correct?

20   A.  I understood he was on the FINRA list.

21   Q.  And the FINRA list was the list of people they showed you

22   who had shared -- who had purchased shares leading to that

23   announcement, correct?

24   A.  I don't know that for certain.  I know that FINRA had an

25   interest in those individuals, but they don't disclose why

H3kdwal3                          Engles - cross

1    they're interested.

2    Q.  Was that your understanding at the time?

3    A.  I believe that they were purchasers of the securities on

4    the list, yes.

5    Q.  And do you recall Theodore Strauss was somebody else on the

6    list?

7    A.  Yes.

8    Q.  He was a longtime investment banker in Dallas?

9    A.  Yes.

10   Q.  Who -- and he knew you, correct?

11   A.  Yes.  We were acquainted.

12   Q.  And he knew the company very well?

13   A.  Yes, he did.

14   Q.  Fair to call him a very sophisticated investor in Dean

15   Foods?

16   A.  He was a sophisticated investor, yes.

17   Q.  And you understood that he was on the FINRA list as well?

18   A.  I did.

19          THE COURT:  So when you say "the FINRA list," this is

20   a document that was received by the company in which FINRA made

21   certain inquiries about what these individuals knew about the

22   transaction?

23          THE WITNESS:  I think it goes more along the lines of

24   do you know these individuals, and, if so, describe the

25   circumstances of your relationship with them and when you would

H3kdwal3                          Engles – cross

```
 1    have spoken to them over some period of time.

 2              THE COURT:  All right.  And are you told why this

 3    inquiry is being made?

 4              THE WITNESS:  No.

 5              THE COURT:  Are you told what information FINRA has

 6    about the activities of these individuals?

 7              THE WITNESS:  No.

 8              THE COURT:  OK.  All right.  Thank you.

 9    BY MR. BERKE:

10    Q.  Sir, I'd like to turn to -- you were asked some questions

11    about trading windows, right?  And that is a Dean Foods policy

12    about when they have a trading window opened or closed,

13    correct?

14    A.  Yes.

15    Q.  A trading window typically refers to, when the trading

16    window is open, it is the general assumption that senior

17    management and board members can trade in Dean Foods' stock

18    unless they are otherwise prohibited for other reasons,

19    correct?

20    A.  Yes.

21    Q.  And then the opening and closing of that is set by Dean

22    Foods and its policy, correct?

23    A.  That's correct.

24    Q.  OK.  If I could show you a document marked Defense Exhibit

25    1125, for identification.
```

H3kdwal3                          Engles - cross

1          And you recognize that as a corporate update, second

2     quarter 2008, for the Board of Directors meeting?

3     A.  Yes.

4              MR. BERKE:  Your Honor, I would offer Defense Exhibit

5     1125.

6              MR. GOLDMAN:  No objection.

7              THE COURT:  Received.

8              (Defendant's Exhibit 1125 received in evidence)

9              MR. BERKE:  If I may publish it, your Honor?

10             THE COURT:  You may.

11             MR. BERKE:  Thank you.

12    BY MR. BERKE:

13    Q.  And there it is.  If we could go to page 27.

14             And, sir, we talked a lot on Thursday about investor

15    relation meetings that would take place with senior management,

16    investor relations, and investors, correct?

17    A.  Yes.

18    Q.  You see here this refers to a meeting with Wellington in

19    Dallas on September 15th?

20    A.  Yes.

21    Q.  And also September 17th and 24th, investor meetings in

22    Chicago in the Washington Baltimore area?

23    A.  I think those were future events --

24    Q.  Yes.

25    A.  -- that were planned.

H3kdwal3                        Engles - cross

1    Q.  OK.  That's in 2008, correct?

2    A.  Yes.

3    Q.  And if I could show you what's been identified as Defense

4    Exhibit 666, for identification.

5            And, sir, you recognize that as an email from Rachel

6    Gonzalez to a lot of other people at Dean Foods?

7    A.  Yes.

8    Q.  And if you go to the bottom of that.

9            And who is Rachel Gonzalez, sir?

10   A.  She was our assistant general counsel.

11   Q.  If you can just go to the gray line and see where it says

12   "Subject:  Trading Windows?"

13   A.  Yes.

14   Q.  The date of that is again, if I can go to the first page?

15   A.  September the 12th, I believe.

16           MR. BERKE:  Your Honor, I would offer Defense Exhibit

17   666.

18           MR. GOLDMAN:  No objection.

19           THE COURT:  All right.  666 is received into evidence.

20           (Defendant's Exhibit 666 received in evidence)

21           THE COURT:  Go ahead.

22   BY MR. BERKE:

23   Q.  Sir, do you see that is on September 12, 2008.  And if we

24   go to the body of this, and it indicates that the trading

25   window during this quarter of 2008 was going to close effective

H3kdwal3                         Engles - cross

1   the close of business September 12th.  Do you see that, sir?

2   A.  Yep.

3   Q.  Thank you.

4        MR. BERKE:  OK.  Thank you, Mr. McLeod.

5   Q.  Mr. Engles, I want to ask you about Tom Davis.

6   A.  OK.

7   Q.  Now, you had been friends with Tom Davis for some time,

8   correct?

9   A.  Yes, I had.

10  Q.  And is it fair to say you considered Mr. Davis to be a good

11  friend?

12  A.  Yes, I did.

13  Q.  And do you recall that you were interviewed at some point

14  by prosecutors in this case and the FBI about Mr. Davis?

15  A.  Yes.

16  Q.  And you understood that Mr. Davis was under investigation

17  at the time, correct?

18  A.  I believed so, yes.

19  Q.  At that time you still considered him a good friend, true?

20  A.  Yes.  Mr. Davis was a friend of mine.

21  Q.  And going back in time, you knew Mr. Davis -- you met him

22  first professionally in his role as an investment banker,

23  correct?

24  A.  That is my recollection, yes.

25  Q.  And he was your investor, you had said, you had indicated

1    when you had initially worked at Suiza Foods?  And I'm sure I'm

2    mispronouncing it.

3    A.  Suiza Foods.  You did very well.

4         It was a company that we bought, a private company.

5    Q.  OK.  And he was your investment banker at the time?

6    A.  We certainly discussed it with him.  I don't remember if he

7    actually did the work or not.

8    Q.  But you had a close business relationship with him?

9    A.  Correct.

10   Q.  You had a high degree of respect for him?

11   A.  I did.

12   Q.  And this is predating whatever you may have learned about

13   him in connection with this case.

14        And fair to say that Mr. Davis had a -- he had a good

15   relationship with Jim Turner and John Muse, who were on your

16   board?

17   A.  Yes, he did.

18   Q.  And you valued Mr. Davis' judgment?

19   A.  Yes, I did.

20   Q.  And you knew that Mr. Turner and Muse valued his judgment

21   as well?

22   A.  I believe so, yes.

23   Q.  And fair to say that you thought Mr. Davis was prepared?

24   A.  Excuse me?

25   Q.  You thought he was generally prepared as a board member?

H3kdwal3                    Engles - cross

1    A.  Yes.

2    Q.  And let me just be clear.  There is a point in time when

3    you asked him -- when he joined the Dean Foods board, correct?

4    A.  Yes.

5    Q.  That is something you supported, correct?

6    A.  Yes.  I asked him.

7    Q.  And you thought it was because of his experience and how

8    you viewed his abilities, correct?

9    A.  Yes, and his knowledge of our company and the industry.

10   Q.  And you viewed him to be a steady hand on the board?

11   A.  Yes, I did.

12   Q.  And you thought he was very valuable?

13   A.  Yes.

14   Q.  And partly this was based on his 20 years of experience as

15   an investment banker?

16   A.  Yes.

17   Q.  And his -- you thought he had invaluable strategic insight;

18   fair to say?

19   A.  Tom was a good thinker.

20   Q.  And you never had any questions at all about his integrity

21   about anything, did you?

22   A.  I did not.

23   Q.  You never had any questions about -- that he was going to,

24   just like you, be careful to follow the law -- withdrawn.

25           You never had any questions at all about his -- that

H3kdwal3                         Engles - cross

1    he was following the law, correct?

2    A.  I did not.

3    Q.  OK.  And am I right, sir, you testified that you had such

4    high regard for him, am I right, that when the spin-off was

5    going to happen, you thought he would be the best person to be

6    the new chairman of the board of Dean Foods, correct?

7    A.  Yes.  It was because of Mr. Davis' particular experience

8    and skill set.

9    Q.  And Gregg Tanner was going to be the new CEO of Dean Foods

10   when you went on to be the CEO of WhiteWave, correct?

11   A.  That's correct.

12   Q.  And you thought, based on how impressed you were with

13   Mr. Davis and his skill set and how valuable his experience and

14   understanding of finance was, that he would be the perfect

15   chairman when Mr. Tanner was CEO; fair statement?

16   A.  Those would not be my words exactly.  My words would be

17   that Mr. Tanner had almost no experience with the financial

18   markets, which is an important aspect of being a public company

19   CEO, and Mr. Davis did have a lot of experience in those

20   matters, and so their combined experiences would make them a

21   good team as the board and executive leadership of Dean Foods.

22   Q.  Yes.  And after the spin-off, this was also an important

23   time for Dean Foods because they had to establish themselves

24   without WhiteWave, correct?

25   A.  Well, they were the established company, Dean was, but any

H3kdwal3                          Engles - cross

time you go through a management transition it is important
that you have the right leadership at the top.

Q.  And it was based on your high regard of Mr. Davis that you
thought he would be a good leader for that --

A.  Yes, I thought he would be a good leader on the board.

Q.  And, sir, am I right, you knew Mr. Davis pretty well,
right?

A.  Pretty well, yes.

Q.  You knew he liked to gamble a lot in Las Vegas, correct?

A.  I knew he liked to go to Las Vegas, yes.

Q.  You knew that he had a high risk appetite when he was
gambling, correct?

A.  Yes, I did.

Q.  I think you at one point saw him lose $150,000 sitting
playing blackjack, correct?

A.  Yes, I did.

Q.  And none of that caused you to have a different view of his
honesty, integrity, or anything else, did it?

A.  He was an honest gambler.

Q.  And you understood, sir, that he -- at some point when his
investment bank DLJ was sold, he got a very substantial payout,
correct?

A.  Yes.  My belief was Tom was quite wealthy.

Q.  And you knew that he -- well, and at some point you
understood he went through a costly divorce with his then wife

H3kdwal3                          Engles - cross

1    Louise?

2    A.  Yes.  I was well aware that he was divorced from Louise.

3    Q.  And you knew some investments he was involved in, like Park

4    Cities, did not turn out to be good investments for him,

5    correct?

6    A.  I don't know what you are referring to with respect to Park

7    Cities.

8    Q.  Well, let me ask you this.  You knew he was involved in

9    some businesses with Bucky Lyons, correct?

10   A.  Yes.

11   Q.  And they were often not successful, correct?

12   A.  I knew they had some challenges, yes.

13   Q.  And there is nothing about his finances that caused you to

14   change your views about Mr. Davis in any way, was there?

15   A.  Nothing that I was aware of, no.

16   Q.  And in fact, sir, am I right that until whenever you

17   learned about Mr. Davis in connection with this case, there was

18   nothing that you learned or saw in your 20-plus years of

19   dealing with Mr. Davis that caused you in any way to question

20   his integrity, his honesty, or his law-abidingness, was there,

21   sir?

22   A.  No.

23            MR. BERKE:  Thank you, your Honor.

24            THE COURT:  All right.  You may cross-examine --

25   redirect, rather.

H3kdwal3                          Engles - redirect

1              MR. GOLDMAN:  Thank you, your Honor.  I will try to

2     keep it brief, and if we might go a couple of minutes past 1, I

3     think I should be finished.

4     REDIRECT EXAMINATION

5     BY MR. GOLDMAN:

6     Q.  Good afternoon, Mr. Engles.

7     A.  Hello, Mr. Goldman.

8     Q.  You were asked a number of questions on Thursday on

9     cross-examination about some of the input costs of the raw

10    materials that are needed to run Dean Foods.  Do you remember

11    that?

12    A.  Yes, I do.

13    Q.  And defense counsel went through a number of factors that

14    affected Dean Foods' performance; do you remember that?

15    A.  Yes, I do.

16    Q.  You were asked about milk prices, right?

17    A.  Yes.

18    Q.  You Were asked about the futures market for milk prices?

19    A.  Yes.

20    Q.  The price of resin?

21    A.  Yes.

22    Q.  The price of diesel fuel?

23    A.  Yes.

24    Q.  The global supply and demand for milk?

25    A.  Yes.

1    Q.  Currency fluctuations?

2    A.  Yes.

3    Q.  And there was more, right?

4    A.  Yes.

5    Q.  And all of that information that you were asked about of

6    those factors was available to the public, is that right?

7    A.  A lot of it is, certainly.

8    Q.  And those people who follow the markets were able to follow

9    the fluctuations in those types of prices and those factors,

10   right?

11   A.  Yes.

12   Q.  Were conversations that took place in board meetings

13   available to the public?

14   A.  No.

15   Q.  Were conversations between you and Tom Davis about

16   significant nonpublic matters related to Dean Foods available

17   to the public?

18   A.  No.

19   Q.  And when you spoke to investors, did you or anyone from the

20   company give a preview of what the future earnings

21   announcements would be for the company?

22   A.  No.

23   Q.  Why not?

24   A.  Because it was often unknown and always material.

25   Q.  And but at earnings calls and other conferences, you I

H3kdwal3                          Engles - redirect

1   believe testified that you would share your long-term outlook

2   on some of those factors with the public, is that right?

3   A.  Yes.

4   Q.  But you didn't set the prices or the costs of all of those

5   factors, did you?

6   A.  No.

7   Q.  And it was perfectly appropriate for you to share with the

8   public your or the company's long-term outlook, is that right?

9   A.  Yes.  We were trying to help the market understand as well

10  as possible the forces that we felt would affect our

11  performance and, therefore, their investment decision.

12  Q.  Sometimes when you had the smaller meetings with investors

13  that you described, would you discuss your long-term outlook on

14  those factors?

15  A.  Yes.

16  Q.  And that was appropriate, in your mind, right?

17  A.  Yes.

18  Q.  Did you ever discuss any of those factors with Billy

19  Walters?

20  A.  No.

21  Q.  To your knowledge, had anyone else in the management of

22  Dean Foods ever discussed those factors with Billy Walters?

23  A.  No.

24  Q.  And you were a member of the board in addition to being

25  CEO, is that right?

H3kdwal3                          Engles - redirect

1    A.  Yes, I was.

2    Q.  And you testified that the board was apprised of meetings

3    with investors, right?

4    A.  Yes.

5    Q.  In fact, Mr. Berke showed a number of slides about meetings

6    with investors, is that right?

7    A.  Yes.

8    Q.  And none of those meetings were improper in any way, right?

9    A.  No.

10   Q.  And did you ever share material nonpublic meetings (sic)

11   with investors in any of those meetings?

12   A.  Would you rephrase, please?

13   Q.  Sure.  Do you recall ever sharing material nonpublic

14   information with any of those investors in the small meetings

15   that you had?

16   A.  No.

17   Q.  Was the board ever apprised of any meetings with Billy

18   Walters?

19   A.  No.

20   Q.  Now, you were shown also lists of the top investors in Dean

21   Foods a couple of times.  Do you remember those?

22   A.  Yes.

23   Q.  At various points in time?

24   A.  Yes.

25   Q.  Those were institutional investors, is that right?

H3kdwal3                         Engles - redirect

A.   Yes.

Q.   And how did Dean Foods determine who the top institutional
investors were?

A.   They have to file forms at the end of each quarter during
the year disclosing which securities they own and in what
amounts.

Q.   So, does Dean Foods then look at those filings to determine
the top investors?

A.   Yes.

Q.   Did you see Billy Walters' name in any of those top
investors?

A.   I did not.

Q.   Did you see The Walters Group included in any of those top
investors?

A.   I did not.

Q.   Did you see the Nature Development included in any of those
slides?

A.   Not that I recall.

         MR. GOLDMAN:  I don't know, Ms. Meister, if we can
pull Defense Exhibit 1040, page 36, which is admitted.  It is
1040B, I believe.  And I think you --

         MR. BERKE:  1040-A, page 36.

         MR. GOLDMAN:  Sorry.  OK.

Q.   This is a list of the top 15 institutional investors in
Dean Foods, is that right?

H3kdwal3                          Engles – redirect

1    A.  Yes, it is, as of various dates.

2    Q.  As of various dates, thank you.

3          So as of September 30, 2012, is that right?

4    A.  Yes.

5    Q.  OK.  And did you or the board have any idea that as of

6    September 30, 2012, Billy Walters owned 5 million shares of

7    Dean Foods' stock?

8    A.  No.

9    Q.  So that would made him the seventh largest investor in Dean

10   Foods at this time?

11   A.  Yes.

12          MR. GOLDMAN:  You can take that down.  Thank you.

13   Q.  You were also asked some questions about Appaloosa and

14   David Tepper.  Do you remember that?

15   A.  Yes, I do.

16   Q.  In fact, I think you were asked about a significant

17   investment by Appaloosa in early 2011, is that right?

18   A.  Yes.

19          MR. GOLDMAN:  And if we could show Defense Exhibit

20   1124 and blow that up.

21   Q.  And this was an email between you and Tom Davis, an email

22   exchange, rather, between you and Tom Davis, is that right?

23   A.  Yes, it is.

24   Q.  Do you see that?

25          And then the original email from Tom Davis to you, can

1    you read the date and time of that email?

2    A.   January 1st -- I'm sorry, January 7th, 2011, at 7:13 p.m.

3    Q.   And Mr. Davis writes to you:  "Did you know anything about

4    Appaloosa before today?  Interesting investment."

5            Do you see that?

6    A.   Yes.

7    Q.   Was it your understanding that Appaloosa had filed that

8    form 13-F on January 7th?

9    A.   Yes.

10   Q.   And do you know if Billy Walters invested in Dean Foods in

11   early 2011?

12   A.   I do not know.

13   Q.   And you were asked questions on cross-examination about how

14   the stock price went up from January through May of 2011, is

15   that right?

16   A.   Yes.

17   Q.   And Mr. Berke was asking you questions about how that

18   related to Appaloosa's investment; do you recall those

19   questions?

20   A.   I don't recall that specific question, no.

21   Q.   OK.  Well, do you have any idea whether Billy Walters

22   bought or sold Dean Foods stock on January 7, 2011?

23   A.   I have no idea.

24   Q.   Now, the email, as you testified to on cross-examination,

25   referenced several conversations.  Do you remember your email

H3kdwal3                              Engles - redirect

1    to Tom Davis?

2    A.  I see that here, yes.

3    Q.  You see that.  And I believe that you testified that you

4    had one conversation with Appaloosa; is that right?

5    A.  Yes.  My recollection is that our investor relations team

6    had received inquiries about the company from Appaloosa.  Those

7    were the conversations that are referred to here as "We had

8    several conversations."  I had one meeting with a

9    representative of Appaloosa which followed these events.  It

10   was later.

11   Q.  It was later.

12           And do you recall -- I believe you may have testified

13   about this on cross, but do you recall whether you discussed

14   the possibility of a spin-off of WhiteWave at that meeting?

15   A.  I don't recall with certainty, no.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  Do you recall whether you told Appaloosa anything about the

2    spinoff of WhiteWave that you had not told the public?

3    A.  I am quite sure we did not.  My general counsel was sitting

4    in the room of the meeting I did have, my head of investor

5    relations.  Had we done so, we would have filed an 8-K.

6    Q.  When you had these one-on-one meetings or these small

7    meetings, did you provide any more information to the investors

8    than you had already provided to the public?

9    A.  Not in general.  We may have answered questions with more

10   specificity about what was happening with the price of a given

11   input or those sorts of things, but in terms of topics and

12   conclusions, no.

13   Q.  If there was something that you deemed to be material to

14   the company, would you provide these investors at these small

15   meetings with any information about that that was not already

16   public?

17   A.  No.

18   Q.  You also have testified a little bit on cross-examination

19   about analysts and what their role was.  Do you recall that?

20   A.  Yes, I do.

21   Q.  I believe that you testified that analysts tried to predict

22   the performance of Dean Foods based on a variety of those

23   factors that we just spoke about.  Do you recall that?

24   A.  Yes.

25   Q.  Did analysts use their own models to make those sorts of

1    predictions?

2    A.   Yes.

3    Q.   Did different analysts say different things about Dean

4    Foods?

5    A.   Absolutely.

6    Q.   Sometimes did analysts directly contradict each other?

7    A.   Of course.

8    Q.   Were there other factors that were not available to the

9    public that would affect the company's quarterly performance?

10   A.   Yes.

11   Q.   Were analysts able to incorporate those factors into their

12   analysis?

13            MR. BERKE:   Objection, your Honor.   Foundation.

14            THE COURT:   Sustained.

15   Q.   Mr. Engles, were analysts able to perfectly predict the

16   performance of Dean Foods?

17   A.   No.

18   Q.   Why not?

19   A.   Because no one can consistently predict the future.

20   Q.   Did analysts have any information that was not available to

21   the public when they made their predictions?

22            MR. BERKE:   Objection, your Honor.

23            THE COURT:   Rephrase that, please.

24   Q.   Did you or anyone from the company provide information to

25   the analysts that was not already public when they made their

H3K3WAL4                         Engles - redirect

1   predictions?

2   A.  No.

3           MR. GOLDMAN:  I just have a couple more topics to

4   touch upon.

5           THE COURT:  Well --

6           MR. GOLDMAN:  If I beg your indulgence.

7           THE COURT:  It's not my indulgence.  It is my jury's

8   indulgence.

9           Give me a time estimate.

10          MR. GOLDMAN:  Five minutes, your Honor.

11          THE COURT:  Then we'll come back five minutes later

12  after the lunch break.  All right, ladies and gentlemen.

13          Go ahead, Mr. Goldman.

14          MR. GOLDMAN:  Thank you, I appreciate that.

15  Q.  Do you recall being asked questions about a Reuters news

16  story that related to Morningstar?

17  A.  Yes.

18  Q.  I think it was the end of your cross-examination this

19  morning.  Did you know how Reuters got that information?

20  A.  No.

21  Q.  But is it fair to say it was somehow leaked to a reporter?

22  A.  Someone disclosed it to the reporter, yes.

23  Q.  Was that a concern for you and the company?

24  A.  Yes.

25  Q.  Why is that?

1   A.  Because it was not information that we had disclosed to the

2   public.  And sometimes these disclosures contain inaccuracies.

3   Q.  Was this something that was material to the company, the

4   sale of Morningstar?

5   A.  Yes, it was.

6   Q.  If I can quickly show Defense Exhibit 663.  This was the

7   e-mail that was admitted into evidence between you and Tom

8   Davis at the top where you say "I totally agree, Tom, been

9   hearing lots of chatter."  Do you see where you say that?

10  A.  Yes.

11  Q.  Did you hear any similar types of chatter about the

12  WhiteWave spinoff before it was announced on August 7, 2012?

13  A.  Not that I recall.

14  Q.  After learning about this Reuters story that was going to

15  run, what did the company do?

16  A.  The company put out a press release regarding our

17  considerations about selling Morningstar, so that the public

18  had good and accurate information regarding the disclosures

19  that had been made in the Reuters article.

20  Q.  Was that press release issued earlier than you would have

21  otherwise publicly released that information?

22  A.  Yes.

23  Q.  Is this generally how Dean Foods handled material

24  information that reached the public in unauthorized ways?

25  A.  That's my recollection, yes.

1   Q.  Mr. Engles, prior to the WhiteWave spinoff announcement on

2   August 7, did you issue a press release earlier than planned?

3   A.  No.

4   Q.  Unlike with Morningstar, prior to August 7, did you have

5   any reason to believe that you needed to issue a public

6   statement because of chatter in the marketplace?

7   A.  No.

8   Q.  You were asked extensively, and I'm going to be brief about

9   this, but you were asked extensively about the chronology of

10  your public comments about the possibility of a WhiteWave

11  spinoff.  Do you remember the general topic?

12  A.  Yes, I do.

13  Q.  You gave public statements about the the WhiteWave spinoff

14  at various points, right?

15  A.  Yes, I did.

16  Q.  In 2010, for example, you addressed the possibility of a

17  WhiteWave spinoff to the public at the Barclays Back to School,

18  is that right?

19  A.  Yes, I did.

20  Q.  You were asked questions at the next earnings call as well?

21  A.  Yes.

22  Q.  At that point, were there other considerations of strategic

23  alternatives for Dean Foods with respect to resolving its debt

24  issues?

25  A.  Yes.

1   Q.   Just briefly, if you could remind the jury what those were.

2   A.   Well, the principal consideration was the possible sale of

3   WhiteWave, and using the proceeds to pay down the debt.

4   Q.   Were you also considering selling other assets of the

5   company as well?

6   A.   Yes, we did sell some other assets.

7   Q.   You also made statements at the CAGNY conference in 2011,

8   is that right?

9   A.   Yes, I did.

10  Q.   Those were public statements, is that right?

11  A.   Yes, they were.

12  Q.   Did you tell the public that once everything was resolved,

13  Dean Foods would in fact pursue a spinoff of WhiteWave?

14  A.   No.

15  Q.   You talked about this concept of unlocking shareholder

16  value which you also discussed at that conference, is that

17  right?

18  A.   Yes.

19  Q.   Explain the various possibilities for unlocking shareholder

20  value with the WhiteWave subsidiary.

21  A.   Well, there were really two.  One was the spinoff, which is

22  the path we ultimately pursued.  But we also constantly

23  highlighted Morning -- or WhiteWave and its value and its

24  performance, like in the Jim Cramer episode.  And we could have

25  also unlocked the value by the market simply recognizing the

1    value of WhiteWave and bidding Dean Foods' stock price up

2    directly.

3    Q.  If that had happened, would you have needed -- would you

4    have gone forward with a spinoff?

5    A.  I don't know.

6    Q.  But would it have been possible that you would not have?

7    A.  Entirely possible.

8    Q.  If I could briefly go to Government Exhibit 460.  I'm

9    sorry.  Well, we can leave that up.

10          This was the May 8 board meeting minutes.  Do you

11   recall that meeting on May 8?

12   A.  I do.

13   Q.  What authority, if any, did the board give you to

14   aggressively pursue a spinoff at that meeting?

15   A.  They gave us the authority to keep working, keep doing the

16   analysis, keep doing the work necessary to determine if it was

17   feasible.

18   Q.  Was that similar to what the board resolved at the next

19   meeting that you looked at on May 17?

20   A.  Yes, virtually identical.

21          MR. GOLDMAN:  If we could briefly bring up Government

22   Exhibit 605-A.  Go to page seven.  This is the earnings call

23   transcript from May 9, 2012.  Yes the top paragraph, please.

24   Q.  I believe Mr. Berke read that entire first sentence except

25   for the last phrase.  So could you read the whole sentence

1  again including the last phrase.

2  A.  Of the top paragraph?

3  Q.  Yes.

4  A.  We expect -- is that the one?

5  Q.  No.  "Despite the slight growth."

6  A.  Oh.  "Despite the slight growth in debt, with a strong

7  growth in EBITDA, our leverage ratio of funded debt to EBITDA

8  as defined by our credit agreements continued to decline

9  reaching 4.41 times at quarter end."

10 Q.  So at this point, May 9, 2012, what did you tell the market

11 that your debt ratio was?

12 A.  4.41 times.

13 Q.  You had on cross-examination explained that you needed the

14 debt to get down to four times in order to consider a spinoff,

15 is that right?

16 A.  Yes.

17 Q.  In this conference call transcript, when did you tell the

18 public that you expected the leverage to be down to four times?

19 A.  By year end 2012.

20 Q.  At any point in your public conversations or communications

21 about the possibility of a WhiteWave spinoff, did you tell the

22 public that Dean Foods intended to do an IPO of WhiteWave as

23 part of that spinoff process?

24 A.  No.  Not that I recall.

25 Q.  What effect did the IPO have on the company's debt ratio?

1    A.  It lowered it by raising cash.

2    Q.  Did that allow you to do the spinoff earlier than you would

3    have otherwise done a straight spinoff?

4    A.  Yes.

5    Q.  Was that known to the public?

6    A.  No, it was not.

7    Q.  Mr. Engles, did you ever tell the public at any point that

8    the company was aggressively pursuing a spinoff?

9    A.  Not that I recall.

10   Q.  Did you ever indicate to the public at any point when the

11   company would file the S-1 registration statement and announce

12   the spinoff?

13   A.  Not that I recall.

14         MR. GOLDMAN:  Last topic, your Honor.

15   Q.  You were shown on a -- we'll pull it up, Government Exhibit

16   702-L, which is a press release June 25, 2008.  Do you recall

17   this?

18   A.  Yes.

19   Q.  Mr. Berke asked you if this was your best guess, quote

20   unquote, of earnings at that time.  Do you recall that?

21   A.  Yes.

22   Q.  What date is this press release?

23   A.  June 25, 2008.

24   Q.  When did the quarter end?

25   A.  June 30, 2008.

1    Q.  At the time that you released this press release, what did

2    you already know about the second quarter earnings performance?

3    A.  We knew what April's results were and May's results, and we

4    had some sense of what sales were for June.

5    Q.  So did you have a pretty good sense of what second quarter

6    earnings were?

7    A.  Well, we had a pretty good sense of what they would be at

8    least.  At least 32 cents.

9    Q.  This pre-announcement of the second quarter earnings

10   guidance, was this forecast to the public that it would be

11   announced on this date?

12   A.  No.

13   Q.  Was it released without any warning to the market or the

14   public?

15   A.  Yes.

16             MR. GOLDMAN:  If we can go to Government Exhibit 1907,

17   finally, please.  If we can highlight the top third, please.

18   Q.  You were asked whether you would have typically discussed

19   that earnings guidance at a board meeting later in the summer,

20   the following board meeting, do you recall that?

21   A.  Yes.

22   Q.  Well, what is the date of this e-mail, Government Exhibit

23   1907?

24   A.  June 11, 2008.

25   Q.  Then if you could just read the second line where it says

H3K3WAL4                          Engles - redirect

1  "by the way."

2  A.   "By the way, we are having a great quarter.  Already at 25

3  cents through two months and guided to 26 to 31 cents."

4  Q.   Anyone who would understand earnings knows if you're

5  already at 25 cents through two months, how would that finish

6  or how would that trajectory project through the end of the

7  quarter?

8            MR. BERKE:  Objection, your Honor.

9            THE COURT:  Sustained.

10 Q.   Mr. Engles, when you understood that you were at 25 cents

11 through two quarters, how did you project that earnings would

12 be for the second quarter?

13           MR. BERKE:  Objection, your Honor.

14           THE COURT:  I'll allow that.

15 A.   Well, we certainly thought they would be better than 25

16 cents, and we expected they would be good.  I would say at or

17 above the top end of this range.

18 Q.   By June 25 -- in fact, as of this date of June 11, 2008,

19 you had already told Tom Davis about the first two quarters of

20 the second quarter, right?

21 A.   The first two months of the second quarter.

22           MR. GOLDMAN:  No further questions.

23           MR. BERKE:  Can I ask one question?

24           THE COURT:  Sure.

25 RECROSS EXAMINATION

H3K3WAL4

1    BY MR. BERKE:

2    Q.  Sir, when we looked at the list of institutional investors

3    that were on the screen, private investors don't have the same

4    obligations to disclose the stocks they're investing in, do

5    they?

6    A.  No, they do not.

7              MR. BERKE:  Thank you, your Honor.

8              THE COURT:  You may step down, sir.  Thank you.

9              (Witness excused)

10             THE COURT:  Ladies and gentlemen, it's 1:15 so we'll

11   pick up at 2:15.  And thank you for accommodating the schedule

12   here to allow Mr. Engles to complete his testimony.  We'll pick

13   up with the next witness who will be in the witness box at the

14   time we resume, and that will be at 2:15.

15             Thank you all, ladies and gentlemen.  Do not discuss

16   the case among yourselves or with anyone.  Thank you.

17             (Jury excused)

18             THE COURT:  Who is next?

19             MR. GOLDMAN:  Thomas Carocci.

20             THE COURT:  Thank you.

21             MR. GOLDMAN:  Thank you, your Honor.

22             (Recess)

23             (Continued on next page)

24

25

H3K3WAL4

1                              AFTERNOON SESSION

2                                  2:15 p.m.

3               (In open court; jury present)

4               THE COURT:  Good afternoon, ladies and gentlemen.

5    We're back in action.  You may call your next witness,

6    Ms. Cucinella.

7               MS. CUCINELLA:  Your Honor, before the government

8    calls its next witness, we'd like to read a stipulation.

9               THE COURT:  Please be seated, sir.

10              Is it testimonial or a factual stipulation?

11              MS. CUCINELLA:  It is testimonial.

12              THE COURT:  All right.  A testimonial stipulation is

13   an agreement by the parties that if a witness were called to

14   testify, the witness would testify in the following manner.

15   You must accept that stipulation, that agreement between the

16   the two sides as to what this witness -- not the witness who is

17   in the witness box, this other witness would testify.  The

18   weight, if any, to be given to the testimony of that witness

19   is, however, a matter for you, the members of the jury, to

20   decide.

21              With that, please proceed.

22              MS. CUCINELLA:  Thank you, your Honor.

23              It is hereby stipulated and agreed by and among the

24   United States of America, by Joon H. Kim, acting United States

25   attorney for the Southern District of New York, Daniel S.

H3K3WAL4

Goldman, Brooke Elizabeth Cucinella, and Michael Ferrara,

assistant United States attorneys, and William T. Walters, the

defendant, with the consent of his attorneys Barry H. Berke and

Paul H. Schoeman that:

    1.  If called to testify, a representative of Dean

Foods Company ("Dean Foods") would testify to the following:

    a.  All documents with Bates numbers beginning with

Dean Foods, Dean Foods-E, DF-CV, DF-SEC-E, or Dean Foods-ER

were maintained in Dean Foods' files.

    b. Government Exhibits 400 through 421, 421-A, 422,

423, 423-A, 424 through 427, 427-A, 428 through 437, 437-A

through 437-E, 438, 439, 439-A, 439-B, 440 through 442, 442-A

and 444 through 479 accurately memorialize the minutes of the

Dean Foods board of directors meetings to which they relate.

    c. Government Exhibits 700-A, 700-B, 701-A through

701-G, 702-A through 702-U, 703-A through 703-W, 704-A through

704-Z, 704-AA, 705-A through 705-Z, 706-A through 706-T, 707-A

through 707-Z, and 707-AA through 707-II are true and correct

copies of Dean Foods press releases.

    d. Government Exhibits 800 through 888, 888-A and 889

through 914 are true and correct copies of Dean Foods filings

with the U.S. Securities and Exchange Commission.

    2.  If called to testify, a representative of

McGraw-Hill Financial would testify that Government Exhibits

600-A, 601-A through 601-D, 602-A through 602-D, 603-A through

H3K3WAL4

603-D, 604-A through 604-D, 605-A through 605-D, 605-A through

605-D, and 606-A through 606-D are true and correct transcripts

of Dean Foods earnings calls.

    3.  If called to testify, a representative of Thomson

Reuters would testify to the following:

    a. Government Exhibit 505 is a true and correct

transcript of a February 22, 2011 CAGNY conference in which

Dean Foods participated.

    b. Government Exhibit 513 is a true and correct

transcript of a September 7, 2010, Barclays Back-to-School

consumer conference in which Dean Foods participated.

    c. Government Exhibit 54 is a true and correct

transcript of a May 30, 2012 Sanford C. Bernstein & Company

Strategic Decisions Conference in which Dean Foods

participated.

    4.  If called to testify, a representative of

Barington Capital would testify that all documents with Bates

numbers beginning BC were maintained in Barington Capital's

files.

    5.  If called to testify, a representative of The

Walters Group would testify that all documents with Bates

numbers beginning WG or WG-GJ were maintained in The Walters

Groups' files.

    6.  If called to testify, a representative of

Bloomberg LP would testify that Government Exhibit 1739

H3K3WAL4

1    accurately reflects daily price and volume data for Dean Foods
2    stock.

3            By this stipulation, each party waives it rights to
4    contest the authenticity of the documents and government
5    exhibits subject to the stipulation under Federal Rule of
6    Evidence 901, but neither party waives its right, with respect
7    to any of the documents or government exhibits subject to this
8    stipulation, to contest admissibility on grounds of relevance,
9    hearsay, or under Federal Rule of Evidence 403.

10           The parties have further agreed that this stipulation,
11   which has been marked as Government Exhibit 2100, may be
12   received in evidence.

13           Dated New York, New York, March 16, 2017, and signed
14   by the parties.

15           Your Honor, at this time, the government would offer
16   both Government Exhibit 2100 and a series of press releases
17   covered by the stipulation, which include Government Exhibit
18   702-C, 702-G, 702-N, 702-Q, 704-C, 704-H, 704-O, 704-W, 706-F,
19   706-L, 706-Q, and 707-D.

20           MR. SCHOEMAN:  No objection.

21           THE COURT:  Received.  Thank you.

22           (Government's Exhibit 2100, 702-C, 702-G, 702-N, 702-Q
23   received in evidence)

24           (Government's Exhibit 704-C, 704-H, 704-O, 704-W,
25   706-F received in evidence)

H3K3WAL4                          Carocci - direct

1              (Government's Exhibit 706-L, 706-Q, 707-D received in

2        evidence)

3              MR. GOLDMAN:  At this time the government calls Thomas

4        Carocci.

5              (Witness sworn)

6         THOMAS CAROCCI,

7            called as a witness by the Government,

8            having been duly sworn, testified as follows:

9        DIRECT EXAMINATION

10       BY MR. GOLDMAN:

11       Q.  Good afternoon, Mr. Carocci.

12       A.  Good afternoon.

13       Q.  What is your educational background?

14       A.  I have a law degree from Duquesne University in Pittsburgh,

15       Pennsylvania, and undergraduate degrees in finance and

16       economics.

17       Q.  Where do you currently work?

18       A.  I work for FINRA, that's F-I-N-R-A.  And it's the Financial

19       Industry Regulatory Authority.

20       Q.  What is FINRA?

21       A.  FINRA is what's called a private self-regulatory

22       organization.  So we regulate the securities industry.

23       Q.  Is it a governmental organization?

24       A.  No.  We're actually funded by the member firms that we

25       regulate, and we're private.

1   Q.  What oversight role does FINRA play on the stock markets?

2   A.  What our mission statement is investor protection and

3   market integrity.  Our goal is to protect investors and to

4   ensure, you know, market integrity.  That there is fair

5   trading.

6   Q.  How long have you worked at FINRA?

7   A.  For approximately 18 years.

8   Q.  What is your current position?

9   A.  I'm the senior counsel with the criminal prosecution

10  assistance group.

11  Q.  What is the criminal prosecution assistance group?

12  A.  It's a group within FINRA that assists federal, state and

13  local prosecutors with their white collar criminal

14  investigations and trials.

15  Q.  What are your duties and responsibilities as a part of this

16  group?

17  A.  To assist investigators with analysis of data, to testify

18  before grand juries or jury trials such as this.

19  Q.  How do you get assigned cases or investigations?

20  A.  Usually prosecutors or investigators will contact us,

21  seeking assistance.  And if we can do it, we usually -- and

22  have some expertise to burn, we usually assist.

23  Q.  Have you had any training as part of your current position?

24  A.  Yes.  At FINRA, I completed what's called our examiner

25  university, and that's just a program where you get an in-depth

H3K3WAL4                           Carocci - direct

1    education on brokerage firms' books and record, what they're

2    required to maintain and how they operate.  I also completed

3    the FINRA Institute at the Wharton School of Business, which is

4    for a certified regulatory compliance professional.  It's a

5    year-long program that you attend different weeks during the

6    year.  So, and then I also just attend conferences and seminars

7    that are continuing education.

8    Q.  How long have you worked in the criminal prosecution

9    assistance group?

10   A.  For approximately 14 out of the 18 years I've been with

11   FINRA.

12   Q.  What have you done in those other four years?

13   A.  I started in FINRA -- they had what's called a corporate

14   finance department.  And this department reviews initial public

15   offerings of stock and the terms that brokerage firms that

16   underwrite the offerings take companies public with.  I did

17   that for a little over two years I believe.

18   Q.  And the other?

19   A.  And I also worked in the FINRA member regulation

20   department.  This department conducts examinations of the

21   member firms, it goes on site and looks at their books and

22   records, their procedures, their operations, to ensure that

23   they're following the FINRA rulebook and federal securities

24   laws and regulations.

25   Q.  Is there a group within FINRA that flags suspicious trading

H3K3WAL4                          Carocci - direct

1    in the stock markets?

2    A.  Yes.  Yes.  We have a market regulation department

3    within -- there is an office or, I'm sorry, there is the office

4    of fraud detection and market intelligence.

5    Q.  Have you ever worked in that group?

6    A.  I have not, no.

7    Q.  What is the relationship between the criminal prosecution

8    assistance group and the market regulation group?

9    A.  Well, we're -- as part of the criminal prosecution

10   assistance group, I'm walled off from all what would be FINRA

11   regulatory investigations or civil investigations.  Because I

12   only assist in criminal matters, and when FINRA brings

13   regulatory actions, that's exactly what they are.  They're

14   non-criminal.

15   Q.  Have you had any involvement in the investigation of Billy

16   Walters?

17   A.  No.

18   Q.  Have you been asked to review trading records and other

19   materials in connection with Billy Walters' trading in Dean

20   Foods?

21   A.  Yes, I have.

22   Q.  You mentioned that FINRA oversees the stock markets.  Does

23   that include the New York Stock Exchange?

24   A.  Yes.  Trading on the NASDAQ and New York Stock Exchange by

25   member firms.

H3K3WAL4                          Carocci - direct

1   Q.  What is the NASDAQ?

2   A.  Right.  The NASDAQ is a stock exchange where stocks are

3   traded, bought and sold.  They're listed for trading and bought

4   and sold on the exchange.

5   Q.  Is that another exchange similar to the New York Stock

6   Exchange?

7   A.  It is similar to the New York Stock Exchange.

8   Q.  Are there requirements to be listed on the New York Stock

9   Exchange?

10  A.  Yes.

11  Q.  What are those?

12  A.  Generally you have to be larger companies, as far as having

13  at least 400 shareholders, a $4 stock price, and generally a

14  market capitalization, which would be your share price times

15  your number of outstanding shares.  So one way to judge the

16  size of a company.  That would need to be over $40 million.

17  Q.  Are you familiar with the S&P 500?

18  A.  Yes, I am.

19  Q.  What is that?

20  A.  It's kind of a group of 500 companies that are the largest

21  500 publicly traded companies listed on the exchanges.

22  Q.  Is Dean Foods listed on the New York Stock Exchange?

23  A.  It was, yes.

24  Q.  Well, is Dean Foods on the New York Stock Exchange?

25  A.  I'm sorry, yes.  Yes, I'm sorry.

H3K3WAL4                          Carocci - direct

1    Q.  Is it listed as part of the S&P 500?

2    A.  It was.  I'm sorry, it was, yes.

3    Q.  It was until when, do you know?

4    A.  Until I believe May 23, 2013.

5    Q.  Do you know what happened on that date?

6    A.  I believe when they divested WhiteWave, they no longer

7    qualified as one of the largest 500 companies because those

8    assets were removed from Dean Foods.

9    Q.  As part of your duties and responsibilities, are you

10   familiar with the required SEC filings of public companies?

11   A.  Yes.

12   Q.  You stated that in order to be listed on the New York Stock

13   Exchange, you must file regular reports with the SEC?

14   A.  Correct.  To be listed and remain listed on the New York

15   Stock Exchange, you need to be current in your SEC filings.

16   Q.  What filings must you be current with?

17   A.  Well, your 10-K, which is your annual report, which would

18   have audited financial statements in it.  So companies are

19   required to file that with the SEC on an annual basis.  And the

20   SEC then puts it on their website so that the investing public

21   can look at it and review it.

22   Q.  What other reports must be filed?

23   A.  There's 10-Qs, which are quarterly reports, that companies

24   listed on the New York Stock Exchange such as Dean Foods would

25   file on a quarterly basis that gives an update of the previous

H3K3WAL4                        Carocci - direct

1     90 days and what's going on with the company and some

2     financials.  They would file three of those a year.  And then

3     the annual report.

4     Q.  Are you familiar with an SEC form 8-K?

5     A.  Yes.

6     Q.  What is that?

7     A.  That's a current report.  And if a company has kind of

8     material information, some information that might be material

9     or important to investors and they want to disclose it to the

10    public, they can file an 8-K report with the Securities and

11    Exchange Commission.  And the Securities and Exchange

12    Commission, again, will put that on their website for the

13    investing public or anybody to see.

14    Q.  Are you also familiar with an SEC regulation called

15    Regulation F.D.?

16    A.  Yes.

17    Q.  What does that stand for?

18    A.  Fair Disclosure.

19    Q.  When was that regulation issued?

20    A.  In 2000.

21    Q.  What does it say?

22    A.  Well --

23              MR. SCHOEMAN:  Objection, your Honor.

24              THE COURT:  No, I'll allow it.  Go ahead.

25    A.  It prohibits companies from selectively disclosing

1    non-public, material information.

2    Q.   What do you mean by selectively?

3    A.   Well, they can't selectively disclose it to an individual

4    or investor or shareholder.  It must be widely disseminated.

5    Widely distributed.

6    Q.   If a company violates the Regulation F.D. rule, what must

7    they do?

8    A.   They must promptly make a wider distribution of this

9    information, for example, if they inadvertently disclosed it to

10   a select group of people.

11   Q.   Are these SEC requirements of public companies that you

12   just mentioned generally available to the investing public?

13   A.   Yes, they are.

14   Q.   Where?

15   A.   On the SEC's website, there's what's called an EDGAR

16   database.  The filings would be on there.

17   Q.   Mr. Carocci, can you briefly explain how shares are

18   actually traded on a stock exchange like the New York Stock

19   Exchange.

20   A.   Yes.  There are brokerage firms that execute buy and sell

21   transactions on behalf of clients who have accounts with their

22   firm.

23   Q.   What is a brokerage firm?

24   A.   Right.  So that would be a firm, it would be a FINRA

25   member, actually, firm, that again, has the ability to

H3K3WAL4                        Carocci - direct

1    execute -- is registered with FINRA and with the SEC, and has

2    the ability to buy and sell stock for the investing public on

3    behalf of the investing public, and charge money to do that.

4    Q.  Can you give some examples for the jury.

5    A.  Sure.  A Goldman Sachs, a E*Trade, you know, a JPMorgan.

6    Q.  What is the name of somebody who actually executes the

7    trades on behalf of the brokerage firm?

8    A.  That would be a broker at the firm can look and see what

9    the stock is being offered to buy at and what it's being

10   offered to sell at.

11   Q.  Must brokers be registered as well?

12   A.  Brokers are also required to be registered with FINRA, and

13   they're also required to pass an examination testing their

14   knowledge of security industry products, rules, regulations,

15   and federal securities laws in order to serve the investing

16   public in that way.

17   Q.  Are you familiar with a concept called margin trading?

18   A.  Yes.

19   Q.  What is that?

20   A.  A margin account is kind of a special brokerage account

21   where the brokerage firm can loan an individual or an entity

22   money to buy and sell stock.

23   Q.  How typically does a brokerage firm determine how much

24   money it will lend to a client?

25   A.  Well, they would do a credit check, like for any other type

1    of loan.  But it generally starts at the initial margin

2    requirement of 50 percent of the assets cash, and then assets

3    in the account would be the initial margin.  And then it would

4    depend, again, a lot on the client from there.

5    Q.   Does trading on margin allow an investor to buy more stock

6    than the money that that investor has in the account?

7    A.   Yes, it does.

8    Q.   Are you also familiar with the type of trade called an

9    option trade?

10   A.   Yes.

11   Q.   What is an option trade?

12   A.   It's a type of security, like a stock, but it's basically a

13   contract stating that if the price reaches a certain level at a

14   certain future date, an individual would have to buy or sell

15   securities per that contract, according to that contract.

16   Q.   Are there special requirements for an investor to have an

17   account that allows for option trading?

18   A.   Yes.  So, again, at a brokerage firm, an options account

19   would also kind of be a special account.  The broker would be

20   responsible for doing what's called a suitability analysis.

21   Because it's somewhat more sophisticated than just buying and

22   selling stock, they're required to ensure that the client has a

23   certain level of sophistication and is suitable for their

24   investment goals to trade options.

25   Q.   Is that also true for margin accounts?

H3K3WAL4                        Carocci - direct

1    A.  Yes.  Yes.

2    Q.  Is there a maximum generally amount of margin that an

3    investor can use to trade stocks in?

4    A.  Well, the initial is 50 percent and then it would go down.

5    I believe 25 percent equity in the account is the bare minimum.

6    Q.  Let's go step by step with explaining what an options trade

7    is.  Are you familiar with something called a call option?

8    A.  Yes.

9    Q.  What is that?

10   A.  Well, that would be an option where the individual writing

11   or selling that option would agree to sell a stock at a certain

12   price called a strike price at some future date.  And so that

13   would be the writer or the seller of the call option.  That

14   contract would be bought by somebody.

15   Q.  So there is both a buyer and a seller in the market of one

16   options contract?

17   A.  Correct.  Just like a stock there -- or any other

18   transaction.  There is a buyer and a seller.

19   Q.  What is a put option?

20   A.  The put option would give someone the right to sell a stock

21   at a future date, at a time in the future if a certain price

22   was met.

23   Q.  So the call option is an option to buy the stock and a put

24   option is the option to sell the stock?

25   A.  That's the way I look at it.  It is the call option you

H3K3WAL4                      Carocci - direct

1   would be calling in the stock to buy it.  And a put option you

2   would be putting off the stock, selling.

3   Q.  If you sell or write an option contract, either a put or a

4   call option, what, if anything, do you receive as the seller?

5   A.  You receive what's called a premium.  So, for writing the

6   contract.

7   Q.  Typically, is that a percentage of the stock price?

8   A.  Yes.  It would be -- yes.

9   Q.  In what amounts are option contracts sold?

10  A.  They're sold by number of contracts, but one contract would

11  equal 100 shares of the underlying stock of the contract.

12  Q.  You just referenced something called a strike price.  Can

13  you explain what a strike price is.

14  A.  That would be the price in the contract that would

15  determine whether the option is kind of in the money or out of

16  the money.

17  Q.  What other aspects of an options contract are there?  In

18  terms of the duration or the timing --

19  A.  Right.  So there is an expiration date.  So, they expire.

20  So that's generally when the strike price has to be reached or

21  not.

22  Q.  Now, does each stock have different possible strike prices

23  for an option contract?

24  A.  Yes.  Yes.  Generally every two and a half dollars.

25  Q.  What about are there different options -- maybe I shouldn't

1    use the word "options."

2            Are there different possibilities for the expiration

3    date of option contracts?

4    A.  Yes.  They can go out, you know, a month or several months,

5    for example.

6    Q.  How do the strike price and the expiration date of the

7    options affect the value of the option contract?

8    A.  Well, you know, if the price of the security is above the

9    stock price for a call option, you own that call option, you

10   would be in the money so it would be valuable.  Especially the

11   expiration date was coming up.

12   Q.  Would the value of the price that you purchased the

13   contract vary depending on how long in the future the

14   expiration date is?

15   A.  Both how long in the future the expiration date is and what

16   the strike price is, yes.

17   Q.  So, if the expiration date was close in time but the stock

18   price or rather the strike price was further away from the

19   current stock price, how would that affect the value of the

20   options contract?

21   A.  Well, for the buyer, it wouldn't be that valuable because

22   it wouldn't appear that the stock would be able to get to the

23   strike price in that short period of time.

24   Q.  In preparation for your testimony today, did you prepare

25   summary charts?

H3K3WAL4                          Carocci - direct

1    A.  Yes.

2    Q.  Let me just clarify again.  Were you involved in the actual

3    investigation of this case at any point?

4    A.  No.

5    Q.  Generally, what do these summary charts that you prepared

6    relate to?

7    A.  The purchases and sales of Dean Foods stocks by Mr. Walters

8    through his accounts, and his holdings in Dean Foods shares.

9    Q.  What types of documents did you rely on to create these

10   charts?

11   A.  I relied on the brokerage account statements for The

12   Walters Group and Nature Development at Wells Fargo, Barclays,

13   and JPMorgan.  I relied on blue sheet data and Bloomberg price

14   volume data.  And company price releases regarding quarterly

15   earnings.

16   Q.  You mentioned something called blue sheet data.  What is

17   blue sheet data?

18   A.  That's trading data.  It's a term regulators use for -- the

19   industry uses for trading data.  So it would show all of the

20   transactions, for example, in a particular stock on a certain

21   day.  It would give you the account that bought or sold, the

22   number of shares, the price at which they bought or sold, and

23   you know, the brokerage firm involved.

24   Q.  Who generally collects the blue sheet data?

25   A.  Well, the firms maintain their trading records so they

H3K3WAL4                          Carocci - direct

1    would maintain records of the buys and sales for an individual.

2    And then regulators with the SEC can request that information

3    from them.

4    Q.  You mentioned something about Bloomberg data for stock

5    price and trading volume.  What is trading volume?

6    A.  Trading volume would be the number of shares of a

7    particular stock bought or sold on a particular day or during a

8    particular month.  It would be the daily trading volume would

9    be for a particular day.

10   Q.  Where did you obtain these documents and records from?

11   A.  The brokerage account statements I obtained from the U.S.

12   attorney's office, the government.  And the blue sheet data I

13   also obtained through the U.S. attorney's office, I believe via

14   the Securities and Exchange Commission.  The Bloomberg data I

15   was able to download myself, I have access to Bloomberg.  And

16   the press releases I was able to view on the Dean Foods

17   website.

18   Q.  You've explained blue sheet data.  But how long do

19   brokerage firms maintain their records of trading that would

20   make up the blue sheet data?

21   A.  They are required to keep it for at least six years.

22           MR. GOLDMAN:  Your Honor, at this time I'm going to

23   read another stipulation with the Court's permission.

24           THE COURT:  Testimonial or factual?

25           MR. GOLDMAN:  It is another testimonial stipulation.

1                  THE COURT:  Please proceed.

2                  MR. GOLDMAN:  All of the following exhibits are going

3       to be admitted at the end of this stipulation.

4                  It is hereby stipulated and agreed among the parties

5       that:

6                  1.  If called to testify, a representatives of

7       Wachovia Securities and Wells Fargo Advisors would testify that

8       Government Exhibits 100-A through 100-L, 101-A through 101-L,

9       102-A through 102-L, 103-A through 103-L, 104-A through 104-L,

10      105-A through 105-J, 106 through 112, 113-A through 113-G,

11      114-A through 114-L, 115-A through 115-L, 116-A through 116-J,

12      117, 319-A through 319-L, 320-A through 320-L, 321-A through

13      321-L, 322-A through 322-L, 323-A through 232-L, 324-A through

14      324-L, 325-A through 325-L and 326-A through 326-L constitute

15      true and accurate records kept in the regular course of

16      business.

17                 b. the times that appear in Government Exhibits 106

18      and 107 all reflect Eastern Standard Time or Eastern Daylight

19      Time, depending on the time of the year.

20                 c. Government Exhibit 117 is a true and accurate

21      glossary of the terms in the column headers of Government

22      Exhibits 106 and 107.

23                 2.  If called to testify, representatives Barclays

24      Capital, Inc. would testify that:

25                 a. Government Exhibits 200 through 214, 215-A, 215-B,

216-A through 216-C, 217-A through 217-L, 218-A through 218-L,

219, 220-A through 220-C, 221-A through 221-L and 222-A through

222-L constitute true and accurate records kept in the regular

course of business.

     b.  The times that appear in Government Exhibits 200

through 210 and 214 all reflect Greenwich Mean Time which is

four hours ahead of Eastern Daylight Time and five hours ahead

of Eastern Standard Time.

     3.  If called to testify, a representative of Charles

Schwab & Co. would testify that Government Exhibits 300-A

through 300-C, 301-A, 301-B, 302-A through 302-D, 303-A through

303-L, 304-A through 304-L, 305-A through 305-L.  Do this

faster.  306 through 311-A through L, 312-A through 312-H,

313-A through 313-E, 314-A through 314-L, 315-A through 315-H,

316-A through 316-E, 317-A through 317-L and 318-A through

318-H constitute true and accurate records kept in the regular

course of business.

     If called to testify, a representative of JPMorgan

could testify that Government Exhibits 223-A through 223-Q,

224-A through 224-K, and 225-A through 225-I constitute true

and accurate records kept in the regular course of business.

     If called to testify, a representative of Bloomberg LP

would testify that Government Exhibit 1738 accurately reflects

daily price and volume data for Dean Foods stock.

     b. Government Exhibits 1739-A through 1739-G are true

H3K3WAL4                        Carocci - direct

1    and accurate excerpts of Government Exhibit 1739.

2              6.  If called to testify, a representative of the

3    United States Securities and Exchange Commission would testify

4    that Government Exhibits 1740-A through 1740-D, 1741-A through

5    1741-D, 1742-A through 1742-C, 1743 through 1745, 1746-A

6    through 1746-C, and 1747 are true and accurate records

7    reflecting blue sheet data for Dean Foods stock.

8              7.  All of the government exhibits listed above and

9    this stipulation, which is marked Government Exhibit 2101, may

10   be admitted into evidence.

11             And your Honor, so that I don't have to repeat all

12   those numbers, the government offers all the aforementioned

13   exhibits and Government Exhibit 2101 and Government Exhibit

14   1739.

15             MR. SCHOEMAN:  No objection.

16             THE COURT:  Received.

17             (Government's Exhibit 100-A to 100-L, 101-A to 101-L

18   received in evidence)

19             (Government's Exhibit 102-A to 102-L, 103-A to 103-L

20   received in evidence)

21             (Government's Exhibit 104-A to 104-L, 105-A to 105-J,

22   106 to 112, 113-A to 113-G received in evidence)

23             (Government's Exhibit 114-A to 114-L, 115-A to 115-L,

24   116-A to 116-J, 117 received in evidence)

25             (Government's Exhibit 319-A to 319-L, 320-A to 320-L

H3K3WAL4                         Carocci – direct

1    received in evidence)

2              (Government's Exhibit 321-A to 321-L, 322-A to 322-L,

3    received in evidence)

4              (Government's Exhibit 323-A to 232-L, 324-A to 324-L

5    received in evidence)

6              (Government's Exhibit 325-A to 325-L 326-A to 326-L

7    received in evidence)

8              (Government's Exhibit 106, 107, 117, 200-210, 214

9    received in evidence)

10             (Government's Exhibit 200-214, 215-A, 215-B, 216-A to

11   216-C, 217-A to 217-L received in evidence)

12             (Government's Exhibit 218-A to 218-L, 219, 220-A to

13   220-C received in evidence)

14             (Government's Exhibit 221-A to 221-L, 222-A to 222-L

15   received in evidence)

16             (Government's Exhibit 300-A to 300-C, 301-A, 301-B,

17   302-A to 302-D received in evidence)

18             (Government's Exhibit 303-A to 303-L, 313-A to 313-E

19   received in evidence)

20             (Government's Exhibit 304-A to 304-L, 305-A to 305-L

21   received in evidence)

22             (Government's Exhibit 306 to 311-A through L, 312-A to

23   312-H received in evidence)

24             (Government's Exhibit 314-A to 314-L, 315-A to 315-H

25   received in evidence)

H3K3WAL4                        Carocci - direct

1              (Government's Exhibit 316-A to 316-E, 317-A to 317-L

2    received in evidence)

3              (Government's Exhibit 318-A to 318-H, 223-A to 223-Q,

4    224-A to 224-K received in evidence)

5              (Government's Exhibit 225-A to 225-I, 1738, 1739

6    received in evidence)

7              (Government's Exhibit 1739-A to 1739-G, 1741-A to

8    1741-D received in evidence)

9              (Government's Exhibit 1742-A to 1742-C, 1743 to 1745

10   received in evidence)

11             (Government's Exhibit 1746-A to 1746-C, 1747 received

12   in evidence)

13             (Government's Exhibit 2101 and 1739 received in

14   evidence)

15   Q.  Mr. Carocci, if you can look in front of you, there is a

16   stack of papers marked Government Exhibits 2000 through 2014.

17   If you can leaf through those.  Do you recognize these

18   exhibits?

19   A.  Yes.

20   Q.  What are they?

21   A.  The exhibits I created in preparation for trial today.

22   Q.  These are the summary charts that you referenced before?

23   A.  Yes, they are.

24             MR. GOLDMAN:  The government offers Government Exhibit

25   2000 through 2014.

H3K3WAL4                          Carocci – direct

1                  MR. SCHOEMAN:  No objection.

2                  THE COURT:  Received.

3                  (Government's Exhibit 2000 through 2014 received in

4      evidence)

5                  MR. GOLDMAN:  If we may now publish Exhibit 2000,

6      please.

7      Q.   Focusing first on Government Exhibit 2000, Mr. Carocci.

8      What does this chart show?

9      A.   It shows Mr. Walters' holdings in Dean Foods stock and the

10     Dean Foods stock price, the closing price for the year 2008.

11                 (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. GOLDMAN:  Ms. Pyun, is there any way to zoom in a

2     little bit?

3     Q.  What is the vertical left axis?

4     A.  So that represents Mr. Walters' holdings, the number of

5     shares that he holds, and it relates to the red line that goes

6     across the bottom of the chart.  So, for example, at the

7     beginning of the year, in January 2008, Mr. Walters is holding

8     500,000 shares of Dean Foods stock.

9     Q.  What is the vertical right axis?

10    A.  That's the stock price axis.  So that's the axis from zero

11    to 30 that gives the range at which the stock closed at during

12    the year 2008.

13    Q.  OK.  Now, in January, at the beginning of the year, what is

14    the highest stock price -- I will use the little clicker which

15    doesn't work, there it is -- right up there, what is that?

16    A.  Approximately $28, which is the highest price for the year,

17    that year.

18    Q.  Now, in February and March, what is the stock price doing

19    in here?

20    A.  It is declining over February and March 2008.

21    Q.  And then at the same time that it's declining, there's an

22    uptick in the red line.  What does that mean?

23    A.  It's Mr. Walters' holdings increasing to over 1.5 million

24    shares from zero to then over 2 million shares.

25    Q.  In the middle of the page there is a significant uptick in

1  the red line for his holdings.  How many shares does he own at

2  this point?

3  A.  There are approximately 4 million shares, if you look at

4  the left-hand axis.

5  Q.  And approximately what is the stock price corresponding to

6  the time when he owns the 4 million shares right in there?

7  A.  It's approximately $18 a share.

8  Q.  So at that point how much were his 4 million shares worth?

9  A.  Approximately $72 million.

10  Q.  Now, moving on later in the year, in late October and early

11  November, what does the stock price do in this period?

12  A.  It declines from over $20 to it looks like close to --

13  over $21 to close to $12.

14  Q.  And what does Mr. Walters do around that same time when it

15  is declining?

16  A.  He's increasing his holdings in Dean Foods shares.

17        MR. GOLDMAN:  If we could now go to Government Exhibit

18  2001 and zoom in.  Thank you.

19  Q.  What does this chart show?

20  A.  This shows the Dean Foods stock price and Mr. Walters'

21  trading activity, his purchases and sales of Dean Foods stock

22  for the year 2008.

23  Q.  Now, there are green and red lines on the bottom.  Can you

24  explain to the jury what the green and red columns are?

25  A.  Yes.  If it's a green column, it represents a purchase by

H3kdwal5                         Carocci - direct

1    Mr. Walters, and if it is a red column, it will represent a

2    sale of Dean Foods stocks by Mr. Walters.

3    Q.   And then how does the left axis correspond to those

4    purchases and sales, the vertical axis?

5    A.   The left vertical axis represents the shares sold and

6    purchased.  That's what that number represents.  And then the

7    horizontal axis would be the date axis.

8    Q.   And the blue line, is that the same blue line of the stock

9    price that we saw in Government Exhibit 2000?

10   A.   Yes.  That's the closing price for 2008.

11   Q.   And then there are four orange boxes on here.  What do

12   those reflect?

13   A.   They reflect the earnings announcements, the Dean Foods'

14   earnings announcements that were made on a quarterly basis

15   during 2008.

16   Q.   And in the middle there is a pink box that says June 25,

17   2008 press release, what is that?

18   A.   There was a press release from Dean Foods on June 25th of

19   2008.

20   Q.   Now, I want to focus your attention in the early part of

21   the year in March and April.  What is Mr. Walters doing here?

22   A.   Mr. Walters is purchasing shares of Dean Foods stock, and

23   that's represented by the green columns above the March and

24   April 2008 dates.

25   Q.   Now, this arrow up here, what is that arrow from the

H3kdwal5                          Carocci - direct

April 30, 2008 Q-1 earnings announcement, what does that arrow

mean?

A.   It's pointing basically to April 30, 2008 on the line to

better kind of depict the price movement.

Q.   And from your review of these earnings announcements, when

during the day did Dean Foods typically make its earnings

announcements?

A.   They are generally released in the mornings prior to the

New York Stock Exchange opening.  So that would be at 9:30.

And these earnings announcements would generally be released to

the public in the morning hours prior -- prior to that.

Q.   So after the April 30, 2008 earnings announcement, what

does Mr. Walters do with his stock?

A.   He sells, and that's represented by the red columns, in May

of 2008, the red columns at the bottom.

Q.   Now, we're going to get to the June 25, 2008 press release

with the next chart.  So I want to focus now your attention

toward the end of the year, the November 4, 2008 earnings

announcement.

        What does this arrow reflect again; can you remind the

jury?

A.   It reflects the earnings announcement was being made

November 4, 2008, prior to the market opening.

Q.   And what does Mr. Walters do shortly after that

announcement?

H3kdwal5                          Carocci - direct

1    A.  He purchases Dean Foods stock, and that's represented by

2    the green columns, in the late October/early November range at

3    the bottom.

4    Q.  Now, I want to just direct your attention for a minute to

5    this June 2008 press release.

6            That arrow reflects when that press release was

7    announced as in correlation to the stock price, is that right?

8    A.  Yes.

9    Q.  And what did Mr. Walters do just before that press release

10   was issued?

11   A.  He purchased shares for the couple of days leading up to

12   that press release.

13   Q.  Right after, the big red column, what is the date of that

14   red column?

15   A.  I believe it's the 25th, and he sells 1.75 million shares.

16   Q.  And I just want to point -- direct your attention to the

17   middle of July here.  What happens with these columns here?

18   A.  The middle of July, there are red columns, so Mr. Walters

19   is selling Dean Foods stock.

20   Q.  And then how does the stock price when he sells in mid-July

21   correspond to the price just before that press release

22   announcement?

23   A.  Well, it's lower.  In fact, it even goes a little bit lower

24   than prior to the press release.

25   Q.  And then shortly after his sales, what does the price of

1    the stock do through the rest of the July and August into

2    September?

3    A.  It increases, the stock price increases.

4    Q.  Now, can we turn to Government Exhibit 2002, please, and

5    zoom in.

6           What is this chart, Mr. Carocci?

7    A.  This is the Dean Foods stock price and Mr. Walters'

8    percentage of trading for June of 2008.  So it's just, you

9    know, the June subsection of really the previous chart.

10   Q.  Now, remind the jury what the column on the left is.

11   A.  Right.  That's the shares sold/purchase column.  So it

12   represents the number of shares purchased or sold by

13   Mr. Walters.

14   Q.  And then on the bottom there are dates.  What are those

15   dates on the chart?

16   A.  They are the market dates.  So they would be the dates in

17   June where the stock market was open and Dean Foods was

18   trading.

19   Q.  And then there are five what look to be sort of light blue

20   boxes or purple boxes that are reflected with the percentage of

21   TMV.  Do you see those?

22   A.  Yes.

23   Q.  What are those?

24   A.  That is the percentage of the total market trading volume,

25   the Bloomberg trading volume, that Mr. Walters' transactions is

H3kdwal5                          Carocci - direct

1   responsible for.

2   Q.  Now, have you reviewed generally the trading volume for

3   Dean Foods from 2008 through 2014?

4   A.  Yes.

5   Q.  Is there a common range of trading volume for Dean Foods

6   throughout that period of time?

7   A.  There is, you know, no special news or announcement.  It

8   generally trades within the 3- to 5-million shares a day when

9   there is no special news or announcements.

10  Q.  In your review, when is the trading volume generally the

11  highest?

12  A.  Well, generally when there's information about the company

13  being made public.  It would either generally encourage -- if

14  it is positive, it could encourage people to want to buy the

15  stock.  If it is negative, it could encourage people to sell

16  the stock.  But either way, the trading volume is generally

17  affected and increasing.

18  Q.  Let's focus on this chart here.  What do we have on this

19  first column, which I believe is dated June 19, 2008.

20  A.  Right.  It's a purchase by Mr. Walters of, you know,

21  approximately 1.8 million shares.

22  Q.  And then in the box, it says "37 percent of TMV."  What

23  does that mean?

24  A.  So that approximately 1.8 figure represents 37 percent of

25  the total market volume, Bloomberg volume, for Dean Foods on

H3kdwal5                        Carocci - direct

1   that date.

2   Q.   Is that a large percentage of the daily trading volume?

3   A.   Yes.  I mean, it's 37 percent.

4   Q.   And then the next day, what do we see here on June 20th?

5   A.   That Mr. Walters again purchases shares, and these

6   purchases represent 33 percent of the total market volume for

7   that particular day.

8            MR. GOLDMAN:  Ms. Pyun, maybe we could zoom in on the

9   right half of the chart, if that's possible.

10  Q.   And then the third green column, what is that?

11  A.   It's another purchase of Dean Foods, and on that date it

12  represents 29 percent of the total market volume, Bloomberg

13  volume.

14  Q.   Now, this is June 23rd and the previous one was

15  June 20th and June 19th.  What is June 21st and 22nd?

16  A.   Those are a Saturday and Sunday so the stock market was

17  closed.

18  Q.   Now, looking at the top of the screen, there is this

19  June 25, 2008 press release again.  And when -- remind the jury

20  when during the day that was released?

21  A.   In the morning, prior to the stock market opening.

22  Q.   And then on that same day, on June 25th, what does this red

23  column represent?

24  A.   It represents a sale of Dean Foods stock -- the sales of

25  Dean Foods stocks on that day by Mr. Walters.

H3kdwal5                              Carocci - direct

1     Q.   And what percentage of the total market volume was that

2     sale that day?

3     A.   20 percent.

4     Q.   Now, this red column appears to be almost pretty similar to

5     the first green column, yet the green column was 37 percent of

6     the total market volume.  Can you explain the difference why

7     this was 37 percent of the total market volume and this sale is

8     20 percent of the total market volume?

9     A.   Yes.  There was a, you know, increase in trading volume on

10    that date, the date of the press release.  So, you know, about

11    1.75, 1.8 million shares on June 25th only represents

12    20 percent of the total market volume, whereas before the press

13    release, on June 19th of 2008, about 1.8, 1.75 million shares

14    represents 37 percent of the total Bloomberg volume.

15    Q.   And was this sale on June 25th after the announcement

16    through that press release?

17    A.   Yes.

18    Q.   And then, finally, on the next day, there is an additional

19    sale of 250,000 shares.  What percentage of the total market

20    volume is that on June 26th?

21    A.   9 percent.

22    Q.   Now, did you have blue sheet data for this time period to

23    analyze as well?

24    A.   I did not.

25    Q.   And remind the jury how long brokerage firms must retain

H3kdwal5                              Carocci - direct

1    their books and records, including their trading data?

2    A.  At least six years.

3              MR. GOLDMAN:  Now if we could move to Government

4    Exhibit 2003.  Please zoom in.

5    Q.  What does this chart shows?

6    A.  It shows Mr. Walters' holdings of Dean Foods and the Dean

7    Foods stock price for the year 2009.

8    Q.  But is it similar to Government Exhibit 2000 but just for

9    the next year?

10   A.  Correct.  It is for the year 2009, but in other respects

11   it's very similar to Government Exhibit 2000 or 2000 full year

12   2008.

13   Q.  How much stock did Mr. Walters come into the year 2009

14   with?

15   A.  1.5 million shares.

16   Q.  And was that the most that he held for any significant

17   period of time that year?

18   A.  Yes.

19   Q.  And what did the stock price do during this year?

20   A.  You know, it really trades I think within a narrow range

21   of, you know, maybe $16 to 20 -- to $20 perhaps.

22   Q.  It remained relatively flat during the course of the year?

23   A.  I would say relatively flat.

24             MR. GOLDMAN:  Now if we could go to Government Exhibit

25   2004, please?

H3kdwal5                           Carocci - direct

1          THE COURT:  All right.  Ladies and gentlemen, you are

2    going to be in suspense on Exhibit 2004.  You are just going to

3    have to wait until after our break.  OK?  So we are going to

4    take a short recess.

5          Please do not discuss the case among yourselves or

6    anyone else.  We will be back in action in ten minutes.

7          Thank you.

8          (Continued on next page)

9          (Jury not present)

10         THE COURT:  We are in recess.

11         (Recess)

12         THE COURT:  Bring our jurors in, please.

13         (Jury present)

14         THE COURT:  All right.  Ladies and gentlemen, we are

15   back in action.

16         Mr. Goldman, keep us in suspense no longer.

17         MR. GOLDMAN:  All right, your Honor.

18         Let's pull up Government's Exhibit 2004.

19   BY MR. GOLDMAN:

20   Q.  And, Mr. Carocci, what does this chart reflect?

21   A.  Mr. Walters' holding in the Dean Foods stock price for the

22   year 2010.

23   Q.  Now, what is it showing when this red line is going up and

24   down so much throughout the course of the year?

25   A.  It would be Mr. Walters' adding or subtracting from his

1    Dean Foods holdings.

2    Q.  When does he first buy Dean Foods in the year 2010?

3    A.  Around April 2010, the beginning of April 2010.

4    Q.  And how much does he buy in April 2010?

5    A.  1.5 -- one-and-a-half million shares.

6    Q.  And approximately where is the stock price when he buys the

7    1.5 million shares in April?

8    A.  It appears to be about approximately $17 per share.

9    Q.  And then at the end of the year where does the stock price

10   end?

11   A.  Approximately $9 per share.

12   Q.  And how much does he own at the end of the year 2010?

13   A.  1 million shares.

14   Q.  Now, if we could go to Government Exhibit 2005.

15          What does this chart show?

16   A.  It is Mr. Walters' purchases and sales of Dean Foods for

17   the year 2010 along with the stock price.

18   Q.  And, once again, what is in the orange boxes?

19   A.  The quarterly earnings announcements for the year 2010.

20   Q.  Now, in a minute we're going to focus on the May 2010

21   earnings and the November 2009 earnings, but let me just draw

22   your attention to June of this year.

23          Do you see two red lines right there?  It is hard to

24   tell but in the middle of June.

25   A.  Yes.

H3kdwal5                        Carocci - direct

1              THE COURT:  June 2010.

2              MR. GOLDMAN:  Yes.  What did I say?

3              THE COURT:  "This year."

4              MR. GOLDMAN:  So, June 2010.

5    Q.  Can you explain to the jury what those red lines are?

6    A.  They are sales from Mr. Walters' account in Dean Foods

7    shares.  These sales were related to the call options that

8    Mr. Walters sold.

9    Q.  So let's take that step-by-step.

10             What did -- remind the jury again of what the call

11   options are.

12   A.  Right.  It is an option where one person or entity sells

13   the right to another individual to call in or to buy their

14   shares at a certain price, the strike price, at a certain date

15   in the future.

16   Q.  And which side of this contract did Mr. Walters take?

17   A.  He sold the call option; he wrote the call option.

18   Q.  When did he do that?

19   A.  In May -- May 11, 2010.

20   Q.  And once again, the earnings announcement was May 10, 2010,

21   is that right?

22   A.  Correct.

23   Q.  And was that earnings announcement made before or after the

24   market had opened?

25   A.  Before.

1  Q.  And we see that after this earnings announcement, the stock

2  drops significantly, right?

3  A.  Yes.  It declines steeply.

4  Q.  And he wrote these call options, you said, on May 11th?

5  A.  Correct.

6  Q.  Now, if you're looking at your screen there, there are a

7  number of green columns that follow that May 10th, 2010

8  earnings announcement, is that right?

9  A.  Yes.

10  Q.  And are the call options that he wrote reflected here in

11  May of 2010?

12  A.  No, because they're contracts so I just have -- the chart

13  is just for stocks.

14  Q.  So why did you include the sale in June of 2010?

15  A.  Well, because they are actually sales of stock.

16  Q.  So when -- so explain what he did with these call options

17  when he sold them.  What was the strike price?

18  A.  It was $10 per share.

19  Q.  And when was the expiration date of these call options?

20  A.  One of them was in May, the third Friday in May.  The

21  others were in June, the third Friday in June.

22  Q.  So what does it mean when he sold the call options with the

23  strike price of $10?

24  A.  It meant that the buyer of the call option exercised his

25  rights under the contract to be able to purchase the shares

from Mr. Walters for $10 per share.  So the stock price was

trading at approximately $10.80 a share, I believe, so it was

in the money.  The strike price was below the actual trading

price of the stock.

Q.  So because of that Mr. Walters had to sell at $10 to this

buyer?

A.  To the other person on the other side of the contract,

correct.

Q.  Now, if the stock had -- Dean Foods' stock had gone down

to $8, let's say, what would have happened to Mr. Walters'

option contracts?

A.  They would have expired.  The buyer of the option contract

would not have exercised the right to call in those shares, to

buy those shares, because he would have to pay $10 a share for

them under the contract.  And why would someone pay $10 per

share for Dean Foods stock when they can go into the market and

buy it for $8 per share?  So the contract would simply expire

on exercise.

Q.  If the contract was not exercised, would Mr. Walters have

made any money on these options?

A.  He would have made his premium for writing the options and

selling the options.

Q.  And focusing your attention toward the end of August of

2010, beginning of September.  There are a number of red

columns there.  What do those represent again?

H3kdwal5                          Carocci - direct

1   A.  They represent Mr. Walters' sales in those months of Dean

2   Foods.

3   Q.  So does he end up selling all of the Dean Foods stock that

4   he purchased right after the May 2010 announcement during that

5   period?

6   A.  Yes.

7   Q.  And then shortly after, in early October, he begins buying

8   again?

9   A.  Yes.

10          MR. GOLDMAN:  Now, if we could turn to Government

11  Exhibit 2006, please.

12          Zoom in.

13  Q.  What is this chart?

14  A.  This is Mr. Walters' trading activity in the Dean Foods

15  stock price from a subset of 2010, just April 1st through

16  May 31st, 2010, just that two-month period.

17  Q.  And what are the purple boxes again?

18  A.  They represent the percentage that Mr. Walters'

19  transactions were on those days to the overall Bloomberg

20  trading volume.

21  Q.  And there is also an asterisk on these boxes.  What does

22  that asterisk mean?

23  A.  Where there is an asterisk, it means that, per the blue

24  sheet data, Mr. Walters' transaction was either the largest

25  purchase or the largest sale on that date as far as raw number

H3kdwal5                              Carocci - direct

1   of shares, that the transaction -- the transaction number of

2   shares.

3   Q.   Sorry.   What do you mean, "the transaction number of

4   shares?"

5   A.   Well, you know, the trading, the single transaction.

6   Q.   So if there is an asterisk there, it was either the largest

7   purchase or the largest sale of Dean Foods' stock on that date?

8   A.   Correct.

9   Q.   And you got that from the blue sheet data?

10  A.   Yes.

11  Q.   Let's focus on April 12th, if we could.

12        What did Mr. Walters do on April 12th?

13  A.   He purchased 1 million shares of Dean Foods.

14  Q.   And what percentage of the total market volume was that?

15  A.   21 percent.

16  Q.   And was that the largest purchase on that date?

17  A.   Yes, it was.

18  Q.   And then going ahead to April 14th, what did he do on that

19  date?

20  A.   He purchased 500,000 shares of stock.

21  Q.   And what percentage of the total market volume was that

22  transaction?

23  A.   19 percent.

24  Q.   Now -- and was that also the largest purchase?

25  A.   Yes.

H3kdwal5                        Carocci - direct

1   Q.  Now, you had mentioned earlier in your testimony that you

2   reviewed records, brokerage accounts, for The Walters Group and

3   Nature Development.  Can you explain what these green and red

4   lines reflect as it relates to both of those brokerage

5   accounts?

6   A.  Right.  So, you know, they are aggregated.  So, for

7   example, if -- on May 3rd, for example, there is sales in both

8   of the Nature Development account and the Walters Group

9   account.

10  Q.  Now, just focusing on this asterisk here where you talk

11  about the largest purchase or transaction, in theory, is it

12  possible that another investor could have multiple accounts and

13  could have purchased more than what you have noted as the

14  largest purchase or sale transaction of a particular day?

15  A.  Yes.  If there was someone with related accounts and

16  executed a bunch of smaller transactions that equaled more than

17  500,000 shares, for example, on April 14th, that's right, that

18  would not be included.  This is the largest single purchase.

19  Q.  Is that difficult for you to determine, whether that

20  aggregate of many small trades occurred?

21  A.  It is because you don't know the interrelation between the

22  other trades that are reflected in the blue sheet data.  You

23  don't know if those accounts have common ownership or not.  All

24  I see really is a name, a name and account number.  So we

25  aggregated Mr. Walters' accounts, but I didn't have enough

H3kdwal5                         Carocci - direct

1   information to aggregate the other accounts.

2   Q.  And is that true for all of the asterisks in these charts?

3   A.  Yes, it is.

4   Q.  Now, in the middle of the page, on May 3rd, 2010, you have

5   a red line here.  What does that represent?

6   A.  Mr. Walters' sales of Dean Foods on May 3, 2010.

7   Q.  And what percentage of the total market volume is that?

8   A.  29 percent.  This is an example of where there were two

9   transactions.  There was a 510,000 share transaction in the

10  Walters Group account, and then there was an approximately a

11  380,000 share sale in the Nature Development account.  The

12  reason the asterisk is there is because the 510,000 sale in The

13  Walters Group account was the largest single transaction on

14  that date.

15  Q.  On May 4, 2010, what did Mr. Walters do?

16  A.  He sold a little over 600,000 shares of Dean Foods stock.

17  Q.  Between May 3rd and May 4th, how much -- how many shares of

18  Dean Foods did Mr. Walt sell?

19  A.  Approximately 1.5 million shares.

20  Q.  Is that the same 1.5 million shares that he purchased on

21  April 12th and 14th?

22  A.  Yes.

23  Q.  And so those purchases on April 12th and/or April 14th also

24  aggregated The Walters Group and Nature Development accounts?

25  A.  Yes, they are.

H3kdwal5                          Carocci - direct

1   Q.   Now, at the top you have the orange box, the Q-1 earnings

2   announcement, May 10, 2010.  Does this line represent where the

3   stock price was when that announcement was made?

4   A.   Yes.

5   Q.   And what did the stock do right after that announcement was

6   made?

7   A.   It declined sharply.

8   Q.   And on that same day, May 10, 2010, what did Mr. Walters

9   do?

10  A.   He purchased 1 million shares of Dean Foods stock.

11  Q.   Now, you don't have the total percentage -- total market

12  volume for that 1 million share purchase on here, do you?

13  A.   I do not.

14  Q.   Do you recall what the total volume for Dean Foods stock

15  was on May 10, 2010?

16  A.   Yes.  It was 47 million -- approximately 47 million shares.

17          MR. GOLDMAN:  Ms. Pyun, if we could do a little

18  side-by-side here and move this to one side and pull up

19  Government Exhibit 1739C at page 2.  And if we could zoom in on

20  that April and from the middle of the page down.

21          (Pause)

22  Q.   There you see May 10th; is that the 47 million shares that

23  you referenced there?

24  A.   Yes.

25  Q.   And then how many shares were traded the following day?

1    A.  Over 33 million shares.

2    Q.  Now, is that 47 million an unusually high volume for Dean

3    Foods stock in your review of these trading records?

4    A.  Yes.  I believe it was the highest, actually.

5    Q.  Let's, as an example, on May 3rd, when he sold some of his

6    stock, what was the total market volume that day?

7    A.  A little over 3 million shares.

8    Q.  And May 4th, what was the volume?

9    A.  3,782,000 shares.

10           MR. GOLDMAN:  If we can take down 1739 and blow the

11   chart back up.

12   Q.  On May 14, 2010, what did Mr. Walters do?

13   A.  On May 14, 2010, Mr. Walters purchased 500,000 shares.

14   Q.  And so how many shares of Dean Foods did Mr. Walters own as

15   of May 14, 2010?

16   A.  Well, he purchased 1.5 million shares between May 10th and

17   May 14th of 2010.

18   Q.  And was that the same amount that he had purchased on

19   April 12th and April 14th of 2010?

20   A.  Approximately the same amount, yes.

21   Q.  And how did the cost of the 1.5 million shares that he

22   purchased on May 10th and May 14th compare to the cost of the

23   same 1.5 million share amount of Dean Foods' stock that he

24   purchased on April 12th and April 14th?

25   A.  Well, on April 12th and April 14th, he was purchasing it at

1   roughly 16 or $17 per share, and then May 10th through the

2   14th he's repurchasing 1.5 million shares for, you know,

3   approximately $10 per share.

4   Q.  So it is a significant reduction in the cost of those

5   shares?

6   A.  Yes.  I would say $6 or $7 is a significant reduction.

7   Q.  And then what occurs on May 19, 2010?

8   A.  There is an additional purchase of shares.

9   Q.  And the following day?

10  A.  Another smaller purchase.

11  Q.  And then May 24th there is a small sale.  What is that?

12  A.  Correct.  That's a sale -- that was the sale for the call

13  option, the one call option that did expire in May.  That

14  sale -- the assignment of that option was to cover that sale.

15          MR. GOLDMAN:  All right.  If we could go to Government

16  Exhibit 2007 now, Ms. Pyun.  And zoom in, please.

17  Q.  What does this chart reflect, Mr. Carocci?

18  A.  Mr. Walters' trading activity from October 1st through

19  November 15th of 2010, so, again, a subsection of the overall

20  2010 trading activity.

21  Q.  I think by this point we are all caught up.  The colors all

22  reflect the same thing as they did on the last chart as well?

23  A.  Correct.  Green for purchases.  Red for sales.

24  Q.  And purple for total market volume?

25  A.  Yes.  Total market volume, and asterisk for largest

1    purchase or sale on the corresponding date at the bottom of the

2    chart.

3    Q.   What did Mr. Walters do on October 4, 2010?

4    A.   On October 4, 2010, he purchased I believe approximately

5    800,000 shares of stock.

6    Q.   And the next day?

7    A.   He purchased again some additional stock.

8    Q.   And on October 4th, what percentage of the total market

9    volume was his purchase?

10   A.   14 percent.

11   Q.   And did that include the largest purchase of any one volume

12   of Dean Foods stock on that date?

13   A.   Yes.

14   Q.   Now, combined together, how many shares did he purchase on

15   October 4th and 5th?

16   A.   On October 4th and 5th, he purchased 1 million shares.

17   Q.   And then the following day, on October 6th, he also

18   purchased more, is that right?

19   A.   Correct, a little less than 250,000 shares.

20   Q.   And what about October 7th?

21   A.   A little more than 250,000 shares.  Those two days totaled

22   an additional 500,000 shares on top of the 1 million bought on

23   the 4th and 5th.

24   Q.   What is the total number of shares he purchased in those

25   four days?

H3kdwal5                          Carocci - direct

1    A.   1.5 million shares.

2    Q.   Now, Mr. Carocci, when large trades such as these are

3    ordered, how are they executed?

4    A.   Well, you know, a broker tries to get the best price for

5    their client, meaning if it's a purchase order, they want to

6    buy it at the lowest price possible.  So if it is a large

7    order, the order may be broken down so that the broker doesn't

8    have to execute it -- the trader doesn't have to execute it all

9    at once and, you know, really hit all the -- all of the prices,

10   driving the price up.  So at times they'll break it up to try

11   and get price improvement, they'll break a large order up to

12   try and get price improvement for their client.

13   Q.   If a broker received an order to purchase 1 million shares

14   of Dean Foods stock on a particular day and the total trading

15   volume was around 3 million and that broker just entered the

16   order, what would happen to the stock?

17   A.   Well, I mean, it could drive the stock price higher.  It

18   could drive the stock price higher, because there would be

19   demand on the buy side.

20   Q.   So what do the brokers try to do in order to prevent the

21   stock from being driven up?

22             MR. SCHOMAN:  Objection.  Speculation.

23             THE COURT:  Sustained.

24             MR. GOLDMAN:  Let's move on, then.

25   Q.   On October 21, 2010, what did Mr. Walters do?

H3kdwal5                        Carocci - direct

1    A.  He sold approximately 400,000 shares of stock.

2    Q.  And the following day, October 22nd?

3    A.  He sold 1.1 million shares of stock.

4    Q.  And what was the percentage of the total market volume on

5    that day?

6    A.  1. -- well --

7    Q.  On October 22nd.  Sorry.  Percentage of the total?

8    A.  I'm sorry.  30 percent -- the 1.1 million shares

9    represented 30 percent of the total market volume on that day.

10   Q.  And both of those transactions were the largest sales of

11   their respective days, is that right?

12   A.  Yes.

13   Q.  And so on October 21st and October 22nd, he sold the 1.5

14   million shares that he had purchased from October 4th through

15   October 7th, is that correct?

16   A.  Yes.

17          MR. GOLDMAN:  If we could, Ms. Pyun, put this on one

18   side and pull up Government Exhibit 1739C at page 5.

19   Q.  Now, before I get there, you have in the orange box the

20   earnings announcement, is that correct?

21   A.  Yes.

22          MR. GOLDMAN:  Ms. Pyun, I don't know if we can pull

23   that up, pull that out, blow it up a little bit for the jury.

24   Q.  Does that arrow point to where the stock price was at the

25   time of that announcement?

H3kdwal5                              Carocci - direct

1    A.  Yes.

2    Q.  And what did Mr. Walters do on November 9, 2010 -- sorry.

3    Withdrawn.

4            When during the day -- we can blow that back up,

5    Ms. Pyun, so we can see the whole thing.

6            When during the day was this announcement made?

7    A.  In the morning, before the market opened.

8    Q.  What did Mr. Walters do on November 9, 2010, after the

9    announcement was made?

10   A.  He purchased 1 million shares in the market after the

11   market opened.

12   Q.  And, once again, you don't have a purple box there, is that

13   right?

14   A.  Correct.

15   Q.  Can you look on the right side and tell us November 9,

16   2010, what the total volume was on that day?

17   A.  It was over 31 million shares.

18   Q.  And how about the next day?

19   A.  Over 30 million shares.

20   Q.  What did the stock price do after this earnings

21   announcement?

22   A.  It declined.

23   Q.  Then just for frame of reference, if we could go back to

24   October 21st.  What was the volume on that day?

25   A.  4,467,971 shares.

H3kdwal5                         Carocci - direct

1   Q.  And on the 22nd, the day that Mr. Walters sold 1.1 million

2   shares, what was the total market volume that day?

3   A.  3,608,633 shares.

4            MR. GOLDMAN:  We can take that down now.

5            Now, if we could go to Government Exhibit 2008,

6   Ms. Pyun.

7   Q.  What is this chart, Mr. Carocci?

8   A.  Mr. Walters' holding in the Dean Foods closing price for

9   the year 2011.

10  Q.  And how much stock of Dean Foods did Mr. Walters own at the

11  beginning of the year?

12  A.  Approximately 1 million shares.

13  Q.  What does he do in early January with that 1 million

14  shares?

15  A.  Sells, sells those shares.

16  Q.  Do you know what date that sale was?

17  A.  I believe it was January 7th.

18            MR. GOLDMAN:  And if we could pull up side-by-side,

19  Ms. Pyun, if we could go to Defense Exhibit 1124, please, and

20  zoom in on the email.

21  Q.  Mr. Carocci, have you ever seen this document before?

22  A.  No.

23  Q.  If you could just read the date of the email sent by Tom

24  Davis to Gregg Engles on the bottom?

25  A.  It's January 7, 2011 at 7:13 at night, Central Standard

H3kdwal5                         Carocci - direct

1   Time.

2   Q.  OK.  And then Mr. Davis writes to Mr. Engles, "Did you know

3   anything about Appaloosa before today?  Interesting investment.

4   Happy new year."

5            All right.  We could pull out of that.

6            Now, is that sale of the million shares the same

7   million shares that he purchased on November 9th after the

8   earnings announcement?

9   A.  Yes.  I believe it is, yes.

10  Q.  And after he sells the million shares on January 7th, when

11  is Mr. Walters' next Dean Foods transaction?

12  A.  It looks like there is some activity in the end of July,

13  the beginning of August 2011.

14  Q.  So he doesn't purchase any Dean Foods stock from

15  January 7th until the middle of July, is that right?

16  A.  Correct.

17  Q.  And it is kind of hard to tell here but it looks a little

18  bit like where he purchased, the stock price was around what

19  price in mid-July?

20  A.  You know, it looked like around 10/$11 per share, perhaps.

21  Q.  And then when he sold where was it?

22  A.  Lower.  It looks like a little below $9 per share.

23  Q.  So it looks like he lost a little money on that --

24  A.  Correct.

25  Q.  -- transaction?

H3kdwal5                           Carocci - direct

1          And toward the back half of the year of 2011, how does

2    the stock price -- how does the stock do?

3    A.  It increases a little bit, it looks like from $9 to maybe

4    10.  It is pretty flat.

5    Q.  And there is a little blip in the middle of September 2011.

6    What is that?

7    A.  A little blip in September.  Where?

8    Q.  I can show you right here.  It goes up a little bit and

9    then --

10   A.  Right.  Right.  There were 58,900 shares bought in the

11   JPMorgan account of Mr. Walters, and that represents 58,900

12   shares.

13   Q.  Based on your review of his brokerage records, was that his

14   primary brokerage account?

15   A.  Not for Dean Foods, no.

16   Q.  For how long did he own the 58,900 shares in the JPMorgan

17   account?

18   A.  Several years.

19          MR. GOLDMAN:  And if we could move to Government

20   Exhibit 2010.  Sorry, 2009, rather.  I skipped one.

21   Q.  What is this chart, Mr. Carocci?

22   A.  Mr. Walters' holdings in Dean Foods for the year 2012.

23   Q.  At the beginning of the year, how much Dean Foods stock did

24   Mr. Walters own?

25   A.  The 58,900 shares in the JPMorgan account that I mentioned

H3kdwal5                         Carocci – direct

1   earlier.

2   Q.   When does he make his first purchase of Dean Foods stock in

3   2012?

4   A.   May, around May 2012.

5   Q.   And from January 1st to his purchase in May, how did the

6   stock -- how did the stock price move?

7   A.   Pretty flat, maybe up slightly.

8   Q.   By the end of the year, how much Dean Foods stock did

9   Mr. Walters own?

10  A.   Approximately 5.4 million shares.

11  Q.   And if you could look up on the screen, do you see this

12  little bump here in October of 2012?

13  A.   Yes.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H3K3WAL6                          Carocci - direct

1   Q.  Do you know what happened right before -- right around this

2   date here, October 17?

3   A.  I think it was the WhiteWave IPO announcement.

4   Q.  Approximately what was the value of Dean Foods' stock at

5   the height of its value in 2012?

6   A.  Approximately 19, $20 per share.

7   Q.  So can you estimate for the jury how much Mr. Walters'

8   approximate 5.4 million shares of Dean Foods was worth at the

9   time, at the height of the stock price right here around $19?

10  A.  Total holding would be worth approximately $100 million.

11          MR. GOLDMAN:  If we can go now to Government Exhibit

12  2010.

13  Q.  What does this chart reflect, Mr. Carocci?

14  A.  Mr. Walters' trading activity from May 1st through

15  November 1st of 2012, so a subsection.

16  Q.  On the left side, we see here the earnings announcement on

17  May 9, 2012.  Do you see that orange box there?

18  A.  Yes.

19  Q.  And the arrow goes right to where the pointer is at the

20  bottom of the stock price on the left there?

21  A.  Yes.

22  Q.  Was that earnings announcement a positive one?

23  A.  Yes, I believe it was.

24  Q.  The day before that earnings announcement on May 8, what

25  did Mr. Walters do?

1    A.   He purchased 803,000 shares of Dean Foods stock.

2    Q.   What happened on May 9?

3    A.   The stock price increases and Mr. Walters buys additional

4    shares.

5    Q.   Moving ahead to July, what does the stock price do in the

6    early half of July where the pointer is?

7    A.   It declines.

8    Q.   During that decline, what does Mr. Walters do?

9    A.   He's purchasing as represented by the green columns

10   counting from the dates below.

11   Q.   Sort of the middle of the page we had Q2 earnings and

12   spinoff announcement August 7, 2012.  Do you see that?

13   A.   Yes.

14   Q.   What was that?

15   A.   That was the quarter -- the second quarter earnings and the

16   announcement of the spinoff of WhiteWave.

17   Q.   What did the stock price do in the trading day after that

18   announcement?

19   A.   Right.  This announcement was made after the close of

20   trading and the stock price increased substantially or sharply

21   after that announcement.

22   Q.   Then after it reaches its peak there, what happened over

23   the next few days to the stock price?

24   A.   It declines somewhat.

25   Q.   After it declines in to here, what did Mr. Walters do?

1    A.  He purchased additional shares.

2    Q.  Then if we move ahead to September, what did Mr. Walters do

3    in September of 2012 with regard to Dean Foods stock?

4    A.  He purchased more shares as represented by the green

5    columns.

6    Q.  Then finally in early to mid October, what did he do?

7    A.  Purchases additional shares.

8    Q.  Finally, at the top you have a pink box that says WhiteWave

9    IPO announcement October 17, 2012.  What was that announcement?

10   A.  It was the announcement of the IPO, of the initial public

11   offering for WhiteWave.

12   Q.  What did the stock do after that announcement?

13   A.  It increases from, you know, approximately $15 a share to I

14   believe close to 18, $19 per share.

15   Q.  Toward the end of this chart, the end of October, does the

16   stock price settle back down a little?

17   A.  Yes.

18   Q.  If we can go to Government Exhibit 2011.  Zooming in a

19   little bit on a narrower time frame.  What is this chart?

20   A.  It's Mr. Walters' trading activity from July 1st through

21   August 15 of 2012.  Another subsection.

22   Q.  At the beginning of July, approximately what was the stock

23   price for Dean Foods?

24   A.  Approximately $17 per share, it looks like.

25   Q.  On July 20 in the middle of these purchases, where was the

1    stock price at this point?

2    A.  It looks like it declines to approximately $12 per share.

3    Q.  Then for the remainder of July, where does the stock

4    remain?

5    A.  It looks like it trades in that $12 range.

6    Q.  On the left side on July 13, what did Mr. Walters do?

7    A.  He purchases over 750,000 shares of stock.

8    Q.  What was the total percentage of the total market volume of

9    that purchase?

10   A.  10 percent.

11   Q.  Was that the largest purchase of that day?

12   A.  Yes.

13   Q.  On the 17th what did Mr. Walters do?

14   A.  He purchases approximately 800,000 shares of stock.

15   Q.  On the 18th?

16   A.  The 18th he purchases additional shares of stock, I believe

17   a hundred -- 125,000 shares I believe.

18   Q.  Combined between the 17th and the 18th, how much did he

19   purchase?

20   A.  One million shares.

21   Q.  Then moving ahead to July 23, what did he do on that day?

22   A.  He purchased 525,000 shares of stock.

23   Q.  What percentage of the total market volume was that?

24   A.  That was 5 percent, and this was another date in which we

25   aggregated the Nature Development account and The Walters Group

1   account.  There are 425,000 shares sold out of the -- I'm

2   sorry, purchased out of The Walters Group account, and 100,000

3   shares purchased in the Nature Development account.  The

4   425,000 purchased out of The Walters Group account represented

5   the largest purchase transaction on that date.

6   Q.  Then what did he do on July 24?

7   A.  On July 24, he purchased additional shares.

8   Q.  Then finally July 31, 2012, what did he do on that date?

9   A.  He purchased approximately 100,000 shares of stock.

10  Q.  Then combined with the 1.2 million shares of stock that he

11  purchased on May 8 and 9th, with the 100,000 shares purchased

12  on July 31, 2012, how many shares of Dean Foods stock did

13  Mr. Walters own in total at that point?  You can approximate

14  it.

15  A.  I thought it was approximately -- approximately three

16  million shares of stock, 2.8 million, three million shares of

17  stock.

18  Q.  That's what he buys in July, is that right?

19  A.  Correct.  I believe he buys 2.8 million shares in July.

20  Q.  Added together with the 1.2 million in May, how much is

21  that?

22  A.  That would be four million shares.

23  Q.  Then you see the announcement, the spinoff announcement on

24  August 7, is that right?

25  A.  Yes.

H3K3WAL6                          Carocci - direct

1   Q.  Then this reflects, this blue line reflects the jump in the

2   price at that point?

3   A.  Correct.

4   Q.  How much does he buy in total on August 10 and August 13,

5   2012?

6   A.  250,000 shares each day for a total of 500,000.

7   Q.  If we can go to Government Exhibit 2012, please.  What does

8   this chart reflect?

9   A.  Mr. Walters' holdings and the Dean Foods stock price for

10   the year 2013.

11   Q.  We see here in the middle of the page a pretty significant

12   drop in the stock price.  What happens then?

13   A.  Now is the distribution of WhiteWave.  So, the value of

14   Dean Foods is less because the WhiteWave assets are no longer

15   part of Dean Foods, and the stock price is reflecting that.

16   That decrease in assets from the Dean Foods --

17   Q.  Did Dean Foods distribute its WhiteWave shares to its

18   shareholders?

19   A.  Correct.

20   Q.  Those trades were traded separately under the WhiteWave

21   symbol?

22   A.  Yeah, it was May 23 I believe, 2013, yes.

23   Q.  Then there is a big jump in August in the stock price.

24   What is that?

25   A.  Dean Foods executed a one-for-two reverse stock split.

1    Q.  What is that?

2    A.  Well, a reverse stock split is, in this case, for every two

3    shares of Dean Foods shareholders like Mr. Walters held, after

4    the reverse stock split they only held one share.  So the

5    number of shares that they held or owned was cut in half.  But,

6    however, the stock price approximately doubles, because the

7    number of outstanding shares have been cut, so, the value of

8    the one share should still be kind of equal to the two shares,

9    and the value of the holdings should be approximately the same

10   as of the reverse stock split.  There is just less outstanding

11   shares, and the shareholder would own less shares.

12   Q.  So, essentially the shares are cut in half, and the value

13   of the stock is doubled?

14   A.  Right.  Essentially, yes.

15   Q.  What does Mr. Walters do -- let's start here at the top.

16   How much of Dean Foods stock did he own entering the year 2013?

17   A.  Approximately 5.4 million shares.

18   Q.  By the end of August, before this reverse stock split, how

19   much Dean Foods stock did Mr. Walters own?

20   A.  Looks like approximately 2.5 million.

21   Q.  I'm sorry.  I'm looking at the bottom level here.

22   A.  Oh, I'm sorry.  Looks like then it's just the 58,900 shares

23   in that JPMorgan account that I spoke about earlier.

24   Q.  Did the trading records that you reviewed reflect what

25   happened -- well.

1        Did the trading records that you reviewed reflect that

2   Mr. Walters received WhiteWave stock in May of 2013?

3   A.  Yes, I saw that in the account, yes, the account

4   statements.

5   Q.  What did he do with his WhiteWave stock in the account

6   statements?

7   A.  He appears to have sold all of it in July and August of

8   2013.

9   Q.  So by the end of August, he's completely out of his Dean

10  Foods and WhiteWave stock?

11  A.  Yes.

12  Q.  If we can move to Government Exhibit 2013, please.  What is

13  this chart?

14  A.  This is Mr. Walters' trading activity, the purchases and

15  sales -- well here, here it's just sales for 2013.  There are

16  no purchases.

17  Q.  What did he do on February 1st, 2013?

18  A.  He sold one million shares of the Dean Foods stock.

19  Q.  On February 13, 2013, what happened?

20  A.  There was an earnings announcement and the stock price

21  declined sharply after that earnings announcement.

22  Q.  Then, the two pink boxes, do those reflect the distribution

23  of WhiteWave shares that you referenced before as well as the

24  reverse stock split?

25  A.  Yes.

1  Q.  What is the black dotted line that you included in here?

2  A.  That was just to give an idea of the stock price kind of

3  unadjusted for the stock split.  It's roughly half of the blue

4  line, which is the actual closing price.  This was just to give

5  an idea of what that unadjusted price may look like.

6          THE COURT:  You mean if there had not been a reverse

7  stock split?

8          THE WITNESS:  That's correct, your Honor.

9          THE COURT:  Thank you.

10 Q.  Is this an approximation, this black dotted line?

11 A.  The black dotted line is an approximation.

12 Q.  If we can finally go to Government Exhibit 2014.  What is

13 this document?

14 A.  That's Mr. Walters' trading activity from September through

15 October 2014 but really for all of 2014.  Because all the

16 purchases at the bottom and the two sales at the bottom were

17 all of the trading activity for the calendar year 2013.

18 Q.  What is the black dotted line here?

19 A.  Again that's the unadjusted stock price, as your Honor

20 said, if the reverse stock split did not occur.

21 Q.  This is how you might be able to compare the stock price

22 from 2014 to 2012 or 2010?

23 A.  Yeah, from a dollar level, yes.

24 Q.  Was there any earnings announcement during the time period

25 that Mr. Walters owned Dean Foods stock beginning in early

H3K3WAL6                          Carocci – cross

1   September before he sold in late October?

2   A.  No.

3   Q.  Did Mr. Walters make any trades in Dean Foods stock between

4   August of 2013 and September of 2014?

5   A.  No.

6           MR. GOLDMAN:  One moment, your Honor.  No further

7   questions.

8           THE COURT:  All right.  You may cross-examine.

9           MR. SCHOEMAN:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. SCHOEMAN:

12  Q.  Good afternoon, Mr. Carocci.

13  A.  Good afternoon.

14  Q.  I'm Paul Schoeman, I represent Mr. Walters.

15          Mr. Carocci, you work for the criminal prosecution

16  assistance group, is that right?

17  A.  Yes.

18  Q.  And the acronym is CPAG, right?

19  A.  Yes.

20  Q.  And the P is prosecution?

21  A.  Yes.

22  Q.  FINRA doesn't have a criminal defense assistance group?

23  A.  Correct.

24  Q.  So no CDAG?

25  A.  Correct.

1    Q.  Not even a neutral assistance group?

2    A.  Well, what would that be called, CNAG?

3    Q.  No one would want to work there.

4    A.  You're right.

5    Q.  You testify for the prosecution.  That's what you do,

6    right?

7    A.  Yes.

8    Q.  That's what your group does.

9    A.  Yes.

10   Q.  And you've done it many times?

11   A.  Yes.

12   Q.  Different courts all over the country.

13   A.  Yes.

14   Q.  And you work closely with prosecutors, including

15   prosecutors in this district?

16   A.  Yes, I do.

17   Q.  And CPAG is part of your organization FINRA, is that right?

18   A.  Yes, it is.

19   Q.  And FINRA is a very big organization, isn't it?

20   A.  I think we have approximately 3,000 employees.

21   Q.  About 3,600, is that right?

22   A.  I guess so, I guess so.  I'll take your word for it.  I

23   haven't looked lately, to be honest with you.

24   Q.  It's got a lot of resources, is that right?

25   A.  Well, we're funded, as I said, by our members.  So, you

H3K3WAL6                          Carocci - cross

1    know, we have to, you know, live within that budget.  That

2    funding.

3    Q.  But the assets of FINRA are about $2.3 billion, is that

4    right?

5    A.  I'll take your word for it.  I haven't looked at that

6    lately.

7    Q.  Let me put on the screen for you what's been marked as

8    Defense Exhibit 5249 for identification.  Just show you the

9    first page.  You see what that is.  And just real quickly,

10   we'll turn to page nine of this document.  And just look for

11   yourself at the first paragraph.

12   A.  Read it to myself?

13   Q.  Just to yourself.  The question is does that refresh your

14   memory that FINRA has about $2.3 billion in total assets?

15   A.  Does it state what year it's from?

16          MR. SCHOEMAN:  Can you show the cover again.

17   A.  Okay.  Yeah.  2015.  Yes.

18   Q.  So, FINRA, fair to say, is a multibillion dollar

19   organization.

20   A.  With assets.  Those are our assets.

21   Q.  It's got about a billion dollars of annual revenues?

22   A.  I don't know.  I haven't looked at the financial statements

23   in a long time.

24          MR. SCHOEMAN:  Back at Defense Exhibit 5249 and let me

25   show you, it's page 14, just so that Mr. Carocci can see.

H3K3WAL6                        Carocci - cross

1  Q.  Look at the top line and ask you if that refreshes your

2  memory that FINRA makes about a billion dollars a year in

3  revenues?

4  A.  For those two years, that appears to be the case.

5          MR. GOLDMAN:  Your Honor, could we clarify whether his

6  recollection is actually being refreshed or if he's reading the

7  document.

8          THE WITNESS:  I'm reading the document.  I haven't

9  looked at our financial statements in years.

10         THE COURT:  Okay.  So, if the document goes into

11 evidence, anyone can read the document.  Let's find out what

12 the question is he's asking.

13         Are you asking what the witness knows or what the

14 document says?

15         MR. SCHOEMAN:  I'm asking whether it refreshes his

16 recollection.

17         THE COURT:  Now, you looked at the document.  Now look

18 away.  Do you have a new and refreshed recollection?

19         THE WITNESS:  I have a new and refreshed recollection.

20         THE COURT:  That you independently recall apart from

21 the document?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  You can tell the jury what that is.

24 Q.  So what is your refreshed recollection about --

25         THE COURT:  And don't look at the document.

H3K3WAL6                          Carocci - cross

1              THE WITNESS:  Sorry.

2              THE COURT:  No, listen.  Do you understand?  So in

3      other words, I used this analogy before.  There could be

4      somebody who was not around in 1986, who didn't know that the

5      Mets won the World Series.  Okay.  And maybe they have a brain

6      lapse or a memory lapse.  And they see the cover of Sports

7      Illustrated, and there it shows the Mets winning the World

8      Series in 1986.

9              Two things are possible.  One is they say that look

10     likes a real cover of Sports Illustrated, and if they say it,

11     it must be true.  Which is not refreshing your recollection.

12     And the other is maybe you remember that someone in your family

13     was born that year, you remember being at the party for the

14     Christening when this all happened, and it genuinely refreshes

15     your recollection.

16             The question is, having looked at the document, do you

17     now have a refreshed recollection?  Not are you capable of

18     reading the document.

19             THE WITNESS:  Okay.

20             THE COURT:  Do you understand the question?

21             THE WITNESS:  I think I do now.

22             THE COURT:  Now look away from the document.  And what

23     is your refreshed recollection?

24             THE WITNESS:  It's not, I don't remember focusing in

25     on numbers like this whenever I've looked at it, and I haven't

1    looked at it in years.  These numbers seem foreign.  Not

2    foreign to me, but they're not refreshing a recollection.  I

3    don't recollect numbers like this.

4    Q.  Mr. Carocci, I'm just asking, FINRA is a big organization,

5    right?

6    A.  Yes.

7    Q.  It's got about 3,500 or so employees?

8    A.  Yes.

9    Q.  And it's got hundreds of millions of dollars of assets?

10   A.  Yes.

11   Q.  And hundreds of millions of dollars of revenue, typically?

12   A.  Yes.

13   Q.  And FINRA makes your services available to the government

14   for free, is that right?

15   A.  Yes, that's correct.

16   Q.  You're not charging the government for your time?

17   A.  No.

18   Q.  FINRA's resources are available to the government when they

19   want them?

20   A.  They reimburse us on travel expenses.  They're available

21   when we agree, when we agree to provide assistance.

22   Q.  Right.  But you agreed in this case?

23   A.  I did, yes.

24   Q.  And FINRA, you said, is a private organization.  But it's

25   what's called a self-regulatory organization or SRO.  Is that

H3K3WAL6                    Carocci – cross

1   right?

2   A.  Yes.

3   Q.  It is a creature of the federal securities statutes, an

4   SRO?

5   A.  Yes.

6   Q.  It's supervised, FINRA, your organization, is supervised by

7   the Securities and Exchange Commission?

8   A.  Correct, they approve our rules and regulations that we

9   apply to the industry.

10  Q.  The Securities and Exchange Commission is an agency of the

11  federal government that administers the securities laws?

12  A.  Yes.

13  Q.  And you often work closely with that agency of the federal

14  government and the federal criminal prosecutors, right?

15  A.  I don't, for the criminal prosecution assistance group, I

16  do not work with the SEC.

17  Q.  But, for example, you testified earlier they provide you

18  with the blue sheet data, right?

19  A.  They provide it to the U.S. attorney's office, and the U.S.

20  attorney's office provided it to me.  I didn't get it directly

21  from them.

22  Q.  But the SEC is part of the same federal government as the

23  prosecutors in this case, right?

24  A.  Yes.

25  Q.  And the SEC is the overseer of FINRA under the securities

H3K3WAL6                          Carocci - cross

1    law, right?

2    A.   Yes.

3    Q.   And in fact recently, the SEC formed something called the

4    FINRA and Securities Industry Oversight Group to monitor FINRA.

5    That was something they did last year?

6    A.   I'm not familiar with that.

7    Q.   You do know there is a whole bunch of people at the SEC

8    whose job it is to monitor what FINRA is doing?

9    A.   I don't know how many people at the SEC monitor FINRA.

10   Q.   But you know that the SEC oversees and has oversight

11   responsibility for FINRA?

12   A.   Correct, yes.

13   Q.   Then in turn, based on the authority that's given to FINRA

14   by the SEC, FINRA has authority over broker-dealers, right?

15   A.   Yes.

16   Q.   So, broker-dealers have to get licensed by FINRA?

17   A.   Registration process, correct.

18   Q.   And you do inspections of them?

19   A.   Yes.

20   Q.   And you can make requests for information from them?

21   A.   Yeah, I can't as a member of CPAG, but the FINRA

22   enforcement and the kind of the civil regulation can make

23   requests of them.  I do not as a member of CPAG.

24   Q.   But FINRA can ask broker-dealers like Barclays or Merrill

25   Lynch or Wachovia for information, right?

H3K3WAL6                           Carocci - cross

1    A.  They can, yes.

2    Q.  And they have the ability to impose discipline on

3    broker-dealers and brokers if they don't comply with FINRA's

4    rules and regulations, right?

5    A.  Yes.

6    Q.  You mentioned in your direct testimony that FINRA has an

7    office that does something called market surveillance.  Is it

8    called the office of fraud detection and market intelligence?

9    A.  Yes.

10   Q.  And that's another part of the FINRA organization where you

11   work?

12   A.  Yeah.  I'm walled off from all of the FINRA civil

13   regulatory departments.  Because I only work on the criminal

14   cases, my group only works in criminal cases, so I really don't

15   know what -- I know the department exists, I know generally

16   what they do.  But I don't know anything else.

17   Q.  It's headed for a long time by a fellow named Cameron

18   Funkhouser?

19   A.  Yeah, yes.

20   Q.  He's been at FINRA even longer than you have, right?

21   A.  Probably.  Probably, but I don't know for sure how many

22   years he's been there.

23   Q.  So he's the head of the office of fraud detection and

24   market intelligence, right?

25   A.  Yes, he is.

H3K3WAL6                    Carocci - cross

1    Q.  And they do market surveillance on the trading of stocks to

2    try to detect things that may be of interest for investigation,

3    is that right?

4    A.  Yes.

5    Q.  And as part of that, they have a computer program called

6    the Securities Observation News Analysis and Regulation program

7    or otherwise known as SONAR?

8    A.  I've heard of that, yes.

9    Q.  That's in fact, going back even before FINRA, FINRA used to

10   be or part of it used to be part of the NASD, right?

11   A.  Correct.

12   Q.  And before the NASD and the New York Stock Exchange got

13   together to create FINRA, CPAG was part of the NASD, right?

14   A.  Yes.

15   Q.  And even before the SONAR computer system, going way back,

16   the NASD did computer-based market surveillance to detect

17   spikes in price and volume, right?

18   A.  I -- I don't know.  Because I've never really worked in

19   that part of FINRA, and I've been walled off as a member of

20   CPAG for most of the past 14 years.

21          THE COURT:  If you don't know, the answer is you don't

22   know.

23          THE WITNESS:  Okay.

24          THE COURT:  You don't have to give an explanation why

25   it is that you don't know something.

H3K3WAL6                           Carocci - cross

1               THE WITNESS:  Okay.

2               THE COURT:  Next question.

3   Q.  But you know that the office exists, the office of -- I'll

4   get the name right.  Fraud detection and market intelligence.

5   A.  Yes.

6   Q.  Headed by Cameron Funkhouser?

7   A.  Yes.

8   Q.  It is not a secret that FINRA does market surveillance,

9   right?

10              THE COURT:  Well, do you know whether it is a secret

11  that FINRA does market surveillance?  That's the question.

12              THE WITNESS:  I don't believe it is a secret.

13              THE COURT:  Next question.

14  Q.  And in fact, Mr. Funkhouser is often quoted in newspapers

15  talking about the great work that his office does.

16              MR. GOLDMAN:  Objection, your Honor.

17              THE COURT:  Wait a second.  Do you know whether

18  Mr. Funkhouser is frequently quoted in newspapers?

19              THE WITNESS:  I don't.

20              THE COURT:  Then you can answer the question.

21  A.  No.

22              THE COURT:  Okay.  What is the objection?

23              MR. GOLDMAN:  It's eliciting hearsay, your Honor.

24              THE COURT:  He doesn't know.  So it's moot.  Go ahead,

25  next question.

H3K3WAL6                          Carocci - cross

1    Q.  Well, let me just show you while we're at it Defense

2    Exhibit 5255 for identification.  And just look at that for

3    yourself.  And at the bottom of the --

4              MR. GOLDMAN:  Your Honor, he says he doesn't know, not

5    that he doesn't remember.

6              THE COURT:  Absolutely.  Next question.

7              MR. SCHOEMAN:  All right.

8    Q.  Let me just ask this question.  Are you familiar at all

9    with Cameron Funkhouser's public statements about the work of

10   his office at FINRA?

11   A.  No, not really.

12   Q.  Okay.  Let's look at your charts.  Let's put up what's

13   already in evidence as Government Exhibit 2000.

14              So first, this is one of the charts that you created

15   as part of your criminal prosecution assistance in this case?

16   A.  Yes.

17   Q.  You testified on direct examination that there are

18   basically two different things going on.  One is this shows the

19   stock price, and the other is that it shows the number of

20   shares that Mr. Walters had.  Is that right?

21   A.  Yes.

22   Q.  So, the scale on the left side is for Mr. Walters'

23   holdings, and the scale on the right side is for the stock

24   price, right?

25   A.  Yes.

H3K3WAL6                       Carocci - cross

1    Q.  But, just to be clear, the two scales are scales that you

2    chose just so you could fit everything on the chart, right?

3    A.  Right.  Well, one is in dollars and one is numbers of

4    shares, so yes.

5    Q.  But there is no significance, for example, to the fact that

6    in the middle of the chart the red line almost touches the blue

7    line.

8    A.  I don't understand the "significance."

9          MR. SCHOEMAN:  Let me show just the witness for

10   demonstrative purposes what we've marked as Defense Exhibit 1.

11   Q.  And let me ask you, just as an illustration, is this

12   basically the same data where the scale on the left goes from

13   zero to 15 million instead of zero to 8 million.

14         MR. SCHOEMAN:  If we can put them up side by side for

15   the witness of Government Exhibit 2000 and Defense Exhibit 1.

16   Q.  And so the question is, is this basically the same data,

17   just a different scale, for Mr. Walters' holdings?

18         MR. GOLDMAN:  Your Honor, we object.  The witness has

19   not seen Defense Exhibit 1 ever.  How could he know whether it

20   is the same data?

21         MR. SCHOEMAN:  I'm just offering it as an aid to the

22   jury to understand scale, and I don't intend to offer it in

23   evidence.  But just to show it as a demonstration of what the

24   effect of scale would be on the chart.

25         So the question is, does this appear to the witness to

H3K3WAL6                        Carocci - cross

1    be a representation of the same data but with a different

2    scale.

3              THE COURT:  Do you know?

4              THE WITNESS:  No.  I mean, there is a different scale

5    on the side.  I don't know about the data.

6    Q.  I'm just asking you to compare Government Exhibit 2000,

7    which is your chart, and Defense Exhibit 1, and ask you

8    whether, just whether it appears to you that the red line in

9    Defense Exhibit 1 is the same data in Government Exhibit 2000,

10   but just with a different scale.

11             THE COURT:  Well, when you say appear, you want to

12   know if it is the same data, not if it appears to be the same

13   data, but whether it is the same data.

14             MR. SCHOEMAN:  What I'm really asking, your Honor, is

15   whether it would assist in showing the jury the effect of scale

16   in portraying data as a demonstrative.

17             THE COURT:  But the foundational question is, is it

18   the same data.  Isn't it?  If it's not the same data, then it

19   can't assist.  Correct?

20             MR. SCHOEMAN:  So my position, your Honor, is if it

21   looks close enough to assist in illustrating the point, it is

22   admissible as a demonstrative for the jury.

23             THE COURT:  You can definitely put in all the exhibits

24   you want.  Right now, you have a witness on the stand and

25   you're trying to get this witness to adopt your exhibit.  So

1    put the question to the witness.  And I don't think it is a

2    question of appearance.  I think it is a question of whether it

3    is in fact the same.  Because I could tell you something

4    appears offhand to look right, but if I don't know whether it

5    does or it doesn't.  My answer could be highly misleading.

6    Q.  I'm going to ask the witness to take a few seconds, look at

7    the two pictures, and ask you whether looking at the pictures,

8    the data is the same.

9               THE COURT:  Okay.

10   A.  I don't know.  I didn't create the exhibit that you've put

11   up.  So I don't know.  I created the exhibit that I testified

12   to on direct with data that I had.  But I didn't create this

13   other exhibit.

14   Q.  So you can't answer my question?

15   A.  Can you rephrase your question?

16   Q.  I'm going to withdraw it.

17              I want to go back to Government Exhibit 2000.  Can we

18   put that on the screen.  Do you see, sir, how the red line in

19   Government Exhibit 2000 in the middle of the page goes halfway

20   up the page, right?

21              MR. SCHOEMAN:  Can we publish that to the jury.

22   A.  Yes.

23   Q.  You see how in the middle, it goes halfway up the page.

24   You see that?

25   A.  Yes.

1   Q.  All right.  But that's because the scale that you did goes

2   from zero to 8,000, right?  So the 4,000 is in the middle.

3   A.  Four million is in the middle.

4   Q.  I'm sorry.  Four million is in the middle, right?

5   A.  Four million is in the middle of the scale between zero and

6   eight million.

7   Q.  If the scale went from zero to say 16 million, then instead

8   of being in the middle, it would be a quarter of the way up,

9   right?

10  A.  Well, four million is a quarter of 16.

11  Q.  My question really, sir, is the -- the two lines, the blue

12  line and the red line, sir, have different scales.  One is on

13  the left and one is on the right, is that right?

14  A.  Yes.

15  Q.  And there is no inherent relationship between how you did

16  the scale on the left and how you did the scale on the right,

17  right?

18  A.  Yeah, no, they show two different things.

19  Q.  Right.  So the fact that, for example, the red line in the

20  middle goes halfway up the page and almost touches the blue

21  line isn't a significant thing, right?

22  A.  I would agree.

23  Q.  Because you could have drawn the same picture with a

24  different scale, and the red line would only go a quarter up

25  the page.

H3K3WAL6                          Carocci - cross

1    A.  Are we talking about the 16 million scale?

2    Q.  Yeah.  Just, for example, I'm trying to ask you to explain

3    the fact that you're showing two different things on this

4    chart, and one has the scale on the left in millions and one

5    has the scale in the right in dollars, and you put them on the

6    same page.

7    A.  Right.  They are on the same page, yes.

8    Q.  Yeah.  If you chose a different scale, it would look very

9    different, right?

10   A.  It would look different.

11   Q.  Because if you put four million at the top of the page,

12   then the part in the middle would go all the way to the top,

13   right?

14   A.  If four million was at the top of the scale?

15   Q.  Yes, sir.

16   A.  Yes.

17   Q.  Okay.  Just to be clear, the blue line that you show for

18   stock price, that's closing price, is that right?

19   A.  Yes.

20   Q.  And the closing price -- stock trades during the day in a

21   range, is that right?

22   A.  Yes.

23   Q.  So the closing price isn't necessarily where it traded

24   during the day, it is just the last quoted price of the day.

25   A.  Yes.

H3K3WAL6                          Carocci - cross

1    Q.  Your chart would be sort of more confusing and messier if

2    you put opening and closing and the range on it.

3    A.  Probably.

4    Q.  And let's look at Government Exhibit 2001, please.  This is

5    a chart that you did for the 2008 time period, is that right?

6    A.  Yes.

7    Q.  You recall that 2008 was the financial crisis?

8    A.  Yeah, yeah, I am aware there was a financial crisis in

9    2008.

10   Q.  The worst recession since the Great Depression was

11   basically in 2008, right?

12   A.  Yeah.

13   Q.  So there was a lot going on in the financial markets in

14   2008 that you did not choose to put on the chart.

15   A.  Well, I mean, the chart just relates to Dean Foods so

16   that's right.

17   Q.  But there are other things going on in the world other than

18   the announcements, for example, relating to Dean Foods that

19   might have had an impact on the stock price?

20   A.  Correct.

21   Q.  Right.  So you are not saying that these announcements are

22   the only announcements that have any impact on the stock price.

23   A.  Correct.

24   Q.  There is a lot going on in the world, particularly in the

25   2008 time period.

H3K3WAL6                              Carocci - cross

1   A.  Yes.

2   Q.  And for example, the earnings announcement that you've

3   identified on November 4, 2008, do you remember what else

4   happened on November 4, 2008?

5   A.  I don't.

6   Q.  Okay.  If I told you it was the second Tuesday of a

7   November in a presidential election year, would that jog your

8   memory?

9   A.  The second Tuesday in November was November --

10  Q.  The first Tuesday in November.

11  A.  It would have been Election Day.

12  Q.  Yeah.  And so do you remember that, for example, on the

13  same day as the earnings announcement, that was also the

14  election of Barack Obama?

15  A.  That's correct.

16  Q.  So again, lots of things going on in the world not depicted

17  on the chart, is that right?

18  A.  The presidential election is not depicted on the chart.

19  Q.  Okay.  And a lot of other things are also going on in the

20  world not depicted on the chart?

21  A.  I guess the chart's limited in that way.

22  Q.  But you show earnings announcements of Dean Foods.  That's

23  a kind of public information, right?

24  A.  That's public information, yes.

25  Q.  It is not the only public information that might be

H3K3WAL6                           Carocci - cross

1   relevant to an investor, that's the point.  Right?

2   A.  Yes.

3   Q.  Okay.  So then let's look at Government Exhibit 2002 also

4   in evidence.  And in this chart, you show Mr. Walters'

5   purchases in green, sales in red, the price in blue, and you

6   also looked at volume as a percentage of total market volume,

7   right?

8   A.  Yes.

9   Q.  So those are the things that you chose to depict on the

10  chart?

11  A.  Yes.

12  Q.  Did the government ask you to put those things on the

13  chart?

14  A.  It was collaboration, but yes, I mean, they wanted them on

15  the chart.

16  Q.  So in collaboration with the government, you selected the

17  data or how to portray this data on the chart?

18  A.  Yes.

19  Q.  Also which data to put on?

20  A.  Right, right.

21  Q.  If, for example, if we go back to Government Exhibit 2001.

22  I think you testified that, for example, so the green bars are

23  Mr. Walters' purchases, right?  Is that right?

24  A.  Yes.

25  Q.  And in the chart we just looked at before, you did analysis

1    of what the volume was doing in the market, right?

2    A.   Yes.

3    Q.   But you see how when Mr. Walters is buying here, here, and

4    here, the stock price is falling?

5    A.   Yeah, that appears, yes.

6    Q.   So, and you had data showing not just the volume in the

7    market, but obviously the price of the stock during the time

8    when Mr. Walters was buying.  You have that data.

9    A.   The volume data and the stock price data, yes.

10   Q.   And you made a chart that showed the indication --

11   information about Mr. Walters' percentage of the total market

12   volume.  You made that chart.  That's the one we -- 2002 we

13   just looked at.

14   A.   Right.  For select dates, yes.

15   Q.   Right.  You selected the dates to put that data on the

16   chart.  But for example, you could have done a chart that

17   indicated how much the price was dropping each time Mr. Walters

18   was buying stock.  You could have done a chart of that.

19   A.   I'm not sure I understand.

20   Q.   Well, for example, this first time that you depict

21   Mr. Walters buying stock, you could have analyzed that data,

22   and if you wanted to, done calculations showing how far the

23   stock had come down when Mr. Walters was buying.

24            Sorry, that's messy.

25            You could have done a calculation like that, but you

H3K3WAL6                          Carocci - cross

1   didn't put it on your chart.

2   A.  Well, I think the stock -- the chart does show how much the

3   price came down roughly from that area you just circled, from

4   $26 down to $19, so I think it does show the stock price

5   decline.

6   Q.  On Government Exhibit 2002, you did a calculation of the

7   percentage of the volume corresponding to Mr. Walters based on

8   your conversations with the government about putting that on

9   the chart, right?

10  A.  In 2002, yes.

11  Q.  Sorry.  In Government Exhibit 2002.

12  A.  Yes.

13  Q.  But just saying there are other calculations related to

14  Mr. Walters' buying that you chose not to put on the chart.

15  A.  On the previous chart, 2001, yes.

16  Q.  We'll go --

17  A.  Yes, yes.

18  Q.  You could have, based on the data you had, indicated how

19  much the price had dropped each time Mr. Walters bought in the

20  market, right?

21  A.  Well, I think the stock price does indicate how much it

22  dropped.  But you're right, there was no percentage analysis on

23  this chart.

24  Q.  And you've heard the expression buy low and sell high?

25  A.  I've heard the expression.

H3K3WAL6                          Carocci - cross

1    Q.  And you worked for a little while at Goldman Sachs, right?

2    A.  Yes.

3    Q.  You understand in the world of private investing, that's

4    generally what people are trying to do, buy low and sell high?

5    A.  I understand that.

6    Q.  Another thing, just to be clear, the announcements that you

7    put on the chart are announcements by Dean Foods the company,

8    and I'm referring now to Government Exhibit 2002.  I'm sorry, I

9    was referring to 2001.  2002.  Those are announcements from the

10   company.

11   A.  Yes.

12   Q.  But you did not include on the chart every announcement

13   that the company made during this time period.

14   A.  Yes, correct, I think it is just the earnings announcement

15   and the press release.

16   Q.  But for example, an exhibit was marked earlier today in

17   evidence, Defense Exhibit 2176.

18            Could we show that to the witness and it's in

19   evidence.

20            You see, sir, this is a press release from Dean Foods

21   on February 29, 2008.  You see that?

22   A.  Yes.

23   Q.  And just going back to the previous chart.  2001.  That

24   February 29 announcement is not depicted on your chart.

25   A.  Correct.

H3K3WAL6                          Carocci - cross

1    Q.  And if you were to depict it, it would be right about --

2    well, the line is too thick, but it's right around here.  Is

3    that right, February 29?

4    A.  That looks more like in March to me.  But --

5    Q.  A little bit to the left?

6    A.  Yeah.  It would be to the left.

7    Q.  So but it's right after Mr. Walters was buying starting on

8    February 25, you see that?

9    A.  Right.  Right.  The press release was on the 29th and this

10   was on the 25th.

11   Q.  Right.

12   A.  Right.

13   Q.  So my point is there is a press release on the 29th,

14   shortly after Mr. Walters started buying, but it is not

15   depicted on your chart, is that right?

16   A.  That's correct.

17   Q.  And that announcement on February 29, actually following

18   the announcement, the price of Dean Foods stock went down.

19   A.  I -- it's tough to tell exactly what the 29th --

20   Q.  So you would want to look at the data that you have in the

21   spreadsheet, is that right?

22   A.  Right.

23   Q.  So if we could show, this is now in evidence by

24   stipulation, government Exhibit 1739 for the February 2008 time

25   period.  Government Exhibit 1739.  And you see that the column

H3K3WAL6                          Carocci - cross

1    that says last price in the middle of your -- that's your

2    spreadsheet, right?

3    A.   It appears to be, yes.

4    Q.   And you said that the announcement on the 29th is where --

5    I think there is actually a time on the previous exhibit.  But,

6    those are generally in the morning, right?

7    A.   Yeah, I believe that exhibit said it was at 7 a.m.

8    Q.   So, the stock price closing price on the 29th is where the

9    stock ended up on the day where the day started with that

10   announcement, right?

11   A.   Right.

12   Q.   And you see that the stock price dropped from the previous

13   day's close, which was 22.99, to 21.52?

14   A.   Yeah that's a decrease.

15   Q.   Of about a buck-fifty?

16   A.   Yes.

17   Q.   And just going back then to your chart, Government Exhibit

18   2001, you would agree with me that Mr. Walters' buying, which

19   started on February 25, 2008, was right before an announcement

20   that actually caused the stock of Dean Foods to sink, isn't

21   that right?

22   A.   You're saying that the buying on the 25th was before the

23   press release on the 29th, and there was a stock decrease from

24   the 28th to the 29th.

25   Q.   During the day on the 29th.

1   A.  Right.  During the day on the 29th.  Yes.

2   Q.  So although it is not on the chart, Mr. Walters' buying was

3   right before an announcement that caused the stock price to go

4   down.

5   A.  Yes.

6   Q.  And so, that was not a great time to buy.

7          MR. GOLDMAN:  Objection, your Honor.

8          THE COURT:  Yes.  Sustained.

9   Q.  Well, the stock was worth less after he bought it than when

10  he bought it, right?

11  A.  Right, because the price declined, yes.

12  Q.  Another thing that your chart, and we'll just use

13  Government Exhibit 2002 as an example, it does not show any --

14  I keep getting that wrong.  Let's do 2001.

15         It shows announcements by the company, but it does not

16  show, for example, any analyst reports.

17  A.  That's right.

18  Q.  Did you have access as a member of the criminal prosecution

19  assistance group at FINRA to analyst reports?

20  A.  I don't.

21  Q.  But could you have requested them?

22  A.  Sure.  I guess.

23  Q.  Okay.  But no analyst reports on any of your charts?

24  A.  That's correct.

25  Q.  And no news articles about significant news in the economy?

H3K3WAL6                          Carocci - cross

1   A.   That's correct.

2   Q.   And one of the things that you were doing with Mr. Goldman

3   on direct examination is talking about whether the stock price

4   went up or down after various purchases by Mr. Walters.  You

5   did some of that on direct examination?

6   A.   Yes.

7   Q.   You could have put on your charts if you wanted to, you

8   could have identified which trades were winners and losers?

9   A.   Yes.

10  Q.   So for example, the very first trade that's listed in any

11  of your exhibits, which is the first one, is February 25, 2008

12  reflected on Government Exhibit 2001, that February 25 trade.

13  A.   The first one is in early February.

14  Q.   The first purchase, I'm sorry.

15  A.   Oh, first purchase, okay.

16  Q.   So, you see that it's kind of hard to see from your chart

17  exactly how much Mr. Walters paid at the first green line.  I

18  don't know, maybe you can do it, but I can't.

19  A.   Right.

20           MR. SCHOEMAN:  So let's show the witness what's been

21  entered into evidence by stipulation as Government Exhibit

22  102-B.  And I'm going to show him what it is.  This is in

23  evidence.

24  Q.   You see that this is an account statement at Wachovia

25  Securities for The Walters Group?

H3K3WAL6                         Carocci - cross

1    A.  Yes.

2    Q.  Is this one of the account statements that you relied on in

3    preparing your charts?

4    A.  Yes.

5    Q.  Let's turn to page 12 of 17 of this document.  That's the

6    one.  Do you see on the 25th there is a purchase of Dean Foods?

7    A.  Yes.

8    Q.  You see that?

9    A.  Hmm-hmm.

10   Q.  And just so we can all see the price, the price is 24 and a

11   penny, and change?

12   A.  Yes.

13   Q.  So that means that Mr. Walters bought 200,000 shares of

14   Dean Foods and he paid a little over $24?

15   A.  Yes.

16   Q.  And the total purchase price was 4,811,567.50?

17   A.  Yes.

18   Q.  The price there was $24 and a little bit, right?

19   A.  Right.

20   Q.  Back to Government Exhibit 2001.  Do you see that at the

21   April 30, 2008 earnings announcement, the price does not reach

22   $24?  Do you see that?

23   A.  Yes.

24   Q.  So, that Mr. Walters on February 25, the first purchase

25   reflected on this chart, bought the stock for more than the

1    stock was worth following the April 30, 2008 earnings

2    announcement, right?

3    A.  Well, again, it is the closing price.  So again,

4    Mr. Walters is buying interday.  But it doesn't appear it

5    closed above $24 after the April 30, 2008 earnings

6    announcement.  It doesn't mean it didn't trade above $24.

7    Q.  Do you have any reason to believe that it did trade above

8    $24?

9    A.  I didn't review that.  We just went with the closing

10   prices.

11   Q.  Right.  Let's go to Government Exhibit 1739 in evidence and

12   I'll show you what your spreadsheet shows.  And let's look at

13   the April 30 time period.  Do you see that the closing price on

14   April 30 is substantially below $24?

15   A.  36 cents below.

16   Q.  Let me ask you this:  Do you know whether it traded ever

17   above $24 on the 30th?

18   A.  I don't know off the top of my head.

19   Q.  If you had an exhibit that showed opening, high, low, and

20   closing trading price, then you would know.  You would know

21   that, right?

22   A.  Well, that would be on the exhibit, yeah.

23   Q.  Right.  Let me show you Defense Exhibit 2037.

24              (Continued on next page)

25

H3kdwal7                          Carocci - cross

1   Q.  And let's just look at -- not for the jury, I'm sorry -- it

2   is not in evidence -- just for the witness.

3            And let's look at on April 30th.  And just look at the

4   entry for April 30th, and I'm just going to ask you whether

5   based on that you have any recollection that the stock did not

6   trade at or above $24?

7            THE COURT:  Do you understand what is being asked of

8   you?

9            THE WITNESS:  Yes.

10           THE COURT:  OK.

11  Q.  I am just asking whether looking at that generates a

12  recollection.

13           THE COURT:  The question is whether you have a

14  recollection after you look at this.

15           So look at this.  Then turn away from the document and

16  see whether you have a recollection.

17           MR. GOLDMAN:  Your Honor, we'll stipulate to the fact

18  that it never went above $24 on that day.

19           THE COURT:  All right.

20           MR. SCHOMAN:  Take that down.

21  Q.  Let's go back to Government Exhibit 2001.  And you see that

22  the blue line in the May time period does not go above $24.  Do

23  you see that?

24  A.  Yes.

25  Q.  And in fact it doesn't go above $24 until the August

1   timeframe.  Do you see that?

2   A.  Yes.

3   Q.  And just on your chart, you show the August 6, 2008,

4   announcement.  Do you see that?

5   A.  Yes.

6   Q.  And from where the arrow is pointing, it kind of looks,

7   doesn't it, like the stock went up on August 6, 2008?

8   A.  Yes.  It looks like that, yes.

9   Q.  Yeah.  But let me show you what's in evidence, Government

10  Exhibit 1739 for the August time period -- sorry, august 6th, a

11  little above that -- in evidence.

12          And just looking at that, can you see that actually on

13  August 6th, the closing price represents a decline from the

14  previous day?

15  A.  Right.  I mean, you know, the arrow approximates the price

16  on the blue line.

17  Q.  Right.  In fact, it is really, just looking at what's on

18  the screen, Government Exhibit 1739, you can see that the day

19  that the closing price actually goes above 24 is August 8th,

20  two days after the announcement, right?

21  A.  That is when it goes above 24, yes.

22  Q.  So going back to Government Exhibit 2001, we're talking

23  about this arrow here.  The arrow for August 6th should really

24  be pointing to a place where the stock went down, right?

25          THE COURT:  All right.  Think about the answer to that

H3kdwal7

1    overnight.  Ladies and gentlemen, I'm going to hold you in

2    suspense on that answer.

3              And as always, have a pleasant evening.  Do not

4    discuss the case among yourselves or with anyone.  We'll be

5    back in action, be here a quarter to 10 tomorrow so we can have

6    a good 10 o'clock start.  And I am going to ask Juror No. 16 to

7    remain behind, please.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3kdwal7

1           (Jury not present except for Juror No. 16)

2           THE COURT:  Just have a seat.

3           Please be seated.  You may be seated.

4           So with the thanks of the Court, and with consent of

5    the parties, you need not report and you should not report

6    further.  Although I'm going to direct that you not discuss the

7    case with anyone until you receive a phone call from Flo

8    Nacanther, my deputy, and she will call you at the end of this

9    case and let you know that all jurors have been discharged and

10   you are relieved of your duty not to discuss the case.

11          JUROR NO. 16:  Thank you.

12          THE COURT:  I wish you the very best in the matters

13   that you discussed with us in the letters, and I thank you for

14   being with us to this point.

15          JUROR NO. 16:  Very good.  Thank you.

16          THE COURT:  All right.

17          JUROR NO. 16:  Thank you.

18          THE COURT:  See you all tomorrow morning at a quarter

19   to 10.

20          MR. GOLDMAN:  Your Honor, I have a couple of things.

21          JUROR NO. 16:  Am I good to go?

22          THE COURT:  Yes.  You are good to go.  Thank you.

23          MR. BERKE:  Your Honor, I was just going to raise a

24   relatively minor matter.

25          MR. GOLDMAN:  Sorry.  Could we allow the witness to --

H3kdwal7

```
1              THE COURT:  Yes.  Go.
2              THE WITNESS:  Thanks.
3              (Witness not present)
4              MR. BERKE:  Your Honor, you probably noticed that
5     earlier today during the cross-examination of Mr. Engles I
6     offered into evidence quite a number of documents that were
7     marked for identification as government exhibits.
8              THE COURT:  Yes.
9              MR. BERKE:  What we did is we had produced to the
10    government from our side a lot of press release company
11    documents that the government had ended up marking as exhibits.
12    To save everybody inconvenience, we tried to avoid, to the
13    extent we knew they already marked it --
14             THE COURT:  Double marked.
15             MR. BERKE:  Exactly.  I would just ask if your Honor
16    would consider telling the jury at some point tomorrow that
17    whether it is listed as a government exhibit or a defense
18    exhibit, it is for identification purposes and either side is
19    free to introduce it.  I don't want to create a greater mystery
20    about why we are doing it.
21             THE COURT:  Great idea.  Just remind me if I forget,
22    but I will make a note to myself here.
23             MR. BERKE:  Thank you, Judge.
24             THE COURT:  Did you have something, Mr. Goldman?
25             MR. GOLDMAN:  We do, your Honor.
```

H3kdwal7

1          We expect that at the conclusion of Mr. Carocci's

2     testimony tomorrow Tom Davis will testify, and there are a

3     couple of outstanding issues that have been briefed to the

4     Court that may come up during his testimony, and we were hoping

5     to get some resolution so that we can properly prepare the

6     witness, including any mention of the wiretap, mention of the

7     leaks, the source of the articles in May and June of 2014, and

8     then more recently, last night and this morning, the parties'

9     briefing on the witness' memory.

10         THE COURT:  Well, it seems to me the witness is not in

11    a position to offer a diagnosis as to the cause of any memory

12    loss.  He can say, if it's the case, that I had a medical

13    condition and a minor stroke.  If that comes up in his answer

14    and that's what he was told by the doctors, he can say he had a

15    minor stroke.  But he cannot sit on the stand and say, you see,

16    I had a minor stroke, but the nature of the minor stroke was

17    such that it temporarily dislodged my memory but then after a

18    period of so many days my memory came back and this is a

19    medically known condition.  I've never heard of the condition

20    myself, and certainly a lay witness is not going to be

21    permitted to testify to that.

22         MS. CUCINELLA:  Just to clarify, your Honor, that is

23    not the testimony that we intend to elicit.  The testimony that

24    we intend to elicit, as described in our letter, is simply that

25    he was recovering from the surgery when he began proffering

H3kdwal7

1    with the government, and that when he started to prepare for

2    his testimony he was no longer recovering and was feeling much

3    healthier and that it was easier for him to remember.  Nothing

4    more than that.  We will not get into causation or diagnosis of

5    any kind.

6            THE COURT:  Well, I think kept at that level and that

7    he was recovered or he felt better at that time, that I don't

8    think is medical testimony.

9            MS. CUCINELLA:  We agree, your Honor.

10            MR. BERKE:  Your Honor, if I may address that?  I

11    think what the government intends to do is certainly suggest to

12    the jury through that testimony that his memory was failing at

13    that time because of a stroke and it came back because he was

14    feeling better.  That's I believe the impression they want to

15    leave.  Again, your Honor, we believe that that is -- there is

16    no medical basis.

17            Mr. Davis, we were told by the government, has not

18    given any medical records to the government to support any of

19    this, and we are left unable to cross-examine what we think is

20    Mr. Davis' claim about how his memory was affected.  We think

21    the cases we cited are clear that he cannot in any way indicate

22    that his memory or his ability to recall events or discuss

23    events was impacted by a medical event.

24            THE COURT:  I agree with you.  I agree with both of

25    you.  And I don't think what I'm hearing that will come out of

H3kdwal7

1    the mouth of the witness runs afoul of that.

2              MR. BERKE:  I've heard this -- what I heard

3    Ms. Cucinella saying is that he is going to say that he is

4    better able to remember things now because he has recovered

5    from the stroke.

6              MS. CUCINELLA:  That's not what I said.

7              THE COURT:  If that's what you said, that is not

8    something he is going to be allowed to do.

9              MS. CUCINELLA:  Yes.

10             THE COURT:  All right.  So I don't think there is much

11   of a disagreement here.  You're going to stand up and object if

12   I hear anything that amounts to a medical explanation beyond

13   the fact that, you know, why did you not tell the government

14   this, that, or the other thing, which is a fair question.  I

15   assume you are going to ask it.  And one of the answers could

16   be because I'm a liar, or I wanted to conceal it?  And if his

17   answer is I was unwell that day, that's his answer.  And he can

18   give that as his answer.

19             What I'm not going to allow him to do is extend that

20   to the point of a medical self-diagnosis.  If it's his

21   testimony that he had a stroke, that's fine.  How did you feel

22   on the day that you second proffered to the government?  I felt

23   much better that day.  That's not going to run afoul of my

24   ruling.

25             MR. BERKE:  Your Honor, based on our discussions with

H3kdwal7

1    Ms. Cucinella, I believe what he is going to say is --

2              THE COURT:  Well, no, no, no, no, no, no, no.  It is

3    not based on your discussions with Ms. Cucinella.  It is based

4    on my ruling.  So I don't think Ms. Cucinella is going to run

5    afoul of my ruling.  Even if in your discussion she planned to

6    have this guy explain an elaborate medical condition, it not

7    going to happen.

8              MR. BERKE:  Your Honor, can I make two requests?

9              THE COURT:  Yes.

10             MR. BERKE:  One, that whatever he is going to say,

11   could we first do it outside the presence of the jury?

12             THE COURT:  No.  No.  I will instruct the jury as

13   appropriate.

14             MR. BERKE:  Two, could I make a request that the

15   government request his medical records so they be produced in

16   order to be able to evaluate his claims about his condition?

17             MS. CUCINELLA:  We don't intend to make any claims

18   about his condition.  He is going to testify about the fact

19   that he had a massive surgery around Thanksgiving in 2015 and

20   prior to that he had a gray out, that he was recovering from

21   that surgery at the time --

22             THE COURT:  What is a gray out?

23             MS. CUCINELLA:  It was an incident where he lost

24   consciousness while he was in a public place, and as a result

25   of that he went to the doctor and learned that he had a carotid

H3kdwal7

1    artery and then after that he had surgery.  After that, all we

2    are eliciting is the fact that he had this surgery and was

3    recovering during the period where he initially proffered with

4    us.  We are not connecting anything else or making any other

5    kind of diagnosis here.

6         MR. BERKE:  Your Honor, if I understand, he had a

7    blockage that was unblocked.  It is a relatively minor surgery,

8    as I understand it, from what I've seen in the 3500 material.

9    I have a lot of information from the 3500 material.

10        For him to now claim that the reason why his story

11   changed dramatically is because somehow he was unwell and I am

12   not going to be in a position to cross-examine him on how

13   unwell he was and then he recovered and was better able to

14   remember things, I don't think that is fair to Mr. Walters,

15   your Honor, and I think the case law says that's what they

16   can't do.

17        THE COURT:  Well, this is where I do agree with you.

18   I'm going to listen to the testimony.  I'm going to see what's

19   said here.  And it may be, based on what comes out of this

20   witness, although I plan to probably sustain objections,

21   instruct the jury that this man is not competent to testify as

22   to the cause and effect of any memory loss, but if I conclude

23   that there is a limitation on your ability to cross-examine him

24   on something that comes out, then I'm going to be open to

25   requiring the production of the medical records.  And in a

H3kdwal7

1    trial of this length, we could have Mr. Davis recalled, if need

2    be.

3              But on the present record, there would be no reason

4    for me to order the production of the medical records, and I

5    don't anticipate that there will be a set of facts where I will

6    find a need, because I'm going to tell the jury he's not in a

7    position to offer a medical explanation for a memory loss.  He

8    can say where he was and what happened to him in general terms:

9    I had surgery.  I was brought to a hospital on a certain date.

10   And I was feeling -- was not feeling well and I was feeling

11   better on such and such a date.

12             That's about it.

13             OK.  Next issue.  What about wiretaps?

14             MR. GOLDMAN:  The wiretaps, your Honor, as we briefed

15   the Court on March 11th, we do not think there should be any

16   mention of a wiretap.

17             And I think what the defendant's response is

18   essentially to do what he is now accusing us of doing, which is

19   to say, oh, this is a legitimate reason to get into the wiretap

20   and then we can argue that there is no wiretap, here but it is

21   essentially a bootstrap argument.  There is no need --

22             THE COURT:  I don't understand you, Mr. Goldman.  So,

23   make yourself clear.

24             MR. GOLDMAN:  Let me start from the beginning.  OK?

25             As your Honor knows, there was a wiretap for a few

H3kdwal7

 1    months.

 2              THE COURT:  Yes.

 3              MR. GOLDMAN:  The government does not intend to

 4    introduce the existence of the wiretap or any calls related to

 5    that wiretap.  There are a few calls on that wiretap that

 6    intercepted Mr. Walters and Mr. Davis.  OK?

 7              I guess we would have two requests.  One is that there

 8    be no mention of the wiretap, and to the extent that any

 9    cross-examination of Mr. Davis occurs related to the wiretap,

10    that it be simply referred to as a recording of some sort, that

11    there doesn't need to be the mention of a wiretap, because

12    essentially it is almost as if you had a mistrial in a prior

13    proceeding instead of a prior trial.  And to the extent --

14              THE COURT:  What is the prejudice to the government

15    from the use of the term "wiretap"?

16              MR. GOLDMAN:  Well, because ultimately what we think

17    they're trying to do, because Mr. Davis -- some of this dates

18    back to the proffers.  Mr. Davis was played these wiretap calls

19    with him and Mr. Walters in his eleventh proffer, well after he

20    had admitted to everything.  So there is really no good faith

21    basis to suggest with the defendant that somehow the wiretap

22    calls were used to coerce or prompt Mr. Davis into cooperating.

23              THE COURT:  I just lost something from you, though.

24    What is the significance of it being a wiretap other than a

25    recorded call?

H3kdwal7

```
1          MR. GOLDMAN:  Because of the next argument that

2     they're going to make.

3          THE COURT:  So far you haven't explained how it would

4     have any impact.  If the argument is that he was coerced to

5     cooperate by hearing the recordings, whether they are called

6     mashed potatoes, recordings, or wiretaps doesn't seem to have

7     much to do with anything.

8          MR. GOLDMAN:  Well, they can't introduce the wiretaps,

9     your Honor.  It is hearsay.

10         THE COURT:  Why do you say then, therefore, that a

11    recording is an OK thing to call it --

12         MR. GOLDMAN:  Well, because --

13         THE COURT:  -- but not a wiretap as if there was some

14    significance at this point in your story?

15         MR. GOLDMAN:  I think I'm getting ahead of myself a

16    couple of steps.

17         THE COURT:  Well, let's stick to where we are right

18    now.  The point you made to me is that they want to argue that

19    there was something coercive about playing these things to him

20    and they need to call these things "recordings," not

21    "wiretaps," and I've lost you on that.

22         MR. GOLDMAN:  Understood, your Honor.  Let me start

23    afresh.

24         THE COURT:  OK.

25         MR. GOLDMAN:  The recordings that they intend -- that
```

H3kdwal7

| | |
|---|---|
| 1 | they have indicated in their letter that they would ask |
| 2 | Mr. Davis about, OK, are hearsay of their own client on a |
| 3 | recording.  It can be in theory used as prior inconsistent |
| 4 | statements if Mr. Davis denies the conversation or in some way |
| 5 | says something that is different than those recordings. |
| 6 | THE COURT:  Right. |
| 7 | MR. GOLDMAN:  OK?  So short of that, there is no basis |
| 8 | to introduce these recordings that we can envision.  Maybe |
| 9 | Mr. Berke has a different view of it.  But there is no basis to |
| 10 | introduce these recordings as impeachment unless they are the |
| 11 | prior inconsistent statements of the defendant.  So we can |
| 12 | cross that bridge when we get there. |
| 13 | But our point is that there is going to be no mention |
| 14 | in front of the jury of the fact that we had a wiretap, even -- |
| 15 | you know, for a variety of reasons.  And the defendant cannot |
| 16 | introduce the wiretap as hearsay and cannot make arguments |
| 17 | related to the wiretap that would be eliciting, you know, in |
| 18 | summary or in any other way eliciting hearsay and so -- |
| 19 | THE COURT:  How -- I lost you again, because you don't |
| 20 | seem to be objecting to his cross-examining on recordings that |
| 21 | were played to him.  Am I correct? |
| 22 | MR. GOLDMAN:  Right.  Well, we do object to it unless |
| 23 | there is -- you know, unless they lay the foundation through a |
| 24 | prior inconsistent statement. |
| 25 | THE COURT:  Are you going to elicit the fact that he |

H3kdwal7

1   was played recordings at the eleventh proffer session?

2           MR. GOLDMAN:  It depends on your Honor's ruling.  So

3   we don't think it is appropriate.  We don't think there is a

4   good faith basis for it.  But if the Court is going to allow

5   them to go down that road with him, notwithstanding the fact

6   that it happened so far down in his cooperation, then we

7   don't -- we would not elicit it because we don't think that the

8   wiretap should play any role in this case.  We don't think the

9   defendant has a basis to do it.

10          And what we think they're trying to do is use this

11  rationale to try to introduce it through Mr. Davis and then

12  make their law enforcement technique argument to the jury,

13  which would flag for the jury that there was a wiretap, and

14  then make an argument that you haven't heard any evidence from

15  the wiretap, which is prejudicial to us because there was a

16  wiretap -- they will now know that there was a wiretap -- and

17  no calls were made.  And they can draw the natural inference --

18  or the defense would believe they're trying to make them draw

19  the inference that, therefore, these calls must be innocent in

20  nature or good, demonstrate --

21          THE COURT:  But if they are called "recordings," this

22  danger ceases to exist?

23          MR. GOLDMAN:  Yes.  We think it actually significantly

24  mitigates the risk of combining the cross-examination and the

25  law enforcement technique argument.

H3kdwal7

1              THE COURT:  Mr. Berke, what are you planning on doing?

2              MR. BERKE:  OK, your Honor, and I will tell your Honor

3    I have never heard of such an objection with regard to

4    wiretaps.  We have a witness who is going to be testifying.  We

5    do anticipate cross-examining him about the recorded calls.  We

6    have -- we do anticipate the likelihood of an inconsistent

7    statement about it and a number of different issues, which I

8    would rather not reveal before direct, but if your Honor wanted

9    to hear it right after the direct or in camera.  And so that is

10   fair game, and we are allowed to refer to them as wiretaps.  I

11   have never heard of a case that said we couldn't.  Typically,

12   it is the government introducing it, but there is nothing that

13   prevents us.  They are recorded calls.  I don't want to have

14   any suggestion that Mr. Walters recorded him.  And it is

15   perfectly appropriate to say these are government recordings

16   and you knew about it.

17             In addition, your Honor, during his discussions of

18   cooperation, we understand that he was told there were recorded

19   calls.  It wasn't our -- we have a good faith basis to believe

20   that he wasn't told the extent of the recordings.  He was

21   played certain recordings.  There was a dramatic shift in his

22   testimony, your Honor, about what he said about critical

23   events.

24             We think his -- what he was told about recorded calls

25   may have influenced that, and we have a right to examine that,

H3kdwal7

1   your Honor, as part of what we believe is our cross-examination

2   about his fabrication --

3            THE COURT:  Well, it sounds to me -- well, I don't

4   know what the witness knows, but it may be that this witness

5   does not know of them as wiretaps but, rather, government

6   recordings of some type.

7            MR. BERKE:  We believe he does know of them as

8   wiretaps.

9            THE COURT:  Well, Mr. Goldman, maybe you can shed some

10  light on that.

11           MR. GOLDMAN:  He was told in the eleventh proffer for

12  the first time that the government had a wiretap that

13  intercepted him and Mr. Walters on a couple of occasions, and

14  he was played those calls at that point.  I don't know what

15  Mr. Berke is referring to when he says that earlier on he was

16  told that there was a wiretap.  It was all done --

17  Ms. Cucinella and I were both present.  It was all done for the

18  first time at that proffer.  So, I'm not sure what he is

19  referring to.

20           THE COURT:  Well, quite frankly, it seems to me that

21  Mr. Berke can explore what Mr. Davis learned from the

22  government in a proffer session.  I don't understand why that

23  should be off limits.  And it's not.

24           MR. GOLDMAN:  OK, your Honor.  I mean, we think there

25  is a 403 argument related to the wiretap and the other

H3kdwal7

1    arguments that flow from the wiretap that we think that the

2    defendant is trying to shoehorn the wiretap through this

3    witness so they can make another argument that is prejudicial

4    and could potentially confuse the jury because it has a lot

5    more force in that regard.

6        THE COURT:  Well, it may, and you may have a good

7    application there.  But I'm not inclined at this stage to cut

8    off cross-examination of what transpired in a proffer session.

9        MR. GOLDMAN:  Your Honor, I think the bigger issue for

10   the government, at least, is the leak issue, and the one that

11   we would like to turn to next, understanding your Honor's

12   ruling on the wiretap.

13       There is absolutely no reason to get into the fact --

14   the source of the articles that were published and including

15   the confidential leaks.  It's inflammatory.  It's prejudicial.

16   It is a nullification play by the defense.

17       If they want to cross-examine the witness about

18   articles that were published about the investigation, they can

19   do that in a permissible fashion, but there is no reason to get

20   into the source of the information.  There is no basis to

21   believe that the witness had any reason to know that the source

22   of the information was leaks by the government -- us -- as

23   opposed to the SEC or as opposed to some other source of

24   information that can get out there and --

25       THE COURT:  Mr. Goldman, I'm sure your concern is

H3kdwal7

1    unfounded.  I'm sure Mr. Berke has no intention of getting into

2    the sources behind newspaper articles.  If he wants to inquire

3    as to how Mr. Davis' actions were influenced by picking up the

4    morning's Wall Street Journal and reading certain information

5    in the Wall Street Journal, that seems to me to be fair game

6    for cross-examination.

7               MR. GOLDMAN:  And we agree.

8               THE COURT:  But what the source -- what sources the

9    reporter had in writing the article does not strike me as

10   anything to do whatsoever with this case.

11              MR. BERKE:  Your Honor, can I address that issue?  Two

12   different unrelated contexts.  One, the articles themselves.

13   In 2014, going into 2015, which the 2015 articles were the

14   first ones that mention Davis and led to him being asked to

15   resign from the Dean Foods board, you recall those articles we

16   believe -- the articles themselves, putting aside what we now

17   know about the leaks and the like, the articles themselves

18   reveal very detailed information about what the government is

19   trying to do and not trying to do.  If you recall, a lot of

20   people who read them said that reads like leaks.

21              We know there are lawyers involved for both Mr. Davis,

22   Mr. Walters, and we know there is a concern of leaks.  I would

23   submit, your Honor, we have a right to say that for Mr. Davis,

24   when he is trying to contemplate whether to fight the

25   government or whether to try to make a deal, the fact that if

1    he believed after reading these articles that it was the

2    government -- whether it is the SEC or the U.S. Attorney's

3    Office, it doesn't matter -- whether the government is leaking

4    information to the press in order to either pressure people, or

5    whatever he thought at the time, that he saw in 2014, he saw it

6    in 2015, and his pressure was building on him because he was

7    losing all his board positions, his money, and everything else

8    in part because of these articles, how he thought the

9    government was doing that, again, his state of mind I would

10   submit, your Honor, that is absolutely fair game.

11         THE COURT:  All right.  My ruling is that you can

12   probe what he did, what his actions were in response to reading

13   the article, but you may not elicit or suggest in front of the

14   jury a source for the article.  The fact that the reporters had

15   certain information about his actions may have led him to do

16   certain things, but probing where do you think the reporter got

17   the information from is -- to the extent it has any probative

18   value, it is substantially outweighed by the danger of unfair

19   prejudice and jury confusion, and I'm not going to allow it.

20         MR. BERKE:  That would include, your Honor, if I

21   wanted to inquire whether he thought the government was putting

22   pressure on him by leaking information in these articles about

23   ultimately him in 2015?

24         THE COURT:  Well, that would be subsumed in the ruling

25   I just made.

H3kdwal7

1          MR. BERKE:  A completely separate issue, your Honor,

2     that we raised in our letter.  So, as your Honor knows, we had

3     briefing on the issue after the leaking by the FBI agent.

4          THE COURT:  Yes.

5          MR. BERKE:  Part of what we on February -- if I got

6     the date right, I think it is February 3rd, the first week of

7     February -- I'm not sure of the exact date -- we submitted our

8     reply brief in support of our motion to dismiss.  One of the

9     arguments we made is that Mr. Walters, we argued, was

10    prejudiced because --

11         THE COURT:  I'll tell you what.  Why don't we take

12    this up tomorrow morning?

13         MR. BERKE:  Absolutely, your Honor.

14         THE COURT:  OK.  Thank you very much.

15         MR. BERKE:  Thank you.

16         THE COURT:  I'll tell you what.  What would be great

17    is why don't you just send me a letter and you can include the

18    excerpts from the reply brief that you want me to read.  That

19    would be even better.

20         MR. BERKE:  Absolutely, Judge.

21         THE COURT:  Thank you.

22         MR. BERKE:  Thank you.

23         (Adjourned to 9:45 a.m., Tuesday, March 21, 2017)

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   GREGG ENGLES

 4   Cross By Mr. Berke . . . . . . . . . . . . . 315

 5   Redirect By Mr. Goldman  . . . . . . . . . . 407

 6   Recross By Mr. Berke . . . . . . . . . . . . 426

 7   THOMAS CAROCCI

 8   Direct By Mr. Goldman  . . . . . . . . . . . 431

 9   Cross By Mr. Schoeman  . . . . . . . . . . . 491

10                     GOVERNMENT EXHIBITS

11   Exhibit No.                            Received

12    603-C   . . . . . . . . . . . . . . . . . 333

13    604B    . . . . . . . . . . . . . . . . . 340

14    604-D   . . . . . . . . . . . . . . . . . 343

15    819     . . . . . . . . . . . . . . . . . 352

16    462     . . . . . . . . . . . . . . . . . 355

17    706-M   . . . . . . . . . . . . . . . . . 373

18    702-C   . . . . . . . . . . . . . . . . . 381

19    601-C   . . . . . . . . . . . . . . . . . 386

20    702-Q   . . . . . . . . . . . . . . . . . 388

21    2100, 702-C, 702-G, 702-N, 702-Q   . . . . . 430

22    704-C, 704-H, 704-O, 704-W, 706-F   . . . . . 430

23    706-L, 706-Q, 707-D  . . . . . . . . . . . 431

24    100-A to 100-L, 101-A to 101-L   . . . . . . 448

25    102-A to 102-L, 103-A to 103-L   . . . . . . 448
```

104-A to 104-L, 105-A to 105-J, 106 to 112, 113-A to 113-G  348

114-A to 114-L, 115-A to 115-L, 116-A to 116-J, 117  448

319-A to 319-L, 320-A to 320-L    . . . . . . 448

321-A to 321-L, 322-A to 322-L,     . . . . . 449

323-A to 232-L, 324-A to 324-L    . . . . . . 449

325-A to 325-L 326-A to 326-L   . . . . . . . 449

106, 107, 117, 200-210, 214   . . . . . . . . 449

200-214, 215-A, 215-B, 216-A to 216-C, 217-A to 217-L  449

218-A to 218-L, 219, 220-A to 220-C   . . . . 449

221-A to 221-L, 222-A to 222-L    . . . . . . 449

300-A to 300-C, 301-A, 301-B, 302-A to 302-D  449

303-A to 303-L, 313-A to 313-E    . . . . . . 449

304-A to 304-L, 305-A to 305-L    . . . . . . 449

306 to 311-A through L, 312-A to 312-H    . . 449

314-A to 314-L, 315-A to 315-H    . . . . . . 449

316-A to 316-E, 317-A to 317-L    . . . . . . 450

318-A to 318-H, 223-A to 223-Q, 224-A to 224-K 450

225-A to 225-I, 1738, 1739    . . . . . . . . 450

1739-A to 1739-G, 1741-A to 1741-D    . . . . 450

1742-A to 1742-C, 1743 to 1745    . . . . . . 450

1746-A to 1746-C, 1747    . . . . . . . . . . 450

2101 and 1739    . . . . . . . . . . . . . . 450

1     2000 through 2014     . . . . . . . . . . . . . 451

2                          DEFENDANT EXHIBITS

3     Exhibit No.                              Received

4     44    . . . . . . . . . . . . . . . . . . . 322

5     1050    . . . . . . . . . . . . . . . . . . 329

6     2031    . . . . . . . . . . . . . . . . . . 361

7     1040A, pages 30 and 36,    . . . . . . . . . 366

8     2176    . . . . . . . . . . . . . . . . . . 382

9     663    . . . . . . . . . . . . . . . . . . . 391

10    1125    . . . . . . . . . . . . . . . . . . 399

11    666    . . . . . . . . . . . . . . . . . . . 400

12

13

14

15

16

17

18

19

20

21

22

23

24

25