H3L3WAL1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,                New York, N.Y.
 4              v.                            S1 16 Cr. 0338(PKC)
 5   WILLIAM T. WALTERS,
 6                 Defendant.
 7   ------------------------------x
                                             March 21, 2017
 8                                           9:50 a.m.
 9   Before:
10                      HON. P. KEVIN CASTEL,
11                                           District Judge
12                         APPEARANCES
13   JOON H. KIM
          Acting United States Attorney for the
14        Southern District of New York
     BY:  DANIEL S. GOLDMAN
15        BROOKE E. CUCINELLA
          MICHAEL FERRARA
16             Assistant United States Attorneys
17   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
          Attorneys for Defendant
18   BY:  BARRY H. BERKE
          PAUL H. SCHOEMAN
19        ANDREW J. ESTES
          MICHELLE BEN-DAVID
20                  -and-
     WRIGHT STANISH & WINCKLER
21   BY:  RICHARD WRIGHT
22             – also present –
23   SA Edmund Rom
     SA Nicholas Anderson, Federal Bureau of Investigation
24   Raymond McLeod, Defense Tech Support
     Holly Meister
25   Sarah Pyun, Government Paralegal Specialists
```

H3L3WAL1

1                (In open court; jury not present)

2                THE COURT:  First of all, let me begin by thanking the

3      parties for their letters of March 20, which I've had a chance

4      now to review.

5                With regard to the issue of Mr. Davis' testimony

6      concerning his memory, I've already indicated yesterday how I

7      am ruling on that, that he cannot offer anything that I

8      consider to be medical testimony, I will sustain an objection.

9      He can state how he felt and whether he felt unwell, and that's

10     basically it.  He can report if he was hospitalized at a given

11     point in time, relative to a particular session with the

12     government, and that's essentially it.  I'll take it on a

13     question-by-question basis.

14               With regard to the issue of the, quote unquote, leaks,

15     I've considered the issue, and the defense is going to be able

16     to ask Mr. Davis what was said to him and by him in any proffer

17     session.  With regard to how any newspaper article affected

18     him, affected his actions, the defense may fully inquire.

19               What the defense may not do, is inquire as to Davis'

20     belief as to the source of the leaks, or what he may have been

21     told or learned as to the source of the leaks.  Because the

22     source of the leaks have very limited probative value in this

23     case, and they're substantially outweighed by the danger of

24     unfair prejudice, because it invites the jury to speculate

25     whether there is something unfair about this prosecution,

H3L3WAL1

1    whether the government should be held to a different standard

2    because of the actions of a government agent.  Those are issues

3    that are reserved to the Court, they are not issues fairly

4    presented to the jury, and allowing inquiry into the source of

5    newspaper articles or Davis' belief of the source of the

6    articles or Davis' speculation as to the source of the

7    articles, delves into an area of limited probative value which

8    is substantially outweighed by the danger of unfair prejudice

9    and jury confusion.  And that's my ruling.

10           All right?  So, any reason not to bring the jury in at

11   this stage?

12           MR. BERKE:  Your Honor, minor issue.  Your Honor

13   asked, I was going to remind you if the some point you could

14   tell the jurors that the stickers, the GX and DXs are solely

15   for identification.  And to avoid duplication, the parties will

16   at times introduce the GX or DX.

17           THE COURT:  It doesn't matter who offered an exhibit.

18   Very good.

19           MS. CUCINELLA:  Two brief issues, your Honor.  One, we

20   were wondering for scheduling purposes for witnesses if your

21   Honor could let us know today your intent on whether or not we

22   are going to be sitting Friday.

23           THE COURT:  All right.

24           MS. CUCINELLA:  And second, we would also like to ask

25   that the defense counsel be ordered to give us the affirmative

H3L3WAL1

1    exhibits that they intend to use with Mr. Davis at the close of

2    court today.  We anticipate there are going to be a number of

3    objections.  Right now it is their intent to give it to us at

4    the end of the direct testimony.  We won't have time then to

5    review them and preview any objections to the Court.  So we

6    think it will end in a delay for the trial.

7            THE COURT:  Have you discussed this with opposing

8    counsel?

9            MS. CUCINELLA:  Yes.  They have told us they would

10   give it at the end of the direct.  And we'd like them so we

11   have time overnight.

12           THE COURT:  This is the thing, Ms. Cucinella.  We

13   have, for example, the Jencks Act.  The Jencks Act says what it

14   says.  The government does not need to turn over the statements

15   of a witness until the witness has completed their direct

16   examination.  As a result of discussions with counsel and

17   certainly not an order of the Court, parties frequently arrive

18   at some other or different accommodation.

19           If the defense team is unwilling to accommodate the

20   government's requests, the government has a remedy, I suppose.

21   And I suppose I will not be hearing from defense counsel that

22   there is anything unfair about the government insisting on its

23   strict rights.

24           MS. CUCINELLA:  Understood, your Honor.  We, as I

25   believe your Honor is aware, turned over our 3500 material a

H3L3WAL1

1    month before trial.  So and we'll go back to them and inquire

2    and see if they would be willing to give us that courtesy, so

3    as not to delay the trial.

4         THE COURT:  You're not required to tell them who your

5    next witnesses are, are you?

6         MS. CUCINELLA:  We are not.

7         THE COURT:  Okay.  And so, if defense counsel is not

8    prepared to accommodate your request, which may be his right,

9    then you have your rights it seems to me.  And I'm sure defense

10   counsel will not burden the Court with any whining or

11   complaining about your having insisted on your rights.

12        MS. CUCINELLA:  Thank you, Judge.

13        MR. BERKE:  Your Honor, if I may, I think there may be

14   some confusion on this exhibit issue.  We provided to the

15   government, although we didn't have to, the vast bulk of our

16   exhibits that we have identified to use at the beginning of the

17   trial, and out of the courtesy for the government we've already

18   identified the vast majority of the exhibits, other than those

19   that may become relevant during the direct, etc.  So they

20   already have them.  They can say whether they have objections.

21   Most of them were produced either by the government or by the

22   SEC or the like, but they've had them.

23        The only thing they're asking for is something else.

24   They're asking specifically for which of those exhibits or any

25   additional exhibits based on the direct we may use on

H3L3WAL1

```
1    cross-examination.
2             THE COURT:  I fully understand that.
3             MR. BERKE:  I've never had a case, your Honor, in
4    every trial I've tried for the last 20 years where I've been
5    required to alert the government to my cross before they close.
6    We have given them all those documents for our exhibits which I
7    would say, the vast bulk of it, that they have.  I don't
8    imagine it would be very controversial.
9             THE COURT:  Listen, there are no accommodations,
10   you're free to each side take the position there will be no
11   accommodations, we will insist on the letter of what the law
12   requires, and the existing judicial orders require, and I
13   assume I will hear no complaints from the government about
14   that, and I assume I'll hear no complaints from you.  Is that
15   right, Mr. Berke?
16            MR. BERKE:  Your Honor, again, we --
17            THE COURT:  You don't want to tell them which exhibits
18   you're using, you're free not to do so.  But I assume I will
19   not hear any complaints from you if the government says I'm not
20   required to tell you who my next witness is, I'm not required
21   to tell you what exhibits I will be using, I'm not required to
22   tell you anything, you'll see in court.  And I assume you will
23   not be coming back to me to complain about that.
24            MR. BERKE:  The only thing I would say, your Honor, is
25   I think we've had a very good back and forth with the
```

H3L3WAL1

1    government, in terms of what we've done, and I think we as the

2    defense have gone above and beyond, given the number of

3    documents in this case, to give them exhibits, identify what

4    we're doing, work with them cooperatively.

5             The only thing I don't think we need to do, which I

6    think is different than some of the issues that the government

7    is talking about, is give them a preview of our

8    cross-examination of their star witness before they go.  But

9    they already have the bulk of the materials.

10            THE COURT:  Don't be surprised if there are some

11   things they don't feel they need to do either.  And please

12   don't come back complaining about it.

13            MR. BERKE:  Understood, your Honor.

14            THE COURT:  All right.  Bring our jury in, please.

15   One second.  Are they here?

16            THE DEPUTY CLERK:  I don't think they're all here yet.

17            THE COURT:  Just check to see whether they're all

18   here.

19            (Continued on next page)

20

21

22

23

24

25

H3L3WAL1                          Carocci - cross

1         (Jury present)

2         THE COURT:  Juror No. 7, I want to compliment you on

3    your very fine attire today.

4         JUROR NO. 7:  Thank you.  Thank you.

5         THE COURT:  It's an improvement in my view.

6         JUROR NO. 7:  Thank you.

7         THE COURT:  All right.  Ladies and gentlemen, in the

8    course of a trial, exhibits will be marked and offered by one

9    side or another.  How an exhibit is marked, as Government

10   Exhibit 212 or Defense Exhibit 509, has absolutely no meaning

11   or significance whatsoever.  This case is decided on the

12   evidence that is before you, not on who marked the exhibit or

13   who offered the exhibit.  So, that is not something that you

14   need to keep track of or worry about.

15        Sometimes the same document may have two different

16   numbers, and the parties could pretty well just arbitrarily

17   pick one or the other to utilize.  We try to avoid having the

18   same exhibit twice in evidence, it doesn't have to be offered

19   twice.  If it's in evidence, then it is in evidence, and either

20   side may rely on it.  Basically, I'm telling you this is just a

21   non-issue.

22        Go ahead, Mr. Schoeman.

23    THOMAS CAROCCI,

24   CROSS-EXAMINATION (Continued)

25   BY MR. SCHOEMAN:

1   Q.  Good morning, Mr. Carocci.

2   A.  Good morning.

3   Q.  I think last night's cliffhanger had to do with Government

4   Exhibit 2001 in evidence.  Could we publish that again.

5           And I think we were talking about where does the

6   August 6, 2008 arrow point.  Do you remember we were talking

7   about that at the end of the day?

8   A.  Yes.

9   Q.  And it is a little hard to tell from Government Exhibit

10  2001 exactly where that arrow points.  Can you tell whether it

11  points to the day before the stock went up or the day before

12  the stock went down?

13  A.  I believe it points to the day the stock goes up.

14  Q.  So let's take a look at what's in evidence as Government

15  Exhibit 1739.  And we'll go to the August 2008 time frame.  Do

16  you see that on the screen?

17  A.  Yes.

18  Q.  You can see that on August 6, 8/6/2008, the stock closed at

19  22.02, down 1.32.  Do you see that?

20  A.  Yes, correct.

21  Q.  And the next day it's basically flat, 22.12?

22  A.  Right, correct.

23  Q.  It's not until August 8 that the stock actually rises

24  dramatically to 24.28?

25  A.  Right.

H3L3WAL1                          Carocci - cross

1    Q.  So back to Exhibit 2001, would you agree with me that just

2    for clarity sake, the arrow from August 6, 2008, should be

3    pointing to the point where the stock goes down on that day,

4    and the rise up to above $24 a share is not until the 8th?

5    A.  Right.  The arrow is supposed to be pointing to the

6    beginning of the trading day on August 6.

7    Q.  Which is the day after the announcement, the stock went

8    down.

9    A.  Correct.

10   Q.  And it's not until August 8 that the stock actually rises

11   above $24 a share.

12   A.  Correct.  Yes.

13   Q.  And you recall that $24 a share and change is the price

14   that Mr. Walters paid for his first purchase of shares back on

15   February 25, which we discussed yesterday?

16   A.  Yes.

17   Q.  So it's not until two days after the August 6 announcement

18   that the stock price for Dean Foods reaches the price that

19   Mr. Walters paid back in February?

20   A.  Yes.

21   Q.  All right.  So, I think yesterday we were talking about the

22   February -- mostly about the February 2008 purchases.  I'm now

23   going to move to the June 2008 purchases and could we put up

24   Government Exhibit 2002.  Okay.

25            This is a chart that you made to illustrate some

H3L3WAL1                         Carocci - cross

1   points that you wanted to make about June 2008, right?

2   A.   Yes, I made this chart.

3   Q.   In consultation with the prosecution?

4   A.   Yes.

5   Q.   What this shows is that in the green bars, as you said

6   yesterday, Mr. Walters purchased stock that was a very large

7   percentage of the daily trading volume on those days, right?

8   A.   Yes.

9   Q.   Nothing illegal about buying a large percentage of the

10  trading volume on any day, right?

11  A.   That's correct.

12  Q.   Or buying a large amount of stock; nothing wrong with that?

13  A.   Correct.

14  Q.   And your chart here shows the percentage of the total

15  market volume that Mr. Walters purchased, but it doesn't

16  actually show what the total market volume was.   Right?

17  A.   That's right.

18  Q.   So it shows, for example, that on the 19th Mr. Walters had

19  37 percent of the total market volume, but the total market

20  volume would be -- you can do the math, you could back into it,

21  right?

22  A.   Right.   You could do the math and get to an estimate of

23  what the volume was.

24  Q.   Or we could look at the closing price -- the volume data

25  that you had and we could see what it was, right?

H3L3WAL1                          Carocci - cross

1   A.  Right.

2   Q.  So let's look at Exhibit 1739 for the June 2008 time

3   period.  And do you see that on the 19th of June, the volume is

4   5,102,845 shares?

5   A.  Yes.

6   Q.  And that's the total volume that Mr. Walters' trade was

7   37 percent of, right?

8   A.  Yes.

9   Q.  But, it doesn't show on your chart, but the day before

10  Mr. Walters purchased any shares, the total volume as reflected

11  on this exhibit is 4,698,921.

12  A.  Yes.

13  Q.  And you see that that is a substantial increase over the

14  volume of the previous day?

15  A.  Substantial from the 17th.

16  Q.  That's right.

17  A.  Yes.

18  Q.  So between the 17th and the 18th, the volume of Dean Foods'

19  stock increased almost six times.  Five or 600 percent.

20  A.  Yes.  I believe that math is right.

21  Q.  So, but, so, and Mr. Walters did not purchase any stock on

22  June 18, 2008, right?

23  A.  No.

24  Q.  Let's go back to Exhibit 2002.  You see the first purchase

25  that you have here is on the 19th?

H3L3WAL1                      Carocci - cross

1   A.  Yes.

2   Q.  There is no purchase on the 18th, right?

3   A.  Right.

4   Q.  And that's the day that the volume of Dean Foods -- trading

5   in Dean Foods stock increased by about five, six times,

6   multiple of five or six?

7   A.  Yes.

8   Q.  You see also that there was a drop in the price of Dean

9   Foods stock the day before Mr. Walters bought, it went down

10  from a closing price of 19.87 to a price of 18.50 the day

11  before he bought.

12  A.  Yes.

13  Q.  So there was a big drop in the price the day before.

14  A.  1.37.

15  Q.  In fact, the price had not been that low for quite some

16  time, right?

17  A.  At $18?

18  Q.  Right.

19  A.  In the $18 range, that's correct.

20  Q.  And let's go back to Government Exhibit 2001.  The time

21  when we're talking about in June is what I've circled in blue,

22  right?

23  A.  Yes.

24  Q.  I circled more than June, but that's the lowest the stock

25  had been for the entire year, right?

H3L3WAL1                         Carocci - cross

1    A.  Not for the entire year.  Later in November, it looks like

2    the stock price is low.

3    Q.  Right.  But leading up to that point, the stock is

4    basically at the lowest it's ever been for the year?

5    A.  Until that point the -- right.  I thought you meant for the

6    entire -- right.  Until that point.

7    Q.  Okay.  And in fact, the stock price on the day before, you

8    can see in this chart pretty clearly, the stock price had

9    dropped precipitously.

10   A.  Right.

11   Q.  There is nothing on your chart to reflect what analysts or

12   newspapers or anybody was saying with respect to that sudden

13   drop in stock price or increase in volume?

14   A.  Right.

15   Q.  Okay.  Let's go back to Government Exhibit 2001.  And now

16   we're going to talk about the November time frame.  You see you

17   put a November 4, 2008 announcement on your chart?

18   A.  Yes.

19   Q.  And I think we established yesterday that was the date that

20   Barack Obama was elected?

21   A.  Yes.

22   Q.  Okay.  And also in sort of the middle of the financial

23   crisis.

24   A.  I can't recall the middle, but there was a financial crisis

25   in 2008.

H3L3WAL1                          Carocci - cross

1    Q.  And you didn't create, in preparing for your testimony

2    today, a chart about the volume, showing the volume of the

3    trading in this time period.  You didn't create one to testify?

4    A.  No.

5    Q.  You could have?

6    A.  Yes.

7              MR. SCHOEMAN:  Let's go back to Exhibit 1739, please.

8    And we'll go to the November 2008 time frame.  And scroll up a

9    little more, Mr. McLeod, so we see the volume before that.  A

10   little bit more, please.  We can start there.  That's good.

11   Q.  So you see November 4 was the day of the announcement, and

12   there is a very large increase in volume up to -- over 12

13   million shares traded that day?

14   A.  On the day of the announcement.

15   Q.  That's right.  And Mr. Walters started buying the following

16   day, right?  On the 5th.

17   A.  Yes, I believe that's right.

18   Q.  So on the day that Mr. Walters started buying, the day

19   after the announcement, the volume in Dean Foods stock was

20   above 5 million shares.  You see that?

21   A.  Yes.

22   Q.  And you see that the stock price had fallen significantly

23   two days before, it had been 22.16?

24   A.  Yes.

25   Q.  And then it closed on the 5th down more than $5 a share?

H3L3WAL1                         Carocci - cross

```
 1   A.  Yes.

 2   Q.  And on a significant increase in trading volume.

 3   A.  From the 3rd to the 5th, yes.

 4   Q.  Yeah.  And Mr. Walters' purchase on the 5th was not such a

 5   big percentage of the volume on the 5th.  Is that fair?  Let's

 6   just, we'll look at it on --

 7   A.  What was the actual amount of the trade on the 5th?  If you

 8   can refresh my recollection.

 9   Q.  We'll go back to Exhibit 2001 and you can see on your

10   chart.  You see that first green line in the November period,

11   and then the total volume was more than 5 million.  Mr. Walters

12   does not account for most of that increase in volume.

13   A.  But it's about -- his volume is about 10 percent.  Or

14   roughly.

15   Q.  Right.  And just back to 1739, please.  So, I think you had

16   testified that the normal trading volume in Dean Foods that you

17   had observed when you were asked questions by Mr. Goldman was

18   in the sort of one or two million shares a day.

19            MR. GOLDMAN:  Objection, your Honor.  It misrepresents

20   the testimony.

21            THE COURT:  Rephrase your question, please.

22   Q.  What did you tell Mr. Goldman yesterday about what you

23   observed as the sort of average trading volume?

24   A.  I thought I said between three to five million a day.

25   Q.  All right.  Well, looking at Government Exhibit 1729, you
```

H3L3WAL1                         Carocci - cross

1    can see in the period before November 4th, that the trading

2    volume is between one and a half and three million a day.

3    A.  Yes.

4    Q.  And that on the 5th, it's more than five million a day.

5    A.  Yes.

6    Q.  And Mr. Walters was only about 10 percent of that.

7    A.  Yes.

8    Q.  So other people account for the millions of additional

9    shares above the average that we see that day?

10   A.  They would account for the other 90 percent.

11   Q.  Okay.  So let's look at 2009.  I think it's Government

12   Exhibit 2003.  And I think this is the only chart you made for

13   2009.  Is that correct?

14   A.  Yes.

15   Q.  You see that the date is February 10, the date of the

16   little increase in Mr. Walters' purchase, you see that?

17   A.  Yes.

18   Q.  And I think you can see from the chart that it's 300,000

19   shares, increase from about 1.5 million to 1.8 million.

20   A.  Yes.

21   Q.  Okay.  Can you tell from your chart whether that's the same

22   day that the price of Dean Foods stock dropped?

23   A.  I mean, it appears that way.  I wouldn't be able to say for

24   certain without looking at the data.

25   Q.  Let's look at the data, Government Exhibit 1739, for the

H3L3WAL1                          Carocci - cross

1    February 2009 time frame.  So you see on the 10th, the day that

2    Mr. Walters bought, the volume basically doubles over the

3    previous day?

4    A.  Yes.

5    Q.  And the stock price fell, that's 80 cents, right?

6    A.  80 cents, yes.

7    Q.  Mr. Walters' purchase, which we established was 300,000 --

8    A.  I believe that's correct, yes.

9    Q.  -- is a small percentage of the increase day over day?

10   A.  The 300,000 being a small percentage of 2.5 million

11   additional --

12   Q.  Yes.

13   A.  Yes.

14   Q.  So Mr. Walters accounts for 300,000 shares of the increase

15   from 2.5 million to basically five million.

16   A.  Right.

17   Q.  And other people in the market account for the rest of that

18   volume of trading on that day?

19   A.  Yes.

20   Q.  You don't know why they traded on that day?

21   A.  I do not know why they traded.

22   Q.  But you do see that the price of the stock had fallen that

23   day, and it was actually I think the lowest it had been for

24   quite some time.  Do you see that?

25   A.  Yes, so it does appear to line up with that day.

H3L3WAL1                          Carocci - cross

1    Q.  Do you know what else happened in the broader market on

2    February 10, 2009?

3    A.  No.  Not --

4    Q.  To the Dow Jones, for example?

5    A.  I don't know.

6    Q.  Do you know when in the day, what time of day Mr. Walters

7    purchased his shares, whether it was before the market opened

8    or later in the day?

9    A.  I don't know.

10   Q.  But you do have a trading blotter that has that information

11   on it?

12   A.  I don't -- I did not have -- no, because I didn't have the

13   blue sheet data for this time period.

14   Q.  But what about the Wachovia Wells Fargo trading blotter,

15   did you have that?

16   A.  I did not.  I just had their account statements.

17   Q.  Let me show what's been marked in evidence by stipulation

18   yesterday as Government Exhibit 1007.

19           MR. SCHOEMAN:  Do we have that, Mr. McLeod?

20   Q.  This is Government Exhibit 1007.  Do you recognize this

21   document?

22   A.  No, I do not.

23   Q.  It's in evidence though so I'm just going to ask you a few

24   questions about it.

25           MR. SCHOEMAN:  Mr. McLeod, I'd like to have an

1    excerpt.  It is a very large spreadsheet, but there is a

2    particular row just as an excerpt, I think it is row 502.  And

3    just again looking at this document, and Mr. McLeod, if we can

4    see the date is 2010 -- sorry.  2/10/2009.

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  If we scroll over to the right.  You see under column A D

8    there is a time of 13:31:10.  Do you see that?

9    A.  Yes.

10   Q.  And 13:31 is commonly used as 1:31 in the afternoon.  Is

11   that right?

12   A.  Yes.  1 -- it's military time.  1:31:10.

13   Q.  I believe there's a stipulation, as used in this exhibit,

14   that's Eastern Time.

15   A.  Okay.

16   Q.  Okay.  All right.  That's not something in your discussions

17   with the government you included on your chart.

18   A.  It was not included in the chart.

19   Q.  Thank you.  All right.  Stay with this exhibit.  That's

20   good.  2003.  And there is another purchase by Mr. Walters I

21   think it's on May 13, and it would be reflected by this sort of

22   bump up here.  Do you see that?

23   A.  Yes.

24   Q.  And am I understanding that correctly when the red line

25   goes up, that means a purchase of shares?

H3L3WAL1                    Carocci - cross

1    A.  It should be an addition to his holdings, a purchase, yes.

2    Q.  It is occurring at the time that the stock price had fallen

3    from its high or a few days earlier?

4    A.  That's what it appears from the chart, yes.

5    Q.  And this for 2009, you did not make a chart reflecting

6    public announcements from the company, like the other charts

7    you made.  2009 you don't have one?

8    A.  Right.

9    Q.  But I think we looked at an exhibit in evidence yesterday,

10   not with you, but it was marked yesterday Government Exhibit

11   703-O.  And this -- just show the witness what that is.

12        You see that is June 15, it is a few lines down the

13   date.  June 15 press release relating to the Dean Foods

14   acquisition of a company called Alpro?

15   A.  Yes.

16   Q.  I think there was testimony yesterday.  It may not be clear

17   this is 2009.  Okay?

18   A.  Okay.

19   Q.  So this is happening on June 15, 2009.

20        If we can go back to 2003.  GX 2003.  So, on that

21   June 15 announcement of the acquisition of Alpro, would have

22   happened on June 15 somewhere in this time period.  Right?

23   A.  Right.

24   Q.  And we'll look at your data in a second, but do you know

25   whether the share price of Dean Foods increased or decreased

H3L3WAL1                          Carocci - cross

1    when the company announced the acquisition of Alpro a few weeks

2    after Mr. Walters purchased stock?

3    A.   On that day, I don't know if it increased or decreased.

4    Q.   So let's look at Government Exhibit 1739.  And we'll look

5    at the June time period.  And you see that the announcement of

6    Alpro in the morning of June 15, that the stock price of Dean

7    Foods actually closed lower that day, 10 -- sorry.  18.56 the

8    day, $18 on the 15th.

9    A.   Yes.

10   Q.   So the announcement of Alpro -- well.  On the day that the

11   Alpro announcement was made, a few weeks after Mr. Walters

12   bought stock, the price of Dean Foods declined.

13   A.   Was the announcement made before the market opened or

14   after?

15   Q.   Let's go back to the 703-O and see if it has a time.  So

16   you see that the line above the date, it says "Dean Foods will

17   host a conference call at 9 a.m. Eastern Time today."

18   A.   Okay.

19   Q.   Does that lead you to believe that the announcement was

20   made before that?

21   A.   Yes, it does.

22   Q.   So on the day this was announced, the price of Dean Foods

23   stock went down?

24   A.   Yes.

25   Q.   Which would be bad for someone who had a few weeks earlier

H3L3WAL1                        Carocci - cross

1    purchased Dean Foods stock?

2    A.  Right.  Their shares would be less valuable.

3    Q.  Let's go forward, let's talk about May 2010, you have a

4    chart Government Exhibit 2006.  So, this chart shows that

5    Mr. Walters purchased shares initially in April, and then he

6    sold those shares about 1.5 million in total a few weeks later,

7    right?

8    A.  Yes.

9    Q.  And it's not indicated on the chart, but let me just ask

10   you, that was a loser, right?

11   A.  You mean, when he was buying -- yeah, it appears to be he

12   was buying the stock at a certain price range and the initial

13   sale seems to be lower.

14   Q.  So that's another way of saying he lost money.  He bought

15   it high and he sold lower.

16   A.  Just for those two transactions, yes.

17   Q.  For those two transactions, right.  And he made very big,

18   conspicuous purchases that you didn't have any trouble finding

19   on the blue sheets, right?

20   A.  Right.

21   Q.  There are you said I think yesterday, there are times when

22   people can buy in multiple accounts and you can't tell whether

23   it's all the same person, right?

24   A.  Right.  Right.  I couldn't tell just from the blue sheet

25   data if it was -- how they could have been related.

H3L3WAL1                        Carocci - cross

1    Q.  But, so if somebody could buy in 10 or 15 different

2    accounts that you wouldn't know were related, and you would not

3    be able to tell whether that one person was the biggest

4    purchaser that day?

5    A.  Aggregate purchaser that day.  Aggregate, yes.

6    Q.  But you didn't have that problem with Mr. Walters, because

7    his trades were either in his Walters Group account or his

8    Nature Development account?

9    A.  Right.  The account -- I knew information about him, he was

10   the sole authorized trader on the account, the account

11   statements were going to the same address in Las Vegas.  There

12   are reasons I could put those together, where with other people

13   trading stock that day I could not.

14   Q.  So it was not hard for you to find those trades when you

15   went through the blue sheets?

16   A.  No, it was not.

17   Q.  Right.  And you were easily able to see that Mr. Walters

18   makes very large purchases accounting for a high percentage of

19   the total market volume?

20   A.  Yes.

21   Q.  There is no rule against doing that?

22   A.  No, no rule.

23   Q.  One of the things that this shows is that Mr. Walters sold

24   those shares at a loss on I think that's May 3 and May 4,

25   right?

H3L3WAL1                          Carocci - cross

1   A.  Yes.

2   Q.  And again, very high conspicuous percentage of the daily

3   volume, right?

4   A.  Yes.

5   Q.  But your chart I think you identified for Mr. Goldman the

6   dates on the chart on the bottom are trading days, right?

7   Dates when the market is open for trading?

8   A.  Yes, that's correct.

9   Q.  So you skip the weekends, but you keep the trading days?

10  A.  Yes.

11  Q.  So you can see from your chart that May 5, 6 and 7th were

12  trading days.

13  A.  May 6th and 7th, yes.

14  Q.  And the 5th, right?

15  A.  And the 5th, yes.

16  Q.  And those are trading days before the May 10 announcement,

17  right?

18  A.  Yes.

19  Q.  And so, if Mr. Walters had sold the same amount of stock,

20  1.5 million shares, but spread it over five days -- we're

21  losing the screen here.  But if he sold the same amount of

22  stock, instead of selling it on two days and taking up a large

23  percentage of the total market volume, if he had spread it over

24  five days, it would be a lower percentage each day.

25  A.  Yes.

H3L3WAL1                         Carocci - cross

1    Q.  And it might not necessarily be the largest percentage on

2    any particular day?

3    A.  It might not have.

4    Q.  Right.  And I think you've talked yesterday that

5    Mr. Walters bought some or wrote some call options in this

6    period.  Do you remember that?

7    A.  Yes.

8    Q.  So he wrote some call options, you were describing to the

9    jury, after the May 10th earnings announcement, right?

10   A.  Yes.  I believe the date of the options were May 11, I

11   believe the next day.

12   Q.  And the call options are basically he would have made money

13   if the stock price had gone down?

14   A.  I believe the stock price was $10 per share, so it would

15   have been unexercised.

16   Q.  But if the stock price doesn't go below $10, then writing

17   call options with a strike price of $10 is a loser, right?

18   A.  No.  You still get a premium for writing the option.

19   Q.  But he would have economically profited more if the price

20   had gone below $10?

21   A.  Well, he wouldn't have had to sell the shares at $10 per

22   share because they were assigned to cover the option.  He would

23   have still kept his premium.

24   Q.  So the way the option works is you write the option and you

25   get the premium.  But if the share price goes down, and the

H3L3WAL1                        Carocci - cross

1    other party exercised the option, then you got to sell the

2    shares?

3    A.   Well, the share price goes down, you wouldn't -- they

4    wouldn't exercise the option.

5    Q.   So if it goes down, they're not going to exercise the

6    option because it's not in the money, essentially?

7    A.   Then you get to keep your shares.

8    Q.   And the premium?

9    A.   And the premium.

10   Q.   But if the price goes up, then the other side will exercise

11   the option, you get the premium, but you got to give up your

12   shares, right?

13   A.   Right.  Not for nothing.  For $10 per share.

14   Q.   Right.  But if the trading price is higher than $10 a

15   share, that's actually a bad deal?

16   A.   Right, because you're selling it for lower than it's

17   trading at.

18   Q.   Right.  So, my point is the options that Mr. Walters wrote

19   after the May 10 announcement would have been a better bet if

20   it turned out that the stock price had gone down, then he would

21   have kept the premium and kept the shares?

22   A.   He would have kept the premium and the shares if the stock

23   price went down.  It went up, so he just kept the premium.

24   Q.   Right.  But writing an option with a $10 strike price is

25   basically a bet that the stock price is going to go down.  You

1   do better if the price goes down.

2   A.   Yes.

3   Q.   And that's not what happened here?

4   A.   That is not what happened.

5   Q.   But you see the stock price did go down before he bought

6   the options or wrote the options, so on May 10 the price

7   dropped?

8   A.   It did.

9   Q.   So if he had written options on the 10th, where the option

10  was structured that he would benefit if the price went down,

11  that would have been a better bet?

12  A.   You mean prior to the 10th?

13  Q.   That's right.

14  A.   Right.

15  Q.   There are ways to profit in the stock market if you are

16  expecting the price of a share to go down, right?

17  A.   Yes.

18  Q.   You could short the stock?

19  A.   Correct.

20  Q.   And shorting a stock -- tell the jury what shorting is.

21  A.   Well, it's just selling stock you basically don't own, you

22  borrow the stock and you sell it, you receive the price for

23  selling it, but you have to then buy the stock back at a future

24  point.

25  Q.   So you sell it first, then you buy it later?

H3L3WAL1                        Carocci - cross

1    A.   Correct.  It's -- you're right, it is to take advantage of

2    stock declines.

3    Q.   So if Mr. Walters had sold Dean Foods short before May 10,

4    and bought it back after May 10, that would have been

5    profitable?

6    A.   Yes.

7    Q.   But he didn't do that?

8    A.   He did not.

9    Q.   And he didn't write call options before the 10th that would

10   have profited from the price going down.  He wrote them after

11   the 10th, and where the price didn't go down after that?

12   A.   Right.

13   Q.   Let's go to the next one, November 2010 period which I

14   think is Government Exhibit 2007.  This is another chart that

15   you prepared?

16   A.   Yes.

17   Q.   And again, you see that Mr. Walters is buying stock

18   represented by the green bars in October, and then he sells

19   later in October.  You see that?

20   A.   Yes, I do.

21   Q.   And can you see that the price had moved down slightly from

22   when he bought to when he sold?  The blue line's going down a

23   little bit?

24   A.   Slightly, I agree.

25   Q.   So, basically, he again paid a little more for the shares

H3L3WAL1                          Carocci - cross

1   than he got when he sold?

2   A.  Yes.

3   Q.  A losing trade?

4   A.  Yes.

5   Q.  Again, Mr. Walters is a very large and conspicuous buyer in

6   the market representing on some days the largest purchaser or

7   seller?

8   A.  Yes.

9   Q.  As far as you could see, because you can't tell whether

10  somebody else had broken up their trades into little small

11  trades, but it's really the same person.

12  A.  Again, it's not aggregate.  It is the largest single

13  transaction.

14  Q.  Right.  This is all one single transaction, but you can't

15  tell if somebody else had decided to break up their transaction

16  among a dozen accounts, you wouldn't be able to tell if that's

17  the same person?

18  A.  Right.

19  Q.  But you didn't have that problem with Mr. Walters' trades,

20  because they were just one big trade?

21  A.  Correct.

22  Q.  Again, you see that those big trades, for example, the

23  sales that occur I think it's on October 21 and 22, are well in

24  advance of the earnings announcement on November 9?

25  A.  Yes.

H3L3WAL1                    Carocci - cross

1   Q.  So, looks like maybe there is about 10, 10 or so trading

2   days before the November 9 announcement after Mr. Walters sells

3   on the 22nd?

4   A.  Yes.

5   Q.  And again, if Mr. Walters had spread his sales over those

6   10 days, if he sold the same amount, it would be a smaller

7   percentage of the total market volume each day?

8   A.  Yes.

9   Q.  You see the price of the stock actually just ticked up a

10  little bit starting around the 27th of October?

11  A.  Yeah, it appears to tick up a little bit.

12  Q.  If Mr. Walters had spread his sales over a longer period

13  with smaller volume each day and had spread it into that

14  period, he would have done a little better?

15          MR. GOLDMAN:  Your Honor, this is pure speculation.

16  Given the nature of his trading, we don't know what the stock

17  price would have been.

18          MR. SCHOEMAN:  Just as a mathematical exercise, if you

19  calculate the percentage of the total market volume, if you

20  spread the trades over more days, it is a lower percentage each

21  day.

22          THE COURT:  Put a new question to the witness.

23  Q.  Just as a matter of math, Mr. Carocci, what you were doing

24  was calculating the amount of the total market volume on the

25  day, right?

H3L3WAL1                    Carocci - cross

1    A.  Right.

2    Q.  But not on, say, percentage of the volume on a week.

3    A.  Right.

4    Q.  Or --

5            THE COURT:  Next question.

6            MR. SCHOEMAN:  Okay.

7    Q.  And let's go back to the October 4, 2010 picture, what

8    we're looking at here.  You show that Mr. Walters was

9    14 percent of the total market volume.  Do you see that?

10   A.  Yes.

11   Q.  And again, you didn't show on the chart what the total

12   market volume is, but you could either do the math of

13   14 percent or we could look at your spreadsheet, right?

14   A.  Right.

15   Q.  Let's look at the spreadsheet, Government Exhibit 1739.

16   Just for the -- yeah, that period.  So, the purchase of

17   Mr. Walters was on October 4.  Do you remember that?

18   A.  Yes.

19   Q.  And the volume had more than doubled from the previous

20   trading day?

21   A.  Yes.

22   Q.  And I think Mr. Walters' purchases on the 4th was about

23   858,000 shares.  We can go back to the previous exhibit.  So

24   you could see that.

25           You see on 2007 Mr. Walters, Government Exhibit 2007,

H3L3WAL1                        Carocci - cross

1   the October 4 one is about 850,000.  Does that look right?

2   A.  It does, yes.

3   Q.  And just back to 1739, so the increase between the 1st and

4   the 4th, Mr. Walters was responsible for about 858,000 shares?

5   A.  Yes.  His volume on the 4th.

6   Q.  But of that total increase of about 3.3 million, the rest

7   of it was other people?

8   A.  The -- besides his 850,000, yes.

9   Q.  But his 850,000 does not account for the total amount of

10  the increase from 2.7 million to six million?

11  A.  Right.

12  Q.  And let's go back to Government Exhibit -- to create these

13  exhibits, you reviewed Mr. Walters' trading records, right?

14  A.  The account statements.

15  Q.  Account statements.  And what you put on this chart was the

16  trading in Dean Foods?

17  A.  Right.  His trading in Dean Foods, right.

18  Q.  That's right.  And let's look at Government Exhibit 104-J,

19  please.  So for example, this is in evidence by stipulation.

20  The Walters Group account record for the October 2010 time

21  period.  You see that?

22  A.  Yes.

23  Q.  I think if we're looking at page eight of this statement.

24  There you see the purchases of Dean Foods that are reflected on

25  your chart, the ones in early October, you see that.

H3L3WAL1                          Carocci - cross

1    A.  Yes.

2    Q.  Totaling $15,871,000?

3    A.  Yes, yes.

4    Q.  Page eight.  You see those are sales that happened on

5    October 4, 5, 6 and 7?

6    A.  Yes.

7    Q.  Let's look at the previous page of the statement.  And if

8    we look at the entries on October 4.  Just the first two lines

9    there.

10            You see that the statement shows on October 4

11   Mr. Walters also made two big sales of stock.  Do you see that?

12   A.  Yes.

13   Q.  And if you add those two together, how much is it?

14   A.  Looks like 275,000 shares.

15   Q.  I'm sorry, the dollars.

16   A.  Oh.  15.7 million, 15.8 million.

17   Q.  15.8 million?

18            MR. SCHOEMAN:  And Mr. McLeod, if we go back to the

19   next page.

20   Q.  Do you recall that Mr. Walters, starting on the 4th, bought

21   15.871 million of Dean Foods?

22   A.  Yes.

23   Q.  So in creating your charts, and showing the purchases of

24   Dean Foods, after discussing it with the government, you did

25   not include on the charts other activity for Mr. Walters'

H3L3WAL1                        Carocci - cross

1   account?

2   A.   For other stocks, no.

3   Q.   Right.  Even on the same days as Mr. Walters was buying

4   Dean Foods?

5   A.   Right.

6            THE COURT:  Mr. Schoeman, do you have much longer?

7            MR. SCHOEMAN:  About 10 minutes, Judge.

8            THE COURT:  Thank you.

9   Q.   Let's go back -- we'll stay with this exhibit.  Government

10  Exhibit 104-J if we can look at page nine.  And these brokerage

11  statements are handy, they show on the bottom when you buy and

12  sell in the same month, whether there was a gain and a loss, so

13  if we can expand the bottom.

14           Do you see that, sir?

15  A.   Yes.

16  Q.   And you see it shows the date that Mr. Walters acquired

17  Dean Foods shares in October and the date that he sold them,

18  the proceeds, and the gain and the loss.  Right?

19  A.   Yes.

20  Q.   And you see that each of those transactions in October

21  resulted in losing money?

22  A.   Yes.

23  Q.   Let's fast forward to May 9, 2012.  Government Exhibit

24  2010.  So May 9 is the -- May 8 I think is the first green bar

25  and May 9 is the second green bar.  Is that right?

H3L3WAL1                              Carocci - cross

1    A.   Yes.

2    Q.   And the increase in the stock price was on the 9th

3    following the earnings announcement?

4    A.   Yes.

5    Q.   And in preparing for your testimony today, you did not make

6    a chart of showing the volume in the market on these days?

7    A.   Right, that's correct.

8    Q.   If we can look back at Government Exhibit 1739, the

9    spreadsheet, we can see what it was, right?

10   A.   Yes.

11   Q.   And on there, so Mr. Walters bought on the 8th and on the

12   9th.  Do you see that?

13   A.   Yes.

14   Q.   But the volume on the 8th was more than 250 percent of the

15   volume on the 7th, right?

16   A.   It was a little more than double.  I don't know about the

17   percentages.

18   Q.   If you double, it is five million and then you got --

19   A.   1.4.  I don't know about percentages, but it's more than

20   double.

21   Q.   Yeah.  And the announcement was not until the 9th, right?

22   A.   Right.

23   Q.   So on the day before there was a public announcement, the

24   volume in the stock more than doubled, right?

25   A.   Yes.

H3L3WAL1                          Carocci - cross

1    Q.  Do you know why?

2    A.  I do not.

3    Q.  And of that volume that doubled from -- more than doubled,

4    Mr. Walters is only 800,000 of those shares, right?

5    A.  Right.

6    Q.  So somebody else accounts for the rest of that buying on

7    the 8th?

8    A.  Right.  Right.  Everybody else that bought or sold on that

9    day would account for that remaining volume.

10   Q.  Right.  But -- all right.

11          Let's go back to Government Exhibit 2010.  And you see

12   that the next time Mr. Walters is buying, which is in July, the

13   stock price is in free fall?

14   A.  It's falling.

15   Q.  Falling, yeah.  Here.  Right?  It's going down.

16   A.  Right.

17   Q.  And Mr. Walters is making very large purchases, right?

18   A.  Yes.

19   Q.  And in preparing for your testimony today, and meeting with

20   government, you did not make a chart showing any other activity

21   going on in the market in that time period.

22   A.  Yeah, I think 2011 shows that time period.  Doesn't it?

23   Q.  All right.  Let's look at 2011.

24   A.  Isn't that what you meant?

25   Q.  No, I meant you showed the earnings announcements, right?

H3L3WAL1                          Carocci - cross

1    A.  Right.

2    Q.  And you show the movement of the stock price?

3    A.  Correct.

4    Q.  That's what you and the government decided to put on these

5    charts?

6    A.  Yes.

7    Q.  But you didn't put anything else on the charts on other

8    days that Mr. Walters is buying?

9    A.  That Mr. Walters what?

10   Q.  Was buying the stock.

11   A.  Correct.

12   Q.  Okay.  Let's go to February 2013.  Which is, I'm sorry,

13   Government Exhibit 2013.  This is another one of your exhibits,

14   right?

15   A.  Yes.

16   Q.  And you see that there is a sale that you marked there on

17   February 1st of a million shares?

18   A.  Yes.

19   Q.  And the million shares was a piece of Mr. Walters' total

20   holdings, right?

21   A.  Yes.

22   Q.  I think you testified yesterday that he had about 5.4

23   million shares at that time?

24   A.  Yes.

25   Q.  And to show 5.4 million shares on this chart, you'd have to

H3L3WAL1                          Carocci - cross

1   go off the roof of the chart, right?

2   A.  Right.

3           MR. SCHOEMAN:  So Mr. McLeod, can we shrink that?

4   Q.  So if we were going to depict on the chart the total

5   holdings that Mr. Walters had at that time of about 5.4 million

6   shares, would go up like this and about like that.  Right?

7   A.  Well, you only have 4.4 million.

8   Q.  Right, but the total he held on that day was 5.4 million.

9   A.  At the start of that day.

10  Q.  That's right.

11  A.  Yes.

12  Q.  And he only sold a million.

13  A.  Right.

14  Q.  But he kept 4.3 or four million?

15  A.  Right.

16  Q.  Okay.  And then let's see that full size again.  Just to

17  explain, Mr. Walters sold a million shares and you see on

18  May 23, you talked about this yesterday, the WhiteWave

19  distribution.

20  A.  Yes.

21  Q.  So what happened on that day is not a calamitous fall in

22  the price of the stock.  There was a distribution made, right?

23  A.  Correct.

24  Q.  So that the holders of the stock now held the stock plus

25  certain amount of shares in WhiteWave?

H3L3WAL1                         Carocci - cross

1    A.  Right.

2    Q.  And that had been announced that that was going to happen

3    to holders of record on that date in advance, right?

4    A.  Yes.

5    Q.  So, if Mr. Walters had held his million shares that he sold

6    on the 1st, if he had held them on the 23rd, he would have

7    captured the price of Dean Foods stock, plus the value of the

8    WhiteWave shares?

9    A.  Right.  He would have had additional WhiteWave shares.

10   Q.  Right.  Do you see that the sale of the million shares on

11   February 1st was for about -- I think it was about $18.30, more

12   or less?

13   A.  Looks about right.

14   Q.  So he got, rough numbers, about $18.3 million for selling a

15   million shares?

16   A.  Okay.

17   Q.  If he had not sold those shares and he kept them until

18   here, the price of Dean Foods stock was above $20?

19   A.  Yes, it was.

20   Q.  In fact, if Mr. Walters had held those million shares, they

21   would have been worth almost $2 million more on the day of the

22   distribution.

23   A.  Yes.

24   Q.  That was a bad sale?

25   A.  It was --

H3L3WAL1                          Carocci - cross

1    Q.   A bad time to sell.

2    A.   Well, he sold at a lower price than he could have in the

3    future.   Yeah, bad.

4               MR. SCHOEMAN:   No further questions.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  All right.  Any redirect?

2            MR. GOLDMAN:  Yes, your Honor.  Thank you.

3   REDIRECT EXAMINATION

4   BY MR. GOLDMAN:

5   Q.  Good morning, Mr. Carocci.

6   A.  Good morning.

7   Q.  On cross-examination you were asked some questions, both at

8   the very beginning yesterday of your cross-examination and just

9   at the end, about the scale of your charts.  Do you recall

10  those?

11  A.  Yes.

12  Q.  OK.  If we could pull up -- is there any way to get rid of

13  this blue?  Clear.  If we could pull up Government Exhibit

14  2000, please.

15          Remind the jury what this chart is.

16  A.  It's Mr. Walters' holdings for the year 2008 and the Dean

17  Foods closing stock price on a daily basis.

18  Q.  And you remember -- I'm going to try to use this as well.

19  You remember Mr. Schoman was focused in on the 8 million shares

20  on the scale there?

21  A.  Yes.

22  Q.  He asked you a whole bunch of questions and drew a lot of

23  lines about if that scale were any different; do you remember

24  that?

25  A.  Yes.

H3ldwal2                      Carocci - redirect

1    Q.  OK.  If I could now show you Government Exhibit 2003.  What

2    is this?

3    A.  This is Mr. Walters' holings in the Dean Foods stock price

4    for the year 2009, so the next year.

5    Q.  And this is the same scale that you used for the year 2008,

6    is that right?

7    A.  Yes.  The left axis goes from zero to 8 million, and the

8    right axis goes from zero dollars to $30.

9    Q.  Let's go to Government Exhibit 2004.

10          The same chart for 2010, the year 2010, right?

11   A.  Correct.  Mr. Walters's holdings and the Dean Foods stock

12   price.

13   Q.  And the same scale?

14   A.  The same scale.

15   Q.  I could show you several other exhibits, but isn't it true

16   that for every chart related to Mr. Walters' holdings and stock

17   price by year, you used the same scale?

18   A.  Yes.  We were consistent by scale.

19   Q.  And if I could go to, I think, Government Exhibit 2011,

20   which was the last one that Mr. Schoman -- sorry, it's -- give

21   me one moment here.  Perhaps it was 2012.  I'm sorry, 2010.

22          2010.  This is one example of a number of similar

23   types of charts that measure Mr. Walters' trading purchases and

24   sales in relation to the stock price, is that right?

25   A.  Yes.

H3ldwal2                          Carocci - redirect

1    Q.  OK.  And up here I think Mr. Schoman used a different one,

2    but this is the volume of Mr. Walters' purchases or sales, is

3    that right, 2,500,000?

4    A.  Correct.

5    Q.  And just so we don't go through all of these, I think the

6    point is that if you can make this point:  Did you use the same

7    scale for all of the charts that measured Mr. Walters'

8    purchases and sales?

9    A.  Yes.  They were all consistent.

10            MR. GOLDMAN:  We can take that down.  Thank you.

11   Q.  I'd like to pull up Government Exhibit 2002.

12            And you were asked a number of -- well, let's first,

13   sorry, go to 2001.

14            You were asked a number of questions on -- about this

15   exhibit.  Do you recall some of those?

16   A.  Yes.

17   Q.  And I think Mr. Schoman was pointing out that the line of

18   the August 6, 2008 earnings announcement may have been slightly

19   misplaced, is that right?

20   A.  Yes.

21   Q.  At this point, did Mr. Walters own any stock of Dean Foods?

22            If you would like, we can go back to Government

23   Exhibit 2000.

24   A.  Right.  Going back to Government Exhibit 2000, it appears

25   he did not own any Dean Foods stock at that time.

H3ldwal2                           Carocci - redirect

1   Q.   OK.   Mr. Schoman spent a fair amount of time discussing

2   with you the February 2008 purchases, February 25th through

3   28th.   Do you recall those, these ones down here?

4   A.   Yes.

5   Q.   OK.   And those purchases occurred right leading up to the

6   February 29th announcement, is that right, that he showed you?

7   A.   Yes.

8   Q.   That announcement of an equity offering by Dean Foods?

9   A.   I'm trying to recall it.   Yes.

10  Q.   OK.

11  A.   I --

12  Q.   So is it possible -- well, let me just take a step back.

13          In doing all of these in your charts, you are unable

14  to determine why Mr. Walters made a trade, is that right?

15  A.   Correct.

16  Q.   You just looked at the brokerage accounts and saw what he

17  did?

18  A.   I just looked at the brokerage accounts, whether there is a

19  trade on the chart.

20  Q.   And you are unable to determine why he bought the stock,

21  right?

22  A.   Right.

23  Q.   And you are unable to determine why he decided to sell his

24  stock at a particular time?

25  A.   That's correct.

H3ldwal2                        Carocci - redirect

1    Q.  If we could pull up 2001 again.

2              Now, the November trades here, where you looked at --

3    you were asked a bunch of questions about the trade and the

4    volumes of trading in that way; do you recall that?

5    A.  Yes.

6    Q.  And I believe you testified on direct, but can you remind

7    the jury what "trading volume" means?  There needs to be both a

8    buyer and a seller, right?

9    A.  Correct.

10   Q.  And these purchases, did they occur before or after that

11   November 4, 2008 announcement?

12   A.  I believe they occurred after, after the announcement.

13   Q.  And I believe that you testified that his

14   November 5th purchase was about 10 percent of the daily trading

15   volume?

16   A.  Yes.

17   Q.  That's a significant percentage of the daily trading

18   volume, right?

19             MR. SCHOMAN:  Objection.

20             THE COURT:  Basis?

21             MR. SCHOMAN:  Characterization.

22             THE COURT:  Overruled.

23   A.  Yes, for one individual.

24   Q.  And if we could go to Government Exhibit 2002.

25             And you were asked a number of questions about his

H3ldwal2                        Carocci - redirect

1    purchases on June 19th, June 20th and June 23rd.  Do you

2    remember those?

3    A.  Yes.

4    Q.  And those were -- that was about 4 million shares that he

5    purchased, right?

6    A.  Yes.

7    Q.  And those purchases were before the June 25, 2008 press

8    release, isn't that right?

9    A.  Yes.

10   Q.  OK.  And then he sold approximately 2 million shares

11   immediately after that press release was announced?

12   A.  Yes.

13   Q.  And after the stock had gone up, is that right?

14   A.  Yes.

15   Q.  OK.  If I could quickly go to Government Exhibit 2009.  And

16   we could zoom in -- well, I'll just ask you this question.

17            From the early part of the year, the stock starts here

18   and goes to about there, is that right?

19   A.  Yes.

20   Q.  OK.  That's a stock that is increasing, is that correct?

21   A.  It looks like it's gradually increasing.

22   Q.  And then Mr. Walters buys on May 8th, right?

23   A.  Yes.

24   Q.  Now, if I could go through to Government Exhibit 2006.

25            Do you remember, Mr. Schoman asked you a few questions

H3ldwal2                        Carocci - redirect

1   about this chart?

2   A.  Yes.

3   Q.  And I think he asked you that that the 1.5 million -- well,

4   do you see that he purchased 1.5 million shares of Dean Foods

5   on April 12th and April 14th, is that right?

6   A.  Yes.

7   Q.  And then he sold those 1.5 million shares on May 3rd and

8   May 4th, is that right?

9   A.  Yes.

10  Q.  And I believe Mr. Schoman characterized that sale as a

11  total loser; do you remember that?

12  A.  Yes.

13  Q.  OK.  And how many days before the May 10th earnings

14  announcement was the last of his two sales on May 4th?

15  A.  So it was approximately six days but, you know, it only

16  looks like just three trading days.

17  Q.  And what did the stock do after that May 10th announcement?

18  A.  It sharply declined from, you know, 15/$16 a share to 10.

19  Q.  So that's about --

20  A.  Below 10.

21  Q.  So that's about a third of its value, right?

22  A.  Yes.

23  Q.  And on the same day that the stock declined that much, what

24  did Mr. Walters to?

25  A.  Well, he buys back 1 million of the 1.5 million that he

1   sold on May 3rd, May 3rd and 4th.

2   Q.  And now on May 14th, what does he do?

3   A.  He buys the remaining 500,000 of the 1.5 million that he

4   sold on May 3rd and 4th.  So, he rebuys the 1.5 million shares

5   at a lower price.

6   Q.  And then if we go to Government Exhibit 2007.

7           I think you were also asked about the success or

8   failure of the sales on October 21st and 22nd, is that right,

9   those sales relative to the purchases about two weeks earlier?

10  A.  Yes.

11  Q.  OK.  And that the stock looked like it was down a little

12  bit from when he purchased those?

13  A.  Yes.

14  Q.  And, similarly, the November 9th announcement, what

15  happened to the stock after that announcement?

16  A.  It declines.

17  Q.  And what does Mr. Walters do after it declines?

18  A.  He repurchases 1 million shares of the 1.5 million he sold

19  on the 21st and 22nd.

20  Q.  OK.  Then, finally, let's go back to Government Exhibit

21  2003, if we could.

22          And you were asked some questions about this little

23  blip here, is that right?

24  A.  Yes.

25  Q.  And you were shown that he made a purchase of I believe

H3ldwal2                        Carocci - redirect

1   300,000 shares on February 10th, is that right?

2   A.  Yes.

3           MR. GOLDMAN:  Your Honor, at this point the government

4   offers 703B, which I don't believe is in evidence.  It is a

5   press release of Dean Foods.

6           MR. SCHOMAN:  May I see it for a second?

7           MR. GOLDMAN:  Can we pull up 703B just for the

8   witness?

9           (Pause)

10          MR. SCHOMAN:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 703B received in evidence)

13          MR. GOLDMAN:  If we can publish this for Mr. Carocci.

14  Q.  Do you see what this is, Mr. Carocci?

15  A.  Yes.

16  Q.  What is the headline of this press release?

17  A.  "Dean Foods posts highest adjusted quarterly operating

18  income in its history."

19  Q.  And what is the date?

20  A.  The date is February 11, 2009.

21  Q.  And typically when does Dean Foods release its press

22  releases?  Before the market opened or after?

23  A.  Before, before the market opens.

24  Q.  So this would have been before the market opened on

25  February 11th, is that right?

H3ldwal2                              Carocci - redirect

1   A.  That's generally when they released the press releases,

2   yes.

3              MR. GOLDMAN:  OK.  And, Ms. Pyun, can I pull up

4   Government Exhibit 103B, page 13, please.  And if you could

5   highlight "The Securities Purchased."

6   Q.  And on February 10th, Mr. Walters purchases 300,000 shares

7   of Dean Foods at a price of $18.29.  Do you see that?

8   A.  Yes.  He purchased them during the day on the 10th.

9   Q.  OK.  And that's the day before that press release is issued

10  about the earnings announcement, the positive earnings

11  announcement?

12  A.  It is the day before the press release.

13             MR. GOLDMAN:  If we could go to page 12, please.  And

14  if we could highlight the activity detail for securities -- if

15  we could blow up "Securities Sold and Redeemed," Ms. Pyun.  If

16  you could highlight the "Dean Foods trade" in the middle on

17  2/11.

18  Q.  What does he do with those 300,000 shares the day after --

19  the trading day of that press release?

20  A.  He sells those 300,000 shares for $19 and approximately 53

21  cents.

22  Q.  So that was a tidy dollar-30 increase in the stock price in

23  one day, is that right?

24  A.  Yes.

25             MR. GOLDMAN:  One moment, your Honor.

H3ldwal2

1              (Pause)

2              No further questions.

3              THE COURT:  All right.  You may step down, sir.

4              (Witness excused)

5              THE COURT:  Ladies and gentlemen, we will take our

6    mid-morning break.  Please do not discuss the case among

7    yourselves or with anyone else.  Have a pleasant break, and

8    we'll be back in action in ten minutes, thank you, with the

9    next witness.

10             THE WITNESS:  Thank you, your Honor.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3ldwal2

1                (Jury not present)

2                THE COURT:  Briefly, I received a note, which has been

3    marked as Court Exhibit 4, from Juror No. 14:

4                "Good morning, your Honor.  My boss would like to know

5    if there will be any days or times during the course of the

6    trial when I am not needed at court or when court will not be

7    in session.  This information will help her to plan my work

8    responsibilities to prepare dinner for Passover.  Thanks in

9    advance.  Juror No. 14."

10               I propose to advise -- I don't know that this is a

11   hundred percent responsive, but I propose to advise that we

12   will not be sitting this Friday.  And that's where we are as of

13   now.  OK?

14               MR. BERKE:  Yes, your Honor.

15               THE COURT:  Have a good break.

16               MR. BERKE:  Thank you, your Honor.

17               THE COURT:  I'll see you in ten minutes.

18               (Recess)

19               THE COURT:  Please remain standing.  We are going to

20   bring our jurors in.

21               (Continued on next page)

22

23

24

25

H3ldwal2                          Davis - direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Ms. Cucinella, the government may call its next

4    witness.

5              MS. CUCINELLA:  The government calls Tom Davis.

6              THE COURT:  Please stand, sir.

7              THE CLERK:  Please stand and raise your right hand.

8    THOMAS C. DAVIS,

9         called as a witness by the government,

10        having been duly sworn, testified as follows:

11             THE CLERK:  Please be seated.

12             State your name.  Spell it for the record, please.

13             THE WITNESS:  It's Thomas C. Davis.

14             MS. CUCINELLA:  Your Honor, may I inquire?

15             THE COURT:  You may.

16   DIRECT EXAMINATION

17   BY MS. CUCINELLA:

18   Q.  Good morning, Mr. Davis.

19   A.  Good morning.

20   Q.  Can you hear me OK?

21   A.  I think so.

22   Q.  Mr. Davis, how old are you?

23   A.  68.

24   Q.  Are you currently employed?

25   A.  I'm not.

H3ldwal2                     Davis - direct

1    Q.   Until recently, what did you do for work?

2    A.   I was in the investment banking business.

3    Q.   When did you leave the investment banking business?

4    A.   I retired in late 2000, when my firm was sold.

5    Q.   After you left the investment banking business, what did

6    you do for work?

7    A.   I didn't -- I didn't actually do anything immediately.  I

8    took an office sharing arrangement with some friends of mine

9    who were running a fund at that time, and I eventually went on

10   a board or two after that.

11   Q.   When you say you went on a board, do you mean that you were

12   a director on the board of a public company?

13   A.   Yes.

14   Q.   Generally, what does it mean to be a director on a public

15   company board?

16   A.   The board of a public company is responsible for the

17   governance of that company and oversees the decisions,

18   represents the shareholders -- primarily represents the

19   shareholders of the company.

20             THE COURT:  All right.  Pause.

21             I am going to suggest the jurors in the top row, the

22   three to the right, move down one seat for better visibility.

23             How is that?  A little better?

24             OK.  You may proceed.

25             MS. CUCINELLA:  Thank you.

H3ldwal2                          Davis - direct

1    BY MS. CUCINELLA:

2    Q.  Mr. Davis, on approximately how many public boards have you

3    served?

4    A.  Six.

5    Q.  Was one of the positions you held on the board of Dean

6    Foods?

7    A.  Yes, it was.

8    Q.  For how long did you serve on the board of Dean Foods?

9    A.  Approximately 14 years.

10   Q.  What kind of information did you have access to through

11   your position on the board at Dean Foods?

12   A.  I had access to a lot of information -- operating

13   information, plans, projections, a variety of confidential

14   information.

15   Q.  Mr. Davis, did you commit any crimes in connection with

16   your role on the board of Dean Foods?

17   A.  Yes, I did.

18   Q.  What crime did you commit?

19   A.  I violated the insider trading laws.

20   Q.  Who did you commit that crime with?

21   A.  Billy Walters.

22   Q.  Do you see Mr. Walters in the courtroom today?

23   A.  I do, yes.

24   Q.  Will you identify him by an article of clothing he's

25   wearing?

H3ldwal2                         Davis - direct

1   A.  Gray suit, light gray suit.

2             THE COURT:  Which table?

3             THE WITNESS:  He's sitting the second row back.

4             THE COURT:  And how many seats in?

5             THE WITNESS:  I'm sorry?

6             THE COURT:  How many seats in?

7             THE WITNESS:  From the right, from my right, he's

8   sitting the third seat in.

9             THE COURT:  All right.  Identification noted.

10             You may continue.

11   BY MS. CUCINELLA:

12   Q.  Mr. Davis, for how long have you known Mr. Walters?

13   A.  I believe I met him in the mid-'90s.

14   Q.  I'm going to direct your attention to your screen where I'm

15   going to ask Ms. Meister to please pull up Government Exhibit

16   1, for identification.

17             Do you recognize the individual in this picture?

18   A.  Yes.

19   Q.  Who is he?

20   A.  That's Bill Walters.

21             MS. CUCINELLA:  The government offers Government

22   Exhibit 1.

23             MR. BERKE:  No objection, your Honor.

24             THE COURT:  Received.

25             (Government's Exhibit 1 received in evidence)

H3ldwal2                        Davis - direct

1                MS. CUCINELLA:  Ms. Meister, will you publish.

2      BY MS. CUCINELLA:

3      Q.  Mr. Davis, by what names do you know Billy Walters?

4      A.  Either Bill or Billy.

5      Q.  You testified that you committed insider trading with

6      Mr. Walters.  What specifically did you do?

7      A.  I gave him extensive information about Dean Foods,

8      nonpublic information about Dean Foods over a rather long

9      period of time.

10     Q.  Why did you provide that information to him?

11               (Pause)

12               For what purpose?

13     A.  I thought it would accrue to my benefit at some point in

14     time.  I think it started fairly innocently, and I provided him

15     some public and nonpublic information initially and it grew to

16     the point where I was a virtual conduit of a lot of nonpublic

17     information to him.

18     Q.  What did you expect him to do with the information you

19     provided to him?

20     A.  I expected him to trade in Dean Foods stock and make some

21     money.

22     Q.  You mentioned "information" a number of times.  What kind

23     of information did you provide to Mr. Walters?

24     A.  It was a variety of information, including projections

25     about earnings, projections about company plans, operating

H3ldwal2                     Davis - direct

1   plans, information about specific transactions that the company
2   was contemplating.  I provided him a lot of information.
3   Q.  What, if any, rules were there against doing that?
4   A.  There were some very specific rules against doing that.
5   Q.  Do board members have duties?
6   A.  Yes.  We had a fiduciary duty to the shareholders.
7   Q.  Mr. Davis, approximately how many times have you provided
8   Mr. Walters with confidential information about Dean Foods?
9   A.  I didn't keep track of it, frankly.  It was so many times I
10  can't count them, frankly.
11  Q.  Over how many years?
12  A.  At least over seven that I recall.
13  Q.  Sitting here today, do you remember all of the times that
14  you provided confidential information to Mr. Walters?
15  A.  No, I don't recall all the times.
16  Q.  Why not?
17  A.  Frankly, there were more times than I can actually recall.
18  So it wasn't one or two or three or four instances, it was
19  multiple instances.
20  Q.  You touched on this briefly, but why did you start
21  providing Mr. Walters with confidential information?
22  A.  It is somewhat of a long explanation.  I developed a
23  friendship with him after we got to know each other in the
24  mid-'90s.  We had a lot of common interests, including golf,
25  sports, gambling, some business interests that we both enjoyed

H3ldwal2                    Davis - direct

1   discussing, and I think I got to the point where I believed

2   that if I provided him some information that was useful to him,

3   that he could benefit from it, that it would eventually accrue

4   to my benefit somehow, whether it was through gambling tips or

5   business transactions that he might share with me.  I didn't --

6   it wasn't clear to me when I started this -- this process

7   exactly how I was going to benefit.  I just believed there

8   would be some benefit for me at the end of the day.

9   Q.  Did there come a time when the reason why you provided

10  Mr. Walters with information changed?

11  A.  Yes, it did.

12  Q.  How did it change?

13  A.  I borrowed money from him.  I became indebted to him.

14  Q.  How much money did you borrow from Mr. Walters?

15  A.  I had two different loans, one -- the first one was for

16  625,000.  The second one was for 350,000.

17  Q.  Just under a million dollars?

18  A.  Yes, that's correct.

19  Q.  You testified that after you borrowed the money from him,

20  you felt indebted.  Did the way that Mr. Walters acted toward

21  you change in any way?

22  A.  I sensed that it did, yes, somewhat.

23  Q.  In what way?

24  A.  He became more demanding of information.

25  Q.  How did you typically communicate confidential information

H3ldwal2                          Davis - direct

1    to Mr. Walters?

2    A.  By phone or sometimes face-to-face meetings.

3    Q.  Did you use your regular cell phone?

4    A.  I'm sorry?

5    Q.  Did you use your regular cell phone?

6    A.  I used my regular cell phone as well as another cell phone.

7    Q.  Can you explain what you mean when you say another cell

8    phone?

9    A.  Yes.  He provided me what's a so-called burner phone, and I

10   used the burner phone as well as my own cell phone.

11   Q.  How, if at all, did you and Mr. Walters refer to what you

12   described as the burner phone?

13   A.  We called it the bat phone.

14   Q.  When Mr. Walters gave you the bat phone, what, if anything,

15   did he tell you about how to communicate with him on that

16   phone?

17   A.  He was very specific the day he gave me the bat phone and

18   said that he would prefer if I used the bat phone when we

19   talked about Dean Foods and if he wanted to get in touch with

20   me, he would call me on my regular cell phone and leave me a

21   message that said let's go get a cup of coffee, and that was

22   the indication that I was supposed to call him back on the bat

23   phone.

24   Q.  Is that like a code?

25   A.  Yes.

H3ldwal2                          Davis - direct

1   Q.  Were there any other codes he asked you to use?

2   A.  He also asked me to refer to Dean Foods as the Dallas

3   Cowboys as we moved forward, and I did so.

4   Q.  Mr. Davis, did you in fact use the bat phone to provide

5   confidential information to Mr. Walters?

6   A.  Yes, I did.

7   Q.  Is there a period of time that you recall using the bat

8   phone frequently?

9   A.  Yes, there was.

10  Q.  When was that?

11  A.  Late 2011 and all of 2012.

12  Q.  What, if anything, do you remember about the type of

13  information that you provided to Mr. Walters over the bat phone

14  during 2012?

15  A.  I provided him a lot of detailed information about the Dean

16  Foods' spin-off that was -- that took place actually in 2012.

17  Q.  Mr. Davis, at a very high level, when you refer to the Dean

18  Foods spin-off, what are you talking about?

19  A.  We actually separated the company into two different

20  pieces, one called WhiteWave Foods and then the residual

21  remaining company was called Dean Foods, so that separation was

22  referred to as the spin-off.

23  Q.  What type of information did you provide to Mr. Walters

24  during 2012 about the spin-off?

25  A.  I provided him extensive information about the timing of

H3ldwal2                        Davis - direct

1    the spin-off, the contemplated valuation for the spin-off,

2    about the timing of an IPO that took place later in 2012.  I

3    provided a lot of detail with regard to this transaction.

4    Q.  When you were providing him this information, did you have

5    an expectation of how, if at all, the spin-off would affect the

6    stock price of Dean Foods?

7    A.  Yes.

8    Q.  What was that expectation?

9    A.  I knew it was going to make the stock price go up,

10   considerably.

11   Q.  Mr. Davis, we're going to talk about all of that in greater

12   detail today, but, first, did there come a time that you

13   learned that you were being investigated by the FBI?

14   A.  Yes.

15   Q.  How did you learn that?

16   A.  They came to my house and interviewed me in May of 2014.

17              (Continued on next page)

18

19

20

21

22

23

24

25

H3L3WAL3                         Davis - direct

1   Q.  Can you tell the jury what happened when the FBI came to

2   your home?

3   A.  Yes.  They came to my home in the evening, and asked to

4   speak to me.  We went outside.  They asked me if I --

5            THE COURT:  Stop.  What do you mean by "they"?  Three

6   people, five people?

7            THE WITNESS:  I'm sorry.

8            THE COURT:  Four people?  Who?

9            THE WITNESS:  Sorry, your Honor.  It was two FBI

10  agents came to my home.

11           THE COURT:  Thank you.

12  A.  And they asked me if I knew Bill Walters, which I told them

13  I did, and they asked me how I knew him, what my relationship

14  was with him, and they asked me if I had provided him any

15  inside information with regard to Dean Foods.  They then told

16  me about a dozen or so transactions that Bill Walters had

17  engaged in, in buying Dean Foods over the course of a period

18  that was between May 2012 and August 2012.  They said did you

19  know that he made umpteen million dollars, I forgot what the

20  number was, 16 or 17 million dollars in this short period of

21  time.  And I said I did not know that.  And we had a fairly

22  short meeting, and they left my house after that.

23  Q.  Did they ask you whether you had provided inside

24  information to Mr. Walters?

25  A.  Yes, yes, they did.

H3L3WAL3                          Davis - direct

1    Q.  How did you respond?

2    A.  I denied it.

3    Q.  Did there come a time after that when you spoke to the FBI

4    again?

5    A.  I spoke to them the following day as I recall, I think they

6    came to my house on a Thursday evening, and I spoke to them

7    either Friday or Saturday following that Thursday.

8    Q.  What, if anything, did the FBI ask you if you were willing

9    to do?

10   A.  The agent from New York called me, and I had told him in

11   our earlier meeting that I had a meeting arranged to see

12   Mr. Walters in the following week.  And they asked me if I

13   would be willing to go have that meeting with him and wear a

14   wire.

15   Q.  How did you respond?

16   A.  I thought about it for a day, and I called the agent back

17   and said I was not willing to wear a wire.

18   Q.  Why weren't you willing to wear a wire?

19   A.  I really -- I'd already engaged counsel at that point in

20   time, and I think based upon the advice of counsel, I didn't

21   think it was something I should be doing.

22   Q.  Mr. Davis, what, if any, steps did you take in the days

23   after the FBI visited your home?

24   A.  Well, I engaged counsel and we talked about the interview.

25   And a day or so later after I engaged counsel, I disposed of

H3L3WAL3                          Davis - direct

1   the bat phone.

2   Q.   Before we get to the disposal of the bat phone, after you

3   engaged counsel, did you notify anyone else that the FBI had

4   visited your home?

5   A.   Yes.  I did.  I notified the legal counsel, in-house legal

6   counsel for Dean Foods, and disclosed it to her.

7   Q.   Okay.  Going back to what you just testified to.  You said

8   that you disposed of the bat phone.  What did you do?

9   A.   I took the bat phone and threw it in a creek near my home.

10  Q.   Why did you do that?

11  A.   I did not want it to be recovered at all.

12  Q.   Following the FBI's approach, did you come to learn that

13  you were also under investigation by the Securities and

14  Exchange Commission or the SEC?

15  A.   Yes, I did.

16  Q.   What did you do in response to learning about that

17  investigation?

18  A.   I -- I obviously provided them a lot of information, they

19  were subpoenaing me for a variety of information.  And then I

20  ultimately provided them a deposition.

21  Q.   What is a deposition?

22  A.   It's an interview that's under oath.

23  Q.   Did you prepare with counsel before you sat for your

24  deposition?

25  A.   Yes, I did.

H3L3WAL3                          Davis - direct

1    Q.  Do you recall when that deposition was?

2    A.  I believe it was in May of 2015, so it was about a year

3    after the FBI had been at my home.

4    Q.  I believe you testified before that that deposition was

5    under oath?

6    A.  Yes.

7    Q.  Were you honest during that deposition?

8    A.  Regrettably, I was not.

9    Q.  What did you lie about?

10   A.  I lied about providing Bill Walters inside information, I

11   lied about a number of things in that deposition.

12   Q.  Did you lie about anything that wasn't related to your

13   conduct with Mr. Walters?

14   A.  Yes, I think they also asked me about my involvement with a

15   charity that I was running at the time called Shelter Golf.

16   Q.  What did you lie about, about Shelter Golf?

17   A.  That I had misappropriated funds from the charity.

18   Q.  You didn't tell them that you had done that, is that right?

19   A.  I told them at the time -- I was trying to disguise the

20   misappropriation of funds.  They asked me about it, and I was

21   trying to disguise it.

22   Q.  Why did you lie?

23   A.  I was -- I used very poor judgment, and I was scared to

24   death that I'd made some horrible mistakes, and I was just

25   trying to cover it up.

H3L3WAL3                     Davis - direct

1    Q.  You said that you also told lies about the information you

2    provided to Mr. Walters.  Correct?

3    A.  Yes, I did.

4    Q.  Did you have a strategy for the deposition?

5    A.  I'm sorry?

6    Q.  Did you have a strategy going into the deposition?

7    A.  I think my strategy was, I recall the strategy was to try

8    to provide my innocence in this process, and to try to deflect

9    a lot of the issues that they were raising in this deposition.

10           THE COURT:  What does that mean, "deflect"?

11           THE WITNESS:  Your Honor, I was just trying to dodge a

12   lot of the issues that they were raising with me.  I think

13   that's a better way to put it.

14           THE COURT:  Thank you.

15   Q.  Did you have a plan for how you were going to dodge that?

16   A.  My plan was, simply put, was just to continue to maintain

17   the course that I'd started on, which was all fictional, and

18   get through the deposition as well as I could and I hoped that

19   this would all go away, frankly.

20   Q.  Along with the SEC, who else, if anyone, did you deny your

21   involvement in insider trading to?

22   A.  Everybody.  Virtually everybody.  My lawyer, my family, my

23   friends, I lied to everybody at the time.

24   Q.  Were you honest with anyone?

25   A.  At that point in time, no.

H3L3WAL3                           Davis - direct

1    Q.   Did there come a point when that changed?

2    A.   Yes.

3    Q.   Why did that change?

4    A.   In late 2015, I had a serious health problem, and had a --

5    what's referred to as a mini stroke.  This occurred in November

6    of 2015.  And as a result of this, I ended up having emergency

7    surgery, and was in the hospital for a few days.  After which I

8    sat down and had a lot of time to think about where I was, what

9    I'd done over the course of the past year and a half.  The

10   intensity of the investigation that I had been through for the

11   last year and a half, frankly, had sort of taken its toll on

12   me.  And I really didn't think I could do this anymore.

13   Q.   When you say "do this anymore," what do you mean?

14   A.   I couldn't continue to lie about this.  And I had some -- I

15   had hired New York counsel at that point in time, you know, and

16   this was -- this was not a decision I made overnight.  I mean,

17   it was a decision that I think was initiated by my health

18   problems, and I thought about it for a month or so.  I

19   eventually sat down with my wife, I told her the truth.

20          MR. BERKE:  Objection, your Honor.

21          THE COURT:  Yes.  You need not get into the

22   conversations with your wife.  Go ahead.

23          MS. CUCINELLA:  Thank you, Judge.

24   Q.   Mr. Davis, after you spoke with your wife, did you agree to

25   meet with prosecutors from the Department of Justice?

1   A.  Yes.  I did.

2   Q.  During your first meeting with prosecutors, do you recall

3   what you told them?

4   A.  Yes.  I do recall.

5   Q.  What did you tell them?

6   A.  I told them about the burner phone, I told them I had

7   disposed of the burner phone.  I told them about receiving the

8   burner phone from Billy, about the codes we used to communicate

9   with each other.  I told them about the length, the period of

10  time that I've been providing Mr. Walters inside information.

11  And I told them about my health problems, too, at that time.

12  Q.  Before we get to your health problems, did you tell them

13  that you had borrowed money from Mr. Walters?

14  A.  Yes, I did.

15  Q.  Did you tell them anything else about that?

16  A.  I told them that I felt indebted to Walters.  It was one of

17  the motivations for me providing him information.

18  Q.  Did you provide the prosecutors with any specific examples

19  of giving inside information to Mr. Walters?

20  A.  Yes.  I did in the first meeting, yes, I did.

21  Q.  Do you recall what those were?

22  A.  The two that stuck out in my mind were I provided him

23  information in May of 2010 that was very relevant at the time,

24  and I also provided him, as I've also referred to, about 2011

25  and '12, detailed information on the spinoff, and I think I

H3L3WAL3                        Davis - direct

1   disclosed all of that to the prosecution in the first meeting.

2   Q.  You also mentioned you told the prosecutors about your

3   health issues.  Why did you tell them about that?

4              MR. BERKE:  Objection, your Honor.

5              MS. CUCINELLA:  I am aware of your Honor's ruling and

6   I don't think we will go afoul.

7              THE COURT:  I'll allow it.

8   A.  I'm sorry?

9   Q.  Why did you tell the prosecutors about your health issue?

10  A.  Well, it was an issue for me.  I mean, it was still an

11  issue in February when I first met with the prosecutors.  I was

12  recovering from surgery, I was clearly not 100 percent healthy.

13  I did not have the stamina to go through lengthy meetings, and

14  I had to disclose all that and just frankly couldn't do it.

15  And I told the prosecutors that.

16  Q.  After that first meeting, did you meet with the prosecutors

17  again during the spring of 2016?

18  A.  Yes, we met several times.

19  Q.  Approximately how many times?

20  A.  I think we met 15 or 16 times during the spring.

21  Q.  Why did you meet with them so many times?

22             MR. BERKE:  Objection, your Honor.

23             THE COURT:  Do you know why the meetings were called?

24  Did you call the meetings with the prosecutors.

25             THE WITNESS:  No, no, sir.

H3L3WAL3                          Davis - direct

1           THE COURT:  Next question.

2    Q.  On average, Mr. Davis, how long was each of the meetings

3    that you had with the government?

4    A.  Each time I met with the prosecution?

5    Q.  Yes.

6    A.  They were relatively short meetings.  We might meet for an

7    hour and a half to two hours, take a break, and meet for

8    another hour, and that was about all I could do in a day.  So

9    they were relatively short.

10   Q.  Mr. Davis, what did you do during these meetings?

11   A.  Well, it was an extensive what I'd call sort of a

12   debriefing process that the prosecution, prosecutors went

13   through with me, and they provided me a lot of information that

14   included board minutes, credit card records, travel records,

15   bank statements, all of which was very useful to help me

16   recollect what was going on at various points in time.

17           THE COURT:  Whose bank statements?

18           THE WITNESS:  My own bank statements.

19           THE COURT:  Whose credit card statements?

20           THE WITNESS:  My own, sir.

21           THE COURT:  Thank you.  Next question.

22   Q.  You mentioned board meeting minutes as well.  What are

23   board meeting minutes?

24   A.  It's a recollection or a short abbreviated version of

25   what's discussed at every board meeting.  Minutes are taken by

H3L3WAL3                    Davis - direct

1    the company's secretary, and they're memorialized in writing to

2    summarize what was discussed at a board meeting.

3    Q.   Are these documents confidential?

4    A.   Yes.

5    Q.   Mr. Davis, did you have an understanding -- withdrawn.

6    Excuse me.

7          What period of time were the prosecutors asking you

8    questions about, about how many years?

9    A.   They asked me about years from 2007 to 2013.

10   Q.   Did you have trouble remembering when certain conversations

11   took place?

12   A.   I did, I did have trouble.  I mean, it's -- you can't

13   remember precisely when you had a conversation with somebody in

14   2008 or 2007 without refreshing your memory with some means to

15   do so.

16   Q.   Did reviewing the documents refresh your recollection?

17   A.   Yes, it helped a great deal.

18   Q.   Mr. Davis, in those meetings, did anyone ever accuse you of

19   lying?

20   A.   No.

21   Q.   Did anyone ever ask you to change your recollections?

22   A.   No, not whatsoever.

23   Q.   Did anyone ever tell you that you needed to remember better

24   information?

25   A.   No.

H3L3WAL3                     Davis - direct

1   Q.   What were you asked to do?

2   A.   Simply put, they asked me to tell the truth.

3   Q.   During those meetings, did you provide information only

4   about Mr. Walters or did you also talk about other people?

5   A.   I talked about other people as well.

6   Q.   Were you honest with the government during those meetings?

7   A.   Absolutely.

8   Q.   Why were you honest?

9   A.   I was required to be honest.

10  Q.   What would happen if you weren't honest?

11  A.   I was going to sign a cooperation agreement with the

12  government, and I knew that, and it provided for certain things

13  for me and I had certain obligations to the government pursuant

14  to that cooperation agreement.  And one of those was for me to

15  be honest.

16  Q.   Mr. Davis, have you pled guilty to federal crimes in

17  connection with the scheme that you had with Mr. Walters?

18  A.   Yes, ma'am, I have.

19  Q.   How many crimes have you pled guilty to?

20  A.   I've pled guilty to 12 felony counts.

21       MR. BERKE:  Your Honor, I would ask to clarify.  I

22  believe the number he pled guilty to is not related to his

23  earlier answer.  I would ask it be clarified on the record.

24       THE COURT:  If you can clarify it.

25       MS. CUCINELLA:  Certainly.

H3L3WAL3                          Davis - direct

1   Q.  What crimes did you plead guilty to?

2   A.  I pled guilty to certain counts for securities fraud,

3   obstruction of justice, and wire transfer.

4           THE COURT:  I didn't hear the last.

5           THE WITNESS:  Wire transfer.

6           THE COURT:  Thank you.

7   Q.  Do you mean wire fraud?

8   A.  Yes, ma'am, I'm sorry.

9   Q.  You said securities fraud, wire fraud, obstruction of

10  justice.  Is there another count that you pled guilty to in

11  connection with your SEC deposition?

12  A.  Oh.  Yes.  Lying.

13  Q.  What specifically was the obstruction of justice count for?

14  A.  I believe it was for my disposing of the bat phone and

15  lying to the FBI.

16  Q.  Mr. Davis, are you testifying today pursuant to a

17  cooperation agreement?

18  A.  Yes, ma'am, I am.

19  Q.  What is a cooperation agreement?

20  A.  It's an agreement that I signed with the Justice Department

21  that provides for a number of things, but primarily provides

22  for me to assist the government in this investigation, to

23  testify if called upon to do so, to tell the truth, and to not

24  violate the law.

25          MS. CUCINELLA:  I'm going to ask Ms. Meister if you

H3L3WAL3                          Davis - direct

1    can please pull up Government Exhibit 1750 for the witness and

2    counsel.

3    Q.  Mr. Davis, do you recognize this document?

4    A.  Yes, ma'am.

5            MS. CUCINELLA:  Ms. Meister, if you'll turn to the

6    last page.

7    Q.  Mr. Davis, is that your signature?

8    A.  Yes, it is.

9    Q.  What is this document?

10           THE COURT:  This document being Government Exhibit

11   1760, is it?

12           MS. CUCINELLA:  50, your Honor.

13           THE COURT:  Thank you.

14   Q.  What is this document?

15   A.  This is the cooperation agreement.

16           MS. CUCINELLA:  The government offers 1750.

17           MR. BERKE:  No objection, your Honor.

18           THE COURT:  Received.

19           (Government's Exhibit 1750 received in evidence)

20           MS. CUCINELLA:  Ms. Meister, will you please publish

21   that.

22   Q.  Mr. Davis, will you repeat again what your understanding is

23   of your obligations as part of this agreement.

24   A.  My understanding is that I was to assist the government in

25   their investigation, that I was to tell the truth in that

H3L3WAL3                    Davis - direct

1    process, and that I would be asked to -- if asked to testify

2    that I would do so, and that I would not break the law in any

3    way.

4    Q.  When you say "assist the government," do you mean meet with

5    the government?

6    A.  I'm sorry?

7    Q.  What do you mean when you say "assist the government"?

8    A.  I think assist the government meant to assist them in their

9    investigation and meet with them if necessary.

10   Q.  What are the prosecutors obligated to do if you abide by

11   the terms of this agreement?

12   A.  They are to provide me what's called a 5K letter.

13   Q.  What is your understanding of the purpose of a 5K letter?

14   A.  My understanding is that it summarizes my conduct, if you

15   will, and my contribution, both good and bad, all the good

16   things and all the bad things that I've done as far as this

17   process with the prosecution.  And that letter goes to the

18   judge at the end of the day.

19   Q.  Why does it go to the judge?

20   A.  For his assistance in determining my sentence.

21   Q.  Has the government made you any promises about what

22   sentence you would get?

23   A.  No, ma'am.

24   Q.  Who determines your sentence?

25   A.  The judge.

H3L3WAL3                          Davis - direct

1    Q.  Do you have an understanding of whether your sentence

2    depends on if Mr. Walters is convicted at trial?

3    A.  My understanding it makes no difference.

4    Q.  What determines whether you get a 5K letter at sentencing?

5              MR. BERKE:  Objection, your Honor.

6              THE COURT:  What's your understanding of what

7    determines whether you get a 5K letter?

8              THE WITNESS:  My understanding, your Honor, is that I

9    have to perform my duty under the cooperation agreement.

10   Q.  Which means what?

11   A.  I have to provide assistance as I've outlined, I've got to

12   tell the truth, and I can't break the law.

13   Q.  We're going to talk more about your cooperation in a little

14   bit.  But before we get into that, I want to talk about your

15   background.

16             Mr. Davis, where did you go to college?

17   A.  I went to Georgia Tech in Atlanta.

18   Q.  When did you graduate?

19   A.  1970.

20   Q.  What did you do after graduation?

21   A.  I enlisted in the military, in the Navy.

22   Q.  For how long did you serve in the Navy?

23   A.  Approximately four years.

24   Q.  While you were in the Navy, did you also get married?

25   A.  Yes, I did.

1   Q.  Approximately what year was that?

2   A.  I got married 1971.

3   Q.  What did you do after the military?

4   A.  I went to Harvard Business School after I got out of the

5   Navy.

6   Q.  Did you graduate?

7   A.  Yes, I did.

8   Q.  What year was that?

9   A.  I graduated 1976.

10  Q.  Did there come a point when you began working at an

11  investment bank commonly referred to as DLJ?

12  A.  Yes, I did.

13  Q.  What does DLJ stand for?

14  A.  Donaldson, Lufkin & Jenrette, the name of the firm.

15  Q.  When was that?

16  A.  I opened the office for DLJ in January of 1984 in Dallas.

17  Q.  When you say you opened the office for them, what do you

18  mean?

19  A.  DLJ had a small brokerage office in Dallas at the time, but

20  they didn't have an investment banking group.  And I opened the

21  office, hired some people, this was an investment banking

22  office specifically, which provided corporate clients advice.

23  Q.  What was your role there?

24  A.  I managed the office and I also acted as an investment

25  banker.

H3L3WAL3                              Davis - direct

1    Q.  Will you explain to the jury what an investment banker

2    does.

3    A.  It's someone who advises corporations, not individuals, but

4    advises corporations with regard to financing, financial

5    advice, merger and acquisition advice, etc.

6    Q.  For how long did you work at DLJ?

7    A.  Until the firm was sold in 2000.

8    Q.  During this period, did you and your first wife divorce?

9    A.  Yes, we did.

10   Q.  Approximately when was that?

11   A.  I think it was 1986.

12   Q.  Did you have children?

13   A.  Yes, we had a daughter.

14   Q.  After the divorce, who got custody of your daughter?

15   A.  I did.

16   Q.  Why was that?

17   A.  My first wife was an alcoholic and had a very difficult

18   time raising our daughter.  We legally had joint custody, but I

19   had physical custody of my daughter and raised her.

20   Q.  Did you remarry?

21   A.  Yes.

22   Q.  Who did you remarry?

23   A.  I remarried a woman named Louise West.

24   Q.  When did you and Louise get married?

25   A.  I think we got married in 1988 is my recollection.

H3L3WAL3                        Davis - direct

1    Q.  For how long were you and Louise married?

2    A.  We were married until 2005.

3    Q.  Turning back to DLJ, how were you compensated for your work

4    there?

5    A.  We were compensated with a salary and a bonus at year end.

6    Q.  What was your bonus based on?

7    A.  The bonus was based on your productivity, the amount of

8    revenues that you were able to generate for the firm during the

9    course of that year, and bonuses were always paid at year end.

10   Q.  What was the range of your bonuses over the time that you

11   were at DLJ?

12   A.  It ranged from $500,000 to $3 million one year.

13   Q.  Did there come a time when you left DLJ?

14   A.  Yes.  I left DLJ when we sold the firm in 2000.

15   Q.  Will you explain that to the jury; what happened?

16   A.  The firm was acquired by a firm, another investment banking

17   firm called Credit Suisse in late 2000.  And I was a

18   shareholder of DLJ and made some money upon the sale, and I was

19   frankly worn out.  I had been traveling 2 or 300,000 miles a

20   year on airplanes all over the world, and I was worn out.  So I

21   decided to retire.

22   Q.  What was your personal financial situation when you

23   retired?

24   A.  It was pretty good.  I was in pretty good shape.  I had

25   made a lot of money on the sale of DLJ, I owned a home in

H3L3WAL3                    Davis - direct

1   California, I owned a home in Dallas.  I was very fortunate.

2   Q.  When you say you made a lot of money on the sale of DLJ,

3   how much money are we talking about?

4   A.  I made close to $8 million on the sale.

5   Q.  Did you intend to get another job?

6   A.  Not immediately, no.  I was going to take some time off,

7   and I think as I explained earlier, I moved into an office with

8   a couple of friends of mine, and we shared investment ideas

9   together, and then shortly thereafter I was asked to go on the

10  board of Dean Foods.

11  Q.  I think you've touched on this earlier, but can you explain

12  to the jury what it means to be on the board of a public

13  company in a little more detail.

14  A.  Well, the board of directors is, they are the

15  representatives for the shareholders of the company.  And so, I

16  think as I mentioned earlier, you have a fiduciary

17  responsibility as a board member.  And in the case of Dean

18  Foods, the directors are reelected every year by the

19  shareholders.  Sometimes there was a staggered board, but I

20  think in our case, we came up every three years.  And that

21  board's responsible for the governance of the company and the

22  decisions -- the major decisions that are made at the company.

23  Q.  On what boards have you served?

24  A.  Besides Dean?

25  Q.  Yes.

H3L3WAL3                        Davis - direct

1   A.   I served on a company called WhiteHorse Finance, Trident

2   Energy, Alphatec Spine, and Affirmative Insurance, and I also

3   served on a small gas company called Saxon Oil.

4   Q.   We're going to come back to your work on the Dean Foods

5   board.  But I want to talk now for a few minutes about your

6   relationship with Billy Walters.

7        Do you recall when you first met Mr. Walters?

8   A.   I do.  Yes.

9   Q.   Approximately when was that?

10  A.   I -- I don't recall precisely what year it was.  But my

11  recollection was it was the mid '90s.

12  Q.   Under what circumstances did you meet?

13  A.   We were introduced by a mutual friend that knew Billy and

14  knew me.  And we played golf together at Del Mar Country Club.

15  Q.   Where is Del Mar Country Club?

16  A.   California.  Del Mar, California.

17  Q.   Did your relationship develop over time?

18  A.   Yes, it did.

19  Q.   How so?

20  A.   I think we became relatively good friends fairly quickly.

21  We had a lot of common interests, as I mentioned before, we --

22  I had a home at the time in southern California, in La Jolla,

23  California, which was not far from Billy's home in southern

24  California.  So we would see each other fairly frequently when

25  I was out in California.

H3L3WAL3                         Davis - direct

1   Q.  Were there times that you were typically in California

2   throughout the year?

3   A.  I spent a lot of time in California in -- from December

4   through February or March when the weather was lousy in Dallas,

5   and I also went back out to California when the weather was hot

6   in Dallas in the summer.

7   Q.  You mentioned that Mr. Walters had a home in southern

8   California near where you had a home.  Over the course of your

9   relationship, did you learn whether Mr. Walters had other

10  residences?

11  A.  Yes, I was aware of that.

12  Q.  How did you learn that?

13  A.  I learned it from him.

14  Q.  Do you recall where he had other residences?

15  A.  I knew he had a home in Las Vegas, I knew he had another

16  home in Rancho Santa Fe at one point in time.  He had a home in

17  Cabo San Lucas, and he also had a home in Florida.

18  Q.  Did there come a point when you sold your house in

19  California?

20  A.  Yes.

21  Q.  When was that?

22  A.  I think we sold the house, my wife and I were in the

23  process of getting a divorce, and we decided to sell the house

24  and split the proceeds, and I think we did that in 2004.

25  Q.  That was the divorce from your first wife?

H3L3WAL3                          Davis - direct

1    A.   From my second wife.  Louise.

2    Q.   Would you continue to see Mr. Walters after you sold your

3    home in California?

4    A.   Yes, I did.  Less frequently, but I saw him.

5    Q.   Was there a time of year that you typically saw him?

6    A.   In the summer.  Generally in the summer.  I, after I sold

7    the house, I still -- I ended up renting a place in Rancho

8    Santa Fe in the summer during a couple of weeks, and I went out

9    there when the racetrack was open in late July, early August.

10   Q.   You did that fairly regularly?

11   A.   I did.  I did it for a number of summers, yes.

12   Q.   Did you tell Mr. Walters what you did for work?

13   A.   I'm sure I did.  He knew I was involved with Dean Foods.

14   Q.   Did he also know that you were involved with an investment

15   fund?

16   A.   Yes, yes, he did.

17   Q.   How did he know that you were involved with Dean Foods?

18   A.   I'm sure I told him.  I'm sure that I told him early on.

19   Q.   Did you have an understanding of what Mr. Walters did for

20   work?

21   A.   Yes.  I did.

22   Q.   What was that understanding based on?

23   A.   I knew he was a professional gambler --

24   Q.   I'm going to stop you.  My question was what was your

25   understanding based on?

H3L3WAL3                        Davis - direct

1    A.  He told me.

2    Q.  What did Mr. Walters tell you about what he did for a

3    living?

4    A.  That he was a sports gambler, and he had some other

5    interests which he told me about.  He had some golf courses, he

6    had some car dealerships as well.

7    Q.  Did you ever meet anyone who worked for Mr. Walters?

8    A.  Yes.

9    Q.  Who?

10   A.  I met a gentleman named Mike Luce who was originally his,

11   Mr. Walters' chief financial officer and then became president

12   I think of one of Billy's companies.

13            MS. CUCINELLA:  Ms. Meister, will you please pull up

14   for the witness Government Exhibit 2.

15   Q.  Mr. Davis, do you recognize the person in this picture?

16   A.  Yes.

17   Q.  Who is it?

18   A.  That's Mike Luce.

19            MS. CUCINELLA:  Government offers Government Exhibit

20   2.

21            MR. BERKE:  No objection, your Honor.

22            THE COURT:  Received.

23            (Government's Exhibit 2 received in evidence)

24            MS. CUCINELLA:  Will you publish it.  Thank you.

25   Q.  Along with Mr. Luce, did Mr. Walters ever tell you that he

H3L3WAL3                        Davis - direct

1   had other people that worked for him in connection with his

2   gambling business?

3   A.  Yes.  He did.

4          MS. CUCINELLA:  Ms. Meister, will you please pull up

5   for the witness what's been marked as Government Exhibit

6   1720-A.

7   Q.  Mr. Davis, do you recognize this?

8   A.  Yes.

9   Q.  What is it?

10  A.  That's my cell phone.  That's a picture of my cell phone

11  with the contact information I had in my cell phone for Billy

12  Walters.

13         MS. CUCINELLA:  Government offers 1720-A.

14         MR. BERKE:  No objection, your Honor.

15         THE COURT:  Received.

16         (Government's Exhibit 1720-A received in evidence)

17  Q.  Mr. Davis, how many numbers do you have in your cell phone

18  for Mr. Walters?

19  A.  I had -- it looks like I had five.

20  Q.  How did these numbers get in your cell phone?

21  A.  I put them in the cell phone.  I was given these numbers by

22  Billy, I'm sure.

23  Q.  Do you recall when you put each of them in your cell phone?

24  A.  I don't recall precisely when, no.

25  Q.  Do you recall the circumstances under which he would

H3L3WAL3                    Davis - direct

1   provide you with each of these numbers?

2   A.  I don't recall the circumstances precisely, no.  But, you

3   know, from time to time, he would use different numbers, and

4   some of those I put in my phone and some I didn't.

5   Q.  When you were with Mr. Walters, did he always use the same

6   cell phone?

7   A.  He used multiple cell phones.

8   Q.  To be clear, what did you observe?

9   A.  I saw more than once where he would respond to phone calls

10  on multiple cell phones.

11  Q.  Just to be clear, Mr. Davis, do you know how the FBI

12  obtained a screen shot of your cell phone?

13  A.  I gave them my cell phone.

14  Q.  This was during the process where you met with the

15  government?

16  A.  Yes, ma'am.

17  Q.  How far into the process was this?

18  A.  I'm sorry?

19  Q.  How far into the process did you allow the FBI to take a

20  picture of your cell phone?

21  A.  During the proffer process?

22  Q.  Yes.

23  A.  I think -- I don't recall precisely when we did that, when

24  I gave you the cell phone, but it seems like it was early on.

25  Q.  Mr. Davis, did you also have a contact for Mr. Luce in your

1   cell phone?

2   A.  Yes, I did.

3           MS. CUCINELLA:  If we can put up for the witness what

4   has been marked for identification as Government Exhibit

5   1720-B.

6   Q.  Do you recognize this?

7   A.  Yes, I do.  It's, again, a picture, a snapshot of my

8   contact information for Mike Luce.

9           MS. CUCINELLA:  Government offers Exhibit 1720-B.

10          MR. BERKE:  Can we just establish again the timing,

11  that this is recently, but otherwise no objection.

12          THE COURT:  When was this?  Why don't you establish

13  the timing.

14  Q.  Mr. Davis, did you provide your cell phone -- remind the

15  jury when you provided the government with your cell phone.

16  A.  During the interview process with the prosecution.

17  Q.  When was that?

18  A.  In the spring of 2016.

19          THE COURT:  Any objection?

20          MR. BERKE:  No objection, your Honor.

21          THE COURT:  Received.

22          (Government's Exhibit 1720-B received in evidence)

23  Q.  Mr. Davis, how often would you and Mr. Walters speak on the

24  phone?

25  A.  Frequently.  Depending on the time of year also, but

H3L3WAL3                          Davis - direct

```
 1   frequently.
 2   Q.  Why would it depend on the time of year?
 3   A.  Depended on what was going on during the course of any
 4   point in time.
 5   Q.  Setting aside for a minute your conversations about Dean
 6   Foods, what types of things did you discuss on the phone, other
 7   than Dean Foods?
 8   A.  Well, we discussed a lot of things.  We had common
 9   interests.  We discussed gambling, sports, golf, a lot about
10   golf, we discussed business transactions that either he was
11   doing or I was doing that might be an opportunity to invest in.
12   Q.  Did you discuss other things that were happening in your
13   professional life?
14   A.  Yes.  Occasionally I did.
15   Q.  You testified earlier that you had an office where you
16   worked on investment opportunities.  Is that right?
17   A.  Yes, that's correct.
18   Q.  Was that office associated with an entity?
19   A.  Yes, it was.  I eventually started a small hedge fund with
20   a partner that's called Crescent Special Situation Fund that we
21   used the acronym CSSF, and I office with my partner at the
22   Crescent Hotel.
23   Q.  What was the name of your partner?
24   A.  Bucky Lyon.
25   Q.  Who is Bucky Lyon?
```

H3L3WAL3                        Davis - direct

1    A.  He's -- he was also a partner of mine in a private aircraft

2    that we owned together.  But he was my partner in this fund.

3    He and I were general partners of this fund.

4    Q.  Other than CSSF, any other funds that you were associated

5    with?

6    A.  No.  No other investment funds, no.

7    Q.  Did you and Bucky Lyon office together?

8    A.  Yes, we did.

9    Q.  Do you recall the phone number to that office?

10   A.  Yes.  I think I do.

11   Q.  What was it?

12   A.  It was 214-871-6755.

13   Q.  Did you discuss your fund with Mr. Walters?

14   A.  I think I recall doing that, yes, at one point in time.

15   Q.  We went through a number of categories of things you and

16   Mr. Walters would talk about.  You testified that you would

17   also speak about Dean Foods, so let's turn back to that.

18           What kind of company is Dean Foods?

19   A.  It's a dairy company.  It is a dairy processing business.

20   It is the largest dairy processor in the United States.

21   Q.  Was it publicly traded?

22   A.  Yes, ma'am.

23   Q.  What does that mean?

24   A.  It means the stock was publicly traded.

25   Q.  Was it traded on a stock exchange?

H3L3WAL3                          Davis - direct

1    A.  Yes, it was on the New York Stock Exchange.

2    Q.  Along with milk, what other kinds of products did Dean

3    Foods make?

4    A.  A variety of, a large variety of dairy products.  Yogurt,

5    ice cream, soy milk, almond milk, organic, non-organic, butter,

6    so it was quite a cast of products.

7    Q.  How did you end up on the board of Dean Foods?

8    A.  I was asked to join the board by the chief executive

9    officer at the time.

10   Q.  Can you lean a little bit closer to the microphone?  I'm

11   sorry.

12   A.  Yes, I'm sorry.

13   Q.  Thank you.  How did you end up on the board of Dean Foods?

14   A.  I was asked to join the board by the chief executive

15   officer of Dean Foods, a fellow named Gregg Engles.

16   Q.  How did you meet Mr. Engles?

17   A.  We knew each other for a long time.  We had been friends

18   since the late '80s as I recall.  And I also did some work for

19   him as an investment banker during the '90s, so I'd actually

20   done some work for the predecessor company to Dean Foods, which

21   was called Suiza Foods.

22   Q.  Was there a particular expertise or skill that you brought

23   to the board?

24   A.  I think Gregg asked me to join the board because of my

25   financial background, because of my investment banking

H3L3WAL3                        Davis - direct

1   experience, yes.

2   Q.   Why did you agree to join the board?

3   A.   It was a great company.  And I liked the board members that

4   I knew, and it was an honor for me to join that board.

5   Q.   What were some of your duties and responsibilities on the

6   board of Dean Foods?  Will you give the jury an overview.

7   A.   Well, aside from my normal duties as a board member, I was

8   at various points in time on different committees that the

9   board had.  I was on the audit committee at one point, I was

10  also on the compensation committee at one point, and on the

11  executive committee at one point.

12  Q.   What did the audit committee do?

13  A.   It primarily interfaced with the finance function at the

14  company with the chief financial officer, and overlooked the

15  relationship between the company and its auditors.

16  Q.   What did the compensation committee do?

17  A.   It was responsible for overseeing the compensation for the

18  top management team.

19  Q.   What did the executive committee do?

20  A.   The executive committee was the small group of the board

21  that would be oftentimes tasked with certain responsibilities

22  that the company asked them to undertake.

23  Q.   Like what?

24  A.   Like decisions to proceed on certain functions, certain

25  strategies, decisions about the company financing.  Stuff like

1    that, basically.

2    Q.  You mentioned your normal duties on the board.  Were you

3    expected to attend meetings?

4    A.  Yes.

5    Q.  What kind of meetings?

6    A.  We had regularly scheduled quarterly meetings and we also

7    had some special meetings that occurred during the year.

8    Q.  How often were meetings held?

9    A.  It varied from year to year depending on how many special

10   meetings we had.  But, on average, we might have six or seven

11   meetings a year.

12   Q.  Were those meetings in person or on the phone?

13   A.  Both.  Sometimes both.

14   Q.  Who attended those meetings?

15   A.  Well, certainly all the board members attended the meetings

16   as well as the top management team.  And sometimes we had

17   guests attend those meetings, advisors attend the meetings.

18           MS. CUCINELLA:  Ms. Meister, will you please pull up

19   for the witness Government Exhibit 20 and 21.

20   Q.  Mr. Davis, do you recognize the individuals in these

21   pictures?

22   A.  Yes, I do.

23           MS. CUCINELLA:  Actually you can show them to the

24   jury, please.  They're already in evidence.

25   Q.  Mr. Davis, who is reflected in these pictures?

H3L3WAL3                          Davis - direct

1   A.  The gentleman on the left is Jim Turner.  And the gentleman

2   on the right is John Muse.

3   Q.  Who are they?

4   A.  They're both members of the board of Dean Foods.

5   Q.  They would attend board meetings as well as you?

6   A.  Yes, yes, they would.

7       MS. CUCINELLA:  You can take those down.

8   Q.  What types of things were discussed at board meetings?

9   A.  A variety of things.  That obviously would change,

10  depending on what was going on at the company at any particular

11  year or any particular point in time.  But, generally the board

12  meetings that we had at Dean were fairly similar in terms of

13  the composition of the tasks of the meeting.

14       There was always a review of operations, there was

15  always a review of the financial history of the company for the

16  particular quarter that we were in, there was always a

17  litigation update, if there was any litigation outstanding,

18  that the company was undertaking or having to deal with.  And

19  there was always an executive session where the board would

20  meet by themselves without management.

21  Q.  What, if any, expectations were there that you would keep

22  the information you learned through board meetings

23  confidential?

24  A.  I'm sorry.  What were the expectations?

25  Q.  Yes.

H3L3WAL3                        Davis - direct

1   A.   It was I think fairly clear what the expectation was.

2   Q.   Why?

3   A.   That what was discussed in the board meeting was always

4   confidential.

5   Q.   I'm going to direct your attention now to the binder that's

6   up there, which has just the exhibits in there.

7   A.   Yes.

8   Q.   I'm going to have you look at Government Exhibit 500

9   through 504.

10  A.   Okay.  I got them.

11  Q.   Do you recognize these?

12  A.   I do.

13  Q.   What are they?

14  A.   This is -- one of the exhibits is the code of ethics for

15  Dean Foods for one particular period of time, there is another

16  code of ethics for another period of time, there is a

17  certification which certified me as having received and read

18  the code of ethics and certifying that I understand and agree

19  to follow the Dean Foods code of ethics.

20  Q.   I think one more.

21  A.   There is, yeah, the last one is the Dean Foods Company

22  insider trading policy.

23         MS. CUCINELLA:  Government offers Government Exhibits

24  500 through 504.

25         MR. BERKE:  If I may have a moment.

H3L3WAL3                    Davis - direct

1               THE COURT:  You may.

2               MR. BERKE:  Your Honor, I have no objection to 500.  I

3    do object to 501, which is dated 2014, after our time period.

4    I object to 502, which is also dated 2014 after our time

5    period.  503, I don't have a date on this document, but I

6    believe it is also after our time period.

7               MS. CUCINELLA:  Your Honor, I'm happy to address this

8    at a break.  We can move the other ones that he has no

9    objections in now.  The conspiracy was --

10              THE COURT:  That would be 500.  Correct?

11              MS. CUCINELLA:  500 is fine.

12              THE COURT:  It is received into evidence.

13              (Government's Exhibit 500 received in evidence)

14              MS. CUCINELLA:  Can we address the others at the

15   break?

16              THE COURT:  That's fine.  Go ahead.

17              MS. CUCINELLA:  Ms. Meister, can you please turn to

18   page six of Government Exhibit 500.

19   Q.  Mr. Davis, were you trained on the disclosure of

20   confidential information?

21   A.  I'm sorry?

22   Q.  It's going to be up on your screen.

23   A.  Yeah, I'm sorry, okay.

24   Q.  Mr. Davis, were you trained on the disclosure of

25   confidential information?

H3L3WAL3                          Davis - direct

1   A.  I didn't hear the question, I'm sorry.

2   Q.  Were you trained on the disclosure of confidential

3   information?

4   A.  Yes, I'm sorry, I was.

5   Q.  What were you trained on?

6   A.  I took a series of courses at various points in time while

7   I was a board member about this subject.

8   Q.  While you were a board member, were you also provided with

9   the company's code of ethics?

10  A.  Yes, I was.

11  Q.  Is that what you're looking at on your screen right now?

12  A.  Yes, ma'am.

13  Q.  Does this document address the disclosure of confidential

14  information?

15  A.  Yes, it does.

16  Q.  What does it say about it?

17  A.  It says "You must at all times maintain the confidentiality

18  of non-public information about our company.  Confidential

19  information is any information of a confidential, proprietary,

20  or secret nature related to our business.  It includes, among

21  other things, confidential business processes, practices, or

22  results of operations, trade secrets, manufacturing techniques,

23  including proprietary technical and non-technical information,

24  research and development information, business plans or

25  forecasts, including plans with respect to proposed

H3L3WAL3                          Davis - direct

1    acquisitions of other companies or their assets, long-range

2    strategic plans, budgets, customer lists."

3          MS. CUCINELLA:  Ms. Meister, can we switch to the next

4    page.  The top paragraph, please.

5    A.  "Or other sales data marketing plans, certain customer,

6    supplier and personnel information and information concerning

7    any pending or threatened litigation or claim against our

8    company.  You must never, directly or indirectly, disclose or

9    use for the benefit of any person, firm, corporation, or other

10   business organization, any of our confidential information."

11   Q.  Mr. Davis, does the policy go on from there?

12   A.  Yes.  It does.

13   Q.  You received training specific to this issue?

14   A.  Yes, I did.

15   Q.  Directing your attention now to page eight of this

16   document.  Were you authorized to make disclosures about the

17   company?

18   A.  No, I was not at all.

19   Q.  Do you know who was authorized to make these types of

20   disclosures?

21   A.  There was a handful of people.  The CEO, the chief

22   financial officer, and the in-house legal counsel.  And also

23   there was a vice president of corporate information who was

24   also authorized.

25   Q.  When you say vice president of corporate information, what

H3L3WAL3                           Davis - direct

1    role is that?

2    A.  He dealt with the analysts community.  The Wall Street

3    analysts primarily.

4               MS. CUCINELLA:  Ms. Meister, you can take that down.

5               MR. BERKE:  Your Honor, when you think it is

6    appropriate, but I ask your Honor give the instruction again on

7    the difference between company policy and the laws that the

8    jury will hear from your Honor.

9               THE COURT:  Yes.

10              Ladies and gentlemen, the defendant on trial here is

11   charged with engaging in certain federal crimes.  Violating a

12   corporate code of ethics is not, standing alone and without

13   more, a federal crime.  It's a violation of the code of the

14   business.  The fact that someone may have violated a company

15   policy or breached a fiduciary duty may have some relevance to

16   some of the issues in the case, but it is not itself a federal

17   crime.

18              You may continue.

19              MS. CUCINELLA:  Thank you.

20              MR. BERKE:  Thank you, your Honor.

21   Q.  Mr. Davis, you mentioned that there was also an insider

22   trading policy at Dean Foods.  Were you trained on that?

23   A.  Yes, I was.

24   Q.  How, if at all, did your training and work as an investment

25   banker impact your understanding of the need to keep

1    confidential information secret?

2    A.   Could you repeat the question?

3    Q.   Sure.   How, if at all, did your training and work as an

4    investment banker impact your understanding of the need to keep

5    confidential information secret?

6    A.   I knew the law very well.   I had not only had the training

7    while I was at Dean Foods, I had a lot of training while I was

8    at DLJ.

9    Q.   Mr. Davis, were you paid for your role on the board of Dean

10   Foods?

11   A.   Yes, I was.

12   Q.   How much?

13   A.   I think initially the directors were -- when I went on the

14   board I think we were paid about $200,000 a year for our

15   service, half of which was in cash, and the other half was paid

16   to us in stock that vested over three years.

17   Q.   Were you able to sell that stock at any time?

18   A.   No.   No, not until it vested.

19   Q.   And after it vested -- what does it mean to vest?

20   A.   It means that we were awarded stock, and that stock that we

21   were awarded in one year, in the first year, a third of it

22   became available the next year, another third of it became

23   available the following year, and so on.   So, you didn't end up

24   with your full compensation in the stock until the third year

25   out.

H3L3WAL3                          Davis - direct

1    Q.   In addition to that, were there other restrictions on when
2    you could sell your stock?
3    A.   Yes, there were a lot of restrictions on when I could sell
4    the stock.
5    Q.   What were some of those?
6    A.   There was a policy, most public companies have it, called a
7    blackout policy.  And it refers to various periods of time
8    during the year when you're blacked out, meaning you can't sell
9    the stock, because of earnings announcements.  And I was not
10   only restricted because of the blackout periods, I was also
11   restricted at a lot of points in time because of other inside
12   information that I had.
13             MS. CUCINELLA:  Your Honor, if this is acceptable to
14   you, we're about to move on to a new topic, so it would be a
15   good time to break for lunch.
16             THE COURT:  That's two minutes early, ladies and
17   gentlemen.  As much as I am reluctant to do so, I'm going to
18   make an exception and break early for lunch today.  We'll pick
19   up at 2 o'clock.
20             Remember, do not discuss the case among yourselves or
21   with anyone.  See you at 2 o'clock.
22             Thank you.
23             (Jury excused)
24             (Continued on next page)
25

H3L3WAL3

```
1              THE COURT:  What did you want to tell me about the --
2              MR. GOLDMAN:  Your Honor, the witness.
3              THE COURT:  I'm sorry.  You may step down, sir.
4          I understood the defendant's point.  I thought the
5    government wanted to address something with regard to the
6    exhibits.  We can wait until Mr. Davis exits the courtroom.
7              (Witness not present)
8              THE COURT:  Go ahead.
9              MS. CUCINELLA:  Certainly, your Honor.  One of the
10   exhibits is a summary of the training he received that covers
11   the time period.
12             THE COURT:  What exhibit?
13             MS. CUCINELLA:  I have to turn to it quickly.  My
14   apologies.
15             MR. BERKE:  I think that's 504.  I see it includes
16   earlier periods.  As to 504 we also would not have an
17   objection.
18             THE COURT:  All right.  If you can remind me of that
19   when we return from the break.  What else?
20             MS. CUCINELLA:  The other ones deal with insider --
21   what the ethics policy and the insider trading policy in 2014.
22   It is the government's allegation that the conspiracy was still
23   ongoing at that point.  It's relevant, he was denying his
24   involvement in this conspiracy, and relevant to the fact that
25   he continued to be trained on these issues.
```

H3L3WAL3

```
 1            MR. BERKE:  But there is no allegation of giving any

 2    tips or Dean Foods trading or anything of the like related to

 3    that period.  That all ends in February of 2013.

 4            THE COURT:  That's my understanding also.

 5            MS. CUCINELLA:  That's fine.  As long as the one with

 6    the summary of the earlier comes in, then I think we're fine

 7    with the others.

 8            THE COURT:  500 has been received.  501, are you

 9    withdrawing that?

10            MS. CUCINELLA:  501 is the code of ethics.  Give me

11    one minute, your Honor.

12            At this point, it is reflected in the other exhibits

13    that he certifies that he is reminded of the code of ethics in

14    2014.  He throughout this period again is denying his

15    involvement in this.  The defense is going to make a big stink

16    about that throughout the cross-examination.  I think it is

17    relevant that to his state of mind throughout the period of the

18    conspiracy that he's continually reminded of his obligations

19    with respect to the board.  He's on the board through August of

20    2015.

21            THE COURT:  Well, let me see whether I understand

22    this.  501 was given to him in or about January 2014, at a

23    point in time when you say the conspiracy continued, but

24    there's no trading at issue in the charges pending against

25    Mr. Walters.
```

H3L3WAL3

1          MS. CUCINELLA:  There is no trading at issue, but the

2     conspiracy and the agreement to disguise the trading, to hide

3     the trading from law enforcement and to pretend that he is an

4     upstanding member of this board continues on.

5          THE COURT:  I understand that.  But how does the code

6     of ethics then have anything to do with anything, if there is

7     no allegation that inside information was communicated to

8     anyone after January 1, 2014?  The conspiracy may have

9     continued, but no inside information was communicated.

10          MS. CUCINELLA:  That's correct, your Honor.  But he

11     certifies that he is in compliance with the code of ethics in

12     2014.

13          THE COURT:  Where is that?

14          MS. CUCINELLA:  That is in I believe Government

15     Exhibit 502.

16          THE COURT:  Where is the compliance certification?

17          MS. CUCINELLA:  "Do you certify that you have received

18     and read the Dean Foods code of ethics?  Yes, I have received

19     and read them.  Do you certify that you fully understand and

20     agree to follow the Dean Foods code of ethics which includes

21     complying with all laws regarding the operation of our

22     businesses and all policies within the code?  Yes."

23          THE COURT:  When you said he certified he's in

24     compliance, it sounded to me like that certification was

25     speaking to some prior period of time.  But the text of this

H3L3WAL3

1    does not appear to be the case.

2              MS. CUCINELLA:  But from this point forward he goes on

3    to lie to law enforcement, to lie to the SEC, to lie to company

4    counsel, and to deny his involvement in this conspiracy.

5              THE COURT:  Okay.  Now what about lying to company

6    counsel, is that covered by the code of ethics?

7              MS. CUCINELLA:  I'm sure it is in some way.  If you

8    want us to look at it over the lunch break, we can.

9              THE COURT:  Yes.  So far, I'm going to allow you to

10   offer 504.  That's it.  See you after lunch.

11             MR. BERKE:  Thank you, Judge.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H3ldwal4                      Davis - direct

**A F T E R N O O N   S E S S I O N**

2:06 p.m.

THOMAS C. DAVIS,

     resumed, and testified further as follows:

          (Jury not present)

          THE COURT:  Please bring in our jurors.

          (Jury present)

          THE COURT:  Good afternoon, ladies and gentlemen.

Please be seated.

          I hope there was a hint of spring out there.  That's

good to hear.

          Please be seated, sir.

          Government Exhibit 504 is received.

          You may continue, Ms. Cucinella.

          (Government's Exhibit 504 received in evidence)

          MS. CUCINELLA:  Thank you, your Honor.

          Ms. Meister, if you can pull up 504 and publish it for

the jury and the witness.

          It will be on your screen, Mr. Davis.

DIRECT EXAMINATION (Resumed)

BY MS. CUCINELLA:

Q.  Just briefly, can you tell the jury what they're looking at

here?

A.  Oh, yes.  This is a report of some module studies that I

did while I was a director of Dean Foods, and there were

H3ldwal4                          Davis - direct

various components to these studies, little classes that I had
to take.  And this depicts those various occasions when I took
these classes, and they all had to do with code of ethics,
insider trading, your responsibilities for financial reporting,
addressing potential whistleblower claims, etc.  So this is a
summary of the studies that I completed.

Q.  Thank you.  Ms. Meister, you can take that down.

Mr. Davis, you testified that you provided Mr. Walters
with inside information so that he could trade over a large
number of years, is that right?

A.  Yes, that's correct.

Q.  Do you remember clearly when you began passing him inside
information?

A.  I don't remember clearly but I certainly remember some
point that I do recall, yes.

Q.  OK.  So I want to go back to the summer of 2006 and
specifically the summer months of 2006.

MR. BERKE:  Your Honor, may we approach?  I apologize.

THE COURT:  Sure.

(Continued on next page)

1          (At the sidebar)

2          MR. BERKE:  Your Honor, you may recall we had a lot of

3    discussions about the conspiracy timeframe, 2008 to 2012.

4          THE COURT:  Yes.

5          MR. BERKE:  And the government indicated that if we,

6    the defense, were to make arguments that the period prior to

7    2008, that Mr. Walters trading in Dean Foods was illegal during

8    that period, they would reserve the right to suggest it wasn't.

9    We have not done that, obviously.  And I am concerned that by

10   starting a question 2006, Ms. Cucinella is going to a place

11   where we would say it is not permitted.

12         MS. CUCINELLA:  Mr. Berke did open on that issue.  He

13   said that you will see that the trading from before the alleged

14   conspiracy began was the same as it was after the conspiracy

15   began.  He opened on the issue.  He opened the door to it.

16         We're just going to go briefly through those sections.

17   His trading records with respect to those issues are already in

18   so we can quote.  This is perfectly proper.

19         MR. BERKE:  Actually, your Honor, we specifically did

20   not reference any trading in Dean Foods prior to 2008.  That is

21   very clear.  What I was referring to was trading in other

22   stocks during the conspiracy and before.  There is no reference

23   to trading Dean Foods before 2008.  It was very clear and it

24   was very deliberate.

25         THE COURT:  Well, it seems to me I start from the

H3ldwal4                          Davis - direct

1    premise that I would ordinarily allow it as background to the

2    conspiracy and how the conspiracy came about, and the fact that

3    it's prior to the period covered by the indictment has

4    significance in that it cannot be the basis for a jury's

5    finding of guilt against the defendant because it predates the

6    date of the charged conspiracy, which is what date is the --

7             MS. CUCINELLA:  I believe we put it down as

8    January 1st of 2008.

9             THE COURT:  Is that correct, January 1, 2008?

10            MR. BERKE:  Yes, your Honor.

11            THE COURT:  So I'm going to instruct the jury that

12   it's taken for the limited purpose that it's background to the

13   conspiracy and that if it is the only evidence in the case

14   predating January 1, 2008, it may not be the basis for a

15   conviction.

16            MR. BERKE:  Well, your Honor, if I may?

17            THE COURT:  Yes.

18            MR. BERKE:  The government is not allowed -- remember

19   your Honor directed them to identify any trading that they

20   would be relying on in this case, and they identified 13

21   trades.

22            THE COURT:  I don't think I ordered them -- I think I

23   ordered them to disclose any trades that were part of the

24   charged crime.

25            MR. BERKE:  I think your Honor ordered that -- and

1   Mr. Schoman will correct me if I am wrong, but I thought your

2   Honor ordered -- I think it is more in the middle -- I think

3   your Honor ordered any trading that they would be offering in

4   support of proving the conspiracy.

5              THE COURT:  OK.  Is that correct?

6              MS. CUCINELLA:  Your Honor, I think I can -- Mr. Davis

7   is expected to testify that he does not recall passing

8   confidential information prior to 2008.  We are establishing

9   background of his role in Dean Foods, what was going on there

10  in Dean Foods during this time period and when he saw the

11  defendant during this time period.  I do expect he will testify

12  he does not have a specific recollection, but it's possible

13  that he passed during this.  So there won't be specific

14  trades --

15             THE COURT:  You are not going to elicit testimony as

16  to any specific trade prior to January 1, 2008; is that

17  correct?

18             MS. CUCINELLA:  Not today, no.  We are going to go

19  through what was going on with Dean Foods.

20             MR. BERKE:  Your Honor, my concern, you will just

21  notice she said "not for today."

22             THE COURT:  I heard that also.  I am only ruling for

23  today also.

24             MR. SCHOMAN:  Your Honor, just to be clear, I don't

25  think at this point, given that, that we would want any special

H3ldwal4                        Davis - direct

1    instruction at this point.

2              MR. BERKE:  That is correct.

3              MS. CUCINELLA:  That's what I wanted to preview that.

4              MR. BERKE:  We are not asking for any special

5    instruction.

6              THE COURT:  OK.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3ldwal4                          Davis - direct

1              (In open court)

2    BY MS. CUCINELLA:

3    Q.  Mr. Davis, I believe I had just directed your attention to

4    the summer of 2006.  I believe you testified that you and

5    Mr. Walters were friends by then, is that correct?

6    A.  Yes, we were.

7    Q.  And you were on the board of Dean Foods?

8    A.  Yes.

9    Q.  Do you recall what was happening with respect to Dean Foods

10   during the summer of 2006?

11   A.  Generally I do recall, yes.

12              MR. BERKE:  Your Honor, again, I am going to object in

13   light of the discussion we just had.

14              THE COURT:  All right.  I am going to take it subject

15   to your objection.

16              Go ahead.

17   BY MS. CUCINELLA:

18   Q.  What do you recall about what was happening in the summer

19   of 2006 with Dean Foods?

20   A.  The company had an inquiry from another investment banking

21   firm that met with Mr. Engles about a possible acquisition of

22   Dean Foods.

23   Q.  Do you recall what company was interested in a potential

24   acquisition of Dean Foods?

25   A.  Yes.

H3ldwal4                          Davis - direct

1   Q.   What company was that?

2   A.   Coke.

3   Q.   When you discussed the potential acquisition at board

4   meetings, did you refer to the company as Coke?

5   A.   No.  It was disguised with a code name.

6   Q.   Do you recall what the code name was?

7   A.   I think in this case it was called Canton, Project Canton.

8   Q.   I'm going to direct your attention to Government Exhibit

9   402, which is already in evidence.

10           MR. BERKE:  Your Honor, I would renew my objection.

11           THE COURT:  So noted.

12           Go ahead.

13           MS. CUCINELLA:  And can you display that for the jury,

14   as well.

15   Q.   Mr. Davis, what are you looking at here?

16   A.   This is the minutes from a telephonic board meeting.

17   Q.   And in looking -- and did you participate in that board

18   meeting?

19   A.   Yes, I did.

20   Q.   And looking be at these minutes, does this refresh your

21   recollection as to what code name was used for Coke?

22   A.   Yes, it does.  It was copper.  We had a lot of different

23   transactions with code names, but this particular one was

24   Copper.

25   Q.   Was it common to use code names in the situation of an

H3ldwal4                           Davis - direct

1    acquisition or a potential acquisition?

2    A.  Yes, it was.

3    Q.  Why was that?

4    A.  To keep it secret.

5    Q.  Were you allowed to share information about a potential

6    acquisition with people outside the company?

7    A.  No.  No, I was not.

8    Q.  Based on your experience as an investment banker and as a

9    member of Dean Foods' board, what would happen if the

10   marketplace learned that Coke was going to acquire Dean Foods?

11   A.  The stock would probably go up precipitously.

12   Q.  If this acquisition had gone through, what would likely

13   have happened to Dean Foods' stock price?

14   A.  It would have gone up, no doubt, because Coca-Cola was

15   talking about paying a significant premium over the current

16   stock price.

17   Q.  What does that mean?

18   A.  It means Coke was going to pay a lot more money than the

19   current stock price was trading at.

20   Q.  Do you recall for how long Dean Foods was in discussion

21   with Coke in connection with Project Copper?

22   A.  Yes.  Yes.  Roughly, I recall the sequence of events.

23   Q.  And, roughly, what do you recall?

24   A.  The companies -- both of the companies exchanged

25   confidentiality agreements to share information with one

H3ldwal4                         Davis - direct

another.  I know that Dean Foods hired legal counsel and

investment banking counsel as well, and there were a number of

meetings that summer between the representatives of Dean Foods

and the representatives of Coca-Cola.

Q.  Did the company undertake a process called due diligence?

A.  Yes.  Precisely.

Q.  What is due diligence?

A.  It's the process of reviewing information, a lot of

information -- financial information, legal information,

operating information.  All of that is called due diligence.

Q.  Did Coke ever purchase Dean Foods?

A.  No, it did not.

Q.  Do you recall exactly when the board learned that Coke

wouldn't be purchasing Dean Foods?

A.  It was a later board meeting in the fall, as I recall,

early fall, as I recall.

          MS. CUCINELLA:  Ms. Meister, if you could please pull

up Government Exhibit 406, which is already in evidence.

Q.  You can take a minute and review Government Exhibit 406.

          (Pause)

          Mr. Davis, do you recall what was disclosed at this

meeting?

A.  Yes.  It was a short meeting, telephonic meeting.

Q.  And what was discussed?

A.  Gregg Engles provided us an update on Project Copper.  And

1    he said that the CEO and CFO of Coca-Cola came to Dallas to

2    meet with him earlier in the week, and that he reported Coke

3    had decided it would not be going forward on a transaction with

4    Dean.  It was focusing on something else.

5    Q.  And do you remember this board meeting or are you reading

6    from the minutes?

7    A.  No.  I remember it very well.

8    Q.  Is it possible that you learned that Coke was no longer

9    interested in Dean Foods prior to this meeting?

10   A.  I probably had a phone call from Gregg Engles.  I don't

11   recall specifically but that would normally be the case.

12   Q.  You testified earlier that you and Mr. Engles were friends.

13   Was it typical for you to have conversations with him about

14   what was happening for the company outside of board minutes --

15   A.  Yes, it was.

16   Q.  -- or board meetings?

17   A.  It was fairly commonplace, yes.

18   Q.  What, if anything, was your reaction to learning that Coke

19   was no longer interested in acquiring Dean Foods?

20   A.  I was frankly surprised and probably somewhat disappointed.

21   I thought it was going to be a good deal for the Dean Foods

22   shareholders.

23   Q.  Up until the point it was called off, did you think it was

24   likely that the transaction would in fact occur?

25   A.  Yes.  I was of the opinion that it was likely to occur.

1    Q.  Were you aware at any point that the negotiations between

2    Dean Foods and Coke had become public?

3    A.  No.  They had not become public.  It had -- there was no

4    leak here that I was aware of.

5    Q.  Was there anything going on at Dean Foods in the summer of

6    2006 that was as significant as this potential transaction?

7    A.  No.

8    Q.  Do you recall whether you told Mr. Walters about the

9    potential Coke acquisition?

10   A.  I don't recall that, no.

11   Q.  You don't recall if you did, or you don't know?

12   A.  I don't know.  It's possible I told him but I don't recall

13   that.

14   Q.  I am going to direct your attention now to the transition

15   from 2006 to 2007.  Do you recall what was going on with the

16   company in late 2006/early 2007?

17   A.  Generally, yes.  It was sort of a transition year.  Yes.

18   Q.  Do you recall being in discussions about any specific

19   transaction for the spring of 2007?

20   A.  Yes.  Yes, we had teed up a specific transaction that

21   involved issuance of a special dividend, which we did in the

22   spring of 2007.

23   Q.  What is a dividend?

24   A.  It's a payment of cash that's made to the shareholders.

25   And in this case this was called a special dividend because it

1    was a one-time payment of cash to the Dean Foods' shareholders.

2    Q.  Did Dean Foods typically pay dividends to its shareholders?

3    A.  No, we did not prior to this.

4    Q.  Why was Dean Foods considering paying a special dividend in

5    the spring of 2007?

6    A.  It was a way to provide the shareholders some form of a

7    return that they wouldn't otherwise get.  They would get the

8    special dividend, retain the stock, and so it was a good deal

9    for the shareholders.

10   Q.  Directing your attention to Government Exhibit 408, which

11   is already in evidence.

12        Mr. Davis, what are we looking at here?

13   A.  Minutes from a Dean Foods board meeting dated February 12,

14   2007.

15   Q.  Did the board of Dean Foods discuss the special dividend at

16   this meeting?

17   A.  Yes, we did.

18   Q.  After this meeting, how likely did you think it was that

19   the dividend would actually occur?

20   A.  It was going to occur.  I mean, there was no reason it

21   wouldn't occur after it would have been approved.

22        MS. CUCINELLA:  Ms. Meister, if I can have you turn to

23   page 3.  I guess if you can put 2 and 3 up side by side.

24   Q.  Mr. Davis, would you have learned of the special dividend

25   prior to this meeting?

H3ldwal4                          Davis - direct

1    A.  I was aware of it, yes.

2    Q.  Do you recall how you were aware of it?

3    A.  I would have received the materials relating to this

4    dividend before this meeting.

5    Q.  Do you recall, Mr. Davis, when the special dividend was

6    announced publicly?

7    A.  My recollection was that it was announced in March, early

8    March, to be paid at the end of March, the beginning of April.

9    That's my recollection.

10   Q.  And prior to the special dividend being announced publicly,

11   did you have -- excuse me.

12          Prior to the announcement of the special dividend, was

13   it public information that Dean Foods was considering paying

14   this out?

15   A.  No.  No.  It was not.

16   Q.  Mr. Davis, did you tell Mr. Walters about the dividend

17   before it was announced on March 2nd?  Do you recall one way or

18   the other?

19   A.  I don't recall one way or the other, no.

20   Q.  Mr. Davis, do you recall generally what was happening with

21   Dean Foods at the end of the summer into the early fall of

22   2007?

23   A.  Well, we paid the special dividend and I think there was --

24   the environment was not fabulous in terms of the business

25   environment for the company.

H3ldwal4                         Davis - direct

1          MS. CUCINELLA:  Ms. Meister, if you will please pull

2     up for the witness Government Exhibit 701E.

3     Q.  Mr. Davis, do you recognize this?

4     A.  Yes.

5     Q.  What is it?

6     A.  This is the Dean Foods press release for the second quarter

7     result.

8          MS. CUCINELLA:  The government offers Government

9     Exhibit 701E.

10         MR. BERKE:  Your Honor, I object.  Relevance.

11         THE COURT:  Let me see.

12         (Pause)

13         The date of the document?

14         MS. CUCINELLA:  Is August 7th of 2007.

15         THE COURT:  I will allow it.

16         MS. CUCINELLA:  Ms. Meister, if you could publish the

17    exhibit.

18         (Government's Exhibit 701E received in evidence)

19    BY MS. CUCINELLA:

20    Q.  Mr. Davis, what was announced on August 7th of 2007?

21    A.  This was the second quarter results were announced here,

22    and they were -- I would characterize them as fairly dismal.

23    Q.  And do you recall generally what was happening with the

24    economy during the last part of 2007?

25    A.  Well, we had a -- the economy was poor, and the environment

that Dean Foods depended upon in terms of commodity prices, raw

milk prices and so forth, was very volatile.

Q.  Can you explain that to the jury, briefly?

A.  The largest input into the cost of processing milk was

obviously raw milk from the dairy farmers.  So as that cost

would rise, it would impact -- negatively impact the profits

that Dean would have.  And, conversely, if the price of raw

milk went down, Dean Foods made more money.

Q.  Mr. Davis, what is guidance when it's provided to the

analyst or investor community?

A.  Guidance is a term that's commonly used on Wall Street to

define what the Wall Street analysts provide in their reports.

They usually provide a range for quarterly and annual earnings

estimates, and that range is the guidance that they provide.

Q.  And how did Dean Foods use guidance?

A.  They were -- they would provide guidance to the analysts,

and the analysts would in turn provide their own estimates

based on the input that the company gave them.

Q.  Is guidance a form of passing the market confidential

information?

A.  No.  Not at all.  No.

Q.  How is it different?

A.  It's a form of providing the market an estimate of what the

projections might be for the company, which are not always

reliable and sometimes change.

H3ldwal4                        Davis - direct

1   Q.  What, if anything, is the difference between what the board

2   knows versus the guidance provided to Wall Street analysts and

3   investors?

4   A.  Generally the difference is that the board would have the

5   benefit of the inside -- or inside information of the company's

6   actual operating results compared to Wall Street's guidance,

7   which were merely estimates based on the public information

8   that they had.

9   Q.  During a quarter, were there circumstances under which a

10  company would change the guidance that it had provided to

11  analysts?

12  A.  It happened.  It does happen occasionally.  It is rare but

13  it does happen.  The guidance is sometimes changed.

14  Q.  Under what circumstances would that sometimes happen?

15  A.  If the guidance that the company has provided the analysts

16  are substantially different from the actual operating results,

17  then the company will sometimes revise the guidance, either up

18  or down, to try to provide a better estimate for the Wall

19  Street analysts about what's actually going to happen.

20  Q.  As a member of a board of directors and the Board of

21  Directors at Dean Foods, would you know if the company was

22  going to change guidance in the middle of a quarter before it's

23  publicly announced?

24  A.  Yes, I would.

25  Q.  Switching gears briefly.

1            We're talking about 2007 and the summer and fall of

2    2007.  During this time, how would you describe your

3    relationship with Mr. Walters?

4    A.  It was good.  It was really good.  We would see each other

5    frequently when I was in California and would play golf

6    together.

7    Q.  How often were you in California?

8    A.  Every summer for some period of time.

9    Q.  Generally when in the summer were you in California?

10   A.  I think I mentioned this earlier.  You know, I was usually

11   out there July and August, part of July and part of August.

12   Q.  Along with seeing Mr. Walters in person, did you also speak

13   with him on the phone?

14   A.  Yes, I did, frequently.

15   Q.  What types of things did you talk about?

16   A.  We talked about a lot of different things.  We talked about

17   golf.  We talked about golf equipment.  We talked about

18   gambling.  We talked about football.  We talked about politics

19   sometimes.  And we talked about some stocks, some investments.

20   Q.  Did you also talk about professional ventures or

21   professional -- or, excuse me, investment opportunities?

22   A.  Yes, we did.

23   Q.  I'm going to direct you to your binder because I think it

24   will easier than the screen, and have you look at what's been

25   marked for identification as Government Exhibit 1731, 1748,

H3ldwal4                          Davis - direct

1    1749 and 1910AA.

2              (Pause)

3    A.  Starting with 1731?

4    Q.  1731, yep, and the next one, two, three, four -- oh, and

5    1912.  Five documents.

6    A.  I've got it.

7    Q.  What are these documents?

8    A.  These are all email threads from various people, from me to

9    a young guy that used to work for me, from -- a forwarded email

10   from some people that knew Bill that were in the golf course

11   business.

12   Q.  Do they all relate to potential investment opportunities

13   involving both you and Mr. Walters?

14   A.  Yes, but primarily sourced by Mr. Walters and he shared

15   this with me.

16   Q.  OK.  Let me stop you for a minute.

17             MS. CUCINELLA:  The government offers Government

18   Exhibit 1731, 1748, 1749, 1910AA and 1912.

19             THE COURT:  Any objection?

20             MR. BERKE:  No objection, your Honor.

21             THE COURT:  Received.

22             (Government's Exhibits 1731, 1748, 1749, 1910AA and

23   1912 received in evidence)

24             MS. CUCINELLA:  Ms. Meister, if you can pull up

25   Government Exhibit 1731 as an example.

```
 1   Q.  And, Mr. Davis, that should come up on your screen which
 2   might make it a little easier.
 3   A.  OK.  I've got it.
 4   Q.  What is the date of this email?
 5   A.  It's June 15, 2007.
 6   Q.  And can you explain what's going on in this email exchange?
 7           MS. CUCINELLA:  Ms. Meister, if it is more than one
 8   page, is it possible to do it side-by-side?
 9           (Pause)
10   Q.  You can go ahead, Mr. Davis, while she is setting that up.
11   A.  OK.  Well, this is a thread -- an email thread.  The bottom
12   one is to a fellow named Joe Munch, who ran a golf course
13   management company, and he was a friend of Mr. Walters.  And I
14   guess I was forwarded this email from Joe, and I, in turn,
15   forwarded the email to a young man named Ricky Reese, who
16   worked for me.  And this email contained a spreadsheet that was
17   attached about a transaction to acquire a group of golf courses
18   that were being sold.
19   Q.  Do you remember, was this an opportunity that Mr. Walters
20   had brought to you, or what was your role in this?
21   A.  This was an opportunity that he brought to me.  He I think
22   sought my opinion about financing this, about whether or not I
23   might want to participate in investing in this.  But we talked
24   about it at some length, and I actually think I even met Joe
25   Munch at one point in time.  But ultimately I think Mr. Walters
```

H3ldwal4                        Davis - direct

1    decided not to pursue this particular investment.

2    Q.  Is this email and this particular transaction an example of

3    the types of transactions or opportunities you would discuss

4    with Mr. Walters during this time period?

5    A.  Yes.  It is a good example.

6    Q.  Let's look at Government Exhibit 1910AA, and we can put up

7    1912 as well.

8           Starting with Government Exhibit 1910AA, Mr. Davis,

9    what are we looking at here?

10   A.  This is an email from Mike Luce who worked for Bill

11   Walters.

12   Q.  And what is it about?

13   A.  This is about a project in Las Vegas.  It was actually an

14   office/high-end strip mall project that -- retail project that

15   he was looking at in Las Vegas.  I'm not sure whether he

16   already had an investment in it or -- actually, Mike says

17   they're currently searching for a loan on the second phase.

18   So, this was a second phase project for them.

19   Q.  Do you have a specific recollection of this transaction or

20   this opportunity, or are you just looking at what you read in

21   the email?

22   A.  I remember seeing a handful of deals like this from

23   Mr. Walters, and I don't remember this one specifically

24   without, you know, referencing the email.  But he showed me a

25   handful of transactions like this.

H3ldwal4                          Davis - direct

1    Q.  And turning to Government Exhibit 1912.

2            What is the date of this email?

3    A.  This is October of 2009.

4    Q.  And who is it from?

5    A.  It's from Mike Luce again, and the subject matter is Castle

6    Hills.  And this was another project that Mr. Walters and I

7    talked about at some length.  Castle Hills was a golf

8    course/residential development project in Dallas, outside of

9    Dallas, in a suburb of Dallas, and it was a pretty interesting

10   project, actually.

11   Q.  Did you get involved in it?

12   A.  I did not, no.  Ultimately did not.

13   Q.  Why not?

14   A.  I'm not sure in this case what stopped us.  I had spent

15   some time looking at Castle Hills because I liked the project.

16   I think it was more the timing was bad.  This email, since it

17   was a big residential development, 2009 still wasn't a great

18   time to be doing a residential development around a golf

19   course.

20   Q.  Did you take Mr. Walters up on any of the opportunities

21   that he showed to you during this 2007 to 2009 period?

22   A.  Not that I recall, no.

23   Q.  Why not?

24   A.  I don't think there was any specific reason why other than

25   they just -- I didn't see anything that just blew me away, to

H3ldwal4                        Davis - direct

1   put it in sort of the vernacular.

2   Q.  Are these emails just examples of the types of deals or

3   transactions you would discuss?

4   A.  Yes, they are.

5   Q.  Sorry, I didn't mean to cut you off.

6   A.  I'm sorry.

7   Q.  Were you done with your answer?

8           THE COURT:  You can finish your answer.

9   A.  These are I think relatively good examples of some

10  transactions that he showed me from time to time.

11  Q.  OK.  Turning back to 2007.  What was happening with you

12  personally in 2007?

13  A.  I got married.

14  Q.  Who did you marry?

15  A.  I married a woman named Terry Rasmussen.

16  Q.  Was Mr. Walters invited to your wedding?

17  A.  No.

18  Q.  Had Mr. Walters met Mr. Rasmussen before?

19  A.  Yes, yes, several times.  A number of times.

20  Q.  When was the wedding scheduled for?

21  A.  September 28th.

22  Q.  Did your wedding plans change?

23  A.  They did, yes.

24  Q.  Why did they change?

25  A.  I need a moment, please.

H3ldwal4                        Davis - direct

1   Q.  Certainly.

2                THE COURT:  Yep.

3                (Pause)

4   A.  Terry and I lost a son.  It was her son and my stepson.

5   And he was tragically killed in the first week of September,

6   two weeks before we got married.

7   Q.  Was that a difficult time for you?

8   A.  Yes.

9   Q.  Did you postpone the wedding?

10  A.  I was going to postpone the wedding.  I postponed what we

11  originally planned to do and told my wife that we would get

12  married at a later date.  We were already living together.  We

13  shared a house together.  And she insisted that we get married

14  on the date that we planned to get married on.  So we did.  We

15  got married on September the 28th, and we just had a small

16  family wedding at a restaurant in Dallas.

17  Q.  Mr. Davis, did you tell Mr. Walters that Terry's son had

18  died?

19  A.  Yes, I did.

20  Q.  What was his reaction?

21  A.  I would say he was -- he and his wife were very

22  sympathetic.  They were quite nice to Terry and I.

23  Q.  How, if at all, did this event impact your relationship

24  with Mr. Walters?

25  A.  Well, we were already close friends, but, you know, I think

1    his legitimate concern and sympathy was -- didn't go unnoticed.

2    Let me put it that way.

3    Q.  By you and your wife?

4    A.  Yes.

5    Q.  Mr. Davis, you testified that through 2007 you don't have a

6    specific recollection of conversations that you had with

7    Mr. Walters about Dean Foods, is that right?

8    A.  I think that's accurate, yes.

9    Q.  When is the first time that you recall having a specific

10   conversation about Dean Foods with Mr. Walters?

11   A.  Early in 2008.

12   Q.  What specifically do you remember about that conversation?

13   A.  I remember we had a very important board meeting.  It was a

14   two-day board meeting in early February.  I think it was

15   February 5th and 6th of 2008.  And this board meeting was a

16   rather lengthy strategy session that the management team

17   provided the Board of Directors.  And I was so impressed with

18   all the changes and the strategy changes that had been

19   suggested by the management that it made a huge impact on me.

20   And I remember calling Billy shortly thereafter and telling

21   him -- this is the reason I remember the call.  Excuse me, your

22   Honor, for the language.  But I said this is a -- this stock is

23   a screaming fucking buy right now.

24   Q.  And when you told Mr. Walters that the stock was a

25   screaming buy, so to speak, what was that based on?

H3ldwal4                         Davis - direct

1    A.  Everything I had just heard at this board meeting on

2    February the 5th and 6th.

3    Q.  I'm going to have Ms. Meister pull up for you, Mr. Davis,

4    what's been marked for identification as Government Exhibits

5    421 and 479.

6            Do you recognize these?

7    A.  Yes, I do.

8    Q.  What are they?

9    A.  These on the left is the minutes from the February 5th and

10   6th board meeting that I was referring to, and on the right is

11   about a hundred-page summary of the Dean Foods strategy that

12   was outlined at this board meeting.

13           MS. CUCINELLA:  The government offers Government

14   Exhibits 421 and 479.

15           MR. BERKE:  No objection, your Honor.

16           THE COURT:  Received.

17           (Government's Exhibits 421 and 479 received in

18   evidence)

19           MS. CUCINELLA:  Ms. Meister, if you could publish

20   those.

21   Q.  Mr. Davis, do you recall where this board meeting was held?

22   A.  This was held at the Crescent Hotel in Dallas.

23   Q.  Did you consider this to be a significant meeting?

24   A.  I did.  I thought it was a very significant meeting.  It

25   was quite enlightening, and it was, as is referred to, the need

H3ldwal4                          Davis - direct

1    for change, and it outlined a number of different strategic

2    changes and operating changes that the management company

3    planned to employ here.

4    Q.  Do you recall any specific changes that were discussed

5    during this meeting?

6    A.  Well, there were a number of changes.  Up until really 2007

7    and early 2008, I think you could characterize Dean Foods as a

8    large decentralized group of dairies.  I think we owned 83

9    different dairies, or approximately that many at this point in

10   time, and each one operated almost separately with a separate

11   management team, a separate finance group, a separate

12   purchasing group and so forth.  And it wasn't very efficient

13   for a $10 billion company to operate that way.  And so part of

14   the need for change here and the strategy was to try to

15   consolidate certain operations like purchasing, where you can

16   save a lot of money by purchasing in bulk, and save a lot of

17   money in terms of managing the financial operations of all

18   these different dairy groups.

19            So, that's just a couple of examples that were

20   outlined in this two-day board meeting.

21   Q.  Mr. Davis, did you consider the information that you

22   learned at this meeting to be confidential?

23   A.  Yes, I did.

24   Q.  Was this information available to the public?

25   A.  No, it was not.

H3ldwal4                        Davis - direct

Q.  You talked a little bit earlier about guidance and that

Dean Foods would make guidance available to investors and

analysts, right?

A.  Yes, we did.

Q.  Along with guidance, would the company's management and/or

investor relations, would they ever alert the public to

strategic changes or anticipated strategic changes?

A.  They would from time to time have meetings with investor

groups and discuss strategic changes, yes, from time to time.

Q.  As a member of the Board of Directors, did you have an

understanding of why management would sometimes alert the

investor community to such changes?

A.  Well, I think sometimes the rationale to do that change,

but in this case this was such a significant change in strategy

and operating strategy that I know that Gregg did a pretty

commendable job of trying to enlighten the investment community

about what might happen here.  This was about a two- or

three-year plan that was going to be deployed here.

Q.  Mr. Davis, were you allowed to make representations about

strategic changes like this to investors?

A.  No.  No, I was not authorized to do that.

Q.  Did you have an expectation, if the plans that were

discussed at that meeting were put into place how, if at all,

that would affect the value of Dean Foods stock?

A.  Yes.  I did have an expectation of that.

H3ldwal4                          Davis - direct

1    Q.   And what was that expectation?

2    A.   I thought it would enhance the value of the stock.  I

3    thought the stock would reflect these changes.

4    Q.   And was that longterm or short-term?

5    A.   Well, both, but primarily longterm.

6    Q.   Short-term, do you have a recollection of what the outlook

7    for Dean Foods was in February of 2008?

8    A.   I'll say, I think the -- my recollection was the outlook

9    was good.

10   Q.   I'm going to turn your attention now to Government Exhibit

11   422.

12           MS. CUCINELLA:  Ms. Meister, if you can pull it up for

13   the witness.

14   Q.   Do you recognize this?

15   A.   Yes.

16   Q.   What is it?

17   A.   These are the minutes from a February 27th board meeting,

18   2008.

19   Q.   And did you attend that meeting?

20   A.   Yes, I did.

21           MS. CUCINELLA:  The government offers Government

22   Exhibit 422.

23           MR. BERKE:  No objection, your Honor.

24           THE COURT:  All right.  Received.

25           (Government's Exhibit 422 received in evidence)

H3ldwal4                          Davis - direct

1            MS. CUCINELLA:  We can publish that for the jury.

2     BY MS. CUCINELLA:

3     Q.  Mr. Davis, did you intend -- did you attend this meeting?

4     A.  Yes, I did.

5     Q.  I'm sorry.  Did you attend it or did you participate?

6     A.  I participated.  Sorry, this was a telephonic meeting.

7     Q.  Do you recall what was discussed at this meeting?

8     A.  Yes, I do.

9     Q.  What was discussed?

10    A.  This was -- this meeting was primarily for the purpose of

11    approving a common stock offering that the company planned on

12    doing.

13    Q.  What's a common stock offering?

14    A.  That means the company was going to sell stock on the

15    public market and raise capital.

16    Q.  Did you have an understanding of why Dean Foods was

17    considering doing a stock offering?

18    A.  Yes.  Yes.  I was well aware of this.

19    Q.  Will you explain it to the jury.

20    A.  Well, one of the reasons was for growth capital.  The

21    second reason was to use some of the proceeds to pay down debt.

22    The company had incurred a large amount of debt in 2007, when

23    we issued the special dividend.  The company incurred about $2

24    billion of additional debt for the special dividend in the

25    prior year.  And so while we were not in any kind of danger

H3ldwal4                    Davis - direct

1   financially, it was just a good practice to try to pay down

2   some of this debt.

3   Q.  When was the equity offering planned for?

4   A.  I think it actually got done in March.

5   Q.  Other than the equity offering, what else was discussed at

6   this meeting?  And if you need to, you can review the minutes

7   in your binder.  Let me know if that refreshes your

8   recollection.

9            (Pause)

10           I can ask it another name -- another way.

11           Was the short-term outlook for the company discussed

12   at this meeting.

13   A.  Yes.  Yes.  I'm sorry.  It was.  And it was good.

14   Q.  OK.  Do you recall, Mr. Davis, when you first learned about

15   the meeting that was going to be held on February 27th and the

16   purpose of the meeting?

17   A.  I think I received a memo prior to the meeting outlining

18   the time for the meeting.

19   Q.  Could you just move the microphone closer to your mouth?

20   A.  Yes.  I'm sorry.  I think I received a memo, or some sort

21   of a notice, prior to the meeting that outlined the time of the

22   meeting.

23   Q.  I'm going to show you Government Exhibit 1900, which is

24   already in evidence, and also Government's Exhibit 1901, which

25   I believe is not yet in evidence so we need to show it to just

H3ldwal4                          Davis - direct

1    the witness.

2              (Pause)

3              Do you recognize Government Exhibit 1901?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  It's an email from my assistant to me basically notifying

7    me of --

8    Q.  I'm going to stop you there.

9    A.  Based on --

10   Q.  I'm going to stop you right there.

11   A.  It is an email from my assistant to me.

12             MS. CUCINELLA:  The government offers Government

13   Exhibit 1901.

14             MR. BERKE:  No objection, your Honor.

15             THE COURT:  Received.

16             (Government's Exhibit 1901 received in evidence)

17             MS. CUCINELLA:  Ms. Meister, if we can put both of

18   those up for the jury.

19   Q.  Can you explain what Government Exhibit 1901 was?

20   A.  1901 is the email from my assistant to me.

21   Q.  And what is that dated?

22   A.  Just the date is February 21st.

23   Q.  And what are you instructing your assistant to do?

24   A.  This is a notice from her about the Dean Foods board call,

25   telephonic board call, and I said put it on my calendar.

H3ldwal4                          Davis - direct

1   Q.  And turning your attention now to Government Exhibit 1900,

2   what is the date of this email?

3   A.  February 19th.

4   Q.  And based on this email, did you know what the

5   February 27th board meeting would be about?

6   A.  I knew precisely what it would be about.  It's quite clear

7   in this email the subject matter for the board meeting.

8   Q.  And what was the subject matter of the board meeting?

9   A.  That we were going to approve the 10K for the company and

10  we were going to discuss this -- the stock offering, this

11  equity offering.

12  Q.  Mr. Davis, what, if anything, did you tell Mr. Walters

13  about the equity offering?

14  A.  I told him that we were going to do this equity offering.

15  And I also told him that I thought it was a positive thing for

16  the company.  I thought it was would be positively received by

17  the shareholders.

18  Q.  What do you mean when you say that, "positively received?"

19  A.  I thought that after the offering was done, the stock might

20  have a chance of going up.

21  Q.  During that conversation, what, if anything, did

22  Mr. Walters say in response to the information that you passed

23  him?

24  A.  He thanked me for it.

25  Q.  Do you recall when this conversation took place?

H3ldwal4                        Davis - direct

1   A.   I don't recall precisely a day, but it was certainly before

2   the equity offering was announced.

3   Q.   When you passed Mr. Walters that information, did you have

4   an expectation of what he would do based on the information you

5   passed him?

6   A.   Yes.  I thought he would use the information and trade in

7   the stock.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3L3WAL5                         Davis - direct

1    Q.  Showing you what's been marked as Government Exhibit 1902.

2    Do you recognize this document?

3    A.  Yes.

4    Q.  What is it?

5    A.  It is an e-mail from my assistant to me.

6              MS. CUCINELLA:  Government offers 1902.

7              MR. BERKE:  No objection, your Honor.

8              THE COURT:  Received.

9              (Government's Exhibit 1902 received in evidence)

10   Q.  Mr. Davis, you testified that you don't recall when this

11   conversation took place where you told Mr. Walters about the

12   equity offering, right?

13   A.  Yes, I didn't recall precisely, yes.

14   Q.  Looking at Government Exhibit 1902, will you read -- remind

15   the jury who is April Moffet?

16   A.  I'm sorry?

17   Q.  Who is April Moffet?

18   A.  She's my assistant.

19   Q.  What is the jury looking at here?

20   A.  This is the e-mail that she sent me, and it says "Subject

21   matter:  Bill Walters called for you.  Here's his phone number,

22   702-604-4141.  That's all I have.  Have a good weekend."

23   Q.  What is the date of this e-mail?

24   A.  It's February 22.

25   Q.  Mr. Davis, do you recall if you called Mr. Walters back?

H3L3WAL5                          Davis - direct

1   A.   It was my practice to call him back, yes, quite soon.   And

2   I did call him back, yes.

3   Q.   Sitting here today, do you remember specifically calling

4   him back?

5   A.   Yes.

6   Q.   Mr. Davis, do you recall how the market reacted to the

7   equity announcement?

8   A.   It didn't react as I expected.   It didn't react well, and I

9   was surprised, frankly.

10  Q.   Mr. Davis, were there occasions when you believed that an

11  event would have a positive effect on the stock price and it

12  didn't?

13  A.   Yes, there were those times, I was wrong sometimes.   My

14  opinion about what happens with the stock wasn't always

15  accurate.

16  Q.   Approximately when did Dean Foods' first fiscal quarter end

17  each year?

18  A.   It always ends in March, the end of March.

19  Q.   Generally speaking, how much time would pass at Dean Foods

20  from when the quarter would end and when the results, the

21  earnings announcement results were announced to the public?

22  A.   Let me break it down this way.   Usually we would get

23  internal sort of flash results a couple of weeks after the

24  quarter ended.   And then we would always have an audit

25  committee meeting to review the actual results, which would be

H3L3WAL5                          Davis - direct

1    available usually a month to six weeks after the quarter ended.

2    Q.  You mentioned flash results.  What are those?

3    A.  That is the unaudited interim results that the company

4    would have before the quarter ended.

5    Q.  Did you typically have access to those?

6    A.  Yes, I did.

7    Q.  Would you have access to those through your role on the

8    audit committee?

9    A.  Yes, I would.

10   Q.  Directing your attention now to Government Exhibit 423.

11   What are you looking at?

12   A.  This is the minutes from the March 5, 2008 board meeting.

13            MS. CUCINELLA:  Government offers Government Exhibit

14   423.

15            MR. BERKE:  No objection, your Honor.

16            THE COURT:  Received.

17            (Government's Exhibit 423 received in evidence)

18   Q.  Mr. Davis, did you attend this meeting on March 5 of 2008?

19   A.  Yes, I did.

20   Q.  Where was it held?

21   A.  This was at the company offices.

22   Q.  Do you recall what the tone or tenor of this meeting was?

23   A.  It was -- I think we had sort -- a mixed review but

24   generally positive at this time.

25   Q.  Can you explain that to the jury.

1    A.  I'm going to take a quick look at the minutes.

2    Q.  Sure.  You can refresh your recollection.  The minutes are

3    in the binder next to you.

4    A.  Okay, great.

5          Yeah, I would characterize the summary as being good.

6    The report at this point in time was largely based on what

7    happened in the fourth quarter of 2007, but the summary for

8    this first quarter looked good at this point in time.

9    Q.  Before we go on, Mr. Davis, you just took a moment to

10   refresh yourself with the board meeting minutes.  Over the

11   course of your tenure at Dean Foods, how many board meetings

12   did you attend?

13   A.  Let's see.  Let's do the math.  14 years on the board, an

14   average of six meetings a year.  What's that, over 100?

15   Q.  Not quite, but close.

16   A.  Okay.

17   Q.  Then as well as the regular board meetings, did you also

18   attend special committee meetings?

19   A.  Yes, I did.  I attended audit committee meetings and

20   compensation meetings.

21   Q.  So you have attended a lot of board meetings, is that

22   right?

23   A.  Yes.

24   Q.  Does reviewing the board meeting minutes help you put

25   things in place in time?

A.  It did.  I mean, I don't think anybody can remember exactly
what happened in a board meeting eight years ago, but I've been
asked to do so.

Q.  On the date in question here, on March 5 of this year,
would you have had the flash financials yet for the first
quarter?  Do you know?

A.  No, probably not.  No.  Not that early in March.

Q.  And if you can tell the jury now what do you remember about
that March 5 meeting after reviewing the minutes?

A.  Well, basically, the 2008 operating plan was -- the view
was mixed for 2008 because there was still a volatile
environment, a commodity environment.  So, it was really hard
for -- my recollection was it was really hard for the company's
management to project what was going to happen here in 2008.

Q.  After the March 5 board meeting but before earnings were
announced, did you have another occasion to discuss Dean Foods'
performance with Mr. Engles?

A.  Yes, I did.  I had a lunch meeting with him.

Q.  I'm going to direct your attention to Government Exhibit
1903 and 1903-A.

         MS. CUCINELLA:  Ms. Meister, if you can pull those up.

Q.  Do you recognize these?  Let's focus on 1903-A.

A.  Yes, it's, again, an e-mail from my assistant to me.
Subject matter:  Lunch with Gregg Engles.

         MS. CUCINELLA:  Government offers 1903-A.

1              MR. BERKE:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibit 1903-A received in evidence)

4              MS. CUCINELLA:  Ms. Meister, if we can just publish

5    1903-A.

6    Q.  Mr. Davis, can you tell the jury what they're looking at

7    here?

8    A.  This was a e-mail from my assistant that said that she had

9    received a call from Gregg Engles' office regarding a lunch

10   meeting that he and I were going to have actually that day.

11   Which we did have.  Dated March 17.

12   Q.  Mr. Davis, sitting here today, do you have a recollection

13   of that lunch?

14   A.  Yes.  Yes, I do, I have a recollection of generally what we

15   talked about at that lunch.

16   Q.  Generally, what did you speak about?

17   A.  We talked about, we talked about the current operations for

18   Dean, how the company was progressing with the strategic

19   changes that had been outlined in February, and we talked about

20   the outlook for Dean for the remainder of the quarter and the

21   remainder of the year.

22   Q.  By March 17 of 2008, would Mr. Engles have had access to

23   the flash financials?

24   A.  Yes.  Yes.  He would have.

25   Q.  Remind the jury what flash financials are.

1   A.  They are usually the first two months of the quarter.  So,

2   that would have been the months of January and February.  He

3   would have had flash financials for the results for January and

4   February.

5   Q.  The information that you and Mr. Engles discussed at the

6   lunch on March 17 of 2008, was that information, the update of

7   the company, its outlook, would that have been known outside

8   the board or management of Dean Foods at that time?

9   A.  No, it would not.

10  Q.  Why do you say that?

11  A.  That was confidential information.  It would not be shared

12  with the public.

13  Q.  That lunch with Mr. Engles was on March 17.  When was the

14  quarter scheduled to close?

15  A.  The end of March.

16  Q.  Do you recall speaking to Mr. Walters after the lunch with

17  Gregg Engles?

18  A.  Yes, I know I had a call with him.  I don't know precisely

19  when it was, but I had a call with him.

20  Q.  Do you recall what you told him on this call?

21  A.  I told him what Gregg and I discussed at the lunch.

22  Q.  Do you have a specific recollection of that conversation?

23  A.  I don't have a specific recollection.  But I told him I

24  thought -- I still have a positive viewpoint on the stock

25  because of what was happening at the company.

H3L3WAL5                        Davis - direct

1    Q.  Mr. Davis, for how long would you and Mr. Walters typically

2    speak on the phone during this period of time?

3    A.  I characterized most of our conversations as short

4    conversations, you know, two or three minutes.  It would be

5    unusual for us to have a 10-minute phone conversation.

6    Q.  Did you typically only talk about one topic or would you

7    talk about more than one thing?

8    A.  I think we talked about more than one thing.  Sometimes if

9    it was a very short phone call and he had a purpose or I had a

10   purpose for the phone call, it might only be one minute and we

11   might only talk about one thing.

12   Q.  During that period of time, do you recall if you were

13   planning a trip to Palm Springs?

14   A.  Yes, I was.

15   Q.  Showing you what's been marked as Government Exhibit 1904

16   and 1905.  What are these?

17   A.  These are again e-mail threads between a friend of mine

18   named Bill Saxon who had a home in Palm Springs, and myself.

19           MS. CUCINELLA:  Government offers 1904 and 1905.

20           MR. BERKE:  No objection, your Honor.

21           THE COURT:  Received.

22           (Government's Exhibit 1904, 1905 received in evidence)

23           MS. CUCINELLA:  Ms. Meister, if we can publish

24   Government Exhibit 1905 for the jury.

25   Q.  Mr. Davis, looking at the bottom e-mail first, will you

1   read the e-mail for the jury.

2   A.   This is an e-mail from me to Mr. Saxon who I called Billy

3   Dee.  I said "I spoke with Billy Walters and he wants us to

4   play golf with him at The Reserve on Wednesday.  We are going

5   to meet him at 11:30 for lunch, and then play.  He also wants

6   us to join him and Susan that night for dinner.  We can bring a

7   fourth for golf if you want to add someone.  How does that

8   sound to you."

9   Q.   What's the date of this e-mail?

10  A.   It's April 2nd.

11  Q.   Looking at the top e-mail.  What's The Reserve, Mr. Davis?

12  A.   It is a golf club that Mr. Walters was a member of in Palm

13  Springs.

14  Q.   What does Mr. Saxon write back?

15  A.   He responded and said "I had dinner with Tom King," who was

16  another friend of ours in Palm Springs "last night and he will

17  be available for next Wednesday.  Tom and I played twice with

18  Billy last year at Eldo and Big Horn" referring to two other

19  golf courses "and then had dinner with all the girls at The

20  Reserve.  Everyone got along very well and a good time was had

21  by all, so everyone is looking forward to next Wednesday."

22  Q.   You can take that down.

23         Mr. Davis, did you in fact go to Palm Springs?

24  A.   Yes, I did.

25  Q.   Do you recall when you went?

H3L3WAL5                              Davis - direct

1    A.   I went in April and stayed with Bill Saxon.  I stayed in

2    his home for this trip.

3    Q.   Did you in fact golf with Mr. Walters?

4    A.   Yes, we did play golf.

5    Q.   I need to finish my question.  I'm sorry.

6    A.   That's all right.

7    Q.   Did you in fact golf with Mr. Walters on that trip?

8    A.   Yes, I did.

9    Q.   Do you recall when?

10   A.   I don't recall the exact day.  But I could reference it

11   based on this e-mail.

12   Q.   Do you recall approximately when?

13   A.   I think it was like April the 9th or 10th.

14   Q.   Early April?

15   A.   Early April, sorry, yes.

16   Q.   When were the first quarter 2008 earnings for Dean Foods

17   expected to be announced?

18   A.   Mid April.

19   Q.   After your trip to Palm Springs?

20   A.   Yes, they were.

21   Q.   Mr. Davis, when you saw Mr. Walters in Palm Springs, did

22   you discuss Dean Foods?

23   A.   Yes, I did.

24   Q.   Tell the jury what happened.

25   A.   We finished playing golf at The Reserve, the four of us had

1   a nice day on the golf course and had a bite to eat or a drink,

2   and Bill and I walked -- Billy Walters and I walked out of the

3   clubhouse together by ourselves to get our cars from the valet,

4   and he put his arm around my shoulder and asked me how the

5   milkman was.

6   Q.  Did you understand what he meant when he said how -- asked

7   how the milkman was?

8   A.  Yes, I understand it perfectly.  He was asking about Dean

9   Foods, which he sometimes referred to as the milkman.

10  Q.  Did you respond?

11  A.  I did.

12  Q.  How did you respond?

13  A.  I told him things looked really good and that the first

14  quarter earnings were going to be better than expected.

15  Q.  What, if anything, did Mr. Walters say in response?

16  A.  He said thanks, pal.

17  Q.  When you told Mr. Walters that information, was that

18  information available to the public?

19  A.  No.

20  Q.  Did you have an understanding of whether Mr. Walters owned

21  Dean Foods stock at this time?

22  A.  I didn't explicitly know that, but it -- I certainly

23  thought he owned stock, yes.

24  Q.  Why did you think that?

25  A.  It's just his reaction to the positive information.

1    Q.  You said that you didn't talk about Dean Foods with

2    Mr. Walters on this trip until you were by yourselves, is that

3    right?

4    A.  That's correct.

5    Q.  Did you typically talk about Dean Foods with Mr. Walters

6    when other people were around?

7    A.  Never, never one time did we ever discuss it in front of

8    anybody, including our wives.

9    Q.  After your trip to Palm Springs, do you recall whether you

10   spoke to Mr. Walters again before earnings were announced?

11               THE COURT:  All right, ladies and gentlemen, I'm going

12   to leave you in suspense.  We're going to take a midafternoon

13   break.  Do not discuss the case among yourselves or with anyone

14   else.  We'll be back in action in 10 minutes.  Thank you.

15               (Jury excused)

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

H3L3WAL5

1          MR. BERKE:  Your Honor, may I make an application

2     after the witness is excused.

3          THE COURT:  Please step out, Mr. Davis.

4          THE WITNESS:  Sure.

5          (Witness not present)

6          MR. BERKE:  Thank you, your Honor.  Your Honor, my

7     application relates to the pre-2008 evidence.  The way the

8     evidence came in is, while your Honor said that the government

9     could introduce it to show the background of the conspiracy, in

10    fact, Mr. Davis testified that he did not recall disclosing any

11    illegal inside information prior to 2008.  And then in response

12    to prompting by Ms. Cucinella said it was possible.  And then

13    Ms. Cucinella presented all sorts of critical events happening

14    in a pre-2008 period, no doubt suggesting -- and specifically

15    asking is it possible you disclosed this, is it possible you

16    disclosed that.  Obviously, your Honor, anything is possible.

17         In light of the testimony, where he didn't say he gave

18    prior to 2008, the allegations in the case, the disclosures in

19    the bill of particulars, and the terrible prejudice to

20    Mr. Walters because he can't be cross-examined since he doesn't

21    recall ever disclosing it, we would move to strike that

22    evidence as improper.  It is a suggestion the jury should draw

23    a conclusion based on nothing but speculation and innuendo, and

24    we would move to strike the pre-2008 testimony.

25         THE COURT:  I'm going to hear from the government.

H3L3WAL5

But what if he said he certainly doesn't remember disclosing

any confidential information.  It still could be background to

the conspiracy.  It shows how the two came to trust one

another, came to know each other, had a growing friendship.

All of that would be permissible.

          MR. BERKE:  First, your Honor, we object in terms of

it coming in as background to the conspiracy.  We understand

your Honor's ruling to that.  But we would say that where the

witness has said -- obviously, we know the witness pled guilty

and said about when he gave information in the conspiracy.  The

witness does not in any way corroborate that the background of

the conspiracy involved sharing material non-public information

before 2008.  He doesn't recall that.  All he says is it is

possible, and of course anything is possible.

          So I would suggest, your Honor, it's not probative of

anything, and it's terribly prejudicial, particularly given the

government brought in all these events that the witness himself

doesn't recall disclosing to Mr. Walters, but the suggestion

certainly is that it could have happened.  And anything could

happen.

          THE COURT:  I'll hear from the government after the

break.  But I renew my proposed instruction to the jury that

they may not base a conviction on any transaction that took

place prior to January 1, 2008.  It's not charged in the

indictment.  And no charge may be sustained solely on evidence

H3L3WAL5

1    of that which took place prior to January 1, 2008.

2              MR. BERKE:  Your Honor, our concern about giving that

3    instruction, at least at this juncture, is that, again, because

4    in our view, the suggestion is based on speculation and

5    innuendo, that it brings greater attention to it.  But we will

6    certainly give it some thought, your Honor, if your Honor

7    denies our application.

8              THE COURT:  Thank you.

9              (Recess)

10             (In open court; jury not present)

11             THE COURT:  Ms. Cucinella, is there anything further

12   you wanted to say on the subject?

13             MS. CUCINELLA:  Your Honor, just very briefly.  It's

14   the government's view that the 2006 and 2007 testimony is

15   relevant, as your Honor has pointed out, to the background of

16   the conspiracy and the development of the relationship.  It's

17   also relevant to, we believe, the issue that the defendant has

18   opened the door to, that being said, that's an issue for

19   another day.  We are not introducing trading at this point.

20             We also raise, your Honor, that this is information

21   that was included in the defendant's 3500, arguably exculpatory

22   material, and material that should be permitted to pull the

23   sting on, quite frankly.  We expect he'll be cross-examined on

24   how the relationship developed --

25             THE COURT:  Information that -- say what you just

H3L3WAL5

1   said?

2           MS. CUCINELLA:  Certainly.  Information that was

3   included in the witness's 3500 material about their

4   communications in 2006 and 2007.  And that he does not recall

5   passing confidential information during this period.  And so

6   it's information that we want to pull the sting on --

7           THE COURT:  That's what I didn't hear.

8           MS. CUCINELLA:  To front it.

9           THE COURT:  "Information that we want to pull the

10   sting on."

11           MS. CUCINELLA:  Yes.

12           THE COURT:  That's what I didn't hear you say.  What

13   does that mean?

14           MS. CUCINELLA:  To front it for the jury, the fact

15   that they talked about Dean Foods.

16           THE COURT:  Pull the sting on it.

17           MS. CUCINELLA:  Yes.  It means to front it for the

18   jury.  And address the fact that even though they were talking

19   about Dean Foods in 2006 and 2007, Mr. Davis has no

20   recollection as to whether or not he was passing confidential

21   information during that time period.

22           So we are fronting it, expecting that Mr. Berke will

23   do a very thorough cross-examination, and will likely go into

24   that area that was included in his 3500.

25           MR. BERKE:  Your Honor, if I may.  Contrary to

H3L3WAL5

1    Ms. Cucinella's suggestion, we had no intention of going into

2    2006, 2007.  In fact, that's why we filed a motion to preclude

3    the government from doing so.  That's why we made all the

4    applications early on for them to disclose whether they are

5    alleging any trades prior to 2008.  And in fact, the government

6    said they're only going to seek to introduce it if we argued

7    that the earlier Dean Foods trading was legal, which of course,

8    your Honor, as we said earlier, we have not done.

9            MS. CUCINELLA:  I believe in our motion in limine we

10   addressed both the background of the conspiracy angle as well

11   as the trading angle.  Mr. Carocci was on the stand yesterday

12   and today.  We have not yet introduced trading relating to 2006

13   and 2007.  It is an issue that we intend to take up another

14   day.  It is not relevant to this witness in the sense that we

15   will not be introducing that evidence at this time.  So we

16   believe that question should be kicked down the road.

17           THE COURT:  Everybody should have a seat.

18           The indictment itself alleges the formation of the

19   relationship in the mid '90s and it explains what it's centered

20   on, and that beginning at least 2007, Walters and Davis had

21   numerous prospective and actual business dealings with each

22   other which included, among other things, and so on.

23           These are not trades on which the government is trying

24   to hold Mr. Walters accountable or suggest that he engaged in

25   unlawful insider trading.  It is testimony from Mr. Davis as to

H3L3WAL5

1    the background of the conspiracy.  So, it stays.

2            The question that the defense must answer is whether

3    it would like me to give a limiting instruction, which I would

4    be delighted to give.

5            MR. BERKE:  Your Honor, thank you for the offer, I

6    don't think we would request it at this stage.

7            THE COURT:  Thank you.  Bring our jury in.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Ms. Cucinella, you may continue.

3    BY MS. CUCINELLA:

4    Q.  Mr. Davis, I'm going to ask Ms. Meister to put up on your

5    screen Government Exhibit 1906.  When we left before the break

6    we had been talking about April of 2008.

7            Do you recognize Government Exhibit 1906?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  It's an e-mail from a Dean Foods to me, subject audit call.

11           MS. CUCINELLA:  Government offers 1906.

12           MR. BERKE:  No objection, your Honor.

13           THE COURT:  Received.

14           (Government's Exhibit 1906 received in evidence)

15   Q.  Mr. Davis, does this e-mail refresh your recollection as to

16   whether you were on the audit committee in April of 2008?

17   A.  Yes, I was on the audit committee.

18   Q.  What is the audit committee?

19   A.  This is a subcommittee of the board of directors, usually

20   there's three people on the audit committee that deal with the

21   chief financial officer and the public accountants.

22   Q.  Over the course of the quarter, what financial information,

23   if any, would audit committee members have access to?

24   A.  I'm sorry, over what period?

25   Q.  Over the course of a typical quarter.

1    A.  We would always meet, the audit committee would always meet

2    before the quarterly earnings were released to the public.

3    Q.  I think my question was what financial information, if any,

4    audit committee members would have access to over the course of

5    a quarter.

6    A.  We would have access to virtually all the financial results

7    that were available.

8    Q.  How did that compare to information that regular board

9    members had access to?

10   A.  The regular board members would have access to that

11   information, they would just get it at a different time.

12   Q.  Who would get it first?

13   A.  The audit committee.

14   Q.  Do you recall on what day in 2008 the first quarter

15   earnings were announced?

16   A.  Well, based on the date of this memorandum, the audit

17   committee was scheduled for April 29, and usually the earnings

18   are released the day after that.  One or two days after that,

19   typically.

20         MS. CUCINELLA:  I'm going to ask Ms. Meister to please

21   pull up Government Exhibit 702-G which is already in evidence.

22   Q.  What are we looking at here, Mr. Davis?

23   A.  This is the press release of the first quarter earnings

24   released on April 30.

25   Q.  How were the Dean Foods earnings this quarter?

H3L3WAL5                         Davis - direct

1   A.  The headline I think sort of speaks for itself.  They were

2   better than expected, first quarter results.  Much better.

3   Q.  Mr. Davis, do you recall if you spoke to Mr. Walters after

4   the April 30 earnings announcement?

5   A.  I did, yes.

6   Q.  What do you recall?

7   A.  We typically talked after quarterly earnings were released.

8   And I would characterize the conversation as being one of a

9   confirmatory nature.  He usually liked to find out if there was

10  anything more I could add to color the first quarter earnings

11  results.

12  Q.  Do you have a specific recollection of talking to him after

13  this announcement or was that just your practice?

14  A.  Just a practice.  Generally.

15          MS. CUCINELLA:  You can take that down, Ms. Meister.

16  Q.  Mr. Davis, do you recall whether the second quarter of 2008

17  was also a good quarter for Dean Foods?

18  A.  It was a good quarter, yes.  It was a very good quarter.

19  Q.  I'm going to direct your attention to Government Exhibit

20  424.  Ms. Meister, if you can put up for the witness.

21          What is Government Exhibit 424?

22  A.  These are the minutes of the regularly scheduled quarterly

23  meeting of the board dated May 22, 2008.

24          MS. CUCINELLA:  Government offers 424.

25          MR. BERKE:  No objection, your Honor.

H3L3WAL5                          Davis - direct

1          THE COURT:  Received.

2          (Government's Exhibit 424 received in evidence)

3    Q.  Mr. Davis, did you attend this board meeting?

4    A.  Yes, I did.

5    Q.  Do you recall if Jack Callahan made a presentation at this

6    meeting?

7    A.  I'm sure, it was.  See if I see his name here listed.  Yes.

8    Yes.

9    Q.  Did he make a presentation at the board meeting?

10   A.  Yes.  Generally he would always make some presentation on

11   the financial update.

12   Q.  Who was Jack Callahan?

13   A.  He was the chief financial officer of Dean.

14   Q.  Sitting here today, Mr. Davis, do you recall this specific

15   board meeting or are you just speaking generally about

16   Mr. Callahan?

17   A.  No, I recall this meeting.  It was a pleasant meeting, very

18   good news.

19   Q.  Why was it good news?

20   A.  Well, we were having a bang up quarter, and the first

21   quarter was good, and the second quarter looked even better.

22   Q.  Was the expectations for the quarter discussed at this

23   meeting?

24   A.  Yes, I think they were.

25   Q.  Was that public information or non-public information?

H3L3WAL5                          Davis - direct

1    A.  It was non-public information.

2    Q.  Typically at a board meeting, was there both public and

3    non-public information presented?

4    A.  Yes, yes, I'm sorry to interrupt.  But yes, there would be

5    both public and non-public information.  But everything that

6    was discussed at the board meeting I tried to assume was

7    non-public.

8    Q.  So you recall that there was good news discussed at this

9    board meeting, correct?

10   A.  Yes, yes, there was.

11   Q.  During this period of time, did you monitor the stock price

12   of Dean Foods?

13   A.  Yes, I would say I did monitor it.  I was a shareholder,

14   yes, of course.

15   Q.  I'm going to direct your attention to Government Exhibit

16   1907 which is already in evidence.  Do you recognize these

17   e-mails?

18   A.  Yes, I remember this e-mail, yes.

19   Q.  Starting at the bottom e-mail, what is the date of this

20   e-mail?

21   A.  June 11, 2008.

22   Q.  Can you read the e-mail to the jury.

23   A.  This was an e-mail I initiated to Gregg Engles.  That said

24   "Do you believe the pressure on DF stock is because Lehman

25   Brothers is finally blowing out their stock."

H3L3WAL5                         Davis - direct

1    Q.   Can you explain that e-mail?

2    A.   Yes.  There had been some pressure on the stock in June.

3            THE COURT:  Meaning downward pressure?

4            THE WITNESS:  Yes, sir, yes, your Honor.

5    A.   The stock had been under some selling pressure.  And I

6    couldn't figure out why, frankly, because we were having a

7    good -- we had a good first quarter, and we were having a good

8    second quarter, so it was kind of a puzzle to me.  And I knew

9    that Lehman Brothers had a large position in the company stock.

10   And I thought maybe they were selling their position, and so I

11   sent this e-mail to Gregg to ask him if that might be the case,

12   because he usually monitored who of the institutional buyers,

13   who was selling and buying stock.

14   Q.   Will you read Mr. Engles' response to the jury.

15   A.   He said "Don't know TD, I would have thought they were

16   gone.  Market is crap and the futures price of milk is soaring.

17   That is probably the issue.  By the way, we're having a great

18   quarter.  Already at 25 cents through two months and guided to

19   26 to 31 cents."

20   Q.   Did you have an understanding of what Mr. Engles was saying

21   in that e-mail?

22   A.   Yes.  I do.

23   Q.   Will you explain your understanding to the jury.

24   A.   I think he's communicating really three messages there.

25   One is he didn't know about Lehman Brothers, he wasn't sure.

1   The second message here is that the futures price of raw milk,

2   which I talked about earlier, which is the milk from the dairy

3   farm, was soaring, which -- going up, which would have a

4   negative impact on Dean.  And then he goes on to say that

5   they're having a great quarter, the company's already earned 25

6   cents through two months and they had guided the analysts to

7   have 26 to 31 cents for the three months.  So, if you make 25

8   cents through two months and you've only given guidance of 26

9   to 31 cents, you are way ahead of the projections.

10  Q.  What is the reference to guidance here?

11  A.  That's the guidance that the company provides to the

12  financial analysts.

13  Q.  Was the information that Mr. Engles was conveying to you in

14  this e-mail publicly known?

15  A.  No, not at all.

16  Q.  What's the date of this e-mail?

17  A.  June 11, 2008.

18  Q.  I'm now going to ask you to turn to Government Exhibit

19  1907-A, just for the witness, Ms. Meister.  If we can look at

20  the second page.

21      Mr. Davis, do you recognize this?

22  A.  Yes.  It's an e-mail from Dean's chief legal officer to a

23  big group of people, including the board of directors.

24      MS. CUCINELLA:  Government offers Exhibit 1907-A.

25      MR. BERKE:  No objection, your Honor.

H3L3WAL5                          Davis - direct

1           THE COURT:  Received.

2           (Government's Exhibit 1907-A received in evidence)

3   Q.  Mr. Davis, who is Steve Kemps?

4   A.  He's the chief legal officer, in-house counsel for Dean

5   Foods.

6   Q.  Will you read this e-mail to the jury.

7   A.  "As a reminder, the trading window for purchases and sales

8   of Dean Foods stock closed today, Friday, June 13, 2008.

9   Purchases and sales of Dean Foods stock will not be permitted

10  until the window is reopened.  The window is expected to reopen

11  on Thursday, August 7, 2008, following our second quarter

12  earnings release."

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

h3ldwal6                        Davis - direct

1   Q.  Mr. Davis, what is a trading window?

2   A.  I think we talked about this a little bit earlier, but

3   basically all public companies have a window that's either open

4   or closed, and if it's closed that's what we refer to as a

5   blackout period.

6   Q.  And refresh the jury, because we did talk about this before

7   at the beginning of your testimony, why are there these

8   blackout periods?

9   A.  There are blackout periods specifically for timeframes

10  after quarterly earnings had been released but before the next

11  quarterly earnings are released.  So there is a period in there

12  where this group of people, including the management and the

13  Board of Directors, all had nonpublic information so they were

14  restricted from selling or purchasing the stock.

15  Q.  Is this an example of a situation where you were in

16  possession of inside information even before the trading window

17  closed?

18  A.  This is a good example of that, yes.

19  Q.  And based on Mr. Engles' email, you were in possession of

20  information about expected earnings, is that right?

21  A.  I'm sorry.  I missed the question.

22  Q.  Sure.  Based on the email from Mr. Engles, you were in

23  possession of information about expected earnings, is that

24  right?

25  A.  Absolutely.  Yes, I was.

1    Q.  Were you allowed to discuss that with anyone outside Dean

2    Foods?

3    A.  No, I was not.

4    Q.  What impact, if any, did you expect that that information

5    would have on the price of Dean Foods if it was publicly

6    announced?

7    A.  I think it would have a positive impact on the stock.  I

8    think it would make the stock go up.

9    Q.  Did you discuss it with anyone outside Dean Foods?

10   A.  At what point in time?

11   Q.  In June of 2008.

12   A.  Yes, I did.

13   Q.  Who did you discuss it with?

14   A.  I discussed it with Mr. Walters.

15   Q.  Were you allowed to do that?

16   A.  No.  It was against the law.

17   Q.  Why did you -- what information did you provide to him?

18   A.  I told him very specifically that we were way ahead of

19   projections for the second quarter.

20   Q.  Why did you tell him that?

21   A.  I expected him to benefit from trading the stock.

22   Q.  When you say benefit from it, what do you mean?

23   A.  It's a lot easier to make buy and sell decisions in the

24   stock if you've got perfect information.

25   Q.  Directing your attention to Government Exhibit 1907B.  Do

h3ldwal6                        Davis - direct

1    you recognize this?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  This is a memorandum from Brenda Carpenter, who was Jack

5    Callahan's assistant, to a group of people, including me.

6            MS. CUCINELLA:  The government offers 1907B.

7            MR. BERKE:  No objection, your Honor.

8            THE COURT:  Received.

9            (Government's Exhibit 1907B received in evidence

10           MS. CUCINELLA:  Ms. Meister, can we display the email

11   and the attachment side-by-side.

12   Q.  Could you explain to the jury what they're looking at?

13   A.  Yes.  The email on the left basically says that Jack

14   Callahan is going to release the press release, which you see

15   on the right.

16   Q.  Prior to receiving this email, did you know whether Dean

17   Foods was going to raise its guidance?

18   A.  I had -- I had a suspicion they were going to raise the

19   guidance.  I'm not sure I specifically knew that, but I had a

20   strong suspicion they were going to raise the guidance because

21   of how far ahead we were of the guidance.

22   Q.  You testified a few moments ago that you had spoken with

23   Mr. Walters and told him that you were expected to beat

24   expectations.  Was that conversation before or after this was

25   announced?

h3ldwal6                          Davis - direct

1   A.   It was definitely before this was announced.

2   Q.   When you had that conversation, did you also tell

3   Mr. Walters that Dean Foods was going to raise guidance?

4   A.   I don't recall doing that specifically.  I'm not sure when

5   I talked to him about being ahead for the quarter that I

6   actually knew that the guidance was going to be changed.  I

7   just don't recall.  I could have but I don't recall.

8   Q.   Mr. Davis, do you recall what the effect was of this

9   announcement that Dean Foods was going to raise its second

10  quarter guidance on the stock price of Dean Foods?

11  A.   My recollection was that it positively impacted the stock

12  price.

13  Q.   Did Dean Foods -- you can take that down, Ms. Meister.

14  Thank you.

15           Did Dean Foods' solid performance continue over the

16  summer of 2008?

17  A.   It did, yes.

18  Q.   Do you recall whether or not you updated Mr. Walters on the

19  progress of Dean Foods during this period?

20  A.   I did, yes.

21  Q.   Do you recall when?

22  A.   I'm sure I saw him that summer, and I'm sure I had a number

23  of phone calls that summer.

24  Q.   Do you have a specific recollection of any specific

25  conversations?

h3ldwal6                           Davis - direct

1    A.  We're in the summer of 2008?

2    Q.  Yes.

3    A.  I don't have a specific recollection, no.

4    Q.  I am going to direct your attention now to August of 2008.

5           Was it typical for Dean Foods to have a board meeting

6    in August every year?

7    A.  Yes, we did.

8    Q.  When was it typically held?

9    A.  It was always -- usually in the third week of August.

10   Q.  Did you usually attend that meeting?

11   A.  Yes, I did.

12   Q.  Was it typically held at the same place every year?

13   A.  Yes, which is why I liked to go to it.  We always had the

14   meeting in Colorado.

15   Q.  Where in Colorado?

16   A.  Typically we went to this hotel called the Broadmoor Hotel.

17   Q.  Do you recall if you attended that meeting in August of

18   2008?

19   A.  Yes, I did.

20   Q.  I am going to direct your attention to Government Exhibit

21   425.  Do you recognize this document?

22   A.  These are the minutes from the August board meeting.

23          MS. CUCINELLA:  The government offers Government

24   Exhibit 425.

25          MR. BERKE:  No objection, your Honor.

h3ldwal6                              Davis - direct

1             THE COURT:  Received.

2             (Government's Exhibit 425 received in evidence)

3    BY MS. CUCINELLA:

4    Q.  Mr. Davis, do you recall what was discussed at this

5    meeting?

6    A.  Again, we discussed the results of the second quarter, and

7    we had our usual update about the operating performance of the

8    company during the quarter.  I'm talking about the existing

9    quarter, which now would have been the third quarter.  And we

10   would talk about the outcome -- the outlook, I'm sorry, for the

11   year.

12   Q.  Directing your attention to page 6.

13   A.  This is 425?

14             (Pause)

15   Q.  Actually, my mistake.  Page 5.

16   A.  Oh, thanks.  I've got it.

17   Q.  I may have the wrong page.

18             Do you remember if you discussed a specific project

19   during this meeting?

20   A.  I do recall this.  I think we discussed -- what was the

21   code name?  Go to the next page.  I can't remember it.

22   Q.  If you don't remember the code name, do you remember

23   generally the topic?

24   A.  I do.  I remember it well, yeah.

25   Q.  What was --

h3ldwal6                         Davis - direct

1   A.  Project Plano.

2   Q.  And what was Project Plano?

3   A.  Project Plano referred to the possible acquisition of Dean

4   Foods by a large European consumer food company.

5   Q.  What was the name of that company?

6   A.  It was Danone.

7   Q.  And sitting here today do you remember that, or are you

8   looking at the board meeting --

9   A.  No, I remember it very well.  It was an interesting

10  opportunity, I thought.

11  Q.  Following this meeting, did you consider yourself to be in

12  possession of nonpublic information about Dean Foods?

13  A.  Yes, I was.

14  Q.  And can you tell the jury a little bit more about Project

15  Plano from your memory?  If you look away --

16  A.  We had actually --

17  Q.  Mr. Davis, if you can look away from the minutes and just

18  tell us what you remember.

19  A.  We had a couple of inquiries -- "we."  Gregg Engles had a

20  couple of inquiries about this European -- large European

21  conglomerate about acquiring Dean Foods.  And Gregg met with

22  the CEO of that company my recollection was on a couple of

23  occasions, a couple of different occasions.

24          And while there was a lot of interest on behalf of

25  this company to acquire Dean, there wasn't apparently any

1    interest in retaining the Dean company management team if they

2    were going to make that acquisition.  So, it wasn't exactly the

3    most appealing situation for Mr. Engles and the management

4    team.  So these discussions between this European conglomerate

5    and Dean eventually died.

6    Q.  And you said that that Project Plano came up a couple of

7    times?

8    A.  Yes, it did.

9    Q.  So not just in 2008?

10   A.  That's correct.  It came up a couple of different times.

11   Q.  Following this meeting -- Ms. Meister, you can take that

12   down.

13           Following this meeting in late August, did there come

14   a time when you went to Kentucky to play golf?

15   A.  Yes, I did.

16   Q.  Tell the jury about that.

17   A.  I was invited to play in a golf tournament that Mr. Walters

18   organized that was in Louisville, I think, Kentucky.

19   Q.  Do you recall what that golf tournament was called?

20   A.  He called it the Cider Cup.

21   Q.  Showing you what's been marked for identification as

22   Government Exhibit 1909.  Do you recognize this?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  It's an email from Mr. Walters to David Feherty and myself.

h3ldwal6                          Davis - direct

1              MS. CUCINELLA:  The government offers 1909.

2              MR. BERKE:  No objection, your Honor.

3              THE COURT:  Received.

4              (Government's Exhibit 1909 received in evidence)

5    BY MS. CUCINELLA:

6    Q.  Mr. Davis, who is Mr. Feherty?

7    A.  David Feherty was at that time a sports commentator for CBS

8    Golf.

9    Q.  Will you read the email?

10   A.  It says:  "Subject:  Cider Cup.

11             "Lappers, I would love to stop in Dallas and gather

12   you gents on the way to Kentucky and back.  I am going in on

13   Wednesday the 10th and will be returning on Wednesday the 17th.

14   If to or from works or both let me know and we will gather you

15   up in Dallas.

16             "BW."

17   Q.  Mr. Davis, what's a lapper?

18   A.  It's just a term that David Feherty used for drunken

19   Scottish golfers, basically.

20   Q.  Did you take Mr. Walters up, or did you have an

21   understanding of what Mr. Walters meant when he said that he

22   would gather you up in Dallas?

23   A.  He was going to stop in Dallas with his plane and offer to

24   give us a ride to Kentucky.

25   Q.  Mr. Walters had a plane?

h3ldwal6                        Davis - direct

1    A.  Yes.

2    Q.  Did you take him up on the offer?

3    A.  I did not, actually.  I flew commercially to the

4    tournament.

5    Q.  Did you play in the Cider Cup?

6    A.  Yes, ma'am, I did.

7    Q.  Do you recall what the date of the Cider Cup was?

8    A.  Well, it would have been that weekend between the 10th and

9    the 17th.  I think it was a couple -- we did it over a two-day

10   timeframe is my recollection.

11   Q.  How did you play?

12   A.  I played pretty well.  That's my recollection.

13   Q.  While you were in Kentucky with Mr. Walters, did you

14   discuss Dean Foods?

15   A.  Only on one occasion, yes.

16   Q.  Tell the jury what happened.

17   A.  We were finished with the golf tournament the last day, and

18   everybody was getting ready to break up and go to the airport.

19   And I remember distinctly Bill and I walked out of the

20   clubhouse together alone, and he put his arm around me and

21   asked me how the milkman looked.

22   Q.  Is that the same move he had used before?

23   A.  Yes.

24   Q.  And he had used that phrase with you before?

25   A.  Yes, he had.

h3ldwal6                    Davis - direct

1    Q.  Multiple previous occasions?

2    A.  Yes, he had.

3    Q.  When he did this at this time, at this Cider Cup, how, if

4    at all, did you respond?

5    A.  I told him that the milkman looked really good, and I

6    expected the remainder of the year to be as good as the first

7    half of the year, that we were ahead of budget.

8    Q.  Did you provide him with any more specificity than that?

9    A.  Not that I recall, no.

10   Q.  What, if anything, did Mr. Walters say when you provided

11   him with this information?

12   A.  He thanked me, as he would typically do.

13   Q.  Directing your attention now to Government Exhibit 702Q,

14   which I believe is already in evidence.

15        Mr. Davis, what is the jury looking at here?

16   A.  This is the press release -- excuse me -- for the third

17   quarter, dated November the 4th.

18   Q.  November the 4th of 2008?

19   A.  Yes.

20   Q.  Do you recall what happened -- what else would have

21   happened on this day besides the Dean Foods' press release?

22   A.  I think it was the presidential election that day.

23   Q.  In this document, how did Dean Foods describe its earnings

24   for the third quarter?

25   A.  Well, the headline is "Dean Foods Company Posts Strong

1   Growth in the Third Quarter."  And, again, it's almost record

2   earnings for the quarter.

3   Q.  Despite referring to the earnings as strong, do you recall

4   how the market reacted?

5   A.  I think I was surprised that the market didn't react better

6   than it did.  That's my recollection.

7   Q.  And when the market --

8   A.  It was sort of a nonevent to the market.

9   Q.  Do you recall anything that happened after this

10  announcement on November 4, 2008?

11  A.  I recall exactly what happened after this announcement.

12  Q.  What happened?

13  A.  I got a call from Billy Walters the next day, on November

14  the 5th.

15  Q.  When you met with the government, were you shown your phone

16  records reflecting a call between you and Mr. Walters on

17  November 5th of 2008?

18  A.  When I first met with the government?

19  Q.  Not in your first meeting but over the course of the

20  proffer.

21          MR. BERKE:  Could we find out, your Honor, which

22  specific meeting?  Are we talking about the first one through

23  the --

24          THE COURT:  I think we are going to find out.

25          MR. BERKE:  Thank you, Judge.

1          THE COURT:  Go ahead.

2     Q.  Not the first meeting but in the spring of 2016, were you

3     shown a phone record reflecting a call on November 5th between

4     you and Mr. Walters?

5     A.  Yes, I think I was.  Yes, I was.

6     Q.  When you were first asked about that call, did you remember

7     what you and Mr. Walters had discussed?

8     A.  My recollection was I didn't remember at all until I

9     reviewed board minutes and remembered that it was Election Day

10    and a lot of other things that helped me recall that.

11    Q.  Sitting here today, do you remember that call?

12    A.  Yes.

13    Q.  What do you remember about that call?

14    A.  I remember that Billy called me, not me calling him, and I

15    think he was concerned.  My recollection was he was concerned

16    that the stock hadn't reacted well and didn't know why.  And he

17    wanted some reassurance about what was going on at Dean.

18    Q.  And was your memory jogged by reviewing your phone records?

19    A.  Yes.  It clearly was.

20          MR. BERKE:  Your Honor, can we be clear that the phone

21    records are literally just nothing more than the fact of a

22    phone call?  I think it is a little unclear given the nature of

23    that question.

24          MS. CUCINELLA:  Absolutely, your Honor.

25    Q.  How, if at all, did you respond on this call, if you

1    recall?

2    A.  I was -- I do recall.  I was reassuring and told him I

3    thought the fourth quarter was going to be fabulous and gave

4    him a bullish report.

5    Q.  Did you provide any more specificity than that?

6    A.  Not much, no, that I recall.  No.

7    Q.  How, if at all, was your response informed by your role on

8    the board at Dean Foods?

9    A.  My response was definitely affected by my knowledge as a

10   board member of Dean Foods, no question about it.  I had a lot

11   of information.

12   Q.  Did you have access to the company's internal forecast?

13   A.  Yes, of course.

14   Q.  And did you consider knowledge of the internal forecast

15   material to the value of Dean Foods' stock?

16   A.  Yes, it was.

17   Q.  Was this information that you were expected to keep

18   confidential?

19   A.  Yes, it was.

20   Q.  Why did you share that information with Mr. Walters on

21   November 5th of 2008?

22   A.  I thought he could benefit from it insofar as trading

23   stock.

24   Q.  Do you recall if you spoke to Mr. Walters again on the next

25   day?

1   A.  Back-to-back phone calls for the 5th and the 6th?

2   Q.  Yes.

3   A.  I don't recall it specifically but I think we did,

4   actually.

5   Q.  And were you shown phone records reflecting that you did?

6   A.  Yes.

7   Q.  Do you remember a second phone call?

8   A.  Yes, I do.

9   Q.  At this point in time, what, if any, appreciation did you

10  have for the size of Mr. Walters' position in Dean Foods?

11  A.  Let me have the question again, please?

12  Q.  Sure.  At this point in time, in November of 2008, what, if

13  any, appreciation did you have for the size of Mr. Walters'

14  position in Dean Foods?

15  A.  I didn't know specifically the size of his position, but it

16  was my suspicion that he had a large position and he was long

17  in the stock.

18  Q.  What was that suspicion based on?

19  A.  It was based on the fact that he seemed to be nervous about

20  how the stock was trading in light of the actual financial

21  results, which were good.

22  Q.  At any point throughout the course of your relationship

23  with Mr. Walters, did you have an appreciation for how big

24  Mr. Walters' position was in Dean Foods?

25          MR. BERKE:  Objection, your Honor.

h3ldwal6                         Davis - direct

1          MS. CUCINELLA:  I will rephrase.

2   Q.  Mr. Davis, at any point through the course of your

3   relationship, did you have an appreciation for the size of

4   Mr. Walters' position in Dean Foods?

5   A.  I'm not sure what you mean by an appreciation for.  Can you

6   be more specific?

7   Q.  Did you have an understanding of the size of Mr. Walters'

8   position at any point?

9   A.  Yes, I did.

10  Q.  Will you tell the jury about that?

11  A.  He would not often but occasionally tell me what his

12  position was.  And I recall on a couple of different occasions

13  where he said, hey, TD, I'm long X number of shares, and those

14  are the only instances where I had a specific understanding

15  about his position.

16  Q.  Did he say X number of shares or did he give you an amount?

17  A.  No.  He said -- on one occasion I remember him saying

18  two-and-a-half million shares, I'm long two-and-a-half million

19  shares, which is a big position.

20  Q.  Now, Mr. Davis, you testified that Mr. Walters called you

21  on November 5, 2008, after Dean Foods released its earnings on

22  November 4th.  Did you have an understanding at that time of

23  whether Mr. Walters followed what was happening publicly with

24  Dean Foods?

25  A.  I'm sorry.  Can you repeat?

1   Q.  Sure.  Did you have an understanding of whether Mr. Walters

2   followed public announcements about what was going on with Dean

3   Foods?

4   A.  Yes.  I had an understanding.  Yes, I did.

5   Q.  What was that understanding based on?

6   A.  He would tell me, I mean, from time to time that he

7   followed -- certain analysts had followed Dean Foods, and would

8   in fact ask me questions about certain analyst reports and ask

9   me to verify certain information or certain speculation that

10   was made in the analyst reports.

11   Q.  Are there certain analysts that followed Dean Foods through

12   the period when you were on the board?

13   A.  Yes.  There was a specific group of analysts, and they were

14   all consumer food analysts, basically.

15   Q.  What kinds of things would be discussed in analyst reports?

16   A.  A wide range of things.  An analyst usually did a pretty

17   good job of describing the company's operations, the company's

18   strategy, and would always have some -- the analyst would

19   always have some projections for the company.  And typically

20   the analyst would then end the report by making a

21   recommendation, either a buy, a hold, or a sell.

22   Q.  Did they make predictions about what was going to happen

23   with the company?

24   A.  They would make estimates, not predictions, but estimates

25   on earnings and revenues.

1    Q.  Did they sometimes disagree with each other?

2    A.  Yes, frequently.

3    Q.  Was that unique to Dean Foods?

4    A.  No, it was not.

5    Q.  You testified that you recalled having conversations with

6    Mr. Walters in which he brought up analyst reports that he had

7    read, correct?

8    A.  Yes.

9    Q.  Did you have an understanding on why if Mr. Walters was

10   reviewing analyst reports he would still be calling you?

11            MR. BERKE:  I object, your Honor.

12            THE COURT:  Sustained.

13            MS. CUCINELLA:  I'll move on.

14   Q.  Mr. Davis, did you continue to talk to Mr. Walters over the

15   end of the year?

16   A.  I'm sure I did, yes.

17   Q.  Do you recall updating him on any specific events relating

18   to Dean Foods?

19   A.  This is the end of 2008?

20   Q.  Yes.

21   A.  I'm trying to refresh my memory about what was happening in

22   the fourth quarter.  I don't recall specifically any updates

23   that I gave him until early 2009.

24   Q.  And what do you remember about early 2009?

25   A.  I remember having a call with him -- very specific memory

h3ldwal6                        Davis - direct

```
 1   of having a call with him to tell him that the fourth quarter
 2   of 2008 was a record quarterly earnings for Dean Foods and I
 3   thought it was going to be very positive for the stock.
 4   Q.  Do you recall when you had this conversation?
 5   A.  I don't recall specifically but it was certainly in
 6   January, if not early February.
 7            MS. CUCINELLA:  One moment.
 8   Q.  Was that information public at the time that you provided
 9   it to Mr. Walters?
10   A.  No, it was not.
11   Q.  Were you expected to keep that information confidential?
12   A.  Yes, I was.
13   Q.  What effect, if any, would you expect the announcement of a
14   record-setting quarter to have on the stock price of the
15   company?
16   A.  I think it would have a positive effect on the stock.  I
17   think it would make it go up.
18   Q.  You testified that you thought you had that conversation
19   approximately when?
20   A.  It was either January or very early February, when I had a
21   clear picture of what the fourth quarter looked like for the
22   prior year.
23   Q.  And why did you provide that information to Mr. Walters?
24   A.  I thought he would benefit from it insofar as trading the
25   stock.
```

h3ldwal6                        Davis - direct

1    Q.  I'm directing your attention to what's been marked as

2    Government Exhibit 703B, which I believe is already in

3    evidence.

4         MS. CUCINELLA:  Ms. Meister, is that already in

5    evidence?

6         (Pause)

7         Yes, OK.

8    Q.  Mr. Davis, will you tell jury what they are looking at

9    here?

10   A.  This is the press release, dated February the 11th, for the

11   fourth quarter quarterly results.

12   Q.  And what does it say on that press release?

13   A.  The headline says, "Dean Foods posts highest adjusted

14   quarterly operating income in its history."

15   Q.  Do you recall how, if at all, Dean Foods' stock price

16   reacted to this announcement?

17   A.  I think it reacted well, that's my recollection.  Yes.

18        MS. CUCINELLA:  You can take that down, Ms. Meister.

19   Q.  Skipping ahead a little bit, Mr. Davis.  Was Dean Foods

20   involved in a transaction with Alpro in the summer of 2009?

21   A.  Yes, it was.  Yes.

22   Q.  Could you explain that transaction to the jury?

23   A.  Yes.  Alpro is a European food company that fit very well

24   with Dean Foods' WhiteWave division.  Alpro manufactured a

25   variety of dairy products, including a lot of soy products, and

h3ldwal6                          Davis - direct

1   was a highly regarded company in Europe.  It was owned by a

2   large German or Swiss conglomerate, as I recall, and that

3   conglomerate had decided they were going to divest themselves

4   of this Alpro division.

5            And Dean was approached by a group of bankers my

6   recollection was in May of that year, 2009, and there was going

7   to be an auction to sell Alpro.  And I was informed of the

8   opportunity I think at a May board meeting.  I think that's

9   when I first learned about it.

10  Q.  I am going to direct your attention to what has been marked

11  Government Exhibit 433.  Do you recognize this?

12  A.  Yes.

13  Q.  What is it?

14  A.  This is the minutes from the quarterly board meeting on

15  May 21, 2009.

16           MS. CUCINELLA:  The government offers Government

17  Exhibit 433.

18           MR. BERKE:  No objection, your Honor.

19           THE COURT:  Received.

20           (Government's Exhibit 433 received in evidence)

21  BY MS. CUCINELLA:

22  Q.  Mr. Davis, do you recall attending this meeting?

23  A.  Yes, I did.

24  Q.  Do you recall what was discussed about the Alpro deal at

25  this meeting?

h3ldwal6                          Davis - direct

1    A.   I think you can flip a couple of pages here and there is a

2    reference to that.

3              MR. BERKE:   Well, your Honor, I am going to object.

4    The witness is asked a question.   If he doesn't recall --

5              THE WITNESS:   I can answer the question, your Honor.

6              THE COURT:   All right.   Put a new question to the

7    witness.

8              MS. CUCINELLA:   Certainly.

9    Q.   Mr. Davis, sitting here today, do you recall what happened

10   at this meeting?

11   A.   Yes, I do.

12   Q.   Without looking at the board meeting minutes, tell the jury

13   what your recollection is.

14   A.   We were -- we discussed -- Gregg Engles presented this

15   opportunity to the board and said that this Alpro division was

16   going to be sold and it was going to be sold in an auction

17   process and he and the management team were very interested in

18   buying this company.

19   Q.   Did you know about the deal before this May board meeting?

20   A.   I knew about this deal when I received the minutes for this

21   board meeting.

22   Q.   When you received the minutes for the meeting?

23   A.   I'm sorry.   When I received the board package itself for

24   this board meeting, not the minutes.

25   Q.   Did you tell Mr. Walters anything about this deal before it

h3ldwal6                          Davis - direct

1   was announced publicly?

2   A.   I did, yes.

3   Q.   What did you tell him?

4   A.   I told him that Dean had a terrific opportunity to buy this

5   company in Europe, it was a fairly sizable company, and I

6   thought it would have a significant impact on the earnings of

7   Dean.

8   Q.   Was the information about Alpro public at the time that you

9   told Mr. Walters about it?

10  A.   No, it was not.

11  Q.   Were you allowed to share it with Mr. Walters or anyone

12  else?

13  A.   No, I was not.

14  Q.   Mr. Davis, was the Alpro acquisition a good deal for the

15  company?

16          MR. BERKE:   Objection, your Honor.   Relevance.   The

17  question is how did the market react when an acquirer is

18  getting it, not whether he thought it was a good deal.

19          THE COURT:   Rephrase.

20          MS. CUCINELLA:   That wasn't the question I intended.

21  Q.   My question was as your role on the Board of Directors, did

22  you believe that the acquisition for Alpro was a good deal for

23  the company?

24  A.   I was excited about it based on what I learned, yes.

25  Q.   How did you believe the market would react, if at all?

h3ldwal6                        Davis - direct

1                   MR. BERKE:  Objection, your Honor.

2                   THE COURT:  Overruled.

3    A.  I thought the market would be very positive to this Alpro

4    deal if it got concluded.

5    Q.  And did you believe that the Alpro acquisition would also

6    offer longterm benefits to the company?

7    A.  Longterm and short-term, both.  It was a terrific company

8    and made a lot of money with high margins.

9    Q.  And when you talked to Mr. Walters about Alpro, did you

10   discuss whether the benefit to the company would be long- or

11   short-term?

12   A.  I don't recall.  What I do recall is I told him it was a

13   terrific deal, and if Dean was successful in buying Alpro, it

14   was going to be a hell of a deal for the stock.

15   Q.  I am going to direct your attention now, Mr. Davis, to

16   Government Exhibit 437.

17                  Do you recognize this?

18   A.  Yes.

19   Q.  What is it?

20   A.  These are the minutes of a special board meeting that was

21   held in December of 2009.

22                  MS. CUCINELLA:  The government offers 437.

23                  MR. BERKE:  No objection, your Honor.

24                  THE COURT:  Received.

25                  (Government's Exhibit 437 received in evidence)

h3ldwal6                        Davis - direct

1    Q.  Mr. Davis, did you attend this meeting?

2    A.  Yes, I did.

3    Q.  Directing your attention to page 2.  Do you recall what was

4    discussed at this meeting?

5    A.  Yes, I do.

6    Q.  Do you recall it sitting here today, or do you need to read

7    the board meeting minutes to recall it?

8    A.  No, I recall this board meeting.

9    Q.  OK.

10   A.  It was -- it was a significant board meeting in terms of

11   what I remember.

12   Q.  What do you remember about it?

13   A.  Well, we had --

14           MR. BERKE:  I would just note, your Honor, it appears

15   the witness is reading the document, and I would just ask that

16   if it is going to be a recollection, it be clear.  If he is

17   going to read it, it be clear what he is doing.  He appears to

18   say it is a recollection but he is reading the document.

19           MS. CUCINELLA:  We have no problem taking that down.

20           THE COURT:  All right.

21   A.  I remember that the company's primary financial advisor, a

22   fellow named Tony Magro, who was with Bank of America Merrill

23   Lynch, I believe, at the time, was in attendance at the

24   meeting, and he made a presentation about strategic

25   alternatives that the company might think about.

h3ldwal6                           Davis - direct

1   Q.  When you say "strategic alternatives," what do you mean?

2   A.  I mean that there were a number of different financial

3   alternatives that the company was considering at this point in

4   time, and we had this advisor from Merrill Lynch give us some

5   advice about the options that we had before us.

6   Q.  What was the company trying to do?

7   A.  The company was trying to unlock value that none of us

8   thought was being realized in the stock price, in the current

9   stock price.

10  Q.  What does that mean?

11  A.  It meant that the -- we believed, as our financial advisors

12  did, that the pieces were worth more as pieces than the stock

13  was trading for alone.

14  Q.  As part of that, was the possibility of spinning off

15  WhiteWave discussed?

16  A.  Yes.  It was certainly one of the alternatives and it was

17  discussed.

18  Q.  Were there other alternatives?

19  A.  Yes, there were some other alternatives.

20  Q.  Do you recall what some of the other alternatives were?

21  A.  There was a kind of a menu of alternatives.  You have to

22  kind of understand how Dean was organized.  There was the

23  primary dairy processing business.  There was a business called

24  Morningstar Foods, which was a commercial distribution company

25  for dairy products, and then there was this WhiteWave-Alpro

```
 1   division.  So you could look at the value of each one of those

 2   businesses if they were independently owned and compare that to

 3   what Dean Foods' stock was trading for in the public market,

 4   and it certainly appeared to us, and our financial advisors

 5   confirmed it, that the pieces were worth more than the whole.

 6   If you get my gist?

 7   Q.  And what was the difference between the different options

 8   that were available to the company at this time?

 9   A.  Well, there was a complicated set of issues that you had to

10   deal with if you were going to try to unlock this value and

11   break the company up into pieces.  There were tax consequences.

12   There were issues with how do you split all the debt up on the

13   balance sheet.  Where does the bank debt go, with which piece?

14   There was an issue about how you split the management team up

15   between the pieces.  And there was an issue with litigation

16   that was outstanding, and what do you do with this litigation

17   that's outstanding?  Who assumes the responsibility for

18   potential liabilities from the litigation?  So, it was a

19   complicated matrix of issues that we were trying to figure out.

20   Q.  Was a spin-off realistic for Dean Foods at this point in

21   time?

22   A.  Not in the near term, no, given these issues that I just

23   referred to.  It wasn't going to happen overnight, for sure.

24   Q.  Was it something that the board was actively working

25   toward?
```

1   A.  I would say it was something the board was sincerely

2   interested in and wanted to continue to study it.

3   Q.  Did you provide the defendant with that information?

4   A.  I told him that it was a serious consideration and I

5   definitely thought Dean Foods' stock was undervalued as a

6   result of this.

7   Q.  Do you recall when you told him that?

8   A.  I don't recall specifically when that phone call was -- or

9   the phone calls we might have had about that, late 2009 or

10  early 2010.

11  Q.  Now, Mr. Davis, I want to talk about 2010.  But before we

12  get back to Mr. Walters, I'd like to ask some questions about

13  your financial situation at this time.

14          By late 2009/early 2010, what was your main source of

15  income?

16  A.  The director's fees I was receiving.

17  Q.  How did that compare to the amount of money that you were

18  making when you were at DLJ.

19  A.  I was not making as much money off the director's fees as I

20  had in my investment banking years.

21  Q.  Along with having a lower income, how, if at all, had your

22  financial situation changed since you had been at DLJ?

23  A.  Well, I had some pretty significant changes.  I mean, I got

24  a divorce, which ended in 2005, and split up my assets with my

25  ex-wife, and that was a pretty significant effect on me.

h3ldwal6                        Davis - direct

1          I had some obligations that my partner and I in the

2     hedge fund had to assume.  I also owned a partnership interest

3     in a private aircraft, which was very expensive, and I had to

4     pay quarterly -- make quarterly payments on the aircraft.  So I

5     had a lot of things impacting me.  In late 2009 and 2010, I was

6     starting to have some pressure on me financially.

7     Q.  At this time, did you have an interest in a professional

8     sports team as well?

9     A.  Yes, I did.

10    Q.  Could you tell the jury about that.

11    A.  I helped a fellow named Tom Hicks, who acquired the Dallas

12    Stars hockey team.  I helped him buy the hockey team, and I

13    invested in the hockey team at the time of the acquisition,

14    which was in '97, I recall, late '96 or early '97.  So we

15    acquired the Stars together.  And then he acquired the Texas

16    Rangers somewhat later on and combined the two teams under one

17    roof, under one umbrella, called the Hicks Sports Group.  And I

18    doubled down and made another investment when he acquired the

19    Texas Rangers.  So I had an interest in his Hicks Sports Group,

20    and it was a significant investment to me.

21    Q.  How much did you invest?

22    A.  It was a million dollars.

23    Q.  And by late 2009, early 2010, what was the state of that

24    investment?

25    A.  They were on the verge of filing bankruptcy.  Hicks

h3ldwal6                          Davis - direct

1    over-leveraged the teams and got in trouble.

2    Q.   And what did that mean for your investment?

3    A.   It looked like I was going to lose all my money.

4    Q.   You also mentioned that you had an interest in an airplane.

5    Tell the jury about the airplane.

6    A.   I had actually I guess there were four partners, including

7    myself, and we bought a Citation V aircraft in I want to say

8    '98 or '99.  And so we continued to own the aircraft and we had

9    bank debt on the aircraft so we were servicing the bank debt on

10   the aircraft regardless of whether you flew it or not, and

11   obviously you would pay your variable expenses if you used the

12   aircraft in addition to your fixed costs of owning the

13   aircraft.  So I had that as an obligation that I was continuing

14   to try to meet.

15   Q.   How much was that costing you?

16   A.   My fixed costs on the airplane was about 40 -- $42,000 a

17   quarter before I flew it an hour.  Before I flew it at all, it

18   was a fixed cost of about 42,000 a quarter I think was my

19   recollection.

20   Q.   Do you recall if you also had tax liabilities coming due in

21   2010?

22   A.   I did, yes, ma'am.  I had a tax liability that was due in

23   April of 2010.

24   Q.   You testified earlier that a big part of your compensation

25   was in Dean Foods stock, is that right?

h3ldwal6                         Davis - direct

1   A.  Yes, of course, of mine, yes, it was.

2   Q.  About half of your compensation for being on the Dean Foods

3   board?

4   A.  Yes, it was.

5   Q.  At this time in late 2009/early 2010, what was the status

6   of the Dean Foods stock that you owned?

7   A.  It was all restricted, every bit of it.

8   Q.  What does that mean?

9   A.  I couldn't sell it.

10  Q.  Why not?

11  A.  It was against the trading rules.  I couldn't sell it.  I

12  was restricted.  I had inside information.

13  Q.  And so you couldn't sell your personal stock?

14  A.  I could not.

15  Q.  What other assets did you have?

16  A.  I had -- I still had an investment in the hedge fund.  I

17  had an investment in a small software company in Austin, Texas,

18  that was doing quite well.  I had some smaller investments.

19  But basically I was fairly illiquid I guess you could say by

20  2010.

21  Q.  What does "illiquid" mean?

22  A.  It means I didn't have a lot of cash.  I had some assets

23  but not a lot of cash that I could monetize, or assets that I

24  could monetize.

25  Q.  Does that mean that you couldn't pay your bills at that

h3ldwal6                              Davis - direct

1    point?

2    A.  It meant I needed cash, yes.

3    Q.  What did you do?

4    A.  I called Billy Walters and told him I wanted to come see

5    him about borrowing some money from him.

6    Q.  Why did you go to Mr. Walters instead of going to a bank?

7    A.  Really for two reasons.  I didn't think I could get a loan

8    from a bank, and, secondly, I felt highly confident that Billy

9    would help me out.

10   Q.  Why did you feel that way?

11   A.  Based on our historical relationship as friends and based

12   on the amount of assistance I had given him about Dean Foods, I

13   felt highly confident that he would give me a loan.

14   Q.  So what did you do?

15   A.  I called him up and I scheduled a meeting and went to Las

16   Vegas and talked to him about it.

17   Q.  Do you recall when you flew to Las Vegas to see him?

18   A.  It was in April, early April.

19   Q.  I'm showing you what's been marked as Government's Exhibit

20   1710.  Do you recognize this?

21   A.  Yes.  That's my -- my American Airlines itinerary.

22             MS. CUCINELLA:  The government offers 1710.

23             THE COURT:  Any objection?

24             MR. BERKE:  I'm not sure -- your Honor, we have no

25   objection.

1        THE COURT:  All right.  Received.

2        (Government's Exhibit 1710 received in evidence)

3        MS. CUCINELLA:  Give it a minute to come up.

4   Q.  Mr. Davis, does this document reflect when you flew to

5   Mr. -- when you flew to Las Vegas to meet with Mr. Walters?

6   A.  Yes, it does.

7   Q.  And when was that?

8   A.  On April the 9th.  I spent the night and came back on the

9   morning of April the 10th.

10  Q.  And you testified that you had spoken to him on the phone

11  before you flew out?

12  A.  Yes, I did.

13  Q.  What time did you land in Las Vegas?

14  A.  It looks like I arrived at 12:10.

15  Q.  Do you recall where you went once you arrived?

16  A.  Yes.

17  Q.  Where did you go?

18  A.  I met Bill at his golf club in Las Vegas.

19  Q.  When you say "his golf club," what do you mean?

20  A.  It was a golf club he owned called Bali Hai.

21  Q.  Tell the jury about that meeting.

22  A.  We had lunch, just he and I, by ourselves.  And I told him

23  that I was in poor financial shape and I needed some help.  I

24  had some obligations that I needed to take care of and I was

25  illiquid.  I had some assets but needed a loan to take care of

1   these obligations.

2   Q.  And what, if anything, did Mr. Walters say in response?

3   A.  He wanted to help me.  He was very agreeable to help me.

4   He asked me how much money I thought I needed, and I told him,

5   I thought I needed 5 to $600,000.

6   Q.  Did you discuss the terms of the loan?

7   A.  We actually didn't discuss the terms of the loan

8   specifically.  He told me that I should work out the details

9   with Mike Luce.

10  Q.  Sitting here today, do you remember what the terms of the

11  loan ended up being?

12  A.  Yes, I do.

13  Q.  What were they?

14  A.  I ended up borrowing $625,000 in this loan.  It was a

15  one-year maturity.  It was unsecured.  It was secured by my

16  guarantee only.  And the rate was at -- I believe it was prime

17  plus one and a half.

18  Q.  Did you discuss the source of the money at this meeting?

19  A.  Yes, we did.

20  Q.  And what was the source of the money going to be?

21  A.  He told me -- Billy told me that he had a friend in

22  Kentucky that was in the lending business and that he wanted to

23  arrange for this loan to be made from his friend.

24  Q.  Did he tell you the name of that friend?

25  A.  Yes.  He said it was a fellow named Luther James.

h3ldwal6                         Davis - direct

1    Q.  Did Mr. Walters say why the loan would be coming from

2    Mr. James instead of from him?

3    A.  He did not, no.

4    Q.  Did you ask?

5    A.  I did not ask either.

6    Q.  Why not?

7              MR. BERKE:  Objection.

8              THE COURT:  I will allow it.

9    Q.  Why not?

10   A.  I'm sorry, what was the question?

11   Q.  Why didn't you ask?

12   A.  I was -- you know, I found it a little strange that this

13   loan was going to be made from somebody else, but I just

14   accepted Bill's suggestion, and, frankly, I just wanted to get

15   the loan done.

16   Q.  Did you sign any paperwork at that meeting?

17   A.  No, we didn't.

18   Q.  At the time of the meeting, did you have a plan as to how

19   you would be able to repay that loan?

20   A.  I didn't have a specific plan, but I had a year to figure

21   it out so I felt confident I was going to figure it out.

22   Q.  Besides the loan, what else did you discuss at this

23   meeting?

24   A.  I gave him an update on Dean Foods as well.

25   Q.  Did Mr. Walters bring up Dean Foods or did you?

1    A.  I believe he brought it up.  He asked me how -- how the

2    company was doing.

3    Q.  Did you have an understanding as to why Mr. Walters was

4    bringing it up then?

5    A.  I didn't have a clear understanding.  It was fairly common

6    practice by this point in time when we visited that he would

7    inquire about Dean Foods, or I would tell him something about

8    Dean Foods.  We usually didn't pass an opportunity to talk

9    about Dean Foods.

10   Q.  Do you recall what about Dean Foods you discussed at this

11   meeting?

12   A.  I was -- we talked about the outlook for the year,

13   generally.

14   Q.  And what was the outlook for the year?

15   A.  It was cloudy.  It was not clear.  The commodity

16   environment was not all that good.

17   Q.  And do you recall if you discussed anything else at this

18   meeting about Dean Foods?

19   A.  I don't recall discussing anything else at this meeting

20   about Dean Foods.

21   Q.  At this point in time, what else was going on with Dean

22   Foods?

23   A.  I could look at some --

24   Q.  Just your recollection is fine.

25            MR. BERKE:  I would ask that Ms. Cucinella let the

1   witness finish the answer.  I believe he said "I could look at

2   some" before she interrupted.

3          THE COURT:  All right.  Are you finished with your

4   answer, Mr. Davis, or did you have more you wanted to add?

5          THE WITNESS:  I was going to finish my statement, I

6   guess, sir.

7          THE COURT:  Go ahead, sir.

8   A.  I could look at some board minutes and refresh myself about

9   what else was going on at that point in time.

10  Q.  Certainly.  I'm going to direct your attention to

11  Government's Exhibit 437, which you just looked at a few

12  minutes ago.  I know it is the end of the day.

13  A.  Yes.  I'm sorry.  Yes.  I know what's going on at this

14  point in time, and I gave him an update about what was going on

15  at this point in time.

16  Q.  What do you mean when you say that?

17  A.  We were continuing to talk about the spin-off and that was

18  a relevant topic.

19         MR. BERKE:  Your Honor, I don't believe the document

20  that he is reading is published to the jury.

21         MS. CUCINELLA:  Sure.  Ms. Meister, would you show

22  what you just showed to Mr. Davis.  And you just showed him the

23  first page of this, right?

24  Q.  And just looking at this first page, does this jog your

25  memory?

h3ldwal6                          Davis - direct

1   A.  Yes, it did.  I don't need to see the rest of it.

2            MR. BERKE:  And, your Honor, could we be clear, is it

3   jogging his memory about what was discussed at the board

4   meeting or something else?

5            THE COURT:  What did it jog your memory as to?

6            THE WITNESS:  It jogged my memory about what Bill

7   Walters and I discussed at our meeting in Las Vegas on April

8   the 9th.

9   Q.  And what was that?

10           MS. CUCINELLA:  I'm sorry.  Do you have it yet?

11           JURORS:  No

12           MS. CUCINELLA:  I'm sorry.  Let's wait for just a

13  minute.

14           (Pause)

15           I think we're having technical difficulties.

16  Q.  While we're waiting, Mr. Davis, what did this refresh your

17  recollection to -- as to what you told Mr. Walters during that

18  meeting.

19  A.  Can you repeat the question?  I'm sorry.

20  Q.  What did this refresh your recollection as to what you told

21  Mr. Walters during that April 9th meeting?

22  A.  It --

23           MR. BERKE:  Your Honor, could we just orient that

24  pursuant to that question what the witness is actually looking

25  at are board minutes that have nothing to do with this meeting.

h3ldwal6                          Davis - direct

1    I think we now have it up.

2              THE COURT:  The jury can see what it says.

3              MR. BERKE:  Thank you, Judge.  It is now up.

4              THE COURT:  Go ahead.

5    Q.  What did you discuss at --

6    A.  I gave Billy Walters an update on the spin-off.

7    Q.  What specifically, if you recall?

8    A.  I told him I thought it was still in the cards and it was

9    going to happen but it wasn't going to happen anytime soon, but

10   it was a positive action for the company and I definitely

11   thought it was going to happen.

12   Q.  Mr. Davis, up until this point had you ever owed the

13   defendant money?

14   A.  No.

15   Q.  You had provided him with inside information before asking

16   for this loan, though, is that right?

17   A.  I'm sorry.  Could you repeat that?

18   Q.  You had provided him with inside information prior to

19   asking him for this loan?

20   A.  Yes.  Yes.  An enormous amount of inside information, yes.

21   Q.  It is the end of the day.  Are you tired, Mr. Davis?

22   A.  I am worn out.  I'm sorry.

23             MS. CUCINELLA:  OK.  Your Honor, it is about

24   5 o'clock.

25             THE COURT:  It is now 5 o'clock.  As you were saying

h3ldwal6                              Davis - direct

1    those words, it became 5 o'clock.

2            So with that, ladies and gentlemen, we're going to

3    call it a full day.  And, as always -- I always tell you this

4    and I mean it from the bottom of my heart -- please do not

5    discuss the case among yourselves or with anyone, be it family

6    member, be it family friend.  Do not do any research on your

7    own.  You are to decide this case on what takes place in this

8    courtroom.

9            Keep an open mind.  There is a lot more to come.

10           And do please have a very pleasant evening.

11           See you for pick up time tomorrow -- oh, and let me

12   tell you, for planning purposes, that we will not be sitting

13   this Friday.  So if any of you have any work responsibilities,

14   family responsibilities, you know that you can put them on for

15   this Friday.

16           All right?  See you tomorrow ready for a 10 o'clock

17   start.  Thank you.

18              (Continued on next page)

19

20

21

22

23

24

25

h3ldwal6                        Davis – direct

1                    (Jury not present)

2                    THE COURT:  See you tomorrow at a quarter to 10.

3                    MR. GOLDMAN:  Have a good evening, your Honor.

4                    THE COURT:  Have a good evening, everyone.

5                    (Adjourned to 9:45 a.m., Wednesday, March 22, 2017)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    THOMAS CAROCCI

 4    Cross By Mr. Schoeman . . . . . . . . . . 551

 5    Redirect By Mr. Goldman . . . . . . . . . 585

 6    THOMAS C. DAVIS

 7    Direct By Ms. Cucinella . . . . . . . . . 597

 8                      GOVERNMENT EXHIBITS

 9    Exhibit No.                           Received

10     703B  . . . . . . . . . . . . . . . . . 593

11     1  . . . . . . . . . . . . . . . . . . . 600

12     1750  . . . . . . . . . . . . . . . . . 619

13     2  . . . . . . . . . . . . . . . . . . . 629

14     1720-A  . . . . . . . . . . . . . . . . 630

15     1720-B  . . . . . . . . . . . . . . . . 632

16     500  . . . . . . . . . . . . . . . . . . 640

17     504  . . . . . . . . . . . . . . . . . . 650

18     701E  . . . . . . . . . . . . . . . . . 664

19     1731, 1748, 1749, 1910AA and 1912  . . . . . 668

20     421 and 479  . . . . . . . . . . . . . . 675

21     422  . . . . . . . . . . . . . . . . . . 678

22     1901  . . . . . . . . . . . . . . . . . 681

23     1902  . . . . . . . . . . . . . . . . . 684

24     423  . . . . . . . . . . . . . . . . . . 686

25     1903-A  . . . . . . . . . . . . . . . . 689
```

1    1904, 1905    . . . . . . . . . . . . . . . . 691

2    1906    . . . . . . . . . . . . . . . . . . 702

3    424    . . . . . . . . . . . . . . . . . . 705

4    1907-A    . . . . . . . . . . . . . . . . 709

5    1907B    . . . . . . . . . . . . . . . . . 712

6    425    . . . . . . . . . . . . . . . . . . 715

7    1909    . . . . . . . . . . . . . . . . . . 718

8    433    . . . . . . . . . . . . . . . . . . 730

9    437    . . . . . . . . . . . . . . . . . . 733

10   1710    . . . . . . . . . . . . . . . . . 742

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25