H3mdwal1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                v.                           S1 16 Cr. 0338(PKC)

WILLIAM T. WALTERS,

                Defendant.

------------------------------x
                                             March 22, 2017
                                             10:10 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                             District Judge

                         APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  DANIEL S. GOLDMAN
     BROOKE E. CUCINELLA
     MICHAEL FERRARA
          Assistant United States Attorneys

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
     Attorneys for Defendant
BY:  BARRY H. BERKE
     PAUL H. SCHOEMAN
     ANDREW J. ESTES
     MICHELLE BEN-DAVID
          -and-
WRIGHT STANISH & WINCKLER
BY:  RICHARD WRIGHT

          - also present -

SA Edmund Rom
SA Nicholas Anderson, Federal Bureau of Investigation
Raymond McLeod, Defense Tech Support
Holly Meister
Sarah Pyun, Government Paralegal Specialists

3hmdwal1                          Davis - direct

1              (Jury not present)

2              THE COURT:  Please be seated.

3              Bring our jurors in, please.

4              (Jury present)

5              THE COURT:  All right.  Please be seated.

6              Good morning, ladies and gentlemen.  I hope you had a

7    pleasant one.

8              We're back in action.

9              Mr. Davis, the Court reminds you that you are still

10   under oath.

11             THE WITNESS:  Yes, your Honor.

12             THE COURT:  You may inquire.

13             MS. CUCINELLA:  Thank you, Judge.

14    THOMAS C. DAVIS,

15        After having been previously sworn, resumed, and testified

16        further as follows:

17   DIRECT EXAMINATION

18   BY MS. CUCINELLA:

19   Q.  Good morning, Mr. Davis.

20   A.  Good morning.

21   Q.  We left off yesterday when we were talking about the spring

22   of 2010 when it was the end of the day.  Do you recall that?

23   A.  Yes, ma'am, I do.

24   Q.  You had asked to see the board meeting minutes from 2009.

25   I believe it was GX437.  Do you recall that?

3hmdwal1                           Davis - direct

1    A.  Yes, ma'am.

2    Q.  And you reviewed those to refresh your recollection,

3    correct?

4    A.  Yes, I did.

5    Q.  And you got a good night's sleep?

6    A.  I did.  Thank you.

7    Q.  So let's start from the beginning of 2010.

8         Going into 2010, what was happening with Dean Foods?

9    A.  The environment was very mixed, I'd say.  The commodity

10   environment was poor, and while everybody was optimistic given

11   what happened the prior year, the outlook was not very good for

12   2010.

13   Q.  What was going on, if anything, with respect to strategic

14   alternatives going in from 2009 to 2010?

15   A.  We clearly had discussed some strategic alternatives at the

16   December board meeting in 2009 and had the company's advisors

17   at that board meeting.

18   Q.  When you say "the company's advisors," what do you mean?

19   A.  The investment bankers that had been advising the

20   company -- Merrill Lynch.

21   Q.  I am going to direct your attention now to Government

22   Exhibit 507A, which is already in evidence.

23         Do you recognize this email?

24   A.  Yes.

25   Q.  What is it?

1   A.   This is an email from Dean Foods to me -- to the group, to

2   the directors, about a forthcoming board call.

3   Q.   Did you finish your answer?

4   A.   Yes.

5   Q.   Will you read the email to the jury?

6   A.   Good afternoon, all.  We would like to conduct a two-hour

7   telephonic meeting on the afternoon of April 14th to discuss

8   strategic alternatives.  Please advise of your availability

9   between 1 and 6 Central on Wednesday, April 14th.  As soon as

10  we have your responses, I will send a confirmation out.

11  Q.   What is the date of this email?

12  A.   It is April the 1st.

13  Q.   And what was going to be the purpose of the board call?

14  A.   It clearly was to discuss strategic alternatives.  This I

15  recall being a special board meeting.

16  Q.   As opposed to a regularly scheduled one?

17  A.   Yes, ma'am.

18  Q.   Had there been any developments with respect to strategic

19  alternatives between the end of 2009 and April of 2010?

20  A.   The only real development was that this was kind of back on

21  the agenda again.  But the outlook in 2010 was I'd call it

22  mixed, at best, and I think as we discussed yesterday, the

23  first quarter in 2010 was -- the results for Dean Foods were

24  poor.

25  Q.   Did the potential spin-off have a project name at this

3hmdwal1                          Davis - direct

1    point in time?

2    A.  I think it was called Project West at this point in time.

3    Q.  You testified yesterday that you went to Las Vegas on

4    April 9th, correct?

5    A.  Yes, that's correct.

6    Q.  And will you remind the jury why you went to Las Vegas?

7    A.  Primarily to talk to Mr. Walters about a loan.

8    Q.  Where did you meet with Mr. Walters?

9    A.  We met at his club, Bali Hai.

10   Q.  Did you in fact ask him for a loan?

11   A.  Yes, I did.

12   Q.  How much did you ask him for?

13   A.  I told him at the meeting at lunch that I thought I was

14   going to need 5 to $600,000.

15   Q.  What did he say?

16   A.  He agreed.  He agreed to loan me the money, and told me

17   that he wanted to arrange the loan from a friend of his in

18   Kentucky.

19   Q.  Did he tell you the name of that friend?

20   A.  Yes.  The gentleman's name was Luther James.

21   Q.  How did you take the fact that --

22            MR. BERKE:  Your Honor, I object.  We have already had

23   these questions and answers, and even if the prosecutors don't

24   like the answers, they can't ask it again.  We had this all day

25   yesterday, the exact questions and answers.

1          THE COURT:  I do recall this being covered yesterday.

2          MS. CUCINELLA:  I am just trying to orient the jury.

3  The witness is giving the exact same answers, just like what

4  Mr. Berke's comment just was.  I'll move on, though.

5  Understood.

6          THE COURT:  Move on, please.

7  BY MS. CUCINELLA:

8  Q.  Mr. Davis, did you talk to Mr. Walters about Dean Foods at

9  that meeting?

10  A.  Yes, I did.

11  Q.  What do you remember about that conversation?

12  A.  I told him that the spin-off was clearly a consideration

13  that we were looking at and that we'd hired bankers to look at

14  that for us.

15  Q.  Anything else about Dean Foods?

16  A.  I gave him a somewhat optimistic view of the first quarter

17  earnings, which at that point in time I thought were going to

18  be decent.  It was sort of a mixed outlook, though, for the

19  year.

20  Q.  Following this meeting, what, if anything, did you do with

21  respect to the loan?

22  A.  I think I recall Mr. Walters told me to call his chief

23  financial officer, Mike Luce, and get the documentation

24  completed, which Mr. Luce and I did so.

25  Q.  I am going to direct your attention to what's been marked

1    as Government Exhibit 1730, for identification.

2              Do you recognize this?

3    A.  Yes, I do.

4    Q.  What is it?

5    A.  It's a memo from me to Luther James, and I've attached the

6    promissory note which I've executed.

7              MS. CUCINELLA:  The government offers 1730.

8              MR. BERKE:  No objection, your Honor.

9              THE COURT:  All right.  Received.

10             (Government's Exhibit 1730 received in evidence)

11             MS. CUCINELLA:  Ms. Meister, will you publish that.

12   BY MS. CUCINELLA:

13   Q.  Mr. Davis, do you know who prepared this document?

14   A.  The memo or the note?

15   Q.  Why don't we start out by explaining to the jury what

16   they're looking at, just the cover page.

17   A.  The cover page is the memo which I prepared, and I attached

18   the note which has not come up on the screen yet.

19             MS. CUCINELLA:  Ms. Pyun, can you put up the second

20   page of this document.

21   Q.  Is this the note that you are referring to?

22   A.  Yes, it is.

23   Q.  Do you know who prepared this?

24   A.  I don't know who prepared this.  I did not prepare it,

25   though; I know that.

1    Q.  Who did you send it to?

2    A.  I faxed it to Luther James' office.

3    Q.  Sitting here today, do you know who Luther James is?

4    A.  No, I don't.

5    Q.  Have you ever met him?

6    A.  No, I haven't.

7    Q.  What terms are reflected in this note?

8    A.  The amount of the loan was $625,000.  It was a one-year

9    promissory note at prime plus one-and-a-half interest rate.

10   Q.  What happened after you faxed this note to Mr. James?

11   A.  The money was wired to my account.  I think -- actually, I

12   think it was wired to my account the following day.

13   Q.  What did you do after the money came to your account?

14   A.  I actually took the funds and put part of the funds into my

15   regular checking account and the remainder of the funds in my

16   brokerage account.

17           MS. CUCINELLA:  Ms. Pyun, if we can pull up what has

18   been marked for identification as Government Exhibit 1914 and

19   1913B.

20   Q.  Mr. Davis, do you recognize these?

21   A.  Yes, I do.

22   Q.  What are they?

23   A.  The one on the left is a memo from me to my assistant,

24   April Moffet.

25   Q.  And the one on the right, 1913B?

3hmdwal1                           Davis - direct

1    A.  The one on the right is also from me to April.  I guess it

2    is an email thread actually back and forth between us.

3    Q.  And when you say "memo," are these both emails?

4    A.  Yes, they were.

5                MS. CUCINELLA:  The government offers 1914 and 1913B.

6                MR. BERKE:  No objection, your Honor.

7                THE COURT:  Received.

8                (Government's Exhibits 1914 and 1913B received in

9    evidence)

10               MS. CUCINELLA:  If we can display Government Exhibit

11   1914.

12   Q.  Mr. Davis, will you tell the jury what they're looking at?

13   A.  This is an email from me to my assistant.

14   Q.  What is the date of this email?

15   A.  It's April 14th.

16   Q.  Will you read the email.

17   A.  Yeah.  The subject matter is MFM invoices and money

18   transfers, and I was instructing my assistant to transfer some

19   money.  I said I would like to go through the invoices that are

20   outstanding with Mef, if any.  I would like to take care of

21   those tomorrow as well.  The wire transfer was completed

22   yesterday.  There is $625,000 in my BB&T account.  I would like

23   to transfer 200 to my Northern Trust account and 425,000 to my

24   Credit Suisse account.

25   Q.  Why were you transferring the money to these specific

3hmdwal1                    Davis - direct

1    accounts?

2    A.   I was going to use $200,000 immediately, and the other

3    425,000 I just put in my securities account for investment

4    purposes, short-term investment purposes.

5    Q.   And there is a reference here to "Mef."  What is Mef?

6    A.   Mef -- his name is Mef McKnight, and he is the gentleman

7    that handled our aircraft -- our partnership for our aircraft

8    that we owned.

9    Q.   And --

10              THE COURT:  What do you mean by "we"?

11              THE WITNESS:  I'm sorry, your Honor.  My partner and

12   I.  I think I referred to this yesterday.  I had an interest --

13   ownership interest in a jet aircraft with two other gentlemen.

14   BY MS. CUCINELLA:

15   Q.   Do you remember if after you received the money you paid

16   off other debts?

17   A.   I'm sorry?

18   Q.   If you paid off any other debts or liabilities that you had

19   in April of 2010?

20   A.   Yes.  I had to pay some income taxes, as I recall.

21   Q.   How did you feel after you paid off your debts?

22   A.   I was somewhat relieved.  I mean, I was very happy to have

23   this loan at this time.

24   Q.   This is the second week of April, is that right?

25   A.   Yes.

3hmdwal1                        Davis - direct

1   Q.  Do you recall what happened after that?

2               (Pause)

3               With respect to Dean Foods?

4   A.  Yes, I do recall.

5   Q.  What happened next with respect to Dean Foods?

6   A.  I found out that -- I learned that the first quarter was a

7   disaster, to put it bluntly.

8   Q.  How did you find that out?

9   A.  I had a conversation with Gregg Engles.

10  Q.  I am going to show you now Government Exhibit 508, which is

11  already in evidence.

12              I am going to direct your attention to the bottom

13  email.  Do you recall receiving this email?

14  A.  Yes.

15  Q.  Will you read it to the jury.

16  A.  The bottom email says -- it's from me to Gregg Engles.

17              Got your voice message.  No problem on the golf

18  tourny.  Let's take care of business first.  I will be

19  available on Friday afternoon.  Talk soon.

20  Q.  What is the date of this email?

21  A.  It's April 30th.

22  Q.  And do you recall what led to this email?

23  A.  I do recall what led to this email.

24  Q.  Tell the jury.

25  A.  Gregg had just learned that the first quarter earnings for

1     Dean Foods were way below expectations.  They were a disaster,

2     as I think I said earlier.  And he and I were scheduled to play

3     in a golf tournament together that weekend, and he canceled

4     because he needed to deal with the earnings issue.

5     Q.  Did you have a further conversation with Mr. Engles on this

6     issue?

7     A.  Yes.  He called me over that weekend.  It was the weekend

8     of May the 1st and 2nd.

9     Q.  And what do you recall, if anything, about that

10    conversation?

11    A.  He called me I think it was on Sunday, May the 2nd, and

12    told me exactly what the first quarter earnings were.  And they

13    were, as I've indicated earlier, they were terrible.  It was a

14    really bad earnings report.  And he was trying to figure out

15    how to handle that in terms of announcing the first quarter

16    earnings.

17    Q.  Was this a surprising development?

18    A.  It was, yes.

19    Q.  What, if anything, did you do after you learned that news

20    from Mr. Engles?

21    A.  I called Mr. Walters later that same day.

22    Q.  To the best of your recollection, what did you say to

23    Mr. Walters and what did he say to you in response?

24    A.  I had given him a fairly optimistic report just a couple of

25    weeks earlier when I met him in Las Vegas, and I had encouraged

3hmdwal1                    Davis - direct

1   him about the spin-off, which I thought was going to be a good

2   event for the company.  And I called him that night and said,

3   look, I want to give you a heads up.  The earnings are

4   terrible.  They're going to be released next week, and I think

5   the stock is going to get hit hard.

6   Q.  What, if anything, did Mr. Walters say in response --

7   A.  He thanked me for it.

8   Q.  Was that information that you gave to Mr. Walters available

9   to the investing public?

10  A.  It was not.  No.

11  Q.  Were you permitted to share it with Mr. Walters?

12  A.  No.  Not at all.

13  Q.  Why did you call Mr. Walters?

14  A.  I -- at this point in time, he just made me a loan for

15  $625,000.  I think you can understand that I felt obligated to

16  him.

17  Q.  What did you expect him -- what, if anything, did you

18  expect him to do with the information?

19  A.  I assumed that if he owned the stock, he was going to sell

20  it.

21  Q.  Mr. Davis, do you know what day of the week this call took

22  place on?

23  A.  I do.  I remember it very well.  Sunday.  Sunday evening.

24  Q.  Now, Mr. Davis, you testified that you felt differently

25  because you had just -- Mr. Walters had just loaned you money,

1    is that right?

2    A.   Yes, I did.

3    Q.   But you testified previously that you had been passing

4    Mr. Walters information for years before this; is that right?

5    A.   That's correct.

6    Q.   And you weren't indebted to him before this, right?

7    A.   That's correct.  Not financially indebted, no, I wasn't.

8    Q.   So why were you passing him information before he gave you

9    the loan?

10   A.   You know, I think I've tried to explain that before.  You

11   know, I really had developed a strong friendship with

12   Mr. Walters over at least a ten-year period prior to this.  And

13   I knew who Billy Walters was.  He was a fairly famous guy and

14   had a lot of connections in Las Vegas.  And I knew all of that.

15   I knew he was a big sports gambler.  And, you know, frankly, I

16   was enamored with him and wanted to develop a relationship with

17   him, and I think that in large part led me to provide him a lot

18   of information prior to the loan.

19   Q.   Mr. Davis, do you recall what happened next with Dean Foods

20   after you placed this call to Mr. Walters?

21   A.   Yes, I do.

22   Q.   What happened next?

23   A.   I believe that following week, May the 7th or May the 8th,

24   the company made the earnings release -- first quarter earnings

25   release.

1    Q.  Do you recall whether there was a board meeting before

2    then?

3    A.  There was, actually.

4    Q.  I am going to direct your attention to Government Exhibit

5    440, which I believe is already in evidence.

6              MS. CUCINELLA:  Thank you.

7    Q.  Did you attend this board meeting?

8    A.  Yes, I did.

9    Q.  What was the tone of the meeting?

10   A.  I would characterize this meeting as being a somewhat

11   somber meeting, but the purpose of the meeting was to have our

12   advisors, the Merrill Lynch people, give us an update on

13   Project West, which they did at this meeting.

14   Q.  And what was the status of Project West after this meeting?

15   A.  It was clear that because of the results in the first

16   quarter and the outlook for the second quarter, and possibly

17   beyond, that Project West wasn't going to happen anytime soon.

18   It was still on the -- it was still on the table, something

19   everybody wanted to do, but it wasn't going to happen anytime

20   soon.  It was going to be delayed.

21   Q.  And I think you testified after this board meeting earnings

22   were actually announced?

23   A.  Yes, they were.  I think I guess it was announced on the

24   next day or day after.

25   Q.  Do you recall along with the bad earnings if Dean Foods

3hmdwal1                    Davis - direct

 1   made any other announcements that day?

 2   A.  Yes, they did.

 3   Q.  What did they announce?

 4   A.  They suspended guidance, which was an unusual thing to do,

 5   but because the market -- I'm sorry.  Because the company's

 6   outlook for the year was so undefined because of the

 7   environment, they decided to suspend guidance with the

 8   analysts, wall street analysts.

 9   Q.  What does it mean to suspend guidance?

10   A.  They were no longer going to provide earnings estimates for

11   the remaining quarters or for the full year because it was just

12   too hard to project.

13   Q.  Did you speak with Mr. Walters -- did there come a time

14   when you spoke with Mr. Walters after this announcement?

15   A.  Yes.  We had another phone conversation.  Yes.

16   Q.  Tell the jury what you remember about that.

17   A.  I think he asked me what all this meant, and I tried to

18   explain it to him as best I could.  It was also clear that --

19   and I told him this -- that this spin-off idea, the Project

20   West, so-called Project West, was not going to happen anytime

21   soon.

22   Q.  Did you meet with Mr. -- did there come a time when you met

23   with Mr. Walters in the spring of 2010 in person?

24   A.  In the spring?

25   Q.  Do you recall?

3hmdwal1                           Davis - direct

1    A.  Of 2010?

2    Q.  Yes.

3    A.  Yeah.  When I went to Las Vegas to meet him, yes.

4    Q.  Was there a time after all the time period that we've been

5    talking about just now that you met with him?

6    A.  I think he met -- he and I may have played golf together.

7    That's my recollection, yes.

8    Q.  I'm going to direct your attention to what's been marked as

9    Government Exhibit 1712.  Do you recognize this?

10   A.  Yes.  That's a -- yes, I do recognize it.

11   Q.  What is it?

12   A.  It was actually taken out of my calendar.  It says, Meet

13   Billy Walters at Love Field, Textar Aviation.

14            MS. CUCINELLA:  The government offers Exhibit 1712.

15            THE COURT:  Any objection?

16            MR. BERKE:  No objection, your Honor.

17            THE COURT:  Received.

18            (Government's Exhibit 1712 received in evidence)

19            MS. CUCINELLA:  If we could display that.

20   Q.  And so what is this, Mr. Davis?

21   A.  This was -- actually, it is a notation taken out of my

22   calendar off of my computer.

23   Q.  What is Textar Aviation?

24   A.  It's a private so-called FBO, fixed-based operator, for

25   private jets out of Love Field.

3hmdwal1                          Davis - direct

1   Q.  What is Love Field?

2   A.  It is an airport in Dallas.

3   Q.  Do you recall whether you met with Bill Walters at Textar

4   Aviation on May 10th of 2012?

5   A.  I really don't recall if we met or not.  The notation is in

6   my calendar but I don't recall meeting him, no.

7            MR. BERKE:  Ms. Cucinella, I think you mean 2010.

8            MS. CUCINELLA:  I thought I said 2010 but, yes, 2010.

9   A.  Yes.  2010?

10  Q.  Yes.

11  A.  I don't recall if we met or not.

12  Q.  Do you recall what else was going on on May 10th of 2010?

13  A.  Yes, I do.

14  Q.  What?

15  A.  We had a golf tournament that day that I participated in at

16  Preston Trail Golf Club.

17           THE COURT:  Preston Trail?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  Thank you.

20  A.  We had a golf tournament there to raise money for Shelter

21  Golf on the same day.

22  Q.  What is Shelter Golf?

23  A.  It's a charity event that raises money for a women's

24  shelter called Genesis Women's Shelter.

25  Q.  Is it sometimes referred to as Project Shelter?

1   A.  That's the name of the golf tournament, yes.

2   Q.  What was your role in connection with Shelter Golf and

3   Project Shelter?

4   A.  I was co-chairman of Shelter Golf.

5   Q.  We're going to talk more about that in a little bit.  But

6   did you participate or play in a tournament in May of 2010?

7   A.  Yes, I did.

8   Q.  I'm going to direct your attention now to the fall of 2010.

9           Do you recall what was happening with Dean Foods in

10  the fall of 2010?

11  A.  Yes.  Generally I do recall.

12  Q.  Can you tell us generally what was going on?

13  A.  It was still a very tough environment.  It was a dismal

14  year and continued to be a dismal year.  And by the fall of

15  2010, we had another board meeting to discuss strategic

16  alternatives.  But it was still clear that this spin-off --

17  so-called spin-off idea was not going to happen anytime soon.

18  Q.  Looking at -- I'm going to direct your attention to

19  Government Exhibits 442 and 442A.

20          Do you recognize these?

21  A.  Yes, I do.

22  Q.  What are they?

23  A.  On the left it's the minutes of our regularly scheduled

24  quarterly meeting, which was in August, which was held up in

25  Colorado at the Broadmoor.

3hmdwal1                          Davis - direct

1    Q.  That's Government Exhibit 442?

2    A.  Yes, it is.

3    Q.  What are you looking at on the right?

4    A.  It's the second quarter operations update that was also

5    included at that board meeting.

6              MS. CUCINELLA:  The government offers 442 and 442A.

7              MR. BERKE:  No objection, your Honor.

8              THE COURT:  Received.

9              (Government's Exhibits 442 and 442A received in

10   evidence)

11             MS. CUCINELLA:  If you can just display 442, Ms. Pyun.

12   Q.  What was the date of this meeting, Mr. Davis?

13   A.  August 19th and 20th of 2010.

14   Q.  Do you recall attending this meeting?

15   A.  Yes, I did.

16   Q.  You said it was at the Broadmoor?

17   A.  Yes, ma'am.

18   Q.  Did Tony Magro attend that meeting?

19   A.  He did, yes.

20   Q.  Will you remind the jury who Tony Magro is?

21   A.  He is the investment banker.  He and Carl Stickel both

22   attended the meeting from Merrill Lynch.

23   Q.  Do you recall why Mr. Magro attended this board meeting in

24   August of 2010?

25   A.  Yes.  I do.

3hmdwal1                          Davis - direct

1   Q.  Why was he there?

2                   And just to -- I know the screen is right in front of

3   you.  Are you reading or do you have an actual recollection of

4   this meeting?

5   A.  No.  I recall this board meeting.

6   Q.  OK.  Tell the jury why Tony Magro was there.

7   A.  He was there to continue to give us an update on these

8   strategic alternatives that I referred to before now.  And he

9   had did give us an update and basically said, you know, because

10  the environment and the company's performance, this option --

11  any one of those strategic alternatives we talked about,

12  including the spin-off idea, was really not feasible at this

13  point in time.

14  Q.  If the spin-off wasn't feasible at this point in time, what

15  were you considering?

16  A.  It looked like we were going to have to do something else,

17  and we were going to have to consider some sort of a

18  refinancing that we ended up doing at year end, as I recall.

19  Q.  Was it clear at this meeting what the company was going to

20  do with WhiteWave?

21  A.  No.  I would say it was not clear at this meeting.

22  Q.  What wasn't clear?

23  A.  It was still the preference, I think, of the board and it

24  was still the advice of our advisors that we consider the

25  spin-off, but it was also clear that it wasn't going to happen

1   anytime soon, so we had to look to some other options.  And the

2   whole issue of litigation was still outstanding.  There were

3   still litigation issues that had not been resolved by the

4   company as well.

5   Q.  Was the company considering selling WhiteWave?

6   A.  It was an option that the Bank of America, Merrill Lynch

7   people discussed with us, but the outcome of just selling

8   WhiteWave as a division was really not very tax efficient.  We

9   were going to have to pay a lot of income taxes on the sale,

10  and it -- the outcome was not very good for us.

11  Q.  Was there a follow-up board meeting to this one?

12  A.  Yes.  I think there was.

13  Q.  Do you recall when that was?

14  A.  I believe it was in September.

15  Q.  I am going to show you Government Exhibit 444, which is

16  already in evidence.

17          What is this, Mr. Davis?

18  A.  Again, minutes of a telephonic board meeting.  This was a

19  special board meeting that was held on September 16th.

20  Q.  Sitting here today, do you recall participating in this

21  meeting?

22  A.  Yes.  It was a telephonic meeting.  Yes, I participated.

23          MS. CUCINELLA:  Oh, I'm sorry.  I had a note that this

24  was already in evidence.  The government offers Government

25  Exhibit 444.

1            MR. BERKE:  No objection, your Honor.

2            THE COURT:  Received.

3            (Government's Exhibit 444 received in evidence)

4            MS. CUCINELLA:  Sorry about that.

5    Q.  OK.  Will you tell the jury what they are looking at here?

6    A.  The minutes of this September 16th meeting.  It was a short

7    meeting, as I recall.

8    Q.  And sitting here today, do you recall participating in that

9    meeting?

10   A.  I do, yes.

11   Q.  When you first met with prosecutors, did you have a clear

12   recollection of the fall of 2010?

13   A.  I don't think I had a clear recollection, no.

14   Q.  What did you do in order to refresh your recollection?

15   A.  I had to go through a lot of -- review a lot of board

16   minutes and review my calendar and a number of other things to

17   make sure I recalled exactly what happened and when it

18   happened.

19   Q.  Following this board meeting, what, if anything, happened

20   next with respect to your involvement with the Dean Foods

21   board?

22   A.  We had another board meeting I think in November, as I

23   recall, and we decided that the company would go ahead and do

24   this financing that I discussed earlier as an option to raise

25   some money, and I think we ended up doing a bond deal --

3hmdwal1                    Davis - direct

1  so-called junk bond deal at year end.

2  Q.  In between the September 16th board meeting and the

3  November board meeting, did you continue to have discussions

4  about the strategic alternatives and what was happening with

5  the company?

6  A.  We did.  We continued to have those discussions, yes.

7  Q.  Did you have discussions outside of formal board meetings?

8  A.  Yes, I did.

9  Q.  I'm going to show you what's been marked for identification

10  as Government 15 -- 516A.

11         Do you recognize this?

12  A.  Yes.  It's a notation in a calendar about a lunch meeting

13  that I had with --

14  Q.  Let me stop you just for a minute.  I'm sorry.

15         MS. CUCINELLA:  If I can have one minute?

16         (Pause)

17         I think I have the wrong exhibit number.

18         Yep.  Instead of 1516A, can we put up 516?

19         My mistake.  I'm sorry.

20  Q.  Do you recognize this?

21  A.  Yes.  This is an email from Gregg Engles to me.

22         MS. CUCINELLA:  I believe it is already in evidence so

23  we can display that.

24         THE COURT:  "That" being GX516?

25         MS. CUCINELLA:  Yes.  Thank you, Judge.

3hmdwal1                          Davis - direct

1   Q.  Starting at the bottom, Mr. Davis, will you read this email

2   chain?

3   A.  Yes.

4            "Gregg, thanks for taking the time to discuss

5   strategic alternatives today.  I'm convinced we will

6   collectively make to right decision.  There are no easy

7   choices, but we will get a an acceptable outcome with hard work

8   and persistence.

9            "Thank for keeping me in the loop."

10  Q.  What's the date of this email?

11  A.  This one is September 27th.

12  Q.  At what time?

13  A.  4:30 in the afternoon -- I'm sorry, 4:56 in the afternoon.

14  Q.  And what was the subject of this email?

15  A.  A lunch meeting.

16  Q.  And did Mr. -- and who is Gregg?

17  A.  Gregg Engles.

18  Q.  Did Mr. Engles respond?

19  A.  I'm sorry?

20  Q.  Did Mr. Engles respond to your email?

21  A.  Yes.  At the top you can see his response.

22  Q.  What did he say?

23  A.  He said:  "You bet TD.  Thanks for taking the time to

24  attend.  It was very helpful, and my thinking is beginning to

25  coalesce."

3hmdwal1                              Davis - direct

1   Q.  Do you recall attending this lunch, Mr. Davis?

2   A.  I did, yes.

3   Q.  What was discussed there?

4   A.  Gregg asked John Muse and I to have lunch with him.  He

5   organized this lunch, and he specifically wanted to seek our

6   advice on what we should do as far as the strategic

7   alternatives were concerned.

8   Q.  And did you come to any conclusions at this lunch?

9   A.  I think we -- my recollection is that John Muse and I both

10  encouraged him to continue to try to make the spin-off happen.

11  Even though all the elements to getting this transaction done

12  were not in place, the litigation hadn't been settled and the

13  environment wasn't perfect, we all thought this was the best

14  outcome for company.

15  Q.  Was this a longterm project or a short-term project?

16  A.  It was a longterm project.

17  Q.  What -- who ultimately would make the decision on whether

18  or not WhiteWave would be spun off from Dean Foods?

19  A.  The board ultimately would make that decision.

20  Q.  And what was Gregg Engles' role -- what, if anything, would

21  Gregg Engles' role be in that decision?

22  A.  He was very important in the decision, not -- you know, he

23  would clearly advise the board as to his thoughts and his

24  feelings about the direction of the company, and the board

25  would either go along with him or not go along with him.

1    Q.  So you testified that you, John Muse -- you and John Muse

2    talked to Gregg Engles and were in favor of the spin-off.

3    A.  Yes, we were.

4    Q.  Do you recall if anyone in management or on the board had a

5    different view?

6    A.  No.  I don't think there was a differing view.

7    Q.  Do you recall whether you spoke to Mr. Walters after this

8    lunch?

9    A.  Yes, I think I did.

10   Q.  What do you recall?

11   A.  I gave him an update after this lunch.

12   Q.  What does that mean?

13   A.  It means I told him again that I thought the spin-off was

14   going to occur but it wasn't going to happen anytime soon.

15   Q.  Mr. Davis, did you go to -- before I get there:  Was that

16   information that you were allowed to share with Mr. Walters?

17   A.  No.  No.  It was not.

18   Q.  Why did you provide him with that information?

19   A.  It was -- by this time it was sort of my practice to give

20   him an update on things that I'd learned about Dean.

21   Q.  Did you have an expectation of what he would do after you

22   gave him an update?

23   A.  I fully expected him to make a decision and trade on stock

24   based on what he learned.

25   Q.  Mr. Davis, did there come a time when you went to Vegas in

3hmdwal1                          Davis - direct

1   the fall of 2010?

2   A.  Yes, I did.  And I think there was a reference to my trip

3   to Vegas in the previous email I sent Gregg Engles.

4   Q.  Do you remember that trip?

5   A.  Yes, I do.

6   Q.  What did you do on that trip to Vegas?

7   A.  I went with a couple of friends from Dallas, and we

8   actually went -- it was the weekend of the Texas-LSU game.

9   Q.  So what did you do while you were in Vegas?

10  A.  I went out to dinner and played blackjack and had a good

11  time.

12  Q.  Did you see Mr. Walters while you were there?

13  A.  I don't think I saw him on that trip, no.

14  Q.  Did there come a time in October -- you testified later

15  that you learned more -- that after this you learned additional

16  information about Dean Foods, is that right?

17  A.  I'm sorry?

18  Q.  You testified that there came a point in the fall where you

19  learned additional information about Dean Foods, right?

20  A.  Yes.

21  Q.  What happened next with respect to Dean Foods?

22  A.  Well, we had a board meeting in November -- I recall that

23  distinctly -- and, again, discussed some options that were

24  available to us.  And I think at the December board meeting my

25  recollection is we decided to go ahead and do this junk bond

3hmdwal1                    Davis - direct

1    financing which we did at year end.

2    Q.  Before the financing, did you have a special board meeting

3    in October?

4    A.  Yes.  I think we did.  Yes.

5    Q.  What happened at that meeting?

6    A.  We talked about a number of things.  There were a couple of

7    divestitures in the yogurt business that we discussed at that

8    board meeting.  I think we also learned at that board meeting

9    that Jack Callahan, who was the Chief Financial Officer, was

10   planning on leaving, and we got a litigation update.  So that's

11   my recollection of kind of the sum and substance of what took

12   place.

13   Q.  I'm going to direct your attention to Government Exhibit

14   445.

15            Do you recognize this?

16   A.  Yes.  This is the special board meeting, October 18th.

17            MS. CUCINELLA:  The government offers Government

18   Exhibit 445.

19            MR. BERKE:  No objection, your Honor.

20            THE COURT:  Received.

21            (Government's Exhibit 445 received in evidence)

22   BY MS. CUCINELLA:

23   Q.  And this is the meeting you just described; is that right,

24   Mr. Davis?

25   A.  I think it was, yes.

3hmdwal1                         Davis - direct

1    Q.  Did you also receive a business update at this meeting?

2    A.  Yes, we did.

3    Q.  Do you recall what that update was?

4    A.  It was again sort of a poor, dismal report.  The third

5    quarter didn't look any better than the previous two quarters.

6    Q.  Is there anything else that you recall about this meeting?

7            MR. BERKE:  Your Honor, I see that Mr. Davis is

8    reading again the report.  I would just ask that the record

9    reflect whether he is reading or remembering something so we

10   have a clear record.

11           THE COURT:  That's fair.  If you are going to read

12   from the report, you ought to indicate you are reading.  The

13   report is in evidence.  But reading from the report is reading

14   from the report.  If you recall something, then you are

15   testifying based on recollection.

16           THE WITNESS:  I understand, your Honor.

17   BY MS. CUCINELLA:

18   Q.  Mr. Davis, have you told us everything that you remember

19   about this meeting?

20   A.  Yes, I have.

21   Q.  Do you recall communicating with Mr. Walters after this

22   meeting?

23   A.  I know I had -- I know I had a phone call with him after

24   this meeting, yes.

25   Q.  Do you actually recall the phone call?

3hmdwal1                         Davis - direct

1    A.  I know I had a phone call with him in early November.  I'm

2    not sure I had a phone call with him immediately after this

3    meeting.

4    Q.  And what do you recall about that phone call?

5    A.  I distinctly remember that it was right after the election

6    that year.

7    Q.  And we're in 2010?

8    A.  That's correct.

9    Q.  And -- so in 2010, are you confusing 2010 with another

10   year?

11   A.  Yes.  I'm sorry.

12   Q.  That's OK.  There were a lot of board meetings.

13            I'm going to have you look again at the board meeting

14   in October 2010.

15   A.  OK.

16            THE COURT:  You can take your time and you can look at

17   it all you want.  You can read it.  There is no problem with

18   that.  If you are reading from it aloud, then you should say

19   I'm now reading from the document aloud.

20            THE WITNESS:  I understand.  Your Honor, I'm just

21   going to take a quick look at it to refresh my memory.

22            THE COURT:  Take your time.

23            (Pause)

24   A.  So what was also discussed at this meeting, and was pointed

25   out in the overview of the minutes, was that the litigation was

3hmdwal1                          Davis - direct

1     still outstanding, and because the litigation had not been

2     dealt with, had not been settled, it was clear that any idea

3     about the spin-off was not going to happen soon.

4     Q.  OK.  I just want to talk for a minute.

5              You just looked at the board meeting minutes again, is

6     that right?

7     A.  Yes, I did.

8     Q.  Why do you need to look at the board meeting minutes?

9     A.  Again, I've reviewed, what did we calculate yesterday, 86

10    different meetings?  I can't remember every meeting precisely,

11    and I just have to, you know, look at a set of minutes to

12    refresh my recollection.

13    Q.  And how many conversations did you have with Mr. Walters

14    over this period of time?

15             THE COURT:  Be more specific about, quote, this period

16    of time.

17             MS. CUCINELLA:  Certainly.

18    Q.  I believe we are in the fall of 2010, and you've talked

19    about conversations you had with him since 2006, is that right?

20             So from 2006 to 2010, how often did you talk with

21    Mr. Walters?

22    A.  I can't even count the number.  I mean, a lot is the

23    answer.

24    Q.  Are you able to remember the exact days that you had

25    conversations with him?

3hmdwal1                    Davis - direct

1    A.  No.  Of course I can't remember the exact dates of every

2    phone call, but I had lots and lots and lots of phone calls

3    with him.

4    Q.  When you review board meeting minutes, does that refresh

5    your recollection as to when you talked about certain things

6    with Mr. Walters?

7    A.  Yes, it does.

8              MR. BERKE:  Objection, your Honor.

9              THE COURT:  Overruled.

10             You may answer.

11   A.  Could you repeat the question?

12   Q.  Certainly.

13             When you review board meeting minutes, does it help

14   you remember when in time you spoke with Mr. Walters?

15   A.  Yes, it does help me.

16   Q.  Can you still remember exact days or dates when you had

17   certain conversations?

18   A.  There were certain phone calls I had with him that I

19   remember distinctly the date.  There are several other phone

20   calls I had with him where I don't remember the precise date.

21   But there are certain notable phone calls I had with him during

22   this period of time, some of which I've already referred to,

23   that I distinctly remember what took place, what was said, and

24   the date.

25   Q.  And with respect to this period of time that we're talking

1  about, did you have a general practice of when you would speak

2  to him?

3  A.  I did have a general practice.  We would generally talk

4  before the quarter ended and generally talk again after the

5  quarter ended.

6  Q.  Why did you generally talk then?

7  A.  It was a practice that he and I initiated.  I talked to him

8  and give him information before the quarter ended, and he would

9  generally call me after the quarter ended and try to confirm

10  what had just been released in terms of the information.

11  Q.  And after the company started talking about the spin-off,

12  how, if at all, did that affect your conversations with

13  Mr. Walters?

14  A.  I would say that we talked about the possibility of the

15  spin-off repeatedly.  It was an important issue, and it was

16  important to Mr. Walters because it would clearly have a huge

17  impact on the value of the stock.

18  Q.  Do you remember exactly when those conversations took

19  place?

20  A.  No, I don't.

21  Q.  Did you have a number of them?

22  A.  A number of them.  Several.

23  Q.  During those conversations, did you provide to Mr. Walters

24  information that was not available to the public?

25  A.  On many occasions I did, yes.

1   Q.  I want to switch gears for a minute, Mr. Davis.  Did there

2   come a point in 2011 when you began to talk to Mr. Walters

3   about a potential business opportunity?

4   A.  Yes, I did.  I talked to him in the spring of 2011.

5   Q.  What was that opportunity?

6   A.  I had been an investor in a company, a software company

7   that was headquartered in Austin, Texas, called Periscope.  And

8   Periscope was in the process of trying to raise some money to

9   do a very specific transaction, and I called Billy and talked

10  to him about this transaction and solicited his interest and

11  see if he wanted to participate.

12  Q.  I think you testified that you had been involved with

13  Periscope for a little bit before this.

14  A.  Actually for a number of years prior to this.

15  Q.  Do you know how many years?

16  A.  I think I was an investor in Periscope for about three

17  years prior to this.

18  Q.  You said you brought the opportunity to Mr. Walters, is

19  that right?

20  A.  Yes, I called him and described it to him.

21  Q.  Did you talk about it -- did you talking about it with

22  Mr. Walters or Mr. Luce?

23  A.  I followed up with a long e-mail to Mike Luce about the

24  opportunity and outlined the details of it.

25  Q.  I'm going to direct your attention to what's marked for

1   identification as Government Exhibit 1917-A.  Do you recognize

2   this?

3   A.  Yes.

4   Q.  Is this the e-mail you just described?

5   A.  Yes, it is.

6           MS. CUCINELLA:  Government offers 1917-A.

7           MR. BERKE:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 1917-A received in evidence)

10  Q.  Looking at the bottom e-mail, what's the date of this

11  e-mail?

12  A.  It's April 26, 2011.

13  Q.  This is an e-mail to Mike Luce?

14  A.  Yes, it is.

15  Q.  Remind the jury who Mike Luce is.

16  A.  He was -- at this time he was Mr. Walters' chief financial

17  officer.

18  Q.  If you spoke to Mr. Walters about this opportunity, why did

19  you send the e-mail to Mr. Luce?

20  A.  Mr. Walters asked me to do so.

21  Q.  Tell the jury what they're looking at here.  What was the

22  Periscope opportunity, at a very high level?

23  A.  This company, Periscope, had two years prior to this done a

24  financing where they sold a preferred stock to an investment

25  company.  That investment company went bankrupt, and as a

result of the bankruptcy, the bankruptcy court was trying to

sell the preferred stock holdings.  And the CEO of Periscope

called me and called the other board members of Periscope and

said we have a terrific opportunity to buy back the preferred

stock that we sold two years ago at a deep discount.  And

essentially, that was the transaction.

          So, we were trying to raise a million dollars to buy

back this preferred stock, and the value of the preferred stock

that had been sold to the investment company was $2 million,

plus accrued dividends, so it was almost $3 million of value

that we were going to have an opportunity to repurchase for a

million dollars.  And the company was doing very well, it was

growing rapidly, and it was a terrific opportunity, only

brought on by the fact that this bankruptcy occurred.

Q.  So why did you bring this opportunity to Mr. Walters?

A.  Because it was a terrific opportunity, and I felt like I

owed him a favor for what he had done for me.

Q.  Were you getting anything out of it?

A.  I was going to participate in this.  And I arranged,

organized a partnership that actually made this investment to

participate.  So Mr. Walters and I were partners in this

partnership.

Q.  Was this is a good deal for you?

A.  This was a good deal for both of us.  This was -- to put it

in Texas vernacular, this was a gut shot.  This was an absolute

1    winner, and I knew it, and when I described it to Bill, and

2    sent Mike Luce this e-mail, they knew it too.

3    Q.   What were you going to get out of the deal?

4    A.   I was going to participate as an investor in the

5    partnership that we organized to buy this stock.

6    Q.   Who was going to put up the money for the partnership?

7    A.   Mr. Walters put up the money.  We ended up -- of the

8    million dollars total that Periscope raised, Bill put up

9    $300,000 of that through a partnership that I organized.

10   Q.   When you brought this opportunity to Mr. Walters and

11   Mr. Luce, did either of them balk at all when they were asked

12   to put up money and that you would get some return out of this?

13   A.   No, not at all.

14   Q.   What ultimately happened that spring with respect to

15   Periscope?

16   A.   We closed on the purchase of this deal and it was -- I

17   organized the partnership, set it up, and sent Mike Luce the

18   partnership documents after we closed on the purchase of this

19   stock.

20   Q.   Showing you what's been marked for identification as

21   Government Exhibit 1708-A.  It's also in your binder.  It is a

22   big document.

23            What is this?

24   A.   This is the partnership agreement I referred to.  My

25   attorney in Dallas drafted the agreement, and we called the

1   partnership Periscope Preferred Investors, LLC.

2              MS. CUCINELLA:  Government offers 1708-A.

3              MR. BERKE:  No objection, your Honor.

4              THE COURT:  Received.

5              (Government's Exhibit 1708-A received in evidence)

6   Q.  Mr. Davis, are the terms that you discussed with Mr. Luce

7   memorialized in this partnership agreement?

8   A.  Yes, they are.

9   Q.  At a very high level, what were those terms?

10  A.  It was pretty simple.  Mr. Walters put up all the capital,

11  the $300,000 that the partnership funded, he was to get all of

12  his money back plus the preferred dividends, and after that

13  occurred, we would split the rest of the proceeds 80 percent to

14  him and 20 percent to me.

15  Q.  Is there anything in this document that suggests what you

16  are to do with the 20 percent you receive?

17  A.  No.

18  Q.  After your initial conversation with Mr. Walters on

19  Periscope, who did you deal with on it?

20  A.  Primarily with Mike Luce.

21  Q.  How often, if at all, would you update Mr. Luce on the

22  status of Periscope?

23  A.  Whenever I got regularly -- whenever I got regular updates

24  from Periscope, I would forward those to Mr. Luce.

25  Q.  Were there times that you would also update Mr. Walters?

1    A.  Yes, if there was a significant event with the company I
2    would -- I would tell Mr. Walters about it.
3    Q.  Showing you what's been marked for identification as
4    Government Exhibit 1721.  Do you recognize this?
5    A.  Yes.
6    Q.  What is it?
7    A.  This is the cover letter I sent to Mike Luce with the
8    enclosed documentation pertaining to this Periscope investment
9    and the stock certificate.
10   Q.  So there were enclosures that had to do with the investment
11   as well?
12   A.  Yes, that's correct.
13           MS. CUCINELLA:  Government offers 1921.
14           MR. BERKE:  No objection, your Honor.
15           THE COURT:  Received.
16           (Government's Exhibit 1921 received in evidence)
17           MS. CUCINELLA:  If we can show the first two pages of
18   that exhibit.
19   Q.  What is the jury looking at here, sideways?
20   A.  This is a copy of the stock certificate for our purchase of
21   the preferred stock that I referred to in this transaction.
22   Q.  Can you read the first sentence of the cover letter.
23   A.  "I've enclosed all of the documentation for Bill's
24   investment in the purchase of the preferred stock in Periscope
25   Holdings, Inc."

H3M3WAL2                          Davis - direct

```
 1              MS. CUCINELLA:  You can take that down.
 2   Q.  Mr. Davis, if this was such a good deal, why didn't you
 3   invest in it yourself?
 4   A.  I didn't have the cash to do it at the time.  I was still
 5   fairly illiquid.  So if I had the money, I would have done it
 6   myself.
 7   Q.  What was the state of your financial statement in 2011?
 8   A.  I was still struggling.  I would characterize it as I was
 9   still struggling.
10   Q.  You had borrowed how much from Mr. Walters in 2010?
11   A.  $625,000.
12   Q.  What happened to that money?
13   A.  I think -- by this point in time in 2011, I had used most
14   of that money to pay off obligations, various obligations which
15   I've referred to earlier.
16   Q.  Had you been making interest payments on that loan?
17   A.  I made interest payments on the original loan for the first
18   year, is my recollection.
19   Q.  To whom did you make those payments?
20   A.  To Luther James.
21   Q.  For how long did you continue to make those payments?
22   A.  I need to refer to my financial records, but I think I made
23   them for a year.
24   Q.  Approximately a year?
25   A.  Approximately, yes.
```

H3M3WAL2                          Davis - direct

1    Q.  Why did you stop?

2    A.  I was trying to figure out how to refinance the loan and I

3    just hadn't paid any attention to it, and couldn't make the

4    interest payments, frankly.

5    Q.  Did you tell anyone that you were going to stop making

6    interest payments?

7    A.  I'm not sure I did.  I'm not sure I discussed it with Bill

8    or Mike Luce.

9    Q.  What other obligations did you have during this time?

10   A.  I still had the interest in the airplane which was a

11   continuing drag on my financial situation.

12   Q.  Did there come a time in 2011 when you got into trouble

13   with a gambling debt?

14   A.  Yes.

15   Q.  Tell the jury what happened.

16   A.  I lost some money on a trip to Las Vegas at the

17   Cosmopolitan Casino.

18   Q.  How much did you lose?

19   A.  I lost $200,000.

20   Q.  How did you lose it?

21   A.  Playing blackjack.

22   Q.  When you say you lost it, did you lose $200,000 that night?

23   Were you gambling with cash?

24   A.  No.  I had a line of credit with the casino.

25   Q.  So, what happened?

1    A.   I ended the trip, it was a two- or three-day trip.  I ended

2    the trip by having $200,000 drawn down on my line of credit at

3    the casino.

4    Q.   So, you owed the casino $200,000?

5    A.   Yes, I did.

6    Q.   What happened after that?

7    A.   As the casinos typically do, they want you to pay off your

8    debt as soon as you can.  I think I made a payment of $100,000

9    shortly after I got back from that trip.  But I still owed them

10   $100,000.

11   Q.   What happened after that?

12   A.   In the summer of 2011, I was gone on a trip to South

13   African.  When I returned, I discovered that the casino had run

14   a hundred thousand dollars' worth of markers through my

15   checking account.

16   Q.   What's a marker?

17   A.   A marker is a like a check that you've written to the

18   casino.

19   Q.   Did you know that they were going to do that?

20   A.   The casino had called me a couple of times, but I -- I was

21   under the impression that they were going to let me take care

22   of this over time.  But, they didn't.  They surprised me.

23   Q.   What effect did it have on your bank account when they ran

24   that marker?

25   A.   It overdrew my bank account.  I mean, it was a -- it was

H3M3WAL2                          Davis - direct

1    devastating.

2    Q.  What did you do?

3    A.  I was not prepared for it.  And I made a very poor decision

4    at that time.

5    Q.  What did you do?

6    A.  I had control of the Project Shelter account because I

7    managed the money for the golf tournament, and I asked my

8    assistant to transfer a hundred thousand dollars out of the

9    Project Shelter account to my checking account.

10   Q.  Remind the jury, what is Project Shelter?

11   A.  It was the golf tournament that raised money.

12   Q.  What was it raising money for?

13   A.  Women's Genesis Shelter in Dallas, a charity that I was

14   involved with.

15   Q.  What is the Women's Genesis Shelter in Dallas?

16   A.  I'm sorry to interrupt you.  Go ahead.

17   Q.  What is the Women's Genesis Shelter in Dallas?

18   A.  It's a wonderful facility for battered women and abused

19   women and their families.

20   Q.  What was your role in Project Shelter or Shelter Golf?

21   A.  I think I stated this earlier.  I was co-chairman of the

22   golf tournament.  But I also managed the funds for the golf

23   tournament.

24   Q.  So you were in charge of the finances?

25   A.  Yes, I was.

1   Q.  For how long had you had that role by 2011?

2   A.  My recollection is that I been involved with the tournament

3   for about 12 or 13 years prior to this.

4   Q.  Typically -- was this an annual event, this golf

5   tournament?

6   A.  Yes, it was.

7   Q.  Approximately how much money did the golf tournament raise

8   each year?

9   A.  Well, it's grown over the period of time that I was

10  involved with it, but the last couple of years we've raised

11  almost anywhere from 300 to $350,000.

12  Q.  Per year?

13  A.  Yes, ma'am.

14  Q.  So, you testified that you did what with respect to the

15  funds from Shelter Golf?

16  A.  I asked my assistant to transfer some funds out of the

17  Shelter Golf account to my checking account, fully intending to

18  repay the funds.  But that's what I did.  It was a very poor

19  decision on my part.  I -- I just panicked.  I don't know any

20  other way to put it.

21  Q.  How much did you take?

22  A.  A hundred thousand dollars.

23  Q.  Were you allowed to just withdraw money from Shelter Golf's

24  account for any reason?

25  A.  No.  I clearly wasn't allowed to do that.

H3M3WAL2                         Davis - direct

1   Q.  Did you know at the time that you did it that it was wrong?

2   A.  Yes, absolutely.  I did.  I can't tell you how much I

3   regret doing it.

4   Q.  You said that when you took it, you intended to pay it

5   back.  How did you expect to be able to pay it back?

6   A.  I -- my immediate game plan was I was going to sell some

7   stock and liquidate some stock, so I had my portfolio to repay

8   the money.

9   Q.  Were you able to do that?

10  A.  I was not, as it turned out.

11  Q.  Did you in fact pay the money back?

12  A.  Yes, I did.

13  Q.  How soon after you took the money did you pay it back?

14  A.  In slightly less than 90 days.

15  Q.  Did that 90 days result in a delay in shelter -- in the

16  Genesis Women's Shelter getting their check that year?

17  A.  Yes.  It did.  We typically -- I would fund the charity

18  every year in September.  So, we didn't fund the charity that

19  particular year until November.

20  Q.  How did you get the money to pay back Shelter Golf?

21  A.  I went to Mr. Walters again, asked him for another loan.

22  Q.  What did you tell Mr. Walters, if anything, about why you

23  needed a loan?

24  A.  I went out to visit him and told him I needed some working

25  capital.  I was working on another transaction to raise some

1   capital for a bank that I was trying to get recapitalized, and

2   I told him I needed some working capital.

3   Q.  How much did you ask for?

4   A.  We ended up -- I had a line of credit under a new credit

5   facility with him that we set up for $400,000.

6   Q.  You said that you told him that you were working on a deal

7   that had to do with what?

8   A.  I told him, which was accurate, I told him I was involved

9   in a bank recapitalization, and that I was going to need some

10  working capital.  And you know, I was going to have expenses

11  over the course of the next year associated with this bank

12  recapitalization, and I needed to borrow some money.

13  Q.  Did you tell him that you had taken money from Shelter

14  Golf?

15  A.  No, I didn't.  I wish I had.  I was embarrassed.  But I

16  didn't.

17  Q.  So you lied to him?

18  A.  Yes, I did.

19  Q.  Had you spoken to Mr. Walters at all about the bank

20  recapitalization project before you asked him for the money?

21  A.  Yes, I think I did.  I talked to him about it.

22  Q.  Did that project have a name?

23  A.  Well, the name of the bank is Park Cities Bank.  It was a

24  small community bank in Dallas that was in trouble financially,

25  the regulators were about ready to come in and shut the bank

1    down.  And I had a partner who is an experienced community

2    banker, and he and I had an arrangement, actually an agreement

3    that the bank board signed with us, which gave us some time to

4    go raise some money to recapitalize the bank.

5    Q.  Through that agreement, were some of your working capital

6    expenses repaid?

7    A.  Yes.  Some of them were.  A limited amount.  But, the bank

8    did pay for some of our expenses, yes.

9    Q.  When you went to Mr. Walters, did you frame this as you

10   asking him for a loan or did you frame it as an investment?

11   A.  I think I framed it as both.  I mean, it was a loan, but

12   the terms I suggested clearly made it an investment, a possible

13   investment.  And by that I mean we actually set up a note where

14   I had an option to pay him back in cash, or I had an option to

15   pay him back in bank stock, Park Cities Bank stock at a

16   premium, so he would make money out of the repayment if I chose

17   to do so with the bank stock.

18   Q.  Directing your attention to what's been marked as

19   Government Exhibit 1722, 1918, and 1723.

20           Starting with 1722, what is this?

21   A.  This is an e-mail from me to Mike Luce, subject line of

22   credit.

23   Q.  Government Exhibit 1918.  What is this?

24   A.  This is a promissory note I signed for this line of credit.

25   Q.  Government Exhibit 1723?

1    A.  This is the guaranty by me for this line.

2              MS. CUCINELLA:  Government offers 1722, 1918 and 1723.

3              MR. BERKE:  No objection, your Honor.

4              THE COURT:  Received.

5              (Government's Exhibit 1722, 1918, 1723 received in

6    evidence)

7    Q.  Can we start with Government Exhibit 1722.  Mr. Davis, what

8    is this?

9    A.  This is the e-mail that outlines the terms of the line of

10   credit.

11   Q.  What's the date of this e-mail?

12   A.  November 2.

13   Q.  Who is it to?

14   A.  To Mike Luce.

15   Q.  Did you speak about this loan with Mike Luce or with

16   Mr. Walters?

17   A.  I talked to Mr. Walters first, and then he told me to

18   follow up with Mike Luce.

19   Q.  What are the terms that the e-mail reflects?

20   A.  This is a $400,000 line of credit with a maturity of one

21   year, an interest rate of prime plus two, and I had a

22   redemption or repayment option, if you will, of the principal

23   and interest outstanding can be converted to founders stock in

24   North Texas Bank shares, that was the holding company for Park

25   Cities Bank, at its original issue value to Tom Davis.  The

H3M3WAL2                          Davis - direct

```
 1   amount of stock to be paid to lender will equal 1.3 times the
 2   total amount of the principal and interest owed.
 3              So, as I referred to earlier, if I chose to repay this
 4   loan in bank stock, I would have to pay him back with a
 5   30 percent premium.
 6   Q.  Otherwise the terms were like a regular loan?
 7   A.  That's correct.
 8   Q.  A regular loan from Mr. Walters?
 9   A.  Yes.  And if I couldn't pay him back with the bank stock,
10   obviously I had to pay him back with cash.
11   Q.  What's T Star III that's mentioned in the first sentence of
12   this e-mail?
13   A.  I'm not familiar with the entity, but it is an entity that
14   I assume Mr. Walters controls, and it's the entity that Mike
15   Luce chose to fund this loan from.
16   Q.  Turning to Government Exhibit 1918.  What is this?
17   A.  This is the promissory note associated with the loan.
18   Q.  Did you draw this up?
19   A.  Pardon me?
20   Q.  Did you draw this up, if you know?
21   A.  I think I -- I think my attorney drew this one up.  I'm not
22   certain about that.  But yes, I think I drew this up.
23   Q.  Either in this document or in Government Exhibit 1722, is
24   there anything that says what you have to do with these funds,
25   any limits on what you can do with the funds?
```

1   A.   No.  No.  Not that I recall, no.

2   Q.   What did you tell Mr. Walters you were going to do with the

3   funds?

4   A.   I told him I needed money for working capital.  And part of

5   those funds I was going to use to help me with the expenses

6   associated with raising money on this bank transaction.

7   Q.   Government Exhibit 1723.  Government Exhibit 1723, just

8   briefly, what is this?

9   A.   This was the guaranty that I signed for this loan.

10  Q.   What's a guaranty?

11  A.   That's a promise, a personal promise to repay the loan.

12  Q.   Did you put up any capital for this loan?

13  A.   I did not.  No.

14  Q.   Just signed this document?

15  A.   Pardon me?

16  Q.   You just signed this document?

17  A.   Yes, I did.

18  Q.   At the time that you took out this line of credit with

19  Mr. Walters, how much money did you still owe him?

20  A.   I owed him 625,000.

21       MR. BERKE:  I'll object, your Honor.  The money was

22  owed to Mr. Luther James, not Mr. Walters at the time.

23       THE COURT:  You can develop that on cross-examination.

24  Go ahead.

25  Q.   Had you been making interest payments at this point in time

H3M3WAL2                          Davis - direct

1   on that $625,000?

2   A.  I think I answered that question earlier by saying that my

3   recollection is I paid interest payments for the first year on

4   the first loan.

5   Q.  So that would have been through 2010?

6   A.  Yes, that's correct.

7   Q.  And this loan was when?

8   A.  2011, the fall of 2011.  You're right.  So at this time, at

9   this point in time, I had suspended paying interest payments on

10  the first loan.

11  Q.  Had anyone been asking you about those interest payments?

12  A.  No.  Not that I recall.

13  Q.  This is a $400,000 line of credit, right, Mr. Davis?

14  A.  Yes.

15  Q.  How much money did you actually draw down from the line of

16  credit?

17  A.  I drew down two draws.  One for $300,000, and one for

18  50,000.  So, the total 350,000.

19  Q.  I just used the word "draw" and so did you.  What does that

20  mean?

21  A.  It means a draw request from the lender.

22  Q.  What did you use that $350,000 for?

23  A.  I used a hundred of it to repay my obligation to Shelter

24  Golf.

25  Q.  Did you ever disclose to anyone in the fall of 2011 that

1    you had taken this money from Shelter Golf?

2    A.   In the fall of 2011?

3    Q.   Yes.

4    A.   No.  I did not.  Not that I recall, no.

5    Q.   As part of your role at Shelter Golf, were you responsible

6    for preparing the Shelter Golf tax returns?

7    A.   Yes, I was.

8    Q.   In the Shelter Golf tax returns, would you have had an

9    obligation to disclose that you had taken money from the

10   charity?

11   A.   Yes, I learned that you were supposed to disclose that.

12   It's called a related party transaction.  It should have been

13   disclosed in the tax returns, yes.

14   Q.   What happened when the 2011 tax returns for Shelter Golf

15   were being prepared, do you remember?

16   A.   Yes, I do.

17   Q.   Tell the jury what happened.

18   A.   We had an accountant, an independent public accountant that

19   had prepared the tax returns for Shelter Golf historically.

20   And typically my assistant would give him all the information

21   for the particular year that the tax returns were being

22   prepared for, bank statements and expenses and revenues and so

23   forth.

24          And in that particular year, when my assistant

25   provided him the information, I think I recall the events, he

H3M3WAL2                          Davis - direct

called me, he said there is an issue here.  And I asked him

what the issue was and he said, well, we're going to have to

disclose that you've borrowed a hundred thousand dollars during

the year.  And I said -- I questioned why we had to do that,

because I'd already repaid the money, and he explained to me

that it was a related party transaction, and it was a required

disclosure.

Q.  Did you agree to make that disclosure?

A.  I did not.  I changed accountants.

        THE COURT:  All right, ladies and gentlemen, on that

note, we'll take our midmorning recess.  Please do not discuss

the case among yourselves or with anyone else, we'll be back in

action in 10 minutes, thank you.

        (Jury excused)

        (Continued on next page)

H3M3WAL2                            Davis - direct

1          THE COURT:  I marked as Court Exhibit No. 5 a note

2     from Juror No. 13, and there is a cover note together with a

3     file of earnings statements and a excerpt from a company

4     manual.  The gist of the note, which I invite counsel to review

5     over the break, is that the individual is only paid for five

6     days of jury duty, and he asserts it is a hardship for him to

7     otherwise continue.  In any event, I invite you to review it

8     and we will discuss it at some juncture.  All right?  We're in

9     recess.  Thank you.

10          MR. BERKE:  Thank you, Judge.

11          (Recess)

12          THE COURT:  Bring in the witness.  And bring in our

13     jurors, please.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)
 2              THE COURT:  I understand, ladies and gentlemen, we may
 3    have fallen down on the job on snacks.  We'll try and pick up
 4    our game and do better in the future.
 5              Ms. Cucinella, you may continue.
 6              MS. CUCINELLA:  Thank you, Judge.
 7    BY MS. CUCINELLA:
 8    Q.  Mr. Davis, before the break, you were talking about Shelter
 9    Golf's taxes.  Do you recall that?
10    A.  Yes, ma'am.
11    Q.  You said that you took the information and you asked
12    another accountant to do the taxes, is that right?
13    A.  Yes, I did.
14    Q.  Who was the accountant that you brought the Shelter Golf
15    tax return to?
16    A.  He was a fellow that I'd known for several years who did my
17    personal tax returns.
18    Q.  What was his name?
19    A.  His name was Lon Houseman.
20    Q.  What information did you provide Lon Houseman?
21    A.  I provided him exactly the same information that I'd
22    provided the previous accountant.
23    Q.  Did Mr. Houseman have the same issues that the previous
24    accountant had?
25    A.  He did not, he didn't say anything to me.  He didn't ask me
```

H3M3WAL2                          Davis - direct

1    any questions about the information.

2    Q.  So was the tax return filed?

3    A.  Yes.

4    Q.  Did the tax return disclose that you had taken and then

5    repaid the hundred thousand dollars?

6    A.  The tax return did not include a disclosure that there was

7    a related party transaction.

8    Q.  Should it have?

9    A.  Yes, it should have.

10   Q.  After the incident in 2011, did there come another time

11   when you took money from Shelter Golf?

12   A.  Yes.  There was another time.

13   Q.  Can you hear me okay?

14   A.  Yes.

15   Q.  Tell the jury what happened.

16   A.  I forgot the date exactly.  But it was in the spring,

17   typically I would spend a lot of money out of my own pocket to

18   fund expenses for the golf tournament prior to the golf

19   tournament, which was usually in April, late April or May.  And

20   I think in April of this particular year, my assistant had been

21   out on sick leave, and I had not submitted my expenses to her

22   for repayment on a regular basis, and I asked her to transfer

23   $25,000 into my account to reimburse me for expenses that I'd

24   incurred.

25   Q.  What happened after that?

1   A.  About two or three weeks later, I also advanced myself

2   $25,000, not knowing that my assistant had already put $25,000

3   in my account.  So I double dipped, so to speak.

4   Q.  I'm going to direct your attention to what's marked as

5   Government Exhibit 1704 and 1705 for identification.  Do you

6   recognize these?

7   A.  Yes, I do.

8   Q.  What are they?

9   A.  The one on the left is a check that my assistant wrote to

10  deposit money into my account, and the check on the right is a

11  check that I wrote to deposit money in my account.

12          MS. CUCINELLA:  Government offers 1704 and 1705.

13          MR. BERKE:  No objection, your Honor.

14          THE COURT:  Received.

15          (Government's Exhibit 1704, 1705 received in evidence)

16          MS. CUCINELLA:  We can display those, Ms. Pyun.

17  Q.  So, again, Mr. Davis, what is the one on the left?

18  A.  The one on the left is the prefunding of expenses that I

19  asked my assistant to take care of.  And she wrote that check

20  and put it in my account.  And then the one on the right dated

21  May 14 is a check I wrote to myself to fund the same expenses.

22  Q.  They both appear to have your signature.  Is that right?

23  A.  Yes.

24  Q.  But the one on the left your assistant wrote?

25  A.  Yes, she did.

```
 1   Q.  So you ended up with --
 2             THE COURT:  But you signed?
 3             THE WITNESS:  Well, actually, your Honor, my assistant
 4   had a stamp.  Technically, I did not sign that check.
 5             THE COURT:  Did you sign the one on the right?
 6             THE WITNESS:  Yes, sir, I did.
 7             THE COURT:  But you did not sign the one on the left.
 8   Is that your testimony?
 9             THE WITNESS:  That's accurate.  Yes.
10   Q.  Was your assistant authorized to use this stamp for things
11   like this?
12   A.  Yes, she was, she -- this was a frequent thing that she did
13   when I authorized her to make transfers.
14   Q.  So, how much money did you end up with in your account?
15   A.  At what point in time?
16   Q.  After these two checks hit.
17   A.  $50,000.
18   Q.  Mr. Davis, were you allowed to reimburse yourself for funds
19   that you had spent on Shelter Golf?
20   A.  Yes, I was.
21   Q.  How much did you intend to reimburse yourself?
22   A.  I'm not sure I understand the question.
23   Q.  How much money did you intend to reimburse yourself for
24   legitimate Shelter Golf expenses?
25   A.  $25,000.
```

1    Q.  But you ended up with 50?

2    A.  Yes, I did.

3    Q.  What did you do when you realized that you had 50?

4    A.  This was actually later in the year, again, when we were

5    preparing to do our tax return, I discovered that there was an

6    extra $25,000 that had been deposited to my account.  I didn't

7    realize it at the time, but I realized it later that same year.

8    Q.  At that point, did you take any steps to pay it back?

9    A.  I did not, regrettably, I did not.  I was -- I sort of

10   ignored it, I guess you could say.

11   Q.  Did you ultimately pay it back?

12   A.  Yes, I did.

13   Q.  What caused you to ultimately pay it back?

14   A.  I was -- I gave a deposition to the SEC in 2015, and the

15   SEC questioned me about this.  And after the deposition with

16   the SEC, I repaid $25,000 plus interest.

17   Q.  So, the government started asking you questions about it?

18   A.  Yes, they did.

19   Q.  The SEC?

20   A.  Yes, ma'am.

21   Q.  Before you paid back that $25,000 to Shelter Golf, did you

22   lie to the government -- excuse me, to the SEC about that

23   money?

24   A.  Yes, I did.

25   Q.  What did you lie about?

H3M3WAL2                          Davis - direct

1    A.   I was not honest about drawing down the second $25,000.

2    Q.   What did you say it was for, if you recall?

3    A.   I don't recall the specific testimony I made.  I could look

4    at the SEC deposition.  But my recollection was I attributed it

5    to additional expenses.

6    Q.   What types of expenses, generally?

7    A.   What type of expenses did I incur?

8    Q.   Yes.

9    A.   For the golf tournament?

10   Q.   Yes.

11   A.   There were a lot of expenses that I would fund prior to the

12   tournament every year.  I would buy gifts for the -- this was a

13   pro-am golf tournament, we had a lot of pros playing in the

14   tournament, so I would buy gifts for the pros every year.  I

15   would have marketing expenses for sponsors that included

16   dinners, lunches, a variety of different kind of marketing

17   expenses where I would entertain sponsors.

18               (Continued on next page)

19

20

21

22

23

24

25

1   Q.  And when you told lies to the SEC about your expenses, do

2   you remember what types of things you claimed were legitimate

3   Shelter Golf expenses?

4   A.  What type things were legitimate expenses?

5   Q.  Yes.

6   A.  Yes.

7   Q.  Do you remember what things you lied about?

8   A.  Yes.  I had some entertainment expenses that were not

9   legitimate expense for Shelter Golf.

10  Q.  Like what?

11  A.  I had included a dinner party that I had in Dallas that I

12  originally appropriated expenses for this dinner party and it

13  was not a legitimate Shelter Golf expense.

14  Q.  And you lied to the SEC about that?

15  A.  I did, yes.

16  Q.  You testified that you ultimately paid the $25,000 back, is

17  that right?

18  A.  I think the actual amount was $29,000 and change.

19  Q.  And was that before or after you began cooperating with the

20  government?

21  A.  It was long before.  I paid it back in the summer of 2015.

22  I wrote the woman who manages Women's Genesis Shelter a letter

23  and with a check that I included to her.

24  Q.  Mr. Davis, as part of your cooperation agreement, were you

25  asked to plead guilty to any of the Shelter Golf related

1    charges?

2    A.  No.  I was not.

3    Q.  Let's turn back to your cooperation agreement, which is

4    Government's Exhibit 1750.  It is already in evidence.

5          Turn to pages 2 and 3.  Do you see that?

6    A.  Yes, ma'am.

7    Q.  And, Mr. Davis, turning away from the document, even

8    without looking at it, do you know what you have to do with

9    respect to Shelter Golf as part of your cooperation agreement?

10   A.  Yes, I do.  I know precisely what I have to do.

11   Q.  What is it?

12   A.  I have to see that the tax returns for the years in

13   question get amended, and I'm responsible for paying any

14   penalty or interest associated with the amended tax returns for

15   Shelter Golf.

16   Q.  And have you filed amended tax returns for Shelter Golf?

17   A.  They're actually being prepared now.  I'm not sure they

18   have been finished, but they are being prepared.

19   Q.  And you spoke earlier about a 5K letter that you're hoping

20   to get.  Will that 5K letter include information about what you

21   did with respect to Shelter Golf?

22   A.  I'm sure it will.

23   Q.  And does that mean -- what does that mean about who will be

24   made aware of your Shelter Golf conduct?

25   A.  That means the Judge is going to be made aware of it, for

1    sure.

2              MS. CUCINELLA:  You can take that down.

3    Q.  Mr. Davis, you testified that you first took money from

4    Shelter Golf because you had a gambling debt, correct?

5    A.  That's accurate, yes.

6    Q.  And that was because you lost money in Las Vegas, right?

7    A.  Yes.

8    Q.  Are you a gambler?

9    A.  Yes.

10   Q.  What kind?

11   A.  I love to play blackjack, and I also bet on some sporting

12   events.

13   Q.  OK.  We're going to talk about each of those things, but

14   let's talk about blackjack first.

15              Where do you play blackjack?

16   A.  Primarily in Las Vegas.

17   Q.  Do you have a favorite casino?

18   A.  I do.  I stayed at the Wynn, typically.

19   Q.  Do you play at other casinos, too?

20   A.  I have, yes.

21   Q.  How often do you go to Las Vegas?

22   A.  On average three or four times a year.

23   Q.  Have you ever gambled in Las Vegas with Mr. Walters?

24   A.  No.  Never.

25   Q.  Who do you typically go to Vegas with?

1    A.  I have a group of male friends in Dallas that we go, sort

2    of the same group, three or four guys, and we all have the same

3    interest.

4    Q.  What do you mean when you say the same interest?

5    A.  We like to go out to dinner.  We like to gamble.  We like

6    to play golf together, basically.

7    Q.  Do you use hosts when you go to Las Vegas?

8    A.  Yes, I do.

9    Q.  What is a host?

10   A.  He's a marketing representative for the casino and hotel.

11   Q.  And what do they do?

12   A.  They help arrange your trip for you and provide you dinner

13   arrangements and also provide you a line of credit at the

14   casino.

15   Q.  Do they ever comp you things?

16   A.  Yes, they do.

17   Q.  What kinds of things?

18   A.  They comp your hotel room and food and beverage, typically.

19   Q.  Mr. Davis, have you ever paid for sex when you were in Las

20   Vegas?

21   A.  Yes, I have.

22   Q.  Approximately how many times?

23   A.  I don't recall.  It's about been awhile.

24   Q.  How much money have you spent on that?

25   A.  Somewhere between 2 and $3,000, I think, total.

H3mdwal3                          Davis - direct

1  Q.  Did you do that while you were married to Louise before

2  your divorce was finalized?

3  A.  Yes, I did.

4  Q.  Mr. Davis, what's the most amount of money you've ever lost

5  playing blackjack in Las Vegas?

6  A.  The $200,000 I lost at the Cosmopolitan.

7  Q.  Have you also won when you were in Las Vegas?

8  A.  I have, yes.

9  Q.  When you were struggling financially, when you were

10  borrowing money from Mr. Walters, did you continue to gamble in

11  Vegas?

12  A.  Yes, I did.

13  Q.  Do you think you have a gambling problem?

14  A.  No, I don't.

15  Q.  Other than gambling in Las Vegas, do you also bet on

16  sports?

17  A.  Yes, I do.

18  Q.  How often do you do that?

19  A.  I bet on football so during football season from August

20  through Super Bowl, I bet on football, both professional and

21  college football.

22  Q.  Do you ever bet on other sports?

23  A.  Infrequently.  I might occasionally bet on a basketball

24  game, college basketball game.

25  Q.  Do you have a bookie?

1    A.  Yes, I do.

2    Q.  What's a bookie?

3    A.  It's a person who takes bets on sporting events.

4    Q.  Have you used more than one bookie?

5    A.  I have, yes.

6    Q.  All in Dallas or in other places?

7    A.  I've got two bookies that I've used in the past in Dallas.

8    Q.  Do those bookies have any connection to the defendant?

9    A.  Not that I know of, no.

10   Q.  How often do you place bets with your bookies?

11   A.  I would characterize my betting activity as generally

12   weekly on football, sometimes twice a month, but generally

13   weekly during football season.  I'm a pretty active football

14   fan.

15   Q.  Would you place bets on behalf of other people?

16   A.  I have in the past, yes.

17   Q.  Why?

18   A.  They didn't have a bookie and they knew I did and they

19   asked me to place a bet for them.

20   Q.  How much do you typically bet on a football game?

21   A.  Anywhere from $250 to a thousand dollars.

22   Q.  What's the most you've ever lost on a sporting event?

23   A.  I lost a Super Bowl bet that I recall one time for $20,000.

24   Q.  Have you ever placed a bet on information that you received

25   from Billy Walters?

1    A.  I've asked Billy for information from time to time, yes,

2    during football season.  I didn't always use his insight but

3    sometimes.  I was -- I appreciated his input I guess is the

4    right way to put it.  But I always made my own decisions about

5    betting on sports.

6    Q.  Did you ever win a bet because you placed a bet -- you made

7    a bet that Mr. Walters recommended?

8    A.  I recall one time, yes, a Super Bowl bet that I placed that

9    he was also enthusiastic about, and I remember that one

10   occasion.

11   Q.  Do you remember which game it was?

12   A.  I think it was one of the Giants Super Bowl victories.  I'm

13   not sure which one.

14   Q.  Did you tell your friends in Dallas about your relationship

15   with the defendant?

16   A.  A handful of my friends in Dallas knew I was close friends

17   with Mr. Walters, yes.

18   Q.  Why?  Why did you tell them?

19   A.  I liked the fact that I had an association with

20   Mr. Walters, frankly.

21   Q.  Did you ever tell your friends that Mr. Walters had certain

22   views on sporting events or if he had made recommendations?

23   A.  I don't know that I pro-actively told my friends, but on

24   occasion I would receive a text message from a friend of mine

25   who knew I had a relationship with Mr. Walters, and they would

1  say to me what does your friend in Vegas think about such and

2  such a game.  That was an occurrence that happened before, yes.

3  Q.  Did you ever tell Mr. Walters that you would sometimes pass

4  on his opinions to your friends?

5  A.  No, I don't think I did.

6  Q.  How often would you speak with Mr. Walters about sports or

7  gambling?

8  A.  I would characterize it as frequently during certain times

9  of year and infrequently during other times of year.

10  Q.  Mr. Davis, is the gambling you did on football games

11  illegal?

12  A.  The gambling I did on football games in Las Vegas was

13  legal.  The gambling I did on football games in Dallas was

14  illegal.

15  Q.  Did you have to plead guilty for gambling as part of your

16  cooperation agreement?

17  A.  No.

18  Q.  Will the Judge be made aware of it?

19  A.  I'm sure he will.

20  Q.  Along with talking about gambling with the defendant, did

21  he ever make stock recommendations to you?

22  A.  I'm sorry?

23  Q.  Did Mr. Walters ever make a recommendation on a stock to

24  you?

25  A.  Yes.  He has on occasion, yes.

H3mdwal3                        Davis - direct

1   Q.  Do you recall what he said?

2   A.  I recall one instance pretty well where he recommended a

3   stock that was the subject of a lot of discussion.  It was a

4   stock that I think Mr. Icahn had taken a position in.

5   Q.  Did he -- what do you remember the defendant telling you

6   about that stock?

7   A.  He was very enthusiastic about it and he liked the company

8   and suggested I should buy it, should own it.

9   Q.  Did he tell you why?

10  A.  No, nothing more than that.

11  Q.  Nothing more than what?

12  A.  That he said, as I recall, my friend in New York likes this

13  company a lot and you should look at it.  You should think

14  about buying the stock.

15  Q.  Mr. Davis, did you ever discuss charities with Mr. Walters,

16  charities that he was involved in?

17  A.  I'm sorry.  Could you repeat it?

18  Q.  Did you ever discuss charities with Mr. Walters, charities

19  specifically that he was involved in?

20  A.  Yes, I did, on occasion.

21  Q.  Before we get to that, did you have an understanding of who

22  Mr. Walters' friend in New York was when he said that?

23  A.  Yes, I did have an understanding.

24  Q.  Who was that?

25  A.  It was Carl Icahn.

1   Q.   What was that understanding based on?

2   A.   He told me that he had a good relationship, a close

3   relationship with Mr. Icahn, and that he would occasionally

4   visit with him in New York.  And I think I recall him saying he

5   actually traveled with Mr. Icahn before.

6   Q.   OK.  Going back, you said that there were times that you

7   would discuss charities that Mr. Walters was involved in with

8   him, correct?

9   A.   Yes.  On occasion, yes.

10  Q.   Did he ever solicit donations from you?

11  A.   He did, yes.

12  Q.   And did he do that during the period of the time when you

13  owed him money?

14  A.   I don't recall exactly when it was, but my recollection was

15  that it was after he made me the first loan, yes.

16  Q.   Did you in fact donate to a charity that he asked you to

17  donate to?

18  A.   I did on one occasion, yes.

19  Q.   I want to turn back to Dean Foods and switch gears back.

20          I think we left off in 2011.  Do you remember what, if

21  anything, happened with respect to Dean Foods in the summer of

22  2011?

23  A.   The litigation was starting to get settled.  I'm not sure

24  exactly when that came up, but there was some what I call light

25  at the end of the tunnel in terms of the litigation.  And the

1   whole notion that we could do the spin-off was kind of back on

2   the front burner in 2011.

3   Q.  Do you recall speaking with Mr. Walters about the

4   settlement of the litigation?

5   A.  Yes, I did.

6   Q.  Do you recall when those conversations took place?

7   A.  Not precisely, no.

8   Q.  Do you know whether those conversations took place before

9   the announcements were publicly announced or -- sorry, before

10  the settlements were publicly announced or after?

11  A.  I'm relatively certain that I disclosed to him the

12  importance of one of the settlements prior to its announcement.

13  Q.  At the end of 2011 and going into 2012, what was the status

14  of your loans with Mr. Walters?

15  A.  I had some communication with Mr. Luce at some juncture, I

16  think it was either at the end of 2011 or early in 2012, about

17  trying to repay the loan, and I ultimately told Mr. Luce I was

18  not in a position to do that.  And I learned that they just --

19  "they," meaning the Walters Group -- purchased the note from

20  Luther James.

21  Q.  OK.  Let's break that down a little bit.

22          In the beginning of 2012, when was the last time, if

23  you recall, that you had made an interest payment on your

24  loans -- that point it was loans, right, multiple loans?

25  A.  Right.

1   Q.  -- to Mr. Walters?

2              MR. BERKE:  Objection, your Honor.

3              THE COURT:  Overruled.

4   A.  When was last time I recall having made an interest

5   payment?  Two years prior to that.

6   Q.  Had anyone contacted you about the fact that you hadn't

7   been making interest payments?

8   A.  No.

9   Q.  You testified that there was a time that Mr. Luce reached

10  out to you and checked in on the loans, is that right?

11  A.  That's my recollection, yes.

12  Q.  I am going to direct your attention to what's been marked

13  as Government Exhibit 1920.  Do you recognize this?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  It's an email from Mike Luce to me with an update.  As I

17  mentioned earlier, he simply said --

18  Q.  I'm going to stop you there.

19  A.  OK.  Sorry.

20             MS. CUCINELLA:  The government offers Government

21  Exhibit 1920.

22             MR. BERKE:  No objection, your Honor.

23             THE COURT:  All right.  Received.

24             (Government's Exhibit 1920 received in evidence)

25  BY MS. CUCINELLA:

826

1    Q.  Mr. Davis, what's the date of this email?

2    A.  March the 12th, 2012.

3    Q.  And it's from Mr. Luce to you?

4    A.  Yes.

5    Q.  Can you read the email?

6    A.  "Tom, can you give me an update?  How do things look in the

7    near term?  We had to take care of Luther but he just endorsed

8    the note over to us.  Thanks.  Mike."

9    Q.  Mr. Davis, do you recall if you have had a conversation

10   with Mr. Luce before you received this email?

11   A.  Yes, I did.

12   Q.  When do you think your first conversation with Mr. Luce

13   was?

14   A.  My recollection was it was in the early part of 2012.

15   Q.  But prior to this?

16   A.  Yes.  Definitely.

17   Q.  Did you have phone conversations with Mr. Luce about the

18   loan?

19   A.  Yes, I did.

20   Q.  Did you also speak with Mr. Walters or just with Mr. Luce?

21   A.  My recollection is I just spoke with Mr. Luce about this.

22   Q.  Did you sign a new note?

23   A.  Yes, ultimately I did.

24   Q.  Do you recall if this one had the same terms as the earlier

25   note?

1   A.  It had a higher interest rate on it.

2   Q.  How much higher, do you recall?

3   A.  Yes.

4   Q.  What was it?

5   A.  It was prime plus two instead of prime plus one-and-a-half.

6   Q.  Showing you what's been marked as Government Exhibit 1724,

7   what is this?

8   A.  That's the original promissory note.

9   Q.  I'm sorry.

10  A.  This is dated January 2012.  Sorry.  This is the revised

11  note, if you will.

12          MS. CUCINELLA:  The government offers 1724.

13          MR. BERKE:  No objection, your Honor.

14          THE COURT:  Received.

15          (Government's Exhibit 1724 received in evidence)

16  A.  So this note --

17  Q.  Let's wait one minute so the jury can follow you.  Sorry

18  for the delay.

19          OK.  What are they looking at?

20  A.  This is the revised promissory note that I signed in early

21  2012.

22  Q.  This version isn't signed, right?

23  A.  I'm sorry?

24  Q.  This version isn't signed, right?

25  A.  No, this one is not signed, but I signed this note

1    eventually.

2    Q.  Once Mr. Walters officially took over this loan, did you

3    make any interest payments on it?

4    A.  I didn't make any payments on this note until late 2014.

5    Q.  Did anyone ask you why you weren't making interest

6    payments?

7    A.  Not that I recall.

8                MR. BERKE:  Your Honor, I object.

9    A.  No.

10               MR. BERKE:  The note doesn't require interest

11   payments.

12               THE COURT:  Yes.  Rephrase it.

13   BY MS. CUCINELLA:

14   Q.  Mr. Davis, did anyone ask you whether you should be making

15   payments on this note?

16   A.  No, not that I recall, no.

17   Q.  Were you concerned about the fact that you weren't making

18   payments to pay down this loan -- interest or otherwise?

19               MR. BERKE:  Again, your Honor the note does not

20   require any regular payments.

21               THE COURT:  It's a question.

22   A.  Could you repeat the question?

23   Q.  Yes.  Were you -- did anyone ask -- I'm sorry.

24               MS. CUCINELLA:  Where did we leave off on the

25   question?

1          THE COURT:  Start a new question.

2          MS. CUCINELLA:  OK.

3  Q.  Were you concerned, Mr. Davis, that you weren't making

4  payments, either interest payments or to pay down the

5  principal, on this note?

6  A.  I viewed this as an obligation.  I was still concerned

7  about the amount of the obligation, but nobody had questioned

8  me about it at this point in time.

9  Q.  Mr. Davis, I want to direct -- you can take that down,

10  Ms. Pyun.

11          I want to direct your attention to the spring of 2012.

12  Did you participate in a board meeting on May 8th of 2012?

13  A.  Yes, I did.

14  Q.  Do you recall that meeting?

15  A.  Yes, I do.

16  Q.  What do you remember about that meeting?  What was

17  discussed at that meeting?

18  A.  It was a fairly important board meeting.  We discussed the

19  spin-off transaction in detail.

20  Q.  And why was it a fairly important meeting?

21  A.  I would characterize this as the kickoff to try to

22  undertake this spin-off transaction.  Everything, the moon and

23  the Stars were now finally aligned properly.  The environment

24  was good.  The market was good.  The company had done well.

25  And it was -- it looked like it was the right time to try to

1   start this transaction.

2   Q.  I am going to direct your attention to Government Exhibit

3   460, which is already in evidence.

4        Are these the minutes of the board meeting you were

5   just talking about?

6   A.  Yes, they are, the May 8th board meeting.

7   Q.  Did you participate in this meeting by phone or in person?

8   A.  I was actually on this -- participated in this meeting by

9   phone.

10       MS. CUCINELLA:  OK.  You can take that down, Ms. Pyun.

11  Q.  Mr. Davis, do you recall where you called in from?

12  A.  I do.  I remember it well.

13  Q.  Where did you call in from?

14  A.  I was out at my golf club that day, that morning early.  I

15  had breakfast and had two board calls that day.

16  Q.  You had two board calls.  Which board calls were those?

17  A.  I had a Periscope board call first.  I had a Dean Foods

18  board call second.

19  Q.  And where were you?

20  A.  I was at my golf club in Dallas.

21  Q.  I'm going to show you what's been marked for identification

22  as Government Exhibit 1752 and 1735.

23       Do you recognize these?

24  A.  Yes, I do.

25  Q.  What are they?

```
 1   A.  The exhibit on the left -- it is not up on the screen,

 2   sorry.

 3   Q.  It is not on your screen?

 4   A.  Oh, it's on -- I'm sorry.

 5           The exhibit on the left is one of my monthly

 6   statements from the golf club.

 7   Q.  And on the right?

 8   A.  And on the right is the starter's sheet for the foursome to

 9   play golf that day.

10   Q.  That is Government Exhibit 1753?

11   A.  Yes.

12           MS. CUCINELLA:  The government offers 1752 and 1753.

13           MR. BERKE:  No objection, your Honor.

14           THE COURT:  Received.

15           (Government's Exhibits 1752 and 1753 received in

16   evidence)

17   Q.  So looking first at Government Exhibit 1752, what does this

18   reflect?

19   A.  The one on the left is my invoice for -- that is the month

20   of May, and it outlines -- itemizes certain expenses that I

21   incurred on May the 8th.

22   Q.  And what expenses did you incur on May the 8th?

23   A.  I had breakfast that morning for sure and I --

24   Q.  Why do you say that?

25   A.  Because it's itemized on my invoice.
```

1   Q.  OK.  And what else does it reflect on May 8th?

2   A.  It reflects expenses that I incurred the same day for green

3   fees and caddy fees and cart rental.

4   Q.  And looking at Government Exhibit 1753, what is this?

5   A.  This is the starter sheet at the golf club, and it lists my

6   group there and the starting time that we played.

7   Q.  What time did you start at?

8   A.  It says 12:40.

9   Q.  OK.  We can take those down.

10          So you testified that when you were at your golf club

11  you participated in two board meetings.  Was that before you

12  golfed?

13  A.  Yes, it was.

14  Q.  What did you do first?

15  A.  I had a Periscope board meeting in the morning.

16  Q.  Do you recall approximately how long that lasted?

17  A.  It was about an hour, as I recall.

18  Q.  And what did you do after the Periscope call ended?

19  A.  I immediately dialed into the Dean Foods board meeting.

20  Q.  And what do you -- you gave us a preview of what you

21  remember about that call, but what do you remember about that

22  call?

23  A.  I remember it was a fairly significant board meeting,

24  although it was a very short board meeting.  And as indicated

25  earlier, this was the kickoff, so to speak, for the spin-off

1    transaction.

2    Q.  Was the information that was discussed on that call

3    confidential?

4    A.  Yes, it was.

5    Q.  Do you recall if the spin-off had the same code name that

6    it had previously?

7    A.  Actually, you can -- I think it is referred to in the

8    minutes of that board meeting.  They -- the company decided to

9    change the code name, because we actually had two transactions

10   that we're going to work on.  One was the spin-off transaction

11   and the other was the sale of the Morningstar division.  So

12   they were code named Project Mito and Project Cyto.

13   Q.  Talking about Project Mito, is that the spin-off?

14   A.  Yes.

15   Q.  Was that important to the financial outlook of the company?

16   A.  Yes, it was very important.

17   Q.  Why?

18   A.  It was a significant event to unlock shareholder value.

19   Q.  What, if anything, did you do after you hung up from the

20   Dean Foods board call?

21   A.  I tried to call Mr. Walters on his cell phone.

22   Q.  Do you recall if you reached him?

23   A.  I don't recall that, no.

24   Q.  Do you know if you spoke to him that day?

25   A.  I don't recall that, no.

H3mdwal3                         Davis - direct

1   Q.  What do you remember about that call?

2   A.  I remember distinctly placing the call and hearing an

3   international ring tone.

4   Q.  Anything else?

5   A.  No.  It was a short call, that's what I recall.  And -- but

6   the distinction was I knew it was an international ring tone

7   when I dialed it.

8   Q.  At this point in time, did you have another way of

9   communicating with Mr. Walters as well as your cell phone?

10  A.  I had the bat phone.

11  Q.  I think we talked about the bat phone a bit yesterday, but

12  will you remind the jury of what that was?

13  A.  This was the burner phone that Mr. Walters gave me to use.

14  Q.  Let's talk about that a little bit.

15          Where were you when Mr. Walters gave you the burner

16  phone?

17  A.  I met him at an FBO called Signature Aviation at Love

18  Field.

19  Q.  What happened during that meeting?

20  A.  He had stopped in Dallas and had asked me to meet him, and

21  I did meet him at the FBO.  We had a short conversation.

22          And as I was leaving to go to the parking lot, he

23  followed me to my car and handed me a box with the burner phone

24  in it.

25  Q.  You used the term "FBO" a few times.  What is that?

1    A.   It's a fixed-base operator, which is a private terminal for

2    a private jet.

3    Q.   What, if anything, did Mr. Walters say when he handed you

4    the box with the phone in it?

5    A.   He asked me to use this phone when we discussed nonpublic

6    information, specifically Dean.  And he asked me to use the

7    phone when I called him back, and he would give me a signal

8    when he wanted me to call him back on the burner phone.  And

9    the signal was that he would leave me a message on my cell

10   phone that said "Let's go have a cup of coffee."  And that

11   phrase was the signal for me to call him back on the burner

12   phone.

13   Q.   How did you react to this?

14   A.   I was -- I was a little taken back by this.  And I asked

15   him, pointblank, I said, "Do you think our conversations have

16   been recorded?"  And he said, "No, I wouldn't worry about that

17   but let's make sure they're not recorded and use this phone

18   from now on."

19   Q.   Did you discuss anything else at that meeting?

20   A.   He also asked me to use the Dallas Cowboys as our code name

21   when I would refer to Dean Foods.

22   Q.   Mr. Davis, do you recall when you received the bat phone

23   from Mr. Walters?

24   A.   It was sometime in 2011.  That's my best recollection.  I

25   remember the weather was good, so I don't remember exactly the

1    date.  I thought it was the summer of 2011.

2    Q.  When you say the weather is good in Dallas, what does that

3    mean?  When is that?

4    A.  It was warm outside.  The sun was shining.  It was not

5    freezing cold.

6    Q.  And what seasons is the weather good in Dallas?

7    A.  Well, summer and fall and spring.  I mean, it could have

8    been later in the year, but my recollection was it was sometime

9    in the summer or the fall timeframe of 2011.

10   Q.  Do you remember the first time that you used the bat phone?

11   A.  I used it a lot from that point in time when he gave it to

12   me all the way through the following year extensively.  I don't

13   recall exactly the first conversation I had on it, no.

14   Q.  Did you continue to use your regular cell phone even after

15   you had the bat phone?

16   A.  Yes, I did.

17   Q.  Why?

18   A.  I didn't carry the bat phone everyplace with me.  I

19   primarily used the bat phone in my home and did not ever take

20   it with me when I traveled.

21   Q.  Where did you store the bat phone?

22   A.  I kept it in my laundry room.

23   Q.  After the May 8, 2012 board meeting that we talked about,

24   do you remember the next thing that happened with respect to

25   the Dean Foods spin-off?

1   A.  We had another board meeting shortly thereafter.

2   Q.  When was that?

3   A.  It was also in May.  I don't have the exact date.

4   May 17th or 18th, something like that.

5   Q.  I'm going to show you what I believe is already in

6   evidence, Government's Exhibit 460.

7            That is the wrong one.  My mistake.  Hold on one

8   moment.

9            (Pause)

10            Never mind.  We don't need the minutes.

11            You remember that there was a board meeting minutes

12   approximately when?

13            MS. CUCINELLA:  You can take that down, Ms. Pyun.

14   A.  I think it was a couple of weeks after this meeting.

15   That's my recollection.

16   Q.  What happened at that meeting?

17   A.  We actually officially approved the spin-off transaction at

18   this next board meeting.

19   Q.  What, if anything, was the significance of that?

20   A.  Well, it was the formal ratification of this plan to move

21   forward.  This was obviously a complicated transaction that

22   involved accountants, attorneys.  A lot of work had to be done

23   in terms of preparation for this separation of these two

24   companies, not the least of which was trying to figure out how

25   to divide up the management team at Dean Foods as well as how

1   to divide up the assets that were going to go with WhiteWave

2   and the assets that were going to remain at Dean Foods.  So

3   there was a lot of work to be done, and we approved that

4   process at this particular board meeting.

5   Q.  The board meeting that you were referencing --

6   A.  Yes.

7   Q.  At this point, do you remember if there was a timeline set

8   for this transaction?

9   A.  There was a timeline set, yes.

10  Q.  What was that timeline?

11  A.  The date to file the registration statement and disclose

12  the spin-off was to be mid-August.  That was the target date.

13  Q.  What, if anything, was the significance of that timeline?

14  A.  Well, it was significant because once you disclose this

15  transaction, a lot of things were going to happen and not the

16  least of which is that the public was going to know about this

17  transaction, and it would probably be reflected in the stock

18  price.

19  Q.  Following the May 8, 2012 meeting and the late May meeting

20  that you just described, did you continue to talk to

21  Mr. Walters about what was happening with Dean Foods?

22  A.  Yes, I did.

23  Q.  What was the nature of your communications with him?

24  A.  I would characterize the communication with him during the

25  summer all the way through the summer as fairly intensive

1    communication.  We communicated a lot on the bat phone as well

2    as my cell phone.

3    Q.  With respect to calls on the bat phone, who would typically

4    initiate them, or did you both do it?

5    A.  He would have called me and leave me a message and say

6    let's go have a cup of coffee.  I'd call him back on the bat

7    phone.

8    Q.  Were there also times when you initiated calls from the bat

9    phone?

10   A.  Yes, there were.

11   Q.  Mr. Davis, do you recall participating in a Dean Foods

12   board meeting on June 27th?

13   A.  Yes.

14   Q.  What do you recall being discussed at that meeting?

15   A.  I think that's the meeting where we actually spent a lot of

16   time and detail on the separation of the management teams and

17   the compensation that -- the ensuing compensation that would be

18   necessary to entice certain members of the management to go

19   with the WhiteWave spin-off versus members of the management

20   that were going to stay with the predecessor company.

21   Q.  Along with talking about those details about the spin-off,

22   was the company still tracking its performance and its

23   earnings?

24   A.  Yes, it was.  It was doing very well.  It was.

25   Q.  And how, if at all, did the company's performance at this

1    time relate to whether or not the spin-off would go forward?

2    A.  I would say it was critical to the spin-off.

3    Q.  Why do you say that?

4    A.  Because if there was a hiccup in the performance, we were

5    not going to get the spin-off done, we were not going to get

6    the IPO, which was part of the transaction, completed.

7    Q.  And do you remember if the company's performance was

8    discussed at the board meeting in June?

9    A.  Yes.  I'm sure it was.

10   Q.  And at that point -- you had mentioned earlier that there

11   was also a discussion about Project Cyto back in May.  What was

12   Project Cyto?

13   A.  That was the code name for the sale of Morningstar Foods,

14   one of the divisions that Dean owned.  So I think I made a

15   reference to Morningstar prior to this.  As part of this sort

16   of global transaction that involved the IPO of WhiteWave Foods,

17   Dean was also considering selling this other division, which

18   was called Morningstar Foods.

19   Q.  OK.  You just used a term there, "IPO."  What is an IPO?

20   A.  It is an initial public offering.  It is a stock

21   offering -- a first-time stock offering, if you will, for --

22            THE COURT:  Haven't you covered this with other

23   witnesses already?

24            MS. CUCINELLA:  We have but it is significant for

25   certain reasons with this witness.  We are not going to go into

H3mdwal3                          Davis - direct

1     a tutorial, I promise, your Honor.

2     Q.  Go ahead, Mr. Davis.

3     A.  IPO means an initial public offering.

4     Q.  What, if anything, was unique about the way that Dean Foods

5     was structuring the spin-off of WhiteWave?

6     A.  It was unique because --

7              MR. BERKE:  Your Honor, I would object and ask for

8     clarification.  Unique compared to what?

9              THE COURT:  I agree.  Rephrase your question.

10             MS. CUCINELLA:  Sure.

11    Q.  Was this a typical spin-off?

12    A.  No.  This was not --

13             THE COURT:  Is there a typical spin-off?

14             THE WITNESS:  Your Honor, there is probably -- yes,

15    there probably is a typical spin-off where you spin-off a

16    hundred percent of a company to the shareholders and in this

17    instance this was different.

18             THE COURT:  All right.  Next question.

19    BY MS. CUCINELLA:

20    Q.  Why was it different?

21    A.  We were only going to sell 20 percent, or less than

22    20 percent of the ownership in WhiteWave Foods to the public,

23    and Dean Foods would retain the remaining 80 percent.  That was

24    the plan.

25    Q.  And you testified earlier that there was an IPO aspect of

1    this.  How did that all interrelate?

2    A.  So the game plan here was to separate the two companies,

3    their management teams and their balance sheets and their

4    assets, and you would literally have two companies, one called

5    WhiteWave Foods and one called Dean Foods.  And the WhiteWave

6    Foods Company would do an initial public offering and sell up

7    to 20 percent of the stock to the public, and Dean Foods would

8    retain the remaining ownership in WhiteWave Foods in the near

9    term.  The game plan also involved a ruling to the IRS so that

10   when the remaining ownership that Dean retained could be

11   spin-off, it would be spin-off on a tax-free basis.

12   Q.  Was that information about the spin-off and the structure

13   of it, would that be significant to an investor in Dean Foods?

14   A.  Yes, very significant.

15   Q.  Why?

16   A.  It was going to -- it was going to make the stock price go

17   up, simply put.

18   Q.  Do you recall communicating with Mr. Walters during this

19   summer?

20   A.  I had extensive conversations with him during this summer.

21   Q.  What types of things did you talk to him about?

22   A.  I talked to him in great detail about the plans for this

23   transaction.  I gave him a lot of information about the

24   transaction and the timing of the transaction.

25   Q.  Specifically, do you recall what information about the

1   transaction you gave to Mr. Walters?

2   A.  Yes, I do.

3   Q.  What?

4   A.  I gave him great detail on the filing range for the IPO,

5   the amount of stock we planned to sell in the IPO, how we

6   planned to separate the two companies, and how we planned to

7   separate the management teams.

8   Q.  Throughout the summer, did you provide him updates on the

9   progress of the transaction?

10  A.  I did provide him updates.  He called me and asked me for

11  updates.

12  Q.  What kind of updates did you provide him?

13  A.  He would call me and ask me if the deal was still on and

14  what was the timing.  Are you sure it's going to happen?  It

15  was that sort of questioning.  He was -- he seemed to be very

16  intense about whether or not this was going to happen or not.

17  And I assured him it was.

18  Q.  Was any of this information public at the time that you

19  were communicating it to Mr. Walters?

20  A.  It was not, no.

21  Q.  Were you allowed to be sharing it with Mr. Walters?

22  A.  No.

23  Q.  What was your expectation, if any, when you were providing

24  Mr. Walters with that information?

25  A.  I was highly confident that he was going to use this

1   information to trade in the stock.

2   Q.  You mentioned Project Seto -- or Cyto a few times.  What,

3   if anything, did you tell Mr. Walters about Project Cyto during

4   the summer of 2012?

5   A.  I told him that -- that it was highly likely that we would

6   undertake to sell Morningstar later in the year but it would be

7   after the IPO was done.

8   Q.  Was that information available to the public?

9   A.  No.

10  Q.  During this time, were you participating in formal board

11  meetings like the one in June you just described?

12  A.  Yes.

13  Q.  Did you also have conversations with management outside the

14  board meetings?

15  A.  Yes, extensively during the summer.

16  Q.  I am going to ask you to turn to your binder and have you

17  look at a couple of documents.

18          We can try and pull them up but there is a few so I

19  think the binder may be a little easier.

20          524C, 524F, 525, 525A, 526 and 527.

21          The first one is 524C.

22  A.  Ms. Cucinella, I might need some help finding this in the

23  binder.  Sorry.

24  Q.  That is OK.  You can take your time.  It should be on the

25  top.

1          MS. CUCINELLA:  Oh, I lied.  It is not you; it is me.

2          Your Honor, may I approach?

3          THE COURT:  You may approach.

4   Q.  Do you recognize these documents, Mr. Davis?

5          (Pause)

6   A.  Yes.

7   Q.  Generally, what are the documents that I just gave to you?

8   A.  These are all emails primarily between Gregg Engles' office

9   and myself about various meetings and various aspects that had

10  to do with the spin-off.

11         MS. CUCINELLA:  Your Honor, the government offers

12  524C, 524F, 525, 525A, 526 and 527.

13         MR. BERKE:  Your Honor, if we may have a minute?

14         THE COURT:  You may.

15         MR. BERKE:  Thank you.

16         (Pause)

17         Your Honor, may I have a moment with Ms. Cucinella?

18         THE COURT:  You may.

19         MR. BERKE:  Thank you.

20         (Pause)

21         MS. CUCINELLA:  Your Honor, we're not going to offer

22  527 -- 527.  We're just going to offer the first page of 527A.

23         MR. BERKE:  We have no --

24         THE COURT:  Tell me what you are withdrawing and tell

25  me what you are offering.

1              MS. CUCINELLA:  Certainly.  We are going to offer

2     524C, 524F, 525, 525A, 526 and the first page only of 527A.

3              THE COURT:  Any objection?

4              MR. BERKE:  We have no objection to that, your Honor.

5              THE COURT:  Received.

6              (Government's Exhibits 524C, 524F, 525, 525A, 526,

7     first page of 527A received in evidence)

8     BY MS. CUCINELLA:

9     Q.  So, Mr. Davis, turning -- let's just look at one example of

10    these.  Looking at 527A, the first page only.

11    A.  Yes.

12    Q.  What is reflected here?

13    A.  This is dated July 24th.  It's an email thread basically

14    setting up a meeting between me and Gregg Engles, a breakfast

15    meeting.

16    Q.  And is this reflective of the types of meetings that you

17    would have with Gregg Engles throughout the summer?

18    A.  Yes.

19              MR. BERKE:  I would object to that, your Honor.

20              THE COURT:  Sustained.

21              MS. CUCINELLA:  I will withdraw it.

22              THE COURT:  Stricken.

23              Rephrase.

24    Q.  Did you have multiple meetings with Mr. Engles throughout

25    the summer?

1   A.  Yes, I did.

2   Q.  What types of things did you discuss at those meetings?

3   A.  We were totally focused on this transaction that I've

4   referred to, all of the aspects of trying to get this

5   transaction completed.  So we had many meetings to talk about

6   the various issues that I've already referred to in terms of

7   separating the two companies.

8   Q.  Did you discuss with Mr. Engles what your role would be

9   after WhiteWave was spin-off?

10  A.  Yes, I did.

11  Q.  What was that?

12  A.  He wanted me to become chairman of Dean Foods at some point

13  in the future after we separated the companies.

14  Q.  Do you recall when you learned, or when Mr. Engles asked

15  you to become chairman of the board?

16  A.  I don't recall precisely what meeting it was that we

17  discussed it, but we discussed it at some point in time during

18  the summer.  That's my recollection.

19  Q.  And, Mr. Davis, you've testified that you would update

20  Mr. Walters regularly throughout this summer.  How would you go

21  about that?

22  A.  By cell phone.  I also actually stayed in his home that

23  summer in late July.

24  Q.  Before we get to that.  You said "by cell phone."  Do you

25  mean your regular cell phone or the bat phone?

1    A.  Both.

2    Q.  OK.  You just mentioned that you went to stay with

3    Mr. Walters in the summer of 2012.  How did that trip come

4    about?

5    A.  I had planned a trip -- my wife and I had planned a trip to

6    visit some friends in California, in Newport Beach, California,

7    and I called Mr. Walters and told him I was coming out to

8    California, that my wife and I were, and suggested that we stop

9    in San Diego and visit with him, and I planned my trip around

10   that.  And we did in fact fly to San Diego first and we stayed

11   with the Walters I think three days and then drove up to

12   Newport Beach.

13   Q.  Do you recall the dates of your trip?

14   A.  It was right at the end of July.  I don't remember the

15   specific dates.  I think it was like the 27th, 8th and 9th of

16   July, right around there.

17   Q.  I'm showing you what's been marked for identification as

18   Government Exhibit 1925.

19           Do you recognize this?

20   A.  Yes.  That's it, yes, my American Express statement, or a

21   confirmation.  I'm sorry.

22           MS. CUCINELLA:  The government offers 1925.

23           THE COURT:  Any objection?

24           MR. BERKE:  Your Honor, could we see the other pages

25   of what is in the exhibit?

```
 1              THE COURT:  Sure.

 2              (Pause)

 3              MR. BERKE:  No objection, your Honor.

 4              THE COURT:  All right.  Received.

 5              (Government's Exhibit 1925 received in evidence)

 6   BY MS. CUCINELLA:

 7   Q.  Mr. Davis, what's the jury looking at here?

 8   A.  This is a confirmation of a rental car, it looks like, that

 9   I rented for the week that we were out there.

10   Q.  And, again, what were your plans?

11   A.  My wife and I flew into San Diego.  We picked the car up in

12   San Diego, and we drove up to Newport Beach after staying with

13   the Walters.

14   Q.  Did you actually stay in Mr. Walters' home?

15   A.  Yes, we did.

16   Q.  How many nights, if you recall?

17   A.  I think it was a couple, two or three.  I'm not sure.  Two

18   or three.

19   Q.  What did you do while you were there?

20   A.  Mr. Walters and I played golf one day.  We went to look at

21   a property that the Walters were remodeling in Rancho Santa Fe

22   one day.  We had dinner together each of the nights that we

23   were there, one night at his home and one night out, as I

24   recall.

25   Q.  Did you discuss Dean Foods during this trip?
```

1    A.   I only recall discussing Dean Foods on one occasion during

2    this trip.

3    Q.   When was that?

4    A.   The night that we went out to dinner.  We were leaving the

5    restaurant and Billy and walked out ahead of our wives, and he

6    put his arm around me, as he typically would do, and asked me

7    if everything was on schedule.

8    Q.   And what, if anything, did you say -- what did you

9    understand Mr. Walters to be asking you?

10   A.   He was referring to the spin-off transaction, I was

11   certain.

12   Q.   And was the spin-off transaction public at that time?

13   A.   No.

14   Q.   What did you say in response, if anything?

15   A.   I responded affirmatively.  I gave him an affirmative

16   response and said everything's on schedule, the deal looks

17   good.

18   Q.   Did Mr. Walters say anything when you said that?

19   A.   He thanked me, as he typically would, and we got our cars

20   and our wives came out and we went home.

21   Q.   Did Mr. Walters make any statements to you on that trip

22   about his future plans?

23   A.   I recall having a conversation with him when we were

24   looking at his property that they were remodeling in Rancho

25   Santa Fe and he took me in his office.  The house was being

1   redecorated, and he had an extensive business office with

2   television screens and monitors around the desk.  And, you

3   know, I found it kind of odd but he seemed to indicate that he

4   was less interested in the gambling business than he had been

5   in the past.  And I got the feeling that he wanted to get out

6   of the gambling business.  He had indicated to me that he had

7   made a big investment in the auto business, and I think he was

8   spending a lot more time focusing on that.

9   Q.  You testified that you golfed on that trip, is that right?

10  A.  We did, yes.

11  Q.  Who did you golf with?

12  A.  With Billy and another couple.

13  Q.  Where did you golf?

14  A.  We played at Bill's club, at Rancho Santa Fe Golf Club.

15  Q.  Had you played there before?

16  A.  Yes.

17  Q.  Had Mr. Walters ever introduced you to other members of

18  that club?

19  A.  Yes, he had.

20  Q.  Who?

21  A.  He introduced me to Phil Mickelson.

22  Q.  Did you see Mr. Mickelson on this trip?

23  A.  I did not, not that I recall, no.

24  Q.  Did you have an understanding of what Mr. Walters'

25  relationship was with Mr. Mickelson?

1    A.  They appeared to be good friends.

2    Q.  What are you basing that on?

3    A.  I'm basing it on what I learned from Mr. Walters, and also

4    on the occasion when I met Phil Mickelson, Billy introduced him

5    to me on the practice tee.

6    Q.  Did Mr. Walters ever tell you that he shared the

7    information that you provided him with anyone else?

8    A.  No.  Never.

9    Q.  Did you ever discuss Dean Foods with Mr. Walters in front

10   of anyone else?

11   A.  Never.

12   Q.  Why not?

13   A.  I just wouldn't do it, period.

14        MS. CUCINELLA:  I'm moving on to a new topic, your

15   Honor, if you want to break now.

16        THE COURT:  Well, since we're one minute over time, I

17   think it is a good time for a break.

18        Ladies and gentlemen, do not discuss the case among

19   yourselves or with anyone.  Keep an open mind.  We'll be back

20   in action at 2 o'clock.

21        Thanks very much.

22        (Continued on next page)

23

24

25

```
 1                 (Jury not present)

 2                 THE COURT:  Please be seated.

 3                 There is a note from Juror No. 6:  "I need a letter

 4      from the Court stating that I'm on a case for four weeks."

 5                 And we will tend to that.

 6                 All right.  Talk to you after the lunch break.

 7                 MR. BERKE:  Your Honor, we have a brief application.

 8                 THE COURT:  Sure.

 9                 MR. BERKE:  We are happy to do it after the break.

10                 THE COURT:  OK.  That's fine.

11                 (Luncheon recess)

12                 (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           AFTERNOON SESSION

2                               2:00 p.m.

3              (In open court; jury present)

4              THE COURT:  Ms. Cucinella, you may continue.

5              MS. CUCINELLA:  Thank you, your Honor.

6    BY MS. CUCINELLA:

7    Q.  Good afternoon, Mr. Davis.  Earlier this morning, we spoke

8    a bit about the burner phone that Mr. Walters gave you, and you

9    testified that you stored it I believe in your laundry room.

10   Do you recall that?

11   A.  Yes, ma'am.

12   Q.  Where did you typically use the bat phone?

13   A.  From my home.

14   Q.  Did you on occasion use it from other places as well?

15   A.  Rarely.  I would occasionally use it from my car, but I

16   never took it anyplace else.

17   Q.  You never took it with you when you were traveling?

18   A.  I did not, no.

19   Q.  When you would use the bat phone, or speak to Mr. Walters

20   during that time period, the summer of 2012, would he ever have

21   you call him back on numbers other than his regular cell phone

22   number?

23   A.  Yes, he did occasionally.

24   Q.  Did that happen on more than one occasion?

25   A.  On more than one occasion, yes, he'd leave me a message and

1   say let's go get a cup of coffee and call me back on a

2   different number.

3   Q.  Did you always put those numbers in your phone?

4   A.  No, no, I didn't.

5   Q.  I think when we left off, you had been describing a weekend

6   that you spent in California where you stayed at Mr. Walters'

7   home.  Do you recall that?

8   A.  Yes.

9   Q.  I believe you testified that was the end of July?

10  A.  It was, yes.

11  Q.  Do you recall, at this point did you know when the spinoff

12  was scheduled to be announced?

13  A.  Yes, I did exactly.

14  Q.  When was that?

15  A.  What was the schedule for?

16  Q.  Yes.  When was that scheduled to be announced?

17  A.  August the 7th.

18  Q.  Do you recall when during the summer of 2012 you learned

19  the exact date that it would be announced?

20  A.  I don't recall the exact date.  But I certainly knew it by

21  I would say mid-June, there was a target set and a detailed

22  itinerary set for completing all the work that needed to be

23  done to make this registration statement filed.

24  Q.  So you were out in California the last weekend of July, and

25  it was scheduled to be announced on August 7, is that right?

1   A.  That's correct.

2   Q.  Do you recall when the last time you spoke to Mr. Walters

3   was after you left his house but before the spin was announced?

4   A.  I don't recall the exact day, no, but I know I spoke to him

5   after I left his house but before August 7.

6   Q.  Do you recall the nature of that conversation?

7   A.  Yes.

8   Q.  What was it?

9   A.  I think it was a confirmation call that this deal was still

10  going to be announced on August 7.  He wanted to know if it was

11  still going to happen on August 7.

12  Q.  Was the spinoff in fact announced on August 7?

13  A.  Yes, it was.

14  Q.  What was announced that day, do you recall?

15  A.  Yes.  I do.

16  Q.  What was announced?

17  A.  That WhiteWave Foods had filed a registration statement to

18  do an IPO to sell up to 20 percent of the equity in a public

19  offering.

20  Q.  Did Dean Foods make announcements about anything else that

21  day?

22  A.  They also said that they had -- I believe they also

23  announced at the same time that they were going to file for an

24  IRS ruling for the spinoff.

25  Q.  Were there any announcements about earnings that day?

1  A.  Yes, I'm sorry.  The second quarter earnings were also

2  released at the same time.

3  Q.  Do you recall how the earnings were?

4  A.  They were good.

5  Q.  I need to --

6  A.  I'm sorry, I couldn't hear you.

7  Q.  Are you having trouble with your hearing?

8  A.  I am, I'm sorry, a little bit.

9          THE COURT:  So maybe what you should do is let

10  Ms. Cucinella finish the question, pause, if you didn't hear

11  the question, so state, if you did hear it, then answer.  I

12  think a little pause in between would be helpful.  Go ahead.

13  Q.  You keep touching your ear.  Are you okay?

14  A.  I'm okay.  Yeah.

15  Q.  Do you recall how the second quarter earnings for Dean

16  Foods in 2012 were?  Were they good, were they bad?

17  A.  They were very good.

18  Q.  You said that on August 7 it was announced that WhiteWave

19  would be filing a registration statement.  What exactly does

20  that mean?

21  A.  That's a document that you have to file with the SEC, the

22  Securities and Exchange Commission, to register the shares you

23  are going to sell to the public.

24  Q.  Were those shares that were going to be sold in the IPO?

25  A.  Yes.

1    Q.  Mr. Davis, as of August 7, was there any uncertainty about

2    whether the IPO and the spinoff would actually go through?

3    A.  Yes, there was still some risk that it wouldn't happen.  It

4    was clearly dependent upon the stock market, and, you know, the

5    registration statement had to get reviewed by the SEC, which

6    was going to take somewhere between 30 and 40 days, and then a

7    roadshow would take place where the company's management team

8    would go out and talk to investors, and then the IPO would be

9    priced eventually.

10   Q.  At the time on August 7, did you know what the IPO would be

11   priced at?

12   A.  No, there was a filing range in the registration statement,

13   so you have a range of prices, but you don't know until the

14   last minute what the exact price is going to be.

15   Q.  Following the August 7 announcement, did you have a

16   conversation with Mr. Walters?

17   A.  Yes, I recall I did, yes.

18   Q.  What did you talk about during that conversation?

19   A.  We talked about the likelihood that the IPO would take

20   place.

21   Q.  Did you talk about the market's reaction to the

22   announcement of the spinoff?

23   A.  It was pretty obvious after the announcement --

24   Q.  My question was did you talk about that with Mr. Walters.

25   A.  I don't recall specifically.

1    Q.  Did Mr. Walters ask you any questions?

2    A.  He asked me how confident I was that the IPO was going to

3    get done.

4    Q.  Did you respond?

5    A.  I did.

6    Q.  What did you say?

7    A.  I told him I was highly confident it would get done.

8    Q.  What were you basing that on?

9    A.  General, my general experience with regard to these types

10   of offerings.  This was a very attractive company, it had a

11   terrific track record, the earnings were good, the outlook for

12   the company was good.  The products were terrific that the

13   consumers loved.  Products like Silk milk and Horizon milk.

14   So, I kind of put all that together, and I thought this was

15   going to be a terrific offering, yes.

16   Q.  You told Mr. Walters that?

17   A.  I did.

18   Q.  How, if at all, was that answer based on information you

19   learned by virtue of your position on the Dean Foods board?

20   A.  Some of it was publicly available information and some of

21   it wasn't.  Obviously, I had more insight as a board member.

22   Q.  At the time of the August 7 announcement, did the public

23   know when the IPO was going to take place?

24   A.  Not at the time of the announcement.  Not precisely, no.

25   Q.  Did you know that?

1    A.   You can't ever predict it precisely, but as I indicated, I

2    knew it was going to take at least 30 to 40 days to get the

3    registration statement approved, and the offering would be made

4    after that.

5    Q.   Was that publicly known?

6    A.   I think most people would understand the delay between

7    filing a registration statement and actually doing the IPO.

8    Yes.

9    Q.   Mr. Davis, following the spinoff, did you have an

10   appreciation for the size of Mr. Walters' position in Dean

11   Foods at that time?

12   A.   He was never specific with me at that time, no.

13   Q.   Do you recall attending a board meeting on September 12 of

14   2012?

15   A.   Yes, I do.

16   Q.   I'm going to direct your attention to Government Exhibit

17   467.  I believe it's already in evidence.

18           MS. CUCINELLA:  Thank you, Ms. Pyun.  My screen is not

19   working.

20           Thank you, gentlemen.

21   Q.   Did you participate in this meeting on September 12 of

22   2012?

23   A.   Yes, I did.

24   Q.   Do you recall what was discussed at this meeting?

25   A.   Yes, I do.

1    Q.   What was discussed?

2    A.   There was an update on the registration statement, the

3    company had just received the first round of comments from the

4    Securities and Exchange Commission on the registration

5    statement.

6         MS. CUCINELLA:   You can take it down, Ms. Pyun.

7    Q.   What does it mean to receive comments from the SEC on the

8    registration statement?

9    A.   It's a typical process where the SEC will review the

10   registration statement, and if they feel like you need to add

11   anything or omit anything in that registration statement,

12   they'll inform you of that and you'll make the amendments that

13   are necessary.

14   Q.   Was that a significant event or no?

15   A.   No.   It's a common event.

16   Q.   What, if anything, was happening with Project Cyto around

17   this time?

18   A.   I think at some juncture, I don't remember the exact date

19   but it was in September, the company actually made an

20   announcement about Morningstar Foods.

21   Q.   Do you remember before the announcement, did you have an

22   understanding of what was going on with Project Cyto?

23   A.   Yes, I did.

24   Q.   What was happening before that announcement?

25   A.   Well, I'm not quite sure what you're asking me.

1    Q.  Do you know what the status of the Project Cyto project was

2    in September of 2012?

3    A.  Yes, I'm sorry.  I do know.  Yes.

4    Q.  What was the status?

5    A.  We were going to sell it.  I mean, we were going to sell

6    Morningstar Foods, and we were going to do it through an

7    auction process.  We hired bankers to represent Dean Foods in

8    the sale of Morningstar.

9    Q.  Do you recall having any conversations with Mr. Walters in

10   September of 2012?

11   A.  Yes.

12   Q.  What, if anything, do you recall discussing during those

13   conversations?

14   A.  I told him about the Morningstar auction and my thoughts on

15   the Morningstar auction.  I thought it was a terrific outcome

16   for Dean Foods.

17   Q.  You had mentioned that there was also an announcement about

18   Morningstar in September of 2012.  Do you recall if your

19   conversation with Mr. Walters was before the announcement or

20   after the announcement?

21   A.  I don't recall whether it was before or after.

22   Q.  Directing your attention to Government Exhibit 706-P which

23   I believe is already in evidence.

24       Mr. Davis, is this the announcement that you were just

25   talking about?

1   A.  Yes, it is.

2   Q.  What is the date of this announcement?

3   A.  September 26.

4   Q.  What specifically is being announced here?

5   A.  Sort of capsulizing, it says "As part of an effort to

6   maximize shareholder value, Dean Foods plans to sell the

7   Morningstar business."

8   Q.  You had mentioned this was going to be an auction process,

9   is that right?

10  A.  Yes.

11          MS. CUCINELLA:  You can take that down, Ms. Pyun.

12  Q.  Did you know when this auction was scheduled to take place?

13  A.  Yes.  Approximately, yes, I did.

14  Q.  When was that?

15  A.  It was going to take place after the IPO was completed.

16  Q.  Was that fact known to the public?

17  A.  No.

18  Q.  After this announcement, and during this period, did you

19  continue to talk to Mr. Walters about --

20  A.  Yes, I'm sorry.

21  Q.  Can you hear okay?

22  A.  Yes, now I can, pardon me.

23  Q.  Sorry.  I'll try and stay on the microphone.

24          After this announcement, did you continue to talk to

25  Mr. Walters about the Morningstar transaction?

1    A.  Yes, I did.

2    Q.  What, if anything, did you tell him about it?

3    A.  I told him about the timing, what I understood to be the

4    timing, which was after the IPO was completed, so that would

5    indicate the sale would take place or the sale process would

6    take place probably in November and December.  And I told him I

7    thought we would have a lot of interest in companies that

8    wanted to buy Morningstar.  I thought it was going to be a

9    highly sought-after deal.

10   Q.  What, if any, impact did you think selling Morningstar

11   would have on the value of Dean Foods' stock?

12   A.  I thought it would enhance the value of Dean Foods' stock.

13   Q.  Do you recall specifically when you had these conversations

14   with Mr. Walters?

15            MR. BERKE:  Objection, your Honor.  It was asked and

16   answered.

17            THE COURT:  I'll allow it.

18   A.  Do I recall specifically when?

19   Q.  Yes.

20   A.  It was in the fall, before the auction outcome was

21   announced.

22   Q.  Do you remember in the fall of 2012 if you went to Vegas?

23   A.  Yes, I did.

24   Q.  What did you go to Las Vegas for?

25   A.  It was another trip with some friends.  Golf, primarily we

H3M3WAL4                        Davis - direct

1    played golf.

2    Q.  Did you also gamble?

3    A.  Yes, I did.

4    Q.  Directing your attention to what's been marked 1931-A.

5    What is this, Mr. Davis?

6    A.  This is my American Airlines itinerary dated September 21,

7    for -- I am assuming this is for my flight to Las Vegas.

8              MS. CUCINELLA:  Government offers 1931-A.

9              MR. BERKE:  No objection, your Honor.

10             THE COURT:  Received.

11             (Government's Exhibit 1931-A received in evidence)

12   Q.  Mr. Davis, when in September of 2012 did you go to Las

13   Vegas?

14   A.  I don't have the exact date in -- this isn't the full

15   itinerary, this is just a confirmation.  There it is.  Okay.

16   Sorry.

17             I went on Saturday the 22nd and came back on Monday

18   the 24th of September.

19   Q.  It was a personal trip?

20   A.  I took my wife with me on this trip.

21   Q.  While you were on this trip, do you recall if you

22   participated in a Dean Foods board meeting?

23   A.  Yes, I did.

24   Q.  Did you participate in it telephonically?

25   A.  Yes, I did.

1   Q.  While you were on this trip, did you visit with

2   Mr. Walters?

3   A.  I did not see him on this trip, no.

4   Q.  You talked -- you can take that down, Ms. Pyun.

5           You talked about a number of conversations that you

6   recall having with Mr. Walters during this time about

7   Morningstar.  Did you have any additional conversations with

8   Mr. Walters about the IPO during the fall of 2012?

9   A.  Yes, I did.

10  Q.  What did you discuss during those conversations?

11  A.  We had numerous conversations, as I recall, all pertaining

12  to the probability that the IPO was going to happen and where

13  the IPO might be priced.

14  Q.  Mr. Davis, during this period of time, did you serve on any

15  committees?

16  A.  Yes, I did.

17  Q.  What committee did you serve on?

18  A.  I was on the pricing committee for the IPO.

19  Q.  What was the role of people on the pricing committee?

20  A.  There were three of us, three directors that were going to

21  interface with the investment bankers when the IPO was priced.

22  Q.  Why does the price of the IPO matter?

23  A.  It determines how much money you raise, and it determines

24  what percentage of the company you actually sell in the IPO.

25  Q.  Is it relevant to investors?

1    A.  Yes, it is.

2    Q.  Why?

3    A.  Well, the price that is set in the IPO is either going to

4    be perfect or it's going to be too high or too low, based on

5    the demand for the offering.  And you hope it's perfectly

6    priced and that the stock trades where you priced it or

7    slightly above where you priced it.  That's the best outcome.

8    Q.  Did you communicate where the IPO was going to be priced to

9    Mr. Walters before it was publicly announced?

10   A.  I indicated to him that I thought the price was going to be

11   above the filing range, because the demand was so great in this

12   offering.

13   Q.  What does that mean?

14   A.  Well, we were -- I don't remember the exact number of

15   shares we were selling, but we were 20 times oversubscribed in

16   this offering, so we had 20 times more demand than we had stock

17   to sell.

18   Q.  What's the significance of that, if anything?

19   A.  It means it was a very successful and sought-after stock,

20   as far as the IPO was concerned.

21   Q.  Do you recall when you told Mr. Walters that the IPO was

22   oversubscribed?

23   A.  I told him that roughly four or five days before the

24   offering got priced, because that's when I had that indication.

25   Q.  Was that information that the public had access to?

1    A.  No.

2    Q.  Did there come a time when WhiteWave announced to the

3    public the timing and price information for the IPO?

4    A.  Yes.

5    Q.  Do you recall when that was?

6    A.  I don't recall the exact date.  It was end of October when

7    it was priced and the announcement was made.

8    Q.  Directing your attention to Government Exhibit 888-A which

9    I believe is already in evidence.

10             Do you recognize this?

11   A.  Yes.

12   Q.  What is it?

13   A.  This is the cover page for the third amendment to the

14   registration statement.

15             MS. CUCINELLA:  The government offers Government

16   Exhibit 888-A.

17             Sorry, it's already in.

18   Q.  What information is included in this?

19   A.  I think this is the final amendment, so this must be the

20   pricing amendment.

21   Q.  What date was this filed with the Securities and Exchange

22   Commission?

23   A.  October 17.

24   Q.  When was the IPO itself actually scheduled to occur?

25   A.  If this was filed on the 17th, then the IPO was going to

H3M3WAL4                          Davis - direct

1    occur the next day.

2    Q.  In between this and the IPO, did anything need to be

3    accomplished?

4    A.  I'm sorry?

5    Q.  Withdrawn.

6              Directing your attention to what's been marked as

7    Government's Exhibit 531, which I believe is already in

8    evidence.  No?

9              Do you recognize this?

10   A.  Yes.

11   Q.  What is it?

12   A.  It is an e-mail from Gregg Engles to the board.

13             MS. CUCINELLA:  Government offers 531.

14             MR. BERKE:  No objection, your Honor.

15             THE COURT:  Received.

16             (Government's Exhibit 531 received in evidence)

17             THE COURT:  How much more do you have, Ms. Cucinella?

18             MS. CUCINELLA:  Probably half an hour, your Honor.

19             THE COURT:  Let's move it along.

20   Q.  Mr. Davis, what is this e-mail?

21   A.  This is an e-mail from Gregg to the board, subject

22   roadshow, and it's basically his summary for us on the progress

23   of the IPO roadshow.  Which is a good summary, it is a positive

24   summary, and he goes on to say they have four days left and

25   they'll price the deal on Thursday.

1   Q.  So this is on what day?

2   A.  This is on the 19th of September.

3   Q.  So when was the IPO actually expected to occur?

4   A.  So I guess -- I'm doing the math.  It would have been on

5   the 23rd.

6   Q.  Okay.  So --

7   A.  Of September -- October, rather.

8   Q.  So in between the registration statement being filed and

9   the IPO occurring, what was going on?

10  A.  In between the filing and the pricing?

11  Q.  Yes.  What's a roadshow?

12  A.  I'm sorry.  The roadshow is the marketing process of doing

13  this IPO.  The management team is scheduled to go around the

14  country and have meetings with a variety of investors,

15  institutional investors as well as brokerage firms that will

16  sell the stock, and that's called the roadshow.

17  Q.  When the IPO happened, do you recall how it was received

18  initially?

19  A.  Yes.

20  Q.  How was it received?

21  A.  After it was priced you mean?

22  Q.  Yes.

23  A.  The stock traded up slightly and then traded down.  That's

24  my recollection.

25  Q.  You said after it was priced.  What process was there for

1   actually pricing it?

2   A.  When you finish the roadshow, the bankers call a meeting

3   with the company's management, in this case it was with the

4   pricing committee, they give you a complete review of what they

5   call the book, and the book is the orders that have been placed

6   for the stock.  And they recommend a price be set based on the

7   book.  And the price was set.

8   Q.  Is that information confidential?

9   A.  Until the price is released to the public, yes.

10  Q.  Is that information that you conveyed to Mr. Walters?

11  A.  At what point in time?

12  Q.  Before it was made public.

13  A.  I told him before it was made public that the demand was so

14  great that I thought the price would be above the filing range.

15  That's what I told him, and it was in fact above the filing

16  range.

17  Q.  Showing you what's been marked as Government Exhibit 1934.

18  Do you recognize this?

19  A.  Yes.  It's an e-mail thread between myself and Gregg

20  Engles.

21          MS. CUCINELLA:  Government offers Exhibit 1934.

22          MR. BERKE:  Your Honor, I don't believe we have it.

23  Can we just scroll down and get a better look at it on the

24  screen.

25          THE COURT:  Sure.

1                 MR. BERKE:  If we can enlarge it.

2                 No objection, your Honor.  Thank you.

3                 THE COURT:  All right.  Received.

4                 (Government's Exhibit 1934 received in evidence)

5     Q.  Mr. Davis, do you recognize this?

6     A.  Yes, it is an e-mail thread between me and Gregg Engles

7     about the trading activity in the stock after it was priced.

8                 MS. CUCINELLA:  Government offers 1934.

9                 MR. BERKE:  I think it's already in.

10                MS. CUCINELLA:  Oh, I'm sorry, I thought you were

11    still looking at it.

12    Q.  What does this conversation reflect?

13                THE COURT:  Are you withdrawing the offer because it's

14    already in evidence?  Are you withdrawing the offer?

15                MS. CUCINELLA:  No.

16                MR. BERKE:  It was just admitted, your Honor, a minute

17    ago.

18                THE COURT:  Are you withdrawing the offer then?

19                MS. CUCINELLA:  No, I'm offering 1934.

20                THE COURT:  Any objection?

21                MR. BERKE:  No, your Honor, but we just went through

22    it and your Honor admitted it.

23                THE COURT:  If it's already admitted, then a second

24    offer should be withdrawn.

25                MS. CUCINELLA:  I'm withdrawing it.  Sorry.  My

1    mistake.

2              THE COURT:  That's what I'm asking you.

3              MS. CUCINELLA:  My mistake, your Honor.

4    Q.  What does this conversation reflect, Mr. Davis?

5    A.  It reflects what I previously indicated when the stock was

6    priced.  It went up quickly and then dropped below the offering

7    price, and it surprised everybody.

8    Q.  You can take that down.

9              Moving to a different topic, Mr. Davis, do you recall

10   whether there came a time when you received an e-mail from Dean

11   Foods' general counsel in connection with a FINRA inquiry?

12   A.  Yes, I did.

13   Q.  What's a FINRA inquiry?

14   A.  It is a regulatory inquiry about trading in the stock -- in

15   a security.

16   Q.  What kind of e-mail did you receive?

17   A.  I received an e-mail from the compliance counsel at Dean

18   Foods.

19   Q.  What were they asking you to do?

20   A.  There was a long list of -- I don't remember how many, a

21   hundred names on the list that we were asked to review and see

22   if we knew any of the parties that were listed on this long

23   list from FINRA.

24   Q.  Directing your attention to then what's been marked as

25   Government Exhibit 1935.  Do you recognize this, Mr. Davis?

1   A.  Yes.

2   Q.  What is it?

3   A.  This is my -- my response to the initial inquiry by the

4   Dean Foods' compliance officer.

5           MS. CUCINELLA:  Government offers 1935.

6           MR. BERKE:  No objection, your Honor.

7           THE COURT:  Received.

8           (Government's Exhibit 1935 received in evidence)

9   Q.  Mr. Davis, what's the date of this e-mail?

10  A.  It's November of 2012, November 29.

11  Q.  Who is Alex Madrazo?

12  A.  He is the in-house compliance counsel.

13  Q.  Looking at the e-mail, will you read the e-mail.

14  A.  This is my response to him.  You want me to read it?

15  Q.  Yes, please.

16  A.  Here's some additional information which you have

17  requested -- I guess this was his second request to me -- about

18  individuals that I know.  Denis Boulle.  1.  Personal friend of

19  mine whom I know --

20          THE COURT:  Why is it necessary to read this?

21          MS. CUCINELLA:  He doesn't have to.  I can ask him

22  questions, your Honor.

23          THE COURT:  Thank you.

24  Q.  Did you have an understanding, Mr. Davis, of why Denis

25  Boulle's name was on here?

H3M3WAL4                    Davis - direct

1   A.  I assumed that he purchased Dean Foods stock.  That's what

2   I assumed when I got this e-mail, initially.

3   Q.  And what were you supposed to do when you recognized a name

4   on the list that had been sent to you by Alex Madrazo?

5   A.  I was asked to give a brief, brief explanation of any of

6   the people that I knew and my relationship to those people and

7   whether I had given them any information about Dean Foods'

8   business.

9   Q.  So, looking first at your answer for Denis Boulle and going

10  directly to part four.  What does it say there?

11  A.  It says "I'm not aware of any circumstance where he gained

12  knowledge of Dean's business."

13  Q.  Is that a true statement?

14  A.  No.

15  Q.  Were you aware of a circumstance where he had gained

16  knowledge of Dean Foods' business?

17  A.  Yes, I was aware of the circumstance.

18  Q.  Tell the jury of the circumstance of which you were aware.

19  A.  He is a friend of mine who runs a jewelry store in Dallas,

20  and I don't recall precisely when this happened, but in July I

21  was in his store, and I told him in a conversation I was having

22  with him about several things, I told him that I thought it was

23  a good time for him to own Dean Foods stock.

24  Q.  Why didn't you include that in this e-mail to Mr. Madrazo?

25  A.  I was trying to conceal the fact that I'd said anything to

 1    him.

 2    Q.  When you provided that information to Mr. Boulle, did you

 3    have an expectation of what he would do with it?

 4    A.  I assumed he would take my recommendation up.

 5    Q.  Let's turn now to paragraph three.  Bill Walters.  Turning

 6    to part four of your response with respect to Bill Walters.

 7    What did you put in this e-mail to Dean Foods' counsel?

 8    A.  I said "I am not aware of any circumstances where he gained

 9    knowledge of Dean's business."

10    Q.  Was that true?

11    A.  No, that was definitely not true.

12    Q.  Why did you lie?

13    A.  I was trying to conceal this at this point in time.

14    Q.  Did you get any followup questions to this e-mail in 2012?

15    A.  I don't recall whether I got followup questions until much

16    later on.

17    Q.  I'm going to direct your attention now to Government

18    Exhibit 1936-A and 1937.  Do you recognize these?

19    A.  Yes, I do.

20    Q.  What are they?

21    A.  These are all e-mail messages between Gregg Tanner who,

22    succeeded Gregg Engles as the new CEO of Dean Foods, and

23    myself.

24              MS. CUCINELLA:  Government offers 1936-A and 1937.

25              MR. BERKE:  Can we put 1937 on?  I believe we don't

```
 1    have it in the binder.

 2                No objection, your Honor.  Thank you.

 3                THE COURT:  Received.

 4                (Government's Exhibit 1936-A, 1937 received in

 5    evidence)

 6    Q.  Turning to 1936-A.  Mr. Davis, what's reflected in this

 7    e-mail?

 8    A.  It's just the fact that we were setting up lunch, to have

 9    lunch together, and this is dated January 8, 2013.

10    Q.  Were you in regular contact with Mr. Tanner around this

11    time?

12    A.  Yes, I was.

13    Q.  What types of things would you talk about with Mr. Tanner

14    during this period of time?

15    A.  Well, since he was the new CEO and I was going to be the

16    new chairman, we usually visited frequently and would talk

17    about a lot of Dean Foods' business and about the Dean Foods'

18    personnel, among other things.

19    Q.  Looking at the e-mail in 1936-A, what's the subject?

20    A.  The subject is Robert Wiseman.

21    Q.  1936-A, oh, sorry, the top e-mail.

22    A.  Sorry.  WMT meeting.

23    Q.  Do you recall what WMT stood for?

24    A.  Actually, I don't recall exactly what that stands for.  Oh.

25    Of course I do, I'm sorry.  It stands for Walmart.  That's the
```

1   symbol for Walmart.

2   Q.  You can take that down.

3           Mr. Davis, what was going on with Walmart during this

4   period of time?

5   A.  We were -- Dean Foods was having some rather serious

6   negotiations with the Walmart people about our contract with

7   Walmart.

8   Q.  What significance -- or what was going on with the

9   contract?

10  A.  Walmart was pressing us, pressing Dean Foods to renegotiate

11  the contract or they were going to take away some of the volume

12  that Dean Foods had and give it to another processor.

13  Q.  What was the significance of that situation with respect to

14  Dean Foods' outlook?

15  A.  It was very serious, because Walmart was our largest

16  customer.  I think Walmart at that time was roughly 20 or

17  23 percent of our total milk volume.  So it was a serious

18  matter.

19  Q.  Did there come a time when Dean Foods lost some of the

20  Walmart business?

21  A.  We did, yes.

22  Q.  During this period of time, did you talk about what was

23  going on with Walmart with Mr. Walters?

24  A.  I gave him an update on the Walmart situation.

25  Q.  Do you recall when you provided him with that update?

1   A.  It was certainly in the first half of 2013.

2   Q.  Do you recall if it was before or after it was publicly

3   announced that you had lost --

4   A.  I gave him an update.

5             THE COURT:  Whoa.

6             THE WITNESS:  I'm sorry, pardon me.

7             THE COURT:  You have to wait until Ms. Cucinella is

8   finished with the question.

9             THE WITNESS:  Yes, your Honor.

10             THE COURT:  Then you can answer.  Go ahead.  Put a

11   question to the witness.

12   Q.  Do you recall whether that conversation was before or after

13   it was announced that Dean Foods had lost some of Walmart's

14   business?

15   A.  It was definitely before it was announced.  I was fearful

16   of the outcome when we had to announce that we lost a

17   significant part of our Walmart business.

18   Q.  I'm going to move on to the summer of 2013.  What was the

19   status of your personal financial situation in the summer of

20   2013?

21   A.  It hadn't changed.  It hadn't gotten any better, that's for

22   sure.

23   Q.  Had you made any payments on your loans to Mr. Walters?

24   A.  I had not, no.

25   Q.  Had anyone said anything to you about that?

1    A.  No, not that I recall.

2    Q.  During the summer of 2013, did you come into possession of

3    confidential non-public information relating to Darden

4    Restaurants?

5    A.  I did, yes.

6    Q.  Mr. Davis, how did you learn about Darden Restaurants?

7    A.  I had a friend of mine that I'd done some business with in

8    Dallas, who called me and set up a meeting with me to discuss

9    this situation that related to Darden Restaurants.  He was --

10   he was a partner with a group in New York that were so-called

11   activist investors.

12   Q.  I'm going to direct your attention to what's been marked as

13   Government Exhibit 1809 and 1809-A.  Do you recognize these?

14   A.  Yes, I do.

15   Q.  What are they?

16   A.  On the left is an e-mail from this friend of mine whom I

17   was referring to.  His name was Al Holland.

18   Q.  That's Government Exhibit 1809.  What's 1809-A?

19   A.  1809-A is the exhibit, a deck that he provided me on this

20   project which was code named Project Dee.

21           MS. CUCINELLA:  The government offers 1809 and 1809-A.

22           MR. BERKE:  No objection, your Honor.

23           THE COURT:  Received.

24           (Government's Exhibit 1809, 1809-A received in

25   evidence)

1  Q.  Mr. Davis, what's the date on the e-mail that you received

2  from Al Holland?

3  A.  September 31, 2013.

4  Q.  Will you take another look?

5  A.  Oh, pardon me.   July.

6  Q.  July 31 of 2013?

7  A.  Yes, ma'am.

8  Q.  Does this e-mail describe the opportunity that you just

9  talked about to the jury?

10 A.  Yes.  It does.  Which -- it summarizes the opportunity that

11 he was sharing with me.

12 Q.  What was attached here?

13 A.  I didn't hear the question, sorry.

14 Q.  What was attached?

15 A.  The attachment was a roughly a 20- or 25-page summary of

16 Darden Restaurant Company.

17 Q.  Did you talk to Mr. Holland after you received this e-mail?

18 A.  I'm sorry?

19 Q.  Did you speak with Mr. Holland after you received this

20 e-mail?

21 A.  Yes, I did, we had a meeting in my office.

22 Q.  Were you requested to sign a non-disclosure agreement in

23 connection with the information contained in Project Dee?

24 A.  Yes, I was.

25 Q.  Turning your attention to Government Exhibit 1800.  Do you

1   recognize this?

2   A.  Yes, it's the non-disclosure agreement you were referring

3   to.

4            MS. CUCINELLA:  Government offers 1800.

5            MR. BERKE:  No objection, your Honor.

6            THE COURT:  Received.

7            (Government's Exhibit 1800 received in evidence)

8   Q.  Mr. Davis, when that comes up on the screen, what's the

9   date on this non-disclosure agreement?

10  A.  It says July 31, 2013.

11  Q.  Mr. Davis, what's the significance of a non-disclosure

12  agreement?

13  A.  It's an agreement where the signatory agrees not to

14  disclose the information he's received.

15  Q.  Mr. Davis, it appears that Mr. Holland sent you an e-mail

16  attaching -- withdrawn.

17            You said that you spoke with Mr. Holland after this.

18  Is that right?

19  A.  We actually met in my office.

20  Q.  I'm going to direct your attention to what's been marked as

21  Government Exhibit 1806 and 1807.  What are these?

22  A.  This is an e-mail on the left from Al Holland to me,

23  signifying that the Project Dee book was attached and that's

24  the attachment on the left.

25  Q.  This is the second e-mail from Mr. Holland?

1    A.  Yes.

2              MS. CUCINELLA:  Government offers 1806 and 1807.

3              MR. BERKE:  No objection, your Honor.

4              THE COURT:  Received.

5              (Government's Exhibit 1806, 1807 received in evidence)

6    Q.  So you had received two deal books from Mr. Holland, is

7    that right?

8    A.  Yes.  I think that's my recollection, yes.

9    Q.  It says Project Dee on the front, I believe on both of the

10   deal books we saw.  What company was Project Dee referring to?

11   A.  Darden Restaurant Company.

12   Q.  Did these deal books say "Darden" anywhere in them?

13   A.  I don't think so.  No.

14   Q.  Were they both marked confidential?

15   A.  Yes, they were.

16   Q.  Why wouldn't a company's name be used in a book like this?

17   A.  In order to disguise it, you'd use a project name and not

18   the company's real name.

19   Q.  Would this information be valuable to an investor in the

20   stock market?

21   A.  Yes, it probably would.

22   Q.  Why?

23   A.  Well, the project itself was somewhat detailed in terms of

24   what this activist investor, which was Barington Capital Group

25   in New York, had planned with regard to Darden Restaurant

H3M3WAL4                        Davis - direct

1   Group.  They had a small position in the stock, my recollection

2   was they owned about 1 percent, and that they were continuing

3   to build a position in the stock, because they thought the

4   company was undervalued, and they were trying to find other

5   investors to participate with them.

6   Q.  Is that information you learned from the deal book and from

7   your meeting with Al Holland?

8   A.  Yes.

9   Q.  I'm going to direct your attention to Government Exhibit

10  1812.  Do you recognize this?

11  A.  Yes.  This is an e-mail between myself and Al Holland.

12          MS. CUCINELLA:  Government offers 1812.

13          MR. BERKE:  No objection, your Honor.

14          THE COURT:  Received.

15          (Government's Exhibit 1812 received in evidence)

16  Q.  Mr. Davis, what's the date of this e-mail?

17  A.  It's -- the top e-mail is August 5.

18  Q.  Can you read the top e-mail, the first line.

19  A.  It says "Al, I plan on seeing you at my office tomorrow at

20  9:30 a.m."

21  Q.  So that meeting on August 6, is that the meeting just

22  described?

23  A.  Yes, it was.

24  Q.  Did the non-disclosure agreement that you signed cover the

25  information you learned from both the deal book and the meeting

1    you had with Al Holland?

2    A.  Yes, it did.

3    Q.  During this meeting with Al Holland, did anyone from

4    Barington Capital participate?

5    A.  Yes, on the phone.

6    Q.  During this meeting, did you agree to do anything?

7    A.  I did not agree to do anything.  I listened.  I was a

8    listener pretty much for the substance of the meeting.

9    Q.  Did you have a --

10              MR. BERKE:  Your Honor, I would ask that we just not

11   have leading questions.

12              THE COURT:  Try to avoid leading, please.

13              MS. CUCINELLA:  Sorry.  I'm trying to move it along,

14   your Honor.

15              THE COURT:  Try and avoid leading, please.

16              MS. CUCINELLA:  I will.

17   Q.  Did there come a time when you had another meeting on

18   Darden foods?

19   A.  Yes, roughly a week after this, I happened to be in New

20   York for a board meeting, and I met with the Barington Capital

21   people and with Al Holland.

22   Q.  So did you agree to go and meet with them in New York?

23   A.  Yes, I did.

24   Q.  During the August 6 meeting, is that when -- what did you

25   learn during that meeting about Dee that was considered

1    confidential information?

2    A.  I learned essentially what their game plan was, they shared

3    it with me.  And as I indicated, they were going to become much

4    more of an activist investor in Darden Restaurants because they

5    thought it was undervalued.  And they wanted me to participate

6    in some way, shape or form.

7    Q.  What, if anything, did you do immediately following that

8    meeting on August 6?

9    A.  I sent this deck, the confidential deck on Project Dee to

10   Billy Walters.

11   Q.  Did you speak to Mr. Walters before you did that?

12   A.  Yes, I think I did.

13   Q.  What do you remember about that conversation?

14   A.  I told him this was something I had come upon and had

15   somebody bring me this opportunity, I looked at it, it looked

16   interesting, I wasn't really all that interested in it.  But I

17   was going to share it with him and see what he wanted to do

18   with it.

19   Q.  Did you have an expectation of what he would do with that

20   information?

21            MR. BERKE:  Objection, your Honor.

22            THE COURT:  Sustained.

23   Q.  Why did you share that information with Mr. Walters?

24   A.  I thought it was interesting.  I thought -- I thought based

25   on what I saw in the presentation that Darden Restaurants was

H3M3WAL4                        Davis - direct

1   undervalued.  It just wasn't a business I enjoyed or thought

2   much about as an investor, but I thought maybe Billy would do

3   something with it.

4   Q.  Did you discuss with Mr. Walters whether you had signed an

5   NDA?

6   A.  I don't think I disclosed that to him, no.

7   Q.  Were you allowed to share that deck with Mr. Walters?

8   A.  No, I was not.

9   Q.  Directing your attention to what's been marked as

10  Government Exhibit 810 and 811.

11          Do you recognize these?

12  A.  Yes.

13  Q.  What are they?

14  A.  This is a receipt and a FedEx shipment notice that I

15  initiated for a FedEx to Bill Walters.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          MS. CUCINELLA:   The government offers 1810 and 1811.

2          MR. BERKE:  No objection, your Honor.

3          THE COURT:  Received.

4          (Government's Exhibits 1810 and 1811 received in

5     evidence)

6     BY MS. CUCINELLA:

7     Q.  Looking first at 1810, what's reflected here?

8     A.  This is the Eagle postal receipt for this FedEx package.

9     Q.  And where is it being shipped to?

10    A.  Bill Walters in Carlsbad, California.

11    Q.  What was the expected arrival?

12    A.  The following day, I think.

13    Q.  If you look on the document?

14    A.  Sorry.  Yes.  It was -- actually, it was sent on the 7th to

15    arrive on the 9th.

16    Q.  Look again at the date.

17    A.  Oh, I'm sorry.  I was looking at the email.  Pardon me.

18    Q.  What day was it sent on?

19    A.  The 6th, expected to arrive on Friday, the 9th.

20    Q.  Is the summer of 2013, Mr. Davis, did you know whether

21    Mr. Walters invested in Darden Foods?

22    A.  No, I had no idea.

23    Q.  After the summer of 2013, did you continue to update

24    Mr. Walters on Dean Foods?

25    A.  Yes, but less frequently.

1    Q.  Did there come time when you presented him with another

2    investment opportunity?

3    A.  Yes, I did, in November of 2013.

4    Q.  On a very high level, what was that opportunity?

5    A.  This was a company I'd been involved with as an investor,

6    much like Periscope.  It was called Benefit Harbor, and it was

7    a healthcare management business.  The company was doing very

8    well.  It was trying to find an investor to come in and replace

9    another investor that had been involved with the company.  And

10   I helped design a transaction to do this company what this

11   company wanted to do, which involved putting up a letter of

12   credit to support some bank debt that the company had

13   outstanding.

14         So I approached Bill with this idea and I said this is

15   a terrific opportunity to get involved with, again, a rapidly

16   growing company, an attractive business, and it requires you to

17   put up a letter of credit for one year for which you will earn

18   stock in the company.

19   Q.  What, if anything, did you get out of the deal?

20   A.  I was also to receive some stock from the company as a

21   placement agent, if you will.

22   Q.  Did you have to do anything to get that stock?

23   A.  Yes.

24   Q.  What did you have to do?

25   A.  I had to make this deal happen.  I had to bring it to

1    fruition.

2    Q.  And when was that?  When did that occur?

3    A.  I think it occurred in November of 2013.

4    Q.  And by 2014, Mr. Davis, did you and Mr. Walters continue to

5    talk about Dean Foods?

6    A.  Infrequently is my recollection, if hardly at all.

7    Q.  In the spring of 2014, what was going on with the Periscope

8    investment?

9    A.  In early 2014, I starting in March, Periscope had no bank

10   debt.  The company had done very well and it had an excess

11   amount of cash on the balance sheet.  So the board made a

12   decision to start redeeming the preferred stock that had been

13   acquired by this investor group that included Mr. Walters.  So

14   that redemption process started I think in March of 2014.

15   Q.  What was the significance of that, if anything?

16   A.  Well, Mr. Walters got his money back, first of all.  The

17   partnership that owned the stock that I described earlier got

18   its money back, and then eventually there was a number of

19   distributions during the year, eventually got the preferred

20   dividend back as well.

21   Q.  And this was when in 2012?

22   A.  It started in March, the distributions, and ran through

23   just --

24          MR. BERKE:  We're in 2014.

25   A.  2014.  Sorry.

H3mdwal5                          Davis - direct

1    Q.   2014.

2    A.   This is in 2014.

3            So the distributions for the redemption of the

4    preferred stock and the preferred dividend occurred between

5    March and November.   That's my recollection.

6    Q.   And what was the status of your loan with Mr. Walters in

7    the spring of 2014?

8    A.   It was still outstanding.

9    Q.   Had you made any payments?

10   A.   No.

11   Q.   Had interest been accruing?

12   A.   Yes.

13   Q.   Had anyone asked you for a payment?

14   A.   Not that I recall.   No.

15   Q.   Had you been certifying each year that you were still in

16   debt to Mr. Walters?

17   A.   I received a questionnaire from the Walters Group,

18   independent public accountants, every year to certify the

19   amount of the debt, yes.

20   Q.   Do you recall when you were next asked about your loan from

21   Mr. Walters?

22   A.   I discussed it with Mike Luce in late 2014.

23   Q.   I'm going to direct your attention to what's been marked as

24   Government Exhibit 1727.

25            Do you recognize this?

1   A.  Yes.

2   Q.  What is it?

3   A.  This is an email from me to Mike Luce.  It's an update on

4   Periscope.

5            MS. CUCINELLA:  The government offers 1727.

6            MR. BERKE:  Can I just have one moment, your Honor?

7            (Pause)

8            No objection, your Honor.

9            THE COURT:  Received.

10           (Government's Exhibit 1727 received in evidence)

11  BY MS. CUCINELLA:

12  Q.  Looking at the middle email from Mr. Luce -- it is an email

13  sent on June 16th -- what does that email say?

14  A.  It says, "On the Periscope partnership I need to understand

15  what portion of these are yours.  I will apply the amount to

16  your note.  I don't have a copy of the partnership."

17  Q.  And did you respond?

18  A.  Yes, I did.

19  Q.  And what did you respond?

20  A.  I told him in the top email.  You can read it.  It says:

21  After the return of $300,000, the ups, or the gains, are split

22  80/20 between Walters Group and Davis.  Apply my share to the

23  note is what I told him.  So this is in June of 2014.

24  Q.  Mr. Davis, was this before or after the FBI came to your

25  home?

1    A.  This was after.

2    Q.  Was the investigation into Mr. Walters public at this

3    point?

4    A.  Yes, it was.

5    Q.  We're going to come back to that, but first I want to talk

6    to you about the conversations you've had with Mr. Luce about

7    the loans.

8            THE COURT:  Let me ask you, how much longer do you

9    have?

10           MS. CUCINELLA:  My estimate was a little off.

11   Probably about 15 minutes.  I'm sorry, your Honor.

12           THE COURT:  Well, quite some time ago, maybe about 45

13   minutes, it was a half an hour.

14           MS. CUCINELLA:  It was a bad estimate.  I'm sorry.  I

15   didn't realize I still had five pages.

16           THE COURT:  All right.  Ladies and gentlemen, why

17   don't we take a mid-afternoon break.

18           Please do not discuss the case among yourselves or

19   with anyone and we'll be back in action in ten minutes.  Thank

20   you.

21           (Continued on next page)

22

23

24

25

H3mdwal5                        Davis - direct

1                    (Jury not present)

2                    THE COURT:  See you in ten minutes.

3                    (Recess)

4                    THE COURT:  Bring our jury in, please.

5                    MS. CUCINELLA:  Your Honor, I have made an effort to

6        pare it down.

7                    THE COURT:  Thank you.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 (Jury present)

2                 THE COURT:  Please be seated.

3                 Ms. Cucinella, you may continue.

4                 MS. CUCINELLA:  Thank you, Judge.

5                 One moment.

6                 (Pause)

7    BY MS. CUCINELLA:

8    Q.  Mr. Davis, I believe right before the break we were talking

9    about having your returns from Periscope applied against the

10   note that you had out with Mr. Walters, is that right?

11   A.  Yes.

12   Q.  I would like to direct your attention to what's been marked

13   as Government Exhibit 1957.

14                Do you recognize this?

15                MS. CUCINELLA:  There two pages, Ms. Pyun.

16   A.  Yes, I do recognize it.

17   Q.  What is it?

18   A.  It's an email thread between Mike Luce and myself.

19   "Subject matter:  Periscope update."

20                MS. CUCINELLA:  The government offers 1957.

21                MR. BERKE:  No objection, your Honor.

22                THE COURT:  Received.

23                (Government's Exhibit 1957 received in evidence)

24   BY MS. CUCINELLA:

25   Q.  Mr. Davis, what was going on that you were updating Mike

1    Luce about in October of 2014?

2              (Pause)

3              You can take a minute to read this.

4    A.  Right.

5              (Pause)

6              Well, the email on the right is an update to Mike

7    about a transaction involving the sale of Periscope.  There's

8    another subject matter there that talks about the letter of

9    credit from Benefit Harbor as well.

10   Q.  And what does Mr. Luce respond in response to your update?

11   A.  He was -- he was asking me about the letter of credit.

12   Actually, he said, I think we would like to be able to

13   terminate the letter of credit.

14   Q.  And that was in connection with Benefit Harbor?

15   A.  Yes, it was.

16   Q.  During this period of time, did you have any face-to-face

17   meetings with Mr. Luce?

18   A.  I'm sorry?

19   Q.  Did you have any face-to-face meetings with Mr. Luce?

20   A.  I did.  I met him for lunch in Las Vegas.

21   Q.  Do you recall approximately when that was?

22   A.  I think I flew out there in May and October.

23   Q.  Of 2014?

24   A.  Yes.

25   Q.  What was your purpose for flying out to meet with Mr. Luce?

1   A.  It was really twofold.  One, I wanted to give him an update

2   on Periscope, because there was a significant event that was

3   about ready to occur.  We were going to sell the company, and

4   as a result of the sale there was going to be a lot of money to

5   distribute to the partnership that Mr. Walters and I had.

6   Q.  What was the secondary purpose?

7   A.  I was -- I had been troubled by the fact that I had used

8   this burner phone and I wanted to try to figure out a way to

9   understand if my use of the burner phone was in fact secret,

10  and I couldn't quite figure out how to do that.  But that was

11  part of the purpose of my having a meeting with Mike Luce.

12          And I actually at the end of the meeting with Mike

13  Luce -- at the end of the lunch with Mike Luce, I asked him

14  about the burner phone.  He offered to take me to the airport.

15  And he and I were walking to the parking lot, and I asked him

16  if I should be concerned about the burner phone that Bill

17  Walters gave me.  And he responded by saying:  "Don't worry

18  about it.  He's got hundreds of those."

19  Q.  What, if anything, did you say in response to that?

20  A.  I thanked him and we got in the car and he drove me to the

21  airport and dropped me off.  That was the extent of the

22  conversation.

23  Q.  And when he said he has hundreds of those, who did you

24  understand him to mean?

25  A.  He was referring to Bill Walters.

1    Q.  Mr. Davis, did there come a time when you signed an updated

2    promissory note with respect to the two loans you had

3    outstanding to Mr. Walters?

4    A.  Yes.

5    Q.  I am going to direct your attention to Government Exhibit

6    1734.  What is this?

7    A.  This is the amended and restated promissory note that I

8    signed in September of 2012.

9    Q.  And there is a stamp at the top that says "paid."

10            MS. CUCINELLA:  Excuse me.  The government offers

11   1734.

12            MR. BERKE:  Your Honor, could we have a moment?

13            THE COURT:  Sure.

14            MR. BERKE:  Thank you.

15            (Pause)

16            Your Honor, we would object.  This is not a loan with

17   Bill Walters.  It is a loan with somebody else.  Totally

18   unrelated.

19            THE COURT:  What is the basis for offering it?

20            MS. CUCINELLA:  I can withdraw it.  I can use a

21   different document.

22            Thank you, Judge.

23            THE COURT:  All right.  Withdrawn.

24   BY MS. CUCINELLA:

25   Q.  Mr. Davis, there was a time when you -- you testified there

1    was a time when you signed an updated promissory note with

2    Mr. Walters, is that right?

3    A.  Yes, I did.

4    Q.  Do you recall when that was?

5    A.  Let's see.  It would have been in the beginning -- I think

6    early 2015.  That's my recollection.

7    Q.  And what was different about this promissory note, if you

8    recall?

9    A.  It was combined.  The two outstanding loans that I had were

10   combined into one note.

11   Q.  And do you recall what the terms were?

12   A.  I think the interest rate was the same.  I don't recall the

13   other -- the maturity date on the note.

14   Q.  And you believe that was in early 2015?

15   A.  I think that's my recollection is that it was.  I know we

16   consolidated the note and I signed a new note I think it was in

17   the early part of 2015.

18   Q.  I am going to jump around a little bit here.  Bear with me.

19           We talked about this a bit yesterday.  Do you recall

20   when the FBI first came to your home to ask you about your

21   involvement in potential insider trading with Mr. Walters?

22   A.  Yes, I do recall.

23   Q.  When was that?

24   A.  May of 2014.

25   Q.  When they visited you at your home, were you supposed to

1    see Mr. Walters shortly after that?

2    A.  Yes.  We had -- we had a meeting planned to meet in -- I

3    think it was actually early June, so within a matter of a week

4    or ten days after the FBI came to my home.

5    Q.  And what was that meeting in connection with?

6    A.  It was really a meeting having to do with Benefit Harbor.

7    Q.  Did you go to that meeting?

8    A.  No.  I canceled that meeting.

9    Q.  Why?

10   A.  The -- based upon advice of counsel, I did not think it was

11   wise for me to go and meet with Mr. Walters.  The news had

12   broken about the investigation and it just wasn't a good idea.

13   Q.  I want to talk to you about what you did right after the

14   FBI came to your home.

15          You testified at the beginning of yesterday, I

16   believe, that you threw the bat phone in a creek, is that

17   right?

18   A.  Yes, that's accurate.

19   Q.  Did you throw it in the creek before or after you canceled

20   that meeting with Mr. Walters?

21   A.  I threw it in the creek before I canceled the meeting with

22   Mr. Walters.

23   Q.  And what exactly did you do when you threw the bat phone in

24   the creek?

25   A.  I found a place near my home that had a huge drainage

 1   system in the middle of Turtle Creek, and I threw the phone in

 2   the creek close to this drainage hole, thinking that it would

 3   be very difficult to ever find.

 4   Q.   Showing you what's been marked for identification as

 5   Government Exhibits 13, 15 and 17.

 6            Do you recognize these?

 7   A.   Yes.

 8   Q.   What are they?

 9   A.   This is a picture of Turtle Creek and the drainage hole I

10   was describing.

11            MS. CUCINELLA:   The government offers 13, 15 and 17.

12            MR. BERKE:   No objection, your Honor.

13            THE COURT:   Received.

14            (Government's Exhibits 13, 15 and 17 received in

15   evidence)

16   BY MS. CUCINELLA:

17   Q.   Mr. Davis, what is the jury looking at?

18   A.   This is the drainage hole on Turtle Creek, and I threw the

19   phone into the creek not far from that drainage hole.

20   Q.   And where were you standing when you threw the phone?

21   A.   On the bank -- on the bank of this creek.

22   Q.   Mr. Davis, does your home -- where is your home in

23   comparison to where Turtle Creek is?

24   A.   It's about two or three blocks from this place.

25   Q.   Do you know whether Turtle Creek has flooded since the time

1   that you threw the phone in there?

2   A.  Yes, it has, at least twice that I know of.

3          MS. CUCINELLA:  You can take that down, Ms. Pyun.

4   Q.  Did there come a time after you canceled the meeting with

5   Mr. Walters after you threw the phone in Turtle Creek that you

6   had another conversation with Mr. Walters?

7   A.  Yes.

8   Q.  And you said the news about the investigation had broken.

9   A.  Yes.

10  Q.  Was that prior to your next conversation with Mr. Walters?

11  A.  Yes, it was.

12  Q.  Tell the jury what you remember about that conversation

13  with Mr. Walters.

14  A.  He called me.  I remember exactly where I was.  I was

15  having lunch with my wife at a little Mexican restaurant in

16  Dallas.  He called me during lunch.  And we had a short phone

17  conversation.  He reiterated in this phone conversation that he

18  hadn't committed any crimes and this investigation was a bunch

19  of nonsense and he hoped that I understood that.  And then he

20  asked me if I had hired my legal counsel.  And I said, yes, I

21  did hire legal counsel.

22  Q.  What else, if anything, was said on this call?

23  A.  I gave him the name of the legal counsel so that he would

24  have it.

25  Q.  Mr. Davis, you said that the investigation was public at

1   this time.  Had your name been listed publicly?

2   A.  No, it had not.

3   Q.  On this conversation, did you tell Mr. Walters that the FBI

4   had visited your home?

5   A.  No, I did not.

6   Q.  Why not?

7   A.  I didn't know whether his phone was tapped or not.  I

8   wasn't going to say anything about the investigation as far as

9   I was concerned.

10  Q.  Did there ever come a time when you told Mr. Walters that

11  the FBI had visited your home?

12  A.  No.  I never talked to him about it.

13  Q.  Did you ever have an in-person meeting with Mr. Walters

14  after that?

15  A.  No, I didn't.

16  Q.  After that conversation with Mr. Walters, did you have an

17  understanding of whether you were still under investigation?

18  A.  Yes.  I knew I was still under investigation.

19  Q.  How did you know that?

20  A.  I continued to get subpoenas for various types of

21  information from the SEC.

22  Q.  What kind of investigation did you think it was?

23  A.  I -- at this point in time in the summer of 2014, I thought

24  it was merely an investigation by the SEC.

25  Q.  You testified yesterday that there came a time when you

1  agreed to sit for a deposition.  Do you recall that?

2  A.  Yes.

3  Q.  Do you remember when that deposition was?

4  A.  I think it was in May of 2015.  It was either May or early

5  June.

6  Q.  And who was that deposition for?

7  A.  It was for me.

8  Q.  And -- sorry, who was hosting the deposition?  Who was

9  asking you questions?

10  A.  There were some lawyers from the SEC that hosted the

11  deposition.

12  Q.  Did you prepare with counsel --

13  A.  Yes.

14  Q.  -- before that deposition?

15  A.  I'm sorry.  Yes, I did.

16  Q.  In connection with meeting with counsel, did you review

17  some of Mr. Walters' trading records?

18  A.  Yes.  I saw some of his trading records, yes.

19  Q.  Do you recall for what period of time you saw his trading

20  records?

21  A.  I certainly saw them for 2012, and I was asked about some

22  other periods of time by the SEC.  Yes.

23  Q.  When you prepared with counsel for your SEC deposition, did

24  you tell counsel that you had intended to lie during the SEC

25  deposition?

1   A.  No.  I did not.

2   Q.  Did you have a cooperation agreement with the Department of

3   Justice at that time?

4   A.  No.  I did not.

5   Q.  After you sat for your deposition, what did you think would

6   happen?

7   A.  I didn't know exactly what was going to happen, but I was

8   hoping this would just go away.  That's what I was really

9   hoping, it would go away.  I thought the inquiry by the SEC

10  was -- based on what they asked me, it looked like a whole

11  bunch of circumstantial evidence and I thought it would just go

12  away.

13  Q.  Mr. Davis, did there come a time when you were asked to

14  step down from the board of Dean Foods?

15  A.  Yes, I was.

16  Q.  Who asked you to step down?

17  A.  I got a call from Gregg Tanner, who was the Chief Executive

18  Officer, in August of 2015.

19  Q.  Did you in fact step down?

20  A.  I did, immediately.  I resigned immediately after he asked

21  me to do so.

22  Q.  Mr. Davis, did there come a time when there was an article

23  published linking you to Mr. Walters in connection with insider

24  trading?

25  A.  Yes.  That's what prompted my resignation.  There was an

1   article that was going to break, and it was going to become

2   public knowledge that I was under investigation for insider

3   trading.

4   Q.  Did you continue to lie about your involvement in insider

5   trading with Billy Walters after that?

6   A.  Regrettably, I did continue.  Yes.  I was trying to conceal

7   it.

8   Q.  Who did you lie to?

9   A.  Virtually everybody -- my friends, my counsel, my wife.

10  Yes.

11  Q.  After that article came out, did there come a time when

12  your counsel made a presentation to the SEC?

13  A.  Yes, they did.

14  Q.  What kind of presentation did they make?

15  A.  They made a presentation to try to prove my innocence, if

16  you will, and to explain a lot of the trading activity that

17  occurred from Mr. Walters.

18  Q.  Did you assist in preparing that presentation?

19  A.  I really did not, no.

20  Q.  Do you know who prepared it?

21  A.  I know my law firm and they had some outside advisor, some

22  economics advisors that helped them with the analysis of the

23  trading activity.

24  Q.  You reviewed it?

25  A.  I saw it, yes.

1    Q.  Did it contain lies?

2    A.  Yes.

3    Q.  What was the presentation supposed to do?

4    A.  It was to try to prove my innocence and conceal my guilt.

5    Q.  Were you innocent?

6    A.  No.  Of course not.

7    Q.  Did there come a point when you understood that the

8    criminal authorities were still involved in this investigation?

9    A.  Yes.

10   Q.  You testified yesterday that in the fall of 2015, you had a

11   health issue, is that right?

12   A.  I did, yes.

13   Q.  Do you recall when -- I think you testified you had surgery

14   as well, correct?

15   A.  I did, yes.  Right before Thanksgiving, the week before

16   Thanksgiving.

17   Q.  Throughout this period of time, did you stay in contact

18   with Mr. Luce?

19   A.  Yes, I did.

20   Q.  Why?

21   A.  We still had some ongoing business together.

22   Q.  And did there come a time when you met with Mr. Luce again?

23   A.  I did.  I met with him.  One more time I had lunch with him

24   in Dallas.

25   Q.  Do you recall approximately when that was?

1    A.  It was in January of 2016.

2    Q.  What did you -- what was the purpose of that meeting?

3    A.  We talked primarily about some ways that I could pay down

4    the loan.  I think he and I were both interested in seeing that

5    happen.  And I owned some assets that he and I were both

6    familiar with.  My interest in Benefit Harbor was one of them.

7    And we talked about my selling those assets to -- in order for

8    me to pay down that loan.

9    Q.  How did you feel after you left that meeting?

10   A.  I was, you know, clearly seriously contemplating coming in

11   to talk to the prosecution at that time.  So, you know, I was

12   nervous.  I -- I didn't know where Luce stood on this, and I

13   was surprised that I never got a call back from him after

14   lunch.

15   Q.  And what was your reaction to that?

16   A.  My --

17              MR. BERKE:  Objection, your Honor.

18              And, your Honor, may we approach briefly on this?

19              THE COURT:  Yes.  Let me see you at the sidebar.

20              (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          MR. BERKE:  Your Honor, the principal objection is

3    prior to this time I believe that Mr. Davis' lawyers had called

4    Mr. Walters' lawyers and said he was pulling me out of the

5    joint defense agreement, clearly indicating his client was

6    making a deal with the government.  I don't know exactly what

7    they're planning to elicit.  I have a relevance question.  But

8    I also think it would be improper to suggest there was anything

9    more going on as to why Mr. Luce wouldn't want to meet with

10   Mr. Davis.

11         THE COURT:  Also, I think I am going to sustain your

12   objection to the form of the question, what was your reaction

13   to silence in that sense.

14         MS. CUCINELLA:  This is the first I'm hearing of that

15   fact, so I'm happy to move on.  I will withdraw the question.

16         THE COURT:  OK.  That is all right.  Thank you.

17         (Continued on next page)

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2              MS. CUCINELLA:  I will withdraw that question, your
 3    Honor.
 4              THE COURT:  All right.
 5    BY MS. CUCINELLA:
 6    Q.  After that meeting with Mr. Luce, Mr. Davis, did you
 7    continue to meet with counsel?
 8    A.  Yes, I did.
 9    Q.  Why were you continuing to meet with counsel?
10    A.  By this time I had hired another law firm in New York that
11    specialized in criminal defense work, and I met with them along
12    with my Dallas counsel on a couple of occasions, as I recall,
13    to talk about where I stood at that point in time.
14    Q.  Did you ultimately decide to cooperate with the government?
15    A.  Yes, I did.
16    Q.  Why did you do that?
17    A.  Well, I think I've explained earlier some of my
18    motivations, but it was pretty clear, based on advice from
19    counsel, that I was highly likely to get indicted in the next
20    couple of months.  And I won't make any bones about it.  I
21    wanted to avoid going to jail.  That's clearly one of my
22    motivations.
23              MR. BERKE:  Objection, your Honor.  I move to strike.
24    Unless there is a complete waiver of the attorney-client
25    privilege, I believe he can't rely on counsel's advice, and it
```

1    is hearsay.

2              MS. CUCINELLA:  I think he is just saying how it

3    impacted his decision, and that is the only reason why we are

4    introducing it.  He is not relying on it.

5              THE COURT:  Well, are you relying on advice of counsel

6    in responding to the last question?

7              THE WITNESS:  No, I'm not.  This is how I felt.

8              THE COURT:  All right.  Then it can stand.

9              All right.  Go ahead.

10   BY MS. CUCINELLA:

11   Q.  After that, did you begin proffering with the prosecutors?

12   A.  Yes, I did, in February.

13             THE COURT:  Why don't you ask the question in English?

14   Q.  After that, did there come a time when you started meeting

15   with the prosecutors?

16   A.  Yes, I did.

17   Q.  Are those meetings sometimes called proffers?

18   A.  Yes, they are.

19   Q.  And we talked about that process yesterday.  We won't go

20   through it again.

21             Did you also meet with prosecutors in preparation for

22   your testimony over the last few days?

23   A.  Yes, I have.

24   Q.  Why did you do that?

25   A.  To get prepared to testify.

H3mdwal5                      Davis - cross

1    Q.  Mr. Davis, how are you feeling generally these days?

2    A.  I feel great.  I feel much better than I did a year ago at

3    this time.

4    Q.  Have you been able to meet for longer?

5    A.  Yes.

6    Q.  Going back to the spring of 2016, how long after you

7    started meeting with prosecutors did you plead guilty?

8    A.  I pled guilty in May of 2016.

9    Q.  Mr. Davis, how many felony counts have you pled guilty to

10   in connection with your cooperation agreement?

11   A.  I pled guilty to 12 felony counts.

12   Q.  Why did you plead guilty?

13   A.  Because I was guilty.

14          MS. CUCINELLA:  Nothing further.

15          THE COURT:  All right.

16          Ladies and gentlemen, why don't you stand up and

17   stretch, and we'll give Mr. Berke an opportunity to set up at

18   the podium.

19          MR. BERKE:  Thank you, your Honor.

20          (Pause)

21          Thank you, your Honor.  Whenever you are ready.  Thank

22   you.

23          THE COURT:  All right.  You may inquire.

24   CROSS-EXAMINATION

25   BY MR. BERKE:

1   Q.  Mr. Davis, do you recall testifying yesterday, the first

2   day of your direct testimony, that you were unconcerned with

3   what the jury here does in this case?

4   A.  I don't recall saying I was unconcerned with what the jury

5   does.  I think I was asked if my -- if the outcome depended on

6   Mr. Walters' outcome in this trial.

7   Q.  So you are concerned about what this jury does in this

8   case?

9   A.  I'm -- can you repeat the question?

10  Q.  So you are concerned about what the jury does in this case?

11  A.  I'm not concerned about it at all.

12  Q.  So you don't care what they do; is that your testimony?

13  A.  It has no bearing on my outcome, no.

14  Q.  And you don't care how they view your credibility, is that

15  correct?

16  A.  I hope they view me credible.

17  Q.  But ultimately you don't care; it is of no interest to you,

18  is it?

19  A.  I don't care about Mr. Walters' outcome, no.

20  Q.  And you don't care how they view your credibility, is that

21  your testimony?

22  A.  I've already stated, I do.

23  Q.  You do.  You deeply care about it, don't you, sir?

24  A.  I hope I appear credible.

25  Q.  Well, it is more than that, sir.  You want them desperately

```
 1    to find you credible, don't you?
 2    A.  I really don't know how to answer your question.
 3    Q.  Yes or no, sir?
 4    A.  I'm not desperate for anything, no.
 5    Q.  You want them to find you credible, don't you, sir?
 6          THE COURT:  That's been asked and answered.
 7    Q.  Sir, isn't it a fact that a few months ago you threatened
 8    your second wife Louise that if she didn't withdraw a lawsuit
 9    against you that you said would damage your credibility with
10    this jury, you were going to sue her; isn't that a fact, sir?
11    A.  I think I did say that to her, yes.
12    Q.  In fact, you specifically said that you have no idea how
13    damaging the lawsuit is to me with regard to my credibility as
14    a witness at the Walters trial.  Frankly, you have already done
15    the damage.  I'm not sure it can be fixed.
16          Isn't that what you said to your second wife, Louise,
17    sir?
18    A.  Are you reading from something that I wrote?
19    Q.  Do you recall texting her that exact -- those exact words?
20    A.  I think I did text her that, yes.
21    Q.  And you told her that you're going to be filing a lawsuit
22    against her the following week for defamation of character and
23    libel, and you guarantee that you will fight her with
24    everything you have if she doesn't withdraw this lawsuit.
25          Isn't that fair, sir?
```

H3mdwal5                          Davis - cross

1             MS. CUCINELLA:  Objection.  This isn't in evidence.

2      He is clearly reading from a document.

3             MR. BERKE:  It is a question, your Honor.

4             THE COURT:  It is a question.

5             THE WITNESS:  I'm sorry.  Can you repeat the question?

6             MR. BERKE:  Yes.

7      BY MR. BERKE:

8      Q.  Didn't you tell her that if she doesn't withdraw that

9      lawsuit, you're going to file a lawsuit against her next week,

10     the following week, for defamation of character and libel, and

11     you guaranteed her that you would fight her with everything you

12     have?

13     A.  I don't recall specifically what I said, but I was pretty

14     upset with her, yes.  I'll certainly agree with that.

15     Q.  All right.  Let me show you for identification Defense

16     Exhibit 4625.

17             (Pause)

18             (Continued on next page)

19

20

21

22

23

24

25

1          MR. BERKE:  Your Honor, if I may, I think there is a

2     glitch.

3          (Pause)

4          MR. BERKE:  Your Honor, if I may approach the witness

5     with a binder.

6          THE COURT:  Sure.

7          MR. BERKE:  Thank you, Judge.  If I may I'm going to

8     move this binder off to the side.  And I'll open this one to

9     the page.

10         Your Honor, if I may, I'm showing the witness what has

11    been marked as Exhibit 4625-A which is an excerpt of Defense

12    Exhibit 4625.

13         THE COURT:  All right.

14         MR. BERKE:  For identification.

15    Q.  If I may, I'll direct your attention to the first page at

16    the bottom.  Will you read that to yourself.

17    A.  I'm sorry?

18    Q.  Directing your attention, sir, to the first page, bottom.

19    A.  Yes, I see it.

20    Q.  Does that refresh your memory, sir, that you told your

21    former second wife Louise that you'll be filing a lawsuit

22    against her next week for defamation of character and libel and

23    you guarantee you'll fight with her with everything you have

24    regarding -- and you said that in response to her legal filing,

25    isn't that correct, sir?

1    A.  Yes.  I went on to say this was not necessary and a poor

2    way to handle any financial issues we may have to settle.

3    Q.  Okay.  You also told her, sir, this is very simple.  You

4    withdraw the lawsuit and we can talk, otherwise I will see you

5    in court.  Correct?

6    A.  Yes, I think that's accurate.

7    Q.  You said it because you told her otherwise you were

8    concerned it was going to damage your credibility with this

9    jury, and it may already have done so in a way that couldn't be

10   fixed, correct?

11   A.  I don't recall saying that.  But --

12   Q.  Let me direct your attention, sir, to the second page, your

13   text message second from the bottom.

14        THE COURT:  Read it to yourself and the question is

15   does it refresh your recollection as to what you said.

16        THE WITNESS:  There's, your Honor, there's about 10

17   text messages on here.  I'm not sure which one.

18   Q.  Second page, second from the bottom.

19   A.  Second from the bottom.

20        (Pause)

21   A.  Yes, I wrote that.

22   Q.  Right.  You told her -- and you understood the lawsuit she

23   filed was about money she claimed that you owed based on assets

24   that were divided up in the divorce, correct?

25   A.  Yes, I think that's the basic issue in the lawsuit.  Yes.

H3M3WAL6                          Davis - cross

1    Q.  You told her she had to withdraw it because you thought it

2    had already damaged your credibility with this jury, correct?

3    A.  I wanted to settle the lawsuit.  That's why.

4    Q.  My only question, sir, is that what you said in your text

5    to your second wife Louise?

6    A.  No, I agree with that.

7    Q.  Sir, isn't it a fact that you also threatened your third

8    wife Terie in order to try to protect your credibility in this

9    case?

10   A.  I don't recall that, no.

11   Q.  Sir, you're in the middle of a divorce with Terie, isn't

12   that correct?

13   A.  Yes, regrettably, I am.

14   Q.  Sir, didn't your lawyer on your behalf send a letter to

15   Terie's lawyer saying that she should come to court and sit

16   here while you testify, because it would be good for you, good

17   for her, and good for everyone concerned, and you would not --

18   if she doesn't, you wouldn't want any harm to come to her?

19   Isn't that what your lawyer said to her divorce lawyer on your

20   behalf, sir?

21   A.  I don't recall the letter.

22   Q.  Sir, let me show you what's marked -- and do we have a

23   screen -- I want to show you what's marked for identification

24   as 3501-86.  I'd ask you to first look at the first page to see

25   what it is.  I'm now going to turn to the second page to a

1    specific paragraph.  I want to look to the first full paragraph

2    on page two.

3            You see where it says in the middle of the paragraph

4    "in fact."  I'd ask that you read that to yourself, sir.

5    A.  I can read that.

6    Q.  Isn't it a fact, sir, that on your behalf, your divorce

7    lawyer wrote to your third wife Terie's divorce lawyer on your

8    behalf and said you understand she's refusing to sit in the

9    courtroom, and that it's your understanding that her mere

10   presence in the courtroom would be helpful for you, and

11   everyone involved, including herself.  Isn't that true, sir?

12   A.  It's based on their understanding, not my understanding.

13   Q.  My only question to you, sir, that's what your lawyer sent

14   to Terie's lawyer on your behalf?

15   A.  Yes, it is.  Yes, this is a true letter.  This is accurate.

16   Q.  Sir, isn't it also true that that same letter, your lawyer

17   wrote to her lawyer that you don't want to see any harm come to

18   her?

19           I'll show you the last paragraph and ask you to read

20   it to yourself.

21           My question, sir, isn't that what your lawyer wrote to

22   her lawyer?

23   A.  Yes, I think that's accurate.

24   Q.  That's because, sir, thank you.  That's because, sir, you

25   wanted her to sit here as if you were still married, so that

```
 1    you would look more credible to these fine folks here.  Isn't
 2    that true, sir?
 3    A.  No, that's not true.
 4    Q.  Isn't it true, sir, that you thought it would be helpful
 5    for you and her, because you thought if you did well, you might
 6    get to keep more of your money and that would be helpful to
 7    her.  Isn't that true, sir?
 8    A.  That's not true either, counselor.  I wanted her to sit
 9    here because I wanted her support.  Quite simply.
10    Q.  So, sir, when your lawyer writes that her mere presence in
11    the courtroom would be helpful for you and her, he's just
12    referring to the support that you want?
13            THE COURT:  Mr. Berke, are you reading from a document
14    not in evidence?
15            MR. BERKE:  Actually, his testimony.  I believe he
16    agreed that was sent, that that language was sent by his lawyer
17    on his behalf.
18            THE COURT:  Are you offering this document?
19            MR. BERKE:  I'm not at this time, your Honor.
20            THE COURT:  Okay.  Well then don't quote from a
21    document not in evidence.
22    Q.  Sir, while you had your lawyer send to her lawyer a letter
23    that told her it would be good for you and good for her for her
24    to come here, you're saying that had nothing to do with what
25    happens to you in connection with your deal with the
```

1    prosecutors?  Is that your testimony?

2    A.   I'm really not following your question, Mr. Berke.  If you

3    can ask it again, it would be helpful.

4    Q.   Your testimony, sir, that your -- the letter your lawyer

5    sent on your behalf to your third wife Terie, telling her that

6    for her to sit here in the courtroom would be good for you, and

7    good for her, is it your testimony that had nothing to do with

8    what you hoped to get out of the deal you have with the

9    prosecutors?

10   A.   I don't think it had anything to do with the deal with my

11   prosecutors.  It had -- this was a lawyer -- this was a letter

12   from my divorce lawyer.  That was his opinion.  Not my opinion.

13   Q.   That was your opinion too, sir.  You thought it would be

14   helpful to you to have Ms. Davis here, isn't that true?  Isn't

15   that true, sir?

16   A.   Mr. Berke, I've already stated I wanted her here to support

17   me.  Period.  That's why I wanted her here.

18   Q.   So you had Mr. Palladino here instead, correct?

19   A.   I don't see him in the courtroom today.

20   Q.   He was here yesterday.  Black turtleneck, jeans, he was

21   here on your first day, right?

22   A.   Yes.

23   Q.   He is a buddy of yours who owns a bar and restaurant --

24              MS. CUCINELLA:  We object to this line of questioning.

25              THE COURT:  Sustained.

1            MR. BERKE:  Can I try one more question?

2            THE COURT:  I sustained the objection.

3   Q.  Isn't it a fact, sir, after you got off the stand

4   yesterday, and you walked by Mr. Palladino, and on your way out

5   of this courtroom, after the jury had been excused, you winked

6   at him?

7            MS. CUCINELLA:  Objection.

8            THE COURT:  Sustained.  And the question and answer

9   preceding it are stricken.  Ladies and gentlemen, you can

10  disregard that.  This trial is not about who's in the visitor's

11  section of this case.

12  Q.  Mr. Davis, as I understand your testimony, you said that

13  sometime in 2011 Mr. Walters gave you what you've called a bat

14  phone, and told you he wanted you to use a code, and he told

15  you when you need to talk about Dean Foods, you refer to it as

16  the cowboys; is that correct, sir?  That was your testimony?

17  A.  The Dallas Cowboys.

18  Q.  The Dallas Cowboys.  That's what he told you, correct?

19  A.  Yes, that's accurate.

20  Q.  Sir, part of your deal with the prosecution, you've looked

21  at a lot of documents, correct?

22  A.  Yes, sir.

23  Q.  You see a single document between you and Mr. Walters where

24  Dean Foods is referred to as the Dallas Cowboys or the cowboys?

25  A.  The only documents that reflect my testimony.

H3M3WAL6                          Davis - cross

1   Q.  My question to you, sir, is did you see any documents

2   between you and Mr. Walters where Dean Foods is referred to as

3   the Dallas Cowboys or the cowboys?

4   A.  No.  Not that I recall, no.

5   Q.  Sir, let me show you what's been marked for identification

6   as Exhibit 4174.  Sir, do you see this is an e-mail from you to

7   Bill Walters dated 5/20/2013?

8   A.  Yes.

9           MR. BERKE:  Your Honor, I'd offer in evidence Defense

10  Exhibit 4174.

11          THE COURT:  Any objection?

12          MS. CUCINELLA:  No, your Honor.

13          THE COURT:  Received.

14          (Defendant's Exhibit 4174 received in evidence)

15          MR. BERKE:  May I publish it, your Honor?

16          THE COURT:  You may.

17  Q.  So, this is an e-mail from you to Bill Walters dated

18  5/20/2013.  Correct?

19  A.  Yes it is.

20  Q.  The subject is "Goldman Sachs buy new DF on capital

21  allocation and debit refi as next key catalyst," correct?

22  A.  Yes.

23  Q.  DF, is that a code for Dean Foods, sir?

24  A.  That's a symbol for the stock.

25  Q.  Not a code, correct?

H3M3WAL6                        Davis – cross

1   A.  Not that I know of, no.

2   Q.  Everybody knows DF stands for Dean Foods, correct?

3   A.  Yes.

4   Q.  It doesn't say DC for Dallas Cowboys, does it?

5   A.  No, I don't think Goldman Sachs used that.

6   Q.  You didn't use it in sending an e-mail when you claimed to

7   be in the middle of a conspiracy with Mr. Walters to his e-mail

8   address, do you?

9   A.  I wasn't trying to hide anything in this e-mail, either.

10  Q.  You were talking to Mr. Walters about Dean Foods, correct?

11  Is that correct, sir?  Yes or no?

12  A.  This is an e-mail that I sent him with a piece of research.

13  Q.  About Dean Foods, correct, sir?

14  A.  Correct, yeah.

15  Q.  You told him it is a great piece of research, correct?

16  A.  I did.

17  Q.  On your regular e-mail, correct?

18  A.  Yes.

19          MR. BERKE:  We can take that down.

20  Q.  Sir, how many people in the world heard you talking to

21  Mr. Walters using the code Dallas Cowboys for Dean Foods?

22  A.  There was only one person besides me and Mr. Walters that's

23  heard that.

24  Q.  So we have your good word that that code was used, correct?

25  A.  Yes.  There's not one other person that's heard that.

H3M3WAL6                        Davis - cross

 1    Q.  Sir, did you ever hear the phrase "every good lie contains
 2    a kernel of truth"?
 3    A.  I'm not familiar with it, no.
 4    Q.  Do you understand what it means?
 5    A.  I think so.
 6    Q.  It is true --
 7              THE COURT:  Mr. Berke, confine your questions to
 8    matters at issue in this case.  We're not going to debate
 9    philosophy.
10              MR. BERKE:  Yes, your Honor.
11    Q.  It is true, sir, that you used Dallas Cowboys as a code,
12    didn't you, sir?
13    A.  I used it frequently when communicating with Mr. Walters.
14    Q.  That's not true, is it, Mr. Davis?
15    A.  I'm sorry?
16    Q.  That's not true, is it?
17    A.  I can't --
18    Q.  That's not true, sir, is it?
19    A.  No, it is true.
20    Q.  You used it for your own personal code, didn't you, sir?
21    A.  I'm not sure I understand the question.
22    Q.  Let me see if I can help.  Can we put up Defense Exhibit
23    4445.  I'm sorry.  4477.
24              Sir is this a registration from ArtBanc to yourself
25    dated 12/30/2014?

1    A.  Yes, it appears to be, yes.

2             MR. BERKE:  Your Honor, I'd offer into evidence

3    Defense Exhibit 4477.

4             MS. CUCINELLA:  No objection, generally.  There are

5    some sensitive identification numbers in here that I just ask

6    before it goes into the record that those perhaps be redacted

7    but --

8             THE COURT:  Where?

9             MS. CUCINELLA:  Social Security number, date of birth.

10            MR. BERKE:  We're at 4477.

11            MS. CUCINELLA:  I'm sorry.  I'm looking at the wrong

12   document.  No objection.

13            THE COURT:  Received.

14            (Defendant's Exhibit 4477 received in evidence)

15            MR. BERKE:  May I publish it, your Honor?

16            THE COURT:  You may.

17            MR. BERKE:  Mr. McLeod, we can first highlight the

18   top.

19   Q.  Sir, this is you getting a response e-mail from a

20   registration for something called ArtBanc.com to you at your

21   e-mail address, correct?

22   A.  Yes.

23   Q.  ArtBanc International?

24   A.  Yes.

25   Q.  It's confirmation that you've been accepted as a buyer for

H3M3WAL6                        Davis - cross

1  this ArtBanc trading platform, correct?

2  A.  Yes.

3  Q.  And sir, would you read -- and your user ID is TCDavis,

4  correct?

5  A.  Yes.

6  Q.  And, sir, would you tell us what password you picked?

7  A.  Cowboy.

8  Q.  As in Dallas Cowboys, correct?

9  A.  No, it simply says "cowboy."

10  Q.  Had nothing to do with the Dallas Cowboy?

11  A.  No.  It has everything to do with the guy that rides a

12  horse.

13  Q.  Nothing to do with it.  2014, I guess that was after you

14  claim that Mr. Walters gave this to you.  So did you use this

15  because that's what Mr. Walters had suggested to you?  Is that

16  why you used that?

17          THE COURT:  Sustained as to form.

18  Q.  This was 2014.  You claim that in 2011 was when Mr. Walters

19  told you to use the Dallas Cowboys as a code?

20  A.  Yes, when I got the bat phone, that's what he asked me to

21  do.

22  Q.  Can we now look at what's marked for identification as

23  4114.  Is this a 2010 e-mail, sir, from April Moffet to you?

24  A.  Yes.

25  Q.  Dated January 26, 2010?

1   A.  Yes.

2          MR. BERKE:  Your Honor, I would offer what's marked

3   for identification as 4114.

4          MS. CUCINELLA:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 4114 received in evidence)

7          MR. BERKE:  May I publish it, your Honor?

8          THE COURT:  You may.

9   Q.  Sir, you see this is April Moffet, your assistant, sending

10  you a message, correct?

11  A.  Yes.

12  Q.  If you look down to the middle you see that you ask her for

13  your password for FINRA, is that right?

14  A.  Yes.  Exactly.

15  Q.  Your password again is cowboy with a number, correct?

16  A.  Yes, it's cowboy 01 dollar sign.

17  Q.  That is in 2010, correct?

18  A.  Yes.

19  Q.  Can I now show you, sir, what has been marked for

20  identification as Defense Exhibit 5205.  Sir, do you recognize

21  this as being your contacts from your phone, sir?

22  A.  Yes, but I don't know where this is taken from.

23  Q.  Well, if we look to the bottom of the -- you recognize this

24  from your phone, correct, sir?

25  A.  Are you saying this is my contact info out of my phone?

1   Q.  Yes, sir.

2   A.  Okay.  I don't know that.  I mean, I can't identify this as

3   that.

4   Q.  Well, sir, let me just ask you.  For Amazon, your password

5   is cowboy, correct?

6   A.  I can't read this.  I'm sorry.

7   Q.  Do you recall what it is, sir?

8   A.  No, I have no idea.  Okay, now I can read it.

9   Q.  Password for Amazon, cowboy, correct?

10  A.  Yes, cowboy 01.

11  Q.  American Airline Pass.  Cowboy, correct?

12  A.  Yes, I see that.

13  Q.  National Car Rental.  Cowboy.

14  A.  I see that as well.

15  Q.  Delta Sky Miles.  Cowboy.

16  A.  Yes, sir.

17          THE WITNESS:  Can I, your Honor, can I ask you a

18  question?

19          THE COURT:  No.

20  Q.  Sir, if we can go down Netflix, cowboy.

21          Do you need to look, sir?  Do you remember PayPal,

22  that's your code, correct?

23  A.  I can read it, yes, sir.

24  Q.  I can go through -- let me show you what's been marked as

25  Defense Exhibit 4445 for identification.  You see this, sir,

1    this is a password from you to yourself dated 5/25/2014.  You

2    see that, sir?

3    A.  I do, yes.

4            MR. BERKE:  Your Honor, I would offer it and we will

5    redact the information at the top.

6            THE COURT:  I think it is more than identification at

7    the top.  I'll receive the document into evidence, but you are

8    to replace it with a redacted version, redacting all numerical

9    identifiers in addition to the information at the top.

10           MR. BERKE:  Absolutely, your Honor.  May I publish it?

11           THE COURT:  You may.

12           (Defendant's Exhibit 4445 received in evidence)

13           THE WITNESS:  Thank you, your Honor.

14           MR. BERKE:  May I give the jury an opportunity to read

15   it, your Honor?

16           THE COURT:  You may.

17           (Pause)

18           MR. BERKE:  Thank you, your Honor.

19   Q.  Supposedly when Mr. Walters gave you this code to use, and

20   directed you to use the code Dallas Cowboys, he also, you

21   claim, gave you a bat phone to use, is that correct?

22   A.  Yes.

23   Q.  And you said in your testimony, you said -- the question

24   was -- do you recall being asked this question and giving this

25   answer:

1    "Q. How, if at all, did you and Mr. Walters refer to what you

2    described as the burner phone?

3    "A. We called it the bat phone."

4           Do you recall that, sir?

5    A.  Yes.

6    Q.  Sir, wasn't it your prior story that you invented the term

7    the bat phone for a second cell phone that you used?  That you

8    invented that, that was your term?

9    A.  I don't recall who invented the term, whether it was

10   Mr. Walters or me.

11   Q.  Well, let me ask you this, sir:  Did you tell the

12   prosecutors in March of 2016 that the bat phone was -- that's a

13   term that you, Tom Davis, invented?

14   A.  I said I don't recall who invented the term.

15   Q.  Well, let me show you what's been marked for identification

16   as 3501-12, and I'll show you the first page so you see what it

17   is.  You see what it is, sir, and you see the date 3/23/2016?

18   A.  Yes.

19   Q.  I'll direct your attention to page one, first sentence

20   under the heading.  Do you see that, sir?

21   A.  Yes.

22   Q.  Sir, does that refresh your memory that when meeting with

23   prosecutors on 3/23/2016, you told them that the bat phone was

24   a term that you invented?

25   A.  I know what it says in this --

1              THE COURT:  No.  Have you ever seen this document

2    before?

3              THE WITNESS:  No, never.

4              THE COURT:  Okay.  Read the document, read it to

5    yourself, and then the question is, does this refresh your

6    recollection on the subject.  That's the question.

7              So look at it all you want.  Then lean back in your

8    chair and look away from it, and answer the question whether

9    you have a refreshed recollection.

10             (Pause)

11   A.  I still don't recall who invented the term.  Whether it was

12   Mr. Walters or me.  I don't recall that.

13   Q.  My only question is did you tell the prosecutors that you

14   invented it?

15   A.  I don't recall telling the prosecutors that, no.

16   Q.  Did you tell the prosecutors that you called it the bat

17   phone only to yourself, that that was your word, you invented

18   it, and you called it to yourself, not anyone else?

19   A.  I don't recall that, no.

20   Q.  Do you deny saying that, sir?

21   A.  I said I don't recall that at all.

22   Q.  Sir, what was the phone number of this so-called bat phone

23   that you say you used for three years?

24   A.  I don't recall the phone number.

25   Q.  I assume it had the number on the back?

1    A.  I don't recall the number at all.

2    Q.  So it's your testimony that you don't recall the number of

3    this phone you used for three years?

4    A.  That's because I never dialed it myself.

5    Q.  It's your testimony you just don't know that number, is

6    that it?

7    A.  I don't recall the number.  That's my testimony.

8    Q.  What color was it, sir?

9    A.  Maroon.

10   Q.  Didn't you tell the prosecutors multiple times it was

11   black, black shiny?

12   A.  I don't recall that.

13   Q.  Let me show you what's been marked for identification as

14   3501-7 and ask you if you told the prosecutors on February 23,

15   2016, that the bat phone was black and plastic.

16           (Pause)

17   Q.  See what it is, sir, first look at the first page.

18   A.  This was a February meeting?

19   Q.  February 23, 2016.  See that, sir?

20           THE COURT:  Don't read from the document.  The

21   question is to look at the document, read what it says, and see

22   whether it refreshes your recollection.  Nothing more, nothing

23   less.

24   Q.  Now I'm going to take you to page --

25           THE COURT:  Give the man a chance to read it.

1          MR. BERKE:  Of course, your Honor.

2          (Pause)

3   A.   There's nothing on this page about the bat phone.

4   Q.   I'm going to take you to page six.  First full paragraph.

5   My question to you, sir, is on February 23, 2016, did you tell

6   the prosecutors that the bat phone was black and plastic?

7   A.   I think I did say that at this meeting.  That was my

8   recollection at that point in time, yes.

9   Q.   Sir, isn't it also true that a month later in March 17, you

10  told them again that it was black and you add the detail that

11  it was shiny?  Do you recall that, sir?

12  A.   I don't recall that specifically.

13  Q.   Let me show you what's been marked for identification as

14  3501-10.  First just to see the date.

15  A.   Yes.

16  Q.   I'm going to direct your attention to page one, I'd ask you

17  to read that to yourself, those two sentences.  Does that

18  refresh your memory, sir, that on March 17, 2016, you told the

19  prosecutors this bat phone was all black and shiny?

20  A.   Yes, I think I did say that at this time.

21  Q.   Sir, isn't it a fact that during the time period we're

22  talking about, you had your own reasons for wanting to have a

23  personal bat phone that was just for your own personal use?

24  Isn't that true, sir?

25  A.   No, I don't recall that.

1   Q.  Isn't it true, sir, that you had a history of infidelity

2   that caused issues in your marriage with Terie?  Isn't that

3   true, sir?

4   A.  I don't recall that.

5   Q.  Do you recall the prosecutors in your proffer sessions

6   asked you a lot of questions about infidelity and paying for

7   sex?  Do you recall that, sir?

8   A.  Yes, I do.

9   Q.  You understood they were asking you that to see if you had

10  your own reasons for your own second cell phone?  Do you

11  understand that?

12  A.  I don't remember them ever asking me about a second cell

13  phone.

14  Q.  You talked a lot about this so-called bat phone, correct?

15  A.  Yes.

16  Q.  Isn't it correct that your first marriage ended because of

17  your -- you had infidelity in your first marriage, correct?

18  A.  That's not why my marriage ended, no.

19  Q.  You had infidelity, correct, sir?

20  A.  Yes.

21  Q.  And your second marriage with Louise, you were married to

22  Louise when you met Terie, correct?

23  A.  Yes, I was.

24  Q.  You had an affair in your second marriage?

25  A.  Yes.

1   Q.   Terie was aware of that, correct?

2   A.   Terie was aware of what?

3   Q.   That you had an affair while you were married to your

4   second wife, correct?

5   A.   Terie was my third wife, sir.

6   Q.   I know.  You met Terie while you were married to Louise,

7   correct, sir?

8   A.   Yes.

9   Q.   In fact, you started seeing Terie when you were still

10  married to Louise, correct?

11  A.   Yes, I did.

12  Q.   Terie knew you had an affair while you were married to

13  Louise, correct?

14  A.   Yes, because I had an affair with her.  If that's what you

15  were referring to.

16  Q.   That's is what I'm referring to.

17  A.   Okay, sure, I get it now.

18  Q.   You also paid for sex while you were married to Louise,

19  correct?

20  A.   Yes, I did.

21  Q.   While you were getting a divorce from Louise and you were

22  together with Terie, you paid for sex then too, didn't you?

23  A.   I don't recall that.

24  Q.   Sir, do you recall telling the prosecutors at a meeting

25  just recently, in February 9, 2017, that during the divorce

1  from Louise there was a girl in Vegas you met at the Wynn and

2  you said you didn't pay each time --

3        THE COURT:  Are you reading from a document not in

4  evidence, Mr. Berke?

5        MR. BERKE:  Your Honor, it is a question.  Let me ask

6  the question.

7  Q.  Do you recall, sir, do you recall telling the prosecutors

8  that you did see, you did pay for sex while getting a divorce

9  from Louise?

10 A.  I don't remember the time frame.  I certainly told the

11 prosecutors that I had extramarital affairs while I was married

12 to my second wife.

13 Q.  Let me show you -- I'm talking about a period when you're

14 getting a divorce from Louise and you were together with the

15 person who became your third wife, Terie.  So I'm talking to

16 you about that period.

17        I'm going to direct your attention to what's been

18 marked for identification as 3501-67.  I'll show you the first

19 page.  Show the bottom what it is.  Just the mark on the

20 bottom.  And then if you're ready, look at the date at the top.

21 I'm going to direct your attention to the second page and ask

22 that you read that to yourself.  If we can make it a little

23 bigger, I think we're losing some text on the right.

24        (Pause)

25 Q.  My question to you, sir, is does that refresh your

H3M3WAL6                          Davis - cross

1    recollection that last month in a meeting with the prosecutors

2    you told them during your divorce from Louise, you paid for sex

3    in Las Vegas?

4    A.  Yes, that's accurate.

5    Q.  And that was while you were with Terie, correct?

6    A.  That's what I'm questioning.  I don't know that occurred

7    when I was dating Terie.

8    Q.  You were dating Terie while you were in the midst of a

9    divorce from Louise, weren't you, sir?

10   A.  Yes.

11   Q.  So that would be the same time, correct, sir?

12   A.  I dated Terie on and off, not steadily during the period I

13   was getting a divorce from Louise.

14   Q.  Sir, do you recall telling the prosecutors that you never

15   paid for sex while you were married to Terie?  Do you recall

16   saying that, sir?

17   A.  Yes.

18   Q.  Were you as truthful about that as everything else you've

19   testified about?

20   A.  I think so, yes.

21   Q.  You got caught once by Terie after you met two women at the

22   Mark Hotel and you were going to meet them for dinner the

23   following week, isn't that true?

24   A.  Yes, that's accurate.

25   Q.  She saw your text message, correct?

1   A.  Absolutely.

2   Q.  She got very angry, correct?

3   A.  She did.

4   Q.  You told the prosecutors about that, correct?

5   A.  I did.

6   Q.  Those women, when you had to cancel because Terie found

7   out, they wanted money from you, correct?

8   A.  She -- yes.  She sent me a text message, yes.  And

9   suggested that I owed her money for a babysitter because she

10  had to cancel dinner.

11  Q.  You told the prosecutors other than that, you never had any

12  situation where you paid for sex at all while you were married

13  to Terie?

14  A.  I think that's accurate, yes.

15  Q.  You married Terie in 2007, correct, sir?

16  A.  Yes.

17  Q.  Sir, do you recall being on a business -- a trip to Chicago

18  in June of 2011?

19  A.  I don't recall this, no.

20  Q.  Let me show you what's been marked for identification as

21  5181.  Do you recognize this, sir?

22  A.  American Express statement.

23  Q.  Yes.

24  A.  Yes.

25  Q.  I'm going to direct your attention to page 68 of it.  I'm

1    going to ask you to read it to yourself.

2            Does that refresh your memory, sir, that in June 2011

3    you were in Chicago?

4    A.   Yes.

5    Q.   Sir, do you recall while you were in Chicago making and

6    receiving eight telephone calls to a number 312-402-7613?

7    A.   I don't recall that, no.

8    Q.   Let me show you what's been marked for identification as GX

9    1002.  I'll be told if it's in evidence.  Not yet.  Okay.

10           You see what it is, sir?  If you look to the left.

11   See your phone number?

12   A.   That's my phone number, yes.

13   Q.   Those are your phone records, correct?

14   A.   Yes.

15   Q.   Directing your attention to page 923.

16   A.   I'm sorry?

17   Q.   Directing your attention to 923.  I'm going to show you the

18   number 312-402-7613.

19           My question to you, sir, is do you recall when you

20   were in Chicago in June of 2011, making and receiving eight

21   calls between 10 o'clock and 12:30 in the morning to an escort

22   service?

23   A.   No, I don't recall this.

24   Q.   Let me show you what's been marked for identification as

25   Defense Exhibit 5157 and 5158.  I'd ask you to look at that

1    number and the top of it and the description of the business.
2    And the next one.
3             Sir, does that refresh your recollection that in 2011
4    you were in Chicago on a business trip and called an escort
5    service?
6    A.  I don't recall it.  No, but -- I can read this.
7    Q.  Did you do it?
8    A.  Apparently I did.  I just don't recall it.
9    Q.  These escort services, that's where you call to pay for
10   sex, correct?
11   A.  I'm sure that's what an escort service does, yes.
12   Q.  You weren't being truthful when you told the prosecutors
13   that you didn't do this in recent times since you've been
14   married to Terie in 2007, were you?
15   A.  Counselor, just because I called the escort service doesn't
16   mean I paid for sex.
17   Q.  So is it your testimony you were, what, window shopping?
18            MS. CUCINELLA:  Objection.
19   A.  Apparently --
20            THE COURT:  Overruled.
21   A.  Apparently I did call the service, but I don't recall ever
22   paying for sex, no.
23   Q.  Let's keep going.  Do you recall being in San Francisco in
24   March of 2012?
25   A.  No.

1   Q.  Let me show you again what's been marked for identification

2   5181.

3           MR. BERKE:  There is a problem with that document?

4   Your Honor, I'm sorry, if I could have one minute.  Your Honor,

5   if we can have one minute I think we'll --

6           (Pause)

7           THE COURT:  It looks like we have something up on the

8   screen here.

9           MR. BERKE:  Good.  Thank you.

10  Q.  Again, Mr. Davis, you see what this is?  Directing your

11  attention to page 57592.

12  A.  Okay, I see it.

13  Q.  We're actually looking at 57582.

14          Sir, does that refresh your memory, if you look at

15  that, that in March 2012 you were in San Francisco?

16  A.  Yes.

17  Q.  Sir, when you were in San Francisco, did you call four

18  separate escort services while you were at a hotel in San

19  Francisco?

20  A.  I don't recall that.

21  Q.  Let me show you GX 1002.  You see what it is, sir?

22  A.  My phone records, yes.

23  Q.  Yeah.  And you see the numbers that you called in San

24  Francisco?

25  A.  Yes.

1    Q.  Does that refresh your memory, sir, let me show you -- look

2    at that number.  Now let me show you Defense Exhibit 5160, 61,

3    62.  Look at the numbers, sir.

4    A.  Okay.  I see it.

5    Q.  5161.  Now, does that refresh your memory that when you

6    were in San Francisco in the evening of March 13, you called

7    escort services repeatedly and multiple escort services?

8    A.  I can see this.  I don't recall making the phone calls, but

9    I can certainly see this.

10   Q.  Isn't it a fact you called escort services when you were in

11   San Francisco to pay for sex?  Isn't that true, sir?

12   A.  I don't recall that, no.

13   Q.  Is it your testimony again, sir, that when you're calling

14   escort services, it's for some other purpose?

15   A.  I don't recall ever paying for sex, no.

16   Q.  So you're denying if your phone reflects phone calls to

17   escort services that you were paying for sex?  Is that your

18   testimony, sir?

19   A.  Yes, it is.

20   Q.  Do you recall, sir, you testified about being in Colorado

21   for a Dean Foods meeting.  Do you recall that, sir?  Dean Foods

22   board meeting in August of 2012?

23   A.  Yes, I think that's accurate.

24   Q.  When you were there, sir, the night before, in the evening,

25   again, sir, you called quite a number of escort services.

1    Isn't that a fact, sir, before the board meeting?

2    A.  I don't recall that, no.

3    Q.  You deny it, sir?

4    A.  I said I just don't recall it.

5    Q.  If your phone reflects calls to escort services, is it your

6    testimony that's for some reason other than for paying for sex?

7    A.  I'm sorry?

8    Q.  Is it your testimony that's for some reason other than

9    paying for sex?

10   A.  I'm not sure I understand the question.  Can you repeat it?

11   Q.  If your phone reflects phone calls to multiple escort

12   services in the evening of August 14, when you are in Colorado

13   for the Dean Foods board meeting, is it your testimony that's

14   for something other than to pay for sex?

15   A.  I don't recall paying anybody for sex, no, when I was in

16   Colorado.

17   Q.  And you're denying calling escort services, sir?

18   A.  No.  I haven't looked at the phone records but --

19   Q.  You just did, sir.

20   A.  No, I'm talking about Colorado.  I don't recall making the

21   calls in Colorado.

22   Q.  So just so I understand your testimony, you don't deny

23   calling escort services, but you say you were still being

24   truthful when you told the prosecutors that in recent times you

25   never paid for sex.  Is that your testimony, sir?

1    A.  Yes, it is.

2    Q.  Sir, you also, when you traveled to New York, you would

3    call women, wouldn't you, sir, when you were married to Terie?

4    A.  I don't recall that.

5    Q.  You know someone named Cristiane Turl, don't you, sir?

6    A.  She is a friend of mine, yes.

7    Q.  You would call her late at night or text her many, many

8    times when you were in New York, isn't that right?

9    A.  She is a friend of mine, yes.

10           THE COURT:  Did you understand the question that was

11   asked of you?

12           THE WITNESS:  Can you repeat the question?

13   Q.  Yes.  You would call her or text her late at night when you

14   were in New York?

15   A.  I did on occasion, I don't know what time I texted her or

16   called her, but yes, she is a friend of mine.

17   Q.  Do you recall that sometimes, sir, you would call her and

18   if it was a short message, you would then call escort services?

19   Do you recall that, sir?

20   A.  No, I don't recall that at all.

21   Q.  Let me show you, sir, what's been marked -- do you recall

22   being in New York for a WhiteHorse Finance board meeting in

23   July of 2014?

24   A.  I don't recall those specific meetings, no.

25   Q.  Let me show you what's been marked for identification as

1    Government Exhibit 5399.  Let me ask you, sir, do you recall

2    going to New York in July 2014?

3    A.  Yes.

4    Q.  Now let me show you what's been marked as GX 1002.

5          Before we get there, let me show you, do you recall

6    Ms. Turl's number, sir?

7    A.  No, I don't recall.

8    Q.  Let me show you, sir, so let me show you what's been marked

9    as Government Exhibit 1002.  These are your phone records,

10   right, sir?

11   A.  Yes.

12         MR. BERKE:  Your Honor I'd offer Government Exhibit

13   1002.

14         THE COURT:  Any objection?

15         MS. CUCINELLA:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibit 1002 received in evidence)

18   Q.  Let me direct your attention to pages 14461.  Sir, do you

19   recall on this date between if you look between 3:10 and 10:07

20   on April 21 --

21   A.  I'm sorry?

22   Q.  April 21.  You see between 3:10 and 10:07, you exchanging

23   28 text messages with the same number?

24   A.  These are -- I'm sorry, text messages?

25   Q.  Yes.  You see SMS?  You recognize that as text, sir?

1   A.  No.  I'm just not familiar with the codes here.

2   Q.  Sir, did you deny --

3           THE COURT:  It says SMSO.  And in another places it

4   says SMST.

5   Q.  Sir, do you know what SMST is?

6           MR. BERKE:  Thank you, Judge.

7   A.  No, I don't.

8   Q.  Do you deny, sir, that you exchanged 28 text messages with

9   Ms. Turl when you were in New York visiting?

10  A.  I don't know whose number this is.

11  Q.  My question is -- aside from the documents.  Do you deny

12  that you did that?

13          THE COURT:  The question is "do you recall doing it."

14  I don't think that's fair form to ask somebody do you deny the

15  following.

16          MR. BERKE:  Fair enough, Judge.

17  Q.  Do you recall texting her 28 times?

18  A.  No, I don't recall it.  No.

19  Q.  Isn't it a fact, sir, that after Terie caught you setting

20  up a dinner date with two women you met at a bar in New York,

21  she was very jealous and suspicious of you?  Isn't that true?

22  A.  I think she was upset.

23  Q.  She was jealous and suspicious of you, isn't that true,

24  sir?

25  A.  I guess you'll have to ask her that.

1    Q.  I'm asking you that, sir.

2    A.  I'm responding to you by saying she was upset with me.

3    Q.  She was upset because you had made plans to meet two women

4    for dinner that you met at a bar in New York, correct?

5    A.  Yes.  She was upset when she saw my text messages, and we

6    had a long discussion about it, yes.

7    Q.  She caught you texting on your regular phone behind her

8    back, correct?

9    A.  Yes, she did.

10   Q.  Terie could have a temper when it came to things like that,

11   couldn't she?

12           MS. CUCINELLA:  Objection.

13   A.  I couldn't hear you.

14   Q.  Terie could have a temper when it came to things like that,

15   couldn't she?

16           MS. CUCINELLA:  Objection.

17           THE COURT:  Overruled.  Did you understand the

18   question?

19           THE WITNESS:  Oh, I'm sorry, your Honor.  No, I didn't

20   understand the question.

21   Q.  She could have a temper when she got upset with you for

22   doing things like that, correct?

23   A.  I don't know.  How would you define a temper?

24   Q.  I'm asking you, sir.  Use your definition.  Did --

25   A.  She was very upset, counselor.  That's how I would describe

1    her.  She had every reason to be upset with me.

2    Q.  Sir, so I understand your testimony about what you claim

3    this so-called bat phone, the number of which you can't

4    remember, you said you threw it in the creek.  Correct?

5    A.  Yes.

6             MR. BERKE:  And if we could put up, your Honor,

7    Government Exhibit 15 in evidence.

8    Q.  Sir, you didn't throw -- let me ask you a question, sir.

9    You're claiming that you threw this so-called bat phone in the

10   creek, you told that to the prosecutors, right?  That's why you

11   didn't have it.  You said you threw it in the creek, you can't

12   give it to them.  That's what you told to them?

13   A.  Yes.

14   Q.  You hadn't told that to your lawyer at the time you did it,

15   you claim.  You said you didn't tell anyone, you just did it.

16   Is that your story?

17   A.  I did tell it to my lawyer, yes.

18   Q.  You told the lawyer right before you told the prosecutors,

19   correct?  That was why you don't have the bat phone, correct?

20   A.  I told my lawyers in advance of my meeting with the

21   prosecutors, yes.

22   Q.  You never said anything like that back in 2014 or 2015, did

23   you?

24   A.  I talked to my lawyers in 2015, yes.

25   Q.  In 2014 you didn't tell your lawyers you did anything with

1  the phone, did you?  You didn't tell them anything about some
2  so-called bat phone you were using, did you?
3  A.  No, I didn't.  I was trying to conceal everything at that
4  point in time.
5  Q.  You told the prosecutors at some point you threw it in the
6  creek, right?
7  A.  Yes.
8  Q.  We're looking now at a hole in the middle.  You told them
9  specifically you did not throw it in that hole, correct?
10  A.  Yes, I did not throw it in the hole.
11  Q.  You understand that based on -- you actually went there and
12  showed them exactly where you were and you threw it, correct?
13  A.  I showed the FBI that, yes.
14  Q.  You understood they brought a big team of very
15  sophisticated people to do a big dive and look for that
16  so-called bat phone, right?
17  A.  Yes, I was aware of that.
18  Q.  You are aware, sir, that after all that effort and expense,
19  based on what you told them, they never found any bat phone,
20  did they?
21  A.  No, not that I am aware of, no.
22  Q.  Sir, did those same agents, with all that technology and
23  resources, did they search for the phone under your mattress?
24  A.  Under my mattress?
25  Q.  Yes, sir.

1    A.  No.

2    Q.  Did they search for any second bat phone you were using in

3    your sock drawer?

4    A.  No.

5    Q.  Did they do anything to see if this so-called second phone

6    you were using was anywhere in your home or on your person?

7    A.  No, they never searched my home, no.

8    Q.  And to this day, sir, have they done anything to look in

9    your possessions and your home to see if you have any second

10   bat phone you may have been using for your own personal

11   reasons?

12   A.  No.  Nobody searched my home.

13   Q.  Sir, if I understand your direct testimony, in trying to

14   explain on day one why you claim you decided to commit the

15   crime of insider trading, according to you, was it your

16   testimony that you did it because you thought that it would

17   eventually accrue to my benefit somehow through gambling tips?

18            Is that one of the reasons you claim that you decided

19   to commit the serious crime of insider trading, using your

20   perch as a board member of Dean Foods, because you were hoping

21   that maybe you would get gambling tips?

22            Is that your testimony, sir?

23   A.  It's one of the reasons, yes.

24   Q.  That was one of the reasons.

25            Sir, isn't it a fact when you were meeting with

1   prosecutors and trying to get your deal in April of 2016, you

2   told them that Mr. Walters rarely offered or volunteered

3   information concerning sports gambling, and only sometimes

4   would you ask him about sports gambling topics?  Isn't that

5   what you said, sir?

6   A.  I think that's accurate, yes.

7   Q.  And then didn't you tell them, sir, the next week,

8   April 13, that you and Mr. Walters spoke infrequently about

9   sports betting?  Isn't that what you told them, sir?

10  A.  I don't recall precisely what I said in that proffer

11  meeting.

12  Q.  Is that in substance what you told them, sir?

13  A.  I'm sorry?

14  Q.  Is that in substance what you told them, sir?

15  A.  My recollection is that's accurate, yes.

16  Q.  And you told them, sir, at that same meeting, it was not

17  typical for you to ask Mr. Walters for sports betting advice.

18  Isn't that true, sir?

19  A.  It was not typical.  I didn't -- I didn't ask him on a

20  routine basis, that's how I'd answer the question.

21  Q.  My question is did you tell them it wasn't typical for you

22  to ask Mr. Walters for sports betting advice?  Did you say

23  that, sir?

24  A.  I don't recall.

25  Q.  Let me show you what's been marked for identification as

1    3501-17.  I'd ask you to look at the date.  And then I'd ask

2    you to look at page five, paragraph one.

3              THE COURT:  Have you seen this before?

4              THE WITNESS:  No, sir, I have not.

5              THE COURT:  Go ahead.

6    Q.  I'd ask you if that refreshes your memory, sir, that when

7    meeting with the prosecutors before you had your deal on

8    April 13, 2016, you told them it was not typical for you to ask

9    Mr. Walters for sports betting advice?

10   A.  I don't know what "typical" means in this instance, but I

11   asked him infrequently for advice.  That's how I would

12   characterize it.

13   Q.  Did you tell them, sir, at that same meeting that you did

14   not ask Mr. Walters for sports betting advice after you started

15   giving Mr. Walters Dean Foods material non-public information

16   as you were claiming at that meeting?  Did you tell them that,

17   sir?

18   A.  That -- ask the question again?  I'm sorry.

19   Q.  Did you tell them, sir, that you did not ask Mr. Walters

20   for sports betting advice after you started giving Mr. Walters

21   Dean Foods material non-public information as you were claiming

22   in trying to get your deal?

23   A.  I don't recall that, no.

24   Q.  Let me show you same document.  Same page, page five.

25   Paragraph two.

1              My question, sir, does that refresh your memory on

2    April 13, 2016, you told the prosecutors that you did not ask

3    Mr. Walters for sports betting advice after you claim you

4    started giving Mr. Walters Dean Foods material non-public

5    information?

6    A.  I don't recall ever saying this, no.  I can certainly read

7    what the FBI's notes say.  But I don't recall ever making that

8    statement.

9    Q.  Do you deny it?

10   A.  Yes.

11   Q.  But you don't deny, do you, sir, saying it was not

12   typical -- withdrawn.

13             You do not deny saying you rarely offered or -- I'm

14   sorry -- that Mr. Walters rarely offered or volunteered

15   information concerning sports gambling.  You do not deny that?

16   A.  "Volunteered"?

17   Q.  Yes.

18   A.  I would ask him.

19   Q.  And do you recall telling them you would do it

20   infrequently?

21   A.  I think that's accurate.

22   Q.  Sir, do you recall at these meetings you also tried to

23   persuade the prosecutors that you really weren't much of a

24   gambler?

25   A.  I don't recall that, no.

1   Q.  Didn't you tell them at these same meetings in April 13,

2   2016, that you did not bet on sports games every week, sports

3   betting was just for fun, an activity you shared with your

4   friends, and your bets were usually 100 or $200 per bet.

5          Didn't you tell them that, sir?

6   A.  I don't recall that, no.

7   Q.  Let me show you the same document.  I'll show you the next

8   paragraph and ask you to read it to yourself.

9   A.  I can certainly read the FBI's notes here.

10  Q.  My question to you, sir, does that refresh your memory on

11  April 13, 2016, you told the prosecutors and the FBI that you

12  did not bet on sports games every week, sports betting was just

13  for fun, an activity you shared with your friends, and bets

14  were usually 100 or $200?

15         Yes or no, sir?

16         MS. CUCINELLA:  Objection.

17         THE COURT:  Overruled.

18  A.  I can read the FBI's notes.  I don't think this is an

19  accurate rendition of what I said in these meetings.

20  Q.  You deny saying it?

21  A.  I'm saying these are the FBI's notes.  This is not

22  accurate, based on what I told the prosecutors.

23         THE COURT:  All right.  Ladies and gentlemen, it's

24  5 o'clock.  We're going to call it a day.  Do not discuss the

25  case among yourselves or with anyone.  Keep an open mind.

H3M3WAL6                          Davis - cross

1    There is much more to come.  And we'll be back in action

2    tomorrow morning same time, so that means get here quarter to

3    10, so you can get here for a good 10 o'clock start.

4              Thank you very much ladies and gentlemen.  And my

5    deputy has notes for two of our jurors who have made inquiries.

6              (Jury excused)

7              (Continued on next page)

H3M3WAL6

```
 1                THE COURT:  So Juror No. 6 --
 2                MR. GOLDMAN:  Do you want to excuse the witness?
 3                THE COURT:  No.
 4                MR. GOLDMAN:  Okay.
 5                THE COURT:  Juror No. 6 had simply wanted a note to
 6      her employer, and I've signed a note and given her one.  And
 7      Juror No. 13 as shown to you in the note is asserting a
 8      hardship, and what I did is I crafted a letter to the employer
 9      asking the employer to continue to pay him.  My thought would
10      be that we'll wait and see what happens.  If I get a second
11      note from the juror, then at that point I would contemplate
12      maybe taking action perhaps to excuse the juror, but not quite
13      yet.
14                Any objection to that?
15                MR. BERKE:  No, your Honor.  Sounds sensible.
16                MS. CUCINELLA:  No, your Honor.
17                THE COURT:  See you all tomorrow morning.
18                MR. BERKE:  Your Honor, can I just raise one issue.
19      Can I ask your Honor to direct the witness while he's on
20      cross-examination to obviously not discuss his testimony with
21      either the prosecutors or his counsel.
22                THE COURT:  Do you understand that, Mr. Davis?  You're
23      now on cross-examination.  So you cannot discuss your testimony
24      with the government or with your lawyer.  Okay.
25                THE WITNESS:  Neither one?
```

1        THE COURT:  Well, what's the basis for his own lawyer?

2   I don't understand that.

3        MR. BERKE:  Your Honor, couple things.  A, I think

4   that's customary.  For example, in the Steinberg case, the

5   insider trading case before Judge Sullivan, I just looked at

6   it --

7        THE COURT:  That may have been Judge Sullivan's rule.

8   I'm just curious what's the legal basis for enjoining

9   conversation with a lawyer.

10        MR. BERKE:  So in this case, your Honor, the New York

11   counsel who Mr. Davis retained is someone who is a recent

12   graduate, includes someone who is a recent graduate of this

13   group, worked very closely with this group, and has been

14   working very closely.  He was a member of this group and tried

15   cases with Mr. Goldman and Mr. Ferrara, has been working

16   closely with the agents in this case throughout.  I saw him

17   yesterday working closely over documents.  He's essentially

18   part of the prosecution team.

19        THE COURT:  Please step out, Mr. Davis.

20        THE WITNESS:  Okay.

21        (Witness not present)

22        MR. BERKE:  And your Honor --

23        THE COURT:  Hang on a second.  That's a very tall

24   accusation I would say.

25        MR. BERKE:  I don't mean it as an accusation.

1          THE COURT:  I think it's an accusation, because the

2     lawyer for Mr. Davis has to view matters with an eye single

3     towards his client, the only person to whom he owes the duty of

4     loyalty.  He owes no duty to friends from a past life and once

5     one severs a connection to go on a bench or to go from being a

6     prosecutor to a defense counsel, one assumes professional

7     responsibilities that must be upheld.

8          MR. BERKE:  Of course, your Honor.  Can I explain a

9     little more what I meant.  All I'm saying is obviously this is

10    a witness who it's in his interest, obviously, to work closely

11    with the prosecutors and the prosecutors' interest.  He has a

12    lawyer, among other lawyers, who is uniquely equipped to do

13    that.

14         My experience has been, and I have case law, your

15    Honor, that supports this, that in order to ensure that the

16    cross-examination is -- that we have an opportunity to fairly

17    examine him based on his recollection and the like, that he not

18    discuss his testimony with any lawyer who can advise him or

19    counsel him about his testimony.

20         I have a Supreme Court case that supports that, your

21    Honor.

22         THE COURT:  I'm only interested in case law you may

23    have that relates to the witness's lawyer.  If it doesn't

24    relate to his lawyer, I don't need it.

25         MR. BERKE:  May I pass it up, your Honor?

1          THE COURT:  Yes.

2          MR. BERKE:  I referred to the Steinberg case only

3    because the government in that case did not oppose the

4    application nor did the lawyer -- let me pass up the case law.

5          THE COURT:  That's not much authority for anything.

6          I will say that if there is not an injunction against

7    his speaking with his lawyer, then you can say did you meet

8    with your lawyer last night.  Did you talk to him about your

9    testimony.  You are allowed to ask that, and that can undermine

10   his credibility as a witness.  I can understand why the

11   prosecution wouldn't want him to do it.  But that's not the

12   issue that I'm faced with.  Not whether you don't want him to

13   do it, and also the prosecution doesn't want him to do it,

14   which sounds like the case that you're citing to me from Judge

15   Sullivan.  But whether or not I should counsel an individual

16   who has entered a plea of guilty and awaits sentencing that he

17   may not consult with his lawyer.

18         MR. BERKE:  Only about his testimony.

19         THE COURT:  About his testimony.

20         MR. BERKE:  Yes.  Could I --

21         THE COURT:  Because that would be really odd.  Let's

22   say he wants to recant his testimony.  He's not allowed to tell

23   his lawyer "I want to recant my testimony"?

24         MR. BERKE:  No, he would be.

25         THE COURT:  Whoa.  Under your theory, no, he wouldn't.

H3M3WAL6

1                    MR. BERKE:  He would have to raise it with your Honor.

2                    THE COURT:  No.  He doesn't have to raise it.  That's

3        privileged information.  His lawyer may say there is no need

4        for you to do that.  But the notion that he would have to tell

5        me what he wants to talk to his lawyer about, and then I would

6        say, oh, recant your testimony, that's perfectly fine.  What

7        business is it of mine to say that's perfectly fine or not

8        perfectly fine?

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3mdwal7

1          MR. BERKE:  Your Honor, seeking leave to speak about

2     something like that with his counsel, not the substance of what

3     it would be.

4          THE COURT:  No, I understand that.  Seeking leave,

5     what business is it of mine to say, no, you may not talk to

6     your counsel about that, or, yes, you may talk to your counsel

7     about that?

8          MR. BERKE:  But obviously -- your Honor, let me just

9     say one thing and then I will direct your Honor to the portion

10     of the case.

11          THE COURT:  Yes, direct me to the portion of Perry v.

12     Leeke.

13          MR. BERKE:  I will direct you there.  Your Honor, it

14     is the case law that begins on page 4 with the Roman numeral 3,

15     and the numbers are a little hard to read but they are on the

16     lower right-hand side.

17          THE COURT:  I see them.

18          MR. BERKE:  It is page 4.

19          THE COURT:  Roman numeral 3.

20          MR. BERKE:  Right.  I would refer your Honor right now

21     to the paragraph -- third paragraph in that section, "The

22     reason."

23          THE COURT:  All right.  Let me just read this.

24          MR. BERKE:  Thank you, Judge.

25          (Pause)

1          THE COURT:  I think you have persuaded me, and I'm

2    going to bring Mr. Davis in and give him the direction.

3          MR. BERKE:  Thank you, your Honor.

4          MS. CUCINELLA:  Your Honor, I would like to make a

5    couple of comments.  With respect to --

6          THE COURT:  Have you read Perry v. Leeke?

7          MS. CUCINELLA:  I did, and it appears to us that it

8    gives you the discretion to order that and, obviously, it is

9    within your discretion, and in our experience in this district

10   I have never seen that happen.  That being said, I do want to

11   clarify the record as to what Mr. Berke just said about it with

12   respect to Mr. Davis' counsel.  The counsel he is referring to

13   has a twin brother who is currently in our office and is

14   working on a completely separate matter with Agent Rom.  That's

15   who he saw.

16         THE COURT:  Ah, it's the old twin brother defense.

17         MS. CUCINELLA:  As weird as that sounds.

18         THE COURT:  It just seems like they were cavorting

19   with the prosecution.

20         MR. BERKE:  I stand by everything.  I don't dispute

21   the twin brother.  I actually have firsthand knowledge that

22   that is true.  I withdraw that portion of the comment but I

23   stand by everything else.

24         MS. CUCINELLA:  That individual has not been here at

25   the trial.  The only counsel that is here for Mr. Davis is his

1    counsel from Texas.

2              As your Honor is aware, as Mr. Berke has spent a lot

3    of time on today, Mr. Davis is going through a divorce.  His

4    counsel is here with him in New York.  He otherwise doesn't

5    have family here.

6              So while we understand that it's within your Honor's

7    discretion to order this -- and this case seems to suggest

8    that, having just been handed it -- it's not customary

9    practice.  As you've said, Mr. Berke has the ability to

10   question him tomorrow to ask him what he spoke about, all of

11   those things.  So we would request that he be permitted to

12   speak with his counsel tonight.

13             MR. BERKE:  Your Honor, if I could just direct you to

14   another portion of this Supreme Court case?

15             THE COURT:  Sure.

16             MR. GOLDMAN:  We obviously are just getting this and

17   trying to catch up.  We haven't had an opportunity to research

18   this at all.  We have had no notice --

19             THE COURT:  Well, this is in realtime.  I am going to

20   give you direction one way or the other, Mr. Goldman, in three

21   minutes.  Do you understand that?

22             MR. GOLDMAN:  I do understand that.  That's why we are

23   trying to respond as quickly as we can.

24             If you would go to the next page, this case seems to

25   be distinguishing between a case in Geders, a different case.

1    And this case, this Leeke case, is focused on whether an

2    attorney can speak with a witness at a 15-minute recess.

3    Geders appears to address a defendant in that case, but it

4    addresses an overnight recess in which the attorney is

5    permitted to speak with his client during an overnight recess,

6    because in this -- again, it is somewhat inapposite because it

7    relates to a defendant who must discuss trial tactics and all

8    of that and a variety of other things.

9              THE COURT:  That makes it really inapposite because

10   there are other things that the attorney must speak with that

11   defendant about, such as who is going to be the next witness

12   and what documents are going to be offered.

13             MR. GOLDMAN:  I do think the distinction between a

14   15-minute break and overnight is important.

15             THE COURT:  The discussion from the Court goes on:

16   "The distinction rests instead on the fact that when a

17   defendant becomes a witness he has no constitutional right to

18   consult with his lawyer while he is testifying.  He has an

19   absolute right to such consultation before he begins to

20   testify, but neither he nor his lawyer has a right to have the

21   testimony interrupted in order to give him the benefit of

22   counsel advice.  The reason for the rule is one that applies to

23   all witnesses, not just defendants."

24             And then the Court goes on:  "It is common practice

25   for a judge to instruct the witness not to discuss his or her

1    testimony with third parties until the trial is completed."

2              And the Court goes on to lay out why the rules serve

3    the truth-seeking function of a trial.

4              So while I think you may be correct that it is not the

5    holding of Perry v. Leeke that the Court must instruct this

6    witness not to consult with his attorney, my initial concern,

7    that there would be something untoward in giving such a

8    direction, is not based in fact.  And the fact of the matter is

9    I think it does undermine the testimony when tomorrow

10   Mr. Davis, when asked, "Did you consult with your lawyer about

11   the testimony you gave on direct and on cross-examination, the

12   substance of that testimony, and how you responded?  It is a

13   'yes' or 'no' question," and the answer is, "Yes," I think the

14   strength of that testimony is weakened in the eyes of the jury

15   and with good reason.

16             So, I'm going to give the direction.

17             You could bring Mr. Davis back in.

18             Am I correct, Mr. Berke, that one of these twins has

19   been seen around your office?

20             MR. BERKE:  Going back many years, your Honor.  Many

21   years.

22             THE COURT:  All right.

23             (Witness present)

24             THE COURT:  Mr. Davis, the Court directs you -- you

25   may stop right where you are.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H3mdwal7

1          The Court directs you not to discuss your direct

2   testimony or your cross-examination with any person, including

3   the prosecutors or your lawyer.

4          Do you understand the direction?

5          THE WITNESS:  Yes, sir, I understand.

6          THE COURT:  OK.  Until you have completed your

7   testimony in this case.

8          THE WITNESS:  Yes, your Honor.  I understand.

9          THE COURT:  Thank you very much.

10          Have a pleasant evening.

11          All right.  Anything else?

12          MR. BERKE:  Not from the defense, your Honor.  Thank

13   you.

14          MS. CUCINELLA:  Not from the government, your Honor.

15          THE COURT:  All right.  We are adjourned.

16          (Adjourned to 10 a.m., Thursday, March 23, 2017)

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    THOMAS C. DAVIS

4    Direct By Ms. Cucinella . . . . . . . . . . 754

5    Cross By Mr. Berke . . . . . . . . . . . . . 912

6                    GOVERNMENT EXHIBITS

7    Exhibit No.                           Received

8     1730  . . . . . . . . . . . . . . . . . . 759

9     1914 and 1913B  . . . . . . . . . . . . . 761

10    1712  . . . . . . . . . . . . . . . . . . 769

11    442 and 442A  . . . . . . . . . . . . . . 772

12    444  . . . . . . . . . . . . . . . . . . . 775

13    445  . . . . . . . . . . . . . . . . . . . 781

14    1917-A  . . . . . . . . . . . . . . . . . 788

15    1708-A  . . . . . . . . . . . . . . . . . 791

16    1921  . . . . . . . . . . . . . . . . . . 792

17    1722, 1918, 1723  . . . . . . . . . . . . 801

18    1704, 1705  . . . . . . . . . . . . . . . 810

19    1920  . . . . . . . . . . . . . . . . . . 825

20    1724  . . . . . . . . . . . . . . . . . . 827

21    1752 and 1753  . . . . . . . . . . . . . . 831

22    524C, 524F, 525, 525A, 526, first page . . . 846

23            of 527A

24    1925  . . . . . . . . . . . . . . . . . . 849

25    1931-A  . . . . . . . . . . . . . . . . . 865
```

1    531    . . . . . . . . . . . . . . . . . . 869

2    1934    . . . . . . . . . . . . . . . . . 872

3    1935    . . . . . . . . . . . . . . . . . 874

4    1936-A, 1937    . . . . . . . . . . . . . 877

5    1809, 1809-A    . . . . . . . . . . . . . 880

6    1800    . . . . . . . . . . . . . . . . . 882

7    1806, 1807    . . . . . . . . . . . . . . 883

8    1812    . . . . . . . . . . . . . . . . . 884

9    1810 and 1811    . . . . . . . . . . . . . 888

10   1727    . . . . . . . . . . . . . . . . . 892

11   1957    . . . . . . . . . . . . . . . . . 895

12   13, 15 and 17    . . . . . . . . . . . . . 901

13   1002    . . . . . . . . . . . . . . . . . 946

14                      DEFENDANT EXHIBITS

15   Exhibit No.                              Received

16   4174    . . . . . . . . . . . . . . . . . 923

17   4477    . . . . . . . . . . . . . . . . . 926

18   4114    . . . . . . . . . . . . . . . . . 928

19   4445    . . . . . . . . . . . . . . . . . 930

20

21

22

23

24

25