H3N3WAL1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                               S1 16 Cr. 0338(PKC)

5  WILLIAM T. WALTERS,

6              Defendant.

7  ------------------------------x
                                                March 23, 2017
8                                               10:15 a.m.

9  Before:

10                    HON. P. KEVIN CASTEL,

11                                              District Judge

12                         APPEARANCES

13 JOON H. KIM
        Acting United States Attorney for the
14      Southern District of New York
   BY:  DANIEL S. GOLDMAN
15      BROOKE E. CUCINELLA
        MICHAEL FERRARA
16          Assistant United States Attorneys

17 KRAMER LEVIN NAFTALIS & FRANKEL, LLP
        Attorneys for Defendant
18 BY:  BARRY H. BERKE
        PAUL H. SCHOEMAN
19      ANDREW J. ESTES
        MICHELLE BEN-DAVID
20          -and-
   WRIGHT STANISH & WINCKLER
21 BY:  RICHARD WRIGHT

22          – also present –

23 SA Edmund Rom
   SA Nicholas Anderson, Federal Bureau of Investigation
24 Raymond McLeod, Defense Tech Support
   Holly Meister
25 Sarah Pyun, Government Paralegal Specialists

1              THE COURT:  Please bring our jurors in.  Bring the

2     witness in also.

3              (Jury present)

4              THE COURT:  Good morning, ladies and gentlemen.  Maybe

5     we're going to get our spring back soon, I hope.

6              Mr. Davis, the Court reminds you that you are still

7     under oath.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Mr. Berke, you may continue.

10             MR. BERKE:  Thank you, your Honor.

11      THOMAS C. DAVIS,

12     CROSS-EXAMINATION

13     BY MR. BERKE:

14     Q.  Mr. Davis, do you recall when we broke yesterday, you had

15     denied that in April of 2016 you had told the prosecutors and

16     the FBI that you did not bet on sports games every week, you

17     did it just for fun, and your bets were usually 100 or $200?

18     Do you recall saying that in April 2016, sir?

19     A.  I think I said my bets ranged from 100 to $1,000.

20     Q.  I'm asking you that yesterday, at the end of your

21     testimony, you denied in April of 2016 telling the FBI and the

22     prosecutors in this case that you didn't bet every week, you

23     bet just for fun, and your bets were usually 100 or $200?

24     A.  This was during the proffer?

25     Q.  Yes.

1          You deny that you said that, correct?

2     A.  I'm sorry.  I don't understand the question.

3     Q.  My question is, sir, do you recall your testimony at the

4     end of yesterday, Wednesday, when I asked you if you had told

5     the FBI and the prosecutors in April of last year that you

6     didn't bet on sports every weekend, and that your bets were

7     usually 100 or $200 a bet.

8          Do you recall that, sir, and you denied saying that?

9     A.  Yesterday I denied that?

10    Q.  Yes.

11    A.  I don't recall, I'm sorry.

12    Q.  Let me ask you today.  Sir, in April of 2016, did you tell

13    the FBI that you did not bet on sports games every week, sports

14    betting was just for fun, and your bets were usually 100 or

15    $200?

16    A.  I don't recall precisely what I said in all the proffers.

17    I'd have to refer to the notes.

18    Q.  Okay.  Let me show you, sir, what's been marked for

19    identification as 3501-108 which we looked at yesterday.  See

20    what it is -- I'm sorry, that's the wrong one.

21         Let me show you what is marked as 3501-17 dated

22    April 13, 2016.  First, you see the date, sir?

23    A.  Yes.

24    Q.  If I can turn your attention to page five, paragraph three.

25    I'll ask you to read that to yourself again.

H3N3WAL1                          Davis - cross

1              I'll ask you again, sir, does that refresh your memory

2     that in April 13, 2016, you told the FBI and the prosecutors in

3     this case that you did not bet on sports games every week,

4     sports betting was just for fun, it's an activity you shared

5     with friends, and your bets were usually $100 to $200 per bet?

6     A.  I can read what the FBI's notes say, yes.

7     Q.  That's not my question, sir.  My question is, did you say

8     that?

9     A.  I don't recall saying that precisely, no.

10    Q.  Do you deny saying it?

11    A.  What I said was I don't recall saying that precisely.

12    Q.  If you said that, that would be a lie, correct?

13    A.  Counselor, I just don't recall saying that precisely.

14    Q.  That's not my question, sir.  My question is if you had

15    said that, that would not be true, would it?

16    A.  No, I don't think that's totally accurate, no.

17    Q.  You bet a lot higher stakes than that, correct?

18    A.  Occasionally I did, yes.

19    Q.  Not occasionally.  Most weekends.  You called it "dimes."

20    You were betting one dime, two dimes, three dimes, four dimes

21    sometimes on games that you wanted to bet on, isn't that right,

22    sir?

23    A.  I don't recall precisely how much I bet every weekend.

24              THE COURT:  What time period are we talking about,

25    sir?

1           MR. BERKE:  I'm talking about the period from -- thank

2      you, your Honor.

3      Q.  From 2012 all the way to 2016.  Do you recall, sir, using

4      the phrase "dimes"?

5      A.  Sure.

6      Q.  One dime is a thousand dollars, correct?

7      A.  Yes, it is.

8      Q.  Do you recall, sir, that you would often talk about betting

9      two dimes on a game, three dimes on a game; do you recall that,

10     sir?

11     A.  It would be highly unusual for me to bet three dimes on a

12     game.

13     Q.  All right.  Let me show you what's been marked for

14     identification as DX 4250.  Sir, if we can make that a little

15     bigger.  Would you go down, please.  I'm sorry.  Go up a little

16     bit.

17          Sir, do you see?  I'd ask you to review this.

18     A.  All right.

19     Q.  I would ask that if we could show the sentence beginning

20     "I'm not that confident."

21     A.  I'm sorry.  Where are you?

22     Q.  I'm going to show you in a second.  Right there.

23          Sir, my question is, does that refresh your

24     recollection that in October of 2013, in talking about a game

25     you said you weren't that confident, so you just took three

H3N3WAL1                    Davis - cross

1    dimes, and then you told your friend Tim Byrne thinking he

2    might want to split it?

3    A.  Yes, I think that's accurate.

4    Q.  That's $3,000?

5    A.  Yes, it is.

6    Q.  I could show you an awful lot of e-mails that you are doing

7    that.  That's not an unusual bet.

8    A.  I don't think you can show me very many e-mails where I bet

9    three dimes.  I've already said that was highly unusual.

10   Q.  Well, let's go some more.  How about I show you DX 4679.

11   Why don't we go to DX 4861.

12           Do you recall, sir, December 29, again e-mailing with

13   your friend Tim Byrne.  Do you recall, sir, on that date, you

14   had two dimes bet on the under?  Do you recall that, sir, just

15   one bet, one game, do you recall that, sir, college football?

16   A.  Yes, I think that's accurate, yes.

17   Q.  Okay.  How about we go to -- why don't we do this, sir.

18   Why don't we go to DX 5318.  5317.

19           Sir, you recognize this is a screen shot of your

20   Ibettor.com account, correct?

21   A.  Okay.

22   Q.  Do you recall, sir, you bet $2,200 on Villanova to win in

23   March of 2016?

24   A.  Yes, I think --

25   Q.  Do you recall, sir, that would be two dimes plus 200,

1   correct?

2   A.  Yes.

3   Q.  Do you recall, sir, that in your Ibettor account at that

4   date you had $70,000 available for bets and you were down

5   28,000 just at that time based on your sports betting, correct?

6   A.  I don't recall that, but it looks like that's the case,

7   yes.

8   Q.  Isn't it a fact, sir, when you were trying to get your deal

9   with the government back in April of 2016, you wanted to

10  minimize your gambling so they would think more highly of you

11  and give you the deal you wanted so you could avoid jail

12  altogether?  Isn't that true, sir?

13  A.  I don't think I ever tried to minimize my gambling.  I

14  think I was straightforward about it.

15  Q.  You also tried, sir, to minimize your discussions with

16  Mr. Walters about sports and gambling, didn't you, sir?

17  A.  With regard to whom?

18  Q.  With regard to discussions you had on the phone with him

19  all the time about sports and gambling.  You tried to minimize

20  that as well, didn't you, sir?

21  A.  With regard to whom?

22  Q.  With regard to the FBI and the prosecutors, when you were

23  trying to get your deal.

24  A.  I think I was straightforward in my testimony with the

25  prosecutors.

H3N3WAL1                          Davis – cross

1    Q.  Sir, do you recall yesterday you agreed that you had told

2    them in April of 2016 that Mr. Walters rarely gave you

3    information about sports gambling, and you would only sometimes

4    ask him, and you spoke infrequently with Mr. Walters about

5    sports or gambling?

6         Do you remember you agreed that you had said that to

7    them in April of 2016?

8    A.  Yes, I think that's accurate.

9    Q.  That was a lie, sir, wasn't it?

10   A.  No.  I still think that's accurate.  I spoke to him

11   infrequently about sports gambling.

12   Q.  Sir, isn't what happened is the prosecutors saw all your

13   e-mails with your friend where you're talking about betting

14   dimes here and three dimes and four dimes and talking about

15   your friend in Las Vegas who gave you a tip, and they

16   confronted you that your prior statements were not true, after

17   you had your deal?  Isn't that true, sir?

18        MS. CUCINELLA:  Objection.  Compound question.  There

19   is so much in there, if he could unpack it.

20        THE COURT:  Rephrase.

21   Q.  Isn't it true, sir, that the prosecutors found your e-mails

22   where you're talking to all your friends about betting three

23   dimes and two dimes and relying on your friend in Las Vegas for

24   sports tips?  Isn't that true, sir?

25   A.  I can assure --

H3N3WAL1                        Davis - cross

1            THE COURT:  The question you're asking is whether the

2   prosecutors found the e-mails?

3            MR. BERKE:  And confronted him.

4            THE COURT:  You didn't include that.  So rephrase your

5   question.

6   Q.  Didn't the prosecutors, sir, confront you with the fact

7   they found your e-mails with your friends indicating you were

8   betting two dimes, three dimes on games, and you were relying

9   on advice from your friend in Las Vegas?

10  A.  I don't recall the prosecutors ever showing me the e-mails.

11  The e-mail thread about my gambling, no.

12  Q.  They told you about it though, right?  They told you they

13  found those e-mails?

14  A.  I don't recall that either, to be frank with you.

15  Q.  Sir, isn't it a fact that last month you changed your

16  statements to them, and last month for the first time you told

17  them that you would talk on the telephone, exchange text

18  messages with Mr. Walters regarding sports events.  Mr. Walters

19  would share his betting strategy with you, and you would

20  discuss the spread on various upcoming games.

21            Didn't you tell the prosecutors that for the very

22  first time last month?

23  A.  I think I did say that.  I think that's accurate.

24  Q.  Isn't it a fact, sir, that the reason you told them a

25  different story at the beginning when you were trying to get

H3N3WAL1                    Davis – cross

1   your deal is because you wanted to say all those phone calls

2   you had with Mr. Walters was about Dean Foods and tips, as

3   opposed to sports and sports gambling.  That's why you didn't

4   admit that back when you were trying to get your deal, and you

5   waited until you already had your deal locked in.

6          Isn't that true, sir?

7   A.  Can you rephrase your question?  I'm not sure I follow.

8   Q.  Isn't it true, sir, you told them at the beginning when you

9   were trying to get your deal that you didn't speak much to

10  Mr. Walters about sports or betting, because you wanted to say

11  that all those calls you had with him were always about Dean

12  Foods and supposed tips you were giving him?

13  A.  I think I've been totally straightforward with the

14  prosecutors about my phone calls with Mr. Walters.

15  Q.  Yes or no, sir?

16  A.  I don't know the question.  You can ask me the question

17  again.  It's kind of hard to follow your questions sometimes.

18  They're linked together.

19  Q.  Sir, isn't it a fact that after meeting with the

20  prosecutors over 23 times for over one year, the first time you

21  ever told them that you gave material non-public information to

22  Mr. Walters because you wanted sports bets, was just a few

23  weeks ago on February 28?

24  A.  I -- I don't recall the first time I told them that.

25  Q.  Let me show you what's been marked for identification as

1  3500-108.  First look at the date, sir.  Now I'm going to show

2  you the first paragraph.

3            MR. BERKE:  First paragraph, please.  Thank you.  The

4  paragraph right after.  "In exchange."  Thank you.  Thank you,

5  Mr. McLeod.

6  Q.  Read that to yourself, please.  My first question, sir,

7  does that refresh your memory on February 28 you told the

8  prosecutors that you gave Mr. Walters illegal inside

9  information because you were hoping to gain from Mr. Walters'

10  insights about sports gambling, particularly football, among

11  other things?

12  A.  I think that's accurate, yes.

13  Q.  You told them that on February 28?

14  A.  Yes, I think that's accurate.

15  Q.  Isn't it also a fact, sir, that you never said that to the

16  prosecutors or the FBI in any of your 24 meetings with them

17  over the course of greater than a year prior, isn't that true,

18  sir?

19  A.  No.  I would disagree with that statement.

20  Q.  That would be an untrue statement?

21  A.  That's correct, that's my view.  I told them about it over

22  a year ago.

23  Q.  So it's your testimony when you began over a year ago, you

24  told them about it.  Is that your testimony, sir?

25  A.  I certainly did.

1    Q.  Are you being as truthful about that as everything else in

2    your testimony?

3    A.  Yes, sir.

4    Q.  Sir, in 2016 you also placed bets through a bookie,

5    correct?

6    A.  Yes.

7    Q.  You still place a bet through a bookie?

8    A.  No.

9    Q.  When did you stop, sir?

10   A.  Certainly after I signed the cooperation agreement with the

11   government.

12   Q.  When you signed the agreement you were still using a

13   bookie, weren't you, sir?

14   A.  No.

15   Q.  You weren't using John Pool?

16   A.  No.

17   Q.  When did you stop, sir?

18   A.  When I signed the cooperation agreement.

19   Q.  That day?

20   A.  As far as I can recall, yes.

21   Q.  While you were cooperating for -- it was many months you

22   were cooperating, correct?

23   A.  Yes.

24   Q.  February, March, April, first half of May, correct?

25   A.  Yes.

H3N3WAL1                          Davis - cross

1   Q.  You were using your bookie throughout that time, correct?

2   A.  I don't recall that, no.

3   Q.  Do you recall telling the prosecutors you were?

4   A.  I recall telling the prosecutors I used a bookie.

5   Q.  Do you recall telling them that you were using him while

6   you were meeting with them over many months?

7   A.  I don't recall that precisely, no.

8   Q.  Let me show you what's been marked for identification as

9   3501-11.  You see the date March 18, 2016.  You see that, sir?

10  A.  Yes, I see it.

11          THE COURT:  Have you seen this document before?

12          THE WITNESS:  No, sir, I haven't.

13          THE COURT:  Okay.

14  Q.  Directing your attention to page three of seven, paragraph

15  six.  Under the heading, second paragraph under the heading.

16  My question to you, sir -- give you a chance to read it.

17          My question to you, sir, does that refresh your memory

18  that in March of 2016 you told the prosecutors that you had

19  placed and you continued to place bets on college football and

20  college basketball games through a bookie named John Pool?

21  A.  I can certainly read the statement.  Yes.

22  Q.  So you're committing a crime, you agree that's a crime to

23  bet through a bookie in Dallas, correct?

24  A.  Yes.

25  Q.  You were committing crimes while you were meeting with the

1    prosecutors, correct?

2    A.  I'm not sure what period of time I continued to place bets

3    with John Pool.

4    Q.  Sir --

5    A.  This says "continues to place."  I'm not sure what that's

6    referring to.

7              MS. CUCINELLA:  I'm going to object, your Honor.  It

8    is unclear right now what the witness's recollection is.  He's

9    reading a document that's not in evidence.  So if Mr. Berke

10   could clarify his question rather than relying on reading the

11   document.

12             THE COURT:  You're welcome to offer the document into

13   evidence if you'd like to.

14             MR. BERKE:  Absolutely, your Honor.  I would offer the

15   paragraph that we're reading of 3501-11 into evidence, your

16   Honor.

17             THE COURT:  You're not offering the document?

18             MR. BERKE:  I don't think I could.  But I'm offering

19   this, your Honor.

20             THE COURT:  All right.  Well, do you want to offer a

21   portion of the document?

22             MR. BERKE:  I do, your Honor.

23             THE COURT:  Any objection?

24             MS. CUCINELLA:  May we have one moment, your Honor.

25             THE COURT:  Yes.

1              MS. CUCINELLA:  Your Honor, I don't think what the

2     witness is testifying to is actually inconsistent, so we think

3     it is improper to offer this paragraph at this time.  We think

4     that Mr. Berke needs to establish what the witness's memory is,

5     based on proper questioning, and then I think we'll be in a

6     better position to go from there.

7              THE COURT:  All right.  I'm going to sustain the

8     objection for the moment.  If you establish an inconsistency,

9     I'll let you have the document in.

10             MR. BERKE:  Thank you, your Honor.

11    Q.  Sir, in March 18, 2016, did you tell the FBI and the

12    prosecutors that you place and you continue to place bets on

13    college football and college basketball through a bookie named

14    John Pool in Dallas, Texas?

15    A.  I don't recall saying that precisely, no.  That's what the

16    FBI notes say.  I don't recall saying that.

17    Q.  You deny saying that, sir?

18             THE COURT:  Do you deny saying that?  That's the

19    question.

20             THE WITNESS:  Your Honor, I just don't recall saying

21    that.

22             THE COURT:  Okay.  That's your answer.

23    Q.  Did you deny that you were using a bookie while you were

24    trying to get your cooperation deal with the prosecutors?

25    A.  I don't think I was ever asked whether I was still using a

H3N3WAL1                    Davis - cross

1    bookie at the time I was proffering.

2    Q.  My question to you, sir, is did you deny that you were

3    using a bookie during the time you were proffering and meeting

4    with the prosecutors trying to get your deal?

5    A.  Counselor, I really don't recall whether I was still using

6    the bookie in February, March and April of 2016.  I just don't

7    recall.

8             MR. BERKE:  Your Honor, I would offer the paragraph

9    now as 3501-11-A.

10            THE COURT:  I think the witness has said he doesn't

11   recall.

12            MR. BERKE:  Okay.

13   Q.  Sir, you would agree with me if you were using a bookie,

14   you would be committing a crime while you were trying to get

15   your deal with the prosecutors, correct?

16   A.  Yes.

17   Q.  That would be a violation of what you were supposed to be

18   doing, correct, sir?

19   A.  A violation of what?

20   Q.  You weren't supposed to be committing crimes while you were

21   trying to get your cooperation agreement, were you?

22   A.  I wasn't supposed to be committing a crime ever.

23   Q.  You definitely weren't supposed to be doing it when you

24   were meeting with them.  You weren't supposed to lie to them,

25   you weren't supposed to commit crimes, correct?

1     A.  I certainly didn't lie to them.  Period.

2     Q.  Sir, did you think it was okay to commit crimes while you

3     were meeting with the prosecutors trying to get your deal?

4     A.  No.  I don't think it's okay.

5     Q.  Sir, do you recall giving testimony the first day of your

6     testimony, that you said on two occasions Mr. Walters put his

7     arm around you and said how's the milkman, asking you for

8     information?  Do you recall that testimony, sir?

9     A.  Yes, I do.

10    Q.  Do you recall, sir, you said the first time was in early

11    April when you were in Palm Springs, it was after playing golf

12    at The Reserve.  And you said Mr. Walters put his arm around

13    your shoulder and said how's the milkman, and you said

14    something like "looking good."  Something to that effect,

15    correct?

16    A.  That's not correct.  It was not before I played golf, it

17    was after we played golf.  That's what I testified to.

18    Q.  Sir, I believe you said -- after playing golf.  You were at

19    the golf course at The Reserve, correct?

20    A.  Yes, sir.

21    Q.  Your testimony is he put his arm around your shoulder and

22    he asked you how's the milkman.

23    A.  That's correct.

24    Q.  That was in April of 2008, correct?

25    A.  That's my recollection, yes.

H3N3WAL1                          Davis - cross

1    Q.  You said it happened again.  You said you were playing at a

2    golf tournament, the Cyder Cup, in September of 2008, correct?

3    A.  Yes.

4    Q.  Mid-September, correct?

5    A.  Yes.

6    Q.  You said again after the golf tournament you recall after

7    playing, Mr. Walters putting his arm around you and saying

8    how's the milkman, correct?  Asking you that question?

9    A.  Yes.

10   Q.  You said again, "doing great, looking good."  Right?  In

11   substance?

12   A.  I think I said something slightly different than that.  But

13   yes.

14   Q.  That was the message you conveyed, it was looking good.

15   Right?  Very positive, correct?

16   A.  Yes.

17   Q.  I want to show you what's in evidence as GX 2001.  Sir, you

18   see on the bottom of this, first, you see the date up top is

19   2008?

20   A.  Yes.

21   Q.  See on the bottom it says the green represents Mr. Walters'

22   purchases?

23   A.  Yes, I see it.

24           THE COURT:  Have you seen this document before?

25           THE WITNESS:  No, your Honor, I have not.

1   Q.  You see, sir, that you see the lines from April 1st, '08 to

2   May 1st, correct?  You see that on the bottom?

3   A.  Yes.

4   Q.  And you see, sir, that when you said that Mr. Walters put

5   his arm around you in early April and asked you, and you told

6   him "looking good," Mr. Walters did not buy any shares of Dean

7   Foods all the way up until the next earnings announcement on

8   April 30, 2008.  Do you see that, sir?  There is no green from

9   April 1st all the way to April 30.  No green.  Do you see that,

10  sir?

11  A.  Yes, I see that.

12  Q.  You also see, sir, if you go further down the same chart,

13  you see September '08, right?

14  A.  Yes.

15  Q.  And you see, sir, that the next earnings announcement is

16  November 4, 2008, correct?

17  A.  Yes, that's correct.

18  Q.  You see again, sir, after you claim the second time

19  Mr. Walters put his arm around you and asked you how the

20  milkman is doing, again, there are no purchases until right

21  after the November 4, 2008 announcement, correct?

22  A.  I see that.

23           THE COURT:  Let me see counsel at sidebar with the

24  exhibit.

25           (Continued on next page)

1          (At the sidebar)

2          THE COURT:  I'm sure I must be misunderstanding or

3     misreading something.  And I don't think anybody would do

4     anything deliberately here.  But, I'm looking at this chart,

5     Government Exhibit 2001, and it looks to me that there were

6     purchases by Mr. Walters between June 15 and June 30.

7          MR. BERKE:  There are, your Honor.  What I was

8     referring to, what I was asking about is the earnings

9     announcement up here, April 30, because he said it was good

10    news.  That was the next earnings announcement that announced

11    the reports.  So I was saying between April and the earnings

12    announcement of April 30, there were no purchases.  I asked him

13    specifically.

14         THE COURT:  I thought you then asked him there weren't

15    any purchases until the earnings announcement of June.

16         MR. BERKE:  No.  Then I went to September, because he

17    said the second time he did it was in early September related

18    to the Cyder Cup.  So I went to September and showed no

19    purchases between that time and the next earnings announcement

20    in November.  So I was going from the time of the supposed tip

21    to the next earnings announcement, because there was two.

22    There was one in April, according to his testimony, and one in

23    September.  So I was doing April to the earnings announcement,

24    and September to the November earnings announcement, and there

25    are no purchases.

H3N3WAL1                          Davis - cross

1             THE COURT:  All right.  In that event I'll leave it

2      for redirect then.

3             MS. CUCINELLA:  Yes, we agree there is nothing --

4             THE COURT:  Thank you.

5             MR. GOLDMAN:  One thing, your Honor.  If we could keep

6      close tabs on argumentative questioning.  This is very

7      argumentative.

8             THE COURT:  Well, you have a pair of lungs, if you

9      find a question argumentative, it's your job to object.

10             MR. GOLDMAN:  Understood.

11             THE COURT:  You don't sit there like choir boys and

12      choir girls and let the big bad judge sua sponte interpose an

13      objection.  If you have something to say, exercise your rights.

14             MS. CUCINELLA:  Understood, your Honor.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. BERKE:  If I may, your Honor?

3              THE COURT:  You may.

4    BY MR. BERKE:

5    Q.  Mr. Davis, do you believe the jurors in this courtroom

6    should believe you because you took an oath to tell the truth?

7    A.  Yes, I do.

8    Q.  Do you believe the jurors in this courtroom should believe

9    you because you're adamant at what you're claiming to be the

10   truth?

11   A.  Yes, I do.

12   Q.  Mr. Davis, do you think the jurors in this courtroom should

13   believe you because you'll get in trouble if you lie?

14             MS. CUCINELLA:  Objection, your Honor.  This is just

15   argumentative.

16             THE COURT:  Sustained.

17   Q.  Sir, you testified under oath before, didn't you?

18   A.  Yes, I have.

19   Q.  You testified before the Securities and Exchange

20   Commission, correct?

21   A.  Yes, sir, I did.

22   Q.  Sir, when you testified before the SEC, you stood up and

23   you took the exact same oath you took here today, correct?

24   A.  I did, yes.

25   Q.  You were wearing a similar suit and tie, you probably

992

```
1    looked very similar to what you look today, correct?

2    A.  I don't recall what I was wearing.

3    Q.  But you swore to tell the truth, correct?

4    A.  Yes, I did.

5    Q.  You were adamant you were telling the truth, correct?

6    A.  I was sworn to tell the truth.

7    Q.  You told the SEC you were being truthful.  You didn't tell

8    them you were lying to them?

9    A.  I did tell them that, that's correct.

10   Q.  You knew you could get in trouble if you lied, correct?

11   A.  I have gotten in trouble.

12   Q.  You knew it at the time you gave your testimony, didn't

13   you, sir?

14   A.  I'm sorry, I didn't hear.

15   Q.  You knew it at the time you gave your testimony, didn't

16   you, sir?

17   A.  I knew I was lying to the SEC, yes.

18   Q.  You knew you could get in trouble for lying, correct?

19   A.  Yes.

20   Q.  You did it anyway?

21   A.  I did, I was trying to conceal my crimes.

22   Q.  Well, let's talk about that, sir.  Do you recall you said

23   on direct that you had a strategy going into your SEC

24   testimony?  Do you recall saying that?

25   A.  Yes.
```

1    Q.  I want to talk to you about that strategy.  You were

2    expecting to be asked about Dean Foods, correct?

3    A.  Yes, I was.

4    Q.  And you were represented by Tom Melsheimer, a very well

5    known, very well experienced lawyer, correct?

6    A.  Yes.

7    Q.  He was somewhat famous -- well, he was very well known for

8    representing people in this context, correct?

9              MS. CUCINELLA:  Objection.

10             THE COURT:  Sustained.

11   Q.  He was very experienced in this area?

12             MS. CUCINELLA:  Objection.

13             THE COURT:  Sustained.

14   Q.  You met with Mr. Melsheimer an awful lot to talk about and

15   prepare for your testimony, correct?

16   A.  For the SEC?

17   Q.  Yes.

18   A.  I had a lot of meetings with Mr. Melsheimer, not only to

19   prepare for the SEC, but a variety of other things.

20   Q.  But you met with him to prepare for the SEC testimony,

21   correct?

22   A.  Yes, I did.

23   Q.  You told him in preparing for what you thought would be

24   about Dean Foods, you told him that you never gave any improper

25   illegal information to Mr. Walters, isn't that true?

1   A.  Yes, that's correct.

2   Q.  And you went over documents with him, and you prepared, and

3   he went over every possible question the SEC could potentially

4   ask about Dean Foods and you prepared for it, correct?

5              MS. CUCINELLA:  Objection.  It's privileged.

6              MR. BERKE:  The door was open, your Honor.  He's

7   already testified on direct about it.

8              THE COURT:  I think so.  Go ahead.

9   A.  I didn't hear the question.  I'm sorry.

10  Q.  In preparing, Mr. Melsheimer asked you all the sorts of

11  questions that he thought the SEC could ask you about Dean

12  Foods and your relationship with Mr. Walters, correct?

13  A.  I suppose he did.

14  Q.  You prepared and gave him the answers that you told him

15  were truthful and honest and based on real facts, correct?

16  A.  I was lying to Mr. Melsheimer at the same time, yes.

17  Q.  I didn't ask you that, sir.  I'm not asking you.  What I'm

18  asking is what you said back then.  Back then you told

19  Mr. Melsheimer that was the truth, correct?

20  A.  I did tell him that, yes.

21  Q.  On every fact and every question that he asked you in

22  preparation, you gave him an answer that made clear you didn't

23  do anything illegal with regard to Mr. Walters, correct?

24  A.  Yes, I told him that.

25  Q.  And at the end, he was satisfied that he could bring you in

1    the SEC for you to repeat that you didn't do anything wrong,

2    correct?

3    A.  He was satisfied?

4    Q.  Yes, that he could bring you in -- he took you into the SEC

5    to give testimony, didn't he?

6           MS. CUCINELLA:  Objection as to Mr. Melsheimer being

7    satisfied.

8           MR. BERKE:  I'll rephrase.

9           THE COURT:  Sustained.

10   Q.  After the preparation, Mr. Melsheimer took you to the SEC

11   and represented you before the SEC where you gave the same

12   answers about Mr. Walters and your relationship that you gave

13   with him when you were preparing, correct?

14   A.  Yes, that's correct.

15   Q.  But the surprise at the SEC is they asked you questions

16   about Shelter Golf that you didn't expect.  Isn't that true,

17   sir?

18   A.  Yes, I think that's accurate.

19   Q.  When they asked you questions about Shelter Golf, they

20   seemed to have figured out that you stole money from Shelter

21   Golf, didn't they?

22   A.  They asked me a lot of questions about Shelter Golf, yes.

23   Q.  You hadn't prepared for that with Mr. Melsheimer, had you?

24   A.  I don't recall whether we discussed that or not.

25   Q.  You lied to the SEC about Shelter Golf, didn't you?

H3N3WAL1                          Davis - cross

1   A.  I did, yes.

2   Q.  You lied repeatedly, didn't you?

3   A.  Yes, I did.

4   Q.  You knew after the testimony that they knew you lied,

5   correct?

6            MS. CUCINELLA:  Objection.

7            MR. BERKE:  Withdrawn.  I'll get to that.

8   Q.  Sir, Mr. Melsheimer -- withdrawn.

9            Sir, I want to ask what you said to the SEC.  And I

10  would ask to put before you what is marked as Defense Exhibit

11  4951 so we have it, if we may put that on the screen for the

12  witness.

13           My question, sir, is do you recall being asked "Well,

14  the example you gave, are there situations where the kind of

15  information China and how it impacts the milk industry and Dean

16  Foods, that information might be information that Dean Foods

17  has but is not yet public yet?"  And you answering "No, no.  I

18  never provided him any confidential information whatsoever.

19  I'm certain of that."

20           Were you asked that question and gave that answer,

21  sir?

22  A.  Yes, I think that's accurate.

23  Q.  I'd like to go if I could go to page 78, line 19.  That is

24  your testimony on the screen, correct?

25  A.  Yes.

1              MR. BERKE:  Your Honor, under 801(d)(1)(A), I would

2      ask to introduce that question and answer.  And we have it

3      marked as 4951-A.

4              THE COURT:  Any objection?

5              MS. CUCINELLA:  No objection.

6              THE COURT:  Received.

7              (Defendant's Exhibit 4951-A received in evidence)

8              MR. BERKE:  If I may publish it to the jury, your

9      Honor, that question and answer.

10             THE COURT:  You may.

11             MR. BERKE:  The question and the answer, please.

12     Mr. McLeod, if it would be easier just just to put up 4151-A.

13     Q.  This is your sworn SEC testimony, correct, sir?

14     A.  Yes.

15     Q.  May 18, 2015.  If I could just publish it.  And sir, the

16     question you were asked is "Well the example you gave are" --

17     you see the question we went over.  Can you read your answer,

18     sir?

19     A.  In the middle paragraph?

20     Q.  Yes.

21     A.  It says "No, no.  I never provided him any confidential

22     information whatsoever.  I'm certain of that.  And whatever we

23     discussed was typically available by analysts.  So yeah, I'm

24     certain of that."

25     Q.  Sir, analysts, those are professionals who work for banks

H3N3WAL1                          Davis - cross

1   who cover the company, correct?

2   A.  Yes.

3   Q.  They issue reports, correct?

4   A.  Yes.

5   Q.  And those reports are often reports based on discussions or

6   information that the analysts may have gotten from the company

7   at various things, correct?

8   A.  Yes, I think so.

9   Q.  You regularly reviewed analyst reports of Dean Foods,

10  correct?

11  A.  Yes.

12  Q.  You discussed it with Mr. Walters, correct?

13  A.  On occasion, yes.

14  Q.  So we looked at yesterday you sending an analyst report in

15  2013, do you recall that, sir?

16  A.  Yes, I did.

17  Q.  Let me now go to page 80 and Exhibit 4951-A.  Just for the

18  witness.  I think we just need the end of the answer.

19          Sir, this also reflects questions and answered you

20  were asked on your SEC testimony?

21  A.  Yes.

22          MR. BERKE:  Your Honor, I would offer this.  And for

23  convenience if your Honor would agree, I can either mark them

24  as A, B, C, D or mark them all as A, the collection we're going

25  to go through.  There is maybe six of them.

1          THE COURT:  Why don't you mark them as A, B, C, D.  I

2     think that's more convenient.  So you are offering this?

3          MR. BERKE:  I'd offer this as 4951-B.

4          THE COURT:  Any objection?

5          MS. CUCINELLA:  No objection.

6          THE COURT:  Received.

7          (Defendant's Exhibit 4951-A received in evidence)

8          MR. BERKE:  May I publish it, please?

9          THE COURT:  Yes.

10    Q.  Sir, you were asked by the Securities and Exchange

11    Commission while under oath "We have gone over your background,

12    but did Mr. Walters know what your position was at Dean Foods?"

13          Would you read the answer, sir?

14    A.  "Yes, I feel certain he did."

15    Q.  "Why do you feel certain?"

16    A.  "I guess I assumed he did that.  He never asked me any

17    leading questions about Dean Foods, so I felt like he respected

18    the fact that I was on the board and didn't want to put me in

19    that kind of position, so he never did."

20    Q.  I'll now show you if we can go to page 72, line 22.

21    Question and answer beginning there.

22          Sir, does that reflect questions and answers you were

23    asked during your SEC testimony?

24    A.  Yes.

25          MR. BERKE:  Your Honor, I would offer the question and

H3N3WAL1                        Davis - cross

1    answer beginning on page 72 as 4951-C.

2              MS. CUCINELLA:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 4951-C received in evidence)

5    Q.  Sir, I'd ask you to read the answers again.  "Did he ever

6    ask you if Dean Foods was going to get around to spinning off

7    WhiteWave?"

8    A.  "Never."

9    Q.  "Did you ever tell him that Dean Foods was considering

10   spinning off WhiteWave?"

11   A.  "Never."

12   Q.  "Did you ever give him a preview of what Dean Foods'

13   earning were prior to an announcement?"

14   A.  "Never."

15   Q.  Now directing your attention to -- and Mr. Davis, when you

16   were giving those answers, did your facial expression look any

17   different than it does today?

18   A.  I'm sorry?

19   Q.  Did you and your face look any different than it does

20   today?

21              MS. CUCINELLA:  Objection.

22              THE COURT:  I'll allow it go ahead.  If you know.

23   A.  I don't recall what my face looked like.

24              THE COURT:  Do you know what your face looked like?

25              THE WITNESS:  At the time of the testimony?

H3N3WAL1                          Davis - cross

1           THE COURT:  Yes.

2           THE WITNESS:  I don't think I looked any different

3     than I do today.

4     Q.  In fact, sir, you told the government, the federal

5     government on multiple, multiple occasions for well over a year

6     that you did not ever give any information about Dean Foods

7     that was improper to Mr. Walters, isn't that true?

8     A.  Could you repeat the question?  I'm sorry.

9     Q.  For well over a year you told the government and others

10    that you didn't give any improper information to Mr. Walters,

11    isn't that true?

12    A.  Yes, I lied, yes.

13    Q.  Well, I'm asking you, sir, about what your position was

14    back then, before you tried to make a deal.  Back then you

15    didn't tell them you were lying, did you?

16    A.  No, I didn't.  I was trying to conceal my guilt.

17    Q.  You told them it was the truth, didn't you, sir?

18    A.  No, I did not.

19    Q.  You told them it was the truth, didn't you, sir?

20    A.  At the time of the testimony, I told them it was the truth,

21    yes.

22    Q.  And when you were explaining about the sorts of information

23    that you gave to Mr. Walters, you believed that information

24    that we just went over, that was proper for you to share,

25    correct?

1   A.  I'm not sure, counselor, which information you're referring

2   to.

3   Q.  The questions and answers we just read, you believed that

4   what you said you shared with Mr. Walters, that that was

5   entirely proper for you to share with Mr. Walters, it wasn't

6   illegal, correct?

7           MS. CUCINELLA:  Objection.  It's a compound question.

8           THE COURT:  Rephrase the question.

9   Q.  When you talked about sharing information that analysts

10  had, your intent was to convey to the SEC that that was

11  perfectly okay, correct?

12  A.  Yes, the analysts' information, yes.

13  Q.  When you told the SEC that you talked about things like

14  milk prices and things at a higher level that could affect the

15  industry and Dean Foods, you intended to convey that was

16  proper, correct?

17  A.  Yes, I did.

18  Q.  You recall, sir, that in 2014, the FBI showed up to your

19  home?

20  A.  Yes, I recall that very well.

21  Q.  That was a surprise, correct?

22  A.  Yes.

23  Q.  You weren't expecting them?

24  A.  No.

25  Q.  It was not a happy moment to have the FBI at your home,

H3N3WAL1                        Davis - cross

1    correct?

2    A.  I think that's accurate.

3    Q.  They came and they wanted to ask you questions, correct?

4    A.  Yes.

5    Q.  And you didn't have a lawyer there, it was just you and the

6    FBI, the surprise visit, correct?

7    A.  Yes.

8    Q.  They wanted to ask you about whether you ever gave any

9    improper information to Bill Walters, correct?

10   A.  Yes, they did.

11   Q.  And you emphatically said you never gave illegal inside

12   information to Mr. Walters, and you said you were certain of

13   that.  Isn't that true, sir?

14   A.  Yes, I lied to the FBI.

15   Q.  Sir, I understand that's what you're saying today.  You

16   didn't tell the FBI you were lying, did you, sir?

17   A.  I did not.

18   Q.  You told them that was the truth, correct, sir?

19   A.  When they interviewed me at my house, I think it's a matter

20   of record what I told them, yes.

21   Q.  You told them that, correct, sir?

22   A.  Yes.

23   Q.  You know it is a crime to lie to a federal officer,

24   correct?

25   A.  I certainly know that well today.

H3N3WAL1                    Davis – cross

1  Q.  You knew it back then too, didn't you, sir?

2  A.  Yes.  I was aware of that.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3ndwal2                    Davis - cross

1   Q.  You told the agents not only were you certain that you

2   didn't give any illegal information to Mr. Walters but that

3   you, sir, do not tolerate that kind of behavior and you fired

4   people in the past for insider trading; isn't that true, sir?

5   A.  Yes, that's accurate.

6   Q.  And it was true what you said, you had fired people in the

7   past for insider trading, haven't you?

8   A.  Yes, I did.

9   Q.  You also said -- you told the FBI openly that you had done

10  some business deals together and you had invested in companies

11  together, correct?

12  A.  Yes.

13  Q.  You told them that you and Mr. Walters very frequently

14  discussed the stock market and capital markets and general

15  things that could influence the price of a stock, correct?

16  A.  Yes.

17  Q.  You told the agents that you talked about Dean Foods, but

18  all the information was proper that you talked about with

19  Mr. Walters, correct?

20  A.  Yes, I did.

21  Q.  You told them that you understood that Mr. Walters likes to

22  talk to a lot of people, didn't you, sir?

23  A.  I didn't hear the question.  Sorry.

24  Q.  You told them that you understood that Mr. Walters like to

25  talk to a lot of people about the stock market and his

H3ndwal2                          Davis - cross

1    investments, including Dean Foods, correct?

2    A.  I don't recall saying that, no.

3    Q.  Sir, didn't you tell the FBI that you understood that

4    Mr. Walters invested in Dean Foods because he respected you, he

5    trusts you, and he has confidence in you?

6    A.  I don't recall all the specifics of the interview.

7    Q.  Let me show you, sir, what's been marked for identification

8    as 3501-3.  And I'll first show you the date and the first

9    couple of lines.

10           Do you see the date, sir?

11   A.  Yes.

12   Q.  Do you want to see the first two paragraphs -- well, the

13   first paragraph so you can see what it is.

14           Do you see what it is, sir?

15   A.  Yes.

16           THE COURT:  Have you ever seen this before?

17           THE WITNESS:  No, sir, I have not.

18   Q.  Let me direct your attention, if I may, to the third page,

19   second paragraph, last sentence.  I would ask that you read it

20   to yourself.

21           (Pause)

22           My question to you, sir, is does that refresh your

23   recollection that you told the FBI, when they showed up on a

24   surprise visit to your home in 2014, that you believed

25   Mr. Walters respects you, trusts you, and has confidence in

1   you?

2   A.  I think that's an accurate reflection of what I said to the

3   FBI, yes.

4   Q.  Did you also tell them that's why you thought he invested

5   in Dean Foods?

6   A.  I think this is an accurate reflection of what I said to

7   them, yes.

8   Q.  And, sir, isn't it a fact that later, after the FBI visited

9   you in 2014, after your SEC testimony, you authorized your

10  lawyers to make a detailed presentation to the SEC, where they

11  would present a lot of material information to defend what you

12  had been telling Mr. Melsheimer that you did nothing wrong with

13  Mr. Walters; isn't that true, sir?

14  A.  I authorized my legal counsel to prepare a presentation,

15  yes.

16  Q.  And you reviewed it before they gave it, correct, sir?

17  A.  I saw it, yes.

18  Q.  And you understood that the presentation explained -- the

19  presentation addressed your actions, correct?

20  A.  The presentation addressed a lot of things, not just my

21  actions but also Mr. Walters' trading activities.

22  Q.  Yes.  So first it addressed your actions, correct?

23  A.  As far as I recall, yes.

24  Q.  And went through all the details why -- all the reasons why

25  your conduct and actions and all -- and everything you did with

1    regard to Mr. Walters was innocent, correct?

2    A.  Yes.  I don't recall the detail of the presentation but I

3    think that's fair.

4    Q.  And you recall generally it also addressed phone calls that

5    you had with Mr. Walters, phone records, and went through all

6    the reasons why those were innocent; do you recall that, sir,

7    generally?

8    A.  I think there was a portion of the presentation that

9    addressed that, yes.

10   Q.  And you recall, sir, that your lawyers also addressed

11   Mr. Walters' trading, as you would say?

12   A.  Yes, I think it did.

13   Q.  And your lawyers, on your behalf, went through to explain

14   why all those trades were explainable based on public

15   information and what was known in the market; isn't that true,

16   sir?

17   A.  I think the presentation did reflect that, yes.

18   Q.  Sir, your lawyers on your behalf told the SEC in this

19   presentation that Mr. Walters' trading was not unusual; isn't

20   that true, sir?  Unusual for him, isn't that true, sir?

21   A.  I'm sorry.  Repeat the question.

22   Q.  Mr. Walters -- excuse me.  Your lawyers, in making a

23   presentation on your behalf, told the SEC that Mr. Walters'

24   trading was not unusual?

25            MS. CUCINELLA:  Objection.  If he could clarify the

H3ndwal2                         Davis - cross

1   question?  Mr. Davis wasn't present for the presentation.

2              THE COURT:  Yes.  Rephrase it.

3   BY MR. BERKE:

4   Q.  You reviewed -- you understood that they gave a

5   hundred-page PowerPoint presentation that had statements in the

6   presentation that they were going to show the SEC, correct?

7   A.  Yes.

8   Q.  And you reviewed that, correct?

9   A.  Yes.  I saw it, yes.

10  Q.  You understood that one slide explained to the SEC why

11  Mr. Walters trading was not unusual; isn't that fair, sir?

12  A.  I don't recall every page of the presentation, no.

13  Q.  Let me show you --

14             THE COURT:  Do you recall that page?

15             THE WITNESS:  I don't recall that page, your Honor.

16  Q.  Let me show you what's been marked for identification as

17  3501-76.  And you see what it is, sir?  I would ask you to look

18  at the front page and also down below.

19  A.  Yes, I see that.

20  Q.  I am going to direct your attention to page 54.  I think on

21  the exhibit it is 157, if that's easier.  157 on yours, I

22  believe.

23             OK.  I'd ask you to review that to yourself, sir.

24             (Pause)

25             Have you reviewed it, sir?

H3ndwal2                         Davis - cross

1  A.  Yes.

2  Q.  My question, sir, is does that refresh your recollection

3  that the presentation that you reviewed, that your lawyers gave

4  to the SEC, laid out reasons why Mr. Walters' trading was not

5  unusual?

6  A.  It certainly says that on the slide, yes.

7  Q.  And do you recall, sir, they also presented information to

8  show that Mr. Walters' trading coincided with analyst

9  recommendations and information that was publicly known?

10  A.  Yes.  I think that's accurate.

11  Q.  And do you recall, sir, they presented information in

12  support for the fact that analysts had anticipated and

13  predicted the WhiteWave spin-off?

14  A.  I think they -- I don't remember exactly what the

15  presentation said, but I think they referred to analysts'

16  reports on the spin-off, yes.

17  Q.  Well, do you recall, sir, that they specifically argued on

18  your behalf, in the slide that you reviewed, that analysts

19  anticipated and predicted the WhiteWave spin-off?

20  A.  I don't recall that they predicted that, no.

21  Q.  Let me show you, sir, pages 88 to 90 of what we are looking

22  at for identification as 3501-76.

23          I would ask you, sir, just to read that to yourself.

24          (Pause)

25  A.  OK.  I have read it.

H3ndwal2                      Davis - cross

1    Q.  Sir, on your behalf, your lawyers told the SEC that

2    analysts had anticipate and predicted the WhiteWave spin-off,

3    correct, before May 2012, correct?

4              MS. CUCINELLA:  Objection.  These don't all reflect

5    analyst reports, or any of them, actually.

6              MR. BERKE:  I actually disagree, your Honor.

7              If we could go to the next page as well.  Read that as

8    well.

9              And we'll go to the next page, too.

10   Q.  My question for you, sir, is does that refresh your memory

11   that your lawyers, on your behalf, told the SEC that analysts

12   had predicted the WhiteWave spin-off before May 2012?

13   A.  Counsel, it looks like to me these are all excerpts from

14   analyst questions or comments, and there was a lot of

15   speculation about the spin-off.

16   Q.  I asked you a different question, sir.  Let's go to the

17   page before.

18             And the page before. 88.

19             My question, sir, is did your lawyers, on your behalf,

20   tell the SEC that the spin-off of WhiteWave was anticipated

21   well before May 2012?  That is my question.

22   A.  That's what the headline says on this page, yes.

23   Q.  And they also -- in support of that, they cited a lot of

24   analyst reports and other things, correct?

25   A.  I'm sorry?

H3ndwal2                          Davis - cross

1    Q.  In support of that, they cited a lot of analyst reports,

2    correct?

3    A.  Yes.  I think that's accurate.

4    Q.  And other things?

5    A.  I don't know what the other things were.

6    Q.  Let's go to page 90.

7           Statements by people at Dean Foods, public statements,

8    correct?

9    A.  Yes.

10   Q.  And, sir, your lawyers also told the SEC, on your behalf,

11   that the Walters' loans were legitimate, documented, that you

12   were paying on the loans; do you recall that, sir?

13   A.  Yes.

14   Q.  And they also told the SEC, gave a lot of support, that Tom

15   Davis knows the securities laws and follows them; isn't that

16   true, sir?

17   A.  Yes.  I think they did tell them that.

18   Q.  You had been involved on the board of Dean Foods for a long

19   time, correct?

20   A.  Yes.

21   Q.  And there came a point in time when they interviewed you,

22   lawyers for Dean Foods interview you after news articles came

23   out to make sure you didn't do anything improper or give any

24   improper information; isn't that right, sir?

25   A.  Yes.  I recall that.

H3ndwal2                        Davis - cross

1   Q.  And you told them, these people you had known, from Dean

2   Foods, you swore to them, that you never gave Mr. Walters any

3   information you shouldn't have given him; isn't that true, sir?

4   A.  Counselor, I think I said quite clearly I lied to everybody

5   about this, including the Dean Foods' board, including the Dean

6   Foods' in-house counsel.

7   Q.  I understand what you are saying right now, sir.  You

8   didn't tell them back then you were lying, did you?

9   A.  No.

10  Q.  You swore to them it was the truth, these people who knew

11  you for so long, that you never gave any information to

12  Mr. Walters that you weren't supposed to give; isn't that true,

13  sir?

14  A.  That's what I told them at that time, yes.

15  Q.  You told them, you talked to them about Dean Foods --

16          THE COURT:  Let the witness answer before you begin

17  the next question.

18          MR. BERKE:  I'm sorry.  Yes, sir.

19  Q.  Were you done, sir?

20  A.  Yes.

21  Q.  You told them that all the information you shared with

22  Mr. Walters was entirely appropriate and none of it was

23  illegal, correct?

24  A.  Yes, I did tell them that.

25  Q.  They didn't ask you any questions about Shelter Golf, did

H3ndwal2                    Davis - cross

1    they?

2    A.  It didn't come up.

3    Q.  You told all your circle of friends in Dallas and across

4    the country, in emails and otherwise, after the articles came

5    out, that you did nothing wrong, correct?

6    A.  Yes.  I think that's a fair statement.

7    Q.  We talked about your friend Mr. Byrne.  He is a close

8    friend, correct?

9    A.  Yes.

10   Q.  You told him that, when the article came out about you in

11   the Wall Street Journal that you talked about on direct, that

12   it is no big deal, you are holding your head high, you didn't

13   do anything wrong, correct?

14   A.  Yes.  I think that's accurate.

15   Q.  And in fact, sir, you authorized your lawyers to tell the

16   world, after the article appeared, that you did nothing wrong,

17   correct, sir?

18   A.  I don't recall authorizing him, but he certainly made a

19   statement on my behalf.

20   Q.  Sir, you knew he made a statement on your behalf that you

21   fully, and without reservation, cooperated with the SEC in

22   their investigation of alleged insider trading in Dean Foods

23   Company from day one and that you have no knowledge of any

24   material nonpublic information about Dean Foods Company being

25   conveyed to Mr. Walters by you or anyone else; isn't that what

H3ndwal2                        Davis - cross

1   your lawyer said to the press and the world on your behalf,

2   sir?

3   A.  Yes, I think that's accurate.

4   Q.  And that was -- that's what you told everyone, including

5   under oath, before you decided to try to make a deal for

6   yourself; isn't that true, sir?

7   A.  It's certainly what I told everybody before I decided to

8   tell the truth.

9   Q.  Sir, it's what you told everyone before you decided to make

10  a deal, to see if you can make a deal for yourself with the

11  government; isn't that true, sir?

12  A.  Yes.  I think that's accurate.

13  Q.  Sir, you have a lifetime of experience making deals, you

14  know how to make deals; that was your job as an investment

15  banker, make deals, correct?

16  A.  That was certainly part of my job, yes.

17  Q.  And, also, after you left DLJ and you were working other

18  ways, you knew how to make deals that benefited you, Tom Davis;

19  isn't that right, sir?  That's something that you had a lot of

20  experience with?

21  A.  I made some good investments from time to time.

22  Q.  You know how to make deals that benefit yourself, correct,

23  sir?

24  A.  I don't know how you want to characterize that, but.

25  Q.  Let me ask you, sir, would you make a false accusation

1   against someone in order to try to get a benefit for yourself?

2   A.  I hope I wouldn't.  I hope that I would not do that.

3   Q.  Not my question, sir.  I'm not asking how aspirational you

4   are.  I'm asking whether you would.

5   A.  I don't think I would do that on purpose, no.

6   Q.  Sir, Bob Utley used to be a friend of yours, correct?

7   A.  I hope he is still a friend of mine.

8   Q.  Bob and Brian Utley, they were involved in Periscope with

9   you, correct?

10  A.  Yes.

11  Q.  You got into a dispute with them because they had to pay

12  $27,000 to respond to a subpoena related to the investigation

13  of you, correct, sir?

14  A.  There was a bit more to it than that.

15  Q.  Well, there was a bit more, but you had a dispute that in

16  part relied on the fact that they thought your role should be

17  limited because there was an issue about paying those fees,

18  correct?

19  A.  I think, counselor, you've got your facts wrong slightly.

20  Q.  Well, you recall, sir, you had an email exchange with

21  Mr. Utley in which he claimed you had a conflict of interest in

22  representing rollover investors of Periscope and in part

23  because there was a question of who should pay the legal costs

24  of $27,000 they had to pay to respond to an SEC subpoena; isn't

25  that correct, sir?

H3ndwal2                         Davis - cross

1   A.  I think we got in a dispute because he felt like I had a

2   conflict of interest and I felt like I did not have a conflict

3   of interest.  It was not a dispute over the legal fees --

4   Q.  And --

5   A.  -- as I recall.

6   Q.  Well, in the middle of that dispute, didn't you call a

7   mutual friend and ask him -- Chuck Wilson, and ask him to

8   intervene, and you told them that if Bob doesn't stop, you're

9   going to get him in big trouble because he violated the terms

10  of a federal subpoena that required confidentiality with regard

11  to the SEC investigation and you're going to report him for

12  committing crimes for talking about that; didn't you do that,

13  sir?

14  A.  I don't recall that conversation, no.

15  Q.  Let me show you what's been marked for identification as

16  4510.  I'd ask you to read that to yourself, sir.

17          (Pause)

18  A.  Yes, I wrote this.  I recall this.

19  Q.  Right.  You said you didn't want to -- do you recall, sir,

20  you said you didn't want to get Bob Utley in trouble but you

21  could and you would because he violated the terms of a federal

22  subpoena by talking about it; isn't that true, sir?

23  A.  You got the wrong person here.  I was referring to Brian

24  Utley, not Bob Utley.

25  Q.  Brian Utley, isn't that true, sir?

H3ndwal2                          Davis - cross

1   A.  Yes.

2   Q.  Brian is the son and Bob is the father?

3   A.  Yes, that's correct.

4   Q.  And that's what you said; isn't that right, sir?

5   A.  This is an accurate email.

6   Q.  And that was a lie, right?  There is no law against

7   violating when it is referring to an SEC subpoena, you couldn't

8   get into trouble; you made that up?

9           MS. CUCINELLA:  Objection.

10          THE COURT:  It is a question.  Overruled.

11  A.  I'm sorry.

12  Q.  You made that up.  That wasn't true.  Somebody can't get in

13  trouble.  There is no --

14  A.  I don't recall.  I don't recall the facts at this point in

15  time, but I certainly wrote this email.  I'm not denying that.

16  Q.  And you made a false accusation so he would drop the

17  dispute you had to get a benefit for yourself, correct?

18  A.  What was the benefit here?

19  Q.  Let's take it a step at a time.

20          You made a false accusation, correct, sir?

21  A.  I don't recall whether this is a false accusation or not.

22  What I was referring to was I was objecting to the way that

23  Brian Utley handled this particular situation.

24  Q.  Right.  And you were threatening him, through a mutual

25  friend to get a message to him, that you can him into big

H3ndwal2                         Davis - cross

1   trouble because he did something you said was unlawful; and

2   that was a lie, you made that up, isn't that true, sir?

3   A.  I don't know whether this was a lie or not.  I had no clue.

4   Q.  Bucky Lyons, sir, you said he was a friend of yours,

5   correct?

6   A.  Yes.  He is a business partner.

7   Q.  You recall you got into a dispute with Bucky Lyons because

8   you testified you weren't paying for the airplane that you

9   shared with him and one other; do you recall that, sir?

10  A.  Yes, that's accurate.

11  Q.  And you recall that you also were in business with him; you

12  were investors in a fund together, correct?

13  A.  We were co-general partners of a fund, yes.

14  Q.  And he took some money that was in the fund and applied it

15  to your expenses, and you objected to that, isn't that right,

16  sir?

17  A.  He misappropriated my share of the management fees for a

18  full year, and I objected to that.

19  Q.  Sir, you owed him money, Falcons, for your partnership in

20  the airplane?  My question is, did you owe him that money?  Did

21  you owe him that money, sir?

22          MS. CUCINELLA:  Objection.

23          THE COURT:  Stop, Mr. Berke.  Withdraw and put a fresh

24  question.  You can't ask a question and then amend the

25  question, have the two questions hanging out in the air.

1           MR. BERKE:  Fair enough, your Honor.  I will withdraw

2    and rephrase.

3           MS. CUCINELLA:  Can we have a sidebar, your Honor?

4           THE COURT:  No.

5    BY MR. BERKE:

6    Q.  You owed Mr. Lyons money for the airplane, didn't you, sir?

7    A.  No, I didn't.

8    Q.  You owed the partnership, Falcons Nest, money, didn't you,

9    sir?

10   A.  No, I did not.

11   Q.  Your belief is you did not owe them money?

12   A.  Absolutely, and that was the issue in dispute.

13   Q.  Didn't you testify, sir, on direct that you had fallen way

14   behind in your payments on your airplane?

15   A.  At an earlier period, yes, I had.

16   Q.  And it is your testimony today, sir, that in 2014 you were

17   all paid up and you didn't owe any money; is that your

18   testimony?

19   A.  I recall when we decided to sell the airplane, and I exited

20   the partnership.  I did not owe the partnership any more money.

21   Q.  So your testimony is that January 2014, you did not owe any

22   money to the partnership?

23   A.  I don't recall exactly when we terminated the partnership.

24   But what I'm testifying to today is that when we terminated the

25   partnership and I exited the partnership, I paid my share of

H3ndwal2                        Davis - cross

1   the liabilities, as I understood them, and I did not owe the

2   partnership any more money.

3   Q.  Isn't it a fact, sir, that you threatened to have Bucky

4   Lyons prosecuted by the district attorney for committing a

5   crime; isn't that true, sir, based on --

6   A.  I'm sorry.  I didn't hear the question.

7   Q.  Didn't you threaten to have Bucky Lyons prosecuted for what

8   you said was a crime as part of this business dispute; isn't

9   that true, sir, in 2014?

10  A.  I had breakfast with Bucky Lyons' father, and I told his

11  father that Bucky had misappropriated approximately $7,000 of

12  management fees from me over the course of a year.  And I told

13  his father that if Bucky did not return the money to me, I was

14  going to have him -- I was going to seek recourse through the

15  District Attorney's office.  I did say that.  And I got a check

16  the next week for $70,000.

17  Q.  I bet you did.

18  A.  I did.

19  Q.  You also threatened to go to his wife's --

20          THE COURT:  Well, wait.  Mr. Berke, "I bet you did" is

21  not a question.  Reframe.

22          MR. BERKE:  I apologize.  Absolutely.

23  Q.  Sir, you also -- before he gave you that check, Mr. Lyons

24  was in the middle of a divorce, correct?

25  A.  I don't recall when his divorce occurred.

H3ndwal2                      Davis - cross

1    Q.  You recall, sir, that you threatened to go to his wife's

2    divorce counsel and give him the renditions of facts and hire a

3    litigator from that same law firm to bring a case against him

4    and to also make a filing with the SEC and the Texas State

5    Securities Commission if he didn't give the money back; do you

6    recall that, sir?

7            MS. CUCINELLA:  Objection.  There are four questions

8    in there.

9            THE COURT:  Rephrase your question.

10   Q.  Do you recall, sir, telling him you were going to go to his

11   wife's divorce lawyer's firm and hire them to sue him; do you

12   recall that, sir?

13   A.  I think in the same breakfast meeting that I just referred

14   to, I told his father that, yes.

15   Q.  Did you tell him you were going to refer him to the

16   Securities and Exchange Commission and make accusations to the

17   Securities and Exchange Commission?

18   A.  Yes, I think I did that as well.

19   Q.  Did you tell him you were going to refer hem to the Texas

20   State Securities Commission as well?

21   A.  I think I said that, yes.

22   Q.  Sir, would you lie to get a benefit for yourself?

23   A.  I hope I would not, no.

24   Q.  I'm not asking you, sir, what you hope.  I'm asking you if

25   you would.

H3ndwal2                          Davis - cross

1          THE COURT:  I think the witness has answered it.

2     Q.  Sir, do you recall you testified on direct that after you

3     had misappropriated a hundred thousand dollars from Shelter

4     Golf, that you simply waited until -- a period of time until

5     you put money back, and then you just paid it all to the

6     shelter, to the Genesis Shelter for Battered Women; is that

7     your testimony on direct, sir?

8     A.  I'm not following the question.

9     Q.  Didn't you testify, sir -- do you recall the testimony,

10    sir, where you said that you owed money to a casino and you

11    misappropriated money that was intended for the shelter; do you

12    recall that, sir?

13    A.  Yes, that's accurate.

14    Q.  And you also testified that what you did is you waited 90

15    days and then you just gave all the money from the golf

16    tournament to Genesis Shelter; do you recall that testimony,

17    sir?

18    A.  I don't think that's totally accurate.  I paid -- I made

19    two payments to the charity that year.

20    Q.  Yep.  And you recall, sir, you made one payment -- do you

21    recall that the charity reached out to you and said, gee, they

22    were waiting on that money and they really needed it?

23    A.  Yes, I do recall that.

24    Q.  You recall, sir, you told them that you were going to pay

25    them money but you were holding some money back for accounting

H3ndwal2                         Davis - cross

1   and marketing expenses; do you recall that, sir?

2   A.  Yes, I think that's accurate.

3   Q.  And you were holding money back because you had

4   misappropriated it, correct?

5   A.  In reality, that's correct, yes.

6   Q.  And you also told them -- ultimately you told them that you

7   decided to invest their money a little bit, that was the delay;

8   do you recall telling them that, too, the women's shelter?

9   A.  I think that is accurate, yes.

10  Q.  Those were all lies so they wouldn't discover your

11  misappropriation, correct?

12  A.  That is totally accurate, yes.

13  Q.  You lied to benefit yourself, correct?

14  A.  I lied because I was trying to conceal this at the time

15  being, yes.

16  Q.  Sir, going back to Bucky Lyons.  The company you had

17  together was CSSF, correct?

18  A.  Yes.

19  Q.  And then he had another business called EBL, correct?

20  A.  Yes.  As far as I know, yes.

21  Q.  Did your wife at the time, Terie Davis, ever work for EBL?

22  A.  I don't recall that.

23  Q.  Do you recall, sir, that you came up with a scheme to

24  pretend that Terie worked for EBL, you would pay a salary for

25  her, so that you could defraud an insurance company?  Do you

H3ndwal2                         Davis - cross

1  recall that, sir?

2  A.  No.  I have no idea what you're talking about.

3  Q.  Let me show you some documents.

4        I am going to show you what's been marked for

5  identification as 4329.  If we can go to the first email which

6  would be on the bottom.  Right there.  Thank you.

7        I'm sorry.  The next one.

8        We can go lower than that, please.

9        There we go.

10        Now go to the next one.

11        So, first I would ask you to review this.

12        THE COURT:  "This" being what, sir?

13        MR. BERKE:  I'm sorry.  Document 4329, for

14  identification.  I'm sorry, Defense Exhibit 4329, for

15  identification.  Thank you, Judge.

16        THE COURT:  But what he has up on the screen is --

17        MR. BERKE:  Oh, it is an email dated --

18        THE COURT:  One line from it.

19        MR. BERKE:  Yes.  Email dated September 27, 2012,

20  8:11 a.m.

21  Q.  I would ask you to read it to yourself, sir.

22  A.  I've read it.

23  Q.  Do you recall, sir, that you were trying to come up with a

24  plan to get insurance coverage for your wife after your

25  business, CSSF, went out of business?  Do you recall that, sir?

H3ndwal2                      Davis - cross

1    A.  I don't recall the circumstances, no, but I can read the

2    email.

3    Q.  Let me show you what's been marked as DX4400.  If we can go

4    to the email at 9:52 a.m.

5              Do you recall, sir, that you asked -- read it to

6    yourself, sir, and I am talking about 4400, an email at

7    9:52 a.m.  And do you recall, sir, you asked what is the

8    minimal amount of time that Terie needs to be employed by the

9    company in order to get insurance?  Do you recall that, sir?

10   A.  Yes, I do recall that.

11   Q.  Then let's go up higher.  Let's go to the answer.

12             And do you recall, sir, that she needed to be working

13   30 hours a week to meet to qualify?  Do you recall that, sir?

14   A.  Yes, that's Christine's response, yes.

15   Q.  And do you recall, sir, that you were told that -- if you

16   will now go to -- I can show you what has been marked for

17   identification as Defense Exhibit 4398 and 4399.

18             If we can put that up there.

19             OK.  I ask you to look at first 4398.  I ask you to

20   read that email.

21             Then I would ask you to look at 4399.

22             Sir, you need to look at 4398 again to compare them.

23             Does that refresh your memory, sir, that you paid this

24   firm $1,408 in order to replicate what approximately 30 hours

25   would have been if Terie was working for the company?

1   A.  Yes.  I recall this, yes.

2   Q.  So this refreshes your memory, sir, that you came upon --

3   that you were involved in a scheme to defraud an insurance

4   company by pretending that Terie Davis was an employee of a

5   company that she never worked one minute for; isn't that true,

6   sir?

7   A.  I don't know that I was trying to defraud anybody.  I

8   clearly recall doing this, and Bucky suggested we do this.  And

9   his assistant, who handled the health insurance coverage,

10  basically managed the situation.  I don't think I was

11  defrauding anybody, but I certainly recall doing this.  This is

12  accurate.

13  Q.  Let's talk about it.  Let's break it down.

14          You agree, sir, Terie Davis did not work for EBL,

15  correct?

16  A.  I agree with that, yes.

17  Q.  You agree, sir, that you created a false record that she

18  did by paying money to EBL for what would have been a one-week

19  salary for 30 hours and having EBL pay that money to Terie,

20  correct?

21  A.  I agree that Christine asked me in an email to send her a

22  check for $1,408.  Yes, I agree to that.

23  Q.  So you are saying it is Christine's fault, Mr. Davis?

24  A.  I'm not pointing fingers at anybody.  I'm just reading what

25  the email says.

 1  Q.  I am asking what you did, sir.  You wrote that check to

 2  Christine?

 3  A.  Yes.  Yes, I did.  Of course.

 4  Q.  And you knew it was to create a false record that Terie was

 5  an employee at this company, correct?

 6  A.  I guess I didn't realize it was a false record, but, yes, I

 7  did that.

 8  Q.  Sir, you knew it was a false record because you knew that

 9  that was supposed to be a salary and Terie wasn't working for

10  EBL; isn't that a fact, sir?

11  A.  I guess that's correct.

12  Q.  And you knew you were creating a false record so they could

13  make a false application to an insurance company for Terie to

14  be covered; isn't that true, sir?

15  A.  I guess that's correct.

16  Q.  And you did that, sir, because you didn't want to go out

17  and buy your own insurance policy, so you defrauded this

18  insurance policy by pretending she was an employee when she

19  wasn't; isn't that true, sir?

20  A.  I could certainly go by my own insurance policy at this

21  point in time.  I'm not really sure why this coverage was

22  necessary.  I don't recall the background as far as my wife and

23  her health was concerned.  I just don't remember the facts.

24  Q.  That's not my question, sir.

25          You remember enough facts to know you defrauded the

1    insurance company, correct, sir?

2    A.  Counselor, I'm not going to admit to defrauding anything

3    here.  I know I paid an amount of money in order to have it

4    appear as if Terie was an employee, yes.

5    Q.  That was not true, correct?

6    A.  That was not true.

7    Q.  So statements were going to be made on Terie's behalf by

8    you through this company to the insurance company that were

9    false, correct?

10   A.  Could you repeat the question?

11   Q.  Yes.  You knew that, because you created this paperwork,

12   false statements were being made to the insurance company,

13   correct?

14   A.  I really didn't report to the insurance company.  I'm not

15   the one who made the report to the insurance company.  So that

16   was not my responsibility.

17   Q.  Well, Mr. Davis, you knew the whole reason you were writing

18   these checks and creating this paperwork was so that the

19   company could submit it to the insurance company to falsely

20   claim that Terie was an employee and would be covered, isn't

21   that true?

22   A.  Counselor, I didn't submit the claim to the insurance

23   company.  That's what I'm telling you.

24           THE COURT:  Did you hear the question that was asked

25   of you, sir?

H3ndwal2                          Davis - cross

1          THE WITNESS:  Could you repeat the question, please?

2          THE COURT:  I'll have the reporter read back the

3    question, please.

4          Vinny, if you don't mind.

5          (Question read)

6    A.  Yes.  I think that's accurate.

7          THE COURT:  OK.

8    Q.  You lied --

9          THE COURT:  Go ahead, Mr. Berke.

10          MR. BERKE:  Thank you, Judge.

11   Q.  You lied to get a benefit for yourself, didn't you, sir?

12   A.  Yes.  It appears I was dishonest about this.  It does

13   appear that way, yes.

14          THE COURT:  All right.  Let's take our mid-morning

15   break.

16          Ladies and gentlemen, do not discuss the case among

17   yourselves or with anyone.  We'll be back in action in ten

18   minutes.

19          (Continued on next page)

20

21

22

23

24

25

 1              (Jury not present)

 2              THE COURT:  See you in ten minutes.

 3              MR. BERKE:  Thank you, Judge.

 4              MS. CUCINELLA:  Your Honor, may we speak to you when

 5     you come back?

 6              THE COURT:  Well, you can speak to me now.

 7              MS. CUCINELLA:  Mr. Ferrara is going to raise an

 8     issue.

 9              MR. FERRARA:  Your Honor, Ms. Cucinella had asked for

10     a sidebar at one point, and we just wanted to explain for the

11     Court, as we had objections before, why we are making those

12     objections to some of these questions.  There are two reasons

13     and they are both under Rule 609.

14              First, Mr. Berke is of course entitled to inquire into

15     specific instances of conduct to the extent they go to the

16     witness' character for truthfulness.  And, for instance, this

17     last one about the defrauding the insurance company certainly

18     fits.  Other things about a potential dispute with business

19     partners seems to fall far afield of that and would be

20     improper.  He cannot simply inquire about some specific

21     instance of conduct unless, under Rule 609, it goes to

22     character or truthfulness.

23              Secondly --

24              THE COURT:  How about the interaction with I think it

25     was Bucky Lyons, the elder, that if the son didn't repay monies

H3ndwal2                          Davis - cross

1    that were taken, that he would take certain actions with the

2    prosecutor or a governmental authority; do you have problems

3    with that?

4              MR. FERRARA:  Yes, potentially, your Honor.  That's

5    water under the bridge, we understand.  But, in other words,

6    moving forward, yes, we might, because it is not necessarily --

7    Mr. Berke wants to suggest that there was something improper

8    about it, but in fact having a dispute with someone and

9    exercising your rights to get to the bottom of it, or get

10   what's yours is not a specific instance -- doesn't go to his

11   character for truthfulness.

12             THE COURT:  I think where Mr. Berke was headed, and

13   maybe his questions misfired, I don't know -- that's going to

14   be for the jury to decide whether they landed or they

15   misfired -- I thought him to be pursuing the line that a false

16   and baseless accusation was being made against the individual,

17   that the individual had been threatened with exposure for

18   revealing the terms of a federal subpoena as if that were some

19   kind of a crime.  So, why is that an improper line of inquiry?

20             MR. FERRARA:  I think that -- I think that may have

21   been a different line of questioning.  I'm not suggesting, your

22   Honor -- again, I'm not moving to strike any of that.  I'm

23   simply --

24             THE COURT:  This is prophylactic for the next topic?

25             MR. FERRARA:  Yes, so we don't have to have a sidebar,

1    so your Honor understands why we are making some of these

2    objections.

3          THE COURT:  The problem, Mr. Ferrara, is there is a

4    certain amount of latitude I have to give Mr. Berke.  I would

5    have headed that one-off at the pass, but there was a kernel of

6    appropriate cross-examination there, so sometimes you have to

7    hear it in order to know what it is appropriate.

8          MR. FERRARA:  Completely understood.  Again, your

9    Honor, we just don't want to have a speaking objection in court

10   when we are making a 609 objection.

11         The other part of the objection, your Honor, which I

12   think is actually more unfairly prejudicial, is 609 excludes

13   extrinsic evidence of these specific instances of conduct.  But

14   by reading in -- sorry, 608.  Pardon me.  Am I saying 609?  I

15   mean 608, and I apologize.  608 excludes extrinsic evidence of

16   these specific instances of conduct.  So when Mr. Berke or the

17   witness is reading off of these documents that are not in

18   evidence and cannot come into evidence, that is prejudicial.

19   It is improper.  It is a back door to getting in essentially

20   this extrinsic evidence.

21         THE COURT:  Whoa.  No.  If it's for the purpose of

22   refreshing a witness' recollection, how is it improper?

23         MR. FERRARA:  No, not at all.  Absolutely fine to put

24   it on the screen and ask if it refreshes.  But Mr. Berke is

25   reading from it, and the witness is saying things like I see it

H3ndwal2                     Davis - cross

in the document.  So, number one, we would like Mr. Berke to

stop reading from it, because it is back-dooring in the

evidence, and we might move to strike when the witness is

reading from it as well because we think it's inappropriate.

          THE COURT:  Yes.  I mean, I've tried repeatedly with

the witness to explain to him the concept of refreshing one's

recollection.  That seems to be a concept that he has resisted.

And he's been asked whether something refreshes his

recollection.  I think he understands what that means, and he's

volunteered:  Well, I see what it says on the page.

          MR. FERRARA:  And we don't fault --

          THE COURT:  Stand up and move to strike it.

          MR. FERRARA:  Understood.  And we just want the Court

to understand the basis for that.  OK.

          THE COURT:  Yes.  But stand up and move to strike it,

then.

          MR. FERRARA:  Understood, your Honor.

          MR. BERKE:  Your Honor, we have probably one more

instance of it and then no more.  I don't think we are in 608

land because I specifically asked the witness whether he would

lie to get a benefit for himself, which is obviously the

critical issue in the case, and he said he wouldn't lie to get

a benefit for himself.  I am impeaching the critical question

in this case, and that is how I've always done it.  And I

believe that takes us out of 608.  I don't think I have

H3ndwal2                        Davis - cross

1    introduced any documents and I don't intend to on that issue,

2    but I do think that covers the bases.

3              THE COURT:  Thank you, Mr. Berke.

4              MR. BERKE:  Thank you, Judge.

5              THE COURT:  OK.  We are in recess.

6              (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; jury present)

 2              THE COURT:  Mr. Berke, you may continue.

 3              MR. BERKE:  Thank you, your Honor.

 4    BY MR. BERKE:

 5    Q.  Mr. Davis, in your well over two dozen meetings with the

 6    prosecutors in this case, did you ever tell them that you

 7    committed insurance fraud?

 8    A.  I wasn't aware I committed insurance fraud, no.

 9    Q.  You knew you did the things we just covered before lunch,

10    correct?

11    A.  Yes, I think we've been through that.

12    Q.  Did you ever tell the prosecutors you did that?

13    A.  I did not, no, I didn't recall it at all.

14    Q.  Sir, you'll agree with me that insurance fraud is a crime,

15    correct, sir?  You know that?

16    A.  I'm not aware that I committed insurance fraud.  So, I know

17    insurance fraud is a crime, yes.

18    Q.  Is it your position, sir, that you believe submitting false

19    information to an insurance company in order to get a person

20    covered for insurance who is not otherwise entitled is not

21    insurance fraud?

22    A.  Counselor, I did not submit the information to the

23    insurance company.  Another employer did.  So, I don't recall

24    the circumstances surrounding why we did it this way.  But I

25    did not submit the claim to the insurance company.  Another
```

1    company did that.  Not me.

2    Q.  Sir, you created the false records, sir, by writing checks

3    that were phony, correct?

4    A.  I did precisely what I was told to do by the woman who

5    handled our insurance.

6    Q.  So it's the woman who handled the insurance for the

7    company, it's her fault that you submitted false information

8    and pretended that Terie was an employee when she wasn't?  It's

9    her fault?

10   A.  I'm merely testifying that I did what she suggested I do.

11   Q.  So it's your testimony that she committed insurance fraud

12   but you didn't?

13   A.  I'm not sure who committed insurance fraud, if at all.

14   Q.  You're not changing your testimony that you knew false

15   information was submitted, are you, sir?

16   A.  I'm not changing my testimony about what I did, no.

17   Q.  Sir, are you reluctant to admit that this is a crime

18   because you know it is a violation of your cooperation

19   agreement?

20           MS. CUCINELLA:  Objection.  I think he's testified he

21   doesn't know whether it insurance fraud.

22           THE COURT:  Overruled.  The question stands.

23   A.  I'm sorry?  The question again?  I'm sorry.

24   Q.  Is the reason, sir, that you're not admitting that making

25   false statements to an insurance company to get insurance

H3N3WAL3                          Davis - cross

1    proceeds you're not entitled to is a crime because you know it

2    is a violation of your cooperation agreement, GX 1750?

3    A.  I think the -- the actions that you've described took place

4    before I signed the cooperation agreement.

5    Q.  Sir, do you recall that your cooperation agreement required

6    you to bring to the U.S. attorney's office's attention all

7    prior crimes you committed?  Do you recall that, sir?

8    A.  Yes, I think that's accurate.

9    Q.  So I ask you again, sir, is the reason you refused to admit

10   that making false statements you know were being submitted to

11   an insurance company so you could get proceeds you're not

12   entitled to is a crime, is because you know it violates your

13   cooperation agreement?

14   A.  I was not aware that I violated my cooperation agreement,

15   no.

16   Q.  Sir, let me put on what's in evidence as Government Exhibit

17   1750.  GX 1750.

18          Sir, that's your cooperation agreement, correct?

19   A.  Yes.

20   Q.  Dated May 11, 2016, correct?

21   A.  Yes.

22   Q.  I'd like to direct your attention to page three, paragraph

23   two.  Make the whole paragraph a little bigger.  You see where

24   it says, sir, "It is understood that Davis."  Let's highlight

25   G.  I'm sorry.  Not G, let's highlight E.  And F.  It's really

H3N3WAL3                    Davis - cross

```
 1    F.  Thank you.

 2             So do you recall, sir, it says "It's understood that

 3    Davis shall bring to this office's attention all crimes which

 4    he has committed and all administrative, civil, or criminal

 5    proceedings"?  You see that, sir?

 6             THE COURT:  Why don't you finish the rest of the

 7    sentence.

 8             MR. BERKE:  Of course, sir.

 9    Q.  And "(g) shall commit no further crimes whatsoever."

10             THE COURT:  No, I mean finish the phrase that you

11    started to quote, which is F.

12             MR. BERKE:  Of course.

13    Q.  "It is understood that Davis (f) shall bring to the

14    office's attention all crimes which he has committed and all

15    administrative, civil or criminal proceedings, investigations

16    or prosecutions in which he has been or is" --

17             THE COURT:  Slow down.

18             MR. BERKE:  I'm sorry.

19    Q.  "Has been or is a subject, target, party or witness."

20             MR. BERKE:  Thank you, your Honor.

21    Q.  You see that, sir?

22    A.  Yes.

23    Q.  So you were obligated to tell these prosecutors about any

24    crimes you committed, correct?

25    A.  Yes.
```

H3N3WAL3                        Davis - cross

1  Q.  You violated that agreement by not telling them about the

2  insurance fraud, correct, sir?

3  A.  Counselor, I'm not aware that I committed insurance fraud.

4  If I was aware of it, I certainly would have disclosed it.

5  Q.  Sir, do you recall in January of 2014, you requested

6  permission from the CEO of Dean Foods, Gregg Tanner, to use the

7  Dean Foods airplane?

8  A.  Yes, I recall that.

9  Q.  Do you recall you said you wanted to use the airplane to go

10  to Las Vegas?

11  A.  Yes, I recall that.

12  Q.  Do you recall you told Gregg Tanner that you were using the

13  airplane to take a Dean Food customer on the trip?

14  A.  Yes, I recall that.

15  Q.  That wasn't true, was it, sir?

16  A.  No.  That is true.

17  Q.  Sir, on this trip, didn't you -- you testified on direct

18  that you had four buddies who you always went to Vegas with,

19  correct?

20  A.  On which trip?

21  Q.  You regularly went to Vegas with people who you called "the

22  Dallas 4."  Isn't that true, sir?

23  A.  Yes.

24  Q.  Joe Palladino was one, correct?

25  A.  Yes.

H3N3WAL3                          Davis - cross

1   Q.  Dennis Fallon another?

2   A.  Yes.

3   Q.  Brian Rawson?

4   A.  Yes.

5   Q.  And you?

6   A.  Yes.

7   Q.  In fact, the prior year, 2013, you wrote that the Dallas 4

8   is coming to Vegas for a bachelor party of sorts.  Isn't that

9   true, sir?

10  A.  A what?

11  Q.  A bachelor party of sorts.

12  A.  I don't recall that.

13  Q.  Let me show you what's been marked for identification as DX

14  4683.

15          My question to you, sir, does that refresh your memory

16  in 2013, October, you told somebody at a casino or you told

17  someone that the Dallas 4 is coming to Vegas for a bachelor

18  party of sorts?

19  A.  Yes, I recall this now, yes.

20  Q.  The Dallas 4 are the same buddies we're talking about,

21  correct?

22  A.  Yes.

23  Q.  When you asked the CEO of Dean Foods then Gregg Tanner for

24  permission to use the airplane to take a customer, that was to

25  take your gang of four and either their wives or girlfriends,

1    correct?

2    A.  Yes, that's correct.

3    Q.  Dennis Fallon, he worked as an employees benefit provider,

4    correct?

5    A.  Yes, that's accurate, I think.

6    Q.  Brian Rawson is an attorney, correct?

7    A.  Yes.

8    Q.  Joe Palladino owns a restaurant, correct?

9    A.  He owns a restaurant business, rather extensive restaurant

10   business.

11   Q.  So you're referring to Joe Palladino, your friend, that's

12   who is the customer of Dean Foods?

13   A.  Yes.

14   Q.  You didn't tell in e-mails you sent to Mr. Tanner you're

15   bringing your buddies, your Dallas 4 friends, you didn't tell

16   him that's who you're bringing, did you?  Those are your

17   buddies who you're bringing to Vegas?

18   A.  I told him the truth.  I told him I'm taking a customer to

19   Vegas.

20   Q.  When you told him a customer, Dean Foods, right?

21   A.  Yes, that's accurate.

22   Q.  Dean Foods is a $10 billion company, correct?

23   A.  Yes.

24   Q.  Mr. Palladino owns a restaurant in Dallas?

25   A.  I said he owns a restaurant business, it is a rather

1    extensive business.  I think they own eight or 10 different

2    restaurants as I recall.

3    Q.  They use milk in their coffee and milk in their drinks?

4    A.  They were a customer of Dean Foods.  They were a customer

5    of Morningstar, actually.

6    Q.  Did you tell Mr. Tanner when asking for permission to use

7    the airplane that's what you meant when you said a customer of

8    Dean Foods?

9    A.  I didn't say anything further than that, no.

10   Q.  You agree with me, sir, it's misleading at best, it is a

11   lie at worst, wouldn't you, sir?

12   A.  No.  I wouldn't agree with that statement at all.

13   Q.  So you took these people to further Dean Foods' business?

14   Is that your testimony?

15   A.  I think what I said to Mr. Tanner is totally accurate.

16   Q.  You're being as truthful about that as anything else in

17   your testimony today, sir?

18          MS. CUCINELLA:  Objection.

19          THE COURT:  Sustained.

20   Q.  Sir, you admitted before we took a break that you lied in

21   the past to get a benefit for yourself, correct?

22   A.  I have, yes.  I think I did say that.

23   Q.  Isn't it true, sir, that in early 2016, you desperately

24   needed a benefit?

25   A.  I'm not sure what you are referring to specifically.

H3N3WAL3                        Davis - cross

```
 1   Q.  Let's talk about it, sir.  Part of your deal with the

 2   prosecutors is you won't be prosecuted for any crimes related

 3   to Shelter Golf, correct?

 4   A.  Yes, that's accurate.

 5   Q.  You testified about the $100,000 you misappropriated.  But

 6   I want to ask you about the two $25,000 checks you testified

 7   about yesterday.  Do you recall that, sir?

 8   A.  Yes, I do.

 9   Q.  Isn't it a fact, sir, that you lied to this jury in your

10   testimony yesterday?

11   A.  I don't think I did, no.

12   Q.  Sir, do you recall being asked this question and giving

13   this answer with regard to these two checks:

14   "Q. Tell the jury what happened."  This is on page 809 of

15   yesterday's transcript.

16            "Tell the jury what happened.

17   "A. I forgot the date exactly, but it was in the spring,

18   typically I would spend a lot of money out of my own pocket to

19   fund expenses for the golf tournament prior to the golf

20   tournament, which was usually in April, late April or May.  And

21   I think in April of this particular year, my assistant had been

22   out on sick leave, and I had not submitted my expenses to her

23   for repayment on a regular basis, and I asked her to transfer

24   25,000 into my account to reimburse me for expenses that I had

25   incurred.
```

1   "Q. What happened after that?

2   "A. About two or three weeks later, I also advanced myself

3   $25,000, not knowing that my assistant had already put 25,000

4   in my account, so I double dipped so to speak."

5        Do you recall that testimony, sir?

6   A. Yes, I do.

7   Q. Then you were shown what's in evidence as Government

8   Exhibit 1704 and 1705 which are those two $25,000 checks.  Do

9   you recall that, sir?

10  A. Yes.

11  Q. I ask you again, sir, that was a lie, wasn't it, sir?

12  A. I don't think so.  I think that was accurate, as I recall.

13  Q. Sir, let me show you what's been marked as Defense Exhibit

14  4102.  Do you recall, sir, that in April of 2012, April Moffet,

15  your assistant, alerted you that you had a little over 8,000 in

16  your account, but you had to pay -- your mortgage was due and

17  it happened at a time that you were in St. Barts?  Do you

18  recall that?

19  A. Yes.

20  Q. Do you recall, sir, that you got a credit card bill that

21  had to be paid?  Do you recall that, sir?

22        MR. BERKE:  That's it, I'm sorry.  If you could just

23  go that same part again, Mr. McLeod.  Thank you.

24  Q. Do you recall a MasterCard account that was due, MasterCard

25  bill?

H3N3WAL3                        Davis – cross

1    A.  I don't recall it specifically.

2    Q.  Do you recall that Ms. Moffet offered to pay it herself,

3    your assistant?

4    A.  Yes, she wrote that in this e-mail.

5           MS. CUCINELLA:  Objection.  Can we clarify whether the

6    witness has a recollection or whether he's reading from the

7    e-mail.

8           THE COURT:  Mr. Davis, let me remind you of a point

9    that we've gone over before.

10          THE WITNESS:  All right.

11          THE COURT:  When you're shown a document, these

12   documents are not in evidence.  You should read them to

13   yourself and ask yourself the question whether it refreshes

14   your recollection on a subject.  It's not an appropriate answer

15   to say "I see what it says here."  These documents are not in

16   evidence.  No one has offered them in evidence.  The reason

17   you're being shown them is so that you can review them and see

18   whether it refreshes your recollection on a subject.  If it

19   refreshes your recollection having read it, then you should

20   testify as to what your refreshed recollection is.

21          Do you understand that?

22          THE WITNESS:  Yes, sir, I do.

23          THE COURT:  Okay.  Mr. Berke, you understand that

24   you're not to read from documents not in evidence.

25          MR. BERKE:  I do, your Honor.

1    THE COURT:  Okay.

2    Q.  So my question is, do you recall this, sir?

3    THE COURT:  I don't understand what "this" means.

4    MR. BERKE:  Fair enough.

5    Q.  Let me ask you, sir, this is an e-mail dated April 16

6    between you and April Moffet.

7    THE COURT:  Your question, Mr. Berke, should be I show

8    you a document which has been marked for identification as

9    whatever the identifier is.  Please take a moment, sir, to

10   review it, and I ask you whether it refreshes your recollection

11   on the subject I asked about in my previous question.

12   MR. BERKE:  Understood, your Honor.

13   THE COURT:  That's proper questioning.

14   MR. BERKE:  Understood.  I'm going to offer it.

15   THE COURT:  That's fine.

16   Q.  You see this is an April 6 e-mail between you and April

17   Moffet, Defense Exhibit 4102?

18   A.  Yes.

19   MR. BERKE:  I would offer it.

20   THE COURT:  Any objection?

21   MS. CUCINELLA:  Yes, we object to it coming in.

22   MR. BERKE:  If you look at the first e-mail it's about

23   Shelter Golf.

24   MS. CUCINELLA:  Your Honor, the objection is under

25   Rule 608, it is extrinsic evidence that shouldn't come in.

H3N3WAL3                        Davis – cross

1            MR. BERKE:  Your Honor, Shelter Golf is part of the

2    deal in this case.  It's not extrinsic at all.

3            THE COURT:  Let me see you at sidebar.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  I didn't understand the last part of what

3      you said.  It's part of the deal?

4           MR. BERKE:  The cooperation agreement between

5      Mr. Davis and the prosecutors in this case gives him immunity

6      from Shelter Golf.  We believe that he lied to the prosecution

7      and lied to this jury, and we want to be able to prove it about

8      a variety of things, and he committed all sorts of other crimes

9      related to Shelter Golf related to this deal, which goes

10     directly to the deal he made with the government.

11          MS. CUCINELLA:  This e-mail is not inconsistent with

12     his testimony.

13          THE COURT:  How is it inconsistent?

14          MR. BERKE:  It will be.  He said that she was gone and

15     she came back and she gave him a check to pay for expenses.  In

16     fact his account was overdrawn.  She gave him 25,000 in order

17     to pay it.

18          THE COURT:  You have to slow down, Mr. Berke.

19          MR. BERKE:  I do, your Honor.

20          We're going to be able to show that he made

21     misrepresentations, he created a false record, he stole another

22     $25,000 check because he needed money, and this whole story he

23     told about accidently reimbursing himself twice for expenses is

24     a lie, and we will be able to show it through documents.

25          MS. CUCINELLA:  His bank account here was overdrawn

H3N3WAL3                         Davis - cross

 1   because of the expenses associated with Shelter Golf.  There

 2   may be other documents that they'll have that go to this, but

 3   this doesn't.

 4              MR. SCHOEMAN:  Your Honor, I think the government is

 5   seeing this the wrong way.  This is not about inconsistent

 6   statements.  This is about crimes that the government's

 7   cooperating witness committed, he's lying to the government

 8   about them, and they've given him a deal that gives him

 9   coverage for them.  So we are not showing inconsistent

10   statements, we're showing his criminal activity that's part of

11   his deal with the government.  The government elicited a

12   version of that on direct.  We want to show that was not true.

13              THE COURT:  Right.  And you did elicit the Shelter

14   Golf story on direct.

15              MS. CUCINELLA:  That's correct.

16              THE COURT:  I'm going to allow the cross-examination

17   and the exhibit will be received.

18              MR. BERKE:  Thank you, Judge.

19              (Continued on next page)

20

21

22

23

24

25

1           (In open court)

2           MR. BERKE:  Your Honor, may I offer Defense Exhibit

3   4102.

4           THE COURT:  Received.

5           (Defendant's Exhibit 4102 received in evidence)

6           MR. BERKE:  May I publish it to the jury?

7           THE COURT:  You may.

8   Q.  Sir, do you see where on April 6, 2012, Ms. Moffet wrote to

9   you "I tried to call you but it didn't go through.  I wanted to

10  bring you up to speed as to what is going on right now.

11  Yesterday you had a little over 8,000 in your account, but we

12  received an e-mail from Dean Foods notifying us of your direct

13  deposit of 26,250 that would have gone into your bank

14  yesterday.  It did not.  Your mortgage came out early this

15  morning leaving you with only 2,238 in your Northern.  I have

16  put a call into Dean Foods and am waiting to hear back from

17  them.  In the meantime, I plan on paying your MC out of my

18  savings account so that you're not stuck in St. Barts without

19  funds.  On Monday when the Dean Foods funds are available, I

20  will cut myself a check out of your Northern to replenish our

21  savings again.  Are you okay with that."

22          Do you see that, sir?

23  A.  Yes.

24          MR. BERKE:  If we can publish the response.

25  Q.  "April.  Just deposit 25,000 out of Shelter Golf until

H3N3WAL3                    Davis - cross

1    Monday and we'll sort it out.  Thanks.  TD."

2             And the reference to Northern, that's your Northern

3    Bank account, right?

4    A.  Yes, it is.

5    Q.  You were in St. Barts on vacation, correct?

6    A.  Yes, I was.

7    Q.  You told her to take that money out, and just put it in

8    your account to cover your bills, correct?  Is that correct,

9    sir, yes or no?

10   A.  I told her to take it out of Shelter Golf and put it in my

11   account because, as I explained yesterday, I'd already incurred

12   close to $20,000 of out-of-pocket expenses that I had not

13   submitted to her.  I was aware of that, and that's why I meant

14   we'll sort it out.  So yes, I did instruct her to do that.

15   Q.  You didn't put that in that e-mail, did you, sir?  You

16   didn't say it was for expenses.  You just said put 25,000 in.

17   A.  I didn't think I needed to.

18   Q.  Just so we're clear, we're talking about -- can I show you

19   what's marked in evidence Government Exhibit 1704.  That's the

20   check that Ms. Moffet deposited in your account at your

21   direction, correct, sir?

22   A.  Yes, it is.

23   Q.  You recall, sir, so, and you recall, sir, that there was a

24   second check in May of 25,000, correct, sir?

25   A.  Yes.

H3N3WAL3                    Davis - cross

1    Q.  Let's put that, that's 1750, Government Exhibit 1705 in

2    evidence.

3              You said that that was to reimburse you for expenses,

4    and it was just a mistake that you were both giving checks to

5    reimburse, and you didn't realize it.  It was just a simple

6    error.

7              Is that your testimony, sir?

8    A.  I think what I said was I wasn't aware, I had no

9    confirmation that Ms. Moffet had put the first $25,000 in my

10   account.  So, I wrote myself a check for $25,000, and

11   discovered afterwards that we double dipped; yes, I think

12   that's what I testified to.

13   Q.  That was a lie, sir, because you knew in April she

14   deposited 25, because you told her to so your account wouldn't

15   be overdrawn?

16   A.  Counselor, I just said I wasn't aware that she did it.  We

17   never discussed it further between April 6 and May 14.

18   Q.  April Moffet, your assistant for a long time, correct?

19   A.  Yes.

20   Q.  And your testimony -- and Northern Bank account, that's

21   your personal -- that's your primary personal bank account,

22   right?

23   A.  Yes, it was.

24   Q.  So is it your testimony before the jury today that you told

25   April Moffet to deposit 25,000, she did, you got 25,000 extra

1   dollars in your bank account so it won't be overdrawn, and your

2   testimony is that the following month you didn't know she

3   actually did?  Is that your testimony, sir?

4   A.  Yes, we did not sort it out.  Yes.  That is my testimony.

5   Q.  Sir, isn't it a fact this second 25,000, the reason you

6   deposited, because you had an extra Shelter Golf check on your

7   person and you needed money, so you made a check out to

8   yourself?  Isn't that true, sir?

9   A.  I don't recall the circumstances, but I think I've

10  described this adequately.

11  Q.  My question, sir, is isn't it a fact you wrote the second

12  check because you had a Shelter Golf check in your pocket, you

13  needed money so you just made it out to yourself?

14  A.  I think I've answered the question already.

15  Q.  Is my statement true or false, sir?

16  A.  I'm sorry?

17  Q.  Is my statement true or false?

18  A.  Repeat the question.

19  Q.  You had an extra Shelter Golf check in your pocket.  You

20  needed money.  So you wrote a check to yourself.

21  A.  I didn't have a Shelter Golf check in my pocket.  No,

22  that's not accurate.

23  Q.  Sir, let me ask you.  Do you recall being interviewed by

24  the prosecutors and the FBI in this case in April of 2016 and

25  telling them exactly that, that you had a Shelter Golf check in

H3N3WAL3                    Davis - cross

1    your pocket, you needed money, so you wrote it to yourself?

2    A.  I don't recall that.

3    Q.  Let me show you what's been marked for identification as

4    3501-15 and I'll first show you the date.  See the date, sir?

5    A.  Yes.

6    Q.  Directing your attention to page seven, paragraph two.  I

7    ask you to read that to yourself, sir.

8            My question to you, sir, does that refresh your

9    recollection on April 5, 2016, you told the FBI and the

10   prosecutors in this case that as to a check dated May 14, 2012,

11   in the amount of $25,000, you had an extra check on your person

12   and needed money so you made the check out to yourself?

13           THE COURT:  Do you understand the question?  The

14   question is reading this document, does it refresh your

15   recollection on what you told the FBI on that given date.

16   That's the question that's before you, Mr. Davis.  Do you

17   understand that?

18           THE WITNESS:  Yes.  Yes, sir.  I do.

19           THE COURT:  Okay.  You may answer.

20   A.  This does not refresh my recollection of what I told the

21   FBI.

22           MR. BERKE:  Your Honor, I would offer as an exhibit

23   3501-15-A this sentence and the date into evidence.

24           THE COURT:  Any objection?

25           MS. CUCINELLA:  No objection.

H3N3WAL3                         Davis - cross

1          THE COURT:  Received.

2          (Defendant's Exhibit 3501-15-A received in evidence)

3          MR. BERKE:  May I publish this and the date of the

4    interview and the statement.

5          THE COURT:  You may.

6          MR. BERKE:  Can we just put up that statement?

7    Q.  Sir, you understand that in this document "CHS," that

8    refers to you, correct, sir?

9    A.  I'm sorry?

10   Q.  You understand this is referring to you, correct, sir?

11   Withdrawn.

12         If I could read it.  "CHS reviewed a check for $25,000

13   dated May 14, 2012.  CHS had an extra check on CHS's person and

14   needed money.  So CHS made a check out to CHS."

15         You see that, sir?

16   A.  Yes, I have no idea what CHS means.

17   Q.  You understood, sir, from looking at the first page it

18   reflected interviews of you in this document, correct, sir?

19   A.  I just don't know what it stands for is all I'm saying.

20   Q.  I know.  But you know this refers to you, correct, sir?

21   A.  Okay.

22         THE COURT:  No.  Do you know it refers to you?

23         THE WITNESS:  I'm understanding that, yes.  I'm sorry.

24         THE COURT:  Next question.

25   Q.  Sir, do you recall that the following year, October 2013,

H3N3WAL3                         Davis - cross

1    you got really worried about this money you took, and you had

2    what you would characterize as an oh shit moment, if you excuse

3    the language.  I'm going to get in a lot of trouble.  Do you

4    recall that, sir?

5    A.  At what point in time?

6    Q.  October 2013.

7    A.  Yes.

8    Q.  You went about to try to create a phony record to hide your

9    theft of $25,000, didn't you, sir?

10   A.  I'm not aware I created a phony record.

11   Q.  Let me show you what's been marked for identification as DX

12   4067.  Do you recognize DX 4067 to be a series of e-mails

13   between you and April Moffet dated October 24, 2013?

14   A.  Yes.

15              MR. BERKE:  Your Honor, I'd offer Defense Exhibit

16   4067.

17              THE COURT:  Any objection.

18              MS. CUCINELLA:  Just one moment, your Honor.  We just

19   got it.

20              THE COURT:  Sure.

21              MS. CUCINELLA:  No objection.

22              THE COURT:  Received.

23              (Defendant's Exhibit 4067 received in evidence)

24              MR. BERKE:  May I publish it, your Honor?

25              THE COURT:  You may.

1    Q.  Sir, would you read your e-mail to Ms. Moffet on

2    October 24, 2013 at 11:16.

3    A.  It says "April, I'm sending you a check today for the

4    amount of money that I did not use for out-of-pocket expenses

5    in 2012 for Project Shelter.  I finally reconciled what I spent

6    vis-a-vis the money out of Project Shelter funds.  I sent an

7    e-mail to get our tax return finalized.  I should have done

8    this sooner, but better late than never.  TD."

9    Q.  And her response is TD -- TD is how you commonly went by.

10   TD.  That's how people called you?

11   A.  Yes.

12   Q.  "TD, okay, thank you, I will be on the look out for it."

13         You said you sent this following the oh shit moment

14   you had in October 2013, correct?

15   A.  Yes, I think that's accurate.

16   Q.  Isn't it a fact, sir, you sent this e-mail so there would

17   be a record, but you never gave a check or any money to pay

18   back what you stole?

19   A.  What's the question?  I'm sorry.

20   Q.  Isn't it a fact, sir, that despite what you wrote in this

21   e-mail, you never sent any check to pay back what you stole?

22   A.  No, I did not.  At that point in time I did not send a

23   check to her.

24   Q.  You never got -- you never sent it back until you got

25   caught when you testified before the SEC, and you had to give

H3N3WAL3                        Davis - cross

1    an accounting.  That's when you sent it back, because you were

2    going to get caught, correct?

3    A.  Yes, that's accurate.

4    Q.  Sir, I want to understand something.  We're looking at

5    times in May and April of 2012, correct, that's what this

6    period is talking about when you took this money out of Shelter

7    Golf, correct?

8    A.  Yes.

9    Q.  Going into 2013, because you were scared about getting

10   caught, correct?

11   A.  I realized what the problem was, yes.

12   Q.  And it was your testimony over yesterday and the day before

13   that this was the same period when you had supposedly given all

14   this material non-public information in 2012 going forward to

15   Mr. Walters, where he made these big bets in Dean Foods and

16   made a ton of money based on what you said.  Correct?  That was

17   your testimony, correct?

18   A.  Yes.

19   Q.  And it's your testimony, sir, that all of that was true,

20   but instead of going to Mr. Walters and say, hey, Bill, you

21   know all those illegal tips I gave you and all those tens of

22   millions you made?  How about giving me $25,000 so I can pay my

23   bills.

24        Is that your testimony?

25   A.  Can you stand closer to the microphone?

H3N3WAL3                          Davis – cross

| | |
|---|---|
| 1 | THE COURT:  I don't understand the question. |
| 2 | MR. BERKE:  I'll rephrase, your Honor. |
| 3 | Q.  Is it your testimony, sir, that despite what you testified |
| 4 | on direct about what you claim you did in 2012 and 2013, you |
| 5 | stole this money from Shelter Golf, and did not simply go to |
| 6 | the person you claim was your alleged co-conspirator and ask |
| 7 | him for some of the profits he made from Dean Foods.  Is that |
| 8 | your testimony, sir, yes or no, sir? |
| 9 | A.  Yes. |
| 10 | Q.  I want to go back, sir.  Do you recall we talked about the |
| 11 | SEC testimony when you were asked questions about Shelter Golf |
| 12 | that you hadn't prepared for with your lawyer.  Do you remember |
| 13 | that testimony earlier today, sir? |
| 14 | A.  Yes. |
| 15 | Q.  And do you recall, sir, they specifically asked you about |
| 16 | the $100,000 advance.  The $100,000 that was paid to you, |
| 17 | correct? |
| 18 | A.  Are you referring to the Shelter Golf money? |
| 19 | Q.  I'm talking about the $100,000 you misappropriated from |
| 20 | Shelter Golf. |
| 21 | A.  Yes, they asked me about that, yes. |
| 22 | Q.  You testified that was simply an advance against expenses, |
| 23 | correct? |
| 24 | A.  I don't recall specifically what I said in the SEC |
| 25 | interview. |

1   Q.  Let me show you what's marked for identification as 3501-5.

2   Your May 18, 2015 SEC testimony.  I'm going to show you page

3   150, line 18.  Page 150 in the lower left.

4            MR. BERKE:  If you can go a little above just to show

5   what that question was referring to.  Now go to the bottom.

6   Q.  Let me ask you this, sir.  Multiple pages.  You lied to the

7   SEC about the moneys you took out of Shelter Golf?

8   A.  Yes, sir.

9   Q.  Repeatedly?

10  A.  Yes, I did.  I think that's fair.

11  Q.  Do you recall you were asked specifically about the 50,000,

12  too?

13  A.  Yes.

14  Q.  You recall you said that was an advance against expenses,

15  too, correct?

16  A.  Yes, I think I did.

17  Q.  And you said, do you recall testifying specifically that

18  you gave your assistant April Moffet an accounting that

19  supported how your expenses were 50,000, and why you were due

20  that money?  Do you recall testifying to that, sir?

21  A.  I think that's accurate, yes.

22  Q.  That was a lie, of course?

23  A.  Yes, it was.

24  Q.  You recall, sir, that the SEC, after your testimony, asked

25  you specifically to give an accounting, not of anything of Dean

1    Foods, but an accounting of your Shelter Golf moneys?  Do you

2    recall that?

3    A.  Yes, I do.

4    Q.  That was a big problem for you, right, sir?

5    A.  I complied with it, however.

6    Q.  It was a problem because you had taken money you hadn't

7    paid back, isn't that true, sir?

8    A.  Yes, that's accurate totally.

9    Q.  First you paid back the money, right?

10   A.  Repeat the question?  I'm sorry.

11   Q.  So the first thing you did is you paid back the money you

12   had stolen, correct?

13   A.  After the SEC interview, yes.  I reimbursed Shelter Golf.

14   Q.  And you had your lawyers submit a letter -- or withdrawn.

15          You authorized your lawyers to submit a letter on your

16   behalf explaining what happened with the moneys and providing

17   that accounting you were asked to give, correct?

18   A.  I think they actually submitted two letters.

19   Q.  Yes.  They did.  That was on your behalf that you

20   authorized, correct, sir?

21   A.  Yes, I did.

22   Q.  Let me show you the first one marked for identification

23   Defense Exhibit 2072.

24          MR. BERKE:  If you can show the whole document for a

25   moment.  And the next page.

1           Your Honor, I would like to offer a redacted version,

2    and I noticed there is one part that did not get redacted if I

3    could have a moment, your Honor, with Ms. Cucinella.

4           THE COURT:  Yes.

5           MR. BERKE:  Your Honor, we're going to offer a

6    redacted version of 2072, and we'll make sure it's redacted.  I

7    believe in agreement with -- I have an agreement with

8    Ms. Cucinella about the redacted version.

9           THE COURT:  Any objection to the exhibit as redacted?

10          MS. CUCINELLA:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 2072 received in evidence)

13          MR. BERKE:  Your Honor, may I just have one moment?

14          THE COURT:  You may.

15          MR. BERKE:  Your Honor, may I publish it?

16          THE COURT:  You may.

17   Q.  You see that this is the letter, if we go to the last page.

18   That was written by Natalie Arbaugh, that's a lawyer who worked

19   with Tom Melsheimer at the time, correct?

20   A.  Yes.

21   Q.  That's a letter submitted on your behalf with your

22   authorization, correct?

23   A.  Yes.

24   Q.  I would like to direct your attention to page two, the

25   paragraph beginning "Mr. Davis also had."  See where it says

1    "Mr. Davis also had $25,000 distributed to him on or about

2    April 6, 2012, from Shelter Golf with the intent of repaying

3    that money.  While Mr. Davis believed this money was paid back,

4    Mr. Davis and his assistant Ms. Moffet reviewed the records and

5    independently determined the $25,000 was inadvertently not

6    returned to Shelter Golf, although both thought it had been."

7    Then you said you paid it back.

8             That was a lie.  That's not true, correct, sir?

9    A.  Yes, I think that's accurate.

10   Q.  It's accurate that it's a lie, correct?

11   A.  Yes.

12   Q.  You lied to your lawyers who wrote false statements on your

13   behalf to the SEC, correct, sir?

14   A.  Yes, that's correct.

15   Q.  Does that sound like your testimony from yesterday that

16   Ms. Moffet wrote you a check for expenses, and you didn't know

17   it, so you accidently wrote another check for the same amount?

18   A.  At the time the two checks were written, I think my

19   testimony is accurate, yes.

20   Q.  If we can go back to the letter.

21            MR. BERKE:  We can take down that section, Mr. McLeod.

22   Thank you.  If you go to the bottom of the first page.  We're

23   going to go over to the second page.  And if we can highlight

24   the paragraph beginning one and the chart.

25   Q.  You see, sir, it says that this letter that was submitted,

1  Defense Exhibit 2072, "Below is a chart explaining these

2  expenses with the supporting documentations.  As you will see,

3  these expenses were paid for with his credit cards."  Do you

4  see that, sir?

5  A.  Yes.

6  Q.  I'd like to begin on the second page about those expenses.

7  And you see the one for -- if we can highlight the one for

8  $5,933.  Where it says dinner for approximately 24 tournament

9  sponsors and/or participants.

10         Do you see that, sir?

11 A.  Yes, I do.

12 Q.  In fact, sir, that was a surprise birthday party that you

13 threw, correct, sir?

14 A.  Yes, it was.

15 Q.  You threw it for your wife at the time, correct, sir?

16 A.  Yes, that's accurate.

17 Q.  Had nothing to do with Shelter Golf?

18 A.  While there were sponsors at the dinner party, that expense

19 was totally inappropriate.

20 Q.  That was a party you threw for your wife, correct?

21 A.  Yes, that's accurate.

22 Q.  Nothing to do with Shelter Golf?

23 A.  That's accurate.

24 Q.  You see, sir, it also says Al Biernat dinner?  Do you see

25 that, sir on the first page?

H3N3WAL3                          Davis - cross

1    A.  Yes.

2    Q.  I'm sorry.  It is on -- let me ask you first, sir.  Do you

3    recall that you were asked in April '16 by the prosecutors if

4    you were ever take friends out and expense to Shelter Golf, and

5    you told them -- this is when you were trying to get your

6    deal -- not purposely.

7             Do you recall being asked that question and giving

8    that answer?

9    A.  Could you repeat the question?  I didn't hear the first

10   part.

11   Q.  Do you recall during your meetings, prior to getting your

12   cooperation agreement, you were asked by the prosecution if you

13   would ever take friends out and expense to Shelter Golf, and

14   you said not purposefully.

15   A.  I don't recall saying that, but it's possible.

16   Q.  Let me show you what's been marked for identification as

17   3501-25.  If we just show the top in terms of what it is --

18             THE COURT:  This is not in evidence, is it?

19             MR. BERKE:  No, I'm sorry.  Should not be on there.

20   Sorry, your Honor.  Thank you, Judge.  Just for witness.

21   Q.  See what it is, sir, and you see the date?

22   A.  Yes.

23   Q.  And I'd like to go to page 13, middle of the page.  Does

24   that refresh your memory that on April 5, 2016, you were asked

25   by the FBI and by the prosecutors in a meeting with the

H3N3WAL3                         Davis - cross

1    prosecutors and the FBI whether you ever purposely took out

2    friends or family for dinner entertainment and charge those

3    expenses to Shelter Golf?  Do you recall that, sir?

4    A.  Do I recall saying that?

5    Q.  Do you recall being asked that question and saying "not

6    purposefully"?

7    A.  I don't recall that during this interview.

8              MR. BERKE:  Your Honor, I would offer again the date

9    and that sentence of Exhibit 3501-25 and call it 3501 -- I'm

10   sorry.  3501-15, and call it 3501-15-A.

11             THE COURT:  Any objection?

12             MS. CUCINELLA:  Yes, we object at this time.  He's

13   take a fragment out of a much longer conversation and trying to

14   make it inconsistent with the testimony today.  So I'm happy to

15   consult with him over the lunch break.  But if this document

16   comes in, more of it needs to come in.

17             MR. BERKE:  And I am, your Honor, I was intending to

18   do that.  Why don't I do the second part and I'll put both in.

19             THE COURT:  Go ahead.

20   Q.  When you gave that answer -- when you were asked that

21   question, the prosecutors knew about the Nick and Sam dinner,

22   isn't that right?

23   A.  Yes, absolutely.

24   Q.  They confronted you with that, correct?

25   A.  Yes.

1  Q.  And to them you admitted that they were right, that it was

2  not appropriate, correct?

3  A.  Yes.

4  Q.  After they confronted you?

5  A.  I admitted it before that as well.

6  Q.  Let me show you on the same document, 3501-15, and if I

7  could show you page five, paragraph seven, lines two and three.

8          THE COURT:  This is a different document than what you

9  showed him before, correct?

10         MR. BERKE:  It is, your Honor, and I think -- yes.

11  This is 3501 -- 3501-15.  Your Honor, what I'm going to do

12  is -- the same meeting, different documents.  I am going to use

13  this one instead.  I apologize.

14         THE COURT:  What's the question?

15  Q.  Sir, do you recall that, do you recall, sir, after you said

16  you did not purposefully take out friends or family and charge

17  it to Shelter Golf, you were shown your credit card statement

18  for the Nick and Sam restaurant?  Do you recall that, sir?

19  A.  Yes.

20  Q.  And then you admitted that you inappropriately expensed

21  that dinner to Shelter Golf, and that you also inappropriately

22  expensed a $2,900 dinner at the Al Biernat restaurant, isn't

23  that true, sir?

24  A.  Yes.

25  Q.  Sir, did you admit all the other dinners and meals and

H3N3WAL3                         Davis - cross

1    expenses that you falsely charged to Shelter Golf at that

2    meeting or any other meeting with the prosecutors?

3    A.   I don't think I charged any other inappropriate charges to

4    the tournament.

5    Q.   Okay.

6              THE COURT:  All right.  Ladies and gentlemen, we are

7    going to break for lunch.  Please do not discuss the case among

8    yourselves or with anyone.  We'll be back in action at

9    2 o'clock.  Thanks a lot.

10             (Jury excused)

11             (Continued on next page)

1          THE COURT:  Have a pleasant lunch.

2          MR. CLARK:  I represent the witness and I have an

3    application.

4          THE COURT:  You can make your application.  Please be

5    seated, everyone else.

6          MR. BERKE:  Could I ask that the witness be excused?

7          MR. CLARK:  That's fine with me.

8          THE COURT:  Why don't you step out, Mr. Davis.

9          THE WITNESS:  Thank you, sir.

10         (Witness not present)

11         THE COURT:  State your appearance, sir, if you will.

12         MR. CLARK:  Christopher Clark, Latham & Watkins, 885

13   Third Avenue, New York, New York for Mr. Davis.

14         Your Honor, I've been advised of your Honor's ruling

15   yesterday about non-contact with the witness during his

16   testimony, and we've abided by that.

17         Today there was cross-examination about whether the

18   witness had committed certain crimes and whether he violated

19   his cooperation agreement.  I believe as his counsel he's going

20   to have questions about that for me.  And I believe --

21         THE COURT:  I believe -- stop.  "I believe as his

22   counsel he's going to have questions for me about that."

23         MR. CLARK:  Yes.

24         THE COURT:  Is that what you said?

25         MR. CLARK:  And I'd like to be able to advise him

H3N3WAL3

1    about any questions he has about that.  I don't want to talk to

2    him about his testimony, I don't want to talk to him about how

3    he should testify later in the day.  But if he wants to ask me

4    about the issues that he's been questioned about, I'd like to

5    be able to give him legal advice.

6             THE COURT:  Well, I understand your point.  But, if it

7    does not relate to the future course of his testimony, but

8    rather what are the consequences of the testimony that he's

9    given -- that's what I understand you to be saying, correct?

10            MR. CLARK:  That's correct, your Honor.

11            THE COURT:  Why doesn't that wait until he's off the

12   stand?  Why can't that wait until he's off the stand?  He might

13   like to know the answer right this minute.  But, what is the

14   pressing need to have a dialogue with him while he's still

15   under examination?

16            MR. CLARK:  It may well cause him to wrongfully answer

17   other questions about the consequences of his testimony.  He

18   has a right to legal advice about the meaning of his

19   cooperation agreement and the meaning of his conduct, and

20   that's what I've been hired to do.  He has not been sentenced,

21   your Honor.

22            THE COURT:  All right.  Mr. Berke?

23            MR. BERKE:  Your Honor, I'm going to defer to my

24   co-counsel.

25            THE COURT:  Mr. Schoeman.

1          MR. SCHOEMAN:  Your Honor, we object to that because I

2     think what Mr. Clark has said is he basically wants to tell the

3     witness how he should answer questions in the future.

4          THE COURT:  I don't think he said quite that.

5          MR. SCHOEMAN:  But the point is, if a witness is on

6     the stand on cross-examination, then during the entire

7     cross-examination, if it were, you know, able to be done in one

8     sitting, he would not have the opportunity at any point to talk

9     to anybody.  Now because of the nature of this case, this

10    cross -- the direct examination and the cross-examination will

11    be lengthy, and as an accommodation to the human condition, we

12    have to take breaks and we have to go home and we have to come

13    back.  But essentially, it's like he's on cross-examination

14    like any witness, and during the cross-examination, a witness

15    is not entitled to consult with somebody in a way that might

16    impact their testimony.

17         So we would ask that any of this consultation take

18    place after the cross-examination is completed.

19         THE COURT:  All right.  I'm going to allow the

20    consultation.  And of course, I'm going to allow counsel to

21    bring out in the cross-examination that over the lunch break,

22    or whatever it turns out to be, you consulted with your

23    counsel.  Not what did you consult with your counsel about, but

24    the fact that you consulted with your counsel.  And that's my

25    ruling.

H3N3WAL3

1          MR. CLARK:  Thank you, your Honor.

2          MR. BERKE:  Just one question.  Can I bring out that

3   he consulted about his cooperation agreement?

4          THE COURT:  No.

5          MR. BERKE:  Okay.

6          MR. CLARK:  Your Honor, he may not have questions

7   about it.  I just want to be available for him.

8          THE COURT:  Right.  Okay.

9          MR. CLARK:  Thank you, your Honor.  Appreciate it.

10         (Recess)

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **A F T E R N O O N   S E S S I O N**

2                                2:07 p.m.

3               (Jury not present)

4               THE COURT:  Please be seated.

5               Bring our jurors in, so remain standing.  I changed my

6     mind.

7               (Jury present)

8               THE COURT:  Please be seated.

9               Welcome back, ladies and gentlemen.  Hope you had a

10    pleasant lunch.  We're back in action.

11              And Mr. Berke, you may continue.

12              MR. BERKE:  Thank you, your Honor.

13    THOMAS C. DAVIS,

14         Resumed, and testified further as follows:

15    CROSS-EXAMINATION (Resumed)

16    BY MR. BERKE:

17    Q.  Mr. Davis, do you recall there came a point in time when

18    you authorized your lawyers to provide more information to the

19    SEC to try to persuade them that the Nick & Sam dinner that was

20    a surprise party for your wife was actually for Shelter Golf;

21    do you recall that, sir?

22    A.  I know that we submitted a second letter, yes.

23    Q.  Do you recall, sir, that your lawyer told them that Mike

24    Rawlings was the keynote speaker at the event for players and

25    sponsors for Shelter Golf at that dinner?  Do you recall that,

H3ndwal4                          Davis - cross

1    sir?

2    A.   Who said that?  I'm sorry.  I didn't hear the first part of

3    the question.

4    Q.   Your lawyer said that to the SEC.

5    A.   I don't recall precisely what he said to the SEC.

6    Q.   Let me show you a document marked Defense Exhibit 2046, for

7    identification.  This is just for you.

8         Do you see what it is, sir?

9    A.   Yes.

10   Q.   I'm going to show you beginning on the bottom of this page

11   going up to the next page, a paragraph beginning "Third."  I

12   would ask that you read that to yourself, sir.

13        (Pause)

14   A.   Yes.  I can see it.

15   Q.   And does that refresh your memory that your lawyer, sir,

16   provided additional information to the SEC about that Nick &

17   Sam dinner?

18   A.   Yes.

19   Q.   Do you recall that they asked for a list of guests, and

20   your lawyer provided that and also told them that Mike Rawlings

21   was the keynote speaker at the dinner?

22   A.   Yes.

23   Q.   Mike Rawlings was the mayor of Dallas, correct?

24   A.   Yes.

25   Q.   He was a friend of yours as well, correct?

A.   Yes.

Q.   Again, this was all a lie because this was not a Shelter
Golf event, so he wasn't a Shelter Golf keynote speaker, was
he?

A.   Not at the dinner, no.

Q.   And, sir, when you tell a lie, you really know how to
embellish it, correct?

A.   I'm not sure I understand the question.

Q.   When you tell a lie, sir, you really know how to embellish
that lie when you are telling it to try to sell it, don't you,
sir?

            MS. CUCINELLA:  Objection.

            THE COURT:  Sustained.

Q.   Do you agree, sir, that this is an embellishment on your
earlier lie to the SEC about the Nick & Sam dinner, correct?

A.   This is not accurate.  That is what I will testify to.

Q.   You have added details to try to persuade the SEC to accept
your initial lie, correct?

A.   They asked for a list of attendees to the dinner, and I
think my attorneys provided that.

Q.   Right.  But then you added an extra touch to get them to
believe that, again, another lie, that Mike Rawlings was the
keynote speaker so that they would accept your initial lie; is
that fair, sir?

            MS. CUCINELLA:  Objection.  The attorneys wrote the

1    letter, not him.

2              THE COURT:  Well, I am going to sustain it as to form

3    as argumentative.

4    Q.  You understood, sir, that your lawyers wrote this because

5    you told them that Mike Rawlings was the keynote speaker at a

6    dinner for Shelter Golf, correct?

7    A.  Yes.

8    Q.  And you lied to your lawyers, correct?

9    A.  Yes, I did.

10   Q.  But there's also a kernel of truth in it in that Mike

11   Rawlings was a friend of yours, correct?

12   A.  Yes.

13   Q.  And he had been a keynote speaker at other events, correct?

14   A.  Yes, he had.

15   Q.  So what you did to construct your lie, you took something

16   that was a kernel of truth, you embellished it, and then tried

17   to sell your original lie; is that fair, sir?

18             MS. CUCINELLA:  Objection.

19             THE COURT:  Overruled.

20   A.  Can you repeat the question?  I'm sorry.

21   Q.  Sure.  So what you did, sir, in order to sell your original

22   lie that the Nick & Sam dinner was for Shelter Golf, you

23   embellished it by including something that had a kernel of

24   truth about Mike Rawlings being the keynote speaker?

25   A.  Yes.  I think I --

H3ndwal4                         Davis - cross

1   Q.  You did that in the hope that they wouldn't uncover your

2   initial lie, that this was a legitimate sponsor Shelter Golf

3   expense, correct?

4   A.  Yes, I think that's accurate.

5   Q.  And you recall, sir, you also told the SEC that -- in the

6   letter we talked about in evidence, 2072 -- that there was also

7   a dinner at Nobu for $806 that was for Shelter Golf?  Do you

8   recall that, sir?

9   A.  I forgot the question.  I'm sorry.  Can you repeat it?

10  Q.  Do you recall, sir, in your lawyer's letter that you

11  authorized to the SEC, you also claimed that there was a dinner

12  at Nobu that was a Shelter Golf expense?

13  A.  I think it was included as an expense, yes.

14  Q.  Let me show you -- if we could publish Defense Exhibit

15  2072, in evidence, page 2.

16          And there it is, sir.  So that was a lie, too, isn't

17  it?

18  A.  I'm trying to recall what that particular expense was for.

19  Q.  And actually, if I can, there is another Nobu --

20          THE COURT:  Stop.  Stop.  Stop.  Mr. Berke, let the

21  witness finish his answer before you start talking again.

22          MR. BERKE:  Your Honor, the only thing I was going to

23  say is it is the wrong Nobu dinner that is highlighted.

24          THE COURT:  It doesn't matter.  Let the witness finish

25  and then you can make your point.

1          MR. BERKE:  Of course, your Honor.

2          THE COURT:  If you make a mistake in the question, you

3    you're only human, but you don't talk over the other person.

4    You don't talk over me and you don't talk over the witness.

5          MR. BERKE:  Fair enough, Judge.

6          Are you finished?

7          THE WITNESS:  Your Honor, I'm sorry.  I lost track of

8    where we are.

9          THE COURT:  Put a new question.

10   BY MR. BERKE:

11   Q.  So look at Defense Exhibit 2072, in evidence.  Do you see

12   that, sir?

13   A.  Yes.

14   Q.  Do you see a May 14 dinner for Nobu?  It says,

15   "Entertainment with tournament players."

16   A.  Yes.

17   Q.  That was a lie, too, sir, that was not a Shelter Golf

18   expense, was it, sir?

19   A.  I'm struggling, counselor.  I don't remember this

20   particular expense.  But if it was removed by me at -- when we

21   filed the tax return, then it was clearly not a legitimate

22   expense.

23   Q.  And, sir, is it possible that it is not a legitimate

24   expense and you didn't remove it from the tax returns?

25   A.  I don't recall precisely what that expense item was for.  I

H3ndwal4                        Davis - cross

1    can recall having more than one dinner at Nobu entertaining

2    sponsors for players for the tournament.

3    Q.  Do you see the date of that as May 14, 2012?

4    A.  Yes.

5    Q.  Let me show you what's marked for identification as Defense

6    Exhibit 5234.

7          Sir, do you see any amounts between you and Daniel

8    Strauss?

9    A.  Yes.

10   Q.  Mr. Strauss was working on a Park Cities deal, that you

11   testified about, with you, correct?

12   A.  Yes.  He was -- he is employed by a hedge fund in New York.

13   Q.  OK.  I am going to ask you to look down -- if we could go

14   to the end of this email chain.  And you see the date of these

15   emails, May 14, 2012?

16   A.  Yes.

17   Q.  I will have you go to the end, please.

18          Excuse me.  Go to the top.

19          Do you see, sir, made plans to go to dinner with Nobu

20   at Nobu with Daniel Strauss on May 14, 2012; do you see that,

21   sir?

22   A.  Yes.

23   Q.  That's what that Nobu dinner was that's listed, isn't that

24   right, sir?

25   A.  Yes.

H3ndwal4                           Davis - cross

1    Q.  That was also not a Shelter Golf expense; isn't that right,

2    sir?

3    A.  Actually, the Clinton Group was somebody I was trying to

4    market, who Daniel Strauss worked for, was somebody I was

5    trying to talk into becoming a sponsor of the tournament.

6          Counsel, I just don't recall that particular expense

7    item.  Either I removed it and it was not a legitimate expense

8    in the final tax return or I didn't.  So if you want to show me

9    the tax return, I could tell you.

10   Q.  My only question to you now, sir, is isn't it a fact, sir,

11   that this was not a legitimate Shelter Golf expense?

12   A.  I guess I can't agree with you on that.

13   Q.  So your testimony -- and I am right, Daniel Strauss, that's

14   who you were working on the Park Cities deal at the time that

15   you testified about yesterday?

16   A.  Yes.

17   Q.  And that was that bank recapitalization you testified,

18   correct?

19   A.  Yes.

20   Q.  If we could -- sir, do you recall, in addition to your

21   testimony about the checks, you gave testimony about your tax

22   returns for Shelter Golf.  Do you recall that, sir?

23   A.  Yes.

24   Q.  And you recall testifying that when Rick Mozley told you

25   that you had to disclose certain issues or potentially face

1    penalties for the hundred thousand dollars you misappropriated,

2    you fired Rick Mozley and asked your longtime accountant Lon

3    Houseman to do the taxes?  Do you recall that testimony, sir?

4    A.  I don't think I said I fired Rick Mozley.  What I said

5    yesterday was I went and got a new tax accountant.

6    Q.  You replaced Rick Mozley with Lon Houseman, correct?

7    A.  Correct.

8    Q.  When you did that, Rick Mozley was no longer working as the

9    accountant for Shelter Golf, is that correct?

10   A.  That is correct.

11   Q.  You terminated his services?

12   A.  That's correct.

13   Q.  And you recall testifying, sir, yesterday that when you did

14   that, you provided the same information to Lon Houseman that

15   you gave to Rick Mozley to do the taxes?  Do you recall that

16   testimony under oath before this jury?

17   A.  Yes.

18   Q.  And that was a lie, too, sir, wasn't it?

19   A.  No.  That was not a lie.  That's accurate.

20   Q.  Sir, let me show you what's been marked for identification

21   as Defense Exhibit 4057.

22            Sir, do you see this to be a -- if we can make it a

23   little bigger, Mr. McLeod.  Thank you.

24            Do you see this as a fax for Shelter Government from

25   April Moffet, somebody -- to Carmelia, and it indicates it is

H3ndwal4                          Davis - cross

1  providing information for taxes for 2014, and it is dated

2  August 6, 2012?

3  A.  It's taxes for 2011.

4  Q.  I'm sorry.  2011, right.

5       Do you see that, sir?

6  A.  Yes.

7       MS. CUCINELLA:  Your Honor, is this document in

8  evidence?

9       THE COURT:  No.

10      MS. CUCINELLA:  He's reading from it.

11      THE COURT:  All right.  Don't read from the document.

12      MR. BERKE:  I'm just trying to help, your Honor.  I

13  apologize.

14      Can we go to the bottom of it, as well.

15 Q.  Sir, do you recognize that -- no just the bottom.

16      Do you recognize that mark on the bottom that says

17 your name and number as being something that came from a

18 production from you, sir?

19 A.  April Moffet, yes.

20 Q.  No.  Do you see the bottom right, the Davis and a number?

21 A.  The document number?

22 Q.  Yes.

23 A.  Yes.

24      MR. BERKE:  Your Honor, I would offer Defense Exhibit

25 4057 into evidence.

H3ndwal4                        Davis - cross

1          THE COURT:  Any objection?

2          MS. CUCINELLA:  No objection.

3          THE COURT:  Received.

4          (Defendant's Exhibit 4057 received in evidence)

5          MR. BERKE:  May I publish it, your Honor?

6          THE COURT:  You may.

7          MR. BERKE:  Mr. McLeod, can you blow that up as much

8    as possible.  Thank you.

9    Q.  Do you see, sir, it is on Shelter Golf, and it says please

10   find attached all the items that you requested to process the

11   taxes for 2011?  Do you see that, sir?

12   A.  Yes.

13   Q.  And I'd like to now direct your attention to page 6 of this

14   document.  And you see that is providing a Shelter Golf ledger,

15   general ledger, for 2011; do you see that?

16   A.  Yes.

17   Q.  And I'd like to bring your attention specifically to two

18   entries on this general ledger.

19          Do you see where it shows on August 29, 2011, a

20   hundred thousand dollars going out to you?

21   A.  Yes.

22   Q.  And then you see it being deposited again?

23   A.  Yes, I see it.

24   Q.  And then out again to Genesis Women.  Do you see that, sir?

25   A.  Yes.

H3ndwal4                        Davis - cross

1    Q.  And that's the general ledger that was initially provided

2    for your taxes by April Moffet, correct?

3    A.  Yes, it is.

4          MS. CUCINELLA:  Mr. Berke, can you clarify to whom

5    this was provided, since you are talking about two accountants?

6          MR. BERKE:  Yes.  If we can go to the first page.

7          OK.

8    Q.  Do you see the date, sir, August 6, 33.

9          And you understand that it's being sent to someone who

10   works with your accountant at that time on August 6, 2012, who

11   worked for Rick Mozley.

12   A.  Yes.  I'm assuming that's who Camella is that worked for

13   Rick Mozley.

14   Q.  OK.  Now, sir, so -- and do you recall, let me show you a

15   document that is marked -- I will show you two documents,

16   Defense Exhibit 4156, for identification, and 4157, for

17   identification.

18         And you see that Defense Exhibit 41-six is an email

19   from Keleigh Wentworth of WENCPA, or the initial is

20   W-E-N-C-P-A, to you, with a copy to Lon Houseman, and it is

21   dated July 31, 2013; do you see that, sir?

22   A.  Yes.

23   Q.  And it says -- and you see the email refers to -- if you

24   look to the second to last sentence, it says, "and including an

25   attachment."  Do you see that?

H3ndwal4                    Davis - cross

1   A.  Yes.

2   Q.  Now let me show you Defense Exhibit 4157.  And you see

3   that's Shelter Golf information.  And if you can look at the

4   Bates numbers for the two documents; you see that, sir?

5   A.  Yes.

6          MR. BERKE:  Your Honor, I would offer in evidence

7   Defense Exhibit 4156 and 4157.

8          MS. CUCINELLA:  No objection.

9          THE COURT:  Received.

10          (Defendant's Exhibits 4156 and 4157 received in

11   evidence)

12          MR. BERKE:  May I publish 4157 -- actually, if I can

13   publish them both?

14          THE COURT:  If it is in evidence, you may publish it.

15          MR. BERKE:  Thank you, Judge.

16   Q.  So, sir, first you see that it is dated July 31, 2013; do

17   you see that, sir?

18   A.  Yes.

19   Q.  And Keleigh Wentworth works with Lon Houseman, correct?

20   A.  Yes, I think so.

21   Q.  You can see they have the same email address; do you see

22   that, sir?

23   A.  Yes.

24   Q.  It says, Hi, Tom, could you send over the balance sheet,

25   income statement and detail of all contributions received for

H3ndwal4                        Davis - cross

1    Shelter Golf in 2012.

2            This is for 2012.  Do you see that, sir?

3    A.  Yes.

4    Q.  It says, I'm trying to finish the tax returns, and it goes

5    on.  And then it says, next sentence:  Attached is what we

6    received last year as a reference.

7            Do you see that, sir?

8    A.  Yes.

9    Q.  Now, can we go to the attachment.

10           And you see, sir, that's what Lon Houseman -- that's

11   what Keleigh Wentworth is saying that Lon Houseman and she

12   received from you for 2011; do you see that, sir?

13   A.  Yes.

14   Q.  OK.  And now can I put up side-by-side Defense Exhibit 4157

15   and Defense Exhibit 4057.  On 4057 we are going to go to page

16   6.

17           If we could blow up the general ledger on 405 --

18   excuse me, on 4057.

19           OK.  If you remember, sir, what you sent to Mr. Mozley

20   was the general ledger that showed the hundred thousand

21   dollars, correct?

22   A.  Yes.

23           MR. BERKE:  Are we able to put this side-by-side,

24   Mr. McLeod, if we can.

25   Q.  OK.  What you sent, when you switched to Mr. Houseman to do

H3ndwal4                    Davis - cross

1   the returns, you sent him an income statement that was very

2   different from the general ledger you gave to Mr. Mozley,

3   correct?

4   A.  This is incomplete, counselor.  We also sent Mr. Houseman

5   the general ledger as well.  This is incomplete.

6   Q.  Are you being truthful about that, sir, as --

7   A.  Totally truthful, yes.

8          MS. CUCINELLA:  Objection to that question.

9          THE COURT:  Sustained.  Answer stricken.

10  Q.  Let me refer you back, sir, to what is in evidence as

11  Defense Exhibit 4156.

12         MR. BERKE:  And you could leave 4157 up, Mr. McLeod,

13  if you can do that.

14  Q.  And you see in 2013 Miss Wentworth is sending, she says,

15  attached is a reference to what we received last year for the

16  taxes.

17         And you see, sir, the attachment that's part of this

18  document is the 4157.  Do you see that, sir?

19  A.  Yes, I see it.

20  Q.  And you see, sir, that -- can you put back, excuse me,

21  Mr. McLeod, but if you can put back 4057, I want to show you

22  that this document -- did you create that income statement,

23  sir?

24  A.  No, not that I know of.

25  Q.  Let me show you.  I will show you what it is.

H3ndwal4                      Davis - cross

1           So if you see now, sir, look at, for example, the team
2     sponsorship numbers.  It's hard to see.
3           MR. BERKE:  If you can go a little bigger, Mr. McLeod,
4     on the general ledger.  Just to show more of it.  And if you
5     can get down a little further.  OK.
6     Q.  So you see, sir, you see the number, you have -- I think we
7     are going to have to make it a little smaller.  OK.
8           Oh, and -- sir, I'm sorry.  Can you go to the next
9     page.
10          OK.  And you see, sir, what you said to Mr. Mozley as
11    team sponsorship, still on the right side, 338,400?
12    A.  Yes.
13    Q.  And then in this income statement that was provided to
14    Mr. Houseman, you see you just have it as one general number
15    without the breakdown?
16    A.  Yes.  Yes.
17    Q.  And if you look at the expenses and everything, the total
18    income, the sponsorship, the donations, it is all split down.
19    Do you see that, sir?
20    A.  Yes.
21    Q.  And it is done in a way that doesn't disclose the details,
22    including the hundred thousand that you had misappropriated
23    from Shelter Golf; isn't that right, sir?
24    A.  An income statement is not going to show that.  So what I'm
25    trying to explain to you is this is incomplete information.  My

1    assistant also provided the auditor the bank records, which

2    clearly showed the hundred-thousand-dollar check and clearly

3    showed the hundred-thousand-dollar deposit.  So this income

4    statement does not reflect that.

5    Q.  Let me ask you this, sir.  Do you recall that you signed

6    the tax returns for 2011?

7    A.  Yes.

8    Q.  Let me show you what's marked as Defense Exhibit 2075, for

9    identification.  2075.

10           This is the Shelter Golf tax return for 2011, correct,

11   sir?

12   A.  Yes.

13           MR. BERKE:  Your Honor, I would offer in evidence

14   Defense Exhibit 2075.

15           MR. GOLDMAN:  One minute, your Honor.

16           (Pause)

17           MS. CUCINELLA:  We have no objection.  We just ask

18   defense counsel to be careful if there is any identifying or

19   otherwise private information relating to the charity, which is

20   still ongoing, that it be redacted before it be made publicly

21   available.

22           MR. BERKE:  We will consult with the government and do

23   that.

24           THE COURT:  OK.  Received subject to redactions of

25   identifying information.

1          (Defendant's Exhibit 2075 received in evidence)

2          MR. BERKE:  Thank you, your Honor.

3          And if I may publish it?

4          THE COURT:  You may.

5    Q.  And this is the 2011 Shelter Golf tax return, correct, sir?

6    A.  Yes.

7    Q.  Can I go to the signature page, at 13.

8          So that's your signature, dated November 30, 2012,

9    correct?

10   A.  Yes, it is.

11   Q.  And you see above it you said, "Under penalties of perjury,

12   I declare that I have examined this return, including

13   accompanying schedules and statements, and to the best of my

14   knowledge and belief, it is true, correct, and complete."  Do

15   you see that, sir?

16   A.  Yes, I do.

17   Q.  And underneath you it says the paid preparer, that is Lon

18   Houseman, correct?

19   A.  Yes, it is.

20   Q.  And he signs it as well.

21         Now, sir, can I show you the questions that are being

22   asked on page 11, part 7B of the tax return?

23         I'm sorry.  It is -- maybe it is at page 13.  There it

24   is.

25         I'm sorry.  We are going to this one that says,

H3ndwal4                           Davis - cross

1    "Statements regarding activities for which form 4720 may be

2    required."

3            Yes.  And you see, sir, it asks "During the year, did

4    the Foundation," and then it includes a question, "Borrow money

5    from, lend money to, or otherwise extend credit to (or accept

6    it from) a disqualified person?"

7            Do you see that, sir?

8    A.  Yes, I do.

9    Q.  That's checked "No," correct?

10   A.  It is.  That's correct.

11   Q.  And that is a lie; that is not true, correct?

12   A.  Yes.  I think I've already admitted this, yes.

13   Q.  That's tax fraud?

14   A.  I'll let somebody else determine that, but it's a lie, for

15   sure.

16   Q.  You pled guilty to tax fraud, didn't you, sir?

17           Well, withdrawn.

18           Is it your testimony that Lon Houseman signed that

19   document, as well, knowing that this had a lie on it?  Is that

20   your testimony, sir?

21   A.  I don't know that Lon Houseman knew that at the time.

22   Q.  Well, if he had the general statement, the general ledger,

23   he would have seen it, wouldn't he have?

24   A.  He had it.  I can tell you he did, for sure.  He had the

25   same information I gave Rick Mozley.

H3ndwal4                     Davis - cross

1   Q.  The same information that Rick Mozley said he would have to

2   check the right box and subject you and the organization to

3   penalties; is that your testimony, sir?

4   A.  Absolutely.

5   Q.  And you recall, sir, later on, for both 2011 and 2012 --

6   sir, do you recall, as well, that in 2012 you also signed a

7   document -- well, let me ask you this, sir.

8        Do you recall that the IRS started asking questions

9   and had concerns about your tax returns?

10  A.  About my personal tax returns?

11  Q.  No.  The tax returns for Shelter Golf.

12  A.  What was the question?  What timeframe?

13  Q.  Let me ask you this, sir.

14       Do you recall there was a time that Lon Houseman

15  started to ask you questions about your expenses and you blamed

16  the problems with bad bookkeeping by April Moffet?

17  A.  I don't recall exactly how that conversation was initiated,

18  but I certainly recall having a discussion with him about

19  correcting the expenses.

20  Q.  And you blamed it on April Moffet's bad bookkeeping as the

21  problem; correct, sir?

22  A.  I don't recall precisely how I discussed it with Lon.

23  Q.  Let me show you what's been marked for identification as

24  4199.

25       I would ask you to look at the email that begins -- it

H3ndwal4                          Davis - cross

1  is the one below -- could you go below that?  Yep.  Review that

2  to yourself, sir.

3            (Pause)

4            You recall, sir, blaming April Moffet's bookkeeping

5  for the problems you had keeping straight your expenses?

6  A.  I certainly recall this email.  That email was from me.

7  Yes.

8  Q.  And you recall, sir -- do you recall, sir, that for 2012

9  you also signed a false tax return that didn't reflect that you

10 had gotten money from Shelter Golf and you signed and swore to

11 it; do you recall that?

12 A.  Yes.

13 Q.  Isn't it a fact, sir, that when the IRS began

14 investigating, you came up with a story that the reason you had

15 so much trouble filing the returns is because your computer

16 crashed and your QuickBooks had to be reconstructed and that's

17 why you were so late with these filings?  Do you recall that,

18 sir?

19 A.  I do recall that, yes.

20 Q.  Again, these were all lies, more lies to cover up your

21 original lies, correct, sir?

22 A.  I'm not sure that was inaccurate at the time.

23 Q.  So the reason you had such a hard time paying your taxes is

24 because you were trying to avoid revealing that you

25 misappropriated money from the charity, correct?

H3ndwal4                         Davis - cross

1    A.  We were late in filing the tax return, that's totally

2    accurate.

3    Q.  And you were late, sir, because you were trying to figure

4    out ways to file without getting caught for misappropriating

5    money from Shelter Golf, correct, sir?

6    A.  I think that's probably accurate, yes.

7    Q.  And that's what delayed you, sir.  So when you told the IRS

8    that the reason you were delayed and you should not have to pay

9    late fees and penalties is because somebody's computer crashed

10   and you lost the information, that, too, was a lie, wasn't it,

11   sir?

12   A.  No.  I think that was also a factor.

13   Q.  So it's your testimony that that part is true?

14   A.  It's my testimony that that part is true, yes.

15   Q.  Sir, let's move on to your personal taxes.

16           Personally, you did not file tax returns for many

17   years, correct?

18   A.  Yes, that's accurate.

19   Q.  By the time you made your deal with prosecutors, you hadn't

20   filed tax returns since 2011, correct?

21   A.  I think that's accurate, yes.

22   Q.  You also cheated on your personal taxes, too, didn't you,

23   sir?

24   A.  I don't recall that, no.

25   Q.  Well, did you disclose --

H3ndwal4                    Davis - cross

1  A.  I actually have to amend the tax return.  Yes, I do recall

2  that.

3  Q.  You haven't done that yet, have you, sir?

4  A.  I have not made the amendment, no.

5  Q.  In addition to -- among other inaccuracies in what you have

6  filed, you also -- you've never disclosed your gambling

7  winnings to the IRS, have you?

8  A.  I don't think that's accurate.  I have from time to time in

9  various years.

10 Q.  Did you disclose any winnings in 2010?

11 A.  I have to go back and look at my tax returns.  I couldn't

12 tell you off the top of my head.

13 Q.  In 2011, had you told your accountants who you work with

14 about any gambling winnings you forgot to include in your tax

15 returns?

16 A.  Counselor, I have to go back and refer to my tax returns.

17 I can't tame you off the top of my head.

18 Q.  Can you tell me one year -- tell me the decade it is in --

19 in which you declared gambling winnings on your taxes?  Give me

20 a decade.

21 A.  I cannot answer the question without going back and looking

22 at my tax returns.

23 Q.  Was it in the last 20 years?

24 A.  The answer is the same.  I cannot answer that specifically

25 without referring to my tax returns.

H3ndwal4                      Davis - cross

1    Q.  And you knew, sir, going into 2016, that you heard from Lon

2    Houseman -- Lon Houseman handled your personal taxes, correct?

3    A.  Yes.

4    Q.  And you knew that the IRS was pressing down about your

5    personal taxes, as well, going into -- the end of 2015, going

6    into 2016, isn't that true, sir?

7    A.  I'm not sure what you mean by "pressing down."  If you can

8    be more specific, I could answer it.

9    Q.  You were getting IRS notices for your failure to pay income

10   tax and file income -- or file tax returns, isn't that true,

11   sir?

12   A.  Yes.  I got some notices, yes.

13   Q.  So you felt like the pressure was building on you from the

14   IRS at the end of 2015 going into 2016, didn't you, sir?

15   A.  I don't recall that specifically, but I filed all my tax

16   returns at this point, yes.

17   Q.  At what point are you talking about, sir?

18   A.  I'm sorry?

19   Q.  What point are you talking about?

20   A.  My personal tax returns.

21   Q.  At what point did you say you filed all your returns?

22   A.  They are all filed.

23   Q.  Today?

24   A.  They have been, yes.

25   Q.  So they weren't filed in late 2015, were they?

H3ndwal4                          Davis - cross

1   A.   No, they were not.

2   Q.   Going back to 2011, they not been filed?

3   A.   I think that's accurate, yes.

4   Q.   And the IRS was pressing you, correct?

5   A.   Yes.  Of course.

6   Q.   I think you said, sir, that -- in your direct testimony,

7   you said that in the summer of 2014, you thought there was only

8   a SEC investigation, not a criminal investigation; do you

9   recall that testimony, sir?

10  A.   Yes, I do.

11  Q.   That's not true, is it, sir?

12  A.   In the summer of 2014, I thought it was only an SEC

13  investigation.  Yes, that was my understanding.

14  Q.   So the FBI came to visit your house, correct?

15  A.   Yes, they did.

16  Q.   In May of 2014, correct?

17  A.   Yes.

18  Q.   In May of 2014, the Wall Street Journal published a big

19  article about that the FBI and criminal authorities are

20  investigating whether information about Dean Foods was leaked;

21  isn't that true, sir?

22  A.   Yes.

23  Q.   The articles referred to -- in May and June referred to the

24  FBI and a criminal investigation into whether Dean Foods'

25  information was leaked; isn't that true, sir?

1    A.  I don't remember the article specifically, but I know there

2    was an article in -- at that point in time, yes.

3    Q.  You don't recall the articles talked about a criminal

4    investigation?

5    A.  I think they were investigating Mr. Walters.  That's what

6    the article referred to.

7    Q.  And leaks at Dean Foods, correct?

8    A.  Yes.

9    Q.  You knew there was a criminal investigation, correct?

10   A.  I knew that Mr. Walters was being investigated, yes.

11   Q.  Sir, is it your testimony that you thought that was just an

12   investigation of Mr. Walters and didn't involve you, it was of

13   no concern to you, given your testimony; is that your

14   testimony, sir?

15   A.  It is my testimony that at that point in time I did not

16   know that I was going to be under investigation.

17   Q.  Sir, isn't it a fact that you knew that in July of 2015,

18   April Moffet was interviewed by the U.S. Attorney's Office and

19   the FBI, and they interviewed her about you and Shelter Golf;

20   isn't that true, sir?

21   A.  Yes, I was aware of that.  Yes.

22   Q.  You knew that because you had your own lawyers represent

23   April Moffet when she was interviewed by the U.S. Attorney's

24   Office, the FBI, and the SEC; isn't that true, sir?

25   A.  I think that's accurate, yes.

H3ndwal4                          Davis - cross

1   Q.  And you knew that what they asked her about in that

2   interview was about the money you misappropriated from Shelter

3   Golf and your misstatements about it; isn't that true, sir?

4   A.  I'm not sure I heard the question.

5   Q.  You knew what they questioned April Moffet about in July of

6   2015 was the money you misappropriated from Shelter Golf and

7   your many misstatements about it; isn't that true, sir?

8   A.  Yes, I was aware of what they questioned her about, yes.

9   Q.  And you knew that was an investigation of you, sir,

10  correct?

11  A.  I could certainly assume that, yes.

12  Q.  Mr. Walters had nothing to do with Shelter Golf, correct?

13  A.  Not that I am aware of, no.

14  Q.  He didn't know anything about the money you stole from

15  Shelter Golf, did he?

16  A.  Not that I am aware of, no.

17  Q.  He didn't know that the testimony that you gave to the SEC

18  about Shelter Golf was a lie, did he?

19  A.  Not that I'm aware of, no.

20  Q.  He didn't know that you had filed false tax returns about

21  Shelter Golf, did he?

22  A.  Not that I am aware of, no.

23  Q.  You knew, though, that the FBI was circling, because not

24  only that, you also learned at the end of the summer -- right

25  after the summer, in September, that the FBI went to visit your

H3ndwal4                          Davis - cross

1    friend Joe Palladino's restaurant, Nick & Sam's, to try to

2    prove that what you put down as a dinner with Mike Rawlings as

3    the keynote speaker, that that was a lie and perjury, too; you

4    knew about that, too, sir, didn't you?

5    A.  I became aware of that, yes.

6    Q.  You knew then, sir, that this was an investigation about

7    you and what you did with regard to Shelter Golf and your

8    perjury and obstruction with regard to the SEC and the FBI;

9    isn't that true, sir?

10   A.  I was aware of the investigation.

11   Q.  My question, sir, is not that.  My question is you knew

12   that they were investigating you and your crime regarding

13   Shelter Golf; isn't that true, sir?

14   A.  Frankly, counselor, I was -- I was aware that they were

15   focusing on the insider trading charges, and little was said

16   about Shelter Golf as far as the investigation was concerned.

17   Q.  April Moffet, she was questioned all about Shelter Golf,

18   correct?

19   A.  I wasn't there for the interview.

20   Q.  No.  But your lawyers were and they gave you a full report

21   about it, didn't they, sir?

22   A.  They gave me a report, yes.

23   Q.  And you knew she was questioned all about Shelter Golf and

24   your role in taking money out of that charity, isn't that true?

25   A.  Pardon me.  Do you want to finish the question?  I'm sorry.

H3ndwal4                          Davis - cross

1    Q.  I'm done.

2    A.  I was aware of the fact that she was interviewed, yes.

3    Q.  And interviewed, sir, about your crimes related to Shelter

4    Golf, correct?

5    A.  I think she was interviewed about a variety of things,

6    including my communications with Mr. Walters as well.

7    Q.  She didn't know anything about that, did she?

8    A.  I wasn't there for the interview.

9            MS. CUCINELLA:  Objection.

10           THE COURT:  Overruled.

11           Do you know whether she knew anything about that?

12           THE WITNESS:  Pardon me?

13           THE COURT:  Do you know whether Ms. Moffet knew

14   anything your communications with Mr. Walters?

15           THE WITNESS:  Well, she knew a lot about my

16   communications with Mr. Walters, not about my inside

17   information that I gave him, but she knew a lot about my

18   communications and my relationship with Mr. Walters.

19           THE COURT:  Thank you.

20           Next questions.

21   BY MR. BERKE:

22   Q.  She knew you talked on the phone with him, right?

23   A.  Yes.

24   Q.  She didn't know anything about the substance of what you

25   talked about, correct?

1   A.  No.

2   Q.  But she did know about the money you took from Shelter

3   Golf, didn't she?

4   A.  Yes.

5   Q.  And Joe Palladino and Nick & Sam, that had nothing to do

6   with Mr. Walters, did it?

7   A.  No.

8   Q.  It had nothing to do with any alleged insider trading, did

9   it?

10  A.  Not that I'm aware of, no.

11  Q.  That related to your crimes with regard to Shelter Golf,

12  didn't it?

13  A.  Yes.

14  Q.  And then in August, sir, the next month, do you recall

15  learning that the Wall Street Journal was going to do a big

16  article about how you were also being criminally investigated

17  with regard to Dean Foods?

18  A.  I became aware that there was going to be a news article,

19  yes.

20  Q.  And you recall, sir, that you were forced to resign from

21  Dean Foods because of that article?

22  A.  Yes.  I was asked to resign and I did.

23  Q.  And you recall, sir, describing that as a very rough week

24  for you?

25  A.  I think that's totally accurate, yes.

1  Q.  And you recall, sir, the article came out, and it

2  specifically mentioned you in a criminal investigation into

3  whether you leaked information about Dean Foods and its

4  performance; do you recall that, sir?

5  A.  Yes, I recall the article.  It didn't mention anything

6  about Shelter Golf, strangely enough.

7  Q.  That hadn't become public yet, had it?

8          (Pause)

9          That hadn't become public yet, had it, sir?

10  A.  The article certainly didn't mention it.

11  Q.  No.  The fact that you misappropriated money from Shelter

12  Golf had not become public yet, had it, sir?

13  A.  I don't think it had, no.

14  Q.  And that was very important for you, to try to protect your

15  role with Shelter Golf, wasn't it, sir?

16  A.  I was -- I was embarrassed by it, yes.  It was not one of

17  my prime moments.

18  Q.  When the article came out in the Wall Street Journal in

19  August, you believe you felt you were being hounded by

20  reporters, didn't you?

21  A.  I was being hounded by reporters, as a matter of fact, as

22  were my family members.

23  Q.  And you continued to all your friends maintaining your

24  innocence, saying you've done nothing wrong; isn't that true,

25  sir?

1   A.  Yes.  That's totally accurate.

2   Q.  You said that, you know, the government's working on it for

3   15 months, but you did nothing wrong and you're hanging in

4   there; isn't that right, sir?

5   A.  I think that's totally accurate.  I was still denying the

6   truth.

7   Q.  You didn't tell anybody that's what -- you told everybody

8   that was the truth that you didn't do anything wrong with

9   regard to Dean Foods; isn't that true, sir?

10  A.  Yes, that's accurate.

11  Q.  Do did your lawyers in September 2015, correct?

12  A.  Yes.  It was totally accurate.

13  Q.  And you're also suffering even more financial problems,

14  true, sir?

15  A.  I'm not sure what you are a referring to.

16  Q.  Well, you were more or less unemployed, weren't you?

17  A.  Yes.  I was no longer receiving board fees from Dean Foods,

18  but I was still on the board of two other companies.

19  Q.  Well, actually, sir, didn't -- after the article, didn't

20  you ultimately have to resign and you did resign from the other

21  boards you were on?

22  A.  I didn't resign from the other boards until I signed my

23  cooperation agreement with the government.

24  Q.  Well, sir, you resigned -- well, sir, you resigned from --

25  sir, do you recall -- let me ask you this:  Do you recall that

1   you still owed money to a variety of different people?

2   A.  I'm not sure who you are referring to.

3   Q.  You owed The Walters Group over $800,000, didn't you?

4   A.  Oh, yes, that's correct.

5   Q.  Your second wife Louise claimed that you owed her

6   substantial money from your divorce going back in time, isn't

7   that true, sir?

8   A.  She filed a lawsuit about it, yes.

9   Q.  And you were concerned about legal fees, isn't that right,

10  sir?

11  A.  I don't specifically recall that being a concern.

12  Q.  Well, didn't you tell your daughter Whitney in August of

13  2015 you couldn't help her with $4,000 in moving expenses

14  because you were hording your cash for legal fees in the event

15  of a long drawn-out process with the SEC; do you recall that,

16  sir?

17  A.  No, I don't recall that.  I recall having some

18  correspondence with her, but you might be taking that out of

19  context.  I'd love to see something.

20  Q.  Let me show you what's marked as Defense Exhibit 4789.  And

21  I'd highlight the bottom email, and ask you to review it to

22  yourself.  I think -- Mr. McLeod, is there a second page to

23  this?  The entry at 12/24.  There you go.  At the bottom.

24          If you need to see the amount, I can show you the

25  prior email.

H3ndwal4                          Davis - cross

             Sir, I'm directing your attention now to the bottom

sentence of this, beginning with "Regrettably."

             Does that refresh your memory, sir, did you tell your

daughter you had to hoard cash for legal fees in the event of a

long, drawn-out process with the SEC?

A.   Counselor, again, I think you're taking this out of

context --

             THE COURT:  No.

             THE WITNESS:  Sorry.

             THE COURT:  We've had this conversation before.  We're

going to have it again.

             THE WITNESS:  OK.  Pardon me.

             THE COURT:  The question is whether reading this

document refreshes your recollection.

             Read the document.  And the only question you're being

asked is whether it refreshes your recollection on the subject

of the question.

             THE WITNESS:  I'm sorry, your Honor.

             THE COURT:  That's it.  Nothing else.

             THE WITNESS:  Pardon me.  I get it.  I'm sorry.

             THE COURT:  All right?

             THE WITNESS:  Yes, sir.

             THE COURT:  Does it refresh your recollection?

             THE WITNESS:  Yes, it does.

BY MR. BERKE:

1    Q.  And you said that, correct, sir?

2    A.  I'm sorry?

3    Q.  Isn't that what you said, you were looking to hoard cash --

4          THE COURT:  No, that is sustained.  That is sustained,

5    Mr. Berke.  You know the rules.

6          MR. BERKE:  Fine, your Honor.

7    Q.  Sir, during this time, you knew you could be prosecuted for

8    lying under oath in your tax returns you filed on behalf of

9    Shelter Golf; isn't that correct, sir?

10   A.  When you say during this period of time, what are you

11   referring to?

12   Q.  September 2015.

13   A.  I was more concerned about being prosecuted for insider

14   trading charges.

15   Q.  So you knew at this time you had lied on your tax returns,

16   didn't you?

17   A.  On the Shelter Golf tax returns, yes.

18   Q.  You knew that you had misappropriated money from Shelter

19   Golf and you were under investigation by the FBI and the U.S.

20   Attorney's Office for that, isn't that right, sir?  We just

21   established in September they visited Nick & Sam's.  In the

22   month prior, April Moffet was interviewed about it.  Do you

23   recall that, sir?

24         THE COURT:  Sustained as to form.

25   Q.  You knew in -- sorry, your Honor.

1       You remember in September of 2015 that you were being

2   investigated criminally for Shelter Golf, correct?

3   A.   Counselor, I'd already paid the money back to Shelter Golf

4   by September of 2015.  It was -- I was more concerned about the

5   insider trading charges, I can assure you.

6   Q.   Sir, you knew you could be prosecute for your crimes

7   related to Shelter Golf, correct?

8   A.   Yes.

9   Q.   That's why you tried to cover it up for so many years,

10  isn't that true, sir?

11  A.   It was something I regretted greatly doing, and I hated to

12  admit I made such a poor decision.

13  Q.   And you didn't want to get caught, correct, sir?

14  A.   I just told you, I was more embarrassed about it than

15  anything else.

16  Q.   You didn't want to get caught and get in trouble, isn't

17  that true, sir?

18  A.   I was more concerned about my insider trading crimes than

19  anything else in my life.

20  Q.   Did you want to get caught for Shelter Golf crimes, sir?

21  A.   Of course not.

22  Q.   And you knew, sir, you learned, didn't you, that the

23  penalties you faced for perjury, your SEC testimony about

24  Shelter Golf, you could go to jail for up to five years; you

25  knew that, sir, didn't you?

1    A.  Yes.

2    Q.  And you knew for tax fraud, for each instance of tax fraud,

3    you could go to jail for another five years for each instance

4    of tax fraud; isn't that true, sir?

5    A.  I'm not familiar with the penalties for tax fraud, but I

6    knew it was a serious consequence.

7    Q.  You knew that you faced upwards of 20 years for obstruction

8    of justice; didn't you learn that from your counsel?

9    A.  I don't recall exactly reviewing the penalties for

10   obstruction of justice, no.

11   Q.  But you knew you faced a lot of time in jail if you were

12   prosecuted; isn't that right, sir?

13   A.  Yes.

14   Q.  Is it fair to say, sir, that in late 2015/early '16, you

15   were in quite a jam and you needed to get a benefit for

16   yourself, didn't you, sir?

17   A.  I didn't hear the end of the question.

18   Q.  You needed to get a benefit for yourself?

19   A.  I can agree to the first part of the question.  Certainly I

20   knew I was in a jam, yes.

21   Q.  And a jam you wanted to get out of, correct?

22   A.  I hadn't figured it out at that point in time.

23   Q.  You recall, sir, in August of 2015 you had made

24   arrangements to meet with your wife, Louise Davis, right after

25   the Wall Street Journal articles came out to discuss those

H3ndwal4                          Davis - cross

1   articles with her?

2   A.  Actually, she made arrangements with me.  She initiated it,

3   not me.

4   Q.  Do you recall, sir, that you picked her up at Nieman's in

5   Dallas, North Park, in the afternoon, you picked her up in your

6   car?

7   A.  Yes.  That's accurate, yes.

8   Q.  Do you recall, sir, you drove her to a cemetery?

9   A.  Yes.

10  Q.  And you recall, sir, you asked her if she was wearing a

11  wire?  Do you recall that, sir?

12  A.  Yes, I think I did ask her that.  Yes.

13  Q.  And you told her, sir, didn't you, that you asked her not

14  to speak to the FBI or SEC?  You told her, I don't think they

15  want me.  They just want me to roll over on Billy Walters.

16          Isn't that what you told your second wife, Louise, in

17  August of 2015?

18  A.  That is totally not accurate.

19          (Continued on next page)

20

21

22

23

24

25

1    Q.  So that didn't happen, sir, is that your testimony?  You

2    deny saying that, sir?

3    A.  I deny saying that to her in the car as we met, yes.

4    Q.  You deny saying that to her at any time?

5    A.  I never said it to her at any time, no.  I deny it.

6    Q.  You testified, sir, at some point in early 2016, you hired

7    new lawyers, correct?

8    A.  I don't recall whether it was December or January.

9    December of 2015 or January, I'm not sure.  But around that

10   point in time, yes.

11   Q.  You hired lawyers to see if they could get you a deal that

12   you hoped might help you avoid jail, correct?

13   A.  I wouldn't characterize it that way.  I hired special

14   counsel who was familiar with insider trading charges and had a

15   good relationship with the prosecutor's office.

16   Q.  So one of the lawyers hired had just left that prosecutor's

17   office, correct?

18   A.  I don't know when he left, I'm not sure.

19   Q.  But they were in the same prosecutor's office, correct?

20   A.  Yes, I think so.

21   Q.  You recall, sir, that while you were in this process, after

22   a number of meetings, you told your friends that you're meeting

23   in New York with the bad guys?  Do you recall that, sir?

24   A.  I don't recall that specifically, no.

25   Q.  Let me show you what's been marked for identification as

1    4687.  The top e-mail, please.  Read that to yourself, sir.

2            Sir, I'll ask you again, does that refresh your memory

3    that in March 22, 2016, you told one of your friends that

4    you're going back to New York to meet with the bad guys?

5    A.   That refreshes my memory, yes.

6    Q.   Sir, I'd ask you to identify for the record who in this

7    courtroom you were referring to as the bad guys in March of

8    2016?

9    A.   Probably the prosecutors, I assume.

10   Q.   Individuals at the first table, correct?

11   A.   Yes.

12   Q.   Isn't it a fact, sir, that you were just pretending to have

13   remorse and pretending to have turned a leaf.  You were still

14   viewing them as the bad guys, and this was just another one of

15   your schemes.  Isn't that true, sir?

16   A.   What's the question again?  I'm not following you.

17   Q.   You referred to them as bad guys because you were just

18   pretending to have turned over a new leaf to try to get your

19   deal, isn't that true, sir?

20   A.   No.  Look, this e-mail was to a good friend of mine, I said

21   that in some levity, frankly, when I responded to him.  So, I

22   wasn't referring to the prosecutors in a demeaning fashion at

23   all.

24   Q.   You were pretending to turn over a new leaf just so you

25   could get your deal, isn't that true?

1   A.  I'm not sure I follow your question.  Pretending to do

2   what?

3   Q.  You were lying to the prosecutors so you could get your

4   deal, and you were pretending to think they were the good guys

5   when you still thought they were the bad guys.

6   A.  Counselor, I absolutely did not lie to the prosecutors when

7   I started this process of interviewing with them.

8   Q.  Sir, do you recall in March of 2016 you felt like your

9   house was burning down because you had so many problems, given

10  all you were getting caught for all the crimes you committed?

11  A.  At what time was this?

12  Q.  March of 2016.

13  A.  Yes.  That's probably true.

14  Q.  Didn't you tell people, sir, that you expected, based on

15  your deal, that you would not serve any jail time for what you

16  did?

17  A.  That was my wish, yes.

18  Q.  And you told people that's what you think was going to

19  happen, didn't you?

20  A.  I was hoping that was the case, yes.

21  Q.  That's what you told people that that's what you expected,

22  correct?

23  A.  Yes, sir, I'm sure I did.  That was my wish.

24  Q.  You recall, sir, from your plea in this case and your

25  cooperation agreement that you face spending the rest of your

H3n3wal5                        Davis - cross

1  life in jail?  Isn't that true, sir?

2  A.  Yes, that's accurate.

3  Q.  And you felt the benefit of this deal when you would go

4  from that to potentially no jail at all?

5  A.  I'm not going to make any bones about it.  I was hoping

6  that my cooperation agreement and providing cooperation to the

7  government would help me avoid going to jail, yes.

8  Q.  You also knew that you faced and still face losing all your

9  assets, isn't that true, sir?

10  A.  It's possible, yes.

11  Q.  There's fines of $5 million or more, correct, sir?

12  A.  Yes.

13  Q.  Restitution you could be ordered to pay, correct?

14  A.  I think that's accurate, yes.

15  Q.  And you're hoping that based on your deal, you're going to

16  get to keep the assets you have remaining, don't you, sir?

17  A.  I'm primarily hoping I can avoid going to jail, counselor.

18  Q.  You want to keep your money, too, though as well?

19  A.  I think that's somewhat secondary.

20  Q.  I understand.  But that in your mind, that would be the

21  best deal for you.  No jail, and you get to keep most of your

22  money and you get to continue your lifestyle.  That's what you

23  want, isn't that true, Mr. Davis?

24  A.  I think that's a fair summary, yes.

25          THE COURT:  Do you have much more, Mr. Berke?

H3n3wal5                        Davis - cross

1              MR. BERKE:  I do, your Honor.

2              THE COURT:  How much more do you have?

3              MR. BERKE:  Quite a bit, your Honor.

4              THE COURT:  Give me an estimate.

5              MR. BERKE:  I'm clearly going to go over into next

6    week, your Honor.

7              THE COURT:  Give me an estimate.  I think I'm entitled

8    to ask that question.

9              MR. BERKE:  Of course, your Honor.  I'm doing the

10   math.

11             THE COURT:  I'm entitled to get an answer.

12             MR. BERKE:  I'm doing the math in my head.

13             THE COURT:  Thank you, sir.

14             MR. BERKE:  So I believe, your Honor, it's

15   approximately a day and a half.

16             THE COURT:  How many hours, sir?

17             MR. BERKE:  Approximately 11 hours, your Honor.

18             THE COURT:  Ladies and gentlemen, we'll take a

19   midafternoon recess.  Do not discuss the case among yourselves

20   or with anyone.  We'll be back in 15 minutes.

21             (Jury excused)

22             (Continued on next page)

23

24

25

H3n3wal5                    Davis - cross

1              THE COURT:  Mr. Berke, let me tell you out of the

2     presence of the jury.  If I hear one word of repetition of your

3     cross-examination, if you go back over any area of

4     cross-examination that you have already covered, I will sustain

5     an objection on grounds of cumulativeness.  Do you understand

6     that, sir?

7              MR. BERKE:  I do, your Honor.  Thank you.

8              THE COURT:  Go over your notes and arrange your

9     affairs so that there is no duplication of any questioning in

10    the ensuing 11 hours.  Do you understand that, sir?

11             MR. BERKE:  I understand, your Honor.

12             THE COURT:  Thank you very much.

13             MR. BERKE:  Thank you.

14             (Recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H3n3wal5                        Davis - cross

1                  (In open court; jury present)

2                  THE COURT:  How are you doing, ladies and gentlemen?

3                  A JUROR:  Hanging in there.

4                  THE COURT:  Temperature is okay?  All right.  You let

5      me know if you need anything or anything I can do to make the

6      jury experience better for you, and I'm going to do what I can,

7      all right.

8                  A JUROR:  Thank you.

9                  THE COURT:  Yes.  Too cold?

10                 A JUROR:  Too cold, too hot.

11                 THE COURT:  Whoa.

12                 A JUROR:  One minute it's hot, hot, hot, the next

13     minute it is cold, cold, cold.

14                 THE COURT:  Maybe the best I can suggest, because

15     you're not the first person to have pointed this out.  But what

16     I'm going to suggest is, for example, on the too cold part,

17     bring something with you.

18                 A JUROR:  I do.

19                 A JUROR:  Mine got confiscated by No. 6.

20                 THE COURT:  You're too much of a gentleman.  Hey, I

21     have a scarf, I can lend you my scarf too.  All right.

22                 All right, ladies and gentlemen, we're back in action.

23     Go ahead, Mr. Berke.

24                 MR. BERKE:  Thank you, your Honor.

25     BY MR. BERKE:

H3n3wal5                              Davis - cross

1    Q.  Mr. Davis, I'd like to ask you about a document marked for

2    identification as Defense Exhibit 4914.  Is that an e-mail to

3    you from Fin Ewing and Bill Duval dated May 26, 2016?

4    A.  Yes, I see it.

5    Q.  They were fellow directors of Shelter Golf, correct?

6    A.  Yes, Bill was the co-chairman with me.

7           MR. BERKE:  Your Honor, I'd offer Defense Exhibit

8    4914.

9           THE COURT:  Any objection?

10          MS. CUCINELLA:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 4914 received in evidence)

13          MR. BERKE:  Your Honor, may I publish?

14          THE COURT:  You have a standing instruction that you

15   may publish any document that's received in evidence.  You

16   don't need to ask.  Okay?

17          MR. BERKE:  Thank you, your Honor.

18          THE COURT:  That's been the standing instruction.

19          MR. BERKE:  Thank you, your Honor.

20   Q.  Sir, this is May 26.  That's after your deal with the

21   prosecutors, correct?

22   A.  Yes.

23   Q.  May I highlight the last paragraph of your e-mail.  You

24   write, sir, "As said in my earlier e-mail, I was not charged

25   with any wrongdoing pertaining to Shelter Golf, and the charges

1    I pled guilty to had nothing to do with Shelter Golf.  I say

2    that to set the record straight.  This has been a grueling

3    process for me.  I hope you'll accept my apologies for any

4    embarrassment that I have caused this wonderful charity.  The

5    prosecutors went to great extent to help me protect Shelter

6    Golf and the SEC needlessly did not follow suit.  Let me know

7    what you want me to do with the audit process."

8            That's what you wrote, correct, sir?

9    A.  Yes.

10   Q.  And sir, do you recall around this time, too, that you had

11   meetings with the board of your golf course, your golf club,

12   where you hosted Shelter Golf, Preston Trails, and tried to

13   persuade them to keep you as a member?

14   A.  Actually that's not correct.

15   Q.  Do you recall wanting to meet with them to tell them your

16   side of the story?

17   A.  I recall getting a call from the president of Preston Trail

18   Golf asking me to resign.

19   Q.  Do you recall, sir, talking to Troy Philips about your

20   desire to continue with Preston Trails?

21   A.  Yes, I do.

22   Q.  Do you recall telling Troy Phillips that you thought you

23   wouldn't serve jail time, and that differentiated you from

24   other members who went to jail and were kicked out?

25   A.  I don't recall the substance of the conversation with Troy,

1    but I asked him to help me with regard to the board because I

2    wanted to remain a member.

3    Q.  Do you recall, sir, showing surprise following your deal

4    when the club kicked you out?

5    A.  I was not surprised.  I was disappointed.

6    Q.  So let me show you what's been marked as Defense Exhibit

7    4602.  I'll ask you to look at it, sir.  It's not an e-mail of

8    yours, I just want you to look at it.  I'm going to direct your

9    attention to the last paragraph of that e-mail.  All the way

10   down.  Read that to yourself, sir.

11            (Pause)

12   Q.  My question for you, sir, does that refresh your memory

13   that you expressed surprise that Preston Trails was taking

14   steps to kick you out?

15   A.  Yes.  It does refresh my memory.

16   Q.  Sir, let me show you what's been marked as Defense Exhibit

17   4597.  Do you recognize that as your letter to Preston Trails

18   when they told you that you had to leave the club dated June 4,

19   2016?

20   A.  This is my resignation letter to the board of directors.

21   Q.  You were told you had to resign, correct?

22   A.  I was asked to resign.

23            MR. BERKE:  Your Honor, I would offer Defense Exhibit

24   4597.

25            THE COURT:  How is this relevant?

```
 1              MR. BERKE:  Your Honor, I'm offering it for the fourth

 2      paragraph.  Beginning "I would like."  For the importance of

 3      the agreement.

 4              THE COURT:  I think any slight probative value of this

 5      letter is substantially outweighed by it being a waste of time.

 6              MR. BERKE:  Okay.  I'll move on, your Honor.

 7      Q.  Do you recall, sir, that after making your deal with the

 8      prosecutors in this case, you reached an agreement with the SEC

 9      based on a separate case they filed against you?

10      A.  Yes, I did.

11      Q.  Do you recall, sir, that the deal you were prepared to

12      agree to did not allow you to contest the validity of any of

13      the allegations, except the allegations related to Shelter

14      Golf?

15      A.  I think that's my recollection, yes.

16      Q.  That was the deal you insisted upon, correct?

17      A.  Yes.

18      Q.  Sir, do you recall that on May 11, 2016, you signed your

19      deal with the prosecutors?

20      A.  Yes, I recall.

21      Q.  You recall you went over your cooperation agreement that

22      had all sorts of potential financial implications as well such

23      as requirements to pay taxes and potentially fines and other

24      things in that agreement?

25      A.  Yes.
```

1    Q.  Isn't it true, sir, that the same day you signed your

2    agreement, you made plans to go on a gambling junket to Las

3    Vegas?

4    A.  Yes, for my birthday.

5    Q.  Sir, isn't it a fact that you then went and you wired

6    $50,000 from your bank account to use there while gambling?

7    A.  Yes, I did.

8    Q.  Is it fair, sir, that on that trip, your average bet was

9    around $4,000 and you gambled until 3 in the morning?

10   A.  I don't recall that.  I don't recall the details of the

11   trip.  But my wife was with me and two other couples went with

12   us.  It was for my birthday, and I had been under a lot of

13   pressure, and we had a good time.

14   Q.  Sir, do you recall your average bet was $4,000?

15   A.  I don't recall precisely what it was, no, sir.

16   Q.  Did you tell the prosecutors you were going on this trip to

17   Las Vegas and spending $50,000 after signing your agreement?

18   A.  I don't recall ever telling them, no.

19   Q.  Sir, do you recall, in addition to that, while you were

20   well into your proffer sessions or cooperation, making a

21   significant trip to travel to Punta Mita in Mexico?

22   A.  Yes, it was a family vacation that we had planned before I

23   even started interviewing with the prosecutors.

24   Q.  Do you recall, sir, that you finalized the plans in

25   March 17, 2016, when you are in the midst of this, and

1    committed to spending over $18,000 for this trip?  Do you

2    recall that sir?

3              MS. CUCINELLA:  I'm going to object to this line of

4    questioning.  We seem to be so far afield at this point that we

5    object.

6              THE COURT:  I'll give Mr. Berke a little bit of

7    latitude.  Keep it moving, Mr. Berke.

8              MR. BERKE:  Yes, your Honor.

9    Q.  Do you need the question again, sir?

10   A.  I'm sorry.  Can you repeat the question?

11   Q.  Do you recall, sir, on March 17 while you were in the midst

12   of trying to get your deal with the prosecutors, you made final

13   reservations to go to Punta Mita, Mexico, and committed to

14   spending $18,000?

15   A.  I recall that I rented a house that I committed to earlier

16   in the year before I started the proffer agreement, the proffer

17   process.  And I made a final payment I believe in March.  I

18   rented a house and took my entire family and my grandkids.

19   Q.  After that trip -- the prosecutors agreed you could go to

20   Mexico, right, sir?

21   A.  Yes, they did.

22   Q.  Did you tell them at the time you were spending $18,000 on

23   a trip?

24   A.  I don't think they asked me, no.

25   Q.  Sir, you have said that you and Mr. Walters are very

1  different people, isn't that correct?  Isn't that one of the

2  things you told the prosecutors?

3  A.  I don't recall that, counselor.

4  Q.  Let me show you what's been marked as -- well, let me ask

5  you.  You grew up under very different circumstance, correct?

6  A.  I believe that to be accurate, yes.

7  Q.  You visited with Bill and Susan Walters, correct?

8  A.  I have in the past, yes.

9  Q.  You know he's been married to Susan Walters for 40 years,

10  correct?

11  A.  Yes.

12  Q.  Mr. Walters really doesn't drink, correct?

13  A.  I'm sorry?

14  Q.  Mr. Walters doesn't drink hardly at all?

15  A.  I am aware of that, yes.

16  Q.  You are a big drinker, correct, sir?

17  A.  I wouldn't characterize my drinking as being a big drinker,

18  no.

19  Q.  You had a drinking problem in your past, correct, sir?

20  A.  I'm not sure that's accurate either.

21  Q.  Did you tell the prosecutors that you did?

22  A.  I told the prosecutors that I had been under a lot of

23  pressure, and my health was poor, and which led to the health

24  problems that I had in the fall of 2015.  And I think some of

25  that was brought up by excessive use of alcohol, yes.

1   Q.  You know, sir, that Mr. Walters -- withdrawn.

2           You knew that Mr. Walters had a lot of respect for

3   some people that you were friends with, correct?

4   A.  Had a lot of respect for whom?

5   Q.  For people who you were friends with at a time, isn't that

6   true, sir?

7   A.  I'm not sure I knew what Mr. Walters thought, but he had --

8   we had some mutual friends.  I would characterize it that way.

9   Q.  For example, Bill Saxon.  That was someone who at the time

10  you were very friendly with, correct?

11  A.  Yes.

12  Q.  You were aware that Mr. Walters has expressed he had a lot

13  of respect and admiration for Mr. Saxon, correct?

14  A.  Yes, I think that was the case.

15  Q.  You knew that Mr. Walters at times was interested in your

16  viewpoint about financial matters and Wall Street when he had

17  transactions that could be relevant to that, isn't that true,

18  sir?

19  A.  He -- I think we've already -- I've already testified and

20  it's already been demonstrated that he showed me some business

21  transactions that I tried to give him advice on.

22  Q.  But you thought that was sincere, that he was interested in

23  your input and advice, correct?

24  A.  Yes.

25  Q.  I want to ask you about some of your testimony on direct

1    about the time you went to Mr. Walters to ask him for a loan.

2    Do you recall that, sir?

3    A.  Which time?

4    Q.  Well, sir, do you recall testifying that there was a time

5    in 2010 that you went to Mr. Walters and you visited him in Las

6    Vegas and you asked him for a loan?  Do you recall that, sir?

7    A.  Yes.

8    Q.  Do you recall, sir, you told Mr. Walters that because of

9    all of the things you described, in terms of where your money

10   was, that while you had wealth, you didn't have liquidity,

11   correct?

12   A.  I think that's accurate, yes.

13   Q.  You also explained to him about the divorce, and that had

14   taken half of your liquid assets, at least at the time,

15   correct?

16   A.  Yes, I think that's accurate.

17   Q.  You told him that you thought he would better understand

18   that you had the financial wherewithal, and it would be less

19   hassle and easier to do than going to a bank?

20   A.  I don't recall saying that specifically.

21   Q.  But you recall, sir, explaining to him what your assets

22   were and why you were of substance and would be able to pay him

23   back?

24   A.  Yes, I think I had some -- some -- gave him some

25   background.

1   Q.  Sir, let me ask you.  So when you flew out to meet with

2   Mr. Walters, you had met him at his golf course Bali Hai, he

3   owns that in Las Vegas, correct?

4   A.  Yes.

5   Q.  It has a big dining area and he has an office there that he

6   works out of, correct?

7   A.  Yes.

8   Q.  You met in his office to have these discussions, correct?

9   A.  No, actually we met in the dining room.

10  Q.  The dining room, you had lunch.  Did you go in his office

11  at all?

12  A.  I'm sorry?

13  Q.  Did you go in his office at all?

14  A.  I didn't hear you.  Pardon me.

15  Q.  I asked did you go in his office at all?

16  A.  Not that I recall on that trip.  I think we sat in the

17  dining room the entire time.

18  Q.  You had lunch there, correct?

19  A.  Yes.

20  Q.  You explained why you needed the loan?

21  A.  Yes.

22  Q.  Sir, you knew, did you not, that Mr. Walters in gambling on

23  sports in Las Vegas, that he needed to use cash because in Las

24  Vegas to gamble on sports you need to use cash.  Did you know

25  that at the time, sir?

1   A.  I don't recall him telling me that, but I would certainly

2   assume that.

3   Q.  I think you already said at this time that Mr. Walters at

4   that time was a very large and active sports gambler, correct?

5   A.  Yes.

6   Q.  Mr. Walters didn't in any time suggest that he would go

7   into a safe and just give you cash, did he?

8   A.  No.

9   Q.  There was never any suggestion at any time of Mr. Walters

10  giving you any of his cash, was there?

11  A.  No.

12  Q.  You talked about Mr. Walters ultimately telling you that he

13  would put you in touch with a friend of his who was in the

14  loaning business with his money, Luther James, correct?

15  A.  Yes.

16  Q.  And we've already gone through it.  You signed agreements

17  with Luther James, correct?

18          THE COURT:  I think we've covered this, Mr. Berke.

19          MR. BERKE:  Yes.

20  Q.  Sir, what I want to ask you is, you recall you had said you

21  made interest payments for close to a year and you don't recall

22  him ever following up.

23          THE COURT:  Haven't you already covered this on

24  cross-examination, sir?

25          MR. BERKE:  I have not, your Honor.

1       THE COURT:  I'll accept your representation.  Go

2   ahead.

3   A.  I'm sorry.  What was the question?

4   Q.  Do you recall you were asked on direct if you recalled

5   Mr. James ever following up with you about when you fell behind

6   in what you owed in monthly payments in terms of interest?

7   A.  Yes, I didn't recall him following up.

8   Q.  Do you recall at some point when you hadn't paid the loan

9   in full, that you did a note extension with Luther James?  Do

10  you recall that, sir?

11  A.  Yes, I think that's accurate.

12  Q.  You signed, and again you signed a note extension, an

13  actual document, correct?

14  A.  I think that's correct, yes.

15  Q.  Do you recall, sir, that when you were falling behind in

16  your statements, at some point Mike Luce asked you to send him

17  a financial, an updated financial statement?

18  A.  Yes, I think I recall that.

19  Q.  You recall that in January of 2012, you told Mr. Luce that

20  you would like to take care of this and take care of the loan?

21  Do you recall that, sir?

22  A.  Yes, I do.

23  Q.  Do you recall, sir, when you fell behind, do you recall,

24  sir, having calls from Luther James' office?

25  A.  I don't recall that, but it could have happened.

1   Q.  You recall that Luther James was in -- do you recall that

2   he was in a 502 area code, sir?  Do you recall that?

3   A.  I don't know what his phone number was.

4   Q.  Let me show you what's marked into evidence as -- let me

5   show you marked for identification DX 5439.  Do you recall, sir

6   he was in a 502 area code?

7             THE COURT:  Do you recall he was in a 502 area code?

8   Stop looking at the screen.  The question is whether you recall

9   he was in a 502 area code.

10            THE WITNESS:  I did not recall that, no.

11            THE COURT:  Next question.

12  Q.  Do you recall at some point when you fell behind being told

13  that Mr. James no longer was interested in having you as a

14  lender?  Do you recall that?

15  A.  No.  I don't recall that.

16  Q.  Well, you recall hearing from Mike Luce that Mr. James was

17  concerned you fell behind but that Bill Walters had agreed to

18  take over the loan?

19            MS. CUCINELLA:  Objection, hearsay.

20            MR. BERKE:  It goes to his state of mind, your Honor.

21            THE COURT:  I'll allow it not for the truth of its

22  content.  Go ahead.

23  A.  Could you repeat the question, please?

24  Q.  Do you recall that you were told that you were falling

25  behind, and that Mike Luce said that The Walters Group had

1    agreed to take over the loan?

2    A.  I recall getting an e-mail from Mike Luce that said they'd

3    taken over the loan, yes.

4    Q.  But you recall that was when you fell behind with Luther

5    James?  Do you recall that, sir?

6    A.  Yes, I think that's accurate.

7    Q.  You recall we talked about you had to sign a new note, but

8    that was at 2 percent -- I'm sorry, at prime plus 2 percent

9    instead of the old prime plus one and a half, correct?

10   A.  Yes.

11   Q.  It was in the context of The Walters Group contemplating

12   that agreement that you had to provide your financial

13   statement, isn't that true?

14   A.  I don't recall that.  No.

15   Q.  Do you recall, sir, that it was in January where you were

16   asked to provide updated financials in connection with the

17   loan?

18   A.  I don't recall that.

19   Q.  Let me show you what's marked as Defense Exhibit 1539 for

20   identification.  Is that an e-mail from Mike Luce to you

21   regarding the loan?

22   A.  Yes, it is.

23   Q.  Dated January 3, 2012, correct?

24   A.  Yes.

25          MR. BERKE:  Your Honor, I would offer Defense Exhibit

H3n3wal5                              Davis - cross

1    1539.

2             THE COURT:  Any objection?

3             MS. CUCINELLA:  No objection.

4             THE COURT:  Received.

5             (Defendant's Exhibit 1539 received in evidence)

6             MR. BERKE:  Sir, may I publish -- I will publish it,

7    Mr. McLeod.  Thank you.  If we can go to the bottom.

8    Q.  Sir, you're saying you're going to send an updated

9    financial statement, correct?

10   A.  Yes.

11   Q.  And then if you go to the next.  Well, okay.  That's okay.

12            Now let me show you a document marked for

13   identification as 1537.  Defense Exhibit 1537.  And that is an

14   e-mail from you to Mike Luce, correct?  January 12, 2012?

15   A.  Yes.

16            MR. BERKE:  Your Honor, I'd offer Defense Exhibit

17   1537.

18            THE COURT:  Any objection?

19            MS. CUCINELLA:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 1537 received in evidence)

22            MR. BERKE:  Mr. McLeod, if we may publish.

23   Q.  You see if you look at the bottom, sir, you see where

24   you're saying to Mr. Luce on January 12 "I certainly haven't

25   forgotten about you.  I have been trying to move my loan.  I

 1   will get you my updated financial shortly."

 2          Sir, what that reflects, doesn't it, is you understood

 3   you, to move your loan from Luther James, Mr. Walters' group

 4   said they would be willing to take it, but they want your

 5   financial statements to review.

 6          Isn't that what that means, sir?

 7   A.  I told him I was going to try to get him an updated

 8   financial, yes.

 9   Q.  Then if you, just one more, go to Defense Exhibit 1538.

10   And again, this is another e-mail from you to Mike Luce the

11   following day, January 13, correct?

12   A.  Yes.

13          MR. BERKE:  Your Honor, I would offer into evidence

14   Defense Exhibit 1538.

15          MS. CUCINELLA:  Your Honor, the bottom e-mail from

16   Mr. Davis we have no objection to.

17          THE COURT:  Okay.

18          MR. BERKE:  That's fine, I'll offer just that.

19          THE COURT:  It's received.

20          (Defendant's Exhibit 1538 received in evidence)

21          MR. BERKE:  If we can just show the bottom.

22   Q.  Mr. Davis, will you read that e-mail that you wrote to Mike

23   Luce on January 13?

24          THE COURT:  The jury has it on the screen.  They can

25   read it.  It's in evidence.

1           MR. BERKE:  Thank you.

2           THE COURT:  Next question.

3    Q.  When you say "Obviously I want to take care of this for my

4    benefit and to clean this up for BW," BW is Bill Walters,

5    right?

6    A.  Yes.

7    Q.  You understood this loan was an issue now, and you were

8    trying to figure out the best way to clean it up, correct?

9    A.  It was an issue for me and him, yes.

10   Q.  Ultimately, we've seen documents, you've signed a new

11   agreement, correct?

12   A.  Yes, I did.

13   Q.  While that agreement was outstanding, we saw -- you believe

14   you indicated you received regular documentation from -- or you

15   testified to regular documentation from the accounting firm

16   that certified that the debt was outstanding and it was a good

17   debt, correct?

18   A.  Yes, that's correct.

19   Q.  And you would sign those and send those in, correct?

20   A.  I did, yes.

21   Q.  Sir, do you recall you testified on direct that you do not

22   recall Mr. Walters or Mike Luce asking you about repaying the

23   loan?  Do you recall that, sir?

24           MS. CUCINELLA:  Objection, that misstates the

25   defendant's prior testimony.

 1                THE COURT:  Do you have the testimony, Mr. Berke?

 2                MR. BERKE:  Your Honor, I will go to the documents.

 3       That's fine.

 4       Q.  Let me show you a document marked Defense Exhibit 1540.

 5       This e-mail exchange between you and Mike Luce dated "update."

 6                THE COURT:  You're asking him whether it's an update?

 7       What's your question?  What's your question, Mr. Berke?

 8       Q.  This is an e-mail on the bottom from you to Mr. Luce,

 9       correct?

10       A.  Yes.

11       Q.  And the top one, correct?

12       A.  Yes.

13                MR. BERKE:  Your Honor, I would offer Defense Exhibit

14       1540 into evidence.

15                THE COURT:  Any objection?

16                MS. CUCINELLA:  Only the e-mail, I believe it is the

17       middle e-mail from Mr. Davis.

18                MR. BERKE:  The two e-mails on the bottom from

19       Mr. Luce and Mr. Davis, I'll offer that, and not the top

20       e-mail, your Honor.

21                THE COURT:  Any objection?

22                MS. CUCINELLA:  No, I think there is a government

23       exhibit on this, so no.

24                THE COURT:  Received.

25                (Defendant's Exhibit 1540 received in evidence)

1    THE COURT:  Ladies and gentlemen, you'll have all the

2    exhibits that have been received into evidence in the jury room

3    at the time of deliberations.

4    Q.  I show you Defense Exhibit 107.  This e-mail is between you

5    and Mike Luce from June 2012, correct?

6    A.  Yes.

7         MR. BERKE:  Your Honor, I'd offer Defense Exhibit 107.

8         THE COURT:  Any objection?

9         MS. CUCINELLA:  No objection.

10        THE COURT:  Received.

11        (Defendant's Exhibit 107 received in evidence)

12   Q.  Sir, you see on the bottom that Mr. Luce says to you "Can

13   you give me an update on anything that may happen, including

14   the bank and potential cash for note reduction."  Do you see

15   that, sir?

16   A.  Yes, I do.

17   Q.  You understand that "note reduction," that was paying down

18   your loan, correct?

19   A.  Yes.

20   Q.  Sir, you recall that this loan did not require periodic

21   payments that you had with Mr. Walters, but simply that you pay

22   it off in full by a certain date?  Do you recall that?

23        MS. CUCINELLA:  Objection.  If Mr. Berke could

24   clarify, I believe there were multiple loans outstanding at

25   this point, so just clarify what you're referring to.

1   Q.   The loan we're talking about that Mr. Walters agreed to

2   take over that you previously had with Luther James.

3   A.   What was the question?

4   Q.   Do you recall that this loan, unlike the Luther James loan,

5   did not require monthly interest payments?

6   A.   I think that's correct, yes.

7   Q.   It required simply at the end of the loan to pay the

8   principal and any interest that accrued?

9   A.   Yes.

10  Q.   Sir, I want to ask you about Periscope.  To be clear, you

11  were on the board of Periscope, correct?

12  A.   Yes, I was.

13  Q.   Am I right, sir, that when you went to Mr. Walters with

14  this opportunity, you had indicated you thought this was a very

15  good opportunity, correct?

16  A.   Yes.

17  Q.   Am I right that still, Mr. Walters and Mr. Luce required

18  you to send them a lot of information about it to evaluate

19  whether they thought this was an investment for them to do?

20  A.   I know I sent Mr. Luce a long e-mail which I think is

21  already in evidence.

22  Q.   We saw actually a number of e-mails, do you recall -- yes.

23           You explained to Mr. Walters and Mr. Luce why you

24  thought that for a $300,000 investment it would immediately be

25  worth a multiple of that, correct?

```
 1    A.  Yes, I think I did.

 2    Q.  You recall, sir, that you would provide periodic updates

 3    about Periscope to both Mr. Walters and Mr. Luce about what was

 4    going on for any significant developments from Periscope?  Do

 5    you recall that, sir?

 6    A.  Yes, I think I did.

 7    Q.  That included things that happened at board minutes or

 8    significant business developments with regard to Periscope,

 9    correct?

10    A.  Yes.

11    Q.  Periscope was successful, is that right, sir?

12    A.  Yes, it was.

13    Q.  Do you recall, sir, when it appeared that Periscope was

14    going to be successful, having discussions starting in --

15    starting fairly early on about using the proceeds from

16    Periscope to pay down the note that you had for Mr. Walters

17    that he had taken over from Mr. James?

18              MS. CUCINELLA:  Objection.  The "fairly early on" is

19    an incredibly unclear period of time.

20              THE COURT:  Do you understand the question, Mr. Davis?

21              THE WITNESS:  Yes, sir, I do.

22              THE COURT:  Then you can answer it.

23    A.  I had some communication with Mike Luce, as I recall, about

24    allocating a portion of my distributions that I was going to

25    receive from Periscope to reduce the note.
```

H3n3wal5                          Davis - cross

1    Q.  Sir, I want to clarify one point.  Periscope was a private

2    company, correct?

3    A.  Yes, it was.

4    Q.  So it didn't trade on any market or anything like that,

5    correct?

6    A.  Correct.

7    Q.  So it was perfectly fine for you to discuss Periscope with

8    Mike Luce and Bill Walters?

9    A.  Absolutely.

10   Q.  Sir, if I could show you what's been marked for

11   identification 1516, DX.  So this is e-mail exchanges between

12   you and Mike Luce?

13   A.  Yes.

14           MR. BERKE:  Your Honor, I'd offer Defense Exhibit 1516

15   for identification.

16           THE COURT:  Any objection?

17           MS. CUCINELLA:  No.

18           THE COURT:  Received.

19           (Defendant's Exhibit 1516 received in evidence)

20           MR. BERKE:  If we can start at the bottom and scroll

21   up.

22   Q.  You understood the renewal on your note, again, is the loan

23   we've been talking about, correct?

24   A.  Yes.

25   Q.  And check on Periscope and the bank, that was the bank

1    renewal transaction you talked about on direct, right?

2    A.  It's the bank recap transaction.

3    Q.  If we go to the next e-mail above it.  And then to the top.

4           Sir, do you recall that if I can show you what's

5    marked as Defense Exhibit 4987.  Actually if I can show you,

6    excuse me, 4986.

7           Sir, this is e-mail exchanges between you and Mike

8    Luce with regard to Periscope in June of 2014?

9    A.  Yes, I recall this.

10          MR. BERKE:  Your Honor, I'd offer Defense Exhibit

11   4986.

12          THE COURT:  Any objection?

13          MR. GOLDMAN:  One minute.

14          MS. CUCINELLA:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 4986 received in evidence)

17   Q.  Sir, do you see, if you go down a little bit lower, please.

18   I'm sorry, a little bit higher.

19          You see there's an e-mail that was sent to Mike Luce

20   and forwarded to you, and on the bottom it says "We received

21   this income from Periscope.  The back of the check is signed

22   over to the TWG.  Please let me know if you're okay with us

23   depositing this way."

24          Did you understand TWG was The Walters Group?

25   A.  Yes.

1  Q.  Now if we can go to the top one.  Do you recall Mike Luce

2  asked you -- wanted to know what portion -- "I need to

3  understand what portion of the proceeds was The Walters Group

4  and what portion was yours because it was going to be applied

5  to the note."  Do you recall that?

6  A.  Yes, I do.

7  Q.  This refers to the 80-20 split that you testified, right?

8  A.  Yes, I think it does.

9  Q.  You had an understanding by this time that the 20 percent

10  was going to be applied to pay down the note we've been talking

11  about, correct?

12  A.  I think at this point in time we did not have that

13  understanding.  I think this brings that into question, because

14  he's asking me a question "we'll apply the amount to your

15  portion of the note."

16  Q.  No question, sir, you understand that that means I'll apply

17  that amount to your note, that referred to the loan we've been

18  talking about, correct?

19  A.  Yes, of course, yes.

20  Q.  That's ultimately what happened, right?

21  A.  I believe that's the case, yes.

22  Q.  Let me show you what has been marked as Defense Exhibit

23  597.  These are e-mails between you and Mike Luce again on the

24  same topic, correct?  Periscope.

25  A.  This is in January of 2016.

1  Q.  Yes.

2  A.  Yes.

3  Q.  Okay.  You see where it says "I'm mailing a check today for

4  62,000 --"

5          THE COURT:  It's not in evidence.

6          MR. BERKE:  I'm sorry, your Honor.  I would offer into

7  evidence, Defense Exhibit 597.

8          THE COURT:  Any objection?

9          MS. CUCINELLA:  May I have one moment, your Honor?

10         THE COURT:  Yes.

11         MS. CUCINELLA:  Your Honor, may we have a brief

12 sidebar?

13         THE COURT:  No.  Do you have an objection?

14         MS. CUCINELLA:  We have an objection simply based on

15 the period of time based on an issue that defense counsel

16 raised yesterday regarding this particular month and year and

17 the communications and the status of the communications.

18         MR. BERKE:  Your Honor, I'm happy to put it off to the

19 side for now.

20         THE COURT:  Fine.

21         MR. BERKE:  We'll deal with it later.  Thank you.

22 Q.  Sir, isn't it a fact that on the Periscope transaction, you

23 actually used part of the Periscope proceeds that were supposed

24 to go to The Walters Group for your own personal expenses?

25 Isn't that true, sir?

1    A.  Yes, and I told Mike Luce I was going to do that.  I

2    actually took some of the funds and paid down credit card debt

3    and I also allocated approximately $80,000 from my share of

4    income taxes on the Periscope deal, and I told Mike Luce all of

5    that, and he told me he was going to take care of that relative

6    to my note balance.  So whatever I used --

7              THE COURT:  Keep going.

8    A.  My understanding with Mr. Luce was whatever funds I used

9    for my personal benefit for taxes and/or anything else, he was

10   going to debit to my note balance.

11   Q.  Let me ask you about that.  So I want to divide it up.

12   This investment, I believe you testified on direct, was made

13   through a partnership, wasn't it?

14   A.  Yes, it was.

15   Q.  The partnership had certain tax expenses, correct?

16   A.  We had auditing expenses every year, we had Texas franchise

17   tax expenses, which were not insubstantial.

18   Q.  You told Mike Luce that any expenses related to the

19   partnership would come out before there were distributions,

20   correct?

21   A.  I believe I did that, yes.

22   Q.  What you didn't tell him is that you were also going to use

23   it to pay your own personal debt and expenses, having nothing

24   to do with the partnership.  Isn't that true, sir?

25   A.  No, that's not correct.  I absolutely did tell him that.

1    Q.  Let me show you what has been marked Defense Exhibit 608

2    for identification.  Again, this is an e-mail between you and

3    Mike Luce?

4    A.  Yes.

5    Q.  If we can scroll down as well.

6              MR. BERKE:  I would offer Defense Exhibit 608 into

7    evidence.

8              THE COURT:  Any objection?

9              MS. CUCINELLA:  No objection.

10             THE COURT:  Received.

11             (Defendant's Exhibit 608 received in evidence)

12             MR. BERKE:  Your Honor, if I can just have one moment.

13             THE COURT:  You may.

14             MR. BERKE:  Thank you.

15             THE COURT:  Ladies and gentlemen, why don't you stand

16   up and stretch.

17             Go ahead, Mr. Berke.

18             MR. BERKE:  Thank you, your Honor.

19   Q.  Do you see where you say in Defense Exhibit 608 on

20   November 2014, that you have not taken any money out of the

21   distributions, so you hope you will credit me for 20 percent of

22   the distributions on my loan balance.

23             Do you see where you say that, sir?

24   A.  Yeah, I think that's accurate as of the date of this

25   e-mail, yes.

H3n3wal5                          Davis - cross

1    Q.  Isn't it a fact, sir, that three days prior you had written

2    a check $10,000 for your personal expenses to Bank of America?

3    A.  I don't recall the date of that.

4    Q.  Let me show you what's marked as Government Exhibit 1708-A

5    in evidence.  I'm sorry.  You see, sir?

6    A.  Yes.

7    Q.  Three days prior --

8    A.  Yes.

9    Q.  That's $10,000?

10   A.  Yes.

11   Q.  And you remember what you wrote to Mr. Luce on the 13th,

12   that you've not taken any money out of the distributions?

13   A.  Yes.

14   Q.  You recall, sir, that this check is for you and your

15   personal expenses?

16   A.  Yes, that's correct.

17   Q.  You recall, sir, that the day after you wrote this e-mail

18   to Mr. Luce that you had not taken any money out of the

19   distributions, you wrote a $40,000 check to your own personal

20   checking account?

21   A.  Yes, I recall that.

22   Q.  You recall, sir, that there were multiple payments to

23   yourself totaling $126,161.69?

24   A.  Over a period of time.  I think that's accurate, yes.

25   Q.  Those were your personal expenses, correct?

H3n3wal5                         Davis - cross

1    A.  They were, some were for my personal expenses and I think

2    some were -- I was reserving some money for taxes as well.

3    Q.  Well, sir, isn't it right that you had a capital -- you had

4    a tax obligation of $79,000 for capital gains, isn't that true,

5    sir?

6    A.  Yes.

7    Q.  But in addition to that, there was 126,000 and change that

8    you paid to yourself, isn't that right, sir?

9    A.  I think that's totally accurate, and I discussed it with

10   Mike Luce over the phone prior to doing it.

11   Q.  So your testimony is, notwithstanding your statement in

12   response to his question in November whether these were all

13   payments in your statement that you haven't taken any money

14   out, that he knew that was an untrue statement because you had

15   already taken the 10,000, and were going to take another 40,000

16   out?  Is that your testimony, sir?

17   A.  I'm telling you I had this conversation with Mike Luce, and

18   I told him we were going to have further distributions and I

19   would square up the account with the further distributions.

20             (Continued on next page)

21

22

23

24

25

1   Q.  Could I pull up again 202 -- 608, so I can show the

2   question that Mike Luce asked you?

3   A.  Yes.

4   Q.  On the bottom.

5        Do you see the question, Mike Luce asked, Is this

6   Walters' share or do we need to apply the 20 percent?  And it

7   was to that that you answered, I have not taken any money out

8   of the distributions, so credit me for the 20 percent.

9   A.  Yes.

10  Q.  At that time, sir, you had taken out money, and then you

11  ultimately, before sending more money to the Walters Group, you

12  took out even more money from Periscope, didn't you, sir?

13  A.  I did.  And I'm telling you I had a phone conversation with

14  Mike Luce about this.  So we had complete clarity on what I was

15  doing.

16  Q.  You would agree with me, sir --

17  A.  I hadn't finished my answer.

18  Q.  Please do.

19  A.  If I was trying to hide this, I certainly wouldn't have

20  written a check on Periscope checks.  There was an easier way

21  to hide this, and I wasn't trying to hide anything.  They had

22  complete and total access to all the Periscope accounts.

23  Q.  Sir, you will agree with me, the Shelter Golf checks were

24  written on the Shelter Golf account statements to you

25  personally, correct?

H3ndwal6                              Davis - cross

```
1    A.  Yes.
2    Q.  And you recall, sir, that the SEC had a lot of questions
3    for you about the monies you had taken out of Periscope and
4    asked you about that in your testimony, and then asked you
5    about it -- asked you to submit an accounting explaining the
6    monies and withdrawals you made; do you recall that, sir?
7    A.  Yes.  And I think I submitted a complete accounting for it.
8    Q.  And you indicated those monies were taken out for your own
9    personal use, correct?
10   A.  I didn't try to hide it, no.
11   Q.  Well, they had already found out about it.  They knew about
12   it.  They had the checks, and they asked about it in your
13   testimony; isn't that true, sir?
14   A.  I didn't hide it, either.
15   Q.  Sir, do you recall that you gave the accounting after you
16   were given testimony where they specifically asked you about
17   the distributions from Periscope to your personal checking
18   account?  Do you recall that, sir?
19   A.  They wanted a complete accounting about it and we gave it
20   to them, but I certainly didn't try to hide in my testimony
21   either.
22   Q.  Sir, do you recall being told in your testimony by the SEC
23   that they're going to -- on the record during your testimony,
24   that they are going to ask you to provide an accounting of
25   Periscope and the bank account because they wanted to come
```

1   up -- they could only come up with a certain amount and they

2   wanted an accounting of what you got out of that?  Do you

3   recall that, sir?

4   A.  Yes.

5   Q.  And you said, in the SEC, you'll give them a complete

6   account.  Do you recall that, sir?

7   A.  Yes.  I think that's correct.

8   Q.  And you recall, sir, after you were asked about the

9   finances of Periscope and asked to give an accounting, only

10  then did you make another $50,000 check to the Walters Group

11  from Periscope Preferred; do you recall that, sir?

12  A.  I remember the timing of it, yes.

13  Q.  And this is all during a time, sir, that you allege,

14  correct, that you were in this so-called conspiracy with

15  Mr. Walters?  It is the same time period, correct, sir?

16  A.  I'm sorry.  What timeframe are you referring to, counselor?

17  Q.  The time period when you wrote these checks to yourself,

18  sir.  Do you recall that?

19  A.  This is 2014?

20  Q.  Yes.

21  A.  And 2015?

22  Q.  No.  2014, sir.  You are alleging that you had entered --

23  that you had been in this conspiracy with Mr. Walters, correct?

24  A.  Yes.

25  Q.  Had been for years?

1    A.   Yes.

2    Q.   There was another investment, Park Cities Bank, correct?

3    A.   Yes.

4    Q.   And, again, you provided this to Mr. Walters and the

5    Walters Group and Mike Luce, telling them this was a great

6    opportunity, a great investment, correct?

7    A.   Yes, I did.

8    Q.   And you actually went to a lot of people you know

9    throughout Dallas in pitching the deal and explaining why this

10   was such a good opportunity if you could finance this and

11   recapitalize this bank in Texas, correct?

12   A.   I went to a lot of people all over the United States.  I

13   worked on it for approximately a year and traveled all over the

14   United States trying to raise this money.

15   Q.   And there are a ton of documents that reflect showing you

16   meeting with them pitching a lot people who you knew from

17   business and the community in Dallas, correct?

18   A.   Yes.

19   Q.   And you were working on this with a gentleman by the name

20   of Roy Salley, is that right?

21   A.   Yes.  He was the community banker who was actually going to

22   run the Park Cities Bank if we were successful.

23   Q.   And in addition to talking to Mr. Walters about a line of

24   credit, which you talked to him about, which you talked about

25   in your direct testimony, you were also talking about making an

H3ndwal6                          Davis - cross

1    investment?

2    A.  Yes.  I did.

3    Q.  OK.  And am I right, sir, that what you were trying to do

4    and you -- and you had some partners in this, correct?

5    A.  Partners in what?

6    Q.  People who were working with you to try to raise the

7    capital for the recapitalization.

8    A.  We had an investment banking firm in Dallas that was

9    assisting us, yes.

10   Q.  And, also, you had in addition to -- there was Roy Salley

11   working with you, correct?

12   A.  Yes.

13   Q.  And the other individuals raising -- working with you to

14   raise money?

15   A.  Yes.  It was a firm in Dallas called Commerce Street

16   Capital.

17   Q.  Who was the individual from Commerce Street Capital, sir?

18   A.  There were two or three gentlemen that were working on it

19   with us.

20   Q.  And you -- and when you told Mr. Walters that this was --

21   and when you told Mr. Walters and Mike Luce that this was a

22   good deal, you believed it?

23   A.  It was a good deal, too.  I was right.

24   Q.  And Mr. Walters and Mr. Luce, again, wanted to do a lot of

25   due diligence before they decided whether or not to do this

1    deal, correct?

2    A.  I don't recall those conversations but I would expect them

3    to do that, yes.

4    Q.  Well, you recall they asked you for documents and

5    information and a lot of emails back and forth in that regard?

6    A.  I think that's true.

7    Q.  And they were trying to decide whether or not to invest

8    their money, correct?

9    A.  I think they were trying to decide whether or not they

10   wanted to make a commitment.  Initially it was going to take

11   quite a while to get the bank deal closed, so there was no

12   cutoff point that I recall pressing them for a decision on

13   this.

14   Q.  Right.  Could I be clear?  So what you were trying to do is

15   get commitments or soft circles of this to people to say if you

16   get approved for this recapitalization, they will put up a

17   certain amount of money, correct?

18   A.  Yes.  I think that's accurate, yes.

19   Q.  And during this process you were getting those, at times

20   you had over 50 million or 60 million towards your goal,

21   correct?

22   A.  That's accurate, yes.

23   Q.  And in addition to that, you had told Mr. Walters that this

24   was a good deal but you were spending a lot of your time on it

25   because it required so much time to both line up the business

H3ndwal6                        Davis - cross

1    side of the recapitalization as well as raising the capital?

2    A.  Yes, I think that's accurate.

3    Q.  And you were spending a lot of your time doing it, correct?

4    A.  Yes.

5    Q.  And you told Mr. Walters that you were looking for a line

6    of credit so you could use those monies to pay the expenses

7    related solely to the bank recapitalization, correct?

8    A.  Yes.  I didn't say "solely" to the bank recapitalization.

9    I think -- I've already testified about this, counselor, and I

10   think I went to him and said I want a line of credit and I need

11   it for some working capital, including expenses I'm going to

12   incur with regard to raising this bank money.

13   Q.  Sir, you indicated that the line of credit was for the

14   business transaction of the bank recapitalization, didn't you,

15   sir?

16   A.  I'll try this one more time.  I indicated to him I needed

17   some working capital, and specifically a line of credit, that I

18   needed to draw down on.

19   Q.  For the Park Cities work, correct?

20   A.  Primarily, yes.  I think that's accurate.

21   Q.  No.  I want to ask you about primarily, sir.

22          Isn't it a fact that you told him you needed the money

23   to pay for your involvement with Park Cities Bank?

24   A.  I don't recall that.

25   Q.  Do you recall, sir, when you met with the prosecutors in

1    March 31, 2016, you told them that you went to Mr. Walters and

2    you told them that you needed the money to pay for your

3    involvement with Park Cities Bank?

4    A.  Well, I'm going to restate what I thought to be the case,

5    which is I needed working capital that I was going to use to

6    help me raise this money for the bank.

7    Q.  So you did tell them that this was a line of credit to be

8    used for the work on the bank, correct, sir?

9    A.  I don't know how I can say this any differently than I've

10   already said it.

11   Q.  Well, what I will say, sir, is you went to Mr. Walters and

12   said this is for a business transaction that I told you about,

13   the Park Cities deal, correct?

14   A.  I went to Mr. Walters and I told him I needed a line of

15   credit for working capital and that I was going to spend a lot

16   of time, probably a year or so, raising money for this

17   recapitalization of this bank.  That's what I told him.

18   Q.  And you told him you were going to use the line of credit

19   to pay for the expenses incurred in connection with that work,

20   correct?

21   A.  And some of that money would be for the expenses, yes.  It

22   would also pay for my time for a year.

23   Q.  But you lied to him, didn't you, because that wasn't in

24   your plan at all?  You lied to him?

25   A.  I don't think I was totally honest with him, that's

H3ndwal6                          Davis - cross

1    correct.

2    Q.  You weren't totally honest because you were already getting

3    the expenses paid -- a lot of the expenses paid by the

4    investment bank, weren't you, sir?

5    A.  They weren't paying me anything, no --

6    Q.  No --

7    A.  Wait a minute.  Let me finish my answer.

8    Q.  Please do.

9    A.  They weren't paying me a cent.  They were merely

10   reimbursing me for out-of-pocket expenses.  So they were not

11   compensating me for any of my work for a year.

12   Q.  I'm not talking about you, sir.  I'm talking about your

13   expenses.  You were having your expenses in connection with

14   Park Cities paid for by the investment bank, correct?

15   A.  I had some of my expenses, not all of them, yes.  That's

16   accurate.

17   Q.  And you led Mr. Walters and Mr. Luce to believe that you

18   were going to use this money in connection with expenses to

19   make this recapitalization happen; isn't that true, sir?

20   A.  I think that's accurate, yes.

21   Q.  When in fact your plan at the time was to use the money to

22   pay down various debts and expenses that were personal to you

23   and had nothing to do with the Park Cities work; isn't that

24   true, sir?

25   A.  I ended up using the money for various things, yes.

1    Q.  And, sir, in terms of -- do you recall when you got this

2    line of credit?

3    A.  It was in November.

4    Q.  Of 2011, correct, sir?

5    A.  Yes, that's correct.

6    Q.  And, again, sir, stepping back, this is the time period

7    when you testified on direct that you were giving allegedly all

8    this illegal information to Mr. Walters so he could make these

9    big investments in Dean Foods and make a lot of money; that's

10   your testimony, right, sir?  That's the same time period,

11   correct?

12   A.  It's certainly a small portion of the time period I gave

13   him inside information, yes.

14   Q.  And you never told Mr. Walters, or Mr. Luce, that you used

15   their money for personal expenses, as opposed to what you told

16   them you were going to use it for, did you?

17   A.  I think I've already testified to that, counselor.

18   Q.  You did not, correct, sir?

19   A.  Yes, that's correct.

20   Q.  And the deal that you signed with Mr. Walters was that you

21   would either have to pay back the loan, prime and interest, or

22   you would get a multiple of the shares of the bank

23   recapitalization, correct?

24   A.  That's correct.

25   Q.  And throughout the period -- this went on for some time,

1    correct, throughout 2012 -- throughout at least until May 2012,

2    correct?

3    A.  Actually, it went until September of 2012, when my

4    agreement with the bank expired.

5    Q.  And ultimately what happened was somebody else came in and

6    they got the deal; you got outbid, correct?

7    A.  I got outbid by another bank, yes.

8    Q.  So that the deal that Mr. Walters, Mr. Luce were interested

9    in investing in was actually a good deal; you just got outbid

10   by another player in the market who did what you were going to

11   do but at a different price, correct?

12   A.  That's correct.

13   Q.  And, sir, again, the people who you had reached out to, you

14   recall that you reached out to various members of the board of

15   Dean Foods, like Jim Turner and June Muse about this

16   investment?

17   A.  I don't recall specifically reaching out to them, but I

18   reached out to a lot of people, including a lot of

19   institutional investors in New York and Chicago and in San

20   Francisco and Boston.

21   Q.  I want to show you what's been marked as Defense Exhibit

22   586, for identification.

23        And, sir, is this an email from Mike Luce to you,

24   dated 5/21/2013?

25   A.  Yes.

1          MR. BERKE:  Your Honor, I would offer Defense Exhibit

2    586 into evidence.

3          THE COURT:  Any objection?

4          MS. CUCINELLA:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 586 received in evidence)

7          MR. BERKE:  Thank you, your Honor.

8    BY MR. BERKE:

9    Q.  And you see, sir, that this says, "Subject:  Note

10   renewal/Periscope."  And it says, "Tom.  I need to get a

11   renewal on your note and check on Periscope and the bank."

12         And, sir, you understood -- you know what Periscope

13   is; we talked about that, correct?

14   A.  Yes.

15   Q.  And the "bank," that's the bank recapitalization we have

16   been talking about, isn't it?

17   A.  Yes, sir.

18   Q.  Sir, by -- isn't it a fact, sir, that by September of 2012,

19   you knew that you had been outbid on your end of the deal?

20   A.  I'm sorry?

21   Q.  Wasn't it your testimony, sir, that by September of 2012,

22   you knew that the deal wasn't going to happen because you got

23   outbid by another market participant?

24   A.  Let's see.  I want to make sure I've got my timeframes

25   right.

1          (Pause)

2          Yes.  I think the -- I think the Periscope deal ended

3    in September of 2012.  I think that's right.

4    Q.  I'm asking about the bank recapitalization deal that we

5    were talking about.

6    A.  I'm sorry.  Pardon me.  I lost my train of thought here.

7    Q.  And do you recall, sir, that that deal fell apart for your

8    group and potential investors in September of 2012?

9    A.  I think that's right.  Yes, I think that's accurate.

10   Q.  But you see this email from Mike Luce is dated May 2013 and

11   he's still asking about the bank?

12   A.  Yes, I see that.

13   Q.  Is that because, Mr. Davis, you didn't tell Mr. Walters or

14   Mr. Luce that the bank deal that they gave you a line of credit

15   for had actually fallen through?

16   A.  I don't think that's accurate.  I think I told them long

17   before this.  I can't answer why Mike Luce asked me this

18   question.  But I don't think that's accurate at all because I

19   recall how disappointed I was when we got outbid by another

20   bank and I know I told Billy Walters about it?

21   Q.  When did you do that, sir?

22   A.  Shortly after the bank deal fell apart and we got outbid.

23   Q.  Sir, do you recall the line of credit was in the amount of

24   $400,000?

25   A.  Yes.

H3ndwal6                          Davis - cross

1    Q.  And you recall, sir, we talked about now at some length

2    that throughout this period of time after you got the line of

3    credit, in late 2011 through 2012, you were in great need of

4    cash, correct?

5    A.  I think that's a fair summary.

6    Q.  That's the time period when you took the money from Shelter

7    Golf, among other things, correct?

8    A.  I think that's accurate, yes.

9    Q.  But you did not draw down the last 50,000 from the line of

10   credit, did you, sir?

11   A.  No, I didn't.

12   Q.  And the reason you didn't is because you wanted to create

13   the impression for Mr. Walters that this really was for the

14   bank recapitalization business and you weren't simply drawing

15   it all down to use for some other purpose.  So despite your

16   dire need for money during that time period, you left the

17   50,000 to continue to defraud -- withdrawn -- to continue to

18   deceive Mr. Walters and Mr. Luce.

19              MS. CUCINELLA:  Objection.  Compound question.

20              THE COURT:  Sustained as to form.

21   Q.  Isn't it a fact, sir, that you left the $50,000 in the line

22   of credit as part of your efforts to deceive Mr. Walters and

23   Mr. Luce about your use of that money?

24   A.  Counselor, until you brought it up today, I never

25   considered that.  So, it's a clever theory, though.

H3ndwal6                    Davis - cross

1   Q.  You don't doubt, do you, sir, that you left the 50,000?

2   A.  I had no preconceived notion to do that, no.

3   Q.  But you did leave it in there, didn't you?

4   A.  I didn't draw down all the money, that's absolutely

5   100 percent correct.

6   Q.  And you were deceiving Mr. Walters about your use of the

7   money, correct?

8   A.  I think I've already testified to that, yes.

9   Q.  You also testified about another business transaction,

10  Benefit Harbor, correct?

11  A.  Yes.

12  Q.  And, again, this was a transaction you brought to

13  Mr. Walters and the Walters Group in October 2013, correct?

14  A.  Yes.  I think that's a correct timeframe, yes.

15  Q.  And again, sir, you thought this was a very good deal,

16  correct?

17  A.  And it was, again.

18  Q.  And then, again, you viewed this to be a benefit that you,

19  sir, were providing to The Walters Group and Mr. Walters by

20  presenting it to them, correct?

21  A.  Yes.  I think that's accurate, yes.

22  Q.  That's how you viewed Periscope, correct?

23  A.  Yes.

24  Q.  And that's how you viewed the bank recapitalization deal,

25  if it had gone through, correct?

1    A.  Yes.

2    Q.  And is it also fair, sir, if you recall, that Mr. Walters

3    and his colleagues at the Walters Group did a lot of due

4    diligence on this deal, too, before making a decision about

5    whether to be involved?

6    A.  I provided them a meeting -- I set up a meeting and brought

7    the management team of Benefit Harbor out to Las Vegas -- I

8    think it was in October -- in advance of this commitment that

9    the Walters Group made.

10   Q.  And that's because The Walters Group, Mr. Walters and

11   Mr. Luce, they were -- and the others folks at the Walters

12   Group were interested in meeting with the management of Benefit

13   Harbor before deciding whether to make an investment?

14   A.  Yes, they did.

15   Q.  Part of what they did is they provided a line of credit, or

16   an LC, some financing for Benefit Harbor, correct?

17   A.  Correct.  That's correct.

18   Q.  And when that ran out, or when it came to the end of its

19   term, Benefit Harbor wanted to continue that financing through

20   The Walters Group, correct?

21   A.  The letter of credit was for one year, and when it expired

22   the following November, the company had not immediately found a

23   replacement for the Walters' line of credit.  So, I did talk to

24   Mike Luce about a possible extension.

25   Q.  And you recall, sir, that the line of credit, ultimately

1    Mr. Walters and the Walters Group decided they had better uses

2    of their money and they declined to continue the line of

3    credit, correct?

4    A.  That's correct.

5    Q.  And the line of credit was also part of an investment in

6    Benefit Harbor, correct?

7    A.  It was actually a letter of credit, counselor, not a line

8    of credit.

9    Q.  A letter of credit.  And it was part of an investment in

10   Benefit Harbor, correct?

11   A.  They received stock as compensation for putting up the

12   letter of credit, yes.

13   Q.  And as we have seen from this time period, that you would

14   have discussions with Mr. Walters and Mr. Luce, from late 2011,

15   2012 into 2013, on all these transactions we have been talking

16   about, correct?

17   A.  Yes.  We had various discussions during that period, yes.

18   Q.  And looking at the monies that you ultimately owed from the

19   personal loan to the bank recapitalization line of credit,

20   those weren't the only financial obligations or loans you had

21   trouble paying back on a timely basis, were they, Mr. Davis?

22   A.  That's correct.  I think that's accurate.

23   Q.  In fact, during the same time period you owed money to a

24   variety of people, correct?

25   A.  I don't know what a variety of people is defined as.

H3ndwal6                         Davis - cross

1   Q.  Well, do you recall, sir, that you owed 220,000 to CSSF,

2   your investment entity with Mr. Lyons, Bucky Lyons?

3   A.  Yes.  I recall that, yes.

4   Q.  And you recall you borrowed 220,000 in 2008 and then

5   another 50,000 in December of 2008?

6   A.  I don't recall that specifically but -- I don't recall the

7   timing of the borrowings from CSSF.

8   Q.  Let me show you what's been marked as Defense Exhibit 4921.

9           And let me ask you, sir, do you recall, if you look at

10  this document, does that help refresh your recollection, the

11  loans were in 2008 initially?  Look at July and December, if

12  you look at the top.

13  A.  Yes.

14  Q.  And do you recall, sir, that ultimately you signed a

15  promissory note in 2010 that it was going to try to make this

16  due -- the note that you owed due in September of 2011?  Do you

17  recall that?

18  A.  I think that's accurate, yes.

19  Q.  And you recall that in the beginning of 2011 you owed CSSF

20  419,000?

21  A.  Yes, I think that's accurate.

22  Q.  And that was a personal loan to you, as well, correct?

23  A.  Yes.  My partner Bucky Lyon and I both had loans

24  outstanding to the partnership.

25  Q.  And do you recall, sir, that you fell behind in the

H3ndwal6                      Davis - cross

1    payments on that loan throughout that time period?

2    A.  I did, yes.

3    Q.  And you recall, sir, that you had frequent

4    communications -- well, withdrawn.

5          And you recall, sir, that Mr. Lyons had inquired at

6    various points in time whether any your investments when they

7    were coming due could be used to pay down your note to him?  Do

8    you recall that, sir?

9    A.  Not to him but to the partnership.

10   Q.  To the partnership?

11   A.  Yes.

12   Q.  And Mr. Lyons was one of the partners, correct?

13   A.  He was the partner of mine that we both had loans

14   outstanding, and he was trying to manage the loans that were

15   outstanding and I had an obligation to him, so I gave him an

16   update.  He would ask me periodically.

17   Q.  But you didn't pay off the note; you told him you couldn't,

18   correct?

19   A.  Not immediately, no.  I ultimately paid it all off.

20   Q.  Do you recall when you did that, sir?

21   A.  I think I made my last payment in -- gosh, when was it? --

22   in December of 2014, I think.  That's right.

23   Q.  And you recall, sir, that throughout 2012 you were

24   e-mailing him about your inability to pay back the loans?  Do

25   you recall that, sir?

1   A.  I'm sure we had email traffic back and forth, yes.

2   Q.  And you recall, sir, you convinced Mr. Lyons to extend your

3   note on three separate occasions before you had to pay it off?

4   A.  I don't recall that specifically but I know I had some

5   extensions, yes.

6   Q.  And there was nothing unusual or untoward or improper about

7   that, correct?

8   A.  Not at all.

9   Q.  You couldn't pay it and so he agreed to extend the note to

10  give you more time to pay it, correct?

11  A.  There was no issue between me and him about that, no.

12  Q.  And we talked about that -- just for timeframe, sir, am I

13  right that during the same time period there was a dispute

14  about monies and proceeds that your second wife claimed that

15  you owed her during this same time period we're talking about?

16  A.  I don't know when the dispute arose.  I'm not sure.

17  Q.  Well, do you recall, sir, as part of your divorce, there

18  were certain assets that were illiquid assets that she got

19  50 percent of when those assets were sold?

20  A.  Yes.

21  Q.  Do you recall, sir, the dispute was when those assets were

22  sold, how to measure what her 50 percent was and how much she

23  was owed?

24  A.  Yes.

25  Q.  And you recall, sir, that throughout an extensive period of

1    time, there was a lot of back and forth between you and her,

2    and you said you could only give her a certain amount but you

3    would give her what you could and try to give her more money?

4    A.  Yes, that's accurate.  The dispute arose because --

5              THE COURT:  I don't know that there is a question

6    pending.

7              THE WITNESS:  I'm sorry.

8    Q.  And, of course, sir, that you had trouble paying debts that

9    you incurred to casinos, correct?  We talked about that.

10   A.  I had problems with the Cosmopolitan, yes.  That's totally

11   accurate.

12   Q.  And that was the $200,000 debt we talked about, correct?

13   A.  Yes.

14   Q.  Sir, you understood that Mr. Walters was a well-educated

15   and a very informed investor, correct?

16   A.  I thought he was a well informed investor, yes, based on

17   what little I knew about his investing.

18   Q.  You knew that he researched the heck out of companies that

19   he was investing in, didn't you, sir?

20   A.  I didn't have personal knowledge of that, but from time to

21   time it was clear he got research from other sources.

22   Q.  Well, isn't it -- well, you knew he talked to a lot of

23   investment professionals who advised him, correct?

24   A.  He never really shared that with me, no.

25   Q.  Well, sir, let me ask you this.  He would ask you, who's

H3ndwal6                      Davis - cross

1  the best analyst covering Dean Foods; isn't that correct, sir?

2  A.  Yes.  He certainly did that.

3  Q.  You would give him the names of who you thought was best,

4  right?

5  A.  Yes.

6  Q.  And at various respective times he would ask you who you

7  thought had, you know, good understanding of Dean Foods,

8  correct?

9  A.  I think he did, yes.

10  Q.  And you would tell him, right?

11  A.  Yes.

12  Q.  And you would at times talk about analyst reports that you

13  had both read, correct?

14  A.  Yes.  I think that's accurate.

15  Q.  And you recall, sir, that Mr. Walters closely followed

16  various commodity prices that impacted Dean Foods and the

17  industry; do you recall that, sir?

18  A.  I don't know specifically that he followed commodity

19  prices.

20  Q.  Well, he would talk to you about it, wouldn't he, sir?

21  A.  We talked about a lot of things, counselor.

22  Q.  Well, you knew he was very -- well, sir -- am I right, sir,

23  that you would at times talk to Mr. Walters about what was

24  going on with the stock price?  When it was moving unusually or

25  there were unusual spikes, he would occasionally ask your

H3ndwal6                         Davis - cross

1   opinion why do you think it's moving?

2   A.  Why do I think it's moving?  Yes, I think we had

3   conversations like that, yes.

4   Q.  And there is nothing wrong with that, is there?

5   A.  Not -- it depends on how I answer it, I guess.

6   Q.  Let me show you this, sir.  Do you recall, you were asked

7   about Government Exhibit 1907, in evidence?

8            (Pause)

9            And you recall, sir, that, on the bottom, you were

10  asking Gregg Engles in 2008, do you believe the pressure on

11  Dean Foods' stock is because Lehman Brothers is finally blowing

12  out their stock?  Do you recall that, sir?

13  A.  Yes, I do.

14  Q.  And that's when Lehman Brothers was having trouble in the

15  market and they were unloading assets, correct?

16  A.  Yes, I think that's accurate.

17  Q.  And you recall that this was a time when there was -- the

18  stock price had gone down so you were trying to figure out who

19  may have been the big sellers out there causing this decline;

20  do you recall that?

21  A.  That's what prompted this email, yes.

22  Q.  And Gregg Engles says, the second sentence, I would have

23  thought they were gone, meaning Lehman Brothers, correct?

24  A.  Correct.

25  Q.  And, sir, what prompted you to ask Mr. Engles this

1  question?

2  A.  Because I was surprised that the stock price was declining

3  as it had in this particular period when the company was doing

4  very well and the results looked like we were way ahead of

5  guidance and projections.  So, I was frankly surprised.

6  Q.  Do you see the date of this is June 11, 2008?

7  A.  Yes.

8  Q.  Let me show you what's been marked for identification as

9  Defense Exhibit 4227.

10         Sir, this is an email from Bucky Lyons to you dated

11 June 10, 2008?

12 A.  No.  It is not from Bucky.

13 Q.  It is from his father, Buck Lyons?

14 A.  That is correct.

15 Q.  Just to be clear, Bucky Lyons is the son and Buck Lyons is

16 the father?

17 A.  That is correct.

18         MR. BERKE:  Your Honor, I would offer Defense Exhibit

19 4227.

20         THE COURT:  Any objection?

21         MS. CUCINELLA:  No objection.

22         THE COURT:  Received.

23         (Defendant's Exhibit 4227 received in evidence)

24         MR. BERKE:  If we could put Government Exhibit 1907 up

25 next to it.

1          And if we could blow up DX4227 so it could be read.

2    Q.  And Buck Lyon asked you:  "DT:  Think this pressure on Dean

3    Foods' stock is coming from liquidation by investment bank that

4    needs capital?"

5          Right?  That is Mr. Lyons asking you about the stock

6    market and what may be causing the decline, correct?

7    A.  Yes.

8    Q.  And that's perfectly appropriate because that's asking

9    what's going on in the market that outsiders -- that may cause

10   outsiders to either buy or sell the stock, correct?

11   A.  Those are an appropriate question, I think, yes.

12   Q.  Just so the record is clear, you said that was an

13   appropriate question, correct?

14   A.  That Buck Lyons was asking, yes.

15   Q.  That is an appropriate question if Bill Walters asked the

16   same question; that is just an appropriate question, correct?

17   A.  That is not an inappropriate question, no.

18   Q.  And that's -- and if you look at now -- if you put that

19   down lower, if you can do that, Mr. McLeod.

20         And then your question -- your email on the 11th, the

21   next day:  "Do you believe the pressure on DF's stock is

22   because Lehman Brothers is finally blowing it out?"

23         Looking at that, do you think you asked Mr. Engles so

24   he could answer Buck Lyons, or do you think the question was

25   prompted by Buck Lyons email?

H3ndwal6                    Davis - cross

1   A.  It could very well have been, counselor.  I don't recall

2   specifically but it could very well have been, yes.

3   Q.  And you would agree that -- and you understood that Buck

4   Lyons, he was an investor in Dean Foods, correct?

5   A.  I had no idea whether he was an investor in Dean Foods, to

6   be honest with you, no.  I had no clue.

7   Q.  When he is asking questions about Dean Foods' stock, wasn't

8   that a strong hint that he was an investor?

9   A.  I'm not going to make that assumption, no.

10  Q.  In any event --

11  A.  I had no knowledge that he was an investor, none.

12  Q.  And this didn't give you any indication that he may have

13  been an investor?

14  A.  It didn't, no.

15  Q.  And Dean Foods is a prominent Dallas public company,

16  correct?

17  A.  Yes.

18  Q.  And, again, just to be clear, these types of questions

19  about spikes in the stock, those sorts of things, appropriate,

20  correct?

21  A.  The questions are appropriate.  It depends on the answer.

22  Q.  It depends on how you, sir, answer it, correct?

23  A.  Absolutely.

24  Q.  Sir, you were an experienced board member with years of

25  training on how to handle material, nonpublic information,

1    weren't you, sir?

2    A.  Yes.

3    Q.  And that's how you carried yourself to the world, correct?

4    A.  Yes, I tried to do that.  Yes.

5    Q.  Sir, you understood that public companies like Dean Foods

6    share information and have meetings all the time with

7    significant investors in the company, correct?

8    A.  Yes.

9    Q.  And you thought that the senior executives could make the

10   right decisions even if they have material, nonpublic

11   information, be careful so they only disclose proper

12   information, correct?

13   A.  Yes.

14   Q.  Let me show you what's been marked for identification as

15   Defense Exhibit 4458.

16        And is this an email exchange between you and Gregg

17   Tanner on -- and I would go to the top email.  Sir, is that an

18   email from you, rather, to Gregg Tanner that -- again, it is

19   last in a chain of emails, and you are on at least the top one.

20   Do you see that, sir?

21   A.  Yes, I do.

22            MR. BERKE:  Your Honor, I offer Defense Exhibit 4458.

23            THE COURT:  Any objection?

24            MS. CUCINELLA:  No objection.

25            THE COURT:  Received.

H3ndwal6                          Davis - cross

1           (Defendant's Exhibit 4458 received in evidence)

2           MR. BERKE:   Thank you.

3     BY MR. BERKE:

4     Q.   And you see on the bottom, sir, that what was forwarded to

5     you is from someone at Dean Foods, and they're trying to decide

6     whether to combine various positions -- or, I'm sorry, they are

7     working on filling a position, and they're talking about

8     whether they can have somebody who has a finance role be in

9     investor relations; do you see that, sir?

10    A.   Yes.

11    Q.   And if we go to the next email above that.

12          And Gregg Tanner forwards that to you, correct?

13    A.   Yes, he did.

14    Q.   And you recall that there was -- the question was can

15    somebody who knows all the finances of the company also play an

16    outward facing investor relations role where they have to deal

17    with investors; that was the issue, correct, sir?

18    A.   Yes.   I think that's a fair summary of this.

19    Q.   And your answer is, to the then CEO of Dean Foods:   In

20    spite of the warnings from Dan, I really like the idea of Scott

21    taking on the IR role.   He is well spoken and knows the numbers

22    cold.   I believe he is capable of only disclosing what is

23    available.   I think you guys should given it a try.

24          Sir, you are saying that even though he would have

25    financial information, too, because of the dual role, he can

1    just determine what is appropriate to share with investors and

2    what is not, correct?

3    A.  Yes.  I think that is correct.

4    Q.  Am I right, sir, that at times that you were thinking about

5    investing in a company, you might reach out to a friend of

6    yours who is either in the management or the director of the

7    company to talk in an appropriate way about that company?

8              MS. CUCINELLA:  Objection.

9              THE COURT:  Rephrase it.

10             MR. BERKE:  Yes.

11   BY MR. BERKE:

12   Q.  Sir, you'll agree with me that there were times that you

13   felt comfortable reaching out to directors of companies that

14   you were thinking about investing in to have appropriate

15   discussions with them about the company?

16   A.  I rarely did that.

17   Q.  I'm not asking you that.  I'm asking you, did you do it?

18   A.  I can't recall an occasion that I did that.

19   Q.  Well, let me show you what's marked as Defense Exhibit

20   4883.  This is an email between you and Mr. Lyons, Buck Lyons,

21   dated August 13, 2010.

22   A.  Yes.

23             MR. BERKE:  Your Honor, I would offer Defense Exhibit

24   4883.

25             THE COURT:  Any objection?

1          MS. CUCINELLA:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 4883 received in evidence)

4   BY MR. BERKE:

5   Q.  OK.  Again, this is from Buck Lyon, at the bottom, to you

6   copying Bucky Lyon.  And you see where it says -- it says,

7   "ATEC at 2.07."  That refers to a company, right?  That is a

8   symbol for Alphatec stock, correct?

9   A.  Yes, it is.

10  Q.  Now, you ultimately later, at a later point, joined the

11  board of Alphatec, correct?

12  A.  Yes, I did.

13  Q.  But you were not on the board in August of --

14  A.  2010.

15  Q.  -- 2010, were you, sir?

16  A.  No.

17  Q.  OK.  And Buck Lyon says to you -- and Buck Lyon is somebody

18  you respect, correct?

19  A.  Yes, I do.

20  Q.  And he says to you, "Have you talked to Foster about it --

21  could be a screaming buy -- great space."

22          Do you see that, sir?

23  A.  Yes.

24  Q.  That refers to John Foster, who was a director at Alphatec,

25  doesn't it?

H3ndwal6                         Davis - cross

1   A.  Yes, it does.

2   Q.  Again, they are talking about it being a screaming buy.

3          You respond, "I have not talked to him about the

4   company in a while ... you should call him.  I would think that

5   it is a buy at that level."

6          Correct?

7   A.  Yes.

8   Q.  And then he responds:  "I have a call in to him."

9          Correct?

10  A.  Yes.

11  Q.  And you would agree, sir, that it was perfectly appropriate

12  to talk to Buck Lyon about him calling a director of Alphatec

13  to see if it is -- to help make a judgment whether it is a

14  screaming buy, correct?

15  A.  I would agree to what?  Would you ask the question again?

16  There was a lot of --

17  Q.  You would agree --

18  A.  You coupled it together.  I'm sorry.

19  Q.  You would agree, sir, that that was perfectly appropriate

20  to discuss with Buck Lyon him calling a director of Alphatec

21  about his potential investment, correct?

22  A.  Well, this email that he forwarded me, he's asking my

23  opinion.  And, frankly, he is just asking me if I talked to

24  Foster, and I responded by saying no, you should call him.

25  Q.  Right.  But you're telling him he should call the director

1    to talk about the company and his potential investment?

2    A.  Yes.  Correct.

3    Q.  You didn't think there was anything wrong with that, did

4    you?

5    A.  I didn't, no.

6    Q.  And, sir, you knew quite well that Dean Foods, both the

7    management and investor relations, would spend a lot of time

8    talking with investors and analysts to get the company message

9    out, correct?

10   A.  Yes.  I think they did a good job of investor relations.

11   Q.  And as a board member, you were sent a lot of emails with

12   analyst reports and descriptions of meetings that took place

13   between management and investors, correct?

14   A.  Yes, I was copied on a lot of those.

15   Q.  And you generally read the analyst reports, correct?

16   A.  I read some of them, yes.

17   Q.  And, sir, you said that you discussed analyst reports with

18   Mr. Walters at times, correct?

19   A.  Yes.  I think I've said that already, yes.

20   Q.  And, sir, am I right that you, sir, would speak to

21   investors at times as well, wouldn't you, sir?

22   A.  I would -- I don't recall ever speaking to any

23   institutional investors, no.

24   Q.  No.  But you would speak to other investors, wouldn't you,

25   sir?

1  A.  I spoke to people, I'm sure, friends of mine who owned

2  stock, yes.

3  Q.  And, sir, do you recall that at times when the management

4  of Dean Foods was making a presentation to investors, that

5  sometimes literally the stock price could rise during that

6  presentation depending on what was said?

7  A.  Yes, I think that's true.

8  Q.  And, sir, am I right that you recall that in 2010, it was a

9  difficult time for Dean Foods, correct?

10 A.  Yes.  It was a tough year.

11 Q.  I'd like to show you what's been marked as Defense Exhibit

12 368.

13         And, sir, do you see that this is an email exchange

14 with you -- between you and another director, Joe Harden, in

15 February of 2010?

16 A.  Yes.

17         MR. BERKE:  Your Honor, I'd offer Defense Exhibit 368.

18         MS. CUCINELLA:  May we just have a moment?

19         THE COURT:  Yes.

20         (Pause)

21         MS. CUCINELLA:  Do you have a copy of the entire

22 document?  I'm sorry.

23         (Pause)

24         Thank you very much.

25         MR. BERKE:  I think it is in the binder.

1    (Counsel conferred)

2    (Pause)

3    MS. CUCINELLA:  No objection.

4    THE COURT:  Received.

5    (Defendant's Exhibit 368 received in evidence)

6    BY MR. BERKE:

7    Q.  Can we just first go to the bottom to see what is being

8    forwarded.

9    Do you see, sir, this is -- and you recall that

10   Mr. Engles, when he was CEO, there was a period of time when he

11   would do a self-evaluation or self-assessment, correct?

12   A.  Yes.  He would do it annually.

13   Q.  Yes.  And although the attachment is not part of the email

14   or the exhibit, you see that he is doing one for 2009, correct?

15   A.  Correct.

16   Q.  OK.  Can we go up to the next email.

17   And, again, the email exchange, that's for Joe Harden,

18   another director, correct?

19   A.  Yes.

20   Q.  And you are giving your reactions to Gregg's

21   self-evaluation, and you say I think it is an accurate

22   assessment.  Do you see that, sir?

23   A.  Yes.

24   Q.  And you say, if you go to the middle, "I'm not sure how

25   Gregg should have handled it differently, but that feedback

1   that I get from certain investors on the buy side is that Dean

2   management team had stumbled somewhat in 2009 with regard to

3   their credibility."  Do you see that, sir?

4   A.  Yes.

5   Q.  And what you're saying to your fellow director is you're

6   describing what you learned based on your communications with

7   buy-side investors, correct?

8   A.  Yes, that's correct.

9   Q.  And just for the jury, sir, would you describe what

10  buy-side investors mean?

11  A.  It is an institutional investor, a money manager, like T.

12  Rowe Price, Templeton, somebody like that.

13  Q.  This reflects, sir, in 2010 the communications you're

14  having with institutional investors, correct?

15  A.  Yes.

16  Q.  Sir, you knew that there were all sorts of topics that you

17  could discuss with investors, whether they were institutional

18  or individual, correct?

19  A.  That I could discuss?

20  Q.  Legally talk about.

21  A.  You mean on behalf of Dean?

22  Q.  On any behalf, under the law you can discuss; they weren't

23  illegal to talk about?

24  A.  Yes.

25  Q.  And do you recall, sir, that at various times you would

1    send emails to Dean Foods that you said you would be poring

2    over analyst reports for various quarters, that that's

3    something you would do, pore over analyst reports?

4    A.  I certainly followed the two or three analysts that I

5    respected that followed the stock, yes.

6    Q.  Let me show you what's been marked for identification as

7    Defense Exhibit 369.

8           And, sir, you see this is an email exchange from you

9    to -- excuse me, first from you to Gregg Engles and then a

10   response from Gregg Engles to you in 2009?  Do you see that,

11   sir?

12   A.  Yes, I do.

13          MR. BERKE:  Your Honor, I would offer Defense Exhibit

14   369.

15          THE COURT:  Any objection?

16          MS. CUCINELLA:  One moment, your Honor.

17          (Pause)

18          The witness' statement isn't inconsistent with that,

19   so I'm curious for what purpose it is being offered for.

20          MR. BERKE:  I'm not offering it as an inconsistent

21   statement.  I am offering it to address what he did with

22   analyst reports, which is in the email.

23          MS. CUCINELLA:  OK.  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit 369 received in evidence)

BY MR. BERKE:

Q.  And, sir, you were sending an email to Gregg Engles about
the third-quarter earnings release in 2009, correct?

A.  Let me take a minute and read this, please.

Q.  Yes.  Please do.

          (Pause)

A.  Yes.  OK, I finished reading.

Q.  OK.  Sir, you would agree with me, this is you trying to
speculate or theorize about how the market reacted to an
earnings release, correct?

A.  Yes.  I believe that's accurate.

Q.  And you said that in order to try to figure out what the
market did, you said it's speculation after poring over the
last couple of quarters of analyst reports.  Do you see that,
sir?

A.  Yes.

Q.  And then you say, "At the end of the day, your theory about
the stock price being correlated milk prices is probably true."
          Correct?  Right?

A.  Yes.

Q.  So, again, this is you with Gregg Engles trying to
speculate about the impact that the milk prices had on the
stock price, correct?

A.  Yes.

Q.  And you would --

1    THE COURT:  All right.  That's it, Mr. Berke.

2    MR. BERKE:  Yes.

3    THE COURT:  Please be seated.

4    Ladies and gentlemen, we've come to the end of our

5    workweek together.  That's not the end of your week, because I

6    know if you're like everybody else, you have a lot more going

7    on in your life.  There is family.  There is laundry.  There is

8    cleaning.  There is dry cleaning.  There are parents, children,

9    people we care for, people we have to look in on, people who

10   look in on us, and I appreciate the sacrifice that you make in

11   serving on this jury.  It's one of the privileges and duties of

12   citizenship, and you're fulfilling your needed service in that

13   regard.  And I have great admiration for you, and I know you've

14   been paying close attention.

15   I'm going to remind you of a few things as we break

16   until Monday morning.

17   Of course, you know I'm going to say do not discuss

18   the case among yourselves or with anyone else, keep an open

19   mind.  But the important thing to remember here is that your

20   jury service is about you.  You and you alone, individually and

21   collectively, have sat in this courtroom and have heard the

22   testimony.  The views of anyone else have nothing to do with

23   this case, and you cannot allow any discussion to take place

24   about this case.

25   You do not discuss it with family and friends.  You'll

 1     have a chance.  You can tell them all about it, everything you

 2     remember about it that took place in the courtroom, but not

 3     now.

 4              And the same way with what I've told you about any

 5     social media, emails, blogging, posting, texting, even between

 6     and among yourselves, and certainly with any other person about

 7     the trial is totally off limits, as are Internet searches or

 8     reading news articles.  It would be terribly unfair to one side

 9     or the other if you took anything like that into account.  You

10     wouldn't want that if you were the person who was personally

11     involved in a trial or any of your family members were involved

12     in a trial.  You would want the case to be decided on what

13     comes out in the courtroom so everybody is on an even playing

14     field and can react to the same information.

15              So, I remind you of those rules.

16              I hope we get some great weather.  I hope you can put

17     this case out of your mind completely.  Forget about it until

18     you arrive at a quarter to 10 on Monday morning ready for more

19     action.  It's my job to keep us on track and on schedule, and I

20     promise I will do that.  I need not get into all of that with

21     you, but that's my job and that's my responsibility, and I take

22     my responsibility to each and every one of you very seriously.

23     I really do.  So, I will be working on that.

24              In the meantime, have a very pleasant one and see you

25     on Monday morning.

1    Stay safe and healthy.

2    (Continued on next page)

H3ndwal6                          Davis - cross

1            (Jury not present)

2            THE COURT:  See you on Monday morning.

3            MR. GOLDMAN:  Have a good weekend, your Honor.

4            MS. CUCINELLA:  Have a good weekend.

5            (Adjourned to 9:45 a.m., Monday, March 27, 2017)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   THOMAS C. DAVIS

 4   Cross By Mr. Berke . . . . . . . . . . . . . 971

 5                     DEFENDANT EXHIBITS

 6   Exhibit No.                              Received

 7    4951-A   . . . . . . . . . . . . . . . . 997

 8    4951-A   . . . . . . . . . . . . . . . . 999

 9    4951-C   . . . . . . . . . . . . . . . .1000

10    4102   . . . . . . . . . . . . . . . . .1051

11    3501-15-A   . . . . . . . . . . . . . . .1056

12    4067   . . . . . . . . . . . . . . . . .1057

13    2072   . . . . . . . . . . . . . . . . .1063

14    4057   . . . . . . . . . . . . . . . . .1084

15    4156 and 4157   . . . . . . . . . . . . .1086

16    2075   . . . . . . . . . . . . . . . . .1091

17    4914   . . . . . . . . . . . . . . . . .1119

18    1539   . . . . . . . . . . . . . . . . .1133

19    1537   . . . . . . . . . . . . . . . . .1133

20    1538   . . . . . . . . . . . . . . . . .1134

21    1540   . . . . . . . . . . . . . . . . .1136

22    107   . . . . . . . . . . . . . . . . . .1137

23    1516   . . . . . . . . . . . . . . . . .1140

24    4986   . . . . . . . . . . . . . . . . .1141

25    608   . . . . . . . . . . . . . . . . . .1145
```

586 . . . . . . . . . . . . . . . . . . .1159

4227 . . . . . . . . . . . . . . . .1171

4458 . . . . . . . . . . . . . . . .1175

4883 . . . . . . . . . . . . . . . .1177

368 . . . . . . . . . . . . . . . . .1181

369 . . . . . . . . . . . . . . . . .1183