H3rdwal1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          S1 16 Cr. 0338(PKC)

5   WILLIAM T. WALTERS,

6              Defendant.

7   ------------------------------x
                                           March 27, 2017
8                                          10:12 a.m.

9   Before:

10                    HON. P. KEVIN CASTEL,

11                                         District Judge

12                    APPEARANCES

13  JOON H. KIM
         Acting United States Attorney for the
14       Southern District of New York
    BY:  DANIEL S. GOLDMAN
15       BROOKE E. CUCINELLA
         MICHAEL FERRARA
16           Assistant United States Attorneys

17  KRAMER LEVIN NAFTALIS & FRANKEL, LLP
         Attorneys for Defendant
18  BY:  BARRY H. BERKE
         PAUL H. SCHOEMAN
19       ANDREW J. ESTES
         MICHELLE BEN-DAVID
20           -and-
    WRIGHT STANISH & WINCKLER
21  BY:  RICHARD WRIGHT

22           – also present –

23  SA Edmund Rom
    SA Nicholas Anderson, Federal Bureau of Investigation
24  Raymond McLeod, Defense Tech Support
    Holly Meister
25  Sarah Pyun, Government Paralegal Specialists

H3rdwal1

1              (Trial resumed; jury not present)

2              THE COURT:  All right.  Bring our jury in, please.

3              Good morning.

4              (Jury present)

5              THE COURT:  Please be seated.

6              Good morning, ladies and gentlemen.  You are

7       impressive individuals and impressive as a group.  You did what

8       I asked.  You're back safe and sound -- and on time -- on a

9       rainy Monday morning.  It's not easy to do that, you know.  It

10      requires you thinking ahead of time:  I've got to get up early,

11      I've got to set the alarm, I've got to get someplace where I

12      don't usually go.  You know, you go to a different location.

13             I hope you had a productive weekend and you got your

14      to-do list done and maybe enjoyed yourself a little while.  OK,

15      I didn't get my to-do list completely done, but I did check off

16      a few items, so that's good, and checked in on everybody in the

17      family and things like that.  So, it's great to see you, and I

18      really am in awe of your service, your dedicated service.  It's

19      so very impressive.

20             This is service, and it's not always easy, and you

21      should be very proud of yourselves.

22             JURORS:  Thank you.

23             THE COURT:  That's where we are.  We are back in

24      action, ladies and gentlemen.

25             And, Mr. Davis, the Court reminds you that you are

H3rdwal1                          Davis – cross

1   still under oath.

2              THE WITNESS:  Yes, your Honor.

3    THOMAS C. DAVIS,

4        Resumed, and testified further as follows:

5              THE COURT:  OK.  Mr. Berke, you may continue.

6              MR. BERKE:  Thank you, your Honor.

7    CROSS-EXAMINATION   (Resumed)

8    BY MR. BERKE:

9    Q.  Mr. Davis, do you recall --

10             THE COURT:  One second.  One second.

11             MR. BERKE:  Of course, Judge.

12             THE COURT:  That's a most reasonable request, and it's

13   granted, even though I'm not the biggest fan of your team.  But

14   that said, that said, I respect a fellow basketball fan, and

15   that's most reasonable.  So we are going to break about 10 or

16   15 minutes early this afternoon so that one of our jurors can

17   get to the regional championship in Bridgeport.  All right.

18             A JUROR:  I'm not ratting out anybody.

19             THE COURT:  No.  Don't rat anybody out.

20             OK.  Go ahead, Mr. Berke.

21             MR. BERKE:  Thank you, Judge.

22   BY MR. BERKE:

23   Q.  Mr. Davis, do you recall, you testified on direct that you

24   would visit Las Vegas three or four times a year?

25   A.  Yes.  On average I think that's right.

H3rdwal1                    Davis - cross

1    Q.  And you said that you would infrequently see or speak to

2    Mr. Walters when you were in Las Vegas?

3    A.  Yes.

4    Q.  And do you recall, sir, you testified that you were there

5    on April 9, 2010, to meet with Mr. Walters at a meeting at his

6    golf course where you said that you asked him for a loan?  Do

7    you recall that testimony, sir?

8    A.  Yes.

9    Q.  And am I right, sir, that after you met with Mr. Walters to

10   explain your financial situation and ask for a loan, you went

11   directly to a casino, correct?

12   A.  I went back to my hotel.

13   Q.  You were staying at a casino, is that correct, sir?

14   A.  I believe I was staying at the Wynn Hotel.

15   Q.  Wynn Hotel and Casino, correct?

16   A.  Yes.

17   Q.  And you proceeded to get a marker for a hundred thousand

18   dollars for gambling; isn't that true, sir?

19   A.  I don't recall.

20   Q.  Sir, let me show you what's been marked for identification

21   as Defense Exhibit 5372.  And if we can first look at the first

22   page and then we're going to go to page 201.  Well, actually --

23   page 201 for 4/9/2010.

24          And, sir, I ask you to look at the top line and page

25   of Defense Exhibit 5372 -- 5372.  Do you see that, sir?

H3rdwal1                    Davis - cross

1    A.  The top line?

2    Q.  You can look at the top line going down for the dates

3    4/9/2010.

4    A.  Yes.

5    Q.  And, sir, does that refresh your memory that after meeting

6    with Mr. Walters asking him for a loan, you went to the Wynn

7    Hotel and Casino and had a marker for a hundred thousand

8    dollars?

9    A.  That's not accurate, no.

10   Q.  You have a balance in your account when you were there on

11   4/9/2010 of a hundred thousand dollars, sir.

12   A.  I drew several different markers there.

13   Q.  And was the total amount, sir, a hundred thousand dollars?

14   A.  I never drew a marker for a hundred thousand dollars, no.

15   Q.  You drew a marker for 20,000, correct?

16   A.  Yes.

17   Q.  You drew a second marker for 20,000, correct?

18   A.  Yes.

19   Q.  You drew a third marker for 20,000, correct?

20   A.  Yes.

21   Q.  You drew a fourth marker for 20,000, correct?

22   A.  Yes.

23   Q.  And you drew a fifth marker for 20,000, correct?

24   A.  Yes.

25   Q.  And you would agree with me, sir, five times 20,000 is a

H3rdwal1                    Davis - cross

1    hundred thousand, correct?

2    A.  Yes.  I would agree with that.

3    Q.  Sir, do you recall testimony in both your direct and a

4    little bit on Thursday that you would discuss with Mr. Walters,

5    and other people you knew outside of Dean Foods, what was in

6    analyst reports?  Do you recall that testimony?

7    A.  Yes.

8    Q.  And that that was appropriate to do; do you recall that

9    testimony?

10   A.  Yes.

11   Q.  I will take you back, sir.  Do you recall that the time

12   period we're talking about, 2008 through 2013, you would

13   regularly be sent analyst reports to review by the Investor

14   Relations Department of Dean Foods?

15   A.  Yes, that's accurate.

16   Q.  And let me show you what's been marked Government Exhibit

17   1945, for identification.

18          And, sir, does this reflect one of the email exchanges

19   with Barry Sievert of Investor Relations to you in May of 2013

20   regarding an analyst report that was sent?

21   A.  Yes.

22          MR. BERKE:  Your Honor, I offer Government Exhibit

23   1945.

24          THE COURT:  Any objection?

25          MS. CUCINELLA:  One moment, your Honor.

H3rdwal1                         Davis – cross

1          THE COURT:  Yes.

2          (Pause)

3          MS. CUCINELLA:  Your Honor, we object.  This email is

4     hearsay for the reasons that we've discussed previously.

5          MR. BERKE:  And, your Honor, I'm offering it for this

6     witness' state of mind.

7          MS. CUCINELLA:  Given the time period here and for

8     other reasons, that's irrelevant.

9          MR. BERKE:  Your Honor, for this one, I am happy to

10    withdraw the offer on this one.

11         THE COURT:  All right.

12    Q.  Sir, you would agree with me, sir, that you would often

13    discuss with people at Dean Foods your reaction to various

14    analyst reports, who you thought was good, who you didn't think

15    was good, correct?

16    A.  Yes.  On occasion, yes.

17    Q.  And you would also discuss with folks, inside Dean Foods

18    and outside, where you thought analyst report -- analyst

19    reports were good or not so good, correct?

20    A.  I don't recall -- I just don't recall that.

21    Q.  Let me show you what's been marked for identification as

22    Defense Exhibit 4171.

23         And, sir, Roby Mize, that was a gentleman who was at

24    Credit Suisse who handled your bank accounts, your trading

25    accounts?

H3rdwal1                          Davis - cross

1    A.  Yes.

2    Q.  And, sir, do you recall that Roby Mize is somebody who you

3    would discuss -- who you have discussed analyst reports and you

4    thought the comments were spot on?  And if you need to look at

5    the email, at the bottom in the middle email.

6           If you need to go one lower, you can.  It is an email

7    chain.

8           (Pause)

9           Does that refresh your recollection, sir?

10   A.  Yes.

11   Q.  And Roby Mize, again -- I'm sorry, Roby Mize, again, he's

12   outside of Dean Foods and it was OK to tell him what analyst

13   reports or comments you thought were spot on, correct?

14   A.  Is that a question?

15   Q.  Yes.

16   A.  Is it OK?

17   Q.  Yes.  There is nothing wrong with doing what you just said

18   you did with Roby Mize, correct?

19   A.  I think the email speaks for itself.

20   Q.  It is not in evidence, sir.  That is why I have to ask you.

21          Sharing your views that an analyst report is spot on

22   with someone outside Dean Foods like Roby Mize was entirely

23   appropriate, correct?

24   A.  Yes, I believe so.

25   Q.  And, sir, do you recall also that you were asked at

H3rdwal1                    Davis - cross

1    times -- for example, do you recall being asked by Terry Quinn,

2    of Kayne Anderson, to speak to his secured lending team in

3    Chicago about the milk industry, to share your perspective and

4    insights?

5    A.  I don't recall that, no.

6    Q.  Let me show you what's been marked for identification as

7    Defense Exhibit 4662.

8         Let me show you the third email from the top, and this

9    is just for you, sir.

10        (Pause)

11        If you would read from the bottom up to yourself.

12   A.  Yes.  This refreshes my memory, yes.

13   Q.  And Terry Quinn, he was a businessman who you knew,

14   correct?

15   A.  Yes.

16   Q.  And he had -- and his company was Kayne Anderson Capital,

17   correct?

18   A.  Yes.

19   Q.  And what he wanted you to do is essentially share your

20   expertise and knowledge about the dairy industry with his

21   secured lending team so they could learn more and make informed

22   decisions, correct?

23   A.  I never ended up talking to him at all.

24   Q.  I understand, sir.  But you said you would be happy to do

25   that because you did have expertise in the milk industry,

H3rdwal1                    Davis - cross

1    correct?

2    A.  I wouldn't say I was an expert, no.

3    Q.  You had expertise, sir, correct?

4    A.  I don't know how to qualify that, but I think the email

5    speaks for itself.

6    Q.  Again, sir, the email is not in evidence.  That's why I'm

7    asking you.

8             You understood that you were being asked to speak to

9    the secured lending team of Kayne Anderson Capital because your

10   friend Terry Quinn thought you had expertise and a perspective

11   to share with his team, correct?

12   A.  Terry Quinn must have assumed that, yes.

13   Q.  And you agreed that you would do it if they needed you to

14   do it, correct?

15   A.  I said I would be happy to do so, yes.

16   Q.  Right.  And that's because he believed that you had

17   knowledge and experience based on your many years involved with

18   Dean Foods to talk about the milk industry, correct?

19   A.  I think that's what Terry Quinn assumed.

20   Q.  Yes.  And you said you would be happy to speak to him,

21   correct?

22   A.  I certainly did.

23   Q.  And that's a fair -- and you assume Terry Quinn assumed

24   that because you knew how long you had been involved with Dean

25   Foods; is that your understanding, sir?

H3rdwal1                    Davis - cross

1                MS. CUCINELLA:  Objection .

2                MR. BERKE:  I will rephrase, your Honor.

3                THE COURT:  Yes, please.

4    Q.  Sir -- and, again, there is nothing wrong with you sharing

5    your insights and observations or thoughts about the milk

6    industry with someone outside of Dean Foods based on your

7    experience, correct, sir?  That's totally proper?

8    A.  So long as I didn't provide him inside information, it is

9    proper, yes.

10   Q.  And Terry Quinn certainly thought when he was making the

11   request, your understanding was that he was asking you to do

12   something that would be proper, correct?

13   A.  I really don't know what his understanding was.

14   Q.  But when you told your friend Terry Quinn that you would be

15   happy to speak to his group, you thought that was something

16   totally appropriate to do, correct?

17   A.  I merely answered his question.  That's all I did.

18   Q.  My only question, sir, is when you say you would be happy

19   to speak to his group, you didn't think you were agreeing to do

20   something that was wrong, did you, sir?

21   A.  No.

22   Q.  Sir, do you recall there was a point in time when you were

23   asked and you knew you were going to be announced to be

24   chairman of Dean Foods after the WhiteWave spin-off?

25   A.  Yes.

H3rdwal1                          Davis - cross

1   Q.  And do you recall there was a press release to that effect

2   issued in May of 2013?

3   A.  Yes.

4   Q.  And you recall, sir, before that press release, you told a

5   number of friends and associates of yours that you were going

6   to be chairman of Dean Foods?

7   A.  Yes, I probably did.  Yes.

8   Q.  Do you recall, for example, you told Bucky Lyons and some

9   other people who you knew?

10  A.  I don't recall who I spoke to, no.

11  Q.  Well, let me show you what's been marked for identification

12  as 4927.

13          My question to you, sir, is does 4927 refresh your

14  recollection that in November of 2012 you told Mr. Lyons,

15  Mr. Bucky Lyons, that you were going to become chairman of Dean

16  Foods the following year?

17  A.  Yes.

18  Q.  And isn't it correct, sir, that you don't recall telling

19  Mr. Walters that you were going to become chairman of Dean

20  Foods until it was announced in 2013, correct?

21  A.  I don't recall when I told Mr. Walters that.

22  Q.  Well, do you recall telling the prosecutors in one of your

23  preparation sessions that you do not recall telling Mr. Walters

24  that you were asked to be the chairman of Dean Foods?

25  A.  I think that's accurate, yes.

H3rdwal1                    Davis - cross

1    Q.  Sir, let me show you what's been marked for identification

2    as 4695.

3           Is that an email exchange between you and Tim Byrne

4    regarding a company you were on the board of, WhiteHorse

5    Financial?

6    A.  Yes.

7           MR. BERKE:  Your Honor, I would offer into evidence

8    Defense Exhibit 4695.

9           THE COURT:  Any objection?

10          MS. CUCINELLA:  One moment, your Honor.

11          (Pause)

12          No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 4695 received in evidence)

15          MR. BERKE:  Thank you.  Mr. McLeod, publish the

16   document.

17   BY MR. BERKE:

18   Q.  Tim Byrne, you testified last week, is a good friend of

19   yours, correct?

20   A.  Yes.

21   Q.  And WhiteHorse Financial, that was a company you were on

22   the board of, correct?

23   A.  Yes.

24   Q.  And a public company, correct?

25   A.  Yes.

H3rdwal1                    Davis - cross

1   Q.  And will you read your email to Mr. Byrne?

2   A.  "Tim, take a look at 'WHF'.  This stock is yielding

3   9-and-a-half percent and is trading at a slight discount to

4   book value ($15.30 per share).  The next record date for the

5   first quarter dividend is March 22.  Interesting alternative

6   for some cash.  Enjoyed dinner; good idea."

7   Q.  And that was a perfectly appropriate email for you to send

8   to Mr. Byrne, correct?

9   A.  Yes.

10  Q.  There was nothing about you being a director of WhiteHorse

11  that prevented you from sharing that sort of information with

12  Mr. Byrne, correct?

13  A.  No, there wasn't.

14  Q.  Let me show you another document marked Defense Exhibit

15  4663.  And this is another email between you and Mr. Byrne

16  dated December 9, 2014 with regard to another company, Alphatec

17  Spine?

18          My question, first, sir is what is it?  Is that what

19  it is?

20  A.  Yes.  I'm sorry.  Yes.

21  Q.  And it is dated December 9, 2014, correct?

22  A.  Yes.

23          MR. BERKE:  Your Honor, I offer Defense Exhibit 4663.

24          THE COURT:  Any objection?

25          MS. CUCINELLA:  No objection.

H3rdwal1                    Davis - cross

1          THE COURT:  Received.

2          (Defendant's Exhibit 4663 received in evidence)

3          MR. BERKE:  Thank you.

4   BY MR. BERKE:

5   Q.  I first want to ask you about the second -- go to the third

6   email.  I'm sorry.  If you go down to the email at 6:24 a.m.,

7   do you see Mr. Byrne is asking you, on December 2014, "Where

8   are you?"

9   A.  Yes.

10  Q.  And you said, "San Diego, back home tonight."

11  A.  Yes.

12  Q.  And then he asked you, "Are you milking cow?"  Do you see

13  that?

14  A.  Yes.

15  Q.  Did you understand that he's asking you about if you're

16  doing Dean Foods' business?

17  A.  I have no idea what he was referring to.

18  Q.  OK.  All right.  Let's go to the top email.

19          Now, Alphatec Spine, that is another company that you

20  were on the board of, correct?

21  A.  Yes.

22  Q.  Also a public company, correct?

23  A.  Yes.

24  Q.  It was a smaller company, correct?

25  A.  Yes.

H3rdwal1                    Davis - cross

1  Q.  Can you read what you wrote to your friend Tim Byrne?

2  A.  "New company that I've gone on the board of ... Alphatec

3  Spine ... ATEC.  Very cool business controlled by my friends in

4  NYC at HealthPort Capital.  Very small market cap.  Lots of

5  upside.  Let's have lunch Thursday if you're in town."

6  Q.  Again, sir, perfectly appropriate for you to share that

7  information as a director of Alphatec Spine with a friend of

8  yours who may be interested in investing, correct?

9  A.  Yes.

10 Q.  Sir, I want to talk about, do you recall that we talked --

11 you gave testimony last week that you had borrowed money from a

12 number of people or entities, one of which was Mr. Walters,

13 correct?

14 A.  Yes.

15 Q.  And you had told Mr. Walters that you needed the money

16 because a lot of your assets were illiquid at the time,

17 including in sports teams and stock, correct?

18 A.  Yes.

19 Q.  And you recall, sir, that you also had outstanding loans to

20 entities in which Bucky -- Buck and Bucky Lyons, father and

21 son, were involved in as well?  Do you remember that testimony,

22 sir?

23 A.  That's not totally accurate.

24 Q.  Well, you owed money -- you had a loan that you borrowed

25 from an entity in which they were involved, correct?

H3rdwal1                          Davis - cross

1   A.  They were not both involved, no.

2   Q.  Well, one or two -- one of them -- which Lyons were

3   involved, sir?

4   A.  Bucky Lyon and I were partners.

5   Q.  OK.  And you had a loan from that entity in which you were

6   partners with Bucky Lyons, correct?

7   A.  Yes, that's correct.

8   Q.  And you also had monies you owed in another corporation

9   related to the aircraft you talked about, correct?

10  A.  Yes, that's correct.

11  Q.  Was that Buck Lyons or Bucky Lyons in that?

12  A.  They were both partners of mine in the aircraft, yes.

13  Q.  Just as -- and you had discussions with them as well about

14  your attempts to pay back those loans and some of the

15  challenges you faced because your assets were illiquid,

16  correct?

17  A.  Yes.

18  Q.  And all those discussions you had with either Buck Lyons,

19  Bucky Lyons or both, those were totally appropriate, correct?

20  A.  Yes, I believe so.  Yes.

21  Q.  And, sir, you'll agree with me that when a director sells

22  or buys stock in a company, that can sometimes send a message

23  to investors, is that correct?

24  A.  Yes.  Yes, sometimes it does.  Yes.

25  Q.  Let me show you what's been marked for identification as

H3rdwal1                         Davis - cross

1    4158.

2             Sir, my question is is this an email between you and

3    Gregg Tanner, who would become CEO of Dean Foods in June of

4    2013?

5    A.  Yes, it is.

6             MR. BERKE:  Your Honor, I would offer into evidence

7    Defense Exhibit 4158.

8             MS. CUCINELLA:  No objection.

9             THE COURT:  Received.

10            (Defendant's Exhibit 4158 received in evidence)

11   BY MR. BERKE:

12   Q.  Sir, will you read -- we can first go to the bottom.  Will

13   you read that, your email to Mr. Tanner?

14   A.  "Gregg, FYI:  I exercised some expiring options and sold

15   some stock today.  I haven't lost the faith, just wanted some

16   liquidity.  TD."

17   Q.  And Mr. Tanner responds:  "I heard a rumor to that effect,

18   but I appreciate you letting me know."

19            Again, you didn't want Mr. Tanner to draw the wrong

20   message from your sales, correct?

21   A.  Yes, I think that was my intent, yes.  I wanted to disclose

22   I sold some stock.

23   Q.  Right.  But that it was for reasons having nothing to do

24   with whether you thought it was a good time to sell the stock

25   based on your opinion about the future performance of the

H3rdwal1                     Davis - cross

1   company, correct?

2   A.  I had some options that were going to expire.  My

3   recollection was they were going to expire in the next 30 days

4   so I needed to do something with them.

5   Q.  Right.  But you were saying the timing of your sale had

6   nothing to do with any concern you may have had that the stock

7   price would fall in the future, corrects?

8   A.  I don't -- I don't agree with that, no.

9   Q.  Sir, when you say in your email "I haven't lost the faith,"

10  you are saying you haven't lost the faith in Dean Foods,

11  correct?

12  A.  Yes, that's accurate, yes.

13  Q.  You still believed Dean Foods will perform well; that's not

14  the reason you sold your stock, correct?

15  A.  I didn't say anything about performance at all.

16  Q.  Sir, when you say "I haven't lost the faith in Dean Foods,

17  "what you meant is you haven't lost the faith that Dean Foods

18  is still a good investment, correct?

19  A.  That's correct.

20  Q.  Sir, do you recall, also, that when you would talk to your

21  broker Roby Mize at Credit Suisse about selling, you often

22  tried to sell at a time when you thought the price would be at

23  a good price point so you could maximize the amount of money

24  you would get from selling your Dean Foods stock?

25  A.  I'm sure I had that kind of conversation with my broker,

1210

1    yes.

2    Q.  And you recall that there were multiple conversations and

3    emails where you would debate whether the price was a good time

4    for you to sell or whether you should wait until it gets to a

5    higher point, isn't that correct?

6    A.  I don't recall the series of emails, but I'm sure I

7    discussed my trades with him.

8    Q.  Right.  And wanting to get the best price at the best time

9    for your stock that you would sell, correct?

10   A.  I think I've answered the question.  I don't recall the

11   specifics, but I certainly used his advice, yes.

12   Q.  Again, just to be clear, the advice is to try to sell your

13   stock at the best time to get the highest price so you would go

14   get the most money for your stock, correct?

15   A.  Yes.  I think that's accurate, yes.

16   Q.  And you recall, sir, that when you owed debts to people,

17   you would frequently talk about what you might be doing to try

18   to pay the debt, including selling your Dean Foods stock; is

19   that fair, sir?

20   A.  Yes, I think that's accurate.

21   Q.  For example, let me show you what's been marked as

22   Government Exhibit 1719, for identification.

23            And -- well, actually, we can take that down for a

24   second.

25            Let me ask you, sir, for example, do you recall

H3rdwal1                    Davis - cross

1    that -- do you recall that in June of 2011, you had a debt that

2    you owed to the Cosmopolitan Hotel and Casino?

3    A.  Yes.

4    Q.  And you recall they were trying to collect on that debt?

5    A.  Yes, I recall.

6    Q.  And you recall telling them that you are going to sell

7    stock but you didn't want to do it at a time when you might

8    have to take a loss on the stock, but that you had a plan to

9    sell your stock to pay off the marker you owed Cosmopolitan?

10   A.  Yes.  I think that's accurate, yes.

11   Q.  And you recall, sir -- and you recall, sir, having similar

12   conversations with Buck or Bucky Lyons about the timing of when

13   you may pay down their loans based on when you thought it was a

14   good time to sell Dean Foods stock?

15   A.  Yes.  I think that's accurate as well.

16   Q.  Let me show you, sir, what's been marked for identification

17   as Defense Exhibit 4933.

18          Is this an email between you and Bucky Lyons, sir, on

19   July 2012 -- July 20, 2012?  And first I am just asking you if

20   you could identify what it is, sir?

21   A.  It is an email.

22          MR. BERKE:  Your Honor, I would offer Defense Exhibit

23   4933 into evidence.

24          THE COURT:  Any objection?

25          MS. CUCINELLA:  May I just have one moment, your

H3rdwal1                          Davis - cross

1    Honor?

2              THE COURT:  Yep.

3              (Pause)

4              MS. CUCINELLA:  No objection.

5              THE COURT:  Received.

6              (Defendant's Exhibit 4933 received in evidence)

7    BY MR. BERKE:

8    Q.  Sir, again, that's July 20, 2012, from you to Mr. Lyons,

9    correct?

10   A.  Yes.

11   Q.  Would you read what you wrote?

12   A.  I'm sorry?

13   Q.  Would you read what you wrote to Mr. Lyons.

14   A.  "Bucky, still working on selling some assets to pay off the

15   loan.  At a minimum, it looks like I will be able to sell some

16   stock in August after the blackout period is over for me.  That

17   will enable me to pay down the loan in August.

18             "I will be in New York City Monday and Tuesday, so

19   maybe we can visit Wednesday.  I should know about my asset

20   sale idea by next week as well.

21             "Hope that works for you."

22   Q.  Sir, do you recall that in July of 2012, the stock price of

23   Dean Foods was very low because of issues in the commodity

24   markets?

25   A.  I don't recall that specifically.

H3rdwal1                         Davis - cross

1    Q.  Do you recall something significant happening in early

2    August of 2012?

3    A.  Yes.

4    Q.  What was that, sir?

5    A.  When they announced the spin-off.

6    Q.  The WhiteWave spin-off, correct?

7    A.  Yes, that's correct.

8    Q.  And you sold your stock in August after that announcement,

9    correct?

10   A.  I don't recall exactly when I sold my stock.

11   Q.  Well, let me show you some documents.

12          Let me show you what's been marked as Defense -- let

13   me show you -- actually, if we can go to the same exhibit on

14   the first page.  We are again in Defense Exhibit 4933.  Let's

15   go to the top.  A little bit lower.  It is going to be on the

16   first page, second email from the bottom.

17          Will you read that, sir?

18   A.  Yes.

19   Q.  What you wrote to Mr. Lyon?

20   A.  Yes.

21   Q.  Read it out loud, sir.

22   A.  "Looks like I will be able to sell some stock after the

23   August 8 earnings announcement in order to pay down -- in order

24   to make a pay down.  I am working on an asset sale which would

25   allow me to may off the note by the end of August.  That

H3rdwal1                        Davis - cross

1    clearly would be my preference."

2              THE COURT:  Did I miss something or did the witness

3    read this already?

4              MR. BERKE:  No.  I read an earlier one saying that was

5    his hope --

6              THE COURT:  All right.

7              MR. BERKE:  He wasn't going to sell in July.

8              THE COURT:  All right.  Thank you.

9              MR. BERKE:  Thank you, Judge.

10   BY MR. BERKE:

11   Q.  And now can I show you what's been marked for

12   identification as Defense Exhibit 4053.

13             Actually, on that, after the August 8th announcement,

14   that's referring -- you knew, sir, of course, that was after

15   the announcement of the WhiteWave spin-off, correct?

16   A.  I referred to the earnings announcement, yes.

17   Q.  But that also was after the WhiteWave spin-off, correct?

18   A.  It happened to coincide with our earnings announcement,

19   yes.

20   Q.  And you knew, of course, the stock price of Dean Foods went

21   up significantly after that announcement, correct?

22   A.  I'm not a predictor of the market.

23   Q.  My only question, as a matter of fact, after the

24   August 7th announcement, the market went up significantly,

25   correct?

H3rdwal1                         Davis - cross

1    A.  Yes, it did.

2    Q.  Now, sir, let me show you what's been marked for

3    identification as Defense Exhibit 4053.

4              And, again, is this an email in August 8th between you

5    and Mr. Bucky Lyon?

6    A.  Yes.

7              MR. BERKE:  Your Honor, I would offer into evidence

8    Defense Exhibit 4053.

9              THE COURT:  Any objection?

10             MS. CUCINELLA:  No objection.

11             THE COURT:  Received.

12             (Defendant's Exhibit 4053 received in evidence)

13   BY MR. BERKE:

14   Q.  If we can go to the bottom first.  We are going to read up.

15             Do you see at 7:23 a.m. on August 8th, Mr. Lyon says:

16   "TD:  I saw the Dean/WhiteWave news -- I hope it's all good.

17   Bucky."

18             And, sir, could you read your response?

19   A.  I said, "It certainly is."

20   Q.  And Mr. Lyons responds, "Fantastic."

21             Again, that's what we are talking about.  That's after

22   the announcement of the WhiteWave spin-off and the stock price

23   went up very high, correct?

24   A.  Yes.  Yes, sir.

25   Q.  And you recall, sir, that throughout September, following

H3rdwal1                    Davis - cross

1    that, you continued to have discussions with Mr. Lyons about

2    paying off the debt that you owed?

3    A.  Yes.

4    Q.  And let me show you what's been marked as Defense Exhibit

5    4048.

6              And, sir, this is an email exchange from you --

7    between you and Mr. Lyon on October 17, 2012, isn't that

8    correct?

9    A.  Yes.  It looks like it, yes.

10             MR. BERKE:  Your Honor, I would offer into evidence

11   Defense Exhibit 4048.

12             THE COURT:  Any objection?

13             MS. CUCINELLA:  Just one moment, your Honor.

14             THE COURT:  Sure.

15             MS. CUCINELLA:  I apologize.

16             (Pause)

17             Are you offering the entire email chain just so I can

18   tell what you are --

19             MR. BERKE:  I was offering emails on the first two

20   pages.  I don't need to go beyond that.  I would just offer the

21   first two pages.

22             (Pause)

23             MS. CUCINELLA:  Your Honor, there is one line in here

24   with respect to the analyst reports that we believe is hearsay

25   in the middle of the first page and is subject to your Honor's

H3rdwal1                          Davis - cross

1    earlier --

2              THE COURT:  Show it to Mr. Berke.

3              (Pause)

4              MR. BERKE:  Your Honor, if I could just have a moment?

5    We are happy to redact the one sentence.

6              THE COURT:  Yes.

7              (Pause)

8              MR. BERKE:  Mr. McLeod, would you put on the screen,

9    the first two pages with that redaction.

10             THE COURT:  All right.  Now, this is Defense Exhibit

11   4048.

12             I want to remind counsel that it is their obligation,

13   each side's obligation, to keep track of their own exhibits.

14   So, in this trial it is incumbent on your team, Mr. Berke, to

15   note that only the first two pages of 4048 were received and

16   they were received with the redaction so that when we get to

17   the end of the trial and the exhibits go into the jury room,

18   the proper exhibit goes in the jury room.

19             That's for both sides.  You will have to keep track of

20   that.  It is not sometimes as easy as just an exhibit number.

21             MR. BERKE:  We will, your Honor.  Thank you.

22             (Defendant's Exhibit 4048, first two pages with

23   redaction, received in evidence)

24   BY MR. BERKE:

25   Q.  So let me -- I would like to begin, sir, if we may, on the

1   second page.  And you see, sir, where you -- sir, this is from

2   you to Mr. Lyon at 11:33 a.m. on the 17th, correct?

3   A.  Yes.

4   Q.  And would you read, sir, the sentence that you write

5   beginning in the middle of that email, "I have an idea."

6   A.  Yes.

7            "I have an idea that might make sense for all of us.

8   I will sell some Dean stock before year end to provide 100K of

9   proceeds, and Buck will loan me the remaining amount on the

10  same loan schedule as you and I have agreed to and pay off the

11  CSSF loan before year end."

12  Q.  And you can stop there.

13           Now if we can go to the email above it.

14           And you recall, sir, you were talking -- this is where

15  Mr. -- where Bucky Lyons is referring to potentially using the

16  Periscope proceeds to pay off part of the loan as well; do you

17  see that, sir?

18  A.  Yes.

19  Q.  That's the same Periscope that we talked about in

20  connection with Mr. Walters' loans, correct?

21  A.  Yes, it is.

22  Q.  Now, if we can go to the email above that, please.

23           Now, it says -- you say to Bucky Lyons:  "Hope you

24  made a lot of money on your investment."

25           Do you see that, sir?

H3rdwal1                        Davis - cross

1    A.  Yes.

2    Q.  Do you recall why you said that to Mr. Lyon on

3    October 17th?

4    A.  I think he told me that he owned some Dean Foods stock

5    after this transaction was announced.  That's my recollection.

6    Q.  And it was announced on -- the WhiteWave IPO was announced

7    on October 17, correct?

8    A.  No.

9    Q.  I'm sorry.  When was it announced, sir?

10   A.  August the 7th.

11   Q.  August 7?

12   A.  Yes.

13   Q.  Excuse me.  That's when the IPO was announced, correct,

14   sir?

15   A.  That's when the spin-off and the plans to do an IPO were

16   announced, yes.

17   Q.  Sir, on October 17th, that was the announcement of the IPO

18   price, correct?

19   A.  No.  I think that's incorrect.

20   Q.  Do you recall there was an announcement about the IPO that

21   provided details about the IPO on October 17th?

22   A.  The IPO wasn't priced on October the 17th.  That's -- my

23   recollection is different.

24   Q.  What do you recall happening on October 17th with regard to

25   the IPO?

1220

H3rdwal1                          Davis - cross

1   A.  I'm sorry.  I didn't hear the question.

2   Q.  What do you recall happening on October 17th with regard to

3   the IPO?

4   A.  I don't recall --

5   Q.  Well, sir --

6   A.  -- what happened on October 17.

7   Q.  We are going to come back to that timeline, but let's stick

8   with this email for now.

9         Do you see where it says, sir, "Hope you made a lot of

10  money on your investment"?

11  A.  Yes.

12  Q.  And you are referring to the investment in Dean Foods in

13  connection with the stock price going up with regard to the --

14  because of the WhiteWave spin-off, correct?

15  A.  I think that's what I was referring to.  I'm not a hundred

16  percent positive, but given the timing, I think I learned that

17  Bucky owned some stock and I think that's what I was referring

18  to, yes.

19  Q.  OK.  And if we could go to the email above that.

20        Do you see Mr. Lyon said to you:  "Made some.  Was

21  hoping to buy more today.  I hope it goes to 25."

22        Do you see that, sir?

23  A.  Yes.

24  Q.  He is saying he hopes the stock price is going to go to 25,

25  do you recall?

H3rdwal1                    Davis - cross

1    A.  Yes?

2    Q.  Does that refresh your memory, sir, that there was an

3    announcement around this time related to the pricing of the

4    IPO?

5    A.  I don't recall precisely when the announcement was made on

6    the pricing of the IPO.

7    Q.  OK.  Let me show you your response.  And would you read it,

8    sir.

9           (Pause)

10          What did you write to Mr. Lyon, sir?

11   A.  "My guess is that it will be $20 by the end of the road

12   show next week."

13   Q.  Again, when you say $20, you are talking about the price of

14   Dean Foods stock, correct?

15   A.  Yes, I think so.  Yes.

16   Q.  When you say "end of the road show," that was the road show

17   with regard to the WhiteWave spin-off and IPO, correct?

18   A.  Yes.

19   Q.  Again, as you said earlier, all of this was entirely

20   appropriate, correct?

21   A.  Yes.

22   Q.  Now, sir, I want to ask you about some testimony on direct

23   about the frequency with which you spoke to Mr. Walters.

24          You spoke to Mr. Walters a lot, I believe you

25   testified, correct?

H3rdwal1                         Davis - cross

1    A.  Yes.

2    Q.  Would you be surprised, sir -- would you be -- well,

3    withdrawn.

4         Do you think between 2008 and -- I'm sorry, January --

5    withdrawn.

6         Do you think, sir, that between January 2008 and

7    December 2012, you would have spoken to Mr. Walters or texted

8    with him more than 430 times?

9    A.  I have no idea how many times I texted or spoke to him.

10   Q.  Well, sir, would you think that on average you spoke to

11   Mr. Walters during that entire time period an average of

12   one-and-a-half to two times per week?

13   A.  What is the question?

14   Q.  Would you believe, sir, that during the time period of

15   January 8th through December 2012, you spoke to Mr. Walters on

16   average between one-and-a-half times to two times every week?

17   A.  I don't -- I don't have my phone records here.  I have no

18   idea how many times I spoke to him.  I think my testimony is

19   accurate.  I spoke to him a lot.

20   Q.  Right?

21   A.  Period.

22   Q.  You spoke to him about business transactions, correct?

23   A.  As well as other things, yes.

24   Q.  You spoke to him about your professional life, correct?

25   A.  I spoke to him about a lot of things.  I've already

H3rdwal1                              Davis - cross

1    testified to that.

2    Q.  You spoke to him about investment banking, correct, sir?

3    A.  I don't recall ever talking about investment banking.  I

4    was out of the investment banking business.

5    Q.  You were, sir, but do you recall telling prosecutors when

6    you were being interviewed that Mr. Walters was curious about

7    investment banking and as an investment banker you were in a

8    position to answer many of his questions?

9    A.  I don't recall that specifically, no.

10   Q.  Let me show you what's been marked as 3501-7.  I will show

11   you the first page first.

12            And now let me show you page 2, paragraph 2.

13            (Pause)

14            Sir, would you read -- that is not the right

15   paragraph.

16            Sir, would you read the second sentence of what is

17   shown up there to yourself.

18            (Pause)

19            My question, sir:  Does that refresh your memory that

20   you told the prosecutors at a meeting in April of 2016 --

21   excuse me -- February of 2016, that Mr. Walters was curious

22   about investment banking and as an investment banker you were

23   in a position to answer many of his questions?

24   A.  That refreshes my memory, yes.

25            (Continued on next page)

H3R3WAL2                         Davis - cross

1   Q.  Do you recall, sir, that you also discussed with

2   Mr. Walters many of your mutual friends?

3   A.  Can you repeat?

4   Q.  Do you recall, sir, that you also during the time period

5   we're talking about, 2008 to the end of 2012, you also

6   discussed with Mr. Walters your many mutual friends?

7   A.  I -- don't know who you're referring to, but we had some

8   mutual friends, yes.

9   Q.  Do you recall, sir, that you discussed mutual friends,

10  that's one of the things you talked about in your many phone

11  calls?  Do you recall that sir?

12  A.  I don't recall that specifically, no.

13  Q.  For example, do you recall you would occasionally talk

14  about Bill Sexton?  Do you recall that, sir?

15  A.  Yes, I'm sure we did.

16  Q.  There was a time you had ill health, you would talk about

17  that over an extensive period of time.

18  A.  Yes, that's accurate.

19  Q.  There were other people who you both know who you might

20  talk about health or things in their lives.  Do you recall

21  that, sir?

22  A.  I don't recall who else we would talk about.

23  Q.  Without going through a long list, sir, you don't dispute

24  you had other mutual friends who you would discuss on the phone

25  or in text, correct?

H3R3WAL2                          Davis - cross

1    A.  The only mutual friend I can recall is Bill Saxon.

2    Q.  Well, sir, do you recall, sir, you talked about stocks

3    together?

4    A.  I'm sorry?

5    Q.  Do you recall you talked about stocks together?

6    A.  Yes, occasionally we did.

7    Q.  You talked about investment opportunities together,

8    correct?

9    A.  Yes, we did.

10   Q.  You talked about gambling together, correct?

11   A.  We talked about some sports ideas, yes.

12   Q.  You talked about -- right, you talked about gambling and

13   sports as well, sometimes even separate from gambling, correct?

14   A.  Yes.

15   Q.  You also were both very avid golfers and belonged at

16   various points in time to the same club, correct?

17   A.  I'm sorry?

18   Q.  You were both avid golfers, correct?

19   A.  Yes.

20   Q.  There was a point in time when you belonged to the same

21   club, right?

22   A.  Yes.

23   Q.  You talked about golf together as well, correct?

24   A.  Yes, we did.

25   Q.  There were a variety of topics you would talk about, having

H3R3WAL2                          Davis - cross

1    nothing to do with Dean Foods, correct?

2    A.  Yes.

3    Q.  I believe you testified on direct, sir, that in late 2015,

4    before Thanksgiving, you had a surgical procedure.  Do you

5    recall that, sir?

6    A.  Yes.

7    Q.  Am I right you had a blocked artery and you had surgery to

8    repair the blocked carotid artery, correct?

9    A.  Yes.

10   Q.  Sir, do you recall that was a few days before Thanksgiving,

11   you had that surgery on November 20, 2015?

12   A.  It was the week before Thanksgiving.  I don't recall what

13   day I went in the hospital, but it was the week before

14   Thanksgiving.

15            THE COURT:  In 2015?

16            THE WITNESS:  Yes, sir, it was.

17            THE COURT:  Thank you.

18   Q.  Do you recall, sir, that within a week of the surgery, you

19   were in good enough health to continue sports gambling with

20   your friends in the amounts of thousands of dollar?  Do you

21   recall that, sir?

22   A.  I don't recall specifically, no.

23   Q.  Let me show you what's been marked for identification as

24   Defense Exhibit 4786.  Please read that to yourself, sir.

25            My question to you, sir, does that refresh your memory

H3R3WAL2                    Davis - cross

1    by November 25, you're betting a couple dimes to -- a couple of

2    thousands of dollars with your friend Tim Byrne on football

3    games?

4    A.  That's not what this e-mail says.

5             THE COURT:  No.  The question you're being asked is

6    whether looking at the e-mail refreshes your recollection on

7    the subject.

8             THE WITNESS:  I'm sorry, your Honor.

9             THE COURT:  Okay.

10            THE WITNESS:  Yes, it does refresh my memory, yes.

11   Q.  So my question is, sir, did you talk with on November 25,

12   2015 -- again, your memory -- about betting a couple dimes on

13   football games?

14   A.  Did I talk to him?

15   Q.  Did you e-mail with him about that?

16   A.  Yes.

17   Q.  Do you recall, sir, that a few weeks after this, you

18   reached out to the Wynn Hotel and Casino to request lodgings

19   for the Super Bowl and that you be allowed to go and bring your

20   friends to the big Super Bowl party they had at the Wynn?

21            Do you recall doing that within weeks of this surgical

22   procedure you had?

23   A.  Yes.

24   Q.  You were going with the usual group of four that you go to

25   Vegas with, correct?

H3R3WAL2                        Davis - cross

1    A.  Yes, I think that's right.

2    Q.  You recall in December that you had asked the Wynn that you

3    wanted to stay there for the Super Bowl, and you needed four

4    tickets for their big Super Bowl party, correct?

5    A.  Yes, I think that's accurate.

6    Q.  You did go there in early February, February 6, 7, 2016,

7    correct?

8    A.  I think that's accurate, yes.

9    Q.  That's before you began meeting with the prosecutors,

10   correct?

11   A.  Yes.

12   Q.  You recall while you were there, sir, you did in fact go to

13   the Super Bowl party.  Do you recall that, sir?

14   A.  Yes.

15   Q.  You recall, sir, that you would sit at the casino tables

16   for many hours and gamble as well when you weren't watching the

17   Super Bowl or going to the party?  Do you recall that, sir?

18   A.  No.

19   Q.  Let me show you what's been marked as Defense Exhibit 4372.

20   Directing your attention to page 294, the middle of the page.

21   4372.  I'd ask you to look at the dates and review it to

22   yourself.

23        My question to you, sir, is does that refresh your

24   memory when you were in Las Vegas for the Super Bowl and the

25   party, first week of February 2016, that in addition to doing

H3R3WAL2                          Davis - cross

 1   all of that, you gambled during your stay at the tables at the

 2   hotel and casino?

 3   A.  I did gamble at the table and I thinks that record

 4   indicates --

 5           THE COURT:  No.

 6   A.  Yes.

 7   Q.  Do you recall, sir, before that Vegas trip in January, you

 8   went on a trip to the Bahamas with friends to celebrate a

 9   friend's birthday?  Do you recall that, sir in January 2016?

10   A.  Yes, I do recall.

11   Q.  You recall, sir, you gave testimony last week that the day

12   you signed your cooperation agreement, you made plans to go to

13   Las Vegas, and shortly thereafter you went to Las Vegas with

14   friends?  Do you recall that?

15   A.  Yes, I was invited to go for my birthday.

16   Q.  Do you recall, sir, that when you were in Vegas just after

17   your meetings with the prosecutors on May 19 and the 20th, you

18   in fact gambled all the way to 3 in the morning on some of

19   those days?  Do you recall that, sir?

20   A.  I don't recall how late I gambled, no.

21   Q.  Let me show you again, sir, what's been marked for

22   identification -- let me show you a different document, rather.

23           Let me show you what's been marked for identification

24   as Defense Exhibit 5372.  I'm going to show you page 294 and

25   ask if that refreshes your recollection the same week you were

1    meeting with the prosecutors and signed your cooperation

2    agreement, you were gambling from 6 at night to 3 in the

3    morning at the Wynn Hotel and Casino.

4    A.  Yes, I recall this.

5    Q.  Sir, talking about -- that was right after the series of

6    meetings that you testified about that led to your cooperation

7    agreement in May of 2016, correct?

8    A.  Yes.

9              MR. BERKE:  Your Honor, if I may, let me show the

10   witness what has been marked as Defense Exhibit 5 for

11   identification.

12             Your Honor, may I have one moment with Ms. Cucinella?

13             THE COURT:  Yes.

14             MR. BERKE:  Thank you.

15             Your Honor, if I may as to Defense Exhibit 5, we have

16   a stipulation with the government that this document reflects

17   the dates that Mr. Davis had meetings with the government in

18   connection with this case.

19             Excuse me.

20             To rephrase, your Honor, the agreement is this

21   document accurately reflects that there were meetings with the

22   government on the dates in the exhibit.

23             THE COURT:  All right.  Is that so stipulated?

24             MS. CUCINELLA:  Yes, your Honor.

25             THE COURT:  All right.  So this is a stipulation of

1    fact, ladies and gentlemen.  And you must accept the fact as

2    proven.  The weight, if any, that you give to the fact is

3    entirely up to you to decide.  Go ahead.

4           MR. BERKE:  If we can enlarge the first half, ending

5    with the May 11.

6    Q.  Sir, you see at the top it says "Davis meetings with the

7    government"?

8    A.  Yes.

9    Q.  You see that there are various dates which you met with the

10   government and numbers next to them, numbers 1 through 13?

11   A.  Yes.

12   Q.  Do you recall, sir, that you met with the government on 13

13   different days prior to signing your cooperation agreement on

14   May 11, 2016?

15   A.  Yes.

16   Q.  If we can show the second half of that document.

17          Do you recall, sir, that following your meeting, your

18   meetings with the prosecutors prior to signing the cooperation

19   agreement, you had at least an additional 16 meetings that are

20   numbered 14 through 29 with the government as well prior to the

21   start of this trial -- or prior to your testimony?

22   A.  Yes.

23          MR. BERKE:  We can take that down for now and come

24   back to it.

25   Q.  Sir, you testified last week that prior to meeting with the

H3R3WAL2                          Davis - cross

1    prosecutors, you hired those new lawyers you talked about in

2    New York to help you try to get a deal.  Do you recall that,

3    sir?

4    A.  I didn't hear the entire question.

5    Q.  Do you recall you testified last week, sir, that when you

6    decided to try to get a deal, you hired new lawyers in New York

7    to try to help you in those efforts?

8          THE COURT:  Try to avoid repetition in your

9    cross-examination, Mr. Berke.  Otherwise I'll sustain

10   objections as cumulative.

11         MR. BERKE:  Yes, your Honor.

12   Q.  My question to you, sir, let me ask you a different

13   question.

14         Do you recall, sir, that the new lawyers you hired met

15   with the prosecution before you met with them to talk about

16   your upcoming meetings that are reflected in the chart?  Do you

17   recall that, sir?

18   A.  Yes, I think they did.

19   Q.  Do you recall, sir, that on your behalf, your lawyers that

20   you retained had told the prosecution team that they wanted to

21   have sufficient time with you to help make sure that the

22   sessions you had with them went off without a hitch?  Do you

23   recall that, sir?

24   A.  I wasn't present for those discussions so I can't -- I

25   don't have a recollection of what my lawyers talked to the

1    prosecutors about.

2    Q.  Did they report back to you something to that effect, that

3    they were talking to them about your upcoming sessions?

4              MS. CUCINELLA:  Objection.

5              THE COURT:  Sustained.

6    Q.  Do you recall, sir, prior to your first meeting, that you

7    had many meetings with your own lawyers before you started

8    meeting with the prosecutors?  Do you recall that, sir?

9    A.  Yes.

10   Q.  And then, sir, do you recall you started on the series of

11   meetings that are reflected in Defense Exhibit 5?  Do you

12   recall that?

13   A.  Yes.

14   Q.  Do you recall, sir, that often between these meetings you

15   would also meet with your lawyers?  Do you recall that, sir?

16   A.  Repeat the question?  I'm sorry.

17   Q.  Do you recall, sir, that between the meetings we were

18   talking about you would often meet with your lawyers between

19   those meetings?

20   A.  Between some of the meetings I did, yes, that's accurate.

21   Q.  Do you recall, sir, that at times the prosecutors would

22   identify documents either at the prior session or between

23   sessions for you and your lawyers?  Do you recall that, sir?

24   A.  Identify documents?

25   Q.  Documents that they would like you to review.

H3R3WAL2                          Davis - cross

1   A.  Yes.

2   Q.  Do you recall, sir, that they at times had you come in on

3   the weekends if they wanted to meet with you before you had

4   your deal?  Do you recall that, sir?

5   A.  I don't recall which days I met with them on.  But I met

6   with them as your exhibit shows.

7   Q.  Sir, when you were meeting with them, they would show you

8   documents, correct?

9   A.  Yes.

10  Q.  Do you recall, sir, that on direct you testified that you

11  were asked, Mr. Davis, what did you do during these meetings

12  and talking about the debriefings, you would say they provided

13  me a lot of information that included board minutes, credit

14  card records, travel records, bank statements.

15          Do you recall that, sir?

16  A.  Yes.

17  Q.  Those were some of the records that you reviewed, correct?

18  A.  That's correct.

19  Q.  You also reviewed phone records, which you didn't mention

20  in your answer, but you did review phone records, correct?

21  A.  A limited amount of phone records, yes.

22  Q.  Whatever phone records they wanted to show you, right?  It

23  was the prosecution who showed you phone records?

24  A.  Yes.

25  Q.  You understood that your own lawyers had phone records as

1    well, correct?

2    A.  Yes, they did.

3    Q.  You understood they had your phone records, correct?

4    A.  Yes.

5    Q.  And you knew they had Mr. Walters' phone records from back

6    when they did that SEC presentation that you testified about,

7    do you recall that?

8    A.  They had some of his records, yes.

9    Q.  Do you recall, sir, that on your testimony on the 21st you

10   were asked this question and gave this answer:  Does reviewing

11   the board meeting minutes help you put things in place in time?

12   And you answered:  It did.  I mean, I don't think anybody can

13   remember exactly what happened in a board meeting eight years

14   ago, but I've been asked to do so.

15          Do you recall being asked those questions, sir?

16   A.  Yes.

17   Q.  And you'll agree with me, sir, that the telephone records

18   that you reviewed were simply records of the time of a call,

19   but not the substance of the call, correct?

20   A.  Yes, I think that's accurate.

21   Q.  You didn't have any text messages.  That wasn't available

22   for you to review or see between you and Mr. Walters, correct?

23   A.  Yes.

24   Q.  You recall, sir, that your lawyers also had Mr. Walters'

25   trading records so they knew when and what amounts he traded in

H3R3WAL2                         Davis - cross

1   Dean Foods stock?  Do you recall that?

2   A.  They had some of his trading records, yes.

3   Q.  You recall they discussed that with you as well before and

4   in between these meetings we're talking about.  Do you recall

5   that sir?

6            MS. CUCINELLA:  Objection.

7            THE COURT:  Basis?

8            MS. CUCINELLA:  Privileged conversations.  The nature

9   of the conversation, what they actually discussed, as opposed

10  to the fact of the discussion.

11           MR. BERKE:  I can rephrase it, your Honor.

12  Q.  My question, sir, is in meetings with your lawyers, did you

13  review -- just if you reviewed it, yes or no -- did you review

14  the trading records or the information in the trading records

15  with your lawyers?

16  A.  I was shown some of the trading records, yes.

17  Q.  You recall, sir, that at many of these meetings at the end

18  of the session you would have with the prosecutors and the FBI,

19  they said we're going to stop talking about this topic and

20  we're going to talk about it again at a later session.

21           Do you recall that, sir, that that happened quite

22  regularly in these sessions?

23  A.  I don't recall that.

24  Q.  Let me show you what's been marked as Exhibit 3501-7.

25  First I'll show you the date, sir.  I'm going to show you page

H3R3WAL2                        Davis - cross

1  two to three.  The bottom of page two and the top of page

2  three, and I'd ask you to review it to yourself, just the last

3  sentence on page and two the first two lines on page three.

4          My question, to you, sir -- have you had a chance to

5  read that?

6  A.  No.  Give me a second.

7          All right, I've read it.

8  Q.  Does that refresh your memory that during these proffer

9  sessions, the prosecution would, to certain topics, say we're

10  going to stop talking about that topic and we'll talk about it

11  at a future date.  Do you recall that?

12  A.  Yes.

13  Q.  Do you recall that between the meetings at times the

14  prosecution would give documents or other materials to your

15  lawyers for you to look at before that meeting?  Do you recall

16  that?

17  A.  Yes, I think that's accurate, yes.

18  Q.  You recall, sir, that during this meeting, there came a

19  point -- during this series of meetings before you had an

20  agreement with the prosecutors -- let me ask you this question.

21          You understood, sir, that you before you had a

22  cooperation agreement, you signed something call a proffer

23  agreement?  Do you recall that, sir?

24  A.  Yes.

25  Q.  The proffer agreement provided some limitations on what the

1    prosecution could do with your statements if they didn't agree

2    to give you a cooperation agreement, is that right?

3    A.  Yes.

4    Q.  Is it right, sir, that for every one of the meetings, the

5    13 meetings before your cooperation agreement, you either

6    signed a new proffer agreement or initialed an existing one?

7    Is that true, sir?

8    A.  Yes, that's accurate.

9    Q.  You understood that although there was some limitations,

10   that once you started meeting with the prosecution, they could

11   make certain uses of your statements that you made, for example

12   about Shelter Golf.  Isn't that true, sir?

13   A.  Can you repeat the question?  I'm not sure I understand.

14   Q.  You understood, sir, if the prosecution decided not to give

15   you a cooperation agreement, or you decided to stop meeting

16   with them, there were some uses they could make of some of the

17   information you gave them, is that correct, sir?

18   A.  I don't -- I don't recall exactly the terms of the proffer

19   agreement.  No.  I don't recall that.

20   Q.  But as a general matter you recall, sir, that there was

21   some uses that they could make of that information?

22   A.  I'm going to have to give you the same answer.  I don't

23   recall the exact terms of the proffer agreement.  But my lawyer

24   said it was in good shape and I could sign it.

25   Q.  Do you recall, sir, that during these sessions, there came

```
 1   a point in time when the prosecution played for you phone calls
 2   that had been recorded pursuant to a wiretap that the
 3   prosecution had used on Mr. Walters' phone?  Do you recall
 4   that, sir?
 5   A.  Yes.
 6   Q.  And they played calls that were between you and him after
 7   articles that appeared in the paper about the investigation
 8   that you testified about last week.  Do you recall that, sir?
 9   A.  Yes.
10   Q.  And you recall that, sir, they played you these
11   conversations that you had with Mr. Walters as part of your
12   review of information, correct?
13   A.  Yes.
14   Q.  Am I right, sir, that the prosecution didn't tell you how
15   many calls had been recorded of you, correct?
16   A.  That's correct.
17   Q.  Did they tell you when the calls were recorded?
18   A.  No.
19   Q.  Do you recall, sir, that prior to them actually playing
20   calls for you, whether or not they had told you in earlier
21   sessions that they had recorded calls with you on them?
22   A.  Can you repeat the question?
23   Q.  Had they told you, sir, in earlier sessions, of the 13
24   sessions we're talking about, that they had calls that were
25   recorded with your statements on them?
```

H3R3WAL2                           Davis - cross

1    A.  I don't recall that.

2    Q.  Do you recall knowing that prior to the time they played it

3    for you and your counsel?

4    A.  Knowing that what?

5    Q.  There were calls that were recorded between you and

6    Mr. Walters.

7    A.  I don't recall them telling me that, I just don't know.

8    Q.  Am I correct, sir, that other than these recorded calls

9    that you are aware of, when you talk about referring phone --

10   to phone records during these sessions or refreshing your

11   memory, there is no record of the substance of any of your

12   calls that you had with Mr. Walters?  Isn't that correct?

13   A.  I don't know what the government has.  They didn't share

14   everything they had with me as far as the investigation's

15   concerned, so I really can't tell you that I have any knowledge

16   about what the government has here.

17   Q.  I'm asking you a different question, sir.

18   A.  Okay.

19   Q.  You testified that at various points you were shown

20   documents and materials to try to refresh your memory, correct?

21   A.  Yes.

22   Q.  You testified, among other things, you were shown phone

23   records, correct?

24   A.  Some, yes.

25   Q.  The phone records were simply the date and time of a call

H3R3WAL2                          Davis - cross

1    and the length of the call, correct?

2    A.   That's what I saw, yes.

3    Q.   Other than these recorded calls that we just talked about,

4    there was nothing in any of the materials shown to you that

5    gave any indication of what was discussed on those calls,

6    correct?

7    A.   There was no materials shown to me, that's correct.

8    Q.   Sir, you recall, do you recall, sir, that on the eve --

9    withdrawn.

10        Do you recall, sir, that the month prior to this

11   trial, you, sir, were interested in learning what would be

12   disclosed to Mr. Walters about your prior statements during the

13   13 sessions that we reviewed?  Do you recall that, sir?

14   A.   I may have asked that question.  I don't recall

15   specifically, but I may have asked that question, yes.

16   Q.   Let me show you, sir, what's been marked for identification

17   as DX 5428.  I'm asking you just to review it to yourself and

18   I'll ask you a question -- it is not in evidence -- about the

19   paragraph on the bottom.

20        My question to you, sir, simply does that refresh your

21   recollection that last month you had asked the prosecutors to

22   tell you what was going to be in the prior -- the records of

23   your prior meetings that were going to be turned over?

24        Do you recall that, sir?

25   A.   Can you -- I'm sorry.  Can you ask the question again?  I

1    want to make sure I understand it.

2    Q.  Just so you know, I'm asking you specifically if it

3    refreshes your recollection, the paragraph in the beginning, in

4    the middle of this top paragraph beginning with the word "he."

5    And my question is, sir, does that refresh your recollection

6    that last month, you asked the prosecutors in this case to tell

7    you what would be in the reports of your prior meetings that

8    were going to be turned over to Mr. Walters?

9    A.  This is an e-mail --

10   Q.  Don't talk about the document, sir.  My only question is

11   does that refresh your memory about what you did?

12   A.  No.  It does not refresh my memory.

13   Q.  Sir, you recall during the direct, your direct testimony at

14   various points Ms. Cucinella asked you if you remembered

15   certain meetings or discussions with Mr. Walters?  Do you

16   recall that?

17   A.  Yes.

18   Q.  You recall, sir, that on March 21, last week, you were

19   asked specifically what you discussed with Mr. Walters at the

20   April 9, 2010 meeting in Las Vegas where you had asked him for

21   the loan.  Do you recall that, sir?

22   A.  Yes, I do.

23   Q.  Sir, do you recall you being asked these questions and

24   giving this answer:  Do you recall what about Dean Foods you

25   discussed at this meeting?  I was -- we talked about the

H3R3WAL2                         Davis - cross

1   outlook for the year generally.  And what was the outlook for

2   the year?  It was cloudy.  It was not clear.  The commodity

3   environment was not all that good.  And do you recall if you

4   discussed anything else at this meeting about Dean Foods?  I

5   don't recall discussing anything else at that meeting about

6   Dean Foods.

7            My question, sir, do you recall being asked those

8   questions and giving those answers on the 21st?

9   A.  Yes.

10  Q.  Do you recall, sir, that after you were giving that answer,

11  you were asked to review an exhibit?  Do you recall that, sir?

12  A.  Yes.

13  Q.  Do you recall the exhibit were board minutes that took

14  place but had nothing to do with your -- withdrawn.

15           Do you recall that the exhibit was board minutes of

16  Dean Foods?

17  A.  Yes, I do.

18  Q.  You recall, sir, after reviewing those board minutes, you

19  were asked does that refresh your memory of what you were -- of

20  what was going on at that time.  Do you recall that, sir?

21  A.  Yes.

22  Q.  You said it does, about the WhiteWave spinoff.  Do you

23  recall that, sir?

24  A.  Yes.

25  Q.  There was nothing in the board minutes that would address

1244

H3R3WAL2                          Davis - cross

1    what you said to Mr. Walters when you met with him in Las Vegas

2    and you testified about earlier in your testimony, was there,

3    sir?

4              MS. CUCINELLA:  Objection.

5              THE COURT:  Rephrase your question.

6              MR. BERKE:  Of course, your Honor.

7    Q.  You'll agree with me, sir, that there was no record of what

8    you discussed with Mr. Walters at your meeting in Las Vegas,

9    correct?

10   A.  Just my vivid memory of it, yes.

11   Q.  Your vivid memory of what you testified about before the

12   board minutes in which you said what you talked about was that

13   the outlook for the year was cloudy.  That was your vivid

14   memory that you gave sworn testimony to, correct?

15   A.  Yes.

16   Q.  And then you looked at the board minutes, correct, sir?

17   A.  Yes.

18   Q.  And the board wasn't talking about your meeting with

19   Mr. Walters, was it?

20             MS. CUCINELLA:  Objection.  Your Honor, may we have a

21   sidebar on this?

22             THE COURT:  No.  Go ahead.  But sustained as to form.

23   Q.  Sir, that process where you had a memory of something and

24   then you would review board minutes or something at Dean Foods,

25   that was similar to the process that you did at the 29 meetings

1    you had before and after you signed your cooperation agreement.

2    Is that fair, sir?

3    A.  I think it was similar, yes.

4    Q.  Sir, do you recall you testified there was a time you pled

5    guilty?

6    A.  I'm sorry?

7    Q.  Do you recall there was -- you testified there was a time

8    you pled guilty to a variety of crimes?  Do you recall that,

9    sir?

10   A.  Yes.

11   Q.  Do you recall, sir, with regard to providing material

12   non-public information, that what had you said when the judge

13   asked you to discuss what -- to say in your own words what

14   you're pleading guilty to, you said that it was for providing

15   information from, quote, about 2008 to 2013.  Do you recall

16   that, sir?

17   A.  What's the time frame again?  I don't -- I'm sorry, I don't

18   follow your question.

19            THE COURT:  And it is sustained as to form.

20   Q.  Sir, do you recall that when you made a sworn statement

21   about this case in court, you had said that you had at that

22   time provided information to Mr. Walters from about 2008 to

23   2013?

24   A.  I don't recall exactly what the time frame was.

25   Q.  Let me show you what's been marked for identification as

H3R3WAL2                        Davis - cross

1   3501-1.  I'll show you the first page and then page 20.  No,

2   I'm sorry.

3              THE COURT:  Ladies and gentlemen, I'll let them get

4   organized.  Let's take our midmorning break.  Please do not

5   discuss the case among yourselves or with anyone.  We'll be

6   back in action in 10 minutes.  Thank you.

7              (Jury excused)

8              THE COURT:  See you in 10 minutes.

9              (Recess)

10             MR. BERKE:  Your Honor, I want to mention one thing to

11  you.

12             (Jury present)

13             THE COURT:  We're missing one juror.  So we'll just

14  patiently wait for a moment.

15             Take your time.  Don't rush.

16             Go ahead, Mr. Berke.

17             MR. BERKE:  Thank you, your Honor.

18  BY MR. BERKE:

19  Q.  Let me show you what's been marked for identification as

20  3501-2.  This is just for you, sir.  I just want to show you

21  what it is.  Go to the second page.  If we go to page 20.

22             My question to you is whether this refreshes your

23  recollection that when you came to court and swore to the

24  conduct as part of your guilty plea, you said that it was from

25  2008 to 2013 that you claimed you provided material non-public

H3R3WAL2                        Davis - cross

1    information related to Dean Foods to Mr. Walters.

2                MS. CUCINELLA:  Objection, your Honor.  The question

3    was specific to the charges in the indictment.

4                THE COURT:  And I don't think the question that was

5    asked has a basis in what I'm looking at, so rephrase your

6    question.

7    Q.  Do you recall, sir, that when you were asked -- actually,

8    we can take that down.

9                Do you recall being asked questions about the

10   cooperation agreement dated GX 1750?  Do you recall that, sir?

11   A.  Yes.

12               MR. BERKE:  If we can publish that on the screen,

13   Mr. McLeod.  If we can first go to the second paragraph on the

14   first page.

15   Q.  Do you recall, sir, that the agreement references

16   information being provided from 2008 through in or about 2014?

17   Do you see that, sir?

18   A.  Yes.

19   Q.  Now if I can show you page two of the agreement.  Do you

20   recall, sir, that we talked about last week that under the

21   agreement, that you would, if you follow the agreement, you

22   would get certain benefits?  Do you recall that, sir?

23   A.  Yes.

24   Q.  Let me show you on page three the last paragraph.  Again,

25   sir, you see this was -- withdrawn.

1          You see, sir, where it says if you fully complied with

2    the understandings specified in this agreement, you will not be

3    further prosecuted criminally by this office for any crimes

4    related to your participation in -- do you see that, sir?

5    A.  Yes.

6    Q.  And on (a) for what you're getting protection from, you see

7    it is the commission of and the conspiracy to commit securities

8    fraud from in or about 2008 through in or about with 2014?  Do

9    you see that, sir?

10   A.  Yes.

11   Q.  That was your understanding -- withdrawn.  Thank you.

12        Do you recall, sir, that throughout your direct

13   testimony, you were asked about various quarters between 2008

14   through 2013 involving Dean Foods securities, correct?

15   A.  Yes.

16   Q.  Sir, with regard to an equity offering announced on

17   February 28, 2008, do you recall testifying that you told

18   Mr. Walters about the equity offering and that you thought it

19   would be a positive thing for the company?  Do you recall that,

20   sir?

21   A.  Yes.

22   Q.  So that was a lie, wasn't it?

23   A.  No.

24   Q.  Isn't it a fact, sir, that you knew the equity offering

25   would cause the stock price of Dean Foods to go down?  Isn't

H3R3WAL2                    Davis - cross

1    that true, sir?

2    A.  No.

3    Q.  Well, you recall, sir, that you were shown Government

4    Exhibit 422 which is the Dean Foods board meeting with regard

5    to the equity offering?  Do you recall that, sir?

6    A.  Yes.

7    Q.  I want to show you what's been marked for identification as

8    DX 471.  And sir, do you see -- well, let me show you first in

9    addition to 471 can I show you what's been marked for

10   identification as well as Defense Exhibit 468.

11          Sir, do you see 468 is a e-mail from Steve Kemps to

12   you and other directors with regard to a Dean Foods board call?

13   Do you see that, sir?

14   A.  Yes.

15   Q.  Dated 2/26.  And sir, do you recall and you see, sir, that

16   it refers to attached file agenda and others?

17   A.  Yes.

18   Q.  And it says summary proposed initiatives.  Do you see that,

19   sir?

20   A.  Yes.

21   Q.  And now we can look at Defense Exhibit 471.  You see, sir,

22   that's summary proposed initiatives?

23   A.  Yes.

24   Q.  You see the Bates stamp on the upper-right-hand corner?

25   A.  Yes.

1          MR. BERKE:  Your Honor, we'd offer Defense Exhibit 468

2     and 471 into evidence.

3          MS. CUCINELLA:  No objection.

4          THE COURT:  Received.

5          (Defendant's Exhibit 468, 471 received in evidence)

6          MR. BERKE:  Mr. McLeod, if we can first show 468.

7     Q.  Sir, that's the e-mail from Steve Kemps, the general

8     counsel, on February 26 to you and other board members,

9     correct?

10    A.  Yes.

11    Q.  You see it says "Subject Dean Foods board call 2/27/08"?

12    A.  Yes.

13    Q.  Then it shows the attachment, correct?

14    A.  Yes.

15    Q.  It says "Attached are the materials for Wednesday's call."

16    A.  Yes, I see that.

17    Q.  Let's go to Defense Exhibit 471.  You see at the top it

18    says "Summary proposed initiatives to provide additional

19    balance sheet flexibility."  You see that, sir?

20    A.  Yes.

21    Q.  And you see it refers to the equity -- the issue of equity

22    that we were just talking about, issuing equity.  You see that,

23    sir?

24    A.  Yes.

25    Q.  You see, sir that it's proposing -- just to pause for a

H3R3WAL2                    Davis - cross

1    second.

2                You understand, sir, when you're issuing equity, it's

3    Dean Foods releasing more stock to the public, correct?

4    A.  It's selling more stock, yes.

5    Q.  They're talking about the 400 million net equity -- excuse

6    me.  Net public equity issuance.  Do you see that, sir?

7    A.  Yes.

8    Q.  They announced they're anticipating announcing transaction

9    after market close on March 3, 2008.  You see that, sir?

10   A.  Yes.

11   Q.  You see where it says discount to last trade expected to be

12   approximately 7 to 9 percent with final pricing dependent upon

13   market conditions?  You see that, sir?

14   A.  Yes.

15   Q.  Now I'd like you to go to the second page.  You see where

16   that refers to a modest dilution?  Do you see that, sir?

17   A.  Yes.

18   Q.  You understand dilution is diluting or reducing the value

19   of a stock, correct?

20   A.  It means there's going to be more shares outstanding.

21   That's what it means.

22   Q.  Which is going to reduce the value of the existing shares,

23   correct?

24   A.  That's not accurate.  No.

25   Q.  Well, sir, why don't you look -- you see the chart.  See

1    where it talks about on the bottom the 2008 projected and it

2    says accretion or dilution?  You see that, sir?

3    A.  Yes.

4    Q.  You see where it says, sir, it's projecting dilution?  You

5    see that, sir?

6    A.  Yes.

7    Q.  You see on the bottom it gives a percentage of how much it

8    thinks it's going to go down.  The bottom row, minus

9    1.3 percent, minus 4.3 percent.

10   A.  That's not referring to the stock price.

11   Q.  Sir, let me show you if we can go to the portion that

12   refers to the assumptions.  You see where it refers to key

13   assumptions on the bottom there, sir?

14   A.  Yes, I do.

15   Q.  If we can enlarge that, please.  You see, sir, where it

16   says "key assumptions" and then it says a 6.8 percent discount

17   to the February 15 closing price of 24.75 to 2306 you see that,

18   sir?

19   A.  Yes.

20   Q.  The assumption that this is reflecting is that the issuance

21   of more stock is going to cause the existing stock to be

22   discounted or fall in value by 6.8 percent after the

23   announcement.  Isn't that what that means, sir?

24   A.  No.  That's not correct.

25   Q.  You dispute that that key assumption in this document is

1   referring to a discount for the February 15 closing price?

2   A.  Can you repeat your question?

3   Q.  Yes.  You're disputing, sir, that when it says 6.8 percent

4   discount to the February 15 closing price, that that refers to

5   a 6.8 percent reduction of the price as of February 15 as one

6   of the key assumptions?

7            Are you disputing that, sir?

8   A.  I'm disputing the fact that it would make the stock go

9   down.  What it's referring to is how the stock got priced in

10  the offering.  Not the aftermarket in the stock.

11  Q.  Sir, you'll agree with me this portion says "key

12  assumptions," correct?

13  A.  Yes.

14  Q.  And then the assumption is it is going to be issuing more

15  stock to pay down the debt, correct?

16  A.  Yes, it does, all of which I thought was positive.

17  Q.  And you recall, sir, that it's referring to some sort of

18  discount -- take it a step at a time -- to the price of the

19  stock as it was on February 15.  Do you recall that, sir?

20  A.  Yes.

21  Q.  Your testimony is that you're saying that the new stock

22  that's being released is going to be released at a price less

23  than 24.75.  Is that your testimony, sir?

24  A.  It was priced below the offering price, yes, that's

25  correct.

H3R3WAL2                          Davis - cross

1    Q.  It's your testimony, sir, that you did not think that's

2    going to have any -- if that's your interpretation, your

3    testimony is you did not think that would have any impact on

4    the price of Dean Foods stock after the announcement.  Is that

5    your testimony, sir?

6    A.  No.  It's not my testimony.

7    Q.  You knew, sir, that the price of Dean Foods stock was going

8    to fall immediately after this announcement, didn't you, sir?

9    Because people who are the shareholders who held stock were

10   going to have their shares diluted.  Isn't that true, sir?

11   A.  That's not what I thought at the time, no.

12   Q.  Your testimony is that's not what that means, that the

13   document does not mean a 6.8 percent discount.  Is that

14   correct, sir?

15           MS. CUCINELLA:  Objection.

16           THE COURT:  Basis?

17           MS. CUCINELLA:  Asked and answered over and over.

18           THE COURT:  Sustained.

19   Q.  Sir, you go to the big chart.  You see again where it's

20   projecting what's going -- you understood earnings per share is

21   EPS, right?

22   A.  Yes, it is.

23   Q.  Where it says dilution, and again, your testimony is that

24   doesn't involve diluting the value of the current shares, is

25   that your testimony, as to that EPS?

H3R3WAL2                          Davis - cross

1                    MS. CUCINELLA:  Objection.  Asked and answered.

2                    MR. BERKE:  Different question.

3                    THE COURT:  Overruled.

4        A.  Question again, please?

5        Q.  Is it your testimony where it says dilution, it has

6        negative percentages projected, that that doesn't involve

7        reducing the value of Dean Foods stock?  Is that your

8        testimony?

9        A.  It's my testimony that does not refer to the value of the

10       stock, yes, that's my testimony.

11       Q.  Isn't it a fact, sir, that when the equity -- when the

12       equity offering was announced in March, it had the exact impact

13       that the board was told it would have, and Dean Foods' stock

14       price fell 6.4 percent just as was listed on the key

15       assumptions?  Isn't that true, sir?

16                    MS. CUCINELLA:  Objection.  Assumes facts not in

17       evidence.

18                    THE COURT:  Rephrase it.

19       Q.  Sir, you know that when this equity offering was announced

20       in March, the stock price of Dean Foods fell 6.4 percent,

21       didn't it?

22       A.  Yes.  To my surprise it did go down, yes.

23       Q.  You're not -- if we can leave that up there.

24                    Sir, you're not disputing that you saw these

25       materials, correct?

H3R3WAL2                          Davis - cross

1    A.   No.

2    Q.   That's referring to the 6.8 percent dilution?

3    A.   I saw these materials, yes.

4    Q.   When you testified before that you were surprised that the

5    announcement of the equity offering resulted in the reduction

6    of 6.4 percent, said you were surprised, that was a lie too,

7    sir, wasn't it, because you were told that at the earlier board

8    meeting, weren't you?

9    A.   I did not lie about it, no.

10   Q.   Sir, you recall you testified on direct that you had a

11   meeting with Mr. Engles on March 17, 2008, and that he had the

12   flash financials for January and February of that quarter.  Do

13   you recall that, sir?

14   A.   Yes.

15   Q.   And you recall, sir, your testimony that you told

16   Mr. Walters that you were going to have a good quarter.  Do you

17   recall that, sir?

18   A.   Yes.

19   Q.   Sir, do you recall in your testimony you were shown a press

20   release from April 30 that showed it was a good quarter?  Do

21   you recall that, sir?

22   A.   Yes.

23   Q.   And you recall, sir, that when you talked about your

24   meetings with Mr. Engles, you said that he had the flash

25   financials for January and February?  Do you recall that, sir?

H3R3WAL2                        Davis - cross

1    Because your meeting with him was on March 17.

2    A.  Yes.

3    Q.  That was all a lie, wasn't it, sir?

4    A.  No.

5    Q.  Isn't it a fact, sir -- let me show you, sir, what's been

6    marked for identification as DX 283-A.  You see, sir, that is

7    the Dean Foods' audit committee meeting financial reports for

8    the quarter ending March 31, 2008.  Do you see that, sir?

9    A.  Yes.

10           MR. BERKE:  Your Honor, I'd offer in evidence Defense

11   Exhibit 283-A.

12           MS. CUCINELLA:  No objection.

13           THE COURT:  Received.

14           (Defendant's Exhibit 283-A received in evidence)

15   Q.  Sir, this is the financial results for the quarter we're

16   talking about, correct?

17   A.  This is the -- yes.  Sorry.

18   Q.  And you'd said when you met with Mr. Engles in early

19   mid-March, he had January and February of this quarter,

20   correct?

21   A.  Yes.

22   Q.  And the quarter ended March 31, 2008, correct?

23   A.  Yes.

24   Q.  I'd like to direct your attention to page four.  And sir,

25   do you see that the report following the close of the quarter

1    shows that the reason there was an announcement following the

2    quarter, that it was a great quarter, was because the

3    performance in excess of anticipated range attributed largely

4    to the March performance.

5         Do you recall that, sir?

6    A.  I can see the chart.  Yes.

7         MR. BERKE:  Thank you, Mr. McLeod.  Your Honor, may I

8    have a moment?

9         THE COURT:  You may.

10   Q.  Sir, do you recall testifying, sir, that you discussed

11   events in the market with Mr. Walters?  Do you recall that,

12   sir?

13   A.  Yes.

14   Q.  That was perfectly okay, correct?  That was perfectly okay

15   to discuss with Mr. Walters or other friends events in the

16   market, correct?

17   A.  So long as it was not providing him non-public information.

18   Q.  I'm talking about events that impact the market generally.

19   Big events in the market.  That was okay to talk about,

20   correct?

21   A.  Sure.

22   Q.  You recall, sir, that there was a time in March where Bear

23   Stearns was going to go under and it was having a impact on the

24   market?  Do you recall that in March of 2008 in the midst of

25   the financial crisis?

H3R3WAL2                         Davis - cross

1    A.  I don't recall exactly when Bear Stearns failed, no.

2    Q.  You recall the event of it failing at some point, yes?

3    A.  Yes, I'm certainly aware of that, yeah.

4    Q.  You recall at some point JPMorgan came in and they

5    ultimately offered a significant premium to Bear Stearns

6    investors over what was previously discussed, and it caused the

7    market to go up a lot?  Do you recall that, sir, that happened

8    at some point?

9    A.  I don't recall the specific events around Bear Stearns, no.

10   Q.  Let me show you what's been marked Defense Exhibit 51 --

11   you regularly read financial reports like The Wall Street

12   Journal, correct?

13   A.  Yes.

14   Q.  Let me show you what's been marked as 5175 for

15   identification.  If we can scroll down, this is just to review

16   yourself, sir.  See if it refreshes your memory.

17             (Continued on next page)

18

19

20

21

22

23

24

25

H3rdwal3                    Davis - cross

1   Q.  My question to you, sir, is do you recall in March 2008,

2   March -- third week in March 2008, that there were these

3   discussions involving the Fed and JPMorgan and Bear Stearns?

4   Do you recall that, sir?

5   A.  Yes, I do.

6   Q.  And do you recall, sir, that it had a significant impact on

7   the market, causing it to go up significantly across the board?

8   Do you recall that, sir?

9   A.  I don't recall exactly what happened in the market, no, on

10  that particular day or week.

11  Q.  But you recall it to be a big event during this quarter

12  we're talking about, correct?

13  A.  I don't know how to define "a big event."  I'm sorry.

14  Q.  An impactful event in the market, correct?

15  A.  I've already testified, I don't recall exactly how the

16  market reacted.

17  Q.  Sir, let me ask you about your testimony regarding the

18  quarter towards the end of 2008.

19          Do you recall being asked on direct testimony if you

20  remember anything that happened after the Dean Foods earnings

21  announcement on November 4, 2008, and answering that you recall

22  exactly what happened after this announcement?  Do you recall

23  that question and testimony?

24  A.  This was referring to what date?  I'm sorry.

25  Q.  November 4, 2008.

H3rdwal3                        Davis - cross

1    A.  Yes.

2    Q.  And you recall going on to say that you had gotten a call

3    from Mr. Walters and that you told him on the call that you

4    thought that the company was going to do fine, it was going to

5    do well the rest of the year?  Do you recall that testimony, in

6    substance?

7    A.  Yes.

8    Q.  And you recall you were also asked about -- that you were

9    previously asked about whether you had told Mr. Walters

10   anything in that time period that you had not -- that you had

11   told the prosecutors in your proffer session and you didn't

12   remember telling them anything?  Do you recall that testimony

13   on direct?

14   A.  I think that's accurate, yes.

15   Q.  And you recall that when you previously stated that you

16   didn't give any information to Mr. Walters, that they showed

17   you the same documents that you said that refreshed your

18   recollection when you testified in court?  Do you recall that,

19   sir?

20   A.  I'm not sure what you are referring to when you say "the

21   same documents."

22   Q.  Well, do you recall that you were shown -- you were asked

23   to review documents that included audit committee meetings for

24   that period.

25            Withdrawn.

1    Do you recall that you were -- yes, that you were

2    asked to review audit committee meetings for that period?

3    A.   What period are you referring to?

4    Q.   November 2008 audit committee meetings held on November 3,

5    2008 and November 18, 2008.

6    A.   Yes, I recall that.

7    Q.   OK.  And notwithstanding that, in your prior session with

8    the prosecutors you told them you didn't remember this,

9    correct?

10   A.   I think that's accurate, yes.

11   Q.   OK.  So, now, isn't it a fact, sir, that what you claim you

12   told Mr. Walters right after the earnings announcement was

13   exactly what the CEO, the CFO, and the company told the

14   investing public at large; isn't that true, sir?

15   A.   I don't recall exactly what they told the public at large,

16   no, but I just don't recall.

17   Q.   Let me show you, sir, what is in evidence as Government

18   Exhibit 601-C.  I will put it up on the screen.

19        And you see that, sir, to be an earnings transcript

20   call November 4, 2008, the same day you claim that you had a

21   conversation with Mr. Walters; do you see that, sir?

22   A.   Yes.

23   Q.   Now, if we could go to page 6, the second-to-last paragraph

24   first, to show who the speaker is.  The second-to-last

25   paragraph.  If we could go up to the prior page to show the

H3rdwal3                         Davis - cross

1    speaker.

2              You see Jack Callahan, the CFO, was speaking; do you

3    see that, sir?

4    A.  Yes.

5    Q.  If we go back to page 6, the second-to-last paragraph.

6              And you see, sir, you see where Mr. Callahan, the CFO,

7    was saying on November 4th, "We expect to finish the year very

8    much on track."  Do you see that, sir?

9    A.  Yes.

10   Q.  And it continues saying, "We expect to deliver on our

11   original guidance for adjusted earnings per share of 1.20," do

12   you see that, sir?

13   A.  Yes, I do.

14   Q.  And that's your response.  And you recall that you

15   testified the markets did not react well to the November 4,

16   2008 announcement, correct?

17   A.  Repeat the question.  I'm sorry.

18   Q.  Do you recall after the November 4, 2008 announcement, the

19   stock price fell?

20   A.  Yes.

21   Q.  Now, you see what Mr. Engles said, if you go to the bottom

22   paragraph.

23              This is at page 8, last paragraph.  Thank you.

24              And you see where it says -- Mr. Engles says, "We look

25   forward to successfully closing out 2008, what we expect to be

H3rdwal3                    Davis - cross

1    a solid fourth quarter."  Do you see that?

2    A.  Yes.

3    Q.  "Solid fourth quarter."

4    A.  Yes.

5    Q.  Again, everything that Mr. Engles is saying on November 4th

6    to Mr. Callahan, that's all public information, correct?

7    A.  Yes, it is.

8    Q.  That is perfectly appropriate for you to talk about with

9    somebody outside the company, correct?  You can repeat exactly

10   what they said, you can say that, you can share this

11   information, it's public; correct?

12          THE COURT:  You've got about five questions there.

13          MR. BERKE:  You're right, your Honor.  I'm sorry.

14   Q.  This is perfectly appropriate to share this public

15   information, correct?

16   A.  Yes.

17   Q.  And you testified, sir, on -- last week that you regularly

18   reviewed analyst reports, correct?

19   A.  Yes, I did.

20   Q.  And you shared the analyst reports with -- and you often

21   discussed analyst reports with Mr. Walters as well, you

22   testified to, correct?

23   A.  Yes.

24   Q.  And you recall, sir, that after these statements by the CFO

25   and CEO of the company, the analyst reports, as well, said that

H3rdwal3                    Davis - cross

Dean Foods was going to have a good quarter -- I'm sorry, was

going to have a good end of year based on the statements of

their senior officers?  Do you recall that, sir?

A.  Yes, I think they did say that.

Q.  And you recall, sir, you talked about -- last week, when

your own lawyers made a presentation to the SEC to say why you

didn't do anything wrong; do you recall that, sir?

A.  Yes.

Q.  And you recall, sir, that with regard to this -- and you

recall, sir, in talking about sort of the next quarter after

November 8th, where we talked about all of this public

information that the year would end well, that your lawyers

provided to the SEC information about what analyst reports --

what analysts were saying in anticipation of the February -- in

anticipation of the next earnings announcement?  Do you recall

that, sir?

A.  Yes.  I think they did provide information, yes.

Q.  And you recall, sir, that one of the analyst reports they

provided was of Eric Katzman, who had a very positive

recommendation for Dean Foods on February 6, 2009?  Do you

recall that, sir?

        MS. CUCINELLA:  Objection.  Analyst reports, the same

ruling -- your Honor's ruling as before.

        MR. BERKE:  Your Honor, I believe it now goes to his

state of mind given the testimony that he reviewed these and

H3rdwal3                    Davis - cross

 1    shared it with Mr. Walker and discussed it with Mr. Walters.

 2              MS. CUCINELLA:  His state of mind at that point I

 3    believe is irrelevant given the testimony of what he did.

 4              THE COURT:  Yes.  It is sustained.

 5              Go ahead.  Next question.

 6    BY MR. BERKE:

 7    Q.  Well, sir, you recall that your lawyers argued that during

 8    the time period in February '09 analysts that were highly

 9    respected were making very positive recommendations and that

10    that was the reason to buy?  Do you recall that, sir?

11              MS. CUCINELLA:  Objection.  The same objection.

12              THE COURT:  Sustained.

13    BY MR. BERKE:

14    Q.  Sir, do you recall, you testified on direct that you told

15    Mr. Walters that the Alpro acquisition would have a significant

16    impact on the earnings of Dean Foods?  Do you recall that, sir?

17    A.  Yes.  I think I said that, yes.

18    Q.  And you recall you told them -- you testified, excuse me,

19    on direct that you told Mr. Walters about this transaction

20    before it was announced publicly?  Do you recall that, sir?

21    A.  Yes, I do.

22    Q.  And you recall -- and you recall, sir, that in the many --

23    withdrawn.

24              You recall, sir, that in your prior meetings with

25    prosecutors, you were asked about when you recall discussing

H3rdwal3                    Davis - cross

1   the Alpro deal with Mr. Walters?  Do you recall that, sir?

2   A.  I don't recall specifics of that, no.

3   Q.  My specific question is, sir, do you recall talking to him

4   after there was a board meeting regarding the Alpro

5   acquisition?  Do you recall that, sir?

6   A.  I didn't hear all your question.  Sorry.

7   Q.  Yes.  Do you recall, sir, previously telling prosecutors

8   that you told Mr. Walters about the Alpro acquisition following

9   a board meeting?  Do you recall that, sir?

10  A.  Yes.  That's accurate.

11  Q.  And you recall, sir, learning that that testimony wasn't

12  helpful to prosecutors because Mr. Walters had bought his Dean

13  Foods stocks before the board meeting you were referring to; do

14  you recall that, sir?

15          MS. CUCINELLA:  Objection.

16          THE COURT:  Sustained.

17  Q.  Sir, your testimony in this trial was different, correct,

18  sir?  You didn't testify that you tipped Mr. Walters after the

19  board meeting, did you?

20          THE COURT:  Sustained as to form.

21  Q.  Sir, your testimony at this trial -- withdrawn.

22          Is it your testimony today, sir, that you told

23  Mr. Walters before or after the board meeting in which the

24  Alpro deal was discussed on May 21, 2009?

25          THE COURT:  Do you understand the question?

H3rdwal3                         Davis - cross

1              THE WITNESS:  Yes, your Honor, I do.

2              THE COURT:  Then you may answer.

3    A.  My recollection is there was a board meeting prior to that

4    board meeting you are referring to, and we also discussed the

5    Alpro acquisition at that board meeting.  That's my

6    recollection.

7    Q.  Sir, do you recall that when you were asked these questions

8    in your prior meetings with prosecutors, you were shown the

9    May 21, 2009 board minutes and asked did you tell Mr. Walters

10   about Alpro before or after that meeting, and you said after

11   the May 21, 2009 meeting?  Do you recall that, sir?

12   A.  That's in my proffer, are you referring to?

13   Q.  Yes.

14   A.  I don't recall that.  No.

15   Q.  Let me show you what's been marked for identification as

16   3501-17.  First let me show you the date on the first page.

17   Then I'm going to show you page 3, last full paragraph, and ask

18   that you review it to yourself.  Read it to yourself.

19             (Pause)

20             My question to you, sir, is does that refresh your

21   recollection that on April 13, 2016, you told the prosecutors

22   that you told Mr. Walters about Alpro following the May 21,

23   2009 meeting?

24   A.  This doesn't refresh my recollection, no.

25   Q.  Do you deny it, sir?

H3rdwal3                    Davis - cross

1  A.  You asked me if it refreshed my recollection.  I just don't

2  recall having said this.  That's my testimony.

3  Q.  Let me ask you this, sir.  Do you recall two weeks later,

4  in another meeting, being asked the identical question based on

5  the exact same minutes?  Do you recall that, sir?

6  A.  I don't recall that, no.

7  Q.  Let me show you what's been marked for identification as

8  3501-19.  I show you the date.

9          Now let me show you what's on page 3 of 8 and the

10 heading and what's underneath it.  I ask you to review that to

11 yourself, sir.

12         (Pause)

13 A.  All right.  I've read it.

14 Q.  My question to you, now, sir:  Does that refresh your

15 recollection that on April 28, 2016, you told prosecutors that

16 following the May 21, 2009 board meeting, right after it took

17 place you called Mr. Walters to discuss Dean Foods' plan to

18 acquire Alpro?

19 A.  This does not refresh my recollection as to what I said in

20 that meeting, no.

21 Q.  Mr. Davis, do you recall testifying on direct, the morning

22 of your second testimony -- second day of your direct

23 testimony, that you said when you met with Mr. Walters in Las

24 Vegas on April 9, 2009, you gave him a somewhat optimistic view

25 of the first quarter earnings?  Do you recall that, sir?

H3rdwal3                         Davis - cross

1    A.  Yes.

2    Q.  Again, sir, that was a lie, wasn't it, sir?

3    A.  No.

4    Q.  The lie, sir, because you knew at the time by

5    April 9th that in fact it was going to be a negative quarter;

6    isn't that a fact, sir?

7    A.  I don't recall when I knew that.

8    Q.  Let me show you what's been marked for identification as

9    GX507-B.  And I'm going to also -- sir, do you see that this is

10   an email by Mr. Engles' assistant on behalf of Mr. Engles, to

11   you and other members of the board?

12   A.  Yes.

13            MR. BERKE:  Your Honor, I would offer GX507-B.

14            THE COURT:  Any objections?

15            MS. CUCINELLA:  No objection.

16            THE COURT:  Received.

17            (Government's Exhibit 507-B received in evidence)

18   BY MR. BERKE:

19   Q.  You see that is on April 1, 2010.  If we can highlight the

20   text.  You see Mr. Engles says he's providing you the first

21   mid-cycle update memo on April 1, 2010.  Do you see that, sir?

22   A.  Yes.

23   Q.  Let me show you what's been marked for identification as

24   GX507.  And you see, sir, that is the update memo Mr. Engles is

25   circulating?

H3rdwal3                        Davis - cross

1           (Pause)

2           Dated April 1, 2010, from Mr. Engles.  Do you see

3      that, sir?  I'm just asking you to identify it first.

4      A.  Yes.

5           MR. BERKE:  Your Honor, I would offer into evidence

6      GX507.

7           THE COURT:  Any objection?

8           MS. CUCINELLA:  No objection.

9           THE COURT:  Received.

10          (Government's Exhibit 507 received in evidence)

11     BY MR. BERKE:

12     Q.  If we can highlight the top just to show what it is.

13          Again, this is from Gregg Engles to the board about

14     the mid-quarter update on April 1, 2010.  Do you see that, sir?

15     A.  Yes.

16     Q.  If we could go and look what it says about first quarter

17     performance.  If we could get the -- if we could just show

18     first what the heading is for that, Mr. McLeod.  Thank you.

19          This is under Q-1 performance, correct?

20     A.  Yes.

21     Q.  You see where Mr. Engles writes to you and other members of

22     the board, "I have attached a preliminary Q-1 forecast."

23          Q-1 means first quarter forecast, correct, sir?

24     A.  Yes.

25     Q.  "Which shows us missing the bottom of our guidance range,

H3rdwal3                        Davis - cross

1  .25 to .30 by .03."  Do you see that?

2  A.  Yes.

3  Q.  He goes on to say, "We are off to a slow start, and there

4  are as yet no apparent good answers to the branded milk mix

5  issues, as discounting to stem share declines or holding price

6  and mixing out to private label are both profit destroying in

7  the near term."

8          Do you see that, sir?

9  A.  Yes.

10 Q.  And then he goes on to describe what can be done.  Do you

11 see that, sir?

12 A.  Yes.

13 Q.  So it's a true fact, sir, that when you met Mr. Walters on

14 April 9th, you had known since April 1st that your first

15 quarter was going to be -- was going to be a bad quarter, was

16 going to miss the bottom of the guidance range; isn't that

17 correct, sir?

18 A.  Yes.

19 Q.  So your testimony on direct that you told him -- you told

20 him to buy because the quarter was going to be a good one was a

21 lie, wasn't it, sir?

22          MS. CUCINELLA:  Objection.  That misconstrues the

23 witness' former testimony.

24          THE COURT:  Overruled.

25 A.  What was the question?

H3rdwal3                    Davis - cross

1    Q.  So your testimony that you told Mr. Walters when you were

2    in Las Vegas that the first quarter was looking good was a lie

3    because you knew he bought stock following that meeting?

4    A.  I didn't lie at all.  That's what I told him.  Period.

5    Q.  So you lied to Mr. Walters; even though you knew it was

6    going to be a bad quarter, you still told him it was going to

7    be a good quarter?  Is that your testimony here today?

8    A.  There were a lot of other things going on at the company,

9    and I did not lie to Mr. Walters.  That was my opinion.

10   Q.  Despite that Mr. Engles is telling you, who has access to

11   the financials, that you are actually going to miss your

12   guidance, which would cause the stock price to go down,

13   correct?

14   A.  Despite that, yes.  I had a different opinion.

15   Q.  And, sir, you had given a lot of testimony, haven't you,

16   that guidance is what -- and the range is what investors look

17   at, and when the company is going to exceed guidance or fall

18   below it, that impacts whether the stock price is going to go

19   up or down?  Isn't that true, sir?  True or false?

20   A.  Have I given testimony to that effect?  Is that the

21   question?

22   Q.  I'm asking you if that's a true statement, sir.

23          THE COURT:  Well, rephrase your question.

24          MR. BERKE:  I will.

25   Q.  Sir, isn't it a fact that your exact words that you

1    testified on direct examination, in response to questions from

2    Ms. Cucinella, was about the April 9th meeting, "I gave them a

3    somewhat optimistic view of the first quarter earnings;" isn't

4    that what you said, sir?

5    A.   That's correct.

6            MS. CUCINELLA:  May we have a transcript cite for

7    that?

8            THE COURT:  Page and line.

9            MR. BERKE:  758, 16 to 17.

10           MS. CUCINELLA:  Thank you.

11           MR. BERKE:  I will just complete the sentence.

12   Q.   "I gave them a somewhat optimistic view of the first

13   quarter earnings, which at that point in time I felt were going

14   to be decent."

15           And that was false, wasn't it, sir?

16           MS. CUCINELLA:  Can you finish the next sentence as

17   well, Mr. Berke.

18           THE COURT:  Yes.  Why don't you put the testimony in

19   front of the witness.

20           MR. BERKE:  Thank you.  If we could put before the

21   witness transcript 758, 16 to 19.

22   Q.   Do you see that, sir?

23   A.   Yes.

24           THE COURT:  Take your time.

25   Q.   And you knew, sir, that your statement that the first

1    quarter earnings were going to be decent, you knew that to be

2    false, because eight days earlier Mr. Engles told you that you

3    were going to miss guidance based on those numbers; isn't that

4    true, sir?

5    A.   There were a lot of other things going on at the company.

6    I thought the first quarter was going to be positive.  I think

7    my statement here is accurate, and that's what I recall telling

8    Mr. Walters, yes.

9    Q.   Sir, your statement that you had an optimistic view of the

10   first quarter earnings, which at that point in time you thought

11   were going to be decent, your testimony is that was true?

12   A.   My testimony is that's what I said and that was my opinion

13   at the time, yes.  That was my opinion.

14   Q.   And you don't dispute, sir, that you were sent Mr. Engles'

15   mid-cycle board review, Government Exhibit 507, in evidence,

16   that said you were going to miss the bottom of the guidance?

17   You don't dispute that you saw that, do you, sir?

18   A.   I don't dispute that, no.

19   Q.   Sir, do you recall testifying on direct that you were at an

20   October 18, 2010 board meeting where you learned that Jack

21   Callahan, who was the chief financial officer at the time, was

22   planning on leaving?  Do you recall testifying to that on

23   direct in response to questions by Ms. Cucinella?

24            MS. CUCINELLA:  May we have a transcript cite?

25            MR. BERKE:  781, 6 to 16, yes.

H3rdwal3                          Davis - cross

 1              THE COURT:  Put the testimony in front of the witness.

 2              MR. BERKE:  Of course, your Honor.  That is 781, 6 to

 3    16.

 4              THE COURT:  Show him the question.

 5    Q.  Yes.  We can do the question.  If we could go to the page

 6    before just so he can see -- there.  That is fine.

 7              So you recall, sir, that you were asked about a

 8    special board meeting in October 2010, and you said, among

 9    other things discussed at that meeting, was that Jack Callahan,

10    who was the Chief Financial Officer, was planning on leaving

11    the company?

12    A.  Yes.

13    Q.  You recall that testimony?

14              THE COURT:  All right.  Listen, you can ask the

15    question and you can show the witness the testimony.  You've

16    got to give him an opportunity to look at the testimony before

17    answering.

18              MR. BERKE:  I'm sorry, your Honor.

19              THE COURT:  All right.

20    Q.  Again, sir, that was a lie because you didn't learn that

21    until November, isn't that true, sir?

22    A.  I don't recall precisely when I learned it at the board

23    meeting, but I was aware of the fact that Jack Callahan was

24    going to leave.

25    Q.  OK.  You learned it in November, not October, isn't that --

H3rdwal3                         Davis - cross

1    A.  No, that's not accurate.  Not at all accurate.

2    Q.  And, sir, you learned it because -- sir, let me show you

3    what's been marked as Defense Exhibit 289, for identification.

4           And, sir, do you see that this is an email from

5    Mr. Engles' assistant to you on November 4, 2010?

6    A.  Yes.

7           MR. BERKE:  Your Honor, I would offer Defense Exhibit

8    289.

9           MS. CUCINELLA:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 289 received in evidence)

12   BY MR. BERKE:

13   Q.  And, sir, you see here that on -- go to the bottom.  Do you

14   see Mr. Engles' assistant is telling you that Mr. Engles was

15   going to be calling you on your cell November 4, 2010, 3:23?

16   A.  Yes.

17   Q.  OK.  If you go up.  And then it says calling you again and

18   it is 8:27 p.m. at night.  Do you see that, sir?

19   A.  Yes.

20   Q.  December -- November 4th.

21          Now let me show you what has been marked for

22   identification as GX1917-D.

23          Sir, you see this is an email from Mr. Engles to you

24   and other members of the board, dated November 8, 2010?

25   A.  Yes.

H3rdwal3                      Davis - cross

1                MR. BERKE:  Your Honor, I would offer into evidence

2     Government Exhibit, for identification, 1917-E.

3                MS. CUCINELLA:  No objection.

4                THE COURT:  Received.

5                (Government's Exhibit GX1917-D received in evidence)

6                MR. BERKE:  I'm sorry.  That is correct.  Let me state

7     it again, your Honor.  I apologize.  GX1917-D, as in dog.

8                MS. CUCINELLA:  Still no objection.

9                THE COURT:  All right.  Thank you.

10    Q.  Sir, do you see this is Mr. Engles sending -- on

11    November 8th, it says "CFO press release"?

12    A.  Yes.

13    Q.  And do you see, he says, "Members of the Board of

14    Directors," November 8th, "I am pleased to inform you that

15    Shaun Mara has accepted our office to succeed Jack Callahan."

16    Then it says, "As I discussed with each of you individually

17    last week, Jack Callahan is resigning to assume the CFO

18    position at McGraw-Hill."

19                Do you see where he says he discussed with each member

20    of the board the prior week?

21    A.  Yes.

22    Q.  Isn't it a fact, sir, that when Mr. Engles' assistant was

23    trying to set up a call with you the prior week on

24    November 4th, that was to tell you that he just learned that

25    Jack Callahan was going to resign; isn't that true, sir?

H3rdwal3                    Davis - cross

A.  I don't recall which phone call I had with Mr. Engles where
he told me Jack Callahan was going to leave.  We had numerous
calls during this period of time.
Q.  Is it your testimony, sir, that Mr. Engles may have told
you in October that Mr. Callahan was resigning, which is why
you testified on direct --
          THE COURT:  Slow down --
          MR. BERKE:  I'm sorry, your Honor.
Q.  -- which is why you testified on direct that you had told
Mr. Walters in October that the CFO was resigning?
          THE COURT:  Do you understand the question?
          THE WITNESS:  Yes.  I think I do, your Honor.
          THE COURT:  OK.  You may answer it.
A.  I don't recall which phone conversation and precisely when
it took place when Mr. Engles informed me that Jack Callahan
was going to leave.
Q.  Well, if Mr. Engles didn't learn that Jack Callahan was
leaving until November 4th, then he couldn't have told you that
before November 4th, could he have, sir?
          MS. CUCINELLA:  Objection.  It assumes facts not in
evidence.
          MR. BERKE:  Actually, those facts are in evidence,
your Honor, during his testimony.
          THE COURT:  I am going to allow the question.  The
witness can address it as he chooses.

H3rdwal3                        Davis - cross

1           Go ahead.

2      A.  I'm sorry.  What is the question.

3      Q.  If Mr. Engles did not learn from Mr. Callahan of his plans

4      to resign until November 4th, he couldn't have told you in

5      October that Mr. Callahan was resigning, could he have?

6      A.  I really don't know when Mr. Engles knew about Jack

7      Callahan's departure.

8      Q.  But if he knew on November 4th, sir, he could not have told

9      you the prior month, correct, sir?

10     A.  My answer is I really don't know when Gregg Engles learned

11     about Jack Callahan's departure.  I have no knowledge of that.

12     Q.  And you recall, sir, in your prior sessions with the

13     prosecutors, in coming up with your -- withdrawn.

14          Do you recall in your prior sessions, your proffer

15     sessions with the prosecutors, they showed you the November 9,

16     2010 press release that Jack Callahan was resigning?  Do you

17     recall that?

18     A.  Yes, I do.

19     Q.  Do you recall telling them -- I'm sorry.

20          Do you recall tell them, oh, I told Mr. Walters that

21     back in October, I told him that?  Do you recall telling them

22     that, sir?

23     A.  I don't recall precisely what I said in that particular

24     proffer session.

25     Q.  Do you recall telling them, in proffer sessions, that you

H3rdwal3                      Davis - cross

1    told -- just like you testified on direct, after reviewing that

2    November 9th press release, you said that you had told

3    Mr. Walters that back in October?  Isn't that what you told --

4    A.  I think that's accurate, yes.

5    Q.  Sir, do you recall you testified on direct that you tipped

6    Mr. Walters after a May 8, 2012 Dean Foods board call?  Do you

7    recall that, sir?

8    A.  Yes.

9              MS. CUCINELLA:  May we have a transcript cite?

10             MR. BERKE:  Yes, of course, Ms. Cucinella.  833/19 to

11   834/10.

12   Q.  And you said that you had a very specific recollection, of

13   this call that took place well over four years ago, that you

14   heard something that sounded like an international ring?  Do

15   you recall that, sir?

16   A.  Yes.

17             THE COURT:  Show the witness the testimony.

18             MR. BERKE:  Of course.  833/19 to 834/10.

19             (Pause)

20   Q.  You recall, sir, telling the -- saying on direct testimony

21   that you have a specific recollection that it was an

22   international ring tone; do you recall that, sir?

23   A.  Yes.

24   Q.  Do you recall, sir, that in your prior proffer sessions

25   leading up to your cooperation agreement, you never said that?

H3rdwal3                    Davis - cross

1    Do you recall that, sir?

2    A.  I think that's accurate.

3    Q.  And you recall, sir, that you knew that your -- you knew

4    from -- without getting into details, but you knew the fact,

5    from discussions you had with counsel, that Mr. Walters was out

6    of the country on that date; isn't that true, sir?  You learned

7    that?

8    A.  What I recall is the prosecution asked me if I ever talked

9    to Mr. Walters while he was in Mexico.  That's what I recall.

10   Q.  Right.  Right.  And, sir, your testimony, again -- sir, do

11   you recall being asked repeatedly about whether or not you

12   called Mr. Walters following a Dean Foods' board meeting on

13   May 8th to discuss Dean Foods?  Do you recall being asked that

14   on many meetings that you had with the prosecutors prior to

15   this trial?

16   A.  Yes, I think that's accurate.

17   Q.  And do you recall, sir, saying -- go back.

18           Do you recall saying at all the meetings leading up to

19   your cooperation agreement, you had no recollection having any

20   discussion with Mr. Walters about Dean Foods following the

21   May 8, 2012 board meeting?  Do you recall that, sir?

22   A.  Ask the question again, please.

23   Q.  In all your meetings leading up to your signing your

24   cooperation agreement, sir, do you recall telling the

25   prosecutors that you did not discuss -- speak to Mr. Walters

H3rdwal3                    Davis - cross

1   about Dean Foods in a call immediately following the May 8,

2   2012 Dean Foods board call?

3   A.   I'm still not following the question.

4   Q.   I will rephrase.

5        Do you recall, sir -- do you recall the meetings that

6   we had talked about on Defense Exhibit 5, the 13 meetings prior

7   to your cooperation agreement?

8   A.   Yes.

9   Q.   Do you recall that, sir?

10  A.   Yes.

11  Q.   Do you recall during those meetings they asked you about

12  this?  And this board call that we're talking about on May 8,

13  2012, was the call that you testified you did from the Preston

14  Trail Golf Club, correct?

15  A.   Yes, that's accurate.

16  Q.   You recall in those sessions they asked you on many

17  occasions about whether or not you called Mr. Walters to

18  discuss Dean Foods following that board call on May 8th; do you

19  recall that, sir?

20  A.   Yes, that's accurate.

21  Q.   And do you recall, sir, you told them at every one of those

22  meetings that you had no recollection and that you do not

23  believe you spoke to Mr. Walters on May 8, 2012 following that

24  Dean Foods board meetings about Dean Foods?  Do you recall

25  that, sir?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MS. CUCINELLA:  Objection as to form.  Compound.

2          THE COURT:  I'll allow it.  Go ahead.

3          Do you understand the question?

4          THE WITNESS:  No.  Could you repeat it, please.

5          THE COURT:  All right.  Rephrase it.

6          MR. BERKE:  Of course, your Honor.

7   BY MR. BERKE:

8   Q.  And in all those sessions that you had prior to signing

9   your cooperation agreement, you told the prosecutors you had no

10  recollection of speaking to Mr. Walters about Dean Foods on

11  May 8, 2012, following the Dean Foods board call, correct?

12  A.  In the proffer sessions?

13  Q.  Yes.

14  A.  I think that's accurate, yes.

15  Q.  And you also told them that it was highly unlikely that you

16  would leave material, nonpublic information on a voicemail?  Do

17  you recall that as well, sir?

18  A.  I think I did say that in a proffer session, yes.

19  Q.  And you recall, sir, that the very first time that you ever

20  offered the additional detail -- withdrawn.

21          Do you recall, sir, that for the very first time you

22  said you had a specific memory of the call going to an

23  international dial -- withdrawn.

24          I'm sorry, your Honor.  If I may start again?

25          Do you recall, sir, for the very first time that you

H3rdwal3                    Davis - cross

1    said you recall calling Mr. Walters after the Dean Foods

2    meeting to discuss Dean Foods was on February 26, 2017?  Just a

3    few weeks ago.  That that was the first time you ever said

4    that?  Isn't that true, sir?

5    A.  There were a number of things that the prosecutors showed

6    me that refreshed my memory, including where I was when I

7    placed those calls.  I didn't remember initially I was at

8    Preston Trail Golf Club until they showed me my calendar.  And

9    after that I recall distinctly, when they asked me about a

10   call, had I ever made a call to him while I was in Mexico, and

11   I remembered distinctly doing that, yes.

12   Q.  Sir, isn't that a lie?  Isn't that another lie?

13   A.  No, it is not.

14   Q.  Isn't it true, sir, that going way back to March and April

15   of 2016, the prosecutors continually told you you were at

16   Preston Trails when you made this call and they showed you

17   records that you were at Preston Trails and you still said you

18   didn't call Mr. Walters about Dean Foods; isn't that true, sir?

19   A.  Whatever the records reflect, that's accurate.

20   Q.  No, sir, I'm asking you.  Do you recall, sir, that going

21   all the way back to last year, when you were asked about this

22   call, you were specifically shown records that you were at

23   Preston Trails for this board meeting?

24   A.  Yes.  That's accurate.

25   Q.  Sir, your testimony, just minutes ago, that your newfound

1   memory at the end of last month was refreshed because you

2   learned for the first time that the call was at Preston Trails;

3   that was another lie, wasn't it, sir?

4          MS. CUCINELLA:  Objection.  Misstates his testimony.

5          THE COURT:  I'll allow the question to stand as

6   phrased and the witness can answer.

7          THE WITNESS:  Could you repeat the question, please?

8   Q.  Sir, your testimony just minutes ago that your newfound

9   memory at the end of last month was refreshed because you

10  learned for the first time that the call was at Preston Trails,

11  that was another lie, wasn't it, sir?

12  A.  No.  I learned about making the phone calls at Preston

13  Trails, that's accurate.

14  Q.  You didn't learn about it, though, for the first time in

15  the end of February, when you came up with your new statements

16  that you had spoke to him; you knew that a year earlier, in

17  2016, didn't you, sir?

18         THE COURT:  OK.  Rephrase your question.  Sustained.

19         MR. BERKE:  Of course, your Honor.

20  Q.  You knew in 2016, sir, that the call you made was in --

21  from Preston Trails, didn't you, sir?

22  A.  Yes, when they showed me the records, yes.  That's

23  accurate.

24  Q.  So there is no new information you were shown at the end of

25  February 2017, when you came up with your different statement

1    that you now recall discussing Dean Foods with Mr. Walters

2    following the May 8th meeting?

3    A.   The only new information that I learned in my most recent

4    discussions with the prosecutors was when they asked me a

5    question.  They asked me a question and they said do you ever

6    recall talking to Mr. Walters in Mexico.  And a light bulb went

7    off and I said yes.  I distinctly remember the dial tone was an

8    international dial tone.

9              MR. BERKE:  Could we put up Defense Exhibit 5,

10   Mr. McLeod.

11   Q.   And you recall, sir, that in many of these 13 meetings,

12   they asked you specifically about this May 8, 2012 call,

13   correct, sir?

14   A.   I think that's accurate, yes.

15   Q.   And each time you gave them the same answer; you did not

16   give Mr. Walters any information or any discussion with him

17   about Dean Foods on May 8th, isn't that correct, sir?

18   A.   Mr. Berke, I think I've already explained this.  Until they

19   asked me if I'd ever placed a call to Mr. Walters when he was

20   in Mexico, I didn't recall this call specifically.

21   Q.   Sir, I would ask you to answer my question.

22   A.   Why don't you re-ask it then.

23   Q.   And each time that they asked you about the May 8, 2012

24   calls throughout those 13 sessions, you gave the same answer,

25   that you did not give Mr. Walters any information or have any

H3rdwal3                        Davis - cross

1    discussion with him about Dean Foods on May 8, 2012; isn't that

2    correct, sir?

3    A.  I think that's an accurate depiction of what I said

4    earlier, yes.

5    Q.  Sir, isn't it a fact that you would provide updates to

6    Mr. Luce and Mr. Walters about the Periscope investment?

7    A.  Yes.

8    Q.  And you would provide updates following Periscope board

9    meetings, wouldn't you, sir?

10   A.  Yes.

11   Q.  And you recall, sir -- well, let me show you an email dated

12   May 1, 2012, DX109, for identification, not in evidence.

13            Do you see, sir, that these are emails dated May 1st

14   and May 2nd, 2012 between you and Mr. Luce?

15   A.  Yes.

16            MR. BERKE:  Your Honor, I would offer into evidence

17   DX109.

18            THE COURT:  Any objection?

19            MS. CUCINELLA:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 109 received in evidence)

22   BY MR. BERKE:

23   Q.  If we can go to the bottom first.

24            This is Mr. Luce on May 1st asking you, "Tom, can you

25   bring me up to date," correct?

H3rdwal3                          Davis - cross

1    A.  Yes.

2            MR. BERKE:  Can you go to the next email, Mr. McLeod.

3    Q.  Then you respond to Mr. Luce by giving an update on the

4    bank recap; do you see that, sir?

5    A.  Yes.

6            MR. BERKE:  Can we go to the next email, please.

7    Q.  And then you see that on 6:02 Mr. Luce says, "Also curious

8    about Periscope.  I have a meeting with Billy tomorrow at 8:30.

9    He would like to go through notes and investments."

10           Do you see that, sir?

11   A.  Yes.

12   Q.  You understood "Billy" was a reference to Mr. Walters,

13   correct?

14   A.  Yes.

15   Q.  You see, sir, that this is May 1, 2012, a week before your

16   phone calls from Preston Trails; do you see that, sir?

17   A.  Yes.

18   Q.  And you recall, sir, that prior to your Dean Foods board

19   call that you did at Preston Trails, at 10 a.m. Central Time

20   you had a board call for Periscope?  Do you recall that, sir?

21   A.  My recollection was it was at 9 a.m., not 10 a.m.

22   Q.  Let me show you what's been marked for identification as

23   Defense Exhibit 100.  If we could go down to May 8th.

24           Sir, do you recognize that as a calendar invite

25   showing that on May 8th -- withdrawn.

1        That is your calendar invite from May 8, 2012; is that

2    correct, sir?

3    A.  Yes, it is.

4             MR. BERKE:  Your Honor, I would offer into evidence

5    Defense Exhibit 100.

6             MS. CUCINELLA:  No objection.

7             THE COURT:  Received.

8             (Defendant's Exhibit 100 received in evidence)

9    BY MR. BERKE:

10   Q.  And, sir, so this reflects that you had on May 8, 2012, you

11   had the Periscope board meeting from 10 a.m. to 12 noon?  Do

12   you see that, sir?

13   A.  That's what's reflected in my calendar, but it didn't occur

14   like that.

15   Q.  But you recall, sir, it did take place that morning,

16   correct?

17   A.  Yes.  Absolutely.

18   Q.  And you recall immediately afterwards, sir, you had a Dean

19   Foods board meeting?  Do you recall that, sir?

20   A.  Yes, I do.

21   Q.  And do you recall you went from one to the other?

22   A.  I called into the Dean Foods board call, yes.

23   Q.  Do you recall, sir, you were sitting in a room at the

24   country club at Preston Trails, correct?

25   A.  I was sitting in a board room by myself, yes.

1   Q.  And you had the -- first you had the Periscope call,

2   correct?

3   A.  Correct.

4   Q.  And you disconnected from the Periscope board call and

5   shortly thereafter you called into the Dean Foods board call,

6   correct?

7   A.  Correct.

8   Q.  And you recall, sir, you were also playing golf shortly

9   after those calls; do you recall that, sir?

10  A.  Right after lunch, yes.

11  Q.  And you recall, sir, that this board call was significant

12  for Periscope that you had; do you recall that, sir?

13  A.  I thought it was fairly significant at the time, yes.

14  Q.  And it had good news for the company; do you recall that,

15  sir?

16  A.  Yes.  But possible good news, that's how I would

17  characterize it.

18  Q.  Let me show you what has been marked for identification as

19  DX303.

20          Sir, am I correct that this reflects emails between

21  you and Brian Utley on May 8, 2012 and May 9, 2012?

22  A.  Yes.

23          MR. BERKE:  Your Honor, I would offer in Defense

24  Exhibit 303.

25          MS. CUCINELLA:  May I have one moment, your Honor?

H3rdwal3                        Davis - cross

 1              (Pause)

 2              No objection.

 3              THE COURT:  Received.

 4              (Defendant's Exhibit 303 received in evidence)

 5              MR. BERKE:  If we could show the middle email.

 6   Q.  This is the evening of May 8th, correct, sir?

 7   A.  Yes.  It appears to be, yes.

 8   Q.  And it is to Brian Utley, correct?

 9   A.  Yes.

10   Q.  And Brian Utley was also a board member and involved with

11   Periscope, correct?

12   A.  He was the CEO.

13   Q.  Yes.  And was he on the board as well, sir?

14   A.  Yes.

15   Q.  And he said -- and you say to him:  Very good board meeting

16   today.  I wish you all well insofar as state contracts are

17   concerned.  The next couple of months will be very important

18   for the company.

19              Do you see that, sir?

20   A.  Yes.

21   Q.  And then if you go to the top, his response the following

22   day.

23              And you recall, sir, that at the board meeting you

24   were talking about a variety of deals in a number of states for

25   that year; do you recall that, sir?

H3rdwal3                          Davis - cross

1    A.  Yes.

2    Q.  And you recall, sir, that this -- we already saw the May 1,

3    2012 email in evidence, at DX109, where Mr. Luce told you that

4    Mr. Walters was interested in Periscope and he was asking for

5    information; do you recall that, sir.

6    A.  Yes.

7    Q.  And you recall, sir, that, again, following this time

8    period, there were further discussions and that Mr. Walters and

9    Mr. Luce were interested in Periscope, correct?

10   A.  I gave them updates, correct.

11   Q.  Because one of the issues during this very time period, May

12   and June, was about the sale of Periscope that could have been

13   very lucrative, correct, sir?

14   A.  I think the sale had been postponed, and there was some

15   reference in the last email that you showed me to the fact that

16   I said don't worry about Stevens, referring to Stevens, Inc.

17   So the sale had been postponed by this point in time.

18   Q.  Let me show you a document marked DX107.

19           Sir, this is a June 1, 2012 email between you and Mike

20   Luce?

21   A.  Yes.

22           MR. BERKE:  Your Honor, I would offer Defense Exhibit

23   107.

24           THE COURT:  Any objection?

25           MS. CUCINELLA:  No objection.

H3rdwal3                    Davis - cross

1    THE COURT:  Received.

2    (Defendant's Exhibit 107 received in evidence)

3    BY MR. BERKE:

4    Q.  Sir, do you see on bottom email, on June 1, 2012, a couple

5    of weeks after -- three weeks after the May 8th board meeting?

6    A.  Yes.

7    Q.  Mr. Luce asks you again for an update on anything that may

8    be happening and he says, "including the banks and potential

9    cash for note reduction."  Do you see that, sir?

10   A.  Yes, I do.

11   Q.  And you understood "note reduction" related to your loan

12   and potential payment of your loan, correct, sir?

13   A.  Yes, it did.

14   Q.  Could you read your response, sir?

15   A.  "I will send you a more detailed update on Monday.  The

16   bank deal is still on track to close the recap in the third

17   quarter.  We have about 75 million in commitments and we need

18   100 million.  Our Periscope sale is in process ... should have

19   indications of interest by mid to late June.  We will know a

20   lot then."

21   Q.  Isn't it a fact, sir, that in June of 2012, the Periscope

22   sale was in progress, isn't that true, sir?

23   A.  My recollection was at the time, because of the Stevens'

24   comments to me as a board member, that this deal was dying and

25   it did die.

H3rdwal3                        Davis - cross

1    Q.  You're not claiming that you're lying here to Mr. Luce that

2    in June the belief was the Periscope sale was in progress, are

3    you?

4    A.  I don't think I misrepresented anything.  I'm just giving

5    you my recollection of the timeframes.

6    Q.  So I ask you again, sir, in the May and June time period,

7    that was a very important tame for Periscope because of the

8    possibility of a very lucrative sale of the entity; isn't that

9    true, sir?

10   A.  Yes, that's accurate, yes.

11   Q.  And you recall, sir, following these two board meetings you

12   were having playing golf with one of the fellow -- one of the

13   individuals who was very active with you in trying to raise

14   capital for Park Cities, the bank recap, Roy Salley, isn't that

15   true, sir?

16   A.  Yes, that's accurate.

17   Q.  And isn't it also true, sir, that this time period in May

18   of 2012 was a key period where you had to tell the regulators

19   of how much money has been promised as investments if you were

20   able to take over the Texas bank as part of the Park Cities

21   deal; isn't that true, sir?

22   A.  I don't recall the precise timing of the reports that we

23   gave the regulators.  I don't recall the precise timing.

24   Q.  Let me show you what's been marked as Defense Exhibit 5294.

25              Sir, do you recognize this as an email -- emails

H3rdwal3                         Davis - cross

1    between you, John Denes, and others on May 9, 2012?

2    A.  Let me take a minute here.

3              (Pause)

4    Q.  I'm just asking you to identify it, sir.  It is not in

5    evidence yet.

6              MR. BERKE:  It should be taken down.

7              I'm sorry, your Honor.  It was on the screen.  It

8    should not be.  It is my fault.

9              THE COURT:  All right.

10   Q.  I'm just asking you to identify it first, sir.

11             Those are emails between you, John Denes, Roy Salley

12   and others --

13   A.  Yes.

14   Q.  -- May 9 --

15   A.  Generally, yes, that's what they are.

16             MR. BERKE:  Your Honor, I would offer Defense Exhibit

17   5294.

18             MS. CUCINELLA:  No objection.

19             THE COURT:  Received.

20             (Defendant's Exhibit 5294 received in evidence)

21             MR. BERKE:  Thank you, your Honor.

22   Q.  Now -- and, again, this is May 9th.  That's the day after

23   the board calls we are talking about, correct?

24   A.  Yes.

25   Q.  And am I right, sir, that -- and I'm going to look on the

H3rdwal3                              Davis - cross

1       first page.

2                    And do you recall, sir, that John Denes, he was

3       involved in the Park Cities deal, correct?

4       A.   He was the bank president at the time, yes.

5       Q.   And Roy Salley, he was your friend but he was also involved

6       working with you to try to make this deal happen?

7       A.   He was my partner in this transaction.

8       Q.   And Dory Wiley and Hatch Smith also had roles in connection

9       with this transaction, correct?

10      A.   Yes.

11      Q.   Do you see where John Denes says to you -- well, do you see

12      where on the email below, you talk about that you had dinner

13      with Ted Rosinus?

14      A.   Rosinous, yes.

15      Q.   And you said you were rather forceful in your tone with him

16      earlier in the week.  And that would have been on the 7th that

17      you would have had dinner with him, correct?

18      A.   I don't recall what night I had dinner with him but --

19      Q.   Do you see from this email, the email is Wednesday,

20      May 9th; do you see that, sir?

21      A.   Yes.

22      Q.   You see you say in your email you had dinner with him

23      Monday night?

24      A.   Yes.  I'm sorry.  Yes, that's true.

25      Q.   That would have been May 7th, correct, sir?

1    A.   Yes.

2    Q.   You say that you were rather forceful in your tone with him

3    and told him you wanted a subscription agreement from them,

4    correct?

5    A.   Yes.

6    Q.   And, again, these were attempts, as you explained last

7    week, to get people to make a commitment that if you won the

8    transaction to refinance this bank, they would invest a certain

9    amount of money, correct?

10   A.   Yes.  That's accurate.

11   Q.   Now, Mr. Dean's responds:  "Thanks, Tom.  Would love to

12   have a big fish (as well as the local, and Vegas, soft circles)

13   sign subscription agreements before the showdown with the

14   regulators the 16th."

15           Do you see that?

16   A.   Yes.

17   Q.   And then it says, "Don't forget I need you and Roy

18   available for that board meeting."

19           Do you see that, sir?

20   A.   Yes.

21   Q.   And the "soft circle," sir, that means that you needed

22   people to commit, that if you got the deal, they would invest a

23   certain amount of money, correct?

24   A.   I would call a soft circle an indication of interest, not a

25   commitment, to be perfectly accurate.

H3rdwal3                         Davis - cross

1    Q.  And when you talk about having, in addition to a big fish,

2    local and Vegas soft circles, the Vegas was the hope that you

3    may be able to get Mr. Walters to agree to make a soft

4    commitment in Park Cities, as you testified last week?

5    A.  Yes.  That's accurate.

6    Q.  And, sir, it's right that the hope was that this could be

7    done by the 16th so the regulators would know you had the

8    commitments and the financial wherewithal to take over the

9    bank; isn't that true, sir?

10   A.  That's John Denes' term in this email.  I don't know what

11   he was referring to when he said the showdown with the

12   regulators.  I just don't recall exactly what he had to do to

13   provide the regulators an update.  I'm not sure.

14   Q.  But you agree, sir, that this is about locking down the

15   soft circles, including Mr. Walters, about Park Cities,

16   correct?

17   A.  Yes.  I agree with that, yes.

18   Q.  And you agree, sir, that right after your Dean Foods board

19   meeting, you had a schedule to play golf with Roy Salley, your

20   partner in the Park Cities deal; isn't that true, sir?

21   A.  Yes.  That's accurate.

22           THE COURT:  All right.  Ladies and gentlemen, let's

23   break for lunch.

24           Remember, please do not discuss the case among

25   yourselves or with anyone.  Keep an open mind.  There is more

H3rdwal3                          Davis - cross

1    to come.  And see you for a 2 o'clock start.  Thank you.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1301

H3rdwal3                    Davis - cross

1           (Jury not present)

2               THE COURT:  Have a pleasant lunch.

3               MR. SCHOMAN:  Your Honor, if I could just alert the

4      Court?  We have an issue to raise, but if your Honor wants, we

5      can do it right before we resume after lunch.

6               THE COURT:  All right.  That's fine.

7           (Luncheon recess)

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3R3WAL4                       Davis - cross

                         AFTERNOON SESSION

                            2:00 p.m.

1           (In open court; jury not present)

2           THE COURT:  There was an issue that you wanted to

3    raise, Mr. Schoeman?

4           MR. SCHOEMAN:  Thank you.  I wanted to explain.  We

5    submitted last night an application, a request for judicial

6    notice relating to longitude and latitude.

7           THE COURT:  I saw it.

8           MR. SCHOEMAN:  I wanted to explain what it was and it

9    is something that's relevant to what's going to happen this

10   afternoon.

11          So what that is, is the longitude and latitude of a

12   cell tower near Love Airport in Dallas.  There is an exhibit in

13   evidence, Government Exhibit 1002, that it is a very long

14   exhibit, but it is Mr. Davis' phone records.  It shows that on

15   December 18, 2012, Mr. Davis' cell phone was calling

16   Mr. Walters and was hitting off a tower at that location.

17          THE COURT:  Mr. Davis' cell phone was hitting off the

18   tower.

19          MR. SCHOEMAN:  Hitting off the tower at Love Field and

20   was calling Mr. Walters.  And it's clear from the record that's

21   already in evidence that cell location on this record is

22   provided by longitude and latitude.  And we actually have a

23   document from AT&T that explains that that column of that cell

H3R3WAL4                       Davis - cross

                         AFTERNOON SESSION

                            2:00 p.m.

            (In open court; jury not present)

            THE COURT:  There was an issue that you wanted to

raise, Mr. Schoeman?

            MR. SCHOEMAN:  Thank you.  I wanted to explain.  We

submitted last night an application, a request for judicial

notice relating to longitude and latitude.

            THE COURT:  I saw it.

            MR. SCHOEMAN:  I wanted to explain what it was and it

is something that's relevant to what's going to happen this

afternoon.

            So what that is, is the longitude and latitude of a

cell tower near Love Airport in Dallas.  There is an exhibit in

evidence, Government Exhibit 1002, that it is a very long

exhibit, but it is Mr. Davis' phone records.  It shows that on

December 18, 2012, Mr. Davis' cell phone was calling

Mr. Walters and was hitting off a tower at that location.

            THE COURT:  Mr. Davis' cell phone was hitting off the

tower.

            MR. SCHOEMAN:  Hitting off the tower at Love Field and

was calling Mr. Walters.  And it's clear from the record that's

already in evidence that cell location on this record is

provided by longitude and latitude.  And we actually have a

document from AT&T that explains that that column of that cell

1    record is the longitude and latitude of the location where the

2    towers pinged.

3         The only thing we want judicial notice of is that a

4    well-respected mapping program would identify that location,

5    that longitude and latitude, as being at Love Field.  And what

6    we would show is that on Mr. Davis' records, where it says cell

7    location, it's that longitude and latitude.  And all we're

8    establishing through that is on that day at that time, when he

9    called Mr. Walters, he was in the vicinity of that tower.

10        THE COURT:  Okay.  I didn't have all the blanks filled

11   in, but I kind of guessed at them.

12        MR. SCHOEMAN:  Thank you, your Honor.

13        THE COURT:  Go ahead.  Any objection?

14        MS. CUCINELLA:  Yes, your Honor.  As your Honor is

15   aware, we just found out about this last night.  The Second

16   Circuit ruled earlier this year that a layperson, even a

17   layperson from a phone company, can't provide testimony about a

18   person's location based on cell tower, because that's expert

19   testimony.  In order to establish -- in that case they were

20   trying to exclude someone who was suspected of an arson, they

21   were trying to establish they must have been in Queens because

22   their phone hit off a cell tower in Queens.

23        THE COURT:  Let's just break this down.  Because part

24   one of this is a request that the Court take judicial notice of

25   where certain coordinates are based on Google Maps.  And that

1    part of it has nothing to do with cell towers in any way, shape

2    or form.

3              MS. CUCINELLA:  That is correct, your Honor.

4              THE COURT:  All right.  So, do you have any objection

5    to my taking judicial notice of the location of these

6    coordinates?

7              MS. CUCINELLA:  No.

8              THE COURT:  All right.  Now, so that much I guess your

9    request for judicial notice is granted.  So, that's what I have

10   on my to-do list.

11             MR. SCHOEMAN:  Just so your Honor sees where this is

12   going, and we don't have a sidebar, what we would like to do is

13   elicit from the witness on the stand using the phone records

14   that are in evidence and the column that is marked "cell

15   location," that the cell location as reflected on that chart

16   are those coordinates.  We could, if necessary, offer in

17   evidence the AT&T explanation that "cell location" means what

18   it says, the location.  But we want to establish with this

19   witness that he was -- that he was in the vicinity of that

20   tower at that time.

21             THE COURT:  I think maybe that last step may be where

22   you're hitting up on the objection.

23             MR. SCHOEMAN:  Yes, your Honor.

24             THE COURT:  But, it seems to me that there is the

25   intermediate step that the coordinates that appear on the phone

H3R3WAL4                       Davis - cross

 1   record are at Love Field.

 2            MR. SCHOEMAN:  Yes.

 3            THE COURT:  That much, do you have any objection to

 4   that much?

 5            MS. CUCINELLA:  Yes, your Honor.  To the extent that

 6   they're trying to establish that there is a meaning, that the

 7   witness on the stand was at Love Field, that's not what that

 8   information actually means.  It means that his phone hit off a

 9   tower --

10            THE COURT:  That's all it means.

11            MS. CUCINELLA:  -- in that vicinity.  But that is

12   expert testimony.  So, I think that there needs to be -- there

13   needs to be more here about what exactly that means in terms of

14   the vicinity, how close in range it could be.  In Texas it's

15   very different than it is in New York because of how close the

16   towers are.  So, this is a whole area where there has been so

17   much debate and --

18            THE COURT:  Listen, there's debate in certain areas

19   and then there is not debate.  I recognize that if you're in

20   lower Manhattan you can ping off a cell tower in Jersey City or

21   vice versa.  And you could be in an entirely different state.

22   I got that.

23            But, do you contest the proposition that -- this is

24   going to be very interesting because I got a lot of government

25   proffers on this subject area all the time.  You're now

```
 1    contesting that a cell phone tower ping does not suggest that
 2    the ping came from approximately a quarter mile from that
 3    location?
 4              MS. CUCINELLA:  We're not contesting it, your Honor.
 5    We need time to determine what it means in Texas versus what it
 6    means here.  It is very different based on the number of towers
 7    in the area, which I think is consistent with what we've always
 8    said and what we've always argued about whether a defendant is
 9    on the phone in Manhattan or versus whether they're on the
10    phone somewhere else.  So we just would like time to speak with
11    someone from AT&T to figure out what it means.  It may be, as
12    we told defense counsel at lunch --
13              THE COURT:  At the moment, maybe I'm misunderstanding.
14    I do have a jury in the jury room, so forgive me for cutting
15    everybody short.
16              But, we've now established this much for today's
17    purposes.  That the defense plans to elicit that there is a
18    phone record that has a longitude and latitude and that
19    longitude and latitude is for Love Airfield.  Dallas Love Field
20    Airport.  That's all at this stage of the game.
21              Are you going to suggest, Mr. Schoeman, so isn't it a
22    fact that you were at Dallas Love Field?  Is that the next
23    question?
24              MR. SCHOEMAN:  So we're going to ask the witness and
25    he can testify to his recollection.  Just so the Court
```

1    understands, Mr. Davis has previously told the government that

2    he met Mr. Walters at Dallas Love Field at a particular

3    facility, and that a particular group of people were there and

4    that Mr. Walters' plane was there.

5            We can establish that there are other records that

6    exactly the people Mr. Davis said were there were there on that

7    day, that Mr. Walters' plane was there on that day, and that

8    through this record Mr. Davis was there.  And we think he's

9    lying, if he denies being there, but we don't need to get into

10   technical cell phone information with Mr. Davis.  We just want

11   to ask him where he was.

12           THE COURT:  You're not asking the jury to draw any

13   inference, you're cross examining a witness.

14           MR. SCHOEMAN:  Correct.

15           THE COURT:  Seems to me that's permissible

16   cross-examination.

17           MS. CUCINELLA:  That's fine with the government.  We

18   were under a different impression as to what they intended to

19   do.

20           MR. BERKE:  I wanted to give you an update.  Over

21   Friday and the weekend I've been cutting the cross and have

22   been giving the government updates, and I expect I'll be done

23   this afternoon.  Just for your planning, your Honor.

24           THE COURT:  Bring my jury in, please.

25           (Continued on next page)

H3R3WAL4                    Davis - cross

1          (Jury present)

2                THE COURT:  Mr. Berke, you may continue.

3                MR. BERKE:  Thank you, your Honor.

4    BY MR. BERKE:

5    Q.  Mr. Davis, do you recall giving testimony on your direct

6    about a trip you took to San Diego in July of 2012?

7    A.  Yes.

8    Q.  If I can put in front of you transcript 848.  And my

9    question is do you recall testifying that you think the date

10   was July 27, 28 and 29th, right around there?

11   A.  Yes.

12   Q.  Isn't it a fact, sir, that you had previously told the

13   prosecution on multiple occasions that you were there visiting

14   the Walters on July 30 and 31st?

15   A.  I don't recall what dates I quoted.

16   Q.  Let me show you what's marked for identification as

17   3501-11.  You see the date first and then I'm going to direct

18   your attention to page six, top first paragraph under the

19   heading.

20                My question to you, sir, does that refresh your

21   recollection that you previously told the prosecutors that you

22   had visited Bill and Susan Walters' home in Carlsbad,

23   California July 30 and July 31?

24   A.  Yes.

25   Q.  In fact, those were the dates that you visited them,

H3R3WAL4                          Davis - cross

1   weren't they?

2   A.   Whatever my itinerary shows, I will clearly stand by that.

3   Q.   Let me show you what's been marked for identification as DX

4   2196.  Sir, do you recognize these as your flight records to

5   San Diego in late July 2012?

6   A.   Yes.

7            MR. BERKE:  I'd offer DX 2196.

8            THE COURT:  Any objection?

9            MS. CUCINELLA:  No objection.

10           THE COURT:  Received.

11           (Defendant's Exhibit 2196 received in evidence)

12           MR. BERKE:  If we can highlight the top half,

13  Mr. McLeod.

14  Q.   Sir, it shows you flying to San Diego near Carlsbad

15  July 30, 2012, correct?

16  A.   Yes.

17  Q.   Let me show you, do you recall, sir, you rented a car also

18  on July 30 in San Diego?

19  A.   Yes, I recall that.

20  Q.   By the way, you knew -- do you know Mr. Walters owned

21  rental car agencies in that area?

22  A.   I don't recall that, no.

23  Q.   Well, let me ask you, sir, do you recall during your direct

24  testimony, the prosecutor showed you a car rental slip that

25  indicated that there was a car pickup for July 28 to see if

1    that refreshed your memory to say that you arrived on July 28?

2              Do you recall that, sir?

3    A.   No, I don't recall it.

4    Q.   Let me put up transcript 848, line 17 to 849, line 13.

5              My question to you, sir, do you recall Ms. Cucinella

6    put up a car rental notification from your American Express to

7    suggest that you had rented the car on July 28 instead of the

8    July 30 dates we just covered?

9    A.   I don't recall the dates.  I clearly recall she showed me a

10   American Express charge for a rental car.  I just don't recall

11   the dates.

12   Q.   Do you recall now, sir, that you originally were scheduled

13   to go the 28th, but you postponed it to the 30th?  Do you

14   recall that, sir?

15   A.   No, I don't actually.

16   Q.   Let me show you your American Express bill.  This is just

17   for you, Defendant's Exhibit 2198 for identification at page

18   four halfway down the page.

19             You see, sir, that your car was rented starting on

20   July 30, 2012?  Do you see that, sir?

21   A.   Yes.

22   Q.   Sir, you testified that you were there with the Walters two

23   nights and you had two dinners, correct?

24   A.   I think that's what I said, yes.

25   Q.   One dinner you had at the Walters' home, correct?

1   A.  Yes.

2   Q.  And one dinner you went out to a restaurant, correct?

3   A.  Yes.

4   Q.  The name of the restaurant was Firenze Trattoria; isn't

5   that correct, sir?

6   A.  I don't recall the name of the restaurant.  That sounds

7   familiar.

8   Q.  Let me show you what's been marked as Defendant's Exhibit

9   3501-20 for identification.  I'm going to show you the second

10  page, last line.

11          Sir, does that refresh your memory that the restaurant

12  you ate at was The Firenze Trattoria?

13  A.  I think that's accurate.  I think that's what I said, yes.

14  Q.  Do you recall, sir, that was the second night that you ate

15  there?

16  A.  The second night?

17  Q.  Yes.

18  A.  In what time frame?

19  Q.  I believe we have established you were visiting the Walters

20  on the 30th and 31st, and you went to the restaurant the second

21  night you were there.  Do you recall that, sir?

22  A.  My recollection is we went on the first night and then ate

23  in the second night.  That's what I thought.  But I could be

24  wrong.

25  Q.  Sir, you only went there one night, correct?  You only went

1    to that restaurant one night?

2    A.  On this particular trip?

3    Q.  Yes.

4    A.  As far as I recall, yes.

5    Q.  So the night that you were at that restaurant would have

6    been the only night that you were there, correct?

7    A.  On this particular trip.

8    Q.  Yes.  And you said that the conversation you relayed that

9    you claim you had with Mr. Walters was leaving that restaurant

10   on that trip, isn't that right?

11   A.  It was leaving the restaurant on that trip, yes, that's

12   accurate.

13   Q.  You recall, sir, that -- withdrawn.

14            Let me now ask you, sir, about -- do you recall, sir,

15   giving testimony about the sale of the Dean Foods entity

16   Morningstar, that the sale of which the code name or the name

17   of it was Project Cyto?

18   A.  Yes.

19   Q.  You recall, sir, on direct that you gave testimony that you

20   tipped Mr. Walters that the sale was going to happen before it

21   was publicly announced?  Do you recall that?

22   A.  Yes, that's accurate.

23   Q.  Okay.  That's another lie, isn't it, sir?

24   A.  No.

25   Q.  You recall, sir, in your prior sessions with the

H3R3WAL4                         Davis - cross

1   prosecution that we've shown on Defense Exhibit 5 telling them

2   exactly the opposite?  Specifically telling them that you did

3   not tell Mr. Walters about Project Cyto until after it was

4   publicly announced in November or December?  Do you recall

5   that, sir?

6   A.  No, I don't.

7   Q.  Let me show you what's been marked for identification as

8   3501-18.  You see the dates, sir?

9   A.  Yes.

10  Q.  Now going to direct your attention to page three and to

11  middle of the page, first paragraph, third sentence.  Do you

12  recall, sir, telling the prosecutors that you told Mr. Walters

13  about Project Cyto in late November, early December?

14  A.  What was the date of this -- these FBI notes?

15  Q.  April 14, 2016.

16  A.  And your question is?

17  Q.  Do you recall, sir, telling the prosecutors that you told

18  Mr. Walters about Project Cyto in late November, early

19  December, 2012?

20  A.  I don't recall this conversation, no.

21  Q.  Let me turn your attention to page three, second paragraph.

22  Do you recall, sir, at this same meeting on April 14, after

23  reviewing the December 3 press release announcing the sale of

24  Morningstar, you told the prosecution that you told Mr. Walters

25  about this transaction after the press release?

1   A.  I don't recall this, this is -- I just don't recall having

2   said that, no.

3   Q.  Do you deny it, sir?

4   A.  I'm simply saying I don't recall having said it, I'm sorry.

5   Q.  My question to you, sir, is do you deny that you told the

6   prosecution prior to your testimony in your prior meetings that

7   you told Mr. Walters about Project Cyto or the sale of

8   Morningstar after it was publicly announced?

9            MS. CUCINELLA:  Objection.  Asked and answered.

10           THE COURT:  It's sustained.  The witness has said he

11  doesn't recall.

12  Q.  You would agree with me, sir, that you were free to discuss

13  the sale of Morningstar, Project Cyto, after it was publicly

14  announced, correct, sir?

15  A.  Yes.

16  Q.  Sir, I want to ask, do you recall August 7, 2012, that's

17  when Dean Foods announced it had filed an S-1 or announced it

18  was going to have the propose -- or announced the filing of

19  documentation with regard to the proposed IPO of WhiteWave,

20  correct, sir?

21  A.  Yes.

22  Q.  You recall, sir, that immediately following it, the next

23  day on the earnings call, Mr. Engles described in very positive

24  terms what this meant?

25  A.  Yes.

H3R3WAL4                          Davis - cross

1   Q.  Let me show you what's in evidence Government Exhibit

2   605-B.  If you give me a moment, it may not be.

3         Let me show you what's not yet in evidence and marked

4   for identification as Government Exhibit 605-B.  You see, sir,

5   this is the Dean Foods earning call transcript for August 8,

6   the day after the August 7 announcement?

7   A.  Yes.

8         MR. BERKE:  Your Honor, I'd offer in evidence

9   Government Exhibit 605-B.

10        THE COURT:  Any objection?

11        MS. CUCINELLA:  No objection.

12        THE COURT:  Received.

13        (Government's Exhibit 605-B received in evidence)

14  Q.  Again, everything in these transcripts, public information,

15  correct?

16  A.  Yes.

17  Q.  Can we go to page three, to show it's Mr. Engles talking.

18  You see these are Mr. Engles' remarks that follow?

19        You see that, sir?

20  A.  Yes.

21  Q.  Now can we go to page four, paragraph two.  See where

22  Mr. Engles says "We also filed a registration statement to

23  conduct an initial public offering of up to 20 percent of the

24  WhiteWave Foods Company, which is comprised of our

25  WhiteWave-Alpro segment.  For all the reasons we've discussed

H3R3WAL4                        Davis - cross

1    in the past, we continue to believe that this is the right move

2    for shareholders."

3            You see that, sir?

4    A.  Yes, I do.

5    Q.  Let me direct your attention to page four, paragraph three.

6    You see where it says at the bottom of this second sentence

7    with regard to the same transaction:  "As such, we believe the

8    separation of WhiteWave-Alpro from Dean Foods is the next

9    logical step in our journey to create value for our

10   shareholders."

11           Do you recall that, sir?

12   A.  Yes.

13   Q.  You recall there are other public statements released by

14   the company about this announcement and about what the intent

15   and plans were with regard to WhiteWave following the August 7

16   announcement, correct, sir?

17   A.  With regard to WhiteWave?

18   Q.  Yes.

19   A.  Yes.

20   Q.  Now, sir, if I can show you what is in evidence as Defense

21   Exhibit 4053.  DX 4053.  Sir, to put this in the timeline, this

22   is the e-mails you had with Mr. Lyons that we looked at earlier

23   today.

24   A.  Yes.

25   Q.  That was entirely appropriate.  So the Dean WhiteWave news

1    that he asks "it's all good" and you said "it certainly is."

2    That's the August 7 announcement, correct?

3    A.  Yes.

4    Q.  That we just talked about.

5           Let me show you, sir, what's marked as Government

6    Exhibit 466 for identification.  You see, sir, these are the

7    minutes of the Dean Foods quarterly meeting for the board of

8    directors for August 14 and 15?

9    A.  Yes.

10          MR. BERKE:  Your Honor, I would offer Government

11   Exhibit 466 into evidence.

12          MS. CUCINELLA:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 466 received in evidence)

15   Q.  Again the board of directors meeting on August 14 and

16   August 15.  Correct?

17   A.  Yes.

18   Q.  I can direct your attention to page five, first paragraph.

19   Sixth sentence.  Beginning "Mr. Mara" stated.  Middle of the

20   paragraph on the right side.  See where it say "Mr. Mara stated

21   that strong second quarter 2012 performance had been well

22   received and that the news of the IPO of WhiteWave was viewed

23   favorably by the investment community."

24          Do you recall that, sir?

25   A.  Yes.

H3R3WAL4                      Davis - cross

1   Q.  Let me show you what's marked as Defense Exhibit 1002-A for

2   identification.  Do you see sir, this is the Dean Foods outlook

3   2012 for the financial business overview and 2012 outlook for a

4   board of directors meeting dated August 15, 2012?

5   A.  Yes.

6           MR. BERKE:  Your Honor, I would offer Defense Exhibit

7   1002-A into evidence.

8           THE COURT:  Any objection?

9           MS. CUCINELLA:  One moment, your Honor.

10          THE COURT:  Yes.

11          MR. GOLDMAN:  The whole document?

12          MR. BERKE:  Your Honor, if I could have a moment with

13  Ms. Cucinella.

14          THE COURT:  Yes.

15          MS. CUCINELLA:  Your Honor, we're fine with the

16  document except for the pages that go through analyst reports

17  for the objection that we've had standing throughout.

18          MR. BERKE:  Your Honor, I believe it is to his state

19  of mind for this time period, because those would have been

20  statements that he would have been free to discuss outside of

21  the company that were shared with him at a board meeting.

22          MS. CUCINELLA:  His state of mind as to this is

23  irrelevant at this point.  It is whether or not the facts

24  themselves were public, and here this is speculation

25  projections, that kind of thing.

1           MR. BERKE:  We're happy to explain why we think it is

2   relevant to his state of mind at that juncture.

3           THE COURT:  No, I understand your point and I'm going

4   to allow it not for the truth of its content, but the fact that

5   it was part of the presentation made at the board meeting.

6           (Defendant's Exhibit 1002-A received in evidence)

7   Q.  This is what we're talking about, the financial business

8   overview and 2012 outlook, the board of directors, August 15,

9   correct, sir?

10  A.  Yes.

11  Q.  If we can first go to page 27.  And you see that the agenda

12  has the post earnings investor reaction?  Do you see that, sir?

13  A.  Yes.

14  Q.  If we can now go to page 31.  And you see where it says

15  "This was a well-received strong quarter," this is following

16  the August 7 and August 8 announcements, correct, sir?

17  A.  Yes.

18  Q.  You see here that it's quoting including for the board from

19  BMO Capital and you see where it says in the middle these are

20  highlights on the document.  It talks that the earnings were

21  stronger than expected performance in Fresh Dairy.  Do you see

22  that?

23  A.  Yes.

24  Q.  Second it says the WhiteWave-Alpro segment continues to be

25  a strong performer.  Right, sir?

1    A.  Yes.

2    Q.  If I can next go to page 32, you see Sanford Bernstein and

3    it lists Sanford Bernstein, but the title is "Strong Reaction

4    to Earnings and IPO Announcement."  Do you see that?

5    A.  Yes, I do.

6    Q.  If we go to page 33.  And you see on the bottom there is a

7    quote from Eric Katzman at Deutsche Bank?

8    A.  Yes.

9    Q.  And you see, sir, that when it talks about in the middle

10   "Catch the White Wave," do you see that?

11   A.  Yes.

12   Q.  It says "With the expected 20 percent IPO of WhiteWave, the

13   market will now be forced to recognize and value a strong,

14   organic product based business."

15   A.  Yes, I see it.

16   Q.  Okay.  Then it says "Assuming no M&A premium for WW,

17   although this is likely long term, we calculate close to $10 of

18   value based on calculations that include," you see that, sir?

19   A.  Yes.

20            THE COURT:  Ladies and gentlemen, as I was trying to

21   explain before, this portion of the document is not admitted

22   for the truth of its content.  It's simply because it may have

23   affected this witness's state of mind, and that's the only

24   purpose for which it's received at this stage.

25   Q.  Sir, do you see that it says under valuation and risk that

1   Eric Katzman of Deutsche Bank gives it a $20 target from 18.

2   Do you see that, sir?

3   A.  Yes, I do.

4   Q.  Now, do you recall I was asking you if you remember what

5   happened on October 17?  And this again, we were looking at

6   this slide deck is from August.  Correct?

7   A.  Yes.

8   Q.  August 15, correct?

9   A.  Correct.

10  Q.  Now I want to take you forward to October 17.  Do you

11  recall this morning I was asking you questions about what

12  happened on October 17?  Do you recall that, sir?

13  A.  Yes.

14  Q.  Let me show you what's in evidence as Government Exhibit

15  888-A.  You see, sir, if we can get the date at the top, too.

16  So you see, sir, that on October 17, there was an amendment

17  filed with regard to the document, the S-1 announcing IPO?  Do

18  you recall that, sir?

19  A.  Yes, this was a third amendment, yes.

20  Q.  If we go to page two.  If we can highlight the box over

21  there.

22          Do you recall, sir, that this amendment announced sort

23  of a proposed pricing for the IPO, which I'm showing on page

24  two.  Do you recall that, sir?

25  A.  Yes.

1   Q.  So that happened on October 17, correct?

2   A.  Yes.

3   Q.  Now let me show you what was asked before, which is in

4   evidence as Defense Exhibit 4048.  Do you recall, sir that

5   after that was filed, the stock -- the share price of Dean

6   Foods stock went up?  Do you recall that?

7   A.  Yes.

8   Q.  Do you recall, now looking at Defense Exhibit 4048, that at

9   1 o'clock on the 17th you wrote to Bucky Lyons "Hope you made a

10  lot of money on your investment," correct?

11  A.  Yes, I did.

12  Q.  You knew he held Dean Foods stock, so it would have gone up

13  in value, correct?

14  A.  Yes, he told me that, yes.

15  Q.  Then when you're talking about he said on the 17th "Made

16  some, was hoping to buy more today, I hope it goes to 25."

17          You see that, sir?

18  A.  Yes.

19  Q.  And then you say "My guess is it will be $20 by the end of

20  the roadshow next week."

21          Do you see that, sir?

22  A.  Yes, referring to Dean Foods stock, yes.

23  Q.  And that's the same -- do you recall that's the same price

24  Eric Katzman gave in the portion of his report that we showed

25  that you were showed at the August 15 board meeting that we

1   just looked at.  Do you recall that, sir?

2   A.  I think you've confused your issues.  I think Eric

3   Katzman's commentary referred to the proposed value of the

4   WhiteWave stock, not the Dean Foods stock.  That's the way I

5   read it.

6   Q.  Let me ask you, sir.  You're speculating with Mr. Lyons

7   that the price of Dean Foods may go up to $20 by the end of

8   roadshows next week.  Entirely appropriate as you testified

9   before, correct?

10  A.  Yes.

11  Q.  Sir, let me show you what's in evidence as Government

12  Exhibit 1934.  Sir, you see that these are e-mail exchanges

13  between you and Mr. Engles?

14  A.  Yes.

15  Q.  If we can go to the bottom one first.  You see where

16  Mr. Engles says "TD, got to tell you that the underwriters are

17  baffled.  They were sure it was going to hit the low 20s in the

18  short term.  When it didn't happen things softened quickly."

19  Right?  That's related to the IPO, correct?

20  A.  Yes, correct.

21  Q.  You recall it was disappointing.  Do you recall that, sir?

22  A.  Yes.

23  Q.  If you go to your response you gave, "I've seen this happen

24  before.  Sometimes it takes days, a few days for the stock to

25  find its comfortable level.  I'll be back on November 3 so we

1    can together almost any time the week of November 5.  I've

2    learned long ago to only worry about stuff that I can control."

3    A.  Yes.

4    Q.  It's fair to say the way the market reacted to the IPO

5    announcement you couldn't control?

6    A.  Yes.

7    Q.  The only thing you could speculate is how the market might

8    react, and you may be right and you may be wrong, correct?

9    A.  Yes, I think that's accurate.

10   Q.  Sir, do you recall between August and October you had a

11   number of things to talk about with Mr. Walters, having nothing

12   to do with Dean Foods stock?

13   A.  Of what year?  I'm sorry.

14   Q.  August to October 2012.

15   A.  I don't recall what we had to talk about then precisely,

16   no, besides Dean Foods.

17          MR. BERKE:  Your Honor, if I can just have one minute.

18          THE COURT:  Yes.

19          MR. BERKE:  Thank you.

20   Q.  Sir, let me ask you, you said before that you couldn't

21   recall that there were other friends that you and Mr. Walters

22   had in common, right?

23   A.  You mean besides Bill Saxon?

24   Q.  Yes.

25   A.  Yes.

H3R3WAL4                    Davis - cross

1    Q.  Tom King, mutual friend, correct?

2    A.  Who?

3    Q.  Tom King.

4    A.  I didn't know that Mr. Walters knew Tom King, other than

5    the one time we played golf.

6    Q.  He is a friend of yours, correct?

7    A.  Yes.

8    Q.  David Feherty?

9    A.  Yes.

10   Q.  Tom Ferguson?

11        THE COURT:  I don't understand the question.  I just

12   hear a name and then I hear a "yes."  So what's the question,

13   Mr. Berke, so I understand the answer?

14        MR. BERKE:  Thank you, your Honor.

15   Q.  These were other mutual friends you had with Mr. Walters,

16   correct?

17   A.  The ones you named, I would agree with, yes.

18   Q.  And now I want to talk about other things, other topics

19   that you were discussing with Mr. Walters between August and

20   October 2012.  Correct, sir?

21        Do you recall, sir, that you agreed to be on the

22   dinner committee for an Opportunity Village charity event that

23   was honoring Mr. Walters?

24   A.  I agreed to contribute money, yes.

25   Q.  Do you recall you were on the dinner committee?

H3R3WAL4                      Davis - cross

1   A.   I think my name was listed on the dinner committee because

2   I made a contribution.

3   Q.   You recall other friends of yours, mutual friends like

4   Mr. Sexton, was also on the dinner committee?  Do you recall

5   that, sir?

6   A.   Who?

7   Q.   Bill Sexton.

8   A.   I don't know who else was on the committee.  I just don't

9   recall.

10  Q.   Do you recall, sir, you were talking to Mr. Walters about

11  that during that time frame?

12  A.   I recall receiving one e-mail from Mr. Walters' office

13  asking me to make a contribution for this function to raise

14  money.  And I did so.

15  Q.   Do you recall you spoke to Mr. Walters about it as well

16  during that time frame, sir?

17  A.   I don't recall.

18  Q.   Are you denying that or are you just saying you don't

19  recall?

20  A.   I'm saying I just don't recall having that conversation,

21  no.

22  Q.   Let me ask you about February 2013.  Do you recall you

23  testified on direct at transcript page 879, lines 12 to 17.  Do

24  you recall testifying that you had learned that Dean Foods was

25  going to lose some of Walmart's business and you claimed that

H3R3WAL4                         Davis - cross

 1    you told Mr. Walters of it before it was publicly announced?

 2              Do you recall that testimony?

 3    A.  Yes, I do.

 4    Q.  Sir, again, that was another lie, wasn't it, sir?

 5    A.  It definitely was not.

 6    Q.  Well, you recall, sir, in your 12th proffer session with

 7    the government on April 14, 2016, you told the prosecution you

 8    didn't recall giving any material non-public information to

 9    Mr. Walters between December 2012 and March 2013?

10              Do you recall that, sir?

11    A.  I don't recall that proffer session, no.

12              MR. BERKE:  Let me show you what's been marked for

13    identification as 3501-18.  Show you page three of five, middle

14    of the third page.  That's not the correct one.  3501-18, page

15    three of five, middle of the third paragraph under the heading

16    2012.  No.  Yes.  Thank you, Mr. McLeod.

17    Q.  Sir, read that first sentence to yourself.  Sir, does that

18    refresh your memory, sir, that you told the prosecution

19    April 14, 2016, that you did not give Mr. Walters any material

20    non-public information between December 2012 and March 2013?

21    A.  That doesn't refresh my memory, no.

22    Q.  Do you deny it, sir?

23    A.  I said it doesn't refresh my memory.

24              THE COURT:  Do you remember one way or the other

25    whether you --

1              THE WITNESS:  No, sir, I don't.

2              THE COURT:  That's the answer.

3    Q.  Do you recall, sir, at this same meeting what you told the

4    prosecution was that the only thing you recall discussing with

5    Mr. Walters about Dean Foods was whether Dean Foods would keep

6    or sell its WhiteWave stock, and you told them you were

7    expressing opinions that was based on pure speculation and was

8    not in any way Dean Foods material non-public information?

9              Do you recall that, sir?

10   A.  No.  I don't recall that, no.

11   Q.  Let me show you again the same document, 3501-18.  Show you

12   page three, fourth paragraph under 2012.  My question to you

13   after you're done reading it, does that refresh your memory,

14   sir, that you told the prosecution in April of 2016 that the

15   only thing you talked about with Mr. Walters during this period

16   was you speculated what might happen with Dean Foods' shares of

17   WhiteWave, and that was not based on any material non-public

18   information?

19             Do you recall that, sir?

20   A.  That's not what this paragraph says and I don't recall

21   that, no.

22   Q.  Let me ask you this, sir.  Do you recall you telling the

23   prosecutors that you shared opinions with Mr. Walters during

24   this time period based on your speculation, not Dean Foods

25   material non-public information?

H3R3WAL4                       Davis - cross

1   A.  I don't recall that, no.

2   Q.  Do you deny you said it, sir?

3   A.  I said I don't recall it.

4   Q.  One way or the other?

5   A.  I don't recall it, no.

6   Q.  Sir, do you recall that in the Super Bowl -- certainly in

7   2013 was in early February, do you recall that, sir?

8   A.  Yes.

9   Q.  Do you recall testifying, sir, that you would discuss at

10  times Mr. Walters' views about big games like the Super Bowl?

11  Do you recall that, sir?

12  A.  Yes.

13  Q.  Do you recall saying further that there was a time

14  Mr. Walters would tell you his picks, who he liked for a game?

15  Do you recall that, sir?

16  A.  Yes.

17  Q.  And his views on the betting line?

18  A.  Yes.

19  Q.  I want to ask you about a different company now, sir.

20          Do you recall being asked questions on direct about a

21  company called Darden Restaurants?

22  A.  Yes, I do.

23  Q.  Do you recall the prosecution showed you a deck or a

24  presentation, two of them, about Darden?  Do you recall that,

25  sir?

H3R3WAL4                    Davis - cross

1   A.  Yes, I do.

2   Q.  Do you recall, sir, that in your prior meetings with the

3   prosecution in April of 2016, you told them that you didn't

4   recall sending anything to Mr. Walters?  Do you recall that,

5   sir?

6   A.  Yes, I do recall that.

7   Q.  Do you recall, sir, even after they showed you some

8   shipping information, you still said you didn't recall sending

9   anything relating to Darden to Mr. Walters?  Do you recall

10  that, sir?

11  A.  Can you repeat the question?

12  Q.  Do you recall, sir, even after they showed you that you had

13  sent something to Mr. Walters, a receipt that you had sent

14  something, you still had no memory of sending anything relating

15  to Darden to Mr. Walters?  Do you recall that sir?

16  A.  My recollection is different.

17  Q.  Well, you recalled that you told the prosecution that you

18  didn't recall sending anything to Mr. Walters?  Do you recall

19  that, sir?

20  A.  At some point in time, I do recall having said that, yes.

21  Q.  Do you recall you said that, sir, after a point in time

22  when they showed you the shipping notification?

23  A.  I don't recall the sequence of events, no.

24  Q.  You don't recall one way or the other?

25  A.  No, I don't.

H3R3WAL4                        Davis - cross

1    Q.  Do you recall, sir, that what you told Mr. Walters about

2    Darden was he should take a look at it because the company was

3    probably undervalued and you thought it was an interesting

4    investment opportunity when you spoke to him on the phone about

5    Darden?

6              Do you recall that, sir?

7    A.  Yes.

8    Q.  Do you recall, sir, it was not a big deal, it was just an

9    "oh by the way" conversation when you talked with him about

10   Darden?  Do you recall that, sir?

11   A.  I don't know what an "oh by the way" conversation is, I'm

12   sorry.

13   Q.  Do you recall, sir, telling the prosecution that you

14   provided this information to Mr. Walters in the context of,

15   quote, "oh by the way"?

16   A.  I don't recall precisely what I said during the proffer

17   sessions, I'm sorry.

18   Q.  Let me show you what's marked as 3501-79.  Look at the

19   date, please, sir.  I'm going to direct your attention to page

20   two, fourth full paragraph.  Fourth line, end of line.  Ask you

21   to review.  I'm going to ask you about the second half of that,

22   the last two lines.  I'd ask you to review the last two lines

23   to yourself.

24             My question to you, sir, does that refresh your memory

25   on March 19, 2016, you told the prosecutors that you provided

1    information to Mr. Walters about Darden in the context of "oh

2    by the way"?

3    A.  I don't recall using that term, no.

4    Q.  Is that an accurate description, that it was an offhanded

5    remark when you told him it could be a good investment in

6    Darden?

7    A.  I don't think it was an offhanded description, no.

8    Q.  So you deny saying that?

9    A.  I deny saying what?

10   Q.  That your discussion with Mr. Walters of Darden was in the

11   context of "oh by the way"?

12   A.  No, it was very specific.

13   Q.  You deny saying that, did you deny --

14   A.  I've already said I don't recall saying that in the proffer

15   session.

16   Q.  But your testimony today is it would be a false to say that

17   you discussed Darden with Mr. Walters in the context of "oh by

18   the way."  Is that your testimony, sir?

19   A.  Yes, it is.

20   Q.  It's true, sir, Mr. Walters never asked you any questions

21   about Darden, isn't that so?

22   A.  I recall he asked me a few questions in a phone

23   conversation that I had with him about Darden, yes.

24   Q.  Sir, didn't you tell the prosecution again at the same

25   meeting -- if we can put that back up.

1    Do you recall telling the prosecution at the same

2  meeting that Mr. Walters never asked you any questions

3  regarding Darden?

4  A.  I think this is in the context of after I sent him the

5  deck.  The confidential deck, he never asked me any further

6  questions about Darden.  That's accurate.

7  Q.  So let's talk about that deck, sir.  Do you recall you were

8  shown the deck, you were shown two decks, correct, sir?

9  A.  Two?

10  Q.  Two.  Do you recall you were shown two different decks?

11  A.  I don't recall that, no.

12    MR. BERKE:  If we can put up on the screen what's

13  admitted in evidence as Government Exhibit 1809-A.

14  Q.  Do you recall being shown or being asked about this deck,

15  Government Exhibit 1809-A, Project Dee Perspectives on Value

16  Creation?

17  A.  Yes.

18  Q.  You recall, sir, also being asked about Government Exhibit

19  1807 which we'll put up.  Do you recall also being asked about

20  this one dated July 12, 2013?

21  A.  That's a different deck?

22  Q.  I'll show you the other one.  Let's put up Government

23  Exhibit 1809-A.  See that's dated July 24, 2013?

24  A.  Yes.

25  Q.  You see Government Exhibit 1807 is dated July 12, 2013.

1    Two separate decks, correct, sir?

2    A.  Yes, apparently there are two separate decks, yes.

3    Q.  You recall, sir, during your testimony, this is on page

4    883, lines nine to 18, you were asked:

5         It says Project Dee on the front I believe on both of

6    the deal books we saw.  You were asked what company was Project

7    Dee referring to?  You said Darden Company.  You were asked did

8    these deal books say Darden anywhere in them?  You said I don't

9    think so.  No.

10        Going down to line 16.  You were asked why wouldn't a

11   company's name be used in a book like this.  And you said in

12   order to disguise it, you'd use a name and not the company's

13   real name.

14        Do you recall being asked those questions, sir, and

15   giving those answers?

16   A.  Yes.

17   Q.  Again, sir, that's not true, is it?

18   A.  I don't know what's not true about that.

19   Q.  Let's take a look if we can put up GX 1809-A.  We'll do the

20   first one.  Let's do 1809-A first.  And again that's one of the

21   decks we were just talking about in your testimony, correct,

22   sir?

23   A.  Yes.

24   Q.  If we can go to page eight.  See the top line.  What word

25   do you see up at the top of the title, sir?

H3R3WAL4                    Davis - cross

1    A.  It says Darden.

2    Q.  So when you testified under oath and swore that the books

3    don't say Darden anywhere, that wasn't right, was it, sir?

4    A.  That was my recollection when I testified.

5    Q.  When Ms. Cucinella asked you why the books didn't say

6    Darden anywhere, you said it was because to maintain the

7    confidentiality to hide the name of the company, that wasn't

8    true either, was it, sir?

9    A.  My recollection was that it was code named on the front of

10   the deck.  That's all I really recall.

11   Q.  You spent at least 29 days meeting with the prosecution

12   about this case, correct, sir?

13   A.  Yes.

14   Q.  You looked at these decks before with them, haven't you,

15   sir?

16   A.  I haven't -- I didn't use this deck to refresh my memory.

17   I didn't need to.

18              (Continued on next page)

19

20

21

22

23

24

25

1   Q.  You never looked at this deck before your testimony last

2   week; is that your testimony, sir?

3   A.  I didn't look at the entire deck.  No, I looked at the

4   front page of it.

5   Q.  And you never looked at any other page; that is your

6   testimony?

7   A.  That is my testimony, yes.

8   Q.  You see, sir, it says Darden throughout this book, correct?

9   A.  I haven't seen the whole book, but certainly it says that

10  on page 7.

11  Q.  Now let's go to the first bullet point.  What does it say?

12  "Darden is one of the world's largest publicly traded

13  companies," right?

14  A.  Yes.

15  Q.  And there is only one Darden Restaurant that you know

16  about, correct, sir?

17  A.  Yes.  That is accurate.

18  Q.  And it describes Darden and all the brand names it

19  operates, right?

20  A.  Yes.

21  Q.  From Red Lobster, Olive Garden, all the way down, correct,

22  sir?

23  A.  Yes, it does.

24  Q.  If you look at this source of this information, it says the

25  source of this information is SEC filings, capital IQ.  Do you

H3rdwal5                        Davis - cross

1    see that, sir?

2    A.  Yes.

3    Q.  You know SEC filings are publicly available information,

4    isn't that true, sir?

5    A.  Yes, they are.

6    Q.  Let's go to 18 -- let's go to Government Exhibit -- the

7    other deck, Government Exhibit 1807.  And this is the July 12

8    book, Project Dee, correct?

9    A.  Yes.

10   Q.  Again, as to this one, your testimony that doesn't mention

11   Darden, that is not true either, is it, sir?

12   A.  I just don't recall.

13   Q.  Go to page 7.  "The company has significant strengths."

14           "The company," sir, is Darden Restaurants, correct,

15   sir?

16   A.  Yes.

17   Q.  And there is no doubt that the company being described here

18   is Darden, correct, sir?

19   A.  I think that's accurate, yes.

20   Q.  And you recall, sir, both reports also said that the

21   analysis was based solely on publicly available information; do

22   you recall that, sir?

23   A.  I don't know that both reports were based solely on public

24   information.  There was a lot more information in these two

25   decks that was privileged and confidential information aside

H3rdwal5                    Davis - cross

1   from what you're showing the courtroom about Darden.

2   Q.  OK.  Let's look at page 2 of this document, "this document"

3   being Government Exhibit 1807, the first paragraph, second

4   line.

5           Do you see what it says, sir, "The views expressed

6   herein represent the opinions of Barington, whose analysis is

7   based solely on publicly available information."  Do you see

8   that, sir?  Do you see that line?

9   A.  Yes.

10  Q.  Now let me show you Government Exhibit 1809A.  Let's look

11  at the first page first.  Then let's go to page 2, the same

12  place.

13          And it says, "The views expressed herein represent the

14  opinions of Barington, whose analysis is based solely on

15  publicly available information."

16          Did I read that correctly, sir?

17  A.  Yes.

18  Q.  Sir, you testified on direct that Mr. Walters you've, seen

19  him use a different -- more than one cell phone on occasion;

20  isn't that your testimony, sir?

21  A.  Yes.

22  Q.  You were aware, sir, that Mr. Walters had people throughout

23  Las Vegas who placed bets for him at different places for

24  games?  You were aware of that, sir, weren't you?

25  A.  Yes.

H3rdwal5                      Davis - cross

1    Q.  And you were aware that Mr. Walters himself personally kept

2    in touch with these folks who had placed these bets for him,

3    weren't you, sir?

4    A.  Yes, I was aware of that.

5    Q.  And you observed him, in the times that you were together

6    at various points, answering one phone; isn't that correct,

7    sir, or a different phone, isn't that correct, sir?

8    A.  Multiple phones, yes.

9    Q.  You are aware, sir, that he used one of those phones for

10   gambling so people wouldn't hear or learn what bets he was

11   placing on certain games, didn't you, sir?

12   A.  I wasn't totally aware of that, no.

13   Q.  So that was your assumption, wasn't it, sir?

14   A.  That was my assumption, yes.

15   Q.  And you already said that he would at times talk to you

16   about betting strategy or how he was going to bet on an

17   upcoming game, isn't that true, sir?

18   A.  Occasionally he would, yes.

19   Q.  And you would at times pass on that information to your

20   friends who were also betting on those games, correct, sir?

21   A.  Yes, I would share it with them.

22   Q.  Sir, I want to ask you about your testimony about when you

23   claim that you had obtained the phone that you called the bat

24   phone; do you recall that testimony on direct, sir?

25   A.  Yes, I do.

H3rdwal5                        Davis - cross

1   Q.  And you recall, sir, your testimony on direct because that

2   was the phone you used -- I believe your testimony was that

3   that was the phone that you obtained, according to you, in --

4   sometime in 2011, and you used it in late 2011 and all of 2012

5   to discuss Dean Foods' information with Mr. Walters; that was

6   your testimony, correct, sir?

7   A.  Yes.

8   Q.  And you said, sir, that you gave this -- withdrawn.

9        Your claim, sir, is that you obtained this bat phone

10  for the purpose of talking about Dean Foods' stock from

11  Mr. Walters at Signature Aviation at Love Field; is that your

12  testimony, sir?

13  A.  Yes, it is.

14  Q.  You had testified that Mr. Walters stopped in his own

15  airplane at Signature Love Field and you met him there and you

16  had a short conversation, and you claim that he then gave you

17  that phone at that visit for purposes of using to discuss Dean

18  Foods stock; that was your testimony, correct, sir?

19  A.  There was a lot of questions there.  What I testified to is

20  I met him at Signature Aviation and he gave me the phone.

21  Q.  And you recall, you remember during this meeting that the

22  weather was good; do you recall that, sir?

23  A.  Yes.

24  Q.  And, sir, you recall testifying that Signature Aviation was

25  a private terminal for private jets at Dallas Love Field; do

1   you recall that, sir?

2   A.  Yes.

3   Q.  And you recall, sir, that you previously said that the

4   meeting was set up for you and Mr. Walters and Mr. Luce to

5   discuss the Periscope investment that you talked a lot about;

6   do you recall that, sir?

7   A.  I'm not sure precisely why the meeting was set up.  I think

8   Mr. Walters called me and asked me to meet with him.  That's my

9   recollection.

10  Q.  Do you recall, sir, previously telling prosecutors that you

11  remember that Mr. Walters set up the meeting at the airport in

12  Dallas because he was going to be there and he wanted to

13  discuss the Periscope deal with you?

14  A.  I think that's accurate, yes.  I think I did say that.

15  Q.  And do you recall, sir, you saw Mr. Walters' plane and you

16  noted it had its initials on the tail; do you recall that, sir?

17  A.  Yes, I think I told the prosecutors that, yes.

18  Q.  And you recall, sir, that you even went so far as to meet

19  with the prosecutors and agents in this case and you took them

20  to Signature Field to show where you and Mr. Walters and

21  Mr. Luce sat down and had a discussion while you were there at

22  that signature terminal; do you recall that, sir?

23  A.  Yes, I do.

24  Q.  And you recall, sir, you told the prosecution that you

25  recall on that airplane there was Susan Walters and Mike Luce

H3rdwal5                         Davis - cross

1    with Mr. Walters on that plane; do you recall telling them

2    that, sir?

3    A.   I didn't say anything about them being on the plane.  I met

4    Susan and Mike Luce in the terminal.  I said nothing about the

5    plane.

6    Q.   On that day, you recalled seeing them at Signature

7    Aviation, where the plane was parked, correct, sir?

8    A.   Yes, that's my recollection.  Yes.

9    Q.   And you recall that on this trip being told that they were

10   there to meet with some banks in Dallas and that was their

11   reason they had to be in Dallas; do you recall that, sir?

12   A.   Yes.  I do recall that, yes.

13   Q.   And you recall, sir, that you said, on this meeting when

14   you claim you got this phone that you used to talk about Dean

15   Foods, that Mr. Walters called you a few days prior to set up

16   the meeting; do you recall that, sir?

17   A.   I know he called me in advance.  I don't know whether it

18   was a couple of days or a few days, I'm not sure.  But he set

19   up the meeting, yes, I know that.

20   Q.   And, sir, I would like to show you what's marked in

21   evidence as Government Exhibit 1002.

22           Do you recognize this as your phone records, sir?

23   A.   Yes.

24   Q.   I would like to direct your attention to page 1662.

25           This is your cell phone records, correct, sir?

H3rdwal5                        Davis - cross

1   A.  Yes.  It appears to be, yes.

2   Q.  And I would like to direct your attention to December 18th.

3   And, sir, do you see a phone call that you made on

4   December 18th, sir?  Do you see that?

5   A.  Yes.

6   Q.  And, sir, do you see the time and it says "UTC time"?

7   A.  Yes.

8   Q.  And you see it has the originating number?  Do you see

9   that, sir?  That's your number, correct?

10  A.  Yes, it is.

11  Q.  And you see, sir, that on the right it has "Cell Location"?

12  Do you see that, sir?

13  A.  Yeah.  It's highlighted.  Yes, I see that.

14  Q.  And that's for December 18, 2012, correct, sir?

15  A.  Yes.

16  Q.  And you see it says "Cell location, 96.86" in numbers and

17  "32.853" in numbers.  Do you see that, sir?

18  A.  Yes, I do.

19  Q.  Do you recognize that as a longitude and latitude number?

20  A.  I'm not familiar with longitude and latitudes, no.

21          MR. BERKE:  Your Honor, if I may ask for your Honor to

22  take judicial notice of those two numbers?

23          THE COURT:  I take judicial notice of the two numbers

24  as latitude and longitude indicators for a location in or about

25  Dallas Love Field Airport in Dallas, Texas.

1    　　　　MR. BERKE:  Thank you, your Honor.

2    BY MR. BERKE:

3    Q.  Isn't it a fact, sir, that the alleged meeting in which you

4    claim that you supposedly got a bat phone from Mr. Walters took

5    place on December 18, 2012, long after the events that you

6    claimed required you to use a bat phone and in which you used

7    it; isn't that true, sir?

8    A.  That's not my recollection.

9    Q.  And, sir, are you being as truthful about that as anything

10   else in your testimony today?

11   　　　　MS. CUCINELLA:  Objection.

12   　　　　THE COURT:  Sustained.

13   　　　　MR. BERKE:  Your Honor, may I have a moment?

14   　　　　THE COURT:  You may.

15   　　　　MR. BERKE:  Thank you.

16   　　　　(Pause)

17   　　　　Thank you, your Honor.  I have no further questions.

18   　　　　THE COURT:  All right.  Ladies and gentlemen, we will

19   take our mid-afternoon break.

20   　　　　Please do not discuss the case among yourselves or

21   with anyone else.  Keep an open mind.  We'll be back with the

22   redirect of the witness by Ms. Cucinella.  Ten minutes.

23   　　　　(Jury not present)

24   　　　　THE COURT:  See you all in ten minutes.

25   　　　　(Recess)

1    THE COURT:  All right.  Please be seated.

2    Bring our jury in.  Well, please remain standing and

3    we'll bring our jury in.  Sorry.

4    (Jury present)

5    THE COURT:  Please be seated.

6    Ms. Cucinella, you may inquire.

7    MS. CUCINELLA:  Thank you, your Honor.

8    REDIRECT EXAMINATION

9    BY MS. CUCINELLA:

10   Q.  Good afternoon, Mr. Davis.

11   A.  How are you?

12   Q.  Mr. Davis, over the last two days, Mr. Berke has asked you

13   a lot of questions.  I'm going to just go over some of them

14   with some follow up and try to do it as fast as I can.

15   Mr. Berke asked you some questions about a

16   presentation that your lawyers made to the SEC.  Do you recall

17   that?

18   A.  Yes.

19   Q.  And that presentation was in the fall of 2015; is that

20   right, sir?

21   A.  Yes.

22   Q.  And the purpose of that presentation was to provide the SEC

23   with supposedly innocent explanations for your conduct and the

24   conduct of Mr. Walters, right, Mr. Davis?

25   A.  That's accurate, yes.

1  Q.  But there aren't any innocent explanations, are there,

2  Mr. Davis?

3  A.  No, I'm afraid not.

4  Q.  Just to be clear, that presentation was part of a cover-up

5  of the insider trading you did with Mr. Walters?

6          MR. BERKE:  Your Honor, I would object to that, the

7  question.  I also object to the leading.

8          THE COURT:  All right.  Go ahead.

9          Overruled.

10  BY MS. CUCINELLA:

11  Q.  Mr. Davis, did this presentation include an analysis of

12  Mr. Walters' trading?

13  A.  Yes, I think it did.

14  Q.  And did you and your lawyer hire experts to do that

15  analysis?

16  A.  Yes.

17  Q.  Did this analysis try and explain the trading through

18  reliance on analyst reports?

19  A.  To some degree, yes.

20  Q.  And that's one of the ways that your lawyers tried to

21  persuade the SEC that there had been no insider trading here,

22  right?

23  A.  Yes, that's accurate.

24          THE COURT:  Now, Ms. Cucinella, on redirect you have a

25  little bit of latitude on leading because you have to take the

1   witness to the subject area, but once you get into the subject

2   area, try to avoid the leading questions.  All right?

3            MS. CUCINELLA:  Certainly, your Honor.  I am just

4   trying to keep it moving.

5   Q.  That presentation, Mr. Davis, did it also include an

6   analysis of phone calls with Mr. Walters?

7   A.  Yes.  I think it did, yes.

8   Q.  And there were explanations for those phone calls, as well?

9   A.  There were some explanations, yes.

10  Q.  Did it suggest that you had talked about gambling?

11  A.  Yes, it did.

12  Q.  Do you recall whether it spoke about mutual friends?

13  A.  I think it did, yes.

14           THE COURT:  What are you referring to now, Mr. Davis?

15           THE WITNESS:  The SEC presentation, your Honor.

16           THE COURT:  All right.  Thank you.

17  BY MS. CUCINELLA:

18  Q.  Mr. Davis, were those explanations truthful?

19  A.  I'm sorry.  Can you repeat?

20  Q.  Were the explanations offered by your lawyers in that

21  presentation, were they truthful?

22  A.  No, not at all.

23  Q.  Were they accurate?

24  A.  No.

25  Q.  Were you -- are you in fact innocent?

 1   A.  No.

 2   Q.  Mr. Davis, Mr. Berke showed you three pages of this

 3   presentation.  It was marked as Government Exhibit 3501-76.  Do

 4   you recall him showing you those pages?

 5   A.  Yes.

 6          MS. CUCINELLA:  Ms. Meister, could you please pull up

 7   for Mr. Davis 3501-76 at page 88.

 8   Q.  Mr. Davis, do you recognize this as one of the pages that

 9   Mr. Berke tried to refresh your recollection with?

10   A.  Yes.

11          MS. CUCINELLA:  The government offers page 88 of

12   Government Exhibit 3501-76 under Rule 612.

13          MR. BERKE:  No objection, your Honor.  Could I just

14   ask that it be scrolled down one page or two.  I just can't

15   tell if it goes over to the second page.

16          MS. CUCINELLA:  At this point we are only offering 88.

17          MR. BERKE:  Your Honor, think that section has

18   multiple pages.  I would just ask that the whole section be --

19          THE COURT:  Show me 89.  Now go back to 88.

20          Keep going.

21          90, page 90, please.

22          Yes.  You can offer 87 to 90 under the rule of

23   completeness.

24          MS. CUCINELLA:  I don't believe we showed him 87, so

25   if we could do 88 through 90?

1    THE COURT:  All right.  That's fine.

2          (Government's Exhibit 3501-76, pages 88 through 90,

3    received in evidence)

4    BY MS. CUCINELLA:

5    Q.  OK.  Starting on page 88, let's go through this document.

6          Looking at the first quote -- I will wait for it to

7    come up.

8          (Pause)

9          Mr. Davis, the first quote, where is that from?

10   A.  It looks like it is from a consumer conference, Barclays

11   Consumer Conference.

12   Q.  That was a public statement as of what date?

13   A.  2010.  September 2010.

14   Q.  And the second quote, and I won't have you read it to save

15   time, but what is that from?

16   A.  It's from an earnings conference call in November 2010.

17   Q.  That is a Dean Foods earnings conference call?

18   A.  Yes.  Yes.  I'm sorry.

19   Q.  And looking at the -- I believe it is the third quote,

20   where is that from?

21   A.  It's again from a conference in New York, an analyst

22   conference in New York in February 2011.

23   Q.  And the fourth quote?

24   A.  It is also a Dean Foods earnings call in May of 2012.

25   Q.  And all of these quotes, they're all speculation about the

1   spin-off, is that right?

2   A.  I think that's accurate, yes.

3   Q.  Mr. Davis, these quotes that deal with speculation, were

4   these your lawyers' efforts to convince the SEC that the

5   spin-off was in the public domain?

6           MR. BERKE:  I would object, your Honor.

7           THE COURT:  Yes.  Rephrase it.

8           MS. CUCINELLA:  I will rephrase.

9   Q.  Mr. Davis, was the WhiteWave spin-off in fact ever made

10  public before it was announced on August 7th of 2012?

11  A.  Never.

12  Q.  So this was a false argument?

13          MR. BERKE:  Objection, your Honor.

14          THE COURT:  Overruled.

15  Q.  Now, Ms. Meister, could we turn to page -- I'm sorry.

16          Can you answer the question?

17  A.  I'm sorry.  Could you repeat the question?  Pardon me.

18          MS. CUCINELLA:  Could we have the question read back?

19          (Record read)

20  A.  Yes, this is a false argument.

21  Q.  Let's turn to page 90.

22          What are we looking at here, Mr. Davis, the caption at

23  the top of the page?

24  A.  It says, "Gregg Engles talked about the spin-off in

25  May 2012."

H3rdwal5                    Davis - redirect

1   Q.  And each one of these two quotes on this page, who are

2   these quotes from?

3   A.  Gregg Engles responding to a question and Gregg Engles

4   again responding to another question.

5   Q.  And each of these questions, is he addressing the

6   possibility of a spin-off?

7   A.  Yes, to some slight degree.  Yes, he was.

8   Q.  To some slight degree?

9   A.  He was purposely vague in answering both questions, as you

10  can see, so as not to disclose the timing or the actual plans

11  of the spin-off.

12  Q.  But by including these statements here, there was also an

13  effort to make it seem like this information was public, right,

14  Mr. Davis?

15  A.  Yes, it was.  That was the intent.

16  Q.  Was this argument also false?

17  A.  Yes.

18  Q.  Now, you authorized your lawyers to make this presentation,

19  right, Mr. Davis?

20  A.  I did, yes.

21  Q.  Had you told your lawyers at that point that you were

22  innocent?

23  A.  Yes, I had told them that.

24  Q.  At the time your lawyers made this presentation to the SEC,

25  were you in fact guilty of insider trading?

1   A.  Yes, I was.

2   Q.  Did you ultimately plead guilty to the conduct that your

3   lawyers tried to convince the SEC that you had never done?

4   A.  Yes, I did.

5   Q.  Did you also plead guilty to lying to the SEC about insider

6   trading when you were trying to cover up your crimes?

7   A.  Yes, I did.

8   Q.  Now, Mr. Davis, I'm going to jump around a bit.

9          You were asked some questions at the end of

10  Mr. Berke's cross about when you received the burner phone from

11  Mr. Walters; do you recall that?

12  A.  Yes.

13  Q.  Do you know when you got that phone?

14  A.  No, not precisely, no.

15  Q.  What do you remember?

16  A.  I distinctly remember meeting him at Love Field and walking

17  out to the parking lot to my car and he handed me a box with

18  this phone in it and a charger.  And as I've already testified,

19  he went into some detail about how we should use the phone.

20  Q.  Mr. Davis, do you know for certain whether Mr. Walters'

21  plane was there that day?

22  A.  I'm not certain of that, no.

23  Q.  Mr. Davis, along with Love Field, is there another airport

24  near Dallas where private planes fly?

25  A.  Yes, there is.

H3rdwal5                    Davis - redirect

1    Q.  What airport is that?

2    A.  It's called Addison Airport.

3    Q.  And where is Addison Airport with respect to downtown

4    Dallas?

5    A.  It's about 15 miles north of downtown Dallas.

6    Q.  And where is Love Field compared to downtown Dallas?

7    A.  It's about six or seven miles north of downtown Dallas.

8    Q.  And where is Love Field compared to Addison Airport?

9    A.  They're roughly five miles apart, five or six miles apart

10   would be my estimate.

11   Q.  Is it fair to say that Love Field is somewhere between

12   Dallas and Addison Airport?

13   A.  Love Field is between downtown Dallas and Addison Airport,

14   correct.

15   Q.  And how far is your home from Love Field?

16   A.  Approximately ten minutes.

17   Q.  Mr. Davis, during cross-examination, Mr. Berke also asked

18   you a number of questions about the burner phone specifically.

19   Do you recall that?

20   A.  Yes.

21   Q.  And on your direct examination, you testified that you

22   would occasion use the burner phone in your car, is that

23   correct?

24   A.  Yes, that's correct.

25   Q.  But you primarily used it in your home, right?

H3rdwal5                    Davis - redirect

1   A.  That's correct.

2   Q.  Where in your house did you typically use it?

3   A.  Out on my patio, outside.

4   Q.  Mr. Davis, did anyone else ever see you using the burner

5   phone?

6   A.  Yes.  Absolutely.

7   Q.  Who?

8   A.  My wife, Terie.

9   Q.  Approximately how many times did Terie see you using the

10  burner phone?

11  A.  Certainly more than once.  A handful of times I would say.

12  Q.  You didn't hide it from her?

13  A.  No, I did not.

14  Q.  And that was years before you started meeting with the

15  government, right?

16  A.  Yes.

17  Q.  Is that during the time that you were actually passing

18  insider information to Mr. Walters?

19  A.  Yes, it was.

20  Q.  When did you throw the burner phone in Turtle Creek?

21  A.  It was after the FBI came to my house and interviewed me.

22  Q.  Now, when you began cooperating with the Department of

23  Justice, you had a number of meetings, right?  You saw the

24  chart.

25  A.  Yes.

H3rdwal5                      Davis - redirect

1   Q.  And Mr. Berke asked you about a number of things that you

2   said during those meetings, right?

3   A.  Yes.

4   Q.  In which meeting did you first mention that Mr. Walters had

5   given you a burner phone to commit insider trading?

6   A.  I'm sorry.  Could you repeat?

7   Q.  In which meeting did you tell the government that

8   Mr. Walters had given you a burner phone to commit insider

9   trading?

10  A.  When I met him at Love Field.  He gave me the burner phone.

11          THE COURT:  No.  Listen to the words of the question.

12          THE WITNESS:  Sorry.  Pardon me.

13          THE COURT:  Vinny, if you will read back the last

14  question.

15          (Question read)

16  A.  The very first time I came in and met with the prosecutors,

17  I disclosed this.

18  Q.  I want to touch briefly on the color of the phone.

19          Fair to say you haven't seen the phone since you threw

20  it in Turtle Creek in 2014?

21  A.  Yes, that's accurate.

22  Q.  You first attempted to describe it when you met with the

23  prosecutors two years later?

24  A.  I'm sorry?

25  Q.  You first attempted to describe it when you met with the

H3rdwal5                    Davis - redirect

1    prosecutors two years later?

2    A.  Yes, I did.

3    Q.  Do you recall that you described the phone as black in your

4    first few meetings with prosecutors?

5    A.  Yes, I did.

6    Q.  And there came a time in those meetings when you told the

7    government that the phone was maroon; do you recall that?

8    A.  Yes, I do.

9    Q.  What, if anything, happened between the meetings with the

10   government that caused you to change your recollection about

11   the color of the phone?

12           MR. BERKE:  Objection, your Honor.

13           May we approach on this?

14           THE COURT:  No.

15           Overruled.

16   A.  I went home after one of the meetings in New York with the

17   prosecutors, and I discussed a lot of the questions that had

18   been asked of me with my wife --

19           MR. BERKE:  Your Honor, I would object again on

20   hearsay grounds.

21           THE COURT:  All right.  OK.  Go ahead.

22           So far he hasn't described any conversation, and I

23   will direct him not to reveal the content of any conversation

24   with your wife.

25           Go ahead.

1    Q.  Mr. Davis, why did you come back and tell the prosecutors

2    that the phone was maroon and not black?

3    A.  Because my wife recalled it as being maroon.  She saw it.

4              MR. BERKE:  Objection.

5              THE COURT:  Yes.  That is stricken.

6              You had a conversation with your wife, right?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Then you went back and you told the

9    prosecutors what?

10             THE WITNESS:  That I had been inaccurate and that the

11   phone was maroon.  It was actually maroon and not black.

12   BY MS. CUCINELLA:

13   Q.  And just to be clear, Mr. Davis, your wife was the other

14   person who had seen you use the phone, right?

15   A.  Yes, she did, on a number of occasions, yes.

16   Q.  Now, Mr. Davis, Mr. Berke, when he started your

17   cross-examination last week, he asked you questions about

18   escort services that you had called; do you recall that?

19   A.  Yes, I do.

20   Q.  And he showed you some phone records; do you recall that?

21   A.  Yes.

22   Q.  To be clear, Mr. Davis, the phone records that Mr. Berke

23   showed you, they refer to your regular cell phone, right,

24   Mr. Davis?

25   A.  Yes, that's accurate.

1   Q.  The one you use every day?

2   A.  Yes.

3   Q.  Not a burner phone?

4   A.  No, not a burner phone.

5   Q.  Mr. Davis, what is the state of your marriage today?

6   A.  My wife has filed for divorce and, umm, I don't think I'm

7   going to be able to reconcile it.

8   Q.  When did she file for divorce?

9   A.  September last year.

10  Q.  Are those divorce proceedings still pending?

11  A.  Yes.

12  Q.  Do you want to get divorced, Mr. Davis?

13  A.  No.

14          MR. BERKE:  Your Honor, I am going to object on

15  relevance grounds.

16          THE COURT:  Yes.  Sustained.

17          The last answer is stricken.  Ladies and gentlemen,

18  disregard it.

19  BY MS. CUCINELLA:

20  Q.  Staying with the burner phone for just another minute.

21          You testified that Mr. Walters told you to use a code

22  when he spoke to you about Dean Foods; do you recall that?

23  A.  Yes.

24  Q.  And what was the code word again?

25  A.  "Dallas Cowboys" to refer to Dean Foods.

1    Q.  Why do you believe Mr. Walters chose that code name?

2            MR. BERKE:  Objection, your Honor.

3            THE COURT:  Sustained.

4    Q.  Mr. Davis, do you have an understanding of why he wanted

5    you to use the Dallas Cowboys to refer to Dean Foods?

6    A.  Yes, I do.

7            MR. BERKE:  I object again, your Honor.  No

8    foundation.

9            THE COURT:  No.  Overruled.

10   Q.  What was that understanding?

11   A.  I think he was trying to conceal the fact that I was giving

12   him inside information, and if our phone conversations were

13   ever recorded, we'd be talking about sports rather than Dean

14   Foods.

15           THE COURT:  All right.  I'm going to strike that

16   answer.  Ladies and gentlemen, disregard it.  It's not based on

17   any conversation that the witness had, and it appears to me to

18   be speculation.

19           Go ahead.  Next question.

20   BY MS. CUCINELLA:

21   Q.  He asked you to use the "Dallas Cowboys," is that right?

22   A.  Yes.

23   Q.  During this time you talked to him about sports a lot,

24   right, Mr. Davis?

25   A.  Yes, I did.

H3rdwal5                        Davis - redirect

1    Q.  You'd also talk about gambling?

2    A.  Yes.

3    Q.  You talked specifically about football?

4    A.  Yes.

5    Q.  When Mr. Berke was questioning you, he asked you about your

6    Netflix password; do you remember that?

7    A.  Yes.

8    Q.  And I think he also asked you about your Amazon password;

9    do you remember that?

10   A.  Yes.

11   Q.  And he showed you Defense Exhibit 5205.

12           MS. CUCINELLA:  Ms. Meister, if we could pull that up

13   just for the witness.

14   Q.  He showed you, to refresh your recollection, contacts from

15   your phone where you had saved your passwords, right,

16   Mr. Davis?

17   A.  Yes.

18   Q.  And what kind of passwords are contained here?

19   A.  I'm sorry?

20   Q.  Do you recall -- withdrawn.

21           This is the same phone that you had handed over to

22   prosecutors during your interviews and meetings with them,

23   right?

24   A.  Yes, it is.

25   Q.  And sitting here today, do you recall what your Netflix

H3rdwal5                    Davis - redirect

1    password is?

2    A.  No, I don't.  I'm sorry.  I do not.  I'd have to look on my

3    phone to dig it out.

4    Q.  OK.  I'll direct you to the first page of Defense Exhibit

5    5205, which is up, and toward the bottom of the page.

6    A.  Yes, I see it.

7    Q.  Does that refresh your recollection --

8    A.  Yes.

9    Q.  -- as to what your Netflix password is?

10   A.  Yes.

11   Q.  What is it?

12   A.  Cowboy01.

13   Q.  And, Mr. Davis, do you recall what your -- one moment --

14   what your CSFB Employee Investment Plan Administration Group

15   password was?

16   A.  No.

17   Q.  If you look at the bottom of this page, does that reflect

18   your recollection as to what your password was?

19   A.  Yes.  I see it.  Yes.

20   Q.  What was it?

21   A.  This is for CSFB Employee Investment Plan?

22   Q.  Yes.

23   A.  Cowboy, capital C, Cowboy01.

24   Q.  Does your Netflix password or your CSFB password have

25   anything to do with the code that you used for Mr. Walters?

H3rdwal5                        Davis - redirect

1   A.  No, none whatsoever, no.

2   Q.  Does it even have anything to do with the Dallas Cowboys?

3   A.  No.

4   Q.  Mr. Berke -- you can take that down.  Thank you, Ms.

5   Meister.

6            Mr. Berke also asked you about the 2011 taxes that

7   were filed on behalf of Shelter Golf; do you recall that?

8   A.  Yes, I do.

9   Q.  And specifically, he asked you a bunch of questions about

10  whether you gave the same information to the two accountants

11  who worked on those taxes.  Do you remember that?

12  A.  Yes, I do.

13  Q.  And the defense put into evidence Defense Exhibit 4057.  Do

14  you remember that document?

15  A.  Yes, I do, actually.

16           MS. CUCINELLA:  And if we can pull that up,

17  Ms. Meister.

18  Q.  And this is the document that was sent to the first

19  accountant, right?

20  A.  Yes.

21  Q.  And if you turn to the page ending in 722, Bates number

22  722.  This is the general ledger, right, Mr. Davis?

23  A.  Yes, it is.

24  Q.  And does it reflect the hundred-thousand-dollar withdrawal

25  by you?

1  A.  Yes, it does.

2  Q.  And does it also reflect when it was paid back?

3  A.  Yes, it does.

4  Q.  And that's the information that he suggested that you had

5  sent to the first accountant but not the second, right?

6  A.  Yes.

7  Q.  Mr. Davis, what was the second accountant's name?

8  A.  Lon Houseman.

9  Q.  And, now, just to be clear, Mr. Davis, you yourself never

10  had a conversation with Mr. Houseman about the hundred thousand

11  dollars, right?

12  A.  No, I didn't.

13  Q.  And Mr. Mozley had already told you about the penalties

14  involved with respect to that transaction, right?

15  A.  Yes.  He said I needed to disclose it.  Yes.

16  Q.  Let's go back to the front page of this document.

17        I'm going to ask you to look at the top right-hand

18  corner.  What does that say?

19  A.  It says, "9/27," which I assume refers to September 27th,

20  "Copies made for Lon."

21  Q.  Whose handwriting is that?

22  A.  That's my assistant, April Moffet.

23  Q.  What did you understand that handwriting to mean?

24  A.  It meant that she had sent exactly the same copies and all

25  of the information to Lon as she had sent to the previous

1    accountant.

2    Q.  And do you know for certain whether your secretary actually

3    sent the same information?

4    A.  I know for certain she did, yes.

5    Q.  Now, Mr. Davis, Mr. Berke asked you a lot of questions

6    about obtaining health insurance for your wife in 2012; do you

7    recall that?

8    A.  Yes.

9    Q.  You testified that you paid money to make it seem like

10   Mrs. Davis was on the payroll of Bucky Lyons' company so that

11   she could get on the company insurance plan, right?

12   A.  Yes.

13   Q.  You knew that was wrong, right, Mr. Davis?

14   A.  Yes.

15   Q.  What were the circumstances that led to needing health

16   insurance for Mrs. Davis?

17          MR. BERKE:  Objection, your Honor.  It not a question

18   of needing health insurance.  It is whether he wanted to pay

19   the balance of the charges.

20          THE COURT:  Yes, sustained.

21   BY MS. CUCINELLA:

22   Q.  Mr. Davis, for how long did you have that arrangement with

23   Mr. Lyons?

24   A.  I don't recall.  I mean, it was a one-time event, as I

25   recall, or I think, as I testified, our human resources person

H3rdwal5                        Davis - redirect

1    asked me to do this one time because of some mix-up on the

2    insurance coverage.  That's my recollection that I was aware

3    of.

4    Q.  Now, Mr. Berke also asked you some questions about the

5    email exchange.  He asked you a question about a couple of

6    email exchanges with regard to a company called Alphatec Spine.

7    Do you recall that?

8    A.  Yes.

9    Q.  And I just want to talk about one of the examples, Defense

10   Exhibit 4883.

11          MS. CUCINELLA:  Could we pull that up, Ms. Meister.

12          (Pause)

13   Q.  Now, this is Buck Lyon, not Bucky Lyon, right, Mr. Davis?

14   A.  Correct.

15   Q.  Buck is the dad?

16   A.  Yes, he is.

17          (Continued on next page)

18

19

20

21

22

23

24

25

H3R3AL6                         Davis - redirect

1    Q.  Buck is the dad?

2    A.  Yes, he is.

3    Q.  You shared office space with Buck Lyon or Bucky Lyon?

4    A.  Both, actually.

5    Q.  For how long did you share office space?

6    A.  From roughly 2001 to about 2012.

7    Q.  In 2012, what was the name of the location where you

8    officed together?

9    A.  In 2012, I think we moved to, we moved from the Crescent

10   office space to another office space, downtown Dallas.

11   Q.  Prior to 2012, you were in the Crescent office suites?

12   A.  I don't recall exactly when the move took place, but yes.

13   Q.  Turning back to this e-mail, take a look at it so you are

14   reminded of the circumstances.  Let me know when you're done.

15   A.  All right.

16   Q.  You told Mr. Berke that there was nothing improper about

17   this, right?

18   A.  Yes, I did.

19   Q.  That's because when you told Mr. Lyon to reach out to Mike

20   Foster, you weren't expecting him to get inside information in

21   Alphatec Spine, right?

22   A.  Right.

23   Q.  Typically if a director talks to someone about a company

24   whose board he's on, do they typically give out inside

25   information?

1    MR. BERKE:  I object to the leading and the question.

2    THE COURT:  I'll sustain as to the form of the

3    question.

4    Q.  Directors of a company have a duty to the company whose

5    board they're on, right?

6    A.  Yes, they do.

7    Q.  What kind of duty is that?

8    A.  It's called a fiduciary duty.

9    Q.  Who does that duty go to?

10   A.  The shareholders of the company, primarily.

11   Q.  What kind of limits does that duty put on what directors

12   can talk about with investors?

13   A.  You can't share any inside information, clearly.  And you

14   shouldn't provide any further information than what has been

15   released by the company.

16   Q.  Those are the typical rules for directors on public

17   companies?

18   A.  Yes.

19   Q.  When you spoke to Mr. Walters, did you follow that rule?

20   A.  No, I did not.

21   Q.  When Mr. Walters asked you for information about Dean

22   Foods, did you give him confidential information about the

23   company so he could trade on it?

24   A.  Yes, I did.

25   Q.  Is that a violation of your duty?

1    A.  Yes, and the law.

2    Q.  Mr. Berke asked you some additional questions today about

3    other communications with Bucky Lyon specifically relating to

4    July of 2012 and whether you were going to sell some stock in

5    Dean Foods.  Do you remember that?

6    A.  Yes.

7    Q.  If we can publish Defense Exhibit 4933 and 4053 side by

8    side.  You can take a minute and refresh yourself on these

9    e-mails.

10           Have you read them, Mr. Davis?

11   A.  Yes, I have.

12   Q.  You reference selling Dean Foods stock after August 8 of

13   2012, right?

14   A.  I'm sorry?

15   Q.  Do they reference selling stock after August 8 of 2012?

16   A.  It makes a reference, yes.

17   Q.  Which was a date known to the public, right?

18   A.  Yes, it would.

19   Q.  Because you specifically reference the earnings

20   announcement that's going to happen on August 8, 2012, right?

21   A.  Yes.

22   Q.  Mr. Davis, are you familiar with the restrictions that you

23   as a director had on selling your Dean Foods stock?

24   A.  Yes, I'm very familiar with it.

25   Q.  Did those restrictions apply around earnings time?

H3R3AL6                          Davis - redirect

1   A.  Yes, they do.

2   Q.  What are those restrictions?

3   A.  Any time a director is deemed to have still, continue to

4   have non-public information that could have an effect on the

5   stock, you're blocked out from trading.

6   Q.  So at the end of July in 2012, you were restricted from

7   selling Dean Foods stock, right?

8   A.  That's correct.

9   Q.  That was regardless of the spinoff, that was because of the

10  earnings on August 8, expected earnings on August 8, right?

11  A.  Yes.

12  Q.  Is that why you wrote that to Bucky Lyon?

13  A.  Yes, I think it had something to do with it.  I was also

14  restricted, as I recall, after August the 7th as well.

15  Q.  Why were you restricted after August 7?

16  A.  I still had non-public information about Dean Foods and I

17  was restricted.

18  Q.  That's because -- what was the non-public information you

19  had after the spinoff announcement on August 7?

20  A.  I still had a lot of information, I had some knowledge

21  about the fact that we were working on Project Cyto which was

22  the sale of Morningstar Foods, which is probably the most

23  important thing that hadn't been disclosed in August.

24  Q.  Well, you also were in possession of information until the

25  final S-1 was filed in October 17, right?

1    MR. BERKE:  Your Honor, again I would object to the

2    leading.  The witness answered the question and it was followed

3    by a leading question.  I'd object.

4    THE COURT:  You're familiar with the text of 611(c) I

5    assume.

6    MR. BERKE:  I am, your Honor.

7    THE COURT:  Okay.  So, leading questions should not be

8    used on direct and ordinarily they may be used on cross.  There

9    is the third area of redirect in which the Court is allowed to

10   give the questioner some latitude, so the objection is

11   overruled.  You may proceed, Ms. Cucinella.

12   A.  Can you repeat the question?

13   Q.  Sure.  When -- did you also have inside information up

14   until the point the final S-1 was filed on October 17?

15   A.  Yes, I did.

16   Q.  You were also shown a couple of e-mails, including one that

17   said that you thought the price of the stock would go up to 20.

18   Do you recall that?

19   A.  Yes.

20   Q.  When Mr. Engles was on the roadshow about the IPO, you had

21   no particular insight into what the price would be for the IPO,

22   right?

23   A.  Not until the end of the roadshow.

24   Q.  What happened at the end of the roadshow?

25   A.  There was an assessment of how much interest there was in

1   buying the stock, and it was way oversubscribed, so it looked

2   like the offering was going to get done, it was going to be

3   priced at or above the range.

4   Q.  But it wasn't until the night before the IPO that it was

5   officially priced, right, Mr. Davis?

6   A.  That's correct.

7   Q.  You were on the pricing committee?

8   A.  Yes, I was.

9   Q.  Who else was on the pricing committee?

10  A.  It was Gregg Engles and John Muse and myself, as I recall.

11  Q.  So, after October 17, until closer to, you weren't in

12  possession -- and closer to the pricing, you weren't in

13  possession of material non-public information, right,

14  Mr. Davis?

15  A.  Yes.

16  Q.  You were free to share where you thought the price of the

17  IPO would go?

18  A.  Yes, I think that's accurate.

19  Q.  You were free to sell your Dean Foods stock after the IPO,

20  right, Mr. Davis?

21  A.  I'm not sure I was, actually.  I'd have to refer to the

22  circumstances, but I still had knowledge about Morningstar, so

23  I'm not sure I was free to sell the stock immediately after the

24  offering.

25  Q.  Fair to say that during the period of August through

1   October of 2012, you didn't sell any of your Dean Foods stock?

2   A.  No, I didn't.  I did not.

3   Q.  Mr. Berke asked you a number of questions about the loans

4   that you had with Mr. Walters.  Do you recall that?

5   A.  Yes.

6   Q.  Just to be clear, with respect to the first loan,

7   Mr. Davis, who did you ask to borrow money from?

8   A.  From Mr. Walters.

9   Q.  Who agreed to loan you that money?

10  A.  A man named Luther James agreed.

11  Q.  When you met with Mr. Walters, did he agree to set up the

12  loan with Mr. James?

13  A.  Yes, he did.  He suggested that.

14  Q.  But it was actually Mr. Walters who agreed?

15  A.  Yes, that's accurate.  I misunderstood your question.

16  Q.  Who did you negotiate that note with?

17  A.  I think I had all those discussions with Mike Luce.

18  Q.  Who does Mike Luce work for?

19  A.  Mr. Walters.

20  Q.  Who ultimately took over that loan?

21  A.  Took over insofar as?

22  Q.  Took over the note for that loan.

23  A.  Mr. Walters did.

24  Q.  Okay.  So on your cross-examination, Mr. Berke went over

25  with you the communication, many of which you described on

1  direct, which you had with Mr. Luce concerning your loans with

2  Mr. Walters.  Right?  He showed you a bunch of e-mails?

3  A.  Yes.

4  Q.  And you testified that you made interest payments to

5  Mr. James for about a year after you borrowed the money from

6  Mr. Walters, right?

7  A.  Yes, that's accurate.

8  Q.  So until the beginning part of 2011, you made interest

9  payments to Mr. James?

10 A.  Yes.

11 Q.  Then I believe you testified that that loan was extended

12 for another year with Mr. James, right?

13 A.  Yes.

14 Q.  But you didn't make any interest payments during that year,

15 right?

16 A.  That's correct.

17 Q.  During 2011, when you were not making any interest payments

18 to Luther James, did the defendant ask you to make interest

19 payments on the loan?

20 A.  No.

21 Q.  Did Mr. Luce ask you to make any payments?

22 A.  No, not that I recall, no.

23 Q.  In 2012, you testified that you had discussions with

24 Mr. Luce about the defendant taking over the loan from

25 Mr. James, right?

1    A.  Yes.

2    Q.  Mr. Davis, to be clear, you spoke to Mr. Luce about a lot

3    of things during this period, right?

4    A.  Yes, that's accurate.

5    Q.  You spoke to him both in person and on the phone?

6    A.  Yes, I did.

7    Q.  When you met in person with Mr. Luce, what, if anything,

8    did he typically ask you to do with your phone?

9            MR. BERKE:  I'm going to object, your Honor.  This is

10   outside the scope of the cross-examination.  We didn't go into

11   any of this.

12           THE COURT:  I'll allow it.

13   Q.  You may answer.

14   A.  He always asked me to turn my phone off.  To power my phone

15   off every time we met.

16   Q.  Turning back to the conversation that you had with Mr. Luce

17   in January of 2012 about Mr. Walters taking over the loan, that

18   was on the phone, right?

19   A.  Yes.

20   Q.  It was because you hadn't been making interest payments,

21   right?

22   A.  Yes, that's accurate.

23   Q.  At that point, you put the loan with the defendant in

24   writing, right?

25   A.  Yes.

1    Q.  But at that time, there was no requirement that you

2    continue making interest payments, right, Mr. Davis?

3    A.  That's also correct.

4    Q.  You didn't have to pay anything for two years until March

5    of 2014, right?

6    A.  That's correct.

7    Q.  And the transfer of this loan was in early 2012?

8    A.  Yes, it was.

9    Q.  So that's shortly after the defendant had just given you

10   another loan for $400,000, right?

11           MR. BERKE:  I will object to the description of it as

12   a loan.  I think the testimony was different.

13           MS. CUCINELLA:  I'll rephrase it, your Honor.

14   Q.  That was right after the defendant had given you a line of

15   credit in November, right, Mr. Davis?

16   A.  That's correct, yes.

17   Q.  And that line of credit, you took almost $350,000 out of it

18   right away, right, Mr. Davis?

19   A.  Yes, I did.

20   Q.  So by early 2012, approximately how much did you owe the

21   defendant?

22   A.  In principal $975,000, plus interest accruing.

23   Q.  I'm going to show you what's been marked as Government

24   Exhibit 1727.  What's the date of this e-mail?

25   A.  June 16, 2014.

1    Q.  In it Mr. Luce says I'll apply that amount to your note.

2    Correct?

3    A.  Yes.

4    Q.  Is this the first e-mail asking you for a payment on the

5    loan, Mr. Davis?

6    A.  Yes, that's my recollection, yes.

7    Q.  From early 2012 until June of 2014, neither Mike Luce nor

8    Billy Walters asked you to actually make a payment on either of

9    your -- either your loan or your line of credit, right,

10   Mr. Davis?

11   A.  That's accurate, yes.

12            MS. CUCINELLA:  Your Honor, the government would like

13   to read a stipulation at this time.

14            THE COURT:  All right.

15            MS. CUCINELLA:  If called to testify, Supervisory

16   Special Agent John Roberts of the Federal Bureau of

17   Investigation would testify to the following:

18            A.  On June 10, 2014, he and another special agent

19   with the FBI formally notified William T. Walters, the

20   defendant, of the existence of the FBI's investigation in this

21   case.

22            The parties have further agreed that this stipulation,

23   which has been marked as Government Exhibit 2104, may be

24   received in evidence.  It's dated March 27, 2017 and signed by

25   the parties.

H3R3AL6                        Davis - redirect

1              THE COURT:  It's marked as what?

2              MS. CUCINELLA:  Government Exhibit 2104.

3              THE COURT:  You're offering it?

4              MS. CUCINELLA:  I am.

5              THE COURT:  Any objection?

6              MR. BERKE:  No objection, your Honor.

7              THE COURT:  Received.

8              (Government's Exhibit 2104 received in evidence)

9    Q.  Mr. Davis, what's the date of this e-mail?

10   A.  June 16, 2014.

11   Q.  So approximately six days after Mr. Walters is notified of

12   the formal investigation, you get an e-mail about payment on a

13   loan?

14             MR. BERKE:  Objection, your Honor.  It's argumentative

15   and it's also contrary to the facts, but this witness has no

16   firsthand knowledge of that.

17             MS. CUCINELLA:  I'll withdraw the question.

18             THE COURT:  All right.

19             MS. CUCINELLA:  I just need one minute.

20   Q.  Now, Mr. Davis, you testified that you didn't review the

21   defendant's trading records when you met with the government in

22   the spring of 2016, right?

23   A.  Yes, that's correct.

24   Q.  Did you review those trading records when you were prepping

25   for your testimony?

1   A.  No, not at all.

2   Q.  So you don't know the specific days on which Mr. Walters

3   bought or sold stock, right?

4   A.  No, I don't.

5        MR. BERKE:  Objection, your Honor.  I think the

6   testimony was his lawyers had it, he discussed it with his

7   lawyers, and over the government's objection we were not

8   allowed to inquire about their discussions of the trading

9   records with Mr. Walters that he had with his lawyers.  I don't

10  think this is proper in light of the government's objection

11  that we couldn't question him about the discussions with his

12  lawyers about trading records.

13        THE COURT:  Overruled.

14  Q.  So you don't know the specific days that Mr. Walters bought

15  and sold stock, right, Mr. Davis?

16  A.  No, I don't.

17  Q.  And during the period where you were passing him

18  information, he didn't always tell you what he was doing,

19  right, Mr. Davis?

20  A.  He didn't tell me what he was doing, rarely.

21  Q.  You testified that you were passing him the information to

22  make trading decisions though, correct?

23  A.  Yes.

24  Q.  And that was the case with respect to the information you

25  sent him on Darden, too, right?

1  A.  Yes, it was.

2  Q.  Because at that point, you had been passing Mr. Walters

3  information on Dean Foods for years, correct?

4  A.  That's accurate, yes.

5  Q.  You expected him to do the same thing with the confidential

6  information you were passing him on Darden?

7  A.  Yes.

8  Q.  During the summer of 2013, when you passed him that

9  information on Darden, did he ever tell you what he had done

10  with the information?

11  A.  No, not at all.

12  Q.  With respect to Dean Foods, if he didn't tell you when he

13  bought or sold stock, why did you believe that the defendant

14  owned Dean Foods stock?

15  A.  At certain points in time, he was very demanding about the

16  information he wanted.  So I assumed he had a position in the

17  stock.

18  Q.  Did he ever make statements about how big his positions

19  were?

20  A.  Yes, on a couple of occasions I recall he did, yes.

21  Q.  Do you recall when those specific conversations took place?

22  A.  I don't.  I do not recall that, no.

23  Q.  While you were passing the information to Mr. Walters, did

24  he ever tell you how much he was making based on the

25  information that you were tipping him?

1    A.   No.   He did not.

2    Q.   When the FBI showed up at your house in May of 2014, was

3    that the first time that you learned that Mr. Walters had made

4    millions of dollars trading in Dean Foods stock?

5    A.   Yes, it is.

6    Q.   Did a time come, Mr. Davis, when you learned that

7    Mr. Walters had made more than 40 million by trading based on

8    information you provided him?

9    A.   Yes.

10   Q.   When did you learn that?

11   A.   I guess when it was reported in the papers.   The FBI gave

12   me some information about certain of his trades during the

13   course of 2012.   But I didn't know the full extent of his

14   trading activity until it was reported later.

15   Q.   Mr. Berke asked you a number of questions about your

16   meetings with the government and the process used to refresh

17   your recollections.   You've testified that you were shown board

18   meeting minutes and travel records, certain phone calls.

19   Right, Mr. Davis?

20   A.   Yes.

21   Q.   And you were also shown things like the bill from Preston

22   Trail on the morning of May 8?

23   A.   Yes, I was.

24   Q.   You were also asked questions like whether or not you had

25   ever spoken to Mr. Walters when he was in Mexico, right?

1    A.  Yes.

2    Q.  Is it fair to say, Mr. Davis, sometimes things refreshed

3    your recollection and sometimes they didn't?

4    A.  Yes, that's totally accurate.

5    Q.  Mr. Berke this morning spent some time trying to show that

6    you may have gotten a fact wrong or that you thought stock

7    would go up when it in fact went down.  Do you remember that?

8    A.  Yes.

9    Q.  What you've testified to over the last few days, Mr. Davis,

10   those are your memories, right?

11   A.  Yes.

12   Q.  Did the prosecutors ever tell you to change your memory?

13   A.  Never.

14   Q.  Were you ever shown Mr. Walters' trading and asked to match

15   up your memory with that trading?

16   A.  No, never.

17   Q.  He asked you a lot of questions about meetings that you had

18   with the government before your cooperation agreement and after

19   your cooperation agreement.  Right?

20   A.  Yes.

21   Q.  In the meetings after your cooperation agreement, they were

22   to prepare for testimony, right?

23   A.  Yes, I think that's accurate, yes.

24   Q.  And the meetings before you signed your cooperation

25   agreement, do you recall whether the prosecutors jumped around

1   to different periods of time?  I think Mr. Berke alluded to

2   that this morning.

3   A.  Yes, I think that's a fair summary of it, yes.

4   Q.  When you were preparing for testimony, did you discuss it

5   chronologically?

6   A.  Sometimes, yes.

7   Q.  When you discussed it chronologically, was it easier for

8   you to put things in the order that you recall them happening?

9   A.  Yes, much easier.  Yes, that's accurate.

10  Q.  You met with the government a lot before your cooperation

11  agreement and after your cooperation agreement, right,

12  Mr. Davis?

13  A.  Yes, ma'am.

14  Q.  Can you remember precisely when you told them what?

15  A.  No, I don't.

16  Q.  Is your testimony here today based on what you told the

17  government in 2016 or is it based on your memory?

18  A.  It's based on my memory.

19  Q.  That's based on what you remember sitting here today,

20  right, Mr. Davis?

21  A.  Yes, ma'am, it is.

22  Q.  Mr. Berke showed you a number of documents that were notes

23  from meetings that you had with the government, right?

24  A.  Yes.

25  Q.  Have you ever seen any of those notes before?

H3R3AL6                          Davis - redirect

1   A.  Not before this trial started, no.

2   Q.  The government never showed you those before, right?

3   A.  No.

4   Q.  Mr. Berke asked you about March of 2008 earlier today, do

5   you recall that?

6   A.  Yes.

7   Q.  You were shown Defense Exhibit 283-A.  Do you remember

8   that?

9   A.  I don't know which exhibit that was.

10          MS. CUCINELLA:  Ms. Meister, can we pull up 283-A.

11  Specifically turn to page four.  Is there a way to flip it?

12  Q.  This is the page he showed you flipped on its side.

13  A.  Yes.

14  Q.  Mr. Berke asked you how it was possible that you or

15  Mr. Engles could possibly know that the quarter was going to be

16  a good one by mid-March.  Do you recall that?

17          MR. BERKE:  Objection, your Honor.  That question was

18  never asked.

19          THE COURT:  Rephrase it.

20  Q.  Do you remember that Mr. Berke asked you some questions

21  about what either you or Mr. Engles knew by mid-March?

22  A.  Yes.

23  Q.  Looking at page four, to the extent you can see it, March

24  was a big month for the company, right, Mr. Davis?

25  A.  Yes.

1   Q.  You would agree with me, wouldn't you, that the CEO would

2   have access to projections and forecasts of how this quarter

3   was doing by the middle of March, right, Mr. Davis?

4   A.  Yes, that's accurate.

5              MR. BERKE:  Objection, your Honor.  The witness's

6   testimony is that it was the financials for January and

7   February.

8              THE COURT:  Overruled.

9              The jury was here.  The jury remembers the testimony.

10  When you're deliberating if you want any testimony read back or

11  brought back in, you can have that back.  Go ahead.  Next

12  question.

13  Q.  Along with financials for January and February, Mr. Davis,

14  would you agree with me that the CEO would have projections for

15  the rest of the quarter by mid-March?

16  A.  Yes, he would.

17  Q.  By the last week of March, the audit committee would also

18  know how the month was shaping up, right?

19  A.  Yes, that's accurate.

20  Q.  You were asked some questions, Mr. Davis, about meeting

21  with Billy Walters on April 9 of 2010 at Bali Hai.  Do you

22  recall that?

23  A.  Yes, I do.

24  Q.  That was the meeting when you asked the defendant to give

25  you a loan?

1   A.  Yes, the first loan, yes.

2   Q.  And he agreed to give you the loan in that meeting?

3   A.  Yes, he did.

4   Q.  You discussed Dean Foods at that meeting, too?

5   A.  Yes, I did.

6   Q.  Did you discuss the possibility of the spinoff of WhiteWave

7   with the defendant at that meeting?

8   A.  Yes, I did.

9   Q.  Was the defendant interested in the possibility of a

10  WhiteWave spinoff?

11  A.  I would characterize it as very interested, yes.

12  Q.  What effect did you think a spinoff of WhiteWave would have

13  on the stock price of Dean Foods?

14  A.  I think -- I believed it was going to have a large effect

15  on the stock price.

16  Q.  At that point, in April 2010, serious consideration of a

17  potential spinoff, that was a relatively new development at the

18  company.  Is that fair?

19  A.  Yes.

20  Q.  Had the company asked investment bankers to evaluate this

21  possibility for the first time?

22  A.  Yes.  That happened, yes.

23  Q.  Was that known to the public at this time?

24  A.  No, it was not.

25  Q.  The defendant was interested in that possibility, right?

1   A.  Yes, I told him we hired bankers, yes.

2   Q.  Did you discuss the possibility of the spinoff, good or

3   bad, likely to happen, unlikely to happen, with him over the

4   next couple of years?

5   A.  Yes, many times.

6   Q.  Was it something he asked about?

7   A.  Yes, repeatedly.

8   Q.  Did you regularly give him updates on the possibility of a

9   spinoff?

10  A.  Yes, I did.

11  Q.  I'm going to direct your attention now to May 8 of 2012.

12  Jumping two years ahead.  You testified on direct and on cross

13  about the fact that the board approved the company to pursue

14  the spinoff at the May 8 board meeting, right?

15  A.  Yes.

16  Q.  That was the board meeting where you took the call from

17  Preston Trail Golf Club, correct?

18  A.  Yes, it was.

19  Q.  And there was also a Dean Foods audit committee call that

20  day, wasn't there?

21  A.  Yes, that's true.

22  Q.  That was in the morning, the same morning, and immediately

23  followed by the board meeting for Dean Foods, right?

24  A.  That's correct, yes.

25  Q.  During that audit committee call, you learned that the

1    company was going to beat expectations for the first quarter,

2    right?

3    A.  Yes, I did.

4    Q.  That announcement was going to be the following day, right,

5    Mr. Davis?

6    A.  I think the announcement was going to be the following day,

7    yes, that's accurate.

8    Q.  Shortly after that Dean Foods board call, you were playing

9    golf that afternoon, right, Mr. Davis?

10   A.  Yes.

11   Q.  Your round would finish after the market closed, right?

12   A.  Yes, that's accurate.

13   Q.  You had a Periscope board meeting that morning as well,

14   right?

15   A.  Yes, I did.

16   Q.  You were shown some e-mails on your cross-examination with

17   Mike Luce about Periscope, right?

18   A.  Yes.

19   Q.  Generally, you updated Mike Luce about Periscope, not Billy

20   Walters, right, Mr. Davis?

21   A.  Could you repeat the question?

22   Q.  Generally, you updated Mike Luce about Periscope, not Billy

23   Walters, right?

24   A.  I think that's an accurate characterization, yes.

25   Q.  Do you recall whether there was anything urgent that you

1    learned in that Periscope board meeting?

2    A.  No.  There wasn't anything urgent, no.

3    Q.  Now, Mr. Berke has suggested through his questioning that

4    you created this whole story about Mr. Walters because you

5    didn't want to be arrested for misappropriating funds from

6    Shelter Golf.

7             MR. BERKE:  Objection, your Honor, to the

8    characterization.

9             THE COURT:  Rephrase the question.

10   Q.  Mr. Davis, have you created this whole story about insider

11   trading because you didn't want to be arrested for

12   misappropriating funds from Shelter Golf?

13   A.  No, I have not.  I'm telling the truth.

14   Q.  When the FBI came to your home in May of 2014, what did

15   they ask you about?

16   A.  They only asked me about Mr. Walters and my relationship

17   and insider trading activity that was mentioned in the

18   interview.  They mentioned nothing else.

19   Q.  When you were deposed by the SEC, what was the focus of

20   that deposition?

21   A.  The focus was about insider trading activity between me and

22   Mr. Walters.

23   Q.  Mr. Berke asked you questions about the conversation you

24   had with your ex-wife Louise Davis when you drove her to the

25   cemetery.  Do you recall that?

1    A.  Yes, I do.

2    Q.  You asked her during that conversation whether she was

3    wearing a wire.  Do you recall that?

4    A.  Yes, I did that.

5    Q.  Were you worried that she was wearing a wire to catch you

6    talking about taking money from Shelter Golf?

7    A.  No.  Not at all.

8    Q.  What crimes had you committed that you were worried about?

9    A.  I was primarily worried about all the insider trading

10   activity that I had undertaken and that was -- that was my

11   focus.

12   Q.  When you met with your lawyers to discuss potentially

13   coming in and cooperating with the government, was Shelter Golf

14   on your mind?

15   A.  No.

16   Q.  At the point that you started cooperating, before you met

17   with the government, had you paid back the $100,000 that you

18   had taken from Shelter Golf?

19   A.  Yes, I had.

20   Q.  So at that point there was 20 or $25,000 that you hadn't

21   paid back, right, Mr. Davis?

22   A.  Yes.

23            MR. BERKE:  Objection, your Honor.

24            THE COURT:  Overruled.

25   Q.  Were you worried about going to jail for that 20 or

1    $25,000?

2    A.  No, I was worried about the insider trading charges,

3    primarily.

4    Q.  Mr. Berke asked you about questions about the penalties for

5    tax fraud and misappropriating funds for the charity.  Do you

6    recall that?

7    A.  Yes.

8    Q.  He pointed out that it was up to five years for tax fraud.

9    Do you recall that?

10   A.  Yes.

11   Q.  And potentially 20 for wire fraud, right, Mr. Davis?

12   A.  Yes.

13           MS. CUCINELLA:  Ms. Meister, if you can pull up

14   Government Exhibit 1750, which is your cooperation agreement,

15   Mr. Davis.  If you can put page one and two side by side.

16   Q.  Mr. Davis, you've pled guilty to the multiple counts of

17   wire fraud, haven't you?

18   A.  Yes.

19   Q.  Count Seven through 10?

20   A.  Yes.

21   Q.  How many counts of securities fraud have you pled guilty

22   to?

23   A.  I think it's three -- I'm sorry, three counts, Three

24   through Six.

25   Q.  You also pled guilty to obstruction of justice, right,

H3R3AL6                        Davis - redirect

1    Mr. Davis?

2    A.  Yes, I did.

3    Q.  What was that for?

4    A.  Destroying evidence, the bat phone, and lying to the FBI.

5    Q.  Separate count for lying to the FBI and destroying the

6    burner phone, right, Mr. Davis?

7    A.  Yes, that's accurate, yes.

8    Q.  You also pled guilty to perjury for lying to the SEC,

9    right?

10   A.  Yes, ma'am.

11   Q.  Sitting here today, what is the maximum penalty you face

12   for committing insider trading and then working for years to

13   cover it up?

14   A.  I could be subject to 210 years in prison.

15   Q.  You're aware that your sentence will be based in part on

16   how much money the defendant made as part of this conspiracy,

17   right, Mr. Davis?

18   A.  Yes.

19   Q.  How does that amount of money compare to the $150,000 that

20   you misappropriated and paid back to Shelter Golf?

21   A.  It's not even on the same level, in my opinion.

22   Q.  Mr. Davis, has anyone made a promise to you about what

23   sentence you would get in this case?

24   A.  No.

25   Q.  What have you been promised?

1    A.  Just the items that are outlined in my cooperation

2    agreement.

3    Q.  What is that, Mr. Davis?

4         You can take that down.

5    A.  I'm getting protection with regard to certain things

6    pertaining to Shelter Golf and the tax returns related to

7    Shelter Golf.

8    Q.  If you abide by the terms of your cooperation agreement,

9    what will you get from the government, what is the government

10   obligated to provide to you?

11   A.  They're going to provide me a letter that goes to the

12   judge.

13   Q.  What will the judge be made aware of through that letter?

14   A.  I'm told he will be fully briefed in that letter of all the

15   good things and all the bad things I've done.

16   Q.  That includes the insider trading and your efforts to cover

17   it up?

18   A.  Yes.

19   Q.  It includes the money you took from Shelter Golf?

20   A.  Yes.

21   Q.  Does it include gambling you've done?

22   A.  Yes.

23   Q.  Any other bad acts that you've committed, includes that,

24   right?

25   A.  Yes, that's what I'm told, yes.

1    Q.   Everything, right?

2    A.   Yes, ma'am.

3    Q.   And that judge will be able to review all of your testimony

4    from this trial, right, Mr. Davis?

5    A.   Yes.

6    Q.   Now, Mr. Davis, Mr. Berke asked you a series of questions

7    about how you recalled additional details as you met with the

8    government and as you reviewed documents.  Do you recall that?

9    A.   Yes.

10   Q.   In which meeting did you tell the government that

11   Mr. Walters had provided you with a burner phone?

12   A.   The very first meeting I had with the government.

13   Q.   In which meeting did you tell the prosecutors that you had

14   thrown the burner phone in Turtle Creek?

15   A.   The first meeting.

16   Q.   In which meeting did you tell them that you had been

17   providing the defendant with inside information about Dean

18   Foods for years?

19   A.   The very first meeting.

20   Q.   In which meeting did you tell them that you had called to

21   warn Mr. Walters about Dean Foods' bad earnings in May of 2010?

22   A.   The very first meeting I told that.

23   Q.   In which meeting did you describe to the prosecutors the

24   specific and detailed information that you gave Mr. Walters

25   during the summer of 2012 about the spinoff?

H3R3AL6                          Davis - redirect

1    A.   The very first meeting.

2    Q.   In which meeting did you tell the prosecutors that you had

3    lied to the FBI and the SEC to attempt to cover up the insider

4    trading that you committed with the defendant?

5    A.   The very first meeting.

6    Q.   Mr. Davis, I'm about to sit down.  But, before I do, I want

7    to ask you about some of the consequences of your cooperation.

8            THE COURT:  I'll tell you what.  We'll take that up

9    tomorrow morning.  There's an important matter that has to be

10   attended to.

11           I had a brain lapse.  I didn't realize it was the

12   Huskies women playing tonight against Oregon.  And I do enjoy

13   the Lady Huskies, I really do, and I am going to be rooting for

14   them.  I really will.  They have amassed one of the most

15   amazing profiles in college sports, and perhaps all of sports.

16   So, I hope you're in for a real treat tonight, and I want to

17   make sure that you get there on time without any stress.  So

18   let's call it, let's not press our luck, and let's call it a

19   day.

20           See you tomorrow morning for a 10 o'clock start.  And

21   I expect that you'll be here on time.  All right.  Good.

22   Enjoy.

23           (Jury excused)

24           (Continued on next page)

25

H3R3AL6

1           THE COURT:  Have a pleasant evening.

2           MR. GOLDMAN:  One thing.

3           MS. CUCINELLA:  Two things, if the witness can --

4           THE COURT:  Mr. Davis, if you can step down.

5           (Witness not present)

6           MS. CUCINELLA:  We would be willing, we only had a few

7    more questions, if there is any way to get the witness home

8    tonight, we would be willing to forgo the remainder of our

9    questions.

10          MR. BERKE:  Your Honor, I had a very brief recross on

11   an issue that I think the testimony was false again, and I

12   would probably do it in about three minutes.

13          If I can have one moment, I may have a proposal.

14          THE COURT:  Yes.

15          MR. BERKE:  Your Honor, I think if I would be

16   permitted as part of a recross to just publish two documents

17   that are in evidence already on an issue that was raised.

18          THE COURT:  You talk to Ms. Cucinella right now.  I'm

19   okay.  You two can talk.  And if you come to an accommodation,

20   you do.  If you don't, you don't.

21          (Pause)

22          THE COURT:  I just point out for the record the jury

23   has been told that there are more questions.  They believe they

24   broke early and that there is going to be further questioning.

25   I'm not going to stand in the way if the parties want to have

1    some sort of a stipulation.  That's certainly not something

2    that I as the trial judge would reject.  I know what the jury

3    went home tonight with an understanding of.

4              MR. BERKE:  Your Honor, if I can just have one moment.

5              THE COURT:  Yes.

6              MR. BERKE:  Your Honor, thank you for your patience.

7    I think I've been overruled and I think we would ask that

8    Mr. Davis be brought back to complete his testimony.

9              THE COURT:  All right.

10             MS. CUCINELLA:  Okay.

11             THE COURT:  It goes with the territory.

12             MR. FERRARA:  There was one other issue we wanted to

13   tee up.  This will come up with a witness we believe tomorrow.

14             THE COURT:  Yes.

15             MR. FERRARA:  It is the issue of whether the defense

16   has opened the door to some evidence of trading in other

17   stocks.  I wanted to clarify one thing as we thought more about

18   it.

19             What we would be seeking to offer on this is

20   essentially we would have a witness, Mr. Walters' former

21   stockbroker would testify in probably under 15 minutes about

22   Mr. Walters buying stock in Clorox on a certain date in July

23   and an announcement by Carl Icahn a few days later and

24   Mr. Walters selling a few days after that.

25             THE COURT:  Here's the question.  So far, I'm not --

H3R3AL6

1    I've been doing this job long enough that I don't get bowled

2    over by threats of if you open this door, this trial will go on

3    for months or years.  I've heard this too many times over my

4    career.  I don't worry about that.

5              The point that I found of interest to me is in

6    specifically with regard to Clorox, whether or not trading on

7    knowledge that Mr. Icahn had taken a position in Clorox is

8    unlawful, material non-public information that he had taken a

9    position in Clorox.  It may be, but it's not self-evident to me

10   and it is a point that's raised in the defense's letter.

11             Is he an insider?  Is it a question that maybe one who

12   trades in tandem with Mr. Icahn maybe has to file a 13D or a

13   13G.  But I don't know whether the trading itself, as it's

14   described in the letter, is unlawful.

15             Is it?

16             MR. FERRARA:  The theory there, your Honor, is

17   Mr. Icahn has his own shareholders in his own company and has a

18   fiduciary duty to them, and is an insider as to his own company

19   and what it does.  To the extent he has passed information

20   about what his company plans to do beforehand, that yes, that

21   can be unlawful trading.  We of course would accept a limiting

22   instruction here, of course.

23             And I just wanted to flag one other thing that makes

24   this sort of more relevant --

25             THE COURT:  This description talks about Mr. Icahn

making the purchases if it was a publicly traded entity which

he presides over, as distinguished from for his personal

account.  That might be a different story.  I didn't get that

from the correspondence.

MR. FERRARA:  Fair enough, your Honor.  I think that's

how the evidence would come in, yes.  And we would have for

instance, I think that was part of the public announcement

surrounding the bid.

I just wanted to flag two other things here.  Number

one is to make this relevant too.  This trading is the reason

why Wells Fargo ends up closing Mr. Walters' account.  And

there will be testimony that this witness Scott Duncan was

asked by the FBI why the account was closed and was evasive

when he answered that.  That would be an appropriate line of

cross-examination.  And he essentially was not forthcoming with

the FBI that he knew the reason was because of the Clorox

trade, and he tried to evade that question.  I plan to ask him

about that.  That's the sort of impeachment that Mr. Berke of

course could inquire about.

So there's some other parts of the story that go back

to this Clorox trading that also make it relevant.

THE COURT:  Well, help me out here of what is the jury

supposed to draw from the fact that Wells Fargo closed the

account?  That the trading in the account was unlawful?  Is

that the inference?

1          MR. FERRARA:  We would not ask the jury to draw the

2     inference that because Wells Fargo closed the account the

3     trading was unlawful.  The argument we would suggest to the

4     jury is to the extent -- the defense is saying, look at all of

5     Mr. Walters' trading, this was insignificant.  He traded the

6     same way in all of these different stocks, he had a large

7     portfolio, he saw tells, he had -- he went all in, etc., etc.

8     We would like the jury to know, well, sometimes getting this

9     sort of edge is not necessarily -- he's done it in other stocks

10    as well.

11         So it's unfair to compare his trading -- it's unfair

12    to say all this other trading is innocent, and if you look at

13    it in context, there is all smoke.

14         We'd like to say, well, there is some other suspicious

15    trading as well, so that's not a fair comparison.

16         THE COURT:  What's your argument on the threshold

17    that, as I read the defendant's correspondence, they take the

18    position that they have not and will not argue that

19    Mr. Walters' course of trading in securities, other than Dean

20    Foods, demonstrates that he complies with the securities laws

21    and has never done anything like this in any other context.

22    They say they haven't and they say they won't.

23         Am I correct, Mr. Schoeman?

24         MR. SCHOEMAN:  Yes, your Honor.  And we don't intend

25    to elicit any evidence, and we don't think anything has been

H3R3AL6

1   said for which anything Mr. Ferrara is talking about is at all

2   a fair response.

3          THE COURT:  You don't intend to argue that to the

4   jury?

5          MR. SCHOEMAN:  Right.  The only thing we wanted to do

6   is to elicit from brokers that Mr. Walters trades in -- trades

7   in stocks and makes big purchases in sales, but that can be

8   established entirely independently of any trading in Clorox or

9   Apple.

10          THE COURT:  You'll carve that out.  I figured that

11   much out.  That's not the concern.

12          MR. SCHOEMAN:  We don't intend to make the argument

13   that the specific, you know, modus operandi, the purchase of a

14   stock right before an announcement is something that

15   Mr. Walters does.  We just want -- and I think it would come

16   out naturally from the brokers, that they were brokers with

17   Mr. Walters for many years and he takes big positions and he

18   buys and sells a lot of stock.

19          We're not going to come close to what I think would be

20   suggesting that every single trade he's ever done is free of

21   suspicion.

22          But, again, what we're talking about here is 404(b)

23   evidence where the government has the added burden of showing

24   that the probative value is greater than the undue prejudice,

25   and the fact that they can identify a trade here or there that

1      they suspect might have been based on something --

2                THE COURT:  But we're mushing concepts together.

3      Mushing concepts together and there are a lot of moving parts

4      here.  It's not your fault.  Not anybody's fault.

5                But, the threshold of whether the door is being

6      opened, it seems to me that when the defendant seeks to

7      introduce evidence of trading in other securities to show that

8      Mr. Walters, as is his right, takes large positions routinely

9      in different securities, that seems to me to be the door opener

10     to saying, yeah, but -- at least their assertion is, maybe they

11     fall flat on their face on this -- their assertion is but in

12     these two instances, it was on material non-public information.

13               MR. SCHOEMAN:  So I guess we have two points.  One is

14     I think that because it's a standalone true fact put without

15     Clorox and Apple, that it doesn't open the door.

16               I understand your Honor's argument, but I think our

17     other argument, which is very important to us, is other than

18     the government saying that they find these trading trades

19     suspicious, nobody has ever actually charged anybody regarding

20     those trades, or articulated a basis to say that Mr. Icahn

21     breached a duty or got a benefit or that Mr. Walters knew there

22     was a breach of duty or got a benefit.

23               THE COURT:  That's the point that I got hung up on.

24     But I think on the door opening, I think the government has the

25     better of that argument.  But let me hear from Mr. Ferrara

1    on -- and I still don't even know what the -- explain to me

2    your theory on Apple.

3         MR. FERRARA:  Your Honor, in fact one of the things we

4    were going to say is we are not going to introduce Apple.  We

5    wanted to slim it down in light of defense counsel's letter, so

6    we are slimming it down to Clorox.

7         And I do want to flag, your Honor, that 404(b) has

8    been interpreted as other act evidence.  It's not necessarily a

9    bad act.  It is other act evidence.  So, we don't have to

10   establish it was unlawful.  We have to establish it goes to one

11   of the permissible reasons to introduce evidence under that

12   rule.

13        THE COURT:  No.  I'm not going to quarrel with you on

14   that aspect of 404(b).  But, if it's a big fat lawful activity

15   that is being developed by the government to kind of create the

16   impression in the jury's mind that it's unlawful, that's

17   something that has its probative value outweighed by the danger

18   of jury confusion and unfair prejudice.

19        MR. FERRARA:  Let me put a finer point on it.  For

20   instance, in opening Mr. Berke said that Mr. Walters invested

21   in close to 100 different companies.  I'm quoting.  And he

22   would do -- and what he would do with these companies is he

23   would invest in them over a period of time, often looking for

24   the moment when there would be action involving those

25   companies, earnings announcements or other significant events

H3R3AL6

1    where he would either win or lose, and you would make that bet.

2           What that leaves out is Mr. Walters also traded at

3    least in one other instance when the circumstances suggest an

4    insider gave him information.  Someone associated with the

5    company.

6           THE COURT:  Okay, so listen.  You're somewhat ahead of

7    the game on door opening and you're somewhat okay on 404(b),

8    that it doesn't have to be an affirmatively bad act.

9           But, tell me what you have here, because it not being

10   a bad act but implying it's a bad act is what 403 is about.  So

11   what do you have here, what are you going to show that is more

12   than just smoke that would confuse a jury into believing that a

13   crime was committed here?

14          MR. FERRARA:  I'm happy to.  First, we have in

15   evidence already, Mr. Davis has suggested that -- has testified

16   that Mr. Walters and Mr. Icahn knew one another.  He was --

17   Mr. Davis described it as -- said Mr. Walters would call him

18   "my friend in New York."  So that is now in the record.

19          We will have the Mr. Walters's broker, that's Scott

20   Duncan.  Mr. Duncan I expect will testify that Mr. Walters and

21   he often discussed -- Mr. Icahn's name came up at times because

22   Mr. Walters did invest in some of Mr. Icahn's stocks.  He

23   will -- Mr. Duncan will then walk us through two account -- two

24   account statements, one for each of Mr. Walters' accounts at

25   that time at Wells Fargo.  He will show us that on July -- and

H3R3AL6

1    I'm going to miss the date, but July something, Mr. Walters

2    bought such-and-such shares of Clorox Company in each of his

3    accounts.  That really two or three days later, Mr. Icahn

4    announced this bid for Clorox or an interest in a bid for

5    Clorox.  That he will describe a conversation he had with

6    Mr. Walters about that, and that one or two days later

7    Mr. Walters sold Clorox.

8           Mr. Duncan will then testify that based on that trade,

9    Wells Fargo made the decision to close the account.  That

10   Mr. Walters was not informed that that was the reason.  And he

11   will then testify that a couple years later, when he was

12   approached by the FBI, he was evasive when answering the

13   question why was the account closed, because he had been told

14   not to discuss the reasons by Wells Fargo.

15          And I missed one important thing.  I want to be

16   complete.  There are phone calls between Icahn and Walters that

17   will come in through a summary witness toward the end of the

18   trial that show phone calls between the two men around the time

19   of those trades.

20          THE COURT:  All right.  Now, the bid that was

21   announced by Icahn, Carl Icahn, was by his publicly traded

22   corporation?

23          MR. FERRARA:  Yes, that's right, your Honor.  And the

24   only reason I'm hesitating is because to the extent that -- I

25   just don't -- I want to say that's in a news article that we

H3R3AL6

1    would offer as the evidence of the announcement.  But standing

2    here today, your Honor, I honestly can't say I remember that.

3    So I'm not 100 percent positive that evidence comes in.  But I

4    believe it is in the news article.

5              Mr. Duncan, for instance, does not know that, so I

6    don't want to represent that would be his testimony.

7              Oh, there is an SEC filing, your Honor.  My colleagues

8    are reminding me there was an SEC filing that says as much.

9              THE COURT:  Says that it is Mr. Icahn?

10             MR. FERRARA:  Enterprises I believe.

11             THE COURT:  Which is a publicly traded company of

12   which he is a board member?  Is that --

13             MR. FERRARA:  That's a little farther --

14             THE COURT:  Listen, you got to get to the point that

15   this is more than what somebody at the SEC thinks is a sharp

16   practice versus something that, at least on its face, suggests

17   that a crime was committed.  Not because 404(b) requires that

18   it be a bad act, but if it's not a bad act, and it's one big

19   pile of smoke, I'm not letting it in.  That's why.  Because

20   it's a 403 problem now, if it's just smoke.

21             MR. FERRARA:  Understood and I apologize I wasn't

22   ready to answer those questions from the Court.  But certainly

23   we can educate ourselves on that and make a proffer as to what

24   we think the evidence would show on that point.

25             THE COURT:  All right.  Mr. Schoeman, let me give you

H3R3AL6

1    a chance to knock this all down and blow it away.

2              MR. SCHOEMAN:  Thank you, your Honor.

3              The first one to knock down, I understood Mr. Ferrara

4    to be saying they want to introduce the fact that the account

5    was closed because somebody may have told Mr. Duncan that it

6    was because of the Clorox trade, although he denies it, but

7    that no one said that to Mr. Walters.  So all you have here is

8    that somewhere somebody up the chain had an idea that something

9    was suspicious and maybe it was told to Mr. Duncan, but it

10   never went to Mr. Walters, and therefore is not relevant to

11   anything that somewhere along the train in a hearsay chain

12   somebody voiced a suspicion.  I understand if it had been

13   expressed to Mr. Walters and they could show that was relevant

14   to something, maybe they would be in business.  But it was not

15   explained to Mr. Walters, and therefore that fact has no

16   relevance.

17             And it's ridiculous to call a witness to have him say

18   he doesn't remember telling Mr. Walters, and then get in a bad

19   act by impeaching your witness with something that the

20   defendant didn't know.  That's the first one I want to knock

21   down.

22             The second one, for the first time in my life I wish I

23   was a securities lawyer.  But I'm not.  But here's what I

24   understand.  Mr. Icahn was not an insider of Clorox.  And so --

25             THE COURT:  Understood.

H3R3AL6

1          MR. SCHOEMAN:  -- the government has now abandoned the

2     idea that there was anything -- and there has been many

3     theories floated over the years that maybe he was making a

4     tender offer, which he wasn't doing, but maybe it is something

5     else.

6          They have now abandoned the idea that it was something

7     owed to Clorox.  What they're now saying, without any support,

8     that maybe this was a misappropriation of Mr. Icahn of

9     information belonging to his company.  But they're completely

10    unable to suggest that Mr. Walters, in talking to Mr. Icahn, if

11    Mr. Icahn had said, "Hey, I'm buying Clorox," that Mr. Walters

12    would say "Ah-ha.  Carl Icahn is misappropriating information

13    from Icahn Enterprises and giving me a tip, even though

14    Mr. Icahn is not an insider at Clorox."

15         And just to round the whole thing out, two more

16    points, which is Mr. Walters is a friend of Carl Icahn's.

17         THE COURT:  Say that again?

18         MR. SCHOEMAN:  Mr. Walters is a friend of Carl

19    Icahn's.  They talk to each other all the time and Mr. Walters

20    has a long history of investing in stocks that Mr. Icahn has

21    publicly announced he's interested in.  So to put what

22    Mr. Ferrara wants to do in context would open the door to a

23    whole other thing.

24         And finally, your Honor, I don't believe the

25    government has turned over any of the tens of thousands of

H3R3AL6

1    pages that they and the SEC amassed in trying to investigate

2    this that we would need to have in order to have a fair

3    opportunity to rebut this allegation.

4           THE COURT:  Anything you want to say, Mr. Ferrara?

5           MR. FERRARA:  Your Honor, I think the whole chain

6    comes in.  The Wells Fargo closure is not, we believe is not

7    hearsay because it goes to the fact of the closing of the

8    account.  But even if that comes out of the story, your

9    Honor --

10          THE COURT:  The fact of the closing of the account is

11   one thing.  Testimony about the reasons for the closing of the

12   account is a different thing.  And that has a hearsay quality

13   to it that someone in the chain of command at Wells Fargo made

14   some kind of a determination that something bad had happened

15   here.  I don't see where that has probative value, so as far as

16   I'm concerned, that's out.  As well as any business about being

17   evasive with an FBI agent.

18          MR. FERRARA:  That's fine, your Honor.  So my

19   understanding is then the defense will not inquire about that

20   either, right?  So I won't elicit it on direct.

21              And your Honor, I wasn't in any way trying to say

22   because these other things, you know, because of these other

23   things, this must come in.  I wanted to describe the story for

24   the Court and have you understand, have your Honor understand

25   what we plan to prove.  I understand your Honor's ruling.  It

H3R3AL6

1    doesn't change the fact that we have an instance here of

2    suspicious trading, we think we're entitled to get it in to

3    rebut some of the assertions that Mr. Berke made in his

4    opening.

5              THE COURT:  Well, not only made in his opening, but I

6    gather from Mr. Schoeman's representations we'll be hearing

7    more about it during the course of this trial.  Which is not

8    necessarily a bad thing, I am just simply saying that I think

9    in my mind it helps the government on the first point, which is

10   the door opening.

11             Now, I do want to hear more from the government as to

12   what the basis for the assertion -- you're going to have to

13   look at the SEC filings -- what the basis for the assertion is

14   that Mr. Walters would have reason to know that Mr. Icahn was

15   breaching his fiduciary duty to his shareholders in disclosing

16   this information.  I'm reserving on this and I'll hear more.

17             What else?

18             Okay.  Have a great evening.  See you tomorrow.

19             (Adjourned until March 28, 2017, at 10 a.m.)

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   THOMAS C. DAVIS

 4   Cross By Mr. Berke . . . . . . . . . . . . .1193

 5   Redirect By Ms. Cucinella  . . . . . . . . .1345

 6                       GOVERNMENT EXHIBITS

 7   Exhibit No.                              Received

 8    507-B  . . . . . . . . . . . . . . . . . .1270

 9    507  . . . . . . . . . . . . . . . . . . .1271

10    GX1917-D  . . . . . . . . . . . . . . . . .1278

11    605-B  . . . . . . . . . . . . . . . . . .1315

12    466  . . . . . . . . . . . . . . . . . . .1317

13    3501-76, pages 88 through 90,  . . . . . .1349

14    2104  . . . . . . . . . . . . . . . . . . .1377

15                       DEFENDANT EXHIBITS

16   Exhibit No.                              Received

17    4695  . . . . . . . . . . . . . . . . . . .1203

18    4663  . . . . . . . . . . . . . . . . . . .1205

19    4158  . . . . . . . . . . . . . . . . . . .1208

20    4933  . . . . . . . . . . . . . . . . . . .1212

21    4053  . . . . . . . . . . . . . . . . . . .1215

22    4048, first two pages with redaction,  . . .1217

23    468, 471  . . . . . . . . . . . . . . . . .1250

24    283-A  . . . . . . . . . . . . . . . . . . .1257

25    289  . . . . . . . . . . . . . . . . . . .1277
```

1411

1    109    . . . . . . . . . . . . . . . . . . .1288

2    100    . . . . . . . . . . . . . . . . . . .1290

3    303    . . . . . . . . . . . . . . . . . . .1292

4    107    . . . . . . . . . . . . . . . . . . .1294

5    5294   . . . . . . . . . . . . . . . . . . .1296

6    2196   . . . . . . . . . . . . . . . . . . .1309

7    1002-A    . . . . . . . . . . . . . . . .1319

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25