H3S3WAL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                v.                           S1 16 Cr. 0338(PKC)

WILLIAM T. WALTERS,

                Defendant.

------------------------------x

                                             March 28, 2017
                                             10:00 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                             District Judge

                        APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  DANIEL S. GOLDMAN
     BROOKE E. CUCINELLA
     MICHAEL FERRARA
          Assistant United States Attorneys

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
     Attorneys for Defendant
BY:  BARRY H. BERKE
     PAUL H. SCHOEMAN
     ANDREW J. ESTES
     MICHELLE BEN-DAVID
          -and-
WRIGHT STANISH & WINCKLER
BY:  RICHARD WRIGHT

        – also present –

SA Edmund Rom
SA Nicholas Anderson, Federal Bureau of Investigation
Raymond McLeod, Defense Tech Support
Holly Meister
Sarah Pyun, Government Paralegal Specialists

H3S3WAL1

| 1 | (In open court; jury not present) |

MR. FERRARA:  One brief point before the jury comes

in, just to put a punctuation mark on yesterday's conversation.

Now that we understand the way your Honor is thinking about the

403 factors with regard to the Clorox evidence, we're not going

to offer that evidence through Mr. Duncan.  We'll wait to see

what happens with the defense case, and we may offer it at a

later time.

THE COURT:  That's fine.  Bring our jury in and our

witness.

(Jury present)

THE COURT:  Good morning, ladies and gentlemen.  I

trust you made it on time?

JUROR NO. 1:  Perfect.  Thank you very much, sir.

THE COURT:  It was quite a show.  111 consecutive wins

for Geno and the Lady Huskies.  You know, Coach John Wooden

with the men's basketball team from UCLA went into the history

books because he had an 88 consecutive game run.  This is quite

something.  But, the team gets the credit.  36-0.  It's very,

very tough in college athletics not to succumb to

overconfidence and let your guard down.  You can get caught in

a long season, you can get caught by somebody, particularly if

you're not focused every game.  So that was quite a show.

JUROR NO. 1:  Thank you.

THE COURT:  Well, we're back in action.

1              Mr. Davis, the Court reminds you, you're still under

2      oath.

3              THE WITNESS:  Yes, your honor.

4              THE COURT:  Ms. Cucinella.

5              MS. CUCINELLA:  The government has no further

6      questions for Mr. Davis at this time.

7              THE COURT:  Mr. Berke, anything?

8              MR. BERKE:  If I may very briefly.

9       THOMAS C. DAVIS,

10     RECROSS EXAMINATION

11     BY MR. BERKE:

12     Q.  Mr. Davis, you recall on redirect yesterday afternoon, the

13     prosecutor asked you -- Ms. Cucinella asked you whether or not

14     the request in June of 2014 was the first time Mr. Walters or

15     Mr. Luce had asked for payment on the loan and you said it was?

16     Do you recall that, sir?

17     A.  Yes, I do.

18     Q.  That was a lie, wasn't it, sir?

19     A.  That was my recollection.

20     Q.  Isn't it a fact, sir, that you said "yes" just because --

21     you said "yes" because the prosecutor asked it?  Isn't that

22     correct, sir?

23     A.  No.

24     Q.  Isn't it a fact, sir, that throughout 2012 and 2013,

25     Mr. Walters and Mr. Luce asked you about payment on the note?

H3S3WAL1                         Davis - recross

1    A.  I don't recall.

2    Q.  Let me show you what's in evidence as Defense Exhibit 107.

3    You see, sir, where Mr. Luce at the bottom on June 1st, 2012,

4    asks you "Tom, can you please give us an update on anything

5    that may be happening, including the bank and potential cash

6    for note reduction."

7         Sir, you understood his question about potential cash

8    for note reduction was asking you about payment on the loan,

9    isn't that true, sir?

10   A.  Yes.

11   Q.  That was in 2012, isn't that true, sir?

12   A.  Yes.

13   Q.  You'll agree with me, sir, 2012 is before 2014, isn't that

14   true, sir?

15   A.  Yes, that's accurate.

16   Q.  You also knew that Mr. Walters was asking specifically

17   about you paying the loan before 2014, didn't you, sir?

18   A.  I don't recall that at all, no.

19   Q.  Let me show you what's in evidence as Defense Exhibit 109.

20   It says Defense Exhibit 109, it's page one middle e-mail.

21   First page.

22        You see, sir, on May 2012, Mr. Luces tell you "I have

23   a meeting with Bill Walters tomorrow.  He would like to go

24   through notes and investments."  You see that, sir?

25   A.  Yes.

1  Q.  Again, sir, "notes," that's a reference to loans, correct,

2  sir?

3  A.  Yes.

4  Q.  Sir, isn't it also true, isn't it also true, sir, that the

5  reason the Periscope moneys were used in 2014 to pay was

6  because that's when that investment return came due?  Periscope

7  paid off in 2014, isn't that correct, sir?

8  A.  Yes, it started then, yes.

9  Q.  So the reason why the Periscope moneys were applied in June

10  of 2014, that's because that's when the return on that

11  investment in which you had a stake came through, isn't that

12  correct, sir?

13  A.  Yes, that's accurate.

14  Q.  Isn't it also true, sir, that your loan with Mr. Walters,

15  you recall testifying that it did not require monthly payments

16  but instead accrued all interest payments so that you owed

17  total principal and total interest when the note became due?

18  Do you recall that, sir?

19  A.  Yes.

20  Q.  That's a very usual note type of note to use in business,

21  isn't it?

22  A.  There are a lot of different notes used in business.

23  Q.  In fact, sir, your own loan that you entered into with CSSF

24  was the same kind of note, wasn't it, sir?

25  A.  I had different maturity dates, yes.

H3S3WAL1                        Davis - recross

1   Q.  Let me show you what's marked for identification as Defense

2   Exhibit 5138 not in evidence.  That's a note on December 29,

3   2010 that you had with CSSF, correct, sir?

4   A.  Yes.

5            MR. BERKE:  Your Honor, I'd offer Defense Exhibit

6   5138.

7            THE COURT:  Any objection?

8            MS. CUCINELLA:  No objection.

9            THE COURT:  Received.

10            (Defendant's Exhibit 5138 received in evidence)

11   Q.  Sir, again see first paragraph, that's with you at CSSF.

12   I'm going to show you the second paragraph.  And you see, sir,

13   that for this $419,000 loan and change that you entered into on

14   December 29 you see the first paragraph it's due and payable

15   September 30, 2011?

16   A.  Yes.

17   Q.  You see in the second paragraph, last sentence it says

18   "interest shall be payable on date that the principal is due

19   and payable or paid."  You see that, sir?

20   A.  Yes.

21   Q.  That's the same type of note you had with Mr. Walters,

22   isn't that true, sir?

23   A.  Yes, I think that's accurate.

24   Q.  Isn't it also true you had to renew this note a couple of

25   times because you were unable to pay it on the date it was due?

1  Isn't that true?

2  A.  Yes, that's accurate.

3  Q.  Sir, didn't you lie also in your redirect testimony

4  yesterday afternoon when you tried to explain a way why your

5  insurance fraud was just a mistake?  Do you recall that

6  testimony, sir?

7  A.  Yes.

8  Q.  Do you recall you said it was just because the human

9  resources person asked you to do it because of some mixup with

10  insurance coverage?  Do you recall that testimony, sir?

11  A.  Yes, I do.

12  Q.  Sir, that was another lie, wasn't it, sir?

13  A.  No.  It was not a lie.

14  Q.  Isn't it true, sir, that in fact, when CSSF closed down,

15  Mr. Lyons had another entity that was called EBL?  Isn't that

16  true, sir?

17  A.  Yes.

18  Q.  You were not an employee of EBL, were you?

19  A.  No.

20  Q.  So you could not get insurance from EBL, not because of

21  some mixup, but you didn't work for EBL.  Isn't that true, sir?

22  A.  That's accurate, yes.

23  Q.  That's why you, sir, came up with the idea of having --

24  withdrawn.

25          That's why you, sir, engaged in the scheme to pretend

1  that Terie worked for EBL, when neither you nor Terie worked on

2  it.  Isn't that true, sir?

3  A.  I was asked to do so.

4  Q.  Sir, you did it.  Sir, you were not an employee of EBL?

5  A.  That's correct.

6  Q.  Neither was Terie, correct?

7  A.  That's also correct.

8  Q.  You wrote checks to EBL so they could write checks to Terie

9  to create the false record trail that she was an employee of

10 EBL, correct?

11 A.  I wrote one check, yes.

12 Q.  That's a lie, too, sir, isn't it?  You wrote many checks

13 over an extended period of time, isn't that true, sir?

14 A.  To EBL?

15 Q.  Yes.  As part of your insurance fraud.  That's a lie, isn't

16 it, sir?

17 A.  I don't recall writing many checks, no, I don't recall

18 that.

19 Q.  That was a lie you gave yesterday in response to

20 Ms. Cucinella's questions when you said it was a one-shot deal.

21 Do you remember giving that testimony yesterday in response to

22 questions from Ms. Cucinella?

23 A.  Yes.

24 Q.  That was a lie, sir, wasn't it?

25 A.  Not that I am aware of, no.

1   Q.  Let me show you what's been marked for identification as DX

2   4282.  Sir, do you recognize that as your Northern Trust bank

3   account?

4   A.  Yes.

5           MR. BERKE:  Your Honor, I'd offer Defense Exhibit 4282

6   into evidence.

7           THE COURT:  Any objection?

8           MS. CUCINELLA:  No.

9           THE COURT:  Received.

10          (Defendant's Exhibit 4282 received in evidence)

11  Q.  Sir, this is your account statement for the period ending

12  November -- go a little lower.  Thank you.  For the period

13  ending November 5, 2012.  Do you see that, sir?

14  A.  Yes.

15  Q.  I'd ask you to look at page six, left column, third check.

16  You see that, sir?  That's the October 12, 2012 check for

17  1,408.04.  And do you recall, sir, we showed looked at records

18  on your cross-examination, that was one of the payments that

19  you made as part of your insurance fraud, correct, sir?

20  A.  That's clearly a payment I made to EBL, yes.

21  Q.  That was part of your insurance fraud, wasn't it, sir?

22  A.  Counselor, I have no idea if I was committing insurance

23  fraud.  I was asked to do this by the human resources person

24  that worked for EBL.  That's all I really know.

25  Q.  So sir, you're accusing the human resource person of EBL --

H3S3WAL1                    Davis - recross

1   what was her name?

2   A.  I don't recall.  I'd have to look at the records.  I don't

3   recall.  I haven't had any contact with her in several years.

4   Q.  Was that Krissy or Kristine, one other the other?

5   A.  Yes.

6   Q.  Or Krissy?

7   A.  Kristine Pratt I think.

8   Q.  So you are accusing Kristine Pratt of directing you to make

9   false records for the insurance company?  Is that your

10  accusation against her, sir?

11  A.  I'm not accusing her of anything.  I'm just telling you she

12  asked me to do it this and I did it this way.

13  Q.  This check October 12, this was a check so that EBL would

14  write a check to Terie to create a false record trail that she

15  was an employee, correct, sir?

16  A.  Yes, I think that's accurate, yes.

17  Q.  Let me show you document DX 4283 for identification.  Not

18  in evidence.  You see this, sir?  This is your Northern Trust

19  bank account for the period ending December 5, 2012.

20  A.  Yes.  I see it.

21          MR. BERKE:  Your Honor, I'd offer Defense Exhibit 4283

22  into evidence.

23          MS. CUCINELLA:  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit 4283 received in evidence)

H3S3WAL1                    Davis - recross

1    Q.  You see that's the period ending December 5, 2012, correct,

2    sir?

3    A.  Yes.

4    Q.  Let me show you page six, left column, first check.  You

5    see, sir, EBL Partners?  You see that, sir?

6    A.  Yes.

7    Q.  1,673, you see that, sir?

8    A.  Yes, I do.

9    Q.  See what it says on the left side?  "Health insurance."

10   A.  Yes, I see it.

11   Q.  That's a second check you wrote to EBL as part of your

12   attempts to create a false record trail to get health insurance

13   for Terie, correct?

14   A.  Yes, it's a second check, yes.

15   Q.  When you said there was only one check, that was a lie,

16   correct, sir?

17   A.  I don't recall this, counselor.

18   Q.  Let me show you what's been marked for identification as

19   Defense Exhibit 4396.  Sir, I ask does this refresh your

20   recollection that you wrote another check in December of 2012?

21   A.  Yes.

22   Q.  Let me show you what's been marked for identification as

23   Defense Exhibit 4395.  Page one towards the bottom.  Does that

24   refresh your recollection, sir, that you paid another check to

25   create a false record trail that Terie Davis was on the payroll

H3S3WAL1                    Davis – recross

1   of EBL in January --

2            THE COURT:  Is this in evidence or are you not

3   offering it?

4            MR. BERKE:  I'm not offering it.

5   Q.  Does that refresh your recollection, sir?

6   A.  Yes.

7   Q.  Do you recall, sir, that the only reason you stopped doing

8   this over an extended time period is because you were told that

9   the insurance company went ahead and canceled your insurance

10  already so you could no longer continue your deception of the

11  insurance company?  That's why you stopped.  Do you recall

12  that, sir?

13  A.  I don't recall that.  No.

14  Q.  Let me show you again what's marked for identification as

15  4395 and I'm going to show you the e-mails at the bottom of

16  page one on to page two and ask if that refreshes your

17  recollection.  Now I'm going to show you the top e-mail.

18           My question to you, sir, does that refresh your

19  recollection that you wanted to write more checks and keep this

20  going on, but you were told that the insurance company canceled

21  the insurance that you had obtained?  Do you recall that, sir?

22  A.  I can read the e-mail, yes.

23  Q.  My question --

24           THE COURT:  No.

25           THE WITNESS:  Yes, I'm sorry, your Honor.

H3S3WAL1                    Davis - recross

1    A.  I recall this, yes.

2    Q.  So, sir, your testimony yesterday was a lie, wasn't it,

3    sir?

4    A.  I wasn't aware of that, no.  I just don't recall this

5    happening.

6    Q.  Sir, after your cross-examination yesterday, you spoke to

7    the prosecutors in this case, didn't you, sir?

8    A.  After yesterday?

9    Q.  After your cross-examination yesterday, you spoke to the

10   prosecutors in this case, didn't you?

11   A.  I spoke to them this morning.

12   Q.  You spoke to them yesterday too, between your

13   cross-examination and your redirect examination, didn't you,

14   sir?

15   A.  I don't recall having any conversations with them until

16   this morning.

17   Q.  Sir, let me ask you, when you spoke to the prosecutors this

18   morning, did they tell you they were going to tear up your

19   cooperation agreement because you committed a crime of

20   insurance fraud that you didn't disclose?

21           MS. CUCINELLA:  Objection.

22           THE COURT:  Overruled.

23   A.  I'm sorry?

24   Q.  Did they tell you they were going to tear up your

25   cooperation agreement because the crime of insurance fraud that

H3S3WAL1                          Davis - recross

1    you didn't disclose to them?

2    A.   No, they didn't say that at all.

3    Q.   Did they tell you they were going to tear up your

4    cooperation agreement because of the lies you've said in this

5    courtroom?

6    A.   No, they didn't say that as all.

7    Q.   Did they tell you they're going to tear up your cooperation

8    agreement because of the lies that was proven that you told

9    them in their prior meetings?

10             MS. CUCINELLA:   Objection.

11             THE COURT:   Objection as to form.   Rephrase it.

12             MR. BERKE:   Of course, your Honor.

13   Q.   Did they tell you they were going to tear up your

14   cooperation agreement because of the lies you told them in your

15   prior meetings?

16             THE COURT:   Sustained as to form.   You can ask him

17   whether they told him they were going to rip up the cooperation

18   agreement.

19   Q.   Did they tell you they were going to rip up your

20   cooperation agreement for any reason?

21   A.   No.

22   Q.   Sir, do you recall that you said that you made your deal

23   with the prosecution and you didn't have anything about Shelter

24   Golf on your mind?  Do you recall that testimony on redirect

25   yesterday?

H3S3WAL1                          Davis - recross

1    A.  Yes.

2    Q.  That was a lie, sir, wasn't it?

3    A.  No.

4    Q.  Sir, do you recall that you knew starting in mid 2015 going

5    towards late 2015, that the prosecutors -- the FBI and the

6    prosecutors had interviewed April Moffet about Shelter Golf?

7    A.  Yes.

8    Q.  Do you recall that you knew that the FBI and the

9    prosecutors had gone down to Dallas Texas to Nick and Sam's to

10   interview the employee of Nick and Sam's to see if you had lied

11   in your SEC testimony about the party there being for Shelter

12   Golf?  Do you recall learning that, sir?

13   A.  Yes, that's accurate.

14   Q.  Do you recall, sir, that you testified all about Shelter

15   Golf before the SEC?  Do you recall that, sir?

16   A.  I testified about a lot of things to the SEC.

17   Q.  I'm asking about Shelter Golf.  Do you recall that, sir?

18   A.  Yes, it came up.

19   Q.  You recall you testified about your personal finances

20   before the SEC?

21   A.  Yes.

22   Q.  You recall you testified about your taxes before the SEC?

23   A.  Yes.

24   Q.  And you recall, sir, you knew in late 2015 that the U.S.

25   attorney's office and the FBI had you dead to rights for the

1    crime of multiple crimes of perjury for all your lies to the

2    SEC about Shelter Golf, your personal finances, your personal

3    taxes, and your taxes for Shelter Golf.  Isn't that true, sir?

4    A.  Could you repeat the question?

5    Q.  In late 2015, you knew that the U.S. attorney's office had

6    you dead to rights for your perjury before the SEC related to

7    your personal finances, your personal taxes, your taxes for

8    Shelter Golf and your net worth?

9    A.  I'm not sure what "dead to rights" means precisely.

10   Q.  Meaning they had an open-and-shut case to prosecute you for

11   perjury.

12   A.  I wasn't aware of that in late 2015, no.

13   Q.  Well, sir, take it a step at a time.  You knew, sir, that

14   you lied to them about Shelter Golf, correct?

15   A.  Yes.

16   Q.  You lied to them about the payments that you claim were

17   simply expenses and advances, do you recall that, sir?

18   A.  Yes.

19   Q.  You knew they had discovered this because they had gone to

20   April Moffet and figured out what happened, and they also

21   learned that party down in Dallas was really a surprise party

22   for your wife.  Isn't that true, sir?

23   A.  Yes, that's accurate.

24   Q.  They knew that you lied to the SEC about Shelter Golf,

25   correct, sir?

1    A.  Yes.

2    Q.  You knew that crime of perjury carries a sentence of five

3    years, correct, sir?  You testified to that yesterday?

4    A.  Yes.

5    Q.  You knew, sir, that you also lied to the SEC about your

6    personal -- withdrawn.

7         You also knew that you authorized your lawyers to

8    submit letters about Shelter Golf that we reviewed to the SEC

9    that were based on the false information you gave them,

10   correct?

11   A.  Yes.

12   Q.  You knew that was also a separate crime, correct, sir?

13   A.  Yes.

14   Q.  You also knew, sir, that you lied to the SEC about your

15   personal finances and that the personal finances were being dug

16   into, didn't you know that, sir?

17   A.  I don't think I lied about my personal finances, no, not at

18   all.

19   Q.  Didn't you plead guilty, sir, to committing perjury based

20   on your personal -- you pled guilty to a charge that said you

21   lied about your personal finances, didn't you, sir?

22              MS. CUCINELLA:  Objection.

23              THE COURT:  Basis?

24              MS. CUCINELLA:  It's not his testimony and it's not

25   why he pled --

H3S3WAL1                        Davis - recross

1              THE COURT:  He can answer the question then.

2      A.  Would you repeat the question, please?

3      Q.  Yes, sir.  You pled guilty to perjury before the SEC

4      testimony, based in part on your personal finances, didn't you,

5      sir?

6      A.  No, that's not accurate.

7      Q.  Sir, do you recall that you pled guilty to a charging

8      instrument called a information?  Do you recall that, sir?

9      A.  I'm sorry?

10     Q.  Do you recall you pled guilty to a document that's called

11     an information?  Do you remember that, sir?

12     A.  I don't know what an information is, I'm sorry.

13     Q.  Let me show you what's marked for identification as

14     3501-69.  This is just for you and I'd ask you to look at the

15     first page.

16              Do you recall, sir, that this document, 3501-69, is

17     the charge against you to which you pled guilty?

18     A.  Yes, okay.  I follow.

19     Q.  I'm going to refer your attention to page 12.  If we can

20     show both page 12 and 13.  I'm going to ask you to read Count

21     12 that you pled guilty to, sir.  You can stop halfway through

22     the first paragraph on 13 for my question, although you can

23     read as much as you want.

24              Did you review that, sir?

25     A.  I haven't finished reading, I'm sorry.

H3S3WAL1                        Davis - recross

1    Q.  That's okay.

2              THE WITNESS:  Your Honor, I forgot my reading glasses.

3    I'm sorry.

4              THE COURT:  Are they with you in the courthouse?

5              THE WITNESS:  They're in the witness room.  I'm sorry.

6              THE COURT:  Why don't you get your reading glasses.

7              THE WITNESS:  Thank you very much.

8              (Pause)

9              THE WITNESS:  Sorry, your Honor.

10             THE COURT:  Take your time.

11   A.  I'm sorry, Mr. Berke.  What did you want me to read?

12   Q.  So, sir, you see the paragraph beginning at the bottom of

13   page 12, the one sentence?  You see that, sir?

14   A.  Count 12, yes.

15   Q.  Go over to page 13.

16   A.  All right.

17   Q.  And you can read at the top, and you can stop with -- there

18   is a sentence at the word "to wit."  I want you to read what

19   follows "to wit" and you don't need to review past that

20   sentence.

21   A.  I'm not -- you're going to having to point it out.  I don't

22   see --

23   Q.  Let me highlight it for you.

24   A.  Thanks.

25             MR. BERKE:  Mr. McLeod, if I can trouble you to

1    highlight the beginning with "to wit."  The seventh line down.

2    There it is.  If you highlight that line and the three lines

3    after it.

4    A.  Okay.

5    Q.  You can keep going one more line and just finish that

6    clause.  You head the highlighted section?

7    A.  "To wit, Davis" --

8    Q.  To yourself.

9    A.  I'm sorry.

10   Q.  My question, sir, does that refresh your recollection that

11   the perjury charge that you pled guilty charged with you making

12   false statements relating to, among other things, your personal

13   finances, your net worth, whether you accurately filed tax

14   returns on behalf of yourself and on behalf of Shelter Golf?

15   A.  Yes.

16   Q.  Sir, that perjury charge that you pled guilty to, you knew

17   in fall of 2015 that you had given that false testimony and you

18   were being caught, didn't you, sir?

19   A.  In the fall of 2015?

20   Q.  Yes.  Before you made your deal.  You knew that, sir,

21   didn't you?

22   A.  Yes, I knew I'd lied, yes.

23   Q.  You knew that the SEC had figured it out and so had the

24   U.S. attorney's office and the FBI, didn't you, sir?

25   A.  I really didn't know exactly what they had figured out.  I

H3S3WAL1                          Davis - recross

1  didn't have the benefit of their investigation.  No.

2  Q.  Sir, you knew you lied, right?

3  A.  Yes, absolutely, I've already testified to that.

4  Q.  You knew April Moffet didn't lie for you, did she?

5  A.  I wasn't there for her testimony but I assumed she didn't.

6  Q.  Your lawyer, though, represented April Moffet?

7           THE COURT:  You assumed she?

8           THE WITNESS:  Did not.

9           THE COURT:  Thank you.

10 Q.  You knew that you didn't have any reason to think people at

11 the restaurant that they visited lied, did they?

12 A.  I wasn't there for their testimony either.

13 Q.  You had no reason to think they were going to lie for you,

14 did they?

15 A.  I have no reason, no.

16 Q.  In fact, you knew they spoke to your accountants, too,

17 didn't you, sir?

18 A.  Yes.

19 Q.  You didn't think your accountants would lie about your net

20 worth or your finances or your taxes; you didn't think they

21 would lie for you, did you?

22 A.  No.

23 Q.  You didn't want to go to jail for five years, 10 years, or

24 any of that time, did you?

25 A.  No, I did not.

1   Q.  Sir, you didn't have the ability to make a deal about your

2   perjured testimony and other crimes related to Shelter Golf and

3   your finances, because there was no one else involved other

4   than you, isn't that true, sir?

5   A.  Yes, I think that's accurate.

6   Q.  So you had no choice other than to go to jail for these

7   crimes that they had you caught on, or try to come up with a

8   different plan.  Isn't that true, sir?

9   A.  I didn't come up with a plan.  I just simply decided to

10  tell the truth.

11  Q.  Sir, aren't I correct that to try to avoid the long jail

12  sentence you faced for your perjury we just went over that you

13  ultimately pled guilty to, you had no direction to go other

14  than plead guilty or to try to fight it?  Isn't that true, sir?

15  A.  I'll restate my answer --

16  Q.  No, sir.

17  A.  I had no choice but to tell the truth at that point in

18  time.

19  Q.  Sir, that's not my question.  My question is, for the

20  crimes that you committed with regard to your perjury about

21  your personal finances, your net worth, your crimes against

22  Shelter Golf and your taxes, you had no other options, isn't

23  that correct, sir, because you did that alone.  Isn't that

24  true, sir?

25  A.  "No other option" meaning what?

H3S3WAL1                    Davis - recross

1  Q.  You did -- do you agree you committed those crimes alone?

2  A.  No, I committed those crimes with Mr. Walters.

3  Q.  Sir, did Mr. Walters help you lie to the SEC about your

4  personal finances?

5  A.  No.

6  Q.  Did Mr. Walters help you lie to the SEC about stealing from

7  Shelter Golf?

8  A.  No.

9  Q.  Did Mr. Walters help you create false letters that you had

10  your lawyers send trying to justify your stealing from Shelter

11  Golf?

12  A.  No.

13  Q.  Did Mr. Walters help you cheat on your personal taxes?

14  A.  No.

15  Q.  Did Mr. Walters help you cheat on the taxes for Shelter

16  Golf?

17  A.  No.

18  Q.  You had no choice but to face up to that five-year sentence

19  on each count of perjury you faced, isn't that true, sir?

20  A.  I think I've already answered the question, and I decided

21  to tell the truth.

22  Q.  That's not my question, sir.  Based on the crimes we just

23  went over, you had no choice but to face the five years you

24  faced on each count of perjury.  Isn't that true, sir?

25  A.  I had plenty of choices.

H3S3WAL1                     Davis - redirect

1    Q.  You understand my question, sir?

2            THE COURT:  The question has been answered, Mr. Berke.

3    You asked the question, there is no reason for you to ask do

4    you understand my question once the witness has answered.

5            MR. BERKE:  Understood.

6            THE COURT:  Do you have anything further?

7            MR. BERKE:  One more question.

8            THE COURT:  Yes, sir.

9    Q.  Isn't it your testimony, sir, that based on your deal with

10   the prosecution, it is your hope that you will not serve one

11   day in jail?  Isn't that true, sir?

12   A.  Yes, that's totally accurate.

13           MR. BERKE:  Thank you, your Honor.

14           THE COURT:  Anything further?

15           MS. CUCINELLA:  Briefly, your Honor.

16   REDIRECT EXAMINATION

17   BY MS. CUCINELLA:

18   Q.  Just a couple of questions.

19           Mr. Davis, Mr. Berke just asked you questions about

20   testimony you gave yesterday on your redirect about the answer

21   you gave with respect to securing health insurance for your

22   wife.  Do you recall that?

23   A.  Yes.

24   Q.  You testified in response to a question, Mr. Davis, for how

25   long did you have that arrangement with Mr. Lyons, you

1   testified "I don't recall.  I mean, it was a one-time event as

2   I recall or I think as I testified."

3           Mr. Davis, when you said it was a one-time event, did

4   you mean you sent one check or did you mean that your wife

5   suffered a health situation at one time?

6           MR. BERKE:  Objection, your Honor.

7           THE COURT:  Overruled.

8   A.  I meant precisely what I said.  Which was this was a

9   one-time event.  I don't recall -- I didn't recall exactly what

10  brought it on.  But it was a one-time event for coverage for my

11  wife.

12  Q.  You weren't referring to the number of checks you sent,

13  right, Mr. Davis?

14          MR. BERKE:  Your Honor, the witness just testified he

15  sent one check today.  I would object, your Honor.

16          THE COURT:  Overruled.  Go ahead.

17  A.  Yes.

18  Q.  Mr. Berke also asked you some questions about e-mails you

19  received from Mike Luce in 2012 and 2013 regarding your

20  outstanding loans from Mr. Walters.  Do you recall that?

21  A.  Yes.

22  Q.  When you received those e-mails from Mr. Luce, did you have

23  any followup conversations with Mr. Luce about that?

24  A.  None whatsoever.

25  Q.  You testified about a number of benefits that you got

1   throughout this period where you were passing information to

2   Mr. Walters.  That included the Periscope deal and the Benefit

3   Harbor deal, right?

4   A.  Yes.

5           MR. BERKE:  Objection, your Honor.

6           THE COURT:  Overruled.

7   Q.  Did you put up any money at all for those deals?

8   A.  No.

9   Q.  Did Mr. Walters put up money and a line of credit for those

10  deals?

11  A.  Yes, he did.

12  Q.  Did you make money anyway, even though you took no risk and

13  put up no money?

14  A.  I made a little money, yes.

15  Q.  But the defendant funded those entire investments, right,

16  Mr. Davis?

17  A.  100 percent, yes.

18  Q.  Mr. Berke just asked you a number of questions about

19  Shelter Golf and your concerns about the government learning

20  about taking money from Shelter Golf.  He specifically asked

21  you about a party you threw for your wife.  That party,

22  Mr. Davis, that was $5,900.  Right, that party?

23  A.  Yes.

24  Q.  That lie you told, it involved $5,000, right?

25  A.  That's accurate, yes.

```
 1    Q.  You did lie about that to the SEC, correct?

 2    A.  I did, yes.

 3    Q.  You told another a number of other lies to the SEC as well,

 4    right?

 5    A.  Yes, that's accurate.

 6    Q.  Did you lie about your relationship with Mr. Walters?

 7    A.  Yes, I did.

 8    Q.  Mr. Davis, to be clear, you pled guilty to perjury,

 9    correct?

10    A.  Yes, I did.

11          MS. CUCINELLA:  At this time, your Honor, the

12    government would like to offer 3501-69 which the defense just

13    used to refresh his recollection under Rule 612.

14          MR. BERKE:  Your Honor, we would have no objection to

15    offering Count 12, which was the count that we showed, under

16    the rule of completeness.

17          MS. CUCINELLA:  That's fine.

18          THE COURT:  Count 12 comes in.

19          (Government's Exhibit 3501-69 Count 12 received in

20    evidence)

21          MS. CUCINELLA:  Ms. Meister, can we pull up 3501-69

22    and show Count 12.

23          MR. BERKE:  Ms. Meister, if you're looking for the

24    page number, it's page 12 --

25    Q.  Mr. Davis, does the document in front of you reflect the
```

H3S3WAL1                          Davis - redirect

1   count of perjury to which you pled guilty for?

2   A.  Yes, it does.

3   Q.  Mr. Berke just had you look at the section that you pled

4   guilty for statements you made about a Dallas-based charity.

5   Correct?

6   A.  Yes.

7   Q.  That's included in here, right?

8   A.  Yes, it is.

9   Q.  You were held accountable for that, correct, Mr. Davis, for

10  the lies you told?

11  A.  Yes, I was.

12  Q.  What other lies did you tell after the line that says

13  Dallas-based charity.  Will you please read the document.

14  Beginning with whether he had ever passed information.

15          THE COURT:  What are you asking him to do,

16  Ms. Cucinella, I don't understand?

17          MS. CUCINELLA:  Certainly.

18  Q.  You also pled guilty to passing information to CC-1 or

19  anyone else regarding Dean Foods or any other company,

20  including but not limited to, the false statements.

21  "Q.  How did you know to the extent that you commented on Dean

22  Foods to CC-1, how did you know whether or not what you were

23  commenting on was public information or information that was

24  not public that you gleaned from your time on the board of Dean

25  Foods?

1   "A.  I never gave him any confidential information.  I'm quite

2   certain about that."

3           Mr. Davis, who is CC-1?

4   A.  I think that's referring to Mr. Walters.

5   Q.  Was your answer here "I never gave him any confidential

6   information, I'm quite certain about that," was that a lie?

7   A.  Yes, it was.

8   Q.  Did you plead guilty to perjury for telling that lie?

9   A.  Yes, I did.

10  Q.  Did you also tell the lie in response to the question "Did

11  you provide CC-1 with any information regarding the progress of

12  the WhiteWave spinoff in July 2012?

13  "A.  I did not."

14          Was that a lie you told?

15  A.  Yes, it was.

16  Q.  Did you plead guilty to perjury for that?

17  A.  Yes, ma'am, I did.

18  Q.  Mr. Davis, you pled guilty to 12 felony counts, correct?

19  A.  Yes.

20  Q.  And that included counts for insider trading, correct?

21  A.  Yes.

22  Q.  Who did you commit insider trading with?

23  A.  Billy Walters.

24          MS. CUCINELLA:  Nothing further.

25          THE COURT:  All right.  You may step down, Mr. Davis.

1    (Witness excused)

2         THE COURT:  Call your next witness.

3         MR. FERRARA:  Thank you, your Honor.  The government

4    calls James Mitarotonda.

5         (Witness sworn)

6         THE DEPUTY CLERK:  State your name and spell it for

7    the record, please.

8         THE WITNESS:  My name is James Mitarotonda,

9    M-I-T-A-R-O-T-O-N-D-A.

10        THE COURT:  All right.  Mr. Ferrara, you may inquire.

11    JAMES MITAROTONDA,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. FERRARA:

16    Q.  Good morning, sir.

17    A.  Good morning.

18    Q.  Where do you work?

19    A.  I work at a firm by the name of Barington Capital Group,

20    which I co-founded.

21    Q.  Before we talk about Barington, would you mind walking us

22    through briefly your educational background.

23    A.  Sure.  I went to the public schools in Queens, since my

24    family and I emigrated from Italy, I was nine years old.  So I

25    went to elementary school, junior high school, and high school,

H3S3WAL1                    Mitarotonda – direct

```
 1   all public schools in Queens.  I then attended Queens College
 2   where I graduated with a bachelor's degree with a concentration
 3   in economics.  And subsequent to that I attended New York
 4   University and earned an MBA, a master's of business
 5   administration, with a concentration in finance.
 6   Q.  So what does Barington Capital do?
 7   A.  Well, Barington invests in undervalued publicly traded
 8   companies.  And we become very actively involved in companies
 9   in which we make investments.  We're considered an activist
10   hedge fund.
11   Q.  Who decides whether the particular company is undervalued?
12   A.  Well, we decide.  But we do an awful lot of work in order
13   to get to that decision.  We literally spend three to six
14   months analyzing a company.  So I and my team, my investment
15   team, spend an awful lot of time in analyzing public companies.
16   And eventually we get to a decision if we determine that the
17   company is undervalued or not.  And at that point we would make
18   an investment in the company, and a meaningful investment.
19   Q.  You described Barington as an activist investor.  What is
20   the difference between an activist investor and let's say a
21   passive investor?
22   A.  Well, a passive investor, for example, a mutual fund is one
23   that would invest in a company and buy shares in a public
24   company, but not really become involved in a company.  A
25   private equity firm, for example, is a firm that buys the
```

1   company outright.

2           An activist investor is one that buys a meaningful

3   stake in a public company, and "meaningful," it could be

4   2 percent, 8 percent, 6 percent, but a meaningful stake, so you

5   do become influential to the company.  And in most cases

6   activist investors would present a plan that they feel that the

7   company should implement in order to improve and enhance

8   shareholder value, which would benefit all of the shareholders.

9   Q.  So what is your role at Barington?

10  A.  Well, I'm the chairman and CEO.  I ultimately make the

11  investment decisions, I am the chief investment officer.  I

12  have an investment team that consists of three other people.

13  We meet every morning at 8:30 and we evaluate, we have a

14  lengthy four-stage process of evaluating businesses.  And that

15  process, as I said, takes us three to five, six months.

16  Q.  Did you say you founded Barington Capital?

17  A.  Yes, I was a co-founder.  There was another individual

18  initially as well.

19  Q.  How long ago was that?

20  A.  Well, when the firm started in 1992 as an investment bank

21  financing smaller companies, and subsequent to that I started

22  to make direct investments in smaller public companies, and the

23  firm then evolved into what it is today.

24  Q.  So Barington Capital makes investments.  Does Barington

25  Capital also have investors?

1   A.  Yes.

2   Q.  How does that work?

3   A.  Well, in order to do what we do, we want to have a

4   considerable amount of capital.  And so we do go out and we do

5   seek investors, individual investors, high net worth

6   individuals, family offices, as well as institutional

7   investors.

8   Q.  Do some of those investors sort of give their money

9   directly to Barington Capital whereas other investors might

10   join you in an investment opportunity?

11   A.  Well, we have a fund, and so investors invest in that fund.

12   We also have some individual managed accounts, and we do in

13   some cases go out and seek to attract some co-investors,

14   depending on the size of the company, and the amount of the

15   investment that we do want to make.

16   Q.  What are your duties and responsibilities to your

17   investors?

18   A.  Well, we have a fiduciary responsibility, we're registered

19   with the SEC, so we have a fiduciary responsibility to all of

20   our investors, which means to be fair, to do everything equally

21   and pro rata, not to front run any other investors, even if

22   they're co-investors or not.

23   Q.  Does Barington Capital have an investment philosophy?

24   A.  Our investment philosophy is we are what is known as value

25   investors.  So we seek to invest in businesses that are trading

1    at a discount to the intrinsic value, what we determine to be

2    the intrinsic value of the company.  And of course subsequent

3    to that is to become very actively involved.  We do not make

4    passive investments.  So once we've concluded our work, and

5    part of that process of analyzing companies is that we do

6    develop a plan that we think that the company should embrace.

7    And so, as part of that, at some point we do approach the

8    company and present that plan.

9    Q.  So let me call your attention to March of 2013.  At that

10   time, was there a company you were looking to invest in?

11   A.  Well, we identified Darden Restaurants.  The company was

12   not doing so well at the time.  And the stock had dropped a

13   considerable amount.  Of course, they had announced earnings,

14   and we started to analyze the business.  And the business

15   looked attractive at that point.

16   Q.  Let's back up for one second before you get into that.

17          What is Darden Restaurants?

18   A.  Well, it is a company that owns eight different chains, it

19   used to own eight, actually they sold one a number of years

20   ago.  They actually announced this morning the acquisition of

21   another chain.  So it has seven different businesses, one of

22   which is Olive Garden.  The one that they did sell which they

23   owned at the time that we did make the investment was Red

24   Lobster.  They own LongHorn Steakhouse.  They also own five

25   specialty brands like Capital Grille and Yard House, so five

H3S3WAL1                         Mitarotonda - direct

1     faster growing specialty brands.  They also own a considerable

2     amount of real estate which they have owned through the years,

3     which of course is quite valuable as a result of the

4     appreciation of real estate.

5     Q.  Is Darden a publicly traded company?

6     A.  Yes.

7     Q.  Was it publicly traded in 2013?

8     A.  Yes.

9     Q.  What was your plan for Darden in March of 2013?

10    A.  Well, initially, as I've stated, it was to analyze the

11    business.  But eventually we did develop a plan that we felt

12    would enhance shareholder value.

13         The stock was trading at the time in the mid to high

14    40s.  It was a $6 billion market capitalization company, and we

15    felt that it was dramatically undervalued, and we thought that

16    the company could -- the shareholder value could be enhanced

17    dramatically if a plan, such as what we had proposed eventually

18    to the company, was implemented.

19    Q.  What was that plan, just at a high level what was that

20    plan?  What did you think Darden could do to unlock that value?

21    A.  Well, we thought they could take the current company and

22    create three companies out of it.  One company, which would

23    hold the mature brands, the large mature brands, which were

24    Olive Garden, Red Lobster and LongHorn, and another company

25    which would own the specialty brands, the five faster growing

1   smaller specialty brands.  And the third company would be a

2   real estate company.  So we felt that they could take the real

3   estate, which we thought was worth 3.3 to 3.9 billion, and that

4   could be spun out.  The shares would then be, of course, given

5   to the shareholders of Darden as well so they would now own

6   shares in three different companies instead of one, and we felt

7   that that real estate company would trade similar to the other

8   publicly traded real estate companies, which are known as

9   REITs.  We felt they would trade in line with that and it would

10  dramatically increase the value of the overall company.

11  Q.  You wanted to take one company, your proposal was to take

12  one company and make it -- a publicly traded company, and make

13  it into three publicly traded companies?

14  A.  Yes.

15  Q.  In March of 2013, was your interest -- and when I say

16  "your" I'm referring to Barington Capital's interest.  Was your

17  interest in Darden public at that time, March 2013?

18  A.  No.

19  Q.  Why not?

20  A.  Well, we were still evaluating the company.  We wouldn't

21  make our interest known publicly until we're ready and we owned

22  a substantial ownership stake in the company.  So, and we had

23  not met with the company yet as well.

24  Q.  How could it have hurt your proposal to invest in Darden in

25  this plan if the public had learned about your plan in March of

H3S3WAL1                          Mitarotonda - direct

1    2013?

2    A.  Well, it could have attracted the interest of other

3    activist investors for one, and we would have lost the

4    opportunity to make that development.  The stock price could

5    have increased.  And of course then we would have had to pay,

6    if we proceeded, a higher price, which I thought would, you

7    know, be a disadvantage of course to us and our investors.

8    Q.  How did you refer to the plan to invest in Darden?  Did you

9    call it the Darden plan or did you have some sort of other name

10   for it?

11   A.  No, we always used a code name just to protect the work

12   that we do, and so that it stays private until we're ready to

13   do so, and the code name was Project Dee.  D-E-E.

14   Q.  So, let's take a look at what's in evidence as Government

15   Exhibits 1807 and 1809-A.  I'm waiting for the jury to be able

16   to see it as well.

17          What are we looking at, sir, on the left 1807 and on

18   the right 1809-A?

19   A.  It looks to me like drafts of the plan that we were

20   developing.

21   Q.  So just for ease of reference, are these sometimes called

22   deal books or decks?

23   A.  Yes.

24   Q.  Sorry.  To be clear, for what project were these deal

25   books?

H3S3WAL1                        Mitarotonda - direct

1   A.  This is for Project Dee.

2   Q.  Just remind us, that relates to Darden?

3   A.  Yes.

4   Q.  So, what are the purpose of these deal books?  Why do you

5   create these?

6   A.  Well, eventually, we would propose this to the company.

7   And at some point we would even make it public so that the rest

8   of the shareholders of Darden would have an opportunity to see

9   our plan.  And if we even gotten much further where we would

10  engage in a proxy contest, if we asked for board representation

11  and the company said no, and we felt very strongly about being

12  on the board and nominating directors to protect, of course,

13  the shareholders, and in an attempt to implement this plan, we

14  would get to what is known as a proxy contest.  And at that

15  point, of course, we would engage in a voting for the directors

16  eventually.

17          But, this is something that we put together as part of

18  our work, it takes an awful lot of time and effort to put this

19  together.  We really have to understand the business.  When we

20  meet with the company it is important that they feel that we

21  understand the business, and it's important for the other

22  shareholders to feel that we understand the business, because

23  why should they support us if we don't understand our own

24  analysis and the business that we're making an investment in

25  and asking for changes to be made.

H3S3WAL1                      Mitarotonda - direct

1   Q.   What are the differences between these two deal books, 1807

2   and 1809-A?

3   A.   I believe it's just a subsequent draft.

4   Q.   Do these deal books discuss the details of your plan?

5   A.   Yes.

6   Q.   Do they discuss Darden?

7   A.   Yes.

8   Q.   And do you see they say on the front page here

9   "confidential" on both drafts?  Do you see that?

10  A.   Yes.

11  Q.   What exactly is confidential about these deal books?

12  A.   Our work.  We spend an awful lot of time, we have to, of

13  course, protect our work, we have a fiduciary responsibility to

14  our investors, and we want to get paid for the work that we do.

15           MR. FERRARA:  Okay.  We can take those down,

16  Ms. Meister.  Thank you.

17  Q.   Let's walk through the steps that you took to execute this

18  plan, okay?  Why don't we start with, I think we talked about

19  investors.  Did you want outside investors to come in with you

20  on this deal?

21  A.   The answer is yes.  Our fund is small.  It's not large like

22  some of the other more well-known activist investors.  And so I

23  did want to get some co-investors to invest with us in the

24  investment.

25           (Continued on next page)

H3sdwal2                          Mitarotonda - direct

1    Q.  So how do you -- explain to us how you bring outside

2    investors into a deal that is otherwise confidential.  How do

3    you do that?

4    A.  Well, the first thing that we do is we could put together a

5    list of people, those that we know, and of course the first

6    thing that we would do is have them sign a nondisclosure

7    agreement, which is an agreement that there is a confidential

8    agreement that restricts their ability to trade on the

9    information for a period of time.  Typically, we have an

10   18-month to two-year period.  And, also, it restricts their

11   ability to share the information with anybody else.

12   Q.  Again, for ease, are nondisclosure agreements sometimes

13   called NDAs?

14   A.  Yes.

15   Q.  And why do you ask --

16   A.  In our business we have an acronym for everything.

17   Q.  Your business and the military.

18        What is -- why do you ask potential investors to sign

19   a nondisclosure agreement?  Why do you do that?

20   A.  Well, for a couple of reasons.  One, because, as I said,

21   we're registered with the SEC, and so we have a fiduciary

22   responsibility to our investors.  We don't want them to be

23   front-running us, for example, which means going out and buying

24   the stock ahead of us; and, two, we want to get paid.  So,

25   clearly there is an awful lot of work that goes on in putting

H3sdwal2                          Mitarotonda - direct

1    together this.  We are our ideas.  There's nothing else that we

2    have.  And so clearly we -- if we find something that's

3    compelling, we want to protect that until we're ready to go

4    public with that investment.

5    Q.  How much money did you think you would need to execute this

6    deal?

7    A.  Well, given that it was a 6 billion market capitalization

8    company, I thought that we would need at least 2 percent of the

9    company in order to be taken seriously by the management, by

10   the board of directors of the company, and so that would be in

11   the 120, $150 million.  I really wanted more.  The larger the

12   percentage ownership, 5, 6, 7 percent, it would make you even

13   more influential, but I felt that at 2 percent we would have

14   been able to be effective with 2/3 percent.  So I felt with

15   2/3 percent that we could be effective.

16   Q.  So there is a lot there.  Let's unpack that a little bit.

17            When you say a $6 billion market capitalization, is

18   that the term you used?

19   A.  Yes.

20   Q.  What does that mean, "market capitalization"?

21   A.  That is the total number of shares outstanding times the

22   stock price.  So if it has --

23   Q.  If you wanted to buy all the stock of Darden at that time,

24   it would cost you about $6 billion?

25   A.  It would cost you $6 billion at the time, that's correct.

H3sdwal2                          Mitarotonda - direct

1    Q.  When you say that the larger -- I mean, when you were using

2    the word stake -- were you using the word "stake"?  What did

3    you mean by stake?

4    A.  An ownership interest in the company.

5    Q.  What did you mean when you said "in order to be taken

6    seriously"?  In other words, how are you taken more or less

7    seriously in a situation like this?

8    A.  Well, the Board of Directors of a public company represent

9    the interests of the owners.  We are all part owners if you own

10   a thousand shares of a stock or if you own 50 percent of the

11   shares of a stock.  There is a Board of Directors, and that

12   Board of Directors represents the interests of all of the

13   owners.  And clearly, obviously, the larger you own of the

14   company, the more serious that they will take you.  Not that

15   they will discard if somebody owns a thousand shares and calls

16   them up and says I think you should do this and I think you

17   should do that, but it won't be the same way as if somebody

18   shows up with 9 percent ownership of the company and says I

19   think you should do this and I think you should do that.

20   Q.  I apologize.  Remind us how much money you thought you

21   needed for this particular deal?

22   A.  Around $150 million.

23   Q.  How much of that was Barington Capital going to invest of

24   its own money?

25   A.  Around $15 million, approximately.

H3sdwal2                          Mitarotonda – direct

1   Q.  So the rest would come from outside investment?

2   A.  Yes.

3   Q.  Now, at some point did Darden learn about your plan?

4   A.  Well, eventually when we were comfortable that we were very

5   confident about the investment and comfortable with the plan

6   that we were about to propose, we did write a letter to the

7   chairman and chief executive of the company, a gentleman by the

8   name of Clarence Otis, and the letter did spell out that we had

9   formed an investment group that owned an interest in the

10  company and that we felt that there were things that the

11  company could do to enhance its value and we wanted to meet.

12  Q.  Was that letter public?

13  A.  No.

14  Q.  To whom was it sent?

15  A.  It was sent -- excuse me.  It was sent to -- is it OK if I

16  have a -- well, it was sent to the chairman and CEO of the

17  company.

18          THE WITNESS:  I just wanted a cup, please.  There is a

19  cup here but it already has water in it.

20          MR. GOLDMAN:  You don't want to use someone else's

21  cup?

22          THE WITNESS:  No.

23          THE COURT:  Highly inadvisable.  If you would take the

24  old one away, Flo, I would appreciate it.

25          THE CLERK:  Yes.

1    THE WITNESS:  Thank you, Flo.

2    (Pause)

3    BY MR. FERRARA:

4    Q.  OK.  So at some point did you meet with the executives of

5    Darden?

6    A.  The first meeting that we had with the chairman and CEO was

7    in June of 2013 at the headquarters of the company.

8    Q.  Where were their headquarters.

9    A.  Orlando, Florida.  And it consisted of myself and two

10   colleagues, a guy by -- a colleague from Barington and an

11   investment banker that we hired as well who was a specialist in

12   these real estate conversions into what is known as a real

13   estate investment trust, a REIT.

14   Q.  Who was present from the Darden side?

15   A.  There were four people, one of which was the chairman and

16   chief executive.  The CFO was there.  The treasurer of the

17   company was there.  And the head of Investor Relations was also

18   at the meeting.

19   Q.  What did you present to Darden at that meeting?

20   A.  We presented that plan, a draft of that plan, and discussed

21   with Mr. Otis what I felt would enhance shareholder value by

22   creating three companies, cutting costs.  We felt that the

23   company's cost infrastructure was extremely bloated, and we

24   felt that there were a couple of hundred million dollars of

25   costs that could be cut.  Even the company's headquarters.

1   They had built this luxurious $153 million headquarters which

2   was a complete waste of money.

3   Q.  What were the Darden executives' response to your plan?

4   A.  They were nice.  They were respectful.  They were

5   responsive.  They said we'd take a look at it.  We would like

6   to even engage some advisors to take a look at the plan and

7   we'd be happy to have a further discussion.

8   Q.  Were the Darden executives with whom you met subject to a

9   nondisclosure agreement?

10  A.  No.  They could have done whatever they wanted at that

11  point, but there would be no reason for them to do anything

12  like that because we were dealing about the company.

13  Q.  Why would there be no reason for them to disclose what you

14  discussed?

15  A.  Well, they wouldn't want to announce that, you know, some

16  activist showed up today and I presented a plan, and they would

17  rather do that on their own if they were to take such an

18  action.

19  Q.  As far as you know, did anyone at Darden make your plan

20  public?

21  A.  No.

22  Q.  Now, at that time -- so that's June 2013 -- were you still

23  looking for outside investors?

24  A.  Yes.

25  Q.  So again, in June 2013, was this deal, was your plan, was

1  that still confidential or had it become public at that time?

2  A.  It was still confidential.

3  Q.  Have you heard the name Tom Davis?

4  A.  Yes.

5  Q.  How did you come to know Tom Davis?

6  A.  A gentleman by the name of Al Holland from Dallas, Texas,

7  someone that I had known, had approached me around that time

8  about trying to have some sort of involvement with our firm to

9  introduce to us very affluent investors from Texas.  He, of

10  course, claimed that he was very close with a number of them

11  and would be happy to introduce these investors.  Of course,

12  obviously he would get paid if that was the case.  But he

13  wanted some sort of an involvement.

14        And he did.  We did go to Texas, again, my colleagues

15  and I, and we did meet with a couple, and then he did call me

16  and said I have someone that I'd like to introduce to you.  He

17  is the chairman of Dean Foods.  His name is Tom Davis.  And

18  that's how I met him.

19  Q.  For clarity, it was Mr. Holland sort of introducing you?

20  A.  Yes.

21  Q.  And Mr. Holland introduced you to Tom Davis?

22  A.  Yes.

23  Q.  Why was Mr. Davis an attractive investor?

24  A.  Well --

25  Q.  Or co-investor?

H3sdwal2                        Mitarotonda – direct

1    A.  Mr. Holland stated that he thought that Mr. Davis and this

2    investment vehicle, he could represent some investors that

3    could invest up to $50 million in this co-investment.  He also,

4    of course, having been the chairman of Dean Foods, which is a

5    fairly substantial milk company involved in foods, I felt it

6    was relevant as well, and obviously given his role at the

7    company, you know, it's something that if we got to requesting

8    board representation, I could have even considered him to be a

9    director of the company.

10   Q.  Did Mr. Davis execute a nondisclosure agreement with you?

11   A.  Yes.

12   Q.  Let's take a look at what's in evidence as Government

13   Exhibit 1800.

14   A.  Mm-hmm.

15   Q.  What is that?

16   A.  Well, this is the nondisclosure agreement that was executed

17   by Mr. Davis.

18   Q.  And what is the date of that?

19   A.  July 31st.

20   Q.  So I want to make sure this is clear, I guess.  Was the

21   plan for Mr. Davis to invest in Barington Capital, or was the

22   plan for Mr. Davis to invest with Barington Capital in Darden

23   Restaurants?

24   A.  With Barington Capital in Darden Restaurants.  And we had

25   formed a special purpose acquisition -- excuse me, a special

1    purpose vehicle that could hold the investment of some

2    co-investors and if it was substantial enough, then it could

3    also be a direct investor, of course, alongside of all of the

4    other co-investors and Barington's fund.

5    Q.  So, in other words, you had investors that had given you

6    money directly, Barington Capital; Mr. Davis would own his own

7    shares of Darden Restaurants?  Is that how it would work?

8    A.  Yes.  But everything would be done together and pro-rata.

9    The shares would be purchased together.  The shares would be

10   sold together.

11   Q.  Now, again, you described NDAs to us.  Generally speaking,

12   just remind us what restrictions this NDA placed on Mr. Davis.

13   A.  Well, this says that Mr. Davis can't buy stock.  He can't

14   share the information of the company with anyone else.  He

15   can't share the plan.  He can't share the name with anyone

16   else.

17          MR. FERRARA:  So let's take this one down.  Thank you.

18   And let's put up Government Exhibit 1809, which is in evidence.

19          If we could blow that up.  Thank you so much.

20   Q.  All right.  So what are we looking at here?

21   A.  Well, this is an email from Al Holland to Tom Davis that

22   basically says --

23   Q.  Before you read it --

24   A.  Sure.

25   Q.  -- what is the date of this email?

H3sdwal2                         Mitarotonda - direct

1    A.   July 31st.

2    Q.   Of 2013?

3    A.   Yes.  Excuse me.

4    Q.   Are you on this email?

5    A.   No.

6    Q.   OK.  So if we look here at the substance of this email,

7    Government 1809, you see the first bullet point here says,

8    "Target D is a well run NYSE Co.  Therefore, my thinking of you

9    personally as to your expertise in this area."

10            Let me step back.  What is -- why is Mr. Holland

11   sending this email to Mr. Davis?  What is the purpose of this

12   email?

13   A.   To attract the interest of Mr. Davis.

14   Q.   So why doesn't -- did Mr. Holland write other emails that

15   you were included on that were like this to other people?

16   A.   I don't recall those that I might have been included on and

17   those that I might have not.  If he was communicating to people

18   like Mr. Davis, I would not have been included.  So, I don't

19   know.

20   Q.   Why wouldn't Mr. Holland simply say that Target D -- why

21   would he not just name Darden in this email?

22   A.   Well, Mr. Holland had signed an NDA himself, a

23   nondisclosure agreement, so he would not have disclosed

24   anything to -- he should not have disclosed anything to anybody

25   until, of course, the individual would have signed the

H3sdwal2                          Mitarotonda - direct

1   nondisclosure agreement and then it would -- they would meet

2   with us.

3   Q.  I think I'm asking a bad question.  So what I'm trying to

4   get at is is this email something that Mr. Holland would send

5   typically before someone had signed an NDA or after someone had

6   signed and NDA?

7   A.  Typically before.  It's possible it could have been after

8   but typically before.

9   Q.  And is this -- you were describing earlier how you get

10  investors into a deal before they have signed an NDA.  Do you

11  remember you were talking about that?

12  A.  Yes.

13  Q.  Is this email an example of trying to bring outside

14  investors into the deal?

15  A.  By a third party, for example, or even us, it would be more

16  of a generic type of email where the company could not be

17  identified and it would be just a brief description of the

18  business.

19  Q.  Now, this email is dated July 31, 2013.  If we look at the

20  second bullet point, it says, "The public announcement of Deal

21  Dee will be made in the next week or so."

22          MR. FERRARA:  If we could just blow that up?  Thank

23  you so much.  That is the second bullet point.  Perfect.

24  Q.  Do you see that?

25  A.  Yes.

H3sdwal2                          Mitarotonda - direct

1   Q.  Was that accurate?

2   A.  No.

3   Q.  Why not?

4   A.  Because it was July 31st.  We were having discussions with

5   the company.  We weren't close to -- we were still hopeful, of

6   course.  We were very hopeful.  We were hopeful, one, in

7   raising some additional capital to co-invest and increase our

8   ownership stake in the company, our ownership interest in the

9   company, and, also, we were having discussions with the

10  company.  They had engaged Goldman Sachs.  Goldman Sachs did

11  meet with us -- I don't recall the date, but did meet with us

12  about the valuation of the real estate, what they thought was

13  the valuation of the real estate, other things about the

14  business.  So, no, that's just a statement that is incorrect.

15  Q.  At this time, July 31st, was the deal public?

16  A.  No.

17  Q.  And was it in fact announced about a week later?

18  A.  No.

19  Q.  I want to take a look at one other thing in this exhibit,

20  1809.  If we look at where it says "attachments."

21  A.  Yes.

22  Q.  Do you see, it says, "Project Dee - presentation 7.23.13

23  pdf," do you see that?

24  A.  Yes.

25  Q.  Would that be the deal book that we saw as Exhibit 1809A

H3sdwal2                      Mitarotonda - direct

1   earlier, do you know?

2   A.  I will think so if it says "presentation 7.23.13 pdf."

3   Q.  Do you know if Mr. Davis had signed an NDA before receiving

4   this email?

5          (Pause)

6          Do you know?

7   A.  Well, it's dated July 31st but I don't know what time it

8   was received by us, and so the answer is I did not know -- I

9   don't know if it was -- if he signed it before or after he

10  received this email and we received it then.  He had signed and

11  sent one version which he signed at the incorrect place, and

12  our general -- internal general counsel sent it back in order

13  to sign it at the appropriate place, as well, but I'm not sure.

14  Q.  Whether Mr. Davis signed the NDA before or after receiving

15  this, would the NDA apply to his receipt of this deal book?

16  A.  Absolutely.  Yeah, it wouldn't really matter if he got it

17  three minutes before or three minutes later.

18          MR. FERRARA:  OK.  So we can take that down.  Thank

19  you so much, Ms. Meister.

20  Q.  Why don't we jump ahead a few days and talk about

21  August 7th of 2013.

22          Did you meet with Davis that day?

23  A.  Yes.

24  Q.  Let's take a look at what's been marked -- this is not in

25  evidence -- what's been marked as Government Exhibit 1754.

1       Are you able to see that, sir?

2   A.  Yes.

3   Q.  What is that?

4   A.  This is an email from Jared Landaw to Mr. Davis.  I am

5   cc'ed on the email.

6   Q.  And what is the date?

7   A.  August 6th.

8   Q.  Of 2013?

9   A.  Yes.

10          MR. GOLDMAN:  The government offers 1754.

11          MR. ESTES:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibit 1754 received in evidence)

14          MR. FERRARA:  If we can throw that up on the screen.

15  Thank you so much.

16          If we could just blow up the text, Ms. Meister.  Thank

17  you.

18  Q.  So this is from -- sorry, who is Mr. Landaw?

19  A.  He's the chief operating officer and general counsel of

20  Barington Capital.

21  Q.  This is memorializing sort of an email before the meeting

22  on August 7th?

23  A.  Yes.  Jared handles all of the nondisclosure agreements and

24  so he was in communication -- he was responding and

25  corresponding with Mr. Davis.

H3sdwal2                          Mitarotonda - direct

1   Q.  Where was the meeting with -- we could take that down.
2   Thank you so much.
3           Where was the meeting with Mr. Davis on August 7th?
4   A.  At our offices, Barington's offices in -- on 57th Street
5   and Seventh Avenue.
6   Q.  What did you discuss with Davis at the meeting?
7   A.  We discussed the company.  We discussed our plan for the
8   company.
9           There were two people at the meeting.  Mr. Davis was
10  alone.  And I was included at the meeting by Gus Vlak, an
11  advisor to Barington.
12  Q.  So how much detail would you have described about the plan
13  with Mr. Davis at that time?
14  A.  All of the detail that would be included in the
15  presentation.
16  Q.  Was that information confidential?
17  A.  At that point, yes, of course.
18  Q.  Did Mr. -- would Mr. Davis' nondisclosure agreement have
19  applied to what was discussed at that meeting?
20  A.  Absolutely.
21  Q.  At any point, did Davis ask for Barington Capital's
22  permission to disclose the details of the plan to anyone else?
23  A.  No, he did not.
24  Q.  Did Davis ever tell you he had done so?
25  A.  No, he did not.

H3sdwal2                          Mitarotonda - direct

1   Q.  Would you have expected him to do so?

2   A.  No.

3   Q.  In August of 2013, was the deal public?

4   A.  It was not.

5   Q.  And at that point, August 2013, how could it have hurt the

6   deal if it had become public?

7   A.  Well, again, we were still trying to attract some

8   additional capital to increase our ownership stake in the

9   company.  We were still engaged in discussions with the

10  company.  We did own an interest in the company, but we did not

11  want for the investment to be made public at that point.

12  Q.  Did you have any other communications with Davis after the

13  August 7th meeting?

14  A.  I did call him a few times but he did not respond any

15  longer.  Eventually I stopped calling him.

16  Q.  Did Davis ultimately invest in the deal?

17  A.  No, he did not.

18  Q.  So let's move ahead a little bit in 2013.

19          THE COURT:  All right.  Ladies and gentlemen, let's

20  take our mid-morning break before we time travel ahead in time.

21          Remember, do not discuss the case among yourselves or

22  with anyone.  Keep an open mind.  We'll be back in action in

23  ten minutes.  Thank you.

24          (Jury not present)

25          THE COURT:  You are on a 10-minute break.

1           (Recess)

2           (Jury present)

3           THE COURT:  All right.  Be seated.

4           Mr. Ferrara, you may continue.

5           MR. FERRARA:  Thank you, your Honor.

6   BY MR. FERRARA:

7   Q.  OK, sir.  So before -- before we time travel, I wanted to

8   ask one last question about Mr. Davis.

9           Did the NDA that Mr. Davis signed cover all of your

10  conversations with him about this deal?

11  A.  Yes.

12  Q.  All right.  Let's time travel.

13          So if we move ahead a little bit in 2013, was Darden's

14  CEO receptive or unreceptive to your plan at that time?

15  A.  Well, his communication with us was somewhat receptive but

16  the action really was not.  There were a couple of meetings

17  that we did have that were canceled, and we just felt that we

18  should go directly to the Board of Directors, which we did.  We

19  wrote a letter to the Board of Directors of the company.

20  Q.  Let's take a look at what's been marked for identification

21  as Government Exhibit 1804.

22          What is that?

23  A.  This is a letter that we wrote directly to the Board of

24  Directors of Darden.

25  Q.  What is the date?

H3sdwal2                          Mitarotonda – direct

1    A.   September 23, 2013.

2             MR. FERRARA:  The government offers 1804.

3             MR. ESTES:  No objection.

4             THE COURT:  Received.

5             (Government's Exhibit 1804 received in evidence)

6             MR. FERRARA:  If we could throw that up on the screen.

7    BY MR. FERRARA:

8    Q.   OK.  So, generally, just tell us, what is this letter

9    doing?

10   A.   It's notifying the Board of Directors of the company that

11   we represent an investment group that has an interest in the

12   company, and we were communicating to them our thoughts about

13   the plan that we felt that the company should implement.

14   Q.   Now, if the CEO was being, I think, as you said, somewhat

15   receptive, why send this letter to the board at this time?

16   A.   We wanted to see further action.  We wanted this plan to be

17   embraced.  We were extremely confident that this was a plan

18   that would enhance value, and he was not being as responsive as

19   we felt he was or should have been.

20   Q.   Had you communicated directly with Darden's Board of

21   Directors prior to December 23, 2013?

22   A.   No.

23   Q.   I'm sorry?

24   A.   No, we did not.  I did not.

25   Q.   Nevertheless, as far as you know, did Darden's Board of

1  Directors know about the plan prior to this letter?

2  A.   Our communication was strictly with Clarence Otis up to

3  that point, and Clarence did represent that he had spoken to

4  the board but we would have no way of knowing that.

5  Q.   What effect, if any, did this letter to the Board of

6  Directors have?

7  A.   Not much.  We didn't get a response from them.

8         MR. FERRARA:  We could take this down.  Thank you.

9  Q.   So what did you do next?

10 A.   Well, we decided to make our investment public at that

11 point.  And we could have done that by issuing a press release

12 which we would send to a newswire, and it could have been

13 picked up by some of the newspapers.  What we decided to do was

14 to give it directly to the Wall Street Journal, and that's how

15 we would go public.  If we owned more than 5 percent, then we

16 would have to file with the SEC a 13-D, which, of course,

17 discloses our interest if our group had more than 5 percent.

18 But since we were less, we decided that we needed to put more

19 pressure on the company and we felt the best way to do that is

20 to do it via the Wall Street Journal.

21 Q.   Let's take a look at what's been marked as Government

22 Exhibit 1808, just for the witness.

23         What's this that?

24 A.   It's an article that appeared in the Wall Street Journal on

25 the morning of October 9th, and that's when it was disclosed

H3sdwal2                         Mitarotonda - direct

1    that we represented a group.

2    Q.  Yes.  Before we get into what the article talks about, let

3    me just offer 1808.

4              MR. ESTES:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 1808 received in evidence)

7              MR. FERRARA:  If we could throw that up on the screen,

8    Ms. Meister.  Thank you so much.

9    BY MR. FERRARA:

10   Q.  OK.  So the date is October 9, 2013.  And what generally

11   does this article describe?

12   A.  That Barington along, with other investors, is taking an

13   interest in the company, 2.8 percent, and that it has some

14   brief information on Barington and has some brief information

15   on Darden and states some of the actions that we wanted the

16   company to take.

17   Q.  To be clear, who provided the information to the Wall

18   Street Journal?

19   A.  We did.

20   Q.  Now, you said, I think, was it that you wanted to put

21   pressure?  Was that what you said?  How would doing this apply

22   pressure to Darden?

23   A.  Well, once it would become public that there was an

24   activist that has an ownership interest in the company and that

25   plan is presented public, the company would have to take some

1    action to improve its value.  The company was underperforming

2    for a long time.  By "underperforming," both operationally,

3    their profits had been declining, the revenues had been

4    declining on some of their brands.  It was just not being run.

5    And we felt that there was tremendous amount of value that was

6    not being recognized.

7    Q.  Was this article the first time your plan had been made

8    public?

9    A.  Yes, at least a description of the plan.

10   Q.  Now, earlier you described to us how it might hurt the deal

11   if it had been made public earlier, in other words, in March of

12   2013 or June of 2013.  Do you remember that?

13           Why did those reasons --

14           THE COURT:  Do you remember that?

15           THE WITNESS:  I do.

16           THE COURT:  Thank you.

17           MR. FERRARA:  Pardon me.  You have to say "yes" and

18   not nod.

19           Thank you, your Honor.

20   Q.  Why did those reasons no longer apply in October of 2013?

21   A.  Two reasons:  One, we did have an ownership interest in the

22   company, which we felt was meaningful; and, two, we had reached

23   the point with the company that we felt that we needed to

24   really ratchet up the pressure in order to get them to

25   implement a plan.  We were hopeful that the company would

1   embrace the plan on their own and there would have been all of

2   Mr. Otis' idea and would have created value and we were still

3   hopeful, but it was clear to us by then that that was not going

4   to be the case.

5   Q.  Were you violating a nondisclosure agreement by going to

6   the press?

7   A.  No.

8   Q.  Why not?

9   A.  It's our own deal.

10  Q.  So what happened to Darden's stock price after the Wall

11  Street Journal story ran?

12  A.  It increased that day 7, 8, 9 percent I think it was.

13  Q.  Do you recall how much Darden stock you owned at that time?

14  A.  Well, the group owned approximately just under 2.8 percent

15  of the company.

16  Q.  Do you recall roughly how many shares that was?

17  A.  Oh, I don't recall the number of shares.

18  Q.  Did you tell Darden you had gone to the press in October --

19  on October 9, 2013?

20  A.  No, we didn't.

21  Q.  In fact, did you give the impression to the Darden CEO that

22  you were not behind this article?

23  A.  We were still hopeful that the company would implement the

24  plan and so that is what we wanted to do, yes.

25  Q.  So why did you want to leave the impression that you were

1    not behind this article?

2    A.  We were still having discussions with the chairman and CEO

3    of the company so I didn't want to break that off.

4            MR. FERRARA:  We can take that down, Ms. Meister.

5    Thank you so much.

6    Q.  Did Darden ultimately adopt your proposal on its own?

7    A.  Well, eventually we actually did a webinar where we

8    presented the plan and made the plan public to all of the

9    shareholders, and a lot of shareholders did attend this webinar

10   that we did.  That was early December.  And the company then

11   did present the plan in mid-December, which called for some

12   cost cuts, not nearly as close as what we felt that the company

13   could implement, and they did announce a sale of Red Lobster.

14   They felt that they should sell Red Lobster.

15   Q.  When you are talking about December, is that December 2013?

16   A.  I don't recall the exact date but yes.

17   Q.  Did there come a time when another private equity firm

18   bought a controlling interest in Darden?

19   A.  On the 23rd of December another activist firm announced

20   that they owned a 5 percent stake in the company, and that was

21   announced both with the Wall Street Journal as well as their

22   filing of a 13-D.

23   Q.  Did they implement the plan that you had proposed?

24   A.  Well, they actually proposed a plan that was very similar

25   to ours with one difference.  They felt that LongHorn should be

1   in the specialty restaurant group.  And as a result of the

2   action that was taken by the company, which was they eventually

3   did sell the Red Lobster chain to a private equity firm, we

4   opposed that.  The other activist fund also opposed that.  And

5   the other activist fund did go out directly to the shareholders

6   for a vote on the sale of Red Lobster, which was a majority

7   vote but was not implemented by the company.  They didn't have

8   to; it wasn't a binding vote.  But they proceeded against the

9   wishes of the shareholders to sell Red Lobster, and eventually

10  there was a proxy by the other activist firm and the board was

11  replaced.

12  Q.  So was your plan ever implemented?

13  A.  Well, the plan of the other activist was implemented, which

14  was very similar to ours.

15  Q.  So did you get credit for that plan?

16  A.  They clearly got credit, and I think we absolutely received

17  an awful lot of credit for that.

18          MR. FERRARA:  May I have one moment, your Honor?

19          THE COURT:  Yes.

20          (Pause)

21          MR. FERRARA:  Nothing further, your Honor.

22          (Continued on next page)

23

24

25

1           THE COURT:  Mr. Estes, you may cross-examine.

2           MR. ESTES:  Your Honor, we have no questions of this

3    witness.

4           THE COURT:  You may step down, sir.  Thank you very

5    much.

6           (Witness excused)

7           THE COURT:  Call your next witness.

8           MR. FERRARA:  Yes, your Honor.  The government calls

9    Scott Duncan.

10          I apologize, I think he's just right outside, your

11   Honor.

12          (Witness sworn)

13          THE DEPUTY CLERK:  Please be seated.  State your name

14   and spell it for the record, please.

15          THE WITNESS:  My name is Scott Duncan.  S-C-O-T-T

16   D-U-N-C-A-N.

17          THE COURT:  You may inquire, Mr. Ferrara.

18    SCOTT DUNCAN,

19       called as a witness by the Government,

20       having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. FERRARA:

23   Q.  Good morning, Mr. Duncan.

24   A.  How are you.

25   Q.  How old are you?

H3S3WAL3                    Duncan - direct

1    A.  I am 47 years old.

2    Q.  Where did you go to college?

3    A.  Arizona State and UNLV.

4    Q.  Both for undergrad or did you do a graduate degree?

5    A.  No, it was undergrad.

6    Q.  What degree did you graduate with?

7    A.  Psychology.

8    Q.  Where do you currently work?

9    A.  Wells Fargo Advisors.

10   Q.  Is that a brokerage firm?

11   A.  It is, yes.

12   Q.  Can you explain what a brokerage firm is.

13   A.  Brokerage firm is a firm that primarily makes investments

14   for clients.

15   Q.  What sorts of investments?

16   A.  It ranges, but stocks, bonds, mutual funds, ETF, options,

17   futures.

18   Q.  What sorts of clients?

19   A.  Well, I mean, the clients vary.  Some of them are active

20   traders, some of them are conservative longterm investors.

21   Q.  What is it you specifically do at Wells Fargo?

22   A.  I manage money for a number of different clients.  I handle

23   401(k)s, but primarily I handle individual accounts for

24   investors.

25   Q.  Do you have any professional licenses or certifications?

1  A.  Yes, I do.

2  Q.  What are those?

3  A.  Series 7, 63, 65, 31, 3, and life insurance.

4  Q.  Why do you have those licenses?

5  A.  I'm required to have them to conduct business.

6  Q.  Do you know a person named William Walters?

7  A.  I do.

8  Q.  How do you know Mr. Walters?

9  A.  He is -- he was a longtime client.

10  Q.  Do you see Mr. Walters in the courtroom today?

11  A.  There he is.  I do see him.

12      THE COURT:  Where is he seated and name an article of

13  clothing.

14      THE WITNESS:  Right in the middle there.  White hair.

15      THE COURT:  First table or second table?

16      THE WITNESS:  I'm sorry, second table.  Looks like a

17  yellowish tie.

18      THE COURT:  Identification noted.  Go ahead.

19  Q.  Sorry, did you say you were once Mr. Walters' broker?

20  A.  That's correct.

21  Q.  When was that?

22  A.  From 2009, about March or April of -- April or May of 2009

23  to 2011.

24  Q.  How did you come to be Mr. Walters' broker?

25  A.  I took over the -- he was a longtime client of my father's,

```
1    and when my father retired, I took over his book of businesses.

2    Q.  That was around when?

3    A.  That was around April, May 2009.

4    Q.  What type of investing did Mr. Walters do through you?

5    A.  Primarily stocks.

6    Q.  Were you his primary stockbroker at the time?

7    A.  I'm not sure that I was, but I believe that I was.

8    Q.  How frequently did you speak to Mr. Walters during that

9    time period?

10   A.  Well, I called, I always called him at the close of the

11   market everyday.  So, at least once a day, but it varied.  I

12   mean, you know, a lot of times I'd call him before the open if

13   there was news on a stock that he owned or anything that I

14   thought was pertinent.  And if we're actively trading, I might

15   talk to him five or six times a day.

16   Q.  You used you the word "call."  So did you speak by phone?

17   A.  Correct.

18   Q.  Did you also e-mail with Mr. Walters?

19   A.  Yes, occasionally.

20   Q.  Can you give us a sense of what was generally the nature of

21   your discussions with Mr. Walters.

22   A.  Well, I mean, it really depended on the call.  It was --

23   when I would call him at the close of business, it was about

24   how the stocks did for the day, what was up and down, any

25   aftermarket information on any of the stocks, what the --
```

H3S3WAL3                          Duncan - direct

1   probably what the whole account was up or down.  And you know,

2   and any pertinent news.

3   Q.  How about if you spoke throughout the day.  What reasons

4   might you and Mr. Walters have to talk throughout the trading

5   day?

6   A.  Well, if he was actively trading, I would probably tell him

7   how many shares we got done or if there was any news or what,

8   you know, if there was a major move in a stock that he owned.

9   Q.  Were you aware of where Mr. Walters held his primary

10  brokerage accounts?

11  A.  I believe it was with us, but I don't know that.

12  Q.  "With us" being Wells Fargo?

13  A.  Yes.

14  Q.  Did you ever socialize with Mr. Walters?

15  A.  No, we -- we didn't socialize.  But there were a couple of

16  business-related like luncheons we had.

17  Q.  How many accounts did Mr. Walters have at Wells Fargo at

18  that time?

19  A.  He had two accounts.

20  Q.  What names were the accounts controlled by Mr. Walters?

21  A.  Walters Group, The Walters Group was one of them, and the

22  other one was Nature Development.

23  Q.  What do you know about The Walters Group?

24  A.  Well, they were I believe involved in a number of business

25  activities, golf courses, real estate development, and stock

H3S3WAL3                          Duncan - direct

1    investing as well.

2    Q.  What do you know about Nature Development?

3    A.  I believed it was an offshore account.  Other than that, I

4    don't know much.

5    Q.  Do you know Michael Luce?

6    A.  I do, yes.

7    Q.  Who is Michael Luce?

8    A.  He was the CFO for The Walters Group.

9    Q.  So, I think you sort of answered this, but those accounts

10   you just described, Nature Development and Walters Group, as

11   far as you know, were those Mr. Walters' primary trading

12   accounts at that time?

13   A.  As far as I know.

14   Q.  You're not still Mr. Walters' broker today, is that right?

15   A.  That's correct.

16   Q.  Why not?

17   A.  The account closed.

18   Q.  When did the account close?

19   A.  2011.

20   Q.  So let's talk a little about Mr. Walters' trading.  And

21   actually let me step back before I do that.

22           About how many clients did you have in addition to

23   Mr. Walters during this time period?

24   A.  I couldn't put an exact number on it, but it was certainly

25   in excess of 200, maybe 250, maybe even more than that.

H3S3WAL3                          Duncan - direct

1  Q.  Were those clients individuals, were they sort of what we

2  think of as institutional investors, did it vary?

3  A.  Well, yeah, it did vary.  I mean, I had corporate accounts,

4  primarily individual investors.

5  Q.  I want to ask about what's sometimes called managing assets

6  versus serving as a broker.  Do you understand the distinction

7  between those two things?

8  A.  Yeah, I do.

9  Q.  Can you explain what each of those things are and what the

10  differences are?

11  A.  Managing assets primarily is making investment

12  recommendations based on a financial plan that was put together

13  for a client.  Serving as a broker, you serve more as almost an

14  order taker for buys and sells.

15  Q.  Which role did you play as to Mr. Walters?

16  A.  I was a broker.

17  Q.  How did you make money from your account with Mr. Walters?

18  A.  Commissions.

19  Q.  How did that work?

20  A.  There was a commission every time there was a buy and sell.

21  Q.  All right.  So let's just sort of maybe break it down a

22  little bit in terms of detail.  Was the commission a set amount

23  or did it vary?

24  A.  Oh no, it varied.

25  Q.  Give us a sense of what the commission range might have

1    been and why it would vary.

2    A.  Well, so, generally it was never more than 2 cents a share,

3    but a lot of times it was a lot less than that.  It depended on

4    the stock.  And if it was a very low priced stock, we would

5    sometimes do a half a cent a share or even lower than that.

6    Q.  So the most you would make is 2 cents per stock, is that

7    right?

8    A.  Primarily, yeah.

9    Q.  If someone traded two shares of a stock, you would make 4

10   cents?

11   A.  Correct.

12   Q.  You said it could be less than that?

13   A.  Yes.

14   Q.  What factors might go into it being less than 2 cents per

15   share?

16   A.  If it was a lower priced stock, maybe a more illiquid

17   stock, you know, if it was a penny stock.  Not necessarily a

18   penny stock, but a very low priced stock, we would lower the

19   amount.

20   Q.  What do you mean when you say "illiquid"?

21   A.  Meaning there is not as much volume on the stock.  It

22   doesn't trade as many shares per day.

23   Q.  Was the commission, was this sort of commission structure

24   that you described, was that the same for all of your clients?

25   A.  No.  Uh-uh.

H3S3WAL3                        Duncan - direct

1   Q.  How did the commission structure, how, if at all, was it

2   different as to Mr. Walters?

3   A.  Well, he paid much lower commissions per share than anyone

4   else.

5   Q.  Why is that?

6   A.  Because he did a lot more business.

7   Q.  When you say "a lot more business," you mean?

8   A.  A lot more transactions.

9   Q.  So in other words, transaction being a buy or a sell?

10  A.  Correct.

11  Q.  So is it fair to say the more a client trades, the more

12  money you make?

13  A.  Correct.

14  Q.  All right.  Sorry, so now let's focus on Mr. Walters'

15  accounts.

16          Do you recall how much, around how much Mr. Walters

17  had in his two accounts when you took over from your father as

18  the primary broker in around April of 2009?

19  A.  I don't know the exact amount.  But I would say it was

20  around -- the total value is around 50 million.

21  Q.  When you say the total value, what do you mean?

22  A.  The total stock value.

23  Q.  So, if the total value then is -- the total stock value was

24  around 50 million, did that mean Mr. Walters had $50 million in

25  his account?

H3S3WAL3                      Duncan - direct

1   A.  No.  It meant the stock value was 50 million, but because

2   we used margin, he had equity in an amount lower than that.

3   Q.  Let's talk about some of those terms you used.  What is

4   margin?

5   A.  Margin is simply a loan from the firm.  It lets you borrow

6   against securities in your account.

7   Q.  What is equity?

8   A.  Equity is your ownership.

9   Q.  So, if Mr. Walters had $50 million worth of stock, do you

10  have a sense of how much equity he would have to have in his

11  account, how much money of his own money he would have to have

12  for the bank to loan him to get him to the 50 million in stock?

13  A.  Well, it changed over time.  So he may have at the time had

14  25 million in equity.  But it changed.

15  Q.  Right.  So just as example, again, it might be that

16  Mr. Walters had 25 million of his own money and the bank loaned

17  him for instance another 25 million?

18  A.  Correct, yes.

19  Q.  That's called trading on margin?

20  A.  Yes.

21  Q.  So, you said it varies.  The amount of margin that the bank

22  extended to Mr. Walters varied I think you said.  Is that

23  right?

24  A.  That's right.

25  Q.  At sort of I guess what I'll call its peak, how much could

```
 1    Mr. Walters invest on margin in his accounts with Wells Fargo
 2    while you were his broker?
 3    A.  Well, they -- at the peak, he had a 30 percent equity
 4    requirement.
 5    Q.  So just give us -- just make up numbers.
 6    A.  What that means is you could have $10 million in stock and
 7    have 3 million in equity, basically.
 8    Q.  3 million of your own money and the bank would loan you the
 9    other 7 million?
10    A.  Right.
11    Q.  Where did Mr. Walters rank in terms of assets that you
12    managed, where did he rank among your other clients?
13    A.  I mean, it varied because there was money, I mean, moved in
14    and out of the accounts.  But it was certainly at some times he
15    was probably at the most assets, but top five or six.  I mean,
16    it varied from month to month and year to year.
17            THE COURT:  I just want to ask a clarifying question.
18    In response to the last question you were asked, did you mean
19    to imply that you managed these accounts?
20            THE WITNESS:  No.  I meant the amount of money that
21    was held in the accounts.
22            THE COURT:  All right.
23            MR. FERRARA:  Thank you for the clarification.
24    Q.  In terms of commissions, where did Mr. Walters rank?
25    A.  Number one.
```

H3S3WAL3                          Duncan - direct

1    Q.  So why the difference?  Why are you able to say he was

2    definitely number one as to commissions but it varied as to

3    assets?

4    A.  Well because he was -- he was a lot more active trader.

5    Assets don't necessarily equate to commissions.  So, he was an

6    active trader, so the commissions were a lot more.

7    Q.  Let's talk a little bit more about your investment

8    relationship or your business relationship with Mr. Walters.

9              You described earlier speaking by phone and why you

10   would speak by phone, and I think you also said you would

11   e-mail from time to time?

12   A.  Yes.

13   Q.  Why might you e-mail with Mr. Walters instead of call?

14   A.  Well, I e-mailed research reports, any analyst updates, if

15   he requested kind of a financial breakdown on the accounts I'd

16   have my assistant put it together.  We'd e-mail things like

17   that.

18   Q.  Would he e-mail you?

19   A.  Yes, he would.

20   Q.  What might he e-mail you about?

21   A.  He'd e-mail me research reports, maybe information on

22   conference calls that he'd like me to listen in on, and that

23   was what he would e-mail me.

24   Q.  Did you have authority to invest in Mr. Walters' accounts

25   without his authorization?

H3S3WAL3                          Duncan - direct

```
 1    A.  No.
 2    Q.  Who made the final decision about what stocks to buy and
 3    sell in Mr. Walters' accounts?
 4    A.  He did.
 5    Q.  Who came up with the ideas for stocks that he invested in?
 6    A.  He did.
 7    Q.  Did you ever suggest a stock that Mr. Walters purchased?
 8    A.  No.
 9    Q.  Was every stock purchased initiated by him?
10    A.  Yes.
11    Q.  How about sales?
12    A.  Yes.
13    Q.  Every one of them?
14    A.  Yes.
15    Q.  That was over what time period?
16    A.  Over two -- roughly two and a half years.
17    Q.  Typically, how would you learn that Mr. Walters was
18    interested in buying a stock?
19    A.  He would -- he would call me and either say, hey, take a
20    look at this stock or what do you think, or he might call and
21    take a position in a stock.
22    Q.  So he might call and take a position the first time you
23    spoke about it?
24    A.  At times.
25    Q.  After he said he was interested in a stock, what would you
```

H3S3WAL3                          Duncan - direct

1    typically do?

2    A.   Well, the first thing I would do is see if we had any

3    research coverage on it and try to e-mail him any available

4    research through our research partners.

5    Q.   When you say "research," what specifically do you mean?

6    A.   Research is just analysts cover -- analysts cover a number

7    of stocks, and they basically give their opinion on the stock,

8    primarily over the next 12 months what their outlook is.

9    Q.   Did Mr. Walters ever ask to speak to analysts?

10   A.   At one time that I recall.

11   Q.   Why did Mr. Walters want to speak to that analyst on the

12   one time you recall?

13   A.   Well, it was regarding one stock that he had a big position

14   in.

15   Q.   What stock?

16   A.   It was Motorola Mobility.

17   Q.   Based on your conversations with Mr. Walters and your

18   participation in the meeting, why did Mr. Walters -- give us a

19   sense why Mr. Walters wanted to speak to that analyst about

20   Motorola?

21   A.   Well, I think at the time, the -- the analyst may not -- I

22   don't know if he was neutral on it necessarily or negative, but

23   I think they had maybe opposing views on the stock.  So it was

24   a conference call.  I don't even remember when it was or who

25   the analyst was.  But it was -- I think they had opposing

1  views.

2  Q.  In other words, describe for us who was on sort of -- how

3  were the views opposing?  Who held which views?

4  A.  Well, Mr. Walters had a big position in the stock, and I

5  think the analyst may have been -- he was either neutral or

6  maybe negative on the stock.

7  Q.  When you say "neutral," in other words neither recommending

8  buying nor recommending sell?

9  A.  Right.

10  Q.  When you say "negative," do you mean recommending sell?

11  A.  Well, probably wouldn't be recommending sell, but maybe

12  underperform.

13  Q.  Okay.  And based on your conversations with Mr. Walters,

14  did you understand he was trying to learn something from the

15  analyst or rather trying to convince the analyst of something?

16  A.  Well, yeah, I wouldn't say he was necessarily trying to

17  convince the analyst of anything.  I think he had one view and

18  was probably trying to figure out how an analyst could have an

19  opposing view.

20  Q.  Let's talk about Mr. Walters' investment sort of

21  philosophy.  Did Mr. Walters have what you think of as an

22  overall investment strategy?

23  A.  I mean, not a clearly defined one.  You know, it was do the

24  research, find out, buy what you think is going up and sell or

25  short what you think is going down.

H3S3WAL3                    Duncan - direct

1   Q.  What does it mean to short?

2   A.  It means to really sell a stock that you don't own.  So you

3   have to borrow stock and you're basically selling it.

4   Q.  So if you short a stock, you're hoping the price goes down?

5   A.  Correct, yes.

6   Q.  Did Mr. Walters have a high or low appetite for risk when

7   investing in stocks?

8   A.  High.

9   Q.  Would you say that Mr. Walters' appetite for risk was

10  higher than your other clients or about the same?

11  A.  Higher.

12  Q.  At any given time, about how many stocks would Mr. Walters

13  own, understanding that it varied day to day?

14  A.  I mean, it changed all the time.  We could have maybe as

15  few as, you know, four or five, maybe as many as 12, maybe at

16  times a little more than that.  I would say probably, I don't

17  know, anywhere from five to seven or eight.

18  Q.  After Mr. Walters would propose an idea to you, I think you

19  described that earlier he might call you about an idea for a

20  purchase, for instance.  Do you remember talking about that

21  earlier?

22  A.  I'm sorry.  Say that again?

23  Q.  Sorry.  I think you had said earlier Mr. Walters might call

24  you to discuss an idea for a stock?

25  A.  Oh, correct, yes.

1   Q.  Did his knowledge, based on your conversations with him,

2   did his knowledge of the stock grow sort of over time, let me

3   say?  Did his knowledge of the stock grow after purchasing it?

4   A.  I mean, I would -- that's probably fair to say.  I mean, he

5   always wanted to know any of the news and the earnings reports,

6   any information that was important to the stock.

7   Q.  Did Mr. Walters ever tell you, based on your conversations

8   with Mr. Walters, do you know whether he had any formal

9   training or education in investing?

10  A.  Not that I know of.

11  Q.  You don't know that from any of your conversations with

12  him, is that how -- or you don't recall?

13  A.  No, not that -- I don't know that he had formal training.

14  Q.  How would you characterize the size of Mr. Walters'

15  investments?

16  A.  They were substantial.

17  Q.  Now, do you know this idea of what we think of as a

18  diversified portfolio?  Have you heard that term?

19  A.  Yes.

20  Q.  What does it mean for a stock portfolio to be diversified?

21  A.  Diversification usually means you're reducing risk by

22  investing in many different asset classes, different sectors of

23  the market.

24  Q.  Is it more risky or less risky to have a diversified

25  portfolio?

1    A.  It's less risky.

2    Q.  Is sort of I'll use the word opposite, maybe that's clumsy,

3    but is the term concentrated, if we use the word concentrated

4    when talking about investing in stocks, what does that mean?

5    A.  That means you're, you have substantial investments in

6    probably a handful of stocks.

7    Q.  So what's riskier, diversification or concentration?

8    A.  Concentration.

9    Q.  Was one was Mr. Walters' portfolio?  Did he have a

10   diversified portfolio or a concentrated portfolio?

11   A.  He was concentrated.

12   Q.  So help us understand.  In what way was it concentrated?

13   A.  Meaning he would have a lot of money invested in a handful

14   of stocks or, you know, three or four, five, six stocks.

15   Q.  Other than buying specific stocks, did Mr. Walters use any

16   investment strategies to offset his concentrated investing in

17   certain stocks?

18   A.  Yeah.  Yes, he did.

19   Q.  What techniques or strategies did he use?

20   A.  He used futures contracts.

21   Q.  What is a futures contract?

22   A.  It's basically a financial contract that allows you to

23   invest in either commodities or financial indexes.

24   Q.  How did he use that to offset his risk?

25   A.  Well, in this case, he would use S&P 500 futures.  And the

1   idea was if he had big stock positions, he could short the S&P

2   mini futures and offset any downside to his portfolio.  It sort

3   of serves like insurance.

4   Q.  How so?  How does it serve as insurance?

5   A.  Meaning the idea is that the futures go up in value if the

6   stock portfolio goes down in value.  It didn't always work that

7   way.

8   Q.  Have you had heard the term "hedge"?

9   A.  Yes.

10  Q.  Would that be called a hedge?

11  A.  Yes.

12  Q.  What is a hedge?

13  A.  A hedge is basically protecting an existing position that

14  you have.

15  Q.  You used the term S&P 500.  What is the S&P 500?

16  A.  It's a financial index of the 500 largest domestic

17  companies.

18  Q.  Did Mr. Walters use these S&P 500 futures as a hedge

19  throughout the time period that you were his broker or did his

20  use of those futures change over time?

21  A.  Yeah.  I mean, I don't -- I don't remember the dates of

22  when we started or when we ended.  I don't recall the length or

23  the period of time that we used them, but we did use them.

24  Q.  I asked a bad question.  Were they always used as a hedge?

25  A.  No.  No, I think there were times where we actually started

1  playing, you know, you know, one side of the market or the

2  other.

3  Q.  So in other words, taking risks in the S&P 500 rather than

4  using to offset risk?

5  A.  Right, correct.

6  Q.  I want to change gears a little bit and talk specifically

7  about a company called Dean Foods.

8       Have you heard of that company, Dean Foods?

9  A.  Yes.

10  Q.  Had Mr. Walters invested in Dean Foods before you became

11  his primary broker in about April 2009?

12  A.  Yes.

13  Q.  Do you recall ever giving Mr. Walters advice or information

14  about Dean Foods?

15  A.  Not that I recall.

16  Q.  Is it possible you did?

17  A.  Well, I mean, I certainly -- if we would have had research

18  reports or anything, I would have sent it to him.

19  Q.  Do you know someone named Tom Davis?

20  A.  No.

21  Q.  Did Mr. Walters ever mention anyone named Tom Davis?

22  A.  No.

23  Q.  Did you and Mr. Walters ever discuss why he was interested

24  in owning Dean Foods stock?

25  A.  Not that I recall.

H3S3WAL3                          Duncan - cross

1   Q.  Did Mr. Walters ever ask you to speak to or say he wanted

2   to speak to an analyst about Dean Foods?

3   A.  Not that I recall.

4            MR. FERRARA:  May I have one moment, your Honor?

5            THE COURT:  You may.

6            MR. FERRARA:  Nothing further, your Honor.

7            THE COURT:  All right.  You may cross-examine,

8   Mr. Berke.

9   CROSS-EXAMINATION

10  BY MR. BERKE:

11  Q.  Good afternoon, Mr. Duncan.

12  A.  How are you.

13  Q.  I'm good.

14  A.  Good.

15  Q.  You worked with your father Alan Duncan for a while at the

16  brokerage firm, correct?

17  A.  Yes.

18  Q.  Before we get started, I can't keep it straight.  Will you

19  help just -- Wells Fargo changed its name and was acquired by a

20  lot of different companies, right?

21  A.  Yes.

22  Q.  Will you help just lay it out for us.  When you first

23  started there, what were they called?

24  A.  When I first started in the firm?

25  Q.  Yeah.

H3S3WAL3                           Duncan - cross

```
 1   A.  It was -- I'm not sure the exact order.  I think it was
 2   Prudential Bache, Prudential Securities.
 3   Q.  First it was Prudential?
 4   A.  Yes.  Prudential Bache.  Then I believe it went to
 5   Prudential Securities.  Then Prudential Financial.  Then it was
 6   Wachovia Securities.
 7   Q.  Can I stop you there.
 8   A.  Yes.
 9   Q.  Wachovia acquired Prudential?
10   A.  Yes.  No.  Wachovia didn't -- I think just the brokerage
11   unit.
12   Q.  So Wachovia acquire the Prudential brokerage unit, so you
13   were an employee of Prudential then you became an employee of
14   Wachovia?
15   A.  Yes.
16   Q.  Okay.  And then after that?
17   A.  After Wachovia Securities, Wells Fargo Advisors.
18   Q.  That's what it remained for a period of time?
19   A.  Yes.
20   Q.  Do you recall when it became Wells Fargo Advisors?
21   A.  It was the financial crisis, I think around 2008 sometime.
22   Q.  Okay.
23   A.  I don't remember the exact date.
24   Q.  Okay.  And so going back, so, you began your career working
25   side by side with your father, right?
```

1    A.  Yes.

2    Q.  And your father had been a longtime broker for Mr. Walters?

3    A.  Yes.

4    Q.  And fair to say that while you were there, you would often

5    be the one to do research and the like, and your father did

6    less of that and he was more the outward facing person dealing

7    with the clients that you guys had.  Is that fair?

8    A.  Yes, that's fair.

9    Q.  You worked certainly over a period of time before your

10   father retired, you worked together, but he was often the

11   person who dealt with the clients?

12   A.  Right.

13   Q.  I'm sorry?

14   A.  Yes.

15   Q.  Yes.  And that was the case with Mr. Walters, up until the

16   time of your father's retirement, your father dealt with

17   Mr. Walters every day, and you would typically not, except if

18   your father was on vacation, something like that.  Is that fair

19   to say?

20   A.  Yes, yes.

21   Q.  Your understanding just from your observations is your

22   father had a good working relationship with Mr. Walters,

23   correct?

24   A.  Yes.

25   Q.  So when your father retired at that point, sort of

H3S3WAL3                      Duncan - cross

1   transitioned into you handling the Wells Fargo account as the

2   broker for Mr. Walters, correct?

3   A.  Yes.

4   Q.  And you understood that the practices you were doing sort

5   of you were continuing your father's practices, correct?

6   A.  Yes.

7   Q.  For example, you knew that your father called Mr. Walters

8   essentially, most generally, called Mr. Walters every morning,

9   correct?

10  A.  Right, yes.

11  Q.  And he would typically call him every afternoon to report

12  on what happened on his various trades, correct?

13  A.  Yes, that's correct.

14  Q.  Depending what would happen during the day, he would call

15  and sometimes multiple, multiple times during the day, correct?

16  A.  That's correct.

17  Q.  And fair to say, again, prior to your father's retirement,

18  that you being the research person, if you saw anything out of

19  the world that might be relevant to one of the stocks

20  Mr. Walters was investing, you would let your father know so he

21  could let Mr. Walters know.  Fair statement?

22  A.  That's fair, yes.

23  Q.  Your father also was not much of an e-mailer and the like.

24  If there were e-mails, that's something typically you would

25  handle?

1   A.  Yeah.  It took him a long time to send e-mails, so I was

2   the e-mail guy.

3   Q.  And then the way Wells Fargo worked, when your father

4   retired, he retired.  I mean, it was a hard cutoff.

5   A.  He was out on a Friday, and that was it.

6           He retired on a Friday, and that was it.

7   Q.  And so, sir, when you took over, again, I think you've

8   essentially said it, but you followed the practices that had

9   been established between Mr. Walters and your father, correct?

10  A.  Yes, that's correct.

11  Q.  Am I right, sir, that depending on what's going on in the

12  market, you recall days where would you speak to Mr. Walters as

13  much as eight times a day if you had information to share with

14  him, correct?

15  A.  Yes, that's correct.

16  Q.  Generally that would be if there was important news

17  regarding a stock he held, you might call him to tell him,

18  correct?

19  A.  Yes.

20  Q.  If there were important events going on in the market

21  generally that was causing the stock market to be up or down or

22  in any way significant, you would generally make sure he was

23  aware of it, correct?

24  A.  Yes.

25  Q.  You were aware that in addition to investing, he also ran

1    his businesses that you described?

2    A.  Yes.

3    Q.  You also knew that he had his gambling business, correct?

4    A.  Yes.

5    Q.  Is it fair to say, sir, if there were significant things

6    going on in the market that could affect stock prices

7    generally, or more specifically his position, you would be sure

8    to let him know?

9    A.  Yes.

10   Q.  And am I right, sir, that what you would do is you would

11   call his, generally, his cell phone you would call?

12   A.  Yes.

13   Q.  He would call you, during working hours, he would generally

14   call you in the office, correct?  The Wachovia, Prudential or

15   Wachovia or Wells Fargo office?

16   A.  Yes.

17   Q.  If he needed to talk to you about a stock or something

18   happening in the market, he would also at times call you at

19   home, correct?

20   A.  Yes, that's correct.

21   Q.  You gave him those numbers and told him to call you at home

22   if he needed you, correct?

23   A.  Yes.

24   Q.  There were times he would call you on your cell phone or

25   your home in the evenings to either talk about a trade he

H3S3WAL3                      Duncan - cross

1   wanted to do or something happening with a stock or the market,

2   fair statement?

3   A.  Yeah, that's a fair statement.

4   Q.  If he needed you he --

5           THE COURT:  Keep your voice up, if you don't mind.

6           THE WITNESS:  Oh.

7   Q.  If he needed you, he would call you on the weekends too,

8   correct?

9   A.  Yes.

10  Q.  He was generally respectful of your time, but you invited

11  him to do that if he wanted to talk about a trade or something

12  off hours, correct?

13  A.  Yes.

14  Q.  Just to be clear, when Mr. Walters was putting on trades,

15  he would generally do that by phone, correct?

16  A.  Yes, that's correct.

17  Q.  You recall sometimes that he was interested in a trade, he

18  might call you about that trade a day or two before he actually

19  wanted it put on.  Do you recall that, sir?

20  A.  I mean it varied, but, yeah, that certainly happened.

21  Q.  You generally, sir, when Mr. Walters gave you an order, he

22  generally had a pretty clear idea of what sort of order he was

23  interested in, but would talk to you about what the market was

24  looking like, correct?

25  A.  Yeah, I think that's fair, yes.

H3S3WAL3                         Duncan - cross

1  Q.  I think you said part of Mr. Walters' philosophy was a

2  fairly common one that he liked to buy low, and sell high.

3  Correct?

4  A.  Yes.

5  Q.  So is it fair when he would call you with an idea for a

6  trade, he might ask you what's the market looking like and do

7  you see anything that suggests it may go higher or lower in

8  terms of the timing of when the trade is executed, correct?

9  A.  Yes.

10 Q.  Am I fair when you were talking about Mr. Walters asking

11 your opinion, he was very much interested in your opinion about

12 what's going on in the market in terms of how to execute the

13 trades, like market execution, correct?

14 A.  Yeah, that's correct.

15 Q.  So, and that's something that, again, if he was putting on

16 a big trade, you might talk about for a while or throughout the

17 day, depending on what was going on in the market that day?

18 A.  Yes.

19 Q.  Is that true?

20         And but, when you and Mr. Walters agreed it was a good

21 time to put on the trade, you would generally put the trade on

22 right at that time.  In other words, you wouldn't wait a while,

23 you would put the trade on usually shortly after Mr. Walters

24 said I agree, let's do the buy or the sell, fair?  Is that

25 fair?

1    A.   Yeah, I mean, generally what would happen is I would put in

2    the trade and then we would work the order.

3    Q.   I guess what I'm getting to first, then we'll get to

4    working the order.   There is a time stamp when the order is

5    placed, correct?

6    A.   Yes.

7    Q.   And --

8    A.   There was, yes.

9    Q.   And you would generally have that time stamp generally

10   would be placed close in time to when Mr. Walters and you

11   decided it was a good time to place that order, correct?

12   A.   Yes, that's correct, yes.

13   Q.   Then for bigger trades, it might take some time to work the

14   order, which is what you're describing, correct?

15   A.   Yes.

16   Q.   Am I right, sir, there were times that Mr. Walters might

17   call you at the end of a trading day after the markets had

18   closed to talk about a trade, and then you would then put it on

19   the next day when the markets reopened, correct?

20   A.   That may have happened.   Generally we would do the trades,

21   he would call and I would do them in the mornings, but that

22   certainly could have happened.

23   Q.   Right.   But if he called you after the market closed, you

24   would have no choice but to put it in the next day, correct?

25   A.   That's right, yes.

1  Q.  That would be whether it was a Friday and Monday was the

2  next trade or whether it was during the week, correct?

3  A.  Correct.

4  Q.  Sir, you were asked whether Mr. Walters had any formal

5  training as an investor.  Do you recall you were asked that on

6  direct?

7  A.  Yes.

8  Q.  Would it be fair to say that Mr. Walters was viewed by

9  Wells Fargo as one of the most sophisticated investors in the

10 world?

11 A.  Yes, that's fair.

12          MR. FERRARA:  Objection, your Honor.

13          THE COURT:  Overruled.

14 Q.  Can you repeat your answer, sir?

15 A.  Yes, that's fair.

16 Q.  That was your view, correct?

17 A.  Yes, that was my view.

18 Q.  You said that Mr. Walters preferred concentrated positions

19 in stocks, is that correct?

20 A.  Yes, that's correct.

21 Q.  You were talking about analysts and analyst reports, you

22 regularly sent Mr. Walters analyst reports on a variety of

23 stocks, correct?

24 A.  Yes.

25 Q.  So the things he was trading, if you saw an analyst report

H3S3WAL3                    Duncan - cross

1   that could be of interest, you sent that to him without
2   question, correct?
3   A.  Yes.
4   Q.  And do you recall, sir, that Mr. Walters talked to other
5   investment professionals and not just you about various stock
6   he was interested in?
7   A.  Yes, I was aware of that.
8   Q.  Do you recall that at times, Mr. Walters may receive
9   reports or information from investment professionals at other
10  brokerage firms that he would send to you?
11  A.  Yes.
12          MR. FERRARA:  Objection, your Honor.  That would be
13  hearsay.  To the extent Mr. Walters told that to the witness,
14  that's hearsay.
15          THE COURT:  Sustained.
16  Q.  Well, sir, let me ask you this.  Mr. Walters would send to
17  you information and reports about the stocks he was invested
18  in, and you could see from the e-mail he was forwarding that he
19  received it from another brokerage firm, correct?
20  A.  Yes.
21          MR. FERRARA:  Same objection.  Regardless of the form,
22  communication from Mr. Walters is hearsay.
23          THE COURT:  I don't think the contents are being
24  offered.  It is the fact of the communication at this stage of
25  the game.  Is that right, Mr. Berke?

H3S3WAL3                         Duncan - cross

1        MR. BERKE:  At this stage, absolutely, your Honor.

2        THE COURT:  Yes.  So that's overruled.  Go ahead.

3   A.  Yes.  That's correct.

4   Q.  Is it fair to say that your understanding that when he was

5   sending you the research material on stocks from other banks,

6   he was sending it to you to get your views or to have

7   discussions with you about it?

8   A.  Yes.

9   Q.  You would have those types of discussions?

10  A.  Yes.

11  Q.  Do you recall that Mr. Walters worked, for example, he

12  forwarded you e-mails from brokers who traded in commodities

13  for him and forwarded those types of e-mails to you related to

14  commodities?

15  A.  I actually -- I think I was cc'd on those.  I mean, the

16  commodity account that we had was actually set up through Wells

17  Fargo or Wachovia at the time.

18  Q.  You understood that trading in commodities, you can trade

19  in any commodities.  You can trade in fuel, is that right?

20  A.  Yes.

21  Q.  Milk?

22  A.  Yes.

23  Q.  Resin?

24  A.  Yes.

25  Q.  Grain?

H3S3WAL3                          Duncan - cross

1   A.   Yup.

2   Q.   And you can trade to make a bet whether any of those

3   commodities are going to go up or down in the future, correct?

4   A.   That's correct.

5   Q.   There is an entire market built around making bets about

6   whether all those commodities will go up or down over time,

7   correct?

8   A.   That's correct.

9   Q.   Let me show you if I may what's marked for identification

10  as Defense Exhibit 2155 for identification.

11           Sir, do you recognize this document or do you see this

12  document is an e-mail, and there's a couple different e-mails

13  but it is between Mr. Walters, yourself, and a fellow named Ed

14  Lashinski from Prudential Bache?

15  A.   Yes.

16  Q.   Were these the sorts of e-mails you were describing earlier

17  that Mr. Walters would send you?

18  A.   Yeah.  And I'm actually surprised.  I thought I was cc'd on

19  all these e-mails, but yeah, we -- we exchanged these -- we

20  exchanged these e-mails frequently.

21  Q.   But I think just on this document, which is not yet

22  evidence, but I think you are copied on that.  Do you see that?

23  A.   Oh yeah, okay.

24           MR. BERKE:  Your Honor, I'd offer Defense Exhibit 2155

25  into evidence.

1           MR. FERRARA:  Object to the hearsay, your Honor, in

2     the second e-mail down.

3           MR. BERKE:  It's not being offered for the truth.

4           THE COURT:  The fact it is said is relevant for what

5     purpose?

6           MR. BERKE:  Your Honor, to establish the practices of

7     what Mr. Walters is sending to Mr. Duncan and the like, and

8     it's really what ultimately the question is.  To build on that.

9           THE COURT:  All right.  I'm going to allow it not for

10     the truth of its content.

11           (Defendant's Exhibit 2155 received in evidence)

12     Q.  So just look at the first -- you see it's Mr. Walters is

13     sending something to a gentleman by the name of Ed Lashinski at

14     Prudential Bache?

15     A.  Right.

16     Q.  He's copying you, correct?

17     A.  Yes.

18     Q.  It's August 21, 2009.

19           THE COURT:  Do you see the date?

20           THE WITNESS:  Yes, I do.  That's correct.

21     Q.  You understood that Ed Lashinski was an investment

22     professional whom Mr. Walters had a relationship with who was

23     affiliated with what was at that time called Prudential Bache,

24     correct?

25     A.  That's correct, yes.

H3S3WAL3                    Duncan - cross

1   Q.  Prudential Bache at that time was a different entity than

2   the entity you worked at, correct?

3   A.  Yes, that's correct.

4   Q.  These entities changed names a lot?

5   A.  Right.

6   Q.  Can we just go to the bottom.  And Mr. Walters ultimately

7   is sending you this whole e-mail chain.  Do you see that, sir?

8   A.  Yes.

9   Q.  You see that Mr. Lashinski on the bottom of this e-mail

10  chain, he's saying in his e-mail "I was surprised by the

11  market's recovery.  I do not believe it will last."  And then

12  is going on talking about factors such as the credit crisis and

13  joblessness and giving a viewpoint about what might happen in

14  the market.

15          Do you see that?

16  A.  Yes.

17  Q.  And then you see Mr. Walters says "Is there anything to

18  play?  Short the S&P or anything else?"

19          Do you see that, sir?

20  A.  Yes, I do.

21  Q.  If you go up, Mr. Lashinski says, among other things, "I

22  think short the S&P is still right."

23          Sir, just to be clear, when it says short the S&P,

24  that is betting that the entire stock market will go down?

25  A.  Yeah, you're a seller of the market.

H3S3WAL3                           Duncan - cross

1   Q.  You think that for whatever reason it is a time the market

2   will fall, correct?

3   A.  Yes, that's correct.

4   Q.  And then you see Mr. Lashinski is talking about other

5   potential investments involving what might happen with the

6   dollar against the euro and other economic factors.  You see

7   that?

8   A.  Yes, I do.

9   Q.  He then sends to Mr. Lashinski "what specific trades do you

10  recommend" and he copies you in the last e-mail.  Correct, sir?

11  A.  Yes.

12  Q.  When Mr. Walters did this, did you have an understanding of

13  why he was copying you when he would ask Mr. Lashinski what

14  specific trades do you recommend based on Mr. Lashinski's

15  market views?

16  A.  Well, I think he kind of wanted to, you know, see what I

17  thought about it, and see what I thought about the e-mail and

18  those trades specifically.

19  Q.  Let me just show you one more like that if I can.  Can I

20  show you what's marked for identification as Defense Exhibit

21  2156.

22          Sir, you see that as another instance of Mr. Walters

23  this time forwarding you directly an e-mail from Mr. Lashinski

24  with a question dated August 24, 2009?  Do you see that?

25  A.  Yes.

1          MR. BERKE:  Your Honor, I would offer into evidence

2     Defense Exhibit 2156.

3          MR. FERRARA:  With the same limiting instruction, no

4     objection.

5          THE COURT:  It's not offered for the truth of its

6     content, but it may be relevant to the practices of certain

7     persons.

8          (Defendant's Exhibit 2156 received in evidence)

9          THE COURT:  Go ahead.

10          MR. BERKE:  Thank you, your Honor.

11    Q.  So Mr. Duncan, you see Mr. Walters is this time forwarding

12    just to you an e-mail from Ed Lashinski dated August 24, 2009?

13    Do you see that, sir?

14    A.  Yes, I do.

15    Q.  If you go to the lower e-mail, the subject line is "Good

16    morning, Bill.  There are two trades please to consider."  You

17    see that?

18    A.  Yes.

19    Q.  Okay.  And there is a lot of information here.  And I just

20    I just want to touch a little bit on what it is, but you see

21    the first thing talks about, it says in the second sentence

22    "The tone across a number of markets is improving

23    internationally from the perspective of positive GDP reports

24    out of France and Germany and now today Israel raised rates,

25    the first country to do so."

1           Do you see that, sir?

2    A.  Yes.

3    Q.  GDP, that means gross --

4    A.  Domestic product.

5    Q.  Domestic product for France.

6    A.  Yes.

7    Q.  In this instance.  Then it talks about the impact on the

8    global markets.  And then there's analysis that continues and

9    is sort of highly technical.  Do you see that?  About how it

10   may affect interest rates.  Do you see that, sir?

11   A.  Yes.

12   Q.  Again, without getting into the details of it, but just the

13   generalities of what this is, and then it goes on to talk about

14   has analysis that says attached is a chart that suggests a way

15   to potentially trade based on interest rates, depending on

16   what's going on in the global markets.  Do you see that, sir?

17   A.  Yes, I do.

18   Q.  Then it attaches a chart of the proposed trade.

19   A.  Yes.

20   Q.  Then goes on to talk about 30-year bond markets.  You see

21   that, sir?

22   A.  Yes, I do.

23   Q.  Then at the bottom it talks about the SPX market.  Can you

24   explain for the jurors what SPX is?

25   A.  That's the S&P 500.

H3S3WAL3                        Duncan - cross

1   Q.  That's the index trades of it, correct?

2   A.  Yes.

3   Q.  In other words, it's a way to trade the market as a whole

4   without trading individual stocks, correct?

5   A.  Yes.

6   Q.  It's talking about it's now 18 percent over this 200-day

7   monthly average.  Do you see that?

8   A.  Moving average, yes.

9   Q.  Did you understand one way sophisticated investors might

10  predict what the market might do is to look at how it's moved

11  over an extended period and compare the movement in terms of an

12  average?

13  A.  Yes, that's correct.

14          MR. FERRARA:  I would object.  If he has an

15  understanding as to what Mr. Walters did, it's relevant.  I

16  think this question is not relevant.

17          MR. BERKE:  I can rephrase it, your Honor.

18          THE COURT:  Rephrase it.  Your question relates to

19  sophisticated investors.  If you have a question about

20  Mr. Walters, that I'll allow.

21          MR. BERKE:  Okay.

22  Q.  Well, let me ask.  So when you read this, sir, you

23  understood what that means, the SPX is now over 18 percent over

24  its 200-day moving average.

25  A.  Yes.

H3S3WAL3                         Duncan - cross

1   Q.  Now let me go to the top.  And Mr. Walters says to you

2   "let's talk about this."  And when Mr. Walters would say things

3   like that forwarding an e-mail from Mr. Lashinski and say let's

4   talk about it, did you have an understanding of what he was

5   asking of you?

6   A.  Yeah, for me to give my opinion on it.  My feedback.

7   Q.  So that would be an opinion whether you thought, A, you

8   agreed with Mr. Lashinski's assumptions, is that fair?

9   A.  That's fair, yes.

10   Q.  And also whether you agreed with the investment

11   recommendations he was making based on those assumptions?

12   A.  Yes.  That's fair.

13   Q.  Without going through it, you would receive quite a number

14   of these e-mails that Mr. Walters would either forward or copy

15   you on involving Mr. Lashinski, correct?

16   A.  Yes, that's correct.

17   Q.  Am I also right that you regularly told Mr. Walters when

18   there was an earnings announcement related to the stock he was

19   invested in?  Is that true?

20   A.  Yes, that's true.

21   Q.  You would periodically send him e-mails with the upcoming

22   earnings announcements of the stocks he was investing in at

23   that time?

24   A.  Yes.

25   Q.  Am I right, sir, that you also throughout the day monitored

1    the price of the stocks that Mr. Walters was invested in, and

2    if there was significant movement, you would let him know?

3    A.   Yes.

4    Q.   And you may have, I think we touched on this a little bit,

5    but also anything significant not just in the market, but that

6    was causing the market as a whole, either the Dow or the S&P

7    500, to go up or down significantly, correct?

8    A.   Yes, that's correct.

9    Q.   And the S&P 500 are just the stock prices of the top 500

10   stocks on the S&P?

11   A.   Yes.

12   Q.   You said when Mr. Walters would be considering a position

13   in the stock, he would -- it wasn't uncommon for him to ask you

14   to do some research or see if you can get some research so he

15   could learn more about that stock?

16   A.   That's correct, yes.

17   Q.   Fair to say in your experience that Mr. Walters had a great

18   interest in getting as much research as he could on a stock

19   that he was interested in?

20   A.   Yes, I'd say that's fair.

21   Q.   Was it your experience that he also would consume that

22   research and come back at times with questions or an interest

23   in getting more research?

24   A.   Yes.

25   Q.   Is it fair to say he would also show great interest in

1    learning anything he can about an industry in which a stock he

2    was either investing in or thinking about investing in was in?

3    A.  Yes, I'd say that's fair.

4    Q.  If you were to characterize Mr. Walters' aggressiveness in

5    terms of how he traded, on a scale of 1 to 10, would you say he

6    was about a hundred?

7    A.  Probably even a little higher.

8    Q.  Right.  He was beyond aggressive?

9    A.  Yes.

10   Q.  And do you remember that you've actually described him as

11   being beyond aggressive in terms of how he traded?

12   A.  Yes.

13   Q.  You have never experienced an investor who traded anywhere

14   near how aggressive Mr. Walters traded.  Is that fair?

15   A.  No.  Not even close.

16   Q.  Am I right, sir, you might have questions such as he would

17   call you and be debating whether it was a good time or bad time

18   to make a trade in the stock, going over the pros and cons and

19   the research, and say, okay, I'm going to do it, and all of a

20   sudden put in a giant order of tens of millions of dollars

21   because he decided to go?

22            Did you experience that, sir?

23   A.  Yes, yes, I did.

24   Q.  Was that sort of -- that was not uncommon for Mr. Walters

25   to do that, correct?

1   A.  No.  That was not uncommon.

2   Q.  He was, you knew him in Las Vegas, of course, as a very

3   well-known famous sports gambler, correct?

4   A.  Yes, that's correct.

5   Q.  Is it right that you viewed his investing, that he invested

6   in stocks like a gambler, correct?

7   A.  Yes.

8   Q.  He made quick decisions?

9   A.  Yes.

10  Q.  He made big bets?

11  A.  Yes.

12  Q.  When he decided to go, he was all in?

13  A.  Yes.

14  Q.  And he would very comfortable taking risk?

15  A.  Yeah, I wasn't always as comfortable, but he was.  Yes.

16  Q.  But he was -- when he would make a big bet, in your

17  experience, you observed him to be cool as a cucumber, correct?

18  A.  Yes.

19  Q.  It was something that you and your father, when you were

20  working with your father, you would talk about it, that you

21  have never seen anyone who invested like him, correct?

22  A.  That's correct.

23  Q.  You said it with admiration, correct?

24  A.  Yeah, I mean, it was, it was certainly nerve racking at

25  times, but I never experienced anyone before or since that was

H3S3WAL3                        Duncan - cross

even close to the level of risk.  I mean.

Q.  It was nerve racking because you were the broker that was
executing the trades that had so much risk, correct?

A.  Yes, correct.

Q.  And I think you've been talking about long and short.
Again, long is a bet the stock price will go up; short is a bet
that the stock price will go down.  And you understood that
Mr. Walters did both, he took long positions in equity and
short positions, correct?

A.  Yes.

Q.  Am I right that it's fair to say you were never surprised
by Mr. Walters' trading position, no matter how large, how
quick, or how aggressive?

A.  That's correct.

Q.  Without spending too much time in his trading records, we
would see stocks and trades in which he took, made individual
trades well into tens of millions of dollars, correct?

A.  Yes.

Q.  You remember trades over 50 million, correct?

A.  Yeah, there were probably a handful of trades even, yeah.

Q.  And you remember certainly -- if we looked, we would see a
lot of positions and trades in the tens of millions, correct?

A.  Yes.

Q.  Also not uncommon for Mr. Walters to trade quickly in and
out of a stock, correct?

1   A.  That's correct.

2   Q.  He made quick decisions?

3   A.  Yes.

4   Q.  I want to talk about margin a little bit, because fair that

5   at the entity that you worked at, margin -- there would be

6   people involved in it who had to approve margin and the margin

7   terms, correct?

8   A.  Yes.

9   Q.  And Mr. Walters was approved for a lot of margin, correct?

10  A.  Yes.

11  Q.  You said it, but can I ask you again, what do you recall

12  the highest margin number that Mr. Walters had?

13  A.  He had, at the peak it was an equity requirement of

14  30 percent across the account.

15  Q.  I'm sorry.  I'm asking for the most the highest amount he

16  could borrow if you remember.

17  A.  Well, it depended how much equity he had.  It could have

18  been, I mean --

19  Q.  It could have been north of a hundred million dollars,

20  correct?

21  A.  Yes.

22  Q.  Mr. Walters had a very, very favorable deal with your

23  brokerage firm, correct?

24  A.  Yes.

25  Q.  In other words, he only had to put up 30 percent of actual

1   the money in order to be able to get the additional 70 percent

2   of buying power, correct?

3   A.  Yes.

4   Q.  Was it your understanding, based on what you knew,

5   firsthand information, that Mr. Walters had the best margin

6   requirement at the bank that you worked at?

7   A.  Yes.

8   Q.  He also had a very low interest rate that he had to pay on

9   that, correct?

10  A.  Yes.

11  Q.  That was, again, very favorable to Mr. Walters, correct?

12  A.  Yes, it was.

13  Q.  You understood Mr. Walters had negotiated that, correct?

14  A.  Right.

15  Q.  Is it fair to say that as the various entities changed over

16  time as you described, at different times different entities

17  had different views about whether, you know, it was a good deal

18  or bad deal, given those terms.  Is that fair?

19  A.  Yes.  That's fair.

20  Q.  There were discussions about that, correct?

21  A.  Yes.

22  Q.  Do you recall, sir, that one of the discussions -- do you

23  recall, sir, that there was a notion that in various debates

24  about margin, it was always said by you or others that during

25  Mr. Walters' entire relationship with all these brokerage

H3S3WAL3                    Duncan - cross

 1    firms, he was never once late or created an unpaid debit
 2    balance from any transaction?  Do you recall that, sir?
 3            MR. FERRARA:  Objection.  We're getting into hearsay
 4    here.
 5            THE COURT:  Yes.
 6            MR. BERKE:  I can rephrase.
 7            THE COURT:  Sustained.
 8    Q.  Sir, you were aware that during Mr. Walters' entire time
 9    relationship with the various entities where you and your
10    father worked on his accounts, he was never once late on a
11    payment for a margin account or had an unpaid balance.  Isn't
12    that true?
13            MR. FERRARA:  Your Honor, if he's aware because
14    someone told him, that's hearsay.
15            THE COURT:  As far as you observed.
16    A.  Yes, that's correct.
17    Q.  Also Mr. Walters would often wire in and out large amounts
18    of money, correct?
19    A.  Yes, that's correct.
20    Q.  You recall that there were times that Mr. Walters had to
21    sell stock and wire out money because of a business transaction
22    he had?
23    A.  Yes.
24    Q.  And you recall or for other reasons that he told you he
25    needed to sell stock and wire money out, do you recall that?

1    A.  Yeah, I mean, there was money wired in and out frequently.

2    Q.  So now I want to turn, sir, to Dean Foods.

3    A.  Yes.

4    Q.  And again, you were a broker for a period of time in which

5    you traded, executed trades and discussed with Mr. Walters

6    trades in Dean Foods stock, correct?

7    A.  Yes.

8    Q.  Do you recall that there was a lot of research reports

9    about Dean Foods that you forwarded to Mr. Walters or

10   Mr. Walters forwarded to you to get your comment on?  Do you

11   recall that, sir?

12   A.  I don't recall specific reports, but certainly if we had

13   research I would have sent it to him.

14   Q.  Can I ask you specifically what that means?  Because we'll

15   call it -- when I say Wells Fargo, you understand I mean Wells

16   Fargo as well as the prior entities, whatever they were called?

17   A.  Yes.

18   Q.  Am I right that at different times Wells Fargo had

19   different relationships with research firms?

20   A.  Yes.

21   Q.  That means they were separate from Wells Fargo, but you

22   would have direct access to their research reports, correct?

23   A.  Yes, correct.

24   Q.  If there were research reports that those firms issued that

25   related to any of the stocks Mr. Walters was either trading in

1   or had express interested in potentially trading in, you would

2   send them to him?

3   A.  Yes.

4   Q.  And also if you obtained any other research related to

5   those stocks from other places, you would send that as well?

6   A.  Yes.

7   Q.  Let me show you if I can what's marked for identification

8   as Defense Exhibit 2122.

9           Sir, is this an example of Mr. Walters forwarding a

10  research note to you about Dean Foods dated August 5, 2009?

11  A.  Yes.

12          MR. BERKE:  Your Honor, I'd offer Defense Exhibit 2122

13  into evidence.

14          THE COURT:  Any objection?

15          MR. FERRARA:  No, assuming it's not for the truth, no

16  objection, your Honor.

17          THE COURT:  Just for the fact it was said.  Okay, go

18  ahead.

19          (Defendant's Exhibit 2122 received in evidence)

20          MR. BERKE:  Thank you, your Honor.

21          Your Honor, I'll do it one at a time.  That's okay.

22  Q.  Sir, you see that on the screen, again, this is August 5,

23  2009, Mr. Walters to you, it says "Dean Foods research note."

24  A.  Yes.

25  Q.  If we can go down lower just to see what he's forwarding.

H3S3WAL3                    Duncan - cross

1    You see it's from a John Downey with a copy to Jeff Turnbaugh

2    and it's to Mr. Walters, Mike Luce, and Sue Butler?  Do you see

3    that, sir?

4    A.   Yes.

5    Q.   You understood Mike Luce was a senior executive at

6    Mr. Walters' company?

7    A.   Yes.

8    Q.   And Sue Butler as well had a position in Mr. Walters'

9    company?

10   A.   Yes.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3sdwal4                          Duncan - cross

1    Q.  And that John Downey was at Bear Stearns JPMorgan, correct?

2    A.  It looks like it, yes.

3    Q.  And Jeff Turnbaugh, did you know the name Jeff Turnbaugh?

4    A.  It sounds familiar.  I may have even met him on one

5    occasion but I'm not sure.

6    Q.  And you do recall knowing, again in this time period, that

7    Mr. Walters also had a relationship with JPMorgan?

8    A.  Yes.  I knew he had other relationships, yes.

9    Q.  And you recall that they had an analyst who covered Dean

10   Foods as well?

11   A.  I was not aware of that or I don't recall it, anyway.

12   Q.  In any event, here you say that you're being sent a Dean

13   Foods research note that he received from JPMorgan correct?

14   A.  Correct.

15   Q.  Now if we go back up to the top.

16            And, again, you see that he is sending it to you.

17            And, again, is this sort of what you described before?

18   He would send these to you to get your reaction and thoughts

19   about?

20   A.  Yes.

21   Q.  You guys would then discuss whatever opinions or views were

22   expressed in that note, correct?

23   A.  Yes, that's correct.

24   Q.  Let me show you what's been marked -- I am going to show

25   you two more, Defense Exhibit 2123 and 2124.

H3sdwal4                          Duncan - cross

1          Actually, let's do 2123.

2          And, sir, do you see that that was the JPMorgan report

3   that -- if you look at the date -- that was sent to you in the

4   prior email; do you see that, sir?

5   A.  Yes.

6          MR. BERKE:  Your Honor, I would offer Defense Exhibit

7   2123 into evidence, again not for the truth of the matter.

8          MR. FERRARA:  No objection.

9          THE COURT:  All right.  Received.

10         (Defendant's Exhibit 2123 received in evidence)

11         THE COURT:  And with that, ladies and gentlemen, we

12  are going to take our mid-afternoon, or lunch break.  And so

13  you know what I'm going to say.

14         A JUROR:  Yes.  Don't talk to anybody else.

15         THE COURT:  All right.  Do not discuss the case among

16  yourselves or with anyone else.  Keep an open mind.  There is

17  more to come.

18         See you at 2 o'clock.  Thank you.

19         (Jury not present)

20         THE COURT:  Have a pleasant lunch.

21         MR. GOLDMAN:  Thank you, your Honor.  You, too.

22         (Luncheon recess)

23

24

25

**A F T E R N O O N   S E S S I O N**

2:10 p.m.

SCOTT DUNCAN,

     Resumed, and testified further as follows:

          (Jury not present)

          THE COURT:  All right.  Please remain standing for the
jury.

          (Jury present)

          THE COURT:  Please be seated.

          Good afternoon, ladies and gentlemen.

          A JUROR:  Good afternoon.

          THE COURT:  All right.  We are back in action.

          Mr. Berke, you may continue.

          MR. BERKE:  Thank you, your Honor.

CROSS-EXAMINATION (Resumed)

BY MR. BERKE:

Q.  Mr. Duncan, I want to just ask you a question.  Do you
recall we were talking about the volume and price of a stock
before lunch?

A.  Yes.

Q.  And on any given day is publicly available online what the
volume of the trading is in a stock or the price in a stock, is
that right?

A.  Yes.

Q.  And I have one other question.  Do you recall that in

1  addition to the two or three things we have been talking about,

2  Mr. Walters would on occasion ask you to listen to a

3  presentation or say if you had time to listen to things that he

4  may be interested in your views about?

5  A.  Yes.

6  Q.  Let me show you, for example -- let me show you what's been

7  marked for identification as Defense Exhibit 2121.

8          And is this an email from Mr. Walters from July 10,

9  2010 to you that is an example of him asking you to listen to

10  something?

11  A.  Yes.

12          MR. BERKE:  Your Honor, I would offer Defense Exhibit

13  2121.

14          MR. FERRARA:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 2121 received in evidence)

17  BY MR. BERKE:

18  Q.  And if we could go to the top.  It is from Bill Walters to

19  you, dated July 10, 2009.  It is a "Live video webcast:

20  Pragmatic after the cyclical trough."

21          If we could go down to the very bottom, the email from

22  Mr. Walters to you that starts this.  And you see where

23  Mr. Walters says, Scott, if you would like to watch this

24  here -- if you would like to watch this, here's the info.

25          And is this the sort of thing that Mr. Walters would

H3sdwal4                    Duncan - cross

1    occasionally send to you and, if you had time, ask you to

2    listen and share your thoughts?

3    A.  Yes.

4    Q.  This was so he was interested in what experts might have to

5    say about a variety of topics that may influence the stock

6    market or his specific stocks; fair statement?

7    A.  Yes.

8    Q.  So if you go just to the middle email.  And this particular

9    email is a 20-minute video overview of the economy mostly as it

10   relates to currencies, is that correct?

11   A.  Yes.

12   Q.  And it says that -- it is talking about whether the U.S.

13   dollar is cheap relative to the Euro.

14           And, I'm sorry, this is your summary that you're

15   giving Mr. Walters, correct?

16   A.  Yes.

17   Q.  So you listened to the video; now you're sharing this to

18   him, correct?

19   A.  Yes.

20   Q.  You're sharing your views with him, correct?

21   A.  Yes.

22   Q.  And it says here, the third one, "The market has stabilized

23   to a large degree, so extreme volatility will subside."

24           And that's you giving the summary that there will not

25   be a lot of giant changes in the market from up and down that

1   defined the financial crisis; is that fair?

2   A.  Yes.

3   Q.  And then you share that the view on the video is that the

4   worst of the recession is behind us, with sluggish growth.

5           And, sir, is this the sort of thing that Mr. Walters

6   would ask your opinions about?

7   A.  Yes.

8   Q.  And you understood that he was consuming this information,

9   these opinions, to help inform his trading decisions, correct?

10  A.  Yes.

11  Q.  And is it fair to say that Mr. Walters was not at all

12  reluctant to sort of get in the weeds and get involved in

13  highly technical and specific issues before making trading

14  decisions?

15  A.  Yes.

16  Q.  Let me put back on the screen what we were talking about

17  right before lunch, which is in evidence now, Defense Exhibit

18  2122, and Defense Exhibit 2123, which I don't believe we've

19  published yet but we will now.

20          And, sir, do you recall, before lunch we were talking

21  about Defense Exhibit 2122, which is Mr. Walters forwarding to

22  you the JPMorgan analyst report, correct?

23  A.  Yes.

24  Q.  And now if we go to 2123.  And just to get a sense of what

25  these are as an example.  All right.  You understood this was

1  being put out by an analyst who works for Equity Research at

2  JPMorgan, correct?

3  A.  Correct.

4  Q.  And it has information regarding here they're analyzing and

5  discussing what the earnings per share was at Dean Foods that

6  morning, is that correct?

7  A.  That's correct.

8  Q.  They talk about how the Dairy Group performed?

9  A.  Correct.

10 Q.  And then here they are talking about how WhiteWave

11 Morningstar performed; do you see that, sir?

12 A.  Yes.

13 Q.  And then they note that there is going to be a conference

14 call.  You understand that is the investor; that is the call of

15 the Dean Foods management, correct?

16 A.  Correct.

17 Q.  If you turn the page, just as an example -- and these

18 reports -- if you could just make that a little bigger,

19 Mr. McLeod -- again, without going through it -- well,

20 actually, we've got to go to the next page.  I'm sorry.

21         Well, let me just say this.  Your understanding is

22 that Equity Research at JPMorgan, for example, is a big group

23 that has a lot of researchers to analyze these companies,

24 correct?

25 A.  Yes.

H3sdwal4                    Duncan - cross

1   Q.  Let me show you -- just go through one more.  Let me show

2   you what has been marked for identification as Defense Exhibit

3   2117, 2118.

4          And, again, do you see Defense Exhibit 2117, for

5   identification, is again another email, this one from April

6   '09, of Mr. Walters forwarding a Dean Foods research report

7   from JPMorgan?  Do you see that, sir?

8   A.  Yes.

9   Q.  You see that 2118 is the research report itself that he is

10  forwarding, correct?

11  A.  Correct.

12         MR. BERKE:  Your Honor, I would offer Defense Exhibit

13  2117, 2118.

14         MR. FERRARA:  If not for the truth, no objection.

15         THE COURT:  All right.  Received.

16         (Defendant's Exhibits 2117, 2118 received in evidence)

17  BY MR. BERKE:

18  Q.  And again, sir, this is Mr. Walters forwarding you this

19  report from Jeff Turnbaugh of Bear Stearns JPMorgan, correct?

20  A.  Correct.

21  Q.  Now if we could go to 2118.  And, again, these are the --

22  this is the sort of reports that Mr. Walters would send to you

23  to discuss the issues in the report, correct?

24  A.  Yes, that's correct.

25  Q.  And, again, if we could just go through, for example, the

1   bullet points.  It says here, JPMorgan, they're raising their

2   estimates for Dean Foods.

3          And is that the sort of thing you would see in reports

4   where analysts would say how they think Dean Foods is going to

5   perform?

6   A.   Yes.

7   Q.   That's based on their own research, correct?

8   A.   Correct.

9   Q.   Then you see it goes through where it talks about Class One

10  milk cost is a factor.  Do you see that, sir?

11  A.   Yes.

12  Q.   It talks about major dairy herd culling; do you see that?

13  A.   Yes, I do.

14  Q.   You understand these are all factors that could influence

15  Dean Foods, correct?

16  A.   Correct.

17  Q.   Then they talk about how Dean Foods could save some money

18  based on a plan.  Do you see that, sir?

19  A.   Yes.

20  Q.   Then at the bottom talking about how the savings program

21  should buffer Dean against inevitable commodity swings.  Do you

22  see that, sir?

23  A.   Yes, I do.

24  Q.   You understood that Dean Foods was very sensitive to

25  changes in commodities that impact it?

H3sdwal4                          Duncan - cross

1              MR. FERRARA:  Objection your Honor.  What is relevant

2     is not Mr. Duncan's understanding, it is Mr. Walters'

3     understanding.

4              THE COURT:  It certainly is.  Sustained.

5     BY MR. BERKE:

6     Q.  And, sir, one of the things you would talk about with

7     Mr. Walters is how Dean Foods was sensitive to commodity

8     changes?

9     A.  Yes.

10    Q.  OK.  And if we could just go to third page on this.  If we

11    could blow up those charts a little bit.

12             Again, sir, you see where this is looking at analyzing

13    over time Class Three milk prices?

14    A.  Yes.

15    Q.  Diesel fuel prices?

16    A.  Right.

17    Q.  And if we could just highlight all three, just the

18    headings.  Thank you.  Figure 3, Figure 4, Figure 5.  Thank

19    you, Mr. McLeod.  It is a little hard to see.

20             And resin price, do you see that?

21    A.  Yes.

22    Q.  It would be common for these sort of commodity factors to

23    be analyzed in these reports that you -- Mr. Walters would at

24    times send you?

25    A.  Yes.

1    Q.  Again, those are the sort of topics you would discuss,

2    correct?

3    A.  Yes.

4    Q.  And there are other technical issues discussed in these

5    reports, correct?

6    A.  Correct.

7    Q.  Now let me show you what is marked for identification as

8    2119.

9            And you see, sir, this is email traffic between you

10   and Mr. Walters that includes an email from you on the same day

11   as the last two documents we were look at, April 28th and a

12   response on April 29th.  Do you see that, sir?

13   A.  Yes.

14           MR. BERKE:  Your Honor, I would offer into evidence

15   Defense Exhibit 2119.

16           MR. FERRARA:  No objection.

17           THE COURT:  Received.

18           (Defendant's Exhibit 2119 received in evidence)

19           MR. BERKE:  If we could just go to the bottom first

20   just to show the start of this -- actually a little bit lower.

21   Q.  This is the original email we were just looking at where

22   Mr. Walters sent you the Dean Foods report, correct?

23   A.  Correct.

24   Q.  April 28th.

25           Now, if we go up.

1        And, Mr. Duncan, do you see where you say to

2   Mr. Walters, "Bill, thanks for the report.  Here is a report

3   from Value Engine.  They like the stock, too, and believe it

4   should be trading around $28.  They have it as an outperform."

5        Sir, first, what is Value Engine?

6   A.  Value Engine was a research partner that we had at the

7   time.

8   Q.  That was when you mentioned various companies you have

9   relationships with to provide research reports in April of

10  2009, Value Engine was one of them?

11  A.  Correct.

12  Q.  And, again, like JPMorgan, they indicated whether they

13  thought the stock was a good buy or not?

14  A.  Yes.

15  Q.  Here they thought it was a good buy, correct?

16  A.  Correct.

17  Q.  And they make predictions about where it may be trading,

18  right?

19  A.  Correct.

20  Q.  Is this an example of the sort of research and materials

21  you would send to Mr. Walters about Dean Foods and other

22  stocks?

23  A.  Yes, it is.

24  Q.  And Mr. Walters responds to this by saying, "If you see any

25  reports on any other stocks, I would appreciate it if you would

H3sdwal4                        Duncan - cross

1   pass them along."  Do you see that, sir?

2   A.  Yes.

3   Q.  That's consistent with your understanding that Mr. Walters

4   wanted you to send any research or reports about stocks that he

5   was invested in or interested in, correct?

6   A.  Yes.

7   Q.  Sir, let me show you what's been marked -- let me ask you

8   first, sir:  And if you found other materials, anything that

9   you came across that could be relevant to a stock he was

10  invested in or interested in, you would generally send that to

11  Mr. Walters, correct?

12  A.  Yes, I would.

13  Q.  Let me show you what's marked as Defense Exhibit 2066, for

14  identification.

15          And does this reflect you, by going onto an online

16  account, forwarding an article to Mr. Walters related to Dean

17  Foods?  If you could scroll down a little bit.

18  A.  Yes.

19  Q.  OK.

20          MR. BERKE:  Your Honor, I would offer Defense Exhibit

21  2066 into evidence.

22          MR. FERRARA:  No objection, your Honor.

23          THE COURT:  Received.

24          (Defendant's Exhibit 2066 received in evidence)

25          MR. BERKE:  And if we could just highlight the bottom

1    of what you are forwarding.  If you could just make it a little

2    bigger, just the bottom half.  Thanks, Mr. McLeod.

3    Q.  So this is an article.  It says, "Kramer's 'Mad Money'

4    recap:  Keep your eye on the prize."

5         And that's Jim Kramer, who has a very popular show,

6    Mad Money?

7    A.  Correct.

8    Q.  Sort of a guy with a lot of energy but who people follow,

9    correct?

10   A.  Yes.

11   Q.  And you write, "Hi, I thought you would be interested in

12   this article from TheStreet.com.  Kramer was pounding the table

13   on the Dean Foods secondary."

14        Again, this is an example of the sort of things you

15   would send Mr. Walters?

16   A.  Yes.

17   Q.  This shows that Jim Kramer was very positive.  He probably

18   was literally pounding the table, right?

19   A.  Yes.

20   Q.  About Dean Foods?

21   A.  Yes.

22   Q.  And then Mr. Walters responds:  "Thank you."

23        Again, this is the sort of exchanges you would

24   regularly have with Mr. Walters about his stocks?

25   A.  Correct.

1    Q.  Sir, am I right that there was nothing about Mr. Walters'

2    trading in Dean Foods that stands out any more or less as

3    compared to his trading in other stocks?

4    A.  That's correct.

5         MR. BERKE:  Thank you, Mr. Duncan.

6         I have no further questions, your Honor.

7         THE COURT:  All right.  You may redirect.

8         MR. FERRARA:  Thank you, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. FERRARA:

11   Q.  Mr. Duncan, you testified on cross-examination that

12   sometimes Mr. Walters would call you about a stock a day or two

13   before putting in a trade; do you remember that?

14   A.  Yes.

15   Q.  And you said you'd send him research -- you would send him

16   research after he said he was interested in a stock, is that

17   right?

18   A.  Right.

19   Q.  And at times Mr. Walters would ask you to put on the trade

20   the very first time you discussed the stock, is that right?

21   A.  At times, yes.

22   Q.  You testified on cross that Mr. Walters often made quick

23   decisions?

24   A.  Yes.

25   Q.  And that would be before you would send him any research,

H3sdwal4                         Duncan - redirect

1   correct?

2   A.  I mean, it depended.  You know, I would send him something,

3   and then he would -- if he put in an order, I'd say where is

4   the stock trading and then he would go all in.

5   Q.  Or he might call you and put in an order before you would

6   send him any research, correct?

7   A.  Correct.

8   Q.  Mr. Berke asked you about whether Mr. Walters was a

9   sophisticated investor and you said in your opinion he was; do

10  you remember that?

11  A.  Yes.

12  Q.  Now, you work in Las Vegas, Nevada, correct?

13  A.  Yes, that's correct.

14  Q.  And that's where you worked at the time that you were

15  Mr. Walters' broker, right?

16  A.  Correct.

17  Q.  Where do most of your clients live?

18  A.  In Las Vegas.

19  Q.  I think you said Mr. Walters' portfolio was not

20  diversified; is that what you said?

21  A.  Yes.

22  Q.  And did you -- I think you testified he had no formal

23  education or training in investing, is that right?

24  A.  No, not that I know of.

25  Q.  Is it fair to say that across his whole portfolio of

H3sdwal4                          Duncan - redirect

1  stocks, Mr. Walters wasn't correct about his trades

2  significantly more or less than an average investor?

3           MR. BERKE:  I would object, your Honor.

4           THE COURT:  Basis?

5           MR. BERKE:  Just the form of the question.  I'm not

6  sure what it means.

7           THE COURT:  I will allow it.

8           I'll tell you what, rephrase it but I'll generally

9  allow it.

10 Q.  Across his whole portfolio of stocks, was Mr. Walters

11 correct about trades significantly more often than an average

12 investor?

13 A.  Not that I know of.

14 Q.  Mr. Berke asked you about commodities on cross-examination.

15 A.  That's correct.

16 Q.  Did Mr. Walters trade in commodities?

17 A.  Yes.

18 Q.  And he also -- Mr. Berke also showed you some emails from

19 analysts.  I think some of them -- Mr. Lashinski, do you

20 remember that?

21 A.  Yes.

22 Q.  And also showed you some analyst reports that Mr. Walters

23 had sent to you.  Do you recall seeing those?

24 A.  Yes.  Yes.

25 Q.  You said those were examples of things you might send or

1    that you might discuss with Mr. Walters, is that right?

2    A.  Yes.

3    Q.  What specific other examples do you remember discussing

4    with Mr. Walters?

5    A.  Outside of research reports?

6    Q.  Outside of the ones we saw, what do you specifically recall

7    discussing with Mr. Walters?  What specific analyst reports do

8    you recall other than the ones we saw?

9    A.  I don't recall any of them specifically, but those are the

10   type of conversations we would have.

11   Q.  Sitting here today, do you recall any other examples other

12   than the ones we saw?

13   A.  No.

14   Q.  Now, you said you -- those are the sort of things you

15   discussed.  For instance, Mr. Berke showed you an analyst --

16   two, I think -- a couple of analyst reports, and asked you if

17   those were the things you would discuss with Mr. Walters; do

18   you remember that?

19   A.  Yes.

20   Q.  Just tell us, what do you recall about those discussions?

21   A.  Well, I mean, generally speaking, you know, I would -- if

22   we had some research, I would send him research, and then I

23   would go over the research, the bullet points --

24   Q.  I apologize, sir.  I'm actually asking, as to the reports

25   Mr. Berke actually showed you --

H3sdwal4                              Duncan - redirect

1    A.  Right.

2    Q.  -- what do you recall in terms of your discussions with

3    Mr. Walters about those reports?

4    A.  Oh, I don't recall any of the discussions.

5    Q.  Mr. Berke asked you about times that you and Mr. Walters

6    would I think he said debate the pros and cons of a stock; do

7    you remember that?

8    A.  Yes.

9    Q.  To be clear, did Mr. Walters ever buy a stock that you had

10   initially recommended?

11   A.  Well, I didn't recommend stocks but I would provide

12   feedback on stocks.

13   Q.  And is it fair to say that --

14        THE COURT:  Did you understand the last question?

15        THE WITNESS:  Did I?

16        THE COURT:  Yes.

17        THE WITNESS:  Yeah.  I think so.

18        THE COURT:  OK.

19   Q.  I think you had testified on direct that you -- am I right

20   you testified Mr. Walters never -- never -- there was never a

21   solicited trade?

22   A.  Correct.

23   Q.  Is that right?

24        What does that mean?

25   A.  Meaning that I initiated the trade by a recommendation.

H3sdwal4                         Cacioppi - direct

1    Q.  That did not happen with Mr. Walters, correct?

2    A.  Correct.

3             MR. FERRARA:  I have no further questions, your Honor.

4             THE COURT:  All right.

5             MR. BERKE:  And I have no questions, your Honor.

6    Thank you.

7             THE COURT:  All right.  You may step down, sir.  Thank

8    you.

9             (Witness excused)

10            THE COURT:  Call your next witness.

11            MR. FERRARA:  Yes, your Honor.

12            The government calls Theodore Cacioppi.

13    THEODORE CACIOPPI,

14        called as a witness by the government,

15        having been duly sworn, testified as follows:

16            THE CLERK:  State your name and spell it for the

17    record.

18            MR. FERRARA:  I apologize, your Honor.  I just want to

19    mention one thing to defense counsel that I plan to ask the

20    witness about.

21            THE WITNESS:  Theodore Cacioppi, C-a-c-i-o-p-p-i.

22            MR. FERRARA:  Sorry.

23    DIRECT EXAMINATION

24    BY MR. FERRARA:

25    Q.  Good afternoon, Agent Cacioppi.

H3sdwal4                         Cacioppi - direct

1    A.  Good afternoon.

2    Q.  Where do you work?

3    A.  I'm an FBI special agent here in New York.

4    Q.  Would you describe your educational background for us?

5    A.  I graduated from the University of Vermont in the early

6    '90s, spent three-and-a-half years as a correction officer,

7    quit, went to law school at St. John's, and spent five years

8    practicing law before I became an FBI agent.

9    Q.  When did you become an FBI agent?

10   A.  In very early 2002.

11   Q.  After you started, what were your sort of -- towards the

12   beginning of your career in the FBI, what types of crimes did

13   you investigate?

14   A.  I was a criminal investigator on a securities fraud squad.

15   Q.  Now, to be clear, did you have any involvement in the

16   underlying investigation of this case?

17   A.  No, I did not.

18   Q.  In fact, what do you do now primarily for the FBI?

19   A.  My primary responsibility is as senior team leader of the

20   Underwater Search Evidence Response Team, which is one of four

21   evidence recovery dive teams that the FBI maintains around the

22   country.

23   Q.  So it's the Underwater Search Evidence Response Team?

24   A.  Yes.

25   Q.  Is that sometimes called "USERT"?

H3sdwal4                         Cacioppi - direct

1   A.  Yes, it is.

2   Q.  And sometimes is it referred to colloquially as the dive

3   team?

4   A.  Yes.

5   Q.  How long have you been on the dive team?

6   A.  I have been a member of the team since 2006.

7   Q.  What is your position on the dive team now?

8   A.  Now I am a team leader.

9   Q.  How did you -- so how does an agent get on the dive team?

10  A.  We canvas for applicants every year.  You have to be a

11  certified scuba diver.  And if your supervisor, because it is a

12  collateral duty -- so you are mostly an FBI agent working

13  cases -- if your supervisor agrees, you are allowed to try out.

14  It is a full-day tryout in a pool consisting of various types

15  of swimming fitness tests, scuba skills evaluation, and an

16  underwater obstacle course done with a blacked-out mask.

17  Q.  How did you become the dive team leader?

18  A.  In 2010, the then dive team leader took a promotion to

19  headquarters to become the program manager for the whole dive

20  program for the FBI.  That is the position I am in now.  I

21  competed for it with two other agents.

22  Q.  Give us a sense of your duties and responsibilities as the

23  dive team leader?

24  A.  I'm responsible for the logistics, the training, the local

25  budget here.  I maintain a fleet of trucks, a fleet of boats, a

1    large supply of, of course, dive gear, sonar equipment, ROV

2    equipment.  "ROV" is a type of underwater robot.  I have to

3    maintain all of that.  We deploy about once a month for about a

4    week a month.  In the interim, I'm essentially managing the

5    logistics of those deployments, repairing what we've broke, and

6    planning for the next one.

7    Q.  Do you also dive?

8    A.  Yes.

9    Q.  What sorts of missions is the dive team typically asked to

10   undertake?

11   A.  We search for weapons and occasionally cars and

12   occasionally bodies, but about 80 percent of our searches --

13   actually, I'd say 90 percent of our searches are for weapons.

14   Q.  What specialized training have you undergone to become a

15   member of the FBI dive team?

16   A.  I went through my two-week basic, which is a very

17   intensive --

18           MR. FERRARA:  I apologize.  We seem to have a broken

19   monitor.  Your Honor, the monitor attacked the juror.

20           THE COURT:  All right.  OK.  Let's see whether we can

21   get it back working.  How is it doing now?

22           A JUROR:  It's good.

23           THE COURT:  Excellent.

24   BY MR. FERRARA:

25   Q.  I apologize, sir.  I think I asked you what specialized

1   training.  Is that where we were?

2   A.  Yes.  We hold our initial basic training in house.  It's

3   two weeks long.  It is a very intense two weeks.  And after

4   that there is an array of trainings available to an agent.  I

5   have been to probably 20 or 30 different types of schools, both

6   some that we run in house, some that we pay vendors to put on

7   for us.  Everything from technical sonar application type of

8   stuff to boat driving schools to, of course, diving schools.

9   Q.  And about how many dive missions have you participated in?

10  A.  At least 40 or 50.

11  Q.  So I want to call your attention to March of 2016.  Were

12  you asked at that time to search for an object in Turtle Creek

13  in Highland Park, Texas?

14  A.  Yes.

15  Q.  What information were you given at that time in March of

16  2016?

17  A.  That a cooperator disposed of a cell phone that was somehow

18  used in the commission of a crime in the pond that is at the

19  end of Turtle Creek.

20  Q.  Do you recall --

21          MR. SCHOMAN:  I take it not for the truth, your Honor?

22          THE COURT:  Yes.  This is not for the truth of its

23  content but the fact that it was said.

24          MR. FERRARA:  Your Honor, may I be heard on that?  May

25  I approach or may I be heard on that?  I would like to offer

 1    that in part for the truth in addition to not for the truth as

 2    a prior consistent statement.

 3              THE COURT:  Hang on one second.

 4              (Pause)

 5              No.  I sustained it as to the truth of the statement.

 6              MR. FERRARA:  Very good, your Honor.  I will continue.

 7              THE COURT:  Yes.

 8    BY MR. FERRARA:

 9    Q.  OK.  So could you walk us through how you prepared for that

10    dive?

11    A.  Like the vast majority of our searches, we first do a site

12    survey in which myself or another senior member of the team

13    would go to the locality, meet with local law enforcement, meet

14    with local FBI evidence response team members who would support

15    us there locally.  Figure out what equipment we needed to

16    bring.  Figure out what equipment we needed to rent.  Figure

17    out the hotels we were going to stay in.  Figure out how to get

18    our trucks and other vehicles there or whether we had to rent

19    vehicles locally.

20              So I went to Dallas.  I met with the local evidence

21    response team team leader there in Dallas.  Met with the case

22    agent.  Met with local law enforcement to see how they would be

23    as far as supporting us with everything from, you know, crime

24    scene management to filling our scuba tanks from a compressor.

25    Met with the cooperator, who pointed out where he says he

H3sdwal4                      Cacioppi - direct

1    dumped the phone in the pond, and ended up writing a fairly

2    lengthy report about how we would get this -- you know, get the

3    job done.

4    Q.  When did that -- when was that site survey?

5    A.  The spring of 2016.  To be more specific, I would have to

6    be reminded by a report I wrote.

7    Q.  OK.  So why don't we actually take a look, then, at what's

8    been marked as 3513-5, just for the witness.

9            (Pause)

10           I don't see it.  Are you able to see it?

11           THE WITNESS:  No.

12           MR. FERRARA:  How about now?

13           THE WITNESS:  Yes.

14           MR. FERRARA:  Does that -- if you would read that

15   quietly to yourself.

16           Whenever you are ready, just look up at me.

17   Q.  Does that refresh your memory as to when the site survey

18   took place?

19   A.  Yes.  It was on April 7, 2016.

20           MR. FERRARA:  We can take that down.  Thank you so

21   much.

22   Q.  I want to show you what have been marked for identification

23   as Government Exhibits 33 and then we'll do 34.  If you can put

24   them side-by-side or one at a time.

25   A.  I have them side-by-side.

1    Q.  So just what are those?

2    A.  The one on the right is a picture of the area of Turtle

3    Creek that we were asked to search, and the one on the left is

4    an overhead view that I took from Google Earth to write the

5    report.

6    Q.  Do those photographs, Exhibits 33 and 34, accurately depict

7    the way the creek looked at the time you did the dive?

8    A.  The one on the right was from the site survey, so its water

9    level is probably two inches higher than when we did the dive,

10   but it's very close.

11          MR. FERRARA:  With that clarification, your Honor, the

12   government offers 33 and 34.

13          MR. SCHOMAN:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibits 33 and 34 received in evidence)

16   BY MR. FERRARA:

17   Q.  So let's start with 33.

18          So if we look first, there is a -- just the one is

19   fine.  Thank you.

20          All right.  So there is this blue arrow and sort of

21   next to it is a yellow pin.  What do those indicate?

22   A.  When I was writing this report, that was kind of my effort

23   to point out to my superiors who would be reading the report

24   and, you know, okaying us spending all the time away from the

25   division and all the money to do this search, where it is

1    indicated to me the cell phone went into the water and how I

2    would conduct the search, what my search area would be given

3    the local conditions.

4    Q.  So this is sort of specifically where -- the most specific

5    area of where you planned to search?

6    A.  Yes.

7    Q.  Are they sort of meant to be sort of the same --

8    A.  They were meant to be a little separate.  The yellow pin is

9    my effort to pinpoint where the phone -- where it was indicated

10   to me that the phone went in the water.  I was going to center

11   the search area somewhat downstream from that because it's not

12   going to go upstream against the current.  If it were to move,

13   it would go downstream.

14   Q.  What is this -- at the bottom of this -- at the bottom of

15   the creek there is this sort of the circular thing in the

16   middle of the water.

17   A.  Yes.

18   Q.  With sort of white at the bottom.

19   A.  Yes.

20   Q.  Do you see that?

21   A.  Yes.

22   Q.  What is that?

23   A.  That was -- I determined during the site survey that is an

24   approximately 100-year old flood control device.  It's

25   basically about a 20-foot high, steel reinforced concrete

1   bucket.  And at the bottom of the bucket there are two large

2   pipes about five feet round.  What that's designed to do is

3   keep the level of that pond at a constant level.  As the water

4   rises in the pond, it would flow into that bucket and then flow

5   downstream underneath the next street, and then that river

6   continues further south.

7   Q.  So it is a big drain?

8   A.  A big drain.  If you would picture a dam going across a

9   river, making it into a circle, and that's what that is.

10  Q.  All right.  Let's take a look at 34.  If we could blow that

11  up.  Thank you so much.

12        All right.  So what do we see here?

13  A.  In the background, at the end of the pond, you can see the

14  top of that flood control device.

15  Q.  When I offered these exhibits, you mentioned the water

16  level might be higher in the photo.  What is it you are seeing

17  that suggests -- like where do you see something that would

18  indicate water level being higher or lower with respect to that

19  drain?

20  A.  When we did the search, the water was just -- the water

21  level had come down significantly.  There during the site

22  survey there was a good two inches of water overtopping that

23  structure.  By the time -- and we had kept track of the weather

24  very carefully for weeks ahead of time, because if there is too

25  much water flowing over that structure it would be too

1    dangerous to put divers into that pond.  And, you know, we

2    didn't want to waste everyone's time and money getting all of

3    this down to Dallas if we just would sit around for days

4    watching a pond.  So that was -- this picture was from about

5    the time of the site survey took place, and by the time we dove

6    the water level had come down significantly.  It was safer.

7    Q.  About how deep was water at the time you dove?

8    A.  In our main search area the water was no more than 8 feet

9    deep, but out around the perimeter of that bucket it was about

10   15 feet deep.

11   Q.  Now, where -- can you show us or can you describe in this

12   photograph where you understood the phone had been thrown from?

13   A.  If you see a tree right in the center of the photograph

14   with a light colored gravel path next to it, it was indicated

15   to me that the phone was thrown from the end of that path

16   straight out into the pond.

17            MR. FERRARA:  So -- and if I could enlist

18   Mr. Schoman's help for the drawing.  Thank you so much.

19            I apologize, your Honor if I could have one second?

20            THE COURT:  Sure.

21            (Counsel conferred)

22            MR. FERRARA:  We will worry about it later.  Maybe we

23   will do it later.

24   BY MR. FERRARA:

25   Q.  So we are talking about the tree that's centered right in

1555

H3sdwal4                          Cacioppi - direct

1   the screen, is that correct?

2   A.  Yes.

3   Q.  OK.

4   A.  Not there.

5   Q.  That is OK.  I think we are talking about the one to our

6   right of that?

7   A.  Right where the cursor is right now.

8   Q.  Perfect.  OK.

9        All right.  So we can take that down for a second.

10  Nice arrow, though.

11       So what tools do you use during a dive to help you

12  find objects?

13  A.  We dive a fairly complex surface supply air system.  It is

14  much more like military salvage divers than certainly

15  recreational divers.  We also use metal detectors, which not a

16  lot of dive teams use because they are very expensive and hard

17  to maintain and they frequently go off because there is a metal

18  object in the water.

19       The way we operate is we will put what's called a

20  jackstay search line system in the water.  That consists of

21  ropes between 50 and 75 feet long with a loop of chain on

22  either end of the rope.  That loop of chain goes through a

23  cinderblock.  From that loop of chain also goes another lighter

24  weight rope to a buoy on the surface.  We set these lines in

25  the water parallel to each other within about a foot of each

1   other.

2            The diver on the right will hold the rope on the right

3   in his left hand.  The diver in the left will hold the rope on

4   the left in his right hand.  They will swim next to each other

5   down their parallel lines, swing the metal detector in their

6   hand.  When the metal detector goes off, they have to dig with

7   their hand to find the object that set the metal detector off.

8   When they get to the end of the rope, they pick up the

9   cinderblock and move it their arm span, since they were

10   sweeping the metal detector back and forth across their body,

11   the width of their arm span, and then reverse the process.  So

12   over the course of days, and it is usually days, those ropes

13   will walk -- slowly walk apart from each other, and then you

14   have an area that was searched in a very methodical way that is

15   usually about 75 feet in width and maybe 150 feet long.

16   Q.  So you are getting a little ahead of me.

17   A.  I'm sorry.

18   Q.  Just let's focus on the metal detectors for a second.

19   A.  Sure.

20   Q.  Why are metal detectors used in the first instance?

21   A.  Usually we're searching for a metallic object.

22   Q.  What was the visibility like at the bottom of the creek at

23   the time you searched it?

24   A.  Very low.  Almost nothing.  Inches to nothing.

25   Q.  Why was it so hard to see at the bottom of the creek?

H3sdwal4                         Cacioppi - direct

1   A.  Well, most waterways in the world, really, are of low

2   visibility because of turbidity, objects -- tiny objects

3   floating in the water.  Even if there is some visibility, when

4   you take a metal detector and put it down in the mud and swing

5   it around in front of you, you create a cloud of zero

6   visibility around you.

7   Q.  For this mission, you said you were searching for a cell

8   phone, is that right?

9   A.  Yes.

10  Q.  Did you perform any tests before the dive?

11  A.  Yes.

12  Q.  To determine whether the -- how well the metal detectors

13  would work as to the cell phone?

14  A.  Yes.

15  Q.  What did you do?

16  A.  We obtained the same make and model of cell phone, and one

17  of the other agents who obtained it brought it over to the

18  site.  I literately put it in my left hand, took off my ring

19  and my watch, and took the metal detector head, which is a

20  doughnut-shaped plastic object, and slowly lowered it down on

21  top of the phone waiting for the metal detector to go off.

22  Q.  What was the result of that experiment?

23  A.  It barely set off the metal detector and only at an

24  extremely close range.

25  Q.  Just give us a sense of comparison.  If you had been

1    holding a gun in your hand, how would the metal detector have

2    reacted?

3    A.  It would have started going off about two-and-a-half feet

4    from the gun.  It would have gone off very loud in the earpiece

5    that is attached to your head as a diver.

6    Q.  So it was harder for the metal detector to read the phone?

7    A.  It almost didn't read it at all.

8    Q.  So when was the actual dive?

9    A.  A few months later.  Again, I would have to refresh my

10   recollection with our diver logs or our dive bill.

11          MR. FERRARA:  OK.  Let's talk a look at just for the

12   witness, Ms. Pyun, if you don't mind, 3513-5 again.  And if we

13   could go to page 12 of that document just for the witness.

14          (Pause)

15   Q.  You are sort of craning your neck.  Are you able to make

16   that out?

17   A.  It's a little light but I've got it.

18   Q.  Whenever you are ready, if you would look at me.

19   A.  It was in --

20   Q.  It began, when was it?

21   A.  We began searching June 6, 2016.

22          MR. FERRARA:  We can take that down, Ms. Pyun.  Thank

23   you.

24   Q.  So how did you prepare for this dive?

25   A.  I had to get about seven or eight members of the team to be

H3sdwal4                        Cacioppi - direct

1    able to, you know, leave their squads and their cases and their

2    families and come to Dallas for a week.  I had to get a couple

3    of medics from headquarters.  We have a unit at headquarters

4    called the Technical Hazardous Response Unit.  Whenever we

5    dive, we have to have medics on side.  They are also experts in

6    hazmat and high-angle rope type of stuff.

7            I had to figure out how to get our gear there.  We

8    ended up shipping about 25 very large boxes that weighed a

9    total of about 2500, maybe 3,000 pounds.  Had to go to a local

10   dive shop and rent scuba tanks because it is just too

11   inefficient to really ship.

12           We have what's called an operational response center

13   in Dallas.  Instead of renting a U-Haul truck, we were able to

14   use one our prepositioned cargo trucks.  And all those people

15   flew to Dallas.  Rented regular vehicles.

16           We shipped all our gear to FBI -- to the FBI office in

17   Dallas.  And the first day of diving picked up all the gear

18   there and went to the dive shop, picked up the tanks, and we

19   were able to get half a day of diving in on the first day.

20   Q.  About how much does it cost -- did it cost to organize and

21   execute this dive mission?

22   A.  My best estimate is in the $35,000 range.

23           MR. FERRARA:  If we could put up Government Exhibit 33

24   again, for the jury.

25           (Pause)

```
 1              I want to ask -- your Honor, if I could just move
 2    around a little bit so I could just illustrate for the jury
 3    some of the questions that I am about to ask?
 4              THE COURT:  You may.
 5    Q.  So you talked about this jackstay system?
 6    A.  Yes.
 7    Q.  Let's just sort of talk through that so we understand how
 8    that works, OK?
 9    A.  OK.
10    Q.  All right.  So where did you -- where did you first --
11    looking at the photo, where did you first lay down the
12    jackstays, approximately where?
13    A.  Pretty much right where the yellow pin was.  The jackstays
14    went across the pond.  So we were set up, if you can see the
15    word "Site," the arrow covers the whole term "search site."  We
16    were set up on the east side of that pond where you can see a
17    bunch of cars partially covered by trees.
18              So the jackstay started -- the jackstays started with
19    the near side cinderblock, meaning the ones closest to where we
20    were, on the shoreline near that yellow pin and pushed across,
21    covering most of the width of that pond.
22    Q.  All right.  So starting sort of right here at the yellow
23    pin?
24    A.  Yes.
25    Q.  And the jackstays would be laid sort of horizontal to the
```

H3sdwal4                        Cacioppi - direct

1    length of the creek, is that right?

2    A.  Yes.

3    Q.  And you said you would have two parallel; is that how it

4    worked?

5    A.  Yes, two parallel.

6    Q.  And they would start right next to each other?

7    A.  Yes.

8    Q.  What would happen -- sorry.  Remind us, what would the

9    diver do along the length of the jackstay?

10   A.  So they were in zero visibility with a metal detector in

11   one hand and a jackstay, which is a guy, in the other hand.

12   That is the reason that search line is in the water, because

13   they are in zero visibility.

14          They slowly swim down the line, swinging the metal

15   detector back and forth.  When it goes off, they dig a hole

16   with their hand.  Pick up whatever it is that set the metal

17   detector off.  Try to determine what it is.  If it is not what

18   we're looking for, it's thrown onto the other side of the line.

19   When the diver gets to the far cinderblock, he picks it up and

20   moves it their arm's width.

21   Q.  Let me stop you just for a moment.

22          Why use a jackstay?  Why not just have the divers jump

23   in and start looking around in that area?

24   A.  Because of the zero visibility environment, you really have

25   kind of no idea where you are.  It is impossible to conduct a

1   methodical search without some sort of guidance either with

2   lines on the bottom or being directed by surface personnel.

3   Q.  So I think you said the jackstays are moved apart as the

4   diver completes each length of the rope?

5   A.  Yes.

6   Q.  I just want to give the jurors a sense of about how far

7   apart they got by the end of the search on the third day.

8           So they started here in parallel?

9   A.  Yes.

10  Q.  Next to each other, correct?

11  A.  Yes.

12  Q.  So just stop me when I sort of get to as far up -- sort of

13  as far north as the jackstays went?

14  A.  About there.  I remember having to do something a little

15  different to cover that little notch that you see right there.

16  Q.  This here right underneath the "s" and the "e" of search?

17  A.  Yes.  We couldn't search in that kind of little culvert

18  with jackstays where the water was shallow enough that the

19  diver could literally be on their hands and knees with their

20  head out of the water searching.

21  Q.  And about how far -- stop me.  About how far down did you

22  go with the jackstays?

23  A.  About there.

24  Q.  Right here?

25  A.  Yeah.

1  Q.  So sort of up here, if we go to the very top of the picture

2  of the creek, was that area searched?

3  A.  No, it was not.

4  Q.  If we go all the way to the bottom down here, for instance,

5  was this area searched?

6  A.  No, it was not.

7  Q.  Why can't you -- why couldn't you search that entire creek?

8  A.  It would have taken months.  The area we did search, it

9  took us about three days.  And we found that eventually you get

10  to a point of diminishing returns.  We can search an area that

11  a person can throw an object in about two to three days.  Once

12  it starts to get to the fourth or fifth day and we have no

13  information that the object is in a particular area, then we're

14  putting, you know, our men and women's lives at risk by putting

15  them in the water in the first place for really almost nothing.

16  Q.  So how many days were spent diving?

17  A.  I believe, three.

18  Q.  Did you yourself dive?

19  A.  Yes, twice.

20  Q.  So how many divers are in the water at once?

21  A.  In this search and in most of our searches, it is two

22  divers at once.

23  Q.  How long does each diver spend in the water?

24  A.  In shallow water like this, where you don't have to worry

25  about nitrogen loading, we kind of expect our divers to work

1    about two-and-a-half hours, maybe three hours.  That way we

2    spend some amount of time putting the system together, maybe an

3    hour in the morning, an hour and a half, get about

4    two-and-a-half hours out of the first diver rotation, pull

5    those divers out, have like a quick lunch, and turn around the

6    system for the next set of divers.  Put them in.  They work for

7    about two-and-an-half to three hours, and by then it's 4:30,

8    5 o'clock; it is time to start tearing the system apart.

9    Q.  So on each full dive day, about how many hours are spent

10   actually with divers in the water searching?

11   A.  Five to six.

12   Q.  Now, what conditions did you find at the bottom of the

13   creek?

14   A.  I was kind of surprised by the bottom composition.

15   Although it was zero visibility, which I expected, the bottom

16   of that creek is almost -- it is a very, very hard clay, almost

17   like concrete.

18   Q.  What did you expect it to be?

19   A.  I expected from the site survey for it to be thick mud and

20   muck and silt.

21   Q.  What did -- what, if anything, what I guess problems did --

22   if any, did it cause you finding clay down at the bottom?

23   A.  Oh, we were going through gloves very quickly.  We were

24   used Kevlar reinforced gloves, and usually each dive rotation,

25   the diver would either have to come up and change gloves or

1   they would come out of the water with a torn up set of gloves

2   that they would just have to throw out.

3   Q.   Let me break that down a little bit.  Why do you use

4   gloves -- sorry, let me back up even one more step.

5        You said the gloves had Kevlar in them?

6   A.   Yes.

7   Q.   What is Kevlar?

8   A.   Kevlar is a tough but flexible material that's often used

9   in body armor.

10  Q.   Why do you use gloves reinforced with body armor -- why did

11  you use gloves reinforced with body armor during this search?

12  A.   There is no industry out there that makes stuff that

13  specially says "FBI dive team" on it or "public safety dive

14  team" on it.  We need gloves that provide thermal protection

15  but that also protect your hands from sharp objects on the

16  bottom as you use your hand to dig up the bottom.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1   Q.  So, as you searched this at the bottom of the creek, what,

2   if anything, did you find in the first couple of days?

3   A.  Mostly crushed beverage cans.

4   Q.  Where did you find them?  Were they floating on top of the

5   clay at the bottom, were they buried in?

6   A.  Just oddly buried in the first inch or two of that

7   extremely hard clay, and they were all crushed flat in

8   irregular shapes.

9   Q.  At any point on the search, did you find a cell phone of

10  any kind?

11  A.  No.

12  Q.  How far into the clay were you able to dig?

13  A.  Inch and a half maybe.

14  Q.  On the third day of the search -- was that the last day,

15  the third day?

16  A.  Yes.

17  Q.  On the third day of the search, did you search a different

18  method, that is to say not using jackstay?

19  A.  Yes.

20  Q.  What did you do that day?

21  A.  We felt that it would be potentially productive to search

22  around the perimeter of the base of that drainage device.

23  Q.  This big -- the sort of bucket thing we talked about?

24  A.  Yes.

25  Q.  Did you search inside it or on the outside?

1    A.  We did not search inside it.

2    Q.  Let's come back to that.  You're describing searching the

3    bottom outside of the drain?

4    A.  Yes.

5    Q.  Let's take a look, before we talk about that, I want to

6    show you what have been marked for identification as Government

7    Exhibits 13 and 15.  These are in evidence, we can take a look

8    at these.

9            What do we see here?

10   A.  Those are two pictures of that flood control device.

11   Q.  It is two different pictures of the same thing, correct?

12   A.  Yes.

13   Q.  If you look at sort of either one of these, 13 and 15,

14   towards the left side of the big drain, what do we see over

15   there?  Is that water spilling?  What's happening there?

16   A.  That's a little bit of the water now that the water has

17   drained into that device and through the pipes coming out of

18   it, that's just a little bit of water spilling into it.

19   Q.  Let's also now take a look, let me show you what has been

20   marked for identification as Government Exhibit 11.

21           MR. FERRARA:  If we could just hit play for maybe

22   two seconds, Ms. Pyun, so the witness can see what we're

23   talking about.  You can pause it there.

24   Q.  Did you have an opportunity to review this video prior to

25   testifying?

H3S3WAL5                           Cacioppi - direct

1    A.   Yes.

2    Q.   What does it depict?

3    A.   That's a video of that flood control device at or about the

4    time of our search.

5              MR. FERRARA:  The government offers Exhibit 11.

6              MR. SCHOEMAN:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 11 received in evidence)

9              MR. FERRARA:  Ms. Pyun, if you wouldn't mind playing

10   that for the jury once it comes up.  Thank you.

11             (Video playing)

12   Q.   If we can pause it just quickly.  What are we hearing?

13   A.   That's the water overtopping the top of that structure and

14   draining away.

15             MR. FERRARA:  You can hit play, Ms. Pyun, thank you.

16   I think we lost it.  There you go.

17             (Video playing)

18             MR. FERRARA:  If we can pause it there.  That's fine.

19   We can leave it right there.

20   Q.   Now, would you mind orienting us, sir.  We saw earlier I

21   think we talked about where you understood the phone had been

22   thrown from?

23   A.   Yes.

24   Q.   Are we able to see a piece of that in this still shot of

25   this video at the very end here?

 1   A.  Yes, just barely that tree at the foreground, if you look

 2   at the knot on it, just below that there is a point of land

 3   that comes out.

 4   Q.  How am I doing?

 5   A.  Right there, yes.

 6   Q.  That corresponds to the area you showed us earlier?

 7   A.  Yes.

 8            MR. FERRARA:  Let's go back if we can, Ms. Pyun, put

 9   up, maybe just put up Government Exhibit 13.

10   Q.  So, how deep is that drainage structure approximately?

11   A.  The inside is probably about 16 to 17 feet deep.  When

12   we -- the outside you're about 15 feet underwater at the

13   perimeter.

14   Q.  So, you were about to describe searching the outside base

15   of this structure.

16   A.  Yes.

17   Q.  What did you do to search that area?

18   A.  Well, we -- myself and one of our other divers -- swam on

19   the surface out to that structure.  We descended next to each

20   other.  We didn't use metal detectors, because it's steel

21   reinforced concrete.  It would have been going off all the time

22   no matter what.

23            I put my left hand on that structure, he put his right

24   hand on the structure.  So we swam around in opposite

25   directions until we met on the other side, the whole time

H3S3WAL5                        Cacioppi - direct

1    basically using the hand not on the structure to pat search the

2    bottom.

3    Q.  What did you find during that portion of the search?

4    A.  Unlike the rest of the pond, a lot of large heavy objects.

5    I remember finding a tree that was too big to get my arms

6    around.  I remember finding a chair.  The other diver said he

7    found part of a desk.  One of us, I forgot who, found a bowling

8    ball.  I found a lot of bricks.  Some of them were smashed into

9    pieces, some of them were intact.  There is a lot of large

10   heavy things.

11           THE COURT:  I'm a little bit lost.  Where were you

12   when you were doing this activity?

13           THE WITNESS:  This segment of the search in the water

14   on the outside of that bucket.

15           THE COURT:  Where was your hand?

16           THE WITNESS:  So I put my left hand on the bucket, so

17   that I could swim in a circle around it without losing contact

18   with it.

19           THE COURT:  So you were not inside the bucket at all.

20           THE WITNESS:  That's correct, your Honor.

21           THE COURT:  So what you are describing with these

22   heavy objects, they were on the outside perimeter of the

23   bucket.

24           THE WITNESS:  Yes, your Honor.

25           THE COURT:  Thank you.

1    MR. FERRARA:  Thank you for the clarification, your

2    Honor.

3    Q.  Why did you decide to search that particular area?  In

4    other words, you had this jackstay method.  Why did you decide

5    to come and search the base of this large bucket?

6    A.  Based on my site area research, we determined the area is

7    subject to violent flooding.  At times flood waters can rise 4

8    or 5 feet above the top of that bucket structure and turn it

9    into a large whirlpool.  There have been floods in that area

10   that have swept away cars that you see on the street behind

11   that pond.

12            So my thought was if something was picked up and made

13   it as far as that bucket, maybe it would hit the outside of the

14   bucket and fall down to the bottom, we could find it there.

15   Q.  So the judge mentioned -- I wanted to ask about searching

16   inside the bucket.  You said you did not search inside the

17   bucket?

18   A.  That's correct.

19   Q.  Why didn't you search inside that structure?

20   A.  Several reasons.  One, completely different mission,

21   completely different equipment setup.  We couldn't have pulled

22   all of our surface supply diving equipment into that area.

23   It's a very confined space.  One of our team did access the

24   area by walking through one of those small, you can kind of see

25   in the background, the black circle.  That's one of the pipes.

1  It was very dangerous in there.  It was extremely slippery from

2  all the slime and algae that had kind of built up over the

3  years.

4        I was also concerned for a hazmat environment that we

5  might have to do something different.  That area, a lot of

6  people use a lot of pesticides, so all that would have been

7  washed down in the water.

8        At the bottom of the bucket below where the water

9  could get drained out of was about another foot and a half of

10 water.  And I remember swimming up to the edge of that bucket,

11 and even with a full face mask on looking down at the bottom

12 and just being disgusted by the smell that was coming out of

13 there.

14       So while we could do that search, it would be a

15 completely separate set -- a completely separate mission.  I

16 also didn't see anything down in the bucket.  And we found a

17 lot of stuff around the outside of the bucket.  So my thought

18 was anything that made it into the bucket probably got flushed

19 down those pipes inside.

20       MR. FERRARA:  May I have one moment, your Honor.

21       THE COURT:  Yes.

22       MR. FERRARA:  Maybe just a few more questions, your

23 Honor.

24       Ms. Pyun, if we could take a look at 33.

25 Q.  To be clear, sorry if this wasn't, Agent.  Which way was

1    the -- you mentioned the current.  Which way was the current

2    moving in this creek?

3    A.  That current moves from in that picture up to down, which

4    is north to south.

5    Q.  Toward the drainage structure?

6    A.  Towards the drainage structure, it drains through that

7    structure.  The pipes go underneath that street that you see in

8    the very bottom of the picture.  And then open up into a

9    continuation of this river.

10   Q.  You were talking about what you found at the bottom of the

11   creek during the first couple of days of searching.

12   A.  Yes.

13   Q.  This is when you were not around the base of the structure,

14   rather when you were just above it?

15   A.  Yes.

16   Q.  You said you found some cans?

17   A.  Mostly dozens, if not hundreds, of this oddly crushed stuck

18   into the clay cans.

19   Q.  What other sorts of things did you find?

20   A.  One of the divers found a meat cleaver, we found some

21   tools, some household objects.

22   Q.  How were you able to find those things?

23   A.  All those things we found with a metal detector.

24   Q.  Were they -- sorry.  Were they on top of the clay or were

25   they buried into the clay?

1    A.  Just sitting on top of the clay.

2               MR. FERRARA:  That's all I have, your Honor.

3               THE COURT:  All right.  You may cross-examine,

4    Mr. Schoeman.

5               MR. SCHOEMAN:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. SCHOEMAN:

8    Q.  Good afternoon, Mr. Cacioppi.

9    A.  Good afternoon.

10   Q.  If I have this right, you didn't find the phone?

11   A.  That's correct.

12   Q.  You were there for four days, and you went near the place

13   where Mr. Davis said he dropped it.  You went downstream from

14   where he said he dropped it.  You went around the thing, the

15   cistern, and somebody went in the cistern?

16   A.  One person, not in dive gear, walked through the pipe to

17   kind of get an idea of what was in that cistern, but we didn't

18   search it.

19   Q.  But nobody found a phone?

20   A.  That's correct.

21   Q.  And your team, sir, is one of the elite dive teams in the

22   world, is that right?

23   A.  I'd like to think so.  We're portrayed sometimes that way

24   in the media.

25   Q.  You're one of the very best in the world at what you do?

1    A.  We're almost the only ones in the world that do exactly

2    what we do.  It is a small universe of people.

3    Q.  Because you're one of the few that do this, when there is

4    an underwater search and rescue kind of thing, you're the guys

5    we call, right?

6    A.  Not rescue.  We only rescue ourselves, and not that often.

7    We're strictly -- that's one of the decision the FBI has made

8    to focus our economic assets on making us only an evidence

9    recovery team, not some of the other things that police dive

10   teams and fire dive teams are sometimes asked to do.

11   Q.  When there is stuff that goes in water and you got to find

12   it, you're the guys to call?

13   A.  Yes.

14   Q.  And were you there, by the way, when a plane landed on the

15   Hudson River and the FBI dive team had to go look for debris on

16   the bottom of the Hudson?

17   A.  I was on the team.  Unfortunately I was stuck at another

18   extremely high profile case at my desk, but literally analyzing

19   sonar imagery that was being sent back from one of the boats at

20   my desk.

21   Q.  Sorry.  So you were looking at the sonar imagery for the

22   Hudson?

23   A.  You were talking about the Hudson, right?

24   Q.  Yes.

25   A.  Yes.

1   Q.  That's when your dive team went into the Hudson in January

2   of 2009 to find stuff on the bottom of the Hudson River, right?

3   A.  It was a joint effort.  In conjunction with the Army Corps

4   of Engineers and New Jersey State Police, the NYPD, everybody

5   played a role.  We used our specific expertise in a type of

6   sonar to find the engine.

7   Q.  There was an engine at the bottom of the Hudson River and

8   there was ice on the river, and your team went down and found

9   the engine on the bottom of the Hudson River?

10  A.  We used sonar to find -- to specifically locate where the

11  engine was so the Army Corps of Engineers could drop a giant

12  hunk of concrete next to it with a buoy and up line so the

13  commercial dive operation could ultimately come and salvage it.

14  Q.  Were you on the team that flew out to Minneapolis when the

15  Interstate 35 bridge collapsed?

16  A.  Yes, I was.

17  Q.  So tell the jury what that was about.

18  A.  The I-35 bridge in Minnesota collapsed quite a few years

19  ago.  And given that it was likely one of two scenarios, either

20  a terrorism or a transportation accident, the FBI would be

21  involved in that.  We're supposed to be the lead if there is a

22  terrorism accident.  If it is transportation, the National

23  Transportation Safety Board generally uses us as the evidence

24  recovery arm.

25  Q.  That was hundreds of feet of bridge in the Mississippi

1    River that your team had to go dive into?

2    A.  Yes.

3    Q.  In this case you searched Turtle Creek in Dallas?

4    A.  Correct.

5    Q.  Smaller body of water?

6    A.  Correct.

7    Q.  In this case, you were actually at Turtle Creek with

8    Mr. Davis during the preparations, right?

9    A.  During the site survey, yes.

10   Q.  That was on April 7, is that right?

11   A.  Yes.

12   Q.  And he told you that he did an underhand toss of the phone

13   about a third of the way across the creek?

14   A.  Yes.

15   Q.  Did he tell you the phone was black and shiny or did he

16   tell you it was maroon?

17   A.  He didn't tell me the color of the phone.

18   Q.  You didn't find a phone of either color?

19   A.  We didn't find a phone of any type.

20   Q.  He told you, by the way, he heard the splash and that the

21   phone sank, right?

22   A.  Yes.

23   Q.  Let me just show the witness what's been marked for

24   identification as 3501-38.

25            Sir, do you recognize this picture?

H3S3WAL5                    Cacioppi - cross

1   A.  That looks like Turtle Creek, yes.

2   Q.  Is that something you took during the site survey?

3   A.  Excuse me?

4   Q.  Is that a picture taken during the site survey?

5   A.  I think it was.  I didn't take it because I'm pretty sure

6   that's my right arm with a yellow pad that I sometimes carry on

7   site surveys.

8   Q.  Is that how Turtle Creek looked that day?

9   A.  For the site survey, yes.

10          MR. SCHOEMAN:  I offer what's been marked 3501-38.

11          MR. FERRARA:  Without objection.

12          THE COURT:  Received.

13          (Defendant's Exhibit 3501-38 received in evidence)

14  Q.  So, that's a picture of Turtle Creek with your left arm,

15  and is that Mr. Davis standing next to you?

16  A.  That's my right arm, and I think that is Mr. Davis, yes.

17  Q.  Thank you.  And he's showing you on that trip where he said

18  he threw the phone, right?

19  A.  Yes.

20  Q.  Let me just show you what's been marked for identification

21  as 3501-39.  Do you recognize what's depicted in that photo?

22  A.  Yes, that's us operating.  That's us searching.

23  Q.  That's the day of the search in June -- one of the days of

24  the search in June of 2016?

25  A.  Yes.

1    MR. SCHOEMAN:  I offer 3501-39.

2    MR. FERRARA:  Without objection.

3    THE COURT:  Received.

4    (Defendant's Exhibit 3501-39 received in evidence)

5    Q.  Sir, that's your team with the 2500 pounds of equipment

6    searching Turtle Creek, right?

7    A.  Yes.

8    Q.  You're searching where Mr. Davis told you that he underhand

9    tossed the phone into the water, right?

10   A.  Yes.

11   Q.  And in this picture, where is the cistern, that big bucket

12   thing that Mr. Ferrara was asking you about?

13   A.  Off screen to the left.

14   Q.  So, downstream from where Mr. Davis said that he flipped

15   the phone?

16   A.  Yes.

17   Q.  Let's look at a couple more pictures.  Let's show the

18   witness 3501-41.

19        And is that another picture during the dive that shows

20   Turtle Creek?

21   A.  Yes.

22   MR. SCHOEMAN:  I offer 3501-41.

23   MR. FERRARA:  No objection.

24   THE COURT:  Received.

25   (Defendant's Exhibit 3501-41 received in evidence)

H3S3WAL5                     Cacioppi - cross

1   Q.  Does that show where your team set up for the dive, with

2   the cistern structure off in the background?

3   A.  Yes.  That's the cistern off to the left, you can see it.

4   Q.  All the people in this photo, there were about eight people

5   went down there?

6   A.  Fairly certain it was eight USERT team members plus the two

7   medics plus the case agent, and we had several -- at least two

8   people from FBI Dallas, the FBI Dallas office every day.

9   Q.  And all that gear is stuff that you shipped from New York,

10  right?

11  A.  Yes.

12  Q.  About 2500 pounds?

13  A.  Yes.

14  Q.  Let's show you one more, 3501-42 just for the witness.

15          Is this another picture during the course of the dive

16  search that we've been talking about?

17  A.  Yes.

18          MR. SCHOEMAN:  I'd offer 3501-42.

19          MR. FERRARA:  Without objection.

20          THE COURT:  Received.

21          (Defendant's Exhibit 3501-42 received in evidence)

22  Q.  Sir, could you tell us what we're looking at there?

23  A.  That's at least one diver in the water.  You can see the

24  bubbles in the middle of the picture.  And the buoys on the up

25  lines of at least one of the jackstays are visible.  There are

1   the orange kind of more angular foam buoys.  And that green

2   ball is a buoy we put on the umbilical, which is we have

3   surfaced supply air.  It delivers the diver air and

4   communications and data.

5   Q.  You guys were in the full gear, the wetsuits, the mask?

6   A.  Dry suits, but yes.

7   Q.  What's a dry suit?

8   A.  A dry suit, you need thermal protection diving.  So when

9   you're driving in Key West, you can wear a wetsuit where it is

10  just a little foam and your body heats up your body under the

11  foam, and you can stay warm for some period of time.

12          If you're in much colder water, in potentially

13  contaminated water, you need to dive in a dry suit, which is

14  individually fitted to that person.  It keeps them dry with

15  these tight latex seals that go around your wrists and neck and

16  a hood.  And it is made out of a heavy-duty vulcanized rubber.

17  As long as the gear doesn't fail, you stay dry on the inside of

18  that suit.

19  Q.  You spent more than two full days searching the area that

20  Mr. Davis told you he flipped the phone into?

21  A.  Yes.

22  Q.  You didn't find it, right?

23  A.  That's correct.

24  Q.  Then after that, you went someplace else with Mr. Davis, is

25  that right?  Sorry.  Withdrawn.

1    Not at the search, but back when you went with

2   Mr. Davis for him to tell you where he flipped the phone in the

3   water.  You went somewhere else with him that day, right?

4   A.  I might have picked him up at a coffee shop as I recall.

5   Q.  Didn't you take him out to Love Field, Dallas Airport, Love

6   Field?

7   A.  Yes, that's right, we did.

8   Q.  You didn't take him to his house?

9   A.  No.

10  Q.  You didn't take him to his garage?

11  A.  No.

12  Q.  You didn't conduct a search of his bedroom or his car?

13  A.  No.

14  Q.  No.  But you did take him out to Dallas Love Field, right?

15  A.  Yes.

16  Q.  You took him to a place called Signature Fixed Base

17  Operator terminal building, right?

18  A.  Yes.

19  Q.  And you took him to the second floor lounge of the

20  Signature Air Fixed Based terminal building, because that's

21  where Mr. Davis told you that he says he received the phone

22  from Mr. Walters that you then searched for for four days,

23  right?

24  A.  I think I might have stayed in the car for that.  The case

25  agent wanted to go to Love Field and take a look at that

1    location.  I remember we were driving, my best recollection is

2    we were driving in the ERT coordinator's car, so it was a total

3    of four of us, and I think two of us stayed in the car and two

4    people went inside.

5    Q.  To the Signature Air building at Love Field?

6    A.  Yes.

7    Q.  And you had an understanding, sir, that the reason you were

8    there is that's where Mr. Davis said that he received the phone

9    from Mr. Walters that you then a few months later tried to

10   search for?

11   A.  That sounds familiar, but that's kind of far enough away

12   from what I need to know to focus on to do my job, to conduct

13   the safe and effective search.  I really didn't focus on it

14   very much.

15   Q.  Let me just show you what's been marked as 3501-21 just to

16   see if that jogs your memory.  Just for the witness and let him

17   see what it is.  And who was listed as being present.  And then

18   we'll go to the bottom of the page just for the witness.

19          THE COURT:  You understand the concept of refreshing

20   your recollection?  In other words, you should read this, then

21   pause, look away from it, and ask yourself the question, having

22   read it, do you have a new and refreshed recollection on the

23   subject of the question.

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Okay.  Go ahead.

1    Q.  So the question is having looked at that, does --

2              THE COURT:  He hasn't -- let him look at it.

3    A.  Okay.

4    Q.  So do you have a memory, sir, that you went with Mr. Davis

5    on the date of the site visit to the Signature Air terminal

6    building at Dallas Love Field?

7    A.  Yes, we went to the building.

8    Q.  Do you recall that the reason you went there is that

9    Mr. Davis had said that that location is where he received the

10   phone from Mr. Walters, the same phone that you later went to

11   search for?

12   A.  Again, that sounds familiar.  But, you know, I can't say if

13   he said that.

14   Q.  But you know you were at Signature Air at Love Field in

15   Dallas?

16   A.  I know it had something to do with the case and I know I

17   was there, yes.

18              MR. SCHOEMAN:  No further questions.

19              THE COURT:  All right.  Any redirect?

20              MR. FERRARA:  Just one question, your Honor.

21   REDIRECT EXAMINATION

22   BY MR. FERRARA:

23   Q.  Sir, based on that experience that Mr. Schoeman just asked

24   you about as a member of the dive team, after the first day of

25   searching the creek, what was your expectation about whether

H3S3WAL5

1  you would find any cell phone?

2  A.  I was extremely pessimistic.

3  Q.  Why?

4  A.  The metal detector barely set off the cell phone to begin

5  with.  And based on the bottom topography and things we ended

6  up finding and where we ended up finding them, the violent

7  flooding that that area experiences just sweeps everything out

8  of that creek and either down the road with the cars that it

9  picks up and takes with it, or through that bucket.

10           MR. FERRARA:  No further questions, your Honor.

11           THE COURT:  All right.  You may step down, sir.

12           (Witness excused)

13           THE COURT:  Ladies and gentlemen, let's take our

14  midafternoon break.  Please do not discuss the case among

15  yourselves or with anyone.  We'll be back in action in 10

16  minutes.

17           (Jury excused)

18           THE COURT:  Have your next witness ready for when

19  we're back from the break.

20           MR. FERRARA:  We're moving now.

21           THE COURT:  We shall see.

22           (Recess)

23           (In open court; jury present)

24           THE COURT:  The government may call its next witness.

25           MR. GOLDMAN:  Thank you, your Honor.  The government

1    calls Renada Lewis.

2              (Witness sworn)

3              THE DEPUTY CLERK:  Please be seated.  State your name

4    and spell it for the record, please.

5              THE WITNESS:  Renada Lewis.  R-E-N-A-D-A L-E-W-I-S.

6              THE COURT:  Mr. Goldman, you may inquire.

7              MR. GOLDMAN:  Thank you, your Honor.

8     RENADA LEWIS,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. GOLDMAN:

13   Q.  Good afternoon.

14   A.  Good afternoon.

15   Q.  Where do you work?

16   A.  Verizon Wireless.

17   Q.  How long have you worked at Verizon Wireless?

18   A.  15 years.

19   Q.  What do you do for Verizon Wireless?

20   A.  I'm a custodian of records.

21   Q.  What are your duties and responsibilities as custodian of

22   records?

23   A.  I authenticate Verizon Wireless records pursuant to court

24   orders, subpoenas, and other legal requests.

25   Q.  Are you familiar with the books and records of Verizon

H3S3WAL5                    Lewis - direct

1   Wireless?

2   A.  Yes.

3   Q.  Are you familiar with how Verizon Wireless generates cell

4   phone bills?

5   A.  Yes.

6   Q.  Are you also familiar with how Verizon Wireless generates

7   what is called call detail spreadsheets?

8   A.  Yes.

9   Q.  Just generally, explain what a call detail spreadsheet is.

10  A.  It's a detailed itemization of incoming and outgoing calls

11  from a cell phone.

12  Q.  We'll get to that in a minute, but let's start with the

13  cell phone bills.  How long does Verizon Wireless maintain cell

14  phone bills?

15  A.  Seven years.

16  Q.  If I can just show the witness for identification what's

17  been marked as Government Exhibit 1240.

18          Ms. Lewis, do you recognize this?

19  A.  Yes, I do.

20  Q.  What is this?

21  A.  This is a billing record.

22  Q.  From Verizon Wireless?

23  A.  Yes.

24  Q.  Is it kept in the regular course of business by Verizon

25  Wireless?

1    A.  Yes.

2              MR. GOLDMAN:  The government offers Exhibit 1240.

3              MR. SCHOEMAN:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 1240 received in evidence)

6    Q.  You said this is a billing record.  Is that another term

7    for a cell phone bill?

8    A.  Yes.

9    Q.  What is reflected in a cell phone bill?

10   A.  Incoming and outgoing calls from a cell phone.

11             MR. GOLDMAN:  If we can blow up the top half of this

12   document so it's a little easier to see, Ms. Pyun.  Thank you.

13   Q.  What is required to happen for a call to apply or be

14   registered with a bill?

15   A.  It must be a phone call that's able to be applied against

16   the calling plan.

17   Q.  What's required in order to apply?

18   A.  It has to be a call that's connected and billable.

19             THE COURT:  Connected and?

20             THE WITNESS:  Billable.

21             THE COURT:  Thank you.

22   Q.  For outgoing calls, what is required for a call to be

23   connected and billable?

24   A.  There has to be a connection on the other end.

25   Q.  What can that connection include?

H3S3WAL5                        Lewis - direct

1    A.  It can be that the call is answered or that voice mail is

2    picked up on the other end.

3    Q.  What about for an incoming call?

4    A.  It has to be connected, but not a call that's coming in and

5    going to voice mail.

6    Q.  Let's briefly just take the jury through this document so

7    they can understand it.

8           Who is the subscriber on this cell phone?

9    A.  William Walters.

10   Q.  What is the cell phone number?

11   A.  702-604-4141.

12   Q.  Now let's go through these columns.  There is a column for

13   date.  That's is that relatively self-explanatory?

14   A.  Yes.

15   Q.  And time as well.  Right?

16   A.  Yes.

17   Q.  We'll get back to time in a minute.

18          There is a column for number.  What number is

19   reflected there?

20   A.  That's the number that is dialed for an outgoing call.  And

21   that's the number that calls received from, if it is an

22   incoming call.

23   Q.  The column that's marked "rate."  What's that?

24   A.  That indicates that the call took place during what's

25   considered peak hours or offpeak hours.

H3S3WAL5                      Lewis – direct

1    Q.   Then there's usage type.  What is that?

2    A.   That indicates if the call is part of the calling plan or

3    if other calling features are activated, such as call

4    forwarding or if the call is received through call waiting.

5            MR. GOLDMAN:  Ms. Pyun, if we can highlight the fourth

6    row.

7    Q.   You mentioned call forwarding.  What is that?

8    A.   That is when a user of a phone has calls that come into

9    that line, forward to another number.

10   Q.   How does a user put call forwarding into effect?

11   A.   You dial star 72 for Verizon Wireless, and then the number

12   that you wish for the calls to be forwarded to.

13   Q.   So does that mean that if a call goes into this 4141 cell

14   phone, and it's been forwarded by the user to a different

15   number, it gets routed to that different number?

16   A.   Yes.

17   Q.   In the number column for a call forward, what is reflected

18   there?

19   A.   If call forwarding is activated, the number that's

20   reflected in the column labeled "number" is the number that the

21   calls are forwarded to.

22   Q.   So, is there anywhere in this row where one could tell what

23   number called in to this 4141 number?

24   A.   No.

25   Q.   So you would not know who was calling the subscriber here,

1   William Walters, if there's call forwarding, is that right?

2   A.  Correct.

3   Q.  If Mr. Walters here with the 4141 number were to make a

4   call from this cell phone out, and the call forwarding is

5   applied, would you be able to see what number he called?

6   A.  Yes.

7   Q.  The next column over is titled "origination."  What is

8   that?

9   A.  That gives the geographic location of the switching station

10  that processed the call.

11  Q.  Without getting overly technical, can you explain briefly

12  what a switching station is.

13  A.  Yes.  So, cell phones operate on radio transmissions, and

14  the switching station is the central mainframe that routes

15  calls where they're going.

16  Q.  The cell phone would be located close to a particular

17  switching station?

18  A.  Yes.

19  Q.  That's how it's registered?

20  A.  Correct.

21  Q.  How does this origination column relate to the time zone of

22  the calls that are included on a bill like this?

23  A.  The time that's reflected would be based on the

24  origination.

25  Q.  So it would be local time of whatever the origination is?

1   A.  Correct.

2   Q.  What is the destination column?

3   A.  The destination column is going to indicate the home area

4   for the number that's dialed, if it is on outbound call.  And

5   if it's an incoming, you'll see incoming CL.

6   Q.  How is the destination determined?

7   A.  It's based on the home area of the number that's dialed.

8   Q.  I want to just go back -- sorry.  How does that compare to

9   origination, the destination?

10  A.  Origination is going to be based on the location of the

11  phone.  Destination -- sorry.

12  Q.  Go ahead.

13  A.  Destination is the home area of the number.

14  Q.  What do you mean by home area of the number?

15  A.  For example, if it's a New York based number, for example a

16  number that starts with 718 or 347, you would see New York, New

17  York in the destination column.

18  Q.  Even if the cell phone itself were in California?

19  A.  Correct.

20  Q.  If I can go back just to the origination column for a

21  minute.  If a cell phone is out of the country, will the

22  origination column reflect the location of the cell phone as

23  well?

24  A.  Yes.

25  Q.  Then, after destination there's MIN period.  What is that?

1    A.  That's the duration of the call rounded up in minutes.

2    Q.  So, if their call is 15 seconds, what would be reflected in

3    this column?

4    A.  One minute.

5             MR. GOLDMAN:  If we can go to page two, Ms. Pyun, and

6    zoom in on the top third.  And highlight the -- I think it is

7    the eighth row where you see a bunch of zeros.

8    Q.  What is reflected in this row by 000-000-086?

9    A.  That's a call to voice mail.

10   Q.  Who made that call to voice mail?

11   A.  The user of the 4141 number is calling into that voice mail

12   for that line.

13   Q.  If the subscriber of the cell phone is out of the country,

14   would a cell phone bill reflect a call to the phone's voice

15   mail?

16   A.  No.

17   Q.  If we can go to page 491 of this exhibit, please.  If we

18   can zoom in on the top half.

19            Is this the same subscriber and phone number

20   information that we just saw on the first page?

21   A.  Yes.

22   Q.  You see the account number there in the highlighted yellow?

23   A.  Yes.

24   Q.  Which ends with 6384?

25   A.  Yes.

1    Q.  Is that right?

2    A.  That's right.

3    Q.  Okay.  We see that the date of the calls here is

4    November 16, and for what year is that?

5    A.  2009.

6    Q.  If we can then go to page 495.  Zoom in on the top half as

7    well.

8            Do you see what the subscriber name is here?

9    A.  Yes.

10   Q.  What is it?

11   A.  Robert Ward.

12   Q.  What is the cell phone number?  Is it the same as the one

13   before?

14   A.  Yes.

15   Q.  Is the account number also the same?

16   A.  Yes.

17   Q.  What is the date of the first calls on this page?

18   A.  January 17, 2010.

19   Q.  Now if I can show just the witness Government Exhibit 1255,

20   please.

21           Do you recognize this document, Ms. Lewis?

22   A.  Yes, I do.

23   Q.  What how do you recognize it?

24   A.  I've seen this many times.

25   Q.  What is it?

1    A.  This is subscriber information.

2    Q.  For what phone number?

3    A.  For 702-604-4141.

4    Q.  Is that the same account number that we saw in the

5    Government Exhibit 1240?

6    A.  Yes.

7    Q.  What is the account name in?

8    A.  The Walters Group.

9    Q.  Then we see a column called a "status."  What does that

10   mean?

11   A.  That indicates if the line was active or disconnected.

12   Q.  Then what does "effective period" mean?

13   A.  The effective period is the time that the line is active.

14   Q.  So, can you explain what we see here in the two separate

15   rows.

16   A.  Yes.  On the one that's on the lower portion, it shows an

17   effective period of September 29, 2004 through October 17,

18   2009.  And the top line says the effective period is

19   November 11 of 2009 through -- the blank indicates the present

20   or the time these records were retrieved.

21   Q.  So there appears to be a gap between October 17, 2009 and

22   November 11, 2009, is that right?

23   A.  That is correct.

24           MR. GOLDMAN:  If I can show the witness what has been

25   marked for identification as Government Exhibit 1221, please.

1    I'm sorry, your Honor.  I forgot to offer Exhibit 1255.

2              MR. SCHOEMAN:  No objection.

3              MR. GOLDMAN:  Ms. Pyun, if we can publish that.

4              THE COURT:  Received.

5              (Government's Exhibit 1255 received in evidence)

6              MR. GOLDMAN:  Sorry, your Honor.  If the jury can see

7    that so the jury can see what Ms. Lewis was just testifying

8    about.  If we can zoom in on the top.

9    Q.  So briefly, Ms. Lewis, correct me if anything I'm saying is

10   wrong, and with Mr. Schoeman's permission I'll lead you back

11   through this.

12             This is this 4141 number with that same account number

13   that we saw before, is that right?

14   A.  Yes.

15   Q.  And what's the account name?

16   A.  The Walters Group.

17   Q.  And then we see the active and disconnected in the status,

18   is that right?

19   A.  That's correct.

20   Q.  Then the effective period that you were just testifying

21   about, is that right?

22   A.  Yes.

23             MR. GOLDMAN:  Thank you.  We can now go to Government

24   Exhibit 1221 for identification.

25   Q.  Do you recognize this document?

1    A.  Yes, I do.

2    Q.  What is this?

3    A.  This is referred to as call detail records.

4    Q.  Is this kept in the regular course of business at Verizon

5    Wireless?

6    A.  Yes.

7              MR. GOLDMAN:  The government offers Exhibit 1221, your

8    Honor.

9              MR. SCHOEMAN:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibit 1221 received in evidence)

12             MR. GOLDMAN:  If we may publish.

13   Q.  How long does Verizon Wireless maintain call detail

14   spreadsheets for a cell phone?

15   A.  One year.

16   Q.  I believe you may have mentioned this at the very beginning

17   of your testimony.  But, explain what we're looking at here.

18   A.  We're looking at detailed itemization of calls that came in

19   and were made from the mobile number ending in 4141.

20   Q.  Let's go through the columns briefly so we can understand

21   it a little better.  What is the network element name?

22   A.  The network element name indicates which switching station

23   served the call.  It's named based on geographic area.

24   Q.  How does this compare to the origination column from the

25   cell phone bill we were looking at in Exhibit 1240?

1    A.  This is more specific in that this -- the network element

2    name is the specific switching station that services the call,

3    and on the billing records the origination gives a general

4    geographic area where the switch was located.

5    Q.  Does this column, the network element name, also determine

6    the time zone that's reflected in this call detail spreadsheet?

7    A.  Yes.

8    Q.  How so?

9    A.  The time that's recorded is going to be based on the

10   switch.

11   Q.  If a call travels internationally, for example, what would

12   ordinarily be reflected in the network element name?

13   A.  The switch for the home area.

14   Q.  So wherever the home area of the cell phone that is being

15   called?

16   A.  Yes.

17   Q.  Or the cell phone for which these are records?

18   A.  Correct.

19   Q.  If someone with this 4141 number were out of the country --

20   I'm sorry.  Withdrawn.

21        I want to turn back to that in a minute, but let's go

22   to the mobile directory number.  What is that?

23   A.  The mobile directory number is also referred to as the

24   target number, and that's the number for which these are the

25   records.

1    Q.  And the dialed digit number?

2    A.  The dialed digit number is the number that's called during

3    the call that's listed.  So if it's an incoming call, you'll

4    see the target number in that column.  And if it is an outbound

5    call, you'll see the number that the subscriber called.

6    Q.  What we're looking at here in this page is, as it's blown

7    up right now, seems to be all incoming calls, is that right?

8    A.  Correct.

9    Q.  Let's move to the call direction column.  And we see in our

10   screen an F and a 5.

11          What does F mean?

12   A.  An F is the incoming call that went to voice mail.

13   Q.  What is 5?

14   A.  And 5 actually indicates that routing took place during the

15   call.

16   Q.  What does that mean, if you can briefly explain.

17   A.  It means if a subscriber is outside of their home area, for

18   example, and they receive a call, the call may need to be

19   routed through different networks, and that's displayed here

20   using line items that have a 5 in the call direction column.

21   Q.  Are there any other line items in the call direction

22   column?

23   A.  Not on this page.

24   Q.  But just generally are there?

25   A.  Yes, generally there can be a zero or a one, which would be

1   an incoming call or a -- I'm sorry.  A zero or 3 or a 1 or a 6,

2   which is outbound.

3   Q.  Is it possible that calls with the call direction 5 are

4   noted here, does that necessarily mean whether there was a

5   connection or not --

6   A.  No.

7   Q.  -- with that phone call?

8          One way or the other?  Could it be both or either I

9   should say?

10  A.  Yes.

11  Q.  Okay.  So, if you see a 5 here, the call may have connected

12  or the call may not have connected?

13  A.  Correct.

14  Q.  What would you need to know -- withdrawn.

15         Can you tell from this document whether the call

16  connected?

17  A.  No.

18  Q.  What would you need in order to determine whether the call

19  connected?

20  A.  You would need the other side of the call information.

21  Q.  What do you mean by other side of the call information?

22  A.  You need information about the other party involved.

23  Q.  What happens if a cell phone is out of the country, would

24  you be able to determine whether or not a call was connected?

25  A.  No.

H3S3WAL5                        Lewis - direct

1    Q.  From a call detail spreadsheet?

2    A.  No, you cannot.

3    Q.  Would you be able to determine if a call was connected

4    through a cell phone bill?

5    A.  No, you cannot.

6    Q.  If a cell phone is outside the -- I'm sorry.  Let me take a

7    step back.

8             On Government Exhibit 1240 where we were looking at

9    the cell phone bills, right?

10   A.  Yes.

11   Q.  If a somebody calls this 4141 number when the 4141 number

12   is out of the country and they have a conversation, would that

13   be reflected on the Verizon Wireless cell phone bill?

14   A.  Yes.

15   Q.  All right.  Now coming back to what we're looking at here,

16   Government Exhibit 1221.  If a cell phone owner was calling his

17   own voice mail, would that be reflected on this document?

18   A.  No.

19   Q.  If someone were out of the country, would an incoming call

20   that goes to voice mail be reflected here with an F?

21   A.  No.

22   Q.  All right.  Now, if someone were out of the country and

23   called in to his own voice mail, would that be reflected on

24   this document?

25   A.  No.

1  Q.  But, I think you said before that sometimes if there were

2  calls connected to voice mail, the F would be reflected on this

3  document, is that right?

4  A.  That is correct.

5  Q.  Is that also true if a cell phone were outside the country?

6  A.  Yes.

7  Q.  Let's move on to the next column here, the seizure date and

8  time.  What is that?

9  A.  That's the date and the start time of the call, and it is a

10  24-hour clock.

11  Q.  So military time?

12  A.  Yes.

13  Q.  Then what is seizure duration?

14  A.  That's the duration of a call in seconds.

15  Q.  When does it begin?

16  A.  It begins when the call is connected to the network.  So,

17  if it is an outbound call, it begins when subscriber presses

18  send or call.

19  Q.  So this includes ring time, for example, right?

20  A.  Yes.

21  Q.  And it doesn't round up like the cell phone bill?

22  A.  Correct.

23      MR. GOLDMAN:  We can take that down.  Thank you,

24  Ms. Pyun.

25  Q.  Ms. Lewis, are you familiar with what's called a phone in

1    the box?

2    A.   Yes.

3    Q.   What is a phone in the box?

4    A.   It is a prepaid phone.

5    Q.   What is a prepaid phone?

6    A.   A prepaid cell phone is a phone that you can purchase time

7    for as you use it, as opposed to receiving a monthly bill as

8    you would for a postpaid account.

9    Q.   Are there other names for a phone in the box?

10   A.   Yes.

11   Q.   What have you heard?

12   A.   I've heard disposable phone, I have heard burner phone.

13            MR. SCHOEMAN:  Objection, your Honor.  I have heard?

14            THE COURT:  Well, is this in the course of your work

15   for Verizon?

16            THE WITNESS:  Yes.

17            THE COURT:  Okay.  I'll let the answer stand.  Go

18   ahead.

19            MR. GOLDMAN:  Thank you, your Honor.

20   Q.   What identification information, if any, must someone

21   provide in order to get a phone in the box?

22   A.   None.

23   Q.   Are there any requirements for the subscriber of a phone in

24   the box to identify him or herself to Verizon Wireless?

25   A.   No.

H3S3WAL5                          Lewis - direct

1   Q.  Is there a monthly bill for a phone in the box?

2   A.  No.

3   Q.  So if someone does not provide their name and

4   identification information, which they're not required to do,

5   is there any way to trace who the owner is for a phone in the

6   box?

7   A.  No.

8   Q.  How long are records kept for phone in the box?

9   A.  One year.

10          MR. GOLDMAN:  If I can show the witness what's been

11  marked as Government Exhibit 1100-A for identification, please.

12  And blow up the top half.

13  Q.  Do you recognize this document?

14  A.  Yes.

15  Q.  What is this?

16  A.  This is subscriber information for a particular cell

17  number.

18  Q.  Is this kept in the regular course of business by Verizon

19  Wireless?

20  A.  Yes.

21          MR. GOLDMAN:  The government offers Exhibit 1100-A.

22          MR. SCHOEMAN:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 1100-A received in evidence)

25          MR. GOLDMAN:  If we may publish.

1   Q.   What is the phone number for these records?

2   A.   702-239-8751.

3   Q.   Then there is a column for account number.  It looks like

4   the second and third columns are the same account number, is

5   that right?

6   A.   Yes.

7            THE COURT:  I lost you there.  The second and the

8   third columns, I'm not following what you mean by that.

9            MR. GOLDMAN:  Very --

10           THE COURT:  Going from left to right?

11           MR. GOLDMAN:  That would be a row, your Honor, not a

12   column, and I apologize.

13  Q.   So account number 471931879-1.  Do you see that, Ms. Lewis?

14  A.   Yes.

15  Q.   Is that the same account number as in the next row as well?

16  A.   Yes.

17  Q.   If I can direct your attention to last name.  What is the

18  last name for those two rows?

19  A.   Phone in the box.

20  Q.   What do you understand phone in the box to mean as a last

21  name?

22  A.   That the last name was not provided.

23  Q.   For first name it says OAS.  Do you see that?

24  A.   Yes.

25  Q.   What does that mean?

H3S3WAL5                         Lewis - direct

1   A.   It's just what we use as a filler if a first name is not

2   provided.

3   Q.   Then for address, do you recognize that address?

4   A.   Yes, I do.

5   Q.   What is that address?

6   A.   That's the address for the Verizon Wireless office.

7   Q.   So, based on your review of this record here, did the owner

8   of this 8751 cell phone with account number ending in 879-1

9   give any identification information when he or she purchased

10  this prepaid phone?

11               MR. SCHOEMAN:   Objection.   It's speculation about what

12  happened when the phone -- he can ask about the record, but not

13  about what happened at the store.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. GOLDMAN:  I think I did ask does the record

2     reflect that.

3          THE COURT:  Your testimony is based on a review of the

4     record, correct?

5          THE WITNESS:  Correct.

6          THE COURT:  You weren't at the store?

7          THE WITNESS:  Correct.

8          THE COURT:  So you're testifying based on a Verizon

9     record?

10          THE WITNESS:  Yes.

11          THE COURT:  All right.  Go ahead.

12     BY MR. GOLDMAN:

13     Q.  So, once again, based on your review of this record and

14     your understanding of how Verizon Wireless maintains its

15     records, did the person who purchased the 8751 cell phone

16     number with account number ending in 879-1 provide any

17     identification information when buying this prepaid phone?

18     A.  Not on September 16th at 2010.

19     Q.  And let's move down to that because that's an important

20     date.

21          Under "Effective Date" for that particular account

22     number, what do you see there?

23     A.  The effective date is the date that the line was activated.

24     Q.  And what is the date that's reflected here for those -- for

25     that account number that we have been talking about?

H3sdwal6                         Lewis - direct

1   A.   September 16, 2010.

2   Q.   And then in one of the rows there is a disconnect date.  Do

3   you see that?

4   A.   Yes.

5   Q.   And what is that disconnect date?

6   A.   That's the date that the line is terminated.

7   Q.   So from these records, can you determine how long the 8751

8   phone number with account number ending 879-1 was active?

9   A.   Yes.

10  Q.   From when to when?

11  A.   From September 16th, 2010 through February 6th of 2014.

12  Q.   And, again, the last column says "Type."  And what does

13  that mean?

14  A.   That indicates whether it is prepaid service, as I

15  discussed before, or post-paid service.

16  Q.   What is post-paid service?

17  A.   Post-paid service is the service that you would receive a

18  monthly bill for.

19  Q.   And that row, the last row, has a last name, a first name,

20  and a specific address in Dublin, California, is that right?

21  A.   Yes.

22       MR. GOLDMAN:  Now, if we can move this exhibit to the

23  left side, please, Ms. Pyun, and pull up on the right side

24  Government Exhibit 1720A, which is in evidence.

25  BY MR. GOLDMAN:

1  Q.  Now, Ms. Lewis, do you see on the right side the middle

2  phone number?  Could you please read that for the jury?

3  A.  Yes.  It's -- the middle number on the phone?

4  Q.  Yes, on the right side there.

5  A.  It's 702-239-8751.

6  Q.  Then if you could look up above -- you can zoom out of

7  that, actually, Ms. Pyun.  Just leave it as it is.

8          And then what we've just been looking at, the Phone in

9  the Box record, could you read that phone number?

10  A.  702-239-8751.

11  Q.  Is that the same number?

12  A.  Yes.

13  Q.  Now, prior to testifying here today, did you review Verizon

14  Wireless records to determine whether this 8751 phone number

15  was associated in any way with the 4141 cell phone number we

16  were looking at earlier?

17  A.  Yes.

18  Q.  Was it?

19  A.  No.

20  Q.  And how about with the account number related to the 4141

21  phone number?

22  A.  No.

23  Q.  And how about was it ever affiliated with The Walters Group

24  that was included on the account information?

25  A.  No.

```
 1              MR. GOLDMAN:  No further questions, your Honor.

 2              THE COURT:  All right.  You may cross-examine.

 3   CROSS-EXAMINATION

 4   BY MR. SCHOMAN:

 5   Q.  Good afternoon.

 6   A.  Good afternoon.

 7              MR. SCHOMAN:  First, could we show the witness

 8   Government Exhibit 1248?

 9              That is a different document.

10   Q.  While they are working on that, you testified about prepaid

11   phones.  The "Phone In The Box," that's a name that Verizon

12   gives this particular product, right?

13   A.  Correct.

14   Q.  It is a popular product?

15   A.  Yes.

16   Q.  A lot of people buy them?

17   A.  Yes.

18   Q.  And the way it works is you have to buy minutes in advance,

19   is that right?

20   A.  That's right?

21   Q.  Are there different calling plans?

22   A.  Yes.

23   Q.  We'll come back to that.

24              What kind of calling plans are there?

25   A.  It depends on how much a person wants to pay.
```

H3sdwal6                          Lewis - cross

1    Q.  Can you buy unlimited minutes?

2    A.  No.

3    Q.  Can you -- if you buy minutes and you don't use them, do

4    they expire at some point?

5    A.  Yes.

6    Q.  At what point do they expire?

7    A.  Usually it's 30 days.

8    Q.  OK.  So if somebody said that they had a prepaid phone and

9    they used it for two-and-a-half years and they never put more

10   minutes on it, that would be a lie, right?

11   A.  Not necessarily.

12   Q.  Well, you have to do it every 30 days, right?

13   A.  Yes.

14   Q.  But if you don't do it every 30 days, the minutes will

15   expire?

16   A.  Correct.

17   Q.  Then you won't be able to use the phone any more?

18   A.  Right.

19   Q.  So they could have the phone but it would be useless?

20   A.  Yes.

21            MR. SCHOMAN:  No further questions.

22            THE COURT:  All right.  Any redirect.

23            MR. SCHOMAN:  I'm sorry.  I just want to offer this

24   document.

25            THE COURT:  Yes.

H3sdwal6

1             MR. SCHOMAN:  Do we have the right number now?

2    BY MR. SCHOMAN:

3    Q.  I put on your screen what's been marked as Government

4    Exhibit 1248.  Do you see that?

5    A.  Yes.

6    Q.  Is that a Verizon business record just sort of setting

7    forth the information about historical call detail reports that

8    you were discussing earlier?

9    A.  Yes.

10            MR. SCHOMAN:  I offer Government Exhibit 1248.

11            THE COURT:  Any objection?

12            MR. GOLDMAN:  No objection, your Honor.

13            THE COURT:  Received.

14            (Government's Exhibit 1248 received in evidence)

15            MR. SCHOMAN:  I won't publish it.

16            MR. GOLDMAN:  No further questions, your Honor.

17            THE COURT:  All right.  You may step down.  Thank you

18   very much.

19            THE WITNESS:  Thank you.

20            (Witness excused)

21            THE COURT:  Call your next witness.

22            MS. CUCINELLA:  At this time, your Honor, the

23   government has a stipulation.

24            THE COURT:  All right.

25            MR. SCHOMAN:  May we approach, your Honor?

H3sdwal6

1              THE COURT:  Is this a stipulation that you entered

2    into, Mr. Schoman?

3              MR. SCHOMAN:  Yes, but it raises an issue that I think

4    the government -- it is an issue I would like to address at the

5    sidebar.

6              THE COURT:  All right.  Ladies and gentlemen, you may

7    stand up and stretch.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2        THE COURT:  Let me see the stipulation.  This is

3   Government Exhibit 2102.

4        MR. SCHOMAN:  OK.

5        THE COURT:  Just one second, please.

6        (Pause)

7        OK.

8        MR. SCHOMAN:  So here's the issue.  The stipulation is

9   a result of a session that I have had with the government over

10  many days, and the issue was not whether the facts are disputed

11  but whether the government is going to make an improper

12  argument based on this stipulation.  And by offering the

13  stipulation now, after this witness, I can see that the

14  government is going to make an argument that is improper and

15  precluded by Rule 404(b).

16       The issue is the government is doing this saying that

17  Mr. Walters previously responded to a subpoena in which he

18  disclosed that he had certain phones.  Now what they want to do

19  is show that he had a phone that he did not disclose in

20  response to the subpoena.  And I discussed this with the

21  government, and I said we're happy to stipulate to the fact

22  that he responded to a subpoena and was on notice that the

23  government was looking at the particular phone but that it

24  couldn't be offered for the improper purpose of saying that,

25  through his counsel in responding to the subpoena, he lied

H3sdwal6

1     about what phones were in his possession.  That would be 404(b)

2     evidence, a lie in response to a subpoena for which we had no

3     notice.  And although the government may say that that's not

4     why they're offering it, juxtaposing this stipulation with a

5     witness who has just said that he had another phone --

6              THE COURT:  Just get your land away from the magic

7     invisible cone.

8              MR. SCHOMAN:  I'm sorry.  Is trying to --

9              THE COURT:  It is like the bucket in the --

10             (Laughter)

11             THE COURT:  You'll get sucked right in.

12             MR. SCHOMAN:  He is trying to imply that Mr. Walters

13    had a phone for his use at this time and lied in response to

14    the subpoena.  And I have had many discussions with the

15    government where they said they were not going to offer it for

16    that purpose and now I think they are.

17             THE COURT:  OK.  I have heard you and I understand

18    your position.

19             Let me hear from the government.

20             MR. GOLDMAN:  We are not making that argument, plain

21    and simple.  We will not argue that.

22             We are happy for you, as we discussed with Mr. Schoman

23    when we entered into the stipulation, to give an instruction

24    that this stipulation comes in for the defendant's state of

25    mind, which is what we had represented to them.  And if he

1    would like a limiting instruction for that as well, that is

2    fine.  We are absolutely not going to make that argument.

3         We just had a whole series of -- this goes to his

4    state of mind when Mr. Davis believes that he received the

5    burner phone from Mr. Walters, and it is around the same time

6    period.  And we want to show that he was under investigation,

7    asked by the SEC for phone numbers, which would have made him

8    more skittish about providing -- about speaking criminally on

9    his phone, and that's what prompted him to give the phone to

10   Mr. Davis.  This goes to giving the burner phone to Mr. Davis.

11   It does not go to Mr. Walters' own use of his burner phone.

12        The reason why we elicited the testimony from the

13   Verizon Wireless witness about the duration of the burner phone

14   that Mr. Walters had is that that is going to be important for

15   us to demonstrate that there were phone calls between Mr. Davis

16   and Mr. Walters on that burner phone, the 8751 number that we

17   just heard about.  It has nothing to do with this stipulation

18   and we are not making that argument

19        MR. SCHOMAN:  There are two things.  One is the only

20   reason to offer this now, I think, is to connect it to the

21   defense.  I think if we leave this to the end of the case, we

22   can work something out.  But I think it draws unnecessary

23   attention to it.

24        And if they are not putting these two pieces together

25   for the idea of saying that he had the other phone at this

H3sdwal6

```
 1    time, then it would be appropriate to strike the exhibit they
 2    entered and enter a redacted exhibit that doesn't show that he
 3    had it at this time, because the calls he's talking about
 4    postdate -- I believe postdate the response to the subpoena.
 5              THE COURT:  Has everybody been heard?
 6              MR. SCHOMAN:  Yes.
 7              THE COURT:  Are you finished?
 8              MR. SCHOMAN:  Yes, your Honor.
 9              THE COURT:  Are you finished?
10              MR. GOLDMAN:  Yes.
11              THE COURT:  OK.  The stipulation can be used.
12              MS. CUCINELLA:  Thank you, Judge.
13              THE COURT:  If you want a limiting instruction, you
14    can ask for it.  Do you want one?
15              MR. BERKE:  Your Honor, could we have one minute?
16              THE COURT:  Yes.
17              (Pause)
18              MR. SCHOMAN:  Not at this time, your Honor.
19              THE COURT:  Thank you.
20              (Continued on next page)
21
22
23
24
25
```

H3sdwal6

1                    (In open court)

2                    THE COURT:  All right.  Go ahead, Ms. Cucinella.

3                    MS. CUCINELLA:  Thank you, Judge.

4                    The parties have agreed that:

5                    If called to testify, Robbie Mayer, an attorney for

6        the Securities and Exchange Commission (the "SEC"), would

7        testify that:

8                    1.  On or about July 15, 2011, William T. Walters, the

9        defendant, was sent a subpoena in connection with an SEC

10       investigation called "In Re:  The matter of trading ImClone

11       Systems, Inc."  That subpoena asked Mr. Walters to, among other

12       things, identify portable hardware devices that he used in his

13       individual or official capacity.

14                   2.  On or about August 1st of 2011, Mr. Walters

15       responded to that subpoena by providing a list of computers and

16       portable hardware that "Mr. Walters had available for his use."

17       This list identified, among other electronics, the hand-held

18       devices associated with three phone numbers, including the 4141

19       phone number as well as phone numbers ending in 0695 and 4044.

20                   3.  The investigation relating to ImClone Systems,

21       Inc. was later closed with the SEC not taking any action

22       against Mr. Walters.

23                   The parties have further agreed that this stipulation,

24       which has been marked as Government's Exhibit 2102, may be

25       received in evidence.  It's signed by the parties and dated

H3sdwal6                          Tanner - direct

1    March 27th of 2017.

2              THE COURT:  And are you offering it?

3              MS. CUCINELLA:  Yes.  The government offers Government

4    Exhibit 2102.

5              THE COURT:  Any objection?

6              MR. SCHOMAN:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 2102 received in evidence)

9              THE COURT:  Call your next witness.

10             MR. FERRARA:  Yes, your Honor.

11             The government calls Gregg Tanner.

12    GREGG TANNER,

13         called as a witness by the government,

14         having been duly sworn, testified as follows:

15             THE CLERK:  Please be seated.

16             State your name and spell it for the record, please.

17             THE WITNESS:  Gregg Tanner.  G-r-e-g-g T-a-n-n-e-r.

18             THE COURT:  Mr. Ferrara, you may inquire.

19             MR. FERRARA:  Thank you, your Honor.

20    DIRECT EXAMINATION

21    BY MR. FERRARA:

22    Q.  Good afternoon, Mr. Tanner.

23    A.  Good afternoon.

24    Q.  Where do you work?

25    A.  At Dean Foods.

1   Q.  Before we talk about Dean Foods, could you briefly walk us

2   through your educational background?

3   A.  Sure.  I went to school at Kansas State University in the

4   Little Apple, in Manhattan, Kansas, and graduated there with a

5   milling science and operations degree.

6   Q.  What year was that?

7               THE COURT:  Can you spell the first word?

8               THE WITNESS:  M-i-l-l-i-n-g.

9               THE COURT:  Thank you.

10  Q.  What year was that, sir?

11  A.  I graduated in 1980.

12              THE COURT:  We don't get much milling in Manhattan.

13              THE WITNESS:  I understand.

14  Q.  So what is your current position at Dean Foods?

15  A.  I'm currently an advisor.

16  Q.  What was your prior position?

17  A.  I was the CEO.

18  Q.  When did you step down from being CEO of Dean Foods?

19  A.  December 31st of 2016.

20  Q.  For how long had you been CEO?

21  A.  A little over four years.

22  Q.  Who was the CEO before you?

23  A.  Gregg Engles.

24  Q.  So let's back up a little bit farther.

25              What did you do before you worked at Dean Foods?

1    A.   I worked for -- right out of school, I went to work for the

2    Ralston Purina Company and then I went to work for the Quaker

3    Oats Company and then to ConAgra Foods and then to Hershey

4    Chocolate and then to Dean Foods.

5    Q.   So when did you start at Dean Foods?

6    A.   In November of 2007.

7    Q.   What was your position when you first began there?

8    A.   I was the chief supply chain officer.

9    Q.   So what was your day-to-day job as the chief supply

10   officer?

11   A.   Took care of all procurements, so the buying of ingredients

12   and package supplies and all of that, as well as the

13   manufacturing facilities.

14   Q.   Was that for all of Dean Foods or one or more particular

15   businesses?

16   A.   It was for all three businesses at the time.

17   Q.   Remind us of what those three businesses were.

18   A.   We had the Direct, or Fresh Dairy Direct, which was the

19   milk business, the dairy business, we had WhiteWave foods, and

20   then we had the Morningstar business, which was a food service

21   business.

22   Q.   So let's talk a little bit about 2007.  And to sort of tee

23   up some of those questions, I want to ask you if you know

24   something called WhiteWave?

25   A.   Yes.

H3sdwal6                          Tanner - direct

1   Q.  What is WhiteWave?

2   A.  WhiteWave was our -- what I characterize as a dairy

3   alternative.  So it was alternative beverages at that point in

4   time, but they did have some dairy in a Horizon Organic.

5   Q.  I think you may have said this, but WhiteWave was a

6   business within Dean Foods in 2007?

7   A.  Yes.

8   Q.  And for what -- what was the nature of that particular

9   business?  Was there a way that you would describe WhiteWave

10  versus the other Dean Foods' businesses at that time?

11  A.  Yes.  They were a nondairy alternative.  So they had soy

12  milk, almond milk, different alternative beverages.

13          THE COURT:  I think the jury is up to speed on this.

14          MR. FERRARA:  Fair enough, your Honor.

15  BY MR. FERRARA:

16  Q.  When did you first learn what WhiteWave was?

17  A.  When I was in the interview process.

18  Q.  And did you speak to Mr. Engles during your interview

19  process?

20  A.  I did.

21  Q.  What, if anything, did he tell you about WhiteWave at that

22  time?

23  A.  That it was a great business, it was growing, and that, you

24  know, it was probably kind of the darling of the three

25  businesses.

H3sdwal6                        Tanner - direct

1   Q.  During those conversations in 2007, did Mr. Engles ever

2   bring up the idea of spinning off WhiteWave?

3   A.  Yes.

4   Q.  What, if anything -- what did he say about that at that

5   time?

6   A.  He just said, you know, when we get the three businesses

7   operating the way they should be, we think there's a

8   significant opportunity to spin off the WhiteWave business.

9   Q.  Was there a time certain for that?

10  A.  No.

11  Q.  Were there any specifics at all in 2007 about spinning off

12  WhiteWave?

13  A.  No.  I mean, other than just the thought of it.

14  Q.  Were you involved in WhiteWave on a day-to-day basis as

15  part of your job as chief supply?

16  A.  I was from a procurement and a manufacturing perspective.

17  Q.  Were you at all involved in any talks about spinning off

18  WhiteWave at that time?

19  A.  No.

20  Q.  When was the next time you heard talk of a WhiteWave

21  spin-off?

22  A.  I know we talked about it in the 2009 timeframe.

23  Q.  What was discussed then?

24  A.  It was really just is the time right.  We had a rough year

25  in 2010, and we could see that coming because of commodity

1    prices.  And we said, you know, now is probably not the right

2    time to do it.

3    Q.  Who were those conversations with?

4    A.  With Gregg, with Joe Scalzo, who Joe was the president of

5    the WhiteWave business.

6    Q.  And Gregg is Mr. Engles?

7    A.  Yes.  I'm sorry.

8    Q.  And so then after around that 2009 period, when was the

9    next time you heard talk of a WhiteWave spin-off?

10   A.  I don't remember exactly.

11   Q.  Let me call your attention to May of 2012.

12        Was there any discussions about it at that time?

13   A.  Yes.

14   Q.  What were the nature of the discussion -- who was

15   discussing spinning off WhiteWave at that time?

16   A.  It was Gregg Engles who -- he had a nice meeting, who told

17   me that we had talked about is now the right time and all three

18   businesses were doing well and it seemed like the conditions

19   and the business environment were good, and we talked about is

20   now the right time.  And he said I'm going to take this to the

21   board in May.

22   Q.  May of 2012?

23   A.  May of 2012.

24   Q.  At that time, during those conversations, was that -- was

25   what Mr. Engles was considering public or not public?

1   A.  No.  No.  It was -- it was our -- before we would have done

2   anything, we would have had to have taken it to the board for

3   their approval.  So there was an internal conversation that we

4   were having at that point.

5   Q.  What was your position in May 2012?

6   A.  I was the president of the Fresh Dairy Direct business and

7   the chief supply chain officer for the company.

8   Q.  So you still had the same earlier position?

9   A.  I still had that earlier position, and I had taken on the

10  president of one of the divisions.

11  Q.  Was Mr. Engles, he was CEO at that time?

12  A.  Yes, he was.

13  Q.  Were you involved in the day-to-day of planning the

14  WhiteWave spin-off in 2012?

15  A.  After the board decision, yes.

16  Q.  What was the planned timing of the WhiteWave spin-off?

17  A.  When I met with Gregg the first time, he said I want to get

18  this done by August assuming that we get board approval, and my

19  first reaction to that was that seems awfully quick.

20  Q.  Why?

21  A.  Just because there was so much work that had to be done.

22  We had three different businesses that were all under certain

23  contracts from a procurement perspective.  We had to break out

24  all the contracts.  We had to go through and negotiate with all

25  our suppliers.  There was just a lot of work that had to be

1    done to prepare for a spin-off and a separation of those

2    businesses.

3    Q.  Why would spinning off WhiteWave change the contracts you

4    had with different suppliers?

5    A.  Because all of them were put together as one contract, and

6    obviously the more you buy from a supplier, the better pricing

7    you get, and so when you're going to separate them out as three

8    different companies, because at the same time we were going to

9    sell the Morningstar business.

10   Q.  So when Mr. Engles wanted to do the spin-off or wanted to

11   announce the spin-off by August of 2012, was it your gut that

12   that would happen or was it your gut that that was too fast?

13   A.  My gut was that that won't happen.

14   Q.  But in fact when was the announcement made?

15   A.  August of 2012.

16   Q.  So it did happen?

17   A.  It did.

18   Q.  And what happened to Dean Foods' stock price after that

19   announcement?

20   A.  It went up.

21   Q.  Prior to the August 7, 2012 announcement, did the public

22   know that Dean Foods would be spinning off its WhiteWave

23   business?

24   A.  I don't think they knew.  Nobody knew for sure, I mean,

25   other than the speculation that at some point in time it was

1    going to happen.

2    Q.  Was the spin-off closely held within Dean Foods?

3    A.  Yes.

4    Q.  Why was that?

5    A.  Well, for a lot reasons.  One was we didn't know the timing

6    when we first started the process, because there were so many

7    things that needed to come together so we didn't know what the

8    timing was.  We also -- you know, you don't want to make it

9    public until there is an official decision made, and there was

10   a lot of work that had to be done before the official decision

11   could get made to announce the spin.

12   Q.  Why wouldn't you want it to become public before an

13   official announcement was made?

14   A.  Well, first and foremost, it would just create a lot of

15   speculation.  It would create a lot of speculation internally

16   with employees, because a lot of employees were going to be

17   impacted by the separation of these three businesses.  One

18   business is going to be sold.  One business is going to be spun

19   off.  And then just the external environment with the analysts

20   and the shareholders.  And so, you know, the stock price could

21   have gone either way at that point.

22   Q.  Now, you said that Mr. Engles -- in May 2012, Mr. Engles

23   was CEO of Dean Foods?

24   A.  Yes.

25   Q.  Did he have another position within Dean Foods as well?

1    A.   Chairman.

2    Q.   Chairman of the Board?

3    A.   Yes.

4    Q.   What was Mr. Engles' plan for himself when the WhiteWave

5    spin-off occurred?

6    A.   That he would go with the WhiteWave spin-off.

7    Q.   Sorry.   What does that mean, go with it?

8    A.   He would go as the chairman and CEO of WhiteWave.

9    Q.   And how, if at all, would your role at Dean Foods change?

10   A.   When he first talked to me about it, I wasn't sure what was

11   going to happen with my role, but subsequently, in June of that

12   year, he came and talked to me about becoming the CEO of Dean

13   Foods.

14   Q.   So that's June of 2012?

15   A.   Yes.

16   Q.   Did you want the job?

17   A.   It was very humbling, but I initially wasn't sure I wanted

18   the job.

19   Q.   Why not?

20   A.   Just because I always -- I grew up being an operator, and

21   much of that job is the external environment with the analysts

22   and bankers and a lot of folks that I don't feel like add a lot

23   of value.

24   Q.   What was Mr. Engles' plan with respect to his position as

25   chairman of the board?

1    A.  He would stay on as chairman until the spin was completed.

2    Q.  Did you and he discuss potential replacements for

3    Mr. Engles as chairman of the board?

4    A.  We did later on during that summer, June/July timeframe.

5    Q.  And whom did you decide?

6    A.  We decided on Tom Davis.

7    Q.  Who was Mr. Davis at the time?  What was Mr. Davis' role at

8    that time?

9    A.  He was a board member.  He was the head of the audit

10   committee, and I think he also served on compensation

11   committee.

12   Q.  Why did you decide on Mr. Davis?

13   A.  I think the biggest reason was he was the -- his financial

14   background was one that Gregg felt like -- Gregg Engles felt

15   like would be a nice compliment to my skill set, be more of an

16   operator, and that the two of us would be fairly complementary

17   to each other.

18   Q.  So who approached Mr. Davis about becoming chairman, you or

19   Mr. Engles or someone else?

20   A.  Mr. Engles.

21   Q.  When was that?

22   A.  I would assume it was in late July, but I -- because we

23   made the announcements at the August board meeting.

24   Q.  Did Mr. Davis in fact become chairman of the board?

25   A.  He did.

1   Q.  Around when did that happen?

2   A.  Well, he didn't take over until May of 2013 as the

3   chairman, when Gregg stepped down -- when Gregg Engles stepped

4   down.

5   Q.  So that would be roughly what, eight or maybe nine months?

6   A.  Nine months?

7   Q.  Nine months?

8   A.  Yes.

9   Q.  So why did it take so long from the time that Mr. Davis was

10  approached until the time that he actually takes on the role as

11  chairman?  What happens during that sort of period in between?

12  A.  Well, I mean, you know, Tom came in and started, you know,

13  almost serving as a lead director type, and so he started

14  getting involved in setting the agendas for the board meetings

15  and those types of things.  He and I then started working

16  closer together.

17  Q.  So it sort of -- he takes on a larger role over time?

18  A.  Yeah.  Yeah.

19  Q.  So after the spin-off announcement in August 2012 but

20  before you became -- officially became CEO, how involved were

21  you with the details of the spin-off?

22  A.  Not very involved.

23  Q.  Who was guiding the spin-off?

24  A.  It was mainly Gregg Engles and then his corporate

25  development.  So Ed Fugger and Steve Schultz and some of the

H3sdwal6                          Tanner - direct

1    attorneys.

2    Q.  What role were you playing with respect to the spin-off at

3    that time?

4    A.  At that point in time I was playing no role.  I mean, I was

5    basically just trying to keep the wheels on the bus going.

6    Q.  So the spin-off had been announced.  Had all of the details

7    of the spin-off been announced in August of 2012?

8    A.  No.

9    Q.  What types of details were still not public around that

10   time?

11   A.  There was a number -- we weren't sure -- we had not put

12   Morningstar out to bid so we weren't sure what the timing would

13   be on the Morningstar sale.  We also had a lot of work yet to

14   get done prior to the actual spin-off of WhiteWave.  And so a

15   lot of it was depended upon different approvals that were

16   needed, different documents that we had to go through.  Many of

17   our procurement contracts had to be completed.  So there was a

18   number of still open-ended questions in August of '12.

19   Q.  All right.  I want to switch gears a little bit and ask you

20   some questions about Wal-Mart.

21          Was Wal-Mart a customer of Dean Foods?

22   A.  Yes.

23   Q.  How significant a customer was Wal-Mart?

24   A.  They were our largest customer.

25   Q.  About what percentage of its milk did Dean Foods sell to

H3sdwal6                          Tanner - direct

1   Wal-Mart?

2   A.   About 20 percent.

3   Q.   So let's focus on the time -- sort of expand the time

4   period from when you arrived in 2007 until, let's say, early

5   2012.

6            Could you explain to us how Dean Foods' relationship

7   with Wal-Mart evolved over that time period?

8   A.   Can you tell me the dates again?

9   Q.   Yes.  Sure.  Just from when you sort of started around 2007

10  into, say, early 2012, did Wal-Mart -- was the business with

11  Wal-Mart the same?  Did it grow?  Did it decrease?  How did it

12  change, if at all, over that period?

13  A.   It had grown a bit.  So I think when I joined the company

14  they were around 18 percent of our total business, and through

15  that period of time, as they continued to open stores and grow,

16  we were growing with them.  So they became about 20 percent of

17  our business by the time we got to 2012.

18  Q.   Have you heard the term --

19  A.   '13.

20  Q.   I'm sorry?

21           THE COURT:  Were you done?

22           THE WITNESS:  2013.  Yes.

23  BY MR. FERRARA:

24  Q.   Have you heard the term "RFP"?

25  A.   Yes.

1   Q.   What is an RFP?

2   A.   A request for proposal.

3   Q.   And what is that?

4   A.   That's basically when a customer comes to you and asks you

5   to come to them with new pricing.  It goes well beyond pricing,

6   but basically coming and asking you for -- that they want to

7   put it out for bid so they request an RFP.

8   Q.   Are there what are called regional RFPs versus national

9   RFPs?

10  A.   Yes.

11  Q.   What is the difference?

12  A.   The biggest difference was in the past, from 2007 through

13  2013, most of the bids that Wal-Mart had done, they had done it

14  on a regional basis geography-wise.  So they would do a bid in

15  the Southeast.  They would do a bid in the Northeast.  Wherever

16  they had stores, they would, you know, butt stores together and

17  then they would put them out for bid.  And during that process,

18  that was always -- you always had RFPs going constantly.  It

19  was just an ongoing process with them for as big as they were.

20  Q.   Just break it down for us a little bit.  And you can use an

21  example.  If Wal-Mart were to do an RFP in the Southeast, like

22  you mentioned --

23  A.   Mm-hmm.

24  Q.   -- just tell us what happens.  What are the actual

25  mechanics of what's happening there?

1  A.  We would go through and then figure out which stores were

2  in that RFP, and then we would figure out what our costs are to

3  go deliver to those stores and from which facility we're going

4  to deliver from.  And during that process, then we would put

5  together a proposal of here's what your new costs will be,

6  here's where you are going to be serviced from, here's the

7  facility you'll be serviced from, here's the service agreement,

8  how many days a week we're going to service the stores, so on

9  and so forth.

10  Q.  Let's back up maybe one step before that.

11          When Wal-Mart puts out, for instance, an RFP for the

12  Southeast, what is it essentially saying in layperson terms to

13  you -- to you, to Dean Foods?

14  A.  Well, I want a new price.

15  Q.  I.e., a lower price?

16  A.  Yes.

17  Q.  And so is it that -- so what's happening?  Is it that

18  Wal-Mart is saying to you please give me a better price, or are

19  they inviting other people to bid?  How is that?

20  A.  That's how they will leverage a lower price is they will go

21  to our competitors and say I want you to bid on this business

22  and we're serious about making a change, so people don't

23  believe that you're not just -- you're not just being a

24  stocking horse or you're not just somebody who is coming in,

25  you know, and you are not going to get the bid.  So whenever

1    they found areas where they felt like there was excess

2    capacity, they would come in and ask to rebid the business.

3    Q.   Now, if Wal-Mart came in with one of these regional RFPs,

4    how would you, Dean Foods, respond?  Would you necessarily meet

5    their price?  Would you not?  Did it depend?  How would that

6    work?

7    A.   Well, we would put together a proposal not knowing what

8    price we needed to meet.  We would put a proposal together

9    under the assumption that they're probably looking for a lower

10   price, and then we would put our proposal together and put the

11   bid in.

12   Q.   Had you ever over the course of your time at Dean Foods,

13   during a regional RFP, had you ever lost Wal-Mart's business in

14   a particular region?

15   A.   We had lost certain stores but we hadn't lost a full

16   region.

17   Q.   And how much, if at all, would it affect Dean Foods' bottom

18   line to lose a store -- some stores in a certain region or

19   another region?

20   A.   It doesn't change it a lot because there is RFPs going on

21   all the time.

22   Q.   It is a pretty common thing?

23   A.   Yes.  You are winning bids and losing bids all the time so

24   it was fairly steady.

25   Q.   Did you learn about a sort of different RFP in mid to late

H3sdwal6                         Tanner - direct

1    2012?

2    A.  Yes.

3    Q.  All right.  What was -- what did you learn from Wal-Mart in

4    mid to late 2012?

5    A.  That they were not -- they were going to discontinue --

6    there was two things I learned.  One was they are not going to

7    do a regional bid, they are going to do a national bid, so they

8    want to bid all their stores, including Sam's.  And then the

9    second thing that we learned was they were uncomfortable with

10   us having 75 percent of their business and that they wanted to

11   move that down.

12   Q.  All right.  So let's take each part.

13          You said -- just to be clear, you said "including

14   Sam's"?

15   A.  Yes.

16   Q.  What is that?

17   A.  Sam's Club, which is their club format.

18   Q.  So at this -- you discussed the regional RFPs.  Is what

19   you're telling us, that at this time they were asking for a

20   price for the entire -- your entire national --

21   A.  For the entire U.S.

22   Q.  Then you went on to say -- talking about 75 percent.  What

23   was that -- what did the 75 percent represent?

24   A.  We produced 75 percent of all of Wal-Mart's milk.

25   Q.  So I think earlier you had talked about a 20 percent

1    number.

2    A.   There were 20 percent of our business but it was 75 percent

3    of all of Wal-Mart's business.

4    Q.   Now, how -- was this RFP, this national RFP that you

5    learned about in 2012, late 2012, was that of a concern to you?

6    A.   It was -- I mean, it was a concern because it was a fairly

7    significant change, and I was trying to figure out why they

8    wanted to do this.  I wasn't sure what the strategy was behind

9    it.  And so that was when I found out that they -- they, first

10   of all, they didn't feel like they were getting national

11   pricing because they were comparing their regional pricing and

12   saying, you know, why is it cheaper in the Southeast than it is

13   in Texas, and why is it cheaper here than it is here.  And so

14   they were starting to make some comparisons, and then they came

15   back with, and, by the way, we're not comfortable with you

16   having 75 percent of our business.

17   Q.   Did that -- did the second part make you more concerned or

18   less concerned?

19   A.   It made me more concerned.

20   Q.   Why?

21   A.   Why?  Because if they don't want you to have 75 percent of

22   their business, that probably means you are going to lose a

23   little business.

24   Q.   What did you think -- when you first learned these two

25   pieces of information from Wal-Mart, what did you -- did you

1  have an expectation as to what was going to happen to your

2  business in the coming months?

3  A.  That we'd better get serious about trying to figure out how

4  to get some costs out of the business because we were going to

5  get some margins squeezed pretty soon.

6  Q.  What was your plan at that time?

7  A.  We were going to probably shut some more facilities down.

8  We were probably going to have to go in and, you know, optimize

9  our network of plants and shut some facilities down to try to

10  get them more cost effective.

11  Q.  How does shutting facilities down help you get more cost

12  effective and help you potentially retain Wal-Mart's business?

13  A.  It reduces your fixed costs.  So if you are not maintaining

14  a facility, you take those fixed costs out of your cost base.

15  Q.  Now, in late 2012 was Wal-Mart's RFP public -- this

16  national RFP, was that public at that time?

17  A.  I don't know that it was public, but I mean it's not

18  something held privately.  It's not something we talked about

19  just because, you know, RFPs are a common thing in the

20  business, so not something you would typically talk about

21  publicly.

22  Q.  And when did Wal-Mart actually make its decision on that

23  RFP?

24  A.  In January of 2013.

25  Q.  What was its decision?

1    A.  Their decision was that they were going to take a

2    significant portion of the business away from us.  They

3    couldn't tell us where and they couldn't tell us exactly how

4    much, but they had made the decision that there were certain

5    regions in the country where they were going to take the

6    business to our competitors.

7    Q.  That was bad news for Dean Foods?

8    A.  Yes.

9    Q.  Why?

10   A.  Well, bad news because it meant if you're going to lose --

11   an average facility for Dean Foods would produce around 30

12   million gallons of milk, and we were going to loss 180 million

13   gallons of business.  That says that there were six facilities

14   that we were going to have to shut down, and six facilities

15   meant a number of people were going to lose their jobs.

16   Q.  Now, at that time, January 2013, when you learned of

17   Wal-Mart's decision, was Wal-Mart's decision public?

18   A.  No.  But, again, I'm not sure it was -- it wasn't under any

19   confidentiality agreement, either.  It is just not something

20   that people talked about.

21   Q.  Was it closely held within Dean Foods?

22   A.  It was closely held with us because we didn't know what the

23   implications were yet, because we didn't know -- we didn't have

24   any idea of what plants we would need to shut down because we

25   didn't know what regions we had lost.  So, yeah, we kept it

1    fairly close at the top levels of the organization.

2    Q.  Did you plan to publicly announce Wal-Mart's decision at

3    some point?

4    A.  Well, we would have to.

5    Q.  Why?

6    A.  Because of the implications to our financials in the

7    business.

8    Q.  So what did you want to do -- between learning of

9    Wal-Mart's decision and whenever you were going to announce it,

10   what did you want do in that period of time?

11   A.  We wanted to figure out exactly which stores they were

12   switching, you know, what stores they were switching or taking

13   away from us, and then we had to relook at our whole network

14   and figure out how could we reconfigure our network to take as

15   much fixed cost out of our system as possible to try to

16   minimize the financial impact.

17   Q.  Why was it important to do that before you made a public

18   announcement?

19   A.  Because the first question that you'll get asked by any

20   analyst or shareholder will be, so what are you going to do

21   about it.

22   Q.  Was Dean Foods' plan, in terms of how to respond to

23   Wal-Mart's decision, was Dean Foods' plan, was that public, or

24   the details of that plan public?

25   A.  They were not at the time.

1    Q.  How could it hurt Dean Foods if word of the plan or your

2    response to the plan had leaked before you were prepared to

3    make a public announcement?

4    A.  I would assume it would have had a negative impact on our

5    stock price.

6    Q.  Why?

7    A.  Because it would have a negative impact to the business, to

8    the financials of the business.

9    Q.  All right.  So let's back up a little bit and talk about

10   what you did when you learned you were going to lose a portion

11   of Wal-Mart's business.  Let's talk a little more specifically.

12          Were you the first person at Dean Foods to know?

13   A.  No.

14   Q.  Who -- from whom did you learn of Wal-Mart's decision?

15   A.  I learned from our vice president of sales who had been

16   contacted by Wal-Mart.

17   Q.  Let's take a look.  I want to show you, Mr. Tanner,

18   Government Exhibit 1936A.  I think that's in evidence.

19          I think we are having a technological problem.

20          (Pause)

21          I think we can show this to everyone.

22          All right.  Let's sort of unblow it up.

23          So what are we looking at here?  Are you able to read

24   it on your screen?

25   A.  Yeah.  It is an email.

1   Q.  And if we look at this, the email sort of third down, dated

2   January 7, 2013, is this an email from you to Mr. Davis?

3   A.  Yes.

4   Q.  Now, you say in this email, "Are you available at all

5   tomorrow, as I need to bring you up to speed on meetings with

6   WMT?"

7   A.  Yes.

8   Q.  What is WMT?

9   A.  Wal-Mart.

10  Q.  And the date of that email is January 7th?

11  A.  Mm-hmm.  Yes.

12          THE COURT:  You have to answer in words.

13          THE WITNESS:  Yes.

14          THE COURT:  Thank you.

15  Q.  And so then if we go to the top email, on January 8th, it

16  says -- you say, "Why don't we plan for 1:00 or whenever you

17  are done with your lunch."  And the subject is "Change to WMT."

18          And, again, "WMT" is Wal-Mart?

19  A.  Yes.

20  Q.  Why were you meeting -- do you recall why you were meeting

21  with Mr. Davis at this time?

22  A.  I would assume to bring him up to speed on what was going

23  on with the Wal-Mart RFP.

24  Q.  Why would you want to bring Mr. Davis in particular up to

25  speed on that?

1   A.  Because he was going to become my boss.

2   Q.  In a sense, he was going to be chairman?

3   A.  He was going to be chairman.

4   Q.  Do you remember exactly what you told Mr. Davis at that

5   meeting?

6   A.  I don't remember exactly.

7   Q.  Now, why did you tell Mr. Davis -- let me ask you this

8   first.

9           Had you told the rest of the board at this point?

10  A.  No.

11  Q.  Why did you tell Mr. Davis before you told the rest of the

12  board?

13  A.  Because he was going to be the chairman.  I had told Gregg

14  Engles, who was the current chairman, what was going on.

15  Q.  When did you plan to tell the rest of the board?

16  A.  We were probably going to plan to tell them prior to the

17  next board meeting, which would have been in February.

18  Q.  Now, I asked you if you remember specifically, but

19  generally speaking, whether it was at this meeting or other

20  meetings, what generally would you have told Mr. Davis about

21  the Wal-Mart or national RFP?

22  A.  I would have told him that we were probably going to lose

23  180 million gallons of business with Wal-Mart.  Not sure what

24  the implications of that are yet.  We're still working through

25  that to see, you know, what our ability to offset that would

1   be.  But at this point that would be about the extent of what I

2   probably would have said.

3   Q.  Did you have a plan at this time, early January 2013, as to

4   when you would make a public announcement about Wal-Mart's

5   decision?

6   A.  We would assume we would have announced it when we

7   announced our fourth quarter earnings.

8   Q.  About when was that?

9   A.  That would have been in mid-February.

10  Q.  So in the meantime, before that, how was the company --

11  what was the company doing to prepare for that announcement?

12  A.  Before -- between when we found out and the public

13  announcement?

14  Q.  Yes.

15  A.  We were getting with Wal-Mart to try to understand what

16  stores they were going to take away, which regions we were

17  going to lose or subregions we were going to lose, so we could

18  start putting plans together to -- and the timing as to when it

19  was going to happen.  Because a big transition like that takes

20  an extended period of time, and so it was going to be very

21  depended upon what stores were they going to move and when,

22  because one of our competitors has to ramp up their production

23  to be able to take on that business as well.

24  Q.  So you needed more detail from Wal-Mart to understand what

25  you would do in response, is that it?

H3sdwal6                         Tanner - direct

1   A.  Yes.

2   Q.  So let's take a look at what's been marked for

3   identification as Government Exhibit 472.

4           What is that, Mr. Tanner?

5   A.  It's minutes of the board meeting on February 8th.

6           MR. FERRARA:  The government offers 472.

7           MR. BERKE:  No objection, your Honor.

8           THE COURT:  Received.

9           (Government's Exhibit 472 received in evidence)

10          MR. FERRARA:  I am just waiting for it to come up for

11  the jurors.

12  BY MR. FERRARA:

13  Q.  OK.  So is this -- do you recall, was this a regularly

14  scheduled board meeting, do you know?

15  A.  No, it would not have been.

16  Q.  Why was it -- why was this scheduled if it was not sort of

17  part of the regularly scheduled board meetings?

18  A.  We were bringing on an additional board member.  Robert

19  Wiseman was coming on as a new board member, and we wanted to

20  get approval to get him on the board prior to our February

21  official board meeting.

22  Q.  Are board meetings typically done telephonically?

23          THE COURT:  All right.  Ladies and gentlemen, you are

24  going to have to wait until tomorrow to find out the answer to

25  that question.

1          So try and get some sleep tonight.  Don't be lying in

2   bed thinking about what you think the answer might be.

3          But have a very pleasant evening.  I know you have a

4   lot else going on in your lives -- bills to be paid and laundry

5   to be picked up and family to be checked up on and a lot of

6   things.  So, have a very pleasant evening.

7          We'll be back in action the same time tomorrow

8   morning.  Thank you for your on-time arrival these days.  We

9   appreciate it.  I appreciate it.

10          Yes, ma'am.

11          A JUROR:  On Friday, are we sitting?

12          THE COURT:  We are not sitting on Friday.

13          A JUROR:  OK.

14          THE COURT:  Thank you.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H3sdwal6

1          (Jury not present)

2          THE COURT:  You may step down, sir.

3          (Witness excused)

4          THE COURT:  So, after this witness, how many

5     additional witnesses do we have?

6          MR. GOLDMAN:  Your Honor, I think we are likely to

7     rest by the end of the day tomorrow.

8          THE COURT:  All right.

9          MR. GOLDMAN:  There are A couple of issues that we

10    wanted to address --

11         THE COURT:  You may be seated.

12         MR. GOLDMAN:  -- before our -- before we do rest.

13         We at this point intend to call the head of investment

14    relations for Dean Foods tomorrow.  One of his responsibilities

15    was to deal with research analysts and also to communicate at

16    various times with members of the board or other management

17    about what research analysts were saying.

18         We have assumed at this point that, similar to

19    Mr. Engles, his review and receipt of analyst reports was --

20    that are not -- that do not include facts that are in the

21    public domain are inadmissible as hearsay because they do not

22    go to the defendant's state of mind.  And we just want

23    clarification because I had a conversation with Mr. Berke that

24    he has already indicated that he would anticipate trying to

25    introduce a number of analyst reports or summaries of analyst

1    reports through this witness, which we think is inadmissible

2    and inappropriate, and we would just like to get a

3    clarification on that ruling because it may affect our decision

4    as to whether to call him or not.

5              THE COURT:  Well, you know, I have said what I have

6    said, which is, generally speaking, the content of an analyst

7    report cannot be offered for the truth of its content and it's

8    hearsay.  Any party who wants to call the analyst for their

9    views, that may put it on different footing.  But there both

10   sides would have the opportunity to examine the analyst on

11   their views.

12             Certainly when you're talking to or examining

13   Mr. Walters' broker, it takes on a different footing if the

14   broker received an analyst report or -- I don't think there was

15   testimony on this -- transmitted an analyst report, the fact of

16   what was said by the analyst may have some relevance because it

17   may go to Mr. Walters' state of mind.

18             MR. GOLDMAN:  And we did not object in that

19   circumstance.

20             THE COURT:  I understand that.

21             MR. GOLDMAN:  Our concern, your Honor, is that during

22   Mr. Davis' testimony, Mr. Berke made an argument that these

23   analyst reports went to Mr. Davis' state of mind.  It is our

24   view that that is not an appropriate means or reason --

25             THE COURT:  Well, there was -- listen, you may be

1    right, but, then, again, you may be wrong, and let me explain

2    what I mean by that.

3          It could go to whether Mr. Davis believed he was

4    transmitting material nonpublic inside information, and in that

5    sense, as an alleged co-conspirator, there is something to be

6    said for that position.  What Mr. Davis thought was material

7    nonpublic information has some relevance to this case.  That

8    was the argument.  Now --

9          MR. GOLDMAN:  Understood.

10         THE COURT:  -- if your concern here is that you may

11   not have sluthed the basis on which Mr. Berke is going to try

12   to get it in, I'll ask Mr. Berke.  Are you going to try and get

13   it in and on what basis?

14         MR. BERKE:  Yes, your Honor.  Really, two bases, your

15   Honor.  Not for Mr. Walters' state of mind; we understand your

16   Honor's ruling on that.  Really to, one, Mr. Sievert was

17   responsible for organizing meetings between senior management

18   and Investor Relations with outside investors.  And in

19   addition, there are times that some of those meetings were

20   attended by analysts, who then published reports quoting what

21   the company had to say at those meetings.  I think we've

22   clearly established that's all public and available.

23         And so to the extent there is information in the

24   public realm that the company is talking about publicly, we

25   believe that is fair game and appropriate, and there is some of

H3sdwal6

1    that that we believe, again, not knowing exactly what the

2    government intends --

3          THE COURT:  Well, it goes to what is or is not

4    nonpublic information.

5          MR. BERKE:  Exactly.

6          THE COURT:  So if it's -- if there is a fact stated in

7    the report, it seems to me that that fact can come in, you can

8    offer that, to rebut the government's evidence that it was

9    nonpublic information.

10          MR. BERKE:  Exactly, your Honor.

11          And then the second point is, again, our position

12    is -- I think Mr. Davis did say, as he has said, that he

13    understood he could share information that he understood was

14    otherwise either public, because the company had disclosed it

15    to analysts, or he could also talk about what's in analyst

16    reports because that's not material nonpublic information about

17    the company but that's about what the analysts are saying about

18    the stock price and the company.

19          THE COURT:  Well, that breaks down into how that is

20    framed.  Certainly, if an analyst says I think there will be a

21    spin-off soon, that's one thing.  If Mr. Davis said the very

22    same words as the analyst said, that takes on a different

23    meaning.  Or I can confirm the accuracy of the analyst's

24    observation, that could be disclosing material nonpublic

25    information, just the confirmation by a board member of an

1       analyst's surmise.

2               MR. BERKE:  And what I was referring to, your Honor,

3       was something different.  For example, we've seen testimony,

4       for example, of Mr. Davis' discussions with some of his friends

5       that he would say was entirely appropriate.  So, for example,

6       if an analyst said that they think the market has overreacted

7       to the prediction of rising milk prices, you know, again,

8       speculation.  I think we have testimony from Mr. Davis,

9       entirely appropriate to talk about.  It is based on opinion,

10      not based on anything he leaked to Dean Foods.

11              And we brought out through Mr. Davis those sorts of

12      discussions he had with many people and other people, and I

13      asked him questions about it, that would be entirely

14      appropriate.  We also elicited from Mr. Davis that he would

15      discuss with Mr. Walters information and analyst reports

16      separate and apart from the sort of things your Honor is

17      talking about in terms of what actually is going on at the

18      company.

19              Mr. Sievert, among his many roles, the other role was

20      to provide to board members those analyst reports or statements

21      that he felt was interesting.  Sometimes, again, a lot of

22      information that would be entirely legal and under anybody's

23      interpretation to talk about, including Mr. Davis by his

24      testimony.

25              So, again, without knowing exactly why the government

is calling Mr. Sievert, given all the testimony we've already

had about WhiteWave and Dean Foods, we think that to the extent

it is proper cross-examination for the direct, it would be

appropriate in those two areas to get into some aspects of

Mr. Sievert's knowledge about what was shared with Mr. Davis or

the public about Dean Foods.  Mr. --

THE COURT:  Well, I am not sure that I have any better

understanding of what you're planning on doing than when we

began this very fine discussion.  I have no problems with your

responses to my questions except the question, what are you

planning on offering or what are you planning on doing with the

analyst reports, which I'm not sure I understand the answer to

that question.

MR. BERKE:  So on the issue, one, of what's public, I

think I would establish through Mr. Sievert that they had

various meetings with significant investors, sometimes

organized by investment banks, and that following those the

analyst would write a report about what happened at the

meeting.  So it would be the description of the meeting that

would be attended by Mr. Sievert and a various collection of

senior management of Dean Foods talking to the attendees of

that meeting.  That would be --

THE COURT:  Well, but what -- you can elicit, "What

did you say to analysts at the meeting," right?  There is no

objection to that, correct?

H3S3WAL7

1          MR. GOLDMAN:  Correct.

2          THE COURT:  All right.  And then, and the analyst

3    repeated what you said in his report.  Do you have an objection

4    to that?

5          MR. GOLDMAN:  No.  If he needs to refresh, he can use

6    to refresh.  We just have an objection to admitting the analyst

7    report, which is an interpretation of a meeting where

8    Mr. Sievert was present for.  It's only Mr. Sievert's

9    recollection as to what was said by the company at that meeting

10   that is relevant.  How an analyst interprets that, among other

11   things, is something that if he wants to try to call an analyst

12   or he wants to show that Mr. Walters --

13         THE COURT:  Mr. Berke, are you offering an analyst's

14   interpretation of what was said?

15         MR. BERKE:  We're what we are talking about now is not

16   the interpretation.  It was the actual statement of what was

17   said in the report.

18         THE COURT:  You wanted to include the statement of

19   what was said.

20         MR. BERKE:  Yes.

21         THE COURT:  Do you want to offer the interpretation of

22   what was said?

23         MR. BERKE:  I do not intend to do that, your Honor.

24         THE COURT:  Okay.  All right.  We're getting

25   somewhere.  What else do you plan to do?

H3S3WAL7

1          MR. BERKE:  Second is Mr. Sievert would do two things

2    in anticipation of board meetings.  He would prepare documents

3    that are summaries, that take two forms.  Sometimes they were

4    just memos that quoted from analyst reports and then attached

5    analyst reports -- three forms.  Sometimes they were just cover

6    memos and e-mails and attached analyst reports that he thought

7    might be of interest to board members, and the third would be

8    board presentations like PowerPoint presentations that said

9    what the investment community, including analysts, are saying

10   about a variety of issues.  And again, we want to introduce

11   that for Mr. Davis' state of mind of what he would have seen.

12   Some of that is already in evidence, but we think if

13   Mr. Sievert is called, he's uniquely positioned to allow us to

14   do that, since that was his job.

15          THE COURT:  All right.  Mr. Goldman.

16          MR. GOLDMAN:  Your Honor, there is a real problem with

17   this.  Because, once we get into this broad world of Mr. Davis'

18   state of mind and having read the analyst reports, there's a

19   significant disconnect that the defense has not demonstrated,

20   which is that Mr. Davis spoke with Mr. Walters about a specific

21   analyst report or ever discussed any specific analyst reports.

22          THE COURT:  No.  But if I understand Mr. Berke, he's

23   disclaiming any need to do that, if the theory is it goes to

24   what Mr. Davis thought.  Mr. Davis, who is alleged to be a

25   co-conspirator, right?  There is a conspiracy count, right?

1            MR. GOLDMAN:  Absolutely, yes.

2            THE COURT:  So he's alleged to be a co-conspirator.

3    And it goes to what, if I understand this correctly, what

4    Mr. Davis thought was material non-public information versus

5    public information.  That's the state of mind element.

6            And if there is a stipulation between the parties that

7    Mr. Davis never discussed the analyst report with Mr. Walters,

8    I take it the argument would still be the same, that it goes to

9    Mr. Davis' state of mind as to what was and what was not

10   material non-public information.

11           MR. GOLDMAN:  I think there are two problems with this

12   argument.  First of all, if a board member confirms something,

13   a rumor or something that's in an analyst report, that is still

14   MNPI and insider trading.

15           THE COURT:  I think I said that already.

16           MR. GOLDMAN:  I understand.  So the relevance of

17   Mr. Davis' state of mind as it relates to analyst reports is

18   absent.  Because even if something is in an analyst report and

19   Mr. Davis confirm it, it doesn't defeat the non-public nature

20   of it.  If he confirms it so I think --

21           THE COURT:  How about this.  How about Mr. Davis is a

22   board member.  He's not on site most days of the week.  And

23   Mr. Sievert meets with analysts.  He sees what Mr. Sievert has

24   told analysts as reflected in what analysts have said the

25   company has said, and he looks at that and he says, well,

H3S3WAL7

1   that's public information, because Sievert already told the

2   analysts this, as reflected in the analysts' report in which

3   they say the company says that X.

4          MR. GOLDMAN:  But the X matters, your Honor, and

5   that's the problem here, is that really what it is, is a

6   bootstrap effort to get in all these analyst reports without

7   showing that -- A, without showing that anything is actually a

8   public fact, which you indicated was the first thing.  There

9   are very few, if any, that we've seen -- we haven't seen any

10  public facts that can be represented to your Honor through an

11  analyst report about anything outside of what is already

12  included in the litany of company statements that we have

13  through earnings calls and conferences and Gregg Engle's

14  testimony, etc.  So there is none of that.  We're not in that

15  world.

16         What we are now talking about is pure speculation that

17  exists in these analyst reports.  What Mr. Berke is trying to

18  do is bootstrap these analyst reports into evidence and somehow

19  argue, as you heard him try do through Scott Duncan, oh, we

20  talked about analyst reports here and there, we talked about

21  analyst reports here and there.  And there is no direct link

22  between Mr. Walters and any of these analyst reports to show

23  that he ever saw them, which is really the only permissible

24  basis why they can come in for his state of mind.

25         Now, I understand the argument that somehow

Mr. Davis -- the analyst reports reflect to Mr. Davis what's

out in the public.  But that's a red herring because it doesn't

matter if he's confirming something that he knows to be

confidential information, and he believes --

THE COURT:  That I said is different.  So an analyst

speculates there's going to be a spinoff announced in August.

Okay.  That's analyst speculation.  If Davis says that buddy

has a good nose, as was famously said in an insider trading

case going back to the '80s and '90s, that can be enough to

support an insider trading charge by confirming somebody's

suspicions.  United States v. Martin Siegel.  I agree with you.

I agree with you.

But, I take this to be no different than a motion in

limine.  If you moved in limine to preclude the

cross-examination on this, I would make Mr. Berke come forward

and show me what he plans to offer under the theory that it

goes to Mr. Davis' state of mind of what he thought was a fact

in the public record.

So I'm going to require you to do that.  And you are

going to mark the exhibits for me with highlighting, and I'm

going to look at it and I'll rule on it before the witness

takes the stand as I would do in any other motion in limine.

MR. BERKE:  Yes, your Honor.  I would be happy to do

that.

MR. GOLDMAN:  One more thing, your Honor, we'll need

H3S3WAL7

1    to get a ruling on before tomorrow.  Which is we've had a

2    discussion about opening the door as it related to some of the

3    Clorox and Apple stuff.

4           What we have not yet discussed is what how their door

5    opening relates to the 2006 and 2007 trading in Dean Foods,

6    which is on an entirely separate footing in terms of potential

7    prejudice as well as showing the duty and breach of the duty.

8           THE COURT:  What do you want to do?  Tell me what you

9    want to do and why you want to do it.

10           MR. GOLDMAN:  We have a witness tomorrow who is going

11    to be putting in summary charts.  And we would like to show

12    phone calls between Davis and Walters, phone calls between

13    Walters and his broker, and Walters' trades around some of the

14    confidential events that occurred within Dean Foods dating back

15    prior to 2008, because they have made this argument that he's a

16    big bettor, he goes in and out, and it's all legitimate, it is

17    all sophisticated investing.

18           And in order to rebut that argument, particularly as

19    it relates to Dean Foods, we think it is absolutely proper,

20    probative, and important for us to be able to show that, no, it

21    isn't actually so innocent, even before the charged conspiracy.

22    And while the jury, we of course would accept a limiting

23    instruction you may not convict him based on any trading that

24    occurs before 2008, that they have opened the door to his

25    alleged innocent trading.  I think there is a quote from the

H3S3WAL7

1    opening statement which says both before and during the alleged

2    conspiracy, and we're moving now to admit that evidence of

3    trading.

4           Tom Davis testified as background of the conspiracy.

5    At that time we said we would leave to a later day the

6    discussion of the trading.  We are at that later day.  And we

7    would like a ruling from your Honor permitting us to include

8    that.

9           THE COURT:  Mr. Berke or Mr. Schoeman?

10          MR. SCHOEMAN:  I'll take this one.  I think we're back

11   to the analysis from yesterday.  There was the door opening and

12   there is on the merits.

13          So on the door opening, this one, I think it's clear

14   we didn't open the door for the reason that we've discussed

15   yesterday, which is the discussion about trading in other

16   stocks before the conspiracy was other companies having nothing

17   to do with Dean Foods.  Which is why we were having a

18   discussion yesterday.  But I don't believe there was anything

19   that was said about trading in Dean Foods before the start of

20   the conspiracy, and therefore we didn't open the door.

21          And remember how we got here is, the government had

22   previously represented that they would not go into the trading

23   in 2006 or 2007 unless we opened the door and then they would

24   rebut it.  But we didn't.  And the only thing they're pointing

25   to is a misreading of some things in opening.

H3S3WAL7

1                But the second point, which is what is the relevance,

2    again, the government in the in limine motions said the

3    relevance was background to the conspiracy.  And we understand

4    that it would make sense for an alleged co-conspirator to say

5    how did his relationship of trust form with Mr. Walters.  They

6    have they asked him that question.  He said I can't be sure,

7    it's possible I tipped him.  That satisfies the legitimate

8    interest that the government may have in saying maybe there was

9    something that predated the conspiracy.

10               But now to go back through pure speculation on the

11   theory that we opened the door, and put in specific trades and

12   calls that are not charged, is neither fair because of opening

13   the door, it's not related to the fact of the conspiracy, and

14   it is basically just asking the jury to speculate.

15               THE COURT:  What about as 404(b) evidence?

16               MR. SCHOEMAN:  So, as 404(b) evidence, I understand

17   the government to be saying it is 404(b) because it serves a

18   legitimate purpose of showing the background of the conspiracy.

19               THE COURT:  Those are usually slightly different

20   arguments.

21               MR. SCHOEMAN:  If it was just pure 404(b), I think it

22   is just propensity.  It's just he did it before, he must have

23   done it later.  They haven't articulated a classic 404(b) that

24   intent or knowledge are somehow specifically in issue because

25   he didn't know some key fact that the prior trading

1    establishes.

2           So, our point is we didn't open the door, it's not

3    relevant for any permissible purpose, and they've already

4    elicited from the witness that he really doesn't remember

5    providing a tip.  So its probative value is substantially

6    outweighed by the danger of confusion and prejudice.

7           THE COURT:  Mr. Goldman.

8           MR. GOLDMAN:  Your Honor, we don't need to demonstrate

9    in this particular instance that Mr. Davis specifically recalls

10   giving the information to Mr. Walters in order for it to be

11   probative.  He has said he doesn't remember.  He may have.  It

12   goes back a long time.  There is a long pattern here that we've

13   established of him giving material non-public information.

14          It would be perfectly permissible for us, assuming --

15   putting aside the 404(b) issue, it would be perfectly

16   permissible for us from an evidentiary matter to say, ladies

17   and gentlemen, you know the pattern, this goes back before,

18   look at the pattern of trading and phone calls which is similar

19   to what you have here.

20          Now, ordinarily, and we had said this from our motions

21   in limine, we would not be offering that evidence, but for the

22   fact that the defendant is arguing specifically in the opening

23   "The prosecution might ask who would bet tens of millions of

24   dollars on a single trade or a single stock when they didn't

25   have illegal inside information.  Bill Walters would, and he

1    did it again and again and again, having nothing do with these

2    allegations.  He did it long before the alleged conspiracy and

3    during.  That's how he invested in the stock market, that's how

4    he made bets."

5         There is a specific reference to the time period of

6    the conspiracy and before.  And the fact of the matter here is

7    that we need to be -- they've left a false impression, there is

8    a legitimate argument for us to make that is not prejudicial to

9    the defendant.  It involves the same stock, it doesn't involve

10   the duty issues.  And we believe that they have opened the door

11   and we should be able to rebut their arguments that the trading

12   before the conspiracy was legitimate as to Dean Foods, or any

13   other trade, and right now the evidence we have is as to Dean

14   Foods.

15        MR. SCHOEMAN:  Your Honor, I just want to be clear.  I

16   think Mr. Goldman and maybe the prosecution are the only people

17   who would have heard that statement in opening as a reference

18   to trading in Dean Foods.  When Mr. Berke says he trades big in

19   stocks having nothing to do with the allegations here, both

20   before and during the conspiracy, that no one would interpret

21   that to be specifically Dean Foods in a way that now the

22   government needs to --

23        THE COURT:  I mean, listen, I don't have a dog in this

24   fight.  I really don't.  And listening to it, it doesn't focus

25   on Dean Foods whatsoever.  I take your point.  But, it speaks

1    of trading patterns other than those charged in this case.  And

2    that, certainly, would include trading patterns in Dean Foods.

3    It doesn't highlight Dean Foods, it doesn't call someone's

4    attention to Dean Foods.  But it certainly doesn't carve out

5    Dean Foods.  It's hey, there are charges here.  Apart from

6    trading in the manner charged in this case, this person has

7    made large bets on stocks in other contexts not charged here.

8    That may include Clorox, it may include Dean Foods, it may

9    include who knows what.

10            That's the way I hear those words.

11            MR. SCHOEMAN:  But I think the point is, if we had

12   caused the jury to believe, and I don't think -- the jury

13   doesn't know what we all know, which is that there were trades

14   before 2008.  Since there is no evidence of trades in Dean

15   Foods before 2008, they can't be sitting there thinking this

16   was a reference to Dean Foods.  And therefore, the government's

17   need to come back at that issue and say, well, we want to show

18   that those trades in Dean Foods that the jury does not know

19   about now needs to be proven, where the witness has said he

20   doesn't know whether he tipped him, and by the way, there's

21   very limited phone records during that time period.  So it's

22   very -- the evidence is very scanty.

23            And I think when the government originally was moving

24   here, they were anticipating that we were going to do through

25   summary charts and other things actually proving up the trading

1    in Dean Foods.  And what they said was, if we do that, they

2    want to be able to rebut us.  And we didn't do it.

3          And I don't think, your Honor, that an ambiguous

4    phrase in the course of an opening statement with no evidence

5    attached can fairly be said to open the door to very confusing

6    evidence.

7          THE COURT:  Door opening, door opening is important in

8    some contexts, I'm not sure this is one of the contexts where

9    door opening has a magical quality to it.  If no door were

10   opened, the government would have the ability to show the

11   background to the conspiracy and the two individuals' pattern

12   of actions predating the conspiracy, as we get all the time in

13   drug conspiracy cases.

14         And further, the government would be able to show that

15   there was intent and absence of mistake in the case of the

16   trading charged in the indictment, by showing that this was

17   done in a similar manner on similar occasions.

18         Whether background to the conspiracy or for 404(b),

19   the probative value is not substantially outweighed by the

20   danger of unfair prejudice, because the evidence on this is no

21   more inflammatory than the evidence on any other issue.  I

22   don't see where door opening or door closing is a required

23   element on this species of proof, though the government may

24   have at various times said, oh well, we're going to wait and

25   see whether they open the door.

H3S3WAL7

1          And I would further say for the reasons that I've

2     already explained on the record that I think the door was

3     opened by referencing trading not covered by the indictment.

4     And while it doesn't call a person's attention to Dean Foods,

5     it doesn't carve out Dean Foods from that consideration.  So I

6     am going to allow the government to do it.

7          What else?

8          MR. GOLDMAN:  Nothing from the government.

9          THE COURT:  All right.  I want to see the analyst

10     reports marked and you're going to show me what you want to

11     use, and I'll look at that tomorrow morning.

12          MR. BERKE:  Absolutely, your Honor.

13          THE COURT:  Thank you.

14          (Adjourned until March 29, 2017, at 10 a.m.)

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

THOMAS C. DAVIS

Recross By Mr. Berke . . . . . . . . . . . .1414

Redirect By Ms. Cucinella  . . . . . . . . .1435

JAMES MITAROTONDA

Direct By Mr. Ferrara  . . . . . . . . . . .1441

SCOTT DUNCAN

Direct By Mr. Ferrara  . . . . . . . . . . .1475

Cross By Mr. Berke . . . . . . . . . . . . .1495

Redirect By Mr. Ferrara  . . . . . . . . . .1539

THEODORE CACIOPPI

Direct By Mr. Ferrara  . . . . . . . . . . .1544

Cross By Mr. Schoeman  . . . . . . . . . . .1574

Redirect By Mr. Ferrara  . . . . . . . . . .1584

RENADA LEWIS

Direct By Mr. Goldman  . . . . . . . . . . .1586

Cross By Mr. Schoman . . . . . . . . . . . .1610

GREGG TANNER

Direct By Mr. Ferrara  . . . . . . . . . . .1619

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 3501-69 Count 12   . . . . . . . . . . . .1438

 1754    . . . . . . . . . . . . . . . . . .1464

 1804    . . . . . . . . . . . . . . . . . .1468

1   1808   . . . . . . . . . . . . . . . . .1470

2   33 and 34   . . . . . . . . . . . . . . .1551

3   11   . . . . . . . . . . . . . . . . . .1568

4   1240   . . . . . . . . . . . . . . . . .1588

5   1255   . . . . . . . . . . . . . . . . .1596

6   1221   . . . . . . . . . . . . . . . . .1597

7   1100-A   . . . . . . . . . . . . . . . .1604

8   1248   . . . . . . . . . . . . . . . . .1612

9   2102   . . . . . . . . . . . . . . . . .1619

10   472   . . . . . . . . . . . . . . . . .1645

11                  DEFENDANT EXHIBITS

12   Exhibit No.                        Received

13   5138   . . . . . . . . . . . . . . . . .1417

14   4282   . . . . . . . . . . . . . . . . .1420

15   4283   . . . . . . . . . . . . . . . . .1421

16   2155   . . . . . . . . . . . . . . . . .1508

17   2156   . . . . . . . . . . . . . . . . .1511

18   2122   . . . . . . . . . . . . . . . . .1523

19   2123   . . . . . . . . . . . . . . . . .1526

20   2121   . . . . . . . . . . . . . . . . .1528

21   2117, 2118   . . . . . . . . . . . . . .1532

22   2119   . . . . . . . . . . . . . . . . .1535

23   2066   . . . . . . . . . . . . . . . . .1537

24   3501-38   . . . . . . . . . . . . . . .1578

25   3501-39   . . . . . . . . . . . . . . .1579

1    3501-41   . . . . . . . . . . . . . . . .1579

2    3501-42   . . . . . . . . . . . . . . . .1580