UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

UNITED STATES OF AMERICA,         :

      -v-              :

WILLIAM T. WALTERS        :
    a/k/a "Billy,"           :

            *Defendant.*    :

                       :

———————————————————— x

**ECF CASE**

S1 16 Cr. 338 (PKC)

## SENTENCING MEMORANDUM ON BEHALF OF WILLIAM T. WALTERS

Barry H. Berke
Paul H. Schoeman

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Counsel for Defendant William T. Walters*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

I.   MR. WALTERS' PERSONAL BACKGROUND AND EXTRAORDINARY GOOD
     WORKS AND SUPPORT OF OTHERS.......................................................................... 2

   A.   Mr. Walters' Personal and Family History ...................................................... 2

      1.   Mr. Walters' early life shaped the man he became: hard working, determined, and self-
           sufficient. ........................................................................................................ 2

      2.   The course of Mr. Walters' life changed in his mid-20s when his eldest son was
           diagnosed with a brain tumor............................................................................ 4

      3.   In his 30s Mr. Walters met his wife of 40 years and their enduring marriage has been
           built on mutual respect and devotion................................................................. 7

      4.   In Las Vegas, Mr. Walters became a successful gambler, but faced with the destructive
           lifestyle, he chose to leave the world of poker behind...................................... 9

      5.   The Walters built a sprawling and successful business enterprise..................... 10

   B.   Mr. Walters' Commitment to Philanthropy ..................................................... 12

      1.   Mr. Walters' commitment to those living with special needs is profound, evidenced by
           his expansive and personal commitment to Opportunity Village and his advocacy on
           behalf of people with disabilities. .................................................................... 12

      2.   In addition to Opportunity Village, Mr. Walters has championed many other worthy
           causes. .............................................................................................................. 23

   C.   Mr. Walters' Extraordinary Commitment to Helping and Supporting Friends, Family,
        Colleagues, Employees and Others.................................................................. 32

      1.   Friends, family, colleagues, and employees repeatedly describe how Mr. Walters was
           there for them during difficult times in their lives............................................ 34

      2.   Mr. Walters is a mentor and advocate and a willing source of advice and
           encouragement. ................................................................................................ 43

   D.   Mr. Walters' Other Intangible and Unique Personal Qualities Reflected In His Treatment
        of Others in his Personal and Professional Lives............................................. 50

II.  THE SENTENCING GUIDELINES.............................................................................. 57

   A.   Not all of the Trades that the Government Referenced at Trial Should Be Included in the
        Calculation ...................................................................................................... 57

   B.   The Court Should Use a Method of Calculating Mr. Walters' Gains that Does Not
        Overstate Them ................................................................................................ 62

KL3 3131011.1

C.    The Advisory Guidelines Calculation ........................................................................ 64

III.  THE NON-GUIDELINES SENTENCE RECOMMENED BY THE PROBATION
      DEPARTMENT IS APPROPRIATE ................................................................................ 64

A.    Standard .................................................................................................................... 64

B.    The Nature and Circumstances of the Crime ........................................................... 66

C.    The History and Characteristics of the Defendant ................................................... 69

      1.    Mr. Walters' lifetime of good works weighs against imposing a Guidelines sentence. 70

      2.    Mr. Walters' age and health weigh against a Guidelines sentence. ................ 73

      3.    A reduced sentence will limit the time that Mr. Walters is unable to assist in the care of
            his mentally impaired son. ............................................................................... 75

D.    A Lenient Sentence Will Provide Adequate Specific and General Deterrence ................ 75

      1.    Specific Deterrence. ........................................................................................ 75

      2.    General Deterrence ......................................................................................... 76

IV.   FORFEITURE ................................................................................................................ 77

V.    FINE ............................................................................................................................... 77

VI.   RESTITUTION ............................................................................................................... 79

VII.  CONCLUSION ............................................................................................................... 82

KL3 3131011.1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apprendi v. New Jersey,*
530 U.S. 466 (2000)........................................................................................................78

*Gall v. United States,*
552 U.S. 38 (2007)..........................................................................................................57

*Rita v. United States,*
551 U.S. 338 (2007)...................................................................................................57, 73

*Southern Union Co. v. United States,*
567 U.S. 343 (2012)........................................................................................................78

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006)........................................................................1, 65, 70

*United States v. Amato,*
540 F.3d 153 (2d Cir. 2008)............................................................................................79

*United States v. Battista,*
575 F.3d 226 (2d Cir. 2009).......................................................................................80, 81

*United States v. Booker,*
543 U.S. 220 (2005)........................................................................................................57

*United States v. Capoccia,*
503 F.3d 103 (2d Cir. 2007)............................................................................................77

*United States v. Carmona-Rodriguez,*
No. 04 CR 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)....................................76

*United States v. Contorinis,*
692 F.3d 136 (2d Cir. 2012)............................................................................................77

*United States v. Donaghy,*
570 F. Supp. 2d 411 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista,*
575 F.3d 226 (2d Cir. 2009)............................................................................................80

*United States v. Ebbers,*
458 F.3d 110 (2d Cir. 2006).......................................................................................62, 63

*United States v. Ebrahim,*
No. 12 Cr. 471 (JPO), 2013 WL 2216580 (S.D.N.Y. May 21, 2013)....................................80

KL3 3131011.1

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)............................................................. *passim*

*United States v. Gupta,*
    925 F. Supp. 2d 581 (S.D.N.Y. 2013).............................................................80

*United States v. Hernandez,*
    No. 03-cr-1257 (RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005) .................76

*United States v. Hodges,*
    No. 07-CR-706 (CPS), 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009) ...................76

*United States v. Johnson,*
    567 F.3d 40 (2d Cir. 2009)..........................................................................65

*United States v. Martoma,*
    48 F. Supp. 3d 555 (S.D.N.Y. 2014)..............................................................63

*United States v. Maynard,*
    743 F.3d 374 (2d Cir. 2014).........................................................................79

*United States v. O'Hagan,*
    521 U.S. 642 (1997)...................................................................................80

*United States v. Pfaff,*
    619 F.3d 172 (2d Cir. 2010).........................................................................78

*United States v. Rajaratnam,*
    No. 09 Cr. 1184 (RJH), 2012 WL 362031, (S.D.N.Y. Jan. 31, 2012)...................62

*United States v. Vaughn,*
    430 F.3d 518 (2d Cir. 2005).........................................................................58

**Statutes**

15 U.S.C. § 78ff ...........................................................................................79

18 U.S.C. § 3553(a) ................................................................................ *passim*

18 U.S.C. § 3553(a)(1)...........................................................................57, 64

18 U.S.C. § 3553(a)(2)(A)–(D)........................................................................65

18 U.S.C. § 3553(a)(2)(B) and (C) ..................................................................75

18 U.S.C. § 3571(b)(1) .................................................................................79

18 U.S.C. § 3571(b)(3) .................................................................................78

KL3 3131011.1

18 U.S.C. § 3571(d) ........................................................................................................78

18 U.S.C. § 3663A ..........................................................................................................79

18 U.S.C. § 3663A(b)(4) .................................................................................................79

18 U.S.C. § 3663A(c)(1)(A)(ii)–(c)(1)(B) ......................................................................79

18 U.S.C. § 3664(h) ........................................................................................................81

U.S.S.G. § 1B1.1 .............................................................................................................58

U.S.S.G. § 2B1.4 cmt. .....................................................................................................62

**Other Authorities**

*United States v. Collins,*
    No. 07 Cr. 1170 (LAP), (S.D.N.Y. July 15, 2013), Sentencing Hearing Tr. .....................70, 72

*United States v. Contorinis,*
    No. 09 Cr. 1083 (RJS), (S.D.N.Y. Dec. 17, 2010), Sentencing Hearing Tr. .....................63, 64

*United States v. Davis,*
    No. S1 16 Cr. 338 (PKC), (S.D.N.Y May 16, 2016), Plea Tr. ................................................58

*United States v. Gupta,*
    No. 11 Cr. 907 (JSR), (S.D.N.Y. Oct. 24, 2012), Sentencing Hearing Tr. ..............................65

*United States v. Newman,*
    No. 12 Cr. 121 (RJS), (S.D.N.Y. May 2, 2012), Sentencing Hearing Tr. ...............................65

*United States v. Walters,*
    No. 16 Cr. 338 (PKC), (S.D.N.Y. Dec. 2, 2016), Pretrial Proceeding Tr. ...............................58

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals,*
    61 Wayne L. Rev. 27, 49 (2015) *available at*
    http://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article=1099&context=
    lawfrp ..................................................................................................................................76

Evelyn J. Patterson, *"The Dose-Response of Time Served in Prison on Mortality:*
    *New York State, 1989-2003,"* Am. J. Pub. Health 103:3 (Mar. 2013) *available*
    *at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3673515/; ............................................73

Anne C. Spaulding et. al., "Prisoner Survival Inside and Outside of the Institution:
    Implications for Health-Care Planning," Am. J. of Epidemiology at Tbl. 2
    (Mar. 2011) available at
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3044840/ ..................................................74

The Osborne Association, "The High Cost of Low Risk: The Crisis of America's
Aging Prison Population" (2014) available at
http://www.osborneny.org/news/unite-for-parole-and-prison-justice/osborne-
aging-white-paper/ ..........................................................................................................74

United States Department of Justice, *Correctional Healthcare: Addressing the
Needs of Elderly, Chronically Ill, and Terminally Ill Inmates,"* 10 (2004)
*available at* https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf ........................74

*U.S.S.C.'s 2016 Sourcebook of Federal Sentencing Statistics,* Table 28, *available
at* http://www.ussc.gov/research/sourcebook-2016 ................................................................65

United States Sentencing Commission, "*Recidivism Among Federal Offenders: A
Comprehensive Overview,*" 23 (2016) *available at*
http://www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-publications/2016/recidivism_overview.pdf ..........................................76

*Amarillo Slim's Superbowl of Poker $10,000 Main Event – No Limit Hold'em,
February 1986, available at*
http://pokerdb.thehendonmob.com/event.php?a=r&n=25108 ............................................9n.3

*Contact,* Opportunity Village (2017), *available at*
https://www.opportunityvillage.org/pages/contact ..........................................................15n.9

Las Vegas Golf Hall of Fame, Bill Walters, Class of 2013, *available at*
http://www.lasvegasgolfhof.com/-bill-walters ................................................................26n.12

*Overview,* About Us, Opportunity Village (2017), available at
https://www.opportunityvillage.org/pages/overview..........................................................13n.6

*Overview: A Tour of Opportunity Village,* YouTube (Jan. 28, 2012), *available at*
https://www.youtube.com/watch?v=Z4yn3_cz_z8..........................................................13n.6

*Project Enable,* Opportunity Village (2017) *available at*
https://www.opportunityvillage.org/pages/enable-1 ..........................................................16n.10

KL3 3131011.1

We submit this memorandum on behalf of William Walters, who is scheduled to be sentenced by this Court on July 27, 2017. We address in this submission the relevant sentencing considerations set forth in 18 U.S.C. § 3553(a) and endeavor, among other things, to provide the Court with a broader and deeper understanding of who Mr. Walters is, and how he has led his life.

Raised in modest circumstances and forced to fend for himself at a young age, Mr. Walters rose above the challenges of his early life to become a successful business owner, professional gambler, and philanthropist. As the scores of letters submitted to the Court describe in great detail, Mr. Walters has devoted his life to improving the lives of developmentally disabled adults, supporting vulnerable communities in Las Vegas and elsewhere, and providing assistance and guidance to friends, colleagues, employees, and complete strangers that we submit is quite remarkable in its scope, impact, and selflessness. In almost every letter that has been submitted, one can find a story of Mr. Walters going out of his way to give support to others, often unsolicited and to the utter surprise of the recipient. The letters speak forcefully to the commitment, kindness, sympathy, altruism, and generosity that Mr. Walters has shown to his communities, friends, employees, and even those he barely knew. As many courts in this district have noted, "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

We respectfully submit that when weighing Mr. Walters' conviction against Mr. Walters' entire life, and considering all of the 3553(a) factors, the Court should impose the sentence recommended by the Probation Department of one year and one day of incarceration –

which we submit, as found by the Probation Department, is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

# I.     MR. WALTERS' PERSONAL BACKGROUND AND EXTRAORDINARY GOOD WORKS AND SUPPORT OF OTHERS

Scores of friends, family members, colleagues, employees, and former public officials have submitted letters of support on Mr. Walters' behalf. In their efforts to identify the qualities in him that they respect and admire, they often describe him as, simply put, "a blend of the ordinary and the remarkable." (Etzkorn Ltr. at 2).[1] We focus here on four aspects of Mr. Walters' personal history that we submit are most relevant for purposes of sentencing: (1) his family history and the challenges he had to overcome; (2) his passionate, personal, and profound commitment to a wide range of charitable causes that he has significantly impacted; (3) his consistent and extraordinary support of friends, family, colleagues, employees, and relative strangers; and (4) his other intangible and exceptional personal qualities, which are reflected in his professional and personal interactions with others throughout his life.

## A.     Mr. Walters' Personal and Family History

### 1.     *Mr. Walters' early life shaped the man he became: hard working, determined, and self-sufficient.*

William Thurman Walters was born 71 years ago on ███, 1946, in Munfordville, Kentucky, and from the very first, his life was shaped by loss. (Presentence Investigation Report ("PSR") ¶ 49). His father passed away when he was less than a year old and thereafter his mother abandoned him and his two sisters. (PSR ¶¶ 49-50). Mr. Walters moved into his grandmother's home with no running water or indoor plumbing and it was from her that he learned the values he still considers most meaningful today: a strong work-ethic,

---

[1]     The letters in support of Mr. Walters are attached to this memorandum and designated as Exhibits A-1 to A-100. An Exhibit Table of Contents is included listing the letters in alphabetical order by last name and indicating the corresponding exhibit number.

respect, loyalty, and charity. (PSR ¶¶ 50-51). All of these are virtues others consistently use to describe Mr. Walters.

At age 7 he began to work, and at 71 he has not stopped. (PSR ¶ 51). His grandmother helped him secure a $40 loan at their local bank and Mr. Walters used the money to purchase a lawnmower, launching his very first business. (*Id.*) He and his grandmother agreed that 50 percent of the proceeds would apply to repayment on the loan and he could pocket the rest. Within two years, at the age of 9, he had repaid his first loan and graduated to his next business venture. (*Id.*) Once again Mr. Walters' grandmother helped him obtain a loan, this time for $90 to secure a paper route. (*Id.*) Mr. Walters would wake up at 4:30 a.m. every morning to deliver papers before school.

When he was 13, Mr. Walters' grandmother passed away. (PSR ¶ 52). Devastated, he tried to jump into the burial plot at her funeral to "'join' her." (Binion Ltr. at 1). With her death, Mr. Walters was forced to move to Louisville to live with his mother and her new family. (PSR ¶ 52). While she, her husband, and her step-children lived on the ground floor of their residence, Mr. Walters' mother required him to pay $10 a week to rent a room in her basement. (*Id.*) No longer able to continue his paper route now that he was in a new city, Mr. Walters secured jobs at the Davis Doughnut Bakery where he worked from 4:30 a.m. to 7:30 a.m. before school, and a Shell gasoline service station, where he worked from 3 p.m. to 11 p.m. after school. Mr. Walters' mother was an alcoholic and verbally abusive. She and her husband would sometimes get drunk and stay locked in their room for multiple days at a time. (*Id.*)

At age 17, while still in high school, Mr. Walters eloped with his first wife and within a year his daughter Tonia was born. (PSR ¶ 53). Though he worked two jobs and had a

new family, Mr. Walters kept a promise he had made to his grandmother and graduated from high school. (S. Walters Ltr. at 1). He was the first person in his family to do so. (PSR ¶ 53).

After high school, Mr. Walters worked at Brown and Williamson Tobacco Company, International Harvester Company, and at Jones Dabney Paint Company to support his young family. (*See* PSR ¶¶ 85-87). While at Jones Dabney, he was offered a job in auto sales and for about five months, he worked at Jones Dabney during the day and then at a car dealership at night. He discovered he enjoyed working at the dealership more and decided to pursue car sales full-time. Meanwhile, Mr. Walters' first marriage ended after two years and his ex-wife remarried a man in the armed forces and moved to Germany with their daughter. (PSR ¶ 53). When Tonia was in her teens, she reached out to her father and they re-established a relationship and later in life he invited her to move to Las Vegas to be closer to him. (*See* S. Walters Ltr. at 1).

   2.   *The course of Mr. Walters' life changed in his mid-20s when his eldest son was diagnosed with a brain tumor.*

Mr. Walters remarried when he was about 20, and together with his second wife, Mary Carole (who goes by Carole), he had two children, William "Scott" Walters and Christopher "Derin" Walters. (PSR ¶ 54). At the age of 7, Scott was diagnosed with a brain tumor and given thirty days to live. The doctors told Mr. Walters and his wife there was no hope. (Cottner Ltr. at 1). Doctors performed a partial lobotomy to remove the tumor. Scott survived but he suffered significant brain damage and has limited ability to care for himself. (PSR ¶ 54). Mr. Walters and his wife "went into a tailspin;" they spent the next year in constant fear that their son would die any day and Mr. Walters began drinking more heavily. (*Id*; Cottner Ltr. at 1). At the time, and throughout his 20s, Mr. Walters worked at car dealerships, advancing from sales to sales management and eventually, though he had no formal business education, to

4

running his own dealership. Meanwhile, he battled depression surrounding Scott's health and struggled with alcohol, which put a significant strain on his marriage and ultimately led to their divorce after nine years together. (PSR ¶¶ 54, 56; Cottner Ltr. at 1).

Carole describes how Mr. Walters was a workaholic, but an otherwise very good father. (Cottner Ltr. at 1-2). "He taught [his sons] the importance of a work ethic, honesty and mutual respect for others." (Cottner Ltr. at 1). Following the dissolution of their marriage, they remained friends and worked tirelessly together to ensure a happy life for their sons, particularly Scott. (*Id.*) "Bill, Susan, Carol[e] and Jerry, [Scott's] parents and step-parents, all worked together to help give Scott dignity and quality of life. [Mr. Walters] especially wanted his son's life to have purpose. He has committed much of his life and resources to this cause." (Abbatangelo Ltr. at 2).

Both Derin and Scott lived with their father and Mr. Walters' current wife, Susan, in Las Vegas for a period of time. The years Scott lived with them were "really good for [Scott] because he got into a routine." (S. Walters Ltr. at 2). Scott worked at a center for people with disabilities where he helped others who were in even greater need of support. Mrs. Walters described the positive impact it had on him by making him feel "valued and important." (S. Walters Ltr. 2). Scott wanted to be a chef and Mr. Walters learned through his friend Bion Wilcox, whose daughter also has special needs, that Ricks College (now BYU-Idaho) offered a program for their children. (*Id*; Wilcox Ltr. at 1; Cottner Ltr. at 2). "[Mr. Walters] wanted Scott to learn how to be independent and be on his own." (Cottner Ltr. at 1). The program was a success for both Scott and Mr. Wilcox's daughter and their families celebrated how much that meant to them. (Wilcox Ltr. at 1).

KL3 3131011.1

Scott currently lives in Kentucky with his mother. He and his father are very close and Carole and Scott both rely on Mr. Walters. Carole has expressed concern that she is aging and that she needs increasing help from Mr. Walters to care for their son. (Cottner Ltr. at 2-3). That is particularly so now as, tragically, Scott's condition has regressed in recent years. (*Id.*) While Scott had once functioned at a sixth-grade level, he has reverted to that of a third-grader. He had another tumor removed a few years ago but has additional tumors that have not been excised and have exacerbated his seizures. (PSR ¶ 57; *see also* Cottner Ltr. at 2-3). The combination of his seizures and his seizure medication has resulted in paranoid delusions. (*Id.*) He believes his mother and step-father are "trying to kill him and is often irrational and sometimes aggressive." (PSR ¶ 57; *see also* Cottner Ltr. at 2-3). He is now largely confined to his house. (*Id.*) Carole describes how the "only person he will still listen to is Bill." (Cottner Ltr. at 2). Sometimes she will call Mr. Walters and "have him ask [Scott] to do something he will not do for [her]. Bill calls and talks to Scott regularly which helps him a lot. He really looks forward to talking to his father. When Scott sees his father, the improvement is remarkable." (Cottner Ltr. at 2; *see also* S. Walters Ltr. at 2; PSR ¶ 57).

With the Court's permission, Mr. Walters recently travelled with Scott to the Mayo Clinic in Rochester, Minnesota for further evaluation. (*See* S. Walters Ltr. at 2-3; Cottner Ltr. at 3; PSR ¶ 57). As he has throughout Scott's life, Mr. Walters continues to seek opportunities to help his son live free from pain and suffering and with purpose. In championing his son, Mr. Walters has also become a champion for others living with disabilities, as described in detail below. (*See infra* pp. 12-22).

6

3.    *In his 30s Mr. Walters met his wife of 40 years and their enduring marriage has been built on mutual respect and devotion.*

At age 30, Mr. Walters married his current wife Susan Berkley Humphries, now Susan Walters, and they have been together for 40 years. (PSR ¶ 55). They have weathered the hard times and celebrated the good. She describes how from the very first they have been "inseparable." (S. Walters Ltr. at 1). When his ex-daughter-in-law, Tina, was approaching her second marriage, Mr. Walters spoke to her "with humility about his marriage and the work that is required. He spoke of trust, communication and laughter. He shared the concept that mutual respect was essential. He took this conversation sincerely . . . [and] emphasized diligence and honor when taking care of one's family, a duty he never took lightly." (Abbatangelo Ltr. at 1-2).[2]

The Walters were in fact the first people their ex-daughter-in-law told of her engagement to her second husband following her divorce from their son, a testament to their love and dedication to family. (Abbatangelo Ltr. at 1). Similarly, Derin Walters' first ex-wife, Regina, who has been divorced from him for fourteen years, continued to work for her ex-father-in-law after the divorce. "Even after all these years, he never ends a phone call without telling [her] he loves [her]." (R. Wright Ltr. at 1). And Mrs. Walters describes how her husband cared for his mother when she grew old and was dying of emphysema, despite the cruelties she inflicted upon him as a child. (PSR ¶ 58).

---

[2]    *See also* Suntha Ltr. at 1 (describing how Mr. Walters gave Dr. Suntha "the advice to treasure the time [he] spend[s] with [his] wife and children, as [he] focused on [his] career. [Mr. Walters'] quote from many years ago still resonates in [Dr. Suntha's] head:  'when I think of what was important to me when I was younger, and I had little, and I look at what is important to me today, as I have material success, it is your family and friends that provide true happiness'. As [Dr. Suntha has] come to know Bill through the years, [Mr. Walters'] actions validate his philosophy.").

Even where there are no familial ties, numerous letter writers embrace Mr. Walters as a cherished member of their own families or describe him as a father-figure. (*See, e.g.*, Dahlstrom Ltr. at 1 (describing how for the past 20 years Mr. Walters has been a "mentor, boss, friend and many times like a second-father"); Filler Ltr. at 2 ("We consider Bill and Susan as members of OUR family"); Grant Ltr. at 2 ("I consider Billy as part of my family, and it is an honor to call Billy my friend"); Kelley Ltr. at 2 ("My kids think of Mr. and Mrs. Walters as family"); Kern Ltr. at 1-2 ("Through the years Bill and my father maintained a friendship that was almost like father/son, so much so that we consider Bill and his wife Susan to be family" and "we love him as if he were our brother"); Peterson Ltr. at 1 ("Billy and Susan also treat my two daughters like they are part of their family"); Poster Ltr. at 1 ("he has acted as a friend, mentor, and even a father figure to me"); F. Smith Ltr. at 2 ("Though Billy and I are the same age, when my father died ███████ at age 58, Billy was there for me and stepped in as a father figure, brother, and best friend"); Stutts Ltr. at 1 ("I have known Bill & Susan eight (8) years and they have been like family to us"); Vizanko Ltr. at 1 ("Bill was like a father figure and a mentor to me"); *see also* Raphael Ltr. at 1 ("many of his employees have told me 'Mr. Walters is like a father to me'")).

Together, Mr. and Mrs. Walters have built a life centered on a commitment to their community. Giving back is important to both of them and they have devoted much of their lives to finding ways to support others. They "decided at some point that [their] Christmas gift to each other would be to give back anonymously to families in [their] community" and for the next decade they "took in seventy-five . . . families at Christmas" and Thanksgiving. (S. Walters Ltr. at 2). Together they also built a sprawling business that endures today, working side by side for many years. (S. Walters Ltr. at 2).

8

        4.     *In Las Vegas, Mr. Walters became a successful gambler, but faced with the destructive lifestyle, he chose to leave the world of poker behind.*

In the early years of his marriage to Susan, Mr. Walters decided to pursue his lifelong passion for sports gambling as a full-time career, and in 1982, broke, with $200,000 in debt, and uncertain about their future, he and his wife sold her 1971 Volkswagen, packed up their lives, and moved to Las Vegas. (PSR ¶ 56; S. Walters Ltr. at 1).

Mr. Walters first started gambling when he was 6 years old. (PSR ¶ 70). His grandmother took him to his uncle's pool hall and gave him a pool stick to keep him busy. (*Id.*) He would play a game of nine-ball for a penny. (*Id.*) In the summers he worked at the poolroom racking balls and prepping food. At age 10, he bet a local grocer $125 – all the money he had in the world – that the New York Yankees would beat the Brooklyn Dodgers. (*Id.*) He was a huge Yankees fan and it took him over two years of hard work in his lawn-mowing and paper-delivery businesses to save that money. The Yankees lost. (*Id.*)

Mr. Walters eventually became one of the most successful sports bettors in the country. He partnered with Michael Kent, a mathematician who had worked for Westinghouse developing nuclear submarines, and pioneered the use of a computer program to handicap games. (*See* PSR ¶ 81). Mr. Walters also partnered with David "Chip" Reese, a Dartmouth graduate who was on his way to Stanford Law School when he stopped in Las Vegas, won a poker tournament, and never left. Mr. Reese taught Mr. Walters everything there was to know about poker and Mr. Walters was a good student. In 1986 he won the "No-Limit Hold'Em" at the Superbowl of Poker.[3]

The professional poker environment often involved heavy drinking in smoke-filled card rooms, and while Mr. Walters could go nights without drinking, once he started, he

---

[3]    *See Amarillo Slim's Superbowl of Poker $10,000 Main Event – No Limit Hold'em, February 1986, available at* http://pokerdb.thehendonmob.com/event.php?a=r&n=25108.

often could not stop. Because of his drinking, he exhibited a lack of self-control and made decisions that jeopardized his business. (PSR ¶ 71; S. Walters Ltr. at 1-2). "As successful as he was sober, his judgment with alcohol was equally as bad" and eventually Mr. Walters quit smoking and drinking and left the world of poker behind. (S. Walters Ltr. at 2).

In 1988, Mr. Walters and his wife started their own company, Berkley Enterprises, using Susan's middle name. (*See* PSR ¶ 79). They later changed the name of the company to The Walters Group ("TWG"), as it is known today. While Mr. Walters continued to be a very successful sports bettor – for which he gained significant renown – the next three decades of his life were in large part centered around his work as an entrepreneur.

     5.    *The Walters built a sprawling and successful business enterprise.*

Mr. and Mrs. Walters began their business by investing in commercial and residential real estate. (*See* PSR ¶ 79). An avid golfer, Mr. Walters entered the golf industry in 1991 with the acquisition of a country club in Albuquerque, New Mexico. In 1994, TWG purchased a second club in Yuma, Arizona, followed by three more in Chicago. All five were sold after extensive improvements. In 1996, TWG opened the Desert Pines Golf Course in downtown Las Vegas, followed a year later by the Stallion Mountain Country Club, and then the Royal Links Golf Club in 1998.[4] Desiree Young, who has worked at The Walters Group since

---

[4]     Letters recount how Mr. Walters chose to build a golf course in a poor neighborhood of Las Vegas as part of an urban revitalization effort, crediting him with greatly improving the community. (*See, e.g.,* Gale Ltr. at 2; Weinberger Ltr. at 2). His friend of many years, Fred Smith, remembers how at the ribbon cutting ceremony, Mr. Walters explained: "'I built this golf course in this beautiful location because golf should be accessible and affordable to all.' At the time Las Vegas golf courses had become so expensive that they were out of reach for many of the city's residents. [Mr. Walters] promised to host clinics for beginners and junior golfers, to host charity events for Opportunity Village, and to make his course an affordable option to all those who wished to play it." (F. Smith Ltr. at 1). Mr. Walters followed through on this promise and he regularly sponsored or hosted charity events at his many golf courses. (*See, e.g.,* Santo Ltr. at 1; Bigelow Ltr. at 1; Hill Ltr. at 2; *see also* Massi Ltr. at 1). Mr. Walters would also empower his management with "authority to donate space, food and golf for charities close to

1996 recalls how when she joined there were only 12 people on staff and then they "just exploded. [TWG] built 2 more golf courses, purchased another one and then [they] started buying auto dealerships. The business was constantly changing." (D. Young Ltr. at 1). In 2000, The Walters Group opened Bali Hai Golf Club on the Las Vegas Strip, along with its restaurant, Cili. They have owned and operated dozens of auto dealerships through partnerships around the country, including in California, Nevada, Georgia, and Kentucky. TWG also owns tee-time reservation and golf vacation package companies and has many passive investments, often in small start-ups. (*See, e.g., United States v. Walters*, No. S1 16-Cr-338 (PKC), (S.D.N.Y. Apr. 3, 2017), at Trial Tr. 2136:16-2138:3 (Butler Direct); *see also* PSR ¶¶ 79, 94).

Mr. Walters' businesses have employed approximately 1500 people around the country and he plays an active role in the many companies that fall within the TWG umbrella. (*See* PSR ¶ 79). Desiree Young and others who have worked with Mr. Walters describe him as "extremely smart, [and] fast paced." He "does a considerable amount of research on any project he wishes to pursue." (*See, e.g.,* D. Young Ltr. at 1; *see also* PSR ¶ 60). "Whether in business dealings, charitable efforts, or personal relationships, Billy truly gives all of himself to everything he takes on." (F. Smith Ltr. at 2). One of Mr. Walters' business associates in the auto dealership industry, Erwin Raphael, described "visit[ing] him early in the morning, for breakfast" and Mr. Walters "had already been working for several hours. Billy is known to put in 12-15 hours of work per day. He is on top of all of the details of his businesses and is able to connect dots between seemingly unrelated events as good as anyone [Mr. Raphael] know[s]."

---

[their] hearts." (*See, e.g.,* Wilson Ltr. at 1; *see also* J. Wright Ltr. at 1-2). In addition, Mr. Walters has supported others' efforts to expand accessibility to golf, such as by donating money to Jim Colbert's efforts to establish a public golf facility in Manhattan, Kansas. "Developmental golf is a cause that is important to Bill and he knows that Manhattan is an important place to me." (Colbert Ltr. at 3).

11

KL3 3131011.1

(Raphael Ltr. at 1).[5] In addition to his incredible work ethic, those who have worked with Mr. Walters, much like his friends, consistently remark on his integrity, and the respect he shows to all those around him, traits that will be obvious from the accounts to follow. (*See infra* pp. 50-56).

**B.    Mr. Walters' Commitment to Philanthropy**

1.    *Mr. Walters' commitment to those living with special needs is profound, evidenced by his expansive and personal commitment to Opportunity Village and his advocacy on behalf of people with disabilities.*

Mr. Walters is well known in the world of gambling, but in Las Vegas, Mr. Walters is equally renowned for his philanthropy. He has been and is a champion of many causes, but it is his dedication to Opportunity Village and people living with disabilities that exemplifies his commitment to helping those in need. From his desire to ensure that his son have the best care and a life of purpose came one of Mr. Walters' most lasting impacts on his community. Mr. Walters "embraced his son's handicap and he became someone [others] looked to for inspiration and strength in dealing with similar circumstances. [Mr. Walters] took his personal challenges of raising a son with intellectual disabilities and made it an opportunity" to help others. (Morrissey Ltr. at 1).

Opportunity Village is a "Las Vegas based non-profit organization serving people with Intellectual and Developmental Disabilities by providing employment, vocational training, day habilitation, and recreation services." (E. Guthrie Ltr. at 1). It has become one of "Nevada's largest private, not-for-profit community rehabilitation program[s], serving nearly 2,000 people .

---

[5]    *See also* Paul Ltr. at 1 (describing how when Mr. Walters was interested in working with Pat Paul on the purchase of a dealership in 2009, Mr. Paul understood early on that Mr. Walters "worked tirelessly, was a very savvy investor, and could quickly identify the most important areas of concern and balance them against his very high tolerance for risk." Having assisted Mr. Walters with the purchase or divestment of roughly 25 dealerships since then Mr. Paul describes how Mr. Walters was "consistent in his approach – endless hours of research coupled with his instincts to recognize and evaluate an immense amount of variables almost instantly.").

KL3 3131011.1

. . Opportunity Village operates four employment training center campuses and a Thrift Store in Southern Nevada. It also operates a vehicle donation program, provides vocational training and places hundreds of adults in jobs throughout the community . . . . The entire [Nevada] community is affected by the organization as businesses not only contract with Opportunity Village to fulfill assembly and packaging, mass mailings and other business-to-business services, but many companies and organizations hire [Opportunity Village] clients as regular employees."[6]

Linda Smith, Opportunity Village's Senior Executive Vice President, first met Mr. Walters at a charitable event over two decades ago. She approached him without introduction, unaware of his son's disabilities, to ask him for a meeting to discuss a donation to Opportunity Village. She recalls being "nervous because [the Walters] were known philanthropists and respected community leaders," but, as she soon discovered, she need not have been concerned; she credits Mr. Walters with being "one of the kindest, gentlest and most generous [men]" she has ever known. She met with him that week and "the rest is charity history. Together, [they] raised over $500 million dollars and built a world class organization of best practices in the country." (L. Smith Ltr. at 1).

Mr. Walters has been a consistent and dedicated advocate for Opportunity Village for the past 20 plus years. Over two decades of "hard work, countless unselfish hours and a belief that the world is better served if we can share our talents and abilities, [Mr. Walters] threw himself and his many friends into the plight of the disabled." (L. Smith Ltr. at 1). He worked tirelessly to help expand Opportunity Village's capacity and scope and has committed himself to

---

[6]    *Overview, About Us*, Opportunity Village (2017), *available at* https://www.opportunityvillage.org/pages/overview. The following video provides a helpful overview: *A Tour of Opportunity Village*, YouTube (Jan. 28, 2012), *available at* https://www.youtube.com/watch?v=Z4yn3_cz_z8.

KL3 3131011.1

the special needs community more broadly by facilitating learning opportunities and community awareness, while watching out for Opportunity Village's participants and would-be participants.

a. <u>Mr. Walters has helped expand Opportunity Village's capacity.</u>

Mr. Walters first became involved in Opportunity Village because of his understanding of the challenges people living with disabilities face and his desire to see them thrive. Witnessing the difference Opportunity Village made in people's lives, including his son Scott's, he has dedicated himself to helping the organization expand and flourish.[7]

Mr. Walters "served as a respected member of Opportunity Village's Foundation Board of Directors for many years" and is now "one of the leaders of [its] Emeritus Board." (Alderucci Ltr. at 2). "When [Mr. Walters] joined the board, he took Opportunity Village to the next level. At the time, [there was] one campus, a yearly budget of $600,000 and a board of eight people. Today, Opportunity Village is considered the leader in vocational training for the intellectually handicapped . . . . Due in large part to [Mr. Walters'] tireless efforts to attract other prominent donors, Opportunity Village's yearly budget has increased to four million dollars. The organization is now managed by two separate boards of directors, each comprised of forty members. [Mr. Walters'] efforts have allowed [Opportunity Village] to expand the organization and changed the lives of thousands of people." (Morrissey Ltr. at 1).

Edward Guthrie, now CEO Emeritus of Opportunity Village, remembers Mr. Walters inquiring as to how Opportunity Village planned to expand its ability to serve the special-needs community in Nevada. At the time, Opportunity Village had only one campus but

---

[7]     As referenced above, *see supra* p. 5, after Mr. Walters first learned of Opportunity Village, Scott came to live with him and Susan in Las Vegas and became involved with their programming. Scott would "show up every day and help take care of people with much more severe disabilities." Edward Guthrie, the former CEO of Opportunity Village, has a fond recollection of watching Scott push an individual in a wheelchair out to a van for a community outing, while another individual who was blind held onto Scott's shoulder for support. (E. Guthrie Ltr. at 1).

14

owned undeveloped land in Henderson. Mr. Walters agreed to chair the capital campaign to raise money for a second facility. He brought in over $4 million, and in April of 2000, The Walters Family Campus opened. (E. Guthrie Ltr. at 1).[8]

The next challenge was to find sufficient work for the individuals at The Walters Family Campus. (*Id.*) The staff outlined a business plan for what would become Opportunity Village's Document Management Program, crediting Mr. Walters as having "single-handedly" helped Opportunity Village shepherd it into existence. (Alderucci Ltr. at 2; *see also* E. Guthrie Ltr. at 1). When Opportunity Village's management reached out to him for advice on how best to start the business from scratch, Mr. Walters embraced the idea and helped develop it. (Alderucci Ltr. at 2; *see also* E. Guthrie Ltr. at 2). "[B]ecause of Mr. Walters' belief in the people [Opportunity Village] serve[s] and the mission Opportunity Village is built on, the Document Management Program is the second largest document handling concern in Southern Nevada." (Alderucci Ltr. at 2). In addition to the Document Management Program, The Walters Family Campus houses a second business, Assembly Authority, which provides assembly and packaging services,[9] and Project Enable, which provides "various activities and rehabilitative

---

[8]     As the President of Opportunity Village Family & Friends, Jacki Folger, explains: "People in need, in 1997, had no place to go in their neighborhood, or their town. People with significant and debilitating disabilities were being bussed long distances to have their needs met. When approached to offer assistance with the development of a location to employ and train adults with disabilities, Bill and his wife Susan were there to assist." (Opportunity Village Friends & Family ("OVFF") Ltr. at 1).

[9]     *Contact*, Opportunity Village (2017), *available at* https://www.opportunityvillage.org/pages/contact.

initiatives," such as "American Sign Language (ASL) classes, reading classes, pet therapy, socialization, and community outings . . . ."[10]

As Las Vegas continued to expand so did the needs of those living with disabilities, and Opportunity Village later opened a third facility in Clark County. Once again, Mr. Walters "helped [to] raise tens of millions of dollars needed to complete [that] campus." (E. Guthrie Ltr. at 1). It opened in 2008 and hosts programs for life and skills enrichment as well as an employment resource center. It will also be the future home of a residential village, in which Mr. Walters "played an important role . . . supporting Opportunity Village's efforts to design and build" a place where people with disabilities "can live active, creative and productive lives . . . in safety." (Alderucci Ltr. at 2; *see also* Morrissey Ltr. at 1).

"There isn't a fundraising initiative embarked upon that doesn't start with a gift from Bill Walters. His gift, always the first million dollars or more for every Campaign and building project." (L. Smith. Ltr. at 1). "He gives with breathtaking decisiveness, his keen eye across the finish line and on to the next project." (*Id.* at 2). More than his personal financial contributions and herculean fundraising efforts, Mr. Walters rolls up his sleeves to help projects cross the finish line, channeling his business expertise and negotiating skills into whatever needs to be done, such as helping to manage Opportunity Village's relationship with local government, securing approval and funding for new projects, and negotiating a favorable land lease for Opportunity Village's new campus. (*See* Morrissey Ltr. at 1-2; E. Guthrie Ltr. at 1). He also inspires others to lend their particular talents to the community. (*See, e.g.*, Grant Ltr. at 1 (describing how "when some issues arose with Board politics" and he was thinking of resigning, Mr. Walters "made a special trip to [his] office to convince [him] to stay, reminding [Mr. Grant]

---

[10]    *Project Enable*, Opportunity Village (2017) *available at* https://www.opportunityvillage.org/pages/enable-1.

that it was ALL about the families" Opportunity Village serves and nothing else); Brown Ltr. at

1 (describing how Mr. Walters called him after his newspaper was sold and he found himself

unemployed to "plant[] the seed that would become [his] new job" as CEO of Opportunity

Village); Gold Ltr. at 2 (describing how as an "early 'pioneer' in digital media [and] marketing,

[Mr. Walters] saw that [Mr. Gold] could bring [his] talents to bear" on Opportunity Village and

invited him for a tour; shortly thereafter Mr. Gold accepted an invitation to join the board)).  Mr.

Walters "has been there consistently through the years, and is always ready to help when asked."

(OVFF Ltr. at 2).  "Throughout the year [Mr. Walters] would also speak at various Opportunity

Village engagements," (Hill Ltr. at 2), and he and his family would regularly volunteer at

Opportunity Village events, (Alderucci Ltr. at 2).  He would also provide business advice and

would reach out to his social networks such as hotel and casino operators to encourage them to

employ Opportunity Village's clients and utilize Opportunity Village's business offerings, like

its paper shredding or its gift bag service.  (*Id*; Santo Ltr. at 1).

> b.    Mr. Walters has increased awareness of Opportunity Village.

Mr. Walters has "worked tirelessly and [taken] on the tremendous responsibility

of connecting new people with Opportunity Village, explaining the mission and personally

giving tours of the facility in an effort to increase awareness for Opportunity Village."

(Newburg Ltr. at 1).  "[E]very year he ran full page ads in the newspaper encouraging the

community to support Opportunity Village and its mission."  (Massi Ltr. at 1).  He brought many

new donors to Opportunity Village over the years; "[s]ome were celebrities and others were just

folks that he thought needed to become involved . . . ."  (E. Guthrie Ltr. at 2; *see also* Alderucci

Ltr. at 1-2).  And he has "encouraged people to stand face-to-face with the clients [Opportunity

Village] serve[s].  His efforts [have done] a world of good in 'normalizing' visitors' expectations

17

and experiences. Bill understands that people are simply people, no more and no less."
(Alderucci Ltr. at 2).

A friend of Mr. Walters, Mike Gottfried, recalls taking one of Mr. Walters' tours
and seeing how "the clients [knew him] by name and [how] many came up to him and gave him
a hug. [Mr. Walters] knew most of them by name and it was clear that he really cared about
them." (Gottfried Ltr. at 2). Numerous letter writers describe their personal experiences with
Opportunity Village from their decision to donate or volunteer, or to go further and join the
board, affirming the significant impact Mr. Walters' dedication to the organization had has on
raising awareness and advancing its mission. (*See, e.g.*, Colbert Ltr. at 2 and Mooney Ltr. at 1
(both of whom Mr. Walters inspired to become donors); Dahlstrom Ltr. at 2 and Hill Ltr. at 2
(both of whom Mr. Walters encouraged to volunteer at the Opportunity Village Christmas
fundraising event); Gold Ltr. at 2, Poster Ltr. at 1, Ruthe Ltr. at 1 (all of whom Mr. Walters
inspired to join the board of Opportunity Village); Santo Ltr. at 1 (whose sons Mr. Walters
encouraged to volunteer with Opportunity Village); F. Smith Ltr. at 2 and Stutts Ltr. at 1
(describing the profound impact visiting Opportunity Village had on them); Watts Ltr. at 2 (who
has also been a donor to Opportunity Village); *see also* Suntha Ltr. at 2 (who credits Mr.
Walters' conversations with his daughters about Opportunity Village and its impact with shaping
their "understanding of the impact of philanthropy.")).

Mr. Walters has often declined media overtures throughout the years but when
"60 Minutes" wanted to do a feature on him, he agreed only if they would also feature
Opportunity Village in the program. "Following that airing, Opportunity Village's now national
recognition [resulted] in the growth of [its] donor base and the development of alliances with
organizations on similar paths." (OVFF Ltr. at 1).

18

One such organization is the Guthrie Opportunity (GO) Center Foundation, whose mission is similar to Opportunity Village's. The alliance came about when a mutual friend introduced Pat Guthrie, a board member of the GO Center, to Mr. Walters, describing him as the "guardian angel" of Opportunity Village. Over time, Mr. Guthrie came "to learn that, due in large part to the significant business expertise and financial support provided by Bill and Susan Walters, [Opportunity Village] has become the 'gold standard' for programs like" the GO Center to emulate. Echoing a common refrain among those who have reached out to Mr. Walters over the years, Mr. Guthrie originally sought out Mr. Walters in the hopes of advice and counsel only to be met with what would become a long-term, meaningful exchange. To Mr. Guthrie's "amazement and eternal gratitude, upon hearing what [he was] trying to accomplish on behalf of the special needs population in [their] small community back in Kentucky, Bill responded with a level of enthusiastic support that was not only unexpected, but was beyond [their] wildest hopes. [Mr. Walters] immediately made phone calls on [Mr. Guthrie's] behalf to set up meetings in Las Vegas for [them] to meet with [Opportunity Village's] management team . . . in order to share their philosophies and business practices . . . ." Mr. Walters then "took time out of his busy schedule to attend [those meetings] personally," and so began a "mentorship relationship between [Opportunity Village] and the GO Center that . . . has continued to this day. The value of the relationships that have been forged, and the knowledge that [the GO Center has] gained from the doors that Bill Walters opened for" Mr. Guthrie have been, in his words, "immeasurable." Always going above and beyond, Mr. Walters also flew to Kentucky to be a keynote at the GO Center's annual fundraising gala and to tour their facilities and offer advice and guidance on their programming. Mr. Walters' "background as one of the key architects of one of the most successful programs of its kind in the world, immediately put the GO Center on

19

the map in an area where it had existed in relative anonymity for 35 years." (P. Guthrie Ltr. at 1-3).

        c.    <u>Mr. Walters has contributed significant time, attention, and energy to Opportunity Village as well as the broader communities it serves.</u>

Mr. Walters has shown an unwavering commitment to assist the individuals at Opportunity Village on a personal level, deploying his business experience, social networks, and financial resources to expand Opportunity Village's reach, as well as foster a culture of respect and dedication to the individuals that benefit from those efforts.

The Walters Group "hired individuals from Opportunity Village throughout the year for various services" and Mr. Walters "created a culture" within The Walters Group of supporting Opportunity Village, and "inspir[ing] others to do the same," such as the "company-wide initiative to volunteer at Opportunity Village events in December," when it is otherwise more difficult for Opportunity Village to find sufficient volunteers, and in which "the majority of [the] company participated," including Mr. Walters. (Hill Ltr. at 1-2; Alderucci Ltr. at 2). One of his employees recalled the impact of seeing Mr. and Mrs. Walters at an Opportunity Village fundraiser, "front and center selling tickets outside in the cold. They were the first ones there and some of the last to leave." (Dahlstrom Ltr. at 2; *see also* Alderucci Ltr. at 2; J. Wright Ltr. at 1).

Cary Alderucci, Director of Fundraising at Opportunity Village, who has known Mr. Walters for eighteen years, describes how "Mr. Walters was a huge surprise to [her]. His incredible focus on the people Opportunity Village served was eye-opening." She had "never seen a supporter have such a connection to people with disabilities . . . . [M]ost people avert their eyes, walk away, generally ignore or worse, point and laugh. Instead, Mr. Walters wholly

embraced them both figuratively and literally." (Alderucci Ltr. at 1).[11]  That sentiment is echoed

by Bob Brown, the current CEO of Opportunity Village, who watched Mr. Walters tour

Opportunity Village over the years, "always taking the time to talk with disabled clients,"

treating them with "dignity and humanity . . . . Today if Bill walked into the work center at

Opportunity Village there would be an audible screech for joy.  An old friend has come to visit."

(Brown Ltr. at 1; *see also* Poster Ltr. at 1 ("I have seen him go to their facilities (which he does

often) and watched how the faces of those who come there for therapy all light up when they see

Bill among them personally helping them with their jobs."); Paul Ltr. at 2 ("Their faces would

light up when he entered a room and they would hug him as he greeted them by name.")).

At every turn, Mr. Walters has championed those with special needs, doing

whatever he can to help them succeed.  An old friend of Mr. Walters, Dr. Hugh Greenway,

provides one small example.  While playing golf at their club, members were having difficulty

placing an order at a snack shack because the employee, who has some intellectual disabilities,

struggled with taking orders over the phone.  While some members had "raised the question

whether he was the right person for the job . . . Bill recognized the situation and very quietly in

his own way worked with the manager so that in addition to calling, members would also write

down their orders, which was helpful to this young man."  Dr. Greenway never overheard Mr.

Walters telling anyone what he'd done, he only knew because he eventually asked Mr. Walters

directly if he'd had anything to do with the change in practice.  What Dr. Greenway does recall

---

[11]     Ms. Alderucci shared one particular anecdote illustrative of the personal connections Mr.
Walters makes with the individuals of Opportunity Village.  One gentleman, ███████, is "one of
Mr. Walters' favorite people . . . ."  He has ████████████████
████████████████████████████.  When one of his prized
possessions, a pocket watch with a Barney picture, broke, he was heartbroken, but his family
could not afford to replace it.  "A simple word to" Mr. Walters, and "a new watch was ordered . .
. ."  (Alderucci Ltr. at 1).

hearing were Mr. Walters' comments in support "of this young man and how he was doing a good job." (Greenway Ltr. at 3).

For all of his work on behalf of Opportunity Village, Jan Jones Blackhurst presented him with "Philanthropist of the Year" during her tenure as Mayor of Las Vegas, (Blackhurst Ltr. at 1), and Opportunity Village itself honored him at its Black Tie Gala in 2012, (Newburg Ltr. at 1). While a building bears his name and many are aware of his involvement with Opportunity Village because of his enthusiastic advocacy on its behalf, Mr. Walters remains humble about his actual contributions. John Grant, who served on Opportunity Village's Board of Directors, described how while his board position afforded him the opportunity to see "firsthand Billy's dedication and insight in addressing the challenges these families have . . . [w]ithout question, [the] Board members don't really know the total amount Billy has donated over the years. Billy has always done it without his name being at the forefront." (Grant Ltr. at 1). And as Pat Guthrie summarized: "[i]n the many conversations that [he has] had with Bill over the intervening years since meeting him, he has never spoken of, or taken credit for, the role that he has personally played in changing the industry of serving people with intellectual disabilities. In fact, whenever [Mr. Guthrie has] tried to thank him for the incredible difference he has made for the GO Center back in Kentucky, he has downplayed his role, and has consistently made a point to applaud [Mr. Guthrie's] efforts . . . ." (P. Guthrie Ltr. at 2).

But Mr. Walters' legacy speaks for itself. Through his commitment to Opportunity Village, Mr. Walters "has given thousands of youth and adults with severe intellectual disabilities an opportunity to have the sense of pride and purpose that comes from earning a paycheck. He has also given the families that love and support these youth and adults a sense of hope for a better tomorrow." (E. Guthrie Ltr. 2). "His generosity of spirit, mind and

wherewithal have enabled this organization to become one of the most respected habilitation organizations of its kind." (Alderucci Ltr. at 2).

      2.    *In addition to Opportunity Village, Mr. Walters has championed many other worthy causes.*

Mr. Walters' commitment to worthy causes is not only profound and sustained, as demonstrated by his work on behalf of Opportunity Village, but also extends far and wide, touching many different lives. He is a willing champion of many other causes in his community and beyond. (*See, e.g.,* Weinberger Ltr. 1-2 ("he has never turned me, my wife or, to my knowledge, any legitimate charity down for a donation . . . . Virtually every charity event we attend in town, and there are many, has a page in its program donated by the Walters Companies. Often we see Bill and his wife, Susan, providing further support by attending"); Santo Ltr. at 1 ("Any time I got involved with a charity, Bill Walters was already involved"); Thayer Ltr. at 2 (who as his CFO witnessed how Mr. Walters was "regularly contacted by non-profit organizations to donate to their cause, and he always found a way to assist them . . . .")).

      a.    <u>Mr. Walters has been extremely active and hands-on in his support of other charitable efforts.</u>

While his friends and family note Mr. Walters' willingness to always say yes to a worthy cause, it is the ease, immediacy and personal, hands-on involvement of his generosity that truly sets him apart. Once he has taken up a cause, he is a sustained and active advocate, "a man of action with a heart of gold." (E. Guthrie Ltr. at 1).

Pastor Bob Perry, who first met Mr. Walters in the summer of 1989, recalls how when he moved to Las Vegas from Dallas, Texas in 1991 to start a church, Mr. and Mrs. Walters became consistent and generous supporters for fifteen years from the day he arrived. While their financial support was "vital," what is most notable is that "[m]ost of their donations were instigated by [Mr. Walters] – there are many people who will answer [Pastor Perry's] call and

make a donation if [he] asked, but Mr. Walters would reach out to [him]. He would call [Pastor Perry] after driving by the church and ask [him], 'what do you need? You're a church, you must need something.'" Furthermore, it was their "compassionate attitude and willing spirit to always give of themselves through volunteering and personally being involved" that Pastor Perry thought most important. In his 28 years as a pastor and international missionary, he has "met tens of thousands of people from many different nations and cultures" but never a couple who could "match the compassion, sincerity, willingness to give of themselves and integrity of Billy and Susan Walters." (Perry Ltr. at 2). Others echo Pastor Perry's sentiment. Matt MacConnell, the head of the Madison Club where Mr. Walters is a member, facilitates the club's charitable foundation. Mr. Walters is "always the first to support [their] many charitable causes" and where Mr. MacConnell might have to chase other members for six months to get payment on a charitable commitment, Mr. Walters always makes it easy, donating right away. (MacConnell Ltr. at 1).

Perry Rogers, former Chairman of the Andre Agassi Foundation, which runs a public charter school for at-risk children, recalls asking Mr. Walters "to come to the school and tour the facility. When [they] were done with the tour, Bill asked how he could help. [Mr. Rogers] asked him if he would consider making a donation for a classroom. A few weeks later, Bill sent the first check of a $250,000 donation." Despite his donation and in light of Mr. Walters' well-known involvement with Opportunity Village, Mr. Rogers felt it was "worth noting that Bill never asked Andre [Agassi] or [Mr. Rogers] to support Opportunity Village. [The Walters] didn't look at their support of the Agassi College Preparatory Academy as a favor that needed to be returned. They simply helped the community where they believed that it

24

needed help. [Mr. Rogers expressed how he has] such respect for Bill, and the way that he helps

others." (Rogers Ltr. at 1; *see also* Agassi Ltr. at 1).

Frank Schreck, a friend of Mr. Walters for many years, similarly recounts how

when the Nathan Adelson Hospice learned they would not be receiving the financial

commitment necessary to put on their fundraising event as planned Mr. Schreck prepared a pitch

for Mr. Walters in order to solicit funds, but when they got on the phone he said no more than a

few words before Mr. Walters cut him off, offered to donate, and sent the necessary funds.

(Schreck Ltr. at 2). Heather Murren, co-founder of the Nevada Cancer Institute to which Mr.

Walters was a founding donor, explains: "Mr. Walters [is] unique in that his philanthropy and

generosity is not about glory but about ensuring an impact on those in need. His service can be

matched by very few individuals." (Murren Ltr. at 1).

It is not just that Mr. Walters is a willing participant and eager supporter when the

opportunity arises. He is often a founder of philanthropic endeavors or plays a major role in their

inception, helping nurture others' charitable visions. For example:

- Mr. Walters envisioned and brought to life the Caregivers Ball, an annual event that
  lasted roughly a decade. He asked different charities in Las Vegas to "nominate one
  of their caregivers and then a committee would evaluate the nominees and [he would]
  host an evening" in their honor, recognizing one in particular as the "Caregiver of the
  Year." The event brought together many community leaders to celebrate these often
  unsung heroes. (S. Walters Ltr. at 2). Friends of Mr. Walters who attended over the
  years recall how it was done "without fanfare," (L. Smith Ltr. 2; Greenspun Ltr. at 2),
  "[j]ust simply a day to say thank you for [these individuals'] service to mankind." (L.
  Smith Ltr. at 2).

- After the Walters decided that their Thanksgivings and Christmases would be
  dedicated to helping others, they spent the next decade "provid[ing] Thanksgiving
  dinner for . . . orphans . . . [and] gave the kids a catalog to choose Christmas gifts . . . .
  Bill made sure each child got the exact gift he or she wanted." (D. Hash Ltr. at 2).
  Lisa Thayer, who worked as the Chief Financial Officer at The Walters Group,
  "fondly recall[s] Christmases in which [Mr. Walters] personally shopped up and

25

down the aisles of the toy stores for the exact items off the 'wish-lists' of foster children and other children in need, making detailed efforts to ensure that each child would receive a gift that would put a smile on his or her face" and how he would "read and re-read" any thank you notes the children sent to their "Secret Santa" aloud to her and Susan. (Thayer Ltr. at 2).

- When Mr. Walters was inducted into the Las Vegas Golf Hall of Fame in 2013[12] for his success in golf and his support of the community at large, he took the opportunity to create a scholarship fund for graduating Las Vegas high school students to go to college, "even though inductees are not required to make any sort of donation." (Hurlburt Ltr. at 1; *see also* Bombard Ltr. at 2).

- As committed animal lovers, Mr. and Mrs. Walters sought to create a non-kill animal shelter in Las Vegas; finding no community support, they started one themselves. (Colbert Ltr. at 2). The Walters have also endowed scholarships for veterinary students in exchange for their commitment to work for a period of time on behalf of animals in Las Vegas shelters after graduation. In addition, they supported the Animal Foundation's construction of a dog adoption park. (Gale Ltr. at 1; Colbert Ltr. at 2).

- Mr. Walters helped his friend Jim Colbert bring the PGA Tour to Las Vegas, creating "the first million-dollar charity golf tournament in the world in 1983." As founders, Mr. Walters and Mr. Colbert secured the commercial sponsor for the tournament as well as 1000 amateur sponsors. Their efforts were all voluntary and the tournament persists today. The first tournament saw the donation of large medical equipment to local hospitals and the endowment of a scholarship for the men's and women's golf teams at the University of Las Vegas. In addition, Mr. Walters and Mr. Colbert worked together to start the First Tee program in Las Vegas, which "teaches underserved children life skills through the sport of golf." The chapter they started is now "one of the largest and most successful in the country." Mr. Walters was also "active in starting a [First Tee] chapter in the Palm Springs area and has both fundraised and helped mentor First Tee kids there." (Colbert Ltr. at 1-2).

- "When the City [of Las Vegas] wanted to launch an outreach campaign to put more police on the streets, Bill volunteered to fund an initiative to educate the public on the benefits of increased policing." (Blackhurst Ltr. at 1).

- In 2000, Mike Gottfried, a former head football coach and on-air analyst for ESPN, started Team Focus in Alabama; a "year-round mentoring and leadership program for

---

[12]    *See also* Las Vegas Golf Hall of Fame, Bill Walters, Class of 2013, *available at* http://www.lasvegasgolfhof.com/-bill-walters.

fatherless young men between the ages of 10 and 18." While trying to establish a chapter in Nevada he flew out to Vegas for a series of meetings but left disappointed. "[He] arrived back in Mobile on a Saturday [and on] Sunday morning [he] received a phone call" from Mr. Walters, who had heard Mr. Gottfried was in town looking for help. Mr. Walters asked Mr. Gottfried what he was trying to start and Mr. Gottfried explained. Mr. Walters asked how much money he needed and when Mr. Gottfried answered Mr. Walters simply replied: "You got it." He sent a check the next week. "Without the help of Bill Walters, [Team Focus] would not have been able to reach over 900 fatherless young men in Nevada" whom they have mentored year-round at no cost to their guardians. But more than his donations, Mr. Walters speaks to the participants and is "invested in helping [them] overcome their circumstances. He spoke on being a leader and doing it the right way. One of [the] young men . . . wrote a letter to Mr. Walters that his speech that day changed his life. He decided to go to college and join the National Guard. He is now 25, graduated from college . . . [and] works in law enforcement[.] [He] just bought his first house." (Gottfried Ltr. at 1-2).[13]

- When Heather Murren decided to co-found the Nevada Cancer Institute to bring advanced treatment options to patients in Nevada, Mr. Walters donated money to help make the Institute possible and worked to raise additional funds on its behalf as a sustained and active donor. (Murren Ltr. at 1).

Brenda Rice, the Founder and President of The Lexington Cancer Foundation, of which the Walters have been one of the largest donors since they first became involved, reflects on how board members often talked about starting an endowment but never committed to the idea. When Mr. Walters heard about this during one of the Foundation's events, he began raising money right there and then. "He went table to table soliciting commitments, and [the]

---

[13]    Daniel Woodbury, the young man Mr. Gottfried mentions, also wrote a letter describing the impact Mr. Walters' message had on his life; in his words: "Bill Walters was one of our main speakers at the camp and I still recall his message of growing up without his father and the motivating words he had to make a plan and go for it. He taught us how to be a leader and strive for excellence. Even though he was speaking to a group of sixty of us, I felt like he was talking right to me. He had it tough growing up, but he chose to not feel sorry for himself and instead became extremely successful. He showed us that he could have been sitting right where we were many years earlier. He was just like us. He encouraged us. I made it a point to talk to him when he was through speaking. I told him I was so excited about all that he said. I could tell that he truly cared about my future. Although I only interacted with Bill that one time, I have looked back on our conversation numerous times throughout my life and it has motivated me to keep working hard to achieve my goals." (Woodbury Ltr. at 1).

KL3 3131011.1

endowment now exceeds $1.5 million." (Rice Ltr. at 1). Likewise, when Mr. Walters'

restaurant, Cili, was the location of a luncheon to benefit Nevada Legal Services, Mr. Walters

was in his office and previously unaware of the benefit. Upon learning that it was taking place

he "immediately offered to pay for the lunch so the additional funds they raised could help more

people in need with their legal fees." (Wilson Ltr. at 1).

  Friends often marvel at how Mr. Walters discovers when and where there is a

need and finds ways to assist. For example, J. Jay Brunza volunteers for a small "'mom and

pop' charity called City of Refuge that helps homeless vets and inner city families in San Diego"

and would "regularly collect[] clothing donations from Billy and other friends. Billy took an

interest in the charity and discovered on his own their need for some imminent financial support.

When [Dr. Brunza] picked up clothing donations from him the next month, [Mr. Walters] very

quietly and without any financial solicitation on [Mr. Brunza's] part, handed [him] an envelope.

That envelope contained an unbelievably generous donation that resolved their financial housing

crisis and prevented [its] closure . . . ." (Brunza Ltr. at 1). Similarly, when Mr. Sandoval was

organizing a fundraising campaign for Together for Charity, a nonprofit that helps orphans in

Mexico, he was struggling to reach his fundraising goal. Mr. Walters reached out to his

"extensive network to ensure that contributions were made because he believed in what

[Together for Charity] was trying to accomplish." Mr. Sandoval was surprised because this was

entirely unsolicited. Mr. Walters had simply heard Mr. Sandoval talking about it in passing "and

proactively provided support." (Castaño-Sandoval Ltr. at 2).[14] As with his efforts on behalf of

---

[14]   Doug Hash, a friend who has known Mr. Walters for 50 some years, explains how when
he worked at the Southwest Christian School, "before [Mr. Walters] became the big success he is
today, [Mr. Walters] once sent [him] a check for $12,000 [and] told [Mr. Hash] to use half the
money to fund the athletic program and the other half to help needy students. [Mr. Hash] did not

Mr. Sandoval, Mr. Walters is often willing to reach out and encourage support for charitable causes amongst his network. As retired Clark County Sheriff Bill Young recalls: "Years ago I put together a fundraiser for Children of the Night, an organization that helps rescue children who are involved in child prostitution. When I worked in law enforcement I saw them do a lot of good for children who had no place else to go. I told Bill about it and he not only contributed himself but reached out to friends on our behalf. In the end we raised about $350 thousand, largely from Bill working phones and talking to friends." (B. Young Ltr. at 1).

Mr. Walters has served on roughly eight charitable boards, including Opportunity Village and the United Way of Southern Nevada. (S. Walters Ltr. at 2; *see also*, Winckler Ltr. at 1). He has supported countless other worthy causes in addition to those previously mentioned, including:

- Team Aloha, to which Mr. Walters made donations as well as introductions when it first started, allowing them to assist many in need including terminally ill children on the outskirts of Las Vegas (Gomes Ltr. at 1);

- Nevada's first nonsectarian, nonprofit college prep, to which Mr. Walters helped "specifically with scholarship funding for low-income families and in providing hosting venues for many of [their] fundraising endeavors" at no cost (C. Goodman Ltr. at 1);

- Southern Nevada Golf for Kids and The First Tee, for which Mr. Walters solicited "donations of golf equipment (including clubs and clothing) from the community . . . and encouraged local golf courses to make their courses available so these organizations could host tournaments so less fortunate kids could play and learn the game" (Massi Ltr. at 2);

- The Public Education Foundation, for which Mr. Walters supported "efforts to mobilize private sector support for public education by helping provide material resources and scholarships to students and teachers in the Clark County School District;" and, Keep Memory Alive / the Lou Ruvo Cleveland Clinic for Brain

---

ask him for help, [Mr. Walters] just called [him] one day and offered the assistance. That is the kind of man he is." (D. Hash Ltr. at 1).

Health, which is "one of the best known research and care facilities in the country for people suffering from brain disorders" (Rogich Ltr. at 1);

- The Governor's Council on Holocaust Education, to which Mr. Walters has made financial contributions as well as donating golf and lunch packages (Weinberger Ltr. at 2);

- Scripps' Fellowship program, which trains physicians who want to specialize in skin cancer surgery (Greenway Ltr. at 2);

- Hope on Wheels, which raises substantial funds in the fight against pediatric cancer (Zuchowski Ltr. at 2);

- The Discovery Land Company Foundation, which raises money for local orphanages (Stutts Ltr. at 1);

- The Cancer Society; the Heart Association; the Meadows School,  (Bigelow Ltr. at 1).

- The National Boys and Girls Club of America (Shannon Ltr. at 2);

- Events for local police and other first responders that Mr. Walters hosts (Hill Ltr. at 2);[15] and,

- Fundraisers to support the military (Watts Ltr. at 2).

Even where it is not an institutional effort, Mr. Walters finds ways to give.  (*See, e.g.*, D. Hash Ltr. at 2 ("[W]e learned a church in Watts, California needed two new vans.  When Bill found out about it, he told me to give them a check for $32,000.00 to purchase [them]."); *see also* Perry Ltr. at 2 (Mr. Walters' unsolicited donations "paid for a van to use in outreach and to transport elderly parishioners [to church] one year, and another time they paid for a badly needed new carpet for [the] building.").

---

[15]    "Multiple times throughout the year, [Mr. Walters] would donate the use of [his] golf courses to the local police and other first responders for appreciation events at zero cost."  As Joshua Hill describes, he and other employees of Mr. Walters would advise against it because of the revenue they would lose but Mr. Walters "always insisted.  When asked why, he would reply 'they are the men and women that protect this community and do right by others, this is the least we can do.'"  (Hill Ltr. at 2).

b.    Mr. Walters' encourages and inspires friends, colleagues and many
others to give back as well.

Mr. Walters leads by example and many of his friends, family, colleagues, and

others describe the impact that Mr. Walters' commitment to charity has had on their own lives.

Linda Smith of Opportunity Village describes Mr. Walters' "single-minded belief

in the concept that all men have value, including the most neglected and misunderstood amongst

us," as motivation to her to "become a true champion for the disabled." (L. Smith Ltr. at 2).

Similarly, Pat Guthrie of the GO Center describes what a "privilege [it has been for him] to

observe and learn, first hand, the impact that one committed individual can make. Bill's

generous, selfless and humble devotion to go far out of his way to make life better for a segment

of society who have no voice of their own, has been an inspiring 'kick in the butt' to all of [the

GO Center's] board members to step up [their] own games and level of commitment." (P.

Guthrie Ltr. at 2).

When Michael Murphy, an auto dealership competitor, moved his business in

next door, Mr. Walters invited him to play a round of golf. Rather than try to dissuade Mr.

Murphy from competing with him in business, Mr. Walters encouraged him. During that first

game together Mr. Murphy disclosed that his "38 year old wife Margot had recently passed away

█████████████████████████████" prompting him to start a non-profit foundation

to serve women below the poverty line who are battling cancer. Mr. Murphy "voiced [his]

frustration to Bill that the nonprofit business was much harder than [he] ever imagined and told

[Mr. Walters] that [he] was considering closing [his] foundation. Bill greatly encouraged [Mr.

Murphy] to hang in there and to continue this philanthropic work, and later he sent [them] a

significant donation. As a result of [Mr. Walters'] encouragement the Love from Margot

foundation continues to grow each year . . . ." When Mr. Murphy later attended an Opportunity

Village event he was further inspired to deepen his own philanthropic commitment, opening a center for women in Oakland, California. (Murphy Ltr. at 1). Likewise, "[b]ecause of the example that Billy Walters has set in doing things to help others," Fred Smith has come out of retirement to start a foundation in his parents' names. (F. Smith Ltr. at 3).

People who have worked with Mr. Walters have been inspired by his commitment to his community and adopted the same practice in their own lives. For example, Haitham Fakhoury describes how Mr. Walters' encouragement led him to sponsor the Chino Hills Police and Fire Departments as well as the local high school football team and local kindergarteners. (Fakhoury Ltr. at 2). Madelena Castaño-Sandoval credits Mr. Walters with inspiring her "to do more" and now she and her husband play an active role with a non-profit that helps orphans in Mexico. (Castaño-Sandoval Ltr. at 2). Mitchell Epstein internalized Mr. Walters' lesson that giving need not be through financial contributions and he "joined the board of The Ranch Recovery Centers, a 104 bed facility for men and women who really need drug and alcohol treatment but cannot afford it," where he has served as Chairman for the past ten years. (Epstein Ltr. at 1-2).

C.    **Mr. Walters' Extraordinary Commitment to Helping and Supporting Friends, Family, Colleagues, Employees and Others**

Much like his institutional giving, Mr. Walters' dedication to individuals on a personal level is proactive and genuine. Over and over again the people in Mr. Walters' life recount the same sentiment:

- "There wasn't a single time that we spoke in person or over the phone in which he didn't ask how my family was doing and if there was anything he could do to help us. And that goes for others as well, every phone call I had ever heard him take always ended with him asking 'how are you doing, anything I can do to help.'" (Hill Ltr. at 2).

- "[T]rue to Bill's character he would also ask how I was doing, was everything going alright with me. Bill would always end his conversations with thank you and take care." (Newburg Ltr. at 2).

- "Each time I see Bill or visit with him his first questions are always about [my family]. Our visits never end without him saying 'anything I can ever do for you or your family please let me know.'" (Hardy Ltr. at 1).

- "Over all the years he would always end our conversations by making sure there was nothing he could do for me or my family. I have never forgotten that." (MacConnell Ltr. at 2).

- "Throughout my parents' illnesses, Bill always made time to come see them whenever he visited Kentucky, and always let us know that if we needed anything he was there for us and he was!" (Kern Ltr. at 2).

Time and again, Mr. Walters followed through on his offers of assistance. As Carole Cottner, who was married to Mr. Walters in his 20s, explains: "Bill is very free hearted, he'd give you the shirt off his back and he'd be there to help. When he was younger in the car business, he had a list of people going all the way down who owed him money and never paid him back. He was always generous." (Cottner Ltr. at 2). Desiree Young, who worked for Mr. Walters at The Walters Group for twenty-one years and handled payments for him, recalls how, because she "wired money for Bill, [she] would . . . see friends of his that had troubles and would call needing money and he would give it to them. He has always helped friends and their families who are ill or need help." (D. Young Ltr. 2). That is affirmed by letter writer after letter writer who came forward to describe small, personal acts of extreme generosity that changed the trajectories of their lives, often unsolicited and unexpected. As his friends of many decades recount, "anyone can love you when the sun is shining, but the storms are when you learn who truly cares for you. Billy is the type of man that is proud to walk with you and be by your side no matter where life's storms may take you." (F. Smith Ltr. at 3; *see also* Ruthe Ltr. at 2 ("If Bill is your friend he is your friend during the good and bad times.")).

1.    *Friends, family, colleagues, and employees repeatedly describe how Mr. Walters was there for them during difficult times in their lives.*

In difficult moments in their lives, friends, family members, colleagues, and employees have all found a champion in Mr. Walters. The stories highlight his sense of intuition and the decisive and unqualified way in which he offers support, follows through, and remains committed. Mr. Walters "always [makes] sure his employees, his friends and their respective families [are] taken care of. And if they [are not], he would stop what he was doing, make a phone call and get the problem fixed." (Hill Ltr. at 2).

Jim Hardy had been Mr. Walters' golf instructor for three years when in the summer of 2012 ███████████████ . Mr. Walters sensed he was in distress while they were practicing one day and when they had a moment alone Mr. Walters asked him what was wrong. Mr. Hardy describes a patient, earnest man who sat there with him in his time of need and really listened:

> How he read me so quickly I don't know, but his concern was so genuine that I opened my heart to him. ████████████████████████
> ██████████████████████████████████
> ██████████████████████ Bill
> listened to me and when I finished he quietly said, 'I think I can help.'

During that conversation Mr. Walters called another friend he thought could be a resource and put Mr. Hardy on the phone. Mr. Hardy and his wife connected with Mr. Walters' friend again shortly thereafter and ████████████████████████████████████
████████████████████████████████████
████████████████" Mr. Walters recognized that the summer was difficult for the Hardys ████████████████████████████
████████████████████ so Mr. Walters would "call weekly to check

34

on" Mr. Hardy and his wife. Sensing the strain they were under, the Walters invited the Hardys
to come to their home in San Diego for a vacation. (Hardy Ltr. at 1).

           Dr. Hugh Greenway is a practicing physician at Scripps Clinic in San Diego and
has been a friend of Mr. Walters for over 25 years. He has also been Mr. Walters' physician, but
"without fail, during a visit [Mr. Walters] is often more interested in how to help someone else
who is experiencing a significant health issue, either a friend or simply someone about whom he
is aware. [Mr. Walters] will often ask [Dr. Greenway] to check on or look for anything he might
offer to help (respecting privacy and the various privacy regulations of course). He really wants
everyone to be happy, healthy, and successful." (Greenway Ltr. at 1). That is evident in the
many accounts of friends for whom Mr. Walters has provided comfort and support in a time of
medical distress:

- Dr. Greenway himself remembers when a friend of Mr. Walters ███████████
  ███████████████, Mr. Walters asked Dr. Greenway to help get her in to see
  someone in Scripps' Radiology Department, which he did. "████████████
  ████████████████████ . . and to see if she needed anything." (Greenway Ltr. at
  2).

- Similarly, Dr. Mohan Suntha, a practicing radiation oncologist and friend of Mr.
  Walters for a decade, has also received a number of phone calls from Mr. Walters
  seeking to help family and friends in need. He "vividly recall[s] the compassion [Mr.
  Walters] demonstrated as he advocated for the healthcare needs of others. The first
  call came a few weeks after [they] met, when ████████████████████ was
  given the diagnosis ███████████. Bill was willing to consider any
  option that provided ████████ with the best possible care, and a chance at both
  quality and quantity of life . . . . [Dr. Suntha] often quote[s] Bill to [his] patients as
  [he] recall[s] that he said . . . 'cancer is the great equalizer, it doesn't care how much
  money you have, what race you are, or where you live, it is an equal opportunity
  killer'. [Mr. Walters] proceeded to expend time, money and emotional support to
  ensure that she received care that provided her family with the comfort of knowing
  that everything that could be done on her behalf had been." (Suntha Ltr. at 2).

35

- When one of Mr. Walters' auto dealership partners, Jared Gaiennie, ██████████
███████████████████████████████████████████ When Mr. Walters found out about
████████████████████████████, Mr. Walters immediately
flew to Lexington, Kentucky to be with him. Mr. Gaiennie recalls being touched to
wake up and unexpectedly find Mr. Walters at his bedside. ████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████" (Gaiennie Ltr. at 1-2).

- Another friend of fifteen years, Chad Mooney, ██████████████████████████
███████████████████████" which Mr. Mooney never asked him to do; it was
something Mr. Walters offered from the "goodness of his heart." (Mooney Ltr. at 1).

- Many times the Director of Golf Operations for the Walters Golf Company, Joe
Kelly, has seen "medical or financial hardship affect a dedicated employee and each
and every time Mr. Walters was always first in line to help ease the pain and suffering
that they were facing." He experienced this personally when five years ago ████████
████████████████████████████████████. "Bill was one of the first phone calls
[Mr. Kelly] received directly after [Mr. Walters] heard the news. ██████████████
███████████████████████████████████████████████
██████████████████████████" (Kelly Ltr. at 2).

- When Mr. Walters learned ██████████████████████████████████who
was recently married and had a young child ████████████
████████████████████ "he was quick to provide them with their last vacation as a
family, as well as compensation as they spent their final moments together. Mr.
Walters gave them a new vehicle to use on their trip, paid for the vacation, and also
paid this employee's full salary while he was away tending ██████████." (Stahl Ltr. at
1).

- When Theresa Weston discovered that her ██████████████████, she had just
started working for Mr. Walters. Though they barely knew one another, "he pulled
[her] aside, comforted [her] with his compassionate words and offered any help he
could give ███████████████████████████████████████████████.
He reassured [her] that all would be fine with [her] new job and encouraged [her] to
take off any time needed ██████████████." (Weston Ltr. at 1).

KL3 3131011.1



- Jason Wright, another employee, recounts how Mr. Walters called "almost every day when ███████████████████████████████████████████. He would constantly call for updates on him and to see if [Mr. Wright and his wife] needed anything personally." A few years later ███████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████" Mr. Wright mentioned his frustrations to Mr. Walters one day when Mr. Walters noticed he seemed distracted and asked him if something was bothering him. Mr. Wright explained the situation and Mr. Walters asked for ██ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████" (J. Wright Ltr. at 1-2).

- In 2008, an old friend, Randy Peterson, was going through a divorce and felt "uncertain about the future." He "leaned on Billy numerous times for advice and guidance." They talked "hundreds of times that year and [Mr. Walters] was always there for [Mr. Peterson], always had time to listen and offer his unique wisdom." Mr. Walters would "call[] consistently to see how things were going and constantly sent messages of encouragement . . . ." Later in the year ██████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████. Mr. Walters offered to pay for whatever Mr. Peterson needed ████████████████ so Mr. Walters offered support in other ways, checking in on Mr. Peterson, offering to take care of his daughters ████████████, and offering to bring Mr. Peterson food. Mr. Peterson described how he was "grateful for [Mr. Walters'] concern and support. But [he] wasn't the least bit surprised by it." Mr. Walters was just being the friend he'd always been. (Peterson Ltr. at 1-2).

- In 2011, Lance Gill learned ████████████████████████████████████ ████████████████████████████. One day while playing golf together, Mr. Walters sensed there was something wrong. Mr. Walters prodded and finally Mr. Gill disclosed that ██████████████████████████. Mr. Gill described how Mr. Walters listened to him patiently all through a round of golf and truly seemed to care about his family. Mr. Walters offered to pay for all of ██████████████ which was ultimately unnecessary so instead Mr. Walters offered to buy Mr. Gill a home in upstate New York so he could be closer ████████████. Mr. Walters "had found out about the house from

one of [Mr. Gill's employees] and offered to buy a place for [his] family to be together and relax, one that [he and his family] would never be able to afford on [their] incomes." Mr. Walters' compassion for others runs so deep that when he returned from trial in New York, "which was devastating to [Mr. Walters] and his family, [he] sat down with [Mr. Gill] privately and [the] first words out of his mouth were 'Lance, what happened to me in NYC this last week is very painful, but what I want to know is this, how is ████████? Because what she is dealing with is tragic . . .'" As Mr. Gill summarized, "Bill Walters took time out of his intense and difficult journey over the past five years to make sure that [Mr. Gill] knew that [his] journey of intensity and difficulty was not being overlooked. That is simply not seen in this world anymore. People are out for their own good and often pay lip service to serious life events . . . . [Mr. Walters] not only gave true care and devotion, he backed it up with acts of love and kindness." (Gill Ltr. at 1-2).

- In 2010, one of Mr. Walters' caddies, Bob Treitler, discovered ████████ ████ "When Mr. Walters became aware of this, he reached out and made sure if there was anything [Mr. Treitler ████████] needed he was there for them . . . . The same generous offer of support by Mr. Walters was repeated in 2012, when [Mr. Treitler] had ████████ ████████." On neither occasion did they end up needing financial support but "knowing that anything [they] needed (especially financial help) was available . . . made the process much easier on [them]." (Treitler Ltr. at 1-2).

- When Fred Smith's ████████ ████████, there was not a single week that went by [that] Billy and his wife Susan didn't call or visit. ████████ ████████ . . . . There is not a text or phone call that Billy and [Mr. Smith] have, no matter what is going on in his own life, that Billy doesn't ask about ████████ and let [him] know she's in his prayers." (F. Smith Ltr. 2).

- In 2015, Marius Telehoi, an employee at one of Mr. Walters' dealerships, ████ ████ When Mr. Walters found out, he called Mr. Telehoi and told him not to worry about anything. He also "told everyone at the dealership they were not to email or call [Mr. Telehoi]" and had his email blocked for the week so Mr. Telehoi could relax. ████████ (Telehoi Ltr. at 1).

- Mr. Walters "personally paid for ████████ [that his] golf course chef could not afford." (A. Wright Ltr. at 1).

38

- When his friend Chuck Ruthe ███████████████████████ Mr. Walters
  called him as soon as he learned to ask "if there was anything that he could do for
  him. Bill then called [Mr. Ruthe's wife] to ask [her] if there was anything that he
  could do and wanted to know how [she] was handling everything . . . . ██████
  ████████████ and invited the Ruthes to stay at his home when they had to travel from Las
  Vegas to California ████████." (Ruthe Ltr. at 1-2).

- The ████
  ████████████████████████████████████████████████. His
  parents discovered ████████████████████████████████ When Mr.
  Walters learned they hoped to provide ██████████ he offered his
  support and within 24 hours had found them ████████████████████████
  ████████████. (Martinez Ltr. at 1).

    Where people's lives are in distress because they are going through a divorce, or

their businesses are falling apart, or their homes may be foreclosed, Mr. Walters is ready to lend

a hand, providing the necessary resources, from financial support, to advice, to connecting

people with others who can help, to simply staying involved with an open heart and willing ear.

When the wife of a friend, Paul Vizanko, lost her business and was "being harassed by the

landlords, debt collectors, and vendors" she was "overwhelmed and on the verge of a nervous

breakdown, and it was a huge financial strain on [Mr. Vizanko's family] and [his] marriage."

Mr. Walters heard through a mutual friend what was happening. Mr. Walters reached out to see

how he could help. They were facing bankruptcy and their marriage was strained, but Mr.

Vizanko credits Mr. Walters' encouragement and reassurances that everything would be alright

as saving his family. Mr. Walters also helped "organize[] and pa[y] for legal counsel for [them]

so the harassment would stop" and the lawyers helped the Vizankos to get "back on the right

track financially . . . . Bill continues to check in on [them] to see how [they] are doing – even

recently while he was going through his own troubles." (Vizanko Ltr. 1-2).

When Marla Letizia and her husband were on the verge of losing their business they reached out to Mr. Walters for help. The Letizias co-owned a PR/media agency and in 2011 they "ran into a financial bind and needed a ███████████ loan to keep [their] business afloat." When they sat down with Mr. Walters to explain the situation he agreed to the full amount – ██████ – on the spot, without question. The loan saved their business and "gave [them] and [their] employees peace of mind. [They] had roughly 120 employees who would have lost their jobs without the funding because [they] would have lost [their] business." (Letizia Ltr. at 1).

Mr. Walters often assists people in financial distress, sometimes with a favorable loan arrangement, and other times by offering to give them the necessary funds outright.

- Joshua Hill of The Walters Group's Digital Marketing team was on the verge of losing his home in 2009 and turned to Mr. Walters "for help and guidance. [He] was only hoping for a good bankruptcy attorney referral; instead the outcome of [that] meeting was nothing short of a miracle, one that changed the trajectory of [Mr. Hill's] life forever. Mr. Walters offered to buy [his] house [as a loan] so that [his] family . . . could avoid foreclosure." (Hill Ltr. at 1).

- Mr. Walters did something similar for Jared Gaiennie. As he explains: "When I was moving from Florida to Kentucky and was trying to purchase a home, I was unable to move forward as I was unable to come up with the down payment in full so I reached out to Bill. I was very hesitant at the time due to my pride but I had no other place to turn. After much thought and deciding to reach out to him, he immediately decided to help me with this." (Gaiennie Ltr. at 1).

- When Mr. Walters learned that Jason Wright was having difficulty getting approved for a loan to buy a house, he immediately offered to loan him the money. In addition, Mr. Walters later loaned him and his wife money so that they could invest in their children's college education by enrolling in a prepaid tuition plan. (J. Wright Ltr. at 2).

- Another employee, Gary Wexler, "went through a very hard moment in [his] life when [his] thirty year marriage was ending and [he] did not have the financial resources to get through it on [his] own." Mr. Walters was always asking his managers how their employees were doing and learned of Mr. Wexler's difficulties.

KL3 3131011.1

Mr. Walters "not only called [Mr. Wexler] immediately but sat down with [him] the next time he was in" Kentucky for a meeting. Mr. Walters "carved out the greater part of the day to talk to [Mr. Wexler]" and together they drilled down on the details and came up with a plan. Mr. Wexler recalls Mr. Walters offering to back him "100%" and loaned Mr. Wexler sufficient funds to make it through his divorce. (Wexler Ltr. at 1).

- Haitham Fakhoury recounts how while they had only known one another a short time, he and Mr. Walters were having lunch one day when Mr. Walters sensed Mr. Fakhoury was not himself and asked if anything was wrong. Mr. Fakhoury shared that he was "in the process of taking out a personal loan, ████████████, to cover the cost of [his] daughter's tuition. [Mr. Walters] offered to give [him] a ████████ personal loan ████████████████████ Mr. Walters told him he could hold off on monthly loan payments "until [he] got back on [his] feet." (Fakhoury Ltr. at 1).

- Mr. Walters offered to pay for Marius Telehoi's travel when his father unexpectedly passed away in 2013. Because it was short notice, Mr. Telehoi could only find a $12,000 business class ticket to Romania and was in distress. Meanwhile his passport was in a different state so he needed to travel from Kentucky to Florida first. Mr. Telehoi was "devastated and couldn't think straight." Mr. Walters assured him not to worry and that he would pay for the flights. Ultimately the airline found an economy class ticket and Mr. Telehoi declined Mr. Walters' offer but that he had made it in the first place was very meaningful to Mr. Telehoi. (Telehoi Ltr. at 1).

It is hard to capture the full extent of the ways Mr. Walters has helped people at the most difficult times of their lives because there are "dozens of stories when Bill has secretly given aid," such as paying for the funeral for a "poor single mom whose son was shot in a gang shooting," (Brown Ltr. at 2), or attending and paying for the funeral of an employee whose daughter was killed in car accident and could not afford a burial, (Kelly Ltr. at 1-2; Wilson Ltr. at 1), or providing for the family of a bartender who was "diagnosed with and ultimately succumbed to a terminal disease," (Watts Ltr. at 1). The Walters have "quietly contributed money to fund full scholarships for underprivileged students and [have] purchased a mobile home for a single mother who fell on hard times." (Binion Ltr. at 2). Joe Dahlstrom, who was a

41

Director of one of Mr. Walters' clubs for many years, was amazed how "dozens, maybe hundreds of times, that someone was hurting within the organization [Mr. Walters] went out of his way to help in any and every way that he could," providing "meal[s], recommendation[s], transportation or even a place to stay. [Mr. Walters] always made these arrangements through [Mr. Dahlstrom], because he did not want the recognition. He just wanted to help someone down on their luck." (Dahlstrom Lt. at 2; *see also* Greenway Ltr. at 3 ("I am honored to know Bill Walters and to be amazed as I still, after all our years together, continue to learn of the positive impact he quietly has on others.")).

Numerous friends and employees shared how when they lost someone close to them Mr. Walters was a source of support, often the first call, always asking how he could help. For example, when Luis Aguilera, lost his son in a terrible drowning accident, he took his son back to Mexico and was away for two years. "Mr. Walters helped [him] with money for the funeral and also guaranteed [him his] job back when [he] was ready to return from this situation," a promise Mr. Walters kept and on which he delivered. (Kelly Lt. at 2). *See also* Ruthe Ltr. at 2 (In the final days of her husband's life, Donna Ruthe called Mr. Walters to let him know the end was near and he flew out there immediately to pay his last respects. Even now, three years later, Mr. Walters will still call to make sure she and her son are doing well);[16] Martinez Ltr. at 2 (When Adolfo Martinez lost his father and brother within the space of six months Mr. Walters "supported [him] like a family member," attending the funerals and "offer[ing] condolences and support").

---

[16]     *See also* Kern Ltr. at 2 (describing how Mr. Walters delivered a moving eulogy at her father's funeral but was so distraught he could not finish, and how when her mother was passing away Mr. Walters and his wife came to see her just "days before she passed," keeping in touch ever since to let Ms. Kern and her family know that they are there if she and her family ever need anything).

KL3 3131011.1

Doug Hash, who has known Mr. Walters most of his life, describes how Mr. Walters was "the one person who [he] could talk to and who listened to [him]" when he was a young man. While Mr. Hash never disclosed to Mr. Walters the underlying reason for his distress, ███████████████████████████████████████, he "could always count on [Mr. Walters] for encouragement and support." "There were some really low spots during this time but because of conversations and encouragement from Bill [he] was able to work through it." (D. Hash Ltr. at 1).[17]

> 2.    *Mr. Walters is a mentor and advocate and a willing source of advice and encouragement.*

Mr. Walters is not just there for people in times of crisis, he is also there to support them in achieving their dreams. "There are many layers to people. Some people are of minimal substance and some have a sense of depth. [Tina Abbatangelo, Mr. Walters' ex-daughter-in-law] put[s] Bill in the latter category. He is a man that came from little and made much. And along the way he brought many people up with him. He hasn't been one to step on people to get to the top. He is one that brings you along." (Abbatangelo Ltr. at 3; *see also* Ford Ltr. at 1 (describing how Mr. Walters is "[n]ever one to pull the ladder up behind him" and instead "seeks opportunities to open . . . doors and share his good fortune")). Repeatedly people credit Mr. Walters with having been a mentor and a guide. Friends and family describe him as always being available to them any time they needed him. (*See, e.g.*, Epstein Ltr. at 1 ("Bill always treated me like one of his sons. He would answer my call any time of day or night");

---

[17]    When Jan Jones Blackhurst was ███████████████████████ during her run for governor, "Bill was always available to sit with [her] and talk through [her] troubles." (Blackhurt Ltr. at 1). Ronald Watts, Mr. Walters' friend of 22 years, also describes Mr. Walters as a confidant: "When [Mr. Watts] faced adversity [he was] always . . . able to turn to Billy Walters knowing [his] concerns would remain confidential . . . ." (Watts Ltr. at 1). Similarly, when things got tough for J.T. Sims, Mr. Walters' former business partner, during the recession, "Bill would always be available for advice and support." (Sims Ltr. at 1-2).

Bombard Ltr. at 1 ("he ALWAYS took my calls no matter what was on his plate" and "[h]is compassion and the way he cared about all of our employees, all of our families, and our personal well-being was sincere. He was only a phone call away"); Abbatangelo Ltr. at 2 ("I also knew when I called him, he always made the time for me"); Murphy Ltr. at 1 ("If I had a question about the automobile business or anything else I would call Bill and he would always pick up the phone or ring me back within 30 minutes")).

Mr. Walters' willingness to invest in others is exemplified by the role he played in the life of Benjamin Kelley. Dr. Greenway first introduced Mr. Walters to Benjamin when he was a young student who worked in Dr. Greenway's office and hoped to go to medical school one day. While working for Dr. Greenway, Benjamin had car trouble. As a child of missionaries, he and his family were of modest means and he did not have the funds to fix it. Dr. Greenway resolved to get the young man a car and asked Mr. Walters if he would be willing to chip in. Mr. Walters agreed, but rather than wait for Dr. Greenway to gather the rest of the funds from other potential donors Mr. Walters simply got this young man a car himself. This began Mr. Walters' investment and involvement in one young man's future that saw him all the way into his residency. Mr. Walters ultimately funded Benjamin's two-year graduate degree and four years of medical school. Dr. Kelley graduated at the top of his class and now works at the Mayo Clinic. (Greenway Ltr. at 2; *see also* Kelley Ltr. at 1).

Dr. Kelley describes Mr. Walters as one of the three men who has profoundly shaped his "integrity, perseverance, [and] work ethic . . . ." Dr. Kelley explains: "[Mr. Walters] may not even realize how important he is to me, which is a testament to his selfless character." Dr. Kelley met Mr. Walters when his "dream of becoming a physician was in its infancy" and he is now weeks away from finishing his residency in dermatology and plans to spend his career

44

diagnosing and treating advanced skin cancer. "Mr. Walters has continually offered his support, encouragement and mentorship along the way." In addition to funding his entire graduate education, Mr. Walters has provided him with "treasured words of wisdom" over the years. When the first car that initiated their years-long friendship finally gave out, Mr. Walters loaned Dr. Kelley a second car, which he ultimately gifted him upon graduation from medical school. The only thing Mr. Walters ever asked for in exchange was that Dr. Kelley "pay it forward someday, a commission that [Dr. Kelley] take[s] very seriously." In the time Dr. Kelley has known Mr. Walters he has married and had three children, who all "think of Mr. and Mrs. Walters as family. When [Dr. Kelley's] oldest son was born Mr. Walters helped start a college fund for him." What Dr. Kelley marvels at most is that he is not an exception: "The truly amazing thing is that Mr. Walters has transformed many lives the way he has transformed mine. The example he has set of hard work and generosity is inspirational. He makes this world, and our country, a better place by enabling people to reach their full potential. While some of his philanthropic work is done in the open, much more is behind the scenes and never for show." (Kelley Ltr. at 1-2).

Mr. Walters' godson, William Ward, provides another example of the way Mr. Walters helps young people succeed. Mr. Ward has "memories from [his] childhood at the age of six when [Mr. Walters] took [him] to get [his] first real baseball glove. [He] still [has] the glove today and it was one of the many gifts from [his] Uncle Bill that helped [him] chase [his] childhood dreams." He also received his first set of golf clubs from Mr. Walters during one Christmas Eve he recalls spending at the Walters' house. When Mr. Walters learned how much Mr. Ward loved the sport, he also paid for lessons for the next two years and sponsored Mr. Ward in any other sport he played. Mr. Walters paid for his first two years of college (before he

45

moved home to finish his schooling at the University of Nevada), helping Mr. Ward become the first in his family to graduate from university. When Mr. Ward did move home, he began working at Bali Hai Golf Club, "Uncle Bill's golf course in Las Vegas," eventually moving up to a management position in the company. More than the material leg up, Mr. Walters "has always been the person to go to when in need of advice or for a helping hand." Mr. Ward credits Mr. Walters positive influence and the opportunities he provided as making him the person he is today. (Ward Ltr. at 1-2).

Mr. Walters' long relationship with Calvin Hash provides another good example of the kind of sustained support that Mr. Walters often provides. The two men were friends for almost 50 years. Mr. Walters helped Mr. Hash, who had a working class background, purchase his home in the early 1980s. As his daughter, Janis Kern, recounts, her whole life her "parents never owned a house, they always rented. [Their family] moved several times over the years. [Her] father worked full time at a car dealership and it was always hard on [her] mother to have to pack up and move while also caring for six children. Bill saw that the stress was taking a toll on [her] mother" and helped them buy a house with "four bedrooms, three baths" and a pool, where her parents lived until they died. Mr. Walters also helped rescue their family farm from being sold out of the family, purchasing it and putting title in her brother's name. When Calvin died he did not have life insurance so Mr. Walters covered the funeral expenses, asking that Ms. Kern keep his generosity in confidence. Calvin ███████████████████████ ████████████████. Before he died, Mr. Walters sought to make one of his lifelong dreams come true and arranged for him to play golf at Augusta National. (Kern Ltr. at 2). A friend of Mr. Walters who also played with the two of them at Augusta described how remarkable it was to see this frail man play 18 holes and how "Calvin cried when saying goodbye, stepping back

onto the plane knowing that his dreams had just come true." (F. Smith Ltr. 2). Throughout Calvin's illness Mr. Walters always made time to come see him whenever he visited Kentucky, and always let Ms. Kern's family know that if there was anything they needed he was there for them, and he always was. (Kern Ltr. at 1-2).

Mr. Walters plays the same mentorship role for many of his employees, encouraging them and investing in their success both inside and outside his employ.

- "About twenty years ago a group of young men took a major chance with their lives and their young families and moved from [Chicago] to [Las Vegas] to build a better life working for Mr. Walters in Las Vegas. One of these gentlemen is Raul Arroyo [who recounts how] 'Everything that Mr. Walters promised me came true. I worked hard for his company and he made sure we had good living conditions, made a fair wage and he provided health insurance for my family. My children have all graduated from high school and we are now proud grandparents. It was a good move for my family.'" (Kelly Ltr. at 1).

- Another one of those men is Ignacio de Anda, who describes his decision to leave Chicago and come work for Mr. Walters in Las Vegas as one of the best he has ever made. He was promoted over the years and while he had opportunities to change jobs over that time to ones that would have been more lucrative, he "stayed with the Walters Group because of Mr. Walters." In the years he has worked for Mr. Walters he became a U.S. citizen, a point of pride that he attributes to Mr. Walters. He expressed his gratitude for Mr. Walters' support as he studied hard for the citizenship exam over several months. "On the day [he] took [his] oath of citizenship Mr. Walters was there with [him] and he took [Mr. de Anda's] family and friends out to dinner afterwards." (de Anda Ltr. at 1).

- Mitchell Epstein worked managing the food and beverage service at Mr. Walters' golf clubs from 1995 to 2002. Prior to that he was the General Manager at a California Pizza Kitchen and Mr. Walters was a regular customer. One day Mr. Walters offered Mr. Epstein a job. Mr. Walters later told Mr. Epstein that the reason he "came in so frequently [was] because he saw something in [Mr. Epstein] and was observing [his] work and admired how careful and meticulous [Mr. Epstein] was in taking care of the restaurant. [Mr. Epstein credits] Bill [with teaching him] about loyalty, integrity and honesty." Before accepting the position with Mr. Walters, Mr. Epstein ████████████████████████. "Bill immediately made [him] feel so comfortable and never looked down on [him], and actually said he saw ████

47

██████████████████████ – it showed [Mr. Epstein] would be honest and have integrity." When Mr. Epstein moved on to open his own restaurant "Bill told [him] how proud he was [and] came to the soft opening . . . with the rest of [Mr. Epstein's] friends and family. He was and still is [Mr. Epstein's] mentor and [his] friend." (Epstein Ltr. 1).

• Joe Dahlstrom first interviewed for the Director of Golf position at one of Mr. Walters' clubs nearly 20 years ago. He was a 24-year-old college dropout, who had barely ever left his home state of Wisconsin, and had never held a comparable position. When he showed up to interview there were several longtime golf professionals from some of the best golf properties in the country vying for the slot. With little to lose Mr. Dahlstrom opened up to Mr. Walters in that interview and in turn Mr. Walters opened up to him. They spent 45 minutes talking about "the importance of treating people fairly, honesty, having a servant's heart and how [Mr. Walters] was committed to helping [Mr. Dahlstrom] develop as a professional and young man. The next day, Mr. Walters offered [him] the position . . . [and for] the past 20 years, [Mr. Walters] has been a mentor, boss, friend and many times like a second-father . . . ." Later ███████████████████████████, Mr. Walters called him into his office and shared his own history of "past struggles as a young man ██████████ and how making the decision ██████████ was the biggest one he ever made. With his uncanny intuition, Mr. Walters noticed ██████████████████████" and "[f]or over an hour" Mr. Walters asked Mr. Dahlstrom questions about his life, offering help, and providing a "heartfelt talk about not letting Las Vegas ██████████ get the best of" him. "The entire time he used the failures and successes of himself and others to inspire [Mr. Dahlstrom] ██████████ ██████████." Mr. Dahlstrom is grateful to Mr. Walters for what he did for him that day; ██████████████████████. (Dahlstrom Ltr. at 1).

• Lisa Thayer met Mr. Walters at a dinner party while on maternity leave from KPMG. She expressed concern about going back there and how she would manage to balance work with motherhood. She recalls how Mr. Walters listened carefully to her and then days later unexpectedly extended an offer to her as CFO, a position she held "with pride" as he "placed immediate trust" in her and "gave [her] a tremendous amount of control" despite her young age and experience level. (Thayer Ltr. at 1).

• Jared Gaiennie came from a family of auto professionals and was working with one of Mr. Walters' partners trying to establish himself in the business. They did not see eye-to-eye however and Mr. Gaiennie resolved to quit. He approached Mr. Walters to say that while he could no longer work with this other individual he wanted to continue working with Mr. Walters. Mr. Walters took a chance on Mr. Gaiennie and asked him "to partner [together] in a Ford store in Lexington. He said that, provided

[they] were successful, [they] would start a new separate Automotive Group. [Mr. Gaiennie] relocated to Lexington, partnered up in his Ford dealership and within 4 years [they] had 14 dealerships in two states. [They] accomplished well beyond [Mr. Gaiennie's] expectations and dreams. Anything and everything [Mr. Walters] ever told [Mr. Gaiennie] he would do for [him] he did." (Gaiennie Ltr. at 1).

- Patrick Beck had a similar experience in 2009. With the economy in crisis, ███████
  ███ . A friend introduced Mr. Beck to Mr. Walters and they spent a couple of hours talking. Mr. Walters then offered Mr. Beck the opportunity to manage a dealership he had just purchased in Bakersfield, California and promised Mr. Beck that after one year "he would extend a net profit partnership to [him] . . . . Bill eventually delivered on that commitment to [him] and allowed [Mr. Beck] to become his partner. Bill Walters is a man of his word. [Four years later], Bill delivered on another promise [and Mr. Beck] became a 25% equity partner . . . ." (Beck Ltr. at 1).

- Charles Bombard, who had previously owned a competing golf club, found himself unemployed in November 2010. As he describes: "my heart, soul, and entire career rested with the PGA Tour and it was over. I called Mr. Walters in late November, as he had said to me at the end of our conversations over the years that I could call him any time I needed or wished to speak to him, even if just to say hello and catch up . . . . I called him shortly before Thanksgiving that year, and explained to him as best I could what happened. He never interrupted or said a word until I was done. His compassion, honesty, and empathy I still feel inside of me, even to this day, as he could have done nothing and said 'he had to go' but he NEVER did. Instead, he explained to me what was going on at his clubs and said it could be awhile but that he would get back to me. Four months later, when the General Manager Position became available at his Royal Links Golf Club I applied and we spoke. He then hired me for the position." (Bombard Ltr. at 1).

- Jason Wright started working for Mr. Walters in 1999 in the marketing department after he graduated from the University of Nevada. He met Mr. Walters in his second week and the day they met Mr. Walters told him he wanted to have breakfast together once a week for the first couple of months so he could give Mr. Wright advice on the golf industry. Mr. Wright reflects: "I was to say the least shocked by this, I was the lowest level marketing person there was, and much younger than all of the other Walters Golf employees. I know he was a very busy man but we had our breakfasts every week and after a few months my learning curve of the golf market in Las Vegas was in my mind shortened to that of a seasoned veteran in the industry, not a kid right out of college. To this day, I am still amazed that he took the time for this – but I am not surprised anymore. After all these years, I now know that is just the person he is.

KL3 3131011.1

He does not view himself as someone that is above you. He wants to be part of what you are doing and wants to be involved anytime you need him, as he wants everyone to succeed in business and personal life." (J. Wright Ltr. at 1).

- When a dear friend of Robert Massi's called him about his son who needed a job and was having a tough time he reached out to Mr. Walters who said, "'friend of yours, friend of mine,' and then "hired this young man, sat him down, counseled him and changed his life. Besides a job [Mr. Walters] mentored him, guided him and was his conduit to a better life." (Massi Ltr. at 2).

- Similarly, when Bion Wilcox's youngest son was struggling to establish himself in the golf world, Mr. Walters met with him and offered to "take Tyler under his wing. He gave him a job as a caddy and mentored him. For a period of time, Tyler lived in a home that the Walters were renovating in Rancho Santa Fe. They often invited him to their house for barbeques and other special events. Over time, Bill give Tyler more responsibilities and eventually hired him to work at one of his offices." (Wilcox Ltr. at 1-2).

In all of these accounts, whether of hardship or triumph, Mr. Walters was there for his friends, family, colleagues, employees, and even those unknown, as a source of support, encouragement, guidance, and generosity.

**D.    Mr. Walters' Other Intangible and Unique Personal Qualities Reflected In His Treatment of Others in his Personal and Professional Lives**

Mr. Walters is universally credited for the respect he shows to others, from executives to groundskeepers. (*See, e.g.* PSR ¶ 60). Friends and colleagues describe how Mr. Walters "treats everyone the same regardless of who they are or what they do. It [does not] matter if [he is] working on a multi-million-dollar transaction or ordering lunch at a small diner, he treat[s] everyone with the same respect." (Paul Ltr. at 2; *see also* F. Smith Ltr. at 3; Rogich Ltr. at 2; McIntosh Ltr. at 1). "He's completely at ease in the back kitchen or the club room and will not tolerate any disrespect in his presence, from cashiers to VIP clients." (Ford Ltr. at 1). He is always "the same decent, straightforward guy, regardless of circumstance . . . ." (Etzkorn

50

Ltr. at 2).[18]  In a world of the "who's who of . . . business, social, and athletics . . . , Billy is one

of the few . . . that never wavered in how he treated all of those around him." (MacConnell Ltr.

at 1).[19]

Mr. Walters is "ALWAYS 100% supportive of [his] staff . . . His compassion and

the way he care[s] about all of [his] employees, all of [their] families, and [their] personal well-

being [is] sincere . . . . Being generous and kind to the staff was # 1 in [Mr. Walters'] book and

he instilled that in all of the managers who worked for him." (Bombard Ltr. at 1-2).  Joe Kelly

recounts how "[t]hroughout [their] years of working together [they] have opened and managed

four golf courses and hundreds of employees.  Bill has always made sure that each employee

understood that they were part of the Walters Golf Family.  He always took time to introduce

himself to them, learn their names and ask about their families." (Kelly Ltr. at 1).

His friends, colleagues, and employees repeatedly describe Mr. Walters as a man

of his word who can always be counted on to live up to whatever promises he makes.  (*See* Beck

---

[18]     Matthew MacConnell described how Mr. Walters never wavered in the respect he
showed to Mr. MacConnell and his staff: "Many of my members position themselves as your
friend or equal until things do not go 'their way' and then they all want to be treated special.
Billy never acted that way.  He is his true self and always gave me and my team his utmost
respect. (MacConnell Ltr. at 1).  Jim Etzkorn noted the same: "Bill never used his position as a
lever over me as many others attempt to in my business.  He's always been the same decent,
straightforward guy, regardless of circumstance, that I've had the honor or working with over the
past 10 years or so."  (Etzkorn Ltr. at 2).  Similarly, Mark Ford, an executive at *Time* magazine
noted: "[i]f our journalists published negative coverage about his courses or a less than stellar
ranking, he never leveraged his ad commitment to try to influence the editorial outcome." (Ford
Ltr. at 1).

[19]     *See also* Rogich Lt. at 2 ("[A]s a former Assistant to the President of the United States,
George H.W. Bush, I would like to speak to Billy's qualities as one of the most kind and
generous people I have had the honor of knowing.  He is a gentleman in every sense of the word,
and I know Governors, members of Congress and significant business leaders as well as
neighbors and community members who also hold Billy in the highest esteem.  He treats people
with respect, dignity and gratitude no matters what their position, and his kindness knows no
bounds.").

Ltr. at 2 ("Bill Walters is a man of his word. He has done everything he ever promised me and more"); Blackhurst Ltr at 1 ("Bill never blurred the lines between business and friendship and always conducted himself in an honest and professional manner"); Bombard Ltr. at 2 ("Mr. Walters has been a man of his word for as long as I have known him these past 20 or so years"); Castaño-Sandoval Ltr. at 2 ("He's self-made, an incredibly hard worker, honest, loyal and a man you can always depend on"); Colbert Ltr. at 3 ("He is an independent, intelligent self-made man. A loyal and respected friend. I trust him with my life"); Dahlstrom Ltr. at 2 ("He taught me that you word is your bond, to put others in front of yourself and the value of hard work"); Etzkorn Ltr. at 1 ("He could always be counted on to respond fully and frankly to any query regarding his personal or business background"); Ford Ltr. at 1 ("I've always found Bill to be a man of integrity, above board, totally straight forward – a man who delivers on his promises"); Futch Ltr. at 2 (describing Mr. Walters as "one of the most honest guys to do business with"); Gaiennie Ltr. at 1 ("He taught me about your word being your bond, overall ethics, being 100% compliant as it relates to doing things the right way, and to always treat people the way you expect to be treated"); Gold Ltr. at 2 ("I've never known a more disciplined, honest & reliable person in my life"); O. Goodman Ltr. at 1 ("His word has been his bond, and you can rely on any representation he has or will make"); Letizia Ltr. at 1-2 ("Bill is honest, forthright and a good person, and he has earned respect and admiration from all who cross his path" and "his word is his bond"); Paul Ltr. at 3 ("I can also attest that in every single deal I've worked on with Bill he has been fair and moral"); Poster Ltr. at 1 (describing how Mr. Walters has "always been the example of an honorable, honest, trustworthy, and generous man of the highest character"); Raphael Ltr. at 2 ("[W]hen I've described Mr. Walters in the business world, the words I most frequently use are honesty and integrity. Whether in business, or personal affairs, Billy's word is

his bond and he takes great pride in making sure that he follows through on his word"); Rogers Ltr. at 1 ("Over the last two decades, I have dealt with Bill on various matters. He has always been honest, smart, and professional"); Ruthe Ltr. at 1 ("My husband was a great judge of people. He always said that Billy . . . is a man that lives by his word. If Bill said something, he did it exactly as he stated"); Weinberger Ltr. at 2 ("I only know him as a man of high character who has always kept his word with me"); A. Wright Ltr. at 1 ("I went on to work for Bill at other golf properties in different markets and was involved in numerous meetings and business strategy sessions. I have always found Bill to be a man true to his word who has demonstrated fairness, honesty, and integrity"); Zuckowski Ltr. at 1 ("[H]is word is his bond")).

Because of the trust others place in him to follow through on his commitments, they can rely on no more than a handshake. John Grant helped arrange a vehicle purchase for one of Mr. Walters' rental companies with a friend of his over the phone. Mr. Walters then flew to Detroit to finish the deal because he "wanted to make sure that, just as [Mr. Grant] told [his] friend, Billy's word would be good. It was." (Grant Ltr. at 2). That sentiment is echoed by Pat Paul, who first met Mr. Walters in 2009 when Mr. Walters was looking to purchase an automobile dealership. Mr. Paul has now assisted Mr. Walters in purchasing or divesting roughly 25 dealerships, during which time they have never had a written engagement letter. Mr. Paul recounts how when Mr. Walters worked out a deal internally with an existing partner, without involving Mr. Paul, Mr. Walters notified him of the deal and that he was still "going to pay [Mr. Paul] a transaction fee," because, while he was under no obligation to do so having negotiated the deal himself, "he felt it was the fair thing to do." (Paul Ltr. at 3).

Mr. Walters invested with J.T. Sims in a chain of fitness centers in Louisville, Kentucky, during which time Mr. Sims felt "Bill's integrity was beyond reproach. His standard

saying was '[do] what is fair, and do what's right.'" Mr. Sims witnessed this in their interactions with their contractors for example, even where the contractors were in the wrong. Mr. Sims also recounts how when they ultimately sold their business in 2002, Mr. Walters was entitled to 50 percent of the profits but told Mr. Sims to keep them because while he had invested in the business, it was Mr. Sims who had built it and worked it every day. (Sims Ltr. at 1).

Shelby Futch, who runs one of the largest golf schools in the United States, remembers approaching Mr. Walters about conducting programming at one of his golf courses in the late 1980s. They met to discuss and Mr. Walters said he like the sound of the program and asked, "'when can you start!'" Mr. Futch "gave him a date and [Mr. Walters] said, 'Great, I have to run.' [Mr. Futch] asked if [Mr. Walters] wanted [him] to send the bullet points on what [they] agreed on. [Mr. Walters] said, 'Aren't you going to do what you said' [Mr. Futch] replied 'yes' and [Mr. Walters] said 'so am I!'" (Futch Ltr. at 1).

In early 2011, one of TWG's dealership managers, Patrick Beck, terminated two employees he found had provided a lender with documents that were inaccurate. Mr. Beck took this to another manager who advised him to "let 'sleeping dogs lie.'" Mr. Beck was uncomfortable with that advice and at his next meeting with Mr. Walters he explained the situation. "Bill was adamant that [Mr. Beck] contact the lender immediately and reveal the issue and take complete responsibility. Bill insisted [he] complete a forensic audit on any deal touched by these [individuals], and act accordingly, which [Mr. Beck] did." (Beck Ltr. at 1). Similarly, Joshua Hill described a marketing meeting where one of Mr. Walters' employees "mentioned having the customer database of a competing golf course in town . . . Mr. Walters stopped him dead in his tracks and said 'there will be no more of that kind of talk!' . . . ." (Hill Ltr. at 2).

KL3 3131011.1

Tony Santo recalls negotiating terms with Mr. Walters, where he sought to open a desk in the lobby of three hotels. "[W]hen [Mr. Walters] learned that the existing operation at [one of the hotels] was owned by a family whose father recently passed away, Bill declined to pursue [that] location as he did not want to create any additional hardship for them." (Santo Ltr. at 1). When Mr. Walters sold his Royal Links golf course he agreed to take an offer that was $700,000 less than another offer because he knew that Shelby Futch would "treat [Mr. Walters'] employees well and keep them on his staff." (Futch Ltr. at 1; *see also* Bombard Ltr. at 2 ("with a pending sale of the club, he took his own personal time to visit me, our staff, and tell us that he had negotiated with a new owner so that all of our jobs were to be protected after the sale"); Weston Ltr. at 1 ("any employees who want[ed] to continue working for the Walters Group" after the sale of Royal Links "would be given a position at Bali Hai")).

Smaller individual acts of decency and humanity that also provide insight into Mr. Walters' character are too numerous to catalog. He will insist that an employee take a week off to help a daughter move into her dorm room. (Fakhoury Ltr. at 1). He will celebrate an employee's wedding, citizenship ceremony, or child's christening. (Bombard Ltr. at 2). He will show up in person at the hospital "bearing balloons and flowers" for the birth of a child, and is the kind of man those children grow up calling "Uncle Billy," even as adults. (Thayer Ltr. at 2). He will throw a friend's child a high school graduation party at his house, (Peterson Ltr. at 1), and fly out just to celebrate when someone he knows finishes their MBA, (Suntha Ltr. at 3). He will treat the people who graciously assist him in a service role as friends, offering snacks and addressing them as equals. (Treitler Ltr. at 1). He will work to drive business to both his own enterprise and that of a competitor. (Bombard Ltr. at 1). He will help find a furnished apartment in a new city for an employee and offer to provide tutors for his children who have emigrated

55

from a foreign country, as well as private instructors for their extracurricular activities.

(Martinez Ltr. at 1). And he will use "I" when describing his own failures and "we" when

discussing his accomplishments or successes. (McIntosh Ltr. at 1).

***

The letters that have been submitted are from people from all walks of life who

have known Mr. Walters in a wide variety of ways. This outpouring of support is not unique to

this submission. When Opportunity Village held a fundraiser a few years ago honoring Bill and

Susan Walters, it included "celebrities, billionaires and millionaires, sports figures and models"

as well as "the clients and families [of Opportunity Village], the valet and caddy staff members,

the other non-profit leaders in town, the linen vendors and retail store owners, the clergy and

medical doctors; all had a story about how Bill and Susan had made a difference in their lives."

(Brown Ltr. at 2)

A plea for leniency is explicit or implied in all of the letters, but to quote one that

captures the sentiment of them all: "I pray that the scales of justice feel the weight of the

positive impact that a man's life can make on other people . . . [H]e has done so much

extraordinary good. I could go out and find a hundred people that would serve thirty days in jail

for Bill. I would be the first in line. That is the Bill Walters I know." (Brown Ltr. at 2). As

former Senator Harry Reid, who served as Senator of Nevada from 1987 to 2017 and as Majority

Leader from 2007 to 2015, remarked: "I do not see how this man getting probation would, in

any way, adversely affect the criminal justice system." (Reid Ltr. at 2).[20]

---

[20]    *See also* B. Young Ltr. at 1 (Mr. Young is the former Sheriff of Clark County in Nevada.
His agency and he personally investigated Mr. Walters' gambling operations, concluding that
Mr. Walters "has not ever committed a crime here in Las Vegas," a fact of which he is certain.
He is such a proponent of Mr. Walters that while he has "never in [his] life written a letter of this

## II.    THE SENTENCING GUIDELINES

With its decision in *United States v. Booker*, the Supreme Court rendered advisory the once-binding Sentencing Guidelines and empowered district courts to take full account of the sentencing factors provided in 18 U.S.C. § 3553(a)(1). *See United States v. Booker*, 543 U.S. 220, 259 (2005). While the sentencing court should use the Guidelines as its "starting point and initial benchmark," it must also consider all of the § 3553(a) factors to determine whether they support the imposition of the Guidelines sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). In weighing the § 3553(a) factors, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007) (citing *Booker*, 543 U.S. at 259-60). The Court need not find "'extraordinary' circumstances" to justify a sentence outside of the Guidelines range. *Gall, 522* U.S. at 47. Instead, the sentencing court must "make an individualized assessment based on the facts presented." *Id.* at 50.

The Presentence Investigation Report calculates an advisory guideline range of 87–108 months, based on a total offense level of 29 and a Criminal History Category of I. This extremely high sentencing range is largely a result of the enhancement under § 2B1.1 corresponding to the purported "gain resulting from the offense." In this case, the PSR includes a 22-level enhancement by assuming gains of $45 million, based on an amount provided by the government. But this gain calculation is deeply flawed because, as set forth below, it relies on an estimation of the defendant's gain that is not supported by the facts or the law.

### A.    Not all of the Trades that the Government Referenced at Trial Should Be Included in the Calculation

The jury convicted Mr. Walters of three substantive counts of insider trading

---

nature" he felt compelled to implore Your Honor to consider "sentenc[ing] Mr. Walters to probation . . . .").

relating to trading in Dean Foods in 2012 and one count relating to insider trading in Darden Restaurants in 2013. Mr. Walters does not dispute that gains associated with those trades, once calculated correctly, are properly included in the gain computation. But the PSR (relying on the government) also includes trades, both inside and outside the bounds of the Indictment's conspiracy counts, for which the jury was not called upon to return a verdict and which are not supported by even a preponderance of evidence. *See United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005) (to calculate the applicable Guidelines range, district courts are "statutorily obliged to . . . find facts relevant to sentencing by a preponderance of the evidence."); U.S.S.G. § 1B1.1.

   The first category of trades included by the government but properly excluded are those that occurred in 2006 and 2007. As the Court will recall, in pre-trial proceedings, the government specifically represented to the Court that the charged conspiracy began in 2008, not 2006 or 2007. *United States v. Walters*, No. 16 Cr. 338 (PKC), (S.D.N.Y. Dec. 2, 2016), Trial Tr. 19:1-7 ("MR. GOLDMAN: Your Honor, we're happy to represent to the defendant that at this time, our allegations as included in the indictment are that the conspiracy began in or about 2008. We reserve the right to amend that, and we will, of course, alert the Court and the defendant to the fact if "at least in or about 2008" means maybe 2007 or earlier, and if necessary, we will seek a superseding indictment to that effect."). In addition, Mr. Davis, in his plea allocution explicitly stated that he began tipping Mr. Walters in 2008. *United States v. Davis*, No. 16 Cr. 338 (PKC), (S.D.N.Y. May 16, 2016), Plea Tr. 20:22-25. And at trial, Mr. Davis testified that he did not specifically recall tipping Mr. Walters in 2006 or 2007. (Trial Tr. 674:9-11). In addition, Mr. Davis' Cooperation Agreement provided protection from prosecution for insider trading offenses he committed only "from in or about 2008 through 2014[.]" (Trial Tr.

1247:15-18; GX 1750). Accordingly, the trading activity in 2006 and 2007, which contributes

$7,962,299.76 to the government's calculation, should be excluded. (Watson Decl., Attach. A)

(attached as Exhibit B).

   The second category of trades that should be excluded from the calculation are

those that occurred in the 2008–2010 period. Although these trades are within the scope of the

Indictment's conspiracy counts, they were not necessary to the jury's verdict and the evidence

the government offered in support of the contention that these trades were based on illegal inside

information was logically inconsistent and contradicted by objectively incontrovertible evidence:

- With respect to trading prior to the April 2008 earnings announcement, Mr. Davis testified that in late February 2008, he tipped Mr. Walters that Dean Foods was going to do an equity offering and that he expected that the news "would be positively received by the shareholders." (Trial Tr. 682:14-17). This testimony was impossible to credit since any sophisticated investor would know that an equity offering would dilute existing shareholders and not be well received by investors. In fact, in materials that Mr. Davis received prior to the February 27 board call, he was specifically informed that the planned March 3, 2008, equity offering would dilute the stock and was anticipated to decrease the company's stock price by 6.8 percent, which is in fact what happened. (DX 471). Mr. Engles also testified that the offering was expected to decrease the company's stock price. (Trial Tr. 383:1-16). Mr. Davis also testified with respect to this period that on March 17, 2008, Mr. Engles informed him that the flash financials for January and February 2008 indicated that Dean Foods would have a positive first quarter. (Trial Tr. 689:8-21). Mr. Davis said that based on this conversation, he told Mr. Walters that he "still ha[d] a positive viewpoint on the stock because of what was happening at the company." (Trial Tr. 690:24-25). The evidence shows, however, that Dean Foods' positive first quarter earnings were primarily attributable to the company's March performance. (DX 283-A). Removing the trading in this time period would reduce the government's calculation by $3,021,911.81. (Watson Decl., Attach. A) (attached as Exhibit B).

- Regarding the alleged tip to Mr. Walters in June 2008, Mr. Davis did not learn about the mid-quarter guidance update until June 24, 2008, after Mr. Walters had already traded. (GX 2304; GX 1907-B). Removing the trading in this time period would reduce the government's calculation by $3,384,818.67. (Watson Decl., Attach. A) (attached as Exhibit B).

- On February 10, 2009, the price of Dean Foods stock decreased by 80 cents due to a significant increase in trading volume. (Trial Tr. 560:25-561:25). That same afternoon – when the trading volume spike would have been apparent – Mr. Walters purchased 300,000 shares of Dean Foods. (GX 107). Before the markets opened the next morning, Dean Foods announced that it had posted its highest adjusted quarterly operating income in history. (Trial Tr. 1912:5-15; GX 703-B). Later that same day, Mr. Walters sold the 300,000 shares, but retained 1.5 million other shares that he had held since November 2008. (Trial Tr. 1912:17-1914:8; GX 2305; GX 2305-A). Removing the trading in this time period would reduce the government's calculation by $370,380. (Watson Decl., Attach. A) (attached as Exhibit B).

- Mr. Davis testified that on April 12, 2010, he told Mr. Walters that Dean Foods was going to have a positive quarter. (Trial Tr. 758:16-19). This testimony makes no sense, because on April 9, 2010, Mr. Davis had received a mid-cycle update informing him that Dean Foods would miss the bottom of its quarterly guidance range. (GX 507). Furthermore, regarding Mr. Walters' sales of Dean Foods stock on May 3 and 4, the government was not able to identify a phone call between Mr. Walters and his broker after his phone call with Mr. Davis on May 2, 2010. Evidence presented by the defense showed that the sales of Dean Foods stock were motivated by the need to raise funds to meet operating expenses because the balance in the Walters Group's bank account had gotten extremely low. (Trial Tr. 2207:2-2209:12). Removing the trading in this time period would reduce the government's calculation by $7,338,256. (Watson Decl., Attach. A) (attached as Exhibit B).

- Mr. Davis testified that in mid-October 2010, he told Mr. Walters that the CFO was resigning. But email correspondence between Mr. Davis and Mr. Engles shows that Mr. Davis did not learn this information until November 4, 2010, at the earliest, when he heard it from Mr. Engles. (DX 289; GX 1917-D). Mr. Engles also testified that he did not learn of the resignation until the first week in November. (Trial Tr. 390:1-13). And the alleged loss-avoiding sale of Dean Foods stock in late October, well in advance of a November 9 earnings release, was necessitated by the purchase of a home. (Trial Tr. 2195:11-2196:6; 2199:3-2201:21). Removing the trading in this time period would reduce the government's calculation by $2,213,410. (Watson Decl., Attach. A) (attached as Exhibit B).

In sum, the evidence relating to the 2008–2010 trading was palpably weaker than the other evidence in the case and, as the defense argued at trial, Mr. Davis' testimony showed clear indications of being reverse-engineered to conform to the government's theory. Mr. Walters submits that this evidence does not rise to the level of preponderance of the evidence with

60

respect to the specific trades included in the government's gain figure. As a result, $16,328,776.48 should be subtracted from the government's calculation. (Watson Decl., Attach. A) (attached as Exhibit B).

Finally, the February 2013 sale of Dean Foods stock by which, according to the government, Mr. Walters avoided a loss of $1,619,618, should not be included in the calculation. Although this trade was within the applicable statute of limitations and is referenced in the Indictment, the government tellingly chose not to make the February 2013 trade the subject of a substantive count. At trial, the government's theory with respect to this trade was that Mr. Davis tipped Mr. Walters that Dean Foods was in danger of losing some of its Wal-Mart business (Trial Tr. 878:22-879:1), but exactly what information Mr. Davis had and when was never established. Moreover, the fact that Mr. Walters sold only one million of his 5.37 million shares (incurring an unrealized loss of $7,085,511.92) rendered the government's theory highly dubious. (Trial Tr. 2106:3-8). The theory was further discredited by the clear documentary proof offered by the defense that the real reason Mr. Walters sold a portion of his Dean Foods stock on February 1 was to fund the purchase of a house. (Trial Tr. 2203:09-2206:23; DX 2087 (Feb. 5, 2013 email instructing Walters Group employee to take $4 million from the Barclays brokerage account and referencing closing on a house)). The "loss avoided" – $1,619,618 – from that sale of stock should therefore not be included in the gain calculation. (Watson Decl., Attach. A) (attached as Exhibit B).

Using the government's calculations but including only the trading that corresponds to the substantive counts of convictions reduced the total gains from over $45 million to $19,245,244.24 (as reflected in Watson Decl., Attach. A, Column III (attached as Exhibit B)).

**B.    The Court Should Use a Method of Calculating Mr. Walters' Gains that Does Not Overstate Them**

For insider trading, the Guidelines define the defendant's "gain" as "the total increase in value realized through trading in securities by the defendant . . . ." U.S.S.G. § 2B1.4 cmt. background.  When calculating loss in securities fraud cases, "[t]he loss must be the result of the fraud," and any "[l]osses from causes other than the fraud must be excluded from the loss calculation." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006).  "[T]he offense in Section 10b-5 'is not the purchase of stock itself, but the use of a manipulative or deceptive contrivance in connection with the purchase.'" *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2012 WL 362031, at *9 (S.D.N.Y. Jan. 31, 2012) (citation omitted).  Accordingly, to calculate the defendant's gain, courts must determine the "size of the increase . . . in the price of a company's shares from the time that [the defendant] purchased them to the time that the public learned the inside information." *Id.* at *15.  Where the defendant bought shares in anticipation of an increase in the share price, the defendant's gain is equal to the sum of the increase in the price of the company's shares from the time the defendant purchased them, to the time the public learned the inside information, multiplied by the number of shares traded. *Id.*  In instances where the defendant traded in order to avoid future losses, the gain is equal to the decrease in value from the time that the defendant sold his shares to the time that the public learned the inside information, multiplied by the number of shares the defendant sold. *Id.*

The problem facing a sentencing court is that determining exactly when non-public information has been factored into the price of a stock is difficult and speculative.  Stock prices react to innumerable factors throughout the course of a day that are unrelated to the disclosure of previously non-public information.  As we understand it, the PSR's calculation, taken from the government, ignores this complexity by using as its yardstick the closing stock

price following the first full trading day after an announcement. For example, where an announcement is made before the market opens, the government uses the price at the close of that day's trading.

The use of the end-of-day price as a measuring point has been the subject of significant debate in recent insider trading cases in this district. In *United States v. Contorinis*, 09 Cr. 1083 (RJS), Judge Sullivan determined that it was more appropriate to measure a defendant's gain based on the "price during the day that results in the least loss" to the defendant. Sentencing Hearing, *United States v. Contorinis*, 09 Cr. 1083 (RJS), (S.D.N.Y. Dec. 17, 2010), Tr. 59:9-15. This approach is consistent with the Second Circuit's instruction that when calculating loss in securities fraud cases, "losses from causes other than the fraud must be excluded from the loss calculation." *Ebbers*, 458 F.3d at 128. Following *Contorinis*, the defendant in *United States v. Martoma* also raised this issue but the court did not need to decide between the two methodologies since either way the gain from the offense was between $200 million and $400 million (resulting in a 28 level enhancement). *United States v. Martoma*, 48 F. Supp. 3d 555, 571-72 (S.D.N.Y. 2014).

We respectfully submit that Judge Sullivan's approach in *Contorinis* is the right one, since it takes a conservative approach to calculating a defendant's gains and avoids exacerbating a Guidelines scheme that courts in this district have sharply criticized as being overly harsh and mechanical in insider trading cases. *See, e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account . . . and, by contrast, effectively guaranteed that many such sentences would be irrational."); Sentencing Hearing,

*United States v. Contorinis*, Tr. 58:5-6, (the Guidelines' loss table is "a clumsy tool to measure loss or gain or seriousness of the crime.").

Using the price most favorable to the defendant for purposes of calculating Mr. Walters' gain (with respect to the trades that, as set forth above, correspond to the substantive counts of conviction), results in a further reduction of $11,744,448.99[21] (as reflected in the difference between the totals in Columns III and V in Watson Decl., Attach. A (attached as Exhibit B)).

### C.    The Advisory Guidelines Calculation

Incorporating the adjustments set forth above yields a total illicit gain of approximately $7,500,795.25, (Watson Decl., Attach. A, Column V Total) (attached as Exhibit B),[22] resulting in an enhancement of four levels less than the PSR's calculation (18 rather than 22 levels), and an advisory sentencing range of 57 to 71 months.

## III.    THE NON-GUIDELINES SENTENCE RECOMMENED BY THE PROBATION DEPARTMENT IS APPROPRIATE

### A.    Standard

Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring the Court to consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The statute's

---

[21]    As part of this calculation, the gain from Mr. Walters' purchases of stock on May 8 and 9, 2012, are computed based on the lowest stock price on May 9, because Dean Foods announced its quarterly earnings prior to the opening of the market on that day and disclosed additional information in an earnings call. The government's calculation appears to use the closing price on August 8, 2012 (the trading day after Dean Foods announced its intention to spinoff WhiteWave) to measure the profit from Mr. Walters' purchases in May and in July.

[22]    Even this calculation is slightly overstated since it does not reflect any reductions to account for the commissions and per-trade charges that Mr. Walters paid to his brokerage firms each time he bought and sold stock. Since those charges total less than 1% of the amounts at issue, they make no difference to the Guideline level and therefore are not separately addressed here.

overarching requirement is that the Court "impose a sentence sufficient but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," to "provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)–(D). In other words, the Court must make "an individualized assessment" of all of the facts and circumstances. *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009) (internal quotation marks omitted). Such an assessment is particularly necessary in insider trading cases, where judges imposing sentences in this district have criticized the Guidelines for "having little to say of helpfulness to the sentencing judge," Sentencing Hearing, *United States v. Gupta*, No. 11 Cr. 907 (JSR), (S.D.N.Y. Oct. 24, 2012), Tr. 9:12-17, and leading to "sometimes absurd or certainly unjust results," Sentencing Hearing, *United States v. Newman*, No. 12 Cr. 121 (RJS), (S.D.N.Y. May 2, 2012), Tr. 50:25-51:7. In fact, in 2016, of the eighteen people sentenced nation-wide pursuant to § 2B1.4, seven received below-Guidelines sentences without government sponsorship, nine received below-Guidelines sentences with government sponsorship (including six under § 5K1.1), and only two received sentences within the Guidelines range. *U.S.S.C.'s 2016 Sourcebook of Federal Sentencing Statistics*, Table 28, *available at* http://www.ussc.gov/research/sourcebook-2016.

As the Probation Department has recognized in its recommendation to the Court, and as further demonstrated below, analysis of the § 3553(a) factors counsels very strongly in favor of imposing a sentence dramatically below the Guidelines range in this case. If sentencing is truly a moment of reckoning where someone's good works should be counted, *see Adelson*, 441 F. Supp. 2d at 513-14, Mr. Walters' lifetime commitment to providing help, support, and counsel throughout his communities and to all who have crossed his path is truly extraordinary

and supportive of a substantial downward variance from the Sentencing Guidelines range. Mr.
Walters has dedicated his life to improving the lives of those with developmental disabilities, as
well as giving back to his adopted community of Las Vegas, through serving on the board of
directors of at least eight different nonprofits and generously donating his time, energy,
expertise, and money to various charitable organizations, including Opportunity Village, the
Nathan Adelson Hospice, the Animal Foundation, and many others. Mr. Walters also continues
to give back to his home state of Kentucky, both through supporting the GO Center and the
Lexington Cancer Institute, and through continuing to lend emotional and financial support to
family and friends who still live there. Most noteworthy, perhaps, are Mr. Walters' countless
acts of support, kindness, and compassion towards friends, family, and even strangers. It is
difficult to imagine an individual who is more willing to go out of his way to lend support to
those in need, whether by buying a car for a struggling pre-med student, or funding the next six
years of his graduate education. A sentence substantially below the advisory Guidelines range is
further supported by Mr. Walters' advanced age and low likelihood of recidivism. In view of
Mr. Walters' extraordinary selflessness, altruism, and chartable spirit that he has shown to his
communities and individuals of all walks of life, we respectfully request that the Court accept the
recommendation of the Probation Department and impose a custodial sentence of no more than
one year and one day.

**B.    The Nature and Circumstances of the Crime**

Mr. Walters stands before the Court for sentencing having been convicted of
serious crimes. Nevertheless, there are certain aspects of the offense conduct that we
respectfully submit the Court should consider in determining the appropriate sentence.

First, we submit it was clear from the trial evidence that Mr. Walters' relationship
with Mr. Davis was based on a genuine friendship, admiration, and mutual respect. They began

66

their friendship in the 1990s – over a decade before the alleged conspiracy began. Over the years, they frequently played golf together and visited each other at their respective homes. When Mr. Davis' stepson passed away in 2007, Mr. Walters was "very sympathetic" and supportive of Mr. Davis and Mr. Davis' wife. (Trial Tr. 673:21-22). There is no evidence that Mr. Walters coerced Mr. Davis into sharing inside information with him – on the contrary, Mr. Davis testified that the information sharing began "fairly innocently." (Trial Tr. 601:14). In fact, according to Mr. Davis, he began sharing information with Mr. Walters in 2008 based only on a vague hope of some future, unspecified benefit. (Trial Tr. 602:20-603:8). Even after Mr. Walters first assisted Mr. Davis in obtaining a loan, initially from Luther James and then from The Walters Group, Mr. Walters never prompted Mr. Davis to share inside information in exchange for a forbearance or grace period on his payments.

There was also evidence presented at trial that Mr. Davis was all too willing to share information about Dean Foods with friends and acquaintances other than Mr. Walters. For example, Mr. Davis testified that in July 2012, shortly before the announcement of the WhiteWave spinoff in August, he told a jeweler friend, Denis Boulle, that he "thought it was a good time for him to own Dean Foods." (Trial Tr. 875:19-23). Mr. Davis admitted that he expected Mr. Boulle to purchase shares of Dean Foods based on his tip. (Trial Tr. 876:4). (And in fact Mr. Boulle and one of Mr. Boulle's associates at the jewelry store bought stock in Dean Foods and Darden Restaurants, but were not prosecuted for either trade.) Mr. Davis also admitted to lying to the in-house compliance counsel at Dean Foods when asked whether he was aware of any circumstances in which Mr. Boulle had gained knowledge of Dean Foods' business. (Trial Tr. 875:9-17). As he explained to the prosecutors before trial, Mr. Davis liked the way it made him feel when Mr. Boulle would call him "Mr. Dean Foods" upon entering the

jewelry store, (Davis 3500 Material, 3501-104, at 1; attached as Exhibit D), and that he "wanted
Boulle to benefit from the information [because] Boulle gave [Davis] good deals on jewelry
[and] occasionally loaned jewelry, such as necklaces and/or earrings, to [Davis'] wife." (Davis
3500 Material, 3501-103, at 2; attached as Exhibit C).

        Similarly, on July 20, 2012, Mr. Davis wrote to a friend that he would be able to
repay part of a loan after selling his Dean Foods shares in August 2012:

> [S]till working on selling some assets to pay off the loan. At a
> minimum, it looks like I will be able to sell some stock in August
> after the blackout period is over for me. That will enable me to
> pay down the loan in August.

(DX 4933; Trial Tr. 1212:14-17). On July 30, 2012, Mr. Davis sent a second email, confirming
that he planned to sell some of his Dean Foods stock after the August 8 earnings announcement:

> Looks like I will be able to sale [sic] some stock after Aug. 8
> earnings announcement in order to make a pay down. I am
> working on an asset sale which would allow me to pay off the note
> by the end of August. That would clearly be my preference. Let
> me update you more this week.

(DX 4933; Trial Tr. 1213:22-1214:1). Mr. Davis testified that shortly after he sent these emails
– on August 7, 2012 – Dean Foods announced its plans to spinoff WhiteWave. (Tr. 1214:13-
1215:1). Following the announcement, the price of Dean Foods stock increased significantly.
Mr. Davis also testified that he was aware that his friend invested in Dean Foods. In fact, in an
email dated October 17, 2012 – the day of the IPO pricing announcement – he wrote to his
friend: "Hope you made a lot of money on your investment." (DX 4048; Tr. 1220:7-18). Based
on this evidence, as well as the other crimes Mr. Davis committed totally independently of Mr.
Walters (including embezzlement, insurance fraud, and tax fraud), it is clear that Mr. Walters
was not responsible for "corrupting" Mr. Davis.

Outside of the conduct for which Mr. Walters was convicted, there is no indication that he conducted himself in a dishonest or dishonorable manner in connection with the investigation into the trading of Dean Foods and Darden securities. He was respectful and polite to the FBI agents who approached him on June 10, 2014 (around the time of the publication of the first news articles containing leaked information), and never lied to law enforcement agents or in sworn testimony. He made no attempts to destroy evidence or obstruct justice.

### C.    The History and Characteristics of the Defendant

The Court will not be surprised by the emphasis this submission places on Mr. Walters' extraordinary personal story, work ethic, magnanimity, and commitment to helping those less fortunate than himself overcome obstacles and achieve success. The long arc of Mr. Walters' life began with poverty and abandonment as a child. It has included the crushing sadness of a child diagnosed with a life-threatening brain disorder and a marriage lost to the throes of alcoholism. From these challenging beginnings, Mr. Walters found a way to straighten out his life, thanks largely to the influence of Susan Walters, his wife and partner for more than 40 years. Mr. Walters learned to tame his alcoholism and channel his passion for gambling and business into a spectacularly successful career. Mr. Walters has sought to emulate his own role models, by giving help to those in need, providing jobs and other opportunities to people from humble origins, and treating everyone with whom he comes into contact as he would want to be treated if their positions were reversed.

Imposing a sentence such as the one recommended by the Probation Department would allow Mr. Walters to continue being the kind of husband, father, employer, friend, benefactor, and productive member of the community that he has been for most of his adult life.

KL3 3131011.1

1.    *Mr. Walters' lifetime of good works weighs against imposing a Guidelines sentence.*

While many white-collar defendants can point to charitable donations and good works of some kind and in some degree, few have displayed Mr. Walters' level of commitment and compassion.  For this small subset of defendants, whose convicted conduct is dramatically at odds with their lives and characters, courts have considered the defendants' past histories of good works and lack of prior convictions and imposed sentences well below the Guidelines range. *See, e.g., Adelson*, 441 F. Supp. 2d. at 513 (noting that the defendant's "exemplary" past history and record of good deeds weighed in favor of a significant downward deviation from the Guidelines); Sentencing Hearing, *United States v. Collins*, 07 Cr. 1170 (LAP), (S.D.N.Y. July 15, 2013), Tr. 22:17-29:19 (describing the defendant's generosity and volunteerism and imposing a sentence of one year and one day, well below the Guidelines recommendation of life in prison); *Gupta*, 904 F. Supp. 2d at 354-55 (imposing a two-year sentence, well below the Guidelines range, based on the defendant's lifetime of good works and service to others).

As explained in great detail in Part I of this submission, over the decades, Mr. Walters has been a driving force for good in the greater Las Vegas community and beyond.  By generously donating his time and money, he has helped Opportunity Village grow into Nevada's largest private, nonprofit community rehabilitation program.  After serving as a member of the Board of Directors for many years, Mr. Walters now serves as one of the leaders of its Emeritus Board.  Due in large part to Mr. Walters' sustaining support and commitment, Opportunity Village is able to serve 2,000 clients annually and is a nationwide model job placement program for individuals with mental disabilities.  From selling tickets at fundraisers to helping develop Opportunity Village's facilities and businesses, Mr. Walters has worked tirelessly to promote Opportunity Village's mission and expand its programs.  According to Linda Smith, Opportunity

KL3 3131011.1

Village's Senior Executive Vice President, Mr. Walters has helped her raise over $500 million for this worthy charity. (L. Smith Ltr. at 1). In addition, Mr. Walters' substantial and direct involvement in furthering Opportunity Village's goals and expanding its reach is well documented in many of the letter submissions.

In addition to Opportunity Village, Mr. Walters has made significant contributions to other Las Vegas nonprofits, including organizations that support animal adoption, Alzheimer's treatment, cancer research, and youth mentoring, among many others. He and Susan started the first non-kill animal shelter in Las Vegas and provided scholarships for veterinary students who, in exchange for receiving a free education, agreed to work at the clinic for a few years after graduation, providing low cost spaying and neutering services. It is clear that Mr. Walters cares deeply for his community and strives to make it a better place for all.

Mr. Walters' kindness and compassion extends to his personal and professional relationships. Dozens of business associates and personal friends have submitted letters to the Court expressing their gratitude for Mr. Walters' friendship and extraordinary support. He has served as a mentor, benefactor, and father figure to numerous young people. He helped a young employee conquer ████████████ and he inspired fatherless teenagers to pursue their dreams. In times when his employees have experienced personal or financial hardship, Mr. Walters has offered support in a myriad of ways. His employees know that they can count on him in good times and bad, and they describe him as a hardworking, generous, and caring employer.

Many of Mr. Walters' friends wrote letters recalling times when they or a loved one were struggling through an illness, and Mr. Walters helped them by researching doctors, offering to pay for medical expenses, or simply offering emotional support. Mr. Walters has paid for a friend's ████████████ and offered financial support to countless other friends and

71

family who were facing serious illnesses. When one of his employees ███████████
███████████, Mr. Walters immediately flew to Kentucky to be by his side. In addition to
offering emotional support, Mr. Walters ██████████████████████████████████
███████████████████████████. (Gaiennie Ltr. at 1-2).

     Although he left his childhood home in Kentucky over four decades ago, Mr.
Walters continues to maintain close relationships with friends and family, sharing in his wealth
and prosperity. He has travelled back to Kentucky to visit sick friends and relatives, and quietly
paid for funeral expenses for loved ones who passed away. Mr. Walters also works closely with
numerous Kentucky nonprofit organizations. He has served as an advisor to the GO Center, in
their efforts to offer employment and life enrichment services to developmentally disabled adults
in Kentucky. He also spearheaded efforts to raise funds for the $1.5 million endowment of the
Lexington Cancer Foundation.

     In considering a potential sentence for Mr. Walters, we respectfully request that
the Court consider the sentencing of Joseph Collins in *United States v. Collins*, 07 Cr. 1170
(LAP), (S.D.N.Y. July 15, 2013). Mr. Collins, an attorney, was convicted of securities fraud and
conspiracy to commit securities fraud, money laundering, and to make false filings with the SEC
in connection with his role in a client's $1 billion accounting fraud scheme. The Guidelines
recommended a sentence of 95 years to life in prison. At his sentencing hearing, Judge Preska
noted Mr. Collins' exceptional history of good works and charitable giving, including opening
his home to his sister and her two young children after her divorce, fostering a friend of his son
whose parents were unable to care for him, providing an education scholarship to a low-income
teenager, and volunteering as a program coordinator and tutor for a scholarship program for at-
risk children in one of Chicago's poorest areas. Judge Preska noted that Mr. Collins' "good

deeds were not performed to gain status or enhance his image." *Id.* at Tr. 26:12–13. The Court also considered the other § 3553(a) factors, noting that Mr. Collins had lost his standing in the legal community as well as his ability to make a living. The Court noted that Mr. Collins faced potentially severe financial penalties in a related civil case. After weighing all of the statutory factors, the Court imposed a sentence of one year and one day, followed by two years of supervised release.

Along the same lines is *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012). The defendant there was facing a Guidelines range of 78–97 months following his conviction at trial for insider trading, but his lifetime of good works merited a significant downward departure. In imposing a sentence of 24 months, the sentencing court remarked: "The Court can say without exaggeration that it has never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need. The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence. And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?" *Id.* at 354.

2.      *Mr. Walters' age and health weigh against a Guidelines sentence.*

"When determining an appropriate sentence, the district court is permitted to consider the defendant's "age, education, mental or emotional condition, [and] medical condition." *Rita*, 551 U.S. at 364 (Stevens, J. concurring). Mr. Walters is 71 years old ███. The imposition of a Guidelines sentence using the range calculated in the PSR would likely approximate a life sentence, given that recent studies have shown that incarceration reduces the average person's lifespan by up to two years per each year in prison. Evelyn J. Patterson, "The

Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003," Am. J.
Pub. Health 103:3 (Mar. 2013) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC367
3515/; *see also* Anne C. Spaulding *et. al.*, "Prisoner Survival Inside and Outside of the
Institution: Implications for Health-Care Planning," Am. J. of Epidemiology at Tbl. 2 (Mar.
2011) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3044840/ (indicating that
non-black male prisoners experience an elevated mortality rate while incarcerated).

   Mr. Walters ███████████████████████████████████
███████████████████████████████████████████████. (PSR ¶¶ 66-67).
The stress of the prison environment will only exacerbate these conditions, causing Mr. Walters'
health to deteriorate over time. "Incarceration not only compounds existing health issues and
heightens the risk of future health problems, but – most alarmingly – has a deteriorating effect on
the bodies of incarcerated people, causing them to physically age at a much faster rate than the
public at large." The Osborne Association, "The High Cost of Low Risk: The Crisis of
America's Aging Prison Population" (2014) *available at* http://www.osborneny.org/news/unite-
for-parole-and-prison-justice/osborne-aging-white-paper/.

   In addition to ████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████. As the Department of Justice has
noted, first-time offenders over the age of 50 are "likely to have problems adjusting to prison
since they are new to the environment, which will cause underlying stress and probable stress-
related health problems." United States Department of Justice, "Correctional Healthcare:
Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates," 10 (2004)
*available at* https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf.

3.   *A reduced sentence will limit the time that Mr. Walters is unable to assist in the care of his mentally impaired son.*

As the PSR notes and as discussed earlier, Mr. Walters' son Scott suffers from paranoid delusions caused by tumors in his brain. (PSR ¶ 57). He has become convinced that his mother and stepfather are trying to kill him and he often becomes irrational and aggressive. For his own safety, Scott is currently confined to his home, with only occasional outings for doctor's appointments. His mother, Carole, wrote that Mr. Walters is often the only person who is able to calm Scott down when he is experiencing one of his episodes. Mr. Walters and his wife frequently travel to Kentucky to visit Scott and to accompany him to doctor's appointments. In June, Mr. Walters, with the Court's permission, accompanied Scott to medical appointments at the Mayo Clinic in Rochester, Minnesota. Carole fears that she will be unable to manage her son's care without Mr. Walters' continued presence and support.

**D.    A Lenient Sentence Will Provide Adequate Specific and General Deterrence**

The Court is of course required to consider both specific and general deterrence and fashion a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) and (C). We respectfully submit that the Probation Department's recommended sentence accomplishes these objectives.

1.   *Specific Deterrence.*

The Court can have confidence that the conduct that led to Mr. Walters' conviction will not recur. This case has destroyed the reputation that Mr. Walters spent a lifetime building and severely damaged his businesses. His conviction has made him a pariah in the financial community and among securities brokerage firms. Any term of incarceration will deprive him of time with his wife and his family and the ability to provide needed support to his

KL3 3131011.1

son. There is no reason to think that Mr. Walters would ever have either the opportunity or the motivation to engage in any similar conduct in the remaining years of his life.

In weighing the need for specific deterrence, the Court should also consider strongly Mr. Walters' age. According to statistics collected by the United States Sentencing Commission, the recidivism rate among offenders who are age 60 or older at the time of their sentencing is 14 percent – significantly lower than any other age group. United States Sentencing Commission, "Recidivism Among Federal Offenders: A Comprehensive Overview," 23 (2016) *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf. In considering the § 3553(a) factors, courts have declined to impose Guidelines sentences on defendants who are "over the age of 40, on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Hernandez*, No. 03-cr-1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005); *see also United States v. Hodges*, No. 07-CR-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting the "inverse relationship between age and recidivism" and "tak[ing] into account the defendant's age in fashioning his sentence"); *United States v. Carmona-Rodriguez*, No. 04 CR 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citing the defendant's age and low probability of recidivism as grounds for imposing a below-Guidelines sentence).

     2.    *General Deterrence.*

"[C]ommon sense suggests that most business executives fear even a modest term to a degree that more hardened types may not." *Gupta,* 904 F. Supp. 2d at 355. And research has shown that more rigorous and frequent enforcement and prosecution of financial crimes, rather than longer sentences, are the most effective deterrents to would-be white collar criminals. *See* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals*, 61 Wayne

L. Rev. 27, 49 (2015) *available at* http://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article=1099&context=lawfrp. For these reasons, the Probation Department is correct in its conclusion, embodied in its recommendation, that a sentence of one year and one day, in addition to the financial penalties and all of the collateral consequences that accompany a prosecution of this kind, is sufficient, but not longer than necessary, to deter potential future offenders.

## IV.    FORFEITURE

When a defendant is convicted of insider trading, a district court may "order the forfeiture of '[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation.'" *United States v. Contorinis*, 692 F.3d 136, 145 (2d Cir. 2012) (quoting 18 U.S.C. § 981(a)(1)(C)). The burden is on the government to establish amounts subject to forfeiture by a preponderance of the evidence. *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). To date, the government has not made an application to the Court for forfeiture and the PSR does not include any information about what the government is seeking. Accordingly, Mr. Walters respectfully requests the opportunity to supplement this submission if and when the government makes an application for forfeiture. The government has, however, asked Mr. Walters to place funds in escrow prior to sentencing and Mr. Walters has voluntarily agreed to deposit $20 million in escrow prior to sentencing without prejudice to either party's ability to make any arguments to the Court.

## V.    FINE

Mr. Walters understands that the Court, in fashioning the appropriate sentence, will require him to pay a fine and that the Court has discretion to determine the amount. In this case, the Probation Department recommends a fine of $10 million, which is within the range provided by the advisory guidelines.

KL3 3131011.1

The PSR is, however, mistaken in its determination that the maximum fine that may be imposed is $90 million. The PSR calculated this maximum based on twice the gain (using the government's number) that Mr. Walters obtained from the offense pursuant to the so-called "alternative method" set forth in 18 U.S.C. § 3571(d). (PSR ¶¶ 104, 106). But that method is not available here as a result of the central holding of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Following *Apprendi*, the Supreme Court has held that "requiring juries to find beyond a reasonable doubt facts that determine the fine's maximum amount is necessary to implement *Apprendi's* 'animating principle.'" *Southern Union Co. v. United States*, 567 U.S. 343, 350-51 (2012). Addressing the same issue presented here, the Second Circuit has explicitly held that increasing the statutory maximum fine using the alternative method in § 3571(d) can only be done based on a specific jury finding of the amount of gain by proof beyond a reasonable doubt. *See United States v. Pfaff*, 619 F.3d 172, 175 (2d Cir. 2010) ("absent a pecuniary gain or loss finding, a district court may not impose a fine greater than that provided for in [§ 3571] subsections (b), (c), or (e), whichever is applicable. Therefore, it is the clear implication of *Apprendi* . . . that when a jury does not make a pecuniary gain or loss finding, § 3571's default statutory maximums cap the amount a district court may fine the defendant.").

Here, the jury did not make a specific factual finding of the actual amount of gains that Mr. Walters incurred as a result of the convicted trades. Accordingly, the Court is limited to imposing the statutory maximum specified for each count of conviction. In this case, Counts 1, 2 and 7–10 carry a maximum fine of $250,000 pursuant to 18 U.S.C. § 3571(b)(3), and

Counts 3–6 carry a maximum fine of $5 million pursuant to 15 U.S.C. § 78ff and 18 U.S.C. § 3571(b)(1). The maximum total fine is therefore $21.5 million.

## VI.    RESTITUTION

The PSR indicates that both Darden and Dean Foods have expressed an intention to make a claim for restitution. (PSR ¶ 27). According to the PSR, Darden intends to make submissions regarding restitution in the near future, while "Dean Foods represented that they are owed $9,290,085.83 due to internal investigation costs, crisis management costs, legal fees, and other expenses[.]" This information, which is the only information provided to the Court or the defense regarding restitution, falls far short of what is required to support an order of restitution.

Under the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, restitution is available following conviction for certain Title 18 offenses where "an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii)–(c)(1)(B). The MVRA enumerates specific types of expenses that are compensable, including "necessary . . . other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). The Second Circuit has clearly held that expenses other than those enumerated in the statute are not compensable under the MVRA. *See United States v. Maynard*, 743 F.3d 374, 378 (2d Cir. 2014).

While certain attorney's fees can qualify, *see United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008), the statute does not provide carte blanche. Rather, the plain language of the MVRA covers only those attorney's fees that the Court finds, by a preponderance of the evidence, were incurred by a victim; were incurred while participating in the investigation, prosecution, or attendance at proceedings regarding the offense; were necessary; and do not require unduly complicated determinations of fact. *See id.* These requirements have not been met.

Beginning with Darden – and putting aside the absence of any submission by the company up to this point – the company is not entitled to any restitution because it is not a "victim" under the MVRA. This is because the government's case, as it related to trades in Darden stock, was based on the misappropriation theory of insider trading, in which the tipper is an outsider who, by tipping, breaches his duty to someone *other than the company whose shares are traded. See United States v. O'Hagan*, 521 U.S. 642, 652-53 (1997). In this case, the government alleged that Mr. Davis passed information to Mr. Walters in breach of a duty that Mr. Davis owed to Barington Capital, not to Darden. Since neither Mr. Davis nor Mr. Walters owed or breached a duty to Darden, Darden does not qualify as a victim under the MVRA.

With respect to Dean Foods, the company has not provided the Court with a basis for determining the amount of restitution, if any, to which it may be entitled. Courts confronted with similar claims have invariably required detailed submissions breaking down the costs at issue and explaining why each category of expense should be compensable under the statute. *See United States v. Donaghy*, 570 F. Supp. 2d 411, 419, 431 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (where NBA sought restitution from referee convicted of gambling conspiracy, the NBA "itemized the amount of money it was seeking for each category of what it believed were compensable costs and expenses and provided some documentation in support of its request," the court rejected those expenses not incurred in the course of assisting the government, and then "directed the NBA to submit further documentation in support of its request," including affidavits); *United States v. Gupta*, 925 F. Supp. 2d 581, 584 (S.D.N.Y. 2013) (court reviewed 542 pages of billing records from the law firm and cut down the fees as needed); *United States v. Ebrahim*, No. 12 Cr. 471 (JPO), 2013 WL 2216580, at *4 (S.D.N.Y. May 21, 2013) (court reviewed law firm billing records and

reduced fees as needed). And when the expenses relate to internal investigations, the Second Circuit requires that district courts be vigilant in ensuring that, consistent with the plain language of the statute, the company's investigation is actually necessary to assist the government in its investigation and prosecution. *See Battista*, 575 F.3d at 234 (agreeing "with the defendants that attorneys' fees associated with counseling the NBA on its public response to Donaghy's guilty plea were not recoverable as an 'investigation cost' pursuant to 18 U.S.C. §§ 3663(b)(4), 3663A(b)(4) . . . . [I]n contrast to the attorneys' fees discussed above and authorized by the district court, such damages, while certainly significant, were not associated with assisting the government in the investigation and prosecution of the defendants' criminal offenses, and thus, are not compensable under 18 U.S.C. § 3663(b)(4)").

Finally, we note that under 18 U.S.C. § 3664(h), the Court may apportion liability for restitution between Mr. Walters and Mr. Davis. Requiring Mr. Davis to pay not just half but most of any restitution owed to Dean Foods would be particularly appropriate here, because Mr. Davis, as the former Chairman of the Board of Directors, was the person who owed and breached a duty to Dean Foods, he is the but-for cause of all of Dean Foods' expenses, and it seems certain that the lion's share of Dean Foods' efforts to assist in the investigation and prosecution of this case were based on the conduct of Mr. Davis, not Mr. Walters (about whom Dean Foods knew nothing at all and certainly nothing that could assist the prosecution). The investigation into well-timed trades in Dean Foods securities by friends of Mr. Davis went beyond Mr. Walters, of course, and was obstructed by the numerous false statements that Mr. Davis made to investigators both inside and outside of Dean Foods. (*See* Trial Tr. 875:9-17).

## VII.   CONCLUSION

For the foregoing reasons, Mr. Walters respectfully requests that this Court follow the sentencing recommendation of the Probation Department, which Mr. Walters respectfully submits is more than sufficient to accomplish the purposes of sentencing under the analysis required by 18 U.S.C. § 3553(a).

Dated: New York, New York
       July 10, 2017

                    Respectfully submitted,

                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                    By:  /s/ Barry H. Berke
                    Barry H. Berke
                    Paul H. Schoeman

                    1177 Avenue of the Americas
                    New York, New York 10036
                    (212) 715-9100  (Phone)
                    (212) 715-8000  (Fax)
                    bberke@kramerlevin.com
                    pschoeman@kramerlevin.com

                    *Counsel for Defendant William T. Walters*

KL3 3131011.1