UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| - v. - | : | S1 16 Cr. 338 (PKC) |
| | : | |
| WILLIAM T. WALTERS, | : | |
| a/k/a "Billy," | : | |
| | : | |
| Defendant. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# **GOVERNMENT'S SENTENCING MEMORANDUM**


JOON H. KIM
Acting United States Attorney for the
Southern District of New York


Daniel S. Goldman
Brooke E. Cucinella
Michael Ferrara
Assistant United States Attorneys
    - Of Counsel -

**Table of Contents**

I.      INTRODUCTION ...................................................................................................... 1

II.     THE OFFENSE CONDUCT ..................................................................................... 2

III.    THE GUIDELINES CALCULATION ...................................................................... 7

   A.   The Correct Total Offense Level Is 30, Not 29 ................................................. 7

   B.   The Court Should Include Walters' Illicit Trading in 2006 and 2007 as Relevant
        Conduct ................................................................................................................ 8

   C.   The Court Should Include Walters' Illicit Trading in 2008 to 2010, and February 2013 ... 9

   D.   The Presentence Report Does Not Overstate Walters' Profits and Avoided Losses ......... 10

IV.     A SUBSTANTIAL INCARCERATORY SENTENCE IS NECESSARY TO ACHIEVE
        ALL OF THE GOALS OF SENTENCING ............................................................ 12

   A.   The Seriousness of the Offense ........................................................................ 12

   B.   Walters' History and Characteristics ............................................................... 16

   C.   The Goals of Sentencing Can Be Served Here Only with a Substantial Prison Term ....... 22

V.      FINANCIAL PENALTIES ....................................................................................... 25

   A.   Forfeiture Is Appropriate ................................................................................. 25

   B.   Additional Time Is Needed to Calculate Restitution ...................................... 25

   C.   The Total Maximum Statutory Fine Is $21.5 Million ..................................... 26

VI.     CONCLUSION ....................................................................................................... 26

# Table of Authorities

## Cases

*SEC* v. *MacDonald*, 699 F.2d 47 (1st Cir. 1983).............................................................. 11

*SEC* v. *Patel*, 61 F.3d 137 (2d Cir. 1995) .................................................................... 11

*SEC* v. *Wyly*, 788 F.Supp.2d 92 (S.D.N.Y. 2011) ......................................................... 11

*United States* v. *Boyd*, 407 F. App'x 559 (2d Cir. 2011)................................................ 8

*United States* v. *Collins*, 07 Cr. 1170 (LAP) ................................................................. 23

*United States* v. *Contorinis*, 692 F.3d 136 (2d Cir. 2012) .......................................... 25

*United States* v. *Fishman*, 631 F. Supp. 2d 399 (S.D.N.Y. 2009) ........................... 20, 21

*United States* v. *Goffer*, 721 F.3d 113 (2d Cir. 2013)................................................. 18

*United States* v. *Gupta*, S1 11 Cr. 907 (JSR)............................................................... 24

*United States* v. *Heffernan*, 43 F.3d 1144 (7th Cir. 1994)........................................ 23

*United States* v. *Jafari*, 663 Fed. App'x. 18 (2d Cir. Sept. 22, 2016) ........................ 25

*United States* v. *Martoma*, 48 F. Supp. 3d 555 (S.D.N.Y. 2014) ...................... 7, 11, 14

*United States* v. *Rajaratnam*, 2012 WL 362031 (S.D.N.Y. 2012) .............................. 11

*United States* v. *Riley*, S1 13 Cr. 339 (VEC) ............................................................... 24

*United States* v. *Silkowski*, 32 F.3d 682 (2d Cir. 1994)............................................. 8

*United States* v. *Vrdolyak*, 593 F.3d 676 (7th Cir. 2010) ......................................... 19

*United States* v. *Zvi Goffer, et al.*, S1 10 Cr. 56 (RJS) ............................................... 14

I.       INTRODUCTION

The Government respectfully submits this memorandum in response to the sentencing

submission of defendant William "Billy" Walters, dated July 10, 2017 ("Def. Mem."), and in

advance of Walters' sentencing, which is set for July 27, 2017. From 2006 to 2013, Walters

masterminded an insider-trading scheme that benefited Walters—and Walters alone—by over

$45 million in profits made and losses avoided. Time and again, quarter after quarter, Walters

exploited his corrupt relationship with Thomas C. Davis, who sat on the board of Dean Foods

Co. ("Dean Foods") and was privy to all manner of its corporate secrets. Davis was undoubtedly

an eager participant in the scheme. But only Walters knew the extraordinary magnitude of his

illicit trading activity, which at one point included a single position in Dean Foods stock worth

over $100 million. In so doing, Walters became an emblematic confirmation of an all too

common fear: that the stock market is rigged against average investors by a network of crooked

insiders, eager to trade market windfalls for favors. Unrepentant in his wrongdoing, Walters

engaged in grave, sustained criminal conduct that was singular in its purpose—to make a rich

man richer.

Despite the seriousness of his crimes, and notwithstanding that the United States

Sentencing Guidelines ("U.S.S.G." or the "Guidelines") call for a sentence of 97 to 121 months'

imprisonment,[1] Walters urges the Court to adopt the Probation Office's recommendation and

impose a term of incarceration of 366 days. As justification for such an extreme variance,

Walters cites what he describes as his extraordinary commitment to charity, letters submitted by

---

[1]        As explained in more detail below, the Government's calculation of the range under the
Guidelines differs from that of the United States Probation Office (the "Probation Office")
because the Probation Office incorrectly calculated the base offense level as seven, using
Guidelines Section 2B1.1, instead of eight under Guidelines Section 2B1.4, which explicitly
applies to insider trading.

his friends and family (all of whom appear to have been completely unaware of Walters' ongoing criminal conduct), and the substantial financial penalties to which he is subject as a result of his crimes. Perhaps unsurprisingly, Walters' submission devotes only two and a half of its 82 pages to the offenses of conviction.

On this record, on the facts specific to this defendant and this case, the Government respectfully submits that the Court should swiftly reject Walters' request and the Probation Office's recommendation, which would set a dangerous precedent for white collar criminals engaged in financial frauds. If the Court were to forego a substantial term of incarceration here in the face of a brazen scheme spanning years, imposing instead only significant financial consequences, it would send a message that wealthy defendants can simply buy their way out of the criminal justice system. Instead of Walters' sentence serving as a deterrent to future criminals, it will become a data point, factored into the risk/reward analysis performed by analysts and executives entrusted with sensitive or proprietary information and traders who may seek to obtain such information illicitly. Such a result would be wholly inconsistent with the principles of sentencing recognized by Congress and the United States Sentencing Commission. In short, the Court should squarely reject the toxic notion that wealthy criminals can write a check in exchange for avoiding meaningful jail time.

For the reasons set forth below, the Government respectfully submits that the goals of sentencing—particularly just punishment, promotion of respect for the law, and adequate deterrence—can be served only by a term of imprisonment within the Guidelines range.

## II.    THE OFFENSE CONDUCT

On April 7, 2017, following a three-week trial, a jury unanimously returned a guilty verdict after approximately four hours of deliberation convicting Walters on every count charged

2

in indictment S1 16 Cr. 338 (PKC) (the "Indictment"). The evidence at trial overwhelmingly established that Walters traded on the basis of inside information he had received from Davis, and that he had done so repeatedly, beginning as early as 2006 and continuing through the summer of 2013. Davis, in breach of his duties, repeatedly gave Walters material, nonpublic information about Dean Foods and Darden Restaurants, Inc. ("Darden"). In exchange, Walters provided Davis with his friendship and, among other benefits, almost $1 million in personal loans—the majority of which went unrepaid through the pendency of the conspiracy. Walters used Davis's tips to make trading profits and avoid losses, benefiting in total by more than $45 million.

At trial, the Government presented devastating documentary and testimonial evidence of Walters' guilt. The trading records and phone records formed the core of the Government's case, establishing a pattern of criminal communications between Walters and Davis—time and again, month after month, year after year.

As just one of many examples, phone, trading, and other records established that Walters and Davis committed insider trading in March 2008. Specifically, on March 17, 2008, Davis had lunch with Gregg Engles, then the CEO of Dean Foods. (GX 1903-A.)[2]  One week later, on March 24, 2008, at 12:51 p.m., Walters called his broker at Wells Fargo Advisors and they spoke for a few minutes. (GX 2303.) Walters hung up with his broker and immediately called Davis, whom he spoke to for 10 minutes. (Tr. 1877; GX 2303.) Walters then immediately called his broker again and bought over $9 million worth of Dean Foods stock. (Tr. 1877-78; GX 2303.) On April 30, 2008, Dean Foods announced better-than-expected quarterly results, and its stock

---

[2]     "GX" refers to a Government exhibit admitted at trial; "Tr." refers to the transcript of Walter's trial.

price increased. (Tr. 1878-79; GX 702-G, 1739-A.) Walters began selling that very day and by May 19 had sold over 2.16 million shares for a realized gain of over $1.7 million. (Tr. 1879-83; GX 2303-A.)

The records showed a similar, culpable pattern in June 2008. On June 11, 2008, Engles told Davis that Dean Foods likely would beat the quarterly earnings guidance it had given to the market in May 2008. (*See, e.g.*, Tr. 131-33; GX 1907.) On June 18, 2008, Walters and Davis spoke by phone for seven minutes. (Tr. 1892; GX 2304.) Later that evening, Walters called his broker three times. (*Id.*) The next morning, June 19, Walters bought almost two million shares of Dean Foods stock. (Tr. 1893; GX 2304.) After the market closed on June 19, Walters and Davis again spoke by phone for about 15 minutes. (Tr. 1895; GX 2304.) The next morning, June 20, Walters bought almost one million more shares of Dean Foods stock. (*Id.*) And Walters bought over 1.1 million more shares on June 23, the next trading day. (GX 2304.)

On June 25, 2008, Dean Foods unexpectedly announced that it was raising its guidance for the second quarter. (Tr. 133-34, 1898; GX 702-L.) After that announcement, the price of its stock rose by about $1.70. (Tr. 1899; GX 1739.) From June 25 to July 16, 2008, Walters sold over four million shares, realizing over $2.6 million in profits. (Tr. 1900-05; GX 2304, 2304-B.)

The records presented at trial clearly showed this same pattern of phone calls and trading beginning in 2006 and 2007 (Tr. 1950-66; GX 2300, 2301, 2302), continuing in late 2008 into early 2009 (Tr. 1906-14; GX 2305), the spring of 2010 (Tr. 1917-33; GX 2306), and the fall of 2010 (Tr. 1934-49; GX 2307).

The records admitted into evidence at trial also reflected a similar pattern of timely phone calls and trades in Dean Foods in May 2012 and continuing through the summer of 2012, leading up to, and after, Dean Foods' announcement that it would spin off its WhiteWave division. For

4

example, on May 8, 2012, Davis called into a special meeting of the Dean Foods board. (GX 1503, 2318.) Three minutes after hanging up, Davis called Walters and left a voicemail. (GX 1102, 1222, 1400, 2318.) Nine minutes after the conclusion of that voicemail, Walters called Robert Miller, his broker at Barclay's, twice in quick succession. (GX 1240, 2318.) One minute after the conclusion of Walters' second phone call to Miller, Miller placed an order in Walters' brokerage account to purchase 1.5 million shares of Dean Foods stock. (GX 202, 2318.)

   In July and August 2012, documentary evidence admitted at trial demonstrated similar patterns of timely calls between Davis and a prepaid phone used by Walters prior to Walters' trades in Dean Foods. For example, on July 16, 2012, Davis called Walters on Walters' prepaid cellphone and they spoke for about two-and-a-half minutes. (GX 1008, 2308.) Approximately one minute after the conclusion of that phone call, Walters called Miller, who then called back Walters approximately 18 minutes later. (*Id.*) Prior to the opening of the market the next morning, Walters purchased nearly $12 million of Dean Foods stock. (GX 204, 217-G, 2308.) Similarly, on July 21, 2012, a Saturday, Walters used his prepaid cellphone to call Davis and they spoke for nearly two minutes. (GX 1008, 2308.) One minute after the conclusion of that call, Walters called Miller, and they exchanged six more phone calls that weekend. (GX 1222, 2308.) On Monday, July 23, 2012, before the market opened, Walters purchased slightly more than $2 million of Dean Foods stock. (GX 202, 217-G, 2308.) Throughout the course of that day and before market open on the following day, Walters purchased another approximately $9 million of Dean Foods stock.[3] All of these purchases were in advance of Dean Foods August 7,

---

[3]  During July 2012, the documentary evidence also showed a number of text messages between Walters' and Davis's primary cellphones prior to other purchases of Dean Foods stock by Walters without any corresponding records of phone calls on any of their known cellphone numbers. (GX 2308.)

2012 announcement that it was spinning off WhiteWave – an announcement that shot value of

Walters' stock up by 40%, translating to $17 million dollars in gains. (GX 2012, 2308-A.)

And, based on more inside information provided by Davis, Walters bought close to $20

million in Dean Foods Stock following the spinoff announcement but before the announcement

of the IPO in October 2012. (GX 2309-A.) Walters held on to the majority of those shares until

the summer of 2013, when he sold them for $110 million—resulting in over $35 million in

profits. (GX 2314.)

In addition to the overwhelming documentary evidence of Walters' guilt, the jury also

heard directly from Walters' co-conspirator, Davis, who testified over the course of five days.

The core of Davis's testimony was that he had, on numerous occasions over the course of several

years, provided material, non-public information to Walters regarding Dean Foods and Darden.

(*E.g.*, Tr. 601-02.) Davis, who had met Walters in the mid-1990s, provided inside information to

Walters so frequently that he "didn't keep track of it."  (Tr. 600, 602.) Davis candidly could not

recall whether he had provided material, non-public information to Walters in 2006 and 2007.

(Tr. 651, 661, 663.) The first time Davis definitely remembered giving Walters inside

information was after a Dean Foods board meeting in early 2008. (Tr. 674.)

In addition to innumerable phone calls over the years, Davis testified about a number of

specific times he met or socialized with Walters in person. For example, Davis recalled an April

2008 trip to Palm Springs to socialize with Walters and others. (Tr. 691-94; GX 1904, 1905.) In

August 2008, Davis played in a golf tournament Walters organized in Kentucky. (Tr. 717-20;

GX 1909.) In April 2010, Davis met Walters at Walters' Las Vegas golf club, where they

discussed Dean Foods and the $625,000 loan that Walters arranged for Davis through Luther

James. (*E.g.*, Tr. 741-48, 757-58; GX 1710.) In late 2011, Davis again visited Walters to ask for

a second loan. (Tr. 798-99.) And Davis visited Walters for a few days in July 2012. (Tr. 848-51, 855-56; GX 1925.) During these meetings, Davis routinely provided Walters with inside information.

Davis also testified about the ways in which Walters sought to avoid scrutiny by law enforcement as the scheme continued through the years. Davis recalled meeting Walters at Love Field near Dallas "sometime in 2011." (Tr. 834-35.) Walters gave Davis the prepaid cellphone nicknamed the "Batphone" and said he would prefer if Davis used it when he needed to discuss Dean Foods with Walters. (Tr. 604, 933.) Walters himself was known to use multiple burner phones to conduct his gambling business. (Tr. 631,1339.) Walters introduced the use of code words and phrases, to avoid anyone overhearing Davis' illicit tips. Walters would call Davis on his regular cellphone "and leave [Davis] a message that said let's go get a cup of coffee, and that was the indication that [Davis] was supposed to call him back on the bat phone." (Tr. 604; *accord* Tr. 835.) Walters also asked Davis to refer to Dean Foods in those conversations as the "Dallas Cowboys." (Tr. 605, 835.)

## III.    THE GUIDELINES CALCULATION

### A.    The Correct Total Offense Level Is 30, Not 29

The Probation Office's calculation of the Guidelines offense level is incorrect, though not for the reasons Walters advances. Specifically, the Probation Office mistakenly looked to Guidelines Section 2B1.1 and began its calculation with a base level of seven. (PSR ¶ 33.) In fact, Guidelines Section 2B1.4 (titled "Insider Trading") applies here. *E.g.*, U.S.S.G. § 2B1.4; *United States* v. *Martoma*, 48 F. Supp. 3d 555, 561 (S.D.N.Y. 2014) ("U.S.S.G. § 2B1.4 of the Guidelines governs the calculation of a defendant's offense level for insider trading.").

Under Section 2B1.4(a), Walters' base offense level is eight. U.S.S.G. § 2B1.4(a). Because Walters' "gain resulting from the offense exceeded $6,500," the base offense level is "increase[d] by the number of levels from the table in § 2B1.1." *Id.* § 2B1.4(b)(1). The Presentence Report is right that "[b]ecause the gain resulting from the offense amounted to more than $45,000,000, a 22-level increase is warranted . . . ." (PSR ¶ 34 (citing U.S.S.G. §§ 2B1.1(b)(1)(L) and 2B1.4(b)(1).) The correct total offense level is therefore 30, not 29, with a resulting advisory sentencing range of 97 to 121 months' imprisonment.

## B. The Court Should Include Walters' Illicit Trading in 2006 and 2007 as Relevant Conduct

Walters objects to the 22-level increase on multiple grounds. First, Walters argues that the Court should not consider profits and avoided losses prior to the time period charged in the Indictment. (Def. Mem. 58.) That argument is meritless. "The Guidelines expressly provide for consideration of 'relevant conduct' in determining the base offense level applicable in a case where the conduct is 'part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States* v. *Silkowski*, 32 F.3d 682, 687 (2d Cir. 1994) (citing U.S.S.G. § 1B1.3(a)(2)); *accord, e.g.*, *United States* v. *Boyd*, 407 F. App'x 559, 561 (2d Cir. 2011).

> This provision applies only to an "offense of a character for which Guidelines § 3D1.2(d) would require grouping of multiple counts," *i.e.*, an offense for which "the offense level is determined largely on the basis of the total amount of harm or loss or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior,"

such as Section 2B1.4, which is applicable here. *Silkowski*, 32 F.3d 682, 687 (internal alterations and ellipsis omitted) (quoting U.S.S.G. § 1B1.3(a)(2)); *see also* U.S.S.G. § 3D1.2(d).

8

It is of no moment that Davis could not himself recall whether he passed inside information to Walters in 2006 and 2007. (Tr. 651, 661, 663.) The documentary evidence at trial established a pattern of timely communications and trades in 2006 and 2007 that mirrors the pattern throughout the period charged in the Indictment. (*See* Tr. 1950-66; GX 2300, 2301, 2302.) As the Court concluded in its opinion denying Walters' motion under Federal Rule of Criminal Procedure 33, "a reasonable jury would likely have convicted even if Davis had not testified." (7/6/2017 Op. at 7.) The documentary evidence therefore establishes by a preponderance of the evidence that Walters engaged in the insider trading scheme throughout 2006 and 2007, and the Court should consider that trading in computing Walters' profits and loss avoidance.

In any event, the applicable offense level would not change even if the Court did not include Walters' 2006 and 2007 trading. Walters concedes that the 2006 and 2007 trading contributed less than $8 million to the $45 million figure used in the Presentence Report. (Mem. 59; PSR ¶ 34). Even if the total gain (comprising profits and loss avoidance) is reduced to $37 million, that number remains well above the $25 million threshold for the 22-level enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(L).

**C.    The Court Should Include Walters' Illicit Trading in 2008 to 2010, and February 2013**

Walters also objects to the 22-level enhancement on the ground that the Government did not prove by a preponderance certain illicit trades from 2008 to 2010, and in February 2013. (Def. Mem. 59-61.) That argument is little more than Walters' summation regarding Davis's credibility recast as a sentencing argument, and it is meritless.

9

As described in Part II, above, and as the Court concluded in its July 6 Opinion, the documentary evidence overwhelmingly proved Walters' participation in criminal insider trading during those time periods. For each and every trade the defendant now challenges, from 2008 to 2010 and in 2013, the Government introduced evidence of the same quantity and caliber as it had for the substantively charged trades, each of which the jury found proven beyond a reasonable doubt. This proof included evidence, for each trade made, that Davis was in possession of material, non-public information; circumstantial and/or direct evidence of Davis passing the information to Walters; evidence of Walters' timely trading; and evidence of the profits Walters had reaped or the losses he had avoided on each trade. (*See, e.g.*, Tr. 1906-14 & GX 2302, 2303, 2303-A, 2304, 2304-B, 2305, 2305-A (2007 through 2009); Tr. 1917-33 & GX 2306, 2306-A (spring 2010); Tr. 1934-49 & GX 2307, 2307-A (fall 2010); Tr. 2012-15 & GX 2310, 2310-A (early 2013).) As such, the Government sufficiently proved Walters' profits and avoided losses from 2008 to 2010, and in early 2013, and they are properly included in the Guidelines calculation.

**D.    The Presentence Report Does Not Overstate Walters' Profits and Avoided Losses**

Finally, Walters objects to the Presentence Report's Guidelines calculation on the ground that it "us[es] as its yardstick the closing stock price following the first full trading day after an announcement." (Mem. 62-63.) This common method of calculating insider trading gains is appropriate in this case and the Court should reject the defendant's objection.[4]

---

[4]    As an initial matter, Walters seeks a reduction of less than $12 million based on this argument. (Def. Mem. 64.) That reduction alone would not lower the applicable Guidelines range, as Walters' profits and avoided losses would still be approximately $37 million, well above the $25 million threshold. *See* U.S.S.G. § 2B1.1(b)(1)(L).

"In determining the amount of gain, '[t]he court need only make a reasonable estimate. The sentencing judge is in a unique position to assess the evidence and estimate the [gain] based upon that evidence.'" *Martoma*, 48 F. Supp. 3d at 562 (alterations in original; ellipsis omitted) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)); *accord United States* v. *Rajaratnam*, 2012 WL 362031, at *21 (S.D.N.Y. 2012) (in insider trading case, determining applicable Guidelines range based on "reasonable estimate of the total gains").

The method employed in the Presentence Report's calculation—using the closing price at the end of the first trading day after the public announcement—is a reasonable one, and the one typically employed by the United States Securities and Exchange Commission ("SEC").  *See, e.g., SEC* v. *Wyly*, 788 F.Supp.2d 92, 100-01 (S.D.N.Y. 2011) (using closing price to calculate profits). A full trading day gives the market the opportunity to digest the materiality of the information disclosed. It is quite common for a stock price to fluctuate throughout a trading day before settling on a value at the close of trading that fully "bakes in" the announcement. Simply put, that is the price-discovery function of market trading at work. *Cf. SEC* v. *Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (finding, in the disgorgement context, that it "seems necessary to examine the movement of a stock's price after the relevant information is made public in order to determine the proper measure of the illicit profit (or loss avoided)" of an insider trader, but noting that "calculations of this nature are not capable of exactitude" and emphasizing that "any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty" (internal quotation marks and alteration omitted)); *SEC* v. *MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983) (en banc) (in disgorgement context, directing sentencing court to "determine a figure based upon the price of . . . stock a reasonable time after public

11

dissemination of the inside information" and emphasizing "that doubts are to be resolved against the defrauding party").

Moreover, Walters' positions in Dean Foods stock were often so large, that an attempt to quickly liquidate such a position would result in temporarily pushing the stock price down. (*See, e.g.*, Tr. 457; GX 2002 (showing that Walters' trades on one day in June 2008 accounted for 37% of the total market volume in Dean Foods stock).) Walters should not be allowed to profit from a proposed methodology that benefits him simply because of the vast scale on which he committed insider trading. On these facts, where there is uncertainty as to the exact price at which Walters could have exited a position, the closing price at the end of the day is a fair estimate on which the Court may reasonably rely.

## IV.   A SUBSTANTIAL INCARCERATORY SENTENCE IS NECESSARY TO ACHIEVE ALL OF THE GOALS OF SENTENCING

Applying the factors set forth in Title 18, United States Code, Section 3553(a), a sentence within the applicable Guidelines range of 97 to 121 months' imprisonment is "sufficient, but not greater than necessary" to serve the goals of sentencing.

### A.   The Seriousness of the Offense

The nature and circumstances of Walters' offense weigh heavily in favor of a sentence within the applicable Guidelines range. As a threshold matter, insider trading is a serious crime. A fundamental purpose of the securities laws is to outlaw deceptive practices in the securities markets. Insider trading undermines the public's confidence in the capital markets and deters ordinary investors from investing in those markets to the extent they are seen as rigged in favor

12

of well-connected, wealthy individuals who are willing to cheat to get ahead.[5] That is exactly what Walters did here.

Walters' conduct in this case was as egregious as it was brazen. Walters traded on inside information provided by Davis for years, making profitable trades ahead of big announcements and cashing out his positions ahead of bad news. At times, Walters' positions in Dean Foods— assembled using dirty information from Davis—amounted to over 30 percent of the trading volume in Dean Foods in a single day (*e.g.*, Tr. 457; GX 2002), a number that would be incredibly high for a hedge fund, and is almost unheard of for an individual. For Walters—who knew his information was good, and thus his risk minimal—it became standard practice to invest millions of dollars in Dean Foods stock before both scheduled and unscheduled announcements, getting it right each time. Walters' scheme with Davis benefited him by more than $45 million in profits and avoided losses, and he actually pocketed over $33 million.

The specifics of Walters' criminal conduct distinguish him from many of the insider traders who have been sentenced in this district, and all in ways that counsel in favor of a significant incarceratory sentence. First, while the present scheme was not the most profitable insider-trading scheme ever charged in this district, its scale as an insider-trading crime of individual gain is almost unprecedented. Walters was not a hedge fund manager. He was not an

---

[5]     *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6044, ("Insider trading damages the legitimacy of the capital market and diminishes the public's faith . . . . [T]he small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him."); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, *A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading,* in Vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.").

analyst. He did not commit his crime to make his investors money and get rich in the process by reaping substantial fees. He was in it simply and purely for himself. Walters made trading decisions based on illegal information, and he *alone* profited from those decisions to the tune of tens of millions of dollars.

A comparison with *United States* v. *Martoma*, S1 12 Cr. 973 (PGG), is instructive. That case charged the largest insider-trading scheme against an individual to date in this district, with illicit gains of approximately $275 million. But Matthew Martoma was trading on behalf of a hedge fund, SAC Capital. And so SAC Capital and its investors benefitted overwhelmingly from Martoma's insider trading. Martoma's personal financial gain, on the other hand, came principally through his incentive compensation, which totaled only approximately $9 million dollars—a number that pales in comparison to the profits reaped by Walters in this case. Following his conviction after a jury trial, the Honorable Paul G. Gardephe sentenced Martoma to 108 months in prison.

Along the same lines, Walters alone masterminded this scheme. This was not a case where blame is diffused through several tipping chains involving the illicit work of multiple levels of criminal conspirators.  Walters made all the important decisions for the scheme. In this way, Walter's personal culpability is somewhat comparable to that of Zvi Goffer, who was convicted after a jury trial in *United States* v. *Zvi Goffer*, *et al*., S1 10 Cr. 56 (RJS). The evidence in that trial established that Goffer organized and operated the insider trading ring, seeking out corruptible lawyers willing to disclose confidential information from their law firm in exchange for cash bribes. Goffer collected cash from co-conspirators to help fund the bribe payments, and distributed prepaid cellular telephones to his co-conspirators in an effort to evade detection by law enforcement. One point of distinction, however, is that as a result of Goffer's scheme, Goffer

14

and his co-conspirators made over $10 million in trading, with Goffer himself directly profiting only $1.3 million (as contrasted with the $33 million profit in this case). The Honorable Richard J. Sullivan sentenced Goffer to 120 months' incarceration. Here, Walters alone groomed Davis to begin sharing confidential information with him. Walters alone pushed for the tips. Walters alone authorized the trades. The process was calculated and deliberate, with a specific goal always in mind: more profit for Walters. Such deliberate and extensive fraudulent conduct, resulting in a huge personal gains, warrants a custodial term of significant length.

This is also not a case where the illicit gains flow from a single transaction or series of transactions. Here, the contrast with *United States* v. *Gupta*, S1 11 Cr. 907 (JSR), is illuminating. Rajat Gupta was convicted of tipping confidential corporate information to Raj Rajaratnam only three times, all within about a month in 2008, and received no share of the trading profits. Walters went back to Davis to obtain the invaluable information he needed again and again— month after month, year after year—for the better part of a decade. On innumerable occasions, he had the opportunity to stop—to say, "This is the last time." He had the opportunity to think of family members who relied upon him and of his good name in the charitable community. On innumerable occasions, he turned his back on his family's best interests by yielding to his greed and continuing to commit serious federal crimes.

As noted, Walters devotes little time in his submission to the nature and circumstances of the offense, focusing instead on Davis's role in the scheme, disputing the idea that Walters somehow "corrupted" Davis, and discussing Davis's conduct in 2012 (six years after he had begun tipping Walters) with other individuals who have no relation to Walters. (Def. Mem. 66-69.) The proof at trial made clear that Davis was quite willing to break the rules, and there is no question that Walters' recognized that quality in him and exploited it. It is no coincidence that

15

Tom Davis ended up in a criminal conspiracy with William Walters. The evidence at trial unequivocally demonstrated that Walters viewed Davis as his golden goose—a relationship to be cultivated and propped up when necessary to keep the illicit information flowing. Walters loaned Davis money in 2010 when he was in desperate financial need, but that was not out of the goodness of Walters' heart. To the contrary, by 2010 Walters had been heavily invested in Dean Foods for four years, and was dependent on Davis as his source of information.

The evidence showed that over time, as Walters lent Davis more money, Walters' phone calls and requests for information became more frequent, culminating in his delivery of the Batphone, which the co-conspirators used to discuss the WhiteWave spinoff in 2012. The Government agrees with the defense that Davis was no mere pawn in this insider trading scheme. But Davis pled guilty for his role in the scheme, and stood before the Court and admitted that he knew that what he had done was wrong when he did it, and he will be sentenced for his conduct. For all Davis's faults, however, Walters was the ultimate force behind this conspiracy. He alone understood the magnitude of the trading involved, and he alone reaped the enormous profits. The Court should therefore punish Walters accordingly.

B.      **Walters' History and Characteristics**

The conduct at issue in this case was not a brief aberration for Walters; it persisted for too long to be classified as such, and part of the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), is thus reflected in Walters' sustained scheme. That history and those characteristics are also reflected in the steps Walters took to hide his illicit contacts with Davis from law enforcement. Specifically, after learning in August of 2011 that the SEC was investigating his trading in an unrelated pharmaceutical stock, Walters could have taken it as a warning, taken a step back, and stopped trading on inside information provided by Davis. But he

16

did not. Instead, in or around the fall of 2011, Walters gave Davis the prepaid, disposable Batphone (the type of phone defense counsel argued that Walters had used regularly in his gambling business) and asked Davis to use it, along with coded language, when he provided Walters with inside information about the WhiteWave spinoff.

Walters continued to receive tips from Davis and to invest additional money in Dean Foods based on those tips. By the summer of 2013, after the WhiteWave spinoff was complete and Davis's tips about Dean Foods had dried up, Walters had invested $30 million in Darden after Davis sent him a confidential presentation. From his purchases of Dean Foods stock ahead of the expected (but never realized) Coke transaction in 2006, to his purchase of Darden Stock in August 2013, Walters engaged in criminal conduct on a regular basis over the course of seven years, each time weighing the risks and rewards of placing a trade based on illegally obtained information, and each and every time deciding that it was worth the risk.

If the Court were to accept the Probation Office's recommendation and sentence Walters to merely 366 days' imprisonment, for seven years' worth of criminal conduct that resulted in $45 million of gains, one could argue that Walters' was right, that it had been worth the risk. The Court would be sending that message not only to Walters, but to financial industry professionals everywhere, people who routinely engage in similar cost/benefit calculations in their trading decisions. A sentence for insider trading should convey that when a trader is tempted to cheat because of exceptionally high rewards (measured in dollars), the downside risk (measured in years of prison if caught) will correspondingly increase.[6] If the penalty is not sufficiently steep, a

---

[6]    In a 2013 survey of 250 financial industry professionals involved in securities trading, a full 23% of respondents stated that they "likely would engage in insider trading to make $10 million if they could get away with it." *See* Jason M. Breslow, *Survey: One in Four on Wall Street Open to Insider Trading*, PBS Frontline, available at http://www.pbs.org/wgbh/pages/

trader might determine that an opportunity to make millions in illegal profits outweighed the

relatively low risk of getting caught and serving a short sentence of imprisonment. But, as the

Second Circuit has recognized, that calculation changes when a potential insider trader considers

a penalty that approximates a decade in prison. *See United States* v. *Goffer*, 721 F.3d 113, 132

(2d Cir. 2013) ("The district court's assertion that insider trading requires high sentences to alter

th[e] calculus" that insider trading is "a game worth playing" given the potential for large profits

"is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors.").

Walters flouted the rules of the marketplace, knowing full well the impact that it would

have on others. Indeed, in the *60 Minutes* interview referenced in Walters' submission (Def.

Mem. 18), Walters complained (on a national platform) of the "thieves" on Wall Street, citing his

own personal losses in Enron, WorldCom, and Tyco, and stating that he "had been swindled" in

each instance. That interview aired in January 2011—at a time when Walters had been

committing insider trading for almost five years, and just months before he provided Davis with

the Batphone, over which he would continue to pump Davis for information in advance of the

WhiteWave spinoff. The interview also demonstrates that Walters knew his crimes were not

victimless; that he had an understanding that everyday investors in the market, who played by the

rules and took real risks in making their investments, lose faith in the market when people cheat.

Walters was deeply involved in a criminal conspiracy at the time of the interview, thus

highlighting his disregard for the rules and his belief that he was above the law.

But none of that mattered to Walters. He was willing to break the law, to take the risk of

hurting the markets and other investors as long as, when it was over, he was a richer man then

---

frontline/business-economy-financial-crisis/untouchables/survey-one-in-four-on-wall-street-
open-to-insider-trading/.

when he had started. Because, to be clear, in 2006, when Walters made his purchase in Dean Foods, he was already a very rich man. He did not commit these crimes out of need or desperation. The Probation Office noted in the Presentence Report that, because of Walters' preexisting wealth, it could not determine a motive for the crime. (PSR at 31.) But anyone who sat through the trial and understands the nature of what happened here—the extensive, insistent phone calls with Davis, the repeated loans to a man who clearly had no way of repaying them, the willingness to make huge trades in the market—knows that Walters was driven both by greed and a desire to flout the law. Despite approximately 70 pages devoted to his history and characteristics, Walters' submission does not touch on that.

Instead, Walters' submission attempts to focus the Court almost entirely on Walters' generosity with respect to Opportunity Village, and his commitment to providing opportunity and education to individuals suffering from a disability. It is true that Walters gave generously to Opportunity Village and, based on the submission, it appears he has helped set up both a financial network and a support structure that will serve the needs of the individuals served by Opportunity Village for years to come—even if he is not there to oversee it.  It is clear that this is an important cause that is meaningful to Walters, and the defendant is right to submit that the Court should consider it when determining the appropriate sentence. It does not, however, excuse his conduct. "Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card." *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010).  The court in *Vrdolyak* further cautioned against allowing an affluent offender "to point to the good his money has performed," and demand a lower sentence in return, warning that this unsavory practice essentially amounts to the purchase of a lower sentence and "suggests that society can always be bought off, even by those whose

19

criminal misconduct has shown contempt for its well-being." *Id.* at 683 (internal citations omitted).

The Court should of course also consider the letters of support filed on Walters' behalf. The question becomes what weight the Court should assign them. There is no doubt that Walters has an incredibly strong support network and helped his friends and employees in the past. That is admirable and something the Court should consider. But these letters also demonstrate the advantages that Walters enjoyed at the time he chose to commit these crimes. In this respect, Walters is as different from many defendants that come before the Court as night is to day. Walters had wealth, he had respect, he had a loving family. His crimes are the very opposite of ones of need. Such considerations do not counsel in favor of a lenient sentence; they counsel against one.[7]

This reality also highlights for the Court the duplicitous nature of the life Walters led—charitable community member by day, serial fraudster by night. In *United States* v. *Fishman*, 631 F. Supp. 2d 399, 400 (S.D.N.Y. 2009), Judge Marrero made a number of observations about sentencing for white collar crime that resonate equally here. Judge Marrero recognized that in white collar cases where the defendant can afford able counsel, the plea for leniency follows a pattern: the list of the defendant's achievements and virtues is "long and impressive"; they are good family men, caring spouses, loving parents, loyal and reliable friends; they are outstanding at their chosen profession; "to their community's charities and public causes, they are generous

_____

[7]      The limitations of character references at sentencing are perhaps best exemplified by the letter written by the former sheriff of Clark County, Nevada, Bill Young. As a member of law enforcement in the Las Vegas area from 1979 through 2007, Sherriff Clark concludes that Walters "has not ever committed a crime here in Las Vegas, I believe that 100%." In fact, Walters had already begun committing insider trading with Tom Davis in 2006. The simple reality is that Walters hid his crimes from all those who have come forward to write on his behalf.

patrons and sponsors"; and letter writers "underscore the loss they and the larger community would suffer if deprived of the defendant's invaluable contributions to their public services." *Id.* at 400-01. Walters' submission adheres to this pattern, including letters from charities, family members, politicians, and sports heroes. But Walters' plea for leniency suffers from the same defect that Judge Marrero recognized in *Fishman*:

> [F]or all of their outward rectitude, these otherwise good people suffer a fatal flaw: they sometimes lead a double life. Somewhere at the core, in a distorted dimension of the soul, the public image they present is as false as the lies they tell to sustain the appearance of an exemplary life. And somehow, for reasons that always defy reason, they fall into crime, doing wrongful deeds that seem aberrational, selfish and greedy acts that, when caught, they claim are entirely out of character with their otherwise law-abiding lives.

*Id.* at 401. Accordingly, in determining the appropriate sentence for Walters, the Court should not view his crimes in isolation to his life. His criminal conduct, the greed and lawlessness with which he behaved, informs who he is and should be given adequate weight in determining his sentence.

Walters also suggests that his advanced age and various medical conditions weigh in favor of leniency. While the Government does not dispute much of what Walters proffers, some context may be helpful. Walters reports that, along with certain physical ailments, in 2014 ██ ████████████████████████████████████████████████████. (PSR ¶¶ 68,69; Def. Mem. 73,74.) In preparation for sentencing, the Government obtained records from Rancho Santa Fe (attached as Exhibit A), just one of the golf clubs to which Walters belongs in the San Diego area, and which he frequented with both Davis and Phil Mickelson. From 2014 to the present, Walters golfed at Rancho Santa Fe 77 times – including three times in the last two weeks. The Government respectfully suggests that since Walters' age and health concerns are not so serious as to keep him off the links, they should not provide a basis to keep him out of jail.

21

Finally, while it is no doubt true that a substantial term of imprisonment will cause grief and hardship to Walters' family, that factor does not weigh against imposition of a Guidelines sentence. Negative impact on family members is the saddest and also perhaps the most predictable consequence of criminal conduct. That consequence is exacerbated here by the challenges faced by Walters' son, who resides in Kentucky with his mother. While incarcerated, Walters will still be able to call his son, hopefully minimizing any impact on his health. And the Government would not object to the defendant's designation to a facility as close to his son's residence as possible to facilitate visitation. But at bottom, Walters knew about his son's condition when he chose to trade on inside information, notwithstanding the hurt it could cause those closest to him. The harm he has caused to others should not inure to his benefit at sentencing.

**C.    The Goals of Sentencing Can Be Served Here Only with a Substantial Prison Term**

In light of the nature and circumstances of the offense, and Walters' history and characteristics, a sentence within the Guidelines range is necessary to serve the goals of sentencing. Only a Guidelines sentence will promote respect for the laws Walters so flagrantly violated, provide just punishment, adequately deter similar conduct, and prevent any disparity in sentencing.

Walters' arguments to the contrary lack merit. First, for the reasons described above, a short prison term would not serve the goals of either specific or general deterrence. There is no assurance that, absent a substantial prison term, Walters will abide by the rules going forward. The defendant's previous arrests did not ensure that. Nor would a lenient sentence send the appropriate message to others contemplating insider trading. Because insider trading schemes are

22

both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). The goals of promoting respect for the law and ensuring just punishment would similarly be undercut rather than furthered by a below-Guidelines sentence here.

Walters does not even argue, nor could he, that a sentence within the applicable range would result in an unwarranted sentencing disparity. Instead, Walters asks the Court to consider the sentence in *United States* v. *Collins*, 07 Cr. 1170 (LAP), which involved an attorney convicted for his limited role in the massive Refco accounting fraud. (Def. Mem. 72.) In that case, the Honorable Loretta A. Preska departed from a Guidelines range of 95 years to life to sentence Collins to 366 days' imprisonment. Walters is correct that Judge Preska focused on Collins' charitable good works as a basis for departure. But nearly every other fact of that case is distinguishable. Collins did not "devise, plan, or initiate any aspect of the fraud." (*Collins* Sentencing Transcript, Docket No. 244 at 21). Collins "did not personally receive or even attempt to receive any profit from the fraud." *Id.* His "lack of any intended or actual personal gain from the fraud distinguishe[d] him from the other Refco defendants." *Id.* While other fraudsters might have a "lust for money," Collins had a relatively modest income at his law practice. *Id.* at 22, 34. Collins lost his law license and his ability to make a living as a result of the conviction. *Id.* at 31.

In contrast, Walters was the architect of this insider trading scheme, working for years to place massive trades on illegitimate information and then seeking to cover his tracks with burner

23

phones and code words. All of the money from the scheme went in Walters' pockets. And Walters will suffer no meaningful professional consequences from his conviction. His car dealerships will continue to operate and he will surely endure no stigma in the twilight world of professional gambling. Indeed, if the Court varies downward substantially, Walters might be lauded for accurately calculating the respective risks and rewards of insider trading; for making the right bet. Thus, *Collins* is not instructive here.[8]

The conduct here was serious, and warrants a serious sentence of incarceration, on par with other significant insider trading cases in this District. Mathew Martoma was sentenced to 108 months' incarceration for his central role in a $275 million insider trading scheme that lasted approximately 18 months and made him $9.3 million dollars. Zvi Goffer was sentenced to 120 months in prison for leading a $10 million insider trading ring for one year, personally netting $1.3 million. In *United States* v. *Rajaratnam*, S1 09 Cr. 1184 (LAP), Raj Rajaratnam was sentenced to 132 months of incarceration for helming five insider trading conspiracies that occurred over the course of approximately six years, resulting in gains of over $50 million (with only $7.5 million going directly to Rajaratnam). In *United States* v. *Riley*, S1 13 Cr. 339 (VEC), David Riley was sentenced to 78 months' incarceration for his role as the tipper in an insider trading conspiracy occurring over the course of two years and resulting in profits of close to $40 million, none of which went to Riley. In comparison to these offenders, Walters' criminal conduct either went on for substantially longer or netted him more money—and in most cases, both. His sentence should reflect the egregious and brazen nature of his sustained criminal

---

[8]     Nor is *United States* v. *Gupta*, S1 11 Cr. 907 (JSR), to which the defendant also directs the Court. (Def. Mem.73.) In *Gupta,* the defendant's professional history, as well as domestic and international good works were truly an outlier, and the conduct of conviction (passing three tips over approximately 5 weeks) bears little resemblance to the sustained criminal conduct at issue here.

conduct, and send a message to the capital markets and investors about the consequences that flow from these crimes. The Government respectfully submits that only a Guidelines sentence can accomplish that.

## V.    FINANCIAL PENALTIES

### A.    Forfeiture Is Appropriate

The Government seeks $33,027,203 in forfeiture. That number represents only what Walters unlawfully and personally profited from insider trading—not his avoided losses. *See United States* v. *Contorinis*, 692 F.3d 136, 145 (2d Cir. 2012) (holding that a defendant "cannot be ordered to forfeit profits that he never received or possessed"). The Government reached that figure by starting with a total profit and loss avoidance of $45,155,938.48 for Walters' illicit trades from 2006[9] through 2013, and subtracting avoided losses, fees, and commissions. The Government will submit a proposed order before sentencing under separate cover.

### B.    Additional Time Is Needed to Calculate Restitution

Though the Government is in discussions with the immediate victims of Walters' crimes, it is not yet in a position to provide a considered view as to whether the different categories of expenses incurred support their restitution requests. The Government therefore respectfully requests an additional 90 days after sentencing, pursuant to Title 18, United States Code, Section

---

[9]    As discussed above, the Government has proven by a preponderance of the evidence that the trades in 2006 and 2007 were part of the same scheme charged in the Indictment. Accordingly, the proceeds of those illicit trades are properly forfeited. *See, e.g., United States* v. *Jafari*, 663 Fed. App'x. 18, 23-24 (2d Cir. Sept. 22, 2016) (in healthcare fraud scheme prosecution, holding that  the defendant was correctly assessed the proceeds of billings not directly charged in the indictment, or contained in counts on which she was acquitted where government established underlying criminal conduct by preponderance of the evidence). In the event that those  trades are not included, the amount subject to forfeiture is $25,352,490.

3664(d)(5), for a final determination of the victims' losses and the finalizing of a proposed restitution order.

###    C.    The Total Maximum Statutory Fine Is $21.5 Million

The Government agrees with Walters that the Presentence Report overstates the maximum fine. (Def. Mem. 77-78; PSR ¶ 104.) The maximum total fine the Court may impose is $21.5 million. (Def. Mem. 79). Moreover, the Presentence Report incorrectly states that the bottom of the applicable fine range is $15,000. (PSR ¶ 106.) In fact, the applicable range is $30,000 to $21.5 million. U.S.S.G. § 5E1.2(c)(3)-(4). The Government seeks a fine within that range.

## VI.    CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose a term of imprisonment within the applicable Guidelines range of 97 to 121 months and order forfeiture and a fine as appropriate.

Dated: July 21, 2017
       New York, New York

Respectfully submitted,

JOON H. KIM
Acting United States Attorney


By:     /s/ Brooke E. Cucinella
        Daniel S. Goldman
        Brooke E. Cucinella
        Michael Ferrara
        Assistant United States Attorneys