H7RQWALs

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3
                 v.                        16 CR 338 (PKC)
 4                                         Sentence
     WILLIAM T. WALTERS
 5
                     Defendant
 6   ------------------------------x

 7                                         New York, N.Y.
                                           July 27, 2017
 8                                         11:15 a.m.

 9
     Before:
10
                         HON. P. KEVIN CASTEL
11                                         District Judge

12
                            APPEARANCES
13
     JOON H. KIM
14        Acting United States Attorney for the
          Southern District of New York
15   BROOKE CUCINELLA
     DANIEL S. GOLDMAN
16   MICHAEL FERRARA
          Assistant United States Attorney
17
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
18        Attorneys for Defendant
     BARRY H. BERKE
19   PAUL H. SCHOEMAN
     MICHELLE BEN-DAVID
20
     WRIGHT STANISH & WINCKLER
21        Attorney for Defendant
     RICHARD A. WRIGHT
22
     -Also Present-
23   NICK ANDERSON, FBI (Special Agent)
     SARAH PYUN, Paralegal (USAO)
24

25
```

H7RQWALs

```
 1                    (In open court; case called)

 2               THE DEPUTY CLERK:  For the government.

 3               MS. CUCINELLA:  Brook Cucinella, Daniel Goldman and

 4      Michael Ferrara for the government.

 5               Joining us at counsel table is Sarah Pyun from our

 6      office, a paralegal specialist, and Special Agent Nick Anderson

 7      from the FBI.

 8               Good morning, your Honor.

 9               THE COURT:  Good morning to you all.

10               THE DEPUTY CLERK:  For the defendant.

11               MR. BERKE:  Good morning, your Honor.

12               On behalf of Mr. Walters, Barry Berke and Paul

13      Schoeman, Michelle Ben-David of Kramer Levin.  We also have

14      Mr. Rick Wright as well.

15               THE COURT:  Good morning to you all.

16               The first thing I'm going to do is I'm going to go

17      through the materials I have, and the question will be do I

18      have everything I should have on the subject of sentencing.

19               I have a presentence report, recommendation and

20      addendum approved by probation on June 30, 2017.

21               I have a sentencing memorandum both in redacted and

22      unredacted form that was submitted on July 10 on behalf of

23      Mr. Walters, and that was accompanied by a volume of sentencing

24      exhibits that was submitted in both redacted and unredacted

25      form.
```

1              I have a sentencing memorandum from the government

2      which was transmitted on July 21.

3              I have a reply sentencing memorandum submitted by

4      Mr. Walters on July 25.

5              I also have a number of letters that have come in.

6      One is from a Michael Douglas Hash which was received on or

7      about June 20, 2017.

8              I have a victim impact statement transmitted on or

9      about July 21, 2017.  It's a letter from Dean Foods dated

10     July 19.  I also have a submission which I received from Dean

11     Foods last evening dated July 26.  It's on the letterhead of

12     the Wilmer Hale law firm.

13             I have a letter from an Allan Creel of Creel Printing

14     dated May 8, 2017.

15             And I have two unredacted copies of Exhibit A to the

16     sentencing memorandum that I received from the government.

17             Do I have everything I should have on the subject of

18     sentencing?

19             First from Mr. Berke.

20             MR. BERKE:  You do, your Honor.  Thank you.

21             THE COURT:  Ms. Cucinella.

22             MS. CUCINELLA:  Yes, your Honor.

23             THE COURT:  Has the defendant read, reviewed and

24     discussed with you, Mr. Berke, the presentence report,

25     recommendation and addendum?

H7RQWALs

1            MR. BERKE:  He has, your Honor.

2            THE COURT:  Does he have any objections to the facts

3    set forth in the presentence report?

4            MR. BERKE:  Your Honor, with the Court's permission,

5    I'm tag-teaming with Mr. Schoeman this morning, and I'll let

6    him address that.

7            THE COURT:  Go ahead.

8            MR. SCHOEMAN:  Thank you, your Honor.

9            There are no objections to the facts in the

10   presentence report.  The only objections that we have are

11   related to the offense level calculation as it affects the

12   guideline range.

13           THE COURT:  All right.  Thank you.

14           Does the government have any objections to the facts

15   set forth in the presentence report?

16           MS. CUCINELLA:  No, your Honor.

17           THE COURT:  All right.  I adopt as my findings of fact

18   the facts as set forth in the presentence report.

19           Now, let me go through the guideline calculations and

20   the issues relating thereto.

21           The government points out that the base offense level

22   for insider trading under Guideline 2B1.4 is level 8, not level

23   7 as set forth in the PSR.

24           Does the defendant agree?

25           MR. SCHOEMAN:  Yes, your Honor.

5

H7RQWALs

1          THE COURT:  So that will be changed to base level 8.

2          Now, as I understand it, with regard to the amount of

3     loss, there are a number of objections raised by the defendant,

4     and as I understand them, the disagreement falls into three

5     categories:

6          First of all, that trading in 2006 and 2007 not be

7     included.  They predate the conspiracy and not merely because

8     they're not included within the indictment but also because of

9     the view that they were not proven, the defendant urges that I

10    not include them in calculating the amount of affected commerce

11    for guideline purposes.

12         With regard to the second category, it relates to the

13    period covered within the conspiracy count, and the defendant

14    urges that I only consider three counts of insider trading in

15    Dean Foods in 2012 and the one count in Darden in 2017 and

16    urges that the other trades in the 2008 to 2013 period were not

17    proven and should not be considered.

18         And the third category, as I understand it, relates to

19    the calculation of the losses and how they are determined, and

20    therefore, you urge that I follow the approach taken by Judge

21    Sullivan and not that urged by the government, which is the end

22    of the full trading day following disclosure.

23         I did that summary because I have spent time with

24    this, I have read the submissions, and I am happy to give both

25    sides an opportunity to say what they wish on this issue.

H7RQWALs

1           Go ahead.

2           MR. SCHOEMAN:  Thank you, your Honor.

3           And you have summarized it exactly right.  We have

4    factual disputes about the trading in the pre-indictment

5    period, as well as the trading that was not the subject of a

6    specific jury verdict, and I would love to sum up again on all

7    of those trades.

8           THE COURT:  We've been there and we've done that.

9           MR. SCHOEMAN:  The only point we want to make is

10   particularly with respect to the 2006-2007 trades, the quality

11   of the proof was much different in that the cooperating witness

12   did not recall tipping, and phone record evidence was not in

13   the same nature that it was in later periods.

14          With respect to the calculation issue, this is, I

15   think, an interesting issue that has popped up in certain cases

16   where it matters or might matter, and I think the point is that

17   the method used by the government is one of many ways to

18   calculate gains and losses, and it is concededly by everyone, I

19   think, somewhat arbitrary; that is, it's the end of a

20   particular day.  And I think it recognizes that there are

21   things that go on in the stock market that aren't directly tied

22   to the release of inside information, and therefore you need to

23   estimate sort of what the market impact or what the gain was

24   related to the release of the inside information.

25          In the Contorinis case, as your Honor pointed out,

H7RQWALs

1   where Judge Sullivan looked at this issue, he basically decided

2   that he was going to use a method that was more favorable to

3   the defendant, and I think in part of recognition of the fact

4   that the guidelines with respect to insider trading and with

5   respect to economic loss are fairly harsh, numbers get big very

6   quickly, guideline ranges get big very quickly and that those

7   big numbers don't necessarily correspond to culpability.

8          And so in order to sort of mitigate the harshness of

9   the guidelines in insider trading cases, I think he agrees that

10  one thing to do would be to adopt the calculation that's more

11  favorable to the defendant.  And as a result, where this leaves

12  us, is if the Court were to exclude the trades that we asked to

13  exclude and use the calculation method that we advance, then

14  the gain calculation is less than $9.5 million and therefore

15  the offense level is four levels less.

16          THE COURT:  Yes.  As I see it, you have to run the

17  table on this.  If you win on two of the three, you're still in

18  the 45 to 65, or, rather, the 25 to 65 category.  The

19  government urges that the gains and losses avoided total

20  $45 million.  If you back out the pre-indictment and you use

21  the Judge Sullivan methodology, you're still in the 25 to 65

22  range.  You have to win I think on all three.

23          MR. SCHOEMAN:  I think there are two ways to get below

24  25, and it's a little confusing.  Our chart I know is hard to

25  read, but I think there are two ways.  You could adopt the

H7RQWALs

```
1    government's methodology and only use the 2012-2013 Dean Foods
2    and Darden trades, you would get $20 million.
3         Or our second column, you could use our methodology,
4    exclude the 2006 and 2007, and that number that's the second
5    row from the bottom, $22.6 million.  So that's exclude the 2006
6    and '07, use our methodology, you get the $22 million.  You
7    don't get below $9.5 million unless all three of those issues
8    are decided in the defendant's favor.
9         THE COURT:  Yes.  Well, I understood your brief to
10   argue not that this is a determinative factor here, but there
11   was a 7.9 deduct if you excluded the '06, '07 trading and 11.7
12   deduct if you used the Judge Sullivan method, which by my
13   calculation still puts you over 25 million, but we're not
14   trying to back into something here in any event.
15        So anyway, anything else you want to tell me beyond
16   that?  I've read your submissions.
17        MR. SCHOEMAN:  Thank you, your Honor.
18        THE COURT:  Anything the government wants to say in
19   response?
20        MS. CUCINELLA:  Briefly, your Honor.
21        First, with respect to the issue of calculation, while
22   it is true that Judge Sullivan chose to use that method in
23   Contorinis, that case is an outlier.  The majority of cases in
24   this district use the calculation method that the government
25   advocates for here, which takes into account movement during
```

9

H7RQWALs

1    the day after the information has been announced to the market.

2              We think that that is reasonable, and we think it is

3    appropriate in this case, and it's appropriate especially in a

4    case like this where the defendant had been trading in huge

5    volumes of stock.

6              To use Judge Sullivan's method would allow essentially

7    a windfall to take the lowest number on that trading day when

8    he's trading in huge volumes because he himself is actually

9    moving the market in certain situations.  Here we have a

10   situation where there are numerous instances where he was

11   trading in 37 percent of the stock, 25 percent, 29 percent, so

12   he himself is a market mover.  In that situation, he can cause

13   a depreciation of the stock price, and thus he gets the benefit

14   of his own sales in this calculation.  We don't think that's

15   appropriate here.  We actually think it's an absurd result

16   given the facts on this case.

17             The guidelines clearly state that it is within the

18   Court's discretion on how to make this calculation and that you

19   are best positioned looking at the facts and circumstances to

20   make that calculation.  Here, it's most appropriate to take the

21   number at the end of the trading day after the information has

22   been essentially baked into the trading activity, and we think

23   that that is the right outcome here, and that's the method the

24   Court should use.

25             With respect to 2006 and 2007, as your Honor is aware,

H7RQWALs

1    the government proved up those trades at trial.  We introduced

2    proof that Mr. Davis was in possession of inside information at

3    the time of each of the trades in situations where we didn't

4    have phone records.  As your Honor will remember, in 2006 and

5    early 2007, we did not have the phone records for that period,

6    but Mr. Davis testified that he was regularly in California

7    with Mr. Walters.

8          Mr. Walters sure enough started trading for the very

9    first time in Dean Foods right as Dean Foods was in

10   communications with Coke about a major acquisition.  He bought

11   heavily right up until October, which is when it was secretly

12   announced at a Dean Foods board meeting that the negotiation

13   had fallen apart.  He sold immediately and he sold all of it.

14   That pattern is consistent with all of the proof in this trial,

15   and that is the case for the 2006 trades.

16         2007 we have phone records that again show the time

17   periods, I believe it's Government Exhibit 2300, that deals

18   with the spring of 2007 where we again have Dean Foods events

19   that Tom Davis is in possession of the information, a

20   communication between Mr. Walters and Mr. Davis and then

21   well-timed trading activity that results in profits.  So we

22   think that that should absolutely be included as relevant

23   conduct in both the gain calculation and for forfeiture, which

24   I know we'll get to later.

25         So we certainly proved it beyond a preponderance of

H7RQWALs

1    the evidence, and the same is true for the trades in 2008

2    through 2010 and 2013.  There we have the same quality and

3    caliber of proof that we had on the substantive counts.  Agent

4    Roberts took the stand and testified through each of the

5    trades, each of the communications.  I have a chart with all of

6    those exhibits or, excuse me, a binder with all of those

7    exhibits, if your Honor would like to see them today, but the

8    government's position is all of those trades, both 2006, 2007

9    and 2008 through 2010 and 2013, were proved up certainly by a

10   preponderance of the evidence.

11           THE COURT:  Thank you.

12           To begin with, today I am not going to determine the

13   dollar amount of restitution or the dollar amount of

14   forfeiture.  Those will follow in an order within 90 days with

15   further briefing by the parties, but Section 3553(a) -- would

16   you like to recess?

17           MR. FERRARA:  I apologize, your Honor.  We were just

18   discussing, we think your Honor has to include some forfeiture

19   order today under the rule, so we just wanted to make sure -- I

20   apologize.

21           THE COURT:  I'm aware.  If you listen, you would have

22   heard that I said the dollar amount of forfeiture.  I did not

23   say that I was going to defer whether I would impose

24   forfeiture, nor did I say I was going to defer restitution.

25           MR. FERRARA:  That's my fault, your Honor.  I

H7RQWALs

1    apologize.

2            THE COURT:  Would you like more time to confer with

3    your colleagues?

4            MR. FERRARA:  Absolutely not, your Honor.

5            THE COURT:  All right.

6            Under the Sentencing Guidelines which are the only

7    things I need to focus on today in terms of dollar amounts, the

8    guidelines calculate an advisory range that I must consider in

9    determining sentencing in this case.  It suffices to say that I

10   am convinced that the methodology on the estimation of loss in

11   terms of using the closing price at the end of the trading day

12   is most appropriate in this case, the end of the trading day

13   following disclosure, and I recognize that some of the

14   disclosures were made even before the market opened.

15           I think the government is quite correct about the fact

16   that the size of the trades by Mr. Walters is such that they

17   make it particularly inappropriate to use intraday trading.

18   The Court only need make a reasonable estimate of the loss, and

19   the Sentencing Commission says the sentencing judge is in the

20   unique position to assess the evidence and estimate the loss

21   based upon the evidence.  And so I will use the end of the

22   trading day methodology.

23           Secondly, with regard to the trades between 2008 and

24   2013; in other words, those for which evidence was offered at

25   trial during the conspiracy period, it seems to me, and I find

H7RQWALs

1    as a fact, that the government proved these by a preponderance

2    of the evidence.  This includes the trading before the '08

3    earning announcements, the tip in June '08, the February '09,

4    April '10, October 2010 and the February '13 trading in

5    connection with the potential loss of Walmart business.  So

6    those I find to have been proven by a preponderance of the

7    evidence.

8            With regard to the trading in '06 and '07, I need not

9    decide that.  That will be an issue on which I will get further

10   briefing when I set the dollar amount of restitution and

11   forfeiture.  And the question for me will be:  Did the

12   government prove those trades to be unlawful by a preponderance

13   of the evidence.

14           So, with that, I conclude that the defendant is at

15   total offense level 30, Criminal History Category I; that with

16   regard to Counts Two through Ten, he may be sentenced up to 20

17   years on each count, up to five years on Count One.  The

18   guideline range is 97 to 121 months imprisonment, and, of

19   course, probation has recommended 366 days' imprisonment, a

20   year and a day, which the defendant urges I adopt.

21           I am first going to hear from Mr. Berke, then I will

22   hear from Mr. Walters if there is anything he wishes to say,

23   and then I will hear from the government.

24           Go ahead, Mr. Berke.

25           MR. BERKE:  Thank you, your Honor.

H7RQWALs

1    As your Honor knows, we have been representing

2 Mr. Walters for some time now, and in the course of

3 representing Mr. Walters, we've had a somewhat unusual

4 experience in that throughout our representation, people of all

5 stations in life have come up to us or contacted us in a

6 variety of ways before the trial to tell us about Mr. Walters'

7 good works and good deeds.

8    It began when we visited Mr. Walters where he has an

9 office at the golf course he owns in Las Vegas, and the people

10 who worked at his restaurant in the kitchen told us stories

11 about how he helped their families, helped them through medical

12 difficulties, helped their families come to the United States,

13 was there in challenging and difficult times, both financially

14 but also personally in providing his support and guidance, how

15 he was there in good times, accompanied them to their

16 children's graduations, high school, college, was there with

17 them when they were sworn in as citizens, in a variety of

18 different ways.

19    Throughout that time, your Honor we continued to hear

20 from people, from his friends, from colleagues and the like of

21 really extraordinary acts of good deeds and good works, and we

22 weren't surprised when the sentencing became appropriate and

23 necessary, given the result at trial, that we learned so much

24 more.  Frankly, we didn't expect as much as we would learn that

25 there were so many more good deeds and good acts, which I know

H7RQWALs

1    your Honor has seen in the many letters submitted in our

2    submission.

3            I felt one of the challenges we would have here, your

4    Honor, is to make sure that we did an adequate job making sure

5    your Honor appreciated all of these factors that we would

6    submit are so relevant under 3553 in evaluating Mr. Walters as

7    a person and his history, as the guidelines dictate.  One of

8    the things that was encouraging to us is that the role that the

9    probation department obviously plays both by statute and

10   practice, and that is that they conducted such a full

11   investigation into his background, they not only reviewed so

12   much but they spoke to people that they asked us to put them in

13   touch with.  They learned as much as they could for their

14   purposes to assist the Court about Mr. Walters, not only about

15   the offense but also about the factors that are relevant under

16   3553.

17           I should tell you, your Honor, that we did not

18   advocate a sentencing position to probation.  We didn't

19   advocate it to the probation officer, the supervisor who

20   approved it or the head of the office who signed off as well.

21   We simply gave them the materials they asked and additional

22   information related to Mr. Walters and his background.  So

23   obviously your Honor makes the decision of sentencing, of

24   course, but we know that the probation department's

25   recommendation is taken seriously in this courthouse and is

1   respected as well.  So we were pleased that probation having

2   learned all that we had learned, or at least a significant

3   portion of that, came out with the sentencing recommendation of

4   a year and a day that we urge your Honor to impose.

5          Your Honor, if I can say again, I think that the

6   dictates of so much of what's been written, and your Honor

7   certainly knows from all the sentences your Honor imposes, if

8   there is ever a time when somebody's good works and good deeds

9   throughout their life should matter and be considered, today

10  would be the day.  Obviously, your Honor is to consider the

11  offense conduct, it gives us the guideline range your Honor

12  said you're starting with, and the question is from our

13  perspective under 3553, how much of a variance is warranted

14  based on these other qualities and characteristics.

15         From my perspective, if may, your Honor, I think the

16  one thing that I personally found so striking, and in some ways

17  humbling, were the individual personalized stories that are

18  told throughout all the letters that were submitted, and it's

19  hard to identify or distinguish between them since there are so

20  many and of a different quality, but the one, if I may, your

21  Honor, that stood out in my mind was Dr. Benjamin Kelly.

22         It stood out because that was the gentleman, if you

23  recall, Mr. Walters simply met when he was visiting the doctor.

24  He was a pre-med student who was having financial difficulties.

25         THE COURT:  Ben.

H7RQWALs

```
 1              MR. BERKE:  Ben, thank you.  Exactly.  Thank you, your
 2    Honor.
 3              And who was having difficult because his car broke
 4    down.  Mr. Walters proceeded first to help him fix his car and
 5    then ultimately got him a new car, and then decided and agreed
 6    to pay for his medical education as well as support him through
 7    his residency; and then ultimately when Dr. Kelly started a
 8    family, to start a college fund for his family, all the while
 9    providing support and guidance, and according to Dr. Kelly,
10    mentorship that helped him achieve.  And Dr. Kelly said, which
11    again did strike me, was that all he asked in return,
12    Mr. Walters was that Dr. Kelly pay it forward.  And Dr. Kelly
13    is just now finishing his residency at the Mayo Clinic with
14    plans to pay it forward.
15              And I would say that is but one example.  I know your
16    Honor saw the scores of people who identify Mr. Walters as one
17    of or the most important person in their life in either helping
18    them overcome a great challenge in their life, whether it
19    involved a personal challenge, a professional challenge or
20    something involving their family or someone who helped them
21    achieve some of their dreams, either by being a mentor or
22    encouraging and giving so much of himself personally in
23    addition to the situations where he also gave of himself
24    financially.
25              And I would submit, your Honor, in trying to evaluate
```

H7RQWALs

1    how much of a variance or how much credit is deserving of that,

2    I would submit those individual personalized stories of where

3    Mr. Walters outside of any limelight, people he knew well,

4    employees, friends, people of all stations, and even strangers,

5    where he put himself out in such a significant, meaningful and

6    direct and selfless way to help people, I would submit today is

7    the day I would ask your Honor to consider the extent of credit

8    that that is deserving.

9         And I would say that beyond that, obviously as I

10   mentioned, not only the employees and colleagues and people he

11   worked with, but again and again the stories that did come out

12   for these purposes showed a person who did not hesitate to show

13   good deeds, good acts and generosity to all the people who

14   either he employed or had contact with either in times of need

15   or times of opportunity, and I really do think that the set of

16   stories are true outliers and I would submit extraordinary in

17   both their scope, number and the impact they had on the people

18   that Mr. Walters tried to help.

19        Beyond that, your Honor -- and again I know your Honor

20   has read and seen the significant materials, and we thank you

21   for that because I know it was a lot -- Mr. Walters also has

22   given back to his community.  Obviously, Mr. Walters had a lot

23   of challenges to overcome in his youth.  He was abandoned by

24   his mother.  After his grandmother who raised him died, he was

25   required to pay rent to live with his mother in her new

H7RQWALs

1    family's home.  And then he had tragedy young in life when his

2    son had a tumor and left him as developmentally disabled in a

3    tragic way that was very difficult for Mr. Walters.  Again,

4    your Honor, in looking at his lifetime of good works and good

5    deeds, I would submit that Mr. Walters' internalizing and

6    acting upon those experiences to try to give back to his

7    community specifically based on what he had learned is, again,

8    truly striking.

9            I know your Honor read a lot and saw a lot about

10   Opportunity Village, and again, I think what is significant is

11   not just I think the number from Linda Smith, the executive

12   director, was over $500 million that he helped to raise, but

13   more than that is that Mr. Walters' individual and personal

14   role in expanding the mission of Opportunity Village to expand

15   to be a residence for people with developmental disabilities,

16   to have programs so that they can function more fully in life

17   and then to have a vocation, where he personally played the

18   significant role in creating the document management system and

19   then finding the businesses throughout Nevada that would use it

20   to the extent that Opportunity Village was the second document

21   management business in all of southern Nevada.  He then

22   expanded it to additional campuses so that the number of people

23   who would be impacted by it would be expanded throughout the

24   state so thousands of people received the benefit of it.

25           I also was struck, your Honor, if I may, by the

H7RQWALs

1    stories of the people who Mr. Walters toured through to try to

2    get their support, the number of residents he knew by name,

3    whom he hugged and had a personal connection with.  And again,

4    your Honor, this is simply beyond raising money, doing those

5    sorts of things, but it is giving of himself over many decades

6    to try to impact significantly the underserved population in

7    his communities, and that he created an entity that became a

8    standard there for other organizations.

9         There are letters, obviously, your Honor, where in

10   Kentucky, for example, you heard from the Guthrie Foundation

11   that provides similar services that reached out to Mr. Walters

12   and he was equally generous with his time and energy and ideas

13   and his resources to support them and try to help them achieve

14   what they achieved at Opportunity Village.

15        And, your Honor, the other things, again, the personal

16   touch that Mr. Walters gave, for example, the caregivers' ball;

17   not a fancy big fund raiding event, but an event that he

18   started with his wife, Susan Walters, to honor the people

19   serving in all the non-profits in Nevada that serve underserved

20   communities and to honor the caregivers each year who most

21   represented the values that they were trying to encourage and

22   respect; that he and his wife for many decades at Christmas,

23   recognizing Mr. Walters' difficult upbringing, they decided to

24   give back to as often as many as 75 families at Christmas of

25   gifts and the like that they would not otherwise have.

H7RQWALs

1          There were other instances and people, of course your

2     Honor saw, who reflected on what Mr. Walters did again, not

3     just financially, but also with his time, energy, commitment

4     and proactive outreach to his churches, hospitals, hospices,

5     homeless organizations, exploited children, first responders,

6     animal shelters, and, again, your Honor, I would submit that

7     what was most striking is that virtually through a letter they

8     talked about not just the resources that Mr. Walters helped

9     raise in many of these instances but his time and energy and

10    leadership that he gave of himself.

11         In addition to that, your Honor, the other thing I

12    found so unusual and striking in any context, let alone in

13    this, were that people talked about how much Mr. Walters sought

14    to encourage other people who had the capacity to be leaders at

15    whatever station to give back and pay it forward as well.  The

16    business competitor who went out with him was surprised to hear

17    Mr. Walters be encouraging of him and encouraging that he

18    continue supporting cancer research that he wanted to do given

19    his wife's illness, the other people who Mr. Walters helped

20    planned the seeds for their business and part of his advice was

21    you've got to give back to your community in doing that and all

22    the people who laid out what they have personally done by

23    inspiration of Mr. Walters.

24         Obviously, your Honor, I appreciate the difficult job

25    you have and don't in any way minimize the offense conduct that

1   your Honor is considering, but I would submit, your Honor, and

2   again, looking at the 3553 factors, the extent of the

3   variances, the incredible, remarkable, I would submit, good

4   deeds and good works that have defined Mr. Walters throughout

5   his life, that this would be the time that he gets credit and

6   it supports a very dramatic variance from the sentencing

7   guideline range.

8           Obviously, Mr. Walters is 71-years-old.  Obviously,

9   his health is laid out.  He has many of the issues that someone

10   in their seventies have, and those issues I can suspect will

11   only get worse, as is generally the case.  And when you look at

12   all the other factors we laid out in our papers, including his

13   son's condition, the role he plays with that, we urge your

14   Honor to sentence Mr. Walters to the sentence range recommended

15   by the probation department, a year and a day, which obviously

16   is a substantial jail sentence for anyone, including for

17   someone 71 years old.

18           If your Honor has any questions about anything we've

19   submitted in our voluminous materials and letters, we're happy

20   to address it; but beyond that, your Honor, again, I would ask

21   you to obviously consider all of this, as I'm sure you will.

22           THE COURT:  Thank you, Mr. Berke.

23           MR. BERKE:  Thank you, your Honor.

24           THE COURT:  Mr. Walters, this is your opportunity to

25   speak to bring the Court's attention any facts or circumstances

H7RQWALs

1    that you believe I should take account of in passing sentence

2    upon you today.  Mr. Walters, if there is anything you wish to

3    say, this is the time to say it.

4              THE DEFENDANT:  Thank you, your Honor.

5              I'd just like to thank you for reading all of the

6    materials that were submitted on my behalf.  There were a lot

7    of them.  I appreciate you taking your time and doing that and

8    taking them into consideration.  Thank you.

9              THE COURT:  Thank you very much.

10             This is the government's opportunity to speak.

11             MS. CUCINELLA:  Thank you, your Honor.

12             The letters and Mr. Berke's submission and the words

13   he said today definitely portray one aspect of Mr. Walters, and

14   the Court should properly consider that in fashioning its

15   sentence.  However, it essentially ignores the reason why we're

16   here today, and that was Mr. Walters' criminal conduct.  His

17   conduct in this case was egregious.  It wasn't aberrational,

18   and it was entirely motivated by greed and a desire for

19   Walters, who was already a very rich man, to get even richer.

20             And it worked.  The defendant in this case personally

21   profited more than almost any other insider trader that this

22   Court has seen.  He wasn't trading on behalf of a fund.  He

23   wasn't simply making commissions or bonuses.  Every dollar of

24   profit of this scheme went into Mr. Walters' pocket.  This sets

25   him apart from almost all of the defendants in insider trading

H7RQWALs

1    cases.  Also setting him apart is the fact of his role in this

2    scheme as well as the sheer length of the conduct.

3           First, with respect to his role, he was at the center

4    of this crime.  He exploited his relationship with Tom Davis.

5    He made the trading decisions, and he made the money.  This is

6    not a situation that involves an extended tipping chain or

7    blame to be spread around.  Yes, Tom Davis is culpable and he

8    was a willing participant in this scheme, but even he didn't

9    know the extent or the scope of the trading that Walters was

10   engaged in.

11          Billy Walters masterminded this scheme, and he alone

12   made every dollar.  Those two facts together separate him from

13   the defendants that have received significant variations or

14   departures from the guidelines, the fact of his role and the

15   fact of the length of his scheme.  He did this year after year

16   after year.  He did it knowing the condition of his son.  He

17   did it knowing his advanced age.  The last trade he made in

18   connection with this crime he was 69-years-old.  That

19   distinguishes him, the length of time that he did this; that he

20   went back to Davis, back to the well and back to the market to

21   just make more money.

22          Matthew Martoma and Mr. Gupta, in both of those cases

23   the defense raised them in their reply submission as

24   significant variations from the guidelines.  Both of those

25   cases their guidelines were incredibly high because they were

H7RQWALs

1   dealing with money that was made by a fund.  Almost all of the

2   insider trading cases, hedge funds and co-conspirators factor

3   into the loss calculation that raises the guidelines.  We have

4   neither co-conspirators nor hedge funds in this case.  This is

5   not a situation where the guidelines overstate culpability.

6   Those situations exist, but this isn't one of them.

7          With respect to Mr. Walters' age and health, and

8   again, I mentioned that he made these decisions knowing his

9   age, knowing the state of his health and knowing his son's

10  conditions.  He was 69, as I said, when he made his last trade.

11  It was a $30 million trade in Darden Restaurants based on a

12  PowerPoint that Tom Davis sent him in the mail.  He shouldn't

13  get a pass simply because he was older.  He also shouldn't get

14  a pass simply because of the harm that it would cause to his

15  family, a factor that is certainly not unique to Mr. Walters.

16         The government is incredibly sympathetic to his son

17  and to the other members of the family that his conduct has

18  hurt, and that is always the case in these crimes.  This is a

19  man who knew that when he did this.  This is also a man who

20  considered very carefully the risks and rewards, the

21  cost-benefit analysis when he decided to engage in this

22  conduct.  He chose money over his family's needs and

23  well-being; not because he needed to.  This is far from a crime

24  of desperation, but simply because of greed.

25         It's also significant, as I mentioned, that this

H7RQWALs

1    conduct was not aberrational.  It started in 2006 and went

2    through 2013.  Year after year he received inside information

3    and he made trading decisions.  Further, what did he do when he

4    learned in 2011 that the SEC was looking into his trading

5    activity?  He started using a burner phone with Tom Davis.  He

6    started using code words.  He took on countersurveillance

7    techniques, and he kept going.  The scheme was calculated, it

8    was premeditated, and it went on for years.

9         The government disagrees with the defense in its

10   submission that stated there isn't a real need for specific

11   deterrence here.  There are a number of things that we point

12   the Court to for that, starting with his 60 Minutes interview

13   that he gave in January of 2011 where he presented himself as a

14   victim of the thieves of Wall Street.  His quote following his

15   conviction of this case that he had just "lost the biggest bet

16   of his life," that doesn't express remorse.  He hasn't been

17   chastened by this process.  Despite being on home detention,

18   the defendant was golfing less than two weeks ago while his

19   defense counsel was preparing the submission citing his health

20   concerns and his age.  This is disingenuous at best;

21   duplicitous at worst.

22        The government asks that the Court reject the

23   defendant's request for a sentence of 366 days and not send a

24   message that this was simply transactional costs or that the

25   rich can buy their way out of jail time.  The government asks

H7RQWALs

1    that the Court send a message to Mr. Walters and everyone else

2    who is willing to roll the dice on insider trading crimes to

3    people who think like Mr. Walters and believe that they are

4    above the law.  A significant incarceratory sentence will send

5    the right message.

6              THE COURT:  Thank you.

7              This is the Court's statement of reasons for the

8    sentence to be imposed on defendant William T. Walters.

9              In sentencing the defendant, I've considered all of

10   the materials that I referenced at the outset.  I've considered

11   the very thoughtful statements of Mr. Berke and Ms. Cucinella,

12   the brief statement by Mr. Walters, I've considered each of the

13   factors set forth in Section 3553(a).  I need not recount all

14   that I've considered, but I've considered all of them.

15             When it comes to the stock market, Billy Walters is a

16   cheater and a criminal and not a very clever one.  The paper

17   trail, the phone records and trading records made it inevitable

18   that he would be caught.  Prosecutors find that white collar

19   criminals faced with the prospect of a significant prison term

20   are often willing to cooperate.  As I've already written, it's

21   not entirely clear that the government couldn't have secured a

22   conviction in this case even without the cooperation of Tom

23   Davis.

24             The crime was amateurishly simple.  Walters knew that

25   Tom Davis was the director of Dean Foods.  As a director, Davis

H7RQWALs

had access to material nonpublic information.  Davis was a
bigshot in the Dallas community and a former investment banker.
Walters was a big deal in sports gambling and golfing circles.
He was a minor celebrity in Las Vegas.  Davis was eager to
please Walters who he considered a friend.  Gifts of
information to Walters would ingratiate Davis to Walters.
Walters wanted the valuable information because he could trade
on it.  Davis passed information to Walters, and Walters placed
trades.  Walters also arranged for over $900,000 in loans for
Davis.  In at least one instance, Walters tipped information to
a person who owed Walters money thereby enabling the person to
trade in Dean Foods and pay down the loan.  The evidence also
supported the conclusion that Davis tipped material nonpublic
information concerning Darden Restaurants to Walters who traded
on that information.

          Walters was not under any economic or financial
pressure to commit these crimes.  He didn't need to.  When he
was not engaged in insider trading, he supported himself
through sports gaming and through the portfolio of golf courses
and car dealerships that he and/or his wife owned.  He has
amassed a fortune.  He had a private plane and a $17 million
home on the West Coast.  With the combined tax years 2011
through 2015, his adjusted gross income exceeded 175 million.
These crimes were not about enhancing a life of comfort or
luxury.  He already had that.  Instead, Walters, or at least it

H7RQWALs

1    seems to me, was fixated on appearing to himself and to others

2    to be a winner.  At this point in life money was mostly a way

3    of keeping score.

4          It's true that Walters had a difficult childhood.  His

5    father died when he was eight-months-old.  His mother moved

6    away for work and he was raised by his grandmother until he

7    moved back in with his mother.  He has by all reports had a

8    wonderful relationship with his wife of 40 years, and the past

9    decade or more has lived a clean lifestyle.  He has a son from

10   a prior marriage who is developmentally disabled, and Walters

11   is supportive of his needs.  He is engaged in large and splashy

12   displays of philanthropy.  He served on eight charity boards.

13   He also is a major contributor to the Opportunity Village,

14   which provides work for the developmentally disabled.  The

15   impressiveness of these charitable endeavors is undercut by the

16   knowledge that some were likely supported by ill-gotten gains.

17         But the nature of his businesses put him in touch with

18   everyday people, and his quiet under-the-radar assistance to

19   many individuals says something important about the man.  It's

20   easy to be jaded by letters of support for people who are rich

21   and powerful.  All of them can get letters.  But these letters

22   are different in kind and character.  They tell of good works

23   that no one was ever supposed to know.  Financial assistance to

24   persons close to him were one thing that he did but some were

25   mere acquaintances with family medical needs that he personally

assisted by finding the right doctors and paying for or
offering to pay for them and paying for travel and housing
related to medical care.  Just isolated to medical assistance,
I count 16 instances of this.

        Just to focus on two that I don't think were mentioned
today, for example, he learned that the wife of a young service
technician in an auto dealership that he owned had terminal
cancer with months to live.  The couple had a young child.  He
paid for a family vacation, a new vehicle, and the employee's
full salary while tending to his wife.  He paid for flights for
attending a father's funeral in Rumania; and you heard about
the story of the young man whose medical school tuition he
paid.  He assisted men in maintaining their sobriety.

        Walters was between 62 and 68 or 69 years of age when
he committed his crimes.  Today he is 71 years of age.  He
correctly describes himself as being in good physical
condition, although he has a host of ailments for which he is
prescribed medications.  So far none have been so severe as to
prevent him from traveling and golfing.  Yet, one of the many
considerations in fashioning a sentence is his remaining life
expectancy, which statistically is 14.6 years.

        Now, in terms of the need for just punishment, I note
that 50 percent of all Americans with annual incomes in the
range of $30,000 to $75,000 own stocks.  They are not placing a
wager at a betting parlor.  These are Americans who are making

H7RQWALs

1   an investment of their hard-earned savings.  Trusting in the

2   integrity of our markets is what makes our national economy

3   work.  Cheating of the type engaged in by Billy Walters

4   undermines confidence in the markets and thus the national

5   economy.  Walters, of course, was not acting as a fiduciary or

6   as an insider in committing his crimes.  He used no

7   sophisticated means and abused no special relationship.  He was

8   neither a broker-dealer nor someone trained or licensed in the

9   securities or banking industries.  He did not put other

10  people's money at risk.  His crimes, his insider trading are

11  remarkable for their sheer size and the profits he made and the

12  losses he avoided.

13          I have concluded in calculating the Sentencing

14  Guidelines that the amounts of profits and losses avoided were

15  well over $25 million.  The government asserts that they were

16  approximately $45 million, and the exact amount will be

17  determined in subsequent orders fixing forfeiture and

18  restitution.

19          In terms of protecting the public from further crimes

20  of this defendant, based upon his age and circumstances, and

21  the fact that the crimes here are well-known, I doubt that

22  Mr. Walters will reoffend.  However, there is a strong need to

23  deter others from engaging in conduct of this type.  While

24  Walters' scheme was not very sophisticated, insider trading is

25  often difficult to detect and when proven should be punished

H7RQWALs

1    with a view towards deterring others.  Insider trading is

2    committed by people in all walks of life:  Investment bankers,

3    hedge fund managers and multimillionaires.  It's also committed

4    by secretaries, administrative assistants, word processing

5    operators and paralegals.  A significant prison sentence is an

6    excellent way to deter this crime.  A year and a day, which

7    winds up to be about ten and a half months after good time

8    allowance, is not a significant prison sentence.  The oath that

9    all new federal judges take includes the following:  That I

10   will administer justice without respect to persons and do equal

11   right to the poor and to the rich.

12          I've considered the Sentencing Guidelines policy

13   statements and official commentary of the United States

14   Sentencing Commission.  I've considered them in an advisory

15   manner and recognize that I am not obligated to sentence within

16   the guidelines.  I acknowledge that I have variance discretion.

17   For all of the foregoing reasons, I intend to sentence the

18   defendant to 60 months' imprisonment on Counts Two through Ten

19   and 60 months on Count One, all to run concurrently; impose a

20   $10 million fine; one year supervised release on Counts One to

21   Ten to run concurrently.  Restitution and forfeiture will be

22   imposed but the amounts will be determined within 90 days, and

23   a special assessment of $1,000.  The foregoing is in my view

24   sufficient but not greater than necessary to achieve the

25   purposes of Section 3553(a).

H7RQWALs

1              Does the defendant or his counsel have any objection

2      to the Court's proposed sentence or to the statement of reasons

3      for that sentence?

4              MR. SCHOEMAN:  No, your Honor.  In light of the fact

5      that the financial penalties with respect to forfeiture and

6      restitution will be settled in the future, I would ask your

7      Honor to consider allowing Mr. Walters to pay his fine at some

8      future date because I believe, and based on conversations with

9      the government, there is a certain amount of money that we've

10     put aside for payment of forfeiture, and I want to make sure

11     that that money that Mr. Walters has voluntarily set aside in

12     escrow for forfeiture can be used for that purpose, and when

13     all of the financial penalties are set then to include the

14     fine, and so I would ask for today if your Honor would consider

15     making the fine payable instead of immediately, 120 days from

16     today.

17             THE COURT:  All right.

18             Any objection from the government to the Court's

19     proposed sentence or the statement of reasons for that

20     sentence?

21             MS. CUCINELLA:  One moment, your Honor.

22             (Pause)

23             MS. CUCINELLA:  No objection, your Honor.

24             THE COURT:  All right.

25             Mr. Walters, if you would please stand, I will

H7RQWALs

1    pronounce sentence.

2              William T. Walters, it is the judgment of this Court

3    that you are hereby remanded to the custody of the United

4    States Bureau of Prisons to be imprisoned for 60 months on

5    Counts One through Ten.  Following release from imprisonment,

6    you shall be placed on supervised release with the following

7    terms and conditions:

8              You shall not commit another federal, state or local

9    crime.

10             You shall not unlawfully possess a controlled

11   substance.

12             You must refrain from any unlawful use of a controlled

13   substance and submit to one drug test within 15 days of release

14   from imprisonment and at least two periodic drug tests

15   thereafter.

16             You must cooperate in the collection of DNA.

17             You must make restitution in accordance with the order

18   which I will enter in this case.  That order will provide

19   financial restitution to Dean Foods who I find was a victim of

20   your crime.

21             The standard conditions of supervision 1 through 13

22   are imposed with the following special conditions:

23             You shall provide the probation officer with access to

24   any requested financial information.

25             You must not incur new credit card charges or open

H7RQWALs

1    additional lines of credit without the approval of the

2    probation officer unless you are in compliance with the

3    schedule for payment of your financial penalties.

4            It is further ordered that you shall pay to the United

5    States a special assessment of $1,000.

6            I will order that the fine of $10 million be paid in

7    full within 120 days from the entry of the written judgment.

8            It is further ordered that you must make restitution

9    for the benefit of Dean Foods by check payable to the Clerk

10   U.S. District Court in an amount to be determined.

11           With regard to forfeiture, you will forfeit all

12   rights, title and interest in all property which reflect the

13   proceeds of the crime, the fruits of the crime or any

14   instrumentalities of the crime as more fully set forth in an

15   order to be entered by this Court.

16           Mr. Walters, you have the right to appeal the sentence

17   that this Court has imposed.  If you cannot afford the cost of

18   an appeal, you may apply for leave to appeal as a poor person.

19   The time limits for filing a notice of appeal are brief, and

20   they are strictly enforced.  If you request, the clerk of court

21   will prepare and file a notice of appeal on your behalf

22   immediately.

23           Do you understand all of that?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  All right.  Please be seated.

H7RQWALs

 1              Anything further from the government?

 2              MS. CUCINELLA:  One minor point, your Honor.  With

 3    respect to our restitution briefing, we expect to be submitting

 4    a claim from Barington Capital as well as Dean Foods.

 5              THE COURT:  All right.

 6              MS. CUCINELLA:  We will include that in our briefing.

 7              THE COURT:  I will reserve on that, and I will direct

 8    that any submission from the government on restitution and

 9    forfeiture be submitted no later than August 11, and that any

10    response by the defendant be submitted by August 25, and any

11    reply by the government by September 6.

12              Mr. Berke, anything further?

13              MR. BERKE:  Yes, your Honor.  Thank you.

14              First, may I ask that your Honor recommend that

15    Mr. Walters be assigned to the federal prison camp at

16    Pensacola, Florida.

17              THE COURT:  Any objection from the government?

18              MS. CUCINELLA:  No, your Honor.

19              THE COURT:  All right.  So recommended.

20              MR. BERKE:  Thank you.

21              And, your Honor, I'd like to next request that your

22    Honor allow Mr. Walters to remain on bail pending appeal, and

23    if I can address that, your Honor, briefly.  As I'm sure your

24    Honor knows, it's governed by 18 U.S.C. 3143.  Factor one is

25    that he is not a risk of flight or danger to the community.  We

H7RQWALs

1    would submit that that is clear and obviously recommended by

2    the probation department on that issue.

3            The second is whether the appeal raises substantial

4    question of law, and if that question is resolved in

5    Mr. Walters' favor would lead to either a reversal or new

6    trial.  On that question, I think the key Second Circuit case,

7    as your Honor may know, is *U.S. v. Randell* where they describe

8    what a substantial question means.  They say it is a fairly

9    debatable or novel question or one which hasn't been decided by

10   clear and controlling precedent.  So, clearly debatable, novel

11   or hasn't been decided by controlling precedent.

12           And as to that, your Honor, I think the first issue

13   which we want to address as an appellate issue that we submit

14   does satisfy the standard is the very extraordinary

15   circumstances that your Honor no doubt recalls at the outset of

16   this trial, whereupon our application for a hearing regarding

17   grand jury leaks, your Honor granted that application, and it

18   really was the unprecedented and extraordinary case where the

19   supervising FBI agent of the investigation of Mr. Walters

20   admitted that he purposely leaked grand jury information, which

21   it was conceded was protected by Rule 6(e) to members of the

22   press in order to seek assistance in part in the investigation

23   of Mr. Walters.

24           Of course, we had some information presented, but the

25   agent then asserted his rights under the Fifth Amendment, and

we never learned exactly what information was obtained in

exchange for the illegal information or what was done with him.

And as your Honor no doubt knows, we sought relief on three

separate and independent grounds prior to trial, which your

Honor denied in an opinion, and we then sought various relief

at trial as well which was the subject of discussions as well

in briefings and the like.

Your Honor, for purposes of bail pending appeal, the

only question is, does it raise a substantial question and if

resolved in our favor, would it result in a new trial.  We

would submit that this novel unprecedented issue definitely

does.  As your Honor will no doubt recall, we were unable to

find another example of such extreme conduct by an agent that

was admitted in the context it was.  I won't go through the

facts because I know your Honor knows it well.  We would

submit, your Honor, it is certainly a novel issue, and no doubt

your Honor gave it much thought and the like, but the sole

question is under the statute is it a substantial issue and the

resolution of which would result in either a reversal or new

trial.  We submit it clearly is and would ask your Honor to

release Mr. Walters on bail pending resolution of that

appellate issue.

THE COURT:  Thank you, Mr. Berke.  Go ahead.

MR. BERKE:  There are two other issues that I would

mention briefly.  The first is the second grounds for it would

H7RQWALs

1    also be that conscious avoidance issue which is often the

2    subject of debate in this court and the Second Circuit.  Your

3    Honor may recall -- and I'm not sure you'll recall this as

4    clearly, but you may -- we had much debate at the charge

5    conference about whether or not a conscious avoidance charge

6    should be given because our argument was the government argued

7    actual knowledge, and we cited some Second Circuit precedent

8    that suggested in our view that that did not justify a

9    conscious avoidance charge.

10        Your Honor initially said you were not going to give

11    the charge -- and we have transcripts if your Honor wants to

12    see any of it, but essentially your Honor said in response to

13    argument for Mr. Goldman, you didn't see the basis.  Then after

14    further discussion, your Honor was contemplating waiting until

15    summations to see about whether or not to give the charge,

16    recognizing that there was a close call there; went back and

17    determined that actually the parties should have recognized as

18    well your Honor was not permitted to do that, and then

19    ultimately gave the charge.  Again, your Honor --

20        THE COURT:  I ultimately decided that I would give the

21    charge before the parties summed up to the jury, exactly.

22        MR. BERKE:  Exactly, your Honor.  Exactly.  Thank you.

23        THE COURT:  Right, and I explained my reason for doing

24    so.

25        MR. BERKE:  A hundred percent, your Honor, exactly.

H7RQWALs

1          Then the government in their rebuttal summation argued

2     forcefully about conscious avoidance in addition to direct

3     knowledge.  So we would submit on this issue as well, your

4     Honor, it is debatable.  There is that as to whether or not the

5     resolution, again, and if resolved in our favor would result in

6     a new trial given the charge.

7          The third issue which I'll address even more briefly

8     is the issue that was the subject of our Rule 33 motion which

9     your Honor denied in your opinion, based on what we submit was

10    perjury of Mr. Davis.

11         So, your Honor, we submit each issue independently

12    would be grounds -- and certainly the first and second given

13    the record before this Court -- and would ask your Honor to

14    continue the bail conditions until resolution of those

15    appellate issues.

16              THE COURT:  Thank you, Mr. Berke.

17              MR. BERKE:  Thank you, your Honor.

18              THE COURT:  It's always a challenge for a judge to

19    decide a question like this.  Is there a substantial question

20    to be raised in an appeal.  I can say with a good and clear

21    conscience that there is not.  The issue arising out of the FBI

22    agent's behavior in leaking grand jury material is the subject

23    of an investigation in which I have ordered periodic reports.

24    I carefully reviewed in my pretrial decision why there was no

25    viable claim of prejudice in this case, and I rejected it.  I

 1    believe that there is a low chance of success on that argument.

 2              Also, I believe the conscious avoidance charge was

 3    properly given in this case, and the fact that a trial judge

 4    entertains argument and gives thoughtful consideration to the

 5    views of both sides doesn't make the issue novel or even a

 6    close question.  It's just simply giving it thoughtful

 7    consideration.

 8              There was really nothing in this trial which in my

 9    view was exceptional.  This was a case where the proof of guilt

10    was overwhelming, and I think the chances of success on appeal

11    are especially low on all of the issues that were raised.  I

12    don't think any of them are left open by controlling precedent

13    or fairly debatable or novel.  So the application for bail

14    pending appeal is denied.

15              I will set a surrender date for Mr. Walters.

16    October 10 at 2:00 p.m. to a facility designated by the United

17    States Bureau of Prisons.  If none is designated, then to the

18    marshal of this district.

19              MR. BERKE:  Your Honor, may I just ask that while I

20    expect by that date there should be a designation, in the event

21    that there is not yet a designation, given the difference of

22    being at a facility like the Metropolitan Correctional

23    Institution or an actual designated camp, can we come back to

24    your Honor ask if it be extended if he's not yet designated.

25              THE COURT:  You can always come back, but you heard my

H7RQWALs

1    ruling.

2           MR. BERKE:  Just one other minor issue, your Honor.

3    We would just ask, could Mr. Walters be permitted to travel to

4    Las Vegas on August 10 and 11 for the purpose of resolving

5    business affairs?

6           THE COURT:  Send me a letter, and I will consider it,

7    and in that way I also will have a written order, you will have

8    a written order and probation will have a written order.

9           MR. BERKE:  We will do that, your Honor.  Thank you.

10          THE COURT:  All right.  Nothing further, Mr. Berke?

11          MR. BERKE:  Nothing further.

12          THE COURT:  And nothing further from the government.

13   Is that correct?

14          MS. CUCINELLA:  No, your Honor.  Nothing further.

15          THE COURT:  Mr. Walters, I wish you and your family

16   the very best.  It's regrettable that you find yourself in this

17   circumstance.  You have had a lot of people who have stood by

18   you in your time of need, and I know you will figure out a way

19   to express your appreciation for their friendship and support.

20   I wish you and your family the best.  We are adjourned.

21          (Adjourned)

22

23

24

25